UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*EX REL.* [UNDER SEAL]<br><br>v.<br><br>[UNDER SEAL]<br><br>DEFENDANTS | COMPLAINT FOR<br>VIOLATIONS<br>OF FALSE CLAIMS ACT<br>31 U.S.C. §§ 3729 *ET SEQ.*)<br><br><u>FILED IN CAMERA AND<br>UNDER SEAL</u><br><br>JURY TRIAL DEMANDED |

1:07CV960

unseal 8/26/09

FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

2007 SEP 21 P 2:56

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> *EX REL. JON H. OBERG* ) <br> ) <br> ) <br> v. ) <br> ) <br> NELNET, INC. *et al.* ) <br> ) <br> DEFENDANTS ) <br> ) | Case No. 1:07CV960 <br><br> COMPLAINT FOR VIOLATIONS OF FALSE CLAIMS ACT <br> 31 U.S.C. §§ 3729 *ET SEQ.*) <br><br> JURY TRIAL DEMANDED |

### INTRODUCTION

1. Plaintiff and *qui tam* relator, Jon H. Oberg ("Oberg"), by his attorneys, individually and on behalf of the United States of America, alleges on information and belief, as follows: Plaintiff and *qui tam* relator Oberg brings this action to recover damages, penalties and attorneys' fees for violations of the False Claims Act committed by Nelnet, Inc. ("Nelnet"), Kentucky Higher Education Student Loan Corp. ("KHESLC"), Pennsylvania Higher Education Assistance Agency ("PHEAA"), SLM Corporation ("Sallie Mae"), Vermont Student Assistance Corporation ("VSAC"), Panhandle Plains Higher Education Authority, Brazos Group, Arkansas Student Loan Authority ("ASLA") and Education Loans Inc/SD (collectively "Defendants").

2. Between 1980 and 1993, the United States Congress guaranteed holders of federal student loans funded with tax-exempt bonds a 9.5 % interest return on investment via a special allowance payment, as detailed herein (the "9.5 SAP").

3.  In 1993, Congress repealed the 9.5 SAP prospectively, continued the 9.5 SAP on existing loans, permitted the refunding of the original bonds, and allowed certain limited recycling of income from the existing loans into new loans. Congress' intent was to phase out the 9.5 SAP program in its entirety. *See PL 103-66, 1993 HR 2264.*

4.  Instead of phasing out their loan programs with 9.5 SAP guarantees, Defendants created new loans which utilized the 9.5 SAP (the "9.5 Loans") beyond 1993 levels. One method devised was to sell or transfer existing 9.5 Loans to another financing vehicle under the loan holder's control (such as a taxable bond) consider the proceeds from that transaction to be a loan pay-off that could be recycled into new 9.5 Loans, and repeat the process over and over.

5.  By 2004, the amount of 9.5 Loans outstanding was several billion dollars higher than any previous level between 1993 and 2002, as Defendants used this and similar techniques to expand their holdings of these lucrative loans.

6.  In creating the new 9.5 Loans, Defendants willfully violated United States law and Congress' intent, and fraudulently and illegally obtained as much as one billion dollars or more in special allowance overpayments from ED, thus stealing from taxpayers and diverting funds that otherwise could be used to source other ED education programs.

7.  With actual knowledge and/or deliberate indifference and/or reckless disregard for the truth, Defendants repeatedly, over a period of years, fraudulently submitted and received such overpayments in illegal 9.5 SAP claims from the United States Government.

8.  Plaintiff and *qui tam* relator Oberg, now seeks relief on behalf of the United States Government for these injuries and imposition of statutory penalties and attorneys' fees for Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

## THE FEDERAL FALSE CLAIMS ACT

9.    The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. Liability attaches both when a defendant knowingly seeks an unwarranted payment from the Government and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the Government. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in the recovery. The Complaint is filed under seal for sixty days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

10.    Based on these provisions, *qui tam* plaintiff and relator, Oberg, seeks through this action to recover damages, civil penalties and attorneys' fees arising from Defendants' fraudulent submission to and receipt of illegal 9.5 SAP payments from the United States Government in sum of over one billion dollars.

