FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2009 AUG 24 P 4: 11

CLERK US DISTRICT COURT
ALEXANDRIA VIRGINIA

UNITED STATES OF AMERICA,
*ex rel.* [UNDER SEAL],

    Plaintiff,

v.

[UNDER SEAL],

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

CIVIL NO. 1:07-CV-960

FIRST AMENDED COMPLAINT
FOR VIOLATIONS OF FEDERAL
FALSE CLAIMS ACT

~~FILED UNDER SEAL~~ Unsealed
~~PURSUANT TO~~ per Order
~~31 U.S.C. § 3730(b)~~ of 9/21/2009

JURY TRIAL DEMANDED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JON H. OBERG, <br><br> Plaintiff, <br><br> v. <br><br> NELNET, INC., PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, KENTUCKY HIGHER EDUCATION STUDENT LOAN CORPORATION, PANHANDLE PLAINS HIGHER EDUCATION AUTHORITY, SLM CORPORATION, SOUTHWEST STUDENT SERVICES CORPORATION, VERMONT STUDENT ASSISTANCE CORPORATION, EDUCATION LOANS INC/SD, BRAZOS HIGHER EDUCATION SERVICE CORPORATION, and ARKANSAS STUDENT LOAN AUTHORITY, <br><br> Defendants. | CIVIL NO. 1:07-CV-960 <br><br> FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT <br><br><br> JURY TRIAL DEMANDED |

## INTRODUCTION

1.     Qui tam relator Jon H. Oberg ("Dr. Oberg" or "Relator"), by his attorneys,

individually and on behalf of the United States of America, files this complaint against

Defendants Nelnet, Inc. ("Nelnet"), Pennsylvania Higher Education Assistance Agency

("PHEAA"), Kentucky Higher Education Student Loan Corporation ("KHESLC"), Panhandle

Plains Higher Education Authority ("Panhandle Plains"), SLM Corporation ("Sallie Mae"),

Southwest Student Services Corporation ("Southwest"), Vermont Student Assistance

Corporation ("VSAC"), Education Loans Inc/SD, Brazos Higher Education Service Corporation

("Brazos"), Arkansas Student Loan Authority ("Arkansas") (collectively "Defendants"). Relator brings this action to recover damages, penalties and attorneys' fees for violations of the Federal False Claims Act committed by the Defendants.

2.     Under the Federal Family Education Loan Program ("FFEL"), the federal government provides lenders with incentives to invest private capital in student loans. One such incentive is a subsidy known as a special allowance payment (often referred to as a "SAP"). This subsidy guarantees lenders a specified rate of return on student loan investments, as set by statute. The FFEL program is administered by the United States Department of Education ("the Department").

3.     Prior to 1980, the United States Government paid the same special allowance rate to student loan lenders that financed their loans with tax exempt obligations and those that financed their loans with taxable obligations. Congress restructured the special allowance payments in 1980 so that lenders employing lower cost, tax exempt financing would receive only one-half of the special allowance rate paid to other lenders. At the same time, however, Congress established a special allowance rate floor. *See* Education Amendments of 1980, Pub. L. No. 96-374 § 420, 94 Stat. 1367 (codified at 20 U.S.C. § 1087-1(b)). Under the revised program, lenders employing tax-exempt financing were guaranteed a minimum annual interest return of 9.5 percent. The minimum amount payable by the Government was set at 9.5 percent, less the interest the lender received directly from the student borrower, and was known as the 9.5% special allowance payment ("9.5 SAP").

4.     In 1993, Congress repealed the 9.5% special allowance payment prospectively, but continued the 9.5% special allowance guarantee on loans made or purchased with certain proceeds of tax exempt obligations that were originally issued before October 1, 1993. *See*

Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66 (the "1993 OBRA"). At this time, the expectation was that the 9.5 SAP loan pool would gradually decline as the pre-1993 tax exempt bonds and associated loans were retired or paid off. *See, e.g.,* 150 Cong. Rec. S. 10918, *10919 ("In 1993, Congress passed legislation intended to phase out the existence of the 9.5% bank guarantee") (statement of Sen. Kennedy); Pub. L. No. 103-66, § 4111 (titled "Reduction in the Special Allowance Payment").

5.      In the relatively higher interest rate environment at the time, the Federal guarantee on loans financed commercially was higher than 9.5 percent and lenders had an incentive to transfer loans from tax-exempt to taxable funding sources in order to obtain a higher effective interest rate. The Department of Education, through regulatory action (*see* 34 C.F.R. § 682.302) and sub-regulatory action (Dear Colleague Letter 96-L-186 (March 1, 1996)), however, prevented tax-exempt issuers from claiming increased guarantees on loans financed by tax exempt funds. As part of the Dear Colleague Letter 96-L-186, the Department advised lenders that "[u]nder the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt)."

6.      Through Dear Colleague Letter 96-L-186, the Department placed lenders on notice that its policy was to prevent shifting of loan portfolios between tax-exempt and taxable funding as a way of profiting from interest rate fluctuations. Through the 1993 legislation, lenders were also on notice that Congress intended and expected that the 9.5% special allowance payment program would be phased out.

