Exhibit IV.5

**Aurora Consulting Group, LLC**

Aurora Consulting, LLC
25 Braintree Hill Park, Suite 407
Braintree, MA 02184

Phone 781-849-8430
Fax 781-849-8433

# Memorandum on Indenture Planning and Special Allowance Management

Prepared for Student Loan Finance Corporation
August 5, 2003

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000178

# Table of Contents

Section I       Executive Summary

Section II      History of Section 302(e) of the Federal Student Loan Program
                Regulations

Section III     Indenture Management Strategies

Section IV      Strategies for Loan Selection and 799 Billing

Attachments 1–12

Tables A and B

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000179

# Section I     Executive Summary

<u>Overview</u>

All financial organizations seek to manage assets and liabilities to maximize efficiency and net return. Matching the characteristics of the asset—whether they be fixed or variable rate, callable or non-callable, long-term or short-term—to the characteristics of the liability financing that asset is a necessary and prudent function of financial management. In the case of a former 150(d) student loan finance corporation, asset-liability management also entails matching Federal Family Education Loan Program ("FFELP") loan assets optimally to both tax-exempt and taxable sources of funds. Many factors impact how and whether loans can be matched to tax-exempt or taxable borrowings including tax and FFELP legal and regulatory considerations.

In this memorandum, we will address how Student Loan Finance Corporation ("SLFC") can manage its tax-exempt financing and the related student loans in the context of those regulations promulgated by the U.S. Department of Education ("ED") that govern how holders of student loan assets made or acquired with tax-exempt sources of funds may bill for special allowance.[1] We will relate and examine the history of ED's shifting policy toward SAP billing for loans that are made or acquired with tax-exempt debt and later refinanced with taxable debt. Based on the parameters of SLFC's tax-exempt indenture and ED's current policy on special allowance billing, we will propose a strategy to optimize SLFC's use of its tax-exempt sources of financing,[2] discuss methods to implement the strategy in compliance with pertinent ED regulations, and estimate the potential savings to SLFC therefrom.

<u>U.S. Department of Education Policy for Special Allowance under 302(e)</u>

Since 1980, the levels of subsidies or Special Allowance Payments (SAP) provided by ED to holders of FFELP loans funded with tax-exempt funding sources have differed from those provided to holders of student loans funded with taxable sources. Holders of loans made or acquired with tax-exempt debt are entitled to receive SAP equal to one-half of the SAP that would be paid had the loans been financed with taxable sources, but with a floor to ensure that a loan financed with tax-exempt debt yields at least 9.5%. The rationale for the different SAP levels came from the perception that since issuers of tax-exempt debt have a lower cost of funds to finance their loan portfolios, they should receive less subsidy or special allowance from the government. In 1993, however, Congress enacted a legislative change that

---

[1] Aurora Consulting, LLC is not a law firm and is not offering legal advice to SLFC on any matters. To the extent any legal issues are raised or implicated by the information provided in this memorandum, SLFC should seek advice from its legal advisors.

[2] The strategy outlined in this memorandum applies only to tax-exempt debt originally issued prior to October 1, 1993.

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000180

eliminated this SAP differential, but only with respect to student loans made or acquired with tax-exempt bonds originally issued after October 1, 1993 (the effective date of the legislation). The result was that loans funded with tax-exempt sources originally issued prior to the effective date continue to be eligible for the half-SAP/9.5% floor SAP rate for as long as those tax-exempt obligations remain outstanding.

Under the initial implementing regulations for the tax-exempt SAP billing rates promulgated in 1985 (34 CFR §682.302(e) ("Section 302(e)")), the applicable special allowance billing rate for a FFELP loan was determined based on the current funding source for that loan. If a loan was made or acquired with a tax-exempt financing source, the tax-exempt rules (half SAP/9.5% floor) applied. If the same loan was subsequently refinanced with taxable sources of financing, the taxable financing SAP rules applied. In 1992, however, ED revised Section 302(e) so that the half-SAP/9.5% floor provision would cover loans that had been made or acquired with tax-exempt sources, but had later been refinanced with taxable sources.

At the time it made this change in historical policy for Section 302(e), the Department intended to reduce the amount of SAP being paid to issuers who had refinanced their loans with taxable sources. Because of the high interest rate environment at the time the new policy was developed, the proposed policy change would in fact have resulted in lower SAP being paid on loans that had been originally financed with tax-exempt sources and then refinanced with taxable sources. In a low interest rate environment, however, the application of the half-SAP/9.5% floor formula on loans refinanced with taxable sources benefits the loan holder, who by billing for SAP at the floor rate (as the regulation requires) can substantially enhance yield. While it may be difficult to believe that ED would intentionally create a situation that could so greatly penalize or benefit a holder depending on the interest rate environment at the time, a careful review of the history of Section 302(e) and ED's communications with the FFELP industry reveals that the 302(e) policy change was intentional and that ED was aware of the effects its policies would have on holders of FFELP loans. A chronological account of the history of Section 302(e) and supporting documentation is provided in Section II of this memorandum.

<u>Strategy for Increased Yield under Indenture</u>

SLFC's existing financing indenture provided approximately $48 million in tax-exempt funding to make or acquire approximately $48 million in FFELP loans.[3] If SLFC transferred this $48 million in loans to one of its taxable sources of funding, under Section 302(e), SLFC would be required to continue to report and bill SAP for these loans under the half-SAP/9.5% floor formula until the tax-exempt obligations have been retired or defeased, or SLFC no longer retains an interest in the loans. Following this "sale" of loans from the tax-exempt to the taxable funding source, SLFC would utilize the proceeds to acquire (or originate) new loans into the tax-

---

[3] It is our understanding that of SLFC's existing tax-exempt financing, approximately $48 million is funding that was originally issued prior to October 1, 1993.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000181

exempt financing and would bill SAP for those loans as required by 302(e) according to the half-SAP/9.5% floor formula.   The result of these transfers would be an increase of 100% in the amount of student loans for which SLFC would be entitled, and indeed required, to bill at the half-SAP/9.5% SAP rate.[4]

The types of transfers described above are representative of asset-liability management strategies that have been in use by other FFELP loan holders for several years.   These lenders have active programs to refinance loans pledged to their tax-exempt financings with taxable financing in an effort to "bank" earnings from increased SAP as an offset to past and future yield limitations in a high interest rate environment.   The clarity of Section 302(e) language itself, consistent regulatory interpretative guidance and the adaption of billing forms to accommodate the revised regulatory language provide ample support for the increased SAP billing received as a result of these strategies.

---

[4] To the extent these transfers involve loans outside the indenture, they will be subject to the parameters of SLFC's indenture. For example, in order to transfer loans out of the indenture, certain valuations of the assets must be performed, as more fully discussed in Section III below. In addition, loans transferred into the indenture must meet the indenture's eligibility definitions.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000182

## Section II        History of Section 682.302(e) of the Student Loan Regulations

Section 682.302(e) of Title 34 of the Code of Federal Regulations sets forth ED's policy with respect to the special allowance treatment of loans made or acquired with tax-exempt sources originally issued before October 1, 1993—that is, loans eligible to receive SAP at the half-SAP/9.5% floor rate—that are later refinanced with taxable sources of financing.  The following is a chronology of the changes made to this section, the Department of Education's policy on SAP billing for loans financed with tax-exempt debt and the FFEL community's communications with ED about Section 302(e).

### December 16, 1980

ED issued Bulletin G-44, R-108, which provided guidance for the then-new half-SAP/9.5% floor Higher Education Act provisions enacted in the Education Amendments of 1980 (See *Attachment 1—U.S. Department of Education Bulletin #G-44, R-108*, p.4).  The guidance clarified that the reduced rate of special allowance and the 9.5% floor "did not apply to any loan . . . which is purchased with funds not exempt from Federal income tax, even if it was originally made or purchased by a lender from the proceeds of obligations exempt from Federal income tax."  This guidance marked the beginning of the Department's historical policy on tax-exempt SAP provisions.

### February 8, 1985

Final regulations governing Special Allowance Payments on Loans Made or Purchased with Proceeds of Tax-Exempt Obligations were issued in the Federal Register[5].  These regulations included for the first time the Plan For Doing Business requirements for tax-exempt issuers and further clarified the policy that the applicable SAP rate for a loan financed at one time from a tax-exempt source was the then-current financing source.  The preamble to the regulations states "any sanctions or limitations imposed under this Subpart on loans financed by those tax-exempt obligations apply only so long as the loans remain financed by tax-exempt debt.  See §§ 682.823; 682.302(e). Therefore, any party which uses funds derived from sources other than tax-exempt obligations to acquire loans from an Authority, or, if an Authority, to refinance those loans, takes or holds those loans free of any sanctions

---

[5] *Federal Register 50, no. 27 (8 February 1985): 5506 et seq., 34 CFR §§682.800-830*

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000183

previously imposed on the Authority."[6]   The preamble further stated "these regulations tie the rate of SAP to the source of funds used to acquire or maintain the Authority's interest in a loan." See *Attachment 2—Final regulations governing Special Allowance Payments on Loans Made or Purchased with Proceeds of Tax-Exempt Obligations*, p. 5512)

### November 1990

ED issued a Notice of Proposed Rulemaking notifying the student loan community of regulations proposed to implement the 1986 Amendments to the Higher Education Act.   See *Attachment 3—Notice of Proposed Rulemaking (Federal Register 55, no.224 (20 November 1990):48353 et seq.)*.   In that NPRM, ED changed the provisions of section 682.302(e).   Under the proposed rule, if a loan was made or acquired with the proceeds of tax-exempt debt and was later refinanced with taxable debt, the tax-exempt special allowance provisions continue to apply, as long as the issuer retains an interest in the loan and the tax-exempt obligation has not been retired or defeased.[7]   The preamble to the NPRM did not address the Department's policy change or the rationale for the change.   The membership organizations like NCHELP did not respond to this change; however, some individual tax-exempt secondary markets did provide comment on the change.

### February 14, 1992

The Department of Education provided the loan community with copies of the "second round clearance draft" of the regulations that were being developed in response to the November 1990 NPRM.   NCHELP Program Regulations Committee members addressed the changes being made to section 682.302(e) on page 16 of their response document.   See *Attachment 4—Excerpt from the NCHELP Program Regulations Committee's Analysis of Second Clearance Draft of the November 20, 1990 Notice of Proposed Rulemaking*.   The NCHELP response focused on the half-SAP provisions, arguing that under the Higher Education Act provisions, it was permissible to receive full-SAPs on loans that had been originally funded with tax-exempt sources and subsequently refinanced with taxable financing.   ED did not change the regulation in response to this comment and did not address NCHELP's comment in the preamble to the final rule.[8]

---

[6] This preamble language was added to address concerns from institutions that were providing credit enhancement or liquidity support for tax-exempt student loan bond financings and the language provided assurance that if they were required to foreclose on the loan portfolio, the loans would qualify for special allowance payments at the taxable SAP rates.
[7] The 1986 Amendments to the Higher Education Act included no changes that would have prompted this regulatory change. The change was initiated by ED.
[8] It is important to note that, at the time the NPRM was issued, the interest rate was such that the loan yields were higher than the 9.5% floor, so the loans were subject to the half-SAP provisions and the 9.5% floor was not triggered.

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000184

January 1993

As an industry negotiator for the Negotiated Rulemaking process, Sheila Ryan wrote to Robert Evans to address a number of technical issues of importance to issuers of tax-exempt debt. In that letter, Ms. Ryan conveyed the industry's concerns with ED's interpretation of Section 302(e) and suggested that the proposed regulation be amended to clarify that the half-SAP/9.5% floor provisions apply only to loans pledged to a tax-exempt indenture. See *Attachment 5—February 16, 1993 Letter to Robert Evans from Sheila Ryan.*

February 1993

When the final regulations were promulgated in December 1992, Secretary Riley issued a letter indicating that the regulations would be subject to a delayed enforcement, until such time clarifying guidance could be issued. To support the Department's efforts to develop such guidance, the community was invited to provide a listing of issues and/or concerns with the regulations. NCHELP prepared a document outlining concerns with the final regulations which was provided to ED in February 1993. See *Attachment 6—Excerpt from NCHELP Comments on December 1992 Final Regulations.* Under section 682.302(e), the community stated that the final rule issued by ED would result in loans being subject to the half-SAP/9.5% floor provisions on a permanent basis. Meetings were held by the Department with the higher education community in March and April of 1993 to review the concerns raised by the community. [9] At the beginning of the March meeting, ED handed out a response to the various comment papers submitted to the Department. In the handouts, ED confirmed that NCHELP's understanding of ED's policy change (once half-SAP/9.5%floor, always half-SAP/9.5%floor) was correct and "remains the Department's position on this issue." See *Attachment 7—ED Response to Loan Community Comments on Final Regulations, March 1993.*

February 16, 1993

As part of the negotiated-rulemaking process of 1993 (for development of regulations to implement the 1992 Higher Education Act Amendments), several tax-exempt special allowance provisions required regulatory clarification. As the FFELP expert on SAP and tax-exempt issues, Sheila Ryan from Nellie Mae was charged with addressing these outstanding matters. Since the tax-exempt issues were technical and many of the negotiators did not have an interest in the topic, the topics were discussed privately with Brian Siegal of the Department's General Counsel's office (at the request of the Department's negotiator, Mr. Robert Evans).

While section 682.302(e) was not impacted by the 1992 Amendments, Ms. Ryan on behalf of the FFELP negotiators sought to re-open the discussion on this matter as part of the 1993 Negotiated Rulemaking process. Following the discussion with Mr.

---

[9] The notes in the margin on Attachment 6 are Sheila Ryan's notes recorded during the March/April meetings, which were subsequently shared with the NCHELP Program Regulations Committee

7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   ELI-HC00000185

Siegal, Ms. Ryan prepared a summary of the issues discussed with Mr. Siegal and distributed that summary to the parties in attendance at Negotiated Rulemaking who were tracking tax-exempt matters.   *See Attachment 8—Memorandum from Sheila Ryan to Certain Negotiated-Rulemaking Participants.*   The memo notes that Mr. Siegal understood the current ED policy was not in the Department's best interest in all interest rate environments and that ED would consider changing the policy to tie tax-exempt special allowance billings to loans pledged in consideration of funds that are tax-exempt. No regulatory changes were included, however, in the final rule developed by the negotiators or any subsequent regulatory package.

