# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* JON H. OBERG, | ) ) ) **PUBLIC VERSION** |
| Plaintiff, | ) ) ) |
| v. | ) Civil No.  1:07-CV-960-CMH-JFA ) |
| NELNET, INC., *et. al.,* | ) ) |
| Defendants. | ) ) |

## RELATOR'S RESPONSE TO DEFENDANTS'
## JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Phone : 202.261.2806
Fax : 202.261.2835
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

Bert W. Rein (admitted *pro hac vice*)
Thomas W. Queen (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
tqueen@wileyrein.com
msturm@wileyrein.com

Christopher M. Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102
Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

July 12, 2010

*Attorneys for Qui Tam Relator Jon H. Oberg*

## INTRODUCTION

Following are Relator's responses to Defendants' Statement of Undisputed Materials Facts (Doc. 327).  Relator presents certain additional facts and supporting evidence applicable to some or all Defendants, identified by Relator's Undisputed Facts "RF."  Following that, Relator has responded to each of Defendants' proposed undisputed material facts.

To avoid the filing of duplicate exhibits, Relator cites, in certain circumstances, to the Declaration of Susan McMahon, and the exhibits thereto, as filed by Defendants on June 18, 2010 in support of their Motion for Summary Judgment ("McMahon Dec.") (Doc. 330) and the Mills Declaration, and the exhibits thereto, filed by Relator on June 18, 2010 in support of Relator's Motion for Partial Summary Judgment ("Mills Dec.") (Doc. 334-1).  New exhibits cited herein and in Relator's Opposition to Defendants' Motion for Summary Judgment are included as exhibits to the Declaration of Lina Soni ("Soni Dec.") filed concurrently herewith.

In instances in which Defendants have merely cited certain language from a document or deposition, Relator may not have disputed that the proposed fact accurately quotes the language, but reserves the right to dispute the underlying truth, accuracy or completeness of any statement made in any document or any statement made in a deposition.  Further, to the extent statements not made under oath are presented by the Defendants that are relied upon for the truth of the matter asserted, they are hearsay.  Relator preserves all objections regarding authenticity and admissibility for any of the cited documents.

References to deposition transcripts are made per the following key:

| Soni Declaration Ex. No. | Deponent |
|---|---|
| 1 | Deposition Transcript of Larry Buckmeier – "Buckmeier Tr." |
| 2 | Deposition Transcript of A. Norgrin Sanderson – "Sanderson Tr." |
| 3 | Deposition Transcript of Steve J. Kohles – "Kohles Tr." |
| 4 | Deposition Transcript of Terry Joe Heimes – "Heimes Tr." |
| 5 | Deposition Transcript of Michael S. Dunlap – "Dunlap Tr." |
| 6 | Deposition Transcript of Daniel F. Kaplan – "Kaplan Tr." |
| 7 | Deposition Transcript of James Parker, Vol. I  – "J. Parker I Tr." |
| 8 | Deposition Transcript of John Amos Wright, II – "Wright Tr." |
| 9 | Deposition Transcript of Ricky L. Turman – "Turman Tr." |
| 10 | Deposition Transcript of Murray Watson, Jr. – "Watson Tr." |
| 11 | Deposition Transcript of Michael S. Chesin – "Chesin Tr." |
| 12 | Deposition Transcript of Vincent Roig – "V. Roig Tr." |
| 13 | Deposition Transcript of Lisa Renee Jacobson– "Jacobson Tr." |
| 14 | Deposition Transcript of Richard J. Chapin – "Chapin Tr." |
| 15 | Deposition Transcript of Carol Rakatansky – "Rakatansky Tr." |
| 16 | Deposition Transcript of Jason Wheeler – "Wheeler Tr." |
| 17 | Deposition Transcript of Richard Nickel – "Nickel Tr." |
| 18 | Deposition Transcript of Saul L. Moskowitz – "Moskowitz Tr." |
| 19 | Deposition Transcript of John Dean – "Dean Tr." |
| 20 | Deposition Transcript of Terri Shaw – "Shaw Tr." |
| 21 | Deposition Transcript of Sally Stroup – "Stroup Tr." |
| 22 | Deposition Transcript of Kristie Hansen – "Hansen Tr." |
| 23 | Deposition Transcript of Jerry Wallace – "Wallace Tr." |
| 24 | Deposition Transcript of Clifford Boyd Baker – "Baker Tr." |
| 25 | Deposition Transcript of Glenn Parker – "G. Parker Tr." |
| 26 | Deposition Transcript of Richard Criswell – "Criswell Tr." |
| 27 | Deposition Transcript of Patricia Trubia – "Trubia Tr." |
| 28 | Deposition Transcript of Benjamin F. McPherson – "McPherson Tr." |
| 29 | Deposition Transcript of Sheila Ryan-Macie – "Ryan-Macie Tr." |
| 30 | Deposition Transcript of Jason H. P. Kravitt – "Kravitt Tr." |
| 31 | Deposition Transcript of James Parker, Vol. II – "J. Parker II Tr." |
| 32 | Deposition Transcript of Jon H. Oberg – "Oberg Tr." |
| 33 | Deposition Transcript of Jane LaRocca Roig – "J. Roig Tr." |

## <u>CERTAIN FACTS APPLICABLE TO MULTIPLE DEFENDANTS</u>

**RF1.   The Defendants did not obtain approval from the Department of Education ("Department" or "DEd") for their loan growth programs.**

(a)      Defendants Nelnet, Inc. ("Nelnet") and Nelnet Education Loan Funding, Inc. ("NELF") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program.  *See* Relator's Responses to JS61-62, *infra.*  The Department did not sign Nelnet's May 29, 2003 letter to concur in the activities it set out in the letter.  Heimes Ex. 31 (McMahon Dec., Ex. II.32); Heimes Tr. 246:13-247:2 (Soni Dec., 4). *See* Relator's Response to JS65, *infra.*

(b)      Defendants Brazos Higher Education Authority ("BHEA") and Brazos Higher Education Service Corporation ("BHESC") (collectively, "Brazos") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. Turman Tr. 328:20-329:15 (Soni Dec., Ex. 9); Watson Tr. 83:12-19, 86:10-15 (Soni Dec., Ex. 10).

(c)      Defendants Education Loans, Inc. ("EdLinc") and Student Loan Finance Corporation ("SLFC") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. Sanderson Tr. 46:10-17, 96:18-97:6 (Soni Dec., Ex. 2); Kohles Tr. 164:22-165:6 (Soni Dec., Ex. 3).

(d)      Defendants Panhandle-Plains Higher Education Authority ("PPHEA") and Panhandle Plains Management and Servicing Corporation ("PPMSC") (collectively "Panhandle") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. J. Parker I Tr. 123:3-18 (Soni Dec., Ex. 7); Wright Tr. 43:8-11 (Soni Dec., Ex. 8).

(e)     Defendant Southwest Student Services Corporation ("Southwest") did not obtain approval from the Department for its 9.5% SAP eligible loan growth program.  J. Roig Tr. 71:11-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16); *see also* V. Roig Tr. 79:1-10  (Soni Dec., Ex. 12) (expressing his view that Southwest made decisions based on its own review of the 9.5% SAP regulations without asking for approval from others).

**RF2.   The Defendants did not affirmatively and fully disclose their 9.5% loan growth programs to the Department.**

(a)     Defendants Nelnet and NELF did not affirmatively and fully disclose their 9.5% loan growth programs to the Department.  Nelnet's meeting with Department personnel in 2002 and 2003 were not full disclosures to the Department of its "Project 950" and related plans for 9.5% SAP eligible loan growth. Dunlap Ex. 47 at N0124998 (Soni Dec., Ex. 54); Heimes Tr. 222:13-225:9 (Soni Dec., Ex. 4). The May 29, 2003 letter from Nelnet to the Department was only a partial disclosure of its "Project 950" and related plans for 9.5% SAP eligible loan growth. *See* Relator's Response to JS65, *infra.*

(b)     Defendants BHEA and BHESC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006. Watson Tr. 83:12-19 (Soni Dec., Ex. 10); Turman Tr. 328:20-330:13 (Soni Dec., Ex. 9).

(c)     Defendants EdLinc and SLFC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006. Buckmeier Tr. 247:5-249:5 (Soni Dec., Ex. 1).

(d)      Defendants PPHEA and PPMSC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006.  G. Parker Tr. 19:17-25 (Soni Dec., Ex. 25).

(e)      Defendant Southwest did not affirmatively disclose its 9.5% loan growth programs to the Department at any time prior to 2006. J. Roig Tr. 71:11-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).

**RF3.   Each Defendant used "new money" – *i.e.*, taxable or tax-exempt financings issued after 1993 – as a key component of its loan growth programs.**

(a)      NELF issued numerous financings that constituted new money, including one taxable issuance in 2003 and two taxable issuances in 2004, each exceeding or approaching $1 billion.  *See* Heimes Tr. 149:2-152:16, 160:2-161:18 (Soni Dec., Ex. 4); Heimes Ex. 23 (Mills Dec., Ex. 33).  Billions of dollars of 9.5% SAP eligible loans ended up securitizing these issuances.  Nelnet Supp. Resp. to Interrog. No. 1 (compare Average Daily balance of NELF for 4Q 2002 of $369.9 million to 2Q 2004 balance of $3.55 billion) (Mills Dec., Ex. 1); Heimes Tr. 42:5-11 (Soni Dec., Ex. 4).

(b)      BHEA issued a new taxable financing in January 2004 to, in part, support its plan for 9.5% SAP eligible loan growth.  Turman Tr. 90:22-91:4 (Soni Dec., Ex. 9).  BHEA had numerous other "new money" issuances that held loans for which it was billing 9.5% SAP.  *Id.* at 90:22-91:4, 110:10-20, 118:1-119:13, 133:18-134:13, 144:9-147:2, 173:14-20, 179:17-180:6, 181:12-18 (Soni Dec., Ex. 9); Final Transfer Spreadsheets for January, April and August transfers (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).

(c)      EdLinc used taxable bonds issued in 1999, 2000, 2001 and 2002, issued in conjunction with its 1999-1 trust, to support its 9.5% loan growth program.  Buckmeier Tr. 60:20-62:3 (Soni Dec., Ex. 1).  Over $100 million in loans for which EdLinc billed 9.5% SAP securitized these issuances.  EdLinc Resp. to Interrog. No. 3 at 9-10 (Mills Dec., Ex. 2).

(d)      Panhandle issued taxable and tax-exempt financings in 2003 and 2004 to support its 9.5% SAP eligible loan growth program.  PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4); Wright Tr. 67:25-68:3 (Soni Dec., Ex. 8).  These issuances resided within the same trust as the pre-1993 9.5% SAP eligible financings.  J. Parker I Tr. 173:2-8 (Soni Dec., Ex. 7).  Almost $400 million in loans for which PPHEA and PPMSC claimed 9.5% SAP securitized the 2003 and 2004 financings.  PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4).

(e)      Southwest issued taxable and tax-exempt financings in 2001, 2002, 2003, and 2004, and transferred loans into them on which Southwest claimed 9.5% SAP.  Southwest and SLM Corporation Response to Interrog. No. 3 (Mills. Dec., Ex. 5); Wheeler Ex. 13 at ████████████████████████████████████████████████████ ████████████████████████████████████████ Jacobson Tr. 38:15- 41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 22:19-23:14, 25:19-27:13, 28:20-29:4, 56:18- 60:21, 104:20-106:3, 113:16-119:20 (Soni Dec., Ex. 16).  By 2004, ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

**RF4.   Each Defendant's transfers from its 9.5% SAP eligible financings to its "new money" (not eligible for 9.5% SAP) financings did not carry the characteristics of a sale.**

(a)      Nelnet's transfers were made at face value for each loan.  No attempt was made to determine or set a market price for the value of the loans.  Nelnet effectively reversed many of its transactions by moving loans to the 1985A trust and then, the next day, back to the financing it originated.  The swapping of collateral between trusts did not result in gains or losses for tax purposes.  The swaps occurred at the direction of NELF, which held the beneficial interest in both trusts at issue in the swaps. The swaps occurred between trust estates "within the same consolidated entity" and were "all part of the same successor in interest." Heimes Tr. 117:11-118:12  (Soni Dec., Ex. 4); Kaplan Tr. 191:19-192:2; 194:21-199:8 (Soni Dec., Ex. 6); *see also* Heimes Ex. 19 (Mills Dec., Ex. 33).

(b)      The transfers were fully controlled by Brazos, with BHESC setting the transfer prices.  The transfers out of the BHEA Eligible Financings were made to other trusts controlled by BHEA.  There were no negotiations regarding the price of these transfers of loans and Brazos set the transfer price at face value plus accrued interest plus, in some cases, unamortized purchase premium.  Brazos could have reversed the transfers if it so desired.  It was part of BHESC's plan to hold the loans in the BHEA Eligible Financing only temporarily.  Turman Tr. 85:11-86:18; 129:3-130:2; 134:14-22; 139:19-141:3; 141:14-142:15; 144:21-146:5 (Soni Dec., Ex. 9).

(c)      For EdLinc, the transfer of loans was not documented with purchase agreements; did not involve arms length negotiations; was not treated as a taxable event; and no valuation process of the collateral was undertaken after the first transfers.  EdLinc was the beneficial owner of both the 1998-1 Trust to the 1999-1 Trust and the trusts had the same trustee.  EdLinc similarly could have discretionarily reversed any of the transactions.  Buckmeier Tr. 145:22-148:18; 149:3-21; 150:1-18 (Soni Dec., Ex. 1).

(d)      PPHEA did not treat the transfers as if they were genuine sales to or a purchase from a third party, and all of the transfers of loans between "bonds" were made within the same indenture. J. Parker I Tr. 186:12-18; 173:2-8 (Soni Dec., Ex. 7).  In each instance, Panhandle gave unilateral direction to the trustee regarding the movement of loan balances, sometimes orally, and could reverse any transfer. *Id.* at 183:6-21; 185:14-22; 202:10-203:21.  Transfers were all done at face value, despite the fact that purchases of replacement loans required a premium. *Id.* at 180:1-16; 184:6-22.  No due diligence review of the loan portfolio was done; no arms length price negotiations took place; no real valuation process of the collateral was undertaken; and no gain or loss was recognized. *Id.* at 180:1-186:18.

(d)      Southwest's personnel could not identify purchase and sales agreements governing Southwest's transfers of loans between the 9.5% eligible and ineligible bonds. Jacobson Tr. 80:11-21 (Soni Dec., Ex. 13).  Southwest could not identify a process to value the transferred loans; they were transferred at face value. *Id.* at 79:22-80:5;  V. Roig Tr. 84:4-12 (Soni Dec., Ex. 12); Chesin Tr. 117:1-118:10 (Soni Dec., Ex. 11). The direction for these transfers from one trust to another came from Southwest's treasurer or controller.  Chapin Tr. 79-80 (Soni Dec., Ex. 14).  The transfers were not taxable events.  Chesin Tr. 117:1-118:1 (Soni Dec., Ex. 11).  The company's former director of finance testified that a "purchase" would not include intra-company transfers.  Jacobson Tr. 37:3-13 (Soni Dec., Ex. 13).  Southwest could have reversed any of the transactions if it so desired.  Wheeler Tr. 111:12-19 (Soni Dec., Ex. 16).

**RF5.  Several Defendants interpreted the applicable statute and regulations to allow for infinite growth of their 9.5% SAP loan pools.**

(a)     Nelnet believed that the statutes and regulations did not put any limits on the volume of loans that could be tagged.  Heimes Tr. 144:20-146:9, 119:14-122:16 (Soni Dec., Ex. 4). Dunlap Tr. 217:22-218:16 (Soni Dec., Ex. 5).

(b)     Defendants BHEA and BHESC believed that they could grow their 9.5% SAP loan pool infinitely, and that there was no limit to the number of loans they could transfer through their tax-exempt indentures. Watson Tr. 127:13-128:16 (Soni Dec., Ex. 10); Turman Tr. 250:3-19 (Soni Dec., Ex. 9).

(c)     EdLinc believed that there was no limit to the potential growth of their 9.5% loan pool.  Buckmeier Tr. 176:10-177:1 (Soni Dec., Ex. 1); Sanderson Tr. 89:12-15 (Soni Dec., Ex. 2); Kohles Tr. 64:9-65:18 (Soni Dec., Ex. 3).

(d)     Panhandle interpreted the applicable statutes and regulations as having no limit on the growth of Panhandle's 9.5% SAP loan portfolio.  Wright Tr. 132:14-133:4, 134:15-18 (Soni Dec., Ex. 8).

(e)     The only limitation that Southwest imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).

**RF6.   Several Defendants interpreted the applicable statute and regulations to allow them to turn every loan they could purchase into 9.5% SAP eligible loans.**

(a)     Nelnet believed that the statutes and regulations did not put any limits on the volume of loans that could be tagged.  The only limits mentioned were bond indenture requirements and operating system requirements.  Heimes Tr. 144:20-146:9 (bond indenture

requirements as the only limiting factor), 119:14-122:16 (operating system required minimum of one day before swapping again) (Soni Dec., Ex. 4). Dunlap Tr. 217:22-218:16 (operating limitations) (Soni Dec., Ex. 5).

(b)     The only limitation that BHEA and BHESC imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to Texas.  Watson Tr. 127:13-17 (Soni Dec., Ex. 10); Turman Tr. 91:15-92:21 (Soni Dec., Ex. 9).

(c)     The only limitation that EdLinc imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to South Dakota.  Buckmeier Tr. 174:10-176:8 (Soni Dec., Ex. 1); Kohles Tr. 62:8-63:5; 163:15-22 (Soni Dec., Ex. 3).

(d)     Panhandle believed that it could convert its entire portfolio into 9.5% SAP loans. Wright Tr. 130:11-131:23 (Soni, Dec., Ex. 8).

(e)     The only limitation that Southwest imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).

**RF7.   Several Defendants interpreted the applicable statute and regulations to allow them to turn every loan that was financed by a pre-October 1, 1993 tax-exempt financing ("old money"), no matter how long that loan was financed by the "old money," into a loan for which they could bill 9.5% SAP.**

(a)     Nelnet believed the loans could have been in their indenture for as little as a millisecond to qualify for 9.5 SAP.  Heimes Tr. 119:14-122:16 (Soni Dec., Ex. 4).

(b)     Panhandle believed that a loan was eligible for 9.5% SAP if it was financed by a pre-October 1, 1993 tax-exempt financing for one second.  Wright Tr. 138:17-139:20 (Soni Dec., Ex. 8)

(c)     Southwest did not have "any requirement that loans had to stay within a bond for any specified period of time."  Wheeler Tr. 72:14-20 (Soni Dec., Ex. 16).

**RF8.   Each Defendant was motivated by the potential revenue from the 9.5% subsidy.**

(a)     The only reason Nelnet sought to increase its loans eligible for 9.5% SAP was because this increased its revenue.  Heimes Tr. 257:7-258:14 (Soni Dec., Ex. 4); Dunlap Tr. 169:11-173:14 (Soni Dec., Ex. 5).

(b)     The goal of Brazos' 9.5% loan program was to maximize its SAP payments. Turman Tr. 31:14-32:10 (Soni Dec., Ex. 9); Watson Tr. 64:6-13 (Soni Dec., Ex. 10).

(c)     The goal of EdLinc's 9.5% loan program was to increase its bottom line. Buckmeier Tr. 155:8-156:6 (Soni Dec., Ex. 1); Sanderson Tr. 88:7-11 ("Q So what you cared about was whether he could get additional dollars in the door? A Yes. Q And that's all you cared about? A   Yes."), 116:3-122:8 (Soni Dec., Ex. 2).

(d)     Panhandle's purpose in issuing new bonds and transferring loans was to increase its revenue. J. Parker I Tr. 174:3-5, 280:22-281:5 (Soni Dec., Ex. 7).

(e)     Southwest's transfers of loans were for the purpose of maximizing the yield on such loans.  Jacobson Ex. 13 at SLMA_EF00000700 ███████████

███████████████████ (Soni Dec., Ex. 145); V. Roig Tr. 103:8-106:5 (explaining that the purpose of the transfers was that it provided the company with a "financial advantage" which "help[ed] the -- the -- the return on the loans") (Soni Dec., Ex. 12); Chapin Tr. 36:6-10 (Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16).

**RF8.   Each Defendant failed to sufficiently vet the legality of their plans for the growth of their 9.5% loan pools.**

(a)      Nelnet obtained its opinions from its lobbyist. Dean Exs. 2, 9, 12, 14 (Soni Dec., Exs. 120, 122, 124, 123); Dean Tr. 54:3-55:3 (Soni Dec., Ex. 19). Furthermore, the opinions spoke of conflicting department guidance and did not address subsection (c). Dean Ex. 9 at N0127090 (Soni Dec., Ex. 122); Dean Tr. 131:14-132:22 (Soni Dec., Ex. 19).

The May 29, 2003 letter was grossly deficient in revealing Nelnet's plan and the Bateman letter in response was insufficient on its face, which Nelnet admitted. Dunlap Tr. 182:10-187:5 (Soni Dec., Ex. 5); *compare* Heimes Ex. 31 N0003047-50, at 31 (Soni Dec., Ex. 71) (May 29, 2003 letter omitting any reference to amount of increased claims) *with* Heimes Ex. 22 N0097043 (Soni Dec., Ex. 65) (internal plan); s*ee also* Heimes Tr. 201 (Soni Dec., Ex. 4) (admitting that Nelnet had done internal projections as of the date of the letter); *see* Relator's Responses to JS61-62, *infra*. The Department did not sign Nelnet's May 29, 2003 letter to concur in the activities it set out in the letter. Heimes Ex. 31 (McMahon Dec., Ex. II.32); Heimes Tr. 246:13-247:2 (Soni Dec., Ex. 4).

(b)      Brazos failed to sufficiently vet the legality of its plans for the growth of its 9.5% loan pools. For instance, Brazos sought an opinion of counsel, but then failed to read the provided opinion. The company's General Counsel only read one paragraph of the final opinion,

and only cared if the opinion stated that Brazos could proceed with its plan to inflate its 9.5 SAP

loan holdings, testifying that "I paid him for the opinion, not how he got there."  Also, Brazos

did not read the applicable Department of Education regulations.  Brazos also failed to get

approval from the Department of Education for its program, noting that dealing with the

Department was a "joke."  *See* Relator's Response to BR7, *infra* (explaining more fully Brazos

actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

(c)     EdLinc failed to sufficiently vet the legality of its plans for the growth of its 9.5%

loan pools.  For instance, EdLinc failed to seek out an opinion from an attorney regarding its

9.5% loan program, despite the fact that the architect of its program urged them to do so.  EdLinc

also failed to obtain approval of its program from the Department of Education.  *See* Relator's

Responses to EL14-15, *infra* (explaining more fully EdLinc's actions and inactions concerning

vetting the legality of its plans to grow its 9.5% SAP loan pool).

(d)     Panhandle failed to sufficiently vet the legality of its plans for the growth of its

9.5% loan pools.  *See* Relator's Responses to PH6-11, *infra* (explaining more fully Panhandle's

actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

(e)     Southwest failed to sufficiently vet the legality of its plans for the growth of its

9.5% loan pools.  For instance, the Southwest employee who drafted a series of memoranda

which formed the basis of Southwest's 9.5% SAP expansion could not identify a source for her

understanding of the requirements for billing for 9.5 SAP, and could not remember reading either

the 1993 Omnibus Budget Reconciliation Act ("OBRA") or the regulations governing 9.5%

SAP.  The Southwest employee who made quarterly certifications to the government that the

company's claims for 9.5% SAP "conform[ed] to applicable laws, regulations, and policies

- 11 -

relating to the Federal Family Education Loan Program" could not identify a source for his understanding of the requirements for billing for 9.5 SAP.  The company's CEO explained that he "wasn't in the habit of asking 'mother may I' or any of that activity."  *See* Relator's Responses to SW5, 8, 16, *infra* (explaining more fully Southwest's actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

**RESPONSES TO DEFENDANTS STATEMENT OF**
**MATERIAL UNDISPUTED FACTS**

I.      **THE RELEVANT LAW, REGULATIONS AND GUIDANCE DURING THE PERIOD OF ALLEGED FALSE CLAIMS**

A.      **The Higher Education Act and Special Allowance Payments**

**JS1.**    In 1965, Congress passed the Higher Education Act. Pub. L. No. 89-329. The Act sought to encourage lenders to provide low-interest loans to students for post-secondary education. To encourage lending at sub-market rates set by Congress, the government provided guarantees in the event of default as well as interest-rate subsidies. This guaranteed loan program eventually became known as the Federal Family Education Loan Program ("FFELP").

**RESPONSE TO NO. JS1.   Disputed.  The special allowance payment subsidy was not introduced until 1969.** *State Profits on Tax-Exempt Student Loan Bonds:  Analysis and Options,* **Congressional Budget Office Report (March 1980) (CBO Report) at 1 (Soni Dec., Ex. 49).**

**JS2.**    Among participants in the FFELP in its early years were non-profit authorities established by state governments. Those authorities raised money to purchase student loans originated by banks by issuing non-taxable bonds. The authorities pledged student loans as collateral to secure payment of the bond obligations.

**RESPONSE TO NO. JS2.   Disputed.  At the inception of the program, most loans were made by commercial banks; state and local government agencies and non-profit corporations did not make student loans in any significant volume until many years later. CBO Report at 1-2 (Soni Dec., Ex. 49).**

**JS3.**    Monies collected through servicing the loans (principal payments, interest payments, collections from guarantors) as well as investment income earned on assets held within the bond estate were used by the authority either to repay bondholders or to purchase new student loans to pledge as collateral, according to the terms of the bond indenture agreements. [McMahon Decl., Ex. II.1 (Reicher Decl. ¶¶ 31, 47).]

**RESPONSE TO NO. JS3.   Disputed.  Reicher's disclosure is not a declaration under oath and, therefore, is not admissible evidence in conjunction with Defendants' Motions for Summary Judgment.**

**JS4.**    From the outset of the FFELP, the Department of Education ("ED") made "Special Allowance Payments" ("SAP") for each qualifying loan. Lenders collected SAP as a quarterly payment to supplement the interest owed by the borrower.  Beginning in 1976, Congress set the interest rate that each FFEL lender could collect on a loan. The SAP was the difference between the guaranteed rate and the rate paid by the student borrower. 20 U.S.C. § 1087-1(a)(1).

**RESPONSE TO NO. JS4.   Disputed and incomplete.  The first sentence is incorrect, as noted above.  *See* Response to JS1, *supra*.  It is unclear what historical version of the statute is being cited.**

**The purpose of SAP is to provide lenders with an amount of money that, when added to the interest paid by the student on a loan, would cover the lender's reasonable administrative fees and cost of funds.  *Guaranteed Student Loan Program*, 50 Fed. Reg. 5,506, 5,512-13 (Feb. 9, 1985) (to be codified at 34 C.F.R. pt. 682).**

**The Department has made clear that SAP is discretionary and only properly payable where a lender has met the statutory and regulatory requirements for SAP, regardless of whether those statutory and regulatory criteria match up with a lender's ordinary or preferred business practices.** *Id.* **at 5,511 ("[T]he Secretary concedes that an Authority retains the legal autonomy to stand on its prerogative to manage its business affairs in all details according to its discretion and not that of its creditors.  An Authority which seeks to qualify . . . for Federal special allowance payments, however, is no longer free to conduct its business entirely according to its preferences.").  Loans that receive SAP will only receive SAP as long as they meet the relevant statutory and regulatory criteria.** *See id.* **at 5528-29.  A lender is always free to forego SAP.** *See id.* **at 5515.**

### B.    The Higher Education Act ("HEA") Amendments of 1980

**JS5.**    In the late 1970s, interest rates increased. In 1979, student loan holders were receiving an interest rate of approximately 16% on student loans, combining the borrower-paid interest and government-paid SAP. [McMahon Decl., Ex. II.2 (CBO Report at 13); McMahon Decl., Ex. II.3 (Delisle Report at 11); Ex. II.1 (Reicher Decl.¶ 28); McMahon Decl., Ex. II.4 (Ryan-Macie Report at 4).]

**RESPONSE TO NO. JS5.    Disputed.  The expert reports filed by Defendants are not declarations under oath and, therefore should not be considered as admissible evidence in conjunction with the Defendants' Motions for Summary Judgment.**

**JS6.**    In March 1980, the Congressional Budget Office ("CBO") described "unanticipated profits" being accumulated by state and local governments during this period of high prevailing interest rates. [McMahon Decl., Ex. II.2 (CBO Report at ix).] Because tax-

exempt issuers obtained financing at lower cost than taxable financing vehicles commanded, non-taxable entities could earn higher returns on student loan portfolios than commercial lenders. The CBO identified a number of possible alternatives to address this issue, including "[r]educing the federal interest subsidy on loans financed with tax-exempt bonds." [Ex. II.2 (CBO Report at xii).] In making cash flow projections under various SAP scenarios, the CBO Report made no distinction between the initial cash received upon issuance and the cash received through investment. [Ex. II.2 (CBO Report at 55-58).]

**RESPONSE TO NO. JS6.   Disputed and incomplete. The first three sentences are undisputed but incomplete.  The CBO was asked to prepare the report because "states began earning unexpected profits from tax-exempt bonds that they had issued to raise funds for loans to college students" in 1979.  CBO Report at iii (Soni Dec., Ex. 49).  One of the options the report set out to address these windfall earnings was lowering the special allowance for student loans financed by tax-exempt bonds.  *Id.* at 30.  That approach "would involve setting up a two-tier yield structure, so that the yield on loans held by private lenders would exceed the yield on loans held by tax-exempt bond authorities.  If the yield on student loans were set at a level just high enough to make the loans a sound investment for bond authorities, the yield reduction would produce almost no cutback in loan availability.  Student loan bond issuers are state agencies and nonprofit corporations, whose motivation should not be to make a profit, but rather to provide a service, in this case making loans available to students.  As long as they can cover their costs in providing this service, the prospect of earning no profits should not affect their decisions about bond issuance."  *Id.* at 31.  The report went on to note that one way of cutting the yield would be to give "bond authorities a lower special allowance than that given to private lenders," and**

that this would result in significant savings for the government.  *Id.* at 32.  It stated that, "[i]f calculated at today's interest rates, the special allowance produced by a formula tied to tax-exempt interest rates would be just half the special allowance produced by the present formula.  In fact, this 1:2 ratio holds under most projections of tax-exempt and taxable interest rates.  . . . Thus, if the Congress wanted to achieve basically the same result as establishing a separate special allowance formula for bond-financed loans, it could set the special allowance on these loans at half the special allowance given to commercial lenders."  *Id.* at 33.  A footnote added that the National Council of Higher Education Loan Programs ("NCHELP") endorsed this approach along with "a floor of 2.5 percent on the tax-exempt special allowance" such that the yield would not fall below 9.5% where the student interest rate was 7%.  *Id.* at n.6; *see also id.* at 37 & n.14.

