JS125.       On December 21, 2006, Terri Shaw noted in an internal ED e-mail that certain review reports already issued had "findings of both under and over billings of 9.5% SAP. Would applying the *new interpretation* to these already issued reports be 'retroactive?'" [McMahon  Decl., Ex. II.75 (ED-A-003342) (emphasis added).] In her deposition, Terri Shaw stated, "I testified in response to the question of the multi-generational issue that that was absolutely a new interpretation and the term had never been used in my experience at the department." [Ex. II.118 (Shaw Dep. 272:12-272:18).]

**RESPONSE TO NO. JS125.        No dispute that the language is quoted accurately.**

JS126.       Sally Stroup testified that she "would argue that the Department had never used the phrases [first generation, second generation] in the history of the program until [the January 2007] Dear Colleague." [Ex. II.119 (Stroup Dep. 208:18-209:1).]

**RESPONSE TO NO. JS126.        Disputed and incomplete.  Stroup had previously testified on direct examination that she believed that individuals in OGC first used the term "third generation loans."  Stroup Tr. 175:2-6 (Soni Dec., Ex. 21).  She had her the phrase some time before she left DEd in March 2006 – *i.e.*, before the DEd-OIG Nelnet audit report.  *Id.* at 181:6-182:5 (Soni Dec., Ex. 21).**

JS127.       On January 23, 2007, Nelnet and ED entered into a Settlement Agreement. The Settlement Agreement resolved any dispute as to the validity of Nelnet's 9.5 SAP billings. The Settlement Agreement followed the extensive audit of and reports regarding Nelnet by ED's own OIG. Under the Settlement Agreement, ED permitted Nelnet to retain all

9.5 SAP previously billed to and received from ED, and released Nelnet thereon. [McMahon Decl., Ex. II.76 (ED-A-003533-42, at ED-A-003537).]

  **RESPONSE TO NO. JS127.**  **Disputed and incomplete. The settlement did not "resolve any dispute as to the validity of Nelnet's 9.5 SAP billings," but rather resolved claims against Nelnet with respect to loans "that are not first-generation or second-generation loans." Settlement Agreement at ED-A-003537 (McMahon Dec., Ex. II. 76). Similarly, Nelnet was permitted to retain all previous 9.5% SAP billings "regardless of whether such payments were made on loans other than first- or second-generation loans." Id.**

  **Moreover, the final agreement contained a provision expressly permitting False Claims Act suits: "The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present, or future violations by Nelnet, its officers, or employees of the criminal laws of the United States or any action against Nelnet, its officers or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33." ED-A-003540 (McMahon Dec., Ex. II. 76).**

  **By including this provision, DEd rejected Nelnet's attempts to foreclose a Department of Justice case. See Email from Nelnet's Counsel at ED-A-003406 (Soni Dec., Ex. 45). A redline of the agreement provided by Nelnet's counsel had contained the following language: "The Department is not presently aware of any investigation, proceedings or actions currently contemplated by, or pending before the Department or any other Federal agency that relate to Nelnet's billing for or receipt of SAP payments at the 9.5 percent floor, nor will the Department urge the same." Draft Settlement Agreement**

**at ED-A-003379-89 at ED-A-003387 (Soni Dec., Ex. 46). That language was not included in the final draft.**

JS128.        ED agreed in the Settlement Agreement that "[t]o avoid further costs and risks of litigation . . . the parties have entered into this Agreement to resolve the issue of Nelnet's past receipt of SAP payments under the 9.5 percent floor calculation on Project 950 loans and loans other than first-generation or second generation loans, as well as its rights with respect to future claims for SAP at the 9.5 percent floor calculation for such loans." [Ex. II.76 (ED-A-00353637).]

**RESPONSE TO NO. JS128.        Incomplete.  *See* Response to JS127, *supra*.**

JS129.        In the Settlement Agreement, ED acknowledged that Nelnet had billed 9.5% SAP on certain loans through June of 2006, and agreed that "Nelnet considers it was authorized to do so." [Ex. II.76 at (ED-A-003534).] ED further agreed that "[t]he OIG interpretation of the Higher Education Act and its implementing regulations differs from that of Nelnet" and that "Nelnet and the Department agree that *bona fide,* good faith disputes and controversies exist between them concerning the matters described above." [*Id.* at (ED-A-003534, ED-A-003536).]

**RESPONSE TO NO. JS129.        No dispute that the language is quoted accurately.  Nelnet's counsel attempted to include language that "each party's interpretation was *reasonable* and adopted in good faith," but DEd rejected the "reasonable" language in the final version of the agreement.  *See* Email from Nelnet's Counsel at ED-A-003402-04 (Soni Dec., Ex. 44).**

**        *See* Response to JS127, *supra*.**

**JS130.**        Prior to the OIG audit report with respect to Nelnet, FSA never looked at generations of loans in processing and approving 799 bills from lenders for 9.5% SAP. [Ex. II.118 (Shaw Dep. 208:12-208:17).]

**RESPONSE TO NO. JS130.**        **No dispute.**

**JS131.**        On July 6, 2007, ED responded to written questions submitted to Secretary Spellings by the House Committee on Education and Labor. [McMahon Decl., Ex. II.77 (ED-E000001-38.] Secretary Spellings wrote the following concerning the Nelnet OIG audit report and settlement with ED:

> The disputed statute and regulations at issue in the IG Audit Report involved novel and complex questions of law. No court has rendered any decision interpreting this specific statutory provision or regulation. Upon a thorough review of the IG Audit Report, the statute and regulations in question, and Department practices, and considering potential litigation risks and costs, the inherent uncertainty pending a definitive court decision (and any appeals), and the potential for an unfavorable decision, the Department settled its claims against Nelnet.

[*Id.* at (ED-E-000020) (emphasis added).]

**RESPONSE TO NO. JS131.**        **No dispute that the language is quoted accurately.**

**JS132.**        Secretary Spellings further stated that ED agreed that "neither individual taxpayers nor the Department of Justice has authority to challenge the Department's settlement with Nelnet." [Ex. II.77 at (ED-E-000021).] She noted that the Department of Justice is not foreclosed from pursuing, as appropriate, separate remedies under other applicable provisions of the law, including the False Claims Act. [*Id.*]

**RESPONSE TO NO. JS132.**      **No dispute that the language is quoted accurately.  *See* Response to JS127, *supra*.**

IV.    **STATEMENTS BY CONGRESSIONAL MEMBERS AND BODIES**

A.    **The September 2004 GAO Report**

**JS133.**      On or about September 21, 2004, the Government Accountability Office ("GAO") issued a report detailing the processes used by lenders to qualify loans for 9.5% SAP payments. [McMahon Decl., Ex. II.78 (ED-G-001021-62).]

**RESPONSE TO NO. JS133.**      **No dispute.**

**JS134.**      In response to a Congressional request, the GAO "examine[d] special allowance payments for 9.5 percent loans." [Ex. II.78 at (ED-G-001025).] Among other things, GAO examined ED data, interviewed ED officials and "12 lenders that reported holding 9.5 percent loans in fiscal year 2003" while conducting its examination.  [*Id.*]

**RESPONSE TO NO. JS134.**      **Incomplete.  GAO was not tasked with analyzing the legality or propriety of 9.5% Loan growth.  *See* November 25, 2003 Letter from Cynthia M. Fagnoni, to Philip S. Link, at OBERG00006115 (Soni Dec., 209) ("Our objectives include examining . . . the extent to which the tax-exempt bonds referenced above are used to finance student loans.").  And in fact, GAO provided none.**

**JS135.**      Among the processes by which lenders were growing their 9.5% SAP loan balances, GAO described the following:

> [U]nder Education regulations, a lender can significantly increase its 9.5 percent loan volume by issuing a taxable bond and using the proceeds to purchase 9.5 percent loans financed by a pre-October 1, 1993 tax-exempt bond. The lender then uses the cash available from the pre-October 1, 1993 tax-exempt bond to make or buy additional loans, which are

guaranteed the minimum 9.5 percent yield. Under regulations issued in 1992, the loans transferred to the taxable bond continue to be guaranteed the minimum 9.5 percent lender yield, so long as the original bond is not retired or defeased.

[Ex. II.78 at (ED-G-001027).]

**RESPONSE TO NO. JS135.**          **No dispute that the language is quoted accurately.  In its Nelnet audit report, DEd-OIG found that the GAO report did not address funds eligibility:**



**Nelnet Final Audit Report at N0016982 (Soni Dec., Ex. 199) (emphasis added).**

JS136.        The GAO Report included a circular diagram of a five-step process by which lenders could increase their holdings of 9.5 loans:

1.      Start. Lender issued a tax-exempt bond prior to 10/1/93, and used proceeds to make or buy 9.5% loans.

2.      Lender issues a taxable bond and uses proceeds to buy 9.5% loans originally financed by a pre-10/1/93 tax-exempt bond.

3.      When loans are moved, the guaranteed minimum 9.5% yield remains with loan, and lender has cash available in tax-exempt bond.

4.      Lender uses cash from pre-10/1/93 tax-exempt bond to make or buy additional loans that are guaranteed the minimum 9.5% yield. Lender has increased 9.5% loan volume.

5.      Lender can continue to transfer so long as the pre-10/1/93 tax-exempt bond is not retired or defeased.

[Ex. II.78 at (ED-G-001055).]

**RESPONSE TO NO. JS136.        No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS137.        The GAO Report stated that "[a]t the time the regulation was promulgated, Education anticipated that interest rates would rise," which would have resulted in "a higher yield for loans financed with taxable bonds than for loans financed with tax-exempt bonds." [Ex. II.78 at (ED-G-001027-28, ED-G-001057).] Thus the GAO Report noted that "[i]ronically…  [a Department of] Education regulation over 10 years old and originally intended to limit the government's exposure to increased special allowance payments has today presented lenders with an extraordinary opportunity to generate additional loans that earn a 9.5 percent yield. As we have shown, lenders are taking advantage of these opportunities." [Ex. II.78 at (ED-G001030).]

**RESPONSE TO NO. JS137.        No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS138.        GAO recommended that ED "change its regulations so that 9.5% loans transferred from a pre-10/1/93 tax-exempt bond no longer receive a minimum 9.5% yield. Education agrees that special allowance payments should be reduced, but believes it has limited options to do so. GAO believes that Education has other options it can explore." [Ex. II.78 at (ED-G-001022).]

**RESPONSE TO NO. JS138.        No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS139.        Sally Stroup testified that she agreed that the five-step process described in the GAO report accurately reflected her understanding of how the regulations and guidance worked prior to the enactment of the TTPA. [Ex. II.119 (Stroup. Dep. 158:7-161:4).] In a September 14, 2004 letter from ED to GAO commenting on a draft of the GAO Report (which letter was attached to the final GAO report), Sally Stroup wrote:

> In general, under the Department's regulations, loans that are eligible for the special 9.5 percent subsidy retain that eligibility as long as the tax-exempt bond whose proceeds were used to make or purchase the loans remains open. In other words, absent a change in the law, unless and until the original financing instrument is retired or defeased, the *loans it supports* qualify for the special subsidy . . . . [T]he Department believes that negotiated rulemaking is required for changes of regulatory interpretation, like changes to the 1996 interpretation at issue here, just as it is required for new legislative rules.

[McMahon Decl., Ex. II.79 (ED-G-001016-18) (emphasis added).]

**RESPONSE TO NO. JS139.        Disputed and incomplete.  When presented with the diagram described in JS136, Stroup testified that she was having difficulty reading the**

words, and when she was first asked, "Does this page, EDG001055, essentially a method by which lenders could convert all of their loans to nine and a half percent SAP loans," she responded, "I don't know." Stroup Tr. 158:7-159:7 (Soni Dec., Ex. 21).

Shaw testified that Stroup's letter to GAO did not contain language addressing Subsection (c) or the eligibility of funds to create 9.5% Loans. Shaw Tr. 264:14-268:10, 271:7-13 (Soni Dec., Ex. 20). Shaw also testified that the Secretary's letter to the Comptroller General did not address Subsection (c) or the eligibility of funds to create 9.5% Loans. *Id.* at 275:16-276:15.

*See* Response to JS37 regarding Stroup's understanding of the applicable laws and regulations.

JS140.          On December 2, 2004, Secretary of Education Rod Paige responded to the GAO Report in a letter to Comptroller General David M. Walker. The letter stated:

> In March 1996, the prior administration issued an authoritative interpretation of Department regulations that provided "if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions." The Bush Administration proposed to change this policy in the President's fiscal year 2005 Budget, and, on October 30, the President signed into law the Taxpayer-Teacher Protection Act of 2004, which closes the loophole and passes the savings on to math, science, and special education teachers in the form of increased student loan forgiveness. Although we would have preferred an even quicker fix to close the loophole, some actions taken by the Administration legally require notice to the public and an opportunity to comment pursuant to the Administrative Procedure Act (APA).

[McMahon Decl., Ex. II.80 (ED-G-000899-90).]

RESPONSE TO NO. JS140.          No dispute that the language is quoted accurately. *See* Responses to JS135, JS139, *supra*.

- 151 -

**B.      Comments from Congressional Members**

**JS141.**        On or about August 26, 2004, Senator Kennedy and Representatives Chris Van Hollen and Dale Kildee sent a letter to the Secretary of Education expressing concern that ED "is allowing banks to exploit a loophole in the student loan program" with respect to 9.5% loans, and that ED "has allowed the use of this loophole to grow." [McMahon Decl., Ex. II.81 (OBERG00003450-3451, at OBERG00003450).]

**RESPONSE TO NO. JS141.**         **No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS142.**        On September 9, 2004, Rep. Kildee stated the growth of 9.5% happened "through a regulatory loophole." [McMahon Decl., Ex. II.82 (OBERG00003416-18, at OBERG00003416).]

**RESPONSE TO NO. JS142.**         **No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS143.**        In October 6, 2004 floor statements during debate on the TTPA, Rep. Boehner stated:

> For more than 10 years, a *complex* Federal policy known as the 9.5 percent "special allowance" has resulted in excess taxpayer subsidies for some student loan providers. This policy was adopted under the Clinton administration, and while some would call it a loophole, the loan

providers were told by the Clinton administration that it was perfectly legal and legitimate.

The excess taxpayer subsidies being paid under this policy have in recent years begun to balloon, and if we fail to act, billions of dollars in excess taxpayer subsidies will be paid to student loan providers *legally*. Now, this may be *technically legal* but I think it is unfair to taxpayers and unfair to students, and it is unfair to the schools, people who should be the beneficiaries of this funding. When you boil it down, it is just plain bad policy.

[McMahon Decl., Ex. II.83 (150 Cong. Rec. H8319, H8320 (2004) (statement of Rep. Boehner) (emphasis added)).]

**RESPONSE TO NO. JS143.          No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS144.**          In October 6, 2004 floor statements during debate on the TTPA, Rep. Kildee stated:

[TTPA] makes an improvement over *current law which has been providing lenders excessive subsidies,* but it also fails to address a large share of this subsidy and only enacts this change for about 1 year. The loophole, which this bill only partially closes, has increased lender profits by nearly $1 billion in fiscal year 2004.

[Ex. II.83, at H8322 (emphasis added).]

**RESPONSE TO NO. JS144.          No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS145.**         In October 9, 2004 floor statements during debate on the TTPA, Senator

Kennedy stated:

> In 1993, Congress passed legislation intended to phase-out of existence the 9.5 percent bank guarantee. *But two key loopholes have kept that subsidy alive and well. The legislation before the Senate closes one.*
>
> The first loophole - the one that isn't closed by this legislation-allows for what is called 9.5 percent loan "recycling." A lender makes a loan to a student-"Student A." Over the course of the next 10 to 25 years, the lender is repaid by Student A and the lender gets a subsidy payment guaranteeing a 9.5 percent rate of return.
>
> Under the 1993 law, after one loan, there should be an end to that 9.5 percent guarantee. But lenders have been recycling Student A payments and the attached Government subsidy into a new loans issued to new students - "Student B" - and claiming a 9.5 percent guarantee on those loans as well. So, 9.5 loans haven't been phased out at all. They've being [sic] maintained. And the Department of Education has done nothing about it.
>
> Worse, 18 months ago, lenders started growing the number of 9.5 percent loans through a process called 'transferring.' A lender shifts a loan out of its tax-exempt bond estate into its taxable bond estate. When the loan shifts, the 9.5 percent guarantee shifts with it *and the tax-exempt bond estate then has money available to it to issue new 9.5 percent loans.* As a result of 'transferring,' 9.5 percent loan bank subsidy payments have *more than doubled in the last 18 months."*

[McMahon Decl., Ex. II.84 (150 Cong. Rec. S10918, S10919 (2004) (emphasis added)).]

**RESPONSE TO NO. JS145.         No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS146.**         In October 9, 2004 floor statements during debate on the TTPA, Senator

Dodd stated:

Mr. President, I would like to commend Senator Gregg for taking what I hope is one of many steps in closing what most, if not all of us agree, is an *egregious loophole in current law* relating to student loans ...

Exploiting a loophole in current law, some lenders . . . have been rolling new loans into old accounts, *sometimes for as little as a day,* to qualify for the subsidy ... .

From January 2004 to June 2004, one bank alone amassed over $3.2 billion in 9.5 percent loans by exploiting this loophole . .

In response to this discovery, the Department of Education has been asked to issue new rules clarifying that the practice in question is, in fact, not within the intent of the current law. They have refused to do so. They claim that their hands are tied, that only Congress can close the current loophole . . . .

Mr. President, in response to this crisis, Senator Gregg has proposed a bill to close the 9.5 percent loophole. There is just one problem with his bill. It does not close the loophole completely and it does not close the loophole

permanently. The loophole should be completely and permanently closed .

The Federal Government is paying hundreds of million [sic] of dollars in unnecessary subsidies to student loan companies. The bill before us allows this practice to continue, even if it is to a lesser extent. I hope we will have an opportunity in the near future to take definitive action to correct this egregious *short-coming in the law.*

[Ex. II.84, at S10919 (emphasis added).]

**RESPONSE TO NO. JS146.          No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135,** *supra***.**

**JS147.**          In October 9, 2004 floor statements during debate on the TTPA, Senator Reed stated:

Mr. President, I support the limited effort before us today to close *a loophole in Federal student loan policy* that has cost taxpayers billions of dollars over the past decade . . . .

[In 1993], a grandfather clause was enacted for outstanding 9.5 percent return, tax-exempt bond generated student loan funds. Rather than end the 9.5-percent loans, this grandfather clause has worked as a loophole.

Owners of 9.5 percent guaranteed loans continually recycle proceeds from tax-exempt bonds originally issued before 1993 — *creating in effect a revolving loan fund* — and the Federal Government continues to guarantee a 9.5-percent rate of return . . . .

[Ex. II.84, at S10920 (emphasis added).]

**RESPONSE TO NO. JS147.** **No dispute that the language is quoted accurately. The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).** *See* **Response to JS135,** *supra.*

**JS148.** On or about October 12, 2004, the *EFC Exchange* published various Congressional members' remarks on the passage of TTPA -- including Senator Kennedy's statements. These members of Congress uniformly stated that the TTPA would prospectively close a loophole that had allowed for 9.5% loan growth. [McMahon Decl., Ex. II.85 (PPHEA_000325-56).]

**RESPONSE TO NO. JS148.** **Incomplete. The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).** *See* **Response to JS135,** *supra.* **The TTPA, by its own language, only prospectively stops the practice of refunding of pre-October 1, 1993 financings for purposes of 9.5% SAP billing and the practice of continuing to bill for 9.5% SAP after a loan is transferred.**

**JS149.**        In a February 6, 2006 letter from Senators Tom Carper and Tom Coburn to Secretary of Education Margaret Spellings, the Senators recognized that 9.5% SAP growth was due to "faulty regulations in the past, which have produced undesirable results." [McMahon Decl., Ex. II.86 (ED-A-002785-87, at ED-A-002786).]

**RESPONSE TO NO. JS149.        Disputed.  The entire letter is couched in terms of addressing illicit payments, *see, e.g.*, February 6, 2006 Letter from Tom Carper and Tom Coburn to Hon. Margaret Spellings, at ED-A-002785 ("[OMB] recently released improper payment estimates for fiscal year 2006 showing that federal agencies made more than $41 billion in payment errors last year.") (McMahon Dec. Ex. II.86), and the quote in full is: "We are well aware that this controversy has been <u>in part due to</u> faulty regulations in the past, which have produced undesirable results." *Id.* at ED-A-002786 (emphasis added).**

## V.    MEDIA AND PUBLIC INTEREST GROUP STATEMENTS

### A.    The April 2004 *Fitch Ratings* Article

**JS150.**        In its quarterly student loan report card for April 2004, *Fitch Ratings* included a "Discussion Topic" on "9.5% Floor Loans." [McMahon Decl., Ex. II.87 (ED-B-000265-66).] In this discussion, *Fitch* noted that there was "a fair degree of controversy throughout the higher education community and on Capitol Hill." [*Id.* at (ED-B-000265).] *Fitch* noted that the "issue stems from the ability of corporations to finance the present and future acquisition of student loans through the use of pre-October 1993 tax-exempt bond estates and have those loans retain the higher tax-exempt SAP eligibility even when subsequently being transferred out of the pre-October 1993 tax-exempt bond estate to a taxable estate." [*Id.*] The report noted that by following ED regulations, "an entity can continually repeat the process of rolling over the available financing provided by the pre-October 1993 tax-exempt

debt obligations to purchase loans into the pre-October 1993 tax-exempt bond estate by simply retaining a legal or equitable interest in the loans and not redeeming the outstanding pre-October 1993 tax-exempt obligations, regardless of the transfer of the half SAP loans out of the trust." [*Id.* at (ED-B-000266).] The report concluded by observing that opponents of FFELP had criticized the government "for allowing the rule to be exploited at a steep cost to the government," and predicted that the issue was likely to be addressed in the final reauthorization bill. [*Id.*]

**RESPONSE TO NO. JS150.      No dispute that the language is quoted accurately.  While conducting his investigation, Relator came across a Fitch Ratings Report for Nelnet in May 2004.  OBERG00007683 (Soni Dec., Ex. 206).  He decided to call Fitch Ratings (from his home) regarding a Nelnet securitization that was made up of 9.5% Loans, to ask if the rating would be less favorable if the 9.5% SAP had to be returned. Oberg Tr. 36:2-14.  Cherry Allen from Fitch Ratings advised Relator that although the company's legal staff had internally raised the question of how Nelnet had acquired its 9.5% Loans, there would be no adverse effect because the questionable DEd payments were on Nelnet's books already as a liability.  Relator described the conversation as fairly in depth, and it included a discussion of how Nelnet was increasing its 9.5% Loan holdings. In 2006, Fitch issued a new report following the Nelnet audit to confirm that Nelnet's rating had not changed.  OBERG00010145 (Soni Dec., Ex. 207).**

**JS151.**      Sally Stroup testified that the process that *Fitch* described above was one of the loopholes that ED could not close without changes to its regulations. [Ex. II.119 (Stroup Dep. 145:9-146:2).]

**RESPONSE TO NO. JS151.** **Incomplete. Stroup testified that this was her personal opinion. Stroup Tr. 145:9-146:8 (Soni Dec., Ex. 21).** *See also* **Response to JS37,** *supra***, regarding Stroup's understanding of the laws and regulations.**

**B.** **The August 2004 TICAS Report**

**JS152.** In or about August, 2004, The Institute for College Access and Success ("TICAS") released a report called "Money for Nothing" (the "TICAS Report") by Robert Shireman and James Kvaal. [McMahon Decl., Ex. II.88 (OBERG00000378-90).]

**RESPONSE TO NO. JS152.** **No dispute.**

**JS153.** Before publication of the TICAS Report, Oberg received a draft copy and made suggested edits. Oberg's notes still exist, and nowhere on that copy did he change the authors' description of the 9.5% SAP issue as involving a "loophole." Nor did Oberg's notes suggest that TICAS use the word "fraud" with respect to the lenders. [McMahon Decl., Ex. II.89 (OBERG00006031-42).]

**RESPONSE TO NO. JS153.** **Incomplete. At his deposition, Relator explained the "loophole" language as follows:**

> **We would have to look here at what they mean by "loopholes." If they are referring to refunding and transferring, that would be one thing. If they are referring to the serial over and over recycling through many generations, that would be another interpretation, so I don't know what they are referring to here as loopholes.**

**Oberg Tr. 286:8-288:3 (Soni Dec., Ex. 32)**

**JS154.** The TICAS Report stated:

> Lenders are exploiting a federal rule that says even if a pre-1993 bond finances a loan only temporarily, that loan earns a 9.5 percent guaranteed

> return for life. Lenders use the bond funds to finance a set of loans for as
> little as one day, then shift them into other portfolios where they still earn
> the 9.5 percent interest. This allows a new set of loans to be financed with
> the bond funds and then shifted, as the process repeats over and over and
> over."

[Ex. II.88 at (OBERG00000380) (emphasis added).]

**RESPONSE TO NO. JS154.        No dispute that the language is quoted accurately.  The Report also states that the 9.5% Loan growth is contrary to Congressional intent.  Money for Nothing at OBERG00000384 (McMahon Dec., Ex. II.88).**

**JS155.**        The TICAS Report also stated that "Department officials knew of lenders' plans to take advantage of the growth loophole." [Ex. II.88 at (OBERG00000380).]

**RESPONSE TO NO. JS155.        No dispute that the language is quoted accurately.**

**JS156.**        The TICAS report continued:

> The rules that the Education Department wrote are now having the
> opposite effect of what Congress intended in 1993. *It is the agency's
> rules that created the loopholes; it is the agency's responsibility to fir
> them.* Waiting for Congress to overturn the Department of Education is
> unnecessary, irresponsible, and costly.

[Ex. II.88 at (OBERG00000387) (emphasis added).]

**RESPONSE TO NO. JS156.        No dispute that the language is quoted accurately.**

**JS157.**        TICAS stated that "clarifying the rules is the first step" and recommended that the Secretary of Education "publish a clarification – tomorrow – that prohibits the serial refinancing of loans and limits the volume of 9.5 percent loans to the size of the original tax-exempt bond." [Ex. II.88 at (OBERG00000387-88).]

**RESPONSE TO NO. JS157.**          **No dispute that the language is quoted accurately.**

**JS158.**          The TICAS report did not suggest that ED should attempt to recover previous payments of 9.5% SAP from lenders. It did, however, also recommend that "Congress and the Administration should restructure the student loan program," specifically mentioning the "Direct Student Loan Program" *(i.e.,* the government's direct-loan competitor to Defendants' FFELP business) as "one such approach." [Ex. II.88 at (OBERG00000388).]

**RESPONSE TO NO. JS158.**          **No dispute that the language is quoted accurately.**

**JS159.**          Terri Shaw reviewed the TICAS report shortly after it came out. She testified that the data on lender growth in the TICAS report was not a surprise to FSA since it had been charting the quarter to quarter growth of 9.5 SAP loan holdings by lender. [Ex. II.118 (Shaw Dep. 133:20-135:18).]

**RESPONSE TO NO. JS159.**          **Disputed.  Shaw did not testify that FSA had been charting "quarter to quarter" growth.**

## C.    Other Media Statements

**JS160.**          On September 4, 2004, the *Los Angeles Times* published a story with the headline "Student Loan Subsidies Questioned." The *L.A. Times* story stated that Bob Shireman, a co-author of the TICAS Report [*see supra* ¶¶ JS152-JS159], had explained that 9.5% SAP loans had grown because "the Department of Education issued a directive aimed at clarifying the law that instead opened up a gaping loophole." [McMahon Decl., Ex. II.90 (NCHELP-

00199- 00201, at NCHELP-00200).] The article then described how 9.5% SAP claims had

grown:

> The directive allows lenders to 'recycle' new loans into old tax-exempt pools, Shireman said. That process gives these newly issued loans the favorable subsidy, even if they remain in the tax-exempt pool for only a day. Department of Education officials confirmed. That allowed lenders to issue billions in new loans, and briefly cycle them through the tax-exempt pools. When the loans were pulled out of the pool, they still would be eligible for that favorable 9.5% subsidy.

[*Id.*]

      **RESPONSE TO NO. JS160.**      **No dispute that the language is quoted accurately. The article also states that the 9.5% Loan growth is contrary to Congressional intent.**

      **JS161.**      On September 21, 2004, *The Chronicle of Higher Education* published a story with the headline, "Critics Fault Bush Administration For Failing to Close a Loophole Worth Billions to Lenders." [McMahon Decl., Ex. II.91 (NCHELP-00208-00210).] The *Chronicle* reported that "Education Department officials say they want to close the loophole and have proposed legislation to do so. But they say they cannot take immediate action because they have determined that the loan companies' actions are legal, based on explanations of the law that the Clinton administration offered in guidance to lenders in the 1990s." [*Id.* at (NCHELP-00209).] The article describes the October 2002 draft audit report of the Iowa Student Loan Liquidity Corporation (*see supra* ¶ JS42-50) as evidence that "[s]ome Education Department officials have read the guidance differently," but then noted that "the department overruled those draft findings." [*Id.*]

**RESPONSE TO NO. JS161.        No dispute that the language is quoted accurately.  The article also suggests that the 9.5% Loan growth is contrary to Congressional intent.**

JS162.        On October 18, 2005, the *Washington Post* published a letter from ED General Counsel Brian W. Jones, which was responding to the *Post's* criticism of ED's handling of "the 9.5 percent student loan loophole." [McMahon Decl., Ex. II.92 (NCHELP-00203-00204, at 00203).] Jones wrote that "The Post ... neglected to note that the loophole is the result of a prior administration's interpretation of a department regulation," and wrote that the "most appropriate and quickest place to end this practice is the halls of Congress[.]" [*Id.* at (NCHELP-00203-04).]

**RESPONSE TO NO. JS162.        No dispute that the language is quoted accurately.**

## VI.    THE JANUARY 2007 DEAR COLLEAGUE LETTER

JS163.        In a Dear Colleague Letter issued on January 23, 2007, ED publicly took the position for the first time that, under its regulations, only those loans "acquired using . . . funds obtained directly from the issuance of [an eligible] tax-exempt obligation" ("first-generation loans") or "acquired using funds obtained directly from first-generation loans" ("second-generation loans") qualified for 9.5 SAP. [McMahon Decl., Ex. II.93 (Dear Colleague Letter FP-07-01 (Jan. 23, 2007)).]

**RESPONSE TO NO. JS163.        Disputed and incomplete.  The 2007 DCL provides:**

> **Recent examination of the activities involving tax-exempt financing of Federal Family Education Loan Program (FFELP) loans indicates that it is appropriate to <u>restate</u> the requirements of the Higher Education Act of 1965, as amended (HEA) and the Department's regulations that control whether FFELP loans made or acquired funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum rate.**

DCL-07-01 at 1 (McMahon Dec., Ex. II.93) (emphasis added).  The 2007 DCL further states that the requirements in Section 682.302(c)(3)(i) with respect to eligible sources of funds for 9.5% Loans "have been in effect since 1993." *Id*. at 2.

JS164.        In a January 24, 2007 letter from ED "that was sent to all lenders," the stated "purpose" of which was "to provide guidance to [lenders] on the requirements applicable to claims for SAP at the 9.5 percent minimum return rate," ED set forth an audit or review process that lenders would be required to follow, and a management certification that lenders would be required to make to ED, in order to claim 9.5 SAP in the future consistent with the new DCL. ED also wrote that it was

> committed to resolving without protracted dispute any potential objections both to the meaning and application of the statutory and regulatory requirements as restated in this letter, and to ensuring that SAP is paid at the 9.5 percent minimum return rate only on eligible loans. Therefore, the Department will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with or accept, as applicable, the following —
>
> 1.      The statutory and regulatory requirements for eligibility for SAP at the 9.5 percent minimum return rate as restated in this letter;
>
> 2.      The requirement that a request for payment of SAP at the 9.5 percent rate be supported by the management certification described above; and

3.      The Department's payment of all SAP claims at the standard rate, rather than the 9.5 percent minimum return rate, until the Department receives, accepts and evaluates the results of the audit or review described here, and determines, after our consideration of any objection you present, which of the loans on which you currently claim SAP at the 9.5 percent rate are eligible for payment at that rate.

[Ex. II.93, Attachment at 1, 4.]

**RESPONSE TO NO. JS164.**          **No dispute that the language is quoted accurately.  In addition to containing identical language with respect to "restat[ing]" the Department's position on funds eligibility, the letter sent to lenders also provides:**

> **On the 'request for payment' form (Form LaRS 799) that you and other lenders submit to the Department, the certifying official represents that the data on the form conforms to the laws, regulations and policies applicable to the Federal Family Education Loan Program.  By so certifying, the lender represents to the Department that no claim is made on that request for payment of 9.5 percent SAP on any loans that are not first-generation or second-generation loans.**

**DCL-07-01 (Attachment at 2-3) (McMahon Dec., Ex. II.93).**

JS165.          In July 6, 2007 responses to questions from the House Committee on Education and Labor, Secretary Spellings wrote the following concerning the January 2007 DCL:

> The Department . . . offered lenders the opportunity to *resolve any liability* for the return of previously received 9.5 percent SAP for loans other than first- or second-generation loans. To do so, lenders were required to take the steps specified in the Dear Colleague letter and forego asserting any claim to continued receipt of 9.5 percent SAP for loans other than first- or second-generation loans . . . . The [January 2007 DCL] to individual lenders sets forth the steps that must be followed for lenders to . . . *settle* any potential Department claims on previous overpayments. Therefore, the Department does not expect, or require, a lender to execute any document to memorialize acceptance of the *offer*. A lender can accept the Department's *offer* simply by the conduct described in that *offer*.

