UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____
                                        )
UNITED STATES OF AMERICA,               )        CIVIL NO. 1:07-CV-960
*ex rel*. JON H. OBERG,                 )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )
                                        )
PENNSYLVANIA HIGHER EDUCATION           )
ASSISTANCE AGENCY, KENTUCKY HIGHER      )        JURY TRIAL DEMANDED
EDUCATION STUDENT LOAN                  )
CORPORATION, VERMONT STUDENT            )
ASSISTANCE CORPORATION, and             )
ARKANSAS STUDENT LOAN AUTHORITY,        )
                                        )
        Defendants.                     )
_____)

## FOURTH AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT

### INTRODUCTION

1.      Qui tam relator Jon H. Oberg ("Dr. Oberg" or "Relator"), by his attorneys,

individually and on behalf of the United States of America, files this complaint against

Defendants Pennsylvania Higher Education Assistance Agency ("PHEAA"), Kentucky Higher

Education Student Loan Corporation ("KHESLC"), Vermont Student Assistance Corporation

("VSAC"), and Arkansas Student Loan Authority ("ASLA") (collectively "Defendants").

Relator brings this action to recover damages, penalties and attorneys' fees for violations of the

Federal False Claims Act committed by Defendants.

2.      Under the Federal Family Education Loan ("FFEL") program, which began in

1965, the federal government provided lenders with incentives to invest private capital in student

loans.  One such incentive was a subsidy known as a special allowance payment (often referred to as a "SAP").  This subsidy guaranteed lenders a specified rate of return on student loan investments, as set by statute.  The FFEL program was abolished prospectively in the Student Aid and Fiscal Responsibility Act, part of the Health Care and Education Reconciliation Act (which was itself an amendment to the Patient Protection and Affordable Care Act), which was signed into law by President Obama on March 30, 3010, meaning that no new loans have been made under the FFEL program since July 1, 2010.  Previously disbursed loans, however, continue to be governed by the terms of the FFEL program, which is still being administered by the United States Department of Education ("the Department").

3.      Student loan companies participating in the FFEL program generally issued notes or bonds to raise the money used to make or buy loans.  Depending on the nature of the issuance, the interest paid by a lender to its note-holders could be either taxable or tax-exempt.  Prior to 1980, the United States Government paid the same special allowance rate to student loan lenders that financed their loans with tax-exempt obligations and those that financed their loans with taxable obligations.  Congress restructured the special allowance payments in 1980 so that lenders employing lower cost, tax-exempt financing would receive only one-half of the special allowance rate paid to other lenders.  At the same time, however, Congress established a special allowance rate floor.  *See* Education Amendments of 1980, Pub. L. No. 96-374 § 420, 94 Stat. 1367 (codified at 20 U.S.C. § 1087-1(b)).  Under the revised program, lenders employing tax-exempt financing were guaranteed a minimum annual interest return of 9.5 percent.  The minimum amount payable by the Government was set at 9.5 percent, less the interest the lender received directly from the student borrower, and was known as the 9.5% special allowance payment ("9.5% SAP").

-2-

4.      In 1993, Congress repealed the 9.5% special allowance payment prospectively, but continued the 9.5% special allowance guarantee on loans made or purchased with certain proceeds of tax-exempt obligations that were originally issued before October 1, 1993 ("9.5% Loans").  *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66 (the "1993 OBRA").  At this time, the expectation was that the 9.5% SAP loan pool would gradually decline as the pre-1993 tax-exempt borrowings and associated loans were retired or paid off.  *See, e.g.,* 150 Cong. Rec. S. 10918, 10919 ("In 1993, Congress passed legislation intended to phase out the existence of the 9.5% bank guarantee") (statement of Sen. Kennedy); Pub. L. No. 103-66, § 4111 (titled "Reduction in the special allowance payment").

5.      In the relatively higher interest rate environment at the time, the Federal guarantee on loans financed commercially was higher than 9.5 percent and lenders had an incentive to transfer loans from tax-exempt to taxable funding sources in order to obtain a higher effective interest rate.  The Department of Education, through regulatory action (*see* 34 C.F.R. § 682.302 (1992)) and sub-regulatory action (Dear Colleague Letter 96-L-186 (March 1, 1996)), however, prevented tax-exempt issuers from claiming the higher SAP payments then available on loans financed by tax-exempt funds.  As part of the Dear Colleague Letter 96-L-186, the Department advised lenders that "[u]nder the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.  If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt)."

6.      Through Dear Colleague Letter 96-L-186, the Department placed lenders on notice that its policy was to prevent shifting of loan portfolios between tax-exempt and taxable

funding as a way of profiting from interest rate fluctuations.  Through the 1993 legislation, lenders were also on notice that Congress intended and expected that the 9.5% special allowance payment program would be phased out.

7.      Interest rates fell substantially in the early 2000s.  Lenders realized that funding through tax-exempt obligations could generate returns superior to commercial funding because the 9.5% special allowance rate floor was well above the commercial SAP.  Lenders were thus incentivized to increase their tax-exempt obligation loan portfolios in order to maximize their 9.5% special allowance payments, but could not lawfully do so because the 1993 OBRA had foreclosed issuance of any new tax-exempt obligations to which 9.5% SAP applied.

8.      The opportunity to receive higher payments on government-guaranteed, low-cost obligations led Defendants to develop schemes to increase their 9.5% SAP loan portfolios. Despite clear action by Congress foreclosing creation of new eligible 9.5% SAP loan funding sources, Defendants engaged in a multiplicity of non-economic sham transactions, and falsely claimed that loans actually funded commercially were technically funded through pre-existing 9.5% eligible borrowings and were therefore eligible for 9.5% SAP.

9.      From 2002 through 2006, Defendants designed and implemented a number of these unlawful schemes for inflating 9.5% SAP claims, for example by repeatedly exchanging loans made or acquired with the proceeds of pre-October 1, 1993 tax-free issuances and thus entitled to the 9.5% floor for loans made or acquired with the proceeds of post-October 1, 1993 issuances, and then claiming that all such portfolios were 9.5% SAP eligible.  These sham transactions enabled Defendants to submit claims for, and receive, 9.5% SAP far above what was intended by Congress and the Department, or allowable under the law (the "9.5% Scheme(s)").

10.     By 2004, despite the fact that 9.5% SAP floor funding sources were capped by the 1993 OBRA, the amount of 9.5% Loans outstanding was several *billion* dollars higher than any previous level between 1993 and 2002, as Defendants and other student loan companies, including the defendants who previously settled this action, used various unlawful techniques to expand their holdings of these lucrative loans.  The exponential expansion in 9.5% Loans occurred even though, as a consequence of the 1993 OBRA, the amount of such loans should have declined.  Defendants submitted claims to the Department on a quarterly basis for 9.5% SAP on the inflated loan portfolios.  As a condition of receiving payment on each such quarterly claim, Defendants falsely certified their compliance with governing law and policy, and specifically claimed their entitlement to 9.5% SAP.

11.     In implementing their 9.5% Schemes and purporting to create and certify new loans for 9.5% SAP eligibility, Defendants willfully violated federal statutory law, Congressional intent, and Departmental regulations, guidance and policy.  The schemes implemented by the Defendants to increase their 9.5% SAP loan portfolios necessarily relied (to the extent that they had any purported justification) on untenable, self-serving interpretations of the relevant statute and regulations to permit a massive and unchecked increase in 9.5% SAP loan portfolios that clearly defied the intent of the Congress and the Department of Education's 1992 determination (explained in Dear Colleague Letter 96-L-186) that the SAP treatment of a loan was determined by the funding source through which it was first made or acquired.

12.     With actual knowledge, deliberate indifference and/or reckless disregard, Defendants repeatedly submitted fraudulent quarterly claims for and received illegal 9.5% SAP from the United States Government.  Defendants fraudulently and illegally obtained approximately $200 million dollars or more in unlawful 9.5% SAP from the Department of

Education, thus unjustly and fraudulently enriching themselves at taxpayer expense and diverting funds that otherwise could have been used to serve other important Department of Education programs.

