676



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


UNITED STATES OF AMERICA,          )
*EX REL.* JON H. OBERG             )
                                   )
     VS.                           )    1:07-CV-960   CMH/JFA
                                   )
                                   )    ALEXANDRIA, VIRGINIA
                                   )    DECEMBER 4, 2017
PENNSYLVANIA HIGHER EDUCATION      )
ASSISTANCE AGENCY                  )
_____)

_____

**TRANSCRIPT OF TRIAL**
**BEFORE THE HONORABLE CLAUDE M. HILTON**
**UNITED STATES DISTRICT JUDGE**
**AND A JURY**

**VOLUME 4 - PM**
_____

**Proceedings reported by stenotype, transcript produced by**

**Norman B. Linnell.**

1                    **A P P E A R A N C E S**

2   FOR THE RELATOR, DR. JON H. OBERG:
          WILEY REIN LLP
3         By:  MR. BERT W. REIN
          MR. MICHAEL L. STURM
4         MR. CHRISTOPHER M. MILLS
          MR. STEPHEN J. OBERMEIER
5         MS. REBECCA L. SAITTA
          MR. MATTHEW J. GARDNER
6         MR. SAVERIO S. ROMEO
          MR. SHANE B. KELLY
7         1776 K Street, NW
          Washington, D.C.  20006
8         202.719.7000
          brein@wileyrein.com
9         msturm@wileyrein.com
          cmills@wileyrein.com
10        rsaitta@wileyrein.com
          mgardner@wileyrein.com

11

12  FOR THE DEFENDANT:
          THE OFFICE OF CRAIG C. REILLY, ESQ.
13        By:  MR. CRAIG C. REILLY
          111 Oronoco Street
14        Alexandria, Virginia  22314
          703.549.5354
15        craig.reilly@ccreillylaw.com

16        KIRKLAND & ELLIS LLP
          By:  MR. MATTHEW T. REGAN, P.C.
17        300 North LaSalle
          Chicago, Illinois  60654
18        312.862.2000
          mregan@kirkland.com

19
          KIRKLAND & ELLIS LLP
20        By: MR. MICHAEL A. GLICK
          MR. JUDSON BROWN
21        MS. TRACIE L. BRYANT
          MR. THOMAS P. WEIR
22        MR. TERENCE J. MCCARRICK, JR.
          655 Fifteenth Street, NW
23        Washington, D.C.  20005
          202.879.5000
24        michael.glick@kirkland.com
          judson.brown@kirkland.com
25        tracie.bryant@kirkland.com
          tom.weir@kirkland.com

678

1          <u>A P P E A R A N C E S</u> (Continued)

2

3       STEVENS & LEE, P.C.
        By:  MR. DANIEL B. HUYETT
4       111 North Sixth Street
        P.O. Box 679
5       Reading, Pennsylvania  19603
        610.478.2000
6       dbh@stevenslee.com

7       STEVENS & LEE, P.C.
        By:  MR. NEIL C. SCHUR
8       1818 Market Street
        29th Floor
9       Philadelphia, Pennsylvania  19103
        215.751.1944
10      ncsc@stevenslee.com

11

12  OFFICIAL U.S. COURT REPORTERS:
        MR. NORMAN B. LINNELL, RPR, CM, VCE, FCRR
13      United States District Court
        401 Courthouse Square
14      Alexandria, Virginia  22314
        703.403.5740

15

16

17

18

19

20

21

22

23

24

25

679

1                                    <u>INDEX</u>

2

3    **(December 4, 2017 ~ Day 4, PM Session)**
                                                    <u>PAGE</u>
4

5    Jury Charge Conference.................................  680
     Closing Argument on behalf of the Plaintiff.............  683
6    Closing Argument on behalf of the Defendant.............  697
     Final Closing Argument on behalf of the Plaintiff.......  719
7    Jury Charge.............................................  726
     Jury Note No. 1.........................................  736
8    Court Reporter's Certification..........................  740

9                                   -*-*-*-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          NOTE:  The afternoon portion of the case on

2   December 4, 2017, 2:00 p.m., begins in the absence of the jury

3   as follows:

4       (JURY OUT)

5          THE COURT:  Okay.  As far as instructions are

6   concerned, as I told you earlier, I will give my own general

7   instructions, the burden of proof, the credibility of

8   witnesses, those matters, jury deliberations and things.

9          As to the technical instructions, if I may use that

10  term, I will tell the jury about the False Claims Act.

11         Tell them about the nature of the claims in this case.

12         Tell them the five essential elements that must be

13  proven.

14         Define the word "claim."

15         Define "false or fraudulent."

16         Tell them that fraud is not presumed.

17         Define "knowingly."

18          And then the standards of knowledge, I will define

19  actual knowledge, and deliberate ignorance, and reckless

20  disregard.

21         Tell them about materiality.

22          And instruct them on damages.

23          Is there anything else I need to tell them?

24         MR. REGAN:  Well, Your Honor, on behalf of PHEAA as a

25  topical matter, instruction on causation, did you intend to

1  give a causation instruction?

2        THE COURT:  I don't think that's warranted here, is

3  it?  If you prove the fraud, that proves the causation.

4        MR. REGAN:  Well, I think there is a pattern

5  instruction for causation in the False Claims Act, but

6  topically we submitted a causation instruction.

7        THE COURT:  It is not one of the elements that has to

8  be proven in the statute.  I don't believe it is proper to give

9  the causation instruction.  I think the false and fraudulent

10  claim takes care of that.

11        MR. REGAN:  Then I mean as a topical matter, Your

12  Honor, we submitted our own specific instructions that would go

13  to the topics that you had mentioned.  But I think as a topical

14  matter that was the one that jumped out to me.

15        THE COURT:  Okay.

16        MR. REIN:  Your Honor, just to make sure I understood,

17  you are going to instruct the jury on knowingly, and then you

18  said that you would advise them that reckless disregard is

19  another element, is an alternative to it, and I just want to

20  make sure that the jury is clear that they don't have to

21  absolutely find that PHEAA knew if PHEAA made those claims with

22  a reckless disregard for what the law was.

23             And I thought I heard that.  I just want to make

24  sure.

25        THE COURT:  I am just going to define the terms.  It

1  will be up to you to argue what they --

2        MR. REGAN:  I understand --

3        THE COURT:  -- should find from the evidence in the

4  case, I believe.

5        MR. REIN:  I'm not talking about the fact.  I'm

6  talking about the fact that I didn't want confusion between

7  whether they were told that we had to prove absolute knowledge

8  or whether proof of a reckless disregard is sufficient under

9  the law.

10        THE COURT:  I believe they will be told that.

11        MR. REIN:  Thank you.

12        THE COURT:  Yes.

13        Okay.  Anything else?  Are we ready for the jury?

14        MR. REGAN:  Well, Your Honor, can we assume that some

15  of -- there wasn't a member of your topics, some of the

16  instructions that were proposed by Relator will not be read?

17  There's a couple of them.  Like one's about other defendants

18  and failure to call witnesses.  It sounds like you are not

19  inclined to read those.  I think we're fine.

20        THE COURT:  I am not reading anybody's instruction.  I

21  have got the areas that I am going to instruct on.

22        MR. REGAN:  I just wanted to make sure that you and I

23  are on the same page, and we are.

24        Thank you.

25        THE COURT:  Okay.

1        Are we ready for the jury?

2        All right.

3        NOTE:  At this point the jury returns to the

4   courtroom; whereupon the case continues as follows:

5      (JURY IN AT 2:04 P.M.)

6        THE COURT:  All right.  You may have a seat.

7              **CLOSING ARGUMENT ON BEHALF OF PLAINTIFF**

8        MR. REIN:  All right.  Ladies and gentlemen of the

9   jury, you know, we have all been sitting here listening to a

10  mass of evidence, and there is a pile of documents.  And we

11  thank you for your attention to this.  This is, you know,

12  something that needs to be sorted through, and I know you will

13  do that in the jury room.

14        So in the few minutes I have today, I would just

15  like to highlight what we think has transpired here and what we

16  think we have proven.

17        When we opened, we made an opening statement; we

18  made a certain commitment.  We told you we were going to prove

19  to you that a false -- fraudulent claims had been made, that a

20  scheme was in place to improperly claim 9.5 percent SAP and

21  take more good money from the government than PHEAA deserved.

22        So, let's review the biddings to you.  What did we

23  prove, what did we put in evidence, and what did it show.

24        First, we told you that this all started with a

25  scheme proposed by Mr. Guenther, the CFO of PHEAA in May of

1  2002, and he -- and we showed you a blueprint, and said, this

2  is the blueprint.  That's what he told them to do.  He told

3  them they could expand their 9.5 claims, most profitable items

4  they had, according to Mr. Willey.  They could do that by

5  raising additional money, post-'93 money, because we're in

6  2002, knowing that money was not allowed under law to generate

7  9.5 claims, and they could somehow do it by transferring it

8  back and forth in a series of noneconomic sham transactions, as

9  to which there were no controls internally and come out with a

10 conversion into 9.5 and money in their pockets.

11         Then we proved that Mr. Guenther had said, This is

12 unlimited.  We can do it over and over and over again.  And in

13 fact, we can effectively nullify an act of Congress, which in

14 1993 said the amount of money you can use to buy 9.5 loans is

15 capped.

16         But it wasn't capped under the Guenther plan.  It

17 was infinite.  You could do as much as you wanted, take as much

18 as you wanted.