## PLAINTIFF/*QUI TAM* RELATOR

11.    *Qui tam* plaintiff and relator Oberg is a resident of Rockville, Maryland. Oberg brings this action for violations of 31 U.S.C. §§ 3729 *et seq.*, on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b) (1). Oberg has personal knowledge of the

false records, statements and/or claims Defendants presented to the Government and of Defendants' fraudulent practices regarding the 9.5 SAP payments and the 9.5 Loans.

12.     Oberg is a former U.S. Navy officer and served as aide to Senator J. James Exon (Nebraska) from 1979 to 1984. He has served as chief fiscal officer for the State of Nebraska, as a member of its housing finance agency, and as a task force investigator for the U.S. Senate Budget Committee.

13.     Oberg is an expert in public finance. He holds a master's degree from the University of Nebraska and a doctorate in political science from the Free University of Berlin. Oberg has taught budget and finance at the graduate level for two universities, published in the peer-reviewed literature, and testified on higher education finance in the U.S. Senate.

14.     Oberg began his civil service at the U. S. Department of Education ("ED") in 1994, in the Office of Legislation and Congressional Affairs. In 1998, he was the legislative liaison between ED and Congress for the reauthorization of the Higher Education Act, including its student loan programs.

15.     In 2001, he requested and was granted a transfer at the same grade (GS-15) to the Office of Educational Research and Improvement (renamed the Institute of Education Sciences in 2002), where he intended to do needed research on federal postsecondary finance.

16.     Oberg retired from the federal government in July, 2005 after serving twenty years in positions in the U.S. Navy, the U.S. Senate, and the U.S. Department of Education.

17.     Oberg is the original source (as defined under the FCA and applicable law) of the disclosure of the illegal and fraudulent 9.5 SAP claim submissions and payments received by Defendants as described herein.

## DEFENDANTS

18. Defendant Nelnet is a Nebraska corporation with headquarters located at 121 South 13th Street, Suite 201, Lincoln, Nebraska 68508.

19. Defendant KHESLC is a Kentucky corporation with a mailing address of PO Box 24266, Louisville, Kentucky 40224-0266.

   a. Defendant PHEAA is a Pennsylvania corporation with headquarters located at 1200 North 7th Street, Harrisburg, Pennsylvania 17102-1444.

   b. Defendant SLM "Sallie Mae" is a Virginia corporation with headquarters located at 12061 Bluemont Way Reston, VA 20190

   c. Defendant VSAC is a Vermont corporation with headquarters located at 10 East Allen Street, Winooski, Vermont 05404.

   d. Defendant Panhandle Plains Higher Education Authority is a Texas corporation with headquarters located at 1403 23rd Street, Canyon, Texas 79015.

   e. Defendant Brazos Group is a Texas corporation with headquarters located at 2600 Washington Avenue, Waco, Texas 76712.

   f. Defendant Arkansas Student Loan Authority is an Arkansas corporation with headquarters located at 101 E. Capitol Avenue, Suite 401 Little Rock, AR 72201.

   g. Defendant Education Loans Incorporated/S.D. is a corporation registered at 105 First Avenue S.W., Aberdeen South Dakota 57401.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

21. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant period, all Defendants resided and/or transacted business in the Eastern District of Virginia and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

22. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or transact business in the Eastern District of Virginia and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## STATUTORY AND REGULATORY BACKGROUND
## OF THE 9.5 SAP AND THE 9.5 LOANS

23. The federal government provides access to low-interest student loans through the Federal Family Education Loan (FFEL) program in Part B, Title IV of the Higher Education Act (HEA) of 1965, as amended. The program is intended to help students from low and middle income families participate in postsecondary education.

24. In the FFEL program, loans are originated by private lenders with private capital. The federal government guarantees lenders against borrower defaults. State, not-for-profit, and for-profit secondary markets administer many aspects of the FFEL program.

25. The federal government provides lenders with incentives to invest private capital in FFEL student loans. Among them is a loan subsidy known as a special allowance payment (SAP). This loan subsidy provides lenders at least a minimum, specified level of return on student loan investments.

26. To encourage greater investment of tax-exempt capital in student loans, Congress created in the Education Amendments of 1980 a separate special allowance calculation for FFEL Program loans made or purchased with proceeds of tax-exempt obligations. *See Pub. L. 96-374.* The special allowance payment for these loans was a minimum annual guarantee of 9.5 percent, minus the interest the lender receives from the borrower, known as the 9.5 SAP.