7.     Interest rates fell substantially in the early 2000s. Lenders realized that funding through tax-exempt obligations could generate returns superior to commercial funding because the 9.5% special allowance rate floor was well above the commercial SAP. Lenders were thus incentivized to increase their tax-exempt obligation loan portfolios in order to maximize their 9.5% special allowance payments, but could not lawfully do so because the 1993 OBRA had foreclosed issuance of any new tax-exempt obligations to which 9.5% SAP applied.

8.     The opportunity to receive higher payments on government-guaranteed, low-cost obligations led Defendants to develop schemes to increase their 9.5% portfolios. Despite clear action by Congress foreclosing creation of new eligible 9.5% funding sources, Defendants engaged in a multiplicity of non-economic sham transactions, and falsely claimed that loans actually funded commercially were technically funded through pre-existing 9.5% eligible borrowings and were therefore eligible for 9.5% SAP.

9.     From 2002 through 2006, Defendants designed and implemented a number of these unlawful schemes for inflating 9.5 SAP claims, for example by repeatedly exchanging existing 9.5 loans for loans supported by taxable bonds, and then claiming that all such portfolios were 9.5% eligible. These sham transactions enabled Defendants to submit claims for, and receive, 9.5 SAP far above what was intended by Congress and the Department, or allowable under the law (the "9.5 Scheme(s)").

10.     By 2004, the amount of 9.5 loans outstanding was several *billion* dollars higher than any previous level between 1993 and 2002, as Defendants used various unlawful techniques to expand their holdings of these lucrative loans. The exponential expansion in 9.5 loans occurred even though, as a consequence of the 1993 OBRA, the amount of such loans should have declined. Defendants submitted claims to the Department on a quarterly basis for 9.5%

SAP on the inflated loan portfolios. As a condition of each such quarterly claim, Defendants falsely certified their compliance with governing law.

11.    In implementing their 9.5 Schemes and purporting to create new 9.5 loans ("9.5 Loans"), Defendants willfully violated federal statutory law, Congressional intent, and Departmental regulations, guidance and policy. The schemes implemented by the Defendants to increase their 9.5 SAP loan portfolios necessarily rely (to the extent that they have any purported justification) on untenable, self-serving interpretations of the relevant statute and regulations to permit a massive and unchecked increase in 9.5 SAP loan portfolios that clearly defied the intent of the Congress.

12.    With actual knowledge, deliberate indifference and/or reckless disregard, Defendants repeatedly submitted fraudulent quarterly claims for and received illegal 9.5 SAP from the United States Government. The Defendants fraudulently and illegally obtained as much as one billion dollars or more in unlawful 9.5% SAP from the Department of Education, thus unjustly and fraudulently enriching themselves at taxpayer expense and diverting funds that otherwise could have been used to serve other important Department of Education programs.

13.    Relator now seeks relief on behalf of the United States Government for these injuries and the imposition of statutory penalties and attorneys' fees for the Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

## QUI TAM RELATOR

14.    Relator Jon H. Oberg is a resident of Rockville, Maryland. Dr. Oberg brings this action for violations of 31 U.S.C. §§ 3729-33, on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

15.     Dr. Oberg has personal knowledge of the false records, statements and/or claims Defendants presented to the Government and of Defendants' fraudulent practices regarding the 9.5 SAP and the 9.5 Loans.

16.     Dr. Oberg is a former U.S. Navy officer and served as aide to Senator J. James Exon (Nebraska) from 1979 to 1984. He has served as chief fiscal officer for the State of Nebraska, as a member of its housing finance agency, and as a task force investigator for the U.S. Senate Budget Committee.

17.     Dr. Oberg is an expert in public finance. He holds a master's degree from the University of Nebraska and a doctorate in political science from the Free University of Berlin. Dr. Oberg has taught budget and finance at the graduate level for two universities, published in peer-reviewed literature, and testified on higher education finance in the U.S. Senate.

18.     Dr. Oberg began his civil service at the Department of Education in 1994, in the Office of Legislation and Congressional Affairs. In 1998, he was the legislative liaison between the Department and Congress for the reauthorization of the Higher Education Act, including its student loan programs.

19.     In 2001, Dr. Oberg requested and was granted a transfer at the same grade (GS-15) to the Office of Educational Research and Improvement (renamed the Institute of Education Sciences in 2002), where he intended to conduct research on federal postsecondary finance.

20.     Dr. Oberg retired from the federal government in July 2005, after serving twenty years in positions in the U.S. Navy, the U.S. Senate, and the U.S. Department of Education.

21.     Dr. Oberg is the original source (as defined under the FCA and applicable law) of the disclosure of the illegal and fraudulent 9.5 SAP claim submissions and payments received by Defendants as described herein.

## DEFENDANTS

22. Defendant Nelnet is a Nebraska corporation with headquarters located at 121 South 13th Street, Suite 201, Lincoln, Nebraska 68508.

23. Defendant PHEAA is a Pennsylvania corporation with headquarters located at 1200 North 7th Street, Harrisburg, Pennsylvania 17102-1444.