<u>March/April 1993</u>

Meetings between ED and the FFEL community were held in March and April of 1993 to review regulatory changes and assist ED in issuing clarifying guidance on the December 1992 regulations.  During the April 1993 meeting, ED clarified that their intent was to change the historical policy and to require that the ½ SAP and floor provisions apply even if the current funding source is taxable.  Since it was clear in these discussions that the FFEL community would not be successful in convincing ED to return to its original 302(e) policy, the loan community refocused its efforts toward encouraging ED to issue guidance on the relevant ED Form 799 changes and seeking clarification on the effective date.  By letter dated April 16, 1993, Ms. Ryan wrote to Robert Evans communicating the FFEL community's request for additional clarification regarding 799 billing in light of ED's 302(e) policy.  See *Attachment 9— Letter dated April 16, 1993 from Sheila Ryan to Robert Evans*.

<u>May through July, 1993</u>

Mr. Evans responded to Ms. Ryan acknowledging receipt of the April 16, 1993 letter and indicated that the concerns would be addressed in an upcoming Dear Colleague Letter.  Ms. Ryan sent reminder letters to Mr. Evans and Mr. Evans responded again that a Dear Colleague letter would address the 799 billing issues.  See *Attachment 10—Correspondence between Sheila Ryan and Robert Evans*.

<u>January 19, 1994</u>

After Congress repealed the unique SAP provisions as part of the Omnibus Reconciliation Act of 1993 such that loans originated or acquired with tax-exempt sources issued on or after October 1, 1993 are entitled to receive special allowance at the full SAP taxable rates, Ms. Ryan wrote to ED to address again the ED Form 799 changes.  At the time, the FFEL community was discussing whether new tax-exempt codes would be necessary to track loans funded with new tax-exempt money originally issued on or after October 1, 1993.  This letter once again reviewed the December 1992 regulations and the Department's change in its historical policy.  See *Attachment 11—Letter dated January 19, 1994 from Sheila Ryan to Pamela Moran*.

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000186

<u>March 1996</u>

ED issued guidance in the form of Dear Colleague Letter 96-L-186, 96-G-287.   The letter, in question and answer format addressed the changes made to section 682.302(e) in the December 1992 regulations.  In Question and Answer No. 30, ED offers two important points of clarification. First, ED clearly articulates that the final December 1992 regulations represented a change in its historical policy.  Second, ED clearly articulates its revised policy that "if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan." See *Attachment 12—U.S. Department of Education Dear Colleague Letter 96-L-186, 96-G-287, March 1996.*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000187

# Section III   Indenture Management Strategy

*SLFC has 65 million of floor*

## Overview

The majority of SLFC's FFELP Loans are financed under an Indenture of Trust dated as of February 1, 1998 (the "Indenture"), by and between Education Loans Incorporated, a wholly-owned subsidiary of SLFC ("ELI") and First Bank National Association, as trustee. Under this Indenture, ELI issued its $923,470,000 Student Loan Asset-Backed Callable Notes, Series 1998-1 (the "1998 Notes"). SLFC has advised us that proceeds of the 1998 Notes were used to refund approximately $48 million of tax-exempt bonds originally issued prior to October 1, 1993. The strategy recommended in this memorandum relates to the $48 million of FFELP Loans that have been made or acquired with this $48 million of refunding debt, which we refer to herein as the "Refunding Notes."

As discussed in the Executive Summary above, in order to increase the yield on the student loans financed by the Refunding Notes, SLFC can adopt a strategy similar to those employed by other tax-exempt issuers participating in the FFELP program. To do so, SLFC would implement a program to refinance the loans that have been made or acquired with proceeds of the Refunding Notes (the "Floor Loans") with other available taxable funds. At the time of the refinancing, the Floor Loans would be transferred to their new taxable funding source and the proceeds of the Refunding Notes made available by this refinancing would then be used to acquire or originate new FFEL loans. Under this program, both the Floor Loans and the additional loans acquired with the Refunding Bonds would be eligible to receive, and ELI would be required to bill for, SAP at the half-SAP/9.5% floor rate for as long as the Refunding Notes are not retired or defeased and ELI retains an interest in those loans. This refinancing strategy could be used one time or periodically depending on SLFC's goals for increased yield.

## Refinancing Floor Loans in Accordance with the Indenture

In implementing a program to refinance loans currently financed by the Refunding Notes, SLFC will need to determine what source of funds it will use to effect the refinancing and what loans it will use for the refinancing. The refinancing can occur using proceeds of the taxable 1998 Notes or proceeds of other taxable bonds, notes, commercial paper or lines of credit that SLFC may have.[10] To the extent that SLFC

---

[10] Because Section 302(e) expressly addresses the situation in which a loan made or acquired with proceeds of a tax-exempt bond originally issued before October 1, 1993 is refinanced with taxable sources, and does not address the situation in which the refinancing takes place with tax-exempt debt issued on or after October 1, 1993 is used to refinance Floor Loans, we are limiting the proposed refinancing strategy to SLFC's taxable sources of financing.

10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000188

chooses to refinance the Floor Loans with proceeds of taxable 1998 Notes, it would transfer the Floor Loans to the taxable 1998 Notes on the books of ELI. The freed proceeds of the Refunding Notes would then be used to make or acquire new loans that would then become Floor Loans. The new Floor Loans will need to meet the Indenture's eligibility requirements as well as applicable tax "nexus" requirements. While we believe that the exchange of Floor loans for loans of equal aggregate value should satisfy tax issues relating to arbitrage and yield on the Refunding Notes, these matters should be examined and confirmed by SLFC's tax advisors. In the event SLFC decides to implement the refinancing strategy with sources of funds outside the Indenture, it may need to transfer Floor Loans, currently pledged to the Trustee under the Indenture to the new source of funding outside the Indenture. The Indenture's provisions govern whether and how financed loans can be released from the lien of the Indenture.[11] In general, Section 1.4(b) of the Indenture sets forth the requirements for any releases of pledged property from the lien of the Indenture. This section provides that prior to the deposit of any property with the Trustee that is to be the basis for the release of collateral under the Indenture (e.g. new loans in exchange for Floor Loans), ELI must provide the Trustee with a certificate certifying the fair value of the property being so deposited. If the property being deposited together with the value of other property deposited in the current fiscal year is valued at 10% or more of the outstanding principal amount of the Notes, the Indenture requires an independent appraisal of the value of the property being deposited. The same valuations are required for the property, in this case, the Floor Loans, being released from the lien of the Indenture.[12] In addition to the fair value certifications, the Indenture requires opinions of counsel to the effect that a first priority security interest is created in the loans being deposited to the Indenture and confirmations from all rating agencies then rating the 1998 Notes that the transfers will not have an adverse affect on the then-current ratings of the 1998 Notes.

In a program to refinance Floor Loans in accordance with the Indenture, SLFC would first identify the loans financed with the Refunding Notes. Based on the aggregate value of the Floor Loans to be transferred out of the Indenture, SLFC would select loans with substantially equal aggregate value to be substituted into the Indenture. Presumably, if the loans being substituted for the Floor Loans have substantially equal aggregate values, the Trustee's concern about impairment of security under the Indenture will be substantially addressed.

---

[11] Whether transfers occur from outside or within the Indenture, SLFC should consult its tax counsel to determine whether substitution of loans raises any tax implications, including nexus issues, that must be considered.

[12] The Indenture provides that the independent appraisal is not needed if the value of the property is less than $25,000 or less than 1% of the then-outstanding principal balance of the 1998 Notes. Other exceptions to the Indenture's requirements for certification of fair value include sales or dispositions of Student Loans "as and to the extent permitted or required by this Indenture or the Servicing Agreement." Examples of sales or dispositions of Student Loans that are permitted or required by the Indenture would include: a sale of a Financed Loan to purchase into the Indenture a serial loan; a sale of a Financed Loan that has defaulted and is being replaced with a "good" loan; the sale of financed loans from the Surplus Account to remedy deficiencies in certain other funds and accounts of the Indenture. We are assuming that none of these exceptions would entirely cover the transfers of financed loans that are being proposed in this memorandum, and that, therefore, the valuation certifications will be required.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER          ELI-HC00000189

# Section IV    Loan Selection Strategy and 799 Billing

Based on ED's current interpretation of Section 302(e) as described above in this memorandum, Section 302(e) effectively fixes the return characteristics of loans made or acquired with tax-exempt financing originally issued prior to October 1, 1993. By focusing on the increase in yield which can be earned on loans that are transferred from the qualifying tax-exempt financing to taxable financings, SLFC can develop an effective asset/liability management strategy.

The table below provides examples of the income benefit that can be derived by moving different types of loans from a pre-10/1/93 tax-exempt financing (such as the Refunding Notes) to a taxable financing and billing for SAP on those loans according to the Section 302(e) requirements. The rates used below are based on those in effect from July 1, 2003– June 30, 2004 and assume a 1.12% T-Bill rate. (See *Table A—Table of 2003-04 Interest Rates on FFELP Loans*)

| Variable Rate Loan Attributes | Annual Income $1,000,000 Loans Financed Taxable | Annual Income on $1,000,000 financed Pre10/1/93 Tax Exempt | Increased Annual Income on $1,000,000 | Increased Annual Income on $48,000,000 |
|---|---|---|---|---|
| 2.82% coupon 1.7% SAP | 28,200 | 95,000 | 66,800 | 3,206,400 |
| 3.42% coupon 2.3% SAP | 34,200 | 95,000 | 60,800 | 2,918,400 |
| 3.62% coupon 2.5% SAP | 36,200 | 95,000 | 58,800 | 2,822,400 |
| 4.22% coupon 3.1% SAP | 42,200 | 95,000 | 52,800 | 2,534,400 |
| 4.37% coupon 3.25% SAP | 43,700 | 95,000 | 51,300 | 2,462,400 |

As the table illustrates, the effect of applying the half-SAP/9.5% floor rates (i) to the Floor Loans moved to taxable financings and (ii) to the "new" Floor Loans made or acquired with the freed-up proceeds of the Refunding Notes may be to double or even triple income with respect to those loans. [13] The largest benefit will be gained by acquiring the lowest coupon rate, lowest SAP rate loans with the proceeds of the Refunding Notes. Given today's extremely low interest environment, the gains noted above are substantial. While these gains would be reduced if T-Bill rates increase,

---

[13] Of course, during a high interest rate environment, when the half-Sap rate comes into effect, SLFC will need to implement a strategy to transfer ownership of the Floor Loans in order to recapture the ability to receive full SAPs on these taxably financed loans.

12

rates would have to increase substantially (more than 5%) for a taxable yield to approach the 9.5% floor associated with loans funded by the Refunding Note financing. In fact, since April of 1992, a loan with a 3.25% SAP rate, financed by a taxable debt would never have earned more than 9.5% and would have averaged a yield of 7.48% based on the quarterly T-Bill auctions See *Table B—Table of historic 91 Day Bond Equivalent Quarterly Average T-Bill Rates*.

In addition to the substantial increase in income that would be achieved by moving more and lower coupon loans into the Refunding Note financing, this type of transfer has the benefit of reducing the loan yield for arbitrage purposes since these computations ignore the effect of special allowance payments. From an arbitrage perspective, the goal of these transfers would be to maintain the lowest coupon debt in the tax-exempt transactions after all other transactions have been completed. Even in the case where a market value in excess of par is ascribed to a portfolio financed by a tax-exempt debt, it may be beneficial to move these loans out of a tax-exempt debt to a taxable one. While premiums and discounts paid on portfolios are included in arbitrage calculations, such amounts are a one time item and may be more than offset if the newly purchased loans have a substantially lower coupon rate.

When loans are acquired with the Refunding Note financing, the SAP codes on these loans must reflect the appropriate tax-exempt SAP codes on the servicing system. As the Floor Loans are transferred to other taxable financings, the servicer must retain the tax-exempt SAP codes for these loans until the tax-exempt debt has been retired or defeased or until SLFC no longer has an interest in the loan. The 799 and servicer systems should be scrutinized to insure that this tracking is in place.

13

ELI-HC00000191

Attachment 1



U.S. DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION
WASHINGTON, D.C. 20202

December 16, 1980

OFFICE OF STUDENT
FINANCIAL ASSISTANCE

Bulletin #G-44
R-108

To All Guarantee Agencies
Effects of the
Education Amendments of 1980

On October 3, 1980, President Carter signed the <u>Education Amendments of 1980</u>
(PL. 96-374). The amendments made significant changes to the Guaranteed
Student Loan Program, some of which require immediate attention by the
guarantee agencies.

<u>LOAN MAXIMUMS</u>

The term "undergraduate student" has been expanded to provide for "dependent
undergraduate" and "independent undergraduate" students. The new loan maximums
for these categories and for graduate students are as follows:

|  | Annual loan maximum | Cumulative loan maximum |
|---|---|---|
| Dependent undergraduate | $2,500 | $12,500 |
| Independent undergraduate | $3,000 | $15,000 |
| Graduate or Professional | $5,000 | $25,000 |

The new maximums apply to any loan disbursed on or after January 1, 1981.
However, the loan may cover costs for periods of instruction which began prior
to that date. As always, no loan may exceed the estimated cost of education
minus estimated financial assistance.