The last sentence is disputed; the tables to which the statement refers list three sources of income for non-profit lenders: (1) program income (principal and interest payments made by students plus claims made on defaulted loans), (2) investment income (interest earned on balances in reserve accounts), and (3) special allowance payments. CBO Report at Tables A-1 & A-2.  The tables do not account for proceeds of bond issuances as "income" at all or refer to movement of loans between bonds for SAP arbitrage as "investment."  *Id.*

JS7.   In 1980, Congress amended the HEA to set a different SAP amount for loans made or purchased on or after October 1, 1980, with funds obtained from tax-exempt obligations. This provision (often referred to as "1/2 SAP," "Floor SAP" or "9.5 SAP") reduced the SAP payment by half for such student loans, but guaranteed that the total interest received by the loan holder would not fall below a floor of 9.5%:

(D)(i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation

under the Internal Revenue Code of 1954 shall be one-half the quarterly rate the special allowance established under subparagraph (A), (B), or (C). Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds. This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.

(ii)      The rate set under division (i) shall not be less than (I) 2.5 per centum per annum in the case of loans for which the applicable interest rate is 7 per centum per annum, (II) 1.5 per centum per annum in the case of loans for which the applicable interest rate is 8 per centum per annum, or (III) 0.5 per centum in the case of loans for which the applicable rate is 9 per centum per annum.

(iii)      No special allowance may be paid under this subparagraph unless the issuer of such obligations complies with section 420(b) of the Education Amendments of 1980.

Education Amendments of 1980, Pub. L. No. 96-374, § 420(a), 94 Stat. 1367, 1425-1427 (1980)

(codified at 20 U.S.C. § 1087-1(b)(2)(D)(i)-(iii); currently codified as amended at 20 U.S.C. §

1087-1(b)(2)(B)(i)-(iii)).

**RESPONSE TO NO. JS7.   No dispute.**

**C.      Regulatory Guidance Pertaining To ½ SAP Provision**

**JS8.**      In December 1980, ED issued guidance to loan holders regarding the 1/2

SAP/Floor provision through Department of Education Bulletin #R-109, G-45, *New Provisions*

*Affecting Entities that Make or Purchase Guaranteed Loans With Funds Received From Issuing*

*Obligations, the Income From Which Is Exempt From Taxation Under the IRS Code of*

*1954* (Dec. 18, 1980). The December 18, 1980 Bulletin explained the new provision as

follows:

> Entities Covered by the Special Allowance Limit
>
> The limit on special allowance applies to any entity which makes or
> purchases loans with funds obtained:
>
> (1)      from the issuance of obligations, the income from which is exempt from
> taxation under the Internal Revenue Code of 1954, or
>
> (2)      from collections or default reimbursements on, or interest or other
> income pertaining to, eligible loans made or purchased with funds described in
> item 1, or
>
> (3)      from income on the investment of funds described in item 1.

[McMahon Decl., Ex. II.5 (ED Bulletin #R-109, G-45).]

**RESPONSE TO NO. JS8.   No dispute.**

**JS9.**    The December 18, 1980 Bulletin instructed holders of loans "made or purchased

with funds obtained from obligations exempt from Federal income tax" to develop systems to

"differentiate between loans disbursed <u>prior to</u> October 1, 1980, and those disbursed <u>on or after</u>

October 1, 1980." [*Id.*]  Similar guidance was provided in a bulletin issued on December

16, 1980, which instructed a "lender [who] makes new loans .. using tax exempt funds

after [HEA's effective date]" to bill at the 9.5 SAP rate.  Department of Education Bulletin

#G-44, R-108, *To All Guarantee Agencies Effects of the Education Amendments of 1980*

(Dec. 16, 1980) [McMahon Decl., Ex. II.6 (ELI-HC-00000192-194, at ELI-HC00000194).]

**RESPONSE TO NO. JS9.    No dispute.**

**JS10.**  In 1985, ED issued regulations to implement the 1/2 SAP/Floor provision of the

Education Amendments of 1980. The 1985 regulations provided:

(2)(i) Subject to paragraph (c)(2)(ii) of this section [listing the floor rate], the percentage rate for the special allowance is one-half the rate determined under paragraph (c)(1) for a loan disbursed on or after October 1, 1980 and made or purchased with funds obtained by the holder from—

(1)     Issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code;

(2)     Funds obtained from collections or payments by a guarantor on a loan described in paragraph (c)(2)(i); and

(3)     Interest or special allowance payments on a loan described in paragraph (c)(2)(i).

Guaranteed Student Loan Program Final Regulations, 50 Fed. Reg. 5,506, 5,523-24 (Feb. 8, 1985), codified at 34 C.F.R. § 682.302(c)(2)(i). *See also* Guaranteed Student Loan Program and PLUS Program Final Regulations, 51 Fed. Reg. 40,886, 40,900-01 (Nov. 10, 1986), codified at 34 C.F.R. § 302(c)(3) (1990).

**RESPONSE TO NO. JS10.  No dispute that the language is cited correctly.  The 1985 regulations, like the 1980 CBO report, made clear that windfall payments of SAP are inconsistent with Departmental policy.  "Congress recognized that a party raising loan acquisition funds by means of tax-exempt borrowings had a financing cost well below that incurred by parties using other sources of funds . . . .  A party using taxable financing to make or acquire student loans has a higher cost of funds[.]" *Guaranteed Student Loan Program Final Regulations*, 50 Fed. Reg. at 5,512.  The Department recognized that congressional intent with regard to "section 438(b)(2) of the HEA [is] to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.  These regulations tie the rate of special allowance to the source of the funds used to acquire or maintain the Authority's interest in a loan, and more particularly, to the financing costs incurred in securing those funds." *Id.* (stating that "the**

**1980 amendments to section 438 of the HEA ... reduced the special allowance to tax-exempt borrowers [to] reflect a Congressional judgment of the subsidy appropriate to their reduced borrowing costs"); *id.* at 5,513 ("Congress clearly intended the amount of subsidy paid in the form of special allowance to bear a reasonable relation to the cost of borrowing the capital used to finance acquisition of student loans."); *id.* at 5,514 ("The formulas used to calculate special allowances payable where taxable and tax-exempt financing are used have been adopted by Congress based on its judgment of the amount of subsidy needed to meet the differing costs of capital under those two kinds of borrowing."). The Department specifically noted that the 1980 amendments "sought to prevent" a "windfall" of SAP to holders of loans made or purchased with tax-exempt funds. *Id.* at 5,513.**

JS11.   ED amended these regulations again in December 1992:

> (3)(i) Subject to paragraph (c)(3)(ii) of this section [listing the floor rate], the special allowance rate is one-half the rate calculated under paragraph (c)(1)(iii)(C) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from —
>
> (A)     The issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1986;
>
> (B)     Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (C)     Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (D)     The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
>
> (E)     The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

*Family Federal Education Loan Programs Final Regulations, 57* Fed. Reg. 60,280, 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302 (c)(3).

**RESPONSE TO NO. JS11.  No dispute.**

**JS12.**  ED's 1990 Notice of Proposed Rulemaking preceding the 1992 amendment to the regulations contained detailed explanations for changes pertaining to other FFEL provisions, but contained no comment describing the reason for, purpose of, or intent of this change to the regulation. *Part II, Department of Education 34 CFR 682 Guaranteed Student Loan Programs, Proposed Rules,* 55 Fed. Reg. 48,324 (Nov. 20, 1990).

**RESPONSE TO NO. JS12.  No dispute.**

**JS13.**  The 1992 regulations also revised a 1985 regulatory provision relating to the SAP applicable to a 1/2 SAP/Floor loan "pledged or otherwise transferred in consideration of funds derived from sources other than" those described in the regulation as a source of funds for 1/2 SAP/Floor loans. *Federal Family Education Loan Programs Final Regulations,* 57 Fed. Reg. 60,280, 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302(e)(2). The regulation specified that such transferred loan would be paid at the Full SAP rate if the loan holder retains a legal or equitable interest in the loan and:

> (A)    The prior tax-exempt obligation is retired; or
>
> (B)    The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bear a [specified] yield[.]

**RESPONSE TO NO. JS13.  Disputed and incomplete.  Misstates the language of the regulation.  The revised regulation provided:**

> **(e)(2) The Secretary pays a special allowance to an Authority at the [ordinary SAP rate] on a loan [ordinarily entitled to Half-SAP/9.5% Floor]—**

(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than [sources of funds eligible to make or purchase loans subject to Half-SAP/9.5% Floor]; and

(ii) If the authority retains a legal or equitable interest in the loan—

(A) The prior tax-exempt obligation is retired; or

(B) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bear [a certain yield].

*Federal Family Education Loan Programs Final Regulations*, 57 Fed. Reg. at 60,343.

In the 1985 rulemaking, in order to align SAP payment and the cost of the funds financing eligible loans, DEd provided that SAP treatment generally should be determined by the loan's current financing source. *See Guaranteed Student Loan Program*, 50 Fed. Reg. at 5,512. Thus, a loan transferred from a tax-exempt Half-SAP/9.5% Floor collateral pool to another lender's taxable ordinary SAP pool would yield ordinary SAP. *Id.* Similarly, if a tax-exempt funding was "refunded," so that prior bondholders were paid out and replaced by new bondholders, the tax treatment of the new bonds would govern the SAP. *Id.* Thus, a tax-free collateral pool could be refunded with taxable bonds and become eligible for ordinary SAP treatment. *See* 34 C.F.R. § 682.302(e)(2) (1986). Even apart from a refunding, individual loans could be transferred between collateral pools with changed SAP treatment. *Id.*

In 1990, DEd recognized that lenders in a high interest rate environment were manipulating loan transfers to increase SAP without incurring additional financing costs. Specifically, a tax-exempt lender (or "authority") could swap a loan bearing a low student interest rate, and thus a high SAP, from a Half-SAP/9.5% Floor pool to an ordinary SAP pool, thus doubling the SAP payable. *See* Ryan-Macie Tr. 150:12-153:22 (Soni Dec., Ex. 29). In exchange, the Half-SAP/9.5% Floor pool would receive a loan of comparable face

value with a higher student interest rate and a smaller SAP, thus reducing SAP only by 50% ("Half-SAP") of a smaller amount. *Id.* Because this loan swap manipulation served no program purpose, DEd sought to disincentivize it by revising subsection (e)(2) as set forth above. *See* Moskowitz Tr. 71:12-73:2 (Soni Dec., Ex. 18); Ryan-Macie Tr. 141:18-142:7) (Soni Dec., Ex. 29).

**D.      The 1993 OBRA's Amendments to the HEA**

**JS14.**  On August 10, 1993, Congress amended the HEA through the Omnibus Budget and Reconciliation Act of 1993 ("OBRA"). The OBRA revised the 1/2 SAP/Floor provision by adding the following new provision:

> (iv) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance for holders of loans which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986, shall be the quarterly rate of the special allowance established under subparagraph (A), (E), or (F), as the case may be [full SAP]. Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds.

Pub. L. No. 103-66, § 4105, 107 Stat. 312, 368 (1993), codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv).

**RESPONSE TO NO. JS14.  No dispute.**

**JS15.**  OBRA directed payment of Full SAP for loans financed with tax-exempt bonds "originally issued" on or after October 1, 1993, as well as for loans made or purchased with certain earnings from loans and investments. The OBRA did not amend the language of 20

U.S.C. § 1087-1(b)(2)(B)(i)-(iii), which describes the sources of funds within a student loan

obligation that could be used to make or purchase 1/2 SAP/Floor loans.  *Id.*

**RESPONSE TO NO. JS15.  Disputed.  Although the language of Subsection (ii) was**

**not directly modified, the addition of Subsection (iv) by the OBRA inherently altered the**

**scope of Subsection (ii).**

**JS16.**   There are no conference or Committee reports from the House of

Representatives or the Senate, or statements by members of Congress prior to the enactment of

OBRA, that describe the reason for, purpose of, or intent of § 4105 of the OBRA. [Ex. II.1

(Reicher Decl.¶ 64).]

**RESPONSE TO NO. JS16.  No dispute that the language is correctly cited, but**

**incomplete.  The Department first put lenders on notice of the import of the OBRA in Dear**

**Colleague Letter 93-L-161 (Nov. 1993).  The Department explained that:**

> **The minimum special allowance rate 'floor' on new loans made or**
> **purchased, in whole or in part, with funds derived from tax-exempt**
> **obligations has been repealed.  Accordingly, loans made or purchased**
> **with funds obtained by the holder from the issuance of obligations**
> **<u>originally issued on or after October 1, 1993</u>, or with funds derived**
> **from default reimbursements, collections, interest, or other income**
> **related to eligible loans made or purchased with such tax-exempt**
> **funds, no longer qualify to receive the minimum special allowance.**

**DCL 93-L-161 at 13 (Nov. 1993) (emphasis in original) (Mills Dec., Ex. 26).[1]**

**A few months later, in a letter from Leo Kornfeld, Deputy Assistant Secretary for**

**Student Financial Assistance Programs, to Larry O'Toole, then-President of Nellie Mae,**

---

[1] Relator inadvertently filed only one page of this document referenced in Mills Declaration, Ex. 26.  Soni
Declaration, Ex. 38 replaces Mills Declaration, Ex. 26.

Kornfeld wrote that the 1993 OBRA had made a distinction between what he termed "old money," meaning funds from "tax-exempt debt originally issued prior to October 1, 1993," and "new money," meaning funds from "tax-exempt debt originally issued on or after October 1, 1993."  Letter from Leo Kornfeld to Larry O'Toole, ED-B-001226-27 (March 14, 1994) (Soni Dec., Ex. 40).  He noted that, following the OBRA, "loans made or purchased with new money clearly are not subject to the reductions that apply to loans made or purchased with old money" – referring to the half-SAP "reduction" applicable to loans made with funds obtained by the holder from tax-exempt obligations issued between October 1, 1980 and October 1, 1993.  *Id.*  Kornfeld also stated that, "generally, the special allowance formula has been 'set' at the time the loan is made and has not changed as a result of subsequent transfers."  *Id.*  Reicher's disclosure is not a declaration under oath and therefore should not be considered as admissible evidence in conjunction with Defendants' Motions for Summary Judgment.

### E.   Post-1993 Regulatory Guidance Regarding Half-SAP Provisions and the Effect of Loan Transfers

**JS17.**   Industry representatives requested clarification of 34 C.F.R. § 682.302(e)(2), as amended in 1992, noting that they believed ED had unintentionally changed prior practice when the 1992 regulation implied that 1/2 SAP loans would continue to be billed at 1/2 SAP after being pledged or transferred to taxable indentures, so long as the tax-exempt issue from which the loan was transferred had not been retired. [Ex. II.4 (Ryan-Macie Report at 8-9, Exhibits L and M).]

**RESPONSE TO NO. JS17.  Disputed.  Exhibits L and M ask only that the Department change Form 799 billing instructions to conform to the rule change and clarify**

the effective date of the change.  They do not say anything about believing that the Department had made a mistake.

Ryan-Macie's report is not a declaration under oath and should not be considered admissible evidence in conjunction with Defendants' Motions for Summary Judgment. Ryan-Macie's recollection was not that the Department was warned that lenders would intentionally convert full-SAP loans to half-SAP loans in a low interest rate environment, but rather simply that a situation might arise in which the 9.5% floor might be a preferable rate.  Ryan-Macie Tr. 173:1-14 (Soni Dec., Ex. 29).

**JS18.**  ED indicated that it would provide clarification by way of a Dear Colleague Letter, which it issued in March 1996. ED stated that the 1992 regulation "changed" its prior policy regarding refinancing of loans financed with tax-exempt obligations with proceeds of a taxable obligation. The 1996 Letter stated:

> [I]f a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, *the loan remains subject to the tax-exempt special allowance provisions* [1/2 SAP] if the authority retains legal interest in the loan. If however, the original tax- exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

> This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

[McMahon Decl., Ex. II.7 (Dear Colleague Letter 96-L-186 at Q 30 (March 1, 1996) (NCHELP 00002-00007) (emphasis added)).]

**RESPONSE TO NO. JS18.  Incomplete.**  *See* **Response to JS13 (last paragraph,** *supra.*

**JS19.**  In 1999, ED further amended the regulations regarding the SAP provisions applicable to loans made or purchased by the issuance of tax-exempt obligations. In addition to incorporating the distinction set out in OBRA between tax-exempt obligations originally issued before October 1, 1993, versus after that date, it also revised the language describing the source of funds from which 1/2 SAP Loans could be derived.

> (3)(i) Subject to paragraphs (c)(3)(ii) and (iii) of this section [listing the floor rate], the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(D) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from —
>
> (A)     The *proceeds* of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);
>
> (B)     Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (C)     Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (D)     The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
>
> (E)     The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.
>
> […](iii)(4) Loans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, and loans made with funds derived from default reimbursement collections, interest, or other income related to eligible loans made or purchased with those tax-exempt funds, do not qualify for the minimum special allowance rate specified in paragraph (c)(3)(iii) of this section [the floor rate], and are not subject to the 50 percent limitation on the maximum rate otherwise applicable to loans made with tax-exempt funds.

*Federal Family Education Loan (FFEL) Program Final Rules,* 64 Fed. Reg. 58,622, 58,626-58,627 (Oct. 29, 1999) (to be codified at 34 C.F.R. § 682.302(c)(4) (2000)) (emphasis added).

**RESPONSE TO NO. JS19.  Disputed.  The 1999 regulations modified the "source of funds" language to incorporate the distinction made by the 1993 OBRA, as Defendants state, but the modification to the "source of funds" language setting forth specific categories (A) through (E) was made in 1992.  *See Federal Family Education Loan Programs Final Reuglations*, 57 Fed. Reg. at 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302(c)(3).**

JS20.   In 2001, Saul Moskowitz, a former attorney in ED's Office of General Counsel, sent an email to Pam Moran, a policy official within OPE. In this email,  Moskowitz asked Ms. Moran:

> Consider the following series of transactions: Loans acquired with taxable proceeds are transferred into the Authority's pre-October 1993 tax-exempt indenture in a swap exchange for loans currently in the tax-exempt indenture. Very shortly thereafter, the loans swapped into the tax-exempt indenture are swapped back out to the taxable indenture in exchange for additional loans acquired with taxable proceeds. This second 'installment' of loans swapped back out in exchange for a third 'installment' of loans acquired with taxable bond proceeds. Assuming that the tax-exempt obligation is not retired or defeased, are we correct in our understanding that, under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture.

[McMahon Decl., Ex. II.8 (MOSKOWITZ_000095-99, at MOSKOWITZ_000098).]

Ms. Moran responded, "Under the swapping scenario that you outlined in your question, we would agree that the reduced [9.5%] SAP/floor yield treatment would continue to apply even when swapped out again." [*Id*. at MOSKOWITZ_000097.]

**RESPONSE TO NO. JS20.  Disputed and incomplete.  To the extent that Moran's response is offered for the truth of the matter asserted, it is hearsay.**

**The email asked a limited question:  if ordinary SAP loans are swapped with loans in a pre-October 1, 1993 tax-exempt bond, and then back out, and ordinary SAP loans are swapped in again, etc., whether "under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture."  MOSKOWITZ_000095-99 at 000098 (McMahon Dec, Ex. II.8).  Moran replied that the loans "swapped out again" would be subject to "the reduced SAP/floor yield treatment."  *Id*. at 000097.  Moskowitz did not provide Moran with any information on the source of funds being used by the pre-October 1, 1993 tax-exempt bond estate to effectuate the swaps, and only asked about the effect of subsection (e)(2), which governs transfers <u>out of</u> the pre-October 1, 1993 tax-exempt bond estate.  Moran never commented on the source of funds and only commented on the effect of subsection (e)(2).  *Id.*  Moreover, the email was written in July 2001, <u>before</u> interest rates had decreased to the point where "dipping" became substantially profitable.  *See* Response to JS56, *infra*.**

> **F.    The Taxpayer-Teacher Protection Act ("TTPA") of 2004**

**JS21.**   In 2004, Congress amended the 1/2 SAP provisions of the HEA to eliminate prospectively the payment of 1/2 SAP for several categories of loans obtained from the issuance of tax-exempt obligations originally issued before October 1, 1993, including loans obtained by refunding bonds or transferred to taxable or other tax-exempt financing vehicles after the effective date of the Act. The Act stated:

> (v) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance shall be the [Full SAP], for a holder of loans that
>
> (I)      were made or purchased with funds -

(aa) obtained from the issuance of obligations the income from which is excluded from gross income under the Internal Revenue Code of 1986 and which obligations were originally issued before October 1, 1993; or

(bb) obtained from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in division (aa), or from income on the investment of such funds; and

(II)    are —

(aa) financed by such an obligation that, after September 30, 2004, and before January 1, 2006, has matured or been retired or defeased;

(bb) refinanced after September 30, 2004, and before January 1, 2006, with funds obtained from a source other than funds described in subclause (I) of this clause; or

(cc) sold or transferred to any other holder after September 30, 2004, and before January 1, 2006.

Pub. Law No. 108-409 § 2, 118 Stat. 2299, 2299-300 (2004), codified at 20 U.S.C. § 1087-1(b)(2)(B)(v).

**RESPONSE TO NO. JS21.  Incomplete.  *See* Responses to JS22, JS89, *infra.***

**G.      The Higher Education Reconciliation Act ("HERA") of 2005**

**JS22.**   In 2006, Congress made permanent the 1/2 SAP Amendments introduced in the TTPA and restricted the prospective ability to claim 1/2 SAP on any loans made or purchased after the effective date of the Act:

(vi) notwithstanding clauses (i), (ii) and (v), but subject to clause (vii), the quarterly rate of the special allowance shall be [Full SAP], for a holder of loans—

(I)      that were made or purchased on or after the date of enactment of the Higher Education Reconciliation Act of 2005; or

(II)     that were not earning [1/2 SAP] as of the date of enactment of the Higher Education Reconciliation Act of 2005.

Pub. L. No. 109-171, § 8013(a) & (b), 120 Stat. 4, 166-67 (2006), codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv),(v),(vi),(vii).

**RESPONSE TO NO. JS22.  Incomplete.  In 2007, the Department issued a Dear Colleague Letter that "restate[d] the requirements of the [HEA] and the Department's regulations that control whether FFELP loans made of acquired with funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum return rate."  Dear Colleague Letter FP-07-01 (Jan. 23, 2007) (McMahon Dec., Ex. II.97).  After quoting the applicable statute and regulation, the Department, referring to the change made by the 1993 OBRA (the last substantive change of interest to the statute) noted that these requirements have been in effect since 1993.  Only the loans described in these statutory and regulatory provisions are eligible for SAP at the 9.5 percent minimum return rate.  Each of the five categories (paragraphs (c)(3)(1)(A) through (c)(3)(i)(E)) includes funds separate and distinct from the funds in any other category.  Each category of funds includes only those funds obtained directly from the specific source named in that paragraph.  The letter specified that the "proceeds of the tax-exempt obligation" are those "obtained directly from the issuance of the tax-exempt obligation" and that the other enumerated sources in subsection (c)(3)(i) are "funds obtained directly from" loans made with the original proceeds of the obligation. *Id.* at 2.**

## II.   THE STRUCTURE OF ED

**JS23.**  The 1998 Reauthorization of the Higher Education Act established a performance-based organization known as Federal Student Aid ("FSA") to administer the Federal Student Aid programs at ED.

[http://www2.ed.gov/about/offices/list/fsa/index.html?src=oc]

**RESPONSE TO NO. JS23.  No dispute.**

**JS24.**  FSA at all periods relevant to this matter was responsible for managing all Title IV programs involving the delivery of financial aid for post-secondary education, including the FFELP and the Federal Direct Loan Program ("FDLP"). [McMahon Decl., Ex. II.118 (Shaw Dep. 21:1-21:17).]

**RESPONSE TO NO. JS24.  No dispute.**

**JS25.**  FSA's operations are managed by a Chief Operating Officer. Terri Shaw served as COO of FSA from September 2002 through June 2007. [Ex. II.118 (Shaw Dep. 13:4-13:8).]

**RESPONSE TO NO. JS25.  Incomplete.  Immediately prior to becoming COO of FSA, Shaw was the executive vice president and chief operating officer of a small technology firm called eNumerate.  Shaw Tr. 13:15-20 (Soni Dec., Ex. 20) .  Prior to that, Shaw was employed for nearly 20 years by Sallie Mae, where she held "probably dozens of positions," and eventually rose to the rank of vice president and chief information officer.  *Id.* at 14:20-15:2, 255:8-12.  In a two-year period between 1986 and 1988, Shaw was employed by both Fairchild Industries and University Support Services, a private education loan company.  *Id.* at 14:7-19.**

**Immediately following her time at FSA, Shaw worked for Educational Credit Management Corporation, first as a consultant and eventually as chief operating officer.  *Id.* at 11:8-12:15.  Currently, she is the chief operating officer at Scantron Corporation.  *Id.* at 10:15-21.  Her coworkers there include Sally Stroup, former Assistant Secretary for the**

Office of Postsecondary Education, and Bill Hansen, former Deputy Secretary of

Education. *Id.* at 330:1-14 (Soni Dec., Ex. 20); Stroup Tr. 10:11-15 (Soni Dec., Ex. 21).

Matteo Fontana, whom Shaw had appointed head of Financial Partners after

Kristie Hansen, eventually pleaded guilty to Making a False Writing and Acts Affecting a

Personal Financial Interest for falsely reporting financial connections to lenders that he

supervised at Financial Partners. (*See*

www2.ed.gov/print/about/offices/list/oig/invtreports/dc102009.html).

Later DEd-OIG opened an investigation into potential conflicts of interest at DEd to

determine whether they resulted in lax oversight of the student loan industry; Shaw was

one of the insiders mentioned by the New York Times in its article on the subject. (*See*

www.nytimes.com/2007/05/05/washington/05loans.html?_r=2&pagewanted=print).

**JS26.**   FSA is responsible for, among other things, ensuring that lenders participating

in the FFELP comply with ED regulations governing the program. [Ex. II.118 (Shaw Dep. 28:7-

28:12).]

**RESPONSE TO NO. JS26.  Incomplete.  Shaw testified that FSA was the**

"operational arm of the Federal Student Aid programs."  Shaw Tr. 19:2-9 (Soni Dec., Ex.

20).  As COO of FSA, it was "not [her] job" to interpret the laws, regulations and policies

of the FFELP, and she was "[i]n fact . . . specifically prohibited from interpreting.  That

was not the role, statutory role of the chief operating officer."  *Id.* at 309:16-310:9.

A 2006 DEd-OIG audit found that Financial Partners was in disarray during the

time of the 9.5% Loan scandal.  *See* Shaw Ex. 49 at OBERG00000063-113 (Soni Dec., Ex.

111).  In a 2006 audit report issued on the same day as the Nelnet audit report DEd-OIG found several weakness.

DEd-OIG's first finding was that there existed at Financial Partners a "Weak Control Environment for Monitoring and Oversight." *Id.* at OBERG000073.  One aspect of this finding was that "[i]n its mission and functional statements, Financial Partners emphasized partnership over compliance in dealing with guaranty agencies, lenders, and servicers.  Weaknesses we identified confirmed that stated emphasis on partnership. . . . Our finding that Financial Partners emphasized partnership over compliance relates to key factor one - integrity and ethical values, and key factor four - agency and organizational structure." *Id.* at OBERG00000075.

DEd-OIG's second finding was that there existed a "Lack of Effective Information and Communication Process Related to Policy Issues." *Id.* at OBERG00000091.  With respect to this finding, DEd-OIG determined that (1) "Financial Partners does not have a reliable process to obtain timely guidance on proper application of the HEA and program regulations or how to resolve issues consistent with Department policy," *id.* at OBERG00000091; (2) "Financial Partners does not have a documented process to regularly obtain OGC review and advice on program reviews or other significant program determinations," *id.* at OBERG0000092; and (3) "Financial Partners does not have a clear and effective process for staff to obtain policy assistance from OPE or FSA's Policy Liaison and Implementation Staff and for management's communication of policy decisions and advice to staff," such that "Financial Partners' regional offices and management may not correctly and consistently resolve compliance and other program issues," and "the guidance provided may be incorrect, or different guidance may be given to different

reviewers which could result in inconsistent interpretation and application between reviewers and regional offices," *id.* at OBERG00000094.

With respect to Finding 3, DEd-OIG recommended that FSA's COO (1) "[d]evelop written policies and procedures for obtaining timely guidance for resolution of program issues and for communicating the results and decisions" and (2) "[d]evelop written policies and procedures for regular review by OGC of program reviews and other significant program determinations." *Id.* at OBERG00000095.  In response to DEd's refusal to accept the second recommendation, DEd-OIG responded: "We have not changed our recommendation, which, if followed, could ensure that all Financial Partners' program reviews and significant program decisions are legally supportable, and consistent with the HEA, program regulations, and agency precedent.  A desire to limit legal review does not reflect positively on management's philosophy and its operating style.  It also accepts too much unnecessary risk, which impacts the control environment reported in Finding 1." *Id.* at OBERG00000096.

Shaw testified that "overall" the 2006 audit of Financial Partners "was quite critical of the operation of and supervision of the enforcement program."  Shaw Tr. 290:10-13 (Soni Dec., Ex. 20).