[Ex. II.77 at (ED-E-000020-21) (emphasis added).]

**RESPONSE TO NO. JS165.**        No dispute that the language is quoted accurately.  Later in the testimony, Spellings suggested that the letters sent to individual lenders following the 2007 DCL did not constitute formal settlements akin to Nelnet's:

> Q. Have any additional settlements been reached and . . . [d]o you still intend to offer forgiveness on a case-by-case basis in accordance to the audit results?

> A. The only written settlement agreement entered into by the Department regarding 9.5 percent SAP is with Nelnet.  The other "settlements" will occur by practice on the part of the lenders.

Responses to May 16, 2007 Written Questions at ED-E-000020-21 (McMahon Dec., Ex. II.77).  DEd's Rule 30(b)(6) witness, Patricia Trubia, confirmed that DEd lacks any authority to settle FCA suits.  *See* Trubia Tr. 53:8-16 ("My understanding is the department does not handle False Claims Act.  That's handled by Justice under title 31.") (Soni Dec., Ex. 27); *see also id.* at 54:16-19, 55:13-56:7, 74:13-16.  Trubia also testified that DEd's offer to refrain from seeking past excess 9.5% SAP was contingent upon the lenders' continuing obligation to agree with DEd's "restatement" of applicable law and regulations. *See id.* at 73:19-74:9, 78:19-79:5, 81:20-82:12, 83:11-84:5, 107:1-9.  *See also* Response to BR33, *infra*.

## VII.   OBERG'S PRIOR STATEMENTS AND ACTIONS

### A.      Concerning Whether Lenders' Claims Were Fraudulent

**JS166.**        Oberg's initial complaint to the OIG on August 7, 2003 stated his view that "[f]or ED to pay [9.5%] SAPs on increases in the amounts [of tax-exempt bonds] outstanding represents waste, abuse and mismanagement." [McMahon Decl., Ex. II.94

(OBERG00000027- 28, at OBERG00000027).] Although Oberg wrote that he did "not

believe there is any legal justification for it," he did not allege fraud on the part of lenders,

which was an option available to him on the OIG's form. [*Id.*]

**RESPONSE TO NO. JS166.        Disputed.  Relator testified that he checked the**

**"Fraud," "Waste," "Abuse" and "Mismanagement" boxes on the complaint form below the**

**question "Which best describes the subject of your allegations?"  Oberg Tr. 105:16-107:14**

**(Soni Dec., Ex. 32).**

**As a result of Relator's complaints to DEd-OIG, Hansen sent a memorandum to the**

**Hotline Operations Director of the Office of Inspector General on September 12, 2003,**

**stating:**

> **As stated in the complaint, ED regulations provide for special**
> **allowance payments that provide an overall minimum return**
> **of 9.5% for student loans made after October 1, 1980 that are**
> **financed with tax-exempt debt issued through September 30,**
> **1993.**
>
> **The Financial Partner Regional Services staff identified several**
> **months ago that the** <u>potential for abuse existed under these</u>
> <u>regulations</u>**.  As a result, lenders claiming special allowance**
> **payments under this regulation have been reviewed.  In cases**
> **where the lenders had incorrectly interpreted the regulation**
> **and submitted incorrect billings to ED, reimbursements of**
> **funds have been requested.**
>
> **FSA is also working with the Office of Post Secondary**
> **Education (OPE) to understand the full scope of the regulation**
> **and its impacts.  Together we are seeking regulatory changes**
> **that will** <u>eliminate the potential for waste, fraud, and abuse</u>
> <u>that has come about since the original regulation was enacted.</u>

**Hansen Ex. 19 at OBERG00005999 (Soni Dec., Ex. 146) (emphasis added).  Hansen**

**testified with respect to the "potential for waste, fraud and abuse" mentioned in the**

memorandum as follows: "I am certain that, you know, this could be taken to an absurd point and expansion, perhaps." Hansen Tr. 271:19-272:2 (Soni Dec., Ex. 22).

**JS167.**         On November 21, 2003, Oberg sent a complaint through his chain of command at ED concerning "what appears to be significant federal waste . . . . In essence, the Department is expanding the base amount of Stafford loans on which a return of 9.5% — well above market — is guaranteed to certain loan holders, when there is no reason to do so." [McMahon Decl., Ex. II.95 (OBERG00000024-25, at OBERG00000024).] Oberg wrote:

> The Secretary could issue a Dear Partner/Colleague letter that would *clarify* the 1996 [DCL], to disallow future increases in the amounts of 9.5% floor loans outstanding . . . . The above discussion deals only with the growth of the amounts of 9.5% floor loans outstanding, not with the existing base of approximately $13 billion. The existing loans could be dealt with as well, however, were the Secretary to ask Congress for authority to contact student borrowers and offer to replace such loans with loans on which the borrowers would pay less interest.

[*Id.* at (OBERG00000025).] Oberg's complaint did not mention fraud by lenders, or suggest that ED should pursue lenders for repayment of previously paid 9.5%/halfSAP.

**RESPONSE TO NO. JS167.**         **No dispute that the language is quoted accurately.  Relator's complaint also stated that lenders were implementing their processes for increasing 9.5% Loan holdings "with little legal authority for the increase beyond a trade association's interpretation of a 1996 ED letter," and that some lenders believed the processes were "questionable."  November 21, 2003 Letter from Dr. Jon Oberg to DEd at OBERG0000024.  (McMahon Dec., Ex. II.95).**

**JS168.**         On January 11, 2004, Oberg wrote GAO with "essentially the same" complaint as the one sent through his ED chain of command on November 21, 2003. [McMahon

Decl., Ex. II.96 (OBERG00003757-58, at OBERG00003757).] Like that complaint, Oberg did not mention fraud by lenders or suggest that ED should pursue lenders for repayment of previously paid 9.5%/half-SAP.

**RESPONSE TO NO. JS168.**      **Incomplete.  This complaint contained the same "little legal authority" and "questionable" language from the November 21, 2003 complaint.  January 11, 2003 Letter from Dr. Jon H. Oberg to GAO at OBERG00003757 (McMahon Dec., Ex. II.96).**

**JS169.**      On June 18, 2004, Oberg wrote John Higgins, ED's IG, to inform him of his prior communications with the OIG's hotline concerning "what I consider not only a waste of money (as even recipients do as well) but *perhaps* an illegal financial procedure designed to get higher SAP payments from ED." [McMahon Decl., Ex. II.97 (OBERG00005965) (emphasis added).]

**RESPONSE TO NO. JS169.**      **No dispute that the language is quoted accurately.**

**JS170.**      On August 27, 2004, Oberg e-mailed numerous individuals within ED, writing that "ED seems to have changed the interpretation in 2002 or 2003 to allow 9.5% growth." [McMahon Decl., Ex. II.98 (OBERG00006786-89, at OBERG00006786.] In response, Jeff Baker of FSA wrote: "Back when there was some question about, what I call, the 'roll-over' of these funds into new loans. I think the Dept. took a position that the law was not clear so we approved it." [*Id.*].

**RESPONSE TO NO. JS170.**          No dispute that the language is quoted

accurately.  The full email exchange demonstrates that it is difficult to determine to what

Baker is referring.  Relator emailed several individuals, including Baker, Brian Siegel, Pam

Moran, and Fred Marinucci (OGC), asking several questions:

> What law is it that requires us to make these payments based
> on 9.5% growth?  I am not aware of any.  Back when I was
> doing the HEA 98 reauthorization for OLCA, there was
> disagreement between the Department and the Hill that 9.5%
> SAP would be phased out over time with no change in law.  As
> late as 2002, I thought, ED program reviewers were not
> allowing the kinds of claims that Nelnet and others are now
> asking.  What changed?
>
> I have heard it said that ED cannot change or even clarify a
> policy set by a 1996 Dear Colleague on this subject.  But ED
> seems to have changed the interpretation in 2002 or 2003 to
> allow 9.5% growth.  Moreover, ED clarifies and even reverses
> Dear Colleagues frequently, including yesterday on the single
> holder rule.  What is different about the 1996 Dear Colleague?

Baker responded:

> Note that I am replying just to you.  While I have not carefully
> reviewed the history here, I think I agree with you.  Back when
> . . . .  Thus, I agree that saying that we cannot do anything
> about it seems strange.
>
> Please keep my comments confidential.

Email Exchange Between Dr. Jon H. Oberg and Brian Siegel, *et. al*, OBERG00006786

(McMahon Dec., Ex. II.98).

**JS171.**          In his September 13, 2004 complaint to ED's Inspector General's Hotline

concerning 9.5% SAP issues, Oberg listed the "alleged violator" as the "Department of

Education." [McMahon Decl., Ex. II.99 (OBERG00007726-28, at OBERG00007726).] Oberg

did not list any of the Defendants as an "alleged violator." [*Id.*]

- 170 -

**RESPONSE TO NO. JS171.** **No dispute.**

JS172.        On June 10, 2005, Oberg wrote Secretary Spellings "as a long time department employee who is concerned about the negative publicity and the unnecessary waste of Department monies on . . . the Department ... subsidizing — needlessly — a guaranteed 9.5% return to lenders of billions of dollars in federally guaranteed student loans." [McMahon Decl., Ex. II.99 (OBERG00000061-62, at OBERG00000061.] Oberg wrote:

> I believe that, as Secretary, you could put an end to this now . . . by contacting all borrowers who have taken out the loans in question and offering them incentives to consolidate their loans into other loans on which the Department does not guarantee lenders a 9.5% return . . . . Thereafter, you could acknowledge that *the Department did not have a coherent policy, forgo attempts to recover past overpayments,* and avoid wasting further time and money in the courts.

[*Id.* (emphasis added).]

Oberg did not suggest to the Secretary that any lenders were engaged in fraud, or that she should pursue any repayment of previously paid 9.5%/half-SAP from lenders (to the contrary, Oberg advocated that the Secretary "forgo attempts to recover past overpayments"). [*Id.*]

**RESPONSE TO NO. JS172.** **No dispute that the language is quoted accurately.  Relator also makes mention of "the obvious intent of Congress in 1993 to put an end to [9.5% Loan] guarantees."  June 10, 2005 Letter from Dr. Jon H. Oberg to Hon. Margaret Spellings, at OBERG0000061 (McMahon Dec., Ex. II.100).**

JS173.        In an earlier draft of this letter to Secretary Spellings, Oberg wrote: "Thereafter, you could concede that the Department did not have a coherent policy, not attempt to recover past overpayments, and avoid wasting further time and money *in court cases the Department may lose."* [McMahon Decl., Ex. II.101 (OBERG00003325) (emphasis added).]

**RESPONSE TO NO. JS173.**   **No dispute that the language is quoted accurately.**

**JS174.**   On February 24, 2006, Oberg purchased approximately $7,500 worth of Nelnet stock because he thought the price of that stock would appreciate. [McMahon Decl., Ex. II.102 (OBERG00009750); Ex. II.124 (Oberg Dep. 804:10-804:15, 807:12-807:14).]

**RESPONSE TO NO. JS174.**   **No dispute.**

**JS175.**   In or about early 2006, Oberg first contacted counsel to explore the possibility of filing an FCA lawsuit based on growth in 9.5%/half-SAP loan balances. [Ex. II.124 (Oberg Dep. 38:21-39:8, 48:8-48:10).]

**RESPONSE TO NO. JS175.**   **No dispute; however, the cited testimony is not clear that it was "early" 2006.**

**JS176.**   On or about September 21, 2007, Oberg filed a complaint alleging that the Defendants' 9.5 SAP claims violated the False Claims Act. [*See* Docket No. 1.]

**RESPONSE TO NO. JS176.**   **No dispute.**

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████

**RESPONSE TO NO. JS177.**   **No dispute that the language is quoted accurately.**

**B.**     **Concerning Whether ED Knew About Defendants' Practices**

[REDACTED]

     **RESPONSE TO NO. JS178.**          No dispute that the language is quoted accurately.

[REDACTED]

     **RESPONSE TO NO. JS179.**          No dispute that the language is quoted accurately.

**JS180.**       Oberg asserted in a May 17, 2007 e-mail that Mirek Halaska's July 14, 2004 email, *see supra* ¶¶JS51-52, was "another piece of evidence that shows ED knew what was going on." [McMahon Decl., Ex. II.106 (OBERG00006375); *see also* McMahon Decl., Ex. 11.107 (OBERG00005907-44).]

**RESPONSE TO NO. JS180.**       **No dispute that the language is quoted accurately.**

**JS181.**       In an undated e-mail, Oberg wrote that, in 2004, the "GAO agreed with my analysis that ED could have stopped the payments at any time, but chose not to." [McMahon Decl., Ex. II.108 (OBERG00007404).] He wrote that emails from within ED "demonstrate that there was never any approval from ED under either the Clinton Administration or the subsequent Bush administration, *until 2003,* to allow 9.5 SAPs to grow." [*Id.*] (emphasis added).]

**RESPONSE TO NO. JS181.**       **No dispute that the language is quoted accurately.**

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

**RESPONSE TO NO. JS182.**       **No dispute that the language is quoted accurately.**

**RESPONSE TO NO. JS183.**        No dispute that the language is quoted accurately.

**RESPONSE TO NO. JS184.**        No dispute that the language is quoted accurately.

## VIII.   INTRA-PORTFOLIO TRANSFERS AS "SALES" FOR PURPOSES OF 34 C.F.R. § 682.302(C)(3)(I)(D)

**JS185.**        On September 8, 2006, Terri Shaw wrote Helen Lew of the OIG to respond to OIG's draft audit report of Nelnet. [McMahon Decl., Ex. II.112 (ED-A-002945-46).] Ms. Shaw wrote: "After review of the draft audit report, Federal Student Aid finds it does not agree with the OIG's position that the transfer of loans under [Nelnet's] Project 950 do not qualify as sales. Based upon the legal opinion of the Office of General Counsel, these transfers qualify as sales . . . ." [*Id.* at (ED-A-002945).]

**RESPONSE TO NO. JS185.**          **No dispute that the language is quoted accurately.**

**JS186.**          In its January 2007 Dear Colleague Letter, ED publicly took the position that "[t]he term 'sale' as used in paragraph (c)(3)(i)(D) includes both a sale to a third party and an intra-portfolio transfer of loans." [Ex. II.93 at n.1.] ED has never announced a change of its position on this issue.

**RESPONSE TO NO. JS186.**          **No dispute that the language is quoted accurately.**

## IX.   REFUNDINGS OF PRE-OCTOBER 1, 1993 TAX-EXEMPT BONDS

**JS187.**          On October 14, 1993, David M. Reicher, a lawyer at Foley & Lardner, wrote ED on behalf of the Alabama Higher Education Loan Corporation to confirm that 9.5%/half-SAP rate would continue to apply to loans transferred from tax-exempt obligations originally issued prior to October 1, 1993 (the "Original Obligations") to newly issued tax-exempt refunding bonds used to redeem or retire the Original Obligations, as well as to loans made or purchased with funds transferred from the Original Obligations to the newly issued refunding bonds. [McMahon Decl., Ex. II.113 (ED-B-001229-31).] Mr. Reicher wrote that because the loans "were or will be financed with funds obtained by the holder from the issuance of tax-exempt obligations originally issued prior to October 1, 1993, they would not be eligible for the full special allowance rate" but instead would receive the 9.5%/half-SAP rate. [*Id.* at (ED-B001230).]

**RESPONSE TO NO. JS187.**          **No dispute that the language is quoted accurately. *See* Response to JS188, *infra*.**

**JS188.**        On November 24, 1993, ED responded to Mr. Reicher's letter, saying that ED "concur[red] that the special allowance rates" applicable to the refunding bonds would continue to be the 9.5%/half-SAP rates. [McMahon Decl., Ex. II.114 (ED-B-001228).]

**RESPONSE TO NO. JS188.        Disputed and incomplete.  DEd responded to Reicher's letter by concurring that the "refunding" of the pre-October 1, 1993 tax-exempt bonds would "redeem or otherwise retire" the original obligations and that the loans that were directly transferred to the refunding bond or loans made or purchased with funds that were transferred to the refunding bond as part of the refunding transaction would be subject to Half-SAP/9.5% Floor treatment.  November 24, 1993 Letter from Pamela A. Moran to David M. Reicher at ED-B-001228 (McMahon Dec., Ex. II.114).  Nothing in DEd's response mentioned Half-SAP/9.5% Floor treatment applying "to the refunding bonds," as Defendants state.**

**JS189.**        In a June 1995 Dear Colleague Letter, ED provided specific instructions for reporting the changes required by the 1993 OBRA when filing SAP claims, and distinguished between "new money" and "old money" as follows:

> A new special allowance category (SH) has been added for loans made or purchased with funds obtained by the holder for (sic) the issuance of obligations originally issued on or after October 1, 1993 ("new money") ...
>
> Tax exempt loans made or purchased with funds obtained by the holder from the issuance, *or refinancing,* of obligations originally issued prior to October 1, 1993 ("old money") will continue to be calculated by taking the greater of one-half the annual special allowance rate using 3.5% in the formula, or using the floor of 9.5% less the applicable interest rate.

[McMahon Decl., Ex. II.115 (ED-B-001298-99) (emphasis added).]

**RESPONSE TO NO. JS189.**          **No dispute that the language is quoted accurately.**

**JS190.**          On July 16, 2002, Jerry Wallace, a field reviewer in FSA's Financial Partners division, e-mailed George Harris of OPE. [McMahon Decl., Ex. 11.116 (ED-B-001010).]  Wallace was conducting a review at Iowa Student Loan Liquidity Corporation ("Iowa") and noted that the average daily balance of Iowa's 9.5%/half-SAP loans for the quarter ended March 31, 2002 was approximately $372 million, even though Iowa had only approximately $168 million in tax-exempt bonds "that were actually issued prior to 10/1/93." [*Id*.]  Mr. Wallace stated that Iowa had informed him that, in addition to this approximately $168 million in tax- exempt bonds, it had issued approximately $158 million in bonds to refinance bonds issued prior to October 1, 1993. [*Id*.]  Iowa contended that these funds were "originally issued prior to 10/1/93" and thus were eligible to fund loans that billed at the 9.5%/half-SAP rate. [*Id*.]  Mr. Wallace sought Mr. Harris' guidance as he believed the issue "require[d] a policy or legal decision." [*Id*.]

**RESPONSE TO NO. JS190.**          **No dispute that the language is quoted accurately.**

**JS191.**          On July 17, 2002, Mr. Harris responded to Mr. Wallace that "if the refinancing does not alter the tax-exempt nature of the obligation, the refinanced bond should still be included" among the sources of funds eligible to fund loans that billed at the 9.5%/half-SAP rate. [Ex. II.116 (ED-B-001010).]

**RESPONSE TO NO. JS191.**          **No dispute that the language is quoted accurately.**

- 178 -

**JS192.**          In a July 14, 2004 e-mail to various persons within ED, Mirek Halaska "summarized" ED's "approach" to the issue, *inter alia,* of whether refundings of pre-October 1, 1993 tax-exempt bonds were eligible sources of funding for 9.5%/half-SAP loans:

> a.          During June 2002, we attempted to approach the issue during a review by limiting the amount that a lender could bill for tax-exempt special allowance to the amount of eligible bonds that they held and allowed for growth as permitted by 682.302 of the pre-October 1993 eligible tax-exempt bonds.
>
> b.          Then we were advised by policy to include refunding/refinancing of eligible bonds that occurred after September 1993.

[Ex. II.10 at (OBERG00000129).]

**RESPONSE TO NO. JS192.          No dispute that the language is quoted accurately.**

**JS193.**          The February 2006 SAP Review Tool (*see supra* ¶¶ JS103-105) included a checklist with following statement and procedure concerning refunding bonds:

> *Policy has deemed that it is acceptable* for lenders to refund bonds issued prior to 1993 and the loans created and held within these bonds remain eligible for tax-exempt special allowance as long as the pre-1993 bond existed or the bond created by the refunding exists or has not reached defeasance. *It appears that lenders could refund bonds that had previously been refunded and the loans remained eligible. The lenders were allowed to create new loans that were eligible under the same rules that applied to pre-1993 bond issues.* As part of the verification [process], obtain documentation that bonds issued after October 1, 1993 and billing for tax-exempt special allowance benefits are indeed a refunding of a pre-1993 bond.

[Ex. II.59 at (ED-B-001576) (emphasis added).]

**RESPONSE TO NO. JS193.          No dispute that the language is quoted accurately.**

**JS194.**          On July 26, 2006, the Western Region of Financial Partners issued a report of a May 2006 program review of CollegeInvest. [Ex. II.62 (ED-A-000937-49).] "The scope [of the review] was a comprehensive examination of CollegeInvest and its management of operations associated with tax-exempt and taxable bond issues used for financing 9.5% floor eligible loans." [*Id.* at (ED-A-000939).] The report noted the following:

> Recycling. Recycling amounts available under each of the Master
> Indentures have been used by CollegeInvest to the extent permitted there
> under [sic] to acquire additional loans in to the related trust estates. The
> loans so acquired have been considered as eligible for a special allowance
> payment rate of 9.5% (Floor SAP) treatment when such loans have been
> acquired with the recycling amounts relating to loans pledged to a Floor
> SAP Financing Vehicle (as described below). A Floor SAP Financing
> Vehicle includes tax-exempt obligations originally issued prior to 10/1/93
> (Pre-1993 Bonds), and also includes tax-exempt refunding bonds so long
> as the proceeds of the refunding bonds are used to pay, defease or redeem
> — and thereby retire — Pre-1993 Bonds or any tax-exempt bonds that
> refunded such Pre-1993 Bonds . . . .

[*Id.* at (ED-A-000941).]

**RESPONSE TO NO. JS194.**          **No dispute that the language is quoted accurately.** *See* **Responses to JS26, JS100,** *supra***.**

## X.     OBERG'S FAILURE TO PRESERVE RELEVANT DOCUMENTS

**JS195.**          Oberg first contacted a lawyer in 2006 to discuss the possibility of bringing an FCA action based on 9.5% SAP issues. [Ex. II.124 (Oberg Dep. 39:2-39:8, 46:9-48:16).]

**RESPONSE TO NO. JS195.**          **No dispute.  Dr. Oberg did not retain an attorney until June 2007.**

**JS196.**     By the spring of 2007, Oberg had retained counsel for the purpose of pursuing an FCA action based on 9.5% SAP issues. [Ex. II.124 (Oberg Dep. 58:8-59:12, 428:1-428:2).]

**RESPONSE TO NO. JS196.**     **No dispute.  For clarity Dr. Oberg did not retain an attorney until June 2007.**

**RESPONSE TO NO. JS197.**     **Incomplete.  As Defendants are aware, Dr. Oberg has produced thousands of pages of documents in this matter, dating as far back as the late 1990s.  Upon retiring from the Department of Education Relator was able (with the Department's permission) to obtain the available emails and other electronic records from his work computer which he retained and those were searched for responsive documents, which were produced.  In March 2009, Dr. Oberg's computer drives were imaged and searched for responsive materials in this case.  Oberg Tr. 619:11-15 (Soni Dec., Ex. 32).**

**Documents from 2007-2009 are outside the time period of the Defendants' improper claims.  During the discovery process, all Defendants but the Panhandle-Plains entities**

objected to producing documents after late 2006 / early 2007 as not relevant (Southwest, SLM and EdLinc – December 31, 2006; Nelnet – January 17, 2007; Brazos – September 30, 2006).

Defendants have had plenty of opportunity to explore the facts in this case and Dr. Oberg's thoughts and opinions, having cross-examined Dr. Oberg for nineteen hours. Defendants have been able to recover emails from the New America Foundation as JS197 states.  After a further search on the subject, Relator discovered files that are AOL email draft files, which were reviewed and responsive files were produced.



**RESPONSE TO NO. JS198.**          **Incomplete.**  *See* **Response to JS197,** *supra.*

        **JS199.**          Oberg did not make a studied effort to retain everything that involved a communication about the Defendants' 9.5% SAP practices in the 2006 and 2007 time period. [Ex. II.124 (Oberg Dep. 542:21-543:4).] After filing his original Complaint on September 21, 2007, Oberg did not have any particular protocols to make sure that any e-mails he exchanged on topics relevant to the lawsuit were preserved, other than whether he chose to save the e-mail. [*Id.* (Oberg Dep. 568:9-568:21).] According to Oberg's deposition testimony, "whether or not I saved something would be somewhat hit or miss . . ." [*Id.* (Oberg Dep. 629:21-630:8).]

**RESPONSE TO NO. JS199.**        **Incomplete.**  *See* **Response to JS197,** *supra.*

**JS200.**        Oberg also testified: "I communicated with everyone from my home computer on my AOL system and, as I understand it, AOL handles that elsewhere and it expires if I don't take some action affirmatively to retain those and save them, they are gone." [Ex. II.124 (Oberg Dep. 623:1-623:17).]

**RESPONSE TO NO. JS200.**        **Incomplete.**  *See* **Response to JS197,** *supra.*

XI.    **UNDISPUTED FACTS CONCERNING CERTAIN DEFENDANTS**

   A.    **Undisputed Facts Concerning Brazos**

      1.    **Background**

**BR1.**    BHEA was formed in the mid-1970s in response to difficulties that students were encountering in receiving student loans from banks. [McMahon Decl., Ex. III.11 (Watson Dep. 14:1-14:11).] It incorporated as a non-profit entity, authorized by state and local governments to issue tax-exempt debt. [*Id.* (Watson Dep. 18:20-19:3).] BHEA raised funds to purchase student loans through the issuance of debt, including tax-exempt debt originally issued before October 1, 1993.

**RESPONSE TO NO. BR1.   No dispute.**

**BR2.**   BHESC is a separate non-profit entity that operates under a master servicing agreement and provides personnel and back office support for, among other non-profit entities, BHEA, which has no employees of its own. [McMahon Decl., Ex. III.12 (Turman Dep. 13:11-

13:16); Ex. III.1 (Watson Dep. 9:16-10:8).] Both BHESC and BHEA are separate 501(c)(3)

standalone entities. [Ex. III.12 (Turman Dep. 15:14-16:4)[4]

**RESPONSE TO NO. BR2.  Incomplete.  BHESC is in charge of all of the "day-to-**

**day operations for all" of the Brazos entities.  BHESC "runs" all of the Brazos entities and**

**"[e]verything in those other companies is controlled by BHESC."  Watson Tr. 10:3 -11:1**

**(Soni Dec., Ex. 10).**

**BR3.**   Brazos was not aware of the potential to increase BHEA's portfolio of 9.5%

loans until 2002 when Murray Watson, the President and General Counsel of BHESC, heard

general discussions on this topic at student loan lender conferences. [Ex. III.11 (Watson Dep.

55:9-55:15).] Brazos was also approached on this subject in mid 2002 by investment bankers

including Paul Sheldon of Citibank and Scott Kaysen of Bank of America. [Ex. III.12 (Turman

Dep. 26:1-28:5).]

**RESPONSE TO NO. BR3.  No dispute.**

**BR4.**   Underwriters also raised this issue with Brazos, mentioning that 9.5% loans

could help with cash flows on financings. [Ex. III.11 (Watson Dep. 55:9-55:19).] When

another Texas entity substantially outbid Brazos on a group of loans, which occurred before

Brazos engaged in any transferring activities, the underwriter informed Mr. Watson Dep. that

the other entity had used income from the 9.5% loans to pay higher premiums. [*Id.*  (Watson

Dep. 55:9-56:9).] The underwriter told him that the competitor was running loans through

---

[4] For ease of reference, this statement of facts will refer to BHEA and BHESC collectively as "Brazos."

eligible tax-exempt financings and that this was a common practice in the industry. [*Id.* (Watson Dep. 60:3-60:14, 89:2-89:11).]

**RESPONSE TO NO. BR4.   Incomplete.  Watson's characterization of Paul Sheldon's statement that the other Texas entity, "Panhandle Plains," was running loans through eligible tax-exempt financings was that they were "whitewashing" them.  Watson Tr. 60:3-9 (Soni Dec., Ex. 10).  Watson also testified, in the same context, that "Panhandle Plains" increased its net worth by $5 million in a short period of time.  *Id.* at 55:20-56:4.  Watson stated that because other lenders were using the 9.5% SAP to their competitive advantage, Brazos should as well.  *Id.* at 89:1-11.**

BR5.   Before it took steps to increase its portfolio of 9.5% loans, Brazos had a business objective of increasing BHEA's eligibility for Texas cap allocation. [Ex. III.11 (Watson Dep. 146:4-146:11); Ex. III.12 (Turman Dep. 26:10-27:1).] Texas caps the amount of tax-exempt debt that it allows non-profit student loan lenders to issue. [Ex. III.12 (Turman Dep. 26:10-27:1).] After a 2003 change in Texas law, a particular lender's cap allocation is determined by its need for tax-exempt debt, which in turn is determined by its total Texas Nexus loan volume. [*Id.*  (Turman Dep. 68:14-69:9, 194:3-8); Ex. III.11 (Watson Dep. 144:16-145:15).] Texas Nexus loans are loans made to Texas residents or students attending school in Texas. [Ex. III.12 (Turman Dep. 44:13-44:18).] Prior to the 2003 change, cap allocation was distributed on a first-to-file basis. [*Id.*  (Turman Dep. 235:9-236:12).] As only loans held within BHEA financings qualified for the Texas cap allocation, Brazos looked at ways to increase BHEA's loan volume to increase its cap allocation. [*Id.*  (Turman Dep. 68:14-69:9).] Obtaining a larger cap allocation of tax-exempt debt carried with it a much lower

cost of funds and allowed BHEA to better compete with other nonprofit entities. [*Id.* (Turman Dep. 237:2-238:13).]

      **RESPONSE TO NO. BR5.  Disputed.  It is unclear what "[b]efore it took steps" means in the first sentence.  Neither the referenced testimony from Watson nor Turman establish that before Brazos began planning to increase its portfolio of 9.5% SAP loans, which went as far back as mid-2002, that Brazos already had a business objective of increasing BHEA's eligibility for the Texas cap allocation.  *See also* Response to BR6, *infra*.**

      **BR6.**   The fact that most of these transfers could also result in 9.5% SAP floor yield on the loans was a byproduct rather than the primary goal. [Ex. III.11 (Watson Dep. 146:4-147:15); Ex. III.12 (Turman Dep. 26:10-27:1).]

      **RESPONSE TO NO. BR6.  Disputed and incomplete.  By its own statements, Brazos was exploring the 9.5% SAP issue as far back as October 2002.  *See, e.g.*, BR3; BR7 (citing McMahon Dec., Ex. III.1 (B9007790-91, B9007778-79, B9007803, B9007810, B0270412, B0270425)) (E-mails between Turman and Moskowitz dating as far back as October 2002).  According to Brazos, the change in the law relevant to the Texas tax-exempt cap allocation was in September 2003 (*see* Brazos Resp. to Rel. Interrog. No. 4), more than a year after Brazos began planning for its 9.5% SAP loan growth.  (Mills Dec., Ex. 3).**

      **Some of the loan transfers made as part of Brazos' 2004 transactions did not qualify for the Texas cap allocation because they were transfers made solely between BHEA entities; however, Brazos did bill these loans for the 9.5% SAP.  Turman Tr. 240:9-241:11 (Soni Dec., Ex. 9).  The 9.5% SAP generated by these transferred loans, which totaled over**

$50 million in value, could not be a "by-product" of the Texas cap allocation because they did not qualify for the Texas cap allocation. Brazos Resp. to Rel. Interrog. No. 4 (Mills Dec., Ex. 3).

Brazos waited to complete the 2004 transfers until it received its opinion from Saul Moskowitz regarding 9.5% SAP applicable to the transferred loans; however, Brazos could have made the transfers regardless of when the opinion from Moskowitz was received. Turman Tr. 194:9-196:17, 242:19-243:3 (Soni Dec., Ex. 9).

Testimony from Watson reveals that Brazos was very interested in the additional potential income from the 9.5% SAP. Watson testified that after he learned of the additional "floor income" allowing one of his competitors to pay premiums for certain loans, he had his investment banker make a presentation to the company. Watson Tr. 55:9-56:15 (Soni Dec., Ex. 10). The stated purpose of this presentation to BHEA was, at least in part, to obtain higher special allowance payments and more income. *Id.* at 63:22-64:11. Watson stated that because other lenders were using 9.5% SAP to their competitive advantage, Brazos should as well. *Id.* at 89:1-11. Watson also testified regarding the increased net worth Panhandle Plains was experiencing in a short period of time. *Id.* at 55:9-56:15.