13.     Relator now seeks relief on behalf of the United States Government for these injuries and the imposition of statutory penalties and attorneys' fees for Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-33 ("FCA").

## QUI TAM RELATOR

14.     Relator Jon H. Oberg is a resident of Rockville, Maryland.  Dr. Oberg brings this action for violations of 31 U.S.C. §§ 3729-33, on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

15.     Dr. Oberg has personal knowledge of the false records, statements and/or claims Defendants presented to the Government and of Defendants' fraudulent practices regarding the 9.5% SAP and the 9.5% Loans.

16.     Dr. Oberg is a former U.S. Navy officer and served as aide to Senator J. James Exon (Nebraska) from 1979 to 1984.  He has served as chief fiscal officer for the State of Nebraska, as a member of its housing finance agency, and as a task force investigator for the U.S. Senate Budget Committee.

17.     Dr. Oberg is an expert in public finance.  He holds a master's degree from the University of Nebraska and a doctorate in political science from the Free University of Berlin. Dr. Oberg has taught budget and finance at the graduate level for two universities, published in peer-reviewed literature, and testified on higher education finance in the U.S. Senate.

18.     Dr. Oberg began his civil service at the Department of Education in 1994, in the Office of Legislation and Congressional Affairs.  In 1998, he was the legislative liaison between

the Department and Congress for the reauthorization of the Higher Education Act, including its student loan programs.

19.     In 2001, Dr. Oberg requested and was granted a transfer at the same grade (GS-15) to the Office of Educational Research and Improvement (renamed the Institute of Education Sciences in 2002), where he intended to conduct research on federal postsecondary finance.

20.     Dr. Oberg retired from the federal government in July 2005, after serving twenty years in positions in the U.S. Navy, the U.S. Senate, and the U.S. Department of Education.

21.     Dr. Oberg is the original source (as defined under the FCA and applicable law) of the disclosure of the illegal and fraudulent 9.5% SAP claim submissions and payments received by Defendants as described herein.

## DEFENDANTS

22.     Defendant PHEAA is a Pennsylvania corporation with headquarters located at 1200 North 7th Street, Harrisburg, Pennsylvania 17102-1444.

23.     PHEAA, rather than the Commonwealth of Pennsylvania, would be responsible for paying a judgment in this action.  Pennsylvania law provides that no obligation of PHEAA shall be a debt of the Commonwealth and PHEAA shall have no power to pledge the credit or taxing power of the Commonwealth nor make its debts payable out of any moneys except those of the corporation.  24 Pa. Cons. Stat. §§ 5104, 5105.1.

24.     Upon information and belief, the monies PHEAA earns from its proprietary business activities are deposited into a segregated fund within the Pennsylvania Treasury, over which PHEAA exercises discretion and control.  24 Pa. Cons. Stat. § 5104.  Under commonwealth law, all of PHEAA's earnings are available to PHEAA and may be utilized at the direction of PHEAA's board of directors.  *Id.*  PHEAA states in its publicly available statements that its expenses are paid from earnings from PHEAA's commercial activities, and that no tax

dollars are used to support PHEAA's lending, servicing, and other proprietary activities.
PHEAA 2008-2009 Annual Report at 5, 26.

25.     PHEAA has stated that it "competes in the private sector and receives no funding
for its operations from the General Assembly."  Right to Know Act Final Decision at 4.  All
appropriations to PHEAA from Pennsylvania go to students in the form of grants, and no
administrative fees are deducted from those appropriations.  Hearing Examiner's Report at 5;
PHEAA 2010-2011 Annual Report at 7-8.

26.     According to published statements, PHEAA has hundreds of millions of dollars in
net assets; over a billion dollars in student loans that it owns and from which it earns steady
income; and earns hundreds of millions of dollars per year through ancillary business functions
such as loan servicing and computer program leasing.  Right to Know Act Final Decision at 4.
PHEAA services over 130 billion dollars of student loans for other companies and earns
hundreds millions of dollars of revenue every year from that activity.  PHEAA Quarterly
Financial Report, March 31, 2012 and 2011 at 9, 21-25.

27.     PHEAA has stated that it, rather than the Commonwealth, would be liable for a
judgment in this case, as its published financial statements have pointed to this lawsuit as a
potential risk of which investors should be aware.  PHEAA Quarterly Financial Report, March
31, 2012 and 2011 at 58.

28.     PHEAA is governed by a board of directors and is not under the direct control of
any commonwealth official.  71 Pa. Cons. Stat. § 111.2.  Pennsylvania is currently in the process
of reducing the number of legislative officials on the board and replacing them with members of
the public.  *Id.*  Upon information and belief, PHEAA's directors cannot be removed by any
commonwealth official.

29.     PHEAA independently contracts with third parties, sues and is sued in its own name, acquires and disposes of property and money, borrows money generally and through the issuance of debt instruments at its discretion, earns profits from investments, and enters into trust arrangements.  71 Pa. Cons. Stat. § 111.2; 24 Pa. Cons. Stat. §§ 5103, 5104, 5104.3, 5105.9. PHEAA also has the power to perform all acts necessary to further its corporate purposes.  24 Pa. Cons. Stat. §5104.

30.     PHEAA has adopted a trade name—American Education Services ("AES")—by which it is known to the public.  http://www.aessuccess.org.

31.     PHEAA has been a registered "foreign corporation" in Virginia since 2002, and maintains a registered agent within the Eastern District of Virginia.

32.     PHEAA's purpose is to provide a mechanism by which lenders and postsecondary institutions could make loans available to students and parents for postsecondary education purposes.  24 Pa. Cons. Stat. § 5102.

33.     PHEAA has stated that it is "financed and operated similar to a private business enterprise," and its activities today are almost completely proprietary.  PHEAA 2008-2009 Annual Report at 8.

34.     PHEAA ceased lending under the FFEL Program in 2008 and today engages in businesses that support the student loan industry, including servicing, acting as a secondary market for disbursed loans, and guaranteeing loans.  PHEAA Quarterly Financial Report, March 31, 2012 and 2011 at 2, 5-7.

35.     After Congress abolished the FFEL program and the Department of Education began issuing all non-private student loans directly, PHEAA was one of four companies—along with settling defendants SLM Corporation and Nelnet, Inc.—awarded a federal government

contract to service the loans made by the Department of Education.  PHEAA 2008-2009 Annual

Report at 3, 8, 14; *Sallie Mae, Nelnet soar on big U.S. student loan pact*, available at

http://www.reuters.com/article/idUSTRE55H37920090618 (June 18, 2009).   PHEAA conducts

its servicing business for the federal government under the trade name of FedLoan Servicing, a

separate enterprise from AES, and now earns tens of millions of dollars per year servicing

federal direct student loans.  http://www.myfedloan.org/about/index.shtml.  PHEAA's loan

servicing activities are conducted on a nationwide basis.

36.     The PHEAA board of directors has hosted retreats at resorts, inviting customers

and contractors and designating the retreats as "business development" exercises.  PHEAA pays

for all to attend and keeps no minutes of those retreats.  PHEAA has also paid out substantial

bonuses to its executives, on the order of $181,000 on top of salaries of up to $217,000.  Right to

Know Act Final Decision at 3-5; Hearing Examiner's Report at 5; *PHEAA Bonuses Enrage

Rendell*, Pittsburgh Post-Gazette (Aug. 24, 2007).  The salaries of top PHEAA executives exceed

the salary of Pennsylvania's Governor.

37.     PHEAA defended itself against criticism of these practices by touting its

independence from the Commonwealth.  In a letter to the editor of the Centre Daily Times, Keith

New, Vice President of AES (PHEAA), responding directly to that paper's criticism of

PHEAA's large executive bonuses and retreats, contrasted PHEAA's status as a "public

corporation" with a "typical state agency" and noted that "not one penny of state taxpayer money

is used to support any of [PHEAA's] operations, including salaries and performance incentives."

The letter also criticized the paper for comparing PHEAA to a government agency "instead of

our market competitors."  *PHEAA works for Pennsylvanians*, Centre Daily Times (Sept. 10,

2005).