19         Now, we showed you that Mr. Willey, to whom the

20 memo was addressed, enthusiastically endorsed it and said,

21 maximize 9.5; let's go do it.  And that is subject to Mr.

22 Gunther's concern about political ramifications and went out

23 and did exactly that.

24         So how did we show you that?  What's the evidence

25 that indicates the plan was carried out?

1          First, we put up Mr. Deslisle.  Mr. Deslisle tried
2   to explain and he gave you a picture of the basic framework of
3   the statute, what were they up against in the effort to
4   generate more 9.5 claims in the year 2002.
5          So, what he told you was that in 1980, money was no
6   longer simply money.  Money for this purpose was two kinds:
7   Money generated by tax free borrowings, and all the other
8   money.  And he said, you know, one side of this gets 9.5
9   treatment; the other side doesn't.  And Congress had put that
10  in place, and it was in place from 1980 onward.  It never
11  changed.
12         He then showed you that in 1993 Congress had said,
13  you know, there is a limit on how many funds you can put on the
14  tax-free side.  You can't do it anymore.  You've got what
15  you've got.  You have got a pot of money you can use to make
16  9.5 loans, but that is capped and there should be no more.  You
17  could never use taxable money to do it, and now you can't raise
18  tax-free money and do it.
19         Okay.  So that was put on the record.  And
20  Mr. Deslisle also explained that it was very easy for someone
21  like PHEAA to come in and get the money.  Because in this
22  regime there was no preapproval.  You didn't file it and say,
23  please approve it.  You filed it, you claimed it, you certified
24  it, and that certificate opened the door.  And you took the
25  money.  The Department reserved its rights thereafter.  But you

1   got the money right away.

2            All you had to do as a trusted colleague was sign a

3   certificate, and that put you responsible for determining that

4   what you were claiming was in accordance with law, regulation,

5   and policy.  You signed it.  And you knew this is going to make

6   the money flow, so it better be true.

7            Okay.  So then what did we do?  We brought Mr.

8   Weiner up here, and he showed you exactly where the money came

9   from to expand the claims.  Very carefully, showed you each

10  borrowing:  When it was done, how much they did.  And when he

11  was through, there was no doubt that the money PHEAA used to

12  expand this pot of claims was money they had raised after 2002.

13  Moneys they knew, according to Mr. Mehalko, were not entitled

14  to generate 9.5 loans.

15           So there they are, they are generating 9.5 loans

16  with money that they knew couldn't generate 9.5 loans.  And

17  they are saying, move the pea under the shell, and it all

18  works.

19           All right.  So, Mr. Weiner explained that, and he

20  showed you how the claims were expanded.

21           So then what did we do?  We brought Mr. Imburgia up

22  there.  He showed you the form.  What did the forms look like?

23  What was PHEAA actually representing?

24           And there were two key elements.  One is the

25  certificate.  We showed you a picture of the certificate.

1   Never changed; it was always there.

2            And the second thing, he went down the claim forms.

3   And he said, look at this X.  The X tells the Department of

4   Education that this loan is qualified legally for 9.5, and when

5   they see that X, they pay it.  And he showed you that.  He went

6   through it in detail.  And then he said, okay, let's compare

7   what you got out of the X with what you would have gotten if

8   you didn't code it X, if you stayed within the bounds of law.

9   And he added those numbers up over all the quarters that we had

10  in this case, and he said, that's $116.5 million.

11           You didn't hear anybody contradict that

12  calculation.  PHEAA knows that calculation is correct.  You

13  could fight about it legally, but you can't fight about the

14  number.  The number is there.  That's what they got out of

15  this.  It was enormously profitable, it was the biggest profit

16  they could make, and it was done at your expense, at taxpayer

17  expense.

18           All right.  But we didn't want to be unfair.  We

19  put on Mr. Mehalko and Mr. Guenther and said, okay, explain it.

20  Explain it to this jury, why can you do what you're doing?

21           So, neither one could find a legal justification.

22  The first thing they said is, oh, there's this DCL in 1996.

23  But the DCL only said that when you transfer a pre-existing 9.5

24  loan, it will remain a 9.5 loan.  As Ms. Ryan-Macie put it this

25  morning, once a half-SAP, always a half-SAP.  That's her

1  expression.

2          But it means it retains its fundamental character.

3  Why?  Because you bought it with qualified funds.

4          But when they were asked, where does it say in that

5  DCL that you can take a loan that was purchased with

6  unqualified funds and transform it into a 9.5 loan, they

7  couldn't find it.  Why couldn't they find it?  Because it's not

8  there.  And it's in conflict with a very fundamental rule.  And

9  that fundamental rule is 9.5 loans come from moneys raised tax

10  free before October 1, 1993.  So that's the first thing they

11  said.

12          Then they said, well, we think there is something

13  in the regulations, you know, somewhere in D of this and that.

14  And when they're asked to explain that, they couldn't.  And

15  they couldn't because it's not there either.

16          Nothing in those regulations can contradict the

17  statute.  And you heard Mr. Sorensen who said, look, there has

18  always been a source of proceeds rule.  It has been there.  And

19  that's -- you know, he is a representative of the Department.

20  We didn't make him up.  He's a lawyer.  He came and said, of

21  course, the statute requires you to have qualified money to

22  come and make a qualified loan.  And it's not there.

23          So, that's why when the Department and the IG of

24  the Department looked at PHEAA's claims, the first time they

25  got their act together and looked at them, they said, these

1   have been unlawful from day one.  Going back to 1993, it ended.

2           So, let's show you something that will kind of give

3   you a clue.  This is what PHEAA is telling you.  They're

4   telling you that you can pass across this line between the

5   green and the red.  And if you pass in one direction, well, it

6   stays green.  That's the once a half-SAP, always a half-SAP

7   rule.  But somehow if you pass the other direction, it is magic

8   and red turns into green.

9           And ask yourself, is there any reality to that?  Or

10  was the DoED saying, look, you crossed the line.  Green stays

11  green because the source of funds you used to get it is green.

12  And red stays red because the source of funds you used to get a

13  red loan is red.  And it's as simple as that.  It's in the

14  statute; has always been in the statute.

15          All right.  So that was what they told you was

16  their basis.  They didn't tell you they had legal opinion

17  because they never asked for one.

18          They didn't tell you that they had gone to the

19  Department and said, look, this is what we intend to do.  We

20  are going to fess up.  We are going to make these massive

21  transfers and really goose up our 9.5 receipts.  Do you think

22  it's okay?  They didn't do that either.

23          In fact, as we showed you, that rather than tell,

24  they tried to mislead everybody at all occasions.  They didn't

25  want anyone to know what they were doing.

1    So what did we show?  Remember that Dr. Oberg early
2  on in his investigation asked them, how are you getting these
3  big increases.

4    So, first story, they are all in the indenture.
5  The devil made us do it.  Right?  And then when you heard Mr.
6  Mehalko, he said, the indenture doesn't make us do anything.
7  It is totally permissive.  We can do whatever we want.  So that
8  story was a total red herring.

9    So then Dr. Oberg comes back and he says, I don't
10  get it.  What are you doing?  And they said, oh, the DCL, which
11  they know doesn't cover everything they're doing.  But they
12  don't tell him.  And, by the way, we have got a plan and a
13  program, and we are doing it massively.  And we intend to keep
14  doing it.  They don't say that.

15    And when he comes back the third time and says, I
16  think I know what you are doing, what happens?  No answer.

17    So in 2003, they are asked by the Department of
18  Defense, what are you doing?  Right?  What's up?

19    And what do they tell the Department of Education?
20  They say to the Department of Education, oh, it's portfolio
21  management.  We are just managing the portfolio, and it's our
22  lowest cost of funds.

23    Well, number one, they weren't managing the
24  portfolio.  Mr. Hayes would tell you, and he did tell you, they
25  are not managing.  They are just swapping things that they own.

1  There is no management, there is no reality, there is no

2  economic basis for this.

3          You heard Ms. Ryan-Macie, their own witness, say,

4  well, when we were doing it, we were conscious of expirations,

5  and we were portfolio managing.  That's portfolio management.

6  What they're doing is wholesale swapping for a regulatory

7  purpose.

8          So, do they fess up?  No.  And they say, that's our

9  lowest cost of funds.

10          Folks, think about it for a moment.  The cost of

11  funds in the pre-'93 trust was fixed at the time they made the

12  loans, and loan rates were higher.  The real cost of funds is

13  what they are paying today to get more money.  That's 1

14  percent.  So where is their lowest cost of funds?  It is

15  another story, and it has got nothing to do with what they are

16  doing.

17          Instead of coming in and saying, look, Department,

18  we think we're right; we are going to do what we are doing,

19  they tell them another story.

20          And then it's 2006, and the Inspector General is

21  kind of saying, well, what are you doing?  You know, we want to

22  understand the basis of what you are doing.

23          And do they send them the Guenther memorandum?  No.

24  And you heard Mr. Nekrasz says, we asked for that.

25          Well, if you think you were doing right, why don't

1   you just give it to them?  Say, look, this what we are doing.

2   The regs allow it.  You know?  We are going to do it.

3            And then the Department comes out and says, you

4   know what, since 2003 what you have been doing is wrong --

5   since 1993, excuse me.  You know, the regs have always been the

6   same; the requirements have always been there.  Your claims are

7   not in accordance with law.