27. In the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66), Congress repealed the 9.5 floor SAP, except for loans made or purchased with the proceeds of tax exempt obligations that were originally issued before October 1, 1993, and certain other limited exceptions.

28. From 2002 through 2004, in a low interest rate environment that made 9.5 Loans very lucrative, Defendants began transferring the 9.5 Loans to taxable issues and using the resulting proceeds to create new 9.5 Loans, resulting in increases in 9.5 Loans well above the 1993 levels, the year the program was repealed.

29. As a result of the recycling of existing 9.5 Loans into new 9.5 Loans, Defendants were able to submit and obtain as much as a billion dollars or more in 9.5 SAP overpayments.

30. With no action from ED, but out of concern that loan holders were abusing the limited exceptions, Congress enacted the Taxpayer-Teacher Protection Act of 2004 (Pub. L. 108-409), followed by the Higher Education Reconciliation Act of 2005 (Pub. L. 109-171). The former

eliminated refunding of pre-1993 bonds and the latter eliminated recycling of any loan proceeds into new 9.5 Loans. *See* 20 U.S.C. § 1087-1 (2006).

31.    In 2007, ED issued a sub-regulatory letter (DCL FP-07-01) that restated previous regulations and guidance. By restating rather than issuing new regulations or guidance, ED confirmed that the use of transferring and unlimited recycling of 9.5 Loans was not, and never had been, legal. The letter concurred with the same finding made in an audit by ED's Inspector General in September, 2006. In the letter, ED announced that it would not seek to recoup illegally claimed 9.5 SAP payments through 2006, citing a desire to avoid protracted disputes over its administration of the program.

### MR. OBERG'S INVESTIGATION AND ORIGINAL SOURCE DISCLOSURE OF DEFENDANTS' FRAUDULENT SAP CLAIMS AND PAYMENTS

32.    In the spring of 2003, after seeing internal ED spreadsheets that showed growing amounts of 9.5 Loan outstanding, Oberg independently decided to research the issue and asked ED colleagues how 9.5 Loan volume could be increasing as much as it was at certain loan holders. Oberg received no explanations.

33.    Oberg started checking claims by individual loan holders by reading their financial reports. On August 7, 2003, Oberg wrote to the Office of the Inspector General ("OIG") Waste, Fraud, and Abuse Hotline and reported irregularities in 9.5 Loan growth at New Mexico Education Association Foundation ("NMEAF") and Defendant PHEAA. On September 12, 2003, ED replied to Oberg's OIG complaint, stating that ED was seeking regulatory changes to eliminate the potential for waste, fraud, and abuse in 9.5 Loans. However, subsequently ED took no action.

34.    On November 10, 2003, Oberg reiterated the 9.5 complaint to the OIG.

35. On November 21, 2003, Oberg wrote a detailed explanation to ED, via the chain of command, as to how loan holders were creating new 9.5 Loans through refunding, transferring, and recycling beyond previously existing levels, how much it would cost taxpayers if the practices were not stopped, and options to deal with illegal claims.

36. On November 24, 2003, Oberg received a reply from the OIG Hotline that the complaint had been forwarded to the OIG's Audit Services.

37. On November 26, 2003, Oberg received a response from his manager that the center where Oberg worked did not have a program of research on postsecondary finance and that whatever Oberg was researching in that regard must not continue without approval. The response also said that Oberg's job description would be changed accordingly, to reflect his responsibilities as a research administrator only.

38. On November 26, 2003, Oberg wrote to the independent federal Office of Special Counsel, enclosing memos to ED and to OIG, and asked for an investigation.

39. On December 9, 2003, Oberg wrote to the OIG with new information on how Defendant Nelnet was creating new 9.5 Loans and obtaining 9.5 SAP overpayments.

40. In February, 2004, Oberg met with the General Accounting Office ("GAO") at its invitation, taking personal leave to do so. Oberg discussed the 9.5 SAP overpayment issue in detail, including identifying certain Defendants as potential parties involved in the fraudulent claims practice.

41. In April and May of 2004, at OIG's request in preparation for upcoming audits, Oberg provided detailed information to OIG regarding the 9.5 SAP overpayment issue.