24. Defendant KHESLC is a Kentucky corporation with a mailing address of PO Box 24266, Louisville, Kentucky 40224-0266.

25. Defendant Panhandle Plains Higher Education Authority is a Texas corporation with headquarters located at 1403 23rd Street, Canyon, Texas 79015.

26. Defendant SLM "Sallie Mae" is a Virginia corporation with headquarters located at 12061 Bluemont Way Reston, VA 20190.

27. Defendant Southwest Student Services Corporation, a wholly owned subsidiary and alter ego of SLM Corporation, is an Arizona Corporation with offices located at 1555 North Fiesta Blvd. Gilbert, AZ 85233.

28. Defendant VSAC is a Vermont corporation with headquarters located at 10 East Allen Street, Winooski, Vermont 05404.

29. Defendant Education Loans Incorporated/S.D. is a corporation registered at 105 First Avenue S.W., Aberdeen South Dakota 57401.

30. Defendant Brazos Higher Education Services Corporation is a Texas corporation with headquarters located at 2600 Washington Avenue, Waco, Texas 76710-7449.

31. Defendant Arkansas Student Loan Authority is an Arkansas corporation with headquarters located at 101 E. Capitol Avenue, Suite 401 Little Rock, AR 72201.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

33.     This Court has jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant period, one or more of the Defendants resided and/or transacted business in the Eastern District of Virginia and many violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

34.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because one or more of the Defendants can be found in, reside in, and/or transact business in the Eastern District of Virginia and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## THE FEDERAL FALSE CLAIMS ACT

35.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

36.     Liability under the FCA, as it is relevant to this action, attaches when a person:

- 8 -

"knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . ." 31 U.S.C. § 3729(a)(1);

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." The Fraud Enforcement and Recovery Act of 2009 (Pub. L. No. 111-21), §§ 4(a)(1), 4(f)) (amending 31 U.S.C. § 3729(a)(2)); or

"knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . . ." 31 U.S.C. § 3729(a)(7).

37.     The terms "knowing" and "knowingly" are defined under the FCA as meaning "that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." Furthermore, "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

38.     The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in the recovery. The Complaint is filed under seal for sixty days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action. *See* 31 U.S.C. § 3730(b).

39.     Based on these provisions, Relator seeks to recover damages, civil penalties and attorneys' fees arising from Defendants' fraudulent submission for and receipt of illegal 9.5 SAP from the United States Government in the sum of over one billion dollars.

## STATUTORY AND REGULATORY BACKGROUND OF THE
## 9.5 SAP AND THE 9.5 LOANS

40.     The federal government provides access to low-interest student loans through the

FFEL program in Part B, Title IV of the Higher Education Act (HEA) of 1965, as amended. The

program is intended to help students from low and middle income families participate in

postsecondary education. In the FFEL program, loans were historically (prior to the enactment

of the Ensuring Continued Access to Student Loans Act of 2008 (Pub. L. No. 110-227))

originated by private lenders with private capital. The federal government guarantees lenders

against borrower defaults. State, not-for-profit, and for profit secondary markets administer

many aspects of the FFEL program. As addressed above, Congress established the 9.5 SAP in

the Education Amendments of 1980, which are applicable to FFEL loans. Only certain types of

funds qualified as eligible funds from which qualifying 9.5 SAP eligible loans could be made.

Both the statute and the regulations prescribed the eligible funds.

41.     During the time period in which Defendants were implementing their 9.5

Schemes, the FFEL program statute provided that:

> (B)(i) The quarterly rate of the special allowance for holders of loans which were
> made or purchased with funds obtained by the holder from the issuance of
> obligations, the income from which is exempt from taxation under the Internal
> Revenue Code of 1954 shall be one-half the quarterly rate of the special
> allowance established under subparagraph (A), except that, in determining the rate
> for the purpose of this division, subparagraph (A)(iii) shall be applied by
> substituting "3.5 percent" for "3.10 percent". Such rate shall also apply to holders
> of loans which were made or purchased with funds obtained by the holder from
> collections or default reimbursements on, or interests or other income pertaining
> to, eligible loans made or purchased with funds described in the preceding
> sentence of this subparagraph or from income on the investment of such funds.
> This subparagraph shall not apply to loans which were made or insured prior to
> October 1, 1980.
>
> (ii) The quarterly rate of the special allowance set under . . . (i) of this subparagraph shall
> not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4.
>
> . . .

(iv) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance for holders of loans which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993 . . . .

*See* 20 U.S.C. § 1087-1(b)(2)(B)(i)-(ii), (iv).

42.     During the time period that Defendants were implementing their 9.5 Schemes, the applicable regulations also set forth the eligible funds from which qualifying 9.5 SAP eligible loans could be made:

(3)(i) Subject to paragraphs (c)(3)(ii) and (iii) of this section, the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from—

(A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);

(B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

. . .

(iii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that are made on or after October 1, 1992, may not be less than 9 1/2 percent minus the applicable interest rate.

34 C.F.R. § 682.302(c)(3)(i), (iii).

43. Under the statute and regulations, 9.5 SAP eligible loans can only be created from funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1,1993 or from certain specified proceeds from such funds. Eligible funding sources are limited to those provided for in the statute and regulations.