In an October "Dear Colleague" letter to all participating schools, we have in-
structed the school to make a determination of the dependent/independent status
of any undergraduate student who applies for a loan in excess of $2,500 for the
current academic year. A copy of that letter has been sent to each guarantee
agency. If the student is determined to be independent, the school was instructed
to indicate the word "INDEPENDENT" in a conspicuous place in the school portion
on the application. This procedure will be followed until the new common applica-
tion forms are in use. Of course, in subsequent years, the same determination
will also be required for any undergraduate student seeking a loan which will
cause the total of loans outstanding to exceed $12,500.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000192

Page 4

## SPECIAL ALLOWANCE

The special allowance provisions have been revised to reflect the changes in the interest rate structure.  The special allowance rate for loans on which the applicable interest rate is 7 percent or less will be computed by determining the average bond equivalent rate of the ninety-one day Treasury bills auctioned during the quarter, subtracting 3.5 percent, rounding the resultant figure upward to the nearest one-eighth of one percent and dividing the result by four.  The special allowance rate for loans on which the applicable interest rate is 8 percent is computed as above except that 4.5 percent is subtracted from the Treasury bill average.  For loans on which the applicable interest rate is 9 percent, 5.5 percent is subtracted from the Treasury bill average.

Although there is nothing to prohibit a lender from charging an interest rate of less than the applicable rate, the special allowance for those loans will be computed as though the interest were charged at the applicable rate.

The special allowance rate for loans made on or after October 1, 1980, from the proceeds of obligations exempt from Federal income tax, will be computed at one-half the quarterly rate of special allowance established above.  However, the rate paid to holders of such loans shall not be less than 2.5 percent in the case of loans for which the applicable interest rate is 7 percent; 1.5 percent in the case of loans for which the applicable interest rate is 8 percent; and 0.5 percent in the case of loans for which the applicable interest rate is 9 percent.  The reduced special allowance does not apply to any loan which was made prior to October 1, 1980, or to any loan made after October 1, 1980, which is purchased with funds not exempt from Federal income tax, even if it was originally made or purchased by a lender from the proceeds of obligations exempt from Federal income tax.  In the case of loans purchased with funds obtained from the proceeds of obligations exempt from Federal income tax, the new special allowance rate applies only to loans made on or after October 1, 1980, regardless of the date purchased.

## BILLING INSTRUCTIONS FOR INTEREST AND SPECIAL ALLOWANCE

The preceding discussion identifies those loans which are subject to the new interest and special allowance provisions.  However, it is important to emphasize that the special allowance provisions do not take effect until January 1, 1981.  Therefore, the first billing affected by the new special allowance provisions is for the quarter ending March 31, 1981.  The following examples are intended to clarify this point:

1.  A lender disburses a 9 percent loan prior to December 31, 1980, because it is made to a first time borrower for a period of instruction beginning on or after January 1, 1981.  On the December 31, 1980, billing, the lender reports the 9 percent loan on line A3 on a supplemental OE form 1166, "Lenders Request for Payment of Interest on Student Loans."  However, for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000193

Page 5

special allowance purposes the 9 percent loan will be included in line K1 of the regular billing form together with all other outstanding GSL loans. The effect is that, for this one quarter only, the lender will receive a greater yield on 9 percent loans (by 2 percentage points) than that received for 7 percent loans.  For the quarter ending March 31, 1981, a new billing form will be available which will, as required by the new legislation, provide separate lines not only for the 9 percent interest rate, but also for the reporting of the appropriate balances for special allowance purposes.

2.   A lender makes new loans at any interest rate using tax exempt funds after October 1, 1980.  The present billing form will be used for requesting special allowance which will be paid at the old statutory rate for the quarter ending December 31, 1980, only.  Beginning with the March 31, billing, a special billing form will be provided in order to segregate loans, for special allowance purposes, by date of disbursement -- those made prior to October 1, 1980, and those made on or after October 1, 1980.  As far as payment of interest benefits, procedures for lenders that make loans with tax exempt funds will be no different from those of any other lender.

DEFERMENTS

The amendments added four new deferment provisions to the GSLP.  They are:

   1.   Not in excess of three years during which the borrower is an Officer in the Commissioned Corps of the Public Health Service;

   2.   Not in excess of three years during which the borrower is temporarily totally disabled, as established by sworn affidavit of a qualified physician, or during which the borrower is unable to secure employment by reason of the care required by a spouse who is so disabled.

   3.   Not in excess of three years during which the borrower is in service, comparable to the service under the Peace Corps Act or the Domestic Volunteer Service Act of 1973, as a full-time volunteer for an organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1954; and

   4.   Not in excess of two years during which the borrower is serving an internship, the successful completion of which is required in order to receive professional recognition required to begin professional practice or service.

Numbers one and two above are self-implementing and will become effective January 1, 1981, for outstanding loans as well as for new loans.  If a borrower, for example, is currently an officer in the Commissioned Corps of the Public Health Service as of January 1, 1981, he or she is entitled to a deferment for up to three years.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    ELI-HC00000194

Attachment 2



Friday
February 8, 1985



Part V

Department of
Education

34 CFR Part 682
Guaranteed Student Loan Program; Final
Rule and Proposed Rulemaking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000195

sources of credit, including that to be made available from each other. The applicant Authority must therefore secure the written concurrence of the other Authorities sharing its service area in its estimates of credit to be provided by lenders and secondary markets other than the Authorities. If that concurrence cannot be secured, the applicant must estimate the amount of credit to be provided by those lenders based on their past performance. § 682.815(g).

In estimating the amount of credit to be provided by other Authorities, however, the applicant Authority should not include the amount of loans to be made or acquired with the proceeds of tax-exempt issues which have not been justified and approved by the Secretary under this Subpart, since such amounts are presumably speculative until that approval. To ensure that all Authorities comply with the statutory prohibition on overissuance, each Authority sharing a service area with another Authority must provide the applicant Authority with reliable information to identify any portion of its loan acquisition budget to be financed by tax-exempt issues not yet approved. The Secretary will, where necessary, assist the applicant Authority in determining this amount using information available to the Department from audits, Plans, issue justifications or other sources.

Third, Authorities sharing a service area must reach agreement on the manner in which each will meet the needs identified there. The statute gives the Secretary no mandate to select one Authority over another to use tax-exempt funds to finance student loans for a commonly-served student population. Therefore, where two or more Authorities propose to finance loans for a commonly-served borrower population, they must agree on the respective portions of that unmet need which each will serve, and where they cannot agree, secure an equitable division by arbitration. Since an apportionment of a State's private activity bond limit among potential issuers is now imposed on State governments by section 621 of the Deficit Reduction Act of 1984, the Secretary expects that in many instances the apportionment required under this Subpart will be governed by the allocation decisions made by the State in which the Authorities operate, and will add no burden beyond that already imposed by these amendments to the Internal Revenue Code.

j. *Review by the Secretary of the Treasury.* § 682.822(c). The final regulations include a new provision which allows the Commissioner of

Internal Revenue to review any ED decision regarding a justification for a proposed tax-exempt obligation. This provision implements section 646 of the Deficit Reduction Act of 1984 (Pub. L. 98–369, July 18, 1984, 98 Stat. 941). This right to review given to affected parties applies only to ED decisions regarding approval of new issues, not to other decisions under this Subpart. *See* 130 Cong. Rec. S 4513 (April 12, 1984). The Secretary of Education will consider his decision in light of the report issued by the Commissioner, and will communicate a final decision to the Authority within 30 days of receiving that report.

k. *Payment of special allowances to parties acquiring loans from or on behalf of an Authority.* §§ 682.823, 682.302(e). The regulations clarify the rights of parties which acquire from or on behalf of an Authority loans financed with tax-exempt obligations. Parties which acquire loans on behalf of an Authority using funds advanced by the Authority are acting as its agent and acquire no greater rights than the Authority. § 682.800. On the other hand parties which acquire loans from an Authority by purchase in a secondary market transaction, or by exercise of a take-out agreement used as a credit support for an issue, typically do so using funds derived from sources other than tax-exempt obligations. The regulations provide that any sanctions or limitations imposed under this Subpart on loans financed by those tax-exempt obligations apply only so long as the loans remain financed by tax-exempt obligations. See §§ 682.823; 682.302(e). Therefore, any party which uses funds derived from sources other than tax-exempt obligations to acquire loans from an Authority, or, if an Authority, to refinance those loans, takes or holds those loans free of any sanctions previously imposed on the Authority.

The regulations do not specifically address the rights of an Authority which uses tax-exempt financing to acquire loans from another Authority. However, only an Authority or an entity acting on behalf of an Authority can issue tax-exempt obligations; loans acquired even from another Authority with the proceeds of a tax-exempt issue qualify for special allowance payments only if the issuing Authority has both an approved Plan and a justification approved under this Subpart for the issue in question.

l. *Special allowance rate payable on taxable financing.* § 682.302(e). The regulations also clarify the closely related issue of the rate of special

allowance payable on loans acquired with funds derived from sources other than tax-exempt obligations. The rule implements the Congressional intention in section 438(b)(2) of the HEA to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders. These regulations therefore tie the rate of special allowance to the source of the funds used to acquire or maintain the Authority's interest in a loan, and more particularly, to the financing costs incurred in securing those funds. Congress recognized that a party raising loan acquisition funds by means of tax-exempt borrowings had a financing cost well below that incurred by parties using other sources of funds, and the 1980 amendments to section 438 of the HEA which reduced the special allowance to tax-exempt borrowers reflect a Congressional judgment of the subsidy appropriate to their reduced borrowing costs. A party using taxable financing to make or acquire student loans has a higher cost of funds, and merits, on that account, the higher, full special allowance rate. While taxable financing was not generally used by Authorities, there was little need to address the rate payable to a party, which shifted from tax-exempt to taxable financing, but that issue must now be addressed. This shift from tax-exempt to taxable financing occurs in two situations. First, a party may use taxable financing to acquire loans from an Authority or its agent by means of a normal secondary market transaction, by exercise of its foreclosure rights under a letter of credit furnished the tax-exempt issuer, or by the exercise of a "take-out" commitment given as a credit support to an issuer. In each of these instances, it is fairly clear that the party acquiring the loans has only one financing cost, and does not share in any way in the reduced borrowing cost enjoyed by the issuer of the bonds. These purchasers therefore receive full special allowance on loans so acquired.

Second, the issuer may shift from tax-exempt to taxable financing when refunding tax-exempt obligations. Here the actual financing cost incurred by that issuer depends on both the interest rate paid on obligations used to effect the refunding, and, if the refunding is an advance refunding, on the yield earned on the investments used to defease the prior tax-exempt bonds. Where a party uses taxable financing to retire tax-exempt bonds, its current borrowing costs is based entirely on the cost of the new funds, and such a party qualifies for full special allowance on loans financed.

ELI-HC00000196

Attachment 3





**Tuesday**
**November 20, 1990**

## Part II

# Department of Education

34 CFR Part 682
Guaranteed Student Loan Programs;
Proposed Rule

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000197

attempt to obtain the missing information from the borrower.

The proposed regulations would treat a certified SLS application as sufficient documentation for a student deferment for an SLS loan up through the student's anticipated graduation date indicated on the application. and for a Stafford loan guaranteed by a guarantee agency whose student status confirmation report system includes a mechanism for the school's confirmation of the borrowers' student deferment status.

Section 682.212   Prohibited Transactions

The Secretary intends to clarify that a loan sold or otherwise transferred at discount by a school may only be done on a case-by-case basis with the Secretary's explicit approval.

Section 682.214   Compliance With Equal Credit Opportunity Requirements

The Secretary proposes to revise the regulations by including a provision requiring a lender making a Stafford loan to comply with the equal credit opportunity requirement of regulation B, 12 CFR part 202. as applicable to credit assistance programs authorized by law for the benefit of an economically disadvantaged class of persons.

*Subpart C—Federal Payment of Interest and Special Allowance*

These sections have been renumbered to accommodate changes.

Section 682.301   Eligibility of Borrowers for Interest Benefits on Stafford Loans

A substantial amount of this section would be deleted. because, under the 1986 Amendments, need, and therefore eligibility for interest benefits. is determined through a need analysis system approved for use in the campus-based programs. Need must be determined for every applicant; therefore, the $30.000 adjusted gross income provision would be eliminated.

In addition. this subpart would be revised to reflect the Secretary's position described above with respect to interest benefits on Stafford loans made to members of a religious order.

Section 682.302   Payment of Special Allowance on GSL Loans

Proposed § 682.302(e) would be revised to refer to § 682.800, and those provisions governing special allowance payments for loans financed by tax-exempt obligations would be incorporated in § 682.800.

Section 682.303   [Reserved]

The proposed regulation would move the provisions of § 682.303 *Prohibition*

*against discrimination as a condition for receiving special allowance payments* to § 682.840.

Section 682.305   Procedures for Payment of Interest Benefits and Special Allowance

The proposed regulations would provide that the Secretary does not consider a request for interest benefits and special allowance to be accurate if the request is not provided on a form prescribed by the Secretary, does not contain all the information required by the Secretary, or includes conflicting information.

The proposed regulations would require that a lender whose outstanding GSL loan portfolio during any fiscal year exceeds $10 million must have an annual independent financial and compliance audit of its billings for interest benefits and special allowance payments. The Secretary believes that an annual audit of such large volume lenders would reduce lender billing errors, and thus reduce the cost to the Federal Government of these payments. This change is being proposed in response to a recommendation by the General Accounting Office (GAO Report HRD 88–72).

*Subpart D—Guarantee Agency Programs*

Section 682.401   Basic Program Agreement

The Secretary proposes to revise this section to require that a guarantee agency require a borrower to notify the school of any change in the borrower's employer or the employer's address, to assist the holder in locating the borrower if he or she "skips", and to facilitate wage garnishment in the event of default.

*Administrative fee for Consolidation loans.* The Secretary proposes to limit to $50 the fee a guarantee agency may charge a lender to defray the agency's administrative costs incurred in guaranteeing a Consolidation loan.

Section 682.402   Death. Disability. and Bankruptcy Payments

The Secretary proposes to amend the regulations to address more specifically the treatment of bankruptcy petitions filed under chapters 11 and 12 of the Bankruptcy Code. In addition. a guarantee agency would be provided with the flexibility to establish a time frame. not to exceed 30 days. for lenders to file a bankruptcy claim with the agency. Proposed § 682.402(d)(2) would also expand the forms of documentation a lender may use to determine that a borrower has filed a bankruptcy petition

to include other appropriate documents. e.g., written notices from the debtor's attorney. in lieu of the notice of the first meeting of creditors.