A 2008 audit by DEd-OIG found significant deficiencies in the way program reviews were conducted in 2006 and 2007.  DEd-OIG found, *inter alia*, that the reviewers had incorrectly calculated loan sample sizes, thereby jeopardizing the accuracy of the reports. 2008 OIG Audit (A09H0015) at 13-14 (Soni Dec., Ex. 50).  The report also stated:

> **FSA's review process for lender payments did not include verification of all components of the special allowance category code, which is used to calculate the special allowance subsidy payable by the Department. The selection of the appropriate special allowance category code is determined by four loan characteristics: loan type, date, borrower status, and funding source (*i.e.*, from either taxable or tax-exempt sources). The review process included verification of the first three loan characteristics, but did not include verification of the funding source. FSA management stated that it was not practical to verify the funding source, because funding documentation is maintained at the lender whereas most of the reviews were conducted at the lender servicer. Additionally, FSA management stated that the funding sources were not confirmed because FSA reviewers had knowledge of the type of funding source generally used by a lender and that separate on going reviews were examining the funding source used to support special allowance invoicing. Thus, FSA's review of sampled loans would not have identified improper payments that could have occurred from lenders placing loans in an inappropriate special allowance category for the funding source. The OIG audit report (ED OIG/A05E0017), which was included in the methodology used for the FY2006 PAR, identified a substantial amount of improper payments that resulted from a lender's use of the inappropriate special allowance category for the funding source.**

*Id.* at 15-16.

> *See also* **Response to JS26,** *supra.*

**JS27.** The Financial Partners ("FP") unit of FSA, with various regional offices, was responsible for performing program reviews of lenders as part of FSA's efforts to monitor compliance by lenders. [Ex. II.118 (Shaw Dep. 28:17-29:7).]

**RESPONSE TO NO. JS27. Incomplete. After October 2005, Financial Partners began to conduct "special allowance" program reviews that focused specifically on a lender's compliance with the Taxpayer Teacher Protection Act. Criswell Tr. 233:19-234:7. (Soni Dec., Ex. 26).**

**JS28.**   During the period 2002-2007, FSA included a policy office to act as a liaison between FSA and the Office of Post-Secondary Education ("OPE"). [Ex. II.118 (Shaw Dep. 39:10-40:7).]

**RESPONSE TO NO. JS28.  No dispute.**

**JS29.**   OPE serves as ED's policy-making arm with respect to post-secondary education issues, including the federal student aid programs. [Ex. II.118 (Shaw Dep. 18:21-19:9).] OPE is headed by an Assistant Secretary of ED, which is a position that requires confirmation by the Senate. [McMahon Decl., Ex. II.119 (Stroup Dep. 17:11-17:14).] Sally Stroup was confirmed as Assistant Secretary for OPE in March of 2002 and served in that position until March of 2006. [Ex. II.119 (Stroup Dep. 12:9-12:14, 17:8-17:14).]

**RESPONSE TO NO. JS29.  Incomplete.  Immediately prior to becoming Assistant Secretary for OPE, Stroup was employed for 10 months at the University of Phoenix.  Prior to that, Stroup worked for seven years as a professional staff member on the House Education and Labor Committee.  Prior to that, Stroup worked for eleven years for the Pennsylvania Higher Education Assistance Authority ("PHEAA").  Stroup Tr. 12:15-13:3 (Soni Dec., Ex. 21).  Stroup is currently employed at Scantron Corporation.  Her coworkers there include Terri Shaw, former Chief Operating Officer of FSA, and Bill Hansen, former Deputy Secretary of Education.  Hansen Tr. 330:1-14 (Soni Dec., Ex. 22).**

**JS30.**   OPE makes policy with respect to post-secondary financial aid programs and FSA enforces that policy. [Ex. II.118 (Shaw Dep. 19:10-19:12).]

**RESPONSE TO NO. JS30.  Incomplete.  Stroup did not have "ultimate authority" in DEd for "interpreting the regulations that apply to 9.5 SAP," and she was never**

delegated that authority by the Secretary.  Stroup Tr.  213:12-214:1 (Soni Dec., Ex. 21).
Nor did she represent to lenders that she had such authority, and she never told lenders
that she "could authorize them to make certain claims on 9.5 SAP." *Id.* at 214:2-7.

**JS31.**  The Office of General Counsel within ED provides legal advice to FSA and
OPE with respect to Title IV programs. [*See, e.g.,* Ex. II.119 (Stroup Dep. 19:11-19:20); Ex.
II.118 (Shaw Dep. 19:18-20:2).] The Postsecondary Education Division of OGC provides legal
services for postsecondary education programs administered by the Assistant Secretary for
Postsecondary Education. [http://www2.ed.gov/about/offices/list/om/fs_po/ogc/prs.html]

**RESPONSE TO NO. JS31.  No dispute.**

**JS32.**  The Office of the Inspector General is under the direction of the Inspector
General and is an office within ED that reports to the Deputy Secretary and Secretary of
Education. The IG serves as the principal advisor to the Secretary on matters related to
promoting economy, efficiency and effectiveness, and preventing and detecting fraud and
abuse in the administration of Departmental programs and operations.
[http://ww2.ed.gov/about/offices/list/om/fs_po/oig/intro.html]

**RESPONSE TO NO. JS32.  No dispute.**

**III.    ED STATEMENTS CONCERNING THE RELEVANT LAW, REGULATIONS
        AND GUIDANCE**

**A.    Early ED Detection and Investigation of 9.5 SAP Growth**

**JS33.**  As interest rates fell in 2001 and 2002, auditors employed in the regional
offices of the FSA noticed that the outstanding balance of loans on which certain lenders were
claiming 9.5% SAP was growing. The auditors investigated the cause for such growth in
connection with a program review undertaken in July 2002 at the Iowa Student Liquidity

Corporation ("Iowa") and prepared a draft audit report in October 2002. [McMahon Decl., Ex. II.9 (ISLLC000035-42); Ex. III.119 (Stroup Dep. 50:11-50:15) (recalling discussions "within the Department of Education as of October 30, 2002, on the eligibility of loans for the minimum special allowance rate").] According to Mirek Halaska, the head of the Southern Regional Office based in Texas,[2] the regional offices had been "looking at proper billing for special allowance prior to raising this issue in 2002," but viewed the Iowa review as a "pivital [sic] point," being the "first time" a region tried to "stop the practice." [McMahon Decl., Ex. II.10 (OBERG00000129-30).]   Halaska described the attempt to stop the practice as an attempt to "modify the guidance."   [*Id.*]

**RESPONSE TO NO. JS33.  Disputed.  The first sentence incorrectly suggests that multiple Financial Partners regional offices had become aware of 9.5% Loan growth in 2001 and 2002.  The cited evidence reflects that only program reviewers in the Southern Region had noticed the growth during the program review of Iowa Student Liquidity Corporation in 2002.  Wallace Ex. 2 at ISLLC-000049-50 (Mills Decl., Ex. 44).**

**To the extent statements by Halaska are offered for the truth of the matter asserted, they are hearsay.**

**JS34.**   The regional offices undertook to gather information concerning the amount of bonds eligible to acquire 9.5 loans that FFELP participants held. [Ex. II.10 (OBERG00000130).] By the summer of 2003, the regional offices assembled data to identify all lenders who submitted claims for 9.5 SAP (designated on ED's 799 forms using an X-code). [*Id.;* Ex. II.119 (Stroup Dep. 60:18-62:12, 165:4-165:6); Ex. II.118 (Shaw Dep. 118:18- 119:4).]

---

[2]      Mr. Halaska was deceased at the time this action was unsealed.

They continued to gather information about 9.5 SAP eligibility during program reviews "by looking at the bond totals and the genealogy of refunded/refinanced bonds." [Ex. II.10 (OBERG00000130).]

**RESPONSE TO NO. JS34.  Disputed.  The Halaska email refers only to the Southern Region's investigation into the 9.5% Loan issue.  *See* OBERG00000130 ("Our regional perspective on the issue is that it costs the Department hundreds of millions of dollars that these entities are not entitled to.") (McMahon Dec., Ex. II.10).**

**To the extent statements by Halaska are offered for the truth of the matter asserted, they are hearsay.**

### B.    The August 2003 CRS Request for Information

**JS35.**    On August 13, 2003, Adam Stoll of the Congressional Research Service e-mailed Ann Clough at ED to obtain information on behalf of a Congressional requester "pertaining to the so called '9.5% floor loans' . . . ." One of the requests was for an explanation of "how the overall outstanding balance of 9.5% floor loans may have grown in recent years...." [McMahon Decl., Ex. II.11 (ED-B-004570).]

**RESPONSE TO NO. JS35.  Incomplete.  Relator's investigation into the 9.5% Loan scandal led to the CRS Request for Information.  As a result of his conversations with Relator, James Kvaal, a member of the minority staff for the House Committee on Education and the Workforce, raised the 9.5% Loan growth issue with Michael Dannenberg, who was at the time senior legal counsel for the Senate Health, Education, Labor and Pensions Committee.  Relator's Resp. to Nelnet Interrog. 1 (Soni Dec., Ex. 112). Dannenberg then solicited from the Congressional Research Service ("CRS") - and more**

specifically, Adam Stoll - a memorandum outlining the history of industry-wide 9.5% loan holdings and SAPs, which was forwarded to Relator by either Kvaal or Dannenberg on or about October 2003.  October 8, 2003 Memorandum from Adam Stoll to Michael Dannenberg, OBERG00005993 (Soni Dec., Ex. 202).  *See also* Relator's Opposition to the Motion to Dismiss by Educations Loans, Inc. and Student Loan Finance Corporation (Doc. 314), pp. 4-5 (and supporting documentation cited therein).

**JS36.**   On August 27, 2003, Ms. Clough forwarded Mr. Stoll's requests and a draft response to, among others, Pam Moran of OPE. [McMahon Decl., Ex. II.12 (ED-B-004567-68).] Ms. Moran responded by e-mail to Ms. Clough on August 27, 2003. She wrote:

> As to the explanation as to how these billings are growing based on the DCL Q&A #30 guidance [*see supra* ¶ JS18], here is an explanation of what can go on under that guidance that leads to growth . . .
>
> 1.      Step One — There is a tax-exempt bond issuance prior to 10/1/93 for $10,000 that doesn't expire until 2012.
>
> 2.      Step Two — Student Loans are originated with these tax exempt funds. They are all subject to the "floor."
>
> 3.      Step Three — Under the #30 Q&A guidance the $10,000 of tax-exempt loans that were originated are refinanced with taxable monies. Prior to ED's changed policy, that would have ended their identity as tax-exempt loans and they would no longer have qualified for the "floor." Under the new policy, they can be refinanced with taxable monies and still retain their eligibility for the "floor."
>
> 4.      The refinancing of the original tax-exempt loans frees up the $10,000 of tax-exempt funds.
>
> 5.      New tax-exempt loans are made with those freed up tax-exempt funds. Now you have $20,000 worth of student loans eligible for the floor.
>
> 6.      *Repeat these steps many time* [*sic*] *over.* As long as you retain legal title to the loans, the bond issuance doesn't expire, and the loans are not otherwise "retired" or "defeased," as the regs say, your pool of loans eligible for the "floor" continues to grow.

[Ex. II. 12 at (ED-B-004567) (emphasis added).]

**RESPONSE TO NO. JS36. Disputed. This document is redacted and a full understanding of Moran's thoughts on this matter is not ascertainable. Furthermore, Moran's email is descriptive and does not purport to interpret these regulations or guidance.**

**To the extent Moran's statements are offered for the truth of the matter asserted, they are hearsay.**

**JS37.** Senior ED officials Sally Stroup, Terri Shaw and Kristie Hansen agreed with Pamela Moran's explanation of how tax-exempt billings could grow under the applicable regulations. [Ex. II.119 (Stroup Dep. 120:17-121:2); Ex. II.118 (Shaw Dep. 101:17-102:6); McMahon Decl., Ex. II.120 (Hansen Dep. 176:7-177:21).]

**RESPONSE TO NO. JS37. Disputed. *See* Response to JS36, *supra*.**

**Kristie Hansen was general manager of Financial Partners from July 2002 to January 2004. Hansen Tr. 11:1-3 (Soni Dec., Ex. 22). Shaw testified that she "made [Hansen] change responsibilities at Federal Student Aid in part, in large part because of her lack of attention to her duties." Shaw further testified that "when [she] asked Victoria Bateman to step in to act in that role temporarily there was quite a bit of unattended to work that was in Hansen's office that nobody, including myself, knew about." Shaw Tr. 57:10-58:18 (Soni Dec., Ex. 20).**

**Prior to joining DEd, Hansen was "assistant president" at the National Council of Higher Education Loan Programs ("NCHELP") from May 1999 until July 2002. Hansen**

Tr. 11:7-17 (Soni Dec., Ex. 22). Hansen testified that NCHELP was "a type of trade association whose members were lenders and guarantors and servicers." In her position as assistant president, acted as "an advocate on their behalf." *Id.* at 231:11-232:8 (Soni Dec., Ex. 22). To the extent Moran's statements are offered for the truth of the matter asserted, they are hearsay.

Hansen testified that she did not study the laws when the 9.5% Loan issue arose between 2002 and 2004. *Id.* at 200:13-21 (Soni Dec., Ex. 22) ("Q: What I'm asking you is in the period 2002 to 204, there was intense interest in the 1996 DCL, did you go back and study the . . . 1992 rule to determine for yourself whether the 1996 DCL was either accurate or a mandatory interpretation of the 1992 rule? . . . A: I don't recall doing that study.") (Soni Dec., Ex. 22). Hansen also testified that she was unaware of whether "there were regulations that specified which funds could be used to acquire loans and qualify them for 9.5 minimum SAP." *Id.* at 248:6-249:12. She did not recall "receiving guidance on the issue . . . whether the refilling of the pre-1993 trust was with 9.5 minimum loans was authorized." *Id.* at 249:18-250:20. Hansen also testified that the letter did not provide sufficient information to understand exactly what Nelnet was doing. *See* Response to JS64, *supra*.

Hansen testified that the question of "refilling" a pre-1993 trust after a loan is transferred to a taxable obligation is not addressed in the 1996 DCL. Hansen Tr. 211:21-213:3 (Soni Dec., Ex. 22).

Hansen testified that when she left Financial Partners in December 2003, she "wouldn't have any specifics" about 9.5% Loan growth. Hansen Tr. 121:21-122:4 (Soni

Dec., Ex. 21).  Hansen also testified: "[I]n hindsight I'd say in some situations we may not have fully grasped what was happening in the actions of the lenders in working the loans." Hansen Tr. 151:20-152:11 (Soni Dec., Ex. 22) (emphasis added). Hansen further testified that DEd lacked the "experts" to understand the "complexity" of the lenders' "transactions."  Hansen Tr. 158:9-159:11 (Soni Dec., Ex. 22).

Shaw had not studied the 1993 OBRA and had no view with respect to its meaning. Shaw Tr. 258:5-259:7, 260:16-21 (Soni Dec., Ex. 20) ("I don't have a view.  I relied on the Office of General Counsel and the Office of Postsecondary Education to render interpretations of language for me to then follow through and enforce or take action against or implement if it was new language.") (Soni Dec., Ex. 20).  Shaw testified that she did not recall getting "any letter, memo, e-mail, other written guidance from OPE or anybody else on how to look at the sources of funds, the proceeds, in other words, the same issue of what loans are the proceeds." *Id.* at 280:2-10.  Shaw testified that she did not recall receiving any written guidance from OGC with respect to the 9.5% SAP prior to the Nelnet audit.  *Id.* at 295:15-297:5.  Shaw testified that she did not understand what the term "cash management needs" meant and never discussed it with anyone.  *Id.* at 328:14-19.

Stroup did not have "ultimate authority" in DEd for "interpreting the regulations that apply to 9.5 SAP," and she was never delegated that authority by the Secretary. Stroup Tr. 213:12-214:1 (Soni Dec., Ex. 21).  Nor did she represent to lenders that she had such authority, and she never told lenders that she "could authorize them to make certain claims on 9.5 SAP."  *Id.* at 214:2-7 (Soni Dec., Ex. 21).  Stroup also testified that she had little independent understanding of the pertinent statutes and regulations.  Stroup testified

that she did not "personally" "undertake a study of the pertinent statutes and regulations." *Id.* at 200:5-13 (Soni Dec., Ex. 21); *see also id.* at 212:9-17.

Regarding the 1996 DCL, Stroup testified that she never looked at it to determine whether it authorized using funds obtained from the transfer of 9.5% Loans to create additional 9.5% Loans, but rather had assumed that was correct because "[t]hat's how it always worked." Stroup Tr. 243:5-15 (Soni Dec., Ex. 21). Stroup also testified that she did not "go behind the 96 DCL and determine whether the underlying regulations supported the DCL." *Id.* at 252:1-9. She further testified that DEd "honored whatever was published" by the Clinton Administration – including the 1996 DCL – "whether or not it might independently be sustainable under the regulations." *Id.* at 253:15-254:6. Stroup did not "know if question and answer 30 was designed to address the situation of lenders moving loans from the nine and a half percent SAP earning to a full commercial SAP earning rate." *Id.* at 27:7-31:18. Stroup did not understand why, as mentioned in the 1996 DCL, the "department changed its policy in the 1992 regulations." *Id.* at 27:7-31:18). Regarding the regulations, Stroup testified that she did not have a "personal opinion with respect to the individual subsections" of Section 682.302. *Id.* at 213:9-11.

Stroup testified about the 1993 OBRA as follows: "Q: As I understand it, you've said in your personal view that the purpose of Congress here was to use a different rule post-1993 tax-free issuances from the rules that applied pre-1993? A: To the best of my knowledge, I think that was Congress' intent. Through the device which called dipping and the 1996 DCL, you thought that was perfectly permissible, perfectly legal to essentially stand that intent on its head? Correct." Stroup Tr. 226:3-13 (Soni Dec., Ex. 21).

Stroup testified that she believed that the large 9.5% SAP payments made between 2002 and 2005 "were too high in the current interest rate environment" and were "bad policy." *Id*. at 198:1-9. She also testified that the 1996 DCL was a "bad decision" by DEd. *Id*. at 151:10-18. And she testified that "my colleague at FSA and I both looked at it and said it was bad for the taxpayer and we were trying to save money for the government." *Id*. at 233:9-11.

Stroup testified that she "had a general understanding of the growth of the 9.5 loan portfolio," but that she never "investigate[d] the specific mechanisms and transactions by which the claimants were growing . . . their portfolio," and she never "personally look[ed] at any of the transactions to see whether [the] limitations [in the 1996 DCL] had been breached." Stroup Tr. 260:17-261:12 (Soni Dec., Ex. 21).

JS38. On October 3, 2003, attorney John Dean sent a letter to the Secretary's Chief of Staff, David Dunn, explaining that "[f]or the past two years, a number of FFEL loan providers have been using the existing legislative and regulatory authority to transfer loans into pre-October 1993 bond estates to secure preferential yields. The practice has become sufficiently widespread that it has attracted notice within the Department of Education and in the FFEL loan community." [McMahon Decl., Ex. II.13 (unnumbered document).]

RESPONSE TO NO. JS38. No dispute that the language is quoted accurately. Dean was writing as special counsel to the Consumer Bankers Association, a trade group of commercial lenders of which Defendant Nelnet was a member. Dean Ex. 18 at 1 (McMahon Dec., Ex. II.13). He was also a lobbyist for the Consumer Bankers Association and Nelnet. Dean Exs. 1, 2 (Soni Dec., Exs. 140, 141). He wrote the letter to advocate for a

legislative solution to what he considered the 9.5% SAP "loophole" because that solution would allow the Department to be given credit for the resulting budgetary savings (under the way budget scoring is done by the CBO) and it would therefore have room in the budget to implement other programs that CBA members, including Nelnet, wanted to see enacted.  Dean Ex. 18 at 2, 5 (McMahon Dec., Ex. II.13); Dean Tr. 268:10-269:9, 285:13-15, 290:21-291:11, 291:22-292:3 (Soni Dec., Ex. 19).  Clarification of the law through purely regulatory action, however, would not, even if it in actuality saved the same amount of money.  Dean Ex. 18 at 2, 5 (McMahon Dec., Ex. II.13); Dean Tr. 297:6-15 (Soni Dec., Ex. 19).

### C.   The October 2003 *U.S. News & World Report* Article and ED's Public Response

**JS39.**   In its October 27, 2003 issue, *US. News & World Report* published an investigative report entitled "Big Money on Campus: How Taxpayers are Getting Scammed by Student Loans." Among other things, the article described a "windfall" being provided to lenders:

> Where does the windfall come from? The subsidy guarantees lenders a return of 9.5 percent on certain loans; that's quite a bonus at a time when most students are paying only about 3.5 percent in interest. Lawmakers thought they had done away with the subsidy a decade ago, but some lenders discovered that by exploiting an Education Department ruling and using creative refinancing, they could issue a nearly infinite number of subsidized loans ... .
>
> Education Department officials told U.S. News that they are now reviewing the loophole but caution against any quick fix.

[McMahon Decl., Ex. II.14 (OBERG00006104-13, at 000013) (emphasis added).]

**RESPONSE TO NO. JS39.  No dispute that the language is quoted accurately.  The article also states "It's a windfall that has no benefit to taxpayers or students."**

**OBERG00013 (McMahon Dec., Ex. 11.14). Shaw testified that she became aware of the 9.5% Loan issue at about the same time the *U.S. News & World Report* article was published. Shaw Tr. 70:4-18 (Soni Dec., Ex. 20). Relator was a source for this article.**

JS40.  In its November 5, 2003 issue, the *EFC Exchange,* a newsletter circulated by a lender trade organization, reported that ED had conducted a "town hall meeting" as part of an ED Electronic Access Conference ("EAC") that week and that a questioner had sought comment on the *U.S. News & World Report* article. According to the article, Assistant Secretary of Education Sally Stroup "had this to say about half SAP/9.5% floor loans: 'This is perfectly legal . . . it is not illegal and there is no fraud and abuse and people are following the DCL. It may be bad policy in a low interest rate environment but there is no fraud and abuse and we knew about this well before the *U.S. News & World Report* article.'" [McMahon Decl., Ex. II.8 (PPHEA_026290-91).]

**RESPONSE TO NO. JS40. No dispute that the language is quoted accurately. The question posed to Stroup has not been reported and she could not remember this exchange. Stroup Tr. 69:1-5 (Soni Dec., Ex. 21). The full context of this comment is not available.**

JS41.  Ms. Stroup testified that she believed she said in substance what was quoted in the *EFC Exchange,* and that she "was speaking on behalf of the Department of Education." [Ex. II.119 (Stroup Dep. 246:10-249:5).] Ms. Stroup's view was that it "was the opinion of the Department of Education" that if "loans governed by regular SAP" were "run through" a pre-October 1, 1993 tax-exempt bond, that "dipped them and blessed them" for 9.5% SAP. That view was based on discussions with the Department's General Counsel, Deputy General Counsel and discussions with "[h]alf of the people in OPE." Ms. Shaw also testified that

"discussions across the department were happening with some regularity" with respect to the subject of growth in 9.5 SAP portfolios. [Ex. II. 118 (Shaw Dep. 186:7-186:14); *see also* Ex. II.119 (Stroup Dep. 224:21-225:8, 235:10-236:9, 240:4-240:19, 241:13-242:1, 251:9-251:15, 258:1-259:19).]

**RESPONSE TO NO. JS41. Disputed and incomplete.** *See* **Responses to JS37,** *supra*. **Stroup also testified had no recollection of even making the statement. Stroup Tr. 69:1-5 (Soni Dec., Ex. 21). To the extent statements by government personnel not made under oath are being offered for the truth of the matter asserted, they are hearsay. She further testified that she had not cleared the response through formal channels.** *Id.* **at 248:16-19. Shaw's testimony that "discussions across the department were happening with some regularity" refers to discussions in and around August 2004 when** *Money for Nothing* **was published. Shaw Tr. 186:4-12 (Soni Dec., Ex. 20).**

*See* **Response to JS37,** *supra***, regarding Stroup's understanding of the relevant laws and regulations.**

### D.    The December 2003 Iowa Program Review Report

**JS42.**   On October 31, 2002, Mirek Halaska circulated an October 30, 2002 draft of his region's report of a July 2002 program review of Iowa to Kristie Hansen and others within ED. [Ex. II.9 (ISLLC 000035-42).] The draft report included a finding entitled "Incorrect Billing for Special Allowance Benefits." [*Id.* at (ISLLC 000039).] The draft finding noted that Iowa had approximately $168 million in tax-exempt bonds, that Iowa's "total of original bonds issued prior to 1993, including refinancing" was approximately $327 million, that the total ending balance of Iowa's 9.5%/half-SAP loans for the quarter ending June 30, 2001, was

approximately $380 million, and that ED had asked Iowa to explain the approximately $53 million difference. [*Id.*] The draft reported that Iowa had explained that its system "was designed so that if a loan is financed using tax-exempt old money bonds and is later transferred to a taxable or tax-exempt new money financing then this loan will retain the 9.5% SAP floor," and had referenced ED's 1996 DCL [*see supra* ¶ JS18] as support for billing the transferred loans at the 9.5%/half-SAP rate. [Ex. II.9 (ISLLC 000035-42).]

**RESPONSE TO NO. JS42. No dispute that the language is quoted accurately. In their depositions, Stroup, Hansen, and Shaw each testified to having little or no recollection of the events surrounding the ISLLC program review. Stroup Tr. 32:12-16 (Q: "Are you familiar with the program review conducted by FSA concerning the Iowa Student Loan Liquidity Corporation? A: I know one was done. I'm not at all familiar what was in it."), 42:11-43:2 ("Q: In your mind what was this issue? A: This is about how loans got moved back and forth and whether or not they remained their eligibility versus refunding which was to me a different issue. Q: So this involved an issue of transferring loans within bonds, from one bond to another? A: Yes. Q: That was the subject of the Iowa program review that appears? . . . I don't actually know."); 43:20-21 ("I still don't remember what the Iowa-specific issues were."); 54:9-11 ("Q: Do you know if as of April 15, 2003 the report regarding Iowa was still in draft form? A: I don't know.") (Soni Dec., Ex. 21); Hansen Tr. 27:20-28:7, 29:9-29:21, 68:20-69:7, 73:15-74:5, 93:18-95:13 (stating, in describing the progression of the Iowa reports, that "[t]his is all just my opinion on this because I don't recall these documents specifically" and that "[h]onestly, I cannot recall discussions about these three documents specifically and that shift at this point.") (Soni Dec., Ex. 22); Shaw Tr. 45:18-46:1 ("Q: Are you familiar with a program review of the**

**Iowa Student Loan Liquidity Corporation that was conducted in 2002?  A:  Not off the top of my head, I couldn't tell you exactly what it was about.");  49:3-50:3 (Soni Dec., Ex. 20)**

> *See also* **Response to JS43,** *infra.*

> **JS43.**   The draft report provided:

> > The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issuance to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate.

[Ex. II.9 at (ISLLC 000040).]

> The report noted, however, that "[a]s a result of ongoing discussions with the Department of Education on the eligibility of loans for the minimum special allowance rate, the refund of special allowance interest will not be enforced until discussions have concluded." [*Id.*]

**RESPONSE TO NO. JS43.  No dispute that the language is quoted accurately. Program reviewers began raising questions about ISLLC's billing practices in July 2002. Wallace Ex. 2 at ISLLC-000048-49 (Mills Dec., Ex. 44).  In particular, Jerry Wallace, after taking into account pre-1993 tax-exempt bonds that had been refunded, determined that ISLLC still had approximately $52 million in unaccounted for 9.5% Loan growth.  Wallace Tr. 300:1-7 (Soni Dec., Ex. 23).  At the time, Jerry Wallace was a "Senior Guarantor and Lender Review Specialist," and today he is the head of the Southern Regional Office of Financial Partners.  *See* Iowa Draft Report at  ISLLC-000042  (McMahon Dec., Ex. II.4). Wallace emailed George Harris at OPE to ask about the $52 million:**

> After comparing their old money and the refinanced money (considered as old money), I still had a gap of about $52,000,000 portfolio balance that didn't match the ED Form 799 numbers for old tax-exempt.   The [sic] have come back with an explanation that the PHEAA system considers any loans originated with "old money" to remain as "old money", even when it is changed to a new money bonds.
>
> They have told me that some of their peers are actually originating all of their loans with "old money" bonds then transferring them immediately to "new money" bonds so they are able to get the "old money" returns from special allowance. That doesn't sound right [sic] me.

Wallace Ex. 2 (Mills Dec., Ex. 44). Wallace testified that the transferring scheme he described did not "sound right" because "[i]t didn't seem like it was a practice that met the legislative intent" of the "Higher Education Act of 1993 followed by the regulatory changes that were resultant."  Wallace Tr. 302:4-13 (Soni Dec., Ex. 23).

Harris responded that he could not "give [Wallace] an answer now" because the question was "[t]oo complicated," and Wallace responded by stating, "I see this as a real problem, if this is allowed to continue as common practice."  Wallace Ex. ISLLC-000048 (Mills Dec., Ex. 44).  Wallace testified that he was referring to "[t]he unlimited transferring of loans from an eligible funding source to other – both to what I would call new money and taxable funding sources."  The "real problem," as he saw it, was that he could not at the time "understand a congressional mandate to eliminate a process and at the same time allowing lenders to, in essence, convert their entire portfolio to tax [exempts] should they choose to do so."  He was "concerned that as [he] understood the regulations or the intent of the regulations at the time, that there should be constraints on growth."  Wallace Tr. 303:4-304:18 (Soni Dec., Ex. 23).