### 2. Obtaining a Legal Opinion

**BR7.** Starting in late 2002 and continuing through 2003, Ricky Turman, the Chief Financial Officer of BHESC, and Adele Williams, Manager of the Asset Liability Management Committee, had a series of discussions and communications with Saul Moskowitz, an outside attorney who advised Brazos on issues relating to the student loan program, to understand

what was permissible under ED regulations and guidance with respect to 9.5% SAP billing. [McMahon Decl., Ex. III.1 (B9007790-91, B9007778-79, B9007803, B9007810, B0270412, B0270425).] Brazos then drafted a proposed policy and procedure to transfer student loans purchased with tax-exempt debt into a taxable financing with the transferred loans retaining the 9.5% floor, and to use the proceeds of those transfers to acquire new student loans into the tax exempt financing to replace the transferred loans where the acquired loans would also be subject to the 9.5% floor. [McMahon Decl., Ex. III.2 (B0270006-08).]

**RESPONSE TO NO. BR7.   Disputed and incomplete.   In a phone conversation between Brazos representatives, Moskowitz gave** ███████████████████ ███████████████████████ **Moskowitz Ex. 5 at B9000508 (Soni Dec., Ex. 114).   He also advised Brazos not to** ██████████ **and to** ██████████████████████ *Id.***; Moskowitz Tr. 188:16-189:10 (Soni Dec., Ex. 18).**

**The correspondence between Turman and Moskowitz concerned "the swapping of loans into a tax-exempt issue for SAP characterization."   B9007778-79 (McMahon Dec., Ex. III.1).   Turman asked Moskowitz on November 13, 2002:** █████████████████████ █████████████████████████████████ ███████████████████████████████████ ██████████ **Turman Ex. 22 at B90007778-79 (Soni Dec., Ex. 96). Turman also asked questions about the** ██████████████████████████████ ██████████**.** *Id.* **Moskowitz responded to Turman's "**██████████**" question by stating that, "**███████████████████████████████████ ██████████████████████████████**"** *Id.* **Moskowitz explained in his deposition that he advised his clients against "going overboard" as a piece**

of "political/PR advice." Moskowitz Tr. 178:21-179:10 (Soni Dec., Ex. 18). He added that by advising against being greedy and abusive, "bad things could happen to you because of this in the real world." *Id.* at 179:18-180:1 (Soni Dec., Ex. 18). By this, he meant that the Department of Education, the media, or Congress could learn about the practice and "bad things could happen to you if you go overboard." Moskowitz Tr. 182:2-8 (Soni Dec., Ex. 18). Turman interpreted this response to mean that they should "be careful from a public perception standpoint." Turman Tr. 251:5-11 (Soni Dec., Ex. 9).

Moskowitz also responded that the two questions regarding refunding were "new ones" to him. B9007778-79 (McMahon Dec., Ex. III.1). He said that he could "ask [the Department of Education] for their view, but I suspect they will be unwilling to respond given the current deliberations that they are conducting on these issues." *Id.* Turman was surprised that these were "new" questions for Moskowitz. Turman Tr. 252:14-254:18 (Soni Dec., Ex. 9).

Over one year after initially contacting Moskowitz on 9.5% Floor issues, Brazos sent Moskowitz a "summary of what Brazos" intentions are with regard to swapping or transferring tax-exempt loans into taxable deals and replacing them with other eligible loans." Email from Adele Williams to Saul Moskowitz at B0270006 (McMahon Dec., Ex. III.2). This statement of "policy and procedures," drafted by Brazos, noted that "it is permissible to sell, swap, or transfer student loans purchased with tax-exempt debt into a taxable bond issue and those student loans will retain their 'floor' status. It is also possible to acquire new student loans to replace those that have been transferred out of the tax-exempt bond issues." *Id.* at B0270007. The legal authority for such practices was left blank. *Id.* This practice was cited as "permissible" in these policies and procedures despite

the fact that this document was created to enable Moskowitz to provide an opinion on the legality of the transactions contemplated in the document. *Id.* The plan generally called for using taxable funds to "purchase" loans earning the 9.5% floor and then use the funds transferred to the pre-October 1, 1993 bond to purchase loans from third parties. *Id.* Once those loans were purchased into the pre-October 1, 1993 bond, the loans would be "sold, swapped, or transferred to a taxable [Brazos] bond issue and, once again, the proceeds will be used to purchase additional non-floor earning Texas-Nexus loans." *Id.* Brazos also attached several questions that were raised in the course of putting together its policies and procedures. Turman Ex. 25 at B0270003, B0270005 (Soni Dec., Ex. 103). Those questions included how ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ *Id.* at B0270005.

    Watson did not know what documents had been provided to Watson. Watson Tr. 81:5-81:13. Turman likewise did not know what materials Moskowitz reviewed. Turman Tr. 311:10-312:8, 326:4-16 (Soni Dec., Ex. 9).

    Moskowitz responded the next day saying that ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Turman Ex. 25 at B0270003 (Soni Dec., Ex. 103). Moskowitz also responded to particular questions that Brazos posed. He said he did not ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

- 190 -

███████████." *Id.* at B0270005. ███████████████████████

████████████████████████████████ *Id.*

  **Brazos also consulted with Mark Westergard, its bond counsel, during this period.**

**In November 2004, Westergard advised Brazos** ███████████████████

███████████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████

**Turman Ex. 26 at B0246473 (Soni Dec., Ex. 97).  He added,** ███████████████

███████████████████████████████

████████████████████████ *Id.*  **He further stated that** ████████

████████████████████████████████████

████████████████████████████████████

████████████████ *Id.*  **He advised that** ███████████████

███████████████. *Id.*

  **BR8.** Brazos' proposed policy and procedure called for BHEA to use recycling proceeds from taxable bond issues to purchase loans housed in BHEA's qualifying tax-exempt obligations that were earning the 9.5% floor. [Ex. III.2, at (B0270007).] The proceeds generated by the transferor tax exempt bond issue were to be used by the tax exempt bond issue to purchase Texas Nexus (loans made to a resident of Texas or a student enrolled in an institution in Texas) from third party sellers or taxable BHEA bond issues. [*Id.*] Once the Texas Nexus loans had been acquired with tax exempt funds, the loans were to be sold or

transferred to a taxable BHEA bond issue and once again the proceeds would be used to purchase to additional Texas Nexus loans not currently earning the 9.5% floor. [*Id.*]

**RESPONSE TO NO. BR8.  Incomplete.  This statement of "policy and procedures," drafted by Brazos, also noted that "it is permissible to sell, swap, or transfer student loans purchased with tax-exempt debt into a taxable bond issue and those student loans will retain their 'floor' status."  Email from Adele Williams to Saul Moskowitz at B0270007 (McMahon Dec., Ex. III.2).  The legal authority for such practices was left blank.  *Id.  See also* Response to BR 7.**

BR9.   Before implementing the proposed policy and procedure explained above, Brazos asked Mr. Moskowitz for a written legal opinion on whether the proposed policy and procedures were permissible under the Higher Education Act and the regulations. [Ex. III.12 (Turman Dep. 40:14-43:3); Ex. III.11 (Watson Dep. 71:17-72:2, 78:22-79:4).] This was consistent with Brazos' general practice in interpreting ED regulations. [Ex. III.12 (Turman Dep. 41:16-42:3).]

**RESPONSE TO NO. BR9.  Disputed in that the cited testimony provides no support for the notion that Brazos' regular practice was to get opinions; it says only that "[t]here's always concerns dealing with the federal government" and they have concerns with "making sure that everything that we do always complies with the federal government." Turman Tr. 40:8-41:12 (Soni Dec., Ex. 9).**

**These facts are incomplete with respect to communications with Moskowitz.  *See* Response to BR7, *supra*.**

- 192 -

Brazos did not disclose or seek approval of input from the Department of Education on its plan. Watson Tr. 83:16-19. Watson thought dealing with the Department was a "joke." Watson Tr. 86:10-15 (Soni Dec., Ex. 10).

**BR10.** Mr. Moskowitz held himself out as an attorney with expertise in the federal student loan program and the applicable regulations governing the program. [McMahon Decl., Ex. III.13 (Moskowitz Dep. 20:9-21:22); [McMahon Decl., Ex. III.14 (Williams Dep. 117:6-117:12); Ex. III.12 (Turman Dep. 29:5-29:15, 40:14-41:15).] Before moving to private practice, Mr. Moskowitz had worked as an attorney in ED's Office of General Counsel, Post-Secondary Education Division, where, among other things, he drafted proposed legislation and regulations as well as subregulatory guidance. [Ex. III.13 (Moskowitz Dep. 30:10-32:14).] Mr. Moskowitz also served as Branch Chief of the Guaranteed Student Loan Branch of the Office of Post-Secondary Education, Office of Student Financial Assistance, Division of Policy and Program Development, [*Id.* (Moskowitz Dep. 35:12-35:17)], where he ran the loan program from the policy side. [*Id.* (Moskowitz Dep. 35:18-35:21).] In that role, Mr. Moskowitz was responsible for drafting statutes and regulations and responding on a day-to day basis to questions from regional offices and the student loan industry on the meaning and application of the HEA, its implementing regulations and subregulatory guidance. [*Id.* (Moskowitz Dep. 35:22-36:13).]

**RESPONSE TO NO. BR10.  Incomplete.  Mr. Moskowitz provided opinions concerning 9.5% SAP issues to lenders ▮▮▮▮▮▮▮▮▮▮.  Wright Ex. 35 (Soni Dec., Ex. 99); Moskowitz Tr. 267:12-14 (Soni Dec., Ex. 18).  Nelnet was told as of December 13, 2002 that Mr. Moskowitz was providing opinions to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**

████████ **N0134075; N0117978 (Soni Dec., Exs. 200, 187).  This information was confirmed when both Brazos and Panhandle paid Mr. Moskowitz sums in this range for their respective opinions.  J. Parker I Tr. 97:21-98:10, 271:16-22 (Soni Dec., Ex. 7). Moskowitz has also served as an advisor to certain Defendants with regard to this action. Moskowitz Tr. 12:22-15:9 (Soni Dec., Ex. 18).**

BR11.  Mr. Moskowitz, after reviewing the Brazos proposed policy and procedures plan, concluded that the transactions that Brazos described to him were permissible under the applicable regulations, and that the loans transferred from a BHEA pre October 1, 1993 tax exempt financing would be entitled to 9.5% SAP until the tax exempt financing was retired or defeased. [McMahon Decl., Ex. III.3 (B0005324-35); Ex. III.2 (B0270006-08).] He provided a signed opinion letter dated January 8, 2004 that concluded "it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions." [Ex. III.3 at (B0005325).]

**RESPONSE TO NO. BR11.  Disputed and incomplete.  Moskowitz submitted a draft opinion to Brazos on November 13, 2003.  Moskowitz Ex. 8 at B0005437-43 (Soni Dec., Ex. 86); Moskowitz Tr. 199:9-200:1 (Soni Dec., Ex. 18).  Ricky Turman provided comments to Mr. Moskowitz on that opinion on November 16, 2003.  Turman Ex. 29 at B0005438 (Soni Dec., Ex. 754).  On the second-to-last page of that draft, Moskowitz wrote that the condition specified in Section 682.302(e)(2)(ii)** ████████

- 194 -

███████████████ *Id.* at B0005442.  Turman testified that one of the attorneys – either Mark Westergard or Saul Moskowitz – told them that False Claims Act liability was a possibility.  Turman Tr. 294:14-295:1 (Soni Dec., Ex. 9).  The note specified that it was ████ ██████████████████████████████████████████████ *Id.*  Turman testified that this comment was made as a result of a conversation with Mark Westergard, Brazos' bond counsel.  Turman Tr. 291:15-293:5 (Soni Dec., Ex. 9).  Watson confirmed that Moskowitz was asking questions of Brazos concerning the terms retirement, refunding, and defeasance as those terms are used in the regulations when he was developing his opinion.  Watson Tr. 76:16-77:15 (Soni Dec., Ex. 10).

In December 2003, Moskowitz again ███████████████████████████████ ██████████████████████████████████████████████ Turman Ex. 33 (Soni Dec., Ex. 106).  Turman did not know how or whether Mr. Moskowitz ever ended up making a determination as to whether a retirement or defeasance had occurred, though he understood that it was a very important issue under the regulations.  Turman Tr. 311:10-312:8 (Soni Dec., Ex. 9).  Moskowitz provided Turman with a revised opinion on January 6, 2004.  Email and Opinion from S. Moskowitz at B0270425 (McMahon Dec., Ex. III.1).

Watson only read one paragraph of the final opinion, did not review any drafts and only cared if Moskowitz said they could go through with the transaction.  Watson Tr. 73:1-8, 74:4-11, 74:22-75:15 (Soni Dec., Ex. 10).  Watson testified that, "I paid him for the opinion, not how he got there."  *Id.* at 79:8-11 (Soni Dec., Ex. 10).  This is despite the fact that he was then the general counsel of BHESC and was the addressee of the opinion.  *Id.* at 79:12-17.  Watson testified that his company accepted subsidies from the government, but did not pay attention to the laws that determined what the subsidies were.  *Id.* at 115:6-8.

- 195 -

Turman likewise did not pay attention to anything in the opinion other than "the four lines where he gives the opinion" that said they could go forward with the transaction; he did not "get into the underlying research or work that Mr. Moskowitz did to come up with that position." Turman Tr. 278:15-279:3; 327:1-18 (Soni Dec., Ex. 9). Turman later reiterated that he relied entirely on one sentence in the opinion, saying, "[t]hat's what we paid the attorney for was to provide an opinion" and that it was not his job "to go in and analyze his rationale for how he arrived at his opinion." *Id.* at 334:9-17.

Moskowitz delivered a final, signed opinion on January 8, 2004. Moskowitz Ex. 9 at B9005756-68 (Soni Dec., Ex. 115); Moskowitz Tr. 203:12-204:4 (Soni Dec., Ex. 18). Mr. Moskowitz relied on " ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ Moskowitz Ex. 9 at B9005757 (Soni Dec., Ex. 115). Moskowitz specifically warned that █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* Watson stated that this fact bothered him. Watson Tr. 82:15-83:3 (Soni Dec., Ex. 10). Moskowitz instructed that ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Moskowitz Ex. 9 at B9005758 (Soni Dec., Ex. 115). Moskowitz then discussed subsection (e)(2) of the regulation, specifically noting that it was designed to ███████████████████████ ████████████████████████████████████████████

███████████████████████████████████████ *Id.* at B9005759.  He wrote

that in enacting this subsection of the regulation in 1992, ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████ *Id.* at B9005760.  Mr.

Moskowitz then examined whether the transactions contemplated by Brazos would meet

the conditions specified in subsection (e)(2) and thus be subject to ordinary SAP.  *Id.* at

B9005761-62.  The two sources that he analyzed were the 1996 Dear Colleague Letter and

an email from a Department of Education employee from 2001.  *Id.*; Moskowitz Tr. 131:13-

132:5 (Soni Dec., Ex. 18).  Mr. Moskowitz also characterized the transactions at issue as

█████████████████████████████████████.”  Moskowitz

Ex. 9 at B9005762 (Soni Dec., Ex. 115).  The discussion of Section 682.302(e)(2)(ii) was

changed to account for Turman's comment, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ *Id.* at B9005762 (emphasis

in original).  A new paragraph was added, saying that the condition specified in Section

682.302(e)(2)(ii) █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████ *Id.*

Mr. Moskowitz came to the opposite conclusion when asked about the effect of refunding

on the ability to transfer loans in his deposition.  Moskowitz Tr. 139:10-141:5, 143:7-21

(Soni Dec., Ex. 18).  The final substantive paragraph of the opinion addressed one of the

questions Brazos had asked Mr. Moskowitz months earlier regarding the effect on SAP of a

subsequent maturity of the underlying pre-October 1, 1993 tax-exempt bond.  Moskowitz
Ex. 9 at B9005762 (Soni Dec., Ex. 115).  The opinion advised that, 
*Id.* at
B9005762-63.  The opinion
*Id.* at B9005757, B9005763;
Moskowitz Tr. 162:2-16 (Soni Dec., Ex. 18).

The opinion recognized that the SAP treatment of a loan depends on the source of
funds used to make or purchase that loan, (Moskowitz Ex. 9 at B9005758 (Soni Dec., Ex.
115); Moskowitz Tr. 227:3-228:4 (Soni Dec., Ex. 18)), but did not "address that specific
issue," Moskowitz Tr. 227:21-228:4, 229:7-10 (Soni Dec., Ex. 18).  Mr. Moskowitz did not
believe it was his job to provide advice on policy compliance and did not do so.  *Id.* at
114:9-115:9.

Mr. Moskowitz attached to his opinion a redacted form of an email exchange with
Pamela Moran of the Department of Education in which Mr. Moskowitz poses certain
hypothetical questions to Moran.  Moskowitz Ex. 9 at B9005764-68 (Soni Dec., Ex. 115);
Moskowitz Tr. 131:18-132:5 (Soni Dec., Ex. 18).  Moskowitz was not sure why he redacted
a particular back-and-forth that also appears in Moskowitz Dep. Exhibit 1 before attaching
the email to the Brazos and Panhandle opinion letters, but testified that it might be because
of a client confidence.  Moskowitz Tr. 204:18-205:14, 207:14-208:6 (Soni Dec., Ex. 18).
Moskowitz nevertheless testified that he relied on the redacted exchange in forming the
opinions he provided to Brazos and Panhandle.  *Id.* at 130:21-132:5.

Mr. Moskowitz admitted that, under his reading of the law, a lender that had access to a pre-October 1, 1993 tax-exempt bond estate could convert its entire portfolio to Half-SAP/9.5% Floor status, as well as any loans that it would purchase from third parties into the pre-October 1, 1993 tax-exempt bond estate.  Moskowitz Tr. 127:9-128:20 (Soni Dec., Ex. 18).  He also recognized that, under his reading of the law, a lender with two pools of loans, one taxable (receiving ordinary SAP) and one tax-exempt (receiving Half-SAP/9.5% Floor), could swap the pools, swap them back the next day, and claim the 9.5% floor on all of them.  *Id.* at 115:14-117:9.

Mr. Moskowitz nevertheless recognized that money residing in a pre-October 1, 1993 tax-exempt bond estate is not necessarily eligible to make or purchase loans subject to Half-SAP/9.5% Floor simply by virtue of its being pledged to that bond; its status as "old money" or "new money" determined eligibility for 9.5% SAP.  *Id.* at 88:18-90:13, 91:3-93:22.  He agreed that the relevant questions to be asked in determining whether a loan should be subject to ordinary SAP or Half-SAP/9.5% Floor are whether it was made or purchased with "old money" or "new money," and if it was purchased with "new money," whether it was part of a transfer process under Section 682.302(e).  *Id.* at 94:19-95:4.

He understood that the purpose of SAP is "[t]o induce lenders to make loans they otherwise might not make on the terms that the statute would like them to make them on," and that the SAP rate is tied to the cost of funds used to make or purchase loans.  *Id.* at 98:20-99:3, 101:8-12.  He did not think it mattered whether a particular transaction was done for no purpose other than to obtain increased SAP, and did not consider whether the transactions had any independent business purpose.  *Id.* at 118:19-22.  He did not consider whether the transactions were conducted at arms-length.  *Id.* at 123:22-16; 258:1-4.

- 199 -

**Mr. Moskowitz understood that the 1992 rule change to Section 682.302(e) was prompted by the Department's "concern[] that transfers from tax-free estates to taxable estates would increase yields above the level necessary to serve the purposes of the program."** *Id.* **at 104:11-17.  He also understood that the judgment of Congress in 1993 was that loans would continue to be made based on ordinary SAP rates and that the 9.5% floor was not necessary for the purpose of the program going forward.** *Id.* **at 109:17-21, 111:21-112:4.**

BR12.  Among the sources upon which Mr. Moskowitz relied to reach his opinion were the 1996 DCL and a 2001 email from Pam Moran, a policy official within OPE. [Ex. III.13 (Moskowitz Dep. 130:21-131:21); *supra* at TJS20.]

**RESPONSE TO NO. BR12.   Incomplete.  *See* Response to BR11, *supra*.  The email asked a limited question:  if ordinary SAP loans are swapped with loans in a pre-October 1, 1993 tax-exempt bond, and then back out, and ordinary SAP loans are swapped in again, etc., whether** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Moskowitz Ex. 1 (Soni Dec., Ex. 116).**
**Moran replied that the loans** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ***Id.*  Moskowitz did not provide Moran with any information on the source of funds being used by the pre-October 1, 1993 tax-exempt bond estate to effectuate the swaps, and only asked about the effect of subsection (e)(2), which governs transfers <u>out of</u> the pre-October 1, 1993 tax-exempt bond estate.  Moran never commented on the source of funds and only commented on the effect of subsection (e)(2).**

**BR13.** Mr. Moskowitz understood that Ms. Moran's conclusions in this e-mail were made after ongoing discussions with ED's Office of General Counsel. [Ex. III.13 (Moskowitz Dep. 137:10-137:18).] Mr. Moskowitz also understood that Ms. Moran's job involved providing ED interpretations of regulations to lenders in the FFEL Program. [*Id.* (Moskowitz Dep. 138:3- 138:11, 217:6-217:19).] Mr. Moskowitz further understood that Ms. Moran has always been conscientious about consulting within the Office of Postsecondary Education prior to advising outside parties about ED interpretations of its regulations. [*Id.* (Moskowitz Dep. 217:6-217:19).]

**RESPONSE TO NO. BR13. No dispute; however, Moran's conscientiousness is neither material nor admissible evidence. Incomplete; *see* Response to BR12, *supra*.**

**BR14.** Brazos relied on the conclusion in Mr. Moskowitz's opinion to go forward with the transfers described in the proposed policy and procedures memo. [Ex. III.12 (Turman Dep. 278:15-279:3); Ex. III.11 (Watson Dep. 74:22-75:15, 95:4-95:12).] Brazos would not have performed  this activity without Mr. Moskowitz's opinion. [Ex. III.12 (Turman Dep. 42:14-43:3, 74:12-74:16); Ex. III.14 (Williams Dep. 71:13-72:1).]

**RESPONSE TO NO. BR14. Disputed in that some of the "purchases" of new loans into BHEA's tax-exempt 9.5% SAP eligible financings were not contemplated by the opinion. Turman Tr. 331:5-333:4 (opinion contemplated that purchases of new loans would be from "third parties;" however, over $53 million in loans from intra-company BHEA transfers were counted as purchases by Brazos.) (Soni Dec., Ex. 9); Brazos Financing Grid (April 2004) (Over $53 million in loans moved "purchased" by BHEA**

9.5% eligible financings from ineligible BHEA financings in April 2004 transactions) (Mills Dec., Ex. 47).

### 3.    2004 Transfers

**BR15.** Brazos undertook three separate transactions in 2004 that had the effect of increasing BHEA's 9.5% SAP loan portfolio. [Ex. III.12 (Turman Dep. 82:22-83:11).] These transactions affected a small portion of BHEA's overall portfolio, estimated in testimony as between three to seven percent. [*Id.*  (Turman Dep. 82:22-83:11, 187:10-187:12).]

**RESPONSE TO NO. BR15.   Incomplete.   The "portion" of BHEA's portfolio affected by these transactions is not material.   Incomplete in that these were three sets of transactions (starting in January 2004, April 2004 and August 2004) in which Brazos moved approximately $463 million out of its Eligible Financings into other BHEA taxable and tax-exempt financings (that were not independently eligible for 9.5% SAP).   In January 2004, BHEA issued a new taxable financing, a portion of which was designated for its 9.5% SAP loan growth plan and was used in part to fund the January and April 2004 transfers (*i.e.*, this newly raised money was moved into the trust securing the Eligible Financings in exchange for loans).   Using the funds generated by these transfers out of its Eligible Financings, BHEA in January, April and August 2004, directed another Brazos entity to transfer loans into the Eligible Financings to replace the loans sent to the new January 2004 financing and the other BHEA ineligible financings.   Turman Tr. 90:22-91:4, 110:10-20, 118:1-119:13, 133:18-134:13, 144:9-147:2, 173:14-20, 179:17-180:6, 181:12-18 (Soni Dec., Ex. 9); Final Transfer Spreadsheets for January, April and August transfers (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).   Brazos eventually financed at least $560 million in loans on which it claimed 9.5% SAP.   *See* Brazos Resp. to Interrog. No. 1

(December 2004 Quarterly Balances for Lender Ids 834086 ($52.9 million) and 833806 ($512.7 million)) (Mills Dec., Ex. 3); Watson Tr. 86:16-22 (testifying that the total was in the low $600 million) (Soni Dec., Ex. 10).

**BR16.** Each of these transactions involved BHEA selling loans from a pre-10/1/93 tax-exempt bond estate to a taxable financing and using the proceeds of that sale to purchase Texas Nexus loans which would become subject to the 9.5% floor. [Ex. III.2 at (B027007-08).] These loans were then sold by the BHEA qualifying tax-exempt obligation to a taxable BHEA bond issuance and the proceeds of this sale could be used to purchase additional loans which became subject to the 9.5% floor. [*Id.*]

**RESPONSE TO NO. BR16.   Disputed that the loans were "sold" from the BHEA qualifying tax-exempt obligation to a taxable BHEA bond.   The transfers were fully controlled by Brazos, with BHESC setting the transfer prices.   The transfers out of the BHEA Eligible Financings were made to other trusts controlled by BHEA.   There were no negotiations regarding the price of these transfers of loans and Brazos set the transfer price at face value, plus accrued interest, plus, in some cases, unamortized purchase premium. Brazos could have reversed the transfers if it so desired.   It was part of BHESC's plan to hold the loans in the BHEA Eligible Financing only temporarily.   Turman Tr. 85:11-86:18, 129:3-130:2, 134:14-22, 139:19-141:3, 141:14-142:15, 144:21-146:5 (Soni Dec., Ex. 9); *see also* (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).   When asked about maintaining an interest in the loans with respect to keeping "floor eligibility" after transferring, Mr. Turman testified "[t]he Authority was the owner of the loans when they first became eligible for floor.   The Authority continues to maintain ownership in a taxable facility as well."   Turman Tr. 143:2-21 (Soni Dec., Ex. 9).**

The money raised in the January 2004 taxable financing facilitated these transfers. *See* **BR17**, *infra*. **Monies from this offering started the process, as proceeds from this offering were exchanged for loans from the BHEA Eligible Financings, which then purchased new loans.**

**BR17.** The first transaction occurred in January 2004. [Ex. III.12 (Turman Dep. 178:19-179:14).] This transaction involved the issuance of new debt. [*Id.* (Turman Dep. 180:7180:15).] The investment bankers involved with the deal were all represented by counsel, and Brazos apprised both the bankers and their counsel of the planned floor project via financing grids. [*Id.* (Turman Dep. 342:9-343:4).] Neither the bankers nor their counsel raised any objections or concerns about the floor project. [*Id.* (Turman Dep. 343:5-343:10).]

**RESPONSE TO NO. BR17.   Incomplete in that the first transaction in January 2004 involved the issuance of new taxable debt.  Turman Tr. 90:10-91:2 (Soni Dec., Ex. 9). This was actually a series of transactions involving over $200 million in loans.  (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).**

**BR18.** The second transaction occurred in April 2004. [Ex. III.12 (Turman Dep. 116:13-116:16).] This transaction did not involve a new issuance of debt, but rather used recycling proceeds to purchase new loans. [*Id.* (Turman Dep. 117:3-117:8).] The third transaction occurred in August 2004. [*Id.* (Turman Dep. 134:9-134:13).]

**RESPONSE TO NO. BR18.   Disputed in that both the April and August 2004 "transactions" were each a series of transactions involving transfers of loans of approximately $138 million and $117 million respectively.  (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).  Further, while neither involved the issuance of new debt,**

- 204 -

the January 2004 taxable financing appears to have funded some of the April transfers. *See id*. All of the transfers out of the BHEA Eligible Financings were funded by financings that were not eligible for 9.5% SAP. *See id.*

BR19. All of the transactions were affected through loan purchase agreements between the selling entity and the purchasing entity, pursuant to which the transferee trust paid full principal, accrued interest and unamortized premiums. [Ex. III.12 (Turman Dep. 125:3-125:19, 129:3-129:16).]

RESPONSE TO NO. BR19. Disputed that these were sales. *See* Response to BR16. Brazos set these prices to be the minimum price as a general rule. Turman Tr. 129:17-130:2 (Soni Dec., Ex. 9). In some cases the agreements were signed by the same Trustee. *Id.* at 135:1-5.

BR20. All loans that were sold into an eligible pre-10/1/93 tax-exempt bond remained in that bond issuance until at least the end of the fiscal quarter. [Ex. III.12 (Turman Dep. 322:4-322:20).] This allowed for a clean audit trail and proper reporting on the quarterly LaRS 799s. [*Id.* (Turman Dep. 323:11-323:16); Ex. III.11 (Watson Dep. III:5-111:15).]

RESPONSE TO NO. BR20. Disputed. These loans were not reported properly on the quarterly filings.

### 4.    2006 Program Review

BR21. In November 2005, ED initiated a Program Review to focus on Brazos' tax exempt special allowance billings scheduled for March 2006. [McMahon Decl., Ex. III.4 (B0004965-67); McMahon Decl., Ex. III.15 (Criswell Dep. 155:1-155:13).]

**RESPONSE TO NO. BR21.  No dispute.**

**BR22.** Richard Criswell, a Senior Guarantor and Lender Review Specialist from the Souther Region of FSA, was the team leader of the March 2006 Program Review. [Ex. III.15 (Criswell Dep. 8:2-8:22, 158:10-159:4).] As lead reviewer, Mr. Criswell had the responsibility to draft the program review report. [*Id*. (Criswell Dep. 209:2-210:10).]

**RESPONSE TO NO. BR22.  No dispute.**

**BR23.** In Mr. Criswell's twenty years of personal experience, "almost all of the [lender] entities without exception are trying their best to do a benefit to the borrowers and do their best to meet the regulations as near as they can interpret them." [Ex. III.15 (Criswell Dep. 224:5-224:22).]

**RESPONSE TO NO. BR23.  Disputed.  This testimony is both irrelevant and inadmissible.  Furthermore, it does not address the activities of any specific Defendant in this case.**

**BR24.** BR25.  Mr. Criswell viewed the applicable regulations as "at best sometimes hard to interpret." [Ex. III.15 (Criswell Dep. 224:5-225:5).] He has never come across an entity that he "felt was not doing the best they could to meet the regulatory requirements." [*Id*.]

**RESPONSE TO NO. BR24.  Disputed.  This testimony is both irrelevant and inadmissible.  Furthermore, it does not address the activities of any specific Defendant in this case.  Moreover, Criswell testified that he lacked authority to resolve policy issues.  *See also* Criswell Tr. 206:9-20 (Soni Dec., Ex. 26)**.

**BR25.** During the March 2006 site visit, Mr. Criswell was able to request whatever documentation he wished from Brazos employees, and they always complied with his requests and provided him with the information. [Ex. III.15 (Criswell Dep. 173:15-173:21).]

**RESPONSE TO NO. BR25.  Disputed.  The testimony does not establish that Mr. Criswell was able to request "whatever" documentation he wished, but rather he was able to request "particular documents."  Criswell Tr. 173:15-173:21 (Soni Dec., Ex. 26).**

**BR26.** Mr. Criswell had already participated in a tax-exempt special allowance billing review of a Kentucky entity prior to visiting Brazos. [Ex. III.15 (Criswell Dep. 159:25-160:5).]

**RESPONSE TO NO. BR26.  No dispute.**

**BR27.** The scope of the Brazos Program Review included both compliance with the Taxpayer Teacher Protection Act as well as Brazos's adherence to regulations regarding tax-exempt debt. The 2006 Program Review Report states that, in addition to evaluating TTPA compliance, the review included "the policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form" from September 1993 through September 2005. [McMahon Decl., Ex. III.5 (ED-B-001390-1397, at ED-B-001392); Ex. III.14 (Williams Dep. 150:18-151:1, 161:8-162:17); Ex. III.15 (Criswell Dep. 250:6-250:25, 254:6-254:19).]

**RESPONSE TO NO. BR27.  Disputed and incomplete.  The Brazos Program Review does not mention the TTPA "in addition to" the "the policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form," but rather states that the review was**

to evaluate the lender's compliance with the TTPA and goes on to say that the "review was limited to the policies and procedures policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form." McMahon Dec., Ex. III.5 (ED-B¬001390-1397, at ED-B-001392). In the same section, the report also states that a "statistical random sample of borrowers was extracted to verify compliance with the Federal requirements." ED-B¬001390-1397 at ED-B-001392). (McMahon Dec., Ex. III.5)

The Program Review contained the "Disclaimer" that: "Absence of statements in this report about specific practices or procedures followed by BHEA should not be construed as acceptance, approval, or endorsement of those practices or procedures. The specific nature of this report does not limit or lessen BHEA's obligations to comply with all provisions of the Family Federal Education Loan Programs." ED-B¬001390-1397 at ED-B-001393. McMahon Dec., Ex. III.5 This disclaimer is in most all program review reports. *See* Criswell Tr. 251:13-252:20 (Soni Dec., Ex. 26).