38.     PHEAA conducts substantial operations outside Pennsylvania.  PHEAA touts its nationwide activities in its financial and press statements.  Right to Know Act Final Decision at 7, 9; *PHEAA works for Pennsylvanians*, Centre Daily Times (Sept. 10, 2005).  In fact, PHEAA made the decision to do business as American Education Services "to signify [its] operational expansion nationwide."  http://www.pheaa.org/partner-access/lenders/index.shtml.

39.     PHEAA lends to students from outside Pennsylvania; purchases, services, and guarantees loans from outside the Commonwealth; and contracts with third parties from outside the Commonwealth to provide it services.  PHEAA is one of the largest loan servicers in the country and asserts that it services loans for public and private companies and governmental agencies nationwide.  PHEAA Quarterly Financial Report, March 31, 2012 and 2011 at 2.

40.     PHEAA has stated that it "operates in an active national, and sometimes international, market that is highly competitive" and that, as of 2005, one-third of PHEAA's earnings come from outside the commonwealth.  Right to Know Act Final Decision at 7, 9. PHEAA has subsequently expanded its operations outside the Commonwealth.

41.     PHEAA is structured and relates to the Commonwealth of Pennsylvania much differently from true Pennsylvania agencies.  PHEAA is a "body corporate and politic constituting a public corporation" rather than a Pennsylvania agency of government.   24 Pa. Cons. Stat. § 5101.

42.     In addition to doing business as AES and FedLoan Servicing, PHEAA has formed, and controls, numerous other business entities, including PHEAA Student Loan Company I, LLC, PHEAA Student Loan Company II, LLC, and PHEAA Student Loan Company III, LLC, all limited liability companies formed in Delaware for the purpose of "purchasing, acquiring, owning, holding, selling, assigning, pledging, and dealing in education

loans to students and parents of dependent students under the FFEL program; and issuing and selling one or more series of bonds, notes or other indebtedness secured by student loans." PHEAA Annual Financial Report, June 30, 2011 and 2010 at 36; PHEAA Annual Financial Report, June 30, 2010 and 2009 at 37-38.

43.     PHEAA has stated that it "provides financial services by managing billions of dollars of loans for third-party, private sector lenders.  Its profit-making activities include loan origination and secondary marketing, loan servicing, loan guaranteeing, and leasing computer programs that process student loans."   Right to Know Act Final Decision at 8.

44.     PHEAA reports that it "has 400 competitors in the lending business, 6 in guaranteeing, 3-4 in loan servicing, and 2-3 in computer-program leasing," but considers its chief competitor in many of its lines of business to be SLM Corporation (formerly known as Sallie Mae), a publicly traded for-profit lender, servicer, and secondary market.  SLM attempted a hostile takeover of PHEAA in 2004.  PHEAA has stated that is especially vigilant in its efforts to not disclose trade secrets to Sallie Mae.  Right to Know Act Final Decision at 7-9.

45.     PHEAA has publicly represented that it is "not considered part of the primary government" of Pennsylvania.  PHEAA Annual Financial Report, June 30, 2007 and 2006 at 34, available at http://www.pheaa.org/about/pdf/financial-reports/annual/2007AuditedFinancialStatements.pdf.

46.     Defendant KHESLC is a Kentucky corporation with a mailing address of PO Box 24266, Louisville, Kentucky 40224-0266.

47.     KHESLC, rather than the Commonwealth of Kentucky, would be responsible for a judgment against KHESLC in this case.  Kentucky has determined that the Commonwealth's funds "be not committed to" making and dealing in federally guaranteed student loans.  Ky. Rev.

Stat. § 164A.010.  Upon information and belief, to the extent that KHESLC receives any appropriations from Kentucky, such appropriations are made for the purpose of providing grants to students.  KHESLC's debts "shall not be deemed to constitute a debt, liability or obligation of the state or a pledge of the faith and credit of the state, but shall be payable solely from the revenues or assets of the corporation."  Ky. Rev. Stat. § 164A.070.

48.     Upon information and belief, judgment in this case would be paid with funds that KHESLC earned through its business activities.

49.     KHESLC is financially independent and earns revenues from servicing loans issued by third parties and from trusts to which legal title to its student loans is transferred to ensure payment of interest and principal on KHESLC-issued bonds.  KHESLC, as administrator of loans within the trusts, controls hundreds of millions of dollars in student loan assets on which it earns income.  KHESLC Audited 2010 Financials at 47, available at

http://www.kheslc.com/investor_relations/pdfs/auditedFinancials_2010.html.

50.     Kentucky law created KHESLC as "an independent de jure municipal corporation and political subdivision."  Ky. Rev. Stat. §§ 164A.020, 164A.030, 164A.040, 164A.050.  KHESLC's powers are vested in a board of directors, who are not removable at will and are not beholden to the Governor or any other Commonwealth official.  Ky. Rev. Stat. § 164A.050.

51.     KHESLC operates autonomously.  The day-to-day operations of KHESLC are administered by an executive director, who takes policy direction from the board of directors.  KHESLC's board of directors has all "powers necessary or convenient" to carry out its business.  Ky. Rev. Stat. §§ 164A.050, 164A.060.

52.     KHESLC sues and is sued in its own name and enters into contracts in its own name.  KHESLC borrows, accepts, spends, and invests money on its own, and exercises control

over employment decisions and its own corporate structure.  Ky. Rev. Stat. §§ 164A.050, 164A.060, 164A.080, 164A.120, 164A.240.  KHESLC can issue the vast majority of its bonds without seeking permission from the Governor and, upon information and belief, it has issued such bonds without obtaining permission from the Governor.  Ky. Rev. Stat. § 164A.080.

53.    KHESLC conducts substantial operations outside Kentucky. Kentucky law does not limit KHESLC's ability to lend to students outside Kentucky or to purchase loans without a nexus to Kentucky, Ky. Rev. Stat. §§ 164A.020, 164A.050, and, upon information and belief, KHESLC conducts business in Alabama and contracts with students and companies outside Kentucky, including as a loan servicer.

54.    Like PHEAA, KHESLC is scheduled to become a nationwide servicer of federal direct student loans under a contract with the Department of Education in October 2012. http://ifap.ed.gov/eannouncements/092311LSINFPNewServicersJoin.html.

55.    KHESLC's activities, unlike those of Kentucky agencies, are principally commercial rather than regulatory: it finances student loan operations through the issuance of debt obligations and acts as a secondary market for federally insured student loans.  KHESLC services student loans and performs servicing and collection activities on student loans for third-party lenders.  Ky. Rev. Stat. §§ 164A.040, 164A.010; KHESLC Audited 2010 Financials at 29.

56.    KHESLC holds itself out to the public and trades as "The Student Loan People" and has done so since 1999.  2009 Annual Report at 2, available at http://www.kheslc.com/investor_relations/pdfs/annual09.html.

57.    KHESLC and Kentucky treat KHESLC as a corporation rather than as a typical part of the commonwealth government.  While the financial statements of KHESLC are combined with those of the Kentucky Higher Education Assistance Authority ("KHEAA"), the

entity that administers the Commonwealth's financial aid and grant programs, those financial statements refer to KHEAA's funds as "governmental," whereas KHESLC's funds are referred to as "proprietary."  KHESLC's financial statements refer to KHESLC as "the corporation" throughout, and specifically designate assets from "business-type activities."   KHESLC Audited 2010 Financials at 9.

58.      Defendant VSAC is a Vermont corporation with headquarters located at 10 East Allen Street, Winooski, Vermont 05404.

59.      VSAC, rather than the State of Vermont, would be responsible for a judgment against VSAC in this case.  VSAC's debts must be paid out of its earnings.  Vt. Stat. tit. 16, §§ 2867, 2868.  VSAC's obligations are not to be deemed a liability or obligation of the State, "nor shall they be deemed to constitute a pledge of the faith and credit of the state or of any political subdivision thereof."  Vt. Stat. tit. 16, § 2823.  The State of Vermont has consistently refused to make any obligation of VSAC an obligation, moral or otherwise, of the State. http://www.hmc2agency.com/clients/vsac/archives/vpr_march_2009.mp3 (March 29, 2009 interview with Don Vickers).