8            So, of course they got up on their hind legs and

9   said, what do you mean?  Our claims are perfectly valid.  We

10  are going to go to court.  Did they do that?  No.  They say, we

11  got the joke.

12           And whose joke was it?  Taking taxpayer money is no

13  joke.  Jon Oberg didn't think it was a joke.  He thought this

14  is a serious business.  You can't do that.  It's not that easy.

15           Okay.  So that was our case, and we proved all

16  those elements.  And now having shown that, what did PHEAA

17  respond?  What did they come up here and tell you?  Same old

18  smoke screen.

19           Mr. Guenther said, oh, this is all caused by the

20  2 percent excise, you know, the 2 percent federal tax, which is

21  a limit on how much money we could earn in the tax-free

22  accounts.  We just had to charge it off.

23           Well, that's an interesting story.  If you hadn't

24  claimed the 9.5 in the first place, you wouldn't have a

25  problem.  So they invented their problem by running 9.5 through

1  those accounts and then turned around and said they were going

2  to fix it.

3         It's interesting, but it wasn't the cause.  The

4  cause was get the money first.  And the 2 percent problem, what

5  Mr. Guenther said, and we can also help ourselves with that by

6  loading costs into those pre-'93 trusts because they are the

7  only ones subject to the 2 percent and we will just take those

8  costs in those trusts.  And that is a miracle because, one, we

9  will charge them off there and use the government's money to

10  pay for the benefits, these benefits being the competitive

11  prices they had to pay for the loans.  And then, even better,

12  that will enhance our profits in the trusts that are not

13  subject to that.  They are not raised tax free, and we can take

14  that money and do anything we want with it, including enrich

15  our salaries, boost our bonuses and secure our retirement

16  accounts.

17         That's what Mr. Guenther said.  It's right there in

18  his plan.  And they executed that plan, and you saw what that

19  result was.  Here is Mr. Willey with a 300-some odd thousand

20  dollar pension as a, quote, state employee.  It might tell you

21  something.

22         Okay.  So then they told us some other stories.

23  First they said, well, we didn't take as much money as we

24  could.  We were kind of restrained.  You know, we didn't

25  convert everything.

1        This is a wonderful story.  It means, if you don't

2    do more, can you get away with less.

3        It's like a bank robber who says, you know, I went

4    into the bank and I could have cleaned the place out, including

5    the vault, but I was a little bit worried about the

6    ramifications, the cops might get me, so I only cleaned out the

7    cash drawers.  Hey, that's okay, right?  Because I didn't take

8    it all.

9        That's what they are saying.  That's not an excuse.

10   You are accountable for what you did take, not for what you

11   didn't take.

12       Then they said, oh, we just did it to fund borrower

13   benefits, you know, kind of a modern Robin Hood defense.  We

14   took it from the government, and we wanted to fund the borrower

15   benefits.  Well, where is the proof of the borrower benefits?

16   It wasn't there.

17       The borrower benefits, and the only borrower

18   benefits that they talked about, were paying the price they had

19   to pay to lay their hands on loans that were going to earn them

20   9.5 percent.  They had to compete for those loans.  Is that a

21   borrower benefit?  It might be to the borrower, but it sure

22   isn't a voluntary provision of borrower benefits.

23       Then they go to what Mr. Guenther said.  If we make

24   the money inside the 1993 trust, it will be bound by law to

25   borrower benefits.  If we can take it out of there by upping

1   those costs, it is ours, and we can do what we want with it.

2   And that's exactly what they did.

3           And then they said that the real point is, the

4   government sort of knew what we were doing, and they let us do

5   it.  And, gee, you know, you can't punish us, because people in

6   the government knew.

7           And they have shown that various people from time

8   to time might have known.  But the government never came to a

9   coordinated position on this until 2007.  And those accounts

10  were not closed, they were subject to continuing audit.  They

11  had an audit, and an audit that said their claims were

12  unrealistic.  They are not under control and they are not

13  authorized by law.

14          So, you know, folks, that's not an excuse.  That

15  doesn't justify the conduct.  If the watchman is asleep in the

16  warehouse, you can't say, well, that's an excuse for looting

17  it, nobody stopped me.  I got in there and did it.

18          And they believed that they could use a smoke

19  screen to keep the government off their backs.  And look at

20  their memo, what they said in their plan, which I will find for

21  you.  They said, the Department was feeble and weak-minded.  In

22  other words, you know, that's their belief.

23          So there they are.  By the way, what that little

24  chart shows you is how you think -- why you think you can

25  create out of 859 million, your cap fund, 2.2 billion.  That's

1   a pretty good trick if you can do it, but you can't do it

2   legally.  Look at that balance.

3              And their view of the Department, it's feeble.

4   It's weak-minded.  We can smoke -- we can blow all the smoke we

5   want.  Incredibly pathetic and weak.

6              Okay.  That just says, keep blowing smoke.  It will

7   work.  It did work until the IG got ahold of it because Dr.

8   Oberg had been after the IG because he thought independent,

9   these people, like Mr. Nekrasz, they know what they are doing.

10  And Mr. Sorensen, and they did.  And they told you, it was

11  never lawful at all.

12             So, you know, one other thing they said is, well,

13  the GAO looked at this and the GAO, they thought it was legal.

14  But we showed you the GAO did not think it was legal.  They

15  reached no opinion.  And the IG said, no, PHEAA, that's not

16  right.  The GAO didn't say it was legal.  The GAO was looking

17  forward and saying, what can the Congress do about it.

18  Entirely different.

19             So, who said it was legal?  They did.  Did they

20  have a reason?  No.  Did they take the money?  Yes.

21             And when they -- push comes to shove and they are

22  told, this is not legal and you can't go on taking moneys that

23  you have been taking quarter after quarter, loans that you

24  claim have qualified, did they fight?  No.  They got the joke.

25  And that's where they stand.

1         Thank you.

2              **CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT**

3         MR. REGAN:  May I proceed?

4         Good afternoon, and thank you.  Thank you for your

5    service, thank you for your attention, thank you for your

6    attentiveness to the witnesses, and to the documents that you

7    have seen over the last week.

8         That evidence is now closed.  There will be no more

9    witnesses, there will be no more documents, and there will be

10   no more testimony.  This is closing argument, Mr. Rein just did

11   as a closing argument, but it's not evidence.  It's not about

12   our positions, it's about our proof.

13        Over the next 30 minutes, I will review that

14   evidence with you, evidence that compels only one verdict in

15   this case, a unanimous verdict in favor of PHEAA.

16        The matters you will be asked to consider in your

17   deliberations are serious.  They are based on the applicable

18   law as you will be instructed by the Court.

19        You will be asked to decide if Relator Jon Oberg

20   met his burden of proof to show that PHEAA violated the False

21   Claims Act between 2002 and 2006.  The answer is clear, Dr.

22   Oberg did not meet his burden of proof.  PHEAA did not violate

23   the False Claims Act, and there are no damages that are owed by

24   PHEAA to the government.

25        First, PHEAA's statements were not false.  PHEAA's

1   conduct was in compliance with the laws and regulations and

2   policies in effect at the time.  That is confirmed by

3   overwhelming evidence from the Department of Education

4   leadership up to the Secretary of Education on what the law

5   allowed.

6           And there is no allegation that PHEAA violated the

7   law after it was changed in 2004 and 2006, affirmative changes

8   in the law that standing alone confirmed that the previous law

9   authorized the conduct at issue in this case.

10          Second, PHEAA had a reasonable belief that its

11  conduct was consistent with the applicable law, regulations,

12  and policies when it submitted its claims every quarter in

13  those 799 forms we heard about.

14          PHEAA employees like Tim Guenther and Andy Mehalko,

15  Richard Willey.  They acted consistent with the directions of

16  the DOE and with multiple signals from the DOE that it approved

17  of these subsidy requests.  No one, not Dr. Oberg, told PHEAA

18  that it was doing something wrong during the damage period.

19  Relying upon and acting consistent with what the government is

20  asking you to do and what the government's direction is is

21  completely at odds with reckless conduct.

22          And there is zero evidence in this case that PHEAA

23  knew or believed its behavior was in violation of the law.

24  None.

25          PHEAA also told the world about its growth in those

1    9.5 loans and its public financial statements every quarter and

2    every year.  PHEAA wasn't hiding information, it was providing

3    information to anyone with access to the Internet, including

4    Dr. Oberg, who wanted to download and inquire about it.

5            Third, DOE also had quarterly data directly from

6    PHEAA showing PHEAA's growth.  PHEAA consistently described to

7    the government how this growth occurred.  It was moving loans

8    to create room in its tax-exempt bonds so as to use excess

9    interest under IRS rules to fund borrower benefits.  Tens of

10   millions of dollars of student borrower benefits.  That was its

11   purpose as a state agency.  It wasn't trying to help

12   stockholders.  It was trying to help students.  And that was a

13   completely legitimate purpose.

14           In combination, the DOE rules and the IRS rules led

15   to growth.  The government testimony that you've heard and the

16   documents confirm that DOE was aware of the growth and

17   internally understood the exact mechanisms for that growth, the

18   1996 Dear Colleague Letter.  With that knowledge, DOE paid the

19   bills.  That is strong evidence that DOE had no issues with the

20   growth.  DOE paid the bills based on its own understanding of

21   its own regulations.  It wasn't induced into payments by PHEAA.