42. In 2005 and 2006, the OIG audited two loan holders (NMEAF and Nelnet).

43. In May, 2005, and September, 2006, OIG published its audits of NMEAF and Nelnet, finding in both cases that the loan holders had made illegal claims as outlined by Oberg in his original complaints.

44. In January, 2007, Nelnet entered into a settlement with ED, pursuant to which Nelnet was not required to repay a single dollar to the United States Government (the "Settlement"). Instead, ED simply required Nelnet not to pursue additional 9.5 SAP claims.

45. The Settlement expressly excluded actions under the FCA and expressly does not bar this action.

46. In statements subsequent to the Settlement, ED officials explained that they had not comprehended, prior to the OIG audit of Nelnet, that loan holders had been submitting illegal claims based on the recycling of ineligible loans.

## SUMMARY OF DEFENDANTS' FRAUDULENT 9.5 SAP CLAIMS AND PAYMENTS

47. From 2002 through 2006, each of the Defendants designed and implemented a scheme to transfer existing 9.5 Loans to other funding vehicles, such as taxable bonds, using the resulting proceeds beyond the limits set forth by law, to create new 9.5 Loans, thereby enabling Defendants to submit claims for, and receive, 9.5 SAP overpayments (the "9.5 Scheme").

48. From 2002 through 2006, Defendants knowingly and/or with reckless disregard implemented the 9.5 Scheme.

49.  From 2002 through 2006, Defendants repeatedly and fraudulently submitted claims for 9.5 SAP overpayments pursuant to the 9.5 Scheme.

50.  The United States Government paid as much as one billion dollars or more in 9.5 SAP overpayments pursuant to the 9.5 Scheme.

## DEFENDANTS' FALSE CERTIFICATIONS OF COMPLIANCE TO THE GOVERNMENT, REQUIRED BY LAW, FOR ELIGIBILITY TO RECEIVE SAP FUNDS

51.  To obtain 9.5 SAP payments, submitting parties are required by law to certify to the United States Government the truth of the information submitted and their compliance with law. *See* 34 CFR 682; OMB 1845-0013 (Lender's Interest and Special Allowance Request and Report LaRS/799); OMB 1845-0032 (Lender's Application Process).

52.  Defendants purposefully and recklessly did not identify eligible sources of funds that would be used to purchase and qualify loans for the 9.5 SAP, did not state that the process would be repeated many times, and did not state that the process would result in a substantial increase in the amount of loans billed under the 9.5 SAP.

53.  Defendants purposefully and recklessly did not reveal that their 9.5 Scheme had the effect of disregarding the 1993 legislation to phase out the 9.5 program.

54.  A submitting party is ineligible to receive 9.5 SAP payments without providing a signed certification of compliance pursuant to the Lender's Application Process agreement and the Lender's Interest and Special Allowance Request and Report LaRS/799.

55.  The Lender's Interest and Special Allowance Request and Report LaRS/799, on which loan holders make quarterly 9.5 SAP claims, expressly states: "As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family Education Loan Program (FFELP) that submits the

Lender Reporting System report (LaRS), I certify, by my signature below that: The data that my organization or its agent, or its third-party servicer, will submit to the U.S. Department of Education is correct to the best of my knowledge and belief. I certify that it conforms to the laws, regulations, and policies applicable to the Federal Family Education loan Program."

56. Defendants, in requesting and receiving as much as a billion dollars or more per year in 9.5 SAP overpayments, repeatedly falsely certified to ED compliance with the Lender's Application Process agreement, the Lender's Interest and Special Allowance Request and Report, and applicable law. In so doing, Defendants falsely induced the United States Government to approve and/or pay out 9.5 SAP overpayments based on Defendants' false promises of compliance. The promises when made were false. Upon making their promises and certifications, Defendants knowingly and/or with reckless disregard for the truth engaged in the 9.5 SAP Scheme described herein.

57. At the time Defendants submitted claims under the 9.5 SAP Scheme, Defendants did not reveal that their 9.5 SAP Scheme did not have any written approval from ED, and ED did not know that the basis upon which the claims were made was illegal or improper.