44. In 2004, Congress enacted the Taxpayer-Teacher Protection Act of 2004, Pub. L. No. 108-409, followed by the Higher Education Reconciliation Act of 2005, Pub. L. No. 109-171. The former eliminated refunding and transferring of pre-1993 bonds and the latter eliminated recycling of any loan proceeds into new 9.5 Loans. *See* 20 U.S.C. § 1087-1 (2006).

## DR. OBERG'S INVESTIGATION AND ORIGINAL SOURCE DISCLOSURE OF DEFENDANTS' FRAUDULENT SAP CLAIMS AND PAYMENTS

45. In the spring of 2003, after seeing internal Department of Education spreadsheets that showed growing amounts of 9.5 Loans outstanding, Dr. Oberg independently decided to research the issue and asked Department of Education colleagues how 9.5 Loan volume could be increasing as much as it was at certain loan holders. Dr. Oberg received no explanation.

46. As part of his investigation of the matter, Dr. Oberg began checking claims by individual loan holders by reviewing their financial reports.

47. On August 7, 2003, Dr. Oberg wrote to the Office of the Inspector General ("OIG") Waste, Fraud, and Abuse Hotline ("OIG Hotline") and reported irregularities in 9.5 Loan growth at New Mexico Education Association Foundation ("NMEAF") and Defendant PHEAA. On September 12, 2003, the Department of Education replied to Dr. Oberg's OIG complaint, stating that the Department was seeking regulatory changes to eliminate the potential for waste, fraud, and abuse in 9.5 Loans. However, subsequently the Department of Education took no action.

48.     On November 10, 2003, Dr. Oberg reiterated his concerns regarding the 9.5 Loan programs to the OIG.

49.     On November 21, 2003, Dr. Oberg wrote a detailed explanation to Department of Education officials, observing the appropriate chain of command, regarding how loan holders were creating new 9.5 Loans through refunding, transferring, and recycling beyond previously existing levels, how much it would cost taxpayers if the practices were not stopped, and options to deal with illegal claims.

50.     On November 24, 2003, Dr. Oberg received a reply from the OIG Hotline that the complaint had been forwarded to the OIG's Audit Services.

51.     On November 26, 2003, Dr. Oberg received a response from his manager stating that the center where Dr. Oberg worked did not have a program of research on postsecondary finance and that whatever Dr. Oberg was researching in that regard must not continue without approval. The response also said that Dr. Oberg's job description would be changed accordingly, to reflect his responsibilities as a research administrator only.

52.     On November 26, 2003, Dr. Oberg wrote to the independent federal Office of Special Counsel, enclosing his previous memoranda to the Department of Education and to the OIG and requesting an investigation.

53.     On December 9, 2003, Dr. Oberg wrote to the OIG with new information on how Defendant Nelnet was creating new 9.5 Loans and obtaining improper 9.5 special allowance payments.

54.     In February 2004, Dr. Oberg met with the General Accounting Office ("GAO") at its invitation, taking personal leave to do so. Dr. Oberg discussed the 9.5 special allowance

payment issue in detail, including identifying certain Defendants as potential parties involved in the fraudulent claims practice.

55.     In April and May of 2004, at OIG's request in preparation for upcoming audits, Dr. Oberg provided detailed information to OIG regarding the 9.5 SAP overpayment issue.

## DEFENDANTS' FRAUDULENT 9.5 SAP CLAIMS AND PAYMENTS

56.     To obtain 9.5 SAP, submitting parties are required by law to certify to the United States Government the truth of the information submitted in their claims and their compliance with law. *See* 34 C.F.R. § 682.302; OMB 1845-0013 (Lender's Interest and Special Allowance Request and Report LaRS/799); OMB 1845-0032 (Lender's Application Process).

57.     The Lender's Interest and Special Allowance Request and Report LaRS/799, on which loan holders submit quarterly 9.5 SAP claims, expressly states: "As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family Education Loan Program (FFELP) that submits the Lender Reporting System report (LaRS), I certify, by my signature below that: The data that my organization or its agent, or its third-party servicer, will submit to the U.S. Department of Education is correct to the best of my knowledge and belief. I certify that it conforms to the laws, regulations, and policies applicable to the Federal Family Education Loan Program."

58.     A submitting party is ineligible to receive 9.5 SAP without providing a signed certification of compliance pursuant to the Lender's Application Process agreement and the Lender's Interest and Special Allowance Request and Report LaRS/799.

59.     Defendants, in requesting and receiving as much as a billion dollars or more in 9.5 SAP overpayments, repeatedly and falsely certified to the Department of Education compliance with the Lender's Application Process agreement, the Lender's Interest and Special Allowance

- 14 -

Request and Report, and applicable laws, regulations and policies. In so doing, Defendants falsely induced the United States Government to approve and/or pay out 9.5 SAP overpayments based on Defendants' false certifications of compliance. The certifications when made were false. Upon making their certifications, Defendants knowingly, with deliberate ignorance and/or with reckless disregard for the truth engaged in the 9.5 Scheme described herein.