The Secretary also proposes to allow a guarantee agency to submit a chapter 13 bankruptcy claim to the Secretary for reimbursement after it has paid the claim to the lender. Guarantee agencies would no longer be required to hold chapter 13 loans until a general order of discharge is entered. which can often occur up to five years after the agency pays the lender on the claim.

The proposed regulations would revise § 682.402(g) regarding the actions required of guarantee agencies in bankruptcy proceedings on loans acquired by the guarantee agencies through payment of bankruptcy claims. The proposed regulations would require the agency in a chapter 7 proceeding, if it determines that repayment would not constitute an undue hardship for the debtor. to determine whether the expected costs of opposing the discharge petition would exceed one-third of the total amount owed on the loan, and if it does not, to oppose the petition, and to seek a judgment if the borrower has defaulted on the loan.

*Payment of death, disability, and bankruptcy claims by the guarantee agency.* The Secretary proposes to reduce from 90 to 45 days the period within which a guarantee agency is required to pay a death. disability. and bankruptcy claim to a lender. The proposed regulations would also clarify a guarantee agency's responsibility to diligently oppose the discharge of a GSL loan in bankruptcy.

Section 682.404   Federal Reinsurance Agreement

The Secretary proposes to clarify that an agency is prohibited from double charging the Secretary for costs of supplemental preclaims assistance if those costs have already been reimbursed under the 30% retention of collection.

The Secretary proposes to revise the regulations to implement the provisions of the 1986 Amendments allowing a guarantee agency to transfer a loan guarantee issued by that agency to another guarantee agency with the approval of the receiving agency and the holder of the loan. The quarterly report (ED Form 1130) would be revised to provide for the reporting of these transfers. Therefore. in proposed § 682.404(b)(5). the definition of the "amount of loans in repayment" would be revised to include the original principal amount of all loan guarantee transfers received from other agencies.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000198

borrower's obligation to repay a GSL loan. This includes, but is not limited to, a lender's duty to engage in the due diligence activities specified in §§ 682.207, 682.208, and 682.411, and a guarantee agency's duty to engage in the due diligence activities specified in § 682.410(b).

(Authority: 20 U.S.C. 1077, 1078, 1078-1, 1078-2, 1078-3, 1082)

## Subpart C—Federal Payments of Interest and Special Allowance

### § 682.300  Payment of interest benefits on Stafford loans.

(a) *General.* The Secretary pays a lender a portion of the interest on a Stafford loan on behalf of a borrower who qualifies under § 682.301. This payment is known as interest benefits.

(b) *Covered interest.* (1) The Secretary pays a lender the interest that accrues on an eligible Stafford loan—

(i) During all periods prior to the beginning of the repayment period, except as provided in paragraph (b)(2) of this section;

(ii) During any period when the borrower has an authorized deferment, and, if applicable, a post-deferment grace period; and

(iii) During the repayment period for loans described in paragraph (d)(2) of this section.

(2) The Secretary's obligation to pay interest benefits on an otherwise eligible loan terminates on the earliest of—

(i) The date the borrower's loan is repaid;

(ii) With respect to the portion of a loan represented by a single disbursement of loan proceeds—

(A) The date the check for the disbursement is returned uncashed to the lender; or

(B) The 120th day after the date of that disbursement, if—

(1) The check for the disbursement has not been cashed on or before that date; or

(2) The proceeds of the disbursement made by electronic funds transfer in accordance with § 682.207(b)(1)(ii)(B) have not been released from the restricted account maintained by the school on or before that date;

(iii) The date of default by the borrower;

(iv) The date that the lender receives payment of a claim for loss on the loan;

(v) The date the borrower's loan is discharged in bankruptcy;

(vi) The date the lender determines that the borrower has died or has become totally and permanently disabled; or

(vii) The date the loan ceases to be guaranteed or ceases to be eligible for reinsurance under this part, with respect to that portion of the loan that ceases to be guaranteed or reinsured, regardless of whether the lender has filed a claim for loss on the loan with the guarantor.

(3) Section 682.412(a) sets forth circumstances under which a lender may be required to repay interest benefits received on a loan guaranteed by a guarantee agency.

(c) *Interest not covered.* The Secretary does not pay—

(1) Interest for which the borrower is not otherwise liable; or

(2) Interest paid on behalf of the borrower by a guarantee agency.

(d) *Rate.* (1) Except as provided in paragraph (d)(2) of this section, the Secretary pays the lender at the actual interest rate on a loan provided that the actual interest rate does not exceed the applicable interest rate.

(2) For a loan disbursed prior to December 15, 1968, or subject to a binding commitment made prior to that date, the Secretary pays an amount during the repayment period equivalent to three percent per year of the unpaid principal amount of the loan.

(Authority: 20 U.S.C. 1078, 1082)

### § 682.301  Eligibility of borrowers for interest benefits on Stafford loans.

(a) *General.* (1) A borrower must demonstrate financial need in accordance with part F of the Act to qualify for interest benefits on a Stafford loan.

(2) The Secretary considers a member of a religious order, group, community, society, agency, or other organization who is pursuing a course of study at an institution of higher education to have no financial need if that organization—

(i) Has as its primary objective the promotion of ideals and beliefs regarding a Supreme Being;

(ii) Requires its members to forego monetary or other support substantially beyond the support it provides; and

(A) Directs the member to pursue the course of study; or

(B) Provides subsistence support to its members.

(b) *Application for interest benefits.* To apply for interest benefits, the student shall submit a loan application to the lender. The application must include a certification from the student's school of the following information:

(1) The estimated cost of attendance for the student for the academic period for which the loan is intended.

(2) The estimated financial assistance for the student for the academic period for which the loan is intended.

(3) The student's expected family contribution, as determined pursuant to part F of the Act, under a need analysis system approved by the Secretary.

(4) The amount of the student's need for a loan, as determined pursuant to part F of the Act, under a need analysis system approved by the Secretary.

(c) *Use of loan proceeds to replace expected family contribution.* A borrower may use the amount of a SLS, PLUS, or non-subsidized Stafford loan obtained for a period of enrollment to replace the expected family contribution determined under paragraph (b)(3) of this section for that period of enrollment.

(Authority: 20 U.S.C. 1078, 1082, 1087-1)

### § 682.302  Payment of special allowance on GSL loans.

(a) *General.* The Secretary pays a special allowance to a lender on an eligible GSL loan. The special allowance is a percentage of the average unpaid principal balance of a loan, including capitalized interest, computed in accordance with paragraph (c) of this section.

(b) *Eligible loans.* (1) Except for Stafford loans disbursed on or after October 1, 1981 that do not qualify for interest benefits under § 682.301, or as provided in paragraph (b)(2) or (e) of this section, GSL loans that otherwise meet program requirements are eligible for special allowance payments.

(2) For a loan made under the SLS or PLUS Program on or after July 1, 1987 or made under § 682.209 (e) or (f) no special allowance is paid for any period for which the interest rate determined under § 682.202(a)(2)(iv)(A) for that loan does not exceed 12 percent.

(c) *Rate.* (1) Except as provided in paragraph (c)(2) of this section, the special allowance rate for an eligible loan during a three-month period is calculated by—

(i) Determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the three-month period;

(ii) Subtracting the applicable interest rate for that loan;

(iii) Adding—

(A) Three and one-quarter percent to the resulting percentage, for a loan made on or after November 16, 1986;

(B) Three and one-quarter percent to the resulting percentage, for a loan made on or after October 17, 1988 but before November 16, 1986, for a period of enrollment beginning on or after November 16, 1986;

(C) Three and one-half percent to the resulting percentage, for a loan made prior to October 17, 1986, or for a loan described in paragraph (c)(2) of this section; or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000199

(D) Three and one-half percent to the resulting percentage, for a loan made on or after October 17, 1986 but before November 16, 1986, for a period of enrollment beginning prior to November 16, 1986;

(iv) Rounding the result upward to the nearest one-eighth of one percent, for a loan made prior to October 1, 1981; and

(v) Dividing the resulting percentage by four.

(2) The special allowance rate determined under paragraph (c)(1)(iii)(C) of this section applies to loans made or purchased from funds obtained from the issuance of an obligation of the—

(i) Maine Educational Loan Marketing Corporation to the Student Loan Marketing Association pursuant to an agreement entered into on January 31, 1984; or

(ii) South Carolina Student Loan Corporation to the South Carolina National Bank pursuant to an agreement entered into on July 30, 1986.

(3)(i) Subject to paragraph (c)(3)(ii) of this section, the special allowance rate is one-half the rate calculated under paragraph (c)(1)(iii)(C) of this section for a loan made or guaranteed on or after October 1, 1980, that was made or purchased with funds obtained by the holder from—

(A) The issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1986;

(B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

(ii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section may not be less than—

(A) Two and one-half percent per year on eligible loans for which the applicable interest rate is seven percent;

(B) One and one-half percent per year on eligible loans for which the applicable interest rate is eight percent; or

(C) One-half of one percent per year on eligible loans for which the applicable rate is nine percent.

(d) *Termination of special allowance payments on a loan.* (1) The Secretary's obligation to pay special allowance on a loan terminates on the earliest of the date—

(i) The borrower's loan is repaid;

(ii) The borrower's loan check is returned uncashed to the lender;

(iii) The lender receives payment on a claim for loss on the loan;

(iv) The loan ceases to be guaranteed or ceases to be eligible for reinsurance under this part, with respect to that portion of the loan that ceases to be guaranteed or reinsured, regardless of whether the lender has filed a claim for loss on the loan with the guarantor;

(v) Forty-five days after the borrower's default on the loan, unless the lender files a claim for loss on the loan with the guarantor together with all required documentation, prior to that 45th day; or

(vi) The 120th day after the date of disbursement, if—

(A) The loan check has not been cashed on or before that date; or

(B) The loan proceeds disbursed by electronic funds transfer in accordance with § 682.207(b)(1)(iii)(B) have not been released from the restricted account maintained by the school on or before that date; or

(vii) The date the guarantee agency returns a claim for loss on the loan to the lender for additional documentation.

(2) Section 682.412(a) sets forth the circumstances under which a lender may be required to repay special allowance received on a loan guaranteed by a guarantee agency.

(e) *Special allowance payments for loans financed by proceeds of a tax-exempt obligations.* (1) The Secretary pays a special allowance on a loan described in paragraph (c)(3)(i) of this section that is held by or on behalf of an Authority only if the loan meets the requirements of § 682.800.

(2) The Secretary pays a special allowance to an Authority at the rate prescribed in paragraph (c)(1) of this section on a loan described in paragraph (c)(3)(i) of this section—

(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section and—

(ii) If the authority retains a legal or equitable interest in the loan—

(A) The prior tax-exempt obligation is retired; or

(B) The prior tax-exempt obligation is rendered null and void by means of obligations that the Authority certifies in writing to the Secretary bear a yield that does not exceed the yield permitted under Internal Revenue Service

regulations, 26 CFR 1.103–14, with regard to investments of proceeds of a tax-exempt refunding obligation.

(Authority: 20 U.S.C. 1077, 1078, 1078–1, 1078–2, 1078–3, 1082, 1087–1)

§ 682.303  [Reserved]

§ 682.304  Methods for computing interest benefits and special allowance.

(a) *General.* The Secretary pays a lender interest benefits and special allowance on eligible loans on a quarterly basis. These calendar quarters end on March 31, June 30, September 30, and December 31 of each year. A lender may use either the average daily balance method or the actual accrual method to determine the amount of interest benefits payable on a lender's loans. A lender shall use the average daily balance method to determine the balance on which the Secretary computes the amount of special allowance payable on its loans.

(b) *Average daily balance method for interest benefits.* (1) Under this method, the lender adds the unpaid principal balance outstanding on all loans qualifying for interest benefits at each actual interest rate for each day of the quarter, and divides the sum by the number of days in the quarter and rounds the result to the nearest whole dollar. The resulting figure is the average daily balance for qualified loans outstanding at each actual interest rate.

(2) The Secretary computes the interest benefits due on all qualified loans at each actual interest rate by multiplying the average daily balance thereof by the actual interest rate, multiplying this result by the number of days in the quarter, and then dividing this result by the actual number of days in the year.

(c) *Actual accrual method for interest benefits.* (1) Under this method, the lender computes the total unpaid principal balance outstanding on all qualified loans at each actual interest rate on each day of the quarter, multiplies this result by the actual interest rate, and divides this result by the actual number of days in the year, or alternatively, 365.25 days. A lender who chooses to divide by 365.25 days must do so for four consecutive years.

(2) The interest benefits due for a quarter equal the sum of the daily interest benefits due, computed under paragraph (c)(1) of this section, for each day of the quarter.

(d) *Average daily balance method for special allowance.* (1) To compute the average daily balance outstanding for special allowance purposes, the lender

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000200

Attachment 4

# NCHELP PROGRAM REGULATIONS COMMITTEE

## ANALYSIS OF SECOND CLEARANCE DRAFT

## 11/20/90 NPRM

## FEBRUARY 14, 1992

*ED didn't respond to comment in final rule

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000201

Page 216.   For Section 682.302(d)(1)(vi)(A) - see comment for Section 682.300(b)(2)(ii)(A) which pertains to "negotiated" checks.  Comment listed for page 211.

For Section 682.302(d)(1)(vi)(B) - see comment for Section 682.300(b)(2)(ii)(B) which pertains to interest benefits and EFT.  If implemented, it will require a 120 day delayed implementation period.

Section 682.302(d)(1)(vii) would terminate special allowance if a lender fails to resubmit a returned claim with the guaranty agency within 30 days.  As stated in our comments, we view this as an issue for lender reviews, however, if the Secretary determines it is necessary to regulate this, 60 days is a more reasonable timeframe to refile returned claims.  Returned claims are often complex and require information be secured from another party.  In addition, lenders should not incur losses due to guarantors inappropriately returning claims nor should lenders be placed in an adversarial position with guarantors in order to recover such inappropriate losses.

In addition to the timeframe concern, the regulation is unclear if special allowance payment is reinstated upon refiling of the claim with the guarantor.  If any timeframe is included in the final regulation, a 120 day implementation period will be necessary to make the required changes to systems.