Not long thereafter, Wallace received a more thorough explanation of ISLLC's billing process from one of the company's officers, Ron Foresman.  At that point, Wallace again emailed Harris:

> [ISLLC] now [sic] taxable money to buy all of their new loans. At some point, about 30 days later, the loans are transferred to a bond issue.  At some point later loans may be transferred to yet another bond issue.
>
> The PHEAA software tags the loan as tax-exempt (old money) if the loan is ever held in [sic] old-money tax-exempt bond. They have provided me with a list with $47 million of loans that at some point in the past had been held in an old-money bond, but are now held in new-money tax-exempt bonds and taxable bonds.  I calculate that these bonds cost [sic] government about an additional 10% of the value to the loan, in this case about $4.7 million in additional special allowance expenses over the last 5 years.  This could add up to some real money, if all of the secondary markets were to start manipulating the system to make all of their loans "old-money".
>
> Ron Foresman has told me that they do not try to manipulate this system, but that other secondary markets do.  If this is acceptable, then ISLC [sic] could simply pass the rest of their $360 million new-money and taxable money through an old money bond, then their entire $750 million portfolio becomes old-money, which would allow them to double their return on special allowance from $2.7 million per quarter to $5.4 per quarter.  Somehow, this just doesn't seem right to me. . . .
>
> It would seem that Congressional intent back in 1992 was to eliminate these bonds with a floor [sic] not to allow extreme expansion of old money.

Wallace Ex. 2 (Mills Dec., Ex. 44).

Wallace testified that by "manipulating the system," he meant "dipping [ineligibible loans] simply to get the 9.5 status."  Wallace Tr. 322:7-323:8 (Soni Dec., Ex. 23).  He explained that he understood ISLLC's point to be that it was not "manipulating the system" because until this program review, it was unaware that the PHEAA compass

system was "tagging" ineligible loans as 9.5% Loans.  In other words, ISLLC was not at

the time engaged in loan transactions simply to create 9.5% Loans, while other entities

were allegedly "intentionally dipping to pick up the 9.5." *Id.* at 323:9-326:5.

     Wallace was "concerned about the potential for unlimited growth" if lenders could

"mov[e] a loan to a tax exempt bond simply for the purpose of tagging it as tax exempt,"

which "didn't seem to be within what [he] presumed to be the mandate of the payment of

tax exempt benefits."  That is, "if you moved a [9.5% Loan] over, there was some

reasonability to bill on it, [but] filling back behind it, moving up and filling behind it again

and again didn't seem kosher."  Wallace further explained that "[e]ven if you moved some

of it out it didn't create more room in the pool, much as a swimming pool.  You start

dipping cups of water out, there is so . . . much in the pool and so much wherever you move

it but, you know, you move back and forth,  you should have a similar amount of water in

the pool, accounting for a little bit of evaporation, a little bit of rainfall, but you don't just

keep refilling the pool over and over again as you empty it." *Id.* at 327:8-330:5.

     Wallace followed up with yet another email to Harris providing even more details

about the ISLLC situation:

> Lenders move loans from one bond issue to another as a
> matter of routine, for a variety of business purposes.  ISLC
> [sic] contends that if a loan has ever been held in one of their
> "old-money" bond issues, then is transferred to a bond issue
> that is not an old-money bond issue, then that loan [sic] forever
> be considered "old-money" for special allowance billing.
>
> Here are examples:
>
> 1. If ISLC [sic] purchase [sic] a $3,000 loan with a tax-exempt
> bond issued prior to 10/1/93, then they bill us with special

allowance code X, indicating that the loan qualifies for an old-money billing category.  At some point they decide to change the financing to another bond issue (that is not an old money bond).   For the life of the loan, they continue to bill the Department as if the loan was still financed with an old-money bond.

2. ISLC [sic] purchases loans with taxable money.  They bill us showing [sic] loan is financed with taxable money.  The loan transfers into an old-money bond and stays there for a few months.  They change the billing indicating the loan is now financed with old-money.   A few months later, the loan transfers back to a taxable bond issue.  For the life of the loan, they continue to bill the Department as if the loan was still financed with an old-money bond.

I guess part of the question related to 682.302(c)(4) could rest on the definition of purchase.  Should the transfer of a loan from one bond fund to another held by the same lender, be considered as a purchase?

Wallace Ex. 2 (Mills Dec., Ex. 44). Harris responded as follows:

There is nothing wrong with ISLC's contention that you described in your first paragraph.  That's ok, and it agrees with what I said in my July 18 email to you where I said "As a general rule, if a loan is made with 'old money' it remains eligible for the 'old money' special allowance, even if it gets transferred and is included in another financing instrument.  But, you should also consider compliance with 34 CFR 682.302(e)."

However, what you described in your second example appears to be a shell game that goes like this:

1. ISLC purchases a loan with taxable money.

2. They bill us showing the loan is financed with taxable money.

3. They transfer the loan to an "old-money" bond for a few months.

4. They change the billing to show that the loan is now financed with "old money."

5. The loan gets quickly transferred back to a taxable bond.

> 6. ISLC continues to bill us as if the loan was financed with "old money."
>
> You know what?  Transferring a dead dog into a freezer full of filet mignon for a few days doesn't mean that the dead dog turns into filet mignon, right?

Wallace Ex. 2 (Mills Dec., Ex. 44).

Wallace testified that in his view, Harris considered the transactions described in part (1) of Wallace's email to be lawful, but that with respect to part (2), "[i]f you merely move a loan into and out of a bond just merely to gain an additional tax exempt portfolio, he did not view that as permissible activity."  Wallace Tr. 335:9-341:11 (Soni Dec., Ex. 23). Wallace also testified that in his view, a "[s]hell game is where you have three shells on the table and you keep moving them around and you make people guess where the bean is underneath one of the shells.  The point is, it's for the dealer to win more times, and oftentimes to hide what's going on underneath the shells . . . .  Maybe not to have anything underneath any of the shells."  *Id.* at 341:21-342:16.

Regarding the draft report, Wallace testified that the "unlimited growth" finding had been lifted from an email he sent to the review leader, Earl Crisp.  Wallace Tr. 343:19-346:5 (Soni Dec., Ex. 23).  He explained the finding as follows: "[T]here was a finite amount of money that could be committed.  . . .  [A]s you committed funding to a particular loan in a bond, . . . when you moved it, that . . . had the effect of reserving that money and didn't create a new hold to create a new loan behind that because you had reserved those funds and committed the funds for the bond out of that source."  He further testified that the 2007 DCL ultimately confirmed what he had written for this initial draft – there were limits to how much a pre-1993 tax-exempt bond could be refilled with 9.5% loans, and in fact, the 2007 DCL was even "more limiting."  *Id.* at 348:2-350:11.

**Hansen could not recall what she had done as a result of the 2002 draft report.**
**Hansen Tr. 53:3-16 ("Q:  What did you do as a result of receiving [the October 2002 Iowa]**
**draft report?  A:  I can't specifically remember."); 59:20-60:2 ("Q:  At the time that you**
**received [the 2002 Iowa] draft report had you formed an opinion on whether the finding**
**was correct or incorrect?  A:  I don't recall.") (Soni Dec., Ex. 22).  Stroup also did not**
**recall reviewing the draft report, Stroup Tr. 49:14-16 ("Q:  Did you receive a copy of the**
**October 30, 2002 draft report on or about October 30, 2002?  A:  I don't know.") (Soni**
**Dec., Ex. 21), and Stroup did not know "who was responsible within the department for**
**determining whether to accept the conclusions in the [2002 Iowa] draft report."  *Id.* at 52:7-**
**10.**

JS44.  Mr. Halaska's October 31, 2002 e-mail to Ms. Hansen and others forwarding
the draft report stated: "It was our interpretation that the regulations do not permit unlimited
growth of tax-exempt funds by transferring loans from one bond issue to another. It is our
opinion that we need a clear legal interpretation on this issue in order to resolve this finding."
[Ex. II.9 at (ISLLC 000035).]

**RESPONSE TO NO. JS44.  No dispute that the language is quoted accurately.  To**
**the extent statements of individuals not made under oath are relied upon for the truth of**
**the matter asserted, they are hearsay.**

JS45.  In a November 6, 2003 e-mail to Assistant Secretary Sally Stroup, the President
and CEO of Iowa asked Ms. Stroup to "clear the release of the report from the [ED] review of
[Iowa] conducted in July 2002. I have made numerous attempts, through the Dallas office and
through Kristy [sic] Hansen, to get this released. The only sticking point was our treatment of

9.5% floors . . . . I noted in the EFC Exchange today that you reiterated at the EAC meeting what you told me on the phone: that our treatment of 9.5% floor loans was in accordance with the 96 DCL. So could we please have our clean review report?" [McMahon Decl., Ex. II.16 (ISLLC-000018-19, at 000019).]

**RESPONSE TO NO. JS45.  No dispute that the language is quoted accurately.  To the extent statements of individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.**

JS46.   On November 7, 2003, Assistant Secretary Stroup forwarded the above e-mail to Ms. Hansen, writing that "there should be no issue with 9.5% floor unless something is going on different from people passing loans thru existing deals and extending times thru refinancing both of which look legal under the DCL." [Ex. II.16 at (ISLLC 000019).]  Ms. Hansen agreed that multigenerational transferring was permitted as reviewed in the ISLLC program review. [Ex. II.120 (Hansen Dep. 93:18-94:8, 96:17-97:11).]

**RESPONSE TO NO. JS46.  Disputed and incomplete.  Stroup's statement in full included: "kristie, I don't know exactly what report he is talking about, but there should be no issue ... ."  ISLLC–000019 (McMahon Dec., Ex. II.16) (emphasis added).  In the testimony cited, Hansen did not address "multigenerational" transferring.**

JS47.   That same day, Ms. Hansen forwarded Ms. Stroup's e-mail to Mr. Halaska, whose region had issued the October 2002 draft report. On November 8, 2003, Mr. Halaska responded to Ms. Hansen that his region could "issue the report by stating that ED guidance is pending in regards to the 9.5% and once resolved we will notify the entity as to what the ED Guidance will be on the 9.5%." [Ex. II.16 at (ISLLC 000018).]

**RESPONSE TO NO. JS47.  No dispute that the language is quoted accurately.  To the extent statements from Halaska are relied upon for the truth of the matter asserted, they are hearsay.**

**JS48.**  On November 10, 2003, ED issued another draft report for the July 2002 Iowa program review.  Unlike the October 30, 2002 draft report, the November 10 report did not contain a finding of improper special allowance billing. Instead, it included an "Observation: Questionable Billing for Special Allowance Benefits." The Observation stated:

> The Department of Education is currently reviewing the applicable legislation and Dear Colleagues [sic] Letters with particular interest concerning the March 1996 Dear Colleague Letter DCL-96-L-186. *In particular, the wording is vague enough to allow more than one interpretation of the content with respect to growing the Tax Exempt Bond base.* It was originally the opinion, of the team, that this interpretation that allowed for growing the base is not the implied intent of DCL-96-L-186.  This has been brought to the attention of Headquarters policy staff for final determination and it appears that an amendment to clarify the existing Dear Colleague Letter will be introduced within the coming months . . . .

[McMahon Decl., Ex. II.17 (ISLLC-000011-17, at 000014) (emphasis added).]

The November 10, 2003 draft report repeated the discussion of the October 30, 2002 draft concerning Iowa's 9.5%/half-SAP loan growth and Iowa's explanation. It eliminated, however, the October 30, 2002 draft's paragraph (quoted *supra* at ¶ JS43) that started: "The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issuance to another." [Ex. II.17 (ISLLC 000011-17).]

**RESPONSE TO NO. JS48.  No dispute that the language is quoted accurately.  Neither Stroup nor Hansen recalled reviewing this draft.  Stroup Tr. 70:16-18 ("[D]o you recall receiving a copy of the [Iowa] draft report dated November 10, 2003?  I don't."), 72:6-10 ("Do you know if this November 10, 2003 report was the final report?  I don't know.  Is this another draft?  I have no idea.") (Soni Dec., Ex. 21); Hansen Tr. 93:18-95:13, 78:6-20 (testifying that she "didn't study" the November Iowa draft report) (Soni Dec., Ex.**

22).  Hansen also testified that she did not know how the "Finding" from the 2002 draft became an "Observation" in the November 2003 draft or who was involved with making that decision.  *Id.* at 81:1-82:1; *see also id.* at 83:20-85:4.

Wallace testified, however, that at least as of May 2003, the Southern Region's position on the 9.5% Loan issue continued to be the same as the position stated in the October 2002 draft of the report.  Wallace Tr. 386:7-11 (Soni Dec., Ex. 23).

Wallace received no explanation for how unlimited growth was legal.  Wallace Tr. 399:6-21 (Soni Dec., Ex. 23), and he still believed it was contrary to Congressional intent. *Id.* at 397:17-399:4

Wallace stated that the Southern Region "still wished to pursue the issue." *Id.* at 388:21-389:11.  Regarding the sentence in the draft that stated that "[i]t was originally the opinion, of the team, that this interpretation that allowed for growing the base is not the implied intent of the DCL-96-L-186," ISLLC-000014 (McMahon Dec., Ex. II.17), Wallace explained that "Question 30 was very limited in its scope and, again, I think this sort of skirts the issue to some extent. ...  In one way you can say that the DCL allowed for the loans to move but the DCL did not give the authority to grow the base.  So it's not implied in there but, like I say, there's other controlling regulations, more so than just the DCL that come into play."  Wallace Tr. 391:21-393:1 (Soni Dec., Ex. 23).  Wallace testified that the "other controlling authority" was  Section 682.302(c).  *Id.* at 393:6-397:15.

JS49.  On December 9, 2003, ED issued the final report of its program review of Iowa. The final report replaced the "Observation" section of the November 10, 2003 draft report with a "[n]ote of interest regarding billing for Special Allowance" (italics omitted). In contrast to

the earlier versions of the report, ED's final report concluded: "The process described above is considered within compliance when consideration is given to the [1996 DCL]." [McMahon Decl., Ex. II.18 (ISLLC000002-08).] Assistant Secretary Stroup agreed that Nelnet's May 29, 2003 letter raised the same issues as the ISLLC program review. [Ex. II.119 (Stroup Dep. 87:9-87:11).] Stroup also testified that she agreed with the statement that the wording of the DCL was vague. [Ex. II.119 (Stroup Dep. 73:3-73:21).] Hansen similarly agreed that the "tax-exempt issue" was confusing. [Ex. II.120 (Hansen Dep. 62:8-62:12).]

**RESPONSE TO NO. JS49.  Disputed and incomplete.  *See* Responses to JS42-48, *supra*.  Stroup testified that Nelnet's May 29, 2003 letter "generally" raised the same issues as the ISLLC program review.  DEd never mentioned the ISLLC program review in its communications with Nelnet, and Nelnet was unaware of the final ISLLC report until this litigation.  Nelnet Audit Report at 57 (Soni Dec., Ex. 199).**

**At their depositions, neither Stroup nor Hansen recalled receiving a copy of the final draft report.  Hansen Tr. 90:5-7 ("Q:  Do you recall receiving [the final Iowa] report and reviewing it when it came out?  A:  Not specifically.") (Soni Dec., Ex. 22);  Stroup Tr. 79:3-6 ("Q:  Do you remember whether you received a copy of the final program review on or about December 9, 2003?  A:  I don't remember.") (Soni Dec., Ex. 21).  Stroup did not know who authorized the language in the final report.  *Id.* at 79:18-80:7 ("Q:  Who made the decision to conclude that the Iowa process was considered within compliance?  A:  I don't remember.  Q:  Did you have a role in that as Assistant Secretary?  A:  I don't remember.  Q:  Do you remember any discussions that you had concerning the change in the language from the two prior versions to the final report as it relates to element twelve?**

A:  No.").  Wallace received no explanation for why the changes to the final draft had been made.  Wallace Tr. 403:7-10 (Soni Dec., Ex. 23).

Neither Hansen, Shaw nor Wallace had ever seen a "Note of interest."  Hansen Tr. 90:1-4 (Soni Dec., Ex. 22); Shaw Tr. 61:16-62:2 (Soni Dec., Ex. 20); Wallace Tr. 403:16-19 (Soni Dec., Ex. 23).  Hansen testified that the final Iowa report did not authorize the refilling of pre-1993 trusts after loan transfers.  Hansen Tr. 251:7-254:13 ("Q: Mr. Foresman didn't discuss the italicized text, did he, the question about what eligible funds were being used within the 1993 trust?  Does he talk about that at all?  A: I don't see a specific reference to that.") (Soni Dec., Ex. 22).  Similarly, Wallace testified that the final report did not discuss 9.5% Loan growth.  Wallace Tr. 404:2-11 (Soni Dec., Ex. 23).  *See also* Response to JS37, *supra*, regarding Stroup's understanding of the applicable laws and regulations.

Shaw did not recall why changes were made to the various report drafts.  Shaw Tr. 55:20-56:12, 56:21-57:4 (Soni Dec., Ex. 20).  Shaw did not "know who was responsible, who made the decision to conclude that the Iowa Student Loan Liquidities process was considered within compliance," *id.* at 62:11-62:17, and she did not "remember any discussions within the department concerning how the Iowa process in October of 2002 was considered out of compliance but in December of 2003 was considered in compliance." *Id.* at 62:18-63:2.  *See also* Response to JS37 regarding Shaw's understanding of the applicable laws and regulations.

**JS50.**  Ms. Shaw testified that the conclusion reached by the Department following deliberation about the outcome of program reviews in late 2003 was "that current billing

practices by lenders on 9.5 were within the statute." [Ex. II.118 (Shaw Dep. 75:4-75:11).] She

testified that the decision was made by OPE and OGC that no action would be taken in

response to Oberg's OIG complaint because "all 9.5 interest and special allowance billings

were being submitted in compliance with existing statute, regulation and department policy."

[Ex. II.118 (Shaw Dep. 108:1-108:16).]

**RESPONSE TO NO. JS50.  Disputed and incomplete.  Shaw does not state in the**

**referenced testimony that this was the conclusion reached by the Department.  To the**

**extent statements of individuals not made under oath are relied upon for the truth of the**

**matter asserted, they are hearsay.**

### E.     The July 2004 Mirek Halaska Summary of ED Policy

**JS51.**   In a July 14, 2004 e-mail to various persons within ED, Mirek Halaska

"summarized" ED's "approach" to the issue of growth in lenders' portfolios of 9.5%/half-SAP

loans as follows:

> c. [T]he issue related to DCL-96-L-186, Question 30 came into play . . . .
>
> d. Then the policy interpretation of the DCL came back with the question of whether the practice of moving loans thru tax-exempt bonds to make them eligible was legal or not. The guidance was that it was legal and as long as a loan had ever been financed by an eligible tax exempt bond then an entity could bill the loan at the tax-exempt special allowance rate as long as the bond had not been defeased . . . .
>
> g. During our reviews in the Southwest region, we recovered $1.1 million for loans improperly billed as being eligible for tax-exempt benefits . . . .  [T]hese loans had never been in a bond eligible for tax-exempt billing . . . . *Had the loans passed thru an eligible bond prior to billing, then they would be [sic] been eligible under current guidance."*

[Decl. II.10 at (OBERG00000129) (emphasis added).]

**RESPONSE TO NO. JS51.  No dispute that the language is quoted accurately.  To the extent Halaska statements are offered for the truth of the matter asserted, they are hearsay.**

**JS52.**   Ms. Stroup and Ms. Shaw both testified that Mr. Halaska's recitation of the history of events "accurately described the policy interpretation of the DCL that was given to FSA." [Ex. II.119 (Stroup Dep. 132:4-132:17); Ex. II.118 (Shaw Dep. 132:19-133:11).]

**RESPONSE TO NO. JS52.  No dispute that the language is quoted accurately.  *See* Response to JS37, *supra*, with respect to Stroup's and Shaw's understanding of the applicable laws and regulations.**

**F.      Nelnet's Communications with ED and Public Disclosures[3]**

**JS53.**   Nelnet, Inc. ("Nelnet") is the parent company of Nelnet Education Loan Funding, Inc. ("NELF").

**RESPONSE TO NO. JS53.  No dispute.**

**JS54.**   In 1998, Nelnet Education Loan Funding, Inc. ("NELF"), a wholly owned subsidiary of Nelnet, acquired the student loan assets and liabilities of Nebraska Higher Education Loan Program, Inc. ("NebHELP"), a non-profit corporation that has previously operated as a qualified scholarship finding corporation under Section 150(d) of the Internal Revenue Code. In connection with that transaction, NELF assumed the obligations of NebHELP to pay the principal and interest due on its outstanding student loan revenue

---

[3]      Paragraphs JS53 to JS55 provide background information about Nelnet and NELF that is necessary to understand the facts relating to Nelnet's communications with ED and public disclosure.

bonds. [McMahon Decl., Ex. II.19 (N0093523-52 at N0093539).] Prior to its conversion to

for-profit status, NebHELP issued a series of tax-exempt bonds in November of 1985 to fund

the acquisition of federally backed student loans, including its 1985 Trust. [McMahon Decl.,

Ex. II.20 (ED-A003480-3516, at ED-A-003481-82).] NELF used proceeds of those bonds to

purchase or originate student loans. The Series 1985A bonds were issued under an indenture,

in relation to which NELF entered into an eligible lender trust agreement, with Wells Fargo

bank, an eligible lender trustee under the Higher Education Act. [McMahon Decl., Ex. II.21

(ED-A-001310-1342 at ED-A-001315).]

**RESPONSE TO NO. JS54. Incomplete. NELF had $463,175,000 in Eligible**

**Financings (including $143,050,000 in its 1985A bond series). Heimes Tr. 149:2-152:16,**

**153:14-154:10, 160:2-161:18 (Soni Dec., Ex. 4).**

**JS55.** NELF was also the beneficiary of several eligible lender trust agreements

relating to financing programs that issued various taxable obligations. Wells Fargo was the

eligible trustee for these "Purchasing Trusts," which included: (i) a securitization program

created by a Trust Indenture dated as of June 1, 1993, between NELF, as grantor and

beneficiary, and Wells Fargo, as trustee that relates to a Student Loan Trust and Agency

Agreement dated as of June 1, 1993 (the "1993A Trust"); (ii) an Eligible Lender Trustee

Agreement dated as of June 1, 2003, that relates to a securitization program created by an

Indenture of Trust as of June 1, 2003, between NELF, as grantor and beneficiary, and Wells

Fargo, as trustee (the "NELF 2003-1 Trust"); (iii) a Student Loan Trust and Agency

Agreement dated as of May 1, 1997, that related to a securitization program trust created by a

Trust Indenture dated as of May 1, 1997, between NELF, as a grantor and beneficiary, and

Wells Fargo as trustee (the "SLM CP Trust"); (iv) an Eligible Lender Trust Agreement dated as

of May 1, 2003, that related to a securitization program trust created by the Warehouse Note Purchase and Security Agreement dated as of May 1, 2003, among NELF as borrower, Wells Fargo as trustee, and various other parties (the "BofA Trust"); and (v) an Eligible Lender Trustee dated as of April 28, 2003, among NELF as borrower, Zions First National Bank, as trustee, and various other parties (the "RBC Trust). Most of these trust arrangements are, by their terms, governed by Nebraska law; the remainder are governed by Minnesota law. [Ex. II.21 at (ED-A-001316-17).]

**RESPONSE TO NO. JS55.  No dispute.**

**JS56.**   After the events of September 11, 2001, the Federal Reserve began decreasing interest rates. [McMahon Decl., Ex. II.121 (Dunlap Dep. 27:8-27:19).] As of the fall of 2002, Nelnet began to hear about a number of competitors that had expanded their portfolios of loans that qualified for 9.5% SAP. [Ex. II.121 (Dunlap Dep. 111:4-111:14); McMahon Decl., Ex. II.122 (Heimes Dep. 25:17-26:6).] Nelnet personnel, Jeff Noordhoek and Mike Pohl, had discussions on this point with Paul Sheldon, an investment banker with Citibank. [McMahon Decl., Ex. II.22 (N0108371); Ex. II.122 (Heimes Dep. 25:11-25:16).] Mr. Sheldon indicated to Nelnet that a number of people were recently taking advantage of the 9.5 floor. [Ex. II.22 (N0108371).] At that time, Nelnet believed that half SAP subject to the 9.5% floor would return more than loans billing at full commercial SAP although there was risk that if interest rates spiked up, the 9.5% SAP loans could earn less at certain points than full SAP loans. [Ex. II.122 (Heimes Dep. 98:7-98:13).]

**RESPONSE TO NO. JS56.  Incomplete.  Dunlap did not name any competitors. Dunlap Tr. 111:1-112:5  (Soni Dec., Ex. 5).  The reference to discussions with  Sheldon are**

in internal Nelnet emails and to the extent such statements are relied upon for the truth of the matter asserted, they are hearsay.

During the relevant time period, the 9.5% SAP loans did not earn less than the full SAP loans. Heimes Tr. 17:6-18 (Soni Dec., Ex. 4). Nelnet had numerous options to mitigate any risk associated with climbing interest rates. Nelnet could retire or defease the 1985A Trust, which would have resulted in the 9.5% SAP no longer applying to loans funded by the 1985A trust. Nelnet could sell the loans to a third party and the loans would have then received commercial SAP rates. *Id.* at 289:21-290:14.

JS57.  In December 2002, after hearing that other lenders were qualifying loans for 9.5% SAP given the low interest rate environment, Nelnet decided to seek guidance from ED as part of its effort to understand what other lenders were doing with respect to their 9.5% SAP loan portfolios and to determine the propriety of these practices. [Ex. II.121 (Dunlap Dep. 158:13-159:9); McMahon Decl., Ex. II.123 (Kaplan Dep. 29:11-30:3).]

RESPONSE TO NO. JS57.  Disputed and incomplete.  The Dunlap Dep. 158:13-159:9 and Kaplan Dep. 29:11-30:3 citations do not support the proposition that Nelnet sought guidance from the Department of Education to "understand" what other lenders were doing.

Mike Dunlap, Chairman and CEO, stated repeatedly that the $300 million plus in inflated 9.5% SAP claimed by Nelnet ███████████████████████████████ ███████████████████████ that Nelnet purported to serve.  Heimes Ex. 29 at N0001001 (Mills Dec., Ex. 36).  (emphasis added).  In December 2002, shortly after what came to be known

as "Project 950" began to be discussed, Dunlap asked his executive colleagues, ████████
████████████████████████ Heimes Ex. 3 at N0120999 (Soni Dec., Ex. 59).

**JS58.**   On December 23, 2002, Paul Tone, Executive Director of Government Relations
for Nelnet, had a telephone call with Kristie Hansen to set up a face-to-face meeting to discuss
issues relating to the 9.5% floor earnings on loans moved from certain tax-exempt
financings to taxable financings.  [McMahon Decl., Ex. II.23 (Tone Decl. ¶ 5).] As General
Manager of Financial Partners, Ms. Hansen was the head person of the division of FSA that
supervised lenders and guarantee agencies participating in the FFELP. During this preliminary
conversation, Ms. Hansen indicated that she was enthusiastic about meeting with Nelnet staff
on the 9.5% issue; she mentioned that she had done some research on the issue, including a call
to Sheila Ryan, formerly with Nellie Mae; and she mentioned the March 1996 DCL as
being relevant to the issue and reinforcing the contention that loans moved from certain tax
exempt issues also carried the floor earnings characteristic of 9.5% if loans were then moved
into the taxable financings. [*Id.*] During the December 23, 2002 telephone call, Tone
arranged for a face-to-face meeting to be held with Ms. Hansen in early January 2003. [*Id.*]

**RESPONSE TO NO. JS58.  Disputed and incomplete.  This is Nelnet's
characterization contained in an internal email from  Tone.  Dunlap Ex. 47 (Soni Dec., Ex.
54).  To the extent statements from individuals not under oath are offered for the truth of
the matter asserted, they are hearsay.**

**Incomplete in that in December 2002, Nelnet first approached Kristie Hansen at the
Department of Education.  Hansen "was a contact that Paul [Tone of Nelnet] had within
the Department," that came to the Department directly from NCHELP, an industry trade**

association of which Nelnet was a member, and worked in a non-policy job as general manager of the "Financial Partners" Section of the Department's Office of Federal Student Aid ("FSA") until relieved of her duties by her supervisor.  Hansen Tr. 10:11-13:3 (jobs at DEd, NCHELP), 14:11-15:4 (FSA is not responsible for policy) (Soni Dec., Ex. 22); Heimes Tr. 220:16-22 (Soni Dec., Ex. 4) (Hansen was a contact known by Tone); Shaw Tr. 58:1-18 (Soni Dec., Ex. 20) (decision to relieve Hansen of responsibilities).  Tone spoke with Hansen on the phone in December 2002.

Hansen's position was a policy-implementing, not a policy-making position or a legal position.  The question of the appropriateness of Nelnet's Project 950 raised policy and legal questions, not implementing questions.  *See* Response to 121, *infra*.  Hansen indicated that she had not thought much about this issue.  *See* Response to JS59, *infra*.  To the extent  statements of individuals not under oath are relied upon for the truth of the matter asserted, they are hearsay.  What was recounted above is from a memo written on January 5, 2003 after the face-to-face meeting with Hansen and Tone's Declaration made for this Motion.  *See* January 5, 2003 Email from Paul Tone at N0002360 (Soni Dec., Ex. 182).

At her deposition, Hansen did not recall a 2002 phone call with Nelnet or Tone.  Hansen Tr.  104:4-9.