All of the Program Reviews findings were actually disclosed to Mr. Criswell by Brazos, rather than discovered by the Department. Criswell Tr. 255:2-7 (Soni Dec., Ex. 26).

**BR28.** The Program Review Report stated that, "Recycling, Refunding and Transferring activities with bonds and loans were validated through the review of IRS Forms 8038, Tax Regulatory Agreements (Bond Amounts and Arbitrage Disclosures), Bond Official Statements, bond genealogy spreadsheets, loan/bond activity charts, and 9.5 percent floor loan samples." [Ex. III.5 at (ED-B-001393); Ex. III.15 (Criswell Dep. 175:17-177:2).]

**RESPONSE TO NO. BR28.   Disputed in that no context is provided for this quote, but the quote is correct.   Incomplete in that the Program Review also states that "[w]ith the use of 50 loan samples from the September 2005 LaRS, loans were tracked from there present issues to the pre-10/1/93 tax-exempt issues by using the loan/bond activity charts." ED-B-001393 (McMahon Dec., Ex. III.5).**

**BR29.** Part of this review process was to validate the transferring activities to ensure that 9.5% SAP loans had spent time in an eligible tax-exempt bond. [Ex. III.15 (Criswell Dep. 175:17-177:2).]

**RESPONSE TO NO. BR29.   Incomplete.   Sampling methodology was used as part of this review.   *See* Response to BR28, *supra*.**

**BR30.** Two of the findings in the program review report related to overbilling for 9.5% SAP. [Ex. III.5, at (ED-B-001395); Ex. III.15 (Criswell Dep. 179:22-181:13).] These overbillings were inadvertent coding errors identified by Brazos prior to the review. [*Id.*] Brazos repaid the overbilled amounts through a quarterly adjustment on their LaRS 799. [*Id.*]

**RESPONSE TO NO. BR30.   Incomplete.   *See* Response to BR27, *supra*.**

**BR31.** The third finding related to an underbilling of 9.5% SAP by Brazos. [Ex. III.5 at (ED-B-001396; Ex. III.15 (Criswell Dep. 182:16-182:21).] A Brazos 2002 bond collapse designed to ease the administrative burden of the trusts resulted in a lack of a separate cash account for recycled funds from loans financed with 9.5% SAP. [Ex. III.5 at (ED-B-001396).] As stated in the Program Review Report, "[c]onsequently, BHEA has billed on some loans acquired with eligible re-cycled funds at the non-floor rate resulting in under-billing." [*Id.*] The principal amount of loans acquired with floor eligible funds from December 31, 2002

through September 30, 2005 totaled over $65 million. [*Id.*] The Program Review Report, under "Required Action" for the third finding, states, "BHEA may, if it chooses, determine the amount of special allowance under billed and make the necessary adjustments on LaRS Form." [*Id.*]

**RESPONSE TO NO. BR31.  Incomplete.  *See* Response to BR27, *supra*.  Brazos chose not to proceed with billing for these amounts.  Watson Tr. 183:10-184:6 (Soni Dec., Ex. 10).**

      5.      2007-2008

**BR32.** Brazos filed a LaRS 799 for the quarter ending September 2006 claiming, among other monies, 9.5% SAP on loans. [Ex. III.12 (Turman Dep. 229:8-230:1).] Based on a subsequent ruling by ED, this was the final quarter for which the Department paid 9.5% SAP claims to Brazos. [*Id.*] Brazos did not claim 9.5% SAP after settling with ED as mentioned below. [*Id.*]

**RESPONSE TO NO. BR32.  No dispute.**

**BR33.** ED issued a Dear Colleague Letter designated DCL FP-07-01 that attached a template letter to lenders that had billed for 9.5% SAP. [McMahon Decl., Ex. III.16 (Trubia Dep. 20:13-21:5).] In a version of this template letter dated January 24, 2007, ED offered Brazos a settlement that would comprehensively resolve issues related to the source of funds used to secure loans billing 9.5% SAP. [McMahon Decl., Ex. III.6 (B9000232-35); Ex. III.16 (Trubia Dep. 15:12-16:1).]

**RESPONSE TO NO. BR33.** Disputed that ED "offered Brazos a settlement that would comprehensively resolve issues related to the source of funds used to secure loans billing 9.5% SAP." The letter does not include the words "settle" or "settlement."

The Higher Education Act does not grant DEd authority to settle claims but only limited authority to compromise claims "with respect to[] the functions, powers, and duties, vested in him by this part" – *i.e.*, the part of Title 20 entitled "Federal Family Education Loan Program." *See* 20 U.S.C. § 1082(a) (emphasis added).

The agreement between Nelnet and the Department provided:

> The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present, or future violations by Nelnet, its officers, or employees of the criminal laws of the United States or any action against Nelnet, its officers, or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33.

Trubia Ex. 9, at 8 ¶ K (Nelnet-DEd Jan. 19, 2007 Settlement Agreement) (Soni Dec., Ex. 129). Similarly, during a deposition of DEd, DEd's corporate witness, Patricia Trubia, confirmed that her "understanding is the department does not handle False Claims Act. That's handled by Justice under title 31." Trubia Tr. 53:8-16 (Soni Dec., Ex. 27). DEd's corporate witness affirmed that this "settlement" was not "trying to do something more for the other lenders than [DEd was] doing for Nelnet" but was merely "trying to put them on a level playing field." *Id*. at 52:3-9 (Soni Dec., Ex. 27).

In official written responses to questions posed during a 2007 congressional hearing, the Secretary of Education directly stated with respect to its asserted settlement that "the Department of Justice is not foreclosed from pursuing, as appropriate, separate remedies under other applicable provisions of the law, including the False Claims Act." Trubia Ex.

7 at 20 (DEd's July 6, 2007 official responses to May 16, 2007 written questions from the House Committee on Education and Labor to Education Secretary Spellings) (Soni Dec., Ex. 128); *see also* Trubia Tr. 54:16-19 ("Q. Do you know of anything that's specified to these other lenders that they were released from claims under the False Claims Act?  A. Not that I'm aware of.") (Soni Dec., Ex. 27), 74:13-16 (confirming that asserted settlement with lenders "did not control the False Claims Act administered by the Department of Justice").  DEd's corporate witness confirmed that this written response "state[s] the official position of the department."  *Id*. at 55:13-56:10, 94:19-95:5.

**BR34.** If a holder of 9.5% SAP loans complied with or accepted the ED's interpretation of the statutory and regulatory requirements for eligibility for 9.5% SAP contained in the letter, then ED released all claims against the lender to recoup historic 9.5% SAP based on source of funding. [Ex. III.6 at (B9000235); Ex. III.16 (Trubia Dep. 17:18-18:5, 20:13-21:5).]

**RESPONSE TO NO. BR34.  Disputed that ED "released all claims."** *See* **Response to BR 33,** *supra.*

**BR35.**  A holder of 9.5% SAP loans could accept ED's settlement offer simply by not billing for 9.5% SAP past September 30, 2006. [Ex. III.16 (Trubia Dep. 45:3-45:12).] A holder of 9.5% SAP loans did not need to execute a document memorializing acceptance of the ED's offer. [*Id*. (Trubia Dep. 46:6-47:6); Ex. II.77 at (ED-E-000021).]

**RESPONSE TO NO. BR35.  Disputed and incomplete.** *See* **Response to BR 33,** *supra.*

**BR36.** ED believed that neither individual taxpayers nor the Department of Justice had the authority to challenge ED's settlement with other lenders via DCL FP-07-01, although the Department of Justice was not precluded from pursuing other "appropriate" remedies, including the False Claims Act. [Ex. III.16 (Trubia Dep. 100:2-100:15, 55:13-56:7); Ex. II.77 at (ED-E-000021).]

**RESPONSE TO NO. BR36.  Incomplete.  *See* Response to BR 33, *supra*.**

**BR37.** Patricia Trubia, testifying as ED's Federal Rule 30(b)(6) designee on the settlement issue, agreed that if Brazos stopped billing 9.5% SAP after September 30, 2006, she had no doubt that ED had released any claims it had against Brazos related to historical 9.5% SAP billing based on funding source prior to September 30, 2006. [Ex. III.16 (Trubia Dep. 99:14-99:21).]

**RESPONSE TO NO. BR37.  Disputed and incomplete.  Trubia also testified that False Claims Act based claims were not being released.  *See* Response to BR 33, *supra*.**

### 6.    Results of 2004 Transfers

**BR38.** All special allowance payments received by BHEA were allocated by BHESC employees to the applicable BHEA bond issue. [Ex. III.12 (Turman Dep. 231:1-231:18).] These monies had to trickle through the "waterfall," or prioritized disbursements, before any residual cash could accrue to Brazos. [Ex. III.11 (Watson Dep. 156:5-156:21).] Brazos has never taken 9.5% money out of a bond even when there were residuals after running through the waterfall. [*Id*.]  (Watson Dep. 170:3-170:8, 185:19-186:1).] Any revenue accrued from the transfers was paid to individual bond issues or went to borrower benefits. [Ex. III.12 (Turman Dep. 31:1432:10).]

**RESPONSE TO NO. BR38.   Disputed and incomplete.   Revenue also went to the purchase of additional loans as well as to payment of costs.   Watson Tr. 158:22-160:22 (Soni Dec., Ex. 10).   Increasing 9.5% Loan revenues permitted Brazos to issue more debt and more loans.   This directly resulted in the potential for employees to obtain higher compensation under the company's management incentive program.   *Id.* at 164:11-167:3 (Soni Dec., Ex. 10).   Payments were made to by BHEA to BHESC for its services.   *Id.* at 163:18-164:2 (Soni Dec., Ex. 10).**

### 7.      Original Source

**BR39.** Prior to filing his original complaint, Oberg obtained various spreadsheets from Congressional offices relating to 9.5% SAP. [McMahon Decl., Ex. III.17 (Oberg Dep. 357:2-358:4, 361:5-366:10).] Oberg obtained a draft spreadsheet dated May 6, 2004 from James Kvaal showing the top 20 holders of 9.5 Loans by quarter (including Brazos). [McMahon Decl., Ex. III.7 (OBERG0007690, OBERG00008352); Ex. III.17 (Oberg Dep. 362:15-363:1; 734:2-736:4).] The spreadsheet was provided to Mr. Kvaal by ED. [Ex. III.7 (OBERG0007690, OBERG00008352); Ex. III.17 (Oberg Dep. 362:15-363:14).]

**RESPONSE TO NO. BR39.   Incomplete.   *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR40.** On or about August 15, 2004, Oberg received spreadsheets from Michael Dannenberg, Senior Counsel to the Senate's Health, Education, Labor and Pensions ("HELP") Committee. [Ex. III.1 7 (Oberg Dep. 376:20-380:20).] The spreadsheets provided the amount paid on 9.5 SAP claims and total 9.5 Loan holdings for all 9.5 Loan holders (including BHEA).

[McMahon Decl., Ex. III.8 (OBERG00007702-10).] Mr. Dannenberg obtained the spreadsheets from ED and provided them to Oberg at his request. [Ex. III.17 (Oberg Dep. 380:21-381:10, 386:12-387:19).]

**RESPONSE TO NO. BR40.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR41.**   On or about March 2007, Oberg received a spreadsheet from Claudette David, a staff assistant on the Senate Subcommittee on Federal Financial Management, showing 9.5% loan holdings and 9.5% SAP claims by lender. [McMahon Decl., Ex. III.9 (OBERG00007772-73); Ex. III.17 (Oberg Dep. 392:15-394:3).] Senators Coburn and Carper obtained this spreadsheet from the Secretary of Education. [Ex. III.17 (Oberg Dep. 396:14-396:19).]

**RESPONSE TO NO. BR41.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR42.**   Approximately two months before filing his initial complaint, Oberg obtained spreadsheets from the office of Representative Thomas E. Petri. [Ex. III.1 7 (Oberg Dep. 422:15-423:13, 427:3-428:19).] The Petri Spreadsheets provided 9.5 SAP claims and principal balances of 9.5 Loans. [McMahon Decl., Ex. III.1 0 (OBERG00007760-71); Ex. III.17 (Oberg Dep. 427:3-428:19).] Representative Petri's office obtained the spreadsheets from ED, which had provided the spreadsheets to the House Committee in response to a question from Representative Petri in the course of the House Committee's public hearing and investigation. [Ex. III.17 (Oberg Dep. 429:1-429:9).]

**RESPONSE TO NO. BR42.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR43.**  Oberg lifted the data relating to BHEA in the Petri spreadsheets and used them in his complaint. [Ex. III.17 (Oberg Dep. 742:7-743:8).] The data lifted from the Petri spreadsheets relating to BHEA's 9.5% loan balances was included in paragraph 58(d) of Oberg's original complaint and has appeared in all subsequent complaints. [*Id.*]

**RESPONSE TO NO. BR43.   Disputed and incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR44.**  Prior to filing his initial complaint, Oberg knew nothing about BHEA's 9.5 SAP practices other than the data contained in the spreadsheets he obtained from Congress described above. [Ex. III.17 (Oberg Dep. 757:17-758:2).]

**RESPONSE TO NO. BR44.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**Relator requested and received a spreadsheet from a Congressional staff member, James Kvaal.  *Id.* (Ex. 8 thereto).  Dated May 6, 2004, the spreadsheet showed the top twenty holders of 9.5% Loans in rank order by quarter, starting with the third quarter of 2002 and ending with the first quarter of 2004.  During this time, Brazos, (i.e., "USB TRUSTEE FOR BHEA INC") went from being unranked in Q3 2002, to being fifth in Q4**

2003, and back to being thirteenth in Q1 2004.  The increase between Q3 of 2002 and Q4 of 2003 was a minimum of $521 million, or 317%.  *See* Relator's Resp. to Brazos' Interrog. No. 1  (Soni Dec., Ex. 112).

In April of 2004, DEd-OIG, which was preparing to audit lenders in response to Relator's earlier complaints, contacted Relator for any further information he might have regarding his investigation.  On May 14, 2004, based on the spreadsheet from Kvaal and other analysis, Relator decided to report Brazos to ED-OIG as of the "Texas entities" that exhibited a significant, rapid and unlawful increase in their 9.5% loan pools over a short period of time.  *See* OBERG0008723 (Soni Dec., Ex. 205); Oberg Tr. 713:9-714:1 (Soni Dec., Ex. 32).  Thus, by this time, Relator had formed a view that Brazos had submitted improper claims in 9.5% SAP.  Documents referenced in B39-43 merely confirmed Relator's conclusion at that time.  *See* Relator's Resp. to Brazos' Interrog. No. 1  (Soni Dec., Ex. 112).

## B.    Undisputed Facts Concerning Education Loans Inc. and Student Loan Finance Corp.

### 1.    Background

**EL1.**   Education Loans Inc. (EdLinc) is a wholly owned subsidiary of Student Loan Finance Corp. (SFLC). SLFC is the corporate successor to a not-for-profit entity (also called SLFC) that was incorporated in 1978 and authorized to issue tax-exempt debt in furtherance of its activity as a secondary market buyer of loans made to students (or parents of students) residing or attending school in South Dakota, *i.e.,* South Dakota "nexus" loans. SLFC and EdLinc were incorporated when the not-for-profit SLFC converted to a for-profit

corporation through a series of transactions in 1997 and 1998. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 3).]

**RESPONSE TO NO. EL1.   Incomplete.  EdLinc has no independent employees, and SLFC employees perform all of EdLinc's operations.  Buckmeier Tr. 19:8-9, 21:20-22:16 (Soni Dec., Ex. 1); Sanderson Tr. 186:3-11 (Soni Dec., Ex. 2).**

### 2.   EdLinc's 1998-1 and 1999-1 Bond Indentures

EL2.   At the time SLFC converted to a for-profit corporation, it issued its series 1998-1 bond obligations. The 1998-1 bond obligations refunded various SLFC obligations, including several tax-exempt bond issuances that had been originally issued by SLFC prior to October 1, 1993. EdLinc assumed liability for the 1998-1 bond obligation and correspondingly acquired student loan and other assets that were refinanced by the 1998-1 bond obligation. The tax-exempt portion of the 1998-1 bond obligation had not matured or been retired or defeased as of December 31, 2006. Such assets and debt are held in an indenture of trust. U.S. Bank National Association serves as the trustee for the 1998-1 indenture of trust. SLFC is the servicer and administrator of the 1998-1 indenture of trust. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 4); Ex. IV.2 (Relator's Resp. to Request for Admission #7).]

**RESPONSE TO NO. EL2.   No dispute.**

EL3.   $57,270,000 of the tax-exempt obligations in the 1998-1 indenture refunded prior tax-exempt obligations that were originally issued prior to October 1, 1993. SLFC recorded and tracked funds in a series of general ledger accounts, including one that used the SLFC bond code of 24 ("Bond Code 24"). The initial deposit recorded into Bond Code 24 was a tax-exempt portion of the proceeds of the 1998-1 bond obligation, which was then used to refund

tax-exempt debt issued by SLFC's predecessor that had been originally issued prior to October 1, 1993, and to acquire their remaining unused acquisition funds. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 7); Ex. IV.2 (Relator's Resp. to Request for Admission #7).]

**RESPONSE TO NO. EL3.   No dispute.**

**EL4.**   The $57,270,000 in Bond Code 24 was eligible to make or purchase student loans eligible for 9.5% SAP. The 1998 obligations that generated the $57,270,000 had not matured, or been retired or defeased, as of December 31, 2006. [McMahon Decl., Ex. IV.2 (Relator's Resp. to Requests for Admission #7-8).]

**RESPONSE TO NO. EL4.   Disputed that the 1998 obligations had not been retired or defeased.**

**EL5.**   In 1999, EdLinc issued its series 1999-1 taxable bond obligations and subsequently acquired student loan and other assets with the proceeds of the 1999-1 bond issuance, all of which are held in its 1999-1 indenture of trust. U.S. Bank National Association serves as the trustee for the 1999-1 indenture of trust. SLFC is the servicer and administrator of the 1999-1 indenture of trust. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 5).]

**RESPONSE TO NO. EL5.   Incomplete.  Using its 1999-1 indenture of trust, EdLinc issued four SLABS (Student Loan Asset Backed Securities) offerings, the Series 1999-1, Series 2000-1, Series 2001-1 and Series 2002-1, which it used in connection with its 9.5% program.  Buckmeier Tr. 60:20-62:3 (Soni Dec., Ex. 1).**

**EL6.**   Both the 1998-1 and 1999-1 indentures permit earnings from loans and other investments held as collateral to be "recycled," or reinvested, to purchase new loans within the indenture. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 6).]

**RESPONSE TO NO. EL6.   No dispute, but for clarity, the purchase of new loans with indenture "earnings" did not necessarily qualify such loans for 9.5% SAP eligibility. EdLinc's methods for generating cash in the 1998-1 indenture are set forth in Responses to EL9-11, *infra*.**

**EL7.**   As of August 31, 2003, EdLinc held loans with an outstanding principal balance of $57,791,30.44 that were eligible for 9.5% SAP, and had $5,554,977.08 in cash and $2,570,503.89 in accrued interest and special allowance payments receivable as collateral within Bond Code 24. At that time, EdLinc's holdings of student loans that were held as collateral for all its taxable and tax-exempt bond issuances totaled $1,261,852,100.12. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 8); Ex. IV.2 (Relator's Resp. to Request for Admission #9).]

**RESPONSE TO NO. EL7.   No dispute; however, EdLinc's total holdings of student loans is not a material fact.**

### 3.     EdLinc's Purchase of Loans

**EL8.**   EdLinc increased its holdings of 9.5 SAP loans between September 2003 and September 2004 through a series of purchases of South Dakota nexus loans. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 72:17-72:20; 82:14-86:4; 168:3-170:9).]

**RESPONSE TO NO. EL8.   Disputed that the loans purchased were 9.5% SAP eligible.  EdLinc more than tripled the dollar amount of loans on which it claimed 9.5 SAP by transferring loans from its tax-exempt 1998-1 indenture to its taxable 1999-1 indenture and replacing loans in its 1998-1 indenture.  EdLinc increased its 9.5% SAP loan pools from $57.79 million dollars to $169.97 million dollars in one year's time.  *See* EdLinc's Resp. to Interrog. No. 3 (Chart of Floor Loan History, pp. 8, 10) (Mills Dec., Ex. 2).  *See also* Responses to EL9-11, *infra*.**

EL9.   In September 2003, EdLinc transferred $28.4 million in South Dakota nexus loans that its 1998-1 bond indenture had purchased as a buyer in the secondary market over time to its 1999-1 bond indenture. The 1999-1 indenture paid cash to the 1998-1 indenture in the amount of the outstanding principal balance of the loans, accrued interest, plus a premium estimated to be what a fair value sale in the current market would command. The 1998-1 indenture used the cash proceeds obtained in consideration of the transfer to purchase new South Dakota nexus loans from independent lenders. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 79:12-79:22; 82:14-83:14; 138:18-142:2); Ex. IV.1 (Buckmeier Decl. at ¶ 10).]

**RESPONSE TO NO. EL9.   Incomplete.  EdLinc first transferred loans to SLFC's GOAL Funding II financing vehicle from its 1999-1 indenture, thereby leaving funds available in the 1999-1 indenture.  Buckmeier Tr. 125:19-127:11; 134:14-135:4 (Soni Dec., Ex. 1).  The 1999-1 indenture then replaced the loans it transferred to GOAL Funding II with loans from the 1998-1 indenture (transferring cash from the 1999-1 indenture to the 1998-1 indenture, and loans from the 1998-1 indenture to the 1999-1 indenture).  *Id.*  The**

**1998-1 indenture then used the cash that it received from the 1999-1 indenture to purchase replacement loans from third parties.** *Id.*

EL10.  Between September 2003 and September 2004, EdLinc made 10 more periodic transfers of 9.5 SAP loans from its 1998-1 to its 1999-1 indenture. Each time, the 1999-1 indenture paid cash in the amount of EdLinc's cost basis, which was determined to represent fair market value, for the loans purchased. Each time, the 1998-1 indenture used the proceeds of the transaction to invest in collateral pledged to the 1998-1 indenture in the form of new South Dakota nexus loans purchased from independent lenders. EdLinc claimed 9.5 SAP for all loans transferred to the 1999-1 indenture, as well as all new loans purchased by the 1998-1 indenture using consideration obtained in the transactions. [McMahon Decl., Ex. IV.2 (Relator's Resp. to Request for Admission #11); Ex. IV.15 (Buckmeier Dep. at 138:15-142:2; 168:3-170:9); Ex. IV.1 (Buckmeier Decl. at ¶¶10-11); Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL10.  Disputed and incomplete.  Buckmeier testified that some of the new loans in the 1998-1 indenture were consolidation loans that EdLinc originated.  Buckmeier Tr. 77:21-78:14 (Soni Dec., Ex. 1).  EdLinc's first move of loans, $28.43 million in September 2003, was initially transferred from the 1998-1 Indenture to EdLinc's GOAL Funding II facility.  However, EdLinc shortly thereafter changed its plans and reversed the transaction, moving the loans back to the 1998-1 Indenture and then on to the 1999-1 indenture.  *Id.* at 80:8-81:14.  Buckmeier testified that EdLinc similarly could have reversed any of the later transactions had it wanted.  *Id.* at 150:1-18.  The transfer of loans from the 1998-1 indenture to the 1999-1 indenture was not documented with purchase agreements.  *Id.* at 145:22-147:2.  The transfer of loans from the 1998-1 indenture**

to the 1999-1 indenture did not involve arms length negotiations, the transactions were not taxable events, and no detailed valuation process of the collateral was undertaken after the first transfer. *Id.* at 149:3-21. After the first transfer, the transfer of loans from the 1998-1 indenture to the 1999-1 indenture was made at the cost to the 1998-1 indenture for purchasing the loans and no gain or loss was recognized. *Id.* at 148:1-18. EdLinc was the beneficial owner of both the 1998-1 indenture to the 1999-1 indenture, and the 1998-1 indenture and the 1999-1 indenture had the same trustee. *Id.* at 147:15-22.

**EL11.** EdLinc did not swap loans from its own portfolio, or from portfolios or related entities, to convert existing Full-SAP loans to 9.5 SAP loans. All proceeds from the transfers were used to purchase loans from independent sellers with no corporate relationship to EdLinc or SLFC. [McMahon Decl., Ex. IV.15 (Buckmeier Dep. at 77:21-79:7, 83:9-86:4, 153:15-154:4); Ex. IV.1 (Buckmeier Decl. at ¶ 11); Ex. IV.16 (Kohles Dep. at 88:16-89:17).]

**RESPONSE TO NO. EL11.** Disputed and incomplete. *See* Response to EL10, *supra*. It is unclear what is meant by "swap" in the asserted fact; however if it is proposed that EdLinc did not exchange loans from it 1998-1 indenture for loans from its 1999-1 indenture with the purpose of gaining 9.5% SAP eligibility for all such loans, no dispute. EdLinc was the beneficial owner of both the 1998-1 and the 1999-1 Trust and did transfer loans from the 1998-1 indenture to the 1999-1 indenture to maximize its 9.5 SAP returns. *See* EL10 and Response thereto, *supra*.

**EL12.** EdLinc increased its holdings of 9.5 SAP loans from $67,452,345.63 in September 2003 to $169,968,655.95 in September 2004. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL12.   Incomplete.  EdLinc's 9.5 SAP loan balance peaked at $186,924,549.58 by March of 2005.  *See* ELI3.**

EL13.  EdLinc's 9.5 SAP loan balance increased to a high of $186,924,549.58 in March 2005. This additional growth resulted from the reinvestment of interest, principal payments, and other income from the loans that were in the 1998-1 indenture before the TTPA was enacted. At its apex, the outstanding balance of EdLinc's 9.5 SAP loan portfolio represented 11.6% of its entire student loan portfolio held as collateral for all its outstanding debt, taxable and tax-exempt. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶¶14-15); Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL13.   Disputed that this loan balance actually qualified for 9.5 SAP.  The percentage of EdLinc's total loan portfolio that its 9.5 SAP loans represented is not a material fact.**

### 4.   The Proposal to Manage EdLinc's Portfolio To Increase 9.5 SAP Loans

EL14.  The proposal to increase EdLinc's 9.5 SAP loan holdings originated with an industry consulting firm, Aurora Consulting Group LLP. One of Aurora's principals, Larry O'Toole, was a lawyer and member of SLFC's board of directors who had extensive experience in the student loan industry as former CEO of Nellie Mae. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 164:10-165:18); Ex. IV.17 (Sanderson Dep. at 49:11-50:7; 70:8-70:17).]

**RESPONSE TO NO. EL14.   Incomplete.  Mr. O'Toole did not represent himself as giving legal advice in his capacity as a consultant for Aurora Consulting Group LLP**

("Aurora"), and in fact encouraged EdLinc to seek the advice of an attorney before implementing the proposal. *See* Sanderson Ex. 1 at ELI-HC00000043 (McMahon Dec., Ex. IV.4). Neither EdLinc nor SLFC sought the advice of counsel. Sanderson Tr. 174:13-17 (Soni Dec., Ex. 2). Also, Mr. O'Toole, who was a paid director SLFC, had a strong financial interest in this proposal, as he entered into a fee agreement with EdLinc to receive 2% of the "take" of EdLinc's loan transfers, a sum ultimately totaling $1,013,534.97. *See* EdLinc's Resp. to Interrog. No. 20 (Soni Dec., Ex. 148); Kohles Tr. 214:10-215:19 (Soni Dec., Ex. 3).

**EL15.** On April 21, 2003, Mr. O'Toole proposed that Aurora develop portfolio management strategies for SLFC to increase the yield on EdLinc's loan portfolio in conformity with DOE regulations and interpretative guidance. [McMahon Decl., Ex. IV.4 (ELI-HC00000043 — ELI-HC00000046, at ELI-HC00000045).]

**RESPONSE TO NO. EL15.** Incomplete. Norg Sanderson, SLFC's Chief Executive Officer, immediately passed the faxed proposal along to Steve Kohles, SLFC's Chief Operating Officer, with a handwritten note on the cover of the proposal directing: "Great idea. Needs to be done." Facsimile from Larry O'Toole to Norg Sanderson of April 23, 2003 at ELI-HC00000043 (McMahon Dec., Ex. IV.4); Sanderson Tr. 64:21-65:22; 67:3-6 (Soni Dec., Ex. 2); Kohles Tr. 47:3-7 (Soni Dec., Ex. 3). Sanderson did not follow up with Kohles, but understood that Kohles was planning for the implementation of the program. Sanderson Tr. 90:3-22 (Soni Dec., Ex. 2). *See* Responses to EL16, 17, *infra*.

EdLinc's decision to engage in the above-described series of loan transfers was motivated by its desire to increase its profitability. Sanderson Tr. 88:7-11 ("Q. So what

you cared about was whether he could get additional dollars in the door?  A.  Yes.  Q.  And

that's all you cared about?  A.  Yes.") (Soni Dec., Ex. 2); Buckmeier Tr. 47:12-17, 155:8-18

("Q.  Well, I take it the whole purpose of the process was for the SAP payments to go up,

right?  MS. KRIS:  Objection.  Buckmeier: The whole purpose, as I understood it, was to

improve our profitability; to make the best with what we have to, you know, increase our

bottom line so that we could survive and continue in the secondary market and fulfill our –

fulfill function.") (Soni Dec., Ex. 1).

EL16.  On August 5, 2003, Aurora provided a detailed memorandum, *Memorandum on

Indenture Planning and Special Allowance Management,* that set forth DOE regulatory

developments since the 1980 creation of the 9.5 SAP/half SAP regime, and provided specific

recommendations for action by SLFC to transfer and purchase loans to increase EdLinc's 9.5

SAP loan holdings. [McMahon Decl., Ex. IV.5 (ELI-HC00000178 — ELI-HC00000230).] The

memo explained:

> The types of transfers described ... are representative of asset-liability
> management strategies that have been in use by other FFELP loan
> holders for several years. These lenders have active programs to refinance
> loans pledged to their tax-exempt financings with taxable financing in an
> effort to 'bank' earnings from increased SAP as an offset to past and
> future yield limitations in a high interest rate environment. The clarity of
> Section 302(e) [34 C.F.R. § 682.302(e)] language itself, consistent
> regulatory interpretative guidance and the adaption of billing forms to
> accommodate the revised regulatory language provide ample support for
> the increased SAP billing received as a result of these strategies. [*Id.* at
> ELI-HC00000182.]

**RESPONSE TO NO. EL16.   Incomplete.  Mr. Sanderson, EdLinc's CEO, testified**

**that he never read the August 5, 2003 memorandum ("Aurora Memo"), nor did he care**

**what it contained, but immediately forwarded the Aurora Memo and a fee agreement to**

**the Compensation Committee of SLFC's Board recommending approval. Sanderson Ex. 4**

(Soni Dec., Ex. 94); Sanderson Tr. 93:5-22, 94:15-95:1, 103:8-11 (Soni Dec., Ex. 2). SLFC's
Compensation Committee recommended approval to the Board on September 17, 2003 and
the Board approved the Aurora fee agreement and plan the next day. Sanderson Ex. 6
(Soni Dec., Ex. 95); Sanderson Tr. 112:2-21 (Soni Dec., Ex. 2). Mr. Sanderson did not read
the Aurora Memo. *Id*. at 95:2-97:2. Mr. Sanderson instead turned the project over to
Kohles, and gave no further oversight of the program at the CEO level. *Id*. at 123:8-24:9.
Sanderson had only a "very general" understanding of the laws governing student loans.
*Id*. at 35:14-36:20, 43:4-44:11 (unsure of special allowance payment applicability to tax-
exempt and taxable financings); 45:13-46:17 (no understanding of the 1993 OBRA
implications on SAP); 46:10-47:12. Sanderson relied upon his bond counsel to provide
legal advice in these types of matters. *Id*. at 46:10-17. ("Let's just make it real clear. I did
not follow the rules and regulations of the Department of Education. I depended on our
financing attorneys to make sure we were compliant with the law. That's my personal
understanding of how this worked."). The Aurora Memo itself, in a letter from Sheila
Ryan, an employee of Aurora, notes that the Department took a position on 9.5 SAP loans
because it did "not want non-profit entities to move loans to various debts to maximize
yield." Memorandum on Indenture Planning and Special Allowance of August 5, 2003 at
ELI-HC00000209 (McMahon Dec., Ex. IV.5); *see also* Responses to EL17, 24-26, *infra*. The
Aurora Memo specifically states that "Aurora Consulting, LLC is not a law firm and is not
offering legal advice to SLFC on any matters. To the extent any legal issues are raised or
implicated by the information provided in this memorandum, <u>SLFC should seek legal
advice from its advisors</u>." Memorandum on Indenture Planning and Special Allowance of

August 5, 2003 at ELI-HC00000180 (emphasis added) (McMahon Dec., Ex. IV.5).  No such

legal opinion was obtained.  Sanderson Tr. 174:13-17 (Soni Dec., Ex. 2).