60.      VSAC retains full control over its own funds, so long as it does not impair its ability to repay its bondholders.  Vt. Stat. tit. 16, §§ 2835, 2867.  VSAC controls one or more trusts to which millions of dollars of outstanding student loan notes are pledged as collateral; VSAC receives an income stream from those trusts. http://services.vsac.org/wps/wcm/connect/vsac/VSAC/Investor+Relations/Documents+and+Reports/ (listing debt issuances).  Such funds belong to VSAC and could be used to pay a judgment in this case.  VSAC June 30, 2011 and 2010 Basic Financial Statement at 4, 5.

61.     VSAC would not pay any judgment with funds appropriated by the State of Vermont.  State appropriations to VSAC are provided only for the purpose of giving grants to students.  VSAC's staff salaries and administrative costs are not paid out of funds provided by the State but rather from its business operations.  http://www.vsacnews.org/wp-content/uploads/2009/02/vsac-faq.pdf; http://www.vsacnews.org/wp-content/uploads/2008/12/vsac-finances-faq.pdf.  In the past, VSAC has satisfied its debts by issuing a General Obligation bond secured by its assets and income stream and paid the judgment with the proceeds of the issuance.  VSAC June 30, 2011 and 2010 Basic Financial Statement at 35.

62.     VSAC operates autonomously from the Vermont State government.  VSAC's board of directors has discretion as to how to carry out VSAC's business.  VSAC has the power to perform "any and all acts and things as may be necessary or prudent" to effectuate its corporate purposes, including all the powers of "nonprofit public corporations" in the state.  Vt. Stat. tit. 16, §§ 2831, 2832, 2834, 2862, 2868; Vt. Stat. tit. 11B, § 3.02.

63.     VSAC enters into contracts and sues and is sued in its own name, owns its own headquarters, and has created one or more subsidiary corporations. http://www.vsacnews.org/wp-content/uploads/2008/12/vsac-finances-faq.pdf; http://www.vsacnews.org/wp-content/uploads/2009/02/vsac-growth-faq.pdf; VSAC June 30, 2011 and 2010 Basic Financial Statement at 21.  VSAC deals in and owns property, manages its own assets, and takes all necessary employment actions.  Vt. Stat. tit. 16, §§ 2868, 2823.  VSAC's board decides if and when to issue debt to finance its lending activities, subject only to obtaining the concurrence of the governor, and VSAC has done so. Vt. Stat. tit. 16, §§ 2823, 2868;

http://services.vsac.org/wps/wcm/connect/vsac/VSAC/Investor+Relations/Documents+and+Reports/ (listing debt issuances).

64.     VSAC conducts substantial operations outside Vermont.  Vermont law allows VSAC to conduct business in other States.  Vt. Stat. tit. 16, §§ 2822, 2823.  Upon information and belief, VSAC has contracted with borrowers and companies outside Vermont.  Like PHEAA and KHESLC, VSAC is scheduled to become a nationwide servicer of federal direct student loans under a contract with the Department of Education in October 2012. http://ifap.ed.gov/eannouncements/092311LSINFPNewServicersJoin.html.

65.     Vermont does not treat VSAC in the manner that it treats true agencies of the state.  VSAC is not a part of the executive branch of the state government, it is not answerable to the governor as to its policies and activities, and its budget is not controlled by the state legislature.  VSAC is a "nonprofit public corporation" and is governed by a board of directors, rather than a state official answerable to the Governor.  Directors serve fixed terms and are not subject to removal by the governor.  Vt. Stat. tit. 16, § 2831.

66.     VSAC has held itself out on its website as a "large corporation."  VSAC states that it "is technically not a state agency," although it "works closely with several state agencies to serve Vermonters."  http://www.vsacnews.org/wp-content/uploads/2009/02/vsac-faq.pdf.

67.     VSAC has also stated that its "relationship with the State of Vermont primarily consists of an annual appropriation designated for grant aid to Vermont students."  VSAC June 30, 2011 and 2010 Basic Financial Statement at 21.

68.     Vermont cannot terminate VSAC's existence as long as it has notes, bonds, or other obligations outstanding.  Vt. Stat. tit. 16, §§ 2821, 2867, 2868.  Unlike typical state agencies, VSAC's principal activity and purpose is commercial, rather than regulatory:

guaranteeing, making, financing, and servicing loans of funds to students.  Vt. Stat. tit. 16,

§ 2821.

69.     Defendant Arkansas Student Loan Authority is an Arkansas corporation with

headquarters located at 101 E.  Capitol Avenue, Suite 401 Little Rock, AR 72201.

70.     ASLA, rather than the State of Arkansas, would be responsible for a judgment

against ASLA in this case.  ASLA's obligations are to be paid from and secured by revenues

derived from or by reason of ownership of guaranteed educational loan notes and investment

income.  Ark. Code § 6-81-114

71.     No obligation issued by ASLA shall be considered a debt of the State of

Arkansas, Arkansas has not pledged its faith and credit to cover ASLA's debts, and ASLA's

debts are not secured by a mortgage or lien on any land or buildings belonging to the State of

Arkansas.  Ark. Code § 6-81-113.

72.     On information and belief, ASLA has in the past borrowed money from the State

of Arkansas on its own credit by executing a promissory note, used the funds to engage in certain

business operations, and repaid the State in full.  ASLA 2011 Audited Financial Statement at 2,

19.

73.     ASLA's funds are not deposited into the state treasury, but rather are kept in

private accounts or are invested in bonds, money market funds, and similar investment vehicles.

Ark. Code § 6-81-118; Ark. Code § 6-81-122; ASLA 2011 Audited Financial Statement at 31.

ASLA controls one or more trusts to which millions of dollars of outstanding student loan notes

are pledged as collateral; ASLA receives an income stream from those trusts.  *See*

http://www.aslafinancials.info/trustindentures.htm (listing trust indentures).  Such funds belong

to ASLA and could be used to pay a judgment in this case.

74.     ASLA would not pay any judgment with funds appropriated by the State of Arkansas.  On information and belief, ASLA receives some appropriation from the State of Arkansas to help defray ASLA's overhead expenses and costs of administration, but such funds are generally earmarked for specific purposes defined by the legislature.  *See* http://staging.arkleg.state.ar.us/data/PBB/91202ASLA.pdf.  On information and belief, ASLA has sufficient cash on hand, equity in land, buildings and equipment, and future income potential to pay a judgment in this case without resort to the use of any funds of the State of Arkansas. ASLA 2011 Audited Financial Statement at 25-31.

75.     ASLA operates autonomously and was created for the commercial, as opposed to regulatory, purpose of making guaranteed educational loans and dealing in, by buying or selling, guaranteed educational loan notes and is a "public body politic and corporate, with corporate succession."  Ark. Code §§ 6-81-102, 122.

76.     ASLA is governed by a board of directors composed of seven members to be appointed by the Governor, but who serve for a fixed term and not at the Governor's pleasure. The board of directors does not consist of state officials or employees.  The board of directors has discretion as to how to conduct ASLA's activities and run its business, with only a few exceptions stated explicitly in the statute.  For example, the board meets as often as it likes, has the discretion to employ whomever it wishes, creates its own rules for internal organization and governance, can create nonprofit special purpose corporations if it deems it necessary to accomplish its objectives, and has full discretion to determine the rates and terms of any debt issuance. Ark. Code § 6-81-102.

77.     ASLA, through the board of directors and ASLA's employees, enters into contracts with outside institutions freely, does not require permission from any government

official before spending its funds, sues and is sued, and can perform its activities itself or through various forms of trust indentures as it sees fit.  Ark. Code §§ 6-81-102, 104, 115, 122, 124, 129; http://www.aslafinancials.info/trustindentures.htm (listing trust indentures).

78.     State officials have little to no day-to-day control over ASLA's activities and provide limited oversight solely in areas where, by law, state permission is required prior to taking major actions that could jeopardize the financial stability of the company.  Ark. Code §§ 6-81-107, 108.