22           Before I turn to the critical evidence to share

23   with you over this 30 minutes, I want to remind you of one of

24   the first things you heard about this case.  You heard from

25   Relator's counsel that Dr. Oberg brings this case standing in

1  the shoes of the government.

2        But what did you see and hear in this case?  While

3  claiming to stand in the shoes of the government, Dr. Oberg

4  walks away from the government evidence.  Instead, it was PHEAA

5  who subpoenaed the government witnesses to come and testify

6  before you.  It was PHEAA who called the government witnesses

7  who were in charge of the program, who were in charge of the

8  policy.  PHEAA, the party that allegedly defrauded the

9  government, was the one who brought that evidence to this

10  court.

11        PHEAA also brought forth third-party witnesses who

12  worked directly with the government.  You saw two of them this

13  morning.

14        Relator presented not one witness from OPE, the

15  Office of Post-Secondary Education; from FSA, Federal Student

16  Aid; from OGC, the Office of General Counsel.  Not one.  He

17  just asked you to accept his personal opinion about what the

18  regulations required.

19        But Dr. Oberg didn't work in setting policy.  He

20  didn't work in administering the program that he's brought

21  before you.  And he wasn't a DOE lawyer.  And when he

22  repeatedly expressed his views of the law up the chain of

23  command at the Department of Education, the same opinions he

24  asked you to accept here, his opinions were rejected by

25  multiple senior people inside the Department who had the

1  responsibility and the authority for the program.  His views

2  were disclosed, his views were discussed, and his views were

3  dismissed.

4         When Congress changed the law in 2004 and 2006,

5  that prospective legal change was what Dr. Oberg was asking for

6  in his many written complaints that you have before you.  He

7  was part of a chorus of voices of people that needed to

8  modernize DOE policy because of a historic change in interest

9  rates.  But, of course, Dr. Oberg didn't share in any recovery

10 based on the actions of Congress.  And he did not benefit from

11 the DOE's decision in 2007 to create a new policy and to tell

12 lenders it would not try to look at their past special

13 allowance payments so long as lenders in 2007 adopted this new

14 rule.  He didn't share that either.

15        Indeed, it is only when he seeks to share in the

16 potential recovery of the money that Dr. Oberg embraces his

17 role as the government's proxy.

18        In short, the evidence shows that Dr. Oberg did not

19 agree with the Government's actions during the relevant period

20 of 2002 to 2006.  To the contrary, as you saw, he thought the

21 violator was the Department of Education.

22        Now, why is that relevant here?  We are in a False

23 Claims Act.  Why is that relevant here?  Well, Dr. Oberg viewed

24 the DOE as the violator precisely because the DOE was aware of

25 the conduct under the 1996 DCL and the regulations, because DOE

1  rejected his view of what those laws provide and because DOE

2  told lenders, like PHEAA, that their increasing subsidies were

3  consistent with regulations and perfectly legal.

4          The reasons why DOE rejected Dr. Oberg's complaints

5  are the same reasons why PHEAA did not violate the False Claims

6  Act.

7          Now, let's go review the evidence.  I want to show

8  you some of the key things you heard and saw.  You are going to

9  get binders when you go back to deliberate, and these exhibits

10  will be in those binders, and I welcome you looking at the

11  evidence.  Because what I am going to -- much of what you just

12  heard of the preceding 20 minutes, I don't think you will find

13  in any of those binders, but what I am going to show you over

14  the next 23 minutes, you will see in all of them.

15          What is this case about?  This case is about

16  interest rates.  It's not about fraud.  It's about a low

17  interest rate environment that happened in the 2000 to 2004

18  time period.  As you heard from Sheila Ryan-Macie, when these

19  regulations were put in place, what was the Department of

20  Education trying to do?  It was trying to sanction and penalize

21  tax exempt -- loans that were coming out of taxable bonds.

22  Why?  Because they didn't want them to jump up, they didn't

23  want them to jump up to that taxable full-SAP in a high

24  interest -- interest rate environment.

25          And if interest rates had gone up, we wouldn't be

1  here.  The government made a choice to try to reduce subsidy

2  payments if interest rates went up.

3  You see this from the GAO that says that that was

4  the education anticipation that it would go up.  But

5  ironically, they did not.  What happened?  They went down.  And

6  that education regulation that was designed to limit payments,

7  presented lenders with an extraordinary opportunity to generate

8  additional loans that earn 9.5 percent yield.

9  That's what took place here.  The government made

10  the choice.  Set a flat fixed rate term, not a variable rate

11  term, on a bet that interest rates would go up, and they went

12  down.

13  Ms. Macie told you that she told the government,

14  this is going to -- if interest rates go down, it is going to

15  be a huge windfall.  They went into this eyes wide open.  And

16  as the GAO, an independent investigator found, without

17  government action the taxpayers remain exposed to additional

18  special allowance payments.

19  Think about that.  The GAO, the congressional

20  investigators were not saying there is exposure to billions of

21  dollars because people are violating the law.  No.  There is

22  exposure to billions of dollars because people are following

23  the law.  Therefore, the GAO concluded to Congress, you need to

24  change the law.  You need to change the regulations, consistent

25  with the new interest rate environment.

1          You have seen this document several times.  This is

2    DX 4.  This was Sally Stroup's comments in public, in a public

3    forum, about the growth of 9.5 loans.  Perfectly legal, not

4    fraud, not abuse.  She was the head of the policy making

5    organization.  But another phrase she said, it may be bad

6    policy in a low interest rate environment, but there is no

7    fraud and abuse.

8          Was she speaking on behalf of the Department of

9    Education?  Well, Relator asked, well, that's just your

10   personal opinion.  Right?

11         No, I was speaking on behalf of the Department of

12   Education.

13         Was it unreasonable for PHEAA to follow the head of

14   the policy group of the Department of Education saying the

15   conduct was perfectly legal?  Of course that is not

16   unreasonable.  Of course that is not reckless.  Of course that

17   is not fraud.

18         The Relator also challenged Terri Shaw, the head of

19   the agency that ran the program.  Well, did you disagree with

20   her statement?  Did you have a different understanding of the

21   policy?

22         And Ms. Shaw testified to you:  Of the policy?  I

23   would think the answer to that question is that as a policy

24   matter I think many people in the Department, including myself,

25   didn't particularly like the policy or the statute or the

1   regulation, but it was what it was.  And until it was changed,

2   we followed the law and the regulations and the policy.

3            That's what happened here.  The same thing inside

4   the Department of Education, the same thing with PHEAA.  This

5   is not fraud.  This is not reckless conduct.

6            In fact, Ms. Stroup said as soon as she got to the

7   Department, 2002, they were already looking at making changes

8   to the regulations.  Lots of power words and scheme, that this

9   was a scheme.

10           Did you see evidence of a scheme in this case?

11  There is none.

12           They point to, well, first of all, look at the

13  payments, look at how enormous they were.  That must be

14  illegal.  Well, payments themselves are a function of the rates

15  and the growth of the loans.  But those red bars that were put

16  up before you from Mr. Weiner, they don't show abuse of the

17  program.

18           How do they compare to the GAO study of the entire

19  industry?  They show the exact same trend.  PHEAA wasn't some

20  outlier doing something that is secretive and, you know, trying

21  to hide under the cover of darkness.  PHEAA was doing exactly

22  what the industry was doing.  They had the same trend line.

23           PHEAA's scheme involved them disclosing every year

24  how much the balance of these loans was growing and then how

25  much it was coming back down.  It came back down why?  Because

1    the law changed.

2           You can see all those financial statements in the

3    jury room.  Those financial statements, by the way, if you want

4    to look at the borrower benefits -- he said there was no

5    evidence of borrow benefits -- look at the first page of every

6    financial statement.  It details them in the first two pages.

7           You saw this chart with Mr. Weiner.  Their expert

8    confirmed that in fact PHEAA's non-9.5 loans grew faster than

9    its 9.5 loans.  That's not a scheme.  That shows that actually

10   PHEAA was doing exactly what it said it was doing.

11          And this data that you see up here about the 9.5

12   data, their other expert, Mr. Imburgia, said DOE had all that

13   data.

14          What was PHEAA doing?  PHEAA was doing its mission.

15   It was doing what it was in business for.  It was helping

16   students get access to higher education, and it was reducing

17   the cost of that access.

18          Well, here is this May 19, 2000 memo, the scheme

19   that was documented in this secret memo.  Well, every time this

20   memo went up, you notice one thing you were never shown is that

21   the very paragraph that they want to say is the scheme has Mr.

22   Guenther saying, under current law and regulation.  It was a

23   scheme to comply with the law, as he said in the memo and as he

24   said when he testified here before you.

25          The second part of this memo about maximizing,

 1  their own witnesses confirmed that PHEAA never did.  Their own

 2  data analysis confirmed that PHEAA never did.

 3          And the GAO is on the bottom.  If you look at what

 4  PHEAA described in this paragraph as to its conduct and then

 5  look at what the GAO said about what lenders do, they align

 6  almost perfectly.  This is not some secret plan.  This is

 7  literally what people do.  They would take their excess

 8  earnings from tax-exempt bonds and they would use them to

 9  provide interest rate reductions for student borrowers.

10          Well, not just the GAO.  How about the audit the

11  DOE did, what did they find?  Well, miraculously, in this

12  scheme, they were told the exact same thing.  They were told by

13  PHEAA what PHEAA was doing.

14          How about the OIG?  Were they deceived by PHEAA?

15  Again, they were told by PHEAA the exact same thing.  They were

16  told exactly by -- told exactly what PHEAA was doing.