## SPECIFIC ALLEGATIONS OF FRAUD WITH RESPECT TO CERTAIN DEFENDANTS

58. Each of the Defendants engaged in specific and repeated activities and efforts to implement the 9.5 Scheme. Examples are as follows:

   a. Defendant PHEAA was first, or among the first, of the loan holders to use the 9.5 Scheme. PHEAA increased its 9.5 Loan holdings from $872 million in June, 2002, to an average balance of $1.3 billion for the quarter ending March 30, 2003. In an e-mail exchange

with relator Oberg on September 15, 2003, chief financial officer Timothy Guenther of PHEAA explained that PHEAA used recycling, and on October 31, 2003, in response to Oberg's further questions, added that PHEAA also used transferring as a part of the process to create new 9.5 Loan volume. The authority cited by PHEAA for the 9.5 loan growth was not ED, but the Education Finance Council, a trade association of which PHEAA is a member. Knowing that Oberg was questioning its legal authority to create 9.5 Loan volume in such large amounts, PHEAA did not reply to Oberg's follow up question, "…did you use a new bond issue to purchase existing 9.5 guaranteed loans, and use the proceeds from that transaction to finance more under the pre-1993 tax-exempt issue?" PHEAA's 9.5 Loan principal balance at the end of 2004 was over $2.3 billion, increased by using their transfer and recycle process.

  b. Defendant Nelnet did not originate the 9.5 Scheme, but soon created its own project to emulate what PHEAA and others were doing. Nelnet ended federal fiscal year 2001 with a balance of $393 million of 9.5 Loans, but ended fiscal 2004 with over $3.3 billion. Until July, 2004, Nelnet held its 9.5 SAP payments from ED in an escrow fund, recorded on its books as a liability, should the payments have to be returned to ED. When relator Oberg called Fitch Ratings in May of 2004 (from his home, as this was not permitted to be a part of his ED duties) about a Nelnet securitization that was made up of 9.5 loans, to ask if the rating would be less favorable if the 9.5 SAP payments had to be returned, Fitch Ratings advised Oberg that although its legal staff had internally raised the question of how Nelnet had acquired its 9.5 Loans, there would be no adverse effect because the questionable ED payments were on Nelnet's books already as a liability. At the end of June, Nelnet persisted with ED in its attempt to get written approval for its 9.5 Loan creation process in

order to take the 9.5 SAP funds out of escrow. In a telephone conversation with an ED employee, Nelnet was advised by the ED employee, according to two separate accounts shared with relator Oberg contemporaneously, that ED would never put approval in writing but that Nelnet could take its chances that ED would never ask for the money back. Thereupon, on July 2, 2004, Nelnet took the funds out of escrow onto its books and filed reports with the SEC that, although very carefully worded so as not to be literally untrue, gave the financial markets its desired, although false and misleading, impression that ED had approved Nelnet's 9.5 Loan creation process. Nelnet stock began a significant rise. Of the $124 million in escrow, over $20 million was immediately directed toward Nelnet compensation of its executives.

    c.    Defendant KHESLC observed Nelnet's process and determined to copy it. At the end of fiscal 2001, KHESLC had an ending balance of $162 million in 9.5 Loans; by the end of fiscal 2004, it had nearly $1.1 billion. KHESLC determined not to ask ED for approval directly, but to rely on the rationale of others as precedent. KHESLC referred questions about the legality of its 9.5 Scheme to the Education Finance Council, the same trade association cited by PHEAA.

    d.    Defendants Panhandle Plains and Brazos are located in the jurisdiction of ED's Dallas regional office, which has looked more thoroughly than any other region into the 9.5 Scheme. The position of the ED staff at the Dallas regional office as late as July 14, 2004, was that the Scheme was illegal and all questions about it were answered cautiously and included a warning that ED may try to recover all illegally claimed 9.5 SAP payments. This is contained in an e-mail discovered by relator Oberg approximately one year after his own first complaint to the OIG. Nevertheless, Panhandle increased its 9.5 holdings from $181

million at the end of fiscal 2001 to $514 million at the end of fiscal 2004, and Brazos increased its 9.5 holdings over the same period from $298 million to $571 million.