60. From 2002 through 2006, Defendants knowingly, with deliberate ignorance and/or with reckless disregard implemented the 9.5 Scheme. Defendants employed many methods to increase their 9.5 Loan portfolios. For example, Defendants repeatedly recycled (or reinvested) funds generated from their 9.5 Loans to make or purchase new 9.5 Loans. Defendants also transferred (or sold) existing 9.5 Loans to other financing vehicles under the loan holder's control (such as a taxable bond). The lender would then consider the proceeds from that transaction to be a loan pay-off and would also recycle those proceeds to make new 9.5 Loans. This process was repeated over and over to improperly expand the pool of 9.5 Loans. These sales and transfers were paper transactions that amounted to no more than intra-company transfers that resulted in the massive inflation of the 9.5 Loan portfolios.

61. From 2002 through 2006, Defendants repeatedly and fraudulently submitted quarterly claims for improper 9.5 SAP pursuant to the 9.5 Scheme.

62. The United States Government paid as much as one billion dollars, and possibly even more, in excessive, unlawful 9.5 SAP payments to Defendants as a result of the 9.5 Scheme.

63. Defendants purposefully and recklessly did not identify eligible sources of funds being used to qualify loans for the 9.5 SAP. They did not reveal that the processes would be repeated over and over for the purpose of increasing the amount of 9.5 balances outstanding, and

they did not reveal that the processes would result in marked increases in the amount of loans pursuant to which 9.5 SAP was billed to the Government. Defendants failed to make such disclosures in either their 9.5 SAP filings or to the Department.

64.     Defendants purposefully and recklessly failed to disclose that their 9.5 Scheme had the effect of disregarding the 1993 legislation to phase out the 9.5 program.

65.     At the time Defendants submitted claims under the 9.5 Scheme, Defendants did not disclose that their 9.5 Scheme did not have any written approval from the Department. The Department did not know that the basis upon which the claims were made was illegal or improper.

66.     Based on Dr. Oberg's investigation and disclosures to the OIG, the OIG conducted several investigations of lenders with 9.5 Loan programs, including NMEAF, Nelnet, and PHEAA. In each instance, the OIG determined that the lender had submitted for and received improper 9.5% special allowance payments.

67.     In September 2006, over three years after Dr. Oberg's initial disclosures, the Inspector General published its audit of Nelnet. *See* Special Allowance Payments to Nelnet for Loans Funded by Tax Exempt Obligations (No. ED-OIG/A07F0017) (Sept. 2006). In accordance with Dr. Oberg's prior investigation and disclosure to the OIG, the Inspector General determined that Nelnet's 9.5 Scheme did not fund loans from an eligible source in compliance with the HEA, regulations, and other guidance issued by the Department and had improperly increased the amount of loans on which 9.5% SAP was paid. In January 2007, Nelnet entered into a settlement with the Department of Education in which Nelnet agreed to stop making claims for such 9.5% SAP but did not agree to repay a single dollar to the United States Government. This settlement expressly excluded actions under the False Claims Act.

68.     In November 2007, the Inspector General published its audit of PHEAA. *See*
Special Allowance Payments to the Pennsylvania Higher Education Assistance Agency for
Loans Funded by Tax Exempt Obligations (No. ED-OIG/A03G0014) (Nov. 2007). In
accordance with Dr. Oberg's prior investigation and disclosure to the OIG, the OIG determined
that because PHEAA failed to maintain adequate documentation, there was no way to determine
the exact amount of improper 9.5% special allowance payments made to PHEAA, but that there
was a significant risk that certain loans billed by PHEAA under the 9.5 percent floor calculation,
during the period July 1, 2003, through June 30, 2006, were ineligible for that calculation.

69.     In May 2009, the Inspector General published its audit of KHESLC. *See* Special
Allowance Payments to the Kentucky Higher Education Student Loan Corporation for Loans
Made or Acquired with the Proceeds of Tax-Exempt Obligations (No. ED-OIG/A05I0011) (May
2009). In accordance with Dr. Oberg's prior investigation and disclosure to the OIG, the OIG
determined that KHESLC also violated the requirements regarding 9.5% special allowance
payments and that KHESCL's 9.5 Scheme must have resulted in ineligible loans being billed
under the 9.5 percent floor. The OIG further determined that there is a substantial risk that all
loans in KHESLC's portfolio from October 1, 2001, through September 30, 2006, were not
eligible for the claimed 9.5% special allowance payments.

70.     In statements subsequent to the Nelnet Settlement, Department of Education
officials explained that they had not comprehended, prior to the OIG audit of Nelnet, that loan
holders had been submitting illegal claims based on ineligible loans.

71.     In 2007, the Department of Education issued a Dear Colleague Letter (Dear
Colleague Letter FP-07-01 (January 23, 2007)) that restated previous regulations and guidance.
By restating rather than issuing new regulations or guidance, the Department of Education

confirmed that the unlimited transferring, refunding and recycling of 9.5 Loans was not, and never had been, legal. Moreover, the Department, in its letter to lenders, stated that the regulatory requirements regarding eligible funding sources "have been in effect since 1993." The letter confirmed the regulatory interpretations made by the OIG in the Nelnet audit issued in September 2006.