Section 682.302(e)(2)(ii) should be deleted.  Subparagraph 682.302(e)(2)(i) describes the conditions under which a loan previously funded from tax-exempt sources and receiving 1/2 special allowance payments can be subsequently funded with taxable sources and be eligible for full special allowance payments.  Subparagraph (ii) is unnecessary and incorrect as it is permissible to receive full special allowance payments on a loan which was "originally" funded with tax-exempt sources, is currently funded with taxable sources, and the tax-exempt debt may not necessarily be retired or null and void.

### .304  Methods for Computing Interest Benefits

Page 217.   Section 682.304(b)(1) describes the average daily balance method for calculating interest benefits.  The Secretary permits use of 365.25 days for the actual accrual method described in 682.304(c)(1).  The reason identified in the Comment/Response section for restricting this calculation to one method is unclear.  Lenders who use a leap year divisor will have to make system changes in order to accommodate this change.  These changes will be significant and require a delayed implementation timeframe.

### .305  Procedures for Payment of Interest Benefits and Special Allowance

Page 219.   Section 682.305(a)(4)(ii) reviews the liability of lenders and subsequent holders for payment of the origination fees.  The Comment/Response indicates that the regulation "codifies" the Secretary's "long-standing view" on this matter.  The only previous binding issuance was paragraph (iii) that stipulated joint liability for loans sold or transferred during the disbursement quarter.  This regulation will require purchasers

16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000202



Attachment 5

The New England Education Loan Marketing Corporation

January 13, 1993

Mr. Robert Evans
Director, Policy and Development
U.S. Department of Education
ROB 3 - Room 4310
7th and D Street, SW
Washington, DC 20202

Dear Bob:

As we discussed last week at the negotiating session, the following are some of the proposed changes to the draft regulations and represent concerns brought to my attention by issuers of tax-exempt debt. Given the uniqueness of these issues, I thought the process would be better served by presenting our proposals to you outside of the formal negotiations. If you find it necessary to include these items in the negotiations process, please let me know and I will request that a financing specialist attend the February negotiations session.

Draft Regulations - Page 15

Proposal: 682.302(b)(2) - We suggest adding the following language at the beginning of this section "Except as provided in (c)(3) of this section, for a loan made under the PLUS or SLS Program....".

Rationale: The change clarifies that PLUS/SLS loans are eligible for special allowance based on the 1/2 SAP provision and the HEA 9.5% floor provision. As written, sections 682.302(b)(2) and 682.302(c)(3) of the draft regulations are in conflict.

Final Regulations - Federal Register Page 60343, Draft Regulations Page 18

Proposal: 682.302(c)(3) - We suggest a new paragraph be added to this section which reads "(c)(3)(iv) The applicable rate for purposes of (c)(3)(ii) and (c)(3)(iii) is the net interest rate of the loan after rebate of any excess interest required to be applied under section 682.202."

Rationale: The change clarifies the statutory intent as reported in the colloquy between Congressman Coleman and Congressman Ford. A copy of this colloquy was provided to Pam Moran last week.

50 Braintree Hill Park, Suite 300, Braintree, Massachusetts 02184-1763
617 849 1325   800 EDU LOAN

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000203

Mr. Robert Evans
Page two

### Final Regulations - Federal Register Page 60343

Proposal: 682.302(e)(2) - We suggest that this section be revised to clarify that the 1/2 SAP and floor provisions apply only to loans pledged to a tax-exempt debt.

Rationale: We continue to disagree with the Secretary's interpretation of this section. This section states that once a loan is pledged to a tax-exempt debt, the 1/2 SAP and floor provisions continue to apply as long as the authority holds legal interest in the loan. Authorities are permitted to pledge loans to various sources of debt which may include taxable as well as tax-exempt debt. Given the Secretary's interpretation, a loan pledged to a tax-exempt source of funding that is subsequently transferred to a taxable source of funding would continue to receive 1/2 SAP and the floor. In addition, this may create a possible crisis for entities who seek to refinance these loans.

### Effective Date Clarification

The amendments make changes to section 438 which include the SAP reduction to 3.10%, SAP changes for PLUS/SLS loans, inclusion of 5% origination fee for PLUS/SLS loans, removal of the discount restriction for tax-exempt debt, and expansion of the floor provisions for tax-exempt debt. While the effective date for the changes made to this section is "loans made on or after 10/1/92", we suggest that the Secretary interpret the 10/1/92 effective as only applying to the SAP reduction to 3.10%, origination fees for PLUS/SLS and changes in SAP eligibility for PLUS/SLS. The floor and discount provisions apply only to tax-exempt financings and as such are tied to purchase dates and/or the date loans are pledged to a tax-exempt debt not the date of disbursement. We suggest therefore that the effective date for these provisions be -- for the discount, for loans purchased on or after 10/1/92 and for the floor, loans pledged to a tax-exempt debt on or after 10/1/92.

### Final Regulation - Federal Register - Page 60347

Proposal: 682.401(b)(15) - The regulation appears to codify the HEA change [428G(g)] to restrict the assignment of a loan until after the loan is fully disbursed. We suggest that the regulation be amended to include the statutory exception which authorizes the assignment of a loan following first disbursement if the assignment does not result in a change in the identity to whom payments must be made.

Rationale: Clarifies statutory language.

ELI-HC00000204

Mr. Robert Evans
Page three

<u>Final Regulation - Federal Register - Page 60382</u>

Proposal:  682.840 - We suggest that this section be revised to track the statutory language.

Rationale:  While we understand that the final regulations are not subject to negotiated rulemaking, we have been asked to comment on the nondiscrimination language included in 682.840(b). This section of the regulation would expand the statutory prohibition for an authority to receive SAP if the authority discriminates to also include the prohibition for SAP if the "authority makes or acquires loans guaranteed by an agency or organization that discriminates." This language is too broad and may have a substantial effect on the availability of authorities to secure financing -- tax-exempt as well as taxable.

<u>Final Regulation - Federal Register - Page 60345</u>

Proposal:  We suggest that the regulations be amended to clarify that the OMB Circular A-133 audit should suffice for audits of nonprofit organizations.

Rationale:  Based on our on-going discussions with OMB officials, we find OMB taking exception to ED's position that is stated in the preamble of the 12/18/92 regulations (see comment under 682.830) and believe OMB is poised to assert the view that the guarantor program review under 682.410(c)(1)(i)(B) remains duplicative, thus inconsistent with A-133 and unenforceable.

Please let me know if I can be of further assistance on any of these proposals. I look forward to your reply.

Sincerely,

Sheila M. Ryan
Director, Strategic Planning
    and Development

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Attachment 6

*Nochange. ED now states 3. The regulation conflicts with HEA 1992. Many changes have been made in the area of
once ½ SAP always ½ SAP special allowance including changes in the rates and new provisions for loans funded
therefore always 9.5%.* with tax-exempt debt. These changes should
be amended through negotiated rulemaking.

*will attempt to* 4. The inclusion of the new filing deadlines has a significant impact on lender risk.
*clarify* Section 682.406 does not provide for a cure for violations of these deadlines.

682.302(e): The regulation states that the 1/2 special allowance provision for loans funded
with tax-exempt debt applies to a loan unless the debt is retired or defeased.

**Issues:**

*ED basically
agrees this results* The regulation is in error. A loan funded with tax-exempt debt may be
*in huge windfalls* transferred and pledged to a taxable financing. Given, ED
*in low int. rate* interpretation on this issue, a loan is always at 1/2 SAP and
*periods.* therefore at the 9.5% floor regardless of the current financing used
to fund the loan.

**SECTION 682.304**

682.304: Two key changes have been made to this section which impact lender
billing for SAP including the removal of the 365.25 leap year option for
billing for SAP for the average daily method and to require rounding to the
nearest whole dollar. These changes are effective on 2/1/93.

**Issues:**

*DCL to
clarify if this* 1. The 365.25 will require major system changes and no delay has been
provided. The mechanism for billing for interest benefits is the 799
*is a system change* report. This report is going through a major revision due to HEA
*at ED payment* 1992. ED has yet to issue a revised report for lenders to begin
*change.* programming the changes in reporting requirements. We strongly
encourage all issues regarding the 799 be deferred until a revised
report has been developed by ED.

2. The effective date needs clarification. Does this apply to government
Billing submitted on/after 2/1/93 or reports due on/after 2/1/93.

**SECTION 682.305**

682.305(a)(4): The regulations change the liability structure for the payment
of origination fees.

*NCHELP
Comments
provided to
ED in 2/93*

*In response to
Riley letter
requesting list
of issues.*

*The handwritten
notes are
my notes from reading*

Page 27

Prepared by NCHELP

deadline specified in (v) of this section."

DCL 3.  The interim guidance provided on the '92 Amendments in GEN-92-21 will be used in conjunction with the final regulations.  The DCL will provide additional guidance on the use of this section in light of the statutory changes.  The '92 Amendment changes will be regulated as part of negotiated rulemaking NPRM.

682.302(e)(2)

1.  That is correct and it remains the Department's position on this issue.

*↳ ED passed out comments at March 1993 on NCHELP's*

SECTION 682.304 *position - unofficial comments -- no date.*

PDI 1. Form 799 has been completed and is being mailed.  The Department understands that systems must be revised to comply with the provision.

DCL 2. The DCL will clarify that this will apply to bills submitted to the Department on/after 2/1/93 unless a further delay in implementation is decided upon.

Section 682.305

1.  Unclear what the commenter is referring to.  The comment and discussion do not appear to add anything not included in the regulations except to discuss some of the operational implications.

DCL 2.  The Department would consider this to be effective for loans transferred on/after 2/19/93.

682.305(c)

PDI 1.& 2.The Department considers the statutory audit requirement to be self-implementing and plans to implement the audit requirement when the audit guide under development is available.  The regulatory requirement, which was subjected to public comment and revised as a result, was also revised to remove any conflicts between the regulatory and statutory requirement.

3.  The provisions of the statutory requirement will be addressed in developing the negotiated rulemaking NPRM.  The Department does not interpret "an audit for other purposes" to mean an alternative to the audit.

4.  Lender reviews are different than audits in the same way that school reviews are different than independent audits for schools.  We believe that .305(c) acknowledges the ability of nonprofits to do a single audit and the applicability of 31 U.S.C. 7502 and OMB Circular A-133.  See the last comment and discussion under .305(c).

16

*Assumed Date 3/93*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000207

Attachment 8



**N E L L I E**
**M A E**

**MEMORANDUM**

TO:     Jean Frohlicher
        Mark Cannon
        Roxy LeFever
        Jane Stewart
        John Morris
        John Wild

FROM:   Sheila Ryan

DATE:   February 16, 1993

RE:     Tax-exempt Issues

As part of the Negotiated Rulemaking process and the development of regulations to implement the 1992 amendments, we identified several issues which are unique to tax-exempt entities. Attached is a copy of my initial letter to Bob Evans regarding these issues. Given the uniqueness and complexity of these issues, I elected not to include these issues as part of the negotiations but rather met with Brian Seigal at OGC to discuss the issues outside of the formal negotiations. The following is a summary of ED's response to each of the issues outlined in my letter to Bob.

I welcome comments regarding our strategy for follow-up of these items.

**Issue #1 - Applicability of PLUS/SLS and the 9.5% floor.** OGC indicated it appears that PLUS/SLS loans would be covered by the floor of 9.5% and would make the necessary changes to the draft regulations to address this issue. I will contact Brian to secure a final confirmation of this ruling.

**Issue #2 - The colloquy and the floor.** OGC reported that the colloquy is not legally binding and therefore will not adopt our proposal. This means that loans subject to the rebate do not have the benefit of the floor. While it should be clear, I will confirm with Brian that variable rate loans do have the benefit of the floor.

*A national leader in student loan financing and services*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000208

Page two

**Issue #3** - Once 1/2 SAP/floor always 1/2/ SAP floor.   This issue has been around since the 12/90 NPRM. ED suggested in the NPRM that the 1/2 SAP applies if the authority retains legal interest in a loan which was/is pledged to a tax-exempt debt unless the financing is paid in full. ED has taken this position because they do not want non-profit entities to move loans to various debts to maximize yield. Brian finally agreed, however, that ED's position would not benefit the Department as this would imply that once we pledged a loan to a tax-exempt debt, we would have the benefit of the 9.5% floor regardless of the current financing source. Brian indicated that ED would consider changing this section to read "if a loan is pledged to a tax-exempt financing...", thus if we reassign a loan to a taxable financing the 1/2 SAP and 9.5% floor provisions would be eliminated.

**Issue #4** - Effective Date Issues. ED indicated that they would not "interpret" the effective dates as we had suggested. We should pursue a technical on this provision.

**Issue #5** - Issues regarding transfers. The draft regulation (round #2) for Negotiated Rulemaking has been amended to address this issue.

**Issue #6** - Nondiscrimination provision. This provision was not changed during Reauthorization thus Brian indicated it is not subject to Negotiated Rulemaking.  Brian stated that this provision was intended to address situations such as ... a guaranty agency does not want to make loans to a certain sector and thus enters into an agreement with a secondary market for these loans to be ineligible for purchase. Whether or not we executed the agreement, per OGC we would be in violation of the regulation. Brian indicated that this provision was to address actions "we knowingly participated in" not blind transactions. He indicated that, while they would not change the regulation, they would respond to letter of inquiry to clarify the scope of this provision.

**Issue #7** - A-133 audit and agency reviews. Again, it was stated that this is not subject to negotiated rulemaking. Brian indicated that OMB Circular A-133 specifically excludes reviews from the single audit provisions. We should pull A-133 to validate his response.

cc:  Larry O'Toole
     Jack Remondi
     Paul Marble
     Marylou Hannon

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000209

Attachment 9



**N E L L I E**
**M A E**

April 16, 1993

Mr. Robert Evans
Director
Policy and Program Development
U.S. Dept. of Education
400 Maryland Ave, SW RM 4310
ROB-3
Washington, DC 20202-5449

Dear Bob:

I am writing as a follow-up to our meeting last week regarding the December 18, 1992 final regulations. As ED prepares the DCL to address the concerns raised at the meeting, there are two sections that are of particular interest to Nellie Mae and ask that the DCL address these issues:

o   Section 682.302 (e)(2) states that once a loan is pledged to a tax-exempt debt, an authority would receive 1/2 SAP and the 9.5% floor as long the authority continues to hold interest in the loan (unless the tax-exempt debt obligation is retired or defeased).