JS59.  On January 3, 2003, Don Bouc (President of NELF), Paul Tone, Ed Martinez (General Counsel of Nelnet) and Gary Schlueger (Mr. Tone's deputy in Nelnet's government relations group reporting to Mr. Tone) met with Kristie Hansen at the Department of Education to discuss whether loans transferred through a tax exempt obligation originally issued before

October 1, 1993, to a taxable financing qualified for 9.5% SAP after leaving the tax exempt

obligation. [Ex. II.23 (Tone Decl. ¶ 6).] Ms Hansen stated that the Department could not

immediately preclude the practice of moving loans between tax-exempt and taxable

financings for the purpose of increasing the number of loans entitled to earn the 9.5% SAP

given the 1996 DCL. [*Id.*]  Ms. Hansen agreed that there was no legal argument prohibiting

a process of transferring loans through a pre-October 1, 1993 tax-exempt financing into a

taxable financing. [McMahon Decl., Ex. II.24 (N0124992).] During this meeting, Ms. Hansen

indicated that while the Department was looking at ways to limit or control the movement

of loans between tax-exempt financings and taxable financings for the purpose of

increasing the number of loans entitled to earn the 9.5% SAP, the Department could not

immediately preclude such practices given the 1996 DCL. [Ex. II.23 (Tone Decl. ¶ 6).] She

further acknowledged that at some points the half SAP return has had and may have in the

future an adverse effect on lenders depending on interest rate movements and that the current

9.5% floor opportunity may be balancing those losses. [*Id.*] Ms. Hansen also agreed that the

1996 DCL was silent on how frequently loans could be moved in and out of a tax-exempt

financing, or how long such loans must remain financed by pre-October 1, 1993 tax-exempt

obligations. [*Id.*] Ms. Hansen acknowledged that, at the time of this meeting, she was aware

that other lenders were engaged in such transferring practices and that this had resulted in an

increase in the volume of 9.5% loans. [*Id.*]

**RESPONSE TO NO. JS59.  Disputed and incomplete.  To the extent statements**

**made by individuals not under oath are relied upon for the truth of the matter asserted,**

**they are hearsay.**

**Hansen did not have a policy making position.  *See* Response to JS58, *supra*.**

Don Bouc, Ed Martinez, Paul Tone and Gary Schleuger met with Hansen on

January 3, 2003.  Hansen recalls virtually nothing of the meeting.  *See* Hansen Tr. 112:18-

113:21 (Soni Dec., Ex. 22).  The new Declaration of Paul Tone (McMahon Dec., Ex. II.23),

reflects that Nelnet ██████████████████████████████████████████████████

███████████████████████████████████████  Dunlap Ex. 47 at N0124998

(Soni Dec., Ex. 54).

Internal Nelnet emails document that Hansen had not thought about the practices

Nelnet discussed with her.  In response to an email from  Dunlap that posed a question, ████

████████████████████████████████████████████████  Bouc

wrote, ████████████████████████████████████████████

N0002362 (Soni Dec., Ex. 182).  In another email,  Bouc wrote, █████████████████

████████████████████████████████████████  *Id*.  Hansen

did not recall using the "fence" language.  Hansen Tr. 114:20-115:10, 272:8-10 (Soni Dec.,

Ex. 22).

After the January meeting, Mike Pohl emailed a group of Nelnet executives that ███

████████████████  Heimes Ex. 26 at N0125904 (Mills Dec., Ex. 35).  In early 2003, Nelnet

adopted "Project 950" to grow its 9.5% eligible loan pools.  Heimes Tr. 18:1-2 (Soni Dec.,

Ex. 4); █████████████████████████████████████.  Multiple internal documents

state that swaps were ██████████████████████  *See* Heimes Ex. 12 at N0102843,

Heimes Ex. 17 at N0119109 (Soni Dec., Ex. 61, 63).  Terry Heimes, Nelnet's CFO, denied

that any ████████████ had taken place, but was unable to explain the express references to

████████████ in the documents prepared by his own department.  Heimes Tr. 82-85, 109-11

(Soni Dec., Ex. 4).

At her deposition, Hansen corroborated very little of Nelnet's own characterizations of the meeting as she could recall very little about it.  Hansen Tr. 106:21-107:14; 109:19-113:21 ("Q: In essence, do you recall anything other than the fact that Nelnet came in to discus 9.5 percent and having the feeling that they said if you don't tell us we can't do it, we're going to do it?  . . . A: I believe every lender was talking about this at the time but I don't remember any specifics out of that conversation except the exploration of 9.5.");  114:16-115:19 (Soni Dec., Ex. 22).  She recalled generally that "[i]t appeared that Nelnet was interested in . . . getting a determination of whether certain practices would be approved for the 9.5 billing.  I'm saying 'certain practices.'  <u>I don't even know if we talked about specifics of what they were proposing</u>.  Both in this meeting and the larger meeting that I know we're going to talk about . . . there was a sense of Nelnet tattling on other lenders who were doing this billing and saying, if I could characterize this, tell us no or we're going to do it because everyone else is doing it.  Completely my opinion."  *Id.* at 107:20-108:13 (Soni Dec., Ex. 22) (emphasis added).

**JS60.**  Based on the review of the regulations, the 1996 DCL, the telephone call between Paul Tone and Kristie Hansen on December 23, 2002, and the January 3, 2003 meeting between the Nelnet executives and Ms. Hansen, Nelnet drafted a summary entitled "Project 950" to describe a three-step operational process to qualify loans for 9.5% SAP under which student loans financed on a taxable basis through various NELF financings were to be transferred to the NELF 1985A tax-exempt financings; temporarily warehoused in the 1985A financing; and then transferred from the 1985A financing to another taxable financing within NELF. [McMahon Decl., Ex. II.25 (N0018269-18273).] Project 950 was an operational overview to ensure that the movement of loans through sales and ultimate financing with tax-exempt and taxable

financings were accomplished effectively from an operational standpoint. [Ex. II.122 (Heimes

Dep. 48:648:21).] On January 10, 2003, John Dean of the law film Dean Blakey issued a

draft written legal opinion addressed to Mike Dunlap, Chairman and President of Nelnet Loan

Services, Inc. and on January 20, 2003, Mr. Dean issued a final signed opinion with the same

conclusion as the draft. [McMahon Decl., Ex. II.26 (N0000400-04).] The legal opinion

stated that "[g]iven that the language of the Dear Colleague letter is unambiguous and that

Departmental officials have informally confirmed our interpretation of 34 C.F.R. 682.302, we

have concluded that Nelnet may transfer loans into the tax-exempt bond estates it acquired

as a result of acquisition of converted qualified scholarship funding organizations

established pursuant to section 150(d)(3) of the Internal Revenue Code, and receive floor-

yield/half SAP treatment on such loans while they are held in the tax-exempt estate and

thereafter, provided that the original tax-exempt obligation has not be retired or defeased."

[*Id.* at (N0000404).] John Dean provided additional legal opinions to Nelnet regarding the

floor-yield/half SAP treatment with the same conclusions on March 4, 2003 [McMahon Decl.,

Ex. II.27 (N0127090-94)]; July 7, 2003 [McMahon Decl., Ex. II.28 (N02667-72)]; January

30, 2004 [McMahon Decl., Ex. II.29 (N0017677-90)]; and April 29, 2004 [McMahon Decl.,

Ex. II.30 (JED202-10).]

**RESPONSE TO NO. JS60.  Disputed and incomplete.  No support is provided for**

**the assertion that Nelnet's "Project 950" summary was based on a review of the**

**regulations, the 1996 DCL, the telephone call between Paul Tone and Kristie Hansen on**

**December 23, 2002, and the January 3, 2003 meeting between the Nelnet executives and**

**Hansen.**

John Dean is a lobbyist and lawyer who has counted Nelnet and its predecessors as a client since the early 1990s.  Dean Tr. 54:3-55:3 (Soni Dec., Ex. 19).  In 2002, he was affiliated with the firm of Dean, Blakey & Moskowitz (with Saul Moskowitz), which broke up during that year; he then restructured his operations to create a lobbying firm called Washington Partners LLP and a law office called Dean Blakey.  *Id.* at 13:22-14:20.  In 2003 and 2004,  Dean estimated that his business was approximately 65% lobbying and 35% legal work.  *Id.* at 15:6-11, 15:20-16:2.  However,  Dean's law firm was a registered lobbyist for Nelnet in 2003 and 2004.  Dean Ex. 2 (Soni Dec., Ex. 141); Dean Tr. 20:22-23:18 (Soni Dec., Ex. 19).  Dean claimed that his law firm did not do any lobbying for Nelnet in 2003 and 2004, but admitted that he personally conducted the lobbying efforts and that his law firm took in lobbying fees and then assigned certain of those fees to the lobbying firm based on "an arbitrary split."  *Id.* at 20:7-16, 23:13-18.  Dean was on a monthly retainer for lobbying and legal work that could be terminated by either party at any time.  *Id.* at 27:13-21.

As of December 18, 2002, Nelnet understood that it could go to John Dean to get the opinion that it wanted supporting its transfer activities.  In its initial "white paper" on what was later dubbed "Project 950," under the heading "strategy and discussion points," Nelnet queried: ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████ "White Paper" N0117977-79 at 78 (Soni Dec., Ex. 187).  Under the



heading "Strategy- (Let's roll- God Bless George Bush)," Nelnet listed ███████████

████████████████████████████████████████████

███████████████ *Id.* at N0117979.  Paul Tone, Nelnet's in-house lobbyist, spoke with  Dean

in early January 2003 and reported back to several people at Nelnet that  Dean would ███

███████████████ Heimes Ex. 5 at N0125008 (Soni Dec., Ex. 60).  Jeff Noordhoek

replied to the group advocating getting the opinion ██████████████████

██████████ Ed Martinez, then Nelnet's general counsel, also replied to the group,

reporting that they had indeed decided on that approach, ████████████████████

██████████ *Id.*

      Dean provided Nelnet with a draft opinion on January 10, 2003.  January 13, 2003

Email from Ed Martinez at N0125331 (Soni Dec., Ex. 197)  Dean provided a signed opinion

on January 20, 2003 that was almost identical to the January 10 draft.  Dean Ex. 8 at

JED214 (Soni Dec., Ex. 121).  However, this January 20 opinion is not one of the opinions

that Nelnet has cited as providing advice on which it relied.  *See* Nelnet Resp. to Relator's

Interrog. No. 9 (providing that it relied on March 4 and July 7, 2003 opinions and January

30 and April 29, 2004 opinions as advice of counsel) (Mills Dec., Ex. 1); Dean Ex. 16 at 45

(Soni Dec., Ex. 125).  The first signed opinion of counsel on which Nelnet has claimed

reliance was signed on March 4, 2003.  Dean Ex. 9 at N01270901-94 ((McMahon Dec., Ex.

II.27).  Dean confirmed that his recollection was that the March 4 opinion was the first one

formally delivered to Nelnet and that any prior opinions were drafts.  Dean Tr. 170:14-22

(Soni Dec., Ex. 19).

      Nelnet paid John Dean $5000 for his "sheep dipping" opinion in January 2003,

N0125789 (Soni Dec., Ex. 198), and ████████████████████████████████

███████████. *See* N0125018 (Soni Dec., Ex. 194). Subsequent opinions cost between $4000 and $7000. June 3, 2004 letter to Ed Martinez from John Dean at JED167, February 12, 2004 letter to Ed Martinez from John Dean at JED173 (Soni Dec., Ex. 211, 210).

Dean stated that his opinions were based on his understanding that any loan that secured a pre-October 1, 1993 tax-exempt bond was eligible for 9.5% SAP. Dean Tr. 103:13-105:18 (Soni Dec., Ex. 19). He believed that if a pre-October 1, 1993 tax-exempt bond estate went out and borrowed money in 1995 and used that money to purchase loans, those loans would be subject to 9.5% SAP. *Id.* at 112:14-116:5.

The informal conversations with department personnel to which Dean referred in his opinions consisted of a single conversation with Kristie Hansen of the FSA section of DEd; he never spoke with anyone from OPE or the DEd general counsel's office. Dean Tr. 183:17-184:22 (Soni Dec., Ex. 19). He never informed Nelnet of the fact that he spoke with Hansen. *Id* at. 184:22-185:8.

Dean confirmed that he did not in fact know the specifics of what Nelnet planned to do with the opinions, *id.* at 164:3-12, and did not know that Nelnet's business plans involved multiplying 9.5% SAP loan holdings many times over. *Id.* at 97:13-98:5.

Dean admitted that although Section 682.302(c)(3)(i)(A)-(E) dictates the sources of funds that can be used to make or purchase loans and have them be subject to 9.5% SAP, he did not specifically analyze whether the loans that Nelnet sought to qualify for 9.5% SAP fell within any of those sources. Dean Tr. 131:14-133:13 (Soni Dec., Ex. 19). The reason that he gave for not performing this analysis was that he did not believe that DEd was pointing lenders towards this subsection of the regulation, so he did not think it

mattered. *Id.* at. 134:14-135:12. Dean also stated that he did not need to perform the analysis because the proper financing of the loans was an assumed fact provided by Nelnet (*id*. at 222:5-223:10), and that Nelnet did not give him enough information to determine whether the loans had been properly financed in any event. *Id.* at 155:14-156:5.

Dean understood that the 1996 Dear Colleague Letter did not address the issue of how to bill for loans transferred in to a pre-October 1, 1993 tax-exempt bond estate and addressed only the transfer out of such a bond. Dean Tr. 148:12-14 (Soni Dec., Ex. 19).

Dean confirmed that his opinions did not consider whether the transactions would be consistent with policy and that he was not asked to consider policy. Dean Tr. 96:3-97:12, 102:12-16, 125:7-126:12 (Soni Dec., Ex. 19). He understood the policies behind the 1993 OBRA. *Id.* at 111:17-112:7.

Nelnet paid its lawyer and expert witness Jason Kravitt "hundreds of thousands of dollars" for opinions regarding the single issue of whether the transfers of loans between NELF bond estates were "sales" under the Uniform Commercial Code, which were submitted to DEd in opposition to the Inspector General audit findings. Kravitt Tr. 36:9-37:4 (Soni Dec., Ex. 30).

JS61. Mike Dunlap, Nelnet's Chief Executive Officer, made the decision to approve the Transferring process described in the Project 950 summary memorandum after the December 23, 2002 phone call between Mr. Tone and Ms. Hansen, the January 3, 2003 meeting between Nelnet executives and Department of Education officials, and after Nelnet received an opinion from Mr. Dean. [Ex. II.121 (Dunlap Dep. 60:17-61:10).]

RESPONSE TO NO. JS61.  Disputed and incomplete.  Hansen testified that "I don't recall exactly what was said but I don't recall I said yes, no or maybe.  I probably said it's under discussion."  Hansen Tr. 108:17-21 (Soni Dec., Ex. 22); *id*. at 108:17-21 ("I don't even know if we talked about specifics of what they were proposing.")).  *See* Responses to JS58 and JS59, *supra*.

Numerous facts reflect that Nelnet had reservations about Project 950 and its 9.5% SAP eligible loan growth.  Although not a full disclosure, Nelnet sent the Department of Education a letter on May 29, 2003, asking for written confirmation.  Heimes Ex. 31 at N003047-49 (McMahon Dec., Ex II.32).  While Nelnet began swapping loans between taxable and tax-exempt trusts, also known within Nelnet as "sheep-dipping" the loans, Nelnet escrowed the surplus 9.5% SAP received from the Department.  Heimes Tr. 208:9-18 (Soni Dec., Ex. 4).  *See also* JS71, JS72 and Responses thereto, *infra*.

On March 5, 2003, Jeff Noordhoek, who was directly involved in Project 950 as head of Nelnet's Capital Markets Group, and who was later promoted to be (and still serves as) President of Nelnet, stated:



Heimes Ex. 15 at N0118352 (Soni Dec., Ex. 62).

**At virtually the same time, Nelnet sent a letter to Hansen** ███████████ ████████████████████████ **Heimes Ex. 33 at N0039677-78 (Soni Dec., Ex. 73). Nelnet asked her to** ██████████ **. In that situation Nelnet** █████████ ████████████████████████ *Id.*

**Heimes admitted in a memo in November 2003, after Project 950 was well underway, that "Although there have been positive comments made related to the concept of billing the 9.5% floor SAP by officials within the DE, these comments have not specifically addressed our situation, nor have we received specific communication to confirm our application of the process and rules." Heimes Ex. 38 at N0000336-37 (Soni Dec., Ex. 78).**

**Numerous public SEC filings made by Nelnet state that Nelnet "may be entitled" to the additional 9.5% SAP it was receiving as part of its Project 950.** *See* **JS73-75.**

**JS62.**  On April 7, 2003, Nelnet submitted its first billing to ED for 9.5% SAP on loans that had been qualified for that rate through Nelnet's transferring process. [McMahon Decl., Ex. II.31 (Heimes Decl. ¶ 6). Nelnet continued to submit such billings in each consecutive quarter thereafter through the third quarter of 2006. [Ex.II.31 (Heimes Decl. ¶ 7).] ED processed and paid all of Nelnet's billings for 9.5% SAP from the first quarter of 2003 through the second quarter of 2006. [Ex. II.31 (Heimes Decl. ¶¶ 9-10).]

**RESPONSE TO NO. JS62.  Disputed that the loans were "qualified" for the 9.5% SAP rate.  Rather, Nelnet certified that the loans met the 9.5% SAP rules and regulations. Heimes Tr. 203:17-206:19 (Soni Dec., Ex. 4).  Nelnet submitted certifications and billings**

for a ██████████████████████ Heimes Ex. 46 at N0018688-89 (McMahon

Dec. Ex. 37).  This submission on April 7, 2003, is before Nelnet's.

     Nelnet acquired loans from third parties, placed them in taxable "warehouse"

financings, and billed them for ordinary SAP.  These loans were then swapped for loans in

the tax-exempt 1985A trust.  Nelnet continued to claim 9.5% SAP on loans transferred out

of the 1985A trust and began claiming 9.5% SAP on each loan that was temporarily

swapped into the 1985A trust.  Loans were transferred to the 1985A trust for as little as one

day (Nelnet's systems could not swap the loans more quickly) and then transferred either

back to "warehouse" financing or other NELF financing.  After the loans were passed

through the 1985A trust, NELF claimed 9.5% SAP on them on a permanent basis.  Heimes

Ex. 19 at N0018269-73 (Mills Dec., Ex. 33); Nelnet Resp. to Interrog. No. 3 (Chart) (Mills

Dec., Ex. 1); Heimes Tr. 119:7-13, 127:9-134:7 (Soni Dec., Ex. 4).

     Nelnet's intra-company transfers were made at face value for each loan.  No attempt

was made to determine or set a market price for the value of the loans.  Nelnet effectively

reversed many of its transactions by moving loans to the 1985A trust and then, the next

day, back to the financing where they originated.  The swapping of collateral between

trusts did not result in gains or losses for tax purposes.  The swaps occurred at the

direction of NELF, which held the beneficial interest in both trusts at issue in the swaps.

The swaps occurred between trust estates "within the same consolidated entity" and were

"all part of the same successor in interest."  Heimes Tr. 117:11-118:12 (Soni Dec., Ex. 4);

Kaplan Tr. 191:19-192:2, 194:21-199:8 (Soni Dec., Ex. 6); *see also* Heimes Ex. 19 (Mills

Dec., Ex. 33).

Nelnet admits that the sole purpose of the transfers engaged in was to generate increased 9.5% SAP to enhance income.  "Nelnet states that the business purpose of the transactions described in Interrogatory No. 4 [sic] included obtaining additional revenues . . . . in order to finance the significant increase in Consolidation loans that Nelnet made or acquired; to enable Nelnet to effectively compete with other lenders and secondary markets, including entities that were receiving 9.5% SAP on loan portfolios . . . ." Nelnet Resp. to Interrog. No. 4 (emphasis added) (Mills Dec., Ex. 1); *see also* Heimes Ex. 19  at N0018269-73 (Mills Dec., Ex. 33).

**JS63.**  On April 22, 2003, Mike Dunlap, Paul Tone and Gary Schlueger met with Terri Shaw (Chief Operating Officer of FSA), Debbie Price, Kristie Hansen (General Manager of FSA's Financial Partners division), and Jeff Baker of FSA. [Ex. II.23 (Tone Decl. ¶ 7); Ex. II.118 (Shaw Dep. 77:1-78:17).] During this meeting, Mr. Dunlap outlined Nelnet's legislative proposal to eliminate the 9.5% SAP. [Ex. II.121 (Dunlap Dep. 134:15-136:14).] Mr. Dunlap also specifically mentioned that the savings could amount to billions of dollars and that, absent some legislative change, Nelnet as the owner of NELF could earn hundreds of millions of dollars by moving loans among pre-October 1, 1993 tax-exempt financings and taxable financings to increase the number of loans earning 9.5% SAP. [Ex. II.121 (Dunlap Dep. 164:11-164:19); Ex. II.23 (Tone Decl. ¶ 7).] He indicated that other lenders were engaged in this transferring process and that if ED did not stop the practice, Nelnet would engage in it. [Ex. II.120 (Hansen Dep. 289:8-289:15).]

**RESPONSE TO NO. JS63.  Disputed and incomplete.  Dunlap said that Nelnet could make "hundreds of millions of dollars" but did not say that this would be "by moving**

loans among pre-October 1, 1993 tax-exempt financings and taxable financings." Dunlap Tr. 164:11-164:19 (Soni Dec., Ex. 5).

Hansen testified that she had little recollection of the substance of those meetings, Hansen Tr. 117:4-17; 122:5-20 (Soni Dec., Ex. 22), but that she generally recalled that Nelnet was "tattling" on other lenders who were already increasing their 9.5% Loan portfolios and threatening to do the same. *Id*. at 107:15-108:13. Hansen testified: "As I recall, Dunlap came in to outline the expansive use of the 9.5 percent billing and to explain that other lenders were going far afield, that is were using – going further and further . . . [a]nd basically saying Nelnet hasn't done this but we're going to be forced to for competitive reasons unless you explain. He also volunteered to be part of the legislative effort to put a stop to – to clarify what the extent of 9.5 billing should be." *Id*. at 117:21-118:11. She then testified that she did not recall herself or anyone else saying anything in response to Nelnet. *Id.* at 119:13-119:16. Hansen also recalled suggesting to Nelnet at the April 22, 2003 meeting that it should make the same presentation to Stroup and Andrade "[b]ecause any clarification of policy would happen at the Office of Postsecondary Education." *Id.* at 125:3-12.

At the April 22, 2003 meeting, Mike Dunlap ████████████████████████████ ████████████████ (*see* Dunlap Ex. 50 at N0002187-88 (Soni Dec., Ex. 55)).

Shaw testified as follows about the April 22, 2003 meeting with Nelnet: "[T]he Nelnet folks were coming in to walk us through a Power Point paper slide presentation that discussed the 9.5 issue and my recollection is they were bringing it to the department's attention that, you know, with interest rates kind of flipping, that this 9.5 special allowance

payment could grow exponentially and was the department aware of that I think was one of their points and I believe they were seeking guidance from the department ultimately." Shaw Tr. 78:19-79:13 (Soni Dec., Ex. 20). Shaw testified that she did not recall Hansen saying anything at the meeting and that she generally did not speak much at those types of meetings. *Id.* at 80:15-20. She did not recall Nelnet mentioning that other lenders were increasing their 9.5% Loan portfolios, and she did not recall a discussion of "tagging." *Id.* at 82:6-19.

Noordhoek recommended that the meeting participants draft ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ Email from Jeff Noordhoek at N0119122. (Soni Dec., Ex. 191).

In the April 23, 2003 memo to file, Gary Schleuger wrote that, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Dunlap Ex. 50, N0002187-191 at 187 (Soni Dec., Ex. 55). In the same memo, Schleuger wrote, ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at N0002188.

The Dunlap Dep. 134:15-136:14 cite does not lay out a legislative proposal, but instead just states the government could save money.

Nelnet executives debated whether or not to send a follow-up letter to Hansen. Noordhoek communicated with Paul Tone, Nelnet's in-house lobbyist, who argued that sending a letter would ████████████████████████████████████ ████████ to advance Nelnet's interests.  Noordhoek replied, suggesting that ██████████ ████████████████████████████████████████████████ Heimes Ex. 27 at 35 (Soni Dec., Ex. 68).  When Tone appeared to acquiesce, Noordhoek added ███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ Heimes Ex. 28 at N125030-31, at 30 (Soni Dec., Ex. 69). Don Bouc, then-president of Nelnet, weighed in ████████████████ ████████████████ ████████████████████████████████████████████ ███████████████████████ Heimes Ex. 27 at N125034 (Soni Dec., Ex. 68).  Noordhoek replied that █████████████████ *Id.*

After the meeting, Nelnet still did not believe it had the necessary authorization for the billing, so it sought out further confirmation from the Department of Education.  *See* JS65, *infra*, and Response thereto.

**JS64.**  In this time period, Mr. Dunlap had decided that Nelnet would seek to become a publicly traded company. Therefore, he determined that it would be prudent to obtain written confirmation from ED of the oral confirmations that Nelnet officials had received

from ED officials regarding the transferring of loans to increase the number of loans earning 9.5% SAP. [Ex. 11.121 (Dunlap Dep. 130:8-131:12; 158:13-159:9).]

**RESPONSE TO NO. JS64.  Disputed that Nelnet had received oral confirmations from ED officials regarding the transferring of loans to increase Nelnet's number of loans earning 9.5% SAP.  *See* Responses to JS58, 59, 63, *supra*, and incomplete.  To the extent Nelnet is relying upon oral conversations from Hansen, she did not have the authority to change the policy or determine a legal interpretation of the Department of Education. Hansen explained that "Office of Postsecondary Education is responsible, as it relates to FSA, is responsible for establishing policy and as I think I said before, FSA is basically the implementation unit of that policy.  There is naturally a crossover and discussion and so forth but basically OPE is responsible for establishing the policies."  Hansen Tr. 14:11-15:1 (Soni Dec., Ex. 22).**

JS65.   On May 29, 2003, Terry J. Heimes, President of NELF, sent a letter to Angela Roca-Baker, the ED official in charge of processing lenders' SAP billings, and copied various high-ranking officials at ED, including Terri Shaw (Chief Operating Officer of FSA), Kristie Hansen (General Manager of FSA's Financial Partners Division), Frank Ramos (Ms. Roca-Baker's supervisor) and Sally Stroup (Assistant Secretary of Education). [McMahon Decl., Ex. II.32 (N0003047-49).] The letter furnished Department officials with details surrounding the transferring process that Nelnet had initiated and intended to follow. The letter explained that "NELF is purchasing portfolios of FFEL loans with funds obtained from the proceeds of the tax exempt 1985 Indenture in a series of acquisitions." [*Id.* at (N0003047).] The letter further explained that the loans financed within the 1985 Indenture would be held "for a period of time depending upon cash management needs and other internal concerns, but in any event

for at least one day or longer. Thereafter, the loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 Indenture." [*Id.*]

**RESPONSE TO NO. JS65. Disputed and incomplete. After the April 2003 meeting, the perceived need for the appearance of written authorization from the Department resurfaced at Nelnet, culminating in a May 29, 2003 letter. Instead of sending the letter to Hansen, with whom Nelnet had earlier conversations, or to OPE, where Hansen had suggested raising their issues, the letter was sent to Angela Roca-Baker. Heimes Tr. 255:4-21 (Soni Dec., Ex. 4). According to Nelnet's internal emails, this allowed the letter to be "given the 'feel' of a more technical question," rather than the major policy change that it was. Heimes Ex. 30 at N0000074-75 at 74 (Soni Dec., Ex. 70).**

**Hansen testified that Angela Roca-Baker "was the person in charge of the SAP billing unit if you'll call it, I believe it's two people. It was actually Angela who had the day to day contact with lenders about their billing from an operational standpoint." Hansen Tr. 129:4-9 (Soni Dec., Ex. 22). Hansen testified further that Nelnet was "asking basically for approval by Angela Roca-Baker of billing practices associated with 9.5 which begs the question of the interpretation of law. . . . But Angela wouldn't really be in a position to approve that, I believe, because it crossed over the issues of interpretation, I think." *Id.* at 130:12-131:2. Stroup, the head of OPE, which was tasked with creating and implementing policy, testified that "[a]ll [she] knew" about Angela Roca-Baker was that "she worked in FSA;" she did not know her personally or what her responsibilities were. Stroup Tr. 89:7-15 (Soni Dec., Ex. 21).**

Several alterations were made to the May 29, 2003 letter during the drafting process.  As initially drafted, the letter concerned a ███████████████ and suggested ██████████████ concerning the supposed billing procedures.  Heimes Ex. 32 at N0001015-16 (Soni Dec., Ex. 72).  In the next draft, the ███████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ █████████

███████████████████████████████████

█████████ *Id.* at N0001016.  That language was omitted, however, replaced by the statement that Nelnet would "assume [the] correctness" of its position "unless otherwise directed by you."  Heimes Ex. 34 at N0001009 (Soni Dec., Ex. 74).  This change was made because the original language ██████████████ *Id.* at N0001011.  Mike Dunlap, Chairman and CEO, was ███████████████████████████████

██████████████████████████████████ ████████

████████████████████.

In the final letter, Nelnet never mentioned the amount of money involved or the fact that it had plans in place internally to "tag" between $700 million and $2.2 billion in loans in 2003 alone.  *Compare* Heimes Ex. 31 at N0003047-50 (Soni Dec., Ex. 71) (May 29, 2003 letter omitting any reference to amount of increased claims) *with* Heimes Ex. 22 N0097043 (Soni Dec., Ex. 65) (internal plan); *see also* Heimes Tr. 261:12-18 (Soni Dec., Ex. 4) (admitting that Nelnet had done internal projections as of the date of the letter).  Nor did Nelnet disclose its plan to increase its 9.5% SAP claims in 2003 by up to $92 million.  *Id.*

The May 29, 2003 letter claimed that the transfers were "part of NELF's overall cash flow management plan" not increased 9.5% SAP. Heimes Tr. 258:11-18 (Soni Dec., Ex. 4) (Q: "...the contribution that tagging made to your overall cash flow management was that you got more revenue from 9.5 SAP, right?  A: Yes.").

Hansen confirmed that, in her view, the letter did not fully disclose the details of the actual transactions undertaken by Nelnet.  Hansen Tr. 259:1-8, 261:21-262:13, 264:1-17 (Soni Dec., Ex. 22).  She testified that the letter provided few details about what Nelnet was in fact doing with its 9.5% Loans, and agreed that "this might have been one of those situations where more information about the actual mechanics of the transaction might have been helpful to the department." *Id.* at 262:5-264:17.  Hansen also testified that she did not have an opinion as to whether "Nelnet's letter followed ED guidance." *Id.* at 138:17-21.  She also testified that she did not view Nelnet's letter as "straightforward." *Id.* at 139:1-10.