　　　**EL17.**  SLFC's Chief Operating Officer and Chief Financial Officer, Steve Kohles, read

the Aurora memo and understood the proposal to be legal—a determination he based on the

documentation contained in the memo itself, as well as on Mr. O'Toole's experience in the

industry and familiarity with the Department's regulations. Larry Buckmeier, a member of

SLFC's accounting department who managed the implementation of the proposal, also read

the Aurora memo and understood the program to be legal. [McMahon Decl., Ex. IV.16

(Kohles Dep. at 84:13-85:3; 164:10-165:18); Ex. IV.1 (Buckmeier Decl. at ¶¶ 9-10); *see also* Ex.

IV.15 (Buckmeier Dep. at 104:2-105:11).]

　　　**RESPONSE TO NO. EL17.**  **Disputed and incomplete.  Kohles is not an attorney,**

**and did not vet the proposal with an attorney.  Kohles Tr. 78:18-79:6, 80:4-13 (Soni Dec.,**

**Ex. 3).  Buckmeier has testified to the same.  Buckmeier Tr.  107:9-108:4 (Soni Dec., Ex. 1).**

**Kohles testified that his recollection of the scope of outside advice sought with respect to**

**the Aurora plan was to ask bond counsel if the trust indentures allowed the contemplated**

**transactions.  Kohles Tr. 78:18-79:6, 80:4-13 (Soni Dec., Ex. 3).  He testified that he had no**

**recollection of conversations regarding whether the program should be implemented,**

**stating that Sanderson and the Board thought it was a good idea.  Kohles Tr. 74:4-77:1**

**(Soni Dec., Ex. 3).  Neither Kohles nor Buckmeier, the officer who had principal**

**responsibility for effectuating the loan transfers to carry out the plan, had discussions with**

**O'Toole regarding the Aurora Memo or plan.  Kohles Tr. 73:13-74:3 (Soni Dec., Ex. 3);**

**Buckmeier Tr. 107:22-08:4 (Soni Dec., Ex. 1).  Buckmeier testified that he understands a**

**"little bit" of the statutory developments but is not an expert on them.  *Id.* at 33:21-34:6**

(Soni Dec., Ex. 1).  Buckmeier's involvement was related to implementation only and he was not consulted on whether the plan should be adopted. *Id.* at 45:16-46:5. *See* Responses to EL16, *supra*, with respect to the Aurora Memorandum's recommendation to seek legal advice.

EL18.  Steve Kohles and Larry Buckmeier believed the transfer of loans from one indenture to another in exchange for cash to be a "sale," rather than a "transfer" of those loans. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 83:14-22, 173:7-174:5); Ex. IV.15 (Buckmeier Dep. at 151:5-19).]

RESPONSE TO NO. EL18.  Disputed and incomplete. *See* Response to EL10, *supra*.

5.      SLFC Officers and Employees' Belief in the Legality of Their Actions

EL19.  SLFC began to implement the Aurora recommendations in September 2003 under the direction of Larry Buckmeier. In coordinating the plan with SLFC's information technology staff (whose assistance was needed to select and transfer loans, and to assure that proper SAP codes were applied), Mr. Buckmeier explained: "ED currently allows us to move these loans and retain floor treatment (earn 9.5% return), but they may close this 'loophole' soon, so we want to keep current on having loans acquired into Bond 24 [EdLinc's eligible pre-1993 tax-exempt bond code], moved on to another fund shortly thereafter." [McMahon Decl., Ex. IV.6 (EL100018266 – ELI00018267); Ex. IV.1 (Buckmeier Decl. ¶ 10).]

RESPONSE TO NO. EL19.  Incomplete.  Buckmeier is not an attorney and testified as to the limited nature of his knowledge of the applicable regulations.  Buckmeier Tr. 33:21-34:6 (Soni Dec., Ex. 1).  Neither SLFC nor EdLinc obtained an opinion regarding the

**legality of the Aurora recommendations. Sanderson Tr. 174:13-17 (Soni Dec., Ex. 2). Buckmeier did not do an in depth analysis of the Aurora Memo. Buckmeier Tr. 104:18-105:11 ("And I remember looking at [the Aurora memo], and I don't remember retaining a copy, but I do remember looking at it at the time and thinking, Well, it looks like it's pretty well documented. That was about the extent of it.") (Soni Dec., Ex. 1).**

**EL20.** SLFC officers and employees tracked potential changes in the governing law and guidance, including as they related to 9.5 SAP eligibility for transferred loans, over the course of the next year. Industry newsletters and conferences were a source of compliance guidance for SLFC. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 28:16-30:4; 31:22-33:1; 35:9-36:16; 153:11-156:9); Ex. IV.1 (Buckmeier Decl. at If 12).]

**RESPONSE TO NO. EL20.** **Incomplete.** *See* **Responses to EL15-19,** *supra***.**

**EL21.** On January 13, 2004, Mr. Kohles wrote to Mr. Buckmeier and SLFC's CEO (Mike Gort) to update them on legislative developments that might impact 9.5 SAP eligibility on transferred loans: "I talked to Larry O'Toole about 302.e (the code that allows the current treatment of floor loans). It is being discussed in the House and it appears from the discussion that the bond deals themselves will not be impacted but only the individual loans. Therefore, the loans that have been moved will continue to get floor treatment and only future loans (after they amend 302e.) will not get the same treatment." [McMahon Decl., Ex. IV.7 (ELI00028067).]

**RESPONSE TO NO. EL21.** **No dispute that the language is quoted accurately.**

**EL22.** SLFC's April 30, 2004 CFO Report states: "Legislation has been submitted to prohibit floor loans in Taxable Financings. To date we have moved $145,000,000. Looks like we

are done 5/5/04." [McMahon Decl., Ex. IV.8 (ELI00034883).] However, the legislation what ultimately became the TTPA—was not enacted until some five months later (October 30, 2004), with an effective date of September 30, 2004.

**RESPONSE TO NO. EL22.** **No dispute that the language is quoted accurately.**

**EL23.** In 2004, SLFC was made aware that the Government Accountability Office had concluded that Department regulations permitted 9.5 SAP eligibility for transferred and recycled loans. A September 23, 2004 email from SLFC's compliance analyst (Loren Jerde) to its CEO (Mr. Gort), COO/CFO (Mr. Kohles), and Mr. Buckmeier, forwarded an industry newsletter about the GAO Report; the newsletter reported: "The GAO acknowledges that Education regulations allow lenders to transfer 9.5 percent loans to taxable bonds and post-1993 tax-exempt bonds." [McMahon Decl., Ex. IV.9 (ELI00054312); Ex. IV.16 (Kohles Dep. at 185:9-186:17).]

**RESPONSE TO NO. EL23.** **Disputed and incomplete.  This insertion mischaracterizes the GAO report.  *See* Responses to 134-35 *supra*.**

**EL24.** Larry Buckmeier understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶16); Ex. IV.15 (Buckmeier Dep. at 104:18-105:11).]

**RESPONSE TO NO. EL24.** **Disputed and incomplete.  *See* Responses to EL15-19, *supra*, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

**EL25.** Steve Kohles understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 83:13-85:3; 164:16-169:6).]

**RESPONSE TO NO. EL25.** **Disputed and incomplete.** *See* **Responses to EL15-19,** ***supra*****, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

**EL26.** Norg Sanderson understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.17 (Sanderson Dep. at 146:13-146:15; 168:12-169:14).]

**RESPONSE TO NO. EL26.** **Disputed and incomplete.  The deposition testimony of Sanderson reveals that he could have no knowledge of the legality of EdLinc's practices as it relates to the Aurora Memo because he did not read the Aurora Memo, possessed a limited knowledge of FFELP regulations, and made no attempt to consult with outside counsel to determine the legality of the proposal.  Sanderson Tr. 95:2-97:2, 35:14-36:20, 46:10-17.  ("Let's just make it real clear.  I did not follow the rules and regulations of the Department of Education.  I depended on our financing attorneys to make sure we were compliant with the law.  That's my personal understanding of how this worked.")  (Soni Dec., Ex. 2).  Buckmeier Tr. 43:5-46:12 (Soni Dec., Ex. 1); Kohles Tr. 78:18-80:13 (Soni Dec., Ex. 3); Sanderson Tr. 46:10-17 (Soni Dec., Ex. 2).  *See* Responses to EL15-19, *supra*, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

6.    **The Decision to Stop Transferring Loans After the Effective Date of the Taxpayer-Teacher Protection Act of 2004**

**EL27.** When Congress amended the Higher Education Act to prohibit 9.5 SAP

eligibility on loans transferred after September 30, 2004, Mr. Kohles understood the amendment

as implicit confirmation that his prior understanding of the law up until that point had been

correct. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 176:22-177:22; 180:5-181:2).]

**RESPONSE TO NO. EL27.   Disputed and incomplete.** *See* **Responses to EL15-18,**

**25,** *supra*. **The Taxpayer-Teacher Protection Act prohibited the billings of 9.5% SAP on**

**loans transferred from tax-exempt to taxable financings.** *See* **JS21 and Response thereto,**

*supra.*

**EL28.** As momentum built behind the TTPA in the early fall of 2004, *The Chronicle of*

*Higher Education* reported:

> Education Department officials say they want to close the loophole, and
> have proposed legislation to do so. But they say they cannot take
> immediate action because they have determined that the loan companies'
> actions are legal, based on interpretations of the law that the Clinton
> administration offered in guidance to lenders in the 1990s. The officials
> say they cannot reverse those interpretations without proposing a new
> regulation and receiving public comment on it, a process that can take up
> to two years. [McMahon Decl., Ex. IV.10 (ELI00014764 —
> ELI00014766, at ELI00014765.]

SLFC's CEO (Mike Gort) forwarded the article to SLFC personnel on September 21,

2004, with clear instructions:

> The controversy between Republicans and Democrats over the 9.5% floor
> loans continues to build. We hold a number of such loans and will
> continue to hold and add to our holdings so long as the law allows such
> investment. Some larger organizations have taken great advantage of this
> provision. *When congress acts to limit the exception, we will, of course,*
> *follow the law to the letter.*

[*Id.* at ELI00014764 (emphasis added); *see also* Ex. IV.16 (Kohles Dep. at 182:13-184:16).]

**RESPONSE TO NO. EL28.   No dispute that the language is quoted accurately.  No context is provided with respect to the referenced "actions".  To the extent the article is offered for the position of Department of Education personnel, it is hearsay.**

**EL29.** Ten days later, when an industry newsletter reported that the TTPA had been introduced in the House and would end 9.5% SAP eligibility for loans transferred after September 30, 2004, Mr. Gort instructed the responsible SLFC personnel: "Given the proposed effective date of this legislation, *we need to stop all floor loan transfers immediately.*" [McMahon Decl., Ex. IV.11 (ELI00018691) (emphasis added).]

**RESPONSE TO NO. EL29.   No dispute that the language is quoted accurately.  *See* Response to EL27, *supra*.**

**EL30.** The last of the 11 periodic transfers occurred before September 30, 2004, the effective date of the TTPA. EdLinc made three subsequent transfers (totaling $18,092.75), which arose when a small number of 9.5% SAP loans were consolidated by students after the effective date of the TTPA. EdLinc self-identified the potential compliance problem and attempted to address it through corrective actions by reducing its net floor loan billings by the amount of these transfers. [McMahon Decl., Ex.IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 210:10-213:21, 213:15-21); Ex. IV.1 (Buckmeier Decl. ¶ 13); Ex. IV.16 (Kohles Dep. at 176:22-177:15).]

**RESPONSE TO NO. EL30.   No dispute.**

### 7.     EdLinc's Settlement with the Department

**EL31.** On January 24, 2007, Theresa Shaw, Chief Operating Officer of the

Department's Federal Student Aid program, wrote to Norg Sanderson, President of EdLinc, to

propose a settlement with the Department. The letter stated:

> The Department is committed to resolving without protracted dispute any
> potential objections both to the meaning and application of the statutory
> and regulatory requirements as restated in this letter, and to ensuring
> that SAP is paid at the 9.5 percent minimum return rate only on eligible
> loans. Therefore, the Department will not seek to recoup [9.5] SAP
> already received in excess of that payable at the standard rate for
> quarters ending on or before September 30, 2006 at the 9.5 percent
> minimum return rate for loans that were neither first-generation loans nor
> second-generation loans for those lenders that promptly comply with or
> accept, as applicable, the following--
>
> 1.     The statutory and regulatory requirements for eligibility for SAP at the 9.5
> percent minimum rate as restated in this letter;
>
> 2.     The requirement that a request for payment of SAP at the 9.5 percent rate
> be supported by [a] management certification[;]
>
> 3.     The Department's payment of all SAP claims at the standard rate,
> rather than the 9.5 percent minimum return rate, until the Department receives,
> accepts, and evaluates the results of the audit or review described here, and
> determines, after our consideration of any objection you present, which of the
> loans on which you currently claim SAP at the 9.5 percent rate are eligible for
> payment at that rate.

[McMahon Decl., Ex. IV.12 (ELI-HC00015124 – ELI-HC00015130, at ELI-HC00015127).]

**RESPONSE TO NO. EL31.   Disputed and incomplete.** *See* **Responses to JS165,**

**BR33,** *supra.*

**EL32.** EdLinc accepted the Department's offer. It accepted regular SAP pending the

audit (beginning with the fourth quarter of 2006); agreed to support claims with management

certifications; and retained an outside auditor—Grant Thornton LLP—to audit its portfolio to

determine which loans qualified for continued receipt of 9.5 SAP payments under the

January 2007 guidance. [*See* McMahon Decl., Ex. IV.13 (ELI00021373 – ELI00021382).] The audit concluded that $37,341,122 of EdLinc's 9.5 loan portfolio as of December 2006 was eligible to continue receiving 9.5 SAP according to the guidance provided in the Department's January 2007 letter. EdLinc submitted the auditors' report to the Department on October 31, 2007. [*Id.*]

**RESPONSE TO NO. EL32.** **Disputed and incomplete.** *See* **Responses to JS165, BR33,** *supra.* **The audit concluded that $37,341,122 of EdLinc's 9.5 loan portfolio as of December 2006 was eligible to continue receiving 9.5 SAP according to the guidance provided in the Department's January 2007 letter; however, based on its own records, EdLinc was tracking over $125 million in "floor" loans as a result of its 9.5% SAP eligible loan growth program for this same period in time.** *See* **EdLinc's Response to Interrog. No. 3 (Interrogatory No. 3 Chart, p. 14 or 16, "Total end-of-month balance of all floor loans" for December 2006) (Mills Dec., Ex 2).  Sanderson signed the results of this audit.  ELI00021382 (McMahon Dec., Ex. IV.13)**

**EL33.**  The Department accepted the Grant Thornton LLP audit report by letter to Mr. Sanderson on February 5, 2008, and agreed to pay 9.5 SAP on the portion of the audited portfolio deemed eligible under the Department's 2007 guidance beginning with the quarter ending December 31, 2006. The letter stated: "We have determined that the audit report is acceptable and that it properly identifies ... eligible first-generation or second-generation loans." The letter did not seek to recover for any 9.5 SAP payments made in prior quarters. [*See* McMahon Decl., Ex. IV.14 (ELI-HC00015120-ELIHC00015123, at ELI-HC00015121). ]

**RESPONSE TO NO. EL33.**  **Incomplete.** *See* **Response to EL32,** *supra.*

**PH1.**   Panhandle Plains Higher Education Authority ("PPHEA") is a nonstock Texas corporation exempt from taxation under Internal Revenue Code §501(c)(3). [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 2); Ex. V.2 (Wright Decl. ¶ 2); Ex. V.3 (G. Parker Decl. ¶ 2); Ex. V.4 at PPHEA_111368, PPHEA_111394-96); *see also* Third Amended Complaint ("TAC"), Docket No. 228 at ¶ 26.] It was organized to help students obtain a college education, particularly persons from in and around the panhandle of Texas. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 3); Ex. V.2 (Wright Decl. ¶ 3); Ex. V.3 (G. Parker Decl. ¶ 3); Ex. V.4 (PPHEA_111370, PPHEA_111368); Ex. V.26 (Baker Dep. 8:8-20, 11:20-12:14).]

**RESPONSE TO NO. PH1.   No dispute.**

**PH2.**   Since its inception, PPHEA has assisted thousands of students with obtaining college degrees. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 4); Ex. V.2 (Wright Decl. ¶ 4); Ex. V.3 (G. Parker Decl. ¶ 4).] PPHEA pays a fee to Panhandle Plains Management and Servicing Corporation ("PPMSC") to handle the logistics of servicing its student loans and to manage its day-to-day operations, as PPHEA has no employees. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 5); Ex. V.2 (Wright Decl. ¶ 5); Ex. V.3 (G. Parker Decl. ¶ 5).] The servicing fees paid to PPMSC by PPHEA were set before the increase of PPHEA's 9.5% SAP-eligible portfolio. In fact, there was a reduction in servicing fees charged over the time period that PPHEA was billing ED for 9.5% SAP. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 4) Ex. V.2 (Wright Decl. ¶ 54); Ex. V.3 (G. Parker Decl. ¶ 53).] PPHEA income in excess of expenses is used to provide borrower benefits (such as loan forgiveness or lower interest rates) or to purchase additional student loans. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.E1 5); Ex. V.2 (Wright Decl. ¶5); Ex. V.3 (G. Parker Decl. ¶ 5 Ex. V.27 ██████████████ ██████████; *see also* Ex. V.28 ████████████████████.]

**RESPONSE TO NO. PH2.   Disputed and incomplete.  The number of students with PPHEA student loans and whether PPHEA paid a reduced servicing fee to PPMSC are not material facts.  PPMSC serviced most of PPHEA's student loans and received a percentage of the loan balance as a fee for these services.  Wright Tr. 44:17-45:9 (Soni Dec., Ex. 8). PPHEA's purchase of additional student loans would increase PPMSC's revenue.  *Id.* Panhandle used excess interest to make higher bids for desired loan portfolios and compete better with other secondary lenders.  *Id.* at 206:11-207:16.**

**PPMSC "manage[s] the day-to-day operations [of PPHEA]."  Specifically, John Wright, Glenn Parker, and Jimmy Parker – all PPMSC employees – ran PPHEA's day-to-day operations.  Wright Tr. 14:5-15:8 (Soni Dec., Ex. 8); J. Parker I Tr. 32:17-33:7 (Soni Dec., Ex. 7).  In fact, Wright testified that he spent 90-95 percent of his time on PPHEA matters despite being a PPMSC employee.  Wright Tr. 14:5-23 (Soni Dec., Ex. 8).  John Wright, Glenn Parker, and Jimmy Parker also frequently attended PPHEA Board Meetings.  J. Parker I Tr. 80:1-12 (Soni Dec., Ex. 7); Wright Tr. 143:13-144:7 (Soni Dec., Ex. 8).  Cliff Baker served as the Executive Director of PPHEA while also being employed by PPMSC.  Baker Tr. 19:1-14 (Soni Dec., Ex. 24).  Currently, Neal Combs serves as Executive Director of PPHEA while also being employed by PPMSC.  J. Parker I Tr. 28:16-20 (Soni Dec., Ex. 7).**

PH3.   Both PPHEA and PPMSC (collectively herein, "Panhandle") are governed by independent boards of directors. [*See, e.g.,* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 6); Ex. V.2 (Wright Decl. ¶ 6); Ex. V.3 (G. Parker Decl. ¶ 6); Ex. V.29 ███████████████.] These persons are generally professionals from in and around Canyon and Amarillo, Texas or in West Texas who donate their time to PPHEA without compensation, with the exception of

reimbursed travel expenses. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 7); Ex. V.2 (Wright Decl. ¶ 7); Ex. V.3 (G. Parker Decl. ¶ 7).] The members on PPMSC's board are also generally professionals who, in most cases, are from, around or connected to Amarillo and Canyon, Texas. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 8); Ex. V.2 (Wright Decl. ¶ 8); Ex. V.3 (G. Parker Decl. ¶ 8).]

**RESPONSE TO NO. PH3. No dispute.**

**PH4.** As of December 31, 2002, PPHEA had bond series 1991AB, 1992AB, and 1993AB, which were outstanding pre-October 1, 1993 tax-exempt bonds (the "Patriarch Bonds"). Together, the Patriarch Bonds had a collective face value of $148,300,000. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶9); Ex. V.2 (Wright Decl. ¶9); Ex. V.3 (G. Parker Decl. ¶ 9); Ex. V.5 ██████████████] These Patriarch Bonds were not retired or defeased until the end of 2009. [McMahon Decl., Ex. V.2 (Wright Decl. ¶9).] All of the loans securing these Patriarch Bonds were eligible to receive, and did receive, so-called 9.5% SAP each quarter. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 10); Ex. V.2 (Wright Decl. ¶10); Ex. V.3 (G. Parker Decl. ¶ 10); *see also* Ex. V.6 ████████████.] PPHEA also had, and always continued to have, other 9.5% SAP-eligible and non-9.5% SAP-eligible bond estates and related loans. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶11); Ex. V.2 (Wright Decl. ¶11); Ex. V.3 (G. Parker Decl. ¶ 11).] Indeed, 9.5% SAP-eligible loans only constituted approximately 50% of PPHEA's loan portfolio at their highest amount. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 12); Ex. V.2 (Wright Decl. ¶ 12); Ex. V.3 (G. Parker Decl. ¶ 12).] PPMSC never issued any bonds related to this case and never owned any loans related to this case. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 13); Ex. V.2 (Wright Decl. ¶ 13); Ex. V.3 (G. Parker Decl. ¶ 13).]

**RESPONSE TO NO. PH4.  Disputed.  Panhandle's** contention that "[a]ll of the loans securing these Patriarch Bonds were eligible to receive, and did receive, so-called 9.5% SAP each quarter" is unclear.  It is not disputed that <u>prior to 2003</u> this was the case. Panhandle's contention that "PPHEA also had, and always continued to have, other 9.5% SAP-eligible and non-9.5% SAP-eligible bond estates and related loans" is also unclear. Whether PPHEA had loans in other bond estates which either were or were not eligible for 9.5% SAP is not material.

Although 9.5% SAP-eligible loans at most ever constituted 50% of PPHEA's loan portfolio, 9.5% SAP was a major source of revenue for PPHEA.  Panhandle estimated that in 2003 ████████████████████████████████████████████████ ████████████████████████ while Panhandle's total annual revenue in 2003 was less than $50 million.  Baker Ex. 32 at PPHEA_045537 (Soni Dec., Ex. 52); PPHEA 2003 Financials, J. Parker Ex. 3 at PPHEA_045347 (Soni Dec., Ex. 127).

Although "PPMSC never issued any bonds related to this case and never owned any loans related to this case," PPMSC controlled the day-to-day operations of PPHEA.  *See* PH2, *supra.*

The 1991AB, 1992AB, and 1993AB bond series (the "Patriarch Bonds") were also under the same indenture and had the same trustee.  J. Parker I Tr. 173:2-11 (Soni Dec., Ex. 7).

PH5.   By in or about the fall of 2002, PPHEA was continuing to expand its operations in furtherance of its Section 501(c)(3) purposes. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 14); Ex. V.2 (Wright Decl. ¶ 14); Ex. V.3 (G. Parker Decl. ¶ 14).] Accordingly, in or about

November 2002, Panhandle senior staff considered whether it would be feasible for PPHEA to issue new bonds, use the proceeds from the issuance of those new bonds to purchase the 9.5% SAP-eligible loans that resided in the Patriarch Bond estates, transfer them to secure the new bonds, and then cause the Patriarch Bonds to purchase new student loans in the open market. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 15); Ex. V.2 (Wright Decl. ¶ 15*); Ex. V.3 (G. Parker Decl. ¶15); *see also* Ex. V.6 ███████████ ██████.] A question was whether, upon the completion of this exercise (hereinafter, the process will be referred to as "Transfers"), all of the loans transferred out of the Patriarch Bond estates and those purchased into the Patriarch Bond estates to replace those transferred out would be considered eligible to receive quarterly 9.5% SAP payments. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 16); Ex. V.2 (Wright Decl. ¶ 16); Ex. V.3 (G. Parker Decl. ¶ 16); Ex. V.6 ██████████████████.].

**RESPONSE TO NO. PH5.   No dispute, but incomplete.**

**The New Bonds were created solely to allow transfers to increase 9.5% SAP. Wright Tr. 107-108 (Soni Dec., Ex. 8).  The sole purpose of the transfers was to increase Panhandle's revenue.  J. Parker I Tr. 60, 174, 281 (Soni Dec., Ex. 7); Wright Tr. 62-63 (Soni Dec., Ex. 8), PPHEA Response to Interrog. No. 4 (Mills Dec., Ex. 4).  Panhandle testified that the Transfers offered no benefit to taxpayers.  Wright Tr. 73-74 (Soni Dec., Ex. 8).**

**A loan receiving 9.5% SAP allowed Panhandle to receive a much higher interest rate on the loan.  Wright Tr. 62:12-24 (Soni Dec., Ex. 8); J. Parker I Tr. 58:21-60:11 (Soni Dec., Ex. 7).  In the early 2000s, a loan subject to full SAP would accrue interest at a rate of approximately four or five percent.  Wright Tr. 61:18-69:17 (Soni Dec., Ex. 8).**

**Panhandle's calculations show that it would receive 5.99 or 5.39 percentage points more (depending upon whether the student loan was in grace or repayment status) in special allowance interest payments from DEd for a 9.5% SAP-eligible loan than for a full SAP loan. Baker Ex. 29 at PPHEA_045870 (Soni Dec., Ex. 51); Wright Tr. 100-01 (Soni Dec., Ex. 8).**

PH6.   The Panhandle senior staff charged with examining issues relating to Transfers included James B. Parker, Glenn E. Parker and John Amos Wright II. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶17); Ex. V.2 (Wright Decl. ¶ 17); Ex. V.3 (G. Parker Decl. ¶ 17); ███████████ █████████████████.] All of these individuals had spent almost all of their entire working careers in either university financial student aid offices, at organizations similar to Panhandle or at Panhandle itself. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶1); Ex. V.2 (Wright Decl. ¶ 1); Ex. V.3 (G. Parker Decl. ¶ 1); Ex. V.27 ██████████████████████; Ex.V.28 ███████████████; Ex. V.29 █████████████████████.]

**RESPONSE TO NO. PH6.   Incomplete.  Glenn Parker is an accountant with a background in business and public accounting including a degree in Accounting.  G. Parker Tr. 9-10 (Soni Dec., Ex. 25).  After leaving Panhandle, he worked in business offices for school districts and public high schools.  *Id.* at 8:14-9:17.  Similarly, Jimmy Parker worked in a university's financial aid office until January 2001.  J. Parker I Tr. 13:18-14:15 (Soni Dec, Ex. 7).**

PH7.   Based on their experience in the student loan business, their experience dealing with ED, and their first-hand knowledge of the 1996 DCL, Messrs. Parker and Mr. Wright believed that both the loans transferred into the new bonds and the new loans purchased into the

Patriarch Bond estates would be eligible to receive 9.5% SAP. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 18); Ex. V.2 (Wright Decl. ¶ 18); Ex. V.3 (G. Parker Decl. ¶ 18); ██████████ ███████████████████████████████████████.] They had also heard, through trade organizations, that other lenders were growing their 9.5% SAP-eligible loan portfolios pursuant to the 1996 DCL. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 19); Ex. V.2 (Wright Decl. ¶ 19); Ex. V.3 (G. Parker Decl. ¶ 19); ████████████████████████████ ██████████████.]

**RESPONSE TO NO. PH7.**  Incomplete.  Beginning in late 2002, John Wright, Glenn Parker and Jimmy Parker investigated various approaches to increase the volume of Panhandle's 9.5% SAP eligible loans.  Wright Tr. 25:16-26:7, 28:4-6 (Soni Dec., Ex. 8); J. Parker I Tr. 26:15-27:4 (Soni Dec., Ex. 7).

Panhandle considered several approaches to increase 9.5% SAP.  Panhandle considered a plan to only bill for 9.5% SAP on loans transferred out of the Patriarch Bonds and not to bill 9.5% SAP on loans purchased from third parties to refill the Patriarch Bonds.  Wright Tr. 53:17-55:10 (Soni Dec., Ex. 8).  This idea was identified as the "conservative approach."  Wright Ex. 35 at PPHEA_045871 (Soni Dec., Ex. 99); Wright Tr. 53:17- 55:10 (Soni Dec., Ex. 8).  Panhandle ultimately rejected this approach.  Wright Tr. 55:6-56:2 (Soni Dec., Ex. 8); G. Parker Tr. 32:13-17 (Soni Dec., Ex. 25).

Panhandle also considered a plan to double its portfolio of loans receiving 9.5% SAP from approximately $143 million to $286 million.  Wright Tr. 91:20-92:2 (Soni Dec., Ex. 8); Baker Ex. 29 at PPHEA_045867-870 (Soni Dec., Ex. 51).  Panhandle rejected this approach as well.  G. Parker Tr. 42:8-9 (Soni Dec., Ex. 25).  Ultimately, Panhandle's

**Transfers more than tripled its portfolio of loans receiving 9.5% SAP from $148 million to over $500 million.  Wright Tr. 68:4-69:3 (Soni Dec., Ex. 8); G. Parker Tr. 77:21-25 (Soni Dec., Ex. 25).**

      **PH8.**   Messrs. Parker and Mr. Wright undertook a due diligence effort to confirm whether their understanding was accurate. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 20); Ex. V.2 (Wright Decl. ¶ 20); Ex. V.3 (G. Parker Decl. ¶ 20); ███████████████████████; *see, e.g.,* ████████████████.] Among them, they read, among other things, applicable laws pertaining to 9.5% SAP and, in or about November 2002, sought legal advice from their regular bond counsel, Kathleen Ellison of Fulbright & Jaworski, LLP. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 20); Ex. V.2 (Wright Decl. ¶ 20); Ex. V.3 (G. Parker Decl. ¶ 20); ███ ████████████████.] Ms. Ellison was, and still is, a partner at the Fulbright firm. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 21); Ex. V.2 (Wright Decl. ¶ 21); Ex. V.3 (G. Parker Decl. ¶ 21).].

      <u>**RESPONSE TO NO. PH8.**</u>  **Disputed.  John Wright testified that eligibility for 9.5% SAP was not in Kathleen Ellison's area of expertise.  Wright Tr. 59:21-60:19 (Soni Dec., Ex. 8).**

      **Panhandle was aware that the 1993 OBRA prevented new issuances from being eligible for 9.5% SAP.  Wright Tr. 66:28-67:8 (Soni Dec., Ex. 8); J. Parker I Tr. 155:15-156:4 (Soni Dec., Ex. 7).  Panhandle also knew that the 1996 regulations were intended to prevent lenders from receiving increased SAP.  Wright Tr. 105:1-10 (Soni Dec., Ex. 8).  Panhandle believed that no statutory, regulatory, or policy limit existed on Panhandle's ability to grow its 9.5% SAP eligible loans.  Wright Tr. 133:5-134:19 (Soni Dec., Ex. 8); G.**

Parker Tr. 49:22-50:2 (Soni Dec., Ex. 25).  Wright testified that a loan in a Patriarch Bond for even one second was eligible for 9.5% SAP.  Wright Tr. 139:7-12 (Soni Dec., Ex. 8). Despite the 1993 OBRA, Panhandle increased its 9.5% SAP-eligible loans from $148.3 million to over $500 million.  Wright Tr. 68:4-69:3 (Soni Dec., Ex. 8); G. Parker Tr. 77:21-25 (Soni Dec., Ex. 25).

Nobody at Panhandle raised the issue of why moving loans to different bonds would result in millions of dollars in additional SAP.  J. Parker I Tr. 94:18-95:11 (Soni Dec., Ex. 7).  Panhandle never questioned how it could grow 9.5% SAP eligible loans from $148.3 million to over $500 million even though Congress banned new issuances from receiving 9.5% SAP.  Wright Tr. 69:10-21 (Soni Dec., Ex. 8).  Further, Panhandle never sought approval or guidance from the U.S. Department of Education.  J. Parker I Tr. 123:3-123:18 (Soni Dec., Ex. 8); Wright Tr. 43:8-11 (Soni Dec., Ex. 8).

PH9.  Ms. Ellison referred PPHEA to Saul Moskowitz, Esq., then an attorney with Moskowitz Strickland Brockington Lewis, PLLC. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 22); Ex. V.2 (Wright Decl. ¶ 22); Ex. V.3 (G. Parker Decl. ¶ 22); *see also* Ex. V.7 (PPHEA 000185).] Mr. Moskowitz specialized in federal education law. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 23-24); Ex. V.2 (Wright Decl. ¶ 23-24); Ex. V.3 (G. Parker Decl. ¶ 23); Ex. V.30 (Moskowitz Dep. 20:9-15, 21:13-20).] He had worked in ED's Office of General Counsel from 1979-1986 before moving to the Office of Post-Secondary Education, until he left ED in 1990. [McMahon Decl., Ex. V.30 (Moskowitz Dep. 30:8-21, 34:6-19, 35:13-21, 36:22); *see also* Ex. V.1 (J. Parker Decl. ¶ 24); Ex. V.2 (Wright Decl. ¶ 24); Ex. V.3 (G. Parker Decl. ¶ 23).] He had served as Branch Chief of OPE's Guaranteed Student Loan division,

- 245 -

which was responsible for administering FFELP (including policy and development). [See McMahon Decl., Ex. V.30 (Moskowitz Dep. 35:13-36:12).].