79.     ASLA conducts substantial operations outside Arkansas.  No provision of Arkansas law requires ASLA to do business only in Arkansas.  Arkansas law allows ASLA to lend to any qualified borrower nationwide and to purchase guaranteed educational loans from almost any national source.  Ark. Code §§ 6-81-101, 124.

80.     On information and belief, ASLA, through the various trusts that it controls, has purchased loans made to students who are neither Arkansas residents nor attended an Arkansas institution of higher education.  In its business dealings ASLA can and has entered into contracts with institutions outside Arkansas to perform a variety of services for ASLA, including banking, the creation of trust indentures, and the like.  *See* Ark. Code § 6-81-110; Amended and Restated Indenture of Trust (Sep. 1, 2000).

81.     ASLA is not part of the primary government of Arkansas.  ASLA is governed by a board of directors rather than through a single official answerable to the governor and is not an Executive department of the state.  ASLA functions primarily through its revenue-generating activities rather than through appropriation.

http://staging.arkleg.state.ar.us/data/PBB/91202ASLA.pdf.

## JURISDICTION AND VENUE

82.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

83.     This Court has jurisdiction over Defendants and is a proper venue for this case pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by 3729 occurred."  Section 3732(a) also authorizes nationwide service of process.

84.     During the relevant period and continuing through today, each of the Defendants transacted business in the Eastern District of Virginia.  SLM Corporation, which was named as a defendant in the original complaint in this action, and which entered into a settlement agreement with the United States and Relator resolving the claims against it, was a resident of this District when this case was filed and continued to maintain its headquarters in this District until 2011. This Court has previously determined that venue is proper as to all defendants that were originally served in this action, including those with their principal offices in other jurisdictions. *See* Dkt. 158 (Dec. 1, 2009) (finding venue proper).

## THE FEDERAL FALSE CLAIMS ACT

85.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government.  *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

86.     Liability under the FCA, as it is relevant to this action, attaches when a person:

"knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . ."  31 U.S.C. § 3729(a)(1);

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ."  The Fraud Enforcement and Recovery Act of 2009 (Pub. L. No. 111-21), §§ 4(a)(1), 4(f)) (amending 31 U.S.C. § 3729(a)(2)); or

"knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . . ."  31 U.S.C. § 3729(a)(7).

87.     The terms "knowing" and "knowingly" are defined under the FCA as meaning "that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  Furthermore, "no proof of specific intent to defraud is required."  31 U.S.C. § 3729(b).

88.     The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in the recovery.  The Complaint is filed under seal for sixty days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action.  *See* 31 U.S.C. § 3730(b).

89.     Based on these provisions, Relator seeks to recover damages, civil penalties and attorneys' fees arising from Defendants' fraudulent submission for and receipt of illegal 9.5% SAP from the United States Government in the sum of over two hundred million dollars.

90.     This action already has resulted in substantial recoveries by the United States. Settling defendants SLM Corporation, Nelnet, Inc., Panhandle Plains Higher Education Authority, Brazos Higher Education Authority, and Education Loans, Inc., along with their affiliates, which were named in the original complaint and alleged to have engaged in the same 9.5% Scheme, collectively paid or agreed to pay in excess of $57 million to resolve the claims against them.  In a written statement announcing the settlement, Tony West, Assistant Attorney General for the Civil Division of the Department of Justice, noted Dr. Oberg's contributions, stating that, "[w]histleblowers like Dr. Oberg are critical to our efforts to recover taxpayer money lost to waste, fraud, and abuse."  Neil MacBride, United States Attorney for the Eastern District of Virginia, confirmed that, "[t]hrough the efforts of one citizen and the government, these lenders will be paying millions back to the government."

http://www.justice.gov/opa/pr/2010/November/10-civ-1307.html.  As detailed below, Defendants engaged in the same 9.5% Scheme as the settling defendants.

## STATUTORY AND REGULATORY BACKGROUND OF THE 9.5% SAP AND THE 9.5% Loans

91.     Prior to 2010, the federal government provided access to low-interest student loans through the FFEL program in Part B, Title IV of the Higher Education Act (HEA) of 1965, as amended.  The program was intended to help students from low and middle income families participate in postsecondary education.  In the FFEL program, loans historically were originated by private lenders with private capital.  The federal government protected lenders against borrower defaults through guarantees.  State, not-for-profit, and for profit secondary markets

administered many aspects of the FFEL program.  As explained above, Congress established 9.5% SAP in the Education Amendments of 1980, which was applicable to FFEL loans.  Only certain types of funds qualified as eligible funds from which qualifying 9.5% SAP eligible loans could be made.  Both the statute and the regulations prescribed the eligible funds.

92.     During the time period in which Defendants were implementing their 9.5% Schemes, the FFEL program statute provided that:

> (B)(i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1954  shall be one-half the quarterly rate of the special allowance established under subparagraph (A), except that, in determining the rate for the purpose of this division, subparagraph (A)(iii) shall be applied by substituting "3.5 percent" for "3.10 percent".  Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds.  This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.
>
> (ii) The quarterly rate of the special allowance set under division (i) of this subparagraph shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4.
>
> . . .
>
> (iv) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance for holders of loans which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986, shall be the [applicable commercial SAP rate]. Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds.

*See* 20 U.S.C. § 1087-1(b)(2)(B)(i)-(ii), (iv) (2003).

93.     During the time period that Defendants were implementing their 9.5% Schemes, the applicable regulations also set forth the eligible funds from which qualifying 9.5% SAP eligible loans could be made:

> (3)(i) Subject to paragraphs (c)(3)(ii) and (iii) of this section, the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from—
>
> (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);
>
> (B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
>
> (E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.
>
> . . .
>
> (iii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that are made on or after October 1, 1992, may not be less than 9 1/2 percent minus the applicable interest rate.

34 C.F.R. § 682.302(c)(3)(i), (iii) (2002).

94.     Under the statute and regulations, 9.5% SAP eligible loans could only be created from funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from certain specified proceeds from such funds.  Eligible funding sources were limited to those provided for in the statute and regulations.

## DR. OBERG'S INVESTIGATION AND ORIGINAL SOURCE DISCLOSURE OF DEFENDANTS' FRAUDULENT SAP CLAIMS AND PAYMENTS

95.     In the spring of 2003, after seeing internal Department of Education spreadsheets that showed growing amounts of 9.5% Loans outstanding, Dr. Oberg independently decided to research the issue and asked Department of Education colleagues how 9.5% Loan volume could be increasing as much as it was at certain loan holders.  Dr. Oberg received no explanation.

96.     As part of his investigation of the matter, Dr. Oberg began checking claims by individual loan holders by reviewing their financial reports.

97.     On August 7, 2003, Dr. Oberg wrote to the Office of the Inspector General ("OIG") Waste, Fraud, and Abuse Hotline ("OIG Hotline") and reported irregularities in 9.5% Loan growth at New Mexico Education Association Foundation ("NMEAF") and Defendant PHEAA.  On September 12, 2003, the Department of Education replied to Dr. Oberg's OIG complaint, stating that the Department was seeking regulatory changes to eliminate the potential for waste, fraud, and abuse in 9.5% Loans.  However, subsequently the Department of Education took no action.

98.     On November 10, 2003, Dr. Oberg reiterated his concerns regarding the 9.5% Loan programs to the Department of Education OIG.

99.     On November 21, 2003, Dr. Oberg wrote a detailed explanation to Department of Education officials, observing the appropriate chain of command (including providing a copy to his immediate supervisor, Mr. Whitehurst), regarding how loan holders were creating new 9.5% Loans through refunding, transferring, and recycling beyond previously existing levels, how much it would cost taxpayers if the practices were not stopped, and options to deal with illegal claims.

100.     On November 24, 2003, Dr. Oberg received a reply from the OIG Hotline that the complaint had been forwarded to the OIG's Audit Services.

101.     On November 26, 2003, Dr. Oberg received a response from Mr. Whitehurst, his supervisor, stating that the center where Dr. Oberg worked did not have "an intramural program of research on postsecondary finance" and that whatever Dr. Oberg was researching in that regard must not continue without approval.  The response also said that Dr. Oberg's job description would be changed accordingly, to reflect his responsibilities as a research administrator only.  Mr. Whitehurst also warned Dr. Oberg that, "in the 18[] months you have remaining, I will expect your time and talents to be directed principally to our business of conceptualizing, competing, and monitoring research grants."