17  Originating loans and issues that have excess interest,

18  necessitate selling loans, and they use this to pay borrower

19  benefits.

20          There is no scheme.  There is nothing hidden here.

21          And that document, the bottom one, do you know who

22  wrote that?  The OIG.  That's who wrote that, based on

23  conversations with PHEAA.

24          Well, did DOE understand it?  Did they -- were they

25  unaware of exactly how this growth was taking place?  What was

1   the reality of the situation?

2          Well, I showed you this in opening, if you recall,

3   the six steps of growth.  Right?  Steps 1, 2, 3, and 4, no

4   dispute.  Step 5 is where the dispute is.  Can that money that

5   comes in, can it create new 9.5 loans?  You remember that.

6          Well, I didn't make this up.  These six steps

7   actually came from someone in the Department of Education.

8   That someone in the Department of Education is Pam Moran, the

9   person that you would call if you had a question about the 1996

10  DCL.

11         So the person you were supposed to call, the person

12  that Ms. Ryan-Macie testified about this morning, the person

13  who was the Department's loan expert and led the policy, this

14  is who you call.

15         Well, what did Ms. Moran say internally in DOE

16  about how growth occurred under the 1996 DCL?  She wrote a

17  six-step memo explaining the growth.  It's hard to read, so

18  let's break it down.

19         Step 1, there is a tax-exempt bond issuance prior

20  to 10/1/93 for $10,000.

21         Step 2, student loans are originated with these

22  tax-exempt funds.  They are all subject to the floor.  No

23  dispute about that.

24         Step 3, under the 10,000 -- under the -- number 30,

25  the Q&A guidance, the 10,000 tax-exempt loans that were

1  originated are refinanced with taxable moneys.  Prior to ED's

2  changed policy, that would have ended their identity as

3  tax-exempt loans, and they would no longer have qualified for

4  the floor.  Under the new policy, they can be refinanced with

5  taxable moneys and still retain their eligibility for the

6  floor.

7            Step 4, the refinancing of the original tax-exempt

8  loans frees up the 10,000 of tax-exempt funds.  Right?  So now

9  the tax-exempt bond has the cash again.  Here we go to step 5.

10           Step 5, under Ms. Moran, the person who was the

11 person you call, she says now -- new tax-exempt loans are made

12 with those freed up tax-exempt funds.  The cash that came back

13 creates new loans.

14           Now you have 20,000 worth of student loans eligible

15 to floor.  This is what the person inside the Department of

16 Education described to her colleagues about how the guidance

17 led to growth.  This is the government's own evidence that

18 confirms there is no violation of the False Claims Act here.

19 This is exactly what they expected to have happen.

20           Ms. Stroup, you saw this just a few -- hours ago.

21 Did she agree with Ms. Moran's explanations?  Yes, she agreed

22 with those explanations.

23           What about the GAO?  They interviewed the DOE.  You

24 have seen this report over and over again.  It's DX 1.  It is

25 the very first exhibit that is going to be back there in the

1  binder because it is such a comprehensive study of what took

2  place.

3          They interviewed the officials at Education about

4  these laws and regulations, they interviewed PHEAA, they

5  interviewed Dr. Oberg.  You have seen this before.  What are

6  they describing here?  Exactly the same thing that Ms. Moran

7  just described, taking money that comes over to a tax-exempt

8  bond from the sale of loans and originating additional 9.5

9  loans.

10         I'm not showing you red bars and green bars and

11 charts.  I'm showing you the evidence.  This is what the

12 government wrote, this is what the government investigators

13 found, and this is why they said they had to change the law.

14         If you were in Congress in 2004 receiving this

15 report from GAO, this chart would have gone on the screen, or

16 whatever they would have used to display it that day.  This is

17 their own chart.  All of the plaintiff's experts confirm, yes,

18 this is the plaintiff's theory of what is fraudulent.  This is

19 the theory of what's wrong.

20         Well, the GAO wrote this in public in 2004.  They

21 didn't conclude this was wrong.  They concluded this is what

22 the regulations were allowing that needed to be changed.

23         And you have seen this before; you have it back

24 before you.  They said, change the law and regulations with

25 respect to the loans.  Change the current regulations.  That's

1   what needs to happen.

2          The Department of Education responded to the GAO

3   report.  Did they say, my goodness, we have been defrauded?  We

4   have been defrauded.  We had no idea.  No, they didn't say

5   that.

6          They said, thank you for this, outlining these

7   strategies.  In other words, absent a change in the law, these

8   things will continue.  That's what the Department of Education

9   said.

10          Ms. Stroup said, yeah, that was the official

11   statement of the Department of Education.

12          What Dr. Oberg say about the GAO report when it

13   came out?  Not about what he said in trial.  What did he say

14   back in 2004?  He said, it looks like an excellent report.

15   It's a fine discussion of regulatory law.

16          You saw his statements at Baruch College.  Did he

17   say that the GAO report was just reporting on what happened

18   when he told -- when was talking about this at Baruch College?

19   No.  He said that the GAO report, which was a bombshell,

20   billions could be saved, how?  Simply by making some

21   sub-regulatory changes, by changing the law.

22          Dr. Oberg also participated in the drafting of that

23   TICAS report.  You heard in the opening statement, well, PHEAA

24   thought it had a blank check.

25          What did Dr. Oberg and his friends write in this

1  draft report?  Something that he didn't delete, he didn't

2  change his handwriting.  He said, by allowing lenders to

3  convert regular loans into 9.5 loans, Education handed them a

4  blank check, allowing them to multiply their federal subsidy

5  payments.  That is not fraud on the Department of Education.

6         The final report, what did it conclude?  It

7  concluded it was the agency's rules that created the loopholes,

8  and it is the agency's responsibility to fix them.

9         How about the Secretary of Education, is he

10  authorized to speak for the Department of Education about his

11  rules?  I think he is.  What did he say about the rules?  He

12  said there were loopholes that needed to be closed by Congress

13  because the current interpretations expressly permitted lenders

14  to extend these payments indefinitely.

15         Now, Jon Oberg believed that he misled Congress

16  when he sent this letter to Congress and made it public.  What

17  is PHEAA supposed to do when they see a letter from the

18  Secretary of Education that says the current regulations allow

19  this conduct?  Are we supposed to say, nope, actually I am

20  going to ignore the Secretary of Education.

21         This is not fraud.  This is not reckless conduct.

22  This is reasonable.

23         And what happened then?  Congress changed the law.

24  This is the House budget report -- House committee report from

25  2005, which I see as sort of the epilogue to this whole story:

1  And Congress confirmed that in 1996 the Department of Education

2  under the Clinton administration issued another piece of

3  administrative guidance that permitted loans to be transferred

4  in and out of eligible bonds, allowing still more loans to

5  become subject to the higher guaranteed rate of return.

6          Dr. Oberg's expert, he disagreed with Congress.

7  But this is what Congress told the world in 2005 what happened.

8          They then say, the time has come to put an end to

9  this unnecessarily high rate of return.

10         If Congress or the DOE felt that someone was

11  breaking the law, defrauding the Department of Education, they

12  don't go and pass new laws that change the rules.  It's just

13  not the way that it works.  This is not fraud.

14         The program reviews.  You have seen it.  The same

15  numbers that were just put up before you, Mr. Rein says, well,

16  they can't do this legally.  Well, the Department of Education

17  auditors, who spend every day with these regulations -- this is

18  what they do -- they had the data, they had the numbers, and

19  they had no -- they concluded there was no issue.

20         So if we look at the evidence, Dr. Oberg cites to

21  you his own memo, he cites the draft Iowa report, the OIG

22  report from 2007, and a 2007 DCL.  He ignores the GAO report,

23  Secretary of Education Page letter, the statements by the

24  Assistant Secretary of Education, statements by Congress,

25  statements by Pam Moran, the person who was -- you are supposed

1    to call with questions, the program review auditing PHEAA's

2    charges, the second program review auditing PHEAA's charges,

3    the TICAS report.  All of these things are saying, this is

4    allowed under the regulations until they change.

5              And now let's look at actually the four documents

6    that he was putting forward to you.  What about that Iowa

7    draft?  Well, Dr. Oberg himself looked at that Iowa draft and

8    said that the finding comment -- he talked about changes, going

9    through the clearance process.  Well, he cites to you a draft.

10   What did the final -- what was the final?  The final was that

11   the conduct was in compliance with the regulations.

12             So it was not a draft report, but what is the

13   final?  The final says compliant.

14             In Iowa, whose system were they using?  PHEAA's

15   system.

16             What about that OIG report?  That OIG report, if

17   you look at it back in the jury room, it is a recommendation to

18   the Department of Education.  It says, we are providing this to

19   FSA for their -- to see what they want to do with it.  When

20   that report came to the Department of Education, they rejected

21   the OIG's findings.  You didn't hear that.

22             Okay.  What about that 2007 DCL?  Well, PHEAA, when

23   that came out -- let me say, first of all, if you remember, Dr.

24   Oberg agreed with me, time does not run backwards.  So whatever

25   that 2007 DCL says, it's kind of hard for PHEAA to have been

 1  violating the False Claims Act for not complying with a DCL

 2  that did not exist during the -- during the claims period.