e. Defendant SLM (Sallie Mae) determined not to try to create new 9.5 Loans as others were doing, because it considered the process suspect. Instead, SLM attempted to buy secondary markets that had already created new 9.5 Loans. Sallie Mae successfully bought Southwest, an Arizona-based not-for-profit secondary market company which had grown its 9.5 Loans from $316 million at the end of fiscal 2001 to $741 million three years later. Sallie Mae attempted to buy PHEAA, but when it appeared as if Congress might end recycling, Sallie Mae withdrew the offer.

f. Defendant VSAC at first determined that the 9.5 Scheme was illegal and unethical, according to Congressional staff who were lobbied by VSAC accordingly. Subsequently, however, VSAC reversed its position, which fact was shared with Oberg by Congressional staff who knew Oberg was analyzing the issue as a private citizen and who provided him (at his home computer) with spreadsheets of ED payments to 9.5 Loan holders. Relator Oberg later reviewed VSAC financial reports and SEC documents to determine that VSAC retroactively reassigned loans among its portfolios in order to make larger 9.5 SAP claims. VSAC claimed, knowingly and falsely, in its financial and SEC reports that it had approval from ED for its procedures according to a September, 2004, document. The only such document known to relator Oberg, however, is a letter to a Senator and a Congressman in which Secretary of Education Paige asserts that he wants to stop the 9.5 abuses because they are not what Congress intended in its 1993 legislation. VSAC's 9.5 holdings at the end of fiscal 2001 were $377 million, which increased to $740 million at the end of fiscal 2004.

g.  Defendant Arkansas made 9.5 SAP claims in error. In 2006, Arkansas returned $5.9 million in illegal claims, but this appears to be an inadequate reimbursement against a balance of $56 million in 9.5 Loans at the end of fiscal 2001, but $182 million three years later.

### COUNT I

### Substantive Violations of the Federal Claims Act
[31 U.S.C. §§ 3729 (a)(1), (a)(2), (a)(7) and 3732(b)]
[For Fraud on ED Relating to the 9.5 SAP Claims and Payments]

59.  *Qui tam* plaintiff and relator Oberg realleges and incorporates by reference the allegations made in all paragraphs of this Complaint.

60.  This is a claim for treble damages and forfeitures under the FCA (31 U.S.C. §§ 372, *et seq.*, as amended).

61.  Through the acts described above and otherwise, Defendants knowingly presented and caused to be presented to the United States Government false and fraudulent claims, records and statements in order to obtain illegal 9.5 SAP payments.

62.  Through the acts described above and otherwise, Defendants knowingly made, used and/or caused to be made or used false records and statements, which also omitted material facts, in order to induce the United States Government to approve and pay such false and fraudulent claims.

63.  Through the acts described above and otherwise, Defendants knowingly made, used and caused to be made or used false records and statements to conceal, avoid and/or decrease its obligation to repay money to the United States Government that it improperly and/or fraudulently

received. Defendants also failed to disclose material facts to the United States Government which would have resulted in substantial repayments by Defendants to the United States Government.

64. The United States and ED, unaware of the falsity of the records, statements and claims made or submitted by Defendants, paid Defendants for claims which would not have been paid if the truth were known.

65. The United States and ED, unaware of the falsity of the records, statements and claims made or submitted by Defendants – or of their failure to disclose material facts that would have reduced government obligations – have not recovered funds which would have been recovered otherwise.

66. By reason of Defendants' false records, statements, claims and omissions, the United States Government has been damaged in the amount of up to one billion dollars or more in 9.5 SAP overpayments.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* plaintiff and relator Oberg prays for judgment against Defendants as follows:

67. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant of $11,000 for each violation of 13 U.S.C. § 3729;

68. That *qui tam* plaintiff and relator Oberg be awarded the maximum amount allowed pursuant to 13 U.S.C. § 3730(d);

69. That *qui tam* plaintiff and relator Oberg be awarded all costs and expenses of this action, including attorneys' fees; and

70. That the United States and *qui tam* plaintiff and relator Oberg receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* plaintiff and relator Oberg hereby demands trial by Jury.

DATED: September 21, 2007

Respectfully Submitted,

THE EMPLOYMENT LAW GROUP, P.C.

R. Scott Oswald, Esq. VSB #41770
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
Attorneys for *Qui Tam* Plaintiff