## FURTHER ALLEGATIONS OF FRAUD

72.    Each of the Defendants engaged in specific and repeated activities and efforts to implement a 9.5 Scheme.

73.    Defendant PHEAA was first, or among the first, of the loan holders to employ the 9.5 Scheme. PHEAA increased its 9.5 Loan holdings from $872 million in June 2002, to an average balance of $1.3 billion for the quarter ending March 30, 2003. In an e-mail exchange with Dr. Oberg on September 15, 2003, chief financial officer Timothy Guenther of PHEAA explained that PHEAA used recycling, and on October 31, 2003, in response to Dr. Oberg's further questions, added that PHEAA also used transferring as a part of the process to create new 9.5 Loan volume. The authority cited by PHEAA for the 9.5 Loan growth was not the Department of Education, but the Education Finance Council, a trade association of which PHEAA is a member. Knowing that Dr. Oberg was questioning its legal authority to create 9.5 Loan volume in such large amounts, PHEAA did not reply to Dr. Oberg's follow up question, ". . . did you use a new bond issue to purchase existing 9.5 guaranteed loans, and use the proceeds from that transaction to finance more under the pre-1993 tax-exempt issue?" PHEAA's 9.5 Loan principal balance at the end of 2004 was over $2.3 billion, increased by using its unlawful transfer and recycle process. PHEAA submitted unlawful 9.5 SAP claims quarterly on this inflated 9.5 Loan base. Based on the increase in PHEAA's 9.5 Loan base, approximately

$92 million in unlawful 9.5 SAP claims were submitted by PHEAA to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

74.     Defendant Nelnet did not originate the 9.5 Scheme, but soon created its own "Project 950" to emulate what PHEAA and others were doing. Nelnet ended federal fiscal year 2001 with a balance of $393 million of 9.5 Loans, but ended fiscal 2004 with over $3.3 billion. Nelnet submitted fraudulent 9.5 SAP claims quarterly on this inflated 9.5 Loan balance, which continued to increase thereafter. Until July 2004, Nelnet held its 9.5 SAP from the Department of Education in an escrow fund, recorded on its books as a liability, should the payments have to be returned to the Department.

75.     Reflecting its own reservations regarding its 950 Program, Nelnet repeatedly acknowledged in its SEC filings that it "*may* be entitled to receive special allowance payments on these loans" and that it had "asked the Department [of Education] to confirm" whether it was "allowed to recognize the income based on the 9.5% minimum rate of return." *See* Nelnet, Inc., Annual Report (Form 10-K), at 16 (Dec. 31, 2003) (emphasis added); Nelnet, Inc., Quarterly Report (Form 10-Q), at 6-7 (March 31, 2004).

76.     On May 29, 2003, Nelnet submitted a request for concurrence in its 9.5% program billing practices to Angela Roca-Baker of Federal Student Aid (FSA). This letter was calculated to mislead in an attempt to secure swift and quiet "concurrence" from a low level Government employee. For example, it represented that "*[a]s part of [Nelnet's] overall cash flow management plan*, the purchased loans will be held within the 1985 [tax free] Indenture and financed by the tax exempt obligations issued by [Nelnet] under that financing for a period of time *depending upon cash management needs and other internal concerns*, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed in financings which

are taxable on a longer term basis. . . ." Nelnet did not disclose in its letter to the Department

that the one day shuffling through the 1985 Indenture was purely for purposes of claiming 9.5

SAP on commercially-funded loans, not benign "cash management needs" and unspecified

"internal concerns." The letter did not constitute a full disclosure of Nelnet's practices,

describing only the basic process, without identifying the eligible source of funds that would be

used to purchase and qualify loans for the 9.5 percent floor. It also did not state that the process

would be repeated many times, or that the process would result in tens of millions of dollars of

additional claims for 9.5 SAP.

77.     Dr. Oberg called Fitch Ratings in May of 2004 (from his home, as this was not

permitted to be a part of his Department of Education duties) regarding a Nelnet securitization

that was made up of 9.5 Loans, to ask if the rating would be less favorable if the 9.5 SAP had to

be returned. Fitch Ratings advised Dr. Oberg that although its legal staff had internally raised

the question of how Nelnet had acquired its 9.5 Loans, there would be no adverse effect because

the questionable Department of Education payments were on Nelnet's books already as a

liability.

78.     At the end of June 2004, Nelnet persisted with the Department of Education in its

attempt to gain some indication of approval for its 9.5 Loan process in order to take the 9.5 SAP

funds out of escrow. In a telephone conversation with a Department employee, Nelnet was

advised by the Department employee, according to two separate accounts shared with Dr. Oberg

contemporaneously, that the Department of Education would never put approval in writing but

that Nelnet could take its chances that the Department would never ask for the money back.