To be certain tax-exempt entities properly bill for SAP pursuant to this section, we suggest the DCL clarify any changes in the 799 instructions which may be necessary to implement this section.

Secondly, we suggest that ED clarify the effective date -- 799's filed on/after February 1, 1993.

o   Section 682.840 (b) pertains to loans held by an authority that are guaranteed by an agency that discriminates. We have in the past expressed our concerns regarding the broad and potentially bankrupting application of this section. During conversations with OGC, I was advised that this section only applies if the agency and the authority enter into a 'special' relationship which would conspire to discriminate against certain borrowers. For example, if an authority agreed not to buy loans made to a certain sector of the population, thereby, causing lenders participating in the agency's program to decline to originate these loans.

*A national leader in student loan financing and services*

50 Braintree Hill Park, Suite 300, Braintree, Massachusetts 02184
617-849-1325   800-EDU-LOAN   Fax 617-849-0086

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          ELI-HC00000210

Mr. Robert Evans                                                    April 16, 1993
Page two

We believe it is necessary for the DCL to clarify the scope of this
section and to limit the authority's liability to only those cases
in which the authority actually was aware of and conspired with the
agency's discriminating practices. As we have stated in the past, the
broad application of the words of the regulation could enforce
devastating penalties against an innocent authority while no penalties
were applied against the offending guaranty agency.

Please call me if I can answer any questions on these issues.

                                        Sincerely,

                                        Sheila

                                        Sheila Ryan
                                        Director
                                        Strategic Planning
                                        and Development

SMR:ss

cc: Jean Frohlicher

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000211



Attachment 10

**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF POSTSECONDARY EDUCATION

MAY - 7 1993

Ms. Shelia Ryan
Director
Strategic Planning and Development
Nellie Mae
Braintree Hill Park, Suite 300
Braintree, Massachusetts  02186

Dear Ms. Ryan:

Thank you for your April 16 letter in which you have requested that the Department address sections 682.302(e) and 682.840(h) of the December 18, 1992 Federal Family Education Loan Program regulations in the forthcoming Dear Colleague Letter.

We appreciate your sharing your concerns with us and will provide clarification of the Department's position on these issues in the Dear Colleague Letter.

Sincerely,

for
Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

400 MARYLAND AVE., S.W.   WASHINGTON, D.C. 20202

Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000212

*Sent follow up 7/22*

# MEMORANDUM

**TO:**      Robert Evans
            U.S. Department of Education

**FROM:**    Sheila Ryan
            Nellie Mae

**RE:**      Tax-exempt issues

**DATE:**    May 27, 1993

As we discussed, the following is a list of issues pertaining to eligibility for interest benefits for loans funded with tax-exempt obligations. The issues include HEA 1992 provisions as well as new provisions included in the December 18, 1992 final regulations. I bring these to your attention because I believe that there is great confusion among participants and to protect against penalties for noncompliance, it is essential that these provisions be clarified.

## HEA 1992 Provisions

- HEA 1992 changed the floor provisions for loans funded with tax-exempt sources of financing. Loans made on or after 10/1/92 are eligible for the floor of 9.5%. The HEA 1992 provision applies to Stafford, Consolidation, PLUS, and SLS loans.

*Issues:*

ED has incorporated this change in the draft regulation developed through the negotiated rulemaking sessions, however, to clarify the PLUS/SLS eligibility it was suggested that 682.302(b)(2) be amended to read "Except as provided in (c)(3) of this section ...". The suggested language was intended to clarify that except for loans covered by the 1992 floor provisions, special allowance would not be paid unless the annual borrower rate on a variable rate PLUS/SLS loan equaled or exceeded the interest rate cap. This change was not incorporated into the draft regulation. In addition, it is my understanding that ED has not paid the appropriate special allowance on PLUS/SLS loans made on/after 10/1/92. [Statutory source: 438(b)(2)(B)(ii) and 438(b)(2)(C)(ii).]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page two
Mr. Robert Evans

- ED rejected the proposal that the applicable interest rate for purposes of the 9.5% is the net interest rate after the rebate of any excess interest was paid. The implications of this decision is that loans funded with tax-exempt debt which are subject to rebate, do not have the benefit of the floor. It appears that there may be conflicting statutory provisions regarding this matter which I hope ED will clarify. We believe ED should be guided by resolving this conflict by the floor colloquey in the House of Representatives between Chairman William Ford and Congressman Tom Coleman on this point. The colloquey confirmed that the applicable rate for purposes of calculating rebates on tax-exempt debt was the net interest rate after the rebate had been applied.

    Section 427A(f) describes the 1986 and 1992 rebate requirements all within the context of borrower interest rates. Paragraph (f)(3)(B) states that "during periods in which the borrower is eligible to have _interest payments_ paid on his or her behalf by the Government pursuant to 428(a), by credit the excess interest to the government." During periods in which the borrower is paying the interest, the rebate is applied to the borrower's account.

    Section 438 addresses eligibility for special allowance. In section 438(b)(2)(A), the HEA requires rebates if the calculation for SAP results in a number less than zero. Section 438(b)(2)(B), which describes SAP calculation for loans funded with tax-exempt debt, does not, however, require rebates.

    Put together, it seems reasonable to conclude and the colloquey clearly demonstrates the intent that loans funded with tax-exempt debt are eligible for the 9.5% minimum rate for purposes of SAP payments whether or not an account is eligible to receive a rebate. The fact that the Congress did not include the SAP rebate requirement in 438(b)(2)(B) supports the language of the colloquy between Congressman Coleman and Chairman Ford. The only possible other interpretation would be that rebates are not required for loans funded with tax-exempt debt during periods in which the government is paying the interest on loan.

## December 1992 Regulations

- Section 682.302(e) states that once a loan is pledged to a tax-exempt debt, an authority would receive 1/2 special allowance and the 9.5% floor as long as the authority continues to hold an interest in the loan (unless the tax-exempt debt obligation is retired or defeased).

    As stated in my letter of April 16, 1993, to be certain that authorities properly bill for SAP pursuant to this section, we suggest the DCL clarify any changes in the 799 instructions which may be necessary to implement this section. Secondly, we suggest that ED clarify the effective date -- 799's filed on/after February 1, 1993.

While I recognize that you and your staff have a number of projects underway, I ask for your immediate attention on these issues so that we can notify the other nonprofit organizations of the correct billing procedures.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000214



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF POSTSECONDARY EDUCATION

JUL 29 1993

Ms. Sheila M. Ryan
Director, Planing and Development
New England Education Loan
   Marketing Corporation
50 Braintree Hill Park
Suite 300
Braintree, Massachusetts  02184-1763

Dear Ms. Ryan:

Thank you for your May 27 memorandum regarding several "tax-exempt issues."  I will address those issues in the order in which they were presented in your memorandum.

o  <u>Tax-exempt "floor" for SLS and PLUS loans</u>.

   Your statement that "...*except for loans covered by the 1992 floor provisions*, special allowance would not be paid unless the annual borrower rate on a variable rate PLUS/SLS loan *equaled* or exceeded the interest rate cap..." (emphasis added) is not correct.

   Section 438(b)(2)(B) of the Higher Education Act of 1965 (the Act), as amended, establishes the special allowance formula for tax-exempt loans, including the tax-exempt floor.  However, §438(b)(2)(C) further specifies that SLS and PLUS loans are not subject to special allowance payments unless the variable rate *exceeds* the appropriate caps of 12%, 11%, or 10%.

   Thus, the provisions of §438(b)(2)(C) "override" the provisions of §§438(b)(2)(A) and (B) with respect to special allowance payments on variable rate PLUS and SLS loans (regardless of the source of financing).  We have not paid special allowance on variable rate PLUS and SLS loans made during the July 1, 1992 - June 30, 1993 period because the variable rates - 7.51%, for loans made prior to 10/1/92, and 7.36%, for loans made on/after 10/1/92 - did not exceed 12% and 11%/10% respectively.  The variable rates for the current July 1, 1993 - June 30, 1994 period similarly do not exceed the applicable caps and *no* PLUS/SLS loans will be subject to special allowance payments during that period.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000215

Ms. Sheila M. Ryan Page - 2

o <u>Use of "net interest" rate for the tax-exempt "floor"</u>.

Section 438(b)(2)(B) of the Act does establish minimum
quarterly special allowance payments for loans that are made
or purchased with tax-exempt funds.  However, the "windfall
profits" provisions in §427A(f) of the Act make no reference
to the special allowance provisions (§438 of the Act) nor do
they contain exceptions for loans made with tax-exempt
funds.  Except when PLUS/SLS loans are not eligible for
special allowance payments (*see* discussion, first bullet
above), tax-exempt loans could very well receive a special
allowance payment pursuant to the "floor" and also be
subject to the "windfall profits" provisions.  In fact, the
lender's annual yield on a "tax-exempt" loan, even with a
rebate, could be higher than the annual yield on a "taxable"
loan.  For example, assume two 9% loans (one "taxable," one
"tax-exempt") are made in October 1992:

● The average of the 91-day T-bills auctioned for the
quarter ending December 31, 1992 was 3.17%  Since "3.17%"
plus "3.1%" (the applicable factor) equals 6.27%, no special
allowance is paid on the "taxable" loan but the "tax-exempt"
qualifies for a 0.5% payment [the tax-exempt "floor" = 9.5%
less 9% (the interest rate).

● The windfall formula would apply to each loan for the
quarter [3.17% + 3.1% is less than the interest rate (9%)]
and the lender rebates "9% less 6.27%," or 3.73% (the annual
figure prior to dividing by four to obtain a quarterly
factor).

● On an annual basis, the *taxable* loan carries a "9%
interest rate" plus "zero special allowance payment" less
"3.73% rebate," equalling a <u>6.27% annual yield</u>.

● On an annual basis, the *tax-exempt* loan carries a "9%
interest rate" plus "0.5% special allowance payment" less
"3.73% rebate," equalling a <u>6.77% annual yield</u>.

● If both loans were 8%/10% loans and only subject to a
rebate formula when the interest rate is 10%, the annual
yield would be identical, since no "tax-exempt" floor would
apply to a 10% rate and the annual yield for both would be
10% less the rebate percentage for both loans.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000216

Ms. Sheila M. Ryan Page - 3

We "rejected" the use of a net interest rate for the "windfall profits" calculations because it is clearly not supported by precise statutory language.  Both the new "windfall profits" provisions enacted by Pub. L. 102-325 and the prior "windfall profits" provisions reference the "applicable interest rate."  *See* §§427A(f)(3) and 427A(f)(1) of the Act, respectively.  Similarly, the formulas for determining the amount of the "windfall profits" adjustment specify "10 percent" and the "applicable interest rate." *See* sections 427A(f)(2)(A) and 427A(f)(4)(A) of the Act. Thus, the "windfall profits" calculations must incorporate both the applicable interest rate, the 91-day Treasury bill average for the quarter, and the "applicable margin" (3.25% or 3.1%).  The precise statutory wording leaves no room for the substitution of any other figures and §438 does not authorize special allowance payments greater than the formulas in that section (which would be the case if any figure other than the applicable interest rate were used).

o  34 CFR 682.302(e), FFEL Program regulations.

The issues you raised will be addressed in a future Dear Colleague Letter.

Please contact me if I can be of further assistance.

Sincerely,

Robert W. Evans
Director
Division of Policy Development
Policy, Training, and Analysis Service

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Attachment 11

**N E L L I E
M A E**

January 19, 1994

Ms. Pamela Moran
Acting Loan Branch Chief
U.S. Department of Education
7th and D Streets, SW
Washington, DC 20202

RE:  Tax-exempt Issues

Dear Pam:

Thanks  for taking the time last  week to walk through the  799 reporting
issues  for loans funded with  tax-exempt financings. As we  discussed, I have
outlined our concerns below.

o    Interpretation of Budget Bill Changes

As  noted in our  letters to Bob  Evans dated December  17, 1993 (RE:  799
Codes) and December 20, 1993 (RE: Budget Bill Dear Colleague),  Nellie Mae
believes  the changes made under the Student Loan Reform Act eliminate the
"floor" and authorize payment of full special allowance. The SAP rate paid
on  loans funded with the proceeds of tax-exempt debt originally issued on
or  after October 1, 1993 is based on  the applicable formula in effect at
at  the time the  loan was originated.  We disagree with  your preliminary
interpretation  that all loans are paid SAP based  on T-Bill plus a factor
of  3.10 percent.  The date  of origination and the  applicable formula of
T-Bill + 3.50 or 3.25 continue to apply.

o    799 Reporting Codes

Based  on our interpretation of the above  changes, several 799 codes need
to  be provided to track such loans. We  have suggested that such loans be
reported using the same codes used for loans funded with taxable debt.  As
you know, the DCL recently published by ED only provides for a single code
of  XF for loans funded with tax-exempt debt originally issued on or after
October 1, 1993.

*A national leader in student loan financing and services*

50 Braintree Hill Park, Suite 300, Braintree, Massachusetts 02184
617-849-1325  800-EDU-LOAN  Fax 617-849-6006

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000218

Ms. Pamela Moran                                    January 19, 1994
Page two

When I suggested the use of the taxable codes, as the special allowance
methodology is the same for these loans, I was advised that ED wanted to
track loans financed with the proceeds of tax-exempt debt for other
purposes. Given the changes made in the December 1992 final regulations in
section 682.302(e) which provide for 1/2 SAP and the floor on loans <u>ever</u>
pledged to a tax-exempt debt which remains outstanding (regardless of the
current funding source), ED cannot then rely on the 799 to track loans
funded with tax-exempt debt.  The changes made to section 682.302(e) will
require Nellie Mae to report loans previously pledged to a tax-exempt
financing, but currently pledged to a taxable financing, using the
tax-exempt reporting codes distorting the accuracy of this report for any
data collection purpose other than SAP payment.