In a June 2003 email chain regarding the letter, both George Harris of OPE and Brian Siegel of OGC likewise concluded that the letter lacked sufficient detail for DEd to issue a decision.  Oberg Ex. 15 at OBERG00004978-79 (Soni Dec., Ex. 87).  Moreover, in a 2006 email to David Dunn, Kristin Conklin, a senior advisor to the Office of the Undersecretary, stated that "Nelnet was not explicit about what it intended to do in its inquiry of [DEd]."  November 3, 2006 Email from David Dunn at ED-D-000578 (Soni Dec., Ex. 47).  Similarly, DEd-OIG stated in its 2006 audit report:



Nelnet Audit Report N0016967-17036 at 978 (Soni Dec., Ex. 199).  And in 2007, Jeff Taylor

from OGC emailed an internal DEd memorandum to Sam Dillon at the New York Times

which stated:

> Nelnet's own description of its Project 950 led the Department
> to understand that they were transferring eligible loans to
> taxable financing sources.  These transfers occurred before
> Congress changed the law in 2004.  If Project 950 actually only
> involved transferring, the actions would have been permissible
> under the existing law at the time.  However, what was not
> comprehended until the September 2006 OIG audit report of
> Nelnet was that Project 950 also resulted in many loans being
> claimed eligible by Nelnet that were not eligible under existing
> law.

OBERG0006390-91 (emphasis added).

No one at the Department ever countersigned and returned Nelnet's May 29, 2003

letter concerning 9.5% SAP.  Heimes Exs. 31 at N0003047, 33 at N0039677-78 (Soni Dec.,

Ex. 71, 73); Hansen Tr. 276:10-277:9 (Soni Dec., Ex. 22).  Less than five months before

sending the May 29 letter, Nelnet had sent the Department a letter asking for a Department

official to sign above the statement ███████████████████ Heimes Ex. 33 at N0039678

(Soni Dec., Ex. 33).  Hansen signed and returned the earlier letter.

Regarding Nelnet's invitation to countersign its letter, Hansen testified: "In the

past, this technique had been used for other interpretations.  I remember seeing a few, for

example, from Pam Moran who was working in FFELP policy, but Angela Roca-Baker wouldn't be authorized to do such a thing, and <u>this was complex enough and under such discussion, you would never approve something like this by a letter back.  It would have to be more generally distributed.  . . .  It also gives the view that this could be done in ten minutes after reading it.  As far as I know, that was not done in this case.</u>"  Hansen Tr. 276:10-277:5 (Soni Dec., Ex. 22) (emphasis added); *see also id.* at 277:16-279:2 ("Q: Do I understand that this kind of concurring signature was done when you had the authority to concur, correct?  A: Yes.  Q:  And when the issue appeared straightforward and you concurred with it?  . . . A: Yes, there could have been consultations with other people before signing it.  I would also say that generally speaking, it was an issue specific to that inquirer, nothing broadly applicable, perhaps, or – because that would be addressed usually in a Dear Colleague letter . . . .").

Stroup testified that Nelnet was the "only lender that actually wrote to the department with questions on the nine and a half percent SAP" prior to enactment of the TTPA.  Stroup Tr. 101:9-13 (Soni Dec., Ex. 21).  Shaw testified that prior to reading the Nelnet letter, no "other lender directly asked FSA for guidance on the proper interpretation of the rules governing billing of 9.5 percent SAP."  Shaw Tr. 89:11-15 (Soni Dec., Ex. 20).

**JS66.**  The letter further explained that Nelnet had "discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices." [Ex. II.32 at (N0003047).] Citing the relevant statute (20 U.S.C. Section 1087-1(b)(2)(B) and regulation, [34 CFR Section 682.302(c)(3)], Nelnet expressly explained that it intended to bill special allowance on

such loans at the 9.5% rate. Nelnet further explained that "[w]e have based this upon 34 CFR Section 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q & A No. 30), and our previous discussions with the Department on this matter." [*Id.* at (N0003048).] Nelnet invited ED to pose any questions it may have had about the described process, and requested verification that its intended billing procedure and practices conformed to existing law and guidance at the time. The letter included a diagram of Nelnet's process to supplement the explanation. [*Id.* at (N0003049).] The letter stated that Nelnet intended to proceed under the analysis described above and assume its correctness unless otherwise directed by ED. [*Id.* at (N0003048).]

**RESPONSE TO NO. JS66.  Disputed and incomplete.  The letter a signature line at the bottom where a DEd official could sign above the statement, "I concur with the above," and date it.  Heimes Ex. 31, N0003047 (McMahon Dec., Ex. II.32).  Nelnet had used this method before and received a signed response.  Also, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Heimes Ex. 32 at N001015 (Soni Dec., Ex. 72).**

**Hansen testified that the Nelnet letter did not discuss the refilling of pre-1993 trusts after loan transfers.  Hansen Tr. 254:20-262:4  ("Q: This flow chart . . . doesn't tell you what is going to be done with the indenture itself, that is to say apart from transferring loans out to long term financing, there's nothing in there that tells you what's happening inside the indenture box? A: Correct.") (Soni Dec., Ex. 22); *id.* ("Q: Did you at any time after looking at this letter get an understanding of what transactions were going to take place other than the transfer out within the 1985 indenture?  A: No, I don't recall."). (Soni Dec., Ex. 22).**

In May 2004 email exchange with Hansen's assistant, Tim Cameron, Pam Moran, a policy analyst at OPE, asked whether Nelnet had been billing as it described in its letter. OBERG00007694 (Soni Dec., Ex 204) ("Have they been billing us as they outline in the letter or are they waiting for our determination on this?"). When Cameron responded that it had, Moran responded, "I think it is always a bad idea for any program participant to begin billing us or taking some other action in advance of hearing definitively from us." ED-B-002658 (Soni Dec., Ex. 34).

**JS67.** On June 9, 2003, NELF's President, Terry Heimes contacted ED to follow up regarding the May 29, 2003 letter. [McMahon Decl., Ex. II.33 (N0000156-157); Ex. II.121 (Dunlap Dep. 56:22-57:5).] From the time Mr. Heimes sent the letter until July 1, 2004, no ED official ever contacted him or raised any questions regarding the letter. [Ex. II.122 (Heimes Dep. 293:21-294:18).]

**RESPONSE TO NO. JS67. Incomplete. No DEd official confirmed the practices at issue in the letter were acceptable.** *See* Response to JS69, *supra*.

During this same time period, Nelnet proceeded with numerous loan swaps to increase its 9.5% loan pools. For thirteen straight business days in 2003 (May 27 – June 13), Nelnet transferred batches of approximately $50 million in loans in and out of its 1985A Trust every day. After the foregoing series of transfers, NELF transferred the loans to three new taxable financings, each with a value in excess of $1 billion (raised on a taxable basis), that were completed in June 2003, January 2004, and April 2004 for the specific purpose of housing the swapped loans. *See* Heimes Tr. 149:2-152:16, 160:2-161:18 (Soni Dec., Ex. 4); Heimes Ex. 23 at N0018269-18273 (Mills Dec., Ex. 33). The proceeds from

these new financings funded Project 950 and permitted Nelnet to increase the loan holdings on which it claimed 9.5% SAP by over 800%. Nelnet Supp. Resp. to Interrog. No. 1 (compare Average Daily balance of NELF for 4Q 2002 of $369.9 million to 2Q 2004 balance of $3.55 billion) (Mills Dec., Ex. 1); Heimes Tr. 42:5-11 (Soni Dec., Ex. 4).

JS68.   When Terri Shaw reviewed the letter sent to Ms. Roca-Baker she understood Nelnet intended to transfer multiple portfolios of loans from a tax-exempt trust to another financing after the loans had spent as little as 24 hours in the tax-exempt financing. [Ex. II.118 (Shaw Dep. 90:10-90:14).] She also understood that this could result in the government paying a significant amount in special allowance to Nelnet [*Id.* (Shaw Dep. 95:6-95:9)], and that Nelnet's SAP billings would increase substantially. [*Id.* (Shaw Dep. 117:6-117:10).] She was not directed to stop payment of Nelnet's quarterly 799 billings and did not instruct anyone on her staff to stop payments of Nelnet's quarterly 799 billings. [*Id.* (Shaw Dep. 94:15-95:5).] Sally Stroup, the Assistant Secretary of OPE, understood from the letter that Nelnet's 9.5% SAP billings would increase. [Ex. II.119 (Stroup Dep. 85:9-85:12).] Kristie Hansen understood that Nelnet intended to engage in multiple transfers of loans through the NELF 1985A Indenture. [Ex. II.120 (Hansen Dep. 288:19-289:20).]

RESPONSE TO NO. JS68.  Disputed and incomplete.  Shaw testified that she did not have knowledge of lenders' specific loan transactions.  Shaw Tr. 333:16-334:16, 337:3-18 (Soni Dec., Ex. 20) ("I was watching at the gross level."). Shaw stated in an email to herself, "While it is not specifically known how the increases in epb for each lender was realized, it is known that xxxx engaged in the practice of recycling, refunding or transfers." Email from Terri Shaw "Re: Nelnet Q's," ED-A-000954 (Soni Dec., Ex. 39).

Stroup testified that she "had a general understanding of the growth of the 9.5 loan portfolio," but that she never "investigate[d] the specific mechanisms and transactions by which the claimants were growing . . . their portfolio," and she never "personally look[ed] at any of the transactions to see whether [the] limitations [in the 1996 DCL] had been breached."  Stroup Tr. 260:17-261:12 (Soni Dec., Ex. 21).

Hansen testified that when she left Financial Partners in December 2003, she "wouldn't have any specifics" about 9.5% Loan growth.  Hansen Tr. 121:21-122:4 (Soni Dec., Ex. 22).  Hansen also testified: "I have to clarify something.  At the same time it is correct that the tax exempt financing questions were seen at that time, <u>I think were, extremely complex and that in hindsight I'd say in some situations we may not have fully grasped what was happening in the actions of the lenders in working the loans</u>. . . .  I think the matter was of such complexity until we head for the guidance, precise guidance – I'm not sure I would have ever said it like this but it would certainly not be a definitive answer."  *Id*. at 151:20-152:11.  Hansen further testified that DEd lacked the "experts" to understand the "complexity" of the lenders' "transactions."  *Id*. at 158:9-159:11 (emphasis added).

*See also* Response to JS37, *supra*, regarding Stroup's, Shaw's and Hansen's understanding of the applicable laws and regulations.

JS69.  In June of 2003, the NELF May 29, 2003 letter was discussed within ED by various employees of Financial Partners as well as Ms. Roca-Baker and an attorney within ED's Office of General Counsel. [McMahon Decl., Ex. II.34 (OBERG00004976-84).] Various options were discussed, including the possibility of performing a focused review to answer the

questions raised in NELF's letter. [*Id.* at (OBERG00004977).] Ms. Roca-Baker stated that

the NELF letter seemed straight forward and Linda Elrod, the director of the Financial

Partners Division San Francisco office stated that "except for the PLUS and SLS exception. . . .

Nelnet's letter follows DOE guidance." [*Id.* at (OBERG00004979-80).] Ms. Stroup

understood without question from the letter that Nelnet's 9.5% SAP claims would increase.

She believed that multigenerational loan transferring was permissible and that the transferred

loans freed up new cash that could be used to purchase new 9.5 SAP loans. [Ex. II.119 (Stroup

Dep. 235:16-236:9, 240:4-240:18).] Ms. Stroup discussed the Nelnet letter with others in ED,

including the Office of General Counsel, and was of the opinion that the Nelnet letter

followed ED's guidance. [*Id.* (Stroup Dep. 89:16-91:2).] She would have recommended

countersigning Nelnet's letter. [*Id.* (Stroup Dep. 257:4-257:9).]

**RESPONSE TO NO. JS69. Disputed and incomplete. In response to Elrod's and**

**Roca-Baker's comments, George Harris, a policy analyst at OPE, stated:**

> **OPE recently declined to answer a question from another**
> **party about tax-exempt financing and special allowance**
> **billing, saying that "...questions relating to tax-exempt**
> **financing can be of such complexity that it is best not to**
> **respond unless we are provided with documentation of the**
> **specific situation."**
>
> **I don't know what NELF means when it says "Some of the**
> **portfolios will be transferred into the 1985 Indenture from the**
> **seller and some will be financed by a different NELF financing**
> **prior to being placed into the 1985 Indenture."**
>
> **"Different NELF financing" in what respect?  This is an**
> **example of where specific documentation could help. ...**
>
> **Given the absence of documentation and the uncertainty about**
> **what kind of decision Financial Partner intends to make**
> **concerning the ISLC review (and perhaps other reviews), I**

> think the OPE answer that I quoted in the first paragraph is
> appropriate.

Email from George Harris, "Re: Reporting Tax-exempt obligations," at OBERG00004979

(Soni Dec., Ex. 147).

> Brian Siegel from DED Office of General Counsel then responded:
>
> > Just to close the loop – I agree with George's advice. Any
> > advice we would give would have to be accompanied by a
> > clearly stated disclaimer that it is based solely on the
> > information provided and is not binding on the Department.
> > There are too many complexities in these financing deals to
> > give an opinion without reviewing all of the documents and
> > financial agreements in detail.

*Id.* at OBERG00004978.  Elrod then forwarded the email chain to Halaska and stated that

Hansen agreed that there should be no approval:

> > Kristie and I talked briefly about this Nelnet, Nebraska, letter
> > while I was in WDC earlier this week.  Considering Nelnet's
> > letter and the subsequent email traffic, what I suggested is that
> > we not approve anything based on the letter which does not
> > provide enough detail.  Rather, we could take one of two
> > approaches: (1) Reiterate the regulatory/letter guidance and
> > state that we cannot render a decision based on only the facts
> > in the letter; or (2) perform a focused review (limited to the
> > special allowance billing only) and get a first-hand
> > understanding of the documents that they have and issue a
> > report thereafter addressing their questions.

*Id.* at OBERG00004978.

"[I]n connection with Nelnet's letter," Stroup did not "at any time look into the

specifics of how Nelnet was affecting the transactions described in the letter."  Stroup Tr.

261:16-20 (Soni Dec., Ex. 21).  With respect to the reference to "cash management needs,"

she testified: "I didn't sit and study the Nelnet letter so I don't know what they meant and

didn't really think about what they meant."  She stated further that she did not "have any

understanding of what cash management would mean within the context of a bond portfolio and a loan portfolio." *Id.* at 261:16-262:11 (Soni Dec., Ex. 21).  In any event, Stroup also testified that she had little independent understanding of the pertinent statutes and regulations.  *See also* Response to JS37, *supra*.

The May 29, 2003, letter did not fully disclose Nelnet's activities.  *See* Responses to JS65-66, *supra*.

A 2006 email from James Manning, acting Assistant Secretary for OPE, to Terri Shaw and Kristin Conklin revealed that OGC had "recently affirmed that no career OGC staff ha[d] previously endorsed past practice on the 9.5 issue."  Oct. 13, 2006 Email from James Manning "Re: talking points," at ED-F-001260 (Soni Dec., Ex. 36).

Although Stroup said she would have countersigned the letter, she did not.  And in fact, although Stroup denied any recollection of it, Stroup Tr. 105:14-19, 256:16 ("I didn't write it.") (Soni Dec., Ex. 21), Shaw testified unequivocally that Stroup drafted DEd's ultimate response.  Shaw Tr. 116:8-15 (Soni Dec., Ex. 20).

JS70.  On June 26, 2003, NELF issued a Prospectus Supplement for $1,030,000,000 Student Loan Asset-Backed Notes, Series 2003-1. The notes were secured by a pool of student loans originated under the FFELP, a cash reserve fund, and the other money and investments pledged to the trustee. [Ex. II.19 (N0093523-52).] The Prospectus Supplement stated that NELF expected that all or substantially all of the notes will be financed by pre-October 1, 1993 tax-exempt obligations. [*Id.* at (N0093535).] The Prospectus Supplement stated the belief that each of these student loans would be entitled to receive half SAP subject to the 9.5 % floor, and that "the Secretary of Education may change these regulations and

interpretations." [*Id.* at (N00093535-36).] The Prospectus Supplement also set out as risk factors that Congressional actions may affect student loan portfolios and that Congress may elect not to reauthorize ED's ability to provide interest subsidies and federal insurance for loans. [*Id.* at (N0093536).] It also noted that "in a rising interest environment the net loan rate may limit the interest rates on the notes in circumstances where the net loan rate would not apply if the student loans received regular special allowance payments." [*Id.*]

**RESPONSE TO NO. JS70.  Disputed and incomplete.  The 2003-1 issuance was taxable and not eligible to make or purchase 9.5 loans.  Heimes Tr. 161:9-18 (Soni Dec., Ex. 4).** ████████████████████████████████████████████
████████████████████████ **Heimes Ex. 23 (Mills Dec., Ex. 34).**

**In conjunction with issuing this securitization, Nelnet's Hannah Smitterberg wrote:**



**Heimes Ex. 36 at N0001028 (Soni Dec., Ex. 76) (emphasis added).** ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████ *Id.* (Soni Dec., Ex. 76).  In response, Nelnet's communications group developed a communications plan, including:



Heimes Ex. 37 at N0001025 (Soni Dec., Ex. 77).  Ultimately, the communications plan does

not appear to have been fully implemented, due to internal objections.  Heimes Ex. 36 at

N0001028 (Soni Dec., Ex. 76)███████████████████████████████████████

████████████████████████████████████████████████████████████

     While Nelnet was submitting escalating claims, Nelnet continued to escrow (and not

take into earnings) its excess SAP through all of 2003 and the first two quarters of 2004.

Heimes Tr. 208:15-212:18 (Soni Dec., Ex. 4).  Terry Heimes, Nelnet's CFO, explained the

reasons that the excess SAP was not taken into income in a November 16, 2003

memorandum:

> Although there have been positive comments made related to
> the concept of billing the 9.5% floor SAP by officials within the
> DE, these comments have not specifically addressed our
> situation, nor have we received specific communication to
> confirm our application of the process and rules.  Accordingly,
> we will continue to defer recognition of such income.

Heimes Ex. 38 at N0000336 (Soni Dec., Ex. 78).  Heimes' memo is dated November 16,

2004, but Heimes testified based on context that it actually was prepared in November

2003.  Heimes Tr. 291:18-21 (Soni Dec., Ex. 4).  Thus, as of November 2003, Nelnet admits

that it had nothing from the Department specifically addressing or authorizing its

activities.  *Id.*; *see also* Heimes Tr. 268:1-269:16 (Soni Dec., Ex. 4) (conceding truth of

Exhibit 38 statement at that time). By the end of 2003, Nelnet had grown its allegedly 9.5%

**SAP eligible loan pools from $370 million at the end of 2002 to over $3.5 billion by mid-2004.  Nelnet Resp. to Interrog. No. 1 (Mills Dec., Ex. 1).**

**JS71.**  Nelnet had not yet received confirmation from ED in response to the May 29, 2003 letter. As a result, it determined that it would escrow the funds representing the additional income due to the receipt of 9.5% SAP until it received a response. Nelnet was concerned about investors using the earnings from the 9.5% SAP floor loans and putting a multiple on those numbers to assess the value of the company. [Ex. II.121 (Dunlap Dep. 197:7-198:13).]

**RESPONSE TO NO. JS71.  Disputed that this was the only reason Nelnet escrowed the funds.  *See* Response to JS61, regarding Nelnet's reservations about increasing its 9.5% SAP loan portfolio.  Nelnet entered into several escrow agreements, including August 14, 2003; January 1, 2004; and April 1, 2004.  Kaplan Tr. 144:16-145:16.  Each escrow agreement contains language that requires,** ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████ **Heimes Ex. 25 at N0029642 (Soni Dec., Ex. 67).  Each escrow agreement also contains language that "there are currently outstanding issues related to the rightful owner and entitlement of said funds."  Kaplan Tr. 147:7-19, 151:1-18 (confirming that it was Nelnet's view that "rightful ownership and entitlement" to the 9.5% SAP were not clear without a response from the Department to Nelnet's May 29, 2003 letter").**

**JS72.**  On July 10, 2003, Nelnet and Wells Fargo, as escrow agent, entered into an Escrow Reserve Agreement, pursuant to which Wells Fargo holds that portion of the income from the 9.5% Loans that exceeds ordinary allowance payment rate. Such escrowed funds were

only to be released upon (a) receipt by the escrow agent of a "copy of a written directive or position statement from the U.S. Department of Education which indicates which persons or entities are the rightful owner of the Escrowed Funds; or (b) the Escrow Agent receives an opinion from outside counsel to the Issuer [NELF], currently Perry, Guthery, Haase & Gessford, P.C., L.L.O., stating that said firm has conducted a sufficient factual and legal investigation to give an opinion on which persons or entities have a reasonably sufficient legal claim to the Escrowed Funds, said opinion shall only be required to identify the party having such a claim to the Escrowed Funds and provide disbursement instructions to the Escrow Agent." [Ex. II.31 (Heimes Decl. ¶ 8).]

**RESPONSE TO NO. JS72.  Incomplete.  Nelnet personnel agreed that release condition was never satisfied as the Department of Education never agreed in writing to Nelnet's position.  *See* Responses to JS82-84, *infra*.**

**JS73.**  On August 19, 2003, Nelnet filed a Form S-1 Registration Statement with the Securities and Exchange Commission which set forth that:

> A portion of our FFELP loan portfolio, with an outstanding balance of
> $925.2 million as of June 30, 2003, is comprised of loans which were
> previously financed with tax-exempt obligations issued prior to October 1,
> 1993. Based upon provisions of the Higher Education Act and related
> interpretations by the DOE, we believe that we may be entitled to receive
> special allowance payments on these loans providing us with a 9.5%
> minimum rate of return. To date, we have not recognized interest income
> generated by these loans based on the 9.5% minimum rate of return.
> We have asked the DOE to confirm that we are allowed to recognize the
> income based on the 9.5% minimum rate of return. We have deferred
> recognition of this excess interest income pending satisfactory
> resolution of this issue. As of June 30, 2003, the amount of excess interest
> income deferred totaled approximately $5.9 million. Since we did not
> refinance loans with the aforementioned tax-exempt obligations until
> 2003, all of this deferred income was recorded this year.

It further stated that:

> A portion of our student loan portfolio is comprised of loans which have been previously financed with the proceeds of tax-exempt obligations issued prior to October 1, 1993. Based upon provisions of the Higher Education Act and related interpretations by the DOE, we believe that, for each of these student loans, we will receive partial special allowance payments, subject to the 9.5% minimum rate of return. However, the DOE may change its regulations or its interpretations of existing regulations, or the Higher Education Act may be amended, to eliminate this special allowance payment treatment. In this event, we would receive regular special allowance payments, but with no minimum rate of return.

> In the current low interest rate environment, we generally receive partial special allowance payments and the minimum 9.5% rate of return with respect to our eligible student loans originated or acquired with qualifying tax-exempt proceeds. In a higher interest rate environment, however, the regular special allowance payments on loans not originated or acquired with qualifying tax-exempt proceeds may exceed the total subsidy to holders of eligible loans originated or acquired with qualifying tax-exempt proceeds. Thus, in a higher interest rate environment, these loans could have an adverse effect upon our earnings.

[McMahon Decl., Ex. II.35 (Nelnet, Inc. S-1 Registration Statement at 12-13, 25, filed Aug. 19, 2003).]

**RESPONSE TO NO. JS73.  No dispute that the language is quoted accurately.**

**JS74.**   On December 10, 2003, Nelnet filed a Prospectus pursuant to Rule 424(b)(1), Registration No. 333-108070, for 8,000,000 shares of Nelnet Class A Common Stock (the "Prospectus"). [McMahon Decl., Ex. II.36 (Nelnet, Inc. Prospectus (filed Dec. 10, 2003).] This was the initial public offering of Nelnet's Class A common stock. The prospectus included a risk factor stating that "future changes [in the Higher Education Act] could result in further negative impacts on our business," and that "Congress . . . may elect not to . . . provide special allowance payments . . . ." [*Id.* at 10-11.] A risk factor was also included about Senator Kennedy's proposed legislation that would eliminate the 9.5% Floor. [*Id.* at

111.]  The Prospectus disclosed that Nelnet held $1.4 billion of 9.5% Loans as of September

30, 2003. [*Id.* at 30.]  With respect to the 9.5% Loans, the MD&A of the prospectus stated:

> A portion of our FFELP loan portfolio, with an outstanding balance of
> $1.4 billion as of September 30, 2003, is comprised of loans which were
> previously financed with tax exempt bonds issued prior to October 1,
> 1993. Based upon provisions of the Higher Education Act and related
> interpretations by the Department of Education, we believe that we may be
> entitled to receive special allowance payments on these loans providing us
> with a 9.5% minimum rate of return. To date, we have not recognized
> interest income generated by these loans based on the 9.5% minimum
> rate of return. We have asked the DOE to confirm that we are allowed
> to recognize the income based on the 9.5% minimum rate of return. We
> have deferred recognition of this excess interest income pending
> satisfactory resolution of this issue. As of September 30, 2003, the amount
> of excess interest income deferred totaled approximately $20.3 million.
> Since we did not refinance loans with the aforementioned tax
> obligations until 2003, all of this deferred income was recorded this
> year."

[*Id.* at 30.] Stroup testified that she read at least some of Nelnet's disclosures as early as 2003.
[Ex. II.119 (Stroup Dep. 98:21-99:6).] Oberg himself has called Nelnet's disclosures
"wonderfully transparent about its 9.5 growth." [McMahon Decl., Ex. II.124 (Oberg Dep. 306:8-
306:15).]

**RESPONSE TO NO. JS74.  Disputed and incomplete.  Stroup testified that she did**

**not remember the date of when she read this document.  Stroup Dep. 98:21-99:6. (Soni**

**Dec., Ex. 21).**

**The Prospectus offers no insight into the methodology Nelnet employed to achieve**

**its $1.4 billion in loans.  (Nelnet, Inc. Prospectus (filed Dec. 10, 2003)) (McMahon Dec.,**

**Ex. II.36).**

**JS75.**  On March 29, 2004, Nelnet filed its Form 10-K for the fiscal year ended

December 31, 2003. [McMahon Decl., Ex. II.37 (Nelnet 10-K for the Fiscal Year Ending

December 31, 2003 (filed Mar. 29, 2004)).] Nelnet stated in the Foul] 10-K that a portion of its

FFELP loan portfolio, with an outstanding balance of $2.6 billion as of December 31, 2003, may be entitled to receive special allowance payments at the 9.5% floor rate. Nelnet noted that it had asked ED to confirm that Nelnet was allowed to recognize the income based on the 9.5% rate of return and deferred recognition of the excess interest income, which totaled approximately $42.9 million. Nelnet further stated that legislation had been proposed to eliminate variable rate floor income and the 9.5% interest rate. [*Id.* at 16.] In early May 2004, Nelnet made the decision to stop transferring loans since it supported legislation that had been introduced that ultimately was passed as the Taxpayer Teacher Protection Act. [Ex. II.121 (Dunlap Dep. 147:13-148:12).]



**RESPONSE TO NO. JS75. Incomplete.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Mar. 14, 2003 Email from Jeff Noordhoek, "Re: Mike D Reauth Priority," at N0118987 (**▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮**") (Soni Dec., Ex. 189).**

**JS76.** On, May 17, 2004, Nelnet filed its Form 10-Q report for the quarterly period ended March 31, 2004. [McMahon Decl., Ex. II.38 (Nelnet, Inc. 10-Q filed May 17, 2004).] Nelnet stated in the 10-Q that a portion of the FFELP loan portfolio, with an outstanding balance of $3.1 billion as of March 31, 2004, may be entitled to receive special allowance payments at the 9.5% floor rate. [*Id.* at 7.] Nelnet also noted that it had asked ED to confirm that it was allowed to recognize this income and that as of March 31, 2004, the amount of excess interest income deferred totaled approximately $79 million. [*Id.* at 8.] Lastly, Nelnet noted that

legislation was introduced to prospectively eliminate floor loan income, but that Nelnet could not predict whether the pending legislation would pass and, if so, only apply prospectively. [*Id.*]

**RESPONSE TO NO. JS76.  Incomplete.  Nelnet did not receive the confirmation it sought.  *See* Responses to JS82-84, *infra*.**

JS77.   On May 20, 2004, Paul Tone of Nelnet received an email from Ms. Hansen informing him that Tim Cameron, then Chief of Staff to the General Manager of the Financial Partners division of FSA, was the point person at ED on the May 29, 2003 Nelnet letter. [McMahon Decl., Ex. II.39 (N0000560-563 at 560); Ex. II.23 (Tone Decl. ¶ 9).] On May 20, 2004, Mr. Tone sent an e-mail to Mr. Cameron asking for a response to the May 29, 2003 request for confirmation on billing for 9.5% SAP. [Ex. II.39 at (N0000562-63).] On May 24, 2004, Mr. Cameron responded to Mr. Tone's e-mail, indicating that he had received a copy of the letter that and that he would review it and respond. [*Id.* at (N000560).]

**RESPONSE TO NO. JS77.  Incomplete.  In 2004, Nelnet continued to work to obtain a letter from the Department that would permit release of the escrowed SAP funds. On May 20, 2004, Hansen contacted Tone at Nelnet and advised that "Tim [Cameron] is your point person now on this issue – that makes you lucky!"  Heimes Ex. 39 at N0000559 (Soni Dec., Ex. 79).  Hansen signed her email "Cheers, k."  *Id.*  Cameron was similarly collegial with Nelnet:  "I hope we can close this out this week!  Will keep you posted."  *Id.* at N0000558.  Cameron also asked Nelnet whether it had already begun billing for excess 9.5% SAP, indicating that at least some at the Department still did not know that Nelnet had already billed for – and been paid – tens of millions of dollars in excess SAP over the course of nearly a year.  *See* Heimes Ex. 40 at N0000562 (McMahon Dec., Ex. II.39) (May**

25, 2004 email from Cameron); Heimes Ex. 43 at N0001194 (Soni Dec., Ex. 80) ███████████

███████████████████████. **To the extent that statements made by individuals**

**not under oath are offered for the truth of the matter asserted, they is hearsay.**

**Tim Cameron came to DEd with Hansen from NCHELP.** *See* **Notes regarding 9.5**

**student loan scandal, at OBERG00002758 (Soni Dec., Ex. 201).  Hansen testified that**

**Cameron "had no policy input but was an assistant, more of a facilitator." Hansen Tr.**

**163:3-4 (Soni Ex. 22).**

**JS78.**   On May 24, 2004, Mr. Cameron e-mailed Mr. Tone that OGC and OPE were

reviewing the request and that he hoped to close it out that week. [Ex. II.39 at (N000560), Ex.