**RESPONSE TO NO. PH9.   No dispute; however, Mr. Moskowitz did not have the expertise to be able to determine whether a** ███████████████████ ██████████████████████ **November 4, 2003 Email from S. Moskowitz at B0270005 (Soni Dec., Ex. 155).** *See also* **Responses to BR7, BR10.**

**PH10.** The two Parkers and Mr. Wright had a number of teleconferences with Ms. Ellison and Mr. Moskowitz to explain PPHEA's proposed transactions and to specifically discuss whether those transactions were legal under applicable law. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 25); Ex. V.2 (Wright Decl. ¶ 25); Ex. V.3 (G. Parker Decl. ¶ 24); *see also* ███████████████████; Ex. V.30 (Moskowitz Dep. 244:16-20).] With Ms. Ellison's assistance, the Panhandle staff also provided Mr. Moskowitz with detailed descriptions of the transactions that PPHEA proposed to undertake in order to grow its 9.5% SAP-eligible portfolios. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶26); Ex. V.2 (Wright Decl. ¶ 26); Ex. V.3 (G. Parker Decl. ¶ 25); ███████████████████.].

**RESPONSE TO NO. PH10.   Incomplete.  Panhandle officials appear to have had their** ██████████████████████████. **Moskowitz Ex. 12 at PPHEA_045871-72 (Soni Dec., Ex. 159).  Panhandle had never utilized Moskowitz's services prior to consulting with him on these Half-SAP/9.5% Floor issues.  G. Parker Tr. 33:23-34:4 (Soni Dec., Ex. 25).  Moskowitz advised that an opinion would be** ███████████ ██████. **Moskowitz Ex. 12.  (Soni Dec., Ex. 159).  Wright took notes of this conversation.** *Id.*; **G. Parker Tr. 46:14-22 (Soni Dec., Ex. 25); Wright Tr. 103:3-10 (Soni Dec., Ex. 8).**

Wright understood from this conversation with Moskowitz that the regulation and the 1996 Dear Colleague Letter represented an attempt to prevent authorities from transferring loans to take advantage of interest rate differentials. Wright Tr. 105:1-10 (Soni Dec., Ex. 8).

They spoke with Moskowitz again a week later and discussed ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Handwritten and Typed Notes of John Wright at PPHEA_045877 (McMahon Dec., Ex. V.6). Wright again took notes. Wright Tr. 109:2-7 (Soni Dec., Ex. 8). Despite the "guidance" Moskowitz received from Pam Moran at the Department (*see* Response to BR12), Moskowitz advised Panhandle ████ ████████████████████████████████████████████████████████████ Handwritten and Typed Notes of John Wright at PPHEA_045877 (McMahon Dec., Ex. V.6). He also advised ██████████████████████████████████████████████████ *Id.* Wright confirmed that the notes accurately represented information Moskowitz provided. Wright Tr. 116:23-121:9 (Soni Dec., Ex. 8).

**PH11.** In forming his legal opinions, Mr. Moskowitz drew upon his long experience with ED officials and the HEA and related laws, which included detailed knowledge of the 1996 DCL and the reasoning behind it. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 27); Ex. V.2 (Wright Decl.¶ 27); Ex. V.3 (G. Parker Decl. ¶ 26); Ex. V.30 (Moskowitz Dep. 21:13-20, 50:8-18, 63:18-22, 87:1-10, 95:5-22, 98:1-18, pp. 30-36, 64-86, 96-97).] He also had numerous personal, contemporary discussions with ED policy personnel regarding the transferring and recycling of 9.5% loans. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 28); Ex. V.2 (Wright Decl. ¶ 28); Ex. V.3 (G. Parker Decl.¶27); Ex. V.10 (Moskowitz 000095-99).]

Mr. Moskowitz concluded that PPHEA's proposed plan to grow its 9.5% SAP-eligible loan portfolio was well within the applicable laws, regulations, and policy, and communicated this in his conversations with Messrs. Parker and Mr. Wright prior to the issuance of any written opinions. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 29); Ex. V.2 (Wright Decl.¶ 29); Ex. V.3 (G. Parker Decl. ¶ 28); Ex. █████████████████████████; Ex. V.7 (PPHEA_000185-95); Ex. V.8 (PPHEA 000196-206); Ex. V.9 (PPHEA_000207-218).] To memorialize his analyses, Mr. Moskowitz issued three opinion letters dated January 27, 2003, June 24, 2003, and February 4, 2004, respectively. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 30); Ex. V.2 (Wright Decl.¶ 30); Ex. V.3 (G. Parker Decl.¶ 29); Ex. V.7 (PPHEA_000185-95); Ex. V.8 (PPHEA_000196- 206); Ex. V.9 (PPHEA_000207-18).] Confirmation by Mr. Moskowitz that PPHEA's plans were legal was a prerequisite to PPHEA's willingness to engage in the Transfers associated with the New Bond transactions in the first instance. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 32); Ex. V.2 (Wright Decl.¶ 32); Ex. V.3 (G. Parker Decl. ¶ 31).]. In fact, Messrs. Parker and Mr. Wright would have never been a part of something they felt was not legal. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 56); Ex. V.2 (Wright Decl. ¶ 56); Ex. V.3 (G. Parker Decl.¶ 55).].

**RESPONSE TO NO. PH11.  Disputed and incomplete.  Whether Messrs. Parker and Wright would have been a part of something they felt was not legal is not a material fact.**

**Panhandle's bond counsel was specifically concerned with the issue of whether any loan that was ever pledged to a pre-October 1, 1993 tax-exempt bond estate would receive the 9.5% Floor.  Handwritten and Typed Notes of John Wright at PPHEA_045899 (McMahon Dec., Ex. V.6).  Moskowitz's draft or final opinions never addressed the issue.**

*See* PPHEA 000185-95 (McMahon Dec., Ex. V.7); PPHEA_000196- 206 (McMahon Dec., Ex. V.8); PPHEA 000207-18 (McMahon Dec., Ex. V.9).

Moskowitz provided PPHEA with a draft opinion sometime late in 2002. Moskowitz Ex. 14 (PPHEA_045883-88) (Soni Dec., Ex. 88); Wright Tr. 168:12-24 (Soni Dec., Ex. 8). In that draft, Moskowitz wrote the following: ████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████ Moskowitz Ex. 14 at PPHEA_045884 (Soni Dec., Ex. 88). The word "become" was crossed off by Wright. Wright Tr. 174:4-16 (Soni Dec., Ex. 8). Also in that draft was a statement that, as a matter of policy, Panhandle ███████████████████████████████████████

███████████████████████████████████████

Moskowitz Ex. 14 at PPHEA_045884. (Soni Dec., Ex. 88). Wright also crossed this out, and assumed it was a vestige of a draft that Moskowitz had prepared for another client. Wright Tr. 171:5-7, 171:22-172:2 (Soni Dec., Ex. 8).

The substance of the three opinion letters Moskowitz provided to Panhandle was the same as that contained in the Brazos ███████████████████████ Moskowitz Tr. 268:7-12 (Soni Dec., Ex. 18); *see compare* Moskowitz Ex. 9 (Soni Dec., Ex. 115) *with* Moskowitz Ex. 13 (Soni Dec., Ex. 87), Moskowitz Ex. 15 (Ex. 89), Moskowitz Ex. 16 (Soni Dec., 90). Jimmy Parker agreed that the transactions at issue were "refinancing" rather than "sale" transactions. J. Parker II Tr. 40:18-41:4 (Soni Dec., Ex. 31).

Panhandle officials understood that the opinion did not address the issue of whether the loans that came in to the pre-October 1, 1993 tax-exempt bond estate should become subject to Half-SAP/9.5% Floor.  Wright Tr. 178:10-180:1 (Soni Dec., Ex. 8).  Wright testified that it was an "oversight" on their part as well as Moskowitz's and that it was something they "didn't dot the 'i's on, cross the t's on."  *Id.* 180:2-10.  Wright testified that he only cared about whether the opinion said that they could do the transaction and get 9.5% SAP on all of the loans.  *Id.* at 181:15-21.

Moskowitz advised Panhandle, as he did Brazos, that he was not giving an opinion on ███████████████████████████████████████████████" PPHEA_045924.  (Soni Dec., Ex. 167); *see also* Responses to BR7, BR10, *supra*.

An additional paragraph was added to the opinions to address a particular concern of Panhandle's:  "whether the same analysis would apply if the loans were transferred to a post-October 1, 1993 tax-exempt bond estate, rather than to a taxable estate." PPHEA_000201 (McMahon Dec., Ex. V. 8).  Moskowitz opined that "it would.  There is no distinction made in the regulation or the Dear Colleague on this point, and we see no reasoned basis for concluding that such a distinction exists."  *Id.*  Moskowitz did not mention that there was no reason for subsection (e) of the regulation or the 1996 Dear Colleague Letter to address this issue because they did not deal with the distinction between pre-October 1, 1993 money and money raised on or after that date.

As of October 2004, long after he finished providing opinions to Brazos and Panhandle, Moskowitz was unsure of when ████████████████████████████████ ███████████████████████████████October 19, 2004 Email from Saul Moskowitz at B0005209-

- 250 -

10 (Soni Dec., Ex. 150); November 3, 2004 Email from Saul Moskowitz at B0004972 (Soni Dec., Ex. 153).  Moskowitz was advised in 2005 that a "refunded" bond had been "retired" and thus met one of the conditions under subsection (e)(2) and making any loans pledged to such a bond ineligible for transfer while maintaining 9.5% Floor status.  Email from George Harris at ED-B-003930 (Soni Dec., Ex. 35).  He did not amend his opinions or go back to Brazos or Panhandle to alert them to this fact, however.

PH12.  PPHEA issued new bonds related to proposed Transfers on February 25, 2003, March 21, 2003, and February 9, 2004 (collectively, the "New Bonds"). [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 31); Ex. V.2 (Wright Decl. ¶ 31); Ex. V.3 (G. Parker Decl. ¶ 30); see Ex. V.11.] PPHEA used proceeds from these New Bond issuances to buy 9.5% SAP-eligible loans from the Patriarch Bond estates at a price equal to the par value of the loans plus accrued interest. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 33); Ex. V.2 (Wright Decl. ¶ 33); Ex. V.3 (G. Parker Decl. ¶ 32); see, e.g., Ex. V.7 (PPHEA_000186).] All 9.5% SAP-eligible loans that were so transferred into the New Bond estates related to this action, at any time, were purchased from the Patriarch Bonds. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 33); Ex. V.2 (Wright Decl. ¶ 33); Ex. V.3 (G. Parker Decl. ¶ 32); see, e.g., Ex. V.7 (PPHEA_000186).] Those Patriarch loans were transferred into the New Bond estates, and the cash consideration received by the Patriarch Bond estates was used to purchase new loans into the Patriarch Bond estates. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 34); Ex. V.2 (Wright Decl. ¶ 34); Ex. V.3 (G. Parker Decl. ¶ 33).] PPHEA billed ED at 9.5% SAP rates for all of these loans, and in doing so, certified that its submissions "conform[] to the laws, regulations, and policies applicable to" FFELP.  [See, e.g., McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 35); Ex. V.2

(Wright Decl.¶ 35); Ex. V.3 (G. Parker Decl. ¶ 34); Ex. V.12 (Organization Participation Agreement, and ED-X-000122).].

**RESPONSE TO NO. PH12.   Incomplete.   Panhandle's first issuance of the New Bonds was the February 25, 2003 taxable issuance.   PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4).   This new issuance was not eligible for 9.5% SAP. Wright Tr. 66-69 (Soni Dec., Ex. 8).   After creating the issuance, Panhandle emptied nearly all loans in its Patriarch Bonds into the new issuance.   PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4); J. Parker I Tr. 173:21-174:2 (Soni Dec., Ex. 7); Select Pages from J. Parker Ex. 11, Portfolio Balances at PPHEA_045103-045107 (Mills Dec., Ex. 41).**

To transfer a loan from a Patriarch Bond to a new issuance, Panhandle gave a unilateral direction to the trustee regarding the movement of a loan, and this direction was sometimes done orally.   J. Parker I Tr. 183:6-21 (Soni Dec., Ex. 7).   Wright explained that loans were transferred by "flip[ping] the switch" on a computer system.   Wright Tr. 200:11-201:5 (Soni Dec., Ex. 8).   Panhandle had the right to reverse these transfers.   J. Parker I Tr. 185:14-22 (Soni Dec., Ex. 7).   These transfers were done at face value, despite the fact that purchases of replacement loans required a premium.   *Id.* at 180:1-16, 184:6-22. No due diligence review of the loan portfolio was done; no arms length price negotiations took place; no real valuation of the collateral was undertaken; and no gain or loss was recognized.   *Id.* at 180:1-186:18.   Wright testified that the movement of a loan from a Patriarch Bond to a new issuance was not a sale because Panhandle controlled both the Patriarch Bonds and the new issuance.   Wright Tr. 159:9-160:22 (Soni Dec., Ex. 8).   Both the Patriarch Bonds and the New Issuances were under the same indenture and same trust. J. Parker I Tr. 173:2-11 (Soni Dec., Ex. 7).

After moving its loans from the Patriarch Bonds to the New Bonds, Panhandle purchased loans from third parties. PPHEA Supp. Resp. to Rel. Interrog. 3 (Mills Dec., Ex. 4). These newly purchased loans were not receiving 9.5% SAP before Panhandle's purchase. Wright Tr. 55:15-17 (Soni Dec., Ex. 8).

Panhandle determined that the newly purchased loans were eligible for 9.5% SAP immediately upon purchase and immediately began billing 9.5% SAP for these loans. J. Parker I Tr. 132:15-133:4 (Soni Dec., Ex. 7); G. Parker Tr. 33:8-11 (Soni Dec., Ex. 25). Thus, Panhandle billed 9.5% SAP on loans transferred out of the Patriarch Bonds as well as loans purchased from third parties used to refill the Patriarch Bonds. G. Parker Tr. 33:8-11 (Soni Dec., Ex. 25).

Panhandle repeated this process in March 2003 when it used a new taxable issuance. Panhandle Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4); Panhandle Undisputed Facts, PH12. Panhandle once again repeated this process in February 2004 by issuing taxable and tax-exempt financings. *Id.* (Mills Dec., Ex. 4).

PH13. From or about September 23 through September 26, 2003, ED conducted a review of PPMSC's operations. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 36); Ex. V.2 (Wright Decl. ¶ 36); Ex. V.3 (G. Parker Decl. ¶ 35); Ex. V.13 (PPHEA 110794).] Since PPMSC was PPHEA's servicer, this review necessarily included an analysis of PPHEA's 9.5% SAP-eligible loan portfolios. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 37); Ex. V.2 (Wright Decl. ¶ 37); Ex. V.3 (G. Parker Decl. ¶ 36); *see, e.g.,* Ex. V.13 (PPHEA 110797, PPHEA 110802).] By that time, of course, two of the New Bonds had been issued and, as a result of the transferring and purchasing described above, PPHEA's 9.5% SAP-eligible loan

portfolio had grown. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 38); Ex. V.2 (Wright Decl. ¶ 38); Ex. V.3 (G. Parker Decl. ¶ 37); *see, e.g.,* Ex. V.11; Ex. V.13 (PPHEA 110802).] This fact was not lost upon 2003 ED reviewers Jerry Wallace and Vincent Clark. Mr. Wallace, along with others in his office, had observed similar practices at the Iowa Student Loan Liquidity Corporation ("Iowa") in 2002. Although his office had formed a view that these practices were impermissible, they had been overruled by ED officials in Washington, who declared them legal. [*See* JSUF ¶ ¶ JS33, JS42-50, JS190.].

**RESPONSE TO NO. PH13.  Disputed and incomplete.  Panhandle has repeatedly stated that the only reviews of it's 9.5% SAP loan portfolios took place during a DEd Program Review in September 2006 and an independent audit required by DEd on October 31, 2007.  PPHEA Resp. to Rel. Interrog. No. 11 (Mills Dec., Ex. 4).  At each of their depositions, Glenn Parker, Jimmy Parker and John Wright offered no memory of any details regarding such a 2003 Program Review nor did they provide any materials surrounding the Program Review.  All three witnesses identified details surrounding the 2006 Program Review and 2007 Audit, but made no reference to an earlier audit or review. G. Parker Tr. 19:17-21 (Soni Dec., Ex. 25); J. Parker I Tr. 159:19-160:4 (Soni Dec., Ex. 7); Wright Tr. 222:24-223:18 (Soni Dec., Ex. 8).**

**With respect to the Iowa Student Loan Liquidity Corporation program review, *see* Responses to JS33, JS42-50, JS190, *supra*.**

PH14. Mr. Wallace did, in fact, take specific note of PPHEA's increased 9.5% SAP-eligible loan portfolios in an "observation" contained within the final program review and noted that PPHEA's loans had grown from $207,775,000 in tax-exempt bonds issued prior to

October 1, 1993 (and thus eligible for 9.5% SAP) to $374,833,433 in 9.5% SAP coded billing. [McMahon Decl., Ex. V.13 (PPHEA 110802).] Mr. Wallace, along with Vincent Clark, specifically asked Glenn Parker whether this growth had occurred pursuant to the 1996 DCL. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 39; Ex. V.2 (Wright Decl.¶ 39); Ex. V.3 (G. Parker Decl. ¶ 38; *see also* Ex. V.13 (PPHEA_110802); Ex. V.14 (PPHEA_111419).] When told yes, the ED reviewers indicated in their final report that this method of portfolio growth was under review and that, as a result, "no further action is required at this time." [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 40); Ex. V.2 (Wright Decl. ¶ 40); Ex. V.3 (G. Parker Decl.¶ 39; *see also* Ex. V.13 (PPHEA 110802, PPHEA_110787).] In addition, the 2003 Program Review was circulated to numerous ED policy personnel by the Southern Region's Director, Mirek Halaska, on July 14, 2004. [*See* JSUF ¶ JS51; McMahon Decl., Ex. II.10 (OBERG00000129-30); Ex. V.31 (Wallace Dep. 96:21-97:17).].

**RESPONSE TO NO. PH14.          Disputed and incomplete.  When asked in deposition when he spoke with the DEd regarding PPHEA's 9.5% SAP billing, Glenn Parker stated that he spoke with the DEd during the 2006 and 2007 time frame; Glenn Parker never mentioned speaking with Clark or others at the Department in response to the 2003 Program Review.  G. Parker Tr. 19:17-20:2 (Soni Dec., Ex. 25).  Glenn Parker stated that he did not speak with the DEd about eligibility for 9.5% SAP in 2002, 2003 or 2004 time period:**

> **Q.      Okay.  You never talked to the department about eligibility for 9.5 SAP in this 2002, 2003, 2004 time period, did you?**

> **A.      No.  I would have talk to them later when they were out doing their reviews.**

> **Q.**     Back -- when they were doing the audits in --
>
> **A.**     '06.
>
> **Q.**     -- 2006 or '07?
>
> **A.**     '06.  And then we had another one in '08.

G. Parker Tr. 19:17-19:25 (Soni Dec., Ex. 25).  Similarly, neither James Parker nor John

Wright testified that such a conversation took place during their depositions.  *See* Response

to PH13, *supra*.  Futher, PPHEA cites to no facts showing the substance of that discussion.

*See* PH14.

Moreover, PPHEA cites to no facts establishing that the discussion that took place

between itself and DEd regarding 9.5% SAP, if any, examined whether all of PPHEA's

actions were permissible under DEd regulations.  *See* PH14.  Instead, the proposed fact

alleges that PPMSC believed it was allowed "to bill tax-exempt status for loans funded by

the February 2003 bond issue" pursuant to the 1996 Dear Colleague Letter (McMahon

Dep., Ex. V.13).  At most, PPMSC discussed whether loans transferred out of the pre-1993

trusts were 9.5% SAP eligible.  *Id.*  The 2003 Program Review does not state and

Panhandle does not allege that PPMSC informed DEd of its practice of refilling the pre-

1993 issuances with new loans to replace those that had been transferred out en masse.  *Id.*

The 2003 Program Review does not establish any discussion between DEd and Panhandle

regarding whether the loans purchased into the pre-1993 trust would be eligible for 9.5%

SAP.  *Id.*

In addition, the 2003 Program Review states: "the absence of statements in this

report about specific practices or procedures of the Servicer should not be construed as

acceptance, approval or endorsement of those practices or procedures.  The findings cited

in this report do not limit nor lessen the Servicer's obligations to comply with all other provisions of the Federal Family Education Loan Programs." **Letter from Vincent Clark, Senior Guarantor and Lender Review Specialist Financial Services, to Clifford Baker at PPHEA_110800 (McMahon Dec., Ex. V.13).**

Finally, by Panhandle's own admission the practice was "under review" at the time that the 2003 Program Review findings were issued. *See* **PH14. Nevertheless, Panhandle, less than a year later executed additional transactions of type that were "under review," resulting in an even greater windfall of ineligible 9.5% SAP earnings, without obtaining any resolution from DEd.** *See* **Response to PH12,** *supra.*

**PH15.** PPHEA consistently billed for 9.5% SAP throughout the time periods in question in this case, including every quarter after the Transfers associated with each respective New Bond. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 41); Ex. V.2 (Wright Decl.¶ 41); Ex. V.3 (G. Parker Decl. ¶ 40).] However, no new 9.5% SAP billing occurred with respect to any new transaction until PPHEA was satisfied that it was legal. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 42); Ex. V.2 (Wright Decl.¶ 42); Ex. V.3 (G. Parker Decl. ¶ 41).] At no time prior to January 2007 did ED tell PPHEA (or PPMSC on PPHEA's behalf) that it was required to stop billing for 9.5% SAP with respect to its New Bonds or Transfers related to New Bonds, or that such billing was improper. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 43); Ex. V.2 (Wright Decl. ¶ 43); Ex. V.3 (G. Parker Decl. ¶ 42).] On the contrary, the Panhandle staff read a newsletter published by *EFC Exchange* in which Assistant Secretary Sally Stroup stated that lenders' 9.5% SAP practices related to the 1996 DCL were "perfectly legal"; Mr. Wright took note of this, and believing it was further confirmation of Mr. Moskowitz's advice, preserved the document in his records and provided it for this

litigation. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 44); Ex. V.2 (Wright Decl. ¶ 44).] The Panhandle staff believed that ED would have brought anything it considered to be improper or illegal to its attention. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 40); Ex. V.2 (Wright Decl. ¶ 40); Ex. V.3 (G. Parker Decl.¶ 39).]

**RESPONSE TO NO. PH15.  Disputed.  PPHEA billed new 9.5% SAP after it secured an opinion that addressed only a portion of Panhandle's  9.5% loan growth practices.  *See* Response to PH 11, *supra*.  Whether DEd ever instructed Panhandle to stop its 9.5% SAP practices or that there actions were improper is immaterial where, as here, Panhandle certified that its 9.5% SAP submissions conformed to the "laws, regulations, and policies" applicable to FFELP.  *See* PH12, *supra*.**

**See Responses to JS40, 68, *supra,* with respect to statements by Stroup.**

**PH16.** From on or about September 12 through September 14, 2006, ED conducted another Program Review of PPHEA that specifically focused on its 9.5% SAP practices. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 45); Ex. V.2 (Wright Decl.¶ 45); Ex. V.3 (G. Parker Decl.¶ 43); Ex. V.15 (PPHEA_000023). One of the reviewers, Vincent Clark, had previously conducted the 2003 Program Review of PPMSC and had observed the growth in PPHEA's 9.5% loan portfolio. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 46); Ex. V.2 (Wright Decl.¶ 46); Ex. V.3 (G. Parker Decl. ¶ 44); *compare* Ex. V.15 (PPHEA_000023) *with* Ex. V.13 (PPHEA 110796).] Upon conclusion of the 2006 review, PPHEA staff was informed that there were no 9.5% SAP issues with regard to the New Bonds. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 47); Ex. V.2 (Wright Decl.¶ 47); Ex. V.3 (G. Parker Decl. ¶  45).] Further, the reviewers indicated that they were surprised that PPHEA had not billed for even more 9.5% SAP. [McMahon Decl., Ex. V.3 (G. Parker Decl. ¶ 46).] Mr. Wallace, who had become ED's

Southern Region Director, reviewed the 2006 program review and signed off on it. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 48); Ex. V.2 (Wright Decl. ¶ 48); Ex. V.3 (G. Parker Decl. ¶ 48); Ex. V.15 (PPHEA 000023); Ex. V.31 (Wallace Dep. 13:5-16, 171:12-172:21).]

**RESPONSE TO NO. PH16.   Incomplete.   The 2006 program review examined PPHEA's 9.5% SAP billing for a sample of loans that may have been refinanced with ineligible funds.   PPHEA_000031 (McMahon Dec., Ex. V.15).   More specifically, DEd examined whether the taxable bridge financing that PPHEA utilized to temporarily secure 9.5% SAP loans before refinancing the loans made the loans ineligible for 9.5% SAP.   *Id.* DEd's findings centered around this element of PPHEA's 9.5% SAP billing and not the repeated wholesale transfer of pre-1993 loans to a newly created trust in order to purchase new loans that could be dipped into the pre-1993 trust and billed at 9.5% SAP.   *See* Response to PH12, *supra*.   This review relied on a sample of loans and does not purport to be a comprehensive study of every aspect of Panhandle's 9.5% SAP billing practices. PPHEA_000027 (McMahon Dec., Ex. V.15).**

**See Responses to JS26, 100, *supra*, with respect to the Department's 2006 program reviews.**

PH17.   As discussed in JSUF ¶¶ JS163-65, ED announced a new "restated" policy regarding 9.5% SAP on or about January 23, 2007. In addition, ED also offered to settle with lenders and to not seek to recoup any historical 9.5% SAP if the lenders would agree to certain terms. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 49); Ex. V.2 (Wright Decl. ¶ 49); Ex. V.3 (G. Parker Decl.¶ 48); JSUF ¶ JS164.] A January 24, 2007 letter from Teresa S. Shaw to Terry D. Langehennig, President and Chief Executive Officer of PPMSC and Executive

- 259 -

Director of PPHEA, memorialized ED's offer. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 50); Ex. V.2 (Wright Decl.¶ 50); Ex. V.3 (G. Parker Decl. ¶ 49); Ex. V.16 (PPHEA_026353-56).]

**RESPONSE TO NO. PH17.  Disputed and incomplete.  *See* Responses to JS165, BR32,** *supra.*

**PH18.** The Panhandle entities accepted ED's settlement offer. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 51); Ex. V.2 (Wright Decl.¶ 51); Ex. V.3 (G. Parker Decl. ¶ 50); Ex. V.17 (PPHEA 037925); Ex. V.32 (Trubia Dep. 34:18-35:3, 38:20-39:10, 97:13-21).]

**RESPONSE TO NO. PH18.   Disputed and incomplete.  *See* Response to JS165, BR32,** *supra.*

**PH19.** The results of PPHEA's audit were submitted to ED on or about October 30, 2007. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 52); Ex. V.2 (Wright Decl.¶ 52); Ex. V.3 (G. Parker Decl.¶ 51); Ex. V.18 (PPHEA_037435-49).] ED accepted PPHEA's audit on or about August 7, 2008 [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 53); Ex. V.2 (Wright Decl.¶ 53); Ex. V.3 (G. Parker Decl.¶ 52); Ex. V.19 (PPHEA_000001-04)], but only after it had confirmed that there were no 9.5% SAP issues stemming from the 2006 program review [*see* McMahon Decl., Ex. V.20 (PPHEA_033132)].

**RESPONSE TO NO. PH19.  Disputed and incomplete.  As a result of the 2007 Audit PPHEA drastically reduced the total amount of loans on which it could claim 9.5% SAP from $300 million to approximately $122 million.  J. Parker I Tr. 209:1-9 (Soni Dec., Ex. 7).  Terry Langehenning signed this audit.  PPHEA_00899 (Soni Dec., Ex. 166).**

Further, Panhandle improperly cites to an email between Patricia Trubia and John Wallace, PPHEA_033132, (McMahon Dec., Ex. V.20), for the alleged fact that ED accepted PPHEA's 2007 Audit "only after [ED] had confirmed that there were no 9.5% SAP issues stemming from the 2006 program review." As discussed above, the 2006 Program Review did not address the 9.5% SAP billing activity at issue in this case, but rather a discrete 9.5% SAP issue regarding improper refinancing. *See* Response to PH16, *supra*.

Similar to the 2003 Program Review, the 2006 Review clearly states: "absence of statements in this report regarding specific practices or procedures followed by Panhandle-Plains Higher Education Authority (PPHEA) should not be construed as acceptance, approval or endorsement of those practices or procedures. The specific nature of this report does not limit or lessen PPHEA's obligations to comply with all other provisions of the Federal Family Education Loan Programs." Moskowitz Ex. 16 at PPHEA_000027 (Soni Dec., Ex. 90).

PH20. Mr. Wallace, who Relator credited with helping to uncover and spotlight the 9.5% SAP practices he is challenging in this case, and who was deeply involved in PPHEA's 2003 and 2006 program reviews, made the following statement in response to a question about how ED goes about assessing risk:

> I believe that most lenders, in my opinion, try to do what they feel they should be doing and most guarantors are doing what they believe they should be doing within the program and that there's really not -- there's very few entities that are involved in fraud. In general we find recoveries, and we do find recoveries, that, you know, there's misinterpretations of the regulations or the law.

Mr. Wallace was then asked the obvious follow-up question of whether he believed Panhandle was among the "very few entities . . . involved in fraud":

Q.   Did you ever feel that Mr. John Wright, Mr. Jimmy Parker, Mr. Glenn Parker and Mr. Terry Langehenning [*i.e.*, Panhandle's personnel who dealt with 9.5% SAP issues] were trying to defraud the federal government in the times that you dealt with them?

A.   No.

MR. OBERMEIER: Objection. BY MR. McEVOY:

Q.   You are welcome to answer. A. No.

Q.   Did you find those gentlemen to be responsive and forthcoming when you made either initial requests or followup requests for information or data?

MR. OBERMEIER: Objection.

THE WITNESS: I believe that they provided me everything that I asked for.

BY MR. McEVOY:

Q.   Did you ever get any sense -- let me back up a minute. You are physically in Canyon[, Texas] on occasion, is that correct, to —

A.   Earlier reviews, not in the most recent review that was conducted there. Q. But you've been in Canyon, in [Panhandle's] facility, and actually looked at documents from these folks and program reviews, is that right? A. That's correct.

Q.   Did you ever get the sense that any of those gentlemen or their colleagues were trying to conceal things from you or not produce things that you requested to look at?

A.   I did not.

[McMahon Decl., Exh. V.31 (Wallace Dep. 34:18-21, 35:1-11, 36:1-6).]

**RESPONSE TO NO. PH20.  No dispute that the language is quoted accurately, but the testimony is mischaracterized.  Wallace was asked whether PPHEA was trying to defraud the government during the course of the program reviews, not when performing its 9.5% SAP scheme.  Whether Wallace believed that PPHEA was trying to conceal things from him during the review period is not a material fact.  PPHEA's actions with respect to**

- 262 -

**the audits or program review is not at issue in this case; their actions with respect to the proper billing for 9.5% SAP is at issue.  Moreover, Wallace is asked to give his personal opinion about lenders, not how the ED "goes about assessing risk" as PPHEA suggests. Wallace believed that the scheme performed by Panhandle and others was contrary to congressional intent.  Wallace Tr. 398:21-399:4 (Soni Dec., Ex. 23).**

**PH21.** In forming his opinion that Panhandle had committed fraud, Relator looked at certain spreadsheets that included PPHEA and "induced or deducted" that the growth was illegal. [McMahon Decl., Ex. V.33 (Oberg Dep. 658:17-659:16, 660:3-661:13) (Relator testified he used his "knowledge of the industry" to deduce what PPHEA might have done).] While he also reviewed the applicable statute Relator admitted in his deposition that there was at least one significant element to 20 U.S.C. Section 1087-1 that he had never considered before the date he was deposed, and that was Congress' use of the word "interests" in §1(b)(2)(B)(i) of the statute but not in §§1(b)(2)(B)(iv) and 1(b)(2)(B)(5). [McMahon Decl., Ex. V.33, Oberg Dep. 604:8-607:20).] Relator admitted that he conducted no independent investigation of the Panhandle entities whatsoever other than looking at loan balances in publicly-disclosed materials:

a.            Among other things, Relator could not identify key people associated with PPHEA's day-to-day operations and its 9.5% SAP activities. The key people included, among others, Messrs. Parker, Mr. Wright, and Clifford Baker, the founder of Panhandle. [McMahon Decl., Ex. V.33 (Oberg Dep. 632:7-633:6); *see also* Ex. V.1 (J. Parker Decl. ¶ 3); Ex. V.2 (Wright Decl.¶ 3); Ex. V.3 (G. Parker Decl.¶ 3).]

    b.        Relator admitted that he never spoke to anyone involved with PPHEA's day-to-day operations, nor has he spoken with anyone about those people. [McMahon Decl., Ex. V.33 (Oberg Dep. 634:3-17); *see also* Ex. V.1 (J. Parker Decl. ¶ 55); Ex. V.2 (Wright Decl.¶ 55); Ex. V.3 (G. Parker Decl. ¶ 54).]

    c.        Relator had no knowledge of PPHEA's board of directors or what any Panhandle board member knew or considered in connection with 9.5% SAP. [McMahon Decl., Ex. V.33 (Oberg Dep. 638:14-639:20, 340:1-3).]

    d.        Relator did not know how many student loans PPHEA has ever held, knew nothing of its bond issuances, and knew nothing of its other business dealings. [McMahon Decl., Ex. V.33 (Oberg Dep. 641:4-16, 656:4-12).]

    e.        Relator admitted that he did not know whether he had sued PPMSC. [McMahon Decl., Ex. V.33 (Oberg Dep. 644:4-10).] He also admitted that he knew nothing about it or what role it might have in the case. [McMahon Decl., Ex. V.33 (Oberg Dep. 643:17-644:8).]