102.     On November 26, 2003, Dr. Oberg wrote to the independent federal Office of Special Counsel, enclosing his previous memoranda to the Department of Education and to the OIG and requesting an investigation.

103.     On December 9, 2003, Dr. Oberg wrote to the OIG with new information on how Nelnet was creating new 9.5% Loans and obtaining improper 9.5 special allowance payments.

104.     At the time of his December 9, 2003 complaint to OIG, Dr. Oberg had concluded that Nelnet and PHEAA had been improperly inflating their 9.5% Loan portfolios.  He believed at the time that VSAC had not engaged in such activity, as he had been told that VSAC executive Scott Giles had sought congressional involvement to preclude the Department of Education paying 9.5% subsidies on loans that were not legally entitled to that subsidy.

105.     During late 2003 and into 2004, Dr. Oberg continued his independent investigation.  Due to his supervisor's admonition not to use working hours for this research, Dr. Oberg conducted his investigation from home.

106.     In early 2004, Dr. Oberg requested and received approval from the Ethics Division of the Office of General Counsel of the Department of Education to communicate directly, as a private citizen, with Congressional offices, staffs, and agencies about the growth in 9.5% SAP loans, both in the aggregate and among specific lenders.

107.     On January 11, 2004, Dr. Oberg sent a memorandum to the General Accounting Office ("GAO"), which reiterated many of the points he had already made to OIG and the Office of Special Counsel.

108.     In February 2004, Dr. Oberg met with GAO staff at their invitation, taking personal leave to do so.  Dr. Oberg discussed the 9.5 special allowance payment issue in detail, explaining that lenders were repeatedly transferring loans from 9.5% bond issues to new bond issuances, transferring new loans in to serve as collateral for the 9.5% bond, and claiming 9.5% SAP on both the "transferred out" and "transferred in" loans, thereby inflating their 9.5% SAP claims. Dr. Oberg also identified certain Defendants as potential parties involved in the fraudulent claims practice.

109.     On April 1, 2004, the Office of Special Counsel responded to Dr. Oberg, explaining that it had too many open cases and would not be pursuing the matter.

110.     In April and May of 2004, at OIG's request and in preparation for upcoming audits, Dr. Oberg provided detailed information to OIG regarding the 9.5% SAP overpayment issue.

111.     In June 2004, Dr. Oberg emailed Jack Higgins at the Department of Education OIG and described the "transferring" and "refinancing" processes that he believed lenders were using to increase their 9.5% Loan portfolios.

112.    On August 16, 2004, Dr. Oberg received an email from GAO, following up on their February 2004 meeting and stating that GAO would be including certain figures in its upcoming report on 9.5% Loans per Dr. Oberg's request.

113.    Dr. Oberg retired from the Department of Education in June 2005.


## DEFENDANTS' FRAUDULENT 9.5% SAP CLAIMS AND PAYMENTS

114.    From 2002 through 2006, each of Defendants PHEAA, KHESLC, VSAC, and ASLA defrauded the Department of Education by claiming 9.5% SAP on student loans that were not eligible for 9.5% SAP.  Defendants employed a common process in improperly claiming their student loans as 9.5% SAP eligible.  In essence, Defendants used transient association of a loan with a pre-October 1, 1993 tax-exempt borrowing (by using that loan as temporary collateral for that borrowing and placing that loan in the trust associated with that borrowing) to confer permanent entitlement to 9.5% SAP, even when that loan originally was funded by and/or was subsequently used as collateral for an ineligible borrowing.

115.    As a general matter, Defendants (as well as the settling defendants and other student loan companies) raised the funds used to make or buy the student loans through the issuance of "Student Loan Asset Backed Securities" or "SLABS."  Proceeds of the SLABS offerings to investors would be placed in a trust according to the terms of an indenture and then would be used to make new student loans or to buy student loans in the secondary market to be held in the trust.  Student loan proceeds, including principal and interest payments from students, special allowance payments from the Federal government, and any payments from guarantors of defaulted loans, would be received in the trust and used to pay note-holders, as well as to pay fees to Defendants or others for servicing the loans in accordance with the terms of the indenture. For the protection of note-holders, and to permit the successful marketing of the SLABS, it was

customary in the SLABS industry to employ a trustee to ensure that funds were distributed from the trust in accordance with the indenture.  Defendants, however, had the ultimate interest in maximizing the return on their student loan portfolios contained in the trust, because they as issuers of the notes and grantors of the trusts held a residual interest in all funds received above and beyond those necessary to meet trust obligations.  Defendants, accordingly, retained the right to manage their loan portfolios, including the transferring of loans among trusts associated with different SLABS for which they were the issuer, subject only to compliance with the relevant indentures.

116.    A required foundation for Defendants' scheme was a pre-1993, tax-exempt borrowing.  Under the 1993 OBRA, loans that were financed by the proceeds of such borrowings were generally eligible for 9.5% SAP.  However, the borrowings were limited as to both duration and capacity (*e.g.*, $50 million).  Thus, only a limited volume of loans could be held at any one time in the trust associated with such a borrowing and potentially entitled to receive 9.5% SAP.

117.    As part of the scheme, Defendants would raise additional funds by issuing new borrowings.  Regardless of whether the new borrowings were taxable or tax-exempt, loans associated with them would not be eligible for 9.5% SAP; loans financed with taxable issuances had never been entitled to 9.5% SAP, and the 1993 OBRA eliminated 9.5% SAP for new tax-exempt issuances after October 1, 1993.  Defendants, however, contrived a fraudulent mechanism to avoid this limitation.  Defendants disassociated loans from their pre-1993 tax-exempt borrowings eligible for 9.5% SAP (typically by transferring them out of the trusts governing those borrowings) and then associated those loans with the new, ineligible borrowings, using them as collateral for such borrowings.  Despite the fact that these transferred loans were now financed by ineligible borrowings, Defendants continued to invoke the rule of

initial source characterization to claim 9.5% SAP on these loans.  Defendants assert that they were entitled to do so under the Department's 1996 DCL, even though they did not comply with the requirements of that DCL.

118.    The disassociation of loans from the pre-1993 tax-exempt borrowing by the Defendants (*i.e.*, transfer of the loans such that they no longer served as collateral for the pre-1993 tax-exempt borrowings) did not, in and of itself, result in Defendants' desired inflation of 9.5% SAP claims.  Rather, Defendants replaced the transferred loans with new loans whose original acquisition depended on post-1993 borrowings.  For every pool of loans used to collateralize the pre-1993 tax-exempt borrowing (even if for a very short time period), Defendants increased the SAP claimed on these loans to 9.5%, even when these loans were entitled to SAP only at the much lower commercial rate.  The DCL referenced by Defendants provides no basis for increasing the SAP claimed on the transferred-in loans to 9.5%, and there is no other legal basis for doing so.

119.    Defendants in many instances were not content merely to double their 9.5% SAP loan portfolios (*i.e.*, through one iteration of the process described above).  Rather, Defendants would move successive batches of loans, temporarily pledging them as collateral for the pre-1993 tax-exempt offerings and then transferring them on to serve as collateral for other 9.5% SAP ineligible borrowings, each time increasing the SAP claimed on the incoming loans from the low commercial SAP rate to 9.5%.  Under Defendants' 9.5% Scheme, temporary and contrived association of a loan or pool of loans with the 9.5% SAP eligible borrowing would confer permanent entitlement to 9.5% SAP, even when the loan was subsequently transferred again to collateralize an ineligible borrowing.

120.    No public benefit was conferred by shuttling loans among various eligible and ineligible borrowings controlled by Defendants.  The only benefit was to Defendants, who submitted claims for and received many millions of dollars in excess SAP from federal taxpayers.

121.    To obtain 9.5% SAP, claimants were required by law to certify to the United States Government the truth of the information submitted in their claims and their compliance with FFEL program law and policy.  *See* 34  C.F.R. § 682.302; OMB 1845-0013 (Lender's Interest and Special Allowance Request and Report LaRS/799); OMB 1845-0032 (Lender's Application Process); Lender/Servicer Organization Participation Agreement.