 3         But four days after that was issued, PHEAA

 4  internally, long before this lawsuit said, this is not

 5  restating any rules.  This is brand new.  Dr. Oberg himself

 6  called it a new approach.  Mr. McCullough on the witness stand

 7  said it was the new regime.

 8         Mr. Sorensen, the OIG auditor, said he's not

 9  aware of any -- that description in that DCL every being used

10  before the late 2006 audit report.  It was brand new; no one

11  had ever heard about it.

12         And how do we really know about that?  The

13  Department of Education itself said, so long as you don't

14  challenge our restatement here and do these new things going

15  forward after January '07, we are not going to seek to recoup

16  those payments you have already received.

17         They changed the rules, said, we're not going to

18  look backwards as long as you adopt these new rules going

19  forward.  There could not be better evidence that this 2007 DCL

20  does not support Dr. Oberg.

21         Lastly, the 2007 DCL talks about this generational

22  approach.  That is not even the damages model that Dr. Oberg

23  puts in front of you.  So he asks you to accept the 2007 DCL,

24  but he doesn't even follow it himself with his damage model.

25  That leaves us then with his own memo, his November memo that

1    he sent all around.

2            We talk about chain of command.  You heard and saw

3    documents with respect to Rod Paige and Margaret Spellings,

4    Sally Stroup, Terri Shaw, Brian Jones.  Who had ultimate

5    responsibility here?  Dr. Oberg?  Or the head of the program,

6    Terri Shaw?  Or the head of policy, Sally Stroup?  Or the head

7    of the General Counsel's office, Brian Jones?  Or the Secretary

8    of Education.  I think it's obvious.

9            You don't have to trust me as to who to go to for

10   these issues.  Dr. Oberg in his very first memo, he cites

11   PHEAA's financial statements showing growth, because they are

12   public, and he sends it to a person in each of those branches.

13           His second complaint, he cites PHEAA's public

14   financials, and he sends that to FSA.  Sends it to OIG and it

15   goes to FSA.

16           His third complaint on the 30th of September, he

17   gets PHEAA's first e-mail back to him, where does he send it?

18   He sends it to two lawyers at the OGC.  And then it goes to

19   multiple people in OGC.

20           His November memo, he sends to the Office of

21   General Counsel.  Where does that go?  It goes to six lawyers

22   in OGC and then it goes to essentially everyone else.

23           Did the Department of Education know Dr. Oberg's

24   views?  Did the Department of Education have PHEAA's financials

25   that showed growth?  Did the Department of Education know that

1    Dr. Oberg did not think transfer and refill was allowed?  The

2    evidence is overwhelming that his views were shared and they

3    were rejected.

4            Well, they said, well, PHEAA, you should have

5    consulted an attorney.  Well, can we guess what an attorney

6    would have said?  We have got six attorneys here from the

7    Department of Education, not one of them believed or took

8    action against PHEAA based on Dr. Oberg's complaints.

9            In fact, what they told Dr. Oberg is we're looking

10   at regulatory changes.  They told Dr. Oberg that actually

11   everything was being submitted in compliance with the existing

12   statutes and regulations and policy.  And that's why he thought

13   the violator was the Department of Education.

14           Not because the Department didn't know, not because

15   the Department was defrauded, not because the Department didn't

16   understand, but because they did know, they did see the data,

17   they did understand, but they didn't agree with him.  That's

18   why.

19           This case comes down to what is the false claim.

20   The false claim, as I showed you in my opening statement, is

21   this document signed by Tim Guenther with Mr. Mehalko's name on

22   there as well, certifying that there was compliance with the

23   laws, regulations, and policies related to the Federal Family

24   Education Loan Program.

25           What did the evidence show about what those laws

1   required when PHEAA was sending in these compliance

2   certifications four times a year?  The GAO report, it says,

3   current law and regulations provide an opportunity for lenders

4   to increase the amount of loans guaranteed a minimum of

5   9.5 percent return.

6           What did the final Iowa report say?  The process

7   described is within compliance when consideration is given to

8   DCL, 1996 DCL in response to question 30.

9           What did Secretary Paige say in 2004:  The prior

10  administration's interpretation expressly permitted lenders to

11  extend these payments.

12          What did the program reviews of PHEAA say?  There

13  are no findings or observations, even though they thought the

14  exact numbers, 858 to 2 billion.

15          What did Congress say?  That the administrative

16  guidance permitted loans to be transferred in and out of these

17  issuances.

18          What did Sally Stroup say in her all-hands meeting

19  in October of 2004?  All lenders were following the letter of

20  the law and growing their 9.5 percent portfolios.

21          What did Sally Stroup say?  This is perfectly

22  legal.  It is not illegal and there is no fraud.

23          What did Sally Stroup say about the movement of

24  money?  Mr. Rein asked her:  You just told me if I transferred

25  the loans out of that pool, essentially, and I replaced those

1  loans with cash, the cash you are certain could be used to buy

2  9.5 loans?  Yes.  That was the Department of Education's

3  position.

4          And what did Terri Shaw say about the guidance that

5  she had from inside the Department of Education?  She is the

6  head of the entire program.  She is running Financial Student

7  Aid.  She said, I am crystal clear in the guidance I received

8  from OPE and the Office of General Counsel, more than once,

9  that 9.5 tax-exempt special allowance billings that had been

10 happening and were happening were in full compliance with the

11 statutes and regulations.

12         Question:  I think you also used the term "policy"?

13 And policy.

14         What also is crystal clear is what you should do

15 with the verdict form that you were handed to by Judge Hilton.

16 When you have that verdict form, you should find that in favor

17 of the defendant, PHEAA.

18         And on behalf of Mr. Mehalko and on behalf of my

19 team, I thank you for your attention.

20         **FINAL CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF**

21     MR. REIN:  Thank you.

22         Mr. Regan has given you an eloquent version of the

23 middle of the story, but he hasn't told you the beginning and

24 the end.

25         The beginning is in 2002, in May of 2002.  And he's

720

1  talking about various events that PHEAA might have seen and

2  relied on in the Department, but those events hadn't happened

3  in 2002.  They are all later.  All those statements, all those

4  events.

5           And I say they are the middle because when you get

6  to the end, the final IG audit, which you have in your

7  documents, you will see that when they got their act together,

8  they concluded, no, it was illegal.  It was illegal throughout

9  the period of the claim.

10          And they will tell you the 2007 DCL, which they had

11  to comply with and which just -- and you can see it, reduced

12  their claims radically; was novel and new.  Mr. Sorensen said,

13  it's always been there.  And what did he mean by that?  You

14  might ask, you know, this is all very confusing, what did he

15  mean?  What he meant by the proceeds rule, that you have to buy

16  them with qualified funds have been there since 1980.  It was

17  no surprise.

18          What Mr. Sorensen had identified was these

19  generational rules, which everybody has talked about, really

20  relate to something called recycling.  That is, what happens to

21  loans that are within a portfolio - they are legitimately 9.5

22  and you turn them over because one is paid off.  You want to

23  buy another one, and then you want to buy another one with the

24  interest on that one, that is called recycling.  That's the

25  word; you have heard it.  Recycling was lawful in 2006.

1          What the Department was saying is, okay, but we

2   have our own limits on how many times you can turn them over

3   even if they are legitimately 9.5.  That has nothing to do with

4   the case.  Dr. Oberg doesn't rest on that.  We're talking about

5   the central, fundamental rule, tax-free money buys.

6              Now, they'll say, oh, the Department.  But the

7   Department didn't tell them to do what they did.  They are not

8   saying the Department made me do it.  They could have not done

9   it.

10             And Dr. Oberg said in his investigation, many

11  lenders didn't do it.  Some did.  PHEAA is one of them.  But

12  not everybody did it because some said, it's wrong.

13             So the end of the story is the Department says it's

14  wrong.

15             They talk about the GAO report.  And what did the

16  OIG, which is looking at it, say about that report?  And we can

17  put it up.  You can see it for yourselves.

18             What they said:  While GAO's report included

19  recommendations for future action, it did not analyze or reach

20  definitive conclusions on the legality of specific lender

21  billing practices.  In particular, the report did not address

22  the requirements of Section 48 -- you know, section of the

23  HEA -- I won't read all those numbers.  The Department

24  qualified its comment on the GAO audit with the words "in

25  general" and did not address the specific circumstances.

1          So, what did PHEAA do?  They didn't tell them the

2   specific circumstances.  Mr. Nekrasz asked for it.  They said

3   no.

4          They said we didn't put up government witnesses.

5   Well, who is Mr. Nekrasz?  Who is Mr. Sorensen?  Who did they

6   put up?

7          We got Ms. Shaw, who said, I just accepted what OPE

8   told me.  I don't make policy.  I enforce it, that's what I

9   understood it to be.

10          You saw Ms. Stroup.  And I will ask you, look at

11   her, see what she knew.  Was she in a position to make

12   authoritative policy.

13          But at the end of the day, the certificate is not

14   written by the Department.  It is the lender who has to

15   certify, I complied with the laws, regulations, and policies.

16          And the fact that your lawyer can get up here and

17   say, well, you know, I think they did.  You can't explain it.

18   They have never explained how this complied.  And they can't

19   explain.  They knew from the very beginning, we're using

20   unauthorized funds.  They signed it.  The Department didn't

21   sign it.

22          So, you know, you can blow smoke, you can create

23   confusion.  They got caught at the end.  But I don't think they

24   can do that with this jury.