79.     Shortly thereafter, on July 2, 2004, Nelnet took the funds out of escrow onto its

books and filed reports with the SEC that, although very carefully worded so as not to be literally

untrue, gave the financial markets its desired, although false and misleading, impression that the Department had approved Nelnet's 9.5 Loan creation process. As a result of Nelnet's decision that it was entitled to the extra 9.5% funding, its stock went up 20% and the company paid its employees $20.7 million in bonuses. Nelnet's profit in the first six months of 2004 was $94 million, up from $17.9 million in the first half of 2003, primarily as the result of recognizing $79 million in government subsidy payments that had previously been deferred.

80.     When Nelnet finally recognized the 9.5 SAP monies (ending its deferral of recognizing the interest income at the 9.5% rate) as income, it did so on its own determination that it was entitled to the funds rather than from any authorized, documented direction from the Department. The June 2004 filing clearly states that it was Nelnet, and not the Department of Education, that "concluded that the earnings process had been completed related to the special allowance payments on [the 9.5%] loans." Nelnet Inc., Quarterly Report (Form 10-Q), at 6 (June 30, 2004). During its audit of Nelnet, the Inspector General did not identify any direct or explicit approval by the Department of Project 950. Based on the increase in Nelnet's 9.5 Loan base, approximately $407 million in unlawful 9.5 SAP claims were submitted by Nelnet to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

81.     Defendant KHESLC observed Nelnet's activity and determined to increase its own 9.5 SAP claims. At the end of fiscal 2001, KHESLC had an ending balance of $162 million in 9.5 Loans; by the end of fiscal 2004, it had nearly $1.1 billion. This massive increase in the outstanding loan balance during this period, like the increase in the 9.5 Loan balances of the other Defendants, could not have occurred had KHESLC complied with the governing law that was intended to phase out 9.5 Loan pools. KHESLC determined not to ask the Department for approval directly, but to rely on the rationale of others as precedent. KHESLC referred questions

about the legality of its 9.5 Scheme to the Education Finance Council, the same trade association cited by PHEAA. KHESLC submitted 9.5% SAP claims quarterly on its unlawfully inflated 9.5 Loan balance. Based on the increase in KHESLC's 9.5 Loan base, approximately $92 million in unlawful 9.5 SAP claims were submitted by KHESLC to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

82.     Defendants Panhandle Plains and Brazos are located in the jurisdiction of the Department's Dallas regional office, which has looked more thoroughly than any other region into the 9.5 Scheme. The position of the Department of Education staff at the Dallas regional office as late as July 14, 2004, was that the Scheme was illegal and all questions about it were answered cautiously and included a warning that the Department might try to recover all illegally claimed 9.5 SAP. This is contained in an e-mail discovered by Dr. Oberg approximately one year after his own first complaint to the OIG. Nevertheless, Panhandle increased its 9.5 holdings from $181 million at the end of fiscal 2001 to $514 million at the end of fiscal 2004, and Brazos increased its 9.5 holdings over the same period from $298 million to $571 million. Both companies submitted quarterly 9.5% SAP claims based on their unlawfully inflated balances. Based on the increase in Panhandle Plains' 9.5 Loan base, approximately $37 million in unlawful 9.5 SAP claims were submitted by Panhandle Plains to the Department. Based on the increase in Brazos' 9.5 Loan base, approximately $9 million in unlawful 9.5 SAP claims were submitted by Brazos to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

83.     Defendant Sallie Mae determined not to try to create new 9.5 Loans as others were doing, because it considered the process suspect. However, Sallie Mae successfully bought Defendant Southwest, an Arizona-based not-for-profit secondary market company that had

grown its 9.5 Loans from $316 million at the end of fiscal 2001 to $741 million three years later. On information and belief, Defendant Southwest is dominated and controlled by Defendant Sallie Mae and is the alter ego of Sallie Mae. Southwest is a wholly owned subsidiary of Sallie Mae and its financial results are consolidated with those of Sallie Mae. The operations of Southwest and Sallie Mae are integrated. For example, Southwest's website states that Southwest's customers are offered access to "superior planning- and paying-for-college tools" "through *Sallie Mae*." Southwest Student Services Corporation Home Page, http://www.sssc.com/website/english/home/sections/general/pages/default.html (last visited Aug. 24, 2009). Also, all aspects of applying for and managing student loans redirect the visitor to Sallie Mae's website. Even the copyright notice on the Southwest website is "© 2009 Sallie Mae, Inc. All rights reserved" and the "terms and conditions" and "privacy policy" on the Southwest website redirect to Sallie Mae's online policies. Visitors to Southwest's website are instructed to contact Sallie Mae. Other than the name "Southwest" there is no material evidence on the Southwest website that any aspect of the student loan program is conducted by any entity other than Sallie Mae. Based on the increase in Southwest's 9.5 Loan base, approximately $35 million in unlawful 9.5 SAP claims were submitted by Southwest, and therefore its alter ego Sallie Mae, to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