The change made in the regulations eliminate the possibility for ED to use
the 799 to track and report loans funded with the proceeds of tax-exempt
financings.  As an alternative, we suggest ED use the data provided by
authorities in the annual audit required pursuant to section 682.830.  We
further suggest the 799 instructions included in the recent DCL be amended
and that loans funded with tax-exempt debt originally issued on or after
October 1, 1993 be reported using the same codes as provided for loans
funded with taxable financings.  This reporting methodology will reduce
unnecessary complexity for ED and for the nonprofit participants.

    This is a complex issue and I hope I have clearly conveyed the problems
arising from the recently published ED 799 Dear Colleague.  If you think it
would be helpful, I am available to discuss these issues with you, Charlotte
Turner, and Ralph Madden via conference call. Please call me on (617) 849-1325
with any questions or comments.

                                    Sincerely,

                                    *Sheila Ryan*

                                    Sheila M. Ryan
                                    Director, Planning and Development

SMR/dms

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                          ELI-HC00000219



**UNITED STATES DEPARTMENT OF EDUCATION**

OFFICE OF POSTSECONDARY EDUCATION

Attachment 12

March 1996

96-L-186
96-G-287

**SUBJECT:** Clarification and interpretative guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992.

**REFERENCE:** December 18, 1992 Federal Family Education Loan Program regulations and May 17, 1994 technical corrections to those regulations.

Dear Colleague:

On July 23, 1992, the Higher Education Amendments of 1992 (Amendments) to the Higher Education Act were enacted. Later that year, on December 18, 1992, the U.S. Department of Education (ED) published final regulations for the Federal Family Education Loan (FFEL) Program that incorporated changes made by the following statutes:

- The Consolidated Omnibus Budget Reconciliation Act of 1985
- The Higher Education Amendments of 1986
- The Higher Education Technical Amendments Act of 1987
- Public Law 100-297
- Public Law 100-369
- The Omnibus Budget Reconciliation Act of 1989
- The Omnibus Budget Reconciliation Act of 1990
- The National and Community Service Act of 1990
- The Higher Education Technical Amendments of 1991
- The Emergency Unemployment Compensation Act of 1991
- Selected self-implementing provisions of the Higher Education Amendments of 1992

Because of the statutory requirement that the majority of the FFEL provisions of the 1992 Amendments be regulated under negotiated rulemaking and the timing involved in publishing the December 18, 1992 regulations, not all the provisions of the 1992 Amendments could be incorporated into the regulatory package. In cases where provisions of the Amendments conflicted with the December 18, 1992 regulations, the Amendments superseded the regulations.

The regulations published on December 18, 1992 generally were to take effect on February 1, 1993. However, in response to inquires from the student aid community, on January 29,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000220

*Page 2 - Outstanding FFEL Program regulations issues*

1993, Secretary Richard W. Riley issued a letter advising FFEL Program participants that he had decided to delay full enforcement of certain provisions of the December 18, 1992 regulations. Doing so, the Secretary explained, would allow ED to issue guidance identifying sections of the December 18, 1992 regulations that had been superseded by the Amendments and clarifying provisions of the regulations that reflected policy changes. Secretary Riley also stated that FFEL Program participants were expected to make a good-faith effort to begin implementing the December 18, 1992 regulations when they went into effect on February 1, 1993, including implementing the provisions on which he was delaying enforcement. The Secretary's enforcement delay did not apply to the self-implementing statutory requirements contained in the regulations or to regulatory provisions that were unchanged from earlier FFEL regulations.

Since Secretary Riley's letter in January 1993, ED has undertaken a number of initiatives to address issues FFEL Program participants raised about the regulations. In March and April 1993, ED met with community representatives to identify and discuss the outstanding issues that the representatives believed should be clarified.

Also since the January 1993 letter, the Secretary, following several negotiated rulemaking sessions, has published a series of regulatory amendments. These incorporate Amendments previously not reflected in the December 18, 1992 regulations, as well as changes enacted by later legislation. These FFEL Program amendatory regulations were published in the *Federal Register* on:

- April 29, 1994
- June 28, 1994
- June 29, 1994
- November 25, 1994
- November 29, 1994
- November 30, 1994
- December 1, 1995

The Secretary's delay of enforcement of certain parts of the December 18, 1992 regulations did not change the effective date of these regulations or other regulations that affect the FFEL program. On May 17, 1994, the Department also published technical corrections to the December 18, 1992 regulations.

The purpose of this" Dear Colleague" letter is to provide guidance only on those regulatory provisions of the December 18, 1992 final regulations that still require clarification and that have not been superseded by later statutory or regulatory changes currently in effect. It does not address issues pertaining to regulations published after the December 18, 1992 regulations. The letter is divided into two sections:

- Section I includes a series of questions and answers intended to clarify policy changes within the December 18, 1992 final regulations.

- Section II addresses the time frames for fully implementing and enforcing those provisions of the December 18, 1992 regulations that required guidance.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000221

## *Page 3 - Outstanding FFEL Program regulations issues*

ED would like to recognize the support and cooperation of the FFEL program participants who assisted in the development of this guidance.

If you have questions about this letter, please contact Ms. Pamela Moran (Loan Branch Chief), Ms. Patricia Newcombe (FFEL Program Loans Branch Section Chief), or Ms. Patsy Beavan (Senior Program Specialist) at (202) 708-8242 or by fax at (202) 708-7196.

Sincerely,

Elizabeth M. Hicks
Deputy Assistant Secretary
for Student Financial Assistance

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000222

<u>*Page 14 - Outstanding FFEL Program regulations issues*</u>

following its receipt of the returned claim, the lender must cease billing for special allowance on the 31st day. The lender may not resume billing for special allowance unless the default is averted or the claim is rejected and subsequently cured.

Yes. (a)-(c) above accurately summarize the interaction of the special allowance termination provisions of sections 682.302(d)(v) and (d)(vii).

29. **Sections 682.302(d)(1)(vii) and 682.406(a)(6) provide for the termination of special allowance and reinsurance interest in the case of a loan returned by the guarantor to the lender solely for inadequate documentation. Are claims returned for other reasons, such as mathematical errors on the claim request form, subject to this same special allowance and reinsured interest termination provision?**

No. Currently the regulations only address claims returned due to inadequate documentation. The Secretary adopted a policy, as reflected in the regulations, that would ensure that lenders file complete claim packages as early as possible, thus supporting a streamlined claim review and claim payment process. Therefore, this provision is only applicable in cases where the lender did not provide complete documentation; it does not apply for cases where erroneous information was provided.

30. **Section 682.302(e), which pertains to eligibility for special allowance for loans made or acquired with obligations on which the interest is exempt from taxation (tax-exempt obligations), has been revised in the 1992 regulations. What is the significance of the change and what is the effective date of the change?**

Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations. The regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions -- if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000223

*Page 15 - Outstanding FFEL Program regulations issues*

This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

Adjustments to ED 799 billings and current billings for any loans covered by this policy should be made using the applicable tax-exempt special allowance codes for the periods that the holder retains legal interest in the loan and the original tax-exempt obligation has not been retired or defeased.

## §682.401

31. Section 682.202(c)(5) provides for the refund of the origination fee whenever: i) the school returns the full amount of the disbursement; ii) the loan disbursement is repaid within 120 days of disbursement; or iii) the loan disbursement is not delivered within 120 days of disbursement.  Section 682.401(b)(10) provides for the refund of the insurance premium whenever: i) the loan disbursement is repaid within 120 days; or ii) the loan disbursement is not delivered within 120 days. Therefore, if a school returns the disbursement amount after the 120th day, the borrower receives a refund of the origination fee but not the insurance premium. May a guaranty agency refund the insurance premium when a school returns the loan proceeds after the 120th day of disbursement?

    Yes, the guaranty agency may, but is not required, to refund the insurance premium under these circumstances.  However, please note that section 682.401(b)(10)(vi) of the final regulations published on December 1, 1995, (effective July 1, 1996) will require the lender to refund the insurance premium, by credit to the borrower's account, whenever a school makes a refund to the lender regardless of whether the refund is the full amount of the loan or a portion of it.

32. Section 682.401(b)(17) states that a guaranty agency shall allow a loan to be assigned to an educational institution (whether or not it is an eligible lender) in connection with the institution's repayment on a loan that was ineligible.  Must the educational institution enforce the debt in accordance with all FFEL program rules (e.g., deferment, forbearance)?

    The institution may only collect on the loan based on the terms of its legal contract with the borrower--in other words, based on the terms of the promissory note.  Therefore, the institution must observe the terms and provide any benefits for which a borrower is eligible based on the terms of the promissory note (e.g., deferments, forbearance). However, since for FFEL program purposes, an ineligible loan has lost its federal reinsurance, the school may not bill the Secretary for any interest or special allowance on the loan nor submit the loan to a guarantor or the Secretary for claim payment. However, the loan remains a debt owed by the borrower and both parties can be required to comply with its terms.

## §682.402

33. **What is the lender's responsibility if a co-maker or an endorser files for bankruptcy?**

ELI-HC00000224

**2003 - 2004 Interest Rates**   Table A
(July 1, 2003 - June 30, 2004)
Stafford Loans
T-Bill Rate = 1.12%

| No. | Qualifying Conditions | T-Bill + | = | Cap | 2003-2004 Rate | 2002-2003 Rate |
|---|---|---|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 07/01/98. Borrower in status other than in-school, grace or deferment. | 2.30% | 3.42% | 8.25% | 3.42% | 4.06% |
| 2 | A variable rate loan first disbursed on/after 07/01/98. Borrower in an in-school, grace or deferment status. | 1.70% | 2.82% | 8.25% | 2.82% | 3.46% |
| 3 | A variable rate loan first disbursed on/after 07/01/95 but before 07/01/98. Borrower in status other than in-school, grace, or deferment. | 3.10% | 4.22% | 8.25% | 4.22% | 4.86% |
| 4 | A variable rate loan first disbursed on/after 07/01/95 but before 07/01/98. Borrower in an in-school, grace, or deferment status. | 2.50% | 3.62% | 8.25% | 3.62% | 4.26% |
| 5 | A variable rate loan first disbursed on/after 07/01/94 but before 07/01/95. Loan period includes 07/01/94 or begins after 07/01/94. | 3.10% | 4.22% | 8.25% | 4.22% | 4.86% |
| 6 | A variable rate loan first disbursed on/after 12/20/93 but before 07/01/94. Borrower had no outstanding balance on any Stafford loan when Promissory Note was signed, but had an outstanding balance on an SLS, PLUS or Consol. loan. | 3.10% | 4.22% | 9.00% | 4.22% | 4.86% |
| 7 | Originally an 8% fixed rate loan made before 12/20/93 now entitled to a variable interest rate. Borrower had no outstanding balance on any Stafford loan when Promissory Note was signed, but had an outstanding balance on an SLS, PLUS or Consolidation loan disbursed before 10/01/92. | 3.10% | 4.22% | 8.00% | 4.22% | 4.86% |
| 8 | A variable rate loan first disbursed on/after 10/01/92 but before 07/01/94. Borrower had no outstanding balance on any FFELP loan when Promissory Note was signed. | 3.10% | 4.22% | 9.00% | 4.22% | 4.86% |
| 9 | An 8-10% loan made on/after 07/23/92 to a borrower with an outstanding FFELP debt on the date the borrower signed the Promissory Note. Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.10% | 4.22% | 10.00% | 4.22% | 4.86% |
| 10 | An 8-10% loan made on/after 07/23/92 to a borrower with an outstanding FFELP debt on the date the borrower signed the Promissory Note. Not yet in the fifth year of repayment but eligible for a variable interest rate when the rate is at 8%. | 3.10% | 4.22% | 8.00% | 4.22% | 4.86% |
| 11 | An 8-10% loan made on/after 07/23/92 to a borrower with no outstanding FFELP debt on the date the borrower signed the Promissory Note. Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.25% | 4.37% | 10.00% | 4.37% | 5.01% |
| 12 | An 8-10% loan made on/after 07/23/92 to a borrower with no outstanding FFELP debt on the date the borrower signed the Promissory Note. Not yet in the fifth year of repayment so not yet eligible for a variable interest rate. | N/A | N/A | N/A | 8.00% | 8.00% |
| 13 | An 8-10% loan made before 07/23/92. Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.25% | 4.37% | 10.00% | 4.37% | 5.01% |
| 14 | An 8-10% loan made before 07/23/92. Not yet in the fifth year of repayment so not yet eligible for a variable rate. | N/A | N/A | N/A | 8.00% | 8.00% |
| 15 | Originally a 9% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 4.22% | 9.00% | 4.22% | 4.86% |
| 16 | Originally an 8% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 4.22% | 8.00% | 4.22% | 4.86% |
| 17 | Originally a 7% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 4.22% | 7.00% | 4.22% | 4.86% |
| 18 | A 9% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A | N/A | 9.00% | 9.00% |
| 19 | An 8% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A | N/A | 8.00% | 8.00% |
| 20 | A 7% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A | N/A | 7.00% | 7.00% |

06/03

LC\PERM\INTERESTRATES\1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000225

## 2003 - 2004 Interest Rates
### (July 1, 2003 - June 30, 2004)
### PLUS Loans

| No. | Qualifying Conditions | 91-day T-Bill (1.12%) + | = | Cap | 2003-2004 Rate | 2002-2003 Rate |
|---|---|---|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 07/01/98 | 3.10% | 4.22% | 9.00% | 4.22% | 4.86% |

| No. | Qualifying Conditions | One-Year Constant Maturity (0.95%) + | = | Cap | 2003-2004 Rate | 2002-2003 Rate |
|---|---|---|---|---|---|---|
| 2 | A variable rate loan first disbursed on/after 07/01/94. | 3.10% | 4.05% | 9.00% | 4.05% | 5.23% |
| 3 | A variable rate loan first disbursed on/after 10/01/92 but before 07/01/94. | 3.10% | 4.05% | 10.00% | 4.05% | 5.23% |
| 4 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate PLUS loan refinanced to a variable rate. | 3.25% | 4.20% | 12.00% | 4.20% | 5.38% |
| 5 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A | N/A | 12.00% | 12.00% |
| 6 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A | N/A | 14.00% | 14.00% |
| 7 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A | N/A | 9.00% | 9.00% |