11.23 (Tone Decl ¶ 9).]

**RESPONSE TO NO. JS78.  No dispute.**

**JS79.**   On May 25, 2004, Mr. Cameron also sent an e-mail to Brian Siegel, an attorney at

ED's OGC, and Pam Moran that he was working with Nelnet on resolving outstanding issues on

LARS. Ms. Moran asked him if Nelnet was still seeking a policy reading on this and asked if

Nelnet had been billing for 9.5% SAP. Mr. Cameron told Ms. Moran that they had been

billing as stated. [McMahon Decl., Ex. II.40 (OBERG00006522-23).]

**RESPONSE TO NO. JS79.  Incomplete.  Cameron did not know if Nelnet was**

**continuing to bill for 9.5% SAP.** *See* **Response to JS77,** *supra.*

**JS80.**   On June 10, 2004, Terry Heimes asked Paul Tone if he had had further

conversations with ED on the 9.5% floor. Mr. Tone responded that he had only had e-mail

follow-up with those trying to help secure a response. Mr. Heimes wanted to know how they

could push it as it was becoming an issue from a reporting standpoint. Mr. Tone said he was pushing it, [McMahon Decl., Ex. II.41 (N0000627).]

**RESPONSE TO NO. JS80.  No Dispute.**

**JS81.**   On the morning of June 30, 2004, Mr. Tone received a telephone call from Tim Cameron in response to Mr. Tone's voice mail and email inquiries regarding NELF's May 29, 2003 letter. [McMahon Decl., Ex. II.42 (N0002674).] During the call, Mr. Cameron stated that the May 29, 2003 letter had been forwarded to ED's OPE and OGC, as well as to Sally Stroup, the Assistant Secretary of Postsecondary Education. [*Id.*] Mr. Cameron indicated to Mr. Tone that the letter that would be sent by ED in response to the May 29, 2003 letter may not be as direct a response as NELF might have expected. [*Id.*] Mr. Cameron summarized a meeting held on Monday, June 28, that he attended with Assistant Secretary Stroup and her boss regarding the May 29, 2003 letter from NELF at which ED determined that it would be inappropriate to endorse a specific lender's process. [*Id.*] Mr. Cameron further told Mr. Tone that nothing arose during this meeting that challenged or questioned the process for billing 9.5% SAP as outlined in NELF's May 29, 2003 letter. [*Id.*] Mr. Cameron concluded by noting that he thought ED's letter to NELF was a positive letter. [*Id.;* Ex. II.23 (Tone Decl. ¶ 10).]

**RESPONSE TO NO. JS81.  Incomplete.  Cameron was a low-level FSA "assistant" with "no policy input."  Hansen Tr. 163:3-4 (Soni Dec., Ex. 22).  One email in Relator's production indicates that Cameron may have been let go by DEd because of the manner in which he handled DEd's letter to Nelnet.  Oct. 28, 2004 Email from Daniel Pollard "Re: Annual PSA all hands meeting," at OBERG00007491 (Soni Dec., Ex. 203).**

To the extent the statements from individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.

**JS82.**   On June 30, 2004, Victoria Bateman, the Chief Financial Officer for the Financial Aid Services Unit of ED sent a letter to Nelnet in response to Nelnet's May 29, 2003 correspondence. [McMahon Decl., Ex. II.43 (N0000054).] The letter referred Nelnet to 34 C.F.R. § 682.302(c) and (e) as well as the Dear Colleague Letter. [*Id.*] Assistant Secretary Stroup did not believe that the letter gave Nelnet or NELF any indication that ED disagreed with Nelnet's intended procedures. [Ex. II.119 (Stroup Dep. 107:18-107:21).]

**RESPONSE TO NO. JS82.   Disputed and incomplete.   This was Stroup's personal opinion, which she admitted.   Stroup Tr. 107:18-21 (Soni Dec., Ex. 21).   Stroup also testified that the Bateman Letter did not say "Nelnet, you are correct."   *Id.* at 256:1-6.**

**On July 2, 2004, the Department's response (dated June 30, 2004) to Nelnet's May 29, 2003 letter was faxed to Dunlap, after Cameron had voluntarily forwarded an unsigned draft to Nelnet.   Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82);** ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**.   After receiving Nelnet's May 29, 2003 letter the Department waited thirteen months before responding.   When DEd sent a letter to Nelnet on June 30, 2004, it contained no language indicating that Nelnet's activities were lawful or that DEd was content with Nelnet's 9.5% Loan growth.   *See* July 2, 2004 letter (McMahon Dec., Ex. II.43); *see also* Stroup Tr. 256:1-6 (Soni Dec., Ex. 21) (testifying that the letter did not say "Nelnet, you are correct").   DEd did not countersign the letter, but referred Nelnet to the applicable regulations.   Hansen testified that approving activities as complex as Nelnet's would have been inappropriate in a countersigned letter and would have required**

a more formal and general legal and policy pronouncement.  Hansen Tr. 276:10-277:9 (Soni Dec., Ex. 22).  She also testified that she had not approved Nelnet's 9.5% loan growth during the January 3, 2003 or April 22, 2003 meetings with Nelnet.  *Id.*



The Department's letter ███████████████████████████████ ███ Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82).  Instead, it ███████████ ███████████████████████████████████████████The letter said, in its entirety:

Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82).

Kaplan testified that he did not rely on the letter, by itself, in issuing his opinion to release the escrowed funds.  Kaplan Tr. 168:20-169:18.

Stroup testified that she did not know who wrote the Bateman Letter, and she could not remember whether she participated in drafting it.  Stroup Tr. 105:14-19, 256:16 (Soni Dec., Ex. 21) ("I didn't write it") (Soni Dec., Ex. 21).  Shaw testified that it was not her responsibility to respond to the letter, but she was responsible for making sure that a response was issued.  She explained: "OPE was the one to respond.  From my perspective it was what is the response going to be from a policy perspective, OPE?  Tell me and we will carry it out."  Shaw Tr. 93:8-94:4 (Soni Dec., Ex. 20).  Shaw testified that she did not

participate in the drafting of the Bateman letter, but she testified unequivocally that Stroup drafted it.  *Id.* at 116:8-15.

Multiple authorities – including the Department itself – have concluded that Nelnet never received authorization to increase its 9.5% loan portfolios.  In a November 18, 2004 letter responding to questions raised by Senator Kennedy about 9.5% loan growth, Secretary Paige stated that "[t]he Department did not approve or disapprove of the methods that Nelnet and other lenders were using."  Nov. 18, 2004 Letter from Rod Paige to Senator Edward Kennedy, at ED-G-000858 (Soni Dec., Ex. 37).  Moreover, in its report of Nelnet's 9.5% Loan scheme, DEd-OIG stated that its review of Nelnet's documentation did not identify any direct or explicit approval by the Department of Project 950.  OBERG00001018-87 at OBERG00001029 (Soni Dec., Ex. 208).  And the White House's Domestic Policy Counsel, in reviewing the Department's response to DEd-OIG's findings that Nelnet had billed unlawfully, stated in a memorandum summarizing Project 950 that "the Department never officially approved of Nelnet's multiple transfers."  Shaw Ex. 26 at ED-F-000142 (Soni Dec., Ex. 110).

In emails to Nelnet, Kaplan said that the Department's letter was open to interpretation.  Kaplan Tr. 173:9-174:19 (Soni Dec., Ex. 6).  Kaplan argued for the deletion of language in the Nelnet press release recognizing its funds from the escrow account as income stating that Nelnet had █████████████████████████ ████████████████████ and changing it to the more indefinite ████████████████ ████████████████ Kaplan Ex. 80 at N0001144-45(Soni Dec., Ex. 84).  Kaplan elaborated on his reasoning for the change, advising Nelnet officers that he wanted to ████████████████████████████████████████████████████████████


**JS83.** On July 2, 2004, the law firm of Perry, Guthery, Haase & Gessford, P.C. issued a written legal opinion addressed to Wells Fargo Bank, N.A. In the letter, the law firm opined that NELF was the party that had a reasonably sufficient claim to the funds held in escrow by Wells Fargo. [McMahon Decl., Ex. II.44 (N0000722-24).]

**RESPONSE TO NO. JS83. No dispute that Perry Guthery offered the opinion. Kaplan testified that he has worked on Nelnet matters for at least seventy-five percent of his time for the past decade. Kaplan Tr. 15:3-22 (Soni Dec., Ex. 6). Several other attorneys from Perry Guthery work on Nelnet matters. *Id.* at 15:21-16:6. The firm also does work for Michael Dunlap's family, which owns stock in Nelnet. *Id.* at 16:17-17:11. The firm does work for Union Bank & Trust, in which Dunlap's family has an equitable interest. *Id.* at 16:14-16, 17:4-11. Since 2003, Kaplan has owned stock in Nelnet. *Id.* at 17:12-20.**

**At this time, Kaplan recognized that the Department could still come after the now-distributed excess SAP. Kaplan Tr. 179:17-180:16 (Soni Dec., Ex. 6). Kaplan suggested that** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **following the July 2, 2009 letter, with the following proposed text:**


Heimes Ex. 44 at N0001247-1248 (Soni Dec., Ex. 81).  As Kaplan explained:



*Id.*

> **JS84.**  On August 16, 2004, Nelnet filed its 10-Q report for the quarterly period ended June 30, 2004. In its 10-Q, Nelnet stated that:

> > [w]hile pending satisfactory resolution of [the issue of whether Nelnet was allowed to recognize the income] with the Department, the Company deferred recognition of the interest income that was generated by these loans in excess of income based upon the standard special allowance rate. In June 2004, after consideration of certain clarifying information received in connection with the guidance it had sought, including written and verbal communications with the Department, the Company concluded that the earnings process had been completed related to the special allowance payments on these loans and recognized $124.3 million of interest income. At December 31, 2003 and March 31, 2004, the amount of deferred excess interest income on these loans was $42.9 million and $78.8 million, respectively.

> [McMahon Decl., Ex. II.45 (Nelnet, Inc. 10-Q at 6 (filed Aug. 16, 2004)).]  Nelnet also noted that in future periods, Nelnet would recognize the income. [*Id.*]

**RESPONSE TO NO. JS84.  No dispute that the language is quoted accurately.  This decision was based on the receipt of the Bateman letter and the Cameron discussions.  *See* Response to JS82.  Kaplan testified that the Bateman letter was open to some interpretation.  *See* Response to JS82.**

**Nelnet was required to disclose the newly-recognized earnings under SEC requirements.  Nelnet's SEC lawyer was adamant that the amount needed to be disclosed.  Dunlap Ex. 55 at N0001137-39 (Soni Dec., Ex. 58).  Tone was opposed:** ████████

████████████████████████████████████████████████████**Heimes Ex.**

43 (Soni Dec., Ex. 80) (emphasis in original).  **In response to a subsequent question as to**

**why Nelnet did not include the dollar amount of earnings recognized, Dunlap stated** ████

████████████ **but admitted** ████████████████████████████ **Dunlap Ex. 56 at**

**N0001260 (Soni Dec., Ex. 101).**

> **JS85.**  From June to August of 2004, ED's Financial Partners Division of FSA
>
> conducted a Program Review of Nelnet Loan Services, Inc. for the time period of March 1, 2000
>
> through 2004. [McMahon Decl., Ex. II.46 (N0017099-123, at 0017099); [McMahon Decl., Ex.
>
> II.47 (ED-D-000232-34).] The Review Team from ED included Mercedes Zajicek (Team
>
> Lead and Senior Guarantor and Lender Review Specialist), Michael Duffin (CPA and IT
>
> Specialist from the Chicago Office), Ben McPherson (Senior Guarantor and Lender Review
>
> Specialist), Peter Sweet (Senior Guarantor and Lender Review Specialist), Leslie Richards
>
> (Guarantor and Lender Review Specialist), and Mark Taylor (Guarantor and Lender Review
>
> Specialist). [*Id.* at (N0017101).]

> **RESPONSE TO NO. JS85.  No dispute.**
>
> **JS86.**  On September 1, 2004, Nelnet personnel attended an exit conference with the
>
> Financial Partners review team. [Ex. II.47 (ED-D-000232-34).] ED personnel attending the Exit
>
> Conference included Mercedes Zajicek, Mike Duffin, Ben McPherson, Peter Sweet, and Mark
>
> Taylor. [*Id.* at (ED-D-000232).]  Attendees from Nelnet included Don Bouc, Matt Hall (Loan
>
> Servicing), Jim Kruger (Financial and Accounting), Jeff Jobes (Loan Origination), and via
>
> telephone Todd Eicher (Loan Origination). [*Id.*]  Nelnet Audit Services personnel included
>
> Brad Walcher, Chris Callan, and Gina Robley. [*Id.*] At the Exit Conference, Ben
>
> McPherson indicated that he was collecting data on the 9.5% floor bond issues for
>
> inclusion within the report, but he stated that Nelnet was complying with the regulations and

was working within 9.5% floor regulations and directions from ED. [*Id.* at (ED-D-000233).] Mr. McPherson noted that the issue was not specific to Nelnet, but was industry-wide. [*Id.*] Mr. McPherson testified that at the time of the exit conference, he understood that Nelnet was complying with the 9.5 rules and directions from ED. [McMahon Decl., Ex. II.125 (McPherson Dep. 82:14-82:20).] Also on this date, Jerry Wallace, a Senior Guarantor and Lender Review Specialist, had noted that Nelnet's 9.5% bond base had grown over eight-fold in one year. [McMahon Decl., Ex. II.117 (Wallace Dep. Ex. 19) (unnumbered document) (emphasis added).] Mr. Wallace stated "[a]s long as we *allow* them to consider loans that get dipped in the tax-exempt bond pool to carry to tax-exempt status for the life of the loan, then they will be able to dip their *entire portfolio,* if they choose to do so." [*Id.* (emphasis added).]

**RESPONSE TO NO. JS86.  Disputed and incomplete.  In a letter dated September 10, 2004, Don Bouc, then President of Nelnet,  purported to address a question that arose as part of the Department's program review of Nelnet.  Dunlap Ex. 57 at N0002116 (Soni Dec., Ex. 102).  Specifically, Nelnet was asked to provide "some background" information about the growth of loans in its portfolio subject to 9.5% SAP.  *Id.*  Bouc claimed that:**



*Id.*  **Applying the figures stated in Bouc's letter,** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **would be $400 million;** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **would be $3.375 billion.  This**

represents a growth rate of the 9.5% SAP portfolio of 843% as compared to the overall
growth rate of ███████

    "Observation 3" in the 2004 Program Review Report noted an "[i]ncrease in
portfolio size and earnings for loans purchased with tax exempt bonds" and contained a
table tracking Nelnet's 9.5% Loan growth between 2000 and 2004.  McPherson Ex.  10 at
ED-B-004654 (Soni Dec., Ex. 763).  As McPherson testified, the report said nothing about
the lawfulness of this growth.  McPherson Tr. 112:10-13 (Soni Dec., Ex. 28).

    Wallace testified as follows regarding his September 1, 2004 email chain with
Halaska and Sutphin: "Q: So this is an extension of the same issue that you ran into in
Iowa and I remember correctly, is this the same issue that the finding was removed? . . .
A:  This is a similar concern.  Without having done the review it's hard to say that it's the
same issue.  Presumably yes, but not reviewed or – this review, as far as I know, this review
did not look at the source of funds or the movement of funds.  <u>This was a question that was
asked on site, not validated during the review</u>."  Wallace Tr. 260:2-16 (Soni Dec., Ex. 23)
(emphasis added).  He testified further: "What happened at the same time that this issue
came up there was an ongoing review of Nelnet as servicer.  Basically through my boss to
Ben McPherson, I tasked him to ask Nelnet on site their understanding of what was going
on, not as part of the review process itself.  So if it got peripherally mentioned in the review
report it's maybe side up."  *Id.* at 261:7-15 (Soni Dec., Ex. 23).

    McPherson testified that Nelnet had failed to divulge many significant details about
its 9.5% loan scheme:

Q.  When you were on this review of Nelnet, did Nelnet tell you that they had an internal plan to increase their 9.5 loan loan [sic] holdings?

A.  No.

Q.  Did Nelnet explain the nature of its transactions in order to increase its 9.5% loan holdings?

A.  No.

Q.  Did it, did Nelnet ever tell you that some of the loans and funds moved between Nelnet's own bonds and corporate entities? . . .

A.  No. . . .

Q.  Did it ever explain that the loans would simply be swapped between warehouse financings and tax-exempt indenture for as little as a day?

A.  No.

Q.  Did Nelnet every tell you how much it could increase its 9.5 loans?

A.  No.

McPherson Tr. 117:15-119:17 (Soni Dec., Ex. 28).  McPherson also testified that he has no

authority to interpret difficult policy issues.  *Id.* at 100:22-102:4; *see also* Criswell Tr.

206:9-20 (Soni Dec., Ex. 26); Wallace Tr. 390:18-391:3 (Soni Dec., Ex. 23) ("[T]he southern

region doesn't determine policy nor can we provide a legal opinion because that comes

from policy or General Counsel and if policy or General Counsel tells us that it's an

approved activity, it's not my office's position that I can say hey, I can overrule General

Counsel or Policy's decision on there.").

JS87.  On November 15, 2004, Nelnet filed its 10-Q report for the quarterly period

ended September 30, 2004. [McMahon Decl., Ex. II.48 (Nelnet, Inc. 10-Q (filed Nov. 15,

2004)).] In its 10-Q, Nelnet summarized the prior information provided to the SEC,

including the fact that Nelnet had sought confirmation from ED, and that Nelnet had deferred

recognition of the interest income pending the resolution of this matter in the "recent

- 117 -

developments" section. [*Id.* at 6.] Nelnet also provided the following disclosure concerning

deferred income from the 9.5% loan portfolio:

> In June 2004, after consideration of certain clarifying information
> received in connection with the guidance it had sought, including written
> and verbal communications with the Department, the Company
> concluded that the earnings process had been completed related to the
> special allowance payments on these loans and recognized $124.3
> million of interest income. At December 31, 2003, the amount of
> deferred excess interest income on these loans was $42.9 million and was
> included in other liabilities on the Company's consolidated balance sheet.

**RESPONSE TO NO. JS87.  No dispute that the language is quoted accurately.**

**JS88.**  On March 4, 2005, the Nelnet Final Program Report resulting from the review

commencing in June 2004 was issued. [Ex. II.46 (N0017099-123).] Observation 3 of the report

indicated there was an increase in the portfolio size and earnings for loans purchased with tax-

exempt bonds. [*Id.* at (N0017105).] A chart was included in the Report that showed the

increasing earnings and loan portfolio between the quarters ending March 31, 2000 and

March 31, 2004. [*Id.*] No action was recommended by ED in connection with this

observation. [*Id.*].

**RESPONSE TO NO. JS88.  No dispute.**

**G.      ED Statements Concerning the TTPA**

**JS89.**  On or about September 30, 2004, following the release of a GAO Report

regarding 9.5% SAP growth, *see infra ¶¶* JS133-140, Secretary Rod Paige and Joshua Bolten

(OMB) sent an email to Representative John Boehner, explaining that "[t]he prior

administration's interpretation [of relevant law] expressly permitted lenders to extend [9.5%

SAP] payments indefinitely" and urged Rep. Boehner to "close this loophole . . . through

legislation." [McMahon Decl., Ex. II.49 (ED-B-000808).] They added that legislation was the

preferred approach because the Secretary of Education had concluded, after careful review, that ED would need to go through negotiated rulemaking in order to change what it considered to be a definitive policy statement about 9.5% SAP practices as expressed through the 1996 DCL. [*Id.*]

**RESPONSE TO NO. JS89. No dispute that the language is quoted accurately. DEd restated its position in the 2007 DCL that unlimited growth is prohibited, demonstrating that neither negotiated rulemaking nor legislation had ever been necessary.** *See* **Responses to JS163-64.**

**According to Stroup, the legislation option was superior because negotiated rule-making "could take a fair amount of time" and because of "budget scoring." Stroup Tr. 113:3-11 (Soni Dec., Ex. 21);** *see also id.* **at 77:17-78:2 (testifying that changing the 9.5% rules through legislation as opposed to clarification would result in positive "budget scoring consequences"). Hansen also agreed that legislation offered attractive cost savings. Hansen 285:12-19 (Soni Dec., Ex. 22).**

**Stroup did not "go behind the 96 DCL and determine whether the underlying regulations supported the DCL." Stroup 252:1-9 (Soni Dec., Ex. 21). She further testified that DEd "honored whatever was published" by the Clinton Administration – including the 1996 DCL – "whether or not it might independently be sustainable under the regulations."** *Id.* **at 253:15-254:6.**

**JS90.**  On October 5, 2004, Pam Moran e-mailed George Harris of OPE that the TTPA, which was soon to be passed, "grandfathers all the loans [the lenders] have already converted

and just prevents any new loans being made and run through the 'conversion' process.
[McMahon Decl., Ex. II.50 (ED-B-000309-10).]

**RESPONSE TO NO. JS90.  No dispute that the language is quoted accurately.  To the extent statements not made under oath are relied upon for the truth of the matter asserted, they are hearsay.**

JS91.   On or about October 7, 2004, Secretary Paige, in a statement on the passage of TTPA, explained "the loophole was not the making of this administration" and that the law "allows lenders to receive special allowance payments on FFEL loans permitting a return of 9.5%." He also stated that ED would have had to engage in negotiated rulemaking in order to achieve the same result as the TTPA. [McMahon Decl., Ex. II.51 (ED-B-000809).]

**RESPONSE TO NO. JS91.  Disputed in that the prior administration did not create a "loophole" with respect to the eligibility of funds to create 9.5% Loans.  *See also* Response to J89.**

JS92.   On or about November 18, 2004, Secretary Paige wrote a letter to Senator Kennedy, discussing the "loophole" that was prospectively closed by the TTPA. [McMahon Decl., Ex. II.52 (ED-B-006306-07, at 006306).] He explained that ED did not "approve or disapprove" of the historical 9.5% SAP portfolio growth, but had rather "implemented the requirements" of the existing laws and regulations that "expressly permit[ed] lenders to extend the excessive special allowance payments indefinitely." [*Id.*] Paige also repeated his characterization of the 1996 DCL as an "authoritative interpretation," and explained that negotiated rulemaking would be required to close the loophole that allowed for 9.5% SAP loan portfolio expansion. [*Id.*]

**RESPONSE TO NO. JS92.  No dispute that the language is quoted accurately.  *See* Responses to J89, 91, *supra*.  Moreover, the letter says in full that "[t]he Department did not approve or disapprove <u>of the methods that Nelnet and other lenders were using</u>."  Letter from Secretary Paige at ED-G-000858  (Soni Dec., Ex. 37) (emphasis added).**

### H.      ED Statements Following the TTPA

**JS93.**   On October 28, 2004, Daniel Pollard at ED e-mailed Oberg that "[i]n response to a question, [FSA] COO Terry [sic] Shaw is saying that all the lenders were following the letter of the law in growing their 9.5% portfolios, and a statutory change is the preferred approach...."  [McMahon Decl., Ex. 11.53 (OBERG00006974-75, at 00006975).] Terri Shaw testified that, although she did not specifically recall making the statement described in Daniel Pollard's email, the statement was consistent with her understanding of ED's position as of October 2004. [Ex. II.118 (Shaw Dep. 150:7-151:9).]

**RESPONSE TO NO. JS93.  No dispute that the language is quoted accurately.  *See* Responses to JS26, JS37.**

**JS94.**   On September 9, 2005, attorney Saul Moskowitz e-mailed George Harris of OPE to ask for guidance on the following question:

> A . . . group of loans are currently financed by non floor-eligible bonds and are not floor eligible. Our client would like to transfer those loans from the existing bond indenture to one of its floor bond indentures. We would contend that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond.

[McMahon Decl., Ex. II.54 (ED-B-003298-99, at 003299).]

**RESPONSE TO NO. JS94.** No dispute that the language is quoted accurately.

Moskowitz's full question demonstrates that he was attempting to distinguish "dipping" of loans:

> A second group of loans are currently financed by non floor-eligible bonds and are not floor eligible. Our client would like to transfer those loans from the existing bond indenture to one of its floor bond indentures. Once again, both bond indentures have the same trustee and beneficial owner. We would contend that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond.  <u>Nothing in P.L. 108-409 (as distinguished from certain pending bills before the Congress (e.g. HR 609)) was intended to prevent new eligible floor loans from being created through new acquisitions of loans by floor bond indentures.  Instead the focus was on so-called "tagging" transactions, whereby a non-floor eligible loan would be moved briefly into a floor bond indenture, thereby becoming floor eligible, and then moved from there into a non floor-eligible bond indenture but (under ED regulations) retaining floor eligibility.  No such "tagging" transaction is involved here.</u>

Email between Saul Moskowitz and George Harris at ED-B-003298-99 (emphasis added) (McMahon Dec., Ex. II.54).

**JS95.** On October 31, 2005, Mr. Harris responded to Mr. Moskowitz: "The Department concurs with your analysis that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond." [Ex. II.54, at 003298.] Before sending this response, Harris sent it in draft to Pam Moran, who replied that she had "checked with" Assistant Secretary Sally Stroup and that "she agrees." [McMahon Decl., Ex. II.55 (ED-B-000177).]

**RESPONSE TO NO. JS95. No dispute that the language is quoted accurately. To the extent statements not made under oath are being offered for the truth of the matter asserted, they are hearsay.**

**JS96.** On October 13, 2005, attorney John Dean e-mailed Pamela Moran and Dan Madzelan of ED to ask the following question concerning implementation of the TTPA:

> "Prior to 9/30/04[:]
>
> > (1)     a loan was originated with post-1993 bond estate funds,
> > (2)     then the loan was 'tagged' by selling it to a 9.5% floor eligible bond estate.
> > (3)     This loan was subsequently, (but prior to 9/30/04) sold to a post-1993 bond estate.
> > (4)     After 10/1/04, the loan was sold again to a different post-1993 bond estate.
> >
> > Does this loan continue to receive the 9.5% floor yield?"

[McMahon Decl., Ex. II.56 (ED-B-000174-75, at ED-B-000175).]

**RESPONSE TO NO. JS96. No dispute that the language is quoted accurately.**

**JS97.** On October 17, 2005, Moran replied that the TTPA "says that the loan loses coverage if it is 'sold or transferred to another holder after September 30, 2004, and before January 1, 2006.' As you describe it below, the loans in question were sold after October 1, 2004 . . . Therefore, the 9.5% ceases *as of the post-October 1, 2004 transfer or sale* to another holder." [Ex. II.56 (ED-B-000174-75) (emphasis added).]

**RESPONSE TO NO. JS97. No dispute that the language is quoted accurately. To the extent statements not made under oath are being offered for the truth of the matter asserted, they are hearsay.**

**JS98.** On October 17, 2005, Dean clarified that "the holder remained the same through the time of the initial origination [of the loan] through the final financing." [Ex. II.56 at (ED-B-

000174).]  On October 27, 2005, Moran replied that the loan still was not eligible for the 9.5%

floor yield post-TTPA, but for a different reason:  "We would consider these *eligible 9.5%*

*loans* to have been refinanced after September 30, 2004 from funds obtained from a source"

other than a source of 9.5% floor eligible funds.  [*Id.* (emphasis added).]

**RESPONSE TO NO. JS98.  No dispute that the language is quoted accurately.**

**Moran also specified that the "holder" of a loan is not the bond estate that possesses legal**

**title in the loan, but the authority that controls it.  ED-B-000174 (McMahon Dec., Ex.**

**II.56).  To the extent statements not made under oath are being offered for the truth of the**

**matter asserted, they are hearsay.**

**JS99.**  In May 2007 congressional testimony, Secretary of Education Spellings

testified that:  "[I]n the summer of 2003, Department staff noted an alarming increase in special

allowance payments made to loan holders on certain FFEL loans made or purchased with tax-

exempt funds.  The Department's staff determined that these claims for the higher payment were

being made under a loophole in the rules written during the previous administration that allowed

certain loans financed with tax-exempt funds to qualify for a 9.5% special allowance subsidy,

minus the applicable rate of interest on such loans.  This led the Administration to include a

proposal in the President's FY 2005 Budget that would stop the increase in 9.5% special

allowance payments."  http://www2.ed.gov/news/speeches/2007/05/05102007.html

**RESPONSE TO NO. JS99.  No dispute that the language is quoted accurately.  The**

**Secretary also indicated that DEd had not previously grasped the problem exposed by the**

**DEd-OIG audit.  ("While the IG's report highlighted another dimension to the problem,**

our work on the 9.5% payments began well before the report's release."). *See* **Response to JS65,** *supra*.

## I.  ED Statements in Program Reviews and Review Guides

**JS100.**  In 2005, the Financial Partners office of FSA prepared a Program Review Schedule which listed a schedule for conducting Program Reviews of various lenders, schools acting as lenders under the FFEL Program, and guaranty agencies, with site visits planned for 2005 and 2006. The schedule indicated that the primary review focus for a number of the lenders identified on the schedule was "Tax-Exempt Bonds." [McMahon Decl., Ex. II.57 (OBERG00004503).]

**RESPONSE TO NO. JS100.**  **No dispute.  Shaw testified that "FSA monitor[ed] compliance of lenders participating in the FFELP program" through a program review process.  Shaw Dep. Tr. 28:13-16 (Soni Dec., 20).  Shaw described the process as follows: "There were dedicated Federal Student Aid staff who did program reviews . . . of all entities participating in the programs, including lenders.  So staff would have a regular review cycle and go visit entities, sometimes on site, sometimes things were not done on site.  A variety of depth of review types were performed and reports drafted and submitted and reviewed and finalized."  *Id*. at 28:17-29:7.  The "review process also include[d] analyzing data submitted by lenders and other participants in the FFELP program."  *Id*. 29:8-11.**

**Shaw testified as follows about program reviews: "Federal Student Aid staff would go to a participant in the programs and conduct a variety of types of reviews.  Some could be very focused, they could be very broad, it could be situational and issue and they would**

do a review to ensure that the entity was complying with the laws and regulations." Shaw Tr. 45:4-13 (Soni Dec., Ex. 20).