**RESPONSE TO NO. PH21.** **Incomplete.** ***See*** **Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation. (Doc. 314) at 1-11.**

    **PH22.** The particular sources of information relied on by Relator to form the basis for his Complaint against PPHEA were as follows:

    a.    *First* was the draft spreadsheet Relator received from James Kvaal, then a Congressional staffer, that was given to Mr. Kvaal by an ED official upon request. [McMahon

Decl., Ex. V.21 (OBERG00007690, OBERG00008351); Ex. V.33 (Oberg Dep. 353:13-358:19, 361:5-366:10).] In response to Panhandle's questioning in his deposition, Relator acknowledged that he relied on this spreadsheet with respect to Panhandle. [McMahon Decl., Ex. V.21 (OBERG00007690); Ex. V.33 (Oberg Dep. 664:6-665:20).] Those spreadsheets did not contain the data that Relator used in his initial Complaint against Panhandle.

b.      *Second* was the information contained in the spreadsheets that Relator received from Michael Dannenberg, then Senior Counsel to the Senate's Health, Education, Labor and Pensions Committee, that he obtained from ED. [McMahon Decl., Ex. V.22 (OBERG00007702-10); Ex. V.33 (Oberg Dep. 377:12-388:9).] Those spreadsheets did not contain the data that Relator used in his initial Complaint against Panhandle.

c.      *Third* was the information Relator received from Representative Thomas Petri (the "Petri Spreadsheets"). The Petri Spreadsheets showed PPHEA's 9.5% SAP loan balances at the end of each fiscal year from 2001 through 2006. [McMahon Decl., Ex. V.23 (OBERG00007760-71); Ex. V.33 (Oberg Dep. 422:15-423:18).] Relator admitted that he used these spreadsheets as the source for his specific allegations against Panhandle. [McMahon Decl., Ex. V.33 (Oberg Dep. 697:18-698:12).] He also used the Petri Spreadsheets to create his own spreadsheet in August 2007 entitled "Estimates of Illegal 9.5 Floor SAP Claims Forgiven by U.S. Department of Education, by Year, by Loan Holder, 2002-2006." [McMahon Decl., Ex. V.24 (OBERG0007780); Ex. V.33 (Oberg Dep. 429:14-434:4).]

**RESPONSE TO NO. PH22.**  Disputed and incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed).

Relator requested and received a spreadsheet from a Congressional staff member, James Kvaal.  *Id*. at Doc. 314, Ex. 8.  Dated May 6, 2004, the spreadsheet showed the top twenty holders of 9.5% Loans in rank order by quarter, starting with the third quarter of 2002 and ending with the first quarter of 2004.  In analyzing the spreadsheet, Relator realized that PPHEA was ranked eleventh in the first quarter of 2004,despite not ranking among the top twenty 9.5% loan holders in 2002.  Relator's Resp. to PPHEA Interrog. No. 1 (Soni Dec., Ex. 112).  Relator determined that PPHEA's 9.5% Loan pool increased, at a minimum $253 million dollars in approximately an 18 month period.  This conservative estimate represented the difference between the amount of 9.5% loans held by the twentieth-place entity in the third quarter of 2002 (PPHEA was not ranked in 2002 and would, therefore, have had a lower amount of 9.5% loans than the twentieth place loan holder on the spreadsheet).  PPHEA had experienced, at a minimum, a 153% increase in approximately an 18 month period.

In April of 2004, DEd-OIG, which was preparing to audit lenders in response to Relator's earlier complaints, contacted Relator for any further information he might have regarding his investigation.  On May 14, 2004, based on the spreadsheet from Kvaal and other analysis, Relator decided to report PPHEA to ED-OIG as of the "Texas entities" that exhibited a significant, rapid and unlawful increase in their 9.5% loan pools over a short period of time.  OBERG00008723 1 (Soni Dec., Ex. 205). Oberg Tr. 713:9-714:1 (Soni Dec., Ex. 32).  Thus, by this time, Relator had formed a view that PPHEA had

submitted improper claims in 9.5% SAP.  Documents referenced in PH21 merely

confirmed Relator's conclusion at that time. Relator's Resp. to PPHEA Interrog. No. 1

(Soni Dec., Ex. 112).

PH23. PPHEA was specifically identified in an article by Paul Basken that appeared in

the *Chronicle of Higher Education* on September 7, 2007, based on the Petri Spreadsheets.

[McMahon Decl., Ex. V.25.]

RESPONSE TO NO. PH23. Incomplete. *See* Relator's Opposition to the Motion to

Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-

11.

SW1.  Southwest Student Services Corporation ("Southwest") was formed in May 1992

as an Arizona nonprofit corporation. Through its nonprofit affiliates the Arizona Educational

Loan Marketing Corporation ("AELMAC") and the Florida Educational Loan Marketing

Corporation ("FELMAC"), Southwest financed the acquisition of federal student loans

through the issuance of tax-exempt and taxable debt obligations. ███████████████

███████████

RESPONSE TO NO. SW1. Incomplete.  Southwest exercised ███████████████

████████████████████████████████████████████

█████████████████████████████████████

Southwest Student Services Corporation and Subsidiaries Consolidated Financial Report

at 7, SLMA_EF00000150 (Mills Dec., Ex. 50). █████████████████████

█████████████████████████████████████

████████████████████████ *Id.* ██████████████████

██████████████████████████████████████████████████████

████████████████████████   *Id.* at 8.  **AELMAC and FELMAC had no employees.  Chapin Tr. 15:10-16:22 (Soni Dec., Ex. 14).**

**SW2.**  In February 2004, Southwest reorganized as a for-profit corporation. [McMahon Decl., ███████████████████████.]

**RESPONSE TO NO. SW2.  No Dispute.**

**SW3.**  At all times relevant to this litigation through early 2005, Southwest used the proceeds of transfers of loans from Floor Bonds to other bonds to originate or purchase new student loans to borrowers who resided or went to school in Arizona or Florida, and treated those newly acquired loans as eligible to receive 9.5 SAP. [████████████████████ ████████████████; Ex. VI.29 (V. Roig Dep. at 41:22-42:8); Ex. VI.3 (SLMA_P0027981); Ex. VI.4 (Southwest and SLM's Responses to Relator's First Set of Interrogatories; Amended Response to Interrogatory No. 3).]

**RESPONSE TO NO. SW3.  Disputed and incomplete.  In October 2001, Southwest began transferring loans from pre-1993 tax exempt 9.5% SAP eligible bonds to post-1993 tax exempt 9.5% ineligible and taxable bonds.  Southwest and SLM Resp. to Interrog. No. 3 (Mills Dec., Ex. 5); Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 22:19-23:14, 28:20-29:4 (Soni Dec., Ex. 16).  Southwest used the cash generated from those transfers to refill the original pre-1993 tax exempt 9.5% SAP eligible bonds with additional loans, acquired either by purchasing existing or originating new student loans.  Southwest and SLM Resp. to Interrog. No. 3 (Mills Dec., Ex. 5); Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 25:19-27:13 (Soni Dec., Ex. 16).  Starting in 2003, Southwest billed**

9.5% SAP for both the transferred loan and (if it had a nexus to either Arizona or Florida) the newly originated or purchased loan.  Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 56:18-60:21, 104:20-106:3 (Soni Dec., Ex. 16).  The only limitation that Southwest imposed on billing 9.5% SAP on both the transferred loan and the newly originated or purchased loan is that the newly originated or purchased loan must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).  In this way, Southwest grew the principal balance of its loans billing 9.5% SAP.  *Id.* at 31:12-32:7.

Southwest implemented this in stages.  Until 2003, Southwest only billed 9.5% SAP on loans residing in pre-1993 tax exempt 9.5% SAP eligible bonds, including those originated or purchased after 1993, but not on loans that had been transferred out of pre-1993 tax exempt 9.5% SAP eligible bonds into other types of bonds.  Wheeler Tr. 28:20-29:15, 53:7-54:22, 56:18-58:7 (Soni Dec., Ex. 16).  At some point in or before 2003, Southwest decided to retroactively bill the government for 9.5% SAP on the loans that had been transferred since 2001; at the same time, Southwest continued to bill 9.5% SAP on loans that had been originated or purchased out of its pre-1993 tax exempt 9.5% SAP eligible bonds since October 2001.  *Id.* at 19:17-20:3, 24:12-25:12, 64:2-6.  Southwest began the retroactive billing once its servicing system had been modified for that purpose.  *Id.* at 40:19-41:22, 47:21-48:10.

To carry out its efforts, Southwest established a cross-functional task force that operated in 2003 to implement and monitor its 9.5% SAP transfers, consisting of at least the company's controller along with representatives of the business technology department, the operations department, and possibly the finance department.  Chesin Tr. 36:20-37:22, 160:8-10 (Soni Dec., Ex. 11); Wheeler Tr. 47:21-48:18 (Soni Dec., Ex. 16).  The task force

identified and tracked the loans for which it claimed 9.5% SAP.  Chesin Tr. 34:15-40:3, 60:1-8 (Soni Dec., Ex. 11).  Southwest established a process whereby loans were assigned "dummy" bond numbers to keep track of which loans would be retroactively billed for 9.5% SAP.  Wheeler Tr. 66-68:18 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000355-59 (Mills Dec., Ex. 39).  Southwest started retroactively billing the government in either the third quarter of 2003, or one quarter before or after that.  Wheeler Tr. 70:19-71:1 (Soni Dec., Ex. 16).

Using these processes, ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. 9.5 Floor Detail at SLMA_P0003643-3650 (Mills Dec., Ex. 43); Wheeler Tr. 113:16-119:20 (Soni Dec., Ex. 16).  *See also* Response to SW7, *infra* (reflecting that Southwest's loan balance had grown to ████████ by March 2005).

███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████

**RESPONSE TO NO. SW4.** Disputed and incomplete.  As explained more fully in Relator's response to SW 3, a cross-functional task force operated in 2003 to design and implement a process whereby Southwest assigned "dummy" bond numbers to transferred loans, allowing Southwest to keep track of them for purposes of retroactively billing 9.5% SAP on those transferred loans.  Chesin Tr. 36:20-37:22, 160:8-10 (Soni Dec., Ex. 11); Wheeler Tr. 47:21-48:18, 66-68:18 (Soni Dec., Ex. 16); SLMA_P0000355-59 (Mills Dec., Ex. 39).

Further, Southwest's purpose for creating the "dummy" bonds was not merely a form of housekeeping: Southwest's purpose in creating "dummy" bonds and transferring loans between different types of financing vehicles was to maximize the yield of 9.5% SAP in its portfolio.  V. Roig Tr. 103:8-106:5 (explaining that the purpose of the transfers was that it provided the company with a "financial advantage" which "help[ed] the -- the -- the return on the loans") (Soni Dec., Ex. 12); Chapin Tr. 36:6-10 ("Q.  Okay.  So AELMAC engaged in moving loans from floor bonds to taxable bonds? A.  In some instances.  Q. Okay.  Why would the company do that?  A.  To optimize the trust estate.") (Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000358-359 (seeking confirmation " ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

█████ ) (Mills Dec., Ex. 39).

███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**RESPONSE TO NO. SW5.  Incomplete.  Starting in 2003, Southwest billed 9.5%** SAP for both the transferred loan and (if it had a nexus to either Arizona or Florida) the newly originated or purchased loan.  Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 56:18-60:21, 104:20-106:3 (Soni Dec., Ex. 16).  At some point in or before 2003, Southwest decided to retroactively bill the government for 9.5% SAP on the loans that had been transferred since 2001; at the same time, Southwest continued to bill 9.5% SAP on loans that had been originated or purchased out of its pre-1993 tax exempt 9.5% SAP eligible bonds since October 2001.  Wheeler Tr. 19:17-20:3, 24:12-25:12, 64:2-6 (Soni Dec., Ex. 16).  Southwest's purpose in doing so was to maximize the yield of 9.5% SAP in its portfolio.  V. Roig Tr. 103:8-106:5 (Soni Dec., Ex. 12); Chapin Tr. 36:6-10 (Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000358-359 (Mills Dec., Ex. 39).

The Southwest employees who implemented this tracking and billing process could not identify any basis for believing that Southwest could legitimately bill 9.5% SAP for both transferred and originated or purchased loans.  For instance, a series of memoranda by Southwest's Director of Finance, Lisa Jacobson, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ Wheeler Tr. 45:12-21 (Soni Dec., Ex. 16); Jacobson Tr. 16:9-17 (Soni Dec., Ex. 13); Jacobson Ex. 1 at SLMA_P0000355 (Mills Dec., Ex. 39).  Yet Jacobson, who had no legal training, could not identify a source for her understanding of the requirements for billing

for 9.5% SAP expressed in those memoranda.  Jacobson Tr. 13:8-14:2, 134:2-135:2 (Soni Dec., Ex. 13).  Jacobson could not remember reading either the 1993 OBRA or the regulations governing 9.5% SAP, even though her memoranda opined that the statute and regulations allowed for billing on transferred loans.  *Id.* at 21:19-21, 32:14-22.

The transfers did not have the characteristics of a sale.  The transfers were not recorded as a taxable event.  Chesin Tr. 117:1-118:1 (Soni Dec., Ex. 11); Wheeler Tr. 110:14-111:11 (Soni Dec., Ex. 16).  The company's former director of finance testified that a "purchase" would not include intra-company transfers.  Jacobson Tr. 37:3-13 (Soni Dec., Ex. 13).  The transfer of loans between bonds was considered a "loan transfer," not a "purchase" or "sale."  Jacobson Tr. 37:3-13, 78:19-79:2 (Soni Dec., Ex. 13); V. Roig Tr. 45:18-46:3 (Soni Dec., Ex. 12).  Southwest's loan transfers were at par.  V. Roig Tr. 83:22-84:12 (Soni Dec., Ex. 12); Wheeler Tr. 102:6-13 (Soni Dec., Ex. 16).  The documentation recording the transfers were not contracts for the sale or purchase of loans, being instead the equivalent of instructions to the trustee to move money from one bond to the other in exchange for the transferred loans.  Wheeler Tr. 107:8-22 (Soni Dec., Ex. 16).  There was no internal requirement that the loans had to stay in a pre-1993 tax exempt 9.5% SAP eligible bond for any specific period of time before being transferred.  *Id.* at 72:14-20.  Such transfers could not have occurred without Southwest's approval.  Wheeler Tr. 108:1-13 (Soni Dec., Ex. 16); Chapin Tr. 79:13-80:14 (Soni Dec., Ex. 14).  Southwest retained the power to reverse the transfers.  Wheeler Tr. 111:12-19 (Soni Dec., Ex. 16).

████████████████████████████████████████

████████████████████████████████████████



**RESPONSE TO NO. SW6.** Incomplete.  Southwest did not treat loans transferred after September 30, 2004 as being eligible to receive 9.5 SAP, ███████████████ ████████████████████████████████████████ Taxpayer-Teacher Protection Act at SLMA_EF00000116 (███████████████████████ █████████) (McMahon Dec., Ex. VI.10).

SW7.  As of the below dates, Southwest's approximate total principal balances of loans for which it was billing at the 9.5 SAP rate were as follows [McMahon Decl., Ex. VI.11 (OBERG00007760-71)]:

| Date | 9.5 Loan Balance |
|---|---|
| September 30, 2001 | $316 million |
| September 30, 2002 | $340 million |
| September 30, 2003 | $489 million |
| September 30, 2004 | $743 million |
| September 30, 2005 | $711 million |
| September 30, 2006 | $449 million |

**RESPONSE TO NO. SW7.** Disputed.  The chart identifies the total principal balance of loans for which Southwest was billing at the 9.5 SAP rate on September 30, 2002 as approximately $321,00,000.  9.5 SAP Summary at OBERG00007762 (McMahon Dec., Ex VI.11).

Incomplete to the extent it does not include periods of time where Southwest's approximate average daily balance of loans for which it was billing at the 9.5% SAP rate were higher than this chart reflects, as reflected in the below chart:

| Date | 9.5 Average Daily Balance |
|---|---|
| March 2001 | $307,195,609 |
| September 2001 | $326,956,097 |
| March 2002 | $329,480,312 |
| September 2002 | $343,884,551 |
| March 2003 | $371,180,191 |
| September 2003 | $476,215,128 |
| March 2004 | $620,136,205 |
| September 2004 | $734,175,185 |
| March 2005 | $799,252,025 |
| September 2005 | $727,177,832 |
| March 2006 | $574,605,627 |
| September 2006 | $339,163,118 |

**Wheeler Ex. 15 at SLMA_P0027981 (McMahon Dec., Ex. VI.3).**

**SW8.** Each quarter from January 1, 2002 through September 30, 2006, Southwest submitted claims to ED for 9.5 SAP on the basis of the average daily principal balance of its 9.5 Loans during the quarter. For each such quarter, ED paid Southwest 9.5 SAP on the basis of Southwest's claims. [Third Amended Complaint ("TAC") (Docket No. 228) ¶¶ 60-63, 89.] ED has never demanded that Southwest repay any 9.5 SAP that it received for those quarters.

**RESPONSE TO NO. SW8. Disputed and incomplete. Disputed that all of the loans qualified as "9.5 Loans." DEd paid Southwest on the basis of its quarterly certifications that its 9.5% SAP claims were "correct to the best of [its] knowledge" and "conform[ed] to applicable laws, regulations, and policies relating to the Federal Family Education Loan Program." *See, e.g.*, Chesin Ex. 11 at SLMA_P0007741-50 (example of a signed Lender's Interest and Special Allowance Request and Report (Form 799) from AELMAC) (Soni Dec., Ex. 143). Southwest's Controller, Michael Chesin, made these quarterly certifications, despite not having knowledge of the laws governing student loans and specifically of the 1993 OBRA limiting 9.5 SAP eligibility to pre-1993 tax exempt financing. Chesin Tr. 32:4-11 ("Q. As corporate controller, was it part of your responsibility to be**

aware of laws, rules, and regulations that might affect the financial business of Southwest Corporation? A.  I was --  Well, that's – that's a tough question.  I had knowledge of the environment, not necessarily knowledge of – of all laws and – and so forth that affected student loans.") (Soni Dec., Ex. 11); *see also id*. at 20:9-19, 30:10-12, 34:15-35:20, 42:12-43:13, 119:21-120:1, 150:9-152:22, 157:13-17, 189:9-11; *see also* Chesin Ex. 11, SLMA_P0007741-50 (example of a Lender's Interest and Special Allowance Request and Report (Form 799) signed by Chesin)  (Soni Dec., Ex. 143).

Chesin did not take steps to educate himself about those laws, did not know how he could have learned the requirements to properly bill for 9.5% SAP and did not have the knowledge about such laws to be able to say whether certain proceeds could give rise to valid 9.5% SAP billing.  Chesin Tr. 178:22-179:4, 191:17-192:12 (Soni Dec., Ex. 11).  Like Jacobson, Chesin could not identify a source for his understanding of the requirements for billing for 9.5% SAP, speculating that his knowledge of what Southwest could lawfully bill may have come from "a news flash or something like that" or "a lot of talk."  *Id.* at 32:4-34:13.

Southwest did not disclose to DEd that it was billing 9.5% SAP on both transferred loans and loans newly acquired or purchased out of the pre-1993 tax exempt 9.5% SAP eligible bond from cash generated by the transfers.  J. Roig Ex. 2 at SLMA_P0027363-65 (McMahon Dec., Ex. VI.14); J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).

**SW9.**  In October 2001, Jane Stewart,[5] then Senior Vice President of Government Relations at Southwest, received a letter with attachments from Sheila Ryan-Macie (the "Ryan-Macie Letter"). [McMahon Decl., Ex. VI.12 (SLMA_P0027274-347.)] Ms. Stewart had asked Ms. Ryan-Macie for assistance in developing a chronological review of communications relating to ED's "policy" under "1992 regulatory changes," and "[g]uidance" on those regulations "issued in March 1996," "whereby the source of funds used to acquire a loan now determines special allowance billing." The Ryan-Macie Letter provided "a review of discussions and guidance on this topic." [McMahon Decl., Ex. VI.12 (SLMA-P0027274); Ex. VI.28 (J. Roig Dep. at 24:17-26:6).]

**RESPONSE TO NO. SW9.  Not disputed, but incomplete.  Ryan-Macie is not a lawyer.  Ryan-Macie Tr. 38:7-17 (Soni Dec., Ex. 29).  Ryan-Macie worked at Aurora Consulting Group, LLC ("Aurora").  During her tenure at Aurora, Aurora advised a number of the defendants in this case – Nelnet, Student Loan Finance Corporation ("SLFC"), Education Loans Inc. ("EdLinc") (a wholly owned subsidiary of SLFC), and Southwest Student Services Corporation.  *Id.* at 16:15-22, 21:15-22; Buckmeier Tr. 18:2-8 (Soni Dec., Ex. 1).  Her firm's advice to Nelnet, SLFC, and EdLinc was on the very 9.5% SAP issue at the core of this proceeding.  Ryan-Macie Tr. 17:9-18, 21:15-24:12, 34:7-36:14. Ryan-Macie was personally "involved in preparing a report" for EdLinc on the 9.5% SAP issue that "propose[d] a strategy to optimize SLFC's use of its tax-exempt sources of financing" (although she claims not to recall whether she prepared the strategic portion of the report).  *Id.* at 17:9-18, 18:1-19:3, 34:7-36:14.  Ryan-Macie's firm received a share of**

---

[5]      Ms. Stewart subsequently married and changed her last name to Roig. [McMahon Dec., Ex. VI.27 (Nickel Dep. at 44:1-6).]

SLFC's and EdLinc's gains from implementing the strategy that Aurora had recommended. *Id.* at 29:18-30:22, 36:1-37:6. *See also* EdLinc Resp. to Rel. Interrog. No. 20 (Soni Dec., Ex. 148). Ryan-Macie herself received not only a salary from Aurora but a year-end bonus based on Aurora's profits. *Id.* at 28:10-16, 29:6-8, 29:18-31:9. EdLinc paid over $1 million – $1,013,534.97, to be precise – to Ryan-Macie's former employer in connection with its implementation of the company's advice on maximizing its 9.5% SAP claims. *See* EdLinc Resp. to Rel. Interrog. No. 20 (Soni Dec., Ex. 148).

Ryan-Macie's letter in response to Jane Roig's request did not address whether the program in which Southwest eventually engaged (using cash generated from loan transfers to purchase or originate new student loans for which Southwest would bill 9.5% SAP in addition to the transferred loans) would be valid. J. Roig Ex. 1 at SLMA_P0027274-76 (McMahon Dec., Ex. VI.12). It did not state that loans originated or purchased after 1993, the cutoff date for new 9.5% SAP loans in the 1993 OBRA, would be eligible for 9.5% SAP. *Id.* (McMahon Dec., Ex. VI.12). The letter stated that Section 682.303 "was intended to curtail authorities from moving loans from one financing source to another." *Id.* at SLMA_P0027276 (McMahon Dec., Ex. VI.12). Further, Jane Roig could not recall giving details of Southwest's 9.5% SAP billing practices to Ryan-Macie before receiving the letter. J. Roig Tr. 75:2-10 (Soni Dec., Ex. 33).

SW10. Ms. Stewart reached out to Ms. Ryan-Macie because the two had served together on the Program Regulations Committee ("PRC") of the National Council of Higher Education Loan Programs ("NCHELP"), a student-loan industry group, for about ten years, and Ms. Stewart considered Ms. Ryan-Macie the most knowledgeable person on this topic. Ms. Stewart recalled from her time on the PRC that ED had proposed a regulation in a 1990

notice, the wording of which suggested "that the original source of funding of the loan basically stamped that loan for its lifetime [of the debt outstanding] as far as eligibility for [9.5% SAP]." Ms. Stewart was trying to recall the sequence of events and documentation of discussions with ED on this topic. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 26:7-28:11).]

**RESPONSE TO NO. SW10.** **Not disputed, but incomplete.** *See* **Response to SW9,** *supra***, regarding Ryan-Macie's qualifications and objectivity. Whether a loan remains eligible for 9.5% SAP after it is transferred out of a 9.5% SAP eligible bond does not address whether a lender can grow its pool of 9.5% SAP loans by also billing for newly originated or purchased student loans, a practice that DEd warned Southwest violated the 9.5% SAP regulations.** *See* **Responses to SW14-15,** *infra***.**

> SW11. In the Ryan-Macie Letter, Ms. Ryan-Macie wrote to Southwest:
>
>> In developing the policy, ED staff failed to consider the consequences of their policy change in low interest rate environments. While this may have initially been an oversight for ED, it was not without comment and concern raised by the FFELP community. You will find from the documentation, numerous references to the FFELP community's objection to the policy.
>>
>> Despite our comments and our clear statements that the policy would result in loans permanently being subject to the 1/2 SAP provisions **as well as the 9.5% floor provisions,** ED declined to revert to its original policy on this matter. *This appears to fall into the We told you so. Now we must comply" category of regulations.*

[McMahon Decl., Ex. VI.12 (SLMA_P0027276 (bold in original, italics added)).]

**RESPONSE TO NO. SW11.** **Not disputed, but incomplete.** *See* **Response to SW9,** *supra***, regarding Ryan-Macie's qualifications and objectivity.**

Ryan-Macie's letter in response to Jane Roig's request did not address whether the program in which Southwest eventually engaged (using cash generated from loan

transfers to purchase or originate new student loans for which Southwest would bill 9.5% SAP in addition to the transferred loans) would be valid.  J. Roig Ex. 1, at SLMA_P0027274-76 (McMahon Dec., Ex. VI.12).  It did not state that loans originated or purchased after 1993, the cutoff date for new 9.5% SAP loans in the 1993 OBRA, would be eligible for 9.5% SAP.  *Id.*  In fact, the letter suggested otherwise, noting that Section 682.303 "was intended to curtail authorities from moving loans from one financing source to another."  *Id.* at  SLMA_P0027276.  Further, Jane Roig could not recall giving details of Southwest's 9.5% SAP billing practices to Ryan-Macie before receiving the letter.  J. Roig Tr. 75:2-10 (Soni Dec., Ex. 33).

SW12.  Ms. Stewart understood the italicized sentence above to mean "[t]hat despite advising the Department of Education . . . that this policy change would result in a change in billing[,] loan holders were required to comply with the regulations." [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 30:5-12).]

**RESPONSE TO NO. SW12.**          **Incomplete.  *See* Response to SW9, *supra*, regarding Ryan-Macie's qualifications and objectivity.  *See* Response to SW11, *supra*, regarding whether the referenced letter fully addressed Southwest's practices.**

SW13.  Vince Roig, Southwest's Chief Executive Officer and Chairman of the Board, consulted with Jean Frohlicher, then President of the National Council of Higher Education Loan Programs ("NCHELP"), on whether the use of proceeds received from the transfer of loans out of 9.5 Eligible Bonds could be used to acquire new loans eligible for 9.5% SAP.  Roig recalls that Ms. Frohlicher "indicated to [him] that all of the literature, all of the regulations — nothing spoke to the issue, and that it was not — it was not contrary to any regulation that

was out there and published." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 35:10-36:3; 38:7-40:11).]

**RESPONSE TO NO. SW13.**        Disputed and incomplete. Vince Roig did not disclose to Frohlicher the details of Southwest's 9.5% billing. V. Roig Tr. 55:15-56: 5 ("Q. Did you give her the details of the activities that Southwest was engaged in? A. No, not precisely . . . I don't specifically remember going, you know, 'This is our issue, Jean.'") (Soni Dec., Ex. 12). According to the quotation cited by Southwest in this Statement of Undisputed Fact, Frohlicher told Vince Roig that there was nothing to support 9.5% SAP recycling activities. *Id.* at 39:22-40:6 (explaining that Frohlicher told him that "nothing spoke to the issue"). Frohlicher did not work for the DEd. *Id.* at 10-36:3. DEd advised Southwest in 2003 that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP – the very practice in which Southwest was then engaging to expand its 9.5% SAP billing. *Id.* at 38:7-22, 42:9-21; J. Roig Ex. 2 at SLMA_P0027358 (McMahon Dec., Ex. VI.13). *See also* SW15, *infra.*

SW14.   In July 2003, the Northern Region of ED's Financial Partners unit conducted a program review of Southwest's FFELP portfolio. [McMahon Decl., Ex. VI.13 (SLMA_P0027353-62).] The report included a finding of "Incorrect Billing for Special Allowance Benefits" on loans held by the University of Miami and serviced by Southwest. The report stated that the University of Miami had billed ED for 9.5%/half-SAP, but did not meet the criteria for issuing tax-exempt debt, resulting in an overbilling of approximately $350,000. [*Id.* (SLMA_P0027358).]

**RESPONSE TO NO. SW14.**        **Not disputed, but incomplete.  As explained more fully in SW15, the report also found that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP.  J. Roig Ex. 2 at SLMA_P0027358 (McMahon Dec., Ex. VI.13).  *See* SW15 and Response to SW15, *infra*.**

SW15. The report continued with the exact language of the October 30, 2002 Iowa report that was removed from the final report in favor of a finding of compliance [*see supra* ¶¶ JS42-50]:

> The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate. [McMahon Decl., Ex. VI.13 (SLMA_P0027358).]

**RESPONSE TO NO. SW15.**        **No dispute that the language is quoted accurately.  Any comparison to the Iowa audit is irrelevant.  *See* Responses to JS33, 42-50, *supra*.  In Southwest's own interpretation of the program review's findings quoted herein, DEd was informing Southwest that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP.  V. Roig Tr. 38:7-22.  ("Q. Okay. What do you understand to be the issue that the government is raising here? A. The – And, again, I – I – I can't speak for the government, but there was – it's clear that in the writing, they are suggesting that – that they have regulation in place or something in place – whatever that**

might be – that prohibits a tax-exempt bond that's eligible for 9 and a half floor SAP payments to receive recycling funds and then re-lend those and have them also qualify for special allowance payments. Q. And it is that issue – A. I'm sorry. 9 and a half are special allowance payments.") (Soni Dec., Ex. 12).  The practice identified in the program review as being contrary to the 9.5% SAP regulations – transferring loans from a 9.5% SAP eligible to a 9.5% SAP ineligible bond and using the cash generated thereby to purchase or acquire new 9.5% SAP loans – was the same as Southwest's process for growing its 9.5% SAP loan pools.  *Id.* at 42:9-21 (Q. "So going back to this Finding 2 in Exhibit 1, this – in this Finding 2, the government is asserting, anyway, that 9.5 recycling is illegal, correct? . . . A. I think it's asserting that it has regulations and it has guidance in certain forms that's out there and that – that our actions were contrary to their guidance."); Wheeler Tr. 142:10-147:5 (Soni Dec., Ex. 16).

**SW16.** Vince Roig, Southwest's Chief Executive Officer and Chairman of the Board, believed that "[t]here was no basis in the law[,] in interpretation of the law, in regulation, or in any guidance that we had received" for ED's comment. [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 33:21-34:15).]

**RESPONSE TO NO. SW16.**        Disputed and incomplete.  Roig attributed his understanding of what it was legal to bill for 9.5% SAP to the company's "opinion" and "information we had gathered in discussion with our colleagues," but the only colleagues he could identify were Jean Frohlicher (the former president of the National Council of Higher Education Loan Programs) and Barbara Ryan (Southwest's general counsel).  Roig did not disclose to Frohlicher the details of Southwest's 9.5% SAP billing practices.  V. Roig Tr. 55:15-56: 5 (Soni Dec., Ex. 12).  Roig could not remember details about his

- 283 -

consultation with Ryan, which may have involved something as fleeting as, in his description, "me wandering down to get a cup of coffee and pok[ing] my head in her office." *Id.* at 40:12-41:10. Ryan did not produce a written report to Southwest on the legality of their 9.5% SAP billing. *Id.* at 55:12-56:13, 64:2-10. Roig testified that his consultations with others in the industry was not "necessarily specifically about 9.5, but in general" about the topic of special allowance payments. *Id.* at 38:10-39:21. In response to a question regarding whether he asked O'Toole if 9.5% SAP recycling was acceptable, Roig testified that "I wasn't in the habit of asking 'mother may I' or any of that activity." *Id.* at 79:1-10.

SW17. Jane Stewart, then Southwest's Chief Operating Officer, believed that ED's comment was "incorrect" because "there was nothing in writing from them that said that." [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 34:11-35:11).]