122.    The Lender's Interest and Special Allowance Request and Report LaRS/799 was the form used to submit quarterly paper claims for 9.5% SAP.  The LaRS/799 expressly states: "As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family Education Loan Program (FFELP) that submits the Lender Reporting System report (LaRS), I certify, by my signature below that: The data that my organization or its agent, or its third-party servicer, will submit to the U.S.  Department of Education is correct to the best of my knowledge and belief.  I certify that it conforms to the laws, regulations, and policies applicable to the Federal Family Education Loan Program."

123.    To participate in electronic submission of 9.5% SAP claims and to receive 9.5% SAP, Defendants or their agents were required to sign and submit a Education Lender/Servicer Organization Participation Agreement.  This Agreement contained a "certification," which provided:

> As an eligible Lender, Servicer, or Eligible Lender Trustee in the Federal Family
> Education Loan Program (FFELP) that submits the LaRS report electronically, I certify,
> by my signature above that:

The data that my organization or its agent, or its third-party servicer, will submit to the Department electronically pursuant to this Agreement is and will be correct to the best of my knowledge and belief. I certify that it conforms to the laws, regulations, and policies applicable to the FFELP. I understand that all documents, files, accounts and records supporting this data are subject to audit or review by the Secretary of Education or other authorized representatives of the United States Government (including representatives of any guaranty agency that provides the guarantees on loans included in data submitted electronically), and I agree to make all such documents, files, accounts and records available to the Secretary or such authorized representatives without restriction.

124.    As part of the submission, claimants coded their loans with codes prescribed by the Department to identify the special allowance payment category that was being claimed. The coding required a two-letter identification for the applicable special allowance category. If the claimant coded the first letter with an "X", it signified that the loan was eligible for 9.5% SAP. As an element of their scheme, Defendants falsely coded loans that were not eligible for 9.5% SAP with the code for 9.5% SAP, and submitted claims on that basis.

125.    A submitting party is ineligible to receive 9.5% SAP without providing a signed certification of compliance pursuant to the Lender's Organization Participation Agreement or the Lender's Interest and Special Allowance Request and Report LaRS/799.

126.    Defendants, in requesting and receiving approximately $200 million in 9.5% SAP overpayments, repeatedly and falsely certified to the Department of Education compliance with the Lender's Organization Participation Agreement, the Lender's Interest and Special Allowance Request and Report, and applicable FFEL laws, regulations and policies. In so doing, Defendants falsely induced the United States Government to approve and/or pay out 9.5% SAP overpayments based on Defendants' false certifications of compliance. The certifications when made were false. Upon making their certifications, Defendants knowingly, with deliberate ignorance and/or with reckless disregard for the truth engaged in the 9.5% Scheme described herein.

-33-

127.    Defendants purposefully and recklessly failed to notify the Department of Education of the specifics of their loan transfer schemes.  Defendants purposefully and recklessly did not identify eligible sources of funds being used to qualify loans for the 9.5% SAP.  They did not reveal that their improper transferring and recycling processes would be repeated over and over for the purpose of increasing the amount of 9.5% SAP eligible loan balances outstanding, and they did not reveal that their improper transferring and recycling processes would result in marked increases in the amount of loans pursuant to which 9.5% SAP was billed to the Government.  Defendants failed to make such disclosures in either their 9.5% SAP filings or to the Department through other means.

128.    Defendants had no legitimate business purpose for the transfers of loans between various 9.5% SAP eligible and ineligible borrowings; the sole purpose of these paper transactions was to inflate their claims for 9.5% SAP.

129.    Defendants knew that their LaRS/799 submissions were not reviewed by the Department for accuracy or irregularities prior to payment of the subsidy claimed.  Defendants took advantage of their superior knowledge of their activities and the lack of any affirmative requirement to justify their claims prior to payment.

130.    Defendants purposefully and recklessly failed to disclose that their 9.5% Scheme had the effect of defeating the 1993 legislation's phasing out of the 9.5% SAP program.

131.    At the time Defendants submitted claims under the 9.5% Scheme, Defendants did not disclose that their 9.5% Scheme did not have any written approval from the Department.  The Department did not know that the basis upon which the claims were made was illegal or improper because Defendants failed to provide the Department with facts sufficient to show that the claims were not proper under the law.

132.     Based on Dr. Oberg's investigation and disclosures to the OIG, the OIG
conducted several investigations of lenders with 9.5% Loan programs, including Nelnet,
KHESLC and PHEAA.  In each instance, the OIG determined that the lender had claimed and
received improper 9.5% special allowance payments.

133.     In November 2007, after Dr. Oberg filed this action, the Inspector General
published its audit of PHEAA.  *See* Special Allowance Payments to the Pennsylvania Higher
Education Assistance Agency for Loans Funded by Tax Exempt Obligations (No. ED-
OIG/A03G0014) (Nov. 2007).  In accordance with Dr. Oberg's prior investigation and disclosure
to the OIG, the OIG determined that because PHEAA failed to maintain adequate
documentation, there was no way to determine the exact amount of improper 9.5% special
allowance payments made to PHEAA, but that there was a significant risk that certain loans
billed by PHEAA under the 9.5 percent floor calculation, during the period July 1, 2003, through
June 30, 2006, were ineligible for that calculation.

134.     In May 2009, the Inspector General published its audit of KHESLC.  *See* Special
Allowance Payments to the Kentucky Higher Education Student Loan Corporation for Loans
Made or Acquired with the Proceeds of Tax-Exempt Obligations (No. ED-OIG/A05I0011) (May
2009).  In accordance with Dr. Oberg's prior investigation and disclosure to the OIG, the OIG
determined that KHESLC also violated the requirements regarding 9.5% special allowance
payments and that KHESCL's 9.5% Scheme must have resulted in ineligible loans being billed
under the 9.5 percent floor.  The OIG further determined that there was a substantial risk that all
loans in KHESLC's portfolio from October 1, 2001, through September 30, 2006, were not
eligible for the claimed 9.5% special allowance payments.

135.    In statements subsequent to the Department of Education's partial settlement with Nelnet in 2007, Department of Education officials explained that they had not comprehended, prior to the OIG audit of Nelnet, that loan holders had been submitting illegal 9.5% SAP claims based on ineligible loans.

136.    In 2007, the Department of Education issued a Dear Colleague Letter (Dear Colleague Letter FP-07-01 (January 23, 2007)) that restated previous regulations and guidance. By restating rather than issuing new regulations or guidance, the Department of Education confirmed that the unlimited transferring, refunding and recycling of 9.5% Loans was not, and never had been, legal.  Moreover, the Department, in its letter to lenders, stated that the regulatory requirements regarding eligible funding sources "have been in effect since 1993." The letter confirmed the regulatory interpretations made by the OIG in a Nelnet audit issued in September 2006.

## FURTHER ALLEGATIONS OF FRAUD

137.    Each of the Defendants engaged in specific and repeated activities and efforts to implement a 9.5% Scheme.

138.    Defendant PHEAA was first, or among the first, of the loan holders to employ the 9.5% Scheme.  PHEAA increased its 9.5% Loan holdings from $872 million in June 2002, to an average balance of $1.3 billion for the quarter ending March 30, 2003.  In an e-mail exchange with Dr. Oberg on September 15, 2003, chief financial officer Timothy Guenther of PHEAA explained that PHEAA used recycling, and on October 31, 2003, in response to Dr. Oberg's further questions, added that PHEAA also used transferring as a part of the process to create new 9.5% Loan volume.  The authority cited by PHEAA for the 9.5% Loan growth was not the Department of Education, but the Education Finance Council, a trade association of which

-36-

PHEAA is a member.   Knowing that Dr. Oberg was questioning its legal authority to create

9.5% Loan volume in such large amounts, PHEAA did not reply to Dr. Oberg's follow up

question, ". . . did you use a new bond issue to purchase existing 9.5  guaranteed loans, and use

the proceeds from that transaction to finance more under the pre-1993 tax-exempt issue?"