25          So, let's look at the timeline.  Can we put up the

1  timeline?

2          And you can see that all of the events they're

3  telling you about are long after they implemented the strategy.

4  They didn't rely on this.  They only relied on it to say, we're

5  getting away with it, we're getting away with it, keep doing

6  it.

7          And, when you see at the end of the strategy is

8  after their second program review in the IG review, they got

9  told, no, you got caught.

10          And when they got caught, did they fight?  Did they

11  say, no.  Just our lawyer tells us, we're in compliance.  We're

12  going to save those loan benefits that we've accrued, we made

13  these 9.5, we can keep billing them forever?  No.  They said,

14  we got the joke.

15          So, ladies and gentlemen, you know, did they -- you

16  know, did they throughout here deal candidly with the

17  Department?  Well, you have seen the evidence.  They didn't.

18  They didn't stand up and say, this is what we're doing.  They

19  say it now.  You know, their lawyer says it now.  But that's

20  not where they decided, that's not what they relied on.  They

21  relied on their ability to blow it past.  And it worked for a

22  while, but it isn't going to work with this jury.  We hope it

23  won't work for this jury.  We call upon you to protect the

24  taxpayer interest.

25          So, here is what they do in front of the jury.  Mr.

1  Guenther was asked -- you heard this testimony.

2        Mr. Guenther, you testified, it's your testimony

3  that PHEAA made no decision to increase its 9.5 percent loan

4  portfolio?  Yes.

5        No decision?  You saw it.  You saw the plan.  You

6  saw the numbers.  Do you believe that?  And this is what we are

7  up against here.  Somebody who has to take the responsibility,

8  sign the certificate, and says, I will say whatever I need to

9  say.  And an argument made after the fact by your lawyer is not

10  what you relied on at the time you did it.

11        So, when you come to the end of this, they want to

12  criticize Dr. Oberg.  They are going to say, oh, he, you know,

13  just -- nobody believed him.  You know, he was wandering around

14  like Diogenes with his lamp looking for a truthful person, but

15  everybody said he was wrong.  That's what they want to tell

16  you.

17        But Dr. Oberg was a voice in the wilderness.  He

18  saw that the taxpayers' money was being taken improperly.  He

19  understood from his own experience that you couldn't use

20  unqualified funds to buy 9.5 loans.

21        Yes, he saw the raw information, the Department saw

22  it, but he put it together.  And he saw it and he kept

23  insisting and insisting and saying, somebody do something.

24        So, when the IG finally responded, and you heard,

25  it took them awhile.  They called him up and said, we're going

1  to check into this.  And they did check into this.  And they

2  forced the Department to confront it in a coordinated way.

3          And guess what?  Jon Oberg was right.  Jon Oberg

4  carried this crusade on for your benefit, my benefit, every

5  taxpayer's benefit, and Jon Oberg should be validated for doing

6  what a good citizen does, continue to press it even after his

7  supervisors said, lay off, you know.  This is okay; these are

8  our friends.  He said, no, I am going to insist.

9          Now, did the GAO say, the only way to fix this is

10  legislative?  No.  The GAO offered three options.  And one of

11  them was, just restate and clarify what the rules are and you

12  can stop this.

13          Now why did Congress act?  Because Congress was

14  suspicious, this Department, maybe they agreed that it was

15  feeble and weak-minded.  They are not going to do it on their

16  own.

17          THE COURT:  All right, it's time.

18          MR. REIN:  We have got to do it for them.  But that's

19  not saying that it was lawful.  It is only saying that they

20  were slow to enforce, and the Congress was going to say, we

21  will show them how.

22          Thank you for your attention.  The judge is telling

23  me I am done.

24          Thank you, Your Honor.

25                    **JURY CHARGE**

1        THE COURT:  All right.  Members of the jury, now that

2  you have heard the evidence and argument of counsel, the time

3  has come for my duty to instruct you as to the law that is

4  applicable to this case.

5            And it's your duty as jurors to follow the law as

6  stated by the Court and to apply the rules of law so given as

7  to the facts as you find them from the evidence in the case.

8            You are not to be concerned with the wisdom of any

9  rule of law as stated by the Court.  Regardless of any opinion

10  you have as to what you think the law ought to be, it would be

11  a violation of your sworn duty if you ignore the law as I give

12  it to you and apply some other law.

13            It would also be a violation of your sworn duty as

14  judges of the facts to base your verdict upon anything but the

15  evidence in this case.

16            Justice through trial by jury must always depend

17  upon the willingness of each individual juror to seek the truth

18  as to the facts from the same evidence presented to all jurors

19  and to arrive at a verdict by applying the same rules of law

20  given by the Court.

21            Now, the False Claims Act is a federal law that

22  allows a private citizen like Dr. Oberg to bring an action on

23  behalf of the United States against any person or company who

24  defrauds the government out of money by, among other things,

25  presenting a false claim for payment or making a false

1 statement in order to get a false claim paid or approved by the

2 government.

3          Now, in this case Dr. Oberg alleges that between

4 January 1, 2002, and December 31, 2006, the defendant presented

5 false or fraudulent claims against the United States by

6 claiming 9.5 percent interest subsidies called 9.5 percent

7 special allowance payments or 9.5 percent SAP, with the

8 Department of Education, when the defendant knew, deliberately

9 ignored, or recklessly failed to recognize that he was not

10 entitled to the 9.5 percent floor SAP on the claimed loans.

11          Dr. Oberg alleges that the defendant falsely or

12 fraudulently signed certifications that its 9.5 percent SAP

13 claims complied with the laws, regulations, and policies of the

14 Federal Family Education Loan Program when in fact they did

15 not.

16          And, of course, as you have heard, the defendant

17 denies these allegations.

18          Now, the plaintiff, in order to establish a claim,

19 must prove the following five essential elements by a

20 preponderance of the evidence:

21          First, that the defendant presented a claim to the

22 United States.

23          Two, the claim presented was false or fraudulent.

24          Three, that the defendant knew the claim was false

25 or fraudulent at the time it was made.

1          Four, that the false statement was material to the

2    government's decision to pay the claim.

3          And five, that the United States sustained the

4    damage because of the defendant's false statements.

5          Now, a claim includes any request or demand for

6    money that is made to the United States government.

7          Now, a claim is false if it is an assertion that is

8    untrue when made.  A claim is fraudulent if the party making

9    the claim knew it was untrue when made.

10          Now, fraud is never presumed, but must always be

11    proved by a preponderance of the evidence.  You should assume

12    persons are fair and honest in their dealings until the

13    contrary appears from the evidence.

14          If a transaction called into question is equally

15    capable of two interpretations, one honest and the other

16    fraudulent, it should be found to be honest.

17          Now, the terms "knowing" and "knowingly" mean that

18    a person, A, had actual knowledge of the falsity of the

19    information; or, B, acted with deliberate ignorance of the

20    truth or falsity of the information; or, C, acted in reckless

21    disregard of the truth or falsity of the information.

22          Now, actual knowledge means the defendant knew that

23    the alleged false claims were in fact false.  Deliberate

24    ignorance means willful blindness.  To find that the defendant

25    acted with deliberate ignorance, you must find that the

1  defendant understood there was a high probability that the

2  claims were false and took deliberate actions to avoid learning

3  whether they were false.

4  Reckless disregard refers to an extreme form of

5  gross negligence.

6  To find the defendant acted with reckless

7  disregard, you must find that the defendant took an

8  unjustifiably high risk that was known or was so obvious that

9  it should have been known.

10  A defendant that only makes a mistake or is

11  negligent, does not act with reckless disregard.

12  Now, a claim is material to the government's

13  decision to pay if it has the natural tendency to influence the

14  government's payment decision.

15  Now, if you should find from the evidence that the

16  plaintiff has proved all of the necessary elements of his False

17  Claims Act by a preponderance of the evidence, you should award

18  damages that have been shown by the evidence.

19  If you should decide in favor of the defendant on

20  any of the elements of the False Claims Act claim, then you

21  should not consider the question of damages and should find for

22  the defendant.

23  Now, the measure of the government's damages is the

24  amount it paid out by reason of the false statements over and

25  above what it would have paid if the claim had been truthful.

1          Now, the burden is on the plaintiff in a civil case

2    such as this to prove every essential element of the claim by a

3    preponderance of the evidence.  If the evidence should fail to

4    establish any essential element of the plaintiff's claim by a

5    preponderance of the evidence, you should find for the

6    defendant.

7          To establish by a preponderance of the evidence

8    means to prove that something is more likely so than not so.

9    In other words, a preponderance of the evidence in this case

10   means such evidence as when considered and compared with that

11   opposed to it has more convincing force and produces in your

12   minds belief that what is sought to be proved is more likely

13   true than not.

14         In determining whether any fact at issue has been

15   proven by a preponderance of the evidence, you may, unless

16   otherwise instructed, consider the testimony of all witnesses

17   regardless of who may have called them, and all exhibits

18   received into evidence regardless of who may have produced

19   them.

20         The concept of preponderance of the evidence is

21   sometimes illustrated by the symbol of the scales.  And a

22   litigant who has the burden to prove something by a

23   preponderance of the evidence does so if he tilts the scales

24   ever so slightly in his favor.

25         Now, there are two types of evidence from which you

1  may properly find the truth of the facts in this case.  One is

2  direct evidence, such as the testimony of an eyewitness, and

3  the other is indirect or circumstantial evidence.  That is, the

4  proof of a chain of circumstances pointing to the existence or

5  nonexistence of certain facts.