84.      Defendant VSAC at first determined that the 9.5 Scheme was illegal and unethical. Subsequently, however, VSAC reversed its position. Dr. Oberg later reviewed VSAC financial reports and SEC documents to determine that VSAC retroactively reassigned loans among its portfolios in order to make larger 9.5 SAP claims. VSAC claimed, knowingly and falsely, in its financial and SEC reports that it had approval from the Department of Education

for its procedures according to a September 2004, document. The only such document known to Dr. Oberg, however, is a letter to a Senator and a Congressman in which Secretary of Education Paige asserts that he wants to stop the 9.5 abuses because they are not what Congress intended in its 1993 legislation. VSAC's 9.5 holdings at the end of fiscal 2001 were $377 million, which increased to $740 million at the end of fiscal 2004. VSAC submitted to the Department unlawful quarterly claims for 9.5% SAP payments based on this inflated 9.5 Loan balance. Based on the increase in VSAC's 9.5 Loan base, approximately $23 million in unlawful 9.5 SAP claims were submitted by VSAC to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

85.     Defendant Arkansas unlawfully increased its balance of 9.5 Loans from $56 million at the end of fiscal 2001 to $182 million three years later. Arkansas submitted 9.5% SAP claims on this unlawfully inflated balance. Based on the increase in Arkansas' 9.5 Loan base, approximately $12.1 million in unlawful 9.5 SAP claims were submitted by Arkansas to the Department. In 2006, Defendant Arkansas returned $5.9 million in illegal claims, but this appears to be an inadequate reimbursement based on the volume of claims submitted.

86.     Defendant Education Loans Inc/SD, through its 9.5 Scheme, unlawfully increased its balance of 9.5 Loans from $49 million at the end of fiscal 2001 to $170 million three years later. Defendant Education Loans Inc/SD submitted quarterly claims for 9.5% SAP payment on the inflated 9.5 Loan balance. Based on the increase in Education Loans Inc/SD's 9.5 Loan base, approximately $15 million in unlawful 9.5 SAP claims were submitted by Education Loans Inc/SD to the Department. Relatively little, if any, of the unlawfully obtained funds has been returned.

**COUNT I**
**Substantive Violations of the Federal False Claims Act**
**(including 31 U.S.C. §§ 3729 (a)(l), (a)(2) (as amended), (a)(7))**
**For Fraud on the Department of Education Relating to the 9.5 SAP Claims and Payments**

87.     Dr. Oberg realleges and incorporates by reference the allegations made in all preceding paragraphs of this Complaint.

88.     Through the acts described above and otherwise, Defendants knowingly presented and caused to be presented to the United States Government false and fraudulent claims, records and statements in order to obtain illegal 9.5 SAP.

89.     Through the acts described above and otherwise, Defendants knowingly made, used and/or caused to be made or used false records and statements that were material to such false and fraudulent claims.

90.     Through the acts described above and otherwise, Defendants knowingly made, used and caused to be made or used materially false records and statements to conceal, avoid and/or decrease their obligation to repay money to the United States Government that they improperly and/or fraudulently received. Defendants also failed to disclose material facts to the United States Government which would have resulted in substantial repayments by Defendants to the United States Government.

91.     The United States and the Department of Education, unaware of the falsity of the records, statements and claims made or submitted by Defendants, paid Defendants for claims that would not have been paid if all of the facts were known.

92.     The United States and the Department of Education, unaware of the falsity of the records, statements and claims made or submitted by Defendants – or of their failure to disclose material facts that would have reduced government obligations – have not recovered funds that would have been recovered otherwise.

93. By reason of Defendants' false records, statements, claims and omissions, the United States Government has been damaged in the amount of approximately one billion dollars or more in 9.5 SAP overpayments.

94. Each of the Defendants are liable under the False Claims Act, including §§ 3729 (a)(1), (a)(2) (as amended) and/or (a)(7) for: (1) civil penalties in the maximum amount for each of their false claims, plus (2) three times the amount of damages that the Government has sustained as a result of the Defendant's false claims, plus (3) reasonable attorneys' fees and expert fees, and other expenses and costs.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Oberg, individually and on behalf of the United States, prays for judgment against Defendants as follows:

95. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

96. That interest be awarded on all of the foregoing amounts;

97. That Dr. Oberg be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

98. That the United States and Dr. Oberg be awarded all costs and expenses of this action, including reasonable attorneys' fees and expert fees; and

99. That the United States and Dr. Oberg receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Oberg hereby demands

trial by Jury.

August 24, 2009

By: _____

Bert W. Rein (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone: 202.719.7000
Fax: 202.719.7049
brein@wileyrein.com
msturm@wileyrein.com

Christopher M. Mills (VSB # 44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA 22102
Phone: 703.905.2800
Fax: 703.905.2820
cmills@wileyrein.com

R. Scott Oswald (VSB # 41770)
David Scher (VSB # 47634)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

*Attorneys for Qui Tam Relator Jon H. Oberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2009, a true and correct copy of the foregoing Relator's First Amended Complaint has been sent via first class mail, postage prepaid, and by facsimile to the parties noted below:

Jay Majors, Esq.
U.S. Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Fax: (202) 514-0280

Gerard Mene, Esq.
Assistant United States Attorney
Counsel for the United States
2100 Jamieson Ave
Alexandria, VA 22314
Fax: (703) 299-3983

Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone: 202.719.7000
Fax: 202.719.7049
msturm@wileyrein.com