## SLS Loans
### (SLS loans were known as ALAS loans before 10/17/86)
### One-Year Constant Maturity Rate = 0.95%

| No. | Qualifying Conditions | One-Year Constant Maturity + | = | Cap | 2003-2004 Rate | 2002-2003 Rate |
|---|---|---|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 10/01/92. | 3.10% | 4.05% | 11.00% | 4.05% | 5.23% |
| 2 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate SLS loan refinanced to a variable rate. | 3.25% | 4.20% | 12.00% | 4.20% | 5.38% |
| 3 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A | N/A | 12.00% | 12.00% |
| 4 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A | N/A | 14.00% | 14.00% |
| 5 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A | N/A | 9.00% | 9.00% |

## Consolidation Loans
### T-Bill Rate = 1.12%

| No. | Qualifying Conditions | T-Bill + | = | Cap | 2003-2004 Rate | 2002-2003 Rate |
|---|---|---|---|---|---|---|
| 1 | A weighted average rate loan rounded to the nearest 1/8th percent, based on applications received by the lender on or after 10/01/98. This calculation excludes the HEAL portion of the loan. See Number 3 below for the HEAL portion of the loan. | N/A | N/A | 8.25% | Weighted Average | Weighted Average |
| 2 | A variable rate loan based on application received on or after 11/13/97 but before 10/01/98. See Number 3 below for the HEAL portion of the loan. | 3.10% | 4.22% | 8.25% | 4.22% | 4.86% |
| 3 | For categories 1 and 2 above, for the portion of the loan represented by a HEAL Loan the interest rate is the sum of the average of the 91-day T-Bill rates auctioned for the quarter ending June 30, plus 3.0 percent with no cap. (April-June 2003 T-Bill Rate = 1.06%) | 3.00% | 4.06% | N/A | 4.06% | 4.75% |
| 4 | A weighted average rate loan rounded up to the nearest whole percent, for all Consolidation loans made on or after July 1, 1994, from applications received by the lender before November 13, 1997. | N/A | N/A | N/A | N/A | N/A |
| 5 | A weighted average rate loan with a 9% minimum rate, for all Consolidation loans made before July 1, 1994. | N/A | N/A | N/A | N/A | N/A |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                ELI-HC00000226

## Interest Rate Chart
### Stafford Loans

| No. | Qualifying Conditions | T-Bill + | Cap |
|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 07/01/98. Borrower in status other than in-school, grace or deferment. | 2.30% | 8.25% |
| 2 | A variable rate loan first disbursed on/after 07/01/98. Borrower in an in-school, grace or deferment status. | 1.70% | 8.25% |
| 3 | A variable rate loan first disbursed on/after 07/01/95 but before 07/01/98. Borrower in status other than in-school, grace, or deferment. | 3.10% | 8.25% |
| 4 | A variable rate loan first disbursed on/after 07/01/95 but before 07/01/98. Borrower in an in-school, grace, or deferment status. | 2.50% | 8.25% |
| 5 | A variable rate loan first disbursed on/after 07/01/94 but before 07/01/95. Loan period includes 07/01/94 or begins after 07/01/94. | 3.10% | 8.25% |
| 6 | A variable rate loan first disbursed on/after 12/20/93 but before 07/01/94. Borrower had no outstanding balance on any Stafford loan when Promissory Note was signed, but had an outstanding balance on an SLS, PLUS or Consol. loan. | 3.10% | 9.00% |
| 7 | Originally an 8% fixed rate loan made on/after 10/01/92 but before 12/20/93 now entitled to a variable interest rate.  Borrower had no outstanding balance on any Stafford loan when Promissory Note was signed, but had an outstanding balance on an SLS, PLUS or Consolidation loan disbursed before 10/01/92. | 3.10% | 8.00% |
| 8 | A variable rate loan first disbursed on/after 10/01/92 but before 07/01/94.  Borrower had no outstanding balance on any FFELP loan when Promissory Note was signed. | 3.10% | 9.00% |
| 9 | An 8-10% loan made on/after 07/23/92 to a borrower with an outstanding FFELP debt on the date the borrower signed the Promissory Note.  Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.10% | 10.00% |
| 10 | An 8-10% loan made on/after 07/23/92 to a borrower with an outstanding FFELP debt on the date the borrower signed the Promissory Note.  Not yet in the fifth year of repayment but eligible for a variable interest rate when the rate is at 8%. | 3.10% | 8.00% |
| 11 | An 8-10% loan made on/after 07/23/92 to a borrower with no outstanding FFELP debt on the date the borrower signed the Promissory Note.  Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.25% | 10.00% |
| 12 | An 8-10% loan made on/after 07/23/92 to a borrower with no outstanding FFELP debt on the date the borrower signed the Promissory Note.  Not yet in the fifth year of repayment so not yet eligible for a variable interest rate. | Not Yet Appl. | Not Yet Appl. |
| 13 | An 8-10% loan made before 07/23/92.  Now in or past the fifth year of repayment and entitled to a variable interest rate. | 3.25% | 10.00% |
| 14 | An 8-10% loan made before 07/23/92.  Not yet in the fifth year of repayment so not yet eligible for a variable rate. | Not Yet Appl. | Not Yet Appl. |
| 15 | Originally a 9% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 9.00% |
| 16 | Originally an 8% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 8.00% |
| 17 | Originally a 7% fixed rate loan made on/after 07/23/92; now entitled to a variable interest rate. | 3.10% | 7.00% |
| 18 | A 9% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A |
| 19 | An 8% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A |
| 20 | A 7% fixed rate loan made before 07/23/92; not qualified for a variable interest rate. | N/A | N/A |

LC\PERM\INTERESTRATES\U

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000227

## Interest Rate Charts
### PLUS Loans

| No. | Qualifying Conditions | 91-day T-Bill + | Cap |
|-----|----------------------|-----------------|-----|
| 1 | A variable rate loan first disbursed on/after 07/01/98. | 3.10% | 9.00% |

| No. | Qualifying Conditions | One-Year Constant Maturity + | Cap |
|-----|----------------------|------------------------------|-----|
| 2 | A variable rate loan first disbursed on/after 07/01/94. | 3.10% | 9.00% |
| 3 | A variable rate loan first disbursed on/after 10/01/92 but before 07/01/94. | 3.10% | 10.00% |
| 4 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate PLUS loan refinanced to a variable rate. | 3.25% | 12.00% |
| 5 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A |
| 6 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A |
| 7 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A |

## SLS Loans
### (SLS loans were known as ALAS loans before 10/17/86)

| No. | Qualifying Conditions | One-Year Constant Maturity + | Cap |
|-----|----------------------|------------------------------|-----|
| 1 | A variable rate loan first disbursed on/after 10/01/92. | 3.10% | 11.00% |
| 2 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate SLS loan refinanced to a variable rate. | 3.25% | 12.00% |
| 3 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A |
| 4 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A |
| 5 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A |

## Consolidation Loans

| No. | Qualifying Conditions | 91-Day T-Bill + | Cap |
|-----|----------------------|-----------------|-----|
| 1 | A weighted average rate loan rounded to the nearest 1/8th percent, based on applications received by the lender on or after 10/01/98. This calculation excludes the HEAL portion of the loan. See Number 3 below for the HEAL portion of the loan. | N/A | 8.25% |
| 2 | A variable rate loan based on application received on or after 11/13/97 but before 10/01/98. See Number 3 below for the HEAL portion of the loan. | 3.10% | 8.25% |
| 3 | For categories 1 and 2 above, for the portion of the loan represented by a HEAL Loan the interest rate is the sum of the average of the 91-day T-Bill rates auctioned for the quarter ending June 30, plus 3.0 percent with no cap. | 3.00% | N/A |
| 4 | A weighted average rate loan rounded up to the nearest whole percent, for all Consolidation loans made on or after July 1, 1994, from applications received by the lender before November 13, 1997. | N/A | N/A |
| 5 | A weighted average rate loan with a 9% minimum rate, for all Consolidation loans made before July 1, 1994. | N/A | N/A |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000228

## Interest Rate Charts
### PLUS Loans

| No. | Qualifying Conditions | 91-day T-Bill + | Cap |
|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 07/01/98. | 3.10% | 9.00% |

| No. | Qualifying Conditions | One-Year Constant Maturity + | Cap |
|---|---|---|---|
| 2 | A variable rate loan first disbursed on/after 07/01/94. | 3.10% | 9.00% |
| 3 | A variable rate loan first disbursed on/after 10/01/92 but before 07/01/94. | 3.10% | 10.00% |
| 4 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate PLUS loan refinanced to a variable rate. | 3.25% | 12.00% |
| 5 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A |
| 6 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A |
| 7 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A |

### SLS Loans
#### (SLS loans were known as ALAS loans before 10/17/86)

| No. | Qualifying Conditions | One-Year Constant Maturity + | Cap |
|---|---|---|---|
| 1 | A variable rate loan first disbursed on/after 10/01/92. | 3.10% | 11.00% |
| 2 | A variable rate loan first disbursed on/after 07/01/87 but before 10/01/92 as well as a fixed rate SLS loan refinanced to a variable rate. | 3.25% | 12.00% |
| 3 | A fixed rate loan first disbursed on/after 11/01/82 but before 07/01/87. | N/A | N/A |
| 4 | A fixed rate loan first disbursed on/after 10/01/81 but before 11/01/82. | N/A | N/A |
| 5 | A fixed rate loan first disbursed on/after 01/01/81 but before 10/01/81. | N/A | N/A |

### Consolidation Loans

| No. | Qualifying Conditions | 91-Day T-Bill + | Cap |
|---|---|---|---|
| 1 | A weighted average rate loan rounded to the nearest 1/8th percent, based on applications received by the lender on or after 10/01/98. This calculation excludes the HEAL portion of the loan. See Number 3 below for the HEAL portion of the loan. | N/A | 8.25% |
| 2 | A variable rate loan based on application received on or after 11/13/97 but before 10/01/98. See Number 3 below for the HEAL portion of the loan. | 3.10% | 8.25% |
| 3 | For categories 1 and 2 above, for the portion of the loan represented by a HEAL Loan the interest rate is the sum of the average of the 91-day T-Bill rates auctioned for the quarter ending June 30, plus 3.0 percent with no cap. | 3.00% | N/A |
| 4 | A weighted average rate loan rounded up to the nearest whole percent, for all Consolidation loans made on or after July 1, 1994, from applications received by the lender before November 13, 1997. | N/A | N/A |
| 5 | A weighted average rate loan with a 9% minimum rate, for all Consolidation loans made before July 1, 1994. | N/A | N/A |

06/03    Published by the NCHELP Regulations Committee.                                    LOVPERMINTERESTRATESM

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                    ELI-HC00000229

**91 Day Bond**
**Equivalent Quarterly**
**Average T-Bill Rates \***

Table B

| Quarter Ending | Rate | Yield on 3.25% SAP loan** |
|---|---|---|
| 30-Jun-03 | 1.06 | 4.31 |
| 31-Mar-03 | 1.17 | 4.42 |
| 31-Dec-02 | 1.36 | 4.61 |
| 30-Sep-02 | 1.67 | 4.92 |
| 30-Jun-02 | 1.75 | 5.00 |
| 31-Mar-02 | 1.76 | 5.01 |
| 30-Dec-01 | 1.97 | 5.22 |
| 30-Sep-01 | 3.35 | 6.60 |
| 30-Jun-01 | 3.77 | 7.02 |
| 31-Mar-01 | 5.32 | 8.57 |
| 31-Dec-00 | 6.23 | 9.48 |
| 30-Sep-00 | 6.19 | 9.44 |
| 30-Jun-00 | 5.94 | 9.19 |
| 31-Mar-00 | 5.72 | 8.97 |
| 31-Dec-99 | 5.22 | 8.47 |
| 30-Sep-99 | 4.82 | 8.07 |
| 30-Jun-99 | 4.60 | 7.85 |
| 31-Mar-99 | 4.54 | 7.79 |
| 31-Dec-98 | 4.40 | 7.65 |
| 30-Sep-98 | 4.97 | 8.22 |
| 30-Jun-98 | 5.13 | 8.38 |
| 31-Mar-98 | 5.19 | 8.44 |
| 31-Dec-97 | 5.24 | 8.49 |
| 30-Sep-97 | 5.18 | 8.43 |
| 30-Jun-97 | 5.21 | 8.46 |
| 31-Mar-97 | 5.21 | 8.46 |
| 31-Dec-96 | 5.11 | 8.36 |
| 30-Sep-96 | 5.26 | 8.51 |
| 30-Jun-96 | 5.17 | 8.42 |
| 31-Mar-96 | 5.08 | 8.33 |
| 31-Dec-95 | 5.43 | 8.68 |
| 30-Sep-95 | 5.54 | 8.79 |
| 30-Jun-95 | 5.79 | 9.04 |
| 31-Mar-95 | 5.95 | 9.20 |
| 31-Dec-94 | 5.46 | 8.71 |
| 30-Sep-94 | 4.63 | 7.88 |
| 30-Jun-94 | 4.15 | 7.40 |
| 31-Mar-94 | 3.34 | 6.59 |
| 31-Dec-93 | 3.14 | 6.39 |
| 30-Sep-93 | 3.08 | 6.33 |
| 30-Jun-93 | 3.05 | 6.30 |
| 31-Mar-93 | 3.05 | 6.30 |
| 31-Dec-92 | 3.17 | 6.42 |
| 30-Sep-92 | 3.14 | 6.39 |
| 30-Jun-92 | 3.78 | 7.03 |
| Average | 4.23 | 7.48 |

\* Source OGSLP.org
\*\* Based on T Bill plus SAP spread only

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ELI-HC00000230