After October 2005, Financial Partners began to conduct "special allowance" program reviews that focused specifically on a lender's compliance with the Taxpayer Teacher Protection Act. Criswell Tr. at 217:12-21 (Soni Dec., Ex. 26). Shaw testified about the 2005 and 2006 reviews: "There was then special purpose audits directed to TTPA? Specifically for that, I believe, yes." Shaw Tr. 339:19-340:11 (Soni Dec., Ex. 20). Shaw testified that the 2005 and 2006 program reviews did not specifically address funds eligibility under Section 682.302(c): "Q: In other words, you've talked a little bit about audits and audit guidelines and what you had or hadn't been looking for in the audits conducted in the program between 2005 and 2006 and I'm asking, to your knowledge, were the auditors charged with looking at these categories to determine . . . whether 9.5 loans were generated by funds that are described in those categories [in Section 682.302(c)], do you remember an instruction of that kind? A: I did not personally given any such instruction, no. Q: Do you remember any guidance being given to the auditors with respect to the interpretation of this regulation? A: Not from me directly, no." *Id.* at 261:8-263:9 (Soni Dec., Ex. 20).

Each program review contained the following explicit disclaimer:

> Absence of statements in this report regarding specific practices and procedures followed by [the lender] should not be construed as acceptance, approval or endorsement of these specific practices or procedures. The specific nature of this report does not limit or lessen [the lender's] obligation to comply with all other provisions of the Federal Family Education Loan (FFEL) programs.

- 126 -

June 8, 2008 Letter from T. Langenhenning at PPHEA_000027 (Soni Dec., Ex. 157) (emphasis added).  Wallace testified about this language as follows: "This is standard language that's in all of our reports that says if we didn't look at it we're not condoning or approving something we didn't look at."  Wallace Tr. 407:14-20 (Soni Dec., Ex. 23).

Program reviews do not constitute formal adjudication of lenders' billing practices, nor do they result in legally binding decisions that affect all lenders.  *See* Stroup Tr. 250:12-251:8 (Soni Dec., Ex. 21).  Both Richard Criswell and Ben McPherson testified that they lacked authority to issue findings with respect to difficult legal and policy questions.  *See* Response to JS86, *supra*.

**JS101.**      On July 26, 2005, the Southern Region of ED's Financial Partners unit issued a report of its July 2005 program review of LoanStar Funding Group. [McMahon Decl., Ex. II.58 (ED-B-001447-55).] The report noted that LoanStar's quarterly SAP billing for the period ending December 31, 2004 included net billing increase adjustments for prior quarters of nearly $25 million. In response to the reviewers' inquiry on this subject, LoanStar stated:

> Beginning in March 2000, LoanStar transferred certain loans that had been financed with pre-October 1, 1993 tax-exempt bond proceeds to other financings, in exchange for cash. This cash, *which, after the transfer, now constituted proceeds of pre-October 1, 1993 tax-exempt bonds,* were [sic] then used to acquire additional FFEL loans. However, *we determined in late 2003 that LoanStar had erroneously failed to treat the newly acquired loans as subject to "Floor/Half SAP" treatment,* due to a misunderstanding of the provisions of 34 CFR 682.302. LoanStar immediately began to work to correct prior billings to comply with the regulations. The majority of these billing adjustments occurred in the 3rd and 4th quarters of 2004.

[*Id*. at (ED-B-001452).]

**RESPONSE TO NO. JS101.**        No dispute that the language is quoted accurately. *See* **Responses to JS26, JS100,** *supra.*

**JS102.**        Based on its sampling review, the review team reached the following "conclusion": "Verified that the loans were associated with tax-exempt bonds and the funds could be tied to tax exempt funding originally issued prior to Oct. 1, 1993." [Ex. II.58 at (ED-B001453).]

**RESPONSE TO NO. JS102.**        No dispute that the language is quoted accurately. *See* **Responses to JS26, JS100,** *supra.*

**JS103.**        In February 2006, ED's Financial Partners unit of FSA promulgated a fourth version of a "Special Allowance Billing Review Program" Lender/Servicer Review Guide to provide "guidance and tools to review lenders' implementation and enforcement of the provisions of the" TTPA. [McMahon Decl., Ex. II.59 (ED-B-001541-96).] The Review Guide noted that, prior to TTPA, there were "three primary ways that a lender could maintain or increase its 9.5% loan volume":

      1.    Recycling earnings to make or purchase loans. This allows lenders to maintain or slightly increase 9.5% loan volume;

      2.    Refunding, which is the process of issuing a new bond to pay the principal, interest, and other costs of an outstanding bond issue; the refunding bond finances the 9.5% loans and may have a later maturity date than the original loan, allowing lenders to maintain their 9.5% loan volume for a longer time; and

      3.    Transferring loans from pre-October 1, 1993 tax-exempt bond financing to taxable bond financing, which allows lenders to increase their 9.5% loan volume. Lenders can use the proceeds from the sale of loans previously financed by the pre-10/1/93 tax-exempt bond to make or buy additional loans, which are also guaranteed a 9.5% yield. Transferring accounted for the largest

increase in eligible 9.5% loans, compared to recycling and refunding, prior to the implementation of the TTPA.

[*Id.* at (ED-B-001542).]

**RESPONSE TO NO. JS103.        No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra*.**

JS104.        The Special Allowance Review program was an automated tool that was to be used by Financial Partners' personnel in performing on-site reviews, included "step-by-step procedures for performing a SAP review," and consisted of checklists and procedures "to assist in completing the review." [Ex. II.59 at (ED-B-001543).] The checklists instructed program reviewers to "test sample loans for attributes of eligibility for 9.5% SAP" and "trace the floor eligibility for the sample loan population that is billed with an 'X' Code [*i.e.*, ED's code for 9.5%/half-SAP billing]. A loan may have been transferred as few as zero times or more than six times . . . . All loans should have been 'dipped' at one time in a floor eligible (tax-exempt) bond so the confirmation of the floor eligibility (tax exempt) status is important." [*Id.* at (ED-B-001582-83) (emphasis added).]

**RESPONSE TO NO. JS104.        No dispute that the language is quoted accurately.  The Special Allowance Billing Review Program FPS Lender/Servicer Review Guide ("Guide") makes clear that those reviews were focused on compliance with the TTPA.  The Guide states: (1) "[t]he purpose of the FPS Lender Servicer Review Guide is to provide guidance and tools to review lenders' implementation and enforcement of the provisions of the Taxpayer-Teacher Protection Act of 2004 (TTPA), which was passed by Congress and signed into law on October 30, 2004," Special Allowance Billing Review Program, ED-B-001542 (McMahon Dec., Ex. II. 59); and (2) "[t]he purpose of a special**

allowance review is verify a lender's implementation and compliance with the provisions of the Taxpayer-Teacher Protection Act of 2004 (TTPA), which became effective October 1, 2004. . . . ," *Id.* at ED-B-001554.  The Guide also instructs reviewers to "specifically indicat[e] that the review is limited to confirming the agency's compliance with the TTPA of 2004."  *Id.* at ED-B-001570.

JS105.        An Appendix C to the Review Guide provided "additional information .. . related to reviewing tax-exempt bonds." [McMahon Decl., Ex. II.60 (ED-B-001639-43, at 001639).] With respect to "[l]oans transferred from eligible tax-exempt bond to an ineligible tax-exempt bond or to a taxable funding source," Appendix C stated as follows:

> *Policy has determined that a loan is eligible* for tax-exempt special allowance benefits from *the time that it enters an eligible bond issue* (including refunding bonds). Loans retain their eligibility for tax-exempt billing as long as the eligible bond has not been defeased (presumably the bond would not be considered to be defeased if had been refunded) . . . . Loans transferred to taxable funding sources and post October 1, 1993 tax-exempt bonds remain eligible for tax-exempt billing as long as the eligible (and subsequent refunding) have not been defeased. Most controversial of these is a practice by a major lender to move loans into an eligible bond for the period of one day then moving the loans to what would otherwise be ineligible for tax-exempt special allowance. Lenders must be able to provide documentation to support billing. This should include the ability to provide documentation showing that all loans currently held by an otherwise ineligible sources [sic] *had spent time in an eligible bond.*

[*Id.* at (ED-B-001641) (emphasis added).]

RESPONSE TO NO. JS105.        Disputed and incomplete.  The documents does not indicate on its face that it is an appendix to Version 4 of the Guide, and Criswell did not recall when this document was in use.  Criswell Tr. 74:2-25 (Soni Dec., Ex. 26).  The "[p]olicy" determination above does not address the eligibility of funds issue.

**JS106.**       On May 11, 2006, the Southern Region of Financial Partners issued a report of an October 2005 program review of the Kentucky Higher Education Student Loan Corporation (KHESLC). [McMahon Decl., Ex. II.61 (ED-B-001437-1446).] "The review focused on the management of the tax-exempt FFEL portfolio and compliance with the Higher Education Act of 1965, as amended, including the Omnibus Budget Reconciliation Act of 1991, the Taxpayer Teacher Protection Act of 2004 and the regulations of the FFEL Program." [*Id.* at (ED-B-001437).] The report noted the following:

> Eligible Bonds: ...The total outstanding [tax-exempt] bond debt as of June 2005 was $81,800,000. Prior to January 2004, KHESLC had not routinely transferred loans from bond issues to take advantage of the regulatory interpretation allowing the loans to retain the 9.5% floor eligibility. Based on legal opinion provided on the application of the Higher Education Act, and applicable Department of Education administrative guidance to student loans made or acquired through such pre October 1, 1993 tax-exempt bond estates KSHESLC initiated its 9.5% floor project on January 16, 2004 to purchase all loans not subject to the 9.5% special allowance floor with funds obtained from the issuance of tax-exempt obligations which were originally issued prior to October 1, 1993.

> 9.5% Floor Project: KHESLC used the Senior Series 2003A-2 bond issue as the refinancing mechanism. Starting January 16, 2004 and continuing through September 2004, KHESLC refinanced in excess of $800,000,000 of loans that were not eligible for the 9.5% floor. We reviewed all of the bond issues that were refinanced and audited the financial transactions supporting the re-funding. KHESLC tracks the bond issue using accounting codes and they monitored the re-funding by changing the accounting code when the loans were re-financed. KHESCL ceased re-funding to comply with the Taxpayer Teacher Protection Act of 2004.

[*Id.* at (ED-B-001444).]

**RESPONSE TO NO. JS106.**       **No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra*.**

- 131 -

JS107.        The KHESLC program review Report also contained a finding that

KHESLC had *underbilled* ED for 9.5% SAP:

> If a loan was eligible for the 9.5% special allowance floor prior to October
> 1, 2004, then loans made or acquired on or after October 1, 2004 with
> proceeds from such loan ("re-cycling") are also eligible for the 9.5%
> special allowance floor. This applies to loans made or acquired with
> re-cycled funds from a 9.5% special allowance floor loan that resides in a
> bond issue that is not a pre-October 1, 1993 tax-exempt bond estate as
> long as the original loan was not subject to the lapsing events listed in the
> Taxpayer-Teacher Protection Act of 2004. KHESLC believed that the re-
> cycled loans were not eligible for the 9.5% special allowance floor
> because these loans were made or acquired on or after October 1, 2004
> from proceeds of loans eligible for the 9.5% special allowance floor, but
> no longer held in a pre-October 1, 1993 tax-exempt bond estate. There
> were 12 loans in the sample that were in this category and are identified
> in the attached spreadsheet as (c) and (d).

[Ex. II.61 at (ED-B-001444).]

**RESPONSE TO NO. JS107.        No dispute that the language is quoted**

**accurately.  *See* Responses to JS26, JS100, *supra*.**

JS108.        On July 26, 2006, the Western Region of Financial Partners issued a report

of a May 2006 program review of CollegeInvest. [McMahon Decl., Ex. II.62 (ED-A-000937-

49).] "The scope [of the review] was a comprehensive examination of CollegeInvest and

its management of operations associated with tax-exempt and taxable bond issues used for

financing 9.5% floor eligible loans." [*Id.* at (ED-A-000939).] The report noted the following:

> Transferred Loans. As stated earlier, a loan may be eligible for Floor SAP
> billing if it is acquired with proceeds of Pre-1993 Bonds *or is otherwise
> pledged to a Floor SAP Financing Vehicle.* Such loans continue to be
> eligible for Floor SAP billing, even if transferred to a non-Floor SAP
> Financing Vehicle, so long as the transfer occurred prior to October 1,
> 2004 [the effective date of the TTPA], and the Floor SAP Financing
> Vehicle remained outstanding or had been refunded with tax-exempt
> obligations. CollegeInvest has transferred loans between its outstanding
> bonds and bills for Floor SAP on those loans which, at some point prior to

October 1, 2004, *had been pledged to* a Floor SAP Financing Vehicle so
long as that Floor SAP Financing Vehicle remains outstanding or has been
refunded with tax-exempt obligations.

[*Id.* at (ED-A-000942) (emphasis added).]

     **RESPONSE TO NO. JS108.**      **No dispute that the language is quoted**

**accurately.** *See* **Responses to JS26, JS100,** *supra.*

     **JS109.**      The Report also contained a finding that CollegeInvest had *underbilled*

ED for 9.5%/half-SAP:

> [In around March 1999, 'loans were transferred from certain existing
> series to new series and also among existing series' [sic] of bonds. As a
> result of those transfers, CollegeInvest transferred some loans from
> existing Floor SAP Financing Vehicles to non-Floor SAP Financing
> Vehicles. According to its policy at the time, CollegeInvest did not bill
> floor SAP for those loans that were originally acquired into a Floor SAP
> Financing Vehicle and subsequently transferred to a non-Floor SAP
> Financing Vehicle. As a result, the Floor SAP billing which took these
> transfers into account declined materially . . . . This resulted in underbillings
> for special allowance payments in the estimated amount of $13,570,112.

[Ex. II.62 at (ED-A-000947).]

     **RESPONSE TO NO. JS109.**      **No dispute that the language is quoted**

**accurately.** *See* **Responses to JS26, JS100,** *supra.*

     **JS110.**      The report included the following "Required Action" concerning this

filing: "CollegeInvest management stated during the on-site review that it would report increase

adjustments to the LaRS to recoup the special allowance payments underbilled for the quarters

of March 31, 1999 to the present." [Ex. II.62 at (ED-A-000947).]

     **RESPONSE TO NO. JS110.**      **No dispute that the language is quoted**

**accurately.** *See* **Responses to JS26, JS100,** *supra.*

**JS111.**        In an internal ED e-mail of October 24, 2006, Terri Shaw (COO of FSA) acknowledged that the CollegeInvest report's "finding is that CollegeInvest UNDERBILLED for 9.5% based on their recycling/refunding/transferring practices." [McMahon Decl., Ex. II.63 (ED-A-002120).]

**RESPONSE TO NO. JS111.        No dispute that the language is quoted accurately.** *See* **Responses to JS26, JS100,** *supra.*

**J.        The Nelnet IG Report and ED Settlement**

**JS112.**        From July 2005 through July 2006, the Office of Inspector General of ED ("OIG") conducted an audit focused on Nelnet's billing of 9.5 SAP loans for the time period of January 1, 2003 through June 30, 2005. [McMahon Decl., Ex. II.64 (OBERG00000397-464).]

**RESPONSE TO NO. JS112.        No dispute.**

**JS113.**        On August 9, 2006, the OIG released a Draft Audit Report "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations" (the "Draft Report"). [McMahon Decl., Ex. II.65 (ED-G-000672-93).] The Draft Report concluded that Nelnet's Project 950 did not fund loans from an eligible source in compliance with the HEA, regulations and other guidance issued by ED. [*Id.* at (ED-G-000675).] The Draft report noted that Nelnet's internal documentation characterized Project 950 transactions as transfers or sales; that sales of loans may result in an eligible source for 9.5% floor funding, but that the Project 950 transfers could not be considered sales for the purposes of these requirements. [*Id.* at (ED-G-000682).]

**RESPONSE TO NO. JS113.        Incomplete.  On the day the draft was released, there was a "deputies meeting on Nelnet . . . and 9.5 percent floor loans with the**

Department of Education and OMB." White House Email, ED-F-000140-41 at ED-F-000140 (Soni Dec., Ex. 110). The meeting included individuals from various offices in the White House, DEd, and OMB. Among the participants from DEd was Terri Shaw. *Id.*

Attached to the meeting notice was a "Summary of Nelnet 950" memorandum drafted by White House Domestic Policy Council. Deputies Meeting Summary, ED-F-000142-43 at ED-F-000142 (Soni Dec., Ex. 110). The memorandum provided a brief background of the FFELP and 9.5% Loans, as well as an overview of Project 950. With respect to Project 950, the memorandum states:

> Nelnet began its Project 950 in 2003. Under Project 950, Nelnet transferred loans from the initial 1985 offering out of the tax-exempt bond to a taxable bond. In essence, it sold those loans to the taxable bond. Since the tax-exempt bond still existed and continuing payments were required to satisfy the bond, Nelnet purchased other loans to replace the ones it sold out of the tax-exempt bond (Loan Set #2). Both sets of loans qualified for 9.5% SAP.
>
> After the initial transfer, Nelnet began a series of subsequent loan transfers in order to increase their 9.5% portfolio. This series of transfers continued until Nelnet increased their initial loan portfolio billed as 9.5% SAP from $558 million to nearly $3.7 billion. <u>The subsequent transfers do not qualify for the 9.5% SAP because they were not purchased with funds obtained from tax-exempt obligations made prior to October 1, 1993</u>.

*Id.* at ED-F-000142-43 (emphasis added). The memorandum further stated that Nelnet justified Project 950 under the 1996 DCL, but concluded that "[t]he DCL was silent on the possibility of repeated transfers such as those undertaken by Nelnet in Project 950." *Id.* at ED-F-000143. The memorandum then states:

> Nelnet also appears to base its justification on the absence of any statement from the Department that the proposed

**transfers were legally impermissible.  Furthermore, Nelnet's counsel provided two opinion letters that simply confirmed the DCL's guidance as applicable to Nelnet's plan, but did not address the regulatory requirement of whether loans involved in Project 950 would be acquired using legally permitted sources of funds so as to be eligible for the 9.5% SAP.  In short, the Department never officially approved of Nelnet's multiple transfers**.

*Id.* (emphasis added).

JS114.        Terri Shaw was designated as the action official within ED for the draft audit report. [McMahon Decl., Ex. II.66 (ED-A-001367); Ex. II.118 (Shaw Dep. 188:5-188:15).]

RESPONSE TO NO. JS114.        No dispute.

JS115.        On or before September 5, 2006, on behalf of ED, Ms. Shaw prepared a draft memorandum to Helen Lew, Assistant Inspector General for Audit Services, responding to the OIG's draft audit report concerning Nelnet. The draft memorandum had been reviewed by ED's General Counsel, Kent Talbert. [Ex. II.118 (Shaw Dep. 191:8-191:17).] In the draft memorandum, Ms. Shaw stated that FSA did not agree with the OIG position that loans under Project 950 did not qualify as sales, and that it was the legal opinion of ED's Office of General Counsel that they did qualify as sales. The draft memorandum further stated:

> In response to the OIG's determination that loans may not have been funded from eligible sources, the Department has *re-evaluated its interpretation* of the Higher Education Act (HEA) and regulations regarding eligible sources of tax exempt funds and those loans that are eligible for the 9.5 minimum return. As a result of the re-evaluation, the Department will publish guidance in the near future on 'eligible sources'. In particular this guidance will *clarify* which generations of loans qualify for the 9.5 percent minimum return SAP rate, effective beginning with the quarterly lender billing cycle ending December 31, 2006.

[McMahon Decl., Ex. II.67 (Shaw Dep. Ex. 31 (unnumbered document) (emphasis added); Ex. 11.118 (Shaw Dep. 192:12-193:5).]

**RESPONSE TO NO. JS115.** **No dispute that the language is quoted accurately. No explanation is provided to support Shaw's position with respect to sales.**

JS116.     Ms. Shaw's draft letter further stated that FSA "made no determination on the recommendation in the draft audit report to retroactively recover potential overpayments that were made to Nelnet." *Id.* Ms. Shaw used the term re-evaluation in her draft letter to mean "absolutely" a change from the Department's prior interpretation of the regulations. [Ex. II.118 (Shaw Dep. 193:9-193:11).]

**RESPONSE TO NO. JS116.** **No dispute that the language is quoted accurately. *See* Responses to JS163, JS164, *infra*, regarding the Department's January 2007 Dear Colleague Letter.**

JS117.     On September 5, 2006, Kristin Conklin, Counselor to the Undersecretary of Education, sent David Dunn, the Secretary of Education's chief of staff, an e-mail regarding Ms. Shaw's draft letter to OIG. Ms. Conklin stated that the Office of Management of Budget ("OMB") and the White House, Domestic Policy Council ("DPC") wanted two changes in the letter: (1) to delete the language that ED "re-evaluated its interpretation," and (2) to spell out that ED had the right to recover past payments. [McMahon Decl., Ex. II.68 (ED-E-000428).]

**RESPONSE TO NO. JS117.** **No dispute.**

JS118.     On September 7, 2006, Erin McNeese of OMB sent a revised version of Ms. Shaw's draft letter, which changed the language ED has "re-evaluated its' interpretation" of the regulations to the phrase ED "concurs with the OIG's interpretation" of the regulations. The revised draft also replaced the term "re-evaluation" with the tell "legal analysis," and

stated that "as a result of the Department's legal analysis, the Department will publish guidance in the near future clarifying eligible sources." [McMahon Decl., Ex. II.69 (ED-X-00001-3); Ex. II.118 (Shaw Dep. 201:12-203:15).]

**RESPONSE TO NO. JS118.        No dispute that the language is quoted accurately.  Shaw testified that the draft letter was sent to OIG and subsequently recalled "to change the language in the last paragraph of the draft."  Shaw Tr. 195:10-196:15;199:13-2016 (Soni Dec., Ex. 20).  According to Shaw, "[L]ots and lots of entities including the White House were involved and that had never ever ever taken place with respect to any other issue that I was involved with at the Department of Education and through all those entities' involvement this is the language they wanted and this was the language it was going to be."  *Id.* at 282:5-18.**

**JS119.**        On September 7, 2006, Terry Heimes sent a letter to Richard Dowd, Regional Inspector of the OIG, in response to the draft audit report, which also enclosed the September 6, 2006 memorandum from Dan Kaplan which concluded that the text of the relevant regulations and official pronouncements of ED supported the eligibility of loans funded by subsequent generation proceeds of a tax-exempt obligation issued prior to October 1, 1993 for the 9.5% floor. [McMahon Decl., Ex. II.70 (ED-A-001303-09); Ex. II.29 (N0017677-90).] Nelnet also provided the OIG with a memorandum from the law firm Mayer, Brown, Rowe and Maw LLP that addressed the issue of whether the transfer of student loans from the NELF 1985A Trust to the Transferee Trusts, described in section "I. Description of the Transactions," constituted sales of such student loans by the 1985A Trust to the applicable Transferree Trust under general commercial law principles. [Ex. II.20 (ED-A-003480-3516).]

**RESPONSE TO NO. JS119.**       **No dispute that the language is quoted accurately.**

JS120.       On September 8, 2006, Terri Shaw sent a revised version of the draft memorandum to Helen Lew. [Ex. II.118 (Shaw Dep. 199:13-201:1).] As in the draft memorandum, Ms. Shaw noted that FSA did not agree with the OIG position that loans under Project 950 did not qualify as sales, and that it is the legal opinion of OGC that they did qualify as sales. The final memorandum adopted the language contained in the draft from Ms. McNeece from OMB. Ms. Shaw believed that it was "highly unusual" to have OMB and DPC edit a response to a draft OIG report, and memorialized that the draft letter was recalled. [McMahon Decl., Ex. II.71 (ED-F-000367); (Ex. II.118 (Shaw Dep. 204:4-204:18).]

**RESPONSE TO NO. JS120.**       **Disputed and incomplete.  Shaw testified that the September 8, 2006 memorandum was in fact sent to DEd-OIG.  Shaw Tr.  203:5-15 (Soni Dec., Ex. 20).  However, the final DEd-OIG Nelnet audit report did not include a copy of the letter.  Nor does the report make reference to DEd's analysis, and it states with respect to sales that "[w]e have been unable to obtain the views of responsible Department officials on whether the regulations and the HEA preclude Nelnet's Project 950 transactions, as described in our report, from qualifying as sales under 34 C.F.R. § 682.302(c)(3)(i)(D)."  OBERG00000411 (McMahon Dec., Ex. II.64)**

JS121.       On September 29, 2006, the OIG's Final Audit Report "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations" (the "Final Report") was released. In the Final Report, the OIG found that "Project 950 did not fund loans in compliance with the HEA, regulations or other guidance issued by the Department." [Ex. II.64 at OBERG

00000399.] The OIG's contention from the Draft Report that the transfers were not sales was not included in the Final Report. [Ex. II.62 (ED-A-000937-49).]

**RESPONSE TO NO. JS121.**        **Incomplete.  The final DEd-OIG Nelnet audit report summarized its findings as follows:**

> **Nelnet's use of Project 950 was not in compliance with requirements in the HEA, regulations, and the Department's guidance.  The increased amount of loans billed under the 9.5 percent floor that resulted from Project 950 was not funded by any eligible source listed in 34 C.F.R. § 682.302(c)(3)(i).**

**OBERG00000404 (McMahon Dec., Ex. II.64).**

In explaining its finding that "The Increase in Nelnet's Special Allowance Payments under the 9.5 Percent Floor Was Based on Ineligible Loans," DEd-OIG explained, *inter alia*, that "Nelnet implemented Project 950 in April 2003 to increase the amount of loans that it billed for special allowance payments under the 9.5 percent floor."  *Id.* at DEd-OIG further explained that "[t]he Project 950 transactions were unrelated to Nelnet's ability to meet its 1985A bond obligations.  Nelnet sold the 2004-1 and 2004-2 bonds to investors with the express condition that 9.5 percent special allowance payments would not become part of the trust estates; only an amount equal to regular special allowance payments would be pledged toward repayment of the bonds.  The excess would be payable to Nelnet for its own purposes."  *Id.* at OBERG00000405.

DEd-OIG also found that the June 30, 2004 letter from Vickie Bateman – "[t]he only written guidance specific to Project 950 indentified by Nelnet" – "did not approve or disapprove of Nelnet's use of Project 950: it only referred Nelnet to existing authorities." *Id.*  Ultimately, DEd-OIG stated that its "review of Nelnet's documentation did not identify

any direct or explicit approval by the Department of Project 950." *Id.* at

OBERG00000406.  Moreover,

> [T]he documentation, including Nelnet's letter of May 29,
> 2003, to FSA . . . does not appear to reflect a comprehensive
> disclosure by Nelnet of the nature or effect of Project 950.  For
> example, Nelnet's May 29, 2003, letter and its accompanying
> flow chart described only the basic process.  The letter did not
> identify the eligible source of funds that would be used to
> purchase and qualify loans for the 9.5 percent floor, did not
> state directly that the process would be repeated many times,
> and did not state that the process would result in a substantial
> increase in the amount of loans billed under the 9.5 percent
> floor.

*Id.*  The report further stated with respect to that letter that "[t]he Department did not sign

or indicate its concurrence, and the Department's written response to Nelnet did not

provide approval of Nelnet's billing procedure." *Id.* at OBERG00000411.  The report also

stated that the November 18, 2004 Paige letter to Kennedy "confirm[ed] this understanding

by stating, 'The Department did not approve or disapprove of the methods that Nelnet and

other lenders were using.'" *Id.*

> Regarding "sales," DEd-OIG stated:

> The evidence we reviewed was mixed as to whether the
> transactions qualified as sales.  According to Nelnet, each of its
> trusts is a separate legal entity, and an exchange of loans from
> one holder trust to another was sufficient to qualify as a sale.
> However, Nelnet's internal documentation varied in its
> characterization of the Project 950 transactions as transfers or
> sales.

*Id.* at OBERG00000407.

JS122.      On September 29, 2006, Terri Shaw was formally designated as the action

official responsible for the resolution of the findings and recommendations in the final report.

[McMahon Decl., Ex. II.72 (ED-A-001407).]

**RESPONSE TO NO. JS122.**          **No dispute.**

      **JS123.**          On October 11, 2006, Scott Walter, from the White House Office of Domestic Policy, advised David Dunn, Secretary Spellings' Chief of Staff, of reports that "[n]obody knows (and the IG has admitted to Hill folks) how to track 'generations of loans' such as the IG report's view of a loan's eligibility would require." [McMahon Decl., Ex. II.73 (ED-E000329).] Ms. Shaw testified that prior to the OIG's report with respect to Nelnet, FSA had never looked at generations of loans" in processing and approving 799 bills for special allowance on tax exempt 9.5 floor loans. [Ex. II.118 (Shaw Dep. 208:12-208:20).] She further testified that for a number of years, FSA paid 9.5 percent SAP on loans that would be classified as third or later generation loans. [*Id.*]

      **RESPONSE TO NO. JS123.**          **No dispute that the language is quoted accurately.  To the extent statements not made under oath are offered for the truth of the matter, they are hearsay.**

      **JS124.**          On December 13, 2006, Terri Shaw wrote in an internal ED e-mail that certain completed program review reports included "[f]indings . . . related to recycling and include both under and over billing scenarios (totaling $26M and $15.6M, respectively for a net UNDER billing of $10.3M) *based on the understanding of statue* [*sic*]*, regulations and policy prior to the issuance of the Nelnet report and the issues presented therein.*" [McMahon Decl., Ex. II.74 (ED-A-003343) (emphasis added).]

      **RESPONSE TO NO. JS124.**          **No dispute that the language is quoted accurately.**