**RESPONSE TO NO. SW17.**        Disputed and incomplete. The program review (*see* SW15) was itself a "writing from [DEd] that said" that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP, which was how Southwest interpreted the program review's finding at the time. V. Roig Tr. 38:7-22, 42:9-21 (Soni Dec., Ex. 12). The practice identified in the program review as being contrary to the 9.5% SAP regulations – transferring loans from a 9.5% SAP eligible to a 9.5% SAP ineligible bond and using the cash generated thereby to purchase or acquire new 9.5% SAP loans – was the same as Southwest's process for growing its 9.5% SAP loan pools. *Id.* at 42:9-21; Wheeler Tr. 142:10-147:5 (Soni Dec., Ex. 16).

*See* **Response to SW18,** *infra,* **regarding Southwest not disclosing its 9.5% SAP loan growth practices to DEd in response to the 2003 program review.**

**SW18.**   In a January 12, 2004 letter, Jane Stewart responded for Southwest to ED's findings and comments. [McMahon Decl., Ex. VI.14 (SLMA_PO027363-65); Ex. VI.28 (J. Roig Dep. at 35:12-36:10).] The response acknowledged that "an incorrect special allowance flag was set due to a manual error," that "this error resulted in an overbilling of special allowance by the University of Miami," and that "reimbursement occurred to the Department of Education well before this review report was issued by the Department."  Southwest, however, went on to "disput[e] several statements made in the context of special allowance billing on tax-exempt loans":

> The suggestion that proceeds received from the sale or transfer of loans cannot be treated as proceeds of tax-exempt debt is incorrect. *There is no basis for the position, and, in fact, recycling of financing proceeds is a common practice among all bond issuers and permitted under rules governed by Treasury.* We also understand that Assistant Secretary for Post Secondary Education Sally Stroup commented on this issue in early November at the Department of Education's Electronic Access Conference by saying that although it may be bad policy in a low interest rate environment, these activities are not illegal and do not constitute fraud and abuse. We are requesting that these irrelevant statements be removed from the finding and that the finding simply address the specific violation (the overbilling of special allowance due to a coding error) and the remedy. [McMahon Decl., Ex. VI.14 (SLMA_P0027365).]

**RESPONSE TO NO. SW18.**       **No dispute that the language is quoted accurately.  Although Southwest submitted a letter in response to the program review, SLMA_P0027363-65 (McMahon Dec., Ex. VI.14), Southwest did not disclose to DEd that it was engaging in the practice identified in the program review as contrary to the 9.5% SAP regulations.** *Id.;* **J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).  Instead, Southwest limited its response to general statements of**

disagreement with the program review's findings. *Id.* at SLMA_P0027365.  A few months prior to the January 2004 Stewart letter, in September 2003, Southwest completed its project for retroactively tagging previous loan transfers with 9.5% SAP to allow for an expansion of its 9.5% SAP claims.  Wheeler Tr. 19:17-20:3, 24:12-25:12, 40:19-41:22, 47:21-48:10, 64:2-6 (Soni Dec., Ex. 16).

See Response to SW21, *infra*, regarding DEd's response to the Stewart's January 2004 letter.

SW19.  Jane Stewart read the EFC Exchange in the normal course of her work at Southwest. Although she did not recall reading the November 5, 2003 issue of EFC Exchange, she was sure that she did read it, and believed that issue of EFC Exchange was the source of her information concerning the Sally Stroup comments referenced in Southwest's response to ED. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 39:19-40:2, 41:14-44:9); *see supra* ¶¶ JS40-41.]

**RESPONSE TO NO. SW19.**        Incomplete.  Stroup's comments did not mention Southwest specifically, or Southwest's 9.5% SAP billing practices specifically.  J. Roig Tr. 81:6-83:4 (Soni Dec., Ex. 33).  *See* Responses to JS39-41, *supra*, regarding Stroup's comments.  Southwest employees responsible for billing for 9.5% SAP did not attend the Electronic Access Conference where Sally Stroup spoke in 2003.  Chesin Tr. 193:15-20 (Soni De., Ex. 11); V. Roig Tr. 57:21-59:21 (Soni Dec., Ex. 12); J. Roig Tr. 39:2-5 (Soni Dec., Ex. 33).  Chesin did not even know who Sally Stroup was.  Chesin Tr. 194:2-3 (Soni Dec., Ex. 11).

SW20.   According to Vince Roig, Southwest's response was meant to convey to ED "that they were absolutely flat wrong in their position." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 34:15-17).]

**RESPONSE TO NO. SW20.**       **Disputed and incomplete.  The record is not clear whether Roig's comment concerned Southwest's response letter.  *See* Response to SW16, *supra*, regarding Roig's understanding of the legality of Southwest's 9.5% SAP practices.  Roig was not aware "at all" of the details of the 1993 OBRA limiting 9.5% SAP eligibility to pre-1993 tax exempt financing.  *Id.* at 37:16-38:5, 63:3-11.**

SW21. On May 21, 2004, ED replied to Southwest's January 12, 2004 letter as follows:

> Due to a manual error, an incorrect special allowance flag was set which resulted in an over-billing of special allowance by the University of Miami. This error was immediately corrected by [Southwest] and the Department was reimbursed. *We agree that statements in the review report relating to the sale or transfer of tax-exempt loans are irrelevant to this finding,* which occurred solely as a result of a coding error. [Southwest] has sufficiently resolved this error and no further action is required. You may now consider this program review <u>closed</u>." [McMahon Decl., Ex. VI.15] (SLMA_P0027366 (italics added, underlining in original)).]

**RESPONSE TO NO. SW21.**       **No dispute that the language is quoted accurately.  DEd did not withdraw or disagree with its earlier conclusion that the growth of 9.5% SAP loan pools through loan transfers – through the exact process in which Southwest was engaged – was invalid.  *See* J. Roig Ex. 2 at SLMA_P0027366-67 (McMahon Dec., Ex. VI.15).  While DEd noted that such a finding was irrelevant to the precise issue at hand, "which occurred solely as the result of a coding error," DEd did not express approval of the growth of 9.5% SAP loan pools, or cast doubt on its earlier finding that unlimited growth of 9.5% SAP loan pools through transfers between 9.5% SAP eligible**

and ineligible bonds was contrary to the applicable laws and regulations. *See id.* Thereafter, Southwest continued to engage in the precise activity that DEd told Southwest was invalid and Southwest continued to certify on a quarterly basis its compliance with "applicable laws, regulations, and policies relating to the Federal Family Education Loan Program." Southwest and Sallie Mae Responses to Interrogatory No. 3 (Mills Dec., Ex. 5).

SW22.   Vince Roig "[a]bsolutely" interpreted ED's response to be "their way of telling us that . . . they had no business putting that in their report to start with." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 45:8-17).]

**RESPONSE TO NO. SW22.**       **No dispute that the language is quoted accurately.** *See* **Response to SW21,** *supra,* **regarding DEd's response letter of May 21, 2004.**

SW23.   Jane Stewart interpreted ED's response to mean that "[t]hat they weren't requiring any further action on our part." Ms. Stewart did not recall anyone from ED following up with her to discuss the position Southwest had taken in its January 12, 2004 letter. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 49:14-50:13).]

**RESPONSE TO NO. SW23.**       **No dispute that the language is quoted accurately.  Although Roig disagreed with the finding, she did not disclose to the Department that Southwest was engaged in the very practice the Department determined was improper in its finding.  J. Roig Ex. 2 at SLMA_P0027365 (McMahon Dec., Ex. VI.14); J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).** *See also* **Response to SW18,** *supra.*

**SW24.**  At some point following March 31, 2004, GAO contacted Southwest with questions for an interview concerning a "study of various FFELP Provisions." Southwest prepared written responses to GAO's questions, which Jane Stewart, Southwest's Chief Operating Officer, conveyed to GAO telephonically. [████████████████ ████████████; Ex. VI.28 (J. Roig Dep. at 50:21-53:2).]

**RESPONSE TO NO. SW24.**     No dispute.





**RESPONSE TO NO. SW25.**          No dispute that the language is quoted accurately. Southwest's answer did not disclose that it was billing 9.5% SAP for both loans transferred from pre-1993 tax exempt 9.5% SAP eligible bonds to post-1993 tax exempt 9.5% ineligible and taxable bonds, and loans originated or purchased with cash generated from the transfer, disclosing only that it continued to bill 9.5% SAP for the transferred loan. *See* **J. Roig Ex. 4 at SLMA_P0027348-52 (McMahon Dec., Ex. VI.2).**

SW26.  Jane Stewart did not recall anyone from the GAO raising any concerns that, based upon Southwest's answers to its questions, Southwest's 9.5% SAP practices were unlawful, improper, or even questionable. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 53:22-55:8).]

**RESPONSE TO NO. SW26.**          Incomplete.  *See* **Response to SW25,** *supra.*

**SW27.**   On February 27, 2007, SLM's General Counsel responded on behalf of its subsidiaries to ED's January 2007 Dear Colleague Letter, in which ED offered to forego attempts to recover historical payments of 9.5 SAP from lenders if they agreed not to submit new 9.5 SAP claims that did not comply with the January 2007 DCL's statement of eligibility for such claims, as follows:

> While we respectfully disagree with the interpretation set forth in the [January 2007 DCL] concerning eligibility for special allowance payment (SAP) at the 9.5% minimum return rate, we agree, subject to the conditions described below, as follows. First, we agree to make no further claims for SAP at the 9.5 percent minimum rate. Second, we agree to accept payment on our recently submitted requests for special allowance payments for the fourth quarter of 2006 at the standard SAP rate . . . . [W]e reserve the right to reevaluate these agreements if Congress, the Executive branch or any governmental entity takes any action that is materially adversely different from the Department of Education's resolution of this matter.

[McMahon Decl., Ex. VI.16 (ED-H-000629).]

**RESPONSE TO NO. SW27.**        **No dispute that the language is quoted accurately.  *See* Responses to JS163-64, *supra*, regarding the January 2007 DCL and DEd's position regarding recovery of historical 9.5% SAP payments.**

**8.        Undisputed Facts Concerning Relator's Alter-Ego Claim Against SLM Corporation.**

**SW28.**   On October 15, 2004, SLM acquired Southwest. [McMahon Decl., Ex. VI.17 (SLM Corp., Yearly Report (Form 10-K) (Mar. 16, 2005)) at 27-28.]

**RESPONSE TO NO. SW28.**        **No dispute.**

**SW29.**   After the first calendar quarter of 2005, the average daily principal balance of Southwest's 9.5 Loans (not including the impact of prior-period adjustment amounts) decreased in each quarter through the end of 2006. [McMahon Decl., Ex. VI.3 (SLMA_P0027981).]

**RESPONSE TO NO. SW29.**        Incomplete.  Southwest's 9.5% SAP loan growth for the March 2001-March 2005 time period was from approximately $307 million to $799 million.  SLMA_P0027981 (McMahon Dec., Ex. VI.3).



SLM was ████████████████████████████████

████████████████.  Project Troy Update at SLMA_EF0000249 (Soni Dec., Ex. 169); Project Troy Update at SLMA_EF00000163 (Soni Dec., Ex. 168).  ████████████

████████████████████████████████████████████████████

████████████████████████████████████  Project Troy Update at SLMA_EF0000249 (Soni Dec., Ex. 169).

At the time of SLM's acquisition of Southwest, Sallie Mae, Inc. officials conducted a due diligence review of Southwest's 9.5% SAP loans and met with Southwest officials and reviewed Southwest documents.  Wheeler Tr. 135:22-136:13, 139:2-12 (Soni Dec., Ex. 16).  After this review, SLM allowed Southwest to continue to bill 9.5% SAP.  *Id.* at 135:22-136:13.

Following the acquisition, Sallie Mae monitored Southwest's entire loan portfolio, including 9.5% SAP loans.  Nickel Tr. 117:14-21 (Soni Dec., Ex. 17).  In this time period, Sallie Mae management made decisions about Southwest's loan portfolio.  V. Roig Tr. 107:11-108:2 (Soni Dec., Ex. 12).  In at least one instance, a Sallie Mae, Inc. official gave a specific order to Southwest to cease recycling and Southwest obeyed the order.  Wheeler Tr. 138:5-140:9 (Soni Dec., Ex. 16).  Sallie Mae, Inc. took over as servicer of Southwest's loans in the Fall of 2005.  *Id.* at 114:19-115:6.  Sallie Mae, Inc. took over the 9.5% SAP claims submission process.  *Id.* at 132:21-133:12.

SLM also requested information about Southwest's 9.5% SAP loans and Southwest provided information when requested.  Nickel Tr. 101:3-14 (Soni Dec., Ex. 17); Nickel Ex. 5, at SLMA_EF00001234 (Soni Dec., Ex. 135); Nickel Ex. 7, SLMA_EF0001235 (Soni Dec., Ex. 136); Jacobson Tr. 91:21-93:10 (Soni Dec., Ex. 13); Jacobson Ex. 6, at SLMA_P0004356-57 (Mills Dec., Ex. 38).

Southwest did not treat loans transferred after September 30, 2004 as being eligible to receive 9.5% SAP ████████████████████████████████████████████ ████████████████████████████. SLMA_EF00000116 (████████████████████ ████████████████████) (McMahon Dec., Ex. VI.10).

SW30. ████████████████████████████████████████████████



████████████████████████████████████████████████████████████████████ ████████████████████████████████████ The services provided by Sallie Mae, Inc. (not SLM Corp.) included accounting, finance, human resources, information technology, and legal. Aspects of many of these functions continued to be handled by Southwest management for some time after the acquisition. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 112:6-15, 114:10-13, 119:1-120:3, 126:22-129:18, 131:14-132:18, 138:22-141:1, 145:17-146:3, 235:12-236:5, 257:22-258:7).]

RESPONSE TO NO. SW30.      Disputed and incomplete.  Sallie Mae, Inc. is a wholly owned subsidiary of SLM.  Nickel Tr. 273:4-8 (Soni Dec., Ex. 17); SLM Corp., Yearly Report (10-K) (Mar. 16, 2005) at 18 (http://salliemae.com/NR/rdonlyres/A0450B59-A4A0-4586-9B4C-253FF335008B/10705/W052931620N.pdf.)  SLM had Sallie Mae, Inc. officials conduct a due diligence review of Southwest's portfolio at the time SLM acquired

Southwest.  Wheeler Tr. 135:22-136:13, 139:2-140:5 (Soni Dec., Ex. 16).  SLM also ordered Southwest to obtain authority from Sallie Mae, Inc. officials for certain transactions. Southwest needed Sallie Mae, Inc.'s Managing Director/Vice President of Facilities approval before entering into leases of facilities, property, or equipment of any amount. Rakatansky Tr. 41:5-13 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 16).  Similarly, Southwest needed the approval of Sallie Mae, Inc.'s Managing Director/Vice President Corporate Finance before engaging in a number of types of transactions - such as investment/hedge portfolio transactions, debt/swap transactions, leveraged lease transactions, equity premium payments, and debt issuances. Rakatansky Tr. 41:15-18 (Soni Dec., Ex. 15); Rakatansky Ex. 4 SLMA_P0027870-871 (Soni Dec., Ex. 16).

Following the acquisition SLM and its subsidiaries provided many services to Southwest involving employee benefits, a stock option program in Sallie Mae stock, legal services, human resources/training, a Sallie Mae 401(k) plan and Sallie Mae stock purchase plan, payroll processing, a Sallie Mae employee stock purchase plan, internal audit services, information technology services, finance and accounting services, servicing of student loans, and processing of loan payment services.  Nickel Tr. 56:16-57:4, 132:11-21, 56:12-19, 113:2-114:12, 134:12-135:10, 120:13-121:3, 135:17-19, 122:2-123:17, 132:22-133:7, 133:8-18, 134:12-135:10, 137:14-142:9, 146:17-147:3, 167:6-13, 183:3-185:2 (Soni Dec., Ex. 17); Chesin Tr. 168:7-169:5 (Soni Dec., Ex. 11); Wheeler Tr. 153:17-155:2 (Soni Dec., Ex. 16).

Richard Nickel testified that he was unaware of payments between Sallie Mae and Southwest for the servicing of student loans.  Nickel Tr. 171:21-172:20, 202:20-203:5 (Soni

Dec., Ex. 17).  Nickel, Southwest's former President, was unaware of the specifics of the administrative services agreement and could not state whether such documents were even in written form and indicated that he did not review such documents.  Nickel Tr. 174:1-14, 115:10-116:11, 142:11-143:4 (Soni Dec., Ex. 17).  Further, Southwest has never asserted that it actually paid SLM or Sallie Mae, Inc. for any services.

SW31. Following the acquisition, Southwest's core business operations — the sale and marketing of, and provision of customer service for, Southwest loan products — continued at Southwest. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 148:13-150:2).] The day-to-day responsibility for overseeing those operations remained the responsibility of Southwest management. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 46:9-17, 92:12-19).]

**RESPONSE TO NO. SW31.**        Disputed and incomplete.  Following SLM's acquisition, Southwest sold Sallie Mae loan products, including signature loans and Sallie Mae's consolidation program in addition to Southwest products.  Nickel Dep. Tr. 151:11-152:4 (Soni Dec., Ex. 17).  Similarly, Southwest also offered call center support to Sallie Mae customers.  *Id.* at 192:2-194:9.  While some sales and marketing functions remained under the control of Southwest, numerous functions that formally had been performed by Southwest employees migrated to SLM and other SLM subsidiaries.  *See* Response to SW 30, *supra*.  As senior officials at Southwest departed from their positions, Southwest did not hire new people for those positions.  Nickel Tr. 250:8-251:8 (Soni Dec., Ex. 17).  Southwest did not create or maintain balance sheets or income statements for the time period after March 2005.  Wheeler Tr. 155:4-10 (Soni Dec., Ex. 16); Nickel Tr. 209:2-15; 210:15-211:9 (Soni Dec., Ex. 17).

**SW32.**  Following the acquisition, Southwest's President hired and fired employees without the need to consult with SLM or obtain its approval. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 98:7-15).] Southwest's President made the decision to shut down Southwest's Miami office, and to let go its employees and one officer, without receiving a directive from SLM. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 259:16-260:16).]

**RESPONSE TO NO. SW32.**         **Disputed and incomplete.  Southwest's President testified that Southwest's sole Director, a SLM employee, had the authority to hire and fire Southwest officers.  Nickel Tr. 88:10-89:1 (Soni Dec., Ex. 17).  Further, this Director and SLM employee had the authority to overrule Southwest's President, gave strategic direction to Southwest, conferred with Southwest's President about Southwest's business plan and its higher level financial decisions, and approved amendments to Articles of Incorporation, Bylaws, and the appointment of officers.  Nickel Tr. 48:19-49:7 (Soni Dec., Ex. 17); Rakatansky Tr. 18:19-19:11, 19:17-20:2 (Soni Dec., Ex. 15).**

**In other areas, Southwest was required to obtain approval of SLM and its subsidiaries for certain actions.  SLM adopted and Southwest was required to follow a Signature Authorization Policy.  Rakatansky Tr. 24:9-17 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).  This document required a certain level of approval before a Southwest employee purchased goods and services.  Rakatansky Tr. 25:17-26:5 (Soni Dec., Ex. 15).  Sallie Mae, Inc.'s finance organization ensured compliance with this policy and only SLM's CEO, COO, Executive Vice President of Finance, or the Executive Vice President of Accounting and Risk Management could make exceptions to this policy.  Rakatansky Tr. 28:8-29:7 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).**

SLM adopted and Southwest was also required to follow a Signature Authority Approval Matrix. Rakatansky Tr. 23:20-24:17 (Soni Dec., Ex. 15); Rakatansky Ex. 4, SLMA_P0027865-871 (Soni Dec., Ex. 131). Southwest purchases above a certain dollar amount required the approval of SLM's COO or CEO. Rakatansky Ex. No. 4 (Soni Dec., Ex. 131); Rakatansky Tr. 34:16-18, 36:17-20 (Soni Dec., Ex. 15). In addition to SLM officers needing to approve Southwest's purchases above a certain dollar amount, other types of purchases, regardless of dollar amount, required SLM or its subsidiaries to review and approve the purchase. Rakatansky Tr. 54:21-55:16 (Soni Dec., Ex. 15). For example, Sallie Mae, Inc's Managing Director/Vice President of Facilities would need to review and approve the leases of facilities, property, and equipment. Rakatansky Tr. 41:5-13 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 131). Sallie Mae, Inc.'s Managing Director/Vice President, Corporate Finance would need to review and approve investment/hedge portfolio transactions, debt/swap transactions, leveraged lease transactions, equity premium payments, and debt issuances. Rakatansky Tr. 41:15-18 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 131).

SW33. Following the acquisition, Southwest began to sell primarily Southwest products in new markets and added sales and customer service staff to do so. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 148:13-150:2, 265:22-268:2).]

RESPONSE TO NO. SW33.        Incomplete. Many other functions of Southwest migrated to SLM. *See* Responses to SW30-31, *supra*. Southwest sold Sallie Mae products and provided customer service support to Sallie Mae customers. *See* Response to SW31, *supra*. Southwest's President at that time, Richard Nickel, testified that he was not sure

**whether Southwest was compensated for these services.  Nickel Tr. 194:21-195:12 (Soni Dec., Ex. 17).**

SW34.   As of the end of 2006, Southwest's sales force numbered about 30 or 40. These Southwest employees visited schools within their assigned territory and promoted primarily Southwest loan products. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 262:19263:22).] These sales personnel used marketing materials generated by Southwest employees. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 264:16-265:1).]

**RESPONSE TO NO. SW34.          Incomplete.  *See* Responses to SW30-31, 33, *supra*.  Overall staffing at Southwest dropped by approximately one quarter from the time of SLM's acquisition to the end of 2006.  *See* Nickel Tr. 179:4-11 (Soni Dec., Ex. 17); Nickel Ex. 13 at SLMA_EF00000163 (Soni Dec., Ex. 133).**

SW35. As of the end of 2006, Southwest had 50 to 60 employees who were working in customer service, primarily for Southwest loan products. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 268:3-269:19).]

**RESPONSE TO NO. SW35.          Incomplete.  *See* Responses to SW30-31, 33-34, *supra*.**

SW36. As of the end of 2006, Southwest had a collections operation that was focused primarily on Southwest loans. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 269:21-270:11).]

**RESPONSE TO NO. SW36.          Incomplete.  *See* Responses to SW30-31, 33-34, *supra*.**

**SW37.** In total, about 200 Southwest employees were working in various capacities at Southwest at the end of 2006. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 261:11-262:18).]

**RESPONSE TO NO. SW37.**        **Incomplete.  Southwest had reduced its staff by approximately one quarter from the time of SLM's acquisition to the end of 2006.** *See* **Nickel Tr. 179:4-11 (Soni Dec., Ex. 17); Project Troy Update (Soni Dec., Ex. 168).**

███████████████████████████████

█████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

███████████████

**RESPONSE TO NO. SW38.**        **Disputed and incomplete.  Following SLM's acquisition of Southwest, Southwest's Board of Directors never held a single meeting. Rakatansky Tr. 17:13-19 (Soni Dec., Ex. 15).**

**Southwest's Board of Directors immediately was reduced from at least six individuals to one individual.  Nickel Tr. 72:16-74:12 (Soni Dec., Ex. 17).  The first Director of Southwest appointed by SLM was John Remondi, who served as Director from October 2004 – March 2005.  Rakatansky Tr. 14:10-21 (Soni Dec., Ex. 15).  Remondi, while serving as Director of Southwest, simultaneously served as Executive Vice President of SLM.  *Id.* at 14:22-15:4.  June McCormack replaced Jack Remondi as Southwest's Director in March 2005.  *Id.* at 15:5-9.  June McCormack also held the title of Executive Vice President of SLM while serving as Southwest's Director.  *Id.* at 15:10-13.  Barry Goulding replaced June McCormack as Southwest's Director in 2007.  *Id.* at 16:1-12.  Barry Goulding**

concurrently served as Director of Southwest, President of Southwest, and Senior Vice President of SLM. *Id.* at 56:10-57:7.

Following the SLM acquisition of Southwest, SLM set business plans for Southwest in an annual business plan and as part of a three-year planning document. *Id.* at 52:12-53:21.

Nickel testified that he believed Southwest remained profitable for a period of time because otherwise he "would have heard about it." Nickel Tr. 245:14-16 (Soni Dec., Ex. 17).

███████████████████████████████████████

███████████████████████████████████████

**RESPONSE TO NO. SW39.**      Incomplete.  After SLM's acquisition of Southwest, no Southwest shareholder meetings were held.  Rakatansky Tr. 18:5-14 (Soni Dec., Ex. 15).  Southwest paid no dividends to SLM.  Nickel Tr. 196:2-5 (Soni Dec., Ex. 17); Wheeler Tr. 169:16-20 (Soni Dec., Ex. 16).

**SW40.**  Southwest's President from May 2005 through the end of 2006 reported to Ms. McCormack as Southwest's single Board member and consulted with her on major decisions and strategic issues, but did not need her approval for the day-to-day activities of Southwest. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 46:9-17, 92:12-19).] During the time he was President, Ms. McCormack never hired or fired, or directed him to hire or fire, a Southwest officer. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 259:16-261:10).]

**RESPONSE TO NO. SW40.**        Incomplete.  Southwest's President testified that Southwest's sole Director had the authority to hire and fire Southwest officers.  Nickel Tr. 88:10-89:1 (Soni Dec., Ex. 17).  Further, Southwest's sole Director had the authority to overrule Southwest's President, gave strategic direction to Southwest, conferred with Southwest's President about Southwest's business plan and its higher level financial decisions, and approved amendments to Articles of Incorporation, Bylaws, and the appointment of officers.  *Id.* at 48:19-49:7 (Soni Dec., Ex. 17); Rakatansky Tr. 18:19-19:11, 19:17-20:2 (Soni Dec., Ex. 15).

Employees that continued working at Southwest following SLM's acquisition could not state whether their employer in this post-acquisition period was Southwest or Sallie Mae, Inc.  Lisa Jacobson testified that she believed that she was employed by Sallie Mae after SLM merged with Southwest.  Jacobson Tr. 125:15-16 (Soni Dec., Ex. 13).  Vince Roig considered himself to be employed by Sallie Mae following the acquisition.  V. Roig Tr. 15:15-19 (Soni Dec., Ex. 12).  Vince Roig identified Southwest as a "division" of Sallie Mae after the acquisition.  *Id.* at 53:6-16.

Nickel did not know about the administrative services agreement with Sallie Mae for services Sallie Mae provided to Southwest.  Nickel Tr. 174:1-14, 115:19-116-11, 142:11-143:4 (Soni Dec., Ex. 17).  Nickel similarly did not know whether Southwest received compensation for services it was providing to Sallie Mae.  *Id.* at 194:21-195:12.  Nickel did not know whether rent was paid to Southwest for Sallie Mae employees housed in Southwest's headquarters.  *Id.* at 202:20-203:5.  Nickel did not know about compilation of Southwest's financial statements – he declared "he had no understanding of that process." *Id.* at 207:18-208:22.  When asked to explain his lack of knowledge about  Southwest's

financial statements, Nickel testified that he relied on the "Sallie Mae financial contingent" along with Southwest financial staff to handle such matters. *Id.* at 215:12-216:4.

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

**RESPONSE TO NO. SW41.**          Incomplete.  SLM gave Southwest a ████████

████████████████ memorialized in an eight page agreement.  Nickel Ex. 20, at

SLMA_P0002852-2859 (McMahon Dec., Ex. VI.22);  Wheeler Tr. 159:13-161:19 (Soni Dec.,

Ex. 16). ██████████████████████████. *Id.* at 159:13-160:20. ████████

██████████████████████████████. Nickel Ex. 20 (McMahon Dec. Ex.

VI.22).  The agreement ████████████████████████████████

█████████████████████████████ Nickel Ex. 20,

SLMA_P0002852-2859 (McMahon Dec., Ex. VI.22).

     Before SLM acquired Southwest, Southwest ████████████████████████

████. Wheeler Ex. 19 at SLMA_P0000652-55(Soni Dec., Ex. 137); Wheeler Tr. 157:20-

158:22 (Soni Dec., Ex. 16).  This ████████████████████████████

████. *Id.* at 158:19-22.

██████████████████████████████████████████

████████████████████████████████████

███████████████████

**RESPONSE TO NO. SW42.**          No dispute.

**SW43.**  Southwest had positive net income in each year following its acquisition by SLM. [█████████████████████████████████; Ex. VI.27 (Nickel Dep. at 244:9-16).]

**RESPONSE TO NO. SW43.**          Disputed and incomplete.  Southwest and SLM sought and obtained from the Court limitations regarding the relevant time period for the alter ego question.  Information presented in SLMA_EF00000832 is outside that time period and Wheeler testified that he believed they were prepared in the last six months.  Wheeler Tr. 152:21-153:7 (Soni Dec., Ex. 16).  Southwest did not create or maintain balance sheets or income statements for the time period after March 2005.  *Id.* at 155:4-10; Nickel Tr. 209:2-15, 210:15-211:9 (Soni Dec., Ex. 17).

███████████████████████████████████████████

████████████████████████████████

**RESPONSE TO NO. SW44.**          Incomplete.  SLM made these contributions for its own tax planning purposes.  Wheeler Tr. 166:13-167:16 (Soni Dec., Ex. 16).

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

**RESPONSE TO NO. SW45.**          Disputed and incomplete.  *See* Response to SW43, *supra.*

- 303 -

Respectfully submitted,


/s/ Michael L. Sturm_____
Bert W. Rein (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
Thomas W. Queen (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
msturm@wileyrein.com
tqueen@wileyrein.com

Christopher Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102
Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C.  20006
Phone :  202.261.2806
Fax :  202.261.2835
*Attorneys for Qui Tam Relator Jon H. Oberg*


July 12, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of July 2010, a true and correct copy of the foregoing Relator's Response to Defendants' Joint Statement of Undisputed Material Facts was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| | |
|---|---|
| Gerard Mene, Esq.<br>Assistant United States Attorney<br>2100 Jamieson Ave<br>Alexandria, VA 22314<br>*Counsel for the United States* | W. Neil Eggleston, Esq.<br>Debevoise & Plimpton LLP (DC)<br>555 13th Street, NW, Suite 1100 East<br>Washington, D.C. 20004<br>*Counsel for SLM Corporation*<br>*and Southwest Student Services*<br>*Corporation* |
| Don Bradford Hardin Jr., Esq.<br>Wilmer Hale LLP<br>1875 Pennsylvania Avenue, NW<br>Washington, D.C. 20006<br>*Counsel for Education Loans*<br>*Inc/SD* | Timothy J. McEvoy, Esq.<br>Christine Crudgington Owen, Esq.<br>Cameron McEvoy, PLLC<br>11325 Random Hills Road, Suite 200<br>Fairfax, VA 22030<br>*Counsel for Panhandle Plains*<br>*Higher Education Authority* |
| David Michael Kopstein, Esq.<br>Kopstein & Perilman<br>8633 Cross Chase Court<br>Fairfax Station, VA 22039<br>*Counsel for Brazos Higher Education*<br>*Service Corporation and Nelnet, Inc.* | Sean T. Beller, Esq.<br>Powers Pyles Sutter & Verville PC<br>1501 M Street NW, Seventh Floor<br>Washington, D.C. 20005-1700<br>*Counsel for Brazos Higher Education Service*<br>*Corporation, Brazos Higher Education*<br>*Authority, Nelnet, Inc., and Nelnet Education*<br>*Loan Funding, Inc.* |
| Nathaniel Thomas Connally III, Esq.<br>Hogan & Hartson LLP<br>7930 Jones Branch Drive<br>McLean, VA 22102-3302<br>*Counsel for Arkansas Student*<br>*Loan Authority* | Jill Marie Dennis, Esq.<br>Hunton & Williams<br>1751 Pinnacle Drive, Suite 1700<br>McLean, VA 22102<br>*Counsel for Pennsylvania*<br>*Higher Education Assistance Agency* |
| Thomas L. Appler, Esq.<br>Heather Austin Jones, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>8444 Westpark Drive, Suite 510<br>McLean, VA 22102<br>*Counsel for Kentucky Higher Education*<br>*Student Loan Corporation* | Mark E. Nagle, Esq.<br>Tameka M. Collier, Esq.<br>Troutman Sanders LLP<br>401 9th Street, NW, Suite 1000<br>Washington, D.C. 20004-2134<br>*Counsel for Vermont Student*<br>*Assistance Corporation* |

| John Stone West, Esq.<br>Megan Conway Rahman, Esq.<br>Troutman Sanders LLP<br>1001 Haxall Point<br>Richmond, VA 23219<br>*Counsel for Vermont Student Assistance Corporation* | |

A copy of the above-referenced document was sent via first class mail, postage prepaid, to the following counsel:

Jay Majors, Esq.
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044

/s/ Michael L. Sturm
Bert W. Rein (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
Thomas W. Queen (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone: 202.719.7000
Fax: 202.719.7049
brein@wileyrein.com
msturm@wileyrein.com
tqueen@wileyrein.com