PHEAA's 9.5% Loan principal balance at the end of 2004 was over $2.3 billion, increased by

using its unlawful transfer and recycle process.  PHEAA submitted unlawful 9.5% SAP claims

quarterly on this inflated 9.5% Loan base.  Based on the increase in PHEAA's 9.5% Loan base,

approximately $92 million in unlawful 9.5% SAP claims were submitted by PHEAA to the

Department.  Relatively little, if any, of the unlawfully obtained funds has been returned.

139.     Defendant KHESLC observed Nelnet's activity and determined to increase its

own 9.5% SAP claims.  At the end of fiscal 2001, KHESLC had an ending balance of $162

million in 9.5% Loans; by the end of fiscal 2004, it had nearly $1.1 billion.  This massive

increase in the outstanding loan balance during this period, like the increase in the 9.5% Loan

balances of the other Defendants, could not have occurred had KHESLC complied with the

governing law that was intended to phase out 9.5% Loan pools.  KHESLC determined not to ask

the Department for approval directly, but to rely on the rationale of others as precedent.

KHESLC referred questions about the legality of its 9.5% Scheme to the Education Finance

Council, the same trade association cited by PHEAA.  KHESLC submitted 9.5% SAP claims

quarterly on its unlawfully inflated 9.5% Loan balance.  Based on the increase in KHESLC's

9.5% Loan base, approximately $92 million in unlawful 9.5% SAP claims were submitted by

KHESLC to the Department.  Relatively little, if any, of the unlawfully obtained funds has been

returned.

140.    Defendant VSAC at first determined that the 9.5% Scheme was illegal and unethical.  Subsequently, however, VSAC joined the scheme in order to not be competitively disadvantaged against those participating in it.  Dr. Oberg later reviewed VSAC financial reports and SEC documents and determined that VSAC retroactively reassigned loans among its portfolios in order to make larger 9.5% SAP claims.  VSAC claimed, knowingly and falsely, in its financial and SEC reports that it had approval from the Department of Education for its procedures according to a September 2004, document.  The only such document known to Dr. Oberg, however, is a letter to a Senator and a Congressman in which Secretary of Education Paige asserted that he wanted to stop the 9.5 abuses because they were not what Congress intended in its 1993 legislation.  VSAC's 9.5% Loan holdings at the end of fiscal 2001 were $377 million, which increased to $740 million at the end of fiscal 2004.  VSAC submitted to the Department unlawful quarterly claims for 9.5% SAP payments based on this inflated 9.5% Loan balance.  Based on the increase in VSAC's 9.5% Loan base, approximately $23 million in unlawful 9.5% SAP claims were submitted by VSAC to the Department.  Relatively little, if any, of the unlawfully obtained funds has been returned.

141.    Defendant ASLA unlawfully increased its balance of 9.5% Loans from $56 million at the end of fiscal 2001 to $182 million three years later.  ASLA submitted 9.5% SAP claims on this unlawfully inflated balance.  Based on the increase in ASLA 9.5% Loan base, approximately $12.1 million in unlawful 9.5% SAP claims were submitted by ASLA to the Department.  In 2006, Defendant ASLA returned $5.9 million in illegal claims, but this appears to be an inadequate reimbursement based on the volume of claims submitted.

## COUNT I
### Substantive Violations of the Federal False Claims Act
### (including 31 U.S.C. §§ 3729 (a)(l), (a)(2) (as amended), (a)(7))
### For Fraud on the Department of Education Relating to the 9.5% SAP Claims and
### Payments

142.    Dr. Oberg realleges and incorporates by reference the allegations made in all

preceding paragraphs of this Complaint.

143.    Through the acts described above and otherwise, Defendants knowingly presented

and caused to be presented to the United States Government false and fraudulent claims, records

and statements in order to obtain illegal 9.5% SAP.

144.    Through the acts described above and otherwise, Defendants knowingly made,

used and/or caused to be made or used false records and statements that were material to such

false and fraudulent claims.

145.    Through the acts described above and otherwise, Defendants knowingly made,

used and caused to be made or used materially false records and statements to conceal, avoid

and/or decrease their obligation to repay money to the United States Government that they

improperly and/or fraudulently received.  Defendants also failed to disclose material facts to the

United States Government which would have alerted the United States Government to the falsity

of the claims in the first place or resulted in substantial repayments by Defendants to the United

States Government.

146.    The United States and the Department of Education, unaware of the falsity of the

records, statements and claims made or submitted by Defendants, paid Defendants for claims

that would not have been paid if all of the facts were known.

147.    The United States and the Department of Education, unaware of the falsity of the

records, statements and claims made or submitted by Defendants—or of their failure to disclose

material facts that would have reduced government obligations—have not recovered funds that would have been recovered otherwise.

148.    By reason of Defendants' false records, statements, claims and omissions, the United States Government has been damaged in the amount of approximately two hundred million dollars or more in 9.5% SAP overpayments.

149.    Each of the Defendants is liable under the False Claims Act, including §§ 3729 (a)(1), (a)(2) (as amended) and/or (a)(7) for: (1) civil penalties in the maximum amount for each of their false claims, plus (2) three times the amount of damages that the Government has sustained as a result of Defendants' false claims, plus (3) reasonable attorneys' fees and expert fees, and other expenses and costs.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Oberg, individually and on behalf of the United States, prays for judgment against Defendants as follows:

150.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729;

151.    That interest be awarded on all of the foregoing amounts;

152.    That Dr. Oberg be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

153.    That the United States and Dr. Oberg be awarded all costs and expenses of this action, including reasonable attorneys' fees and expert fees; and

154.    That the United States and Dr. Oberg receive all such other relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Oberg hereby demands trial by Jury.


August 31, 2012                          /s/ Christopher M. Mills_____
                                         Bert W. Rein (admitted *pro hac vice*)
                                         Michael L. Sturm (VSB # 27533)
                                         Brendan J. Morrissey (admitted *pro hac vice*)
                                         Roger H. Miksad (VSB # 78827)
                                         WILEY REIN LLP
                                         1776 K Street, NW
                                         Washington, D.C. 20006
                                         Phone:  202.719.7000
                                         Fax:  202.719.7049
                                         brein@wileyrein.com
                                         msturm@wileyrein.com
                                         bmorrissey@wileyrein.com
                                         rmiksad@wileyrein.com

                                         Christopher M.  Mills (VSB # 44358)
                                         WILEY REIN LLP
                                         7925 Jones Branch Drive
                                         Suite 6200
                                         McLean, VA  22102
                                         Phone: 703.905.2800
                                         Fax: 703.905.2820
                                         cmills@wileyrein.com

                                         *Attorneys for Qui Tam Relator Jon H.  Oberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 31st day of August, 2012, a true and correct copy of the foregoing Relator's Fourth Amended Complaint for Violations of the False Claims Act was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gerard Mene, Esq.
Assistant United States Attorney
2100 Jamieson Ave
Alexandria, VA 22314
*Counsel for the United States*

Nathaniel Thomas Connally III, Esq.
Hogan Lovells US LLP
Park Place II Ninth Floor
7930 Jones Branch Drive
McLean, VA 22102-3302
*Counsel for Arkansas Student
Loan Authority*

Thomas L. Appler, Esq.
Heather Austin Jones, Esq.
Andrew Clark Hall, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
*Counsel for Kentucky Higher Education Student
Loan Corporation*

Jill Marie deGraffenreid, Esq.
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102
*Counsel for Pennsylvania
Higher Education Assistance Agency*

John Stone West, Esq.
Megan Conway Rahman, Esq.
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA 23219
*Counsel for Vermont Student Assistance
Corporation*

Mark E. Nagle, Esq.
Tameka M. Collier, Esq.
Troutman Sanders LLP
401 9th Street, NW, Suite 1000
Washington, D.C. 20004-2134
*Counsel for Vermont Student
Assistance Corporation*

/s/ Christopher M. Mills
Christopher M. Mills (VSB # 44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA 22102
Phone: 703.905.2800
Fax: 703.905.2820
cmills@wileyrein.com

*Counsel for Qui Tam Relator Jon H. Oberg*