6          As a general rule, the law makes no distinction

7  between direct and circumstantial evidence, but simply requires

8  that the jury find the facts in accordance with a preponderance

9  of all the evidence in the case, both direct and

10 circumstantial.

11         You also have exhibits, and those are considered

12 direct forms of evidence.

13         Now, arguments and statements of counsel are not

14 evidence in the case.  Attorneys can enter into stipulations,

15 and a stipulated fact becomes proper evidence.

16         Now, from time to time in their arguments the

17 lawyers may have stated what law was applicable to this case.

18 If they made a reference, as they had a right to do, that is

19 contrary to what I state the law to be, you must disregard what

20 the lawyers said and abide by what the Court states the law to

21 be.

22         The lawyers from time to time have referred to

23 certain facts that came out in evidence.  If your recollection

24 of those facts is different from the lawyers', your

25 recollection prevails because you are the sole judges of the

1 facts.

2       Now, from time to time during the course of the

3 trial the lawyers made objections to the introduction of

4 certain evidence or to the form of questions.  If I sustained

5 those objections, you cannot consider any evidence that I

6 sustained an objection to or facts contained in a question to

7 which an objection was sustained.

8       If I ordered something stricken from the record

9 after a question was put to a witness and he answered, you must

10 disregard what was struck from the record.

11       Now, the rules of evidence ordinarily do not permit

12 witnesses to testify as to opinions or conclusions.  An

13 exception to this rule exists as to those whom we call expert

14 witnesses.  Witnesses whom by education and experience have

15 become expert in some art, science, profession, or calling.

16 And they may state their opinions as to relevant and material

17 matters in which they profess to be expert and may also state

18 their reasons for the opinions.

19       You should consider each expert opinion received in

20 evidence in this case and give it such weight as you think it

21 deserves.

22       If you should decide that the opinion of an expert

23 witness is not based upon sufficient education and experience,

24 or if you should conclude that the reasons given in support of

25 the opinion are not sound, or if you feel that it is outweighed

1   by other evidence, you may disregard the opinion entirely.

2           Now, you, as jurors, are the sole judges of the

3   credibility of the witnesses and the weight that their

4   testimony deserves.  You may be guided by the appearance and

5   conduct of the witness, or by the manner in which the witness

6   testified, or by the character of the testimony given.

7           You should carefully scrutinize all the testimony,

8   the circumstances under which each witness has testified, and

9   every matter in evidence which tends to show whether a witness

10  is worthy of belief.

11          Consider each witness' intelligence, motive, state

12  of mind, and demeanor and manner while on the stand.  Consider

13  the witness' ability to observe the matter to which he has

14  testified and whether he impresses you as having an accurate

15  recollection of these matters.

16          Consider also any relation each witness may bear to

17  either side of the case, the manner in which each witness might

18  be affected by the verdict, and the extent to which, if at all,

19  each witness is either supported or contradicted by other

20  evidence in the case.

21          Now, inconsistencies and discrepancies in the

22  testimony of a witness or between the testimony of different

23  witnesses may or may not cause you to discredit such testimony.

24          Two or more persons witnessing an incident or a

25  transaction may see or hear it differently.  And innocent

1   misrecollection, like failure of recollection, is not an

2   uncommon experience.

3           In weighing the effect of the discrepancy, always

4   consider whether it pertains to a matter of importance or an

5   unimportant detail, and whether the discrepancy results from

6   innocent error or intentional falsehood.

7           After making your own judgment, you will give the

8   testimony of each witness such weight, if any, as you may think

9   it deserves.

10          And remember, your verdict cannot be based upon

11  surmise, speculation, or sympathy for either party, but must be

12  based solely upon the evidence and the instructions of the

13  Court.

14          Now, as you-all retire to deliberate on your

15  verdict, your first duty will be that of selecting a

16  foreperson, and then to proceed with your deliberations for the

17  purpose of reaching a unanimous verdict.

18          Each of you should decide for yourselves within the

19  context of the law and the evidence, but give proper

20  consideration to the views of other jurors.  Reconsider your

21  views if persuaded by a rational discussion, but don't do so

22  solely for the sake of reaching a unanimous verdict.

23          Now, your verdict must be unanimous.

24          I am going to send the verdict form into the jury

25  room with you.  It has got the style and number of the case and

 1 | reads:  We, the jury, find -- and there is a blank in favor of
 2 | the defendant, or there is a blank in favor of the plaintiff,
 3 | and then award damages in the amount of blank.
 4 |       There is a place for your foreperson to sign and
 5 | date at the bottom.
 6 |       And remember, once you retire to deliberate on your
 7 | verdict, if any communications are necessary with the Court,
 8 | they must be in writing and signed by your foreperson.
 9 |       If you do have to communicate for some reason,
10 | please don't indicate numerically how you stand on any issue
11 | before you.
12 |       And you-all may retire to deliberate on your
13 | verdict.  And we will get these exhibits to you with the
14 | verdict form as promptly as the Marshal can get them all
15 | together.
16 |       But you can go begin your deliberations.
17 |      NOTE:  At this point, 3:20 p.m., the jury leaves the
18 | courtroom to begin their deliberations.
19 |   (3:19 P.M., JURY OUT FOR DELIBERATIONS.)
20 |      THE COURT:  I have got to see if you have got any
21 | objections.
22 |       All right.  Is there any objection to the
23 | instructions that I gave or the manner in which I instructed
24 | them?
25 |      MR. REIN:  No objection from the Relator.

736

1         MR. REGAN:  Your Honor, for the record, we would just
2   object to the instructions on scienter and materiality based on
3   some new developments in the law.  But those are our
4   objections.
5         THE COURT:  All right.  Then we'll stand in recess
6   until the jury returns.  And I guess I will let these people go
7   until about 5 o'clock and see if they can get a verdict by that
8   time.
9         MR. REGAN:  Whatever is your practice, Your Honor.
10        THE COURT:  All right.  We will stand in recess.
11        NOTE:  At this point a recess is taken; whereupon at
12  4:35 the Court and counsel meet in the absence of the jury as
13  follows:
14     (JURY OUT)
15        THE COURT:  All right.  I have got a note from the
16  jury that says:  Can we have the five conditions that must be
17  met in order to find for the Relator.  Signed by the foreman.
18         I will just read -- they want the essential
19  elements of the offense read to them again, as I understand it.
20  And I will be glad to do that.
21         Bring them in.
22        NOTE:  At this point, 4:37 p.m., the jury returns to
23  the courtroom; whereupon the case continues as follows:
24     (JURY IN)
25        THE COURT:  All right.  You all may have a seat.

1        I gather from your note you want me to read you

2   again the five essential elements that the plaintiff must prove

3   beyond a reasonable doubt.

4        MR. REGAN:  Your Honor, preponderance.

5        MR. REIN:  No, preponderance.

6        THE COURT:  I mean preponderance of the evidence,

7   excuse me, trying a criminal case.

8            Preponderance of the evidence.  First, that the

9   defendant presented a claim against the United States.

10           Two, that the claim presented was false or

11  fraudulent.

12           Three, the defendant knew the claim was false or

13  fraudulent at the time it was made.

14           Four, the false claim was material to the

15  government's decision to pay the claim.

16           And five, that the government sustained damages

17  because of the defendant's false statements.

18           Okay.  All right, you all may retire to continue

19  your deliberations.

20       NOTE:  At this point, 4:39 p.m., the jury leaves the

21  courtroom; whereupon the case continues as follows:

22    (JURY OUT TO CONTINUE DELIBERATIONS.)

23       THE COURT:  And I am going to go until about 5:00.

24  And then if they haven't reached a verdict, we will adjourn

25  until tomorrow.

1        Let's gather -- I don't need to have all of you

2   here, but somebody representing each side.  So we will adjourn

3   until 5:00 and send them home.

4           MR. REGAN:  Very well, Your Honor.

5           MR. REIN:  All right, Your Honor.

6           THE COURT:  All right.  We will stand in recess.

7           NOTE:  At this point a recess is taken; whereupon at

8   5:00 p.m., the Court and counsel meet in the absence of the

9   jury as follows:

10      (JURY OUT)

11          THE COURT:  Let's bring the jury in.

12          NOTE:  At this point the jury returns to the

13  courtroom; whereupon the case continues as follows:

14      (5:00 P.M., JURY IN)

15          THE COURT:  All right.  It's time to recess.  We will

16  recess until tomorrow at 10 o'clock a.m.  We will see you all

17  then.

18          All right.  We're in recess.

19          NOTE:  The December 4, 2017 portion of the case is

20  concluded.

21          (PROCEEDINGS ADJOURNED AT 5:01 P.M.)

22                          -oOo-

23

24

25

739

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA     )

3

4         I, NORMAN B. LINNELL, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the record of proceedings in the above matter, to the best

8  of my ability.

9         I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action in

11 which this proceeding was taken, and further that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14        Certified to by me this 9TH day of DECEMBER, 2017.

15

16

17

18                        _/s/_____

                          NORMAN B. LINNELL, RPR, CM, VCE,
19                        FCRR
                          Official U.S. Court Reporter
20                        401 Courthouse Square
                          Tenth Floor
21                        Alexandria, Virginia  22314
                          703.549.4626
22

23

24

25

Norman B. Linnell, OCR-USDC/EDVA

12/4/17   PM Session