UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA, | ) | **FILED UNDER SEAL** |
| *ex rel.*  JON H. OBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:07-CV-960-CMH-JFA |
| | ) | |
| NELNET, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C.  20006
Phone :  202.261.2806
Fax :  202.261.2835
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

Bert W. Rein (admitted *pro hac vice*)
Thomas W. Queen (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
tqueen@wileyrein.com
msturm@wileyrein.com

Christopher M. Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102
Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

*Attorneys for Qui Tam Relator Jon H. Oberg*

July 12, 2010

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY ....................................................... 1

II.    SUMMARY JUDGMENT STANDARD.................................................... 5

III.   THE GOVERNING FCA *SCIENTER* STANDARD ............................... 6

IV.  RECORD EVIDENCE OF DEFENDANTS' DISREGARD OF "RED FLAGS"
SHOWS THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER ......... 8

    A.    Nelnet.................................................................................................. 8

    B.    Panhandle ........................................................................................ 22

    C.    EdLinc/SLFC ................................................................................... 28

    D.    Southwest/SLM................................................................................. 31

    E.    Brazos .............................................................................................. 34

V.   A RATIONAL JURY COULD FIND THAT DEFENDANTS ACTED WITH
THE REQUISITE SCIENTER. ...................................................................... 36

    A.    Defendants' "Reasonable Interpretation" Arguments Provide No Legal Or
Factual Basis For Summary Judgment. ........................................... 37

        1.    Even Reasonable Regulatory Interpretations Are Insufficient To
Oust The Jury From Determining Whether Defendants Acted With
The Requisite Scienter. ..................................................... 38

        2.    *Safeco* Does Not Compel A Different Result. ......................... 39

    B.    Defendants' Regulatory Interpretations Are Far From Reasonable. ................. 41

    C.    Defendants' "Government Knowledge Defense" Cannot Defeat Scienter
As A Matter Of Law. ....................................................................... 49

        1.    Defendants Made No Qualifying Disclosures To The Government........ 51

        2.    Defendants Have Not Met The Stringent Requirements For
Demonstrating That The Government Approved Of Or Directed
The Submission Of Objectively False Claims. ......................... 53

            a.    DEd Never Instructed Defendants To Increase Their 9.5%
Loan Holdings............................................................... 53

            b.    The Evidence Does Not Demonstrate Government
Approval Of Defendants' Schemes To Increase Their 9.5%
Loan Holdings............................................................... 54

                (1)    Public Statements Of Department Officials.................... 56

                (2)    Private Statements And Actions. .................................... 59

                (3)    Non-Communicated DEd Activity. ................................. 64

   c. The Evidence Demonstrates No More Than Defendants'
    Belief That DEd Would Not Take Immediate Enforcement
    Action Against Their False Claims............................................. 66

 D. The Jury Must Resolve The Issues Of Material Fact Relating To Certain
  Defendants' "Advice Of Counsel" Contentions. .................................... 68

VI. DED'S PURPORTED SETTLEMENT OF TITLE 20 HIGHER EDUCATION
 ACT ISSUES DID NOT AFFECT TITLE 31 FALSE CLAIMS ACT ACTIONS
 OR DAMAGES. ........................................................................................... 74

VII. THE PANHANDLE AND BRAZOS DEFENDANTS ARE NOT ENTITLED TO
 DISMISSAL UNDER RULE 12. .................................................................... 79

VIII. FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT FOR SLM AS
 SOUTHWEST'S ALTER EGO........................................................................ 80

 A. The Fourth Circuit's *DeWitt* Factors Support Piercing The Corporate Veil
  And Holding SLM Responsible For Southwest's Fraudulent Scheme To
  Bill Unnecessary 9.5 SAP........................................................... 82

 B. Injustice And Fundamental Unfairness Would Result If SLM Were Not
  Held Liable As Southwest's Alter Ego............................................. 85

IX. CONCLUSION.............................................................................................. 87

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................5

*Campbell v. Hewitt, Coleman & Associates*, 21 F.3d 52 (4th Cir. 1994) ..................................5

*Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979) .............................................5

*Commercial Contractors, Inc. v. United States*, 154 F.3d 1357 (Fed. Cir. 1998) ...............7, 47

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*,
    540 F.2d 681 (4th Cir. 1976) .......................................................................................80, 81

*Greensboro Professional Fire Fighters Association, Local 3157 v.
    City of Greensboro*, 64 F.3d 962 (4th Cir. 1995) .................................................................6

*Harris v. State Farm Fire and Casualty Co.*,
    No. Civ. A 4:05-CV-5, 2006 WL 73602 (E.D. Va. Jan. 11, 2006) ....................................47

*Heckler v. Chaney*, 470 U.S. 871 (1985) ..................................................................................4

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984) .........47

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ..................................................................................5

*Keffer v. H.K. Porter Co.*, 872 F.2d 60 (4th Cir. 1989) ..........................................................80

*Kinney Shoe Corp. v. Polan*, 939 F.2d 209 (4th Cir. 1991) ..............................................80, 81

*Martin J. Simko Construction, Inc. v. United States*, 852 F.2d 540 (Fed. Cir. 1988) .............76

*Massachusetts v. Mylan Laboratories*, 608 F. Supp. 2d 127 (D. Mass. 2008) .......................43

*Metric/Kvaerner Fayetteville v. Federal Insurance Co.*, 403 F.3d 188 (4th Cir. 2005) ...........5

*Minnesota Association of Nurse Anesthetists v. Allina Health System Corp.*,
    276 F.3d 1032 (8th Cir. 2002) ..........................................................................................38

*Overstreet v. Ky. Central Life Insurance Co.*, 950 F.2d 931 (4th Cir. 1991) .......................5, 6

*Perini Corp. v. Perini Construction, Inc.*, 915 F.2d 121 (4th Cir. 1990) .................................5

*In re Powers*, No. 98-32172, 1999 WL 33114276 (Bankr. E.D. Va. Dec. 17, 1999) .............81

*Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141 (1920)........................................46

*Rockwell International Corporation v. United States*, 549 U.S. 457 (2007)....................79, 80

*Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007) .........................................40, 41

*In re Sanders*, 551 F.3d 397 (6th Cir. 2008).........................................................................46

*Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000)....................49, 64

*Trichilo v. Sec'y of Health & Human Services*, 823 F.2d 702 (2d Cir. 1987) ........................45

*United States ex rel. Asch v. Teller, Levit & Silvertrust, P.C.*,
    No. 00-C-3289, 2004 WL 1093784 (N.D. Ill. May 7, 2004)...........................................60

*United States ex rel. Becker v. Westinghouse Savannah River Co.*,
    305 F.3d 284 (4th Cir. 2002) .................................................................................. *passim*

*United States ex rel. Bennett v. Genetics & IVF Institute, Inc.*,
    199 F.3d 1328, 1999 WL 978881 (4th Cir. Oct. 28, 1999) .......................................53, 54

*United States ex rel. Bidani v. Lewis*, 2001 WL 32868 (N.D. Ill. 2001) ...............................68

*United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995) ..........54

*United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542 (7th Cir. 1999)..........................50

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati*,
    No. 1:03-cv-00167, 2008 WL 5282139 (S.D. Ohio Dec. 18, 2008)................................39

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati*,
    No. 1:03-cv-00167, 2009 WL 485501 (S.D. Ohio 2009) ................................................39

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
    352 F.3d 908 (4th Cir. 2003) ...............................................................................50, 51, 53

*United States ex rel. Haskins v. Omega Institute, Inc.*,
    11 F. Supp. 2d 555 (D.N.J. 1998) ..................................................................................76

*United States ex rel. Hixson v. Health Mgt. System, Inc.*,
    657 F. Supp. 2d 1039 (S.D. Iowa 2009) ........................................................................40

*United States ex rel. K&R Ltd. Partnership v. Massachusetts Housing Finance
    Agency*, 456 F. Supp. 2d 46 (D.D.C. 2006) ...............................................................37, 41

*United States ex rel. K&R Ltd. Partnership v. Massachusetts Housing Finance Corp.*,
530 F.3d 980 (D.C. Cir. 2008) .................................................................................6, 39, 40

*United States ex rel. Mayman v. Martin Marietta Corp.*,
894 F. Supp. 218 (D. Md. 1995) .........................................................................42, 77

*United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999) ......................37, 38

*United States ex rel. Perales v. St. Margaret's Hospital*,
243 F. Supp. 2d 843 (C.D. Ill. 2003) ...............................................................68

*United States ex rel. Pritsker v. Sodexho, Inc.*,
No. Civ. No. 03-6003, 2009 WL 579380 (E.D. Pa. Mar. 6, 2009)...................................40

*United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720 (1st Cir. 2007)...................................49

*United States ex rel. Werner v. Fuentez System Concepts, Inc.*,
319 F. Supp. 2d 682 (N.D. W. Va. 2004) ........................................................54

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
525 F.3d 370 (4th Cir. 2008) ........................................................................37

*United States v. Automated Medical Laboratories, Inc.*, 770 F.2d 399 (4th Cir. 1985)..........66

*United States v. Butler*, 211 F.3d 826 (4th Cir. 2000) ............................................................68

*United States v. Chen*,
No. 2:04CV00859, 2006 WL 1554546 (D. Nev. May 30, 2006) ......................................39

*United States v. Domestic Industrial, Inc.*, 32 F. Supp. 2d 855 (E.D. Va. 1999) ....................6

*United States v. Dynamics Research Corp.*,
No. 03-cv-11965, 2008 WL 886035 (D. Mass. Mar. 31, 2008) .......................................50

*United States v. Greenberg*, 237 F. Supp. 439 (S.D.N.Y. 1965) ...........................................75

*United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997) ........................................................55

*United States v. Newport News Shipbuilding, Inc.*,
276 F. Supp. 2d 539 (E.D. Va. 2003) ................................................................... *passim*

*United States v. President and Fellows of Harvard College*,
323 F. Supp. 2d 151 (D. Mass. 2004) ..............................................................7

*United States v. Rachel*, 208 F. App'x 236 (4th Cir. 2006)....................................................6

*United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436 (S.D.N.Y. 1999) ...............47

*United States v. Science Applications International Corp.*,
     653 F. Supp. 2d 87 (D.D.C. 2009) .........................................................................41

*United States v. Southland Mgt. Corp.*, 326 F.3d 669 (5th Cir. 2003) ....................................49

*United States v. Woodbury*, 359 F.2d 370 (9th Cir. 1966)......................................................75

*Vt. Agency of Natural Resource v. United States*, 529 U.S. 765 (2000)................................78

*Wis. Department of Revenue v. William Wrigley, Jr. Co.*, 505 U.S. 214 (1992)...................42

*X Corp. v. Doe*, 816 F. Supp. 1086 (E.D. Va. 1993) ........................................................49, 64

## FEDERAL STATUTES

15 U.S.C. § 381.......................................................................................................................42

20 U.S.C. § 1082.....................................................................................................................75

20 U.S.C. § 1087-1 ........................................................................................................ *passim*

31 U.S.C. § 3729 ........................................................................................................... *passim*

31 U.S.C. § 3730........................................................................................................... *passim*

31 U.S.C. § 3711 .....................................................................................................................76

## FEDERAL REGULATIONS

34 C.F.R. § 682.302 ...................................................................................................... *passim*

*Guaranteed Student Loan Program; Final Rule and Proposed Rulemaking*, 50 Fed.
     Reg. 5505, 5512 (Feb. 8, 1985) ....................................................................................43, 45

## LEGISLATIVE HISTORY

H.R. Rep. No. 99-660 ............................................................................................................7, 40

S. Rep. No. 99-345.................................................................................................................40

## I.    __INTRODUCTION AND SUMMARY__

Defendants' summary judgment memoranda seek to paint Defendants as innocent victims of a complex, uncertain regulatory regime that they "reasonably" interpreted in vastly expanding their 9.5% SAP claims between 2002 and 2005.  According to Defendants, the Department of Education ("DEd") had full knowledge of the transactions on which their claims were based and had condoned, if not stimulated, these activities and claims by pronouncing them "lawful."  Hence, say Defendants, Relator's action should be summarily dismissed.  In addition, certain Defendants link themselves to pending Rule 12(b)(1) motions and to arguments that Relator's False Claims Act ("FCA") claims have been "settled" by DEd, at least as to any claim for damages incurred by the United States.

As shown in this memorandum and Relator's counterstatement of facts, Defendants have woven a gauzy tapestry of alleged innocence out of half-truths and erroneous legal principles.  Based on the evidence already adduced, a rational jury could (and we are confident will) find that Defendants engaged in their essentially similar transfer/refilling schemes on their own initiative, to serve their own avaricious purposes.  No governing law or DEd regulation required, or even suggested, that Defendants engage in economically meaningless transactions solely to multiply their SAP claims.  In fact, Defendants openly acknowledge that the at least ten-fold increase in SAP payments they reaped had no benefit to the students, families or academic institutions that the FFELP ("Federal Family Education Loan Program") was designed to serve.  Rather, Defendants prided themselves on exploiting a supposed regulatory "loophole" through which they could eviscerate the express restriction Congress imposed on claiming 9.5% floor SAP on loans made or purchased with any funds raised after October 1, 1993.

In rejecting Defendants' Rule 12(b)(6) motions on December 1, 2009, Judge Hilton held that Relator Jon H. Oberg's allegations of "sham" transactions were legally sufficient to sustain

his FCA claims.  Doc. 158 at 1-2.  Defendants have provided no basis for reconsidering Judge

Hilton's holding and no facts that would meaningfully dispute Relator's evidence concerning

these sham transactions.  Defendants' motions should be denied on this basis alone.

Defendants also disregard the additional record evidence demonstrating that their

unlawful 9.5% SAP claims were knowingly or recklessly false.  While Defendants claim to have

relied on a "reasonable" interpretation of DEd regulations, that "reasonableness" falls apart on

examination of the statutory and regulatory regime.  Defendants' alleged "loophole" was based

on DEd regulation Section 682.302(e), an exception to the normal rule that the current financing

source for a loan defined its SAP categorization.  Based on prior loan swap abuses, Section

682.302(e) denied re-categorization to 9.5% floor SAP loans transferred into commonly-

controlled full SAP trusts when such economically meaningless transfers in a high interest

environment would have needlessly increased DEd's SAP obligations.  Defendants sought to

capitalize on this "non-recognition" to preserve the 9.5% SAP status of loans transferred out of

their tax-free trusts, while simultaneously claiming that offsetting transfers of loans or funds into

the tax-free trust should be recognized as "proceeds" creating additional 9.5% SAP acquisition

capacity.  That inherently inconsistent approach – which allowed Defendants to open a virtually

unlimited taxpayer-funded 9.5% SAP spigot at will – was not reasonable or lawful between 2002

and 2005 and is no more reasonable or lawful today.

Moreover, the record is clear that no Defendant contemporaneously reviewed Section

682.302(c)(3)(i), which limits the funds that can be used to make or acquire 9.5% SAP eligible

loans.  Defendants' tacit assumption that any loan held within a trust arising from a pre-1993 tax-

free issuance, however funded, can claim 9.5% SAP is without regulatory support and, even

apart from Defendants' failure to analyze Section 682.302(c)(3)(i), precludes finding their belated regulatory interpretations of that regulation to be reasonable.

Defendants' "government knowledge" defense has no merit.  Since the 1986 Amendments to the FCA, alleged government knowledge is only one element of the larger and fact bound issue whether Defendants' claims were knowingly or recklessly false – *i.e.*, whether Defendants acted with the scienter required to sustain an FCA claim.  No Defendant except Nelnet approached DEd to explain its challenged transactions before or after they were undertaken.  In those cases where after-the-fact program reviews were undertaken by lower level DEd employees, there is no evidence that Defendants disclosed the purpose or mechanics of their transactions, the absence of arms-length consideration, or the ready reversibility of the transfers they now claim as "sales."

Nelnet's claim of government knowledge arises from a January 2003 meeting with DEd officials and a follow-up letter Nelnet sent in May 2003, after its "Project 950" had been implemented.  As the record demonstrates, Nelnet contrived a Nixonian "limited, modified hang out" approach to DEd.  Nelnet concentrated its disclosure and request for DEd concurrence on its claim to 9.5% SAP treatment of loans transferred out of tax-exempt trusts under Section 682.302(e), while saying almost nothing about raising the SAP claimed on transferred-in loans to exponentially inflate 9.5% SAP claims.  Nelnet's representation that its transfers were intended to meet "cash management" needs was flatly false and designed to mask Nelnet's abusive "sheep-dipping" activities.  Nelnet's Project 950 was initiated without the requested DEd concurrence, which never occurred, and Nelnet cannot now reasonably revive its failed concurrence approach under a generalized government knowledge banner.

Defendants' further contention that scienter is overcome because DEd officials were generally aware that 9.5% SAP claims were expanding through transfer/recycling loan swaps but took no enforcement action while making generalized public and Congressional statements that such activities were lawful is equally insufficient to support summary judgment. Defendants cannot claim that DEd required or encouraged their sham swap transactions – indeed the history of Section 682.302(e) was to the contrary. Nor can Defendants claim that, apart from Nelnet's failed effort, they sought or secured DEd acquiescence to their individual claims. Thus, the strict legal requirements for a government approval defense cannot be met.

A reasonable jury could also find that the various DEd actions Defendants invoke were unknown to Defendants at the relevant time or otherwise plainly inadequate to negate the scienter proven by their own conduct. Much of the internal DEd record on which Defendants rely was unknown to them contemporaneously and could not have affected their state of mind. Similarly, the absence of DEd enforcement activity in program reviews, while it may have persuaded Defendants that their false claiming was low risk, cannot convey a conclusion of legality. *Heckler v. Chaney*, 470 U.S. 871 (1985) (enforcement decisions purely discretionary). The only two DEd public statements of significance – Sally Stroup's November 2003 "town hall" rebuttal to an embarrassing *U.S. News & World Report* expose and Secretary Paige's November 2004 letter to Senator Kennedy urging Congress to end 9.5% SAP abuse – were made after initiation of Defendants' schemes and contained no regulatory analysis. Neither of these statements precluded DEd from challenging Defendants under Section 682.302(c)(3)(i) when the Inspector General first undertook a serious regulatory analysis in 2005.

Relator previously has responded to certain Defendants' motions challenging his capacity to bring this FCA action and supplements that response briefly here. In light of the Court's

interest in the significance of DEd's 2007 DCL circulation and "settlement offer," Relator further explains the limited scope of that offer and the absence of any foreclosure of FCA claims.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Metric/Kvaerner Fayetteville v. Fed. Ins. Co.*, 403 F.3d 188, 197 (4th Cir. 2005) (quoting Fed. R. Civ. P. 56). "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (second alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). As the Fourth Circuit has stated, the non-moving party is entitled:

> to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). "[T]o grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (*citing Anderson*, 477 U.S. at 248). "[A] court should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir. 1994) (quotation marks and citation omitted). Moreover, only evidence admissible at trial can be considered on summary judgment; thus, unauthenticated documents and hearsay cannot be considered as such and must

be evaluated in a trial setting.  *Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

"Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie." *Overstreet*, 950 F.2d at 937 (citation omitted).  In light of this rule, this Court and the Fourth Circuit have repeatedly held in FCA cases that summary judgment is inappropriate regarding whether its "knowledge" element has been established.  *United States v. Rachel*, 208 F. App'x 236, 238 (4th Cir. 2006); *United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539, 562 (E.D. Va. 2003); *United States v. Domestic Indus., Inc.*, 32 F. Supp. 2d 855, 863 (E.D. Va. 1999).

## III.   THE GOVERNING FCA *SCIENTER* STANDARD

Defendants' summary judgment motions principally rest on Relator's alleged inability to establish the scienter element of the FCA, 31 U.S.C. § 3729(a).  Defendants bear the heavy burden of showing that a rational trier of fact could not find evidence sufficient to establish scienter either because Relator has no evidence to support his position or because the evidence so overwhelmingly supports Defendants that no rational juror could possibly find for Relator, despite all reasonable inferences being drawn in Relator's favor.

Scienter can be established by proof that Defendants had either actual knowledge of the falsity of their claims, deliberately ignored whether their claims were false, or acted recklessly in submitting their false claims.  *Id*. § 3729(b)(1)(A).  Relator need not prove that Defendants had a "specific intent to defraud."  *Id*. § 3729(b)(1)(B).  Based on the explicit legislative history explaining the expansion of the scienter element in 1986, courts have espoused the "red flag" standard as a means of assessing an FCA defendant's state of mind.  *See Newport News*, 276 F. Supp. 2d at 564; *United States ex rel. K&R Ltd. Partnership v. Massachusetts Housing Finance Corp.*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) ("*K&R*"); *Commercial Contractors, Inc. v. United*

*States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998); *see also* H.R. Rep. No. 99-660, at 21 (1986) ("It is intended that persons who ignore "red flags" that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act.  This definition, therefore, enables the Government not only to effectively prosecute those persons who have actual knowledge, but also those who play 'ostrich.'").  Where a defendant submits false SAP claims despite obvious indications of questionable legality, and without seeking to put those doubts to rest by candid interaction with the government, the jury may reasonably infer "deliberate indifference" or "recklessness."  This is doubly true where, as here, the claiming party must affirmatively certify that it has complied with governing law and policy.  *United States v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 192 (D. Mass. 2004) (certification of compliance with laws creates duty to ensure accuracy).

Here, the record shows the following:  (1) Defendants knowingly embarked on a course of action seeking to evade the explicit limitation of the 1993 Omnibus Budget Reconciliation Act ("OBRA") prohibiting the billing of 9.5% SAP on taxable or newly raised money and submitted false claims and certifications to generate automatic payment by DEd; (2) Defendants were aware that their claims flatly contradicted the decision of the Congress to cut off 9.5% SAP for loans made or purchased with funds raised after 1993 – but plunged ahead despite this "elephant in the room" based on alleged assurances that DEd had somehow presciently created an exploitable loophole in 1992 regulations; and (3) Defendants, facing an elephantine red flag, had no definitive guidance from DEd on regulatory assumptions critical to making that loophole work, did not seek guidance from DEd, did not fully or accurately disclose their intentions or

proffered interpretations to DEd, and altogether backed away from the opportunity to test the validity of critical loophole assumptions that turned out to be very wrong.

Defendants now claim that Relator cannot prove that they acted with the requisite scienter because they are able to concoct post-hoc legal interpretations that are supposedly consistent with their course of conduct, because the government knew what they were doing, because the government explicitly approved of and encouraged their behavior, and because (in some cases) they obtained opinions of counsel assuring them that a loophole in fact existed. None of these arguments can withstand legal or factual analysis.

## IV.    RECORD EVIDENCE OF DEFENDANTS' DISREGARD OF "RED FLAGS" SHOWS THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER

Defendants' motions paint Defendants as benefactors of students, their families and institutions of higher learning who proceeded in good faith as "colleagues" and "financial partners" to make legitimate SAP claims under arcane rules over which reasonable minds could differ.  In truth, Defendants were more Bernie Madoff than Mother Theresa – their universal goal was to grab every possible taxpayer dollar.  As established in the documents and deposition testimony, but conveniently ignored in their motion papers, their single-minded pursuit of this goal led Nelnet to actively mislead the Department and the others to act recklessly (at a minimum) in submitting false claims.

### A.    Nelnet

Nelnet does not dispute that, as alleged in the Complaint, it executed a scheme known internally as "Project 950" for using meaningless inter-trust loan transfers to intentionally and massively increase 9.5% SAP claims.  Nelnet nevertheless seeks summary judgment based on the assertion that it "made the Department aware of Nelnet's process and took diligent steps to confirm the propriety of that process."  Nelnet Mem. at 6 (lead caps omitted); *see also id.* at 6

("Nelnet sought to ensure that its transferring process was lawful").  As revealed by its internal correspondence, however – none of which is mentioned in Nelnet's papers – Nelnet was not just reckless; it actively misled DEd and concealed the truth.  While Nelnet sought and failed to obtain DEd acquiescence, particularly by taking advantage of its DEd contacts, the internal documents prove that the concept of "full disclosure" discussed in the cases was completely alien to Nelnet.

Nelnet's executives recognized from the outset the questionable nature of inflated SAP claims based on swapping of loan pools.  As Mike Dunlap, Chairman and CEO, stated repeatedly, the $300 million plus in inflated 9.5% SAP claimed by Nelnet "provide[d] no additional value to the students, families and schools" that Nelnet purported to serve.  Heimes Ex. 29 at N0001001 (emphasis added) (Mills Dec., Ex. 36).[1]  In December 2002, shortly after what came to be known as "Project 950" began to be discussed, Dunlap presciently asked his executive colleagues, "Has anyone here given a deposition besides me??"  Heimes Ex. 3 at N0120999 (Soni Dec., Ex. 59).[2]

In its campaign to obtain the appearance of DEd acquiescence, Nelnet first approached Kristie Hansen.  Hansen "was a contact that Paul [Tone of Nelnet] had within the Department," came to DEd directly from NCHELP, an industry trade association of which Nelnet was a

---

[1]    To avoid the filing of duplicate exhibits, Relator cites, where possible, to the Declaration of Susan McMahon, and the exhibits thereto, as filed by Defendants on June 18, 2010 in support of their Motion for Summary Judgment ("McMahon Dec.") (Doc. 330) and the Mills Declaration, and the exhibits thereto, filed by Relator on June 18, 2010 in support of Relator's Motion for Partial Summary Judgment ("Mills Dec.") (Doc. 334-1).  New exhibits cited herein and in Relator's Response to Defendants' Statement of Undisputed Facts are included as exhibits to the Declaration of Lina Soni ("Soni Dec."), filed concurrently herewith.

[2]    Relator's Response to Defendants' Joint Statement of Undisputed Facts contains a list of deponents in this case and a key to their transcript citations.  Citations to a deponent and "Ex." indicates an exhibit that was used at the deposition of the cited individual.  Citations also include a reference to the declarations with which copies of the exhibits have been filed.

member, and worked in a non-policy position as general manager of the "Financial Partners"

Section of DEd's Office of Federal Student Aid ("FSA") until relieved of her duties by her

supervisor.[3]  Nelnet has failed to produce any contemporaneous notes of the January 3, 2003

meeting between Nelnet representatives and Hansen; Hansen herself recalls virtually nothing.

*See* Hansen Tr. 109:19-113:21 (Soni Dec., Ex. 22).  Even according to Nelnet's post-hoc file

memos and the new Declaration of Paul Tone (Doc. 320-23, at ¶¶ 3-9) (McMahon Dec., Ex.

II.23), however, Nelnet focused its presentation on the continuation of 9.5% SAP following

transfers of loans <u>out of</u> tax-exempt trusts to taxable trusts, as permitted in some circumstances

by the March 1996 DCL.  Dunlap Ex. 47 (Soni Dec., Ex. 54).[4]  There is no express reference in

the memos or even Tone's Declaration to the other essential element of the scheme – increasing

to 9.5% the SAP charged on the loans used to "refill" (or, in Nelnet's case, swapped into) the

tax-exempt trusts.

Notwithstanding the jubilant "I smell $20 million" comments following the Hansen

meeting (Heimes Ex. 26 (Mills Dec., Ex. 35)), Nelnet recognized at the time that the Hansen

discussion did not constitute a Departmental authorization to proceed with Project 950.  While

Nelnet began swapping loans between taxable and tax-exempt trusts, also known within Nelnet

as "sheep-dipping" the loans, Nelnet escrowed the surplus 9.5% SAP received from DEd.

Heimes Tr. 207:22-208:18 (Soni Dec., Ex. 4).  Senior Nelnet executives also soon began

---

[3] Hansen Tr. 8:21-11:17, 12:12-13:15 (jobs at DEd, NCHELP), 14:11-15:4 (FSA is not responsible for policy) (Soni Dec., Ex. 22); Heimes Tr. 220:16-22 (Hansen was a contact known by Tone) (Soni Dec., Ex. 4); Shaw Tr. 58:1-18 (decision to relieve Hansen of responsibilities) (Soni Dec., Ex. 20).

[4] Jason Kravitt, who served as an advocate for Nelnet in the Inspector General investigation and who has now been offered as an expert witness by Nelnet, recently testified that, in fact, Nelnet's transfers would not meet the retained interest limitation in the March 2006 DCL and Section 682.302(e) because Nelnet never had the required ownership interest in the loans in the trust.  Kravitt Tr. 65:2-67:6 (Soni Dec., Ex. 30).

debating internally whether sending a "confirming" letter to Hansen would be too risky to the plan that was already being implemented.[5]

As Nelnet began approaching its Wall Street contacts regarding its plan to raise billions of dollars in "new money" to fund the acquisition of loans to be dipped, Nelnet faced unexpected resistance from its bankers, who "all" thought the plan was "too good to be true."[6]  On March 5, 2003, Jeff Noordhoek, who was directly involved in Project 950 as head of Nelnet's Capital Markets Group, and who was later promoted to be (and still serves as) President of Nelnet, stated:

> All bankers who are helping us to achieve the 9.5% tagging issue are coming back with similar questions about "Headline risk," and if it sounds too good to[] be true, it usually is, etc.
>
> To help further protect Nelnet from such future DOE staff questioning our practices, I have asked Ed to draft a letter to [Kristie Hansen] at the DOE describing the meeting they had, including the topic of 9.5 floors and what was said by both parties, and to have a signature line that she agrees with what was discussed at the meeting.  This would be for our files, if the DOE ever came back and tried to take back any floor earnings.  Ed will draft it and circulate internally so we can debate the potential ramifications of sending it to DOE.  My goal would not to wait to get it to go forward, but hopefully get it eventually to paper our files.

---

[5]     Nelnet obtained an opinion letter only from its on-retainer Washington lobbyist, John Dean, not from an independent counsel.  The deficiencies of the Dean opinion are discussed *infra* Section V.D.

[6]     The conclusion of even Wall Street bankers in 2002 that Nelnet's scheme was "too good to be true" is telling.  In stark contrast to the apparently cautious Wall Street bankers, it seems to have never crossed the minds of Nelnet executives that getting $300 million of taxpayer funds merely for undertaking loan swaps that provide "no additional value" could be "too good to be true."  Indeed, while according to Jeff Noordhoek "[a]ll bankers who are helping us" had these concerns, both Terry Heimes and Mike Dunlap denied that they had ever heard such comments in conversations with bankers.  Heimes Tr. 97:7-18 (Soni Dec., Ex. 4); Dunlap Tr. 104:3-12, 135:22-136:8 (Soni Dec., Ex. 5).  The jury should assess the credibility of that testimony.

Heimes Ex. 15 (emphasis added) (Soni Dec., Ex. 62).  Nelnet has never offered any reason as to

why – apart from the obvious inference – it would be necessary for the senior executives of

Nelnet to discuss the "ramifications" of sending the letter to DEd.[7]

Noordhoek volleyed back and forth with Paul Tone, Nelnet's in-house lobbyist, who

argued that sending a letter would "put a severe chill on our ability to have future meetings with

Hanson" to advance Nelnet's interests.  Heimes Ex. 27 at N0125035 (Soni Dec., Ex. 68).

Neither this opinion, nor any of the discussions with Noordhoek, is mentioned in Tone's

Declaration.  *See* Doc. 320-23 (Tone Dec.) (McMahon Dec., Ex. II.23).  Noordhoek pushed

back, suggesting that "the key is to very delicately word the letter so it is factual, yet does not

[pin] them down to a decision."  Heimes Ex. 27 at N0125035 (emphasis added) (Soni Dec., Ex.

68).  When Tone appeared to acquiesce, Noordhoek added "you are awesome, Paul.  I know you

can walk the fine political tightrope and come out a winner with Nelnet's rear end protected!  I

have faith in you Brother Tone!  Bring us to the promise[d] land.  Amen."  Heimes Ex. 28 at

N0125030 (Soni Dec., Ex. 69).  After Tone's objections to bringing Nelnet to the "promised

land" of 9.5 riches via a letter persisted, however, Don Bouc, then-president of Nelnet, argued

for tactical silence: "I think this is a very bad idea.  Kristie will resist signing, as she would fear it

was a 'commitment' by DOE without her first taking it through proper channels."  Heimes Ex.

27 at N0125034 (Soni Dec., Ex. 68).  Noordhoek yielded, at least temporarily, conceding that

"[i]t is a bad idea.  *Id*.

---

[7]     Mike Dunlap suggested dismissively that Nelnet was concerned about not wanting to bother Department officials unnecessarily with minor inquiries.  Dunlap Tr. 112:6-113:10 (Soni Dec., Ex. 5).  But the sheer amount of money involved and the fact that Nelnet's senior executives were debating the "ramifications" of the letter belie any suggestion that this was some routine or insignificant matter.  Dunlap's testimony is even more disingenuous because, at virtually the same time, Nelnet sent a letter to Hansen requesting Department acquiescence on a less significant matter.  Heimes Ex. 33 (Soni Dec., Ex. 73).  In that situation, unlike the present one, Nelnet received the requested concurrence in writing from Hansen; this further undermines Nelnet's assertion of department acquiescence to Nelnet 9.5% SAP claims.  *Id*.

The acknowledged lack of any commitment by DEd "through proper channels" never slowed Nelnet's loan tagging. In May 2003, as the pace of Nelnet's transfers escalated and following an April 22, 2003 meeting with DEd at which Dunlap reiterated the policy reasons that expanding 9.5% SAP portfolios made no sense (*see* Dunlap Ex. 50 (Soni Dec., Ex. 55)), the perceived need for the appearance of written authorization from DEd resurfaced, culminating in a May 29, 2003 letter that Nelnet relies upon as evidence of its supposed good faith. Nelnet Mem. at 7. The letter's drafting history, related internal emails, and misleading final form, provide ample support for a reasonable jury to discredit Nelnet's characterizations.

Insofar as the proposed letter allegedly sought confirmation of a prior oral conversation, the logical recipient would have been Hansen, the person actually involved. Instead, consistent with Nelnet's overall strategy, the letter was sent to a processing subordinate, Angela Roca-Baker, two levels below Hansen. According to Nelnet's internal emails, this allowed the letter to be "given the 'feel' of a more technical question," helping to conceal its true intent and increasing the chances of duping the Department. Heimes Ex. 30 at N0000074 (emphasis added) (Soni Dec., Ex. 70).

The alterations to the letter made during the drafting process also confirm that Nelnet's goal was acquiescence by DEd based on carefully controlled disclosure. As initially drafted, the letter concerned a "billing statement question" and suggested "[a] question has arisen" concerning the supposed billing procedures. Heimes Ex. 32 (Soni Dec., Ex. 72). In the next draft, however, the "question" became a "confirmation" and Nelnet's plan to bill for 9.5% SAP became a reference to a complex but meaningless formula.[8] Heimes Ex. 34 at N0001008 (Soni

---

[8]     Rather than simply referring to billing for the 9.5% floor, as in the initial draft, the revised letter included the complex "half-SAP" calculations. Because of the low interest rates over the last decade, however, half-SAP never came close to reaching the 9.5% floor. Heimes Tr. 17:6-15 (Soni Dec., Ex. 4). Thus, consistent with the rest of the drafting history, the jury

Dec., Ex. 74).  The draft letter originally suggested that "[i]f you feel our analysis is incorrect or deficient in any manner, please advise us as soon as possible."  *Id.* at N0001016.  That language was deleted, however, in favor of a statement that Nelnet would "assume [the] correctness" of its position "unless otherwise directed by you."  Heimes Ex. 34 at N0001009 (Soni Dec., Ex. 74).  This change occurred because the original language "gives them an out," which was unacceptable to Nelnet.  Heimes Ex. 35 at N0001011 (Soni Dec., Ex. 75).  Nelnet's internal scheming with respect to the May 2003 letter cannot be ascribed to overzealous, low-level staffers.  Mike Dunlap, Chairman and CEO, was directly involved in the drafting process, even to the extent of personally selecting who at DEd would receive a "cc" of the letter.  *Id.*

As a consequence of this artful drafting, which Terry Heimes claimed was only "to make it read better" (Heimes Tr. 245:6-14 (Soni Dec., Ex. 4)), Nelnet's final letter was a masterpiece of obfuscation, misdirection, and outright deception.  Nelnet never mentioned the amount of money involved or the fact that it had plans in place internally to "tag" between $700 million and $2.2 billion in loans in 2003 alone.  *Compare* Heimes Ex. 31 (May 29, 2003 letter omitting any reference to amount of increased claims) (Soni Dec., Ex. 71) *with* Heimes Ex. 22 (internal plan) (Soni Dec., Ex. 65); *see also* Heimes Tr. 258:15-18 (admitting that Nelnet had done internal projections as of the date of the letter) (Soni Dec., Ex. 4).  Nor did Nelnet disclose its plan to increase its 9.5% SAP claims in 2003 by up to $92 million.  Heimes Ex. 22 (Soni Dec., Ex. 65).  The May 29, 2003 letter claimed that the transfers were "part of NELF's overall cash flow management plan," falsely suggesting that they had some routine, legitimate business purpose, when in fact the transfers were for the purpose of inflating 9.5% SAP claims.  Heimes Tr.

---

could reasonably conclude that Nelnet's purpose in adding the full formula was obfuscation, not accuracy.

258:11-14 (Q: "...the contribution that tagging made to your overall cash flow management was that you got more revenue from 9.5 SAP, right?  A: Yes.") (Soni Dec., Ex. 4).

Even though Nelnet from the outset planned to jack up the SAP claimed on acquired loans to 9.5% SAP, which could lead to up to a ten-fold increase in the amount charged to the government, that critical fact was never explicitly disclosed.  Rather, Nelnet benignly stated that it would claim 9.5% SAP "[d]uring the time that the loans are held in the 1985 [tax-exempt] indenture" and subsequent to refinancing.  Heimes Ex. 31 (Soni Dec., Ex. 71).  By focusing on the transfers out of the 1985 tax-exempt indenture, as it did at the early meetings, Nelnet sought to focus DEd on outward transfer consequences under the 1996 DCL and Section 682.302(e) and deflect attention from the lack of authority for the essential step of treating inward transfers as 9.5% SAP eligible.[9]  Kristie Hansen and other government officials confirmed that the letter did not fully disclose the details of the actual transactions undertaken by Nelnet.  Hansen Tr. 255:6-259:8, 261:21-264:17 (Soni Dec., Ex. 22); Nelnet Audit N0016967-17036 at 978 (Soni Dec., Ex. 199); ED-D-000578 (Soni Dec., Ex. 47).

Notwithstanding Nelnet's efforts to minimize the significance of the request for countersignature, it is undisputed that, in contrast to Nelnet's request in Exhibit 33, no one at DEd ever countersigned and returned Nelnet's May 29, 2003 letter concerning 9.5% SAP.  Heimes Exs. 31, 33 (Soni Dec., Exs. 71, 73); Hansen Tr. 277:7-9 (Soni Dec., Ex. 22).  Consistent

---

[9]      Nelnet's letter states that loans would be held in the 1985A tax-exempt indenture for at least a day, as if that somehow imbued the transactions with substance.  In fact, as Nelnet officials admitted at their depositions:  (i) the one-day holding period simply reflected the fastest speed at which Nelnet's computers could process the transactions; and (ii) the one-day holding had no other significance, as Nelnet officials believed that even a millisecond of affiliation with the 1985A indenture would permanently entitle the loans to 9.5% SAP.  Heimes Tr. 119:7-122:16 (Soni Dec., Ex. 4).  This testimony both confirms the contrived nature of the transactions and the objective unreasonableness of Nelnet's position.  If, in the course of two days, Nelnet shuffled loan pools back and forth between two trusts that it controlled, why should taxpayers pay millions of dollars more to Nelnet?  Despite moving for summary judgment and asserting the purported "objective reasonableness" of its position, Nelnet has never answered that question.

with Noordhoek's early direction that "[m]y goal would not be to wait to get it to go forward, but
hopefully get it eventually to paper our files" (Heimes Ex. 15 at N0118352) (Soni Dec., Ex. 62),
this lack of written authorization did not stop Nelnet from furiously "sheep-dipping" or
"tagging" loans.

     In addition to a pre-1993 tax-exempt trust that could serve to "wash," "tag" or "sheep-
dip" loans, Project 950 and the similar schemes engaged in by the other Defendants had two
additional requirements: a supply of loans to be washed, and massive amounts of new money to
buy them.[10]  As to the latter, Nelnet's first billion-dollar securitization in the summer of 2003
posed a problem, as described by Hannah Smitterberg:

> I think we all need to think about what our response is going to be when this book
> [prospectus] hits the street next week.  Certain people will figure out what we are
> doing by reading it.  We can only assume that it will just be a matter of time until
> someone who we don't much care for and who is able to put two and two together
> gets a copy.  It has the potential to be a top-shelf conversation and controversy
> piece, and I think we need to decide what the party line will be and what spin we
> are going to put on it.

Heimes Ex. 36 at N0001028 (emphasis added) (Soni Dec., Ex. 76).  Noordhoek agreed:  "It is a
good point.  Essentially, the world will know that we are securitizing a billion $ in 9.5% floor
loans.  We should have a company line." *Id.* (emphasis added).[11]  In response, Nelnet's
communications group developed a communications plan, including:

---

[10]    As the schemes spread, loan sellers (mostly banks) began to demand a cut of the excess
profits and buyers such as Nelnet (and other Defendants) began paying a higher premium to
acquire loans, in some cases competing with each other for inflated purchases.  *See, e.g.,* Dunlap
Ex. 53 (Soni Dec., Ex. 57); Heimes Ex. 21 (Soni Dec., Ex. 64); Watson Tr. 55:9-56:15, 59:7-
60:9 (describing competition for purchased loans between Brazos and Panhandle) (Soni Dec.,
Ex. 10).  Nelnet perceived this spreading of taxpayer money as useful in pursuing banker
political support for preserving Nelnet's gains.  Dunlap Ex. 50 at N0002188 (Soni Dec., Ex. 55).

[11]    Noordhoek's statement encapsulates at the most basic level why Nelnet's scheme was
illegal.  It is undisputed that the 1993 OBRA was intended to cut off 9.5% SAP for all issuances
after October 1, 1993.  Yet, in June 2003, nearly ten years later, Nelnet was planning a new,
billion dollar issuance for which it intended from the outset to claim 9.5% SAP on associated
loans.  This was not a loophole; it was the total evisceration of the statute.

> Step 2:  We will issue a letter to the Department of Education that outlines the steps we took to confirm the viability of the 9.5% utilization, masked as a thank-you to them for their guidance and a statement of our commitment to the student loan industry as a funder.  A copy of this letter could then be provided to anyone we would feel appropriate (*i.e.*, a reporter, etc.) as proof that we have been overly cautious to follow all procedures, etc.

Heimes Ex. 37 at N0001025 (emphasis added) (Soni Dec., Ex. 77).  Ultimately, the communications plan does not appear to have been fully implemented, not because of its impropriety, which based on the record was irrelevant to Nelnet's management, but rather because Tone once again objected to the public "outing" of his prized DEd contacts.  Heimes Ex. 36 at N1028 ("To reference these people [inside DEd] and to send another letter would destroy our relationship with ED") (Soni Dec., Ex. 76).  Not surprisingly, this sequence is omitted entirely from Tone's highly-selective Declaration submitted with Nelnet's motion papers.  Doc. 320-23 (McMahon Dec., Ex. II.23).

Nelnet suggests in its Memorandum that it was confident that its 9.5% SAP claims would go unchallenged based on its private conversations with Hansen and public comments by Sally Stroup.  Nelnet Mem. at 6-8.  In fact, however, Nelnet continued to escrow (and not take into earnings) its excess SAP through all of 2003 and the first two quarters of 2004.  Heimes Tr. 207:22-209:8 (Soni Dec., Ex. 4).  Terry Heimes, Nelnet's CFO, explained the reasons that the excess SAP was not taken into income in a November 16, 2003 memorandum:

> Although there have been positive comments made related to the concept of billing the 9.5% floor SAP by officials within the DE, these comments have not specifically addressed our situation, nor have we received specific communication to confirm our application of the process and rules.  Accordingly, we will continue to defer recognition of such income.

Heimes Ex. 38 at N0000337 (emphasis added) (Soni Dec., Ex. 78).[12]  Thus, as of November

2003, Nelnet admits that it had <u>nothing</u> from DEd specifically addressing or authorizing its

activities.  *Id.*; *see also* Heimes Tr. 268:22-269:16 (conceding accuracy of Exhibit 38 statement

at that time) (Soni Dec., Ex. 4).[13]

      In 2004, Nelnet continued to work its DEd contacts to obtain a letter that would permit

release of the escrowed SAP funds.  On May 20, 2004, Hansen (who had been removed from her

position and therefore had no official involvement) nonetheless contacted Paul Tone at Nelnet

and advised that "Tim [Cameron] is your point person now on this issue – that makes you

lucky!"  Heimes Ex. 39 (Soni Dec., Ex. 79).  Evidencing her close relationship with Nelnet,

Hansen signed her email "Cheers, k."  *Id.*  As another NCHELP trade association transferee (*i.e.*,

from lobbyist to supposed regulator), Cameron was similarly collegial with Nelnet, and

seemingly unconcerned with the protection of taxpayers:  "I hope we can close this out this

week!  Will keep you posted."  *Id.*  Notably, Cameron also asked Nelnet whether it had already

begun billing for excess 9.5% SAP, indicating that at least some at DEd still did not know that

Nelnet had already billed for – and been paid – tens of millions of dollars in excess SAP over the

course of nearly a year.  *See* N0000562 (McMahon Dec., Ex II.39); Heimes Ex. 43 at N0001194

($79 million already in escrow through March 2004) (Soni Dec., Ex. 80).

---

[12]    Heimes' memo is dated November 16, 2004, but Heimes testified based on context that it actually was prepared in November 2003.  Heimes Tr. 268:1-21; 291:15-21 (Soni Dec., Ex. 4).  By the end of 2003, notwithstanding this continuing lack of specific authorization, as admitted by Heimes, Nelnet had inflated its purported 9.5% SAP eligible loan pools from $370 million (average daily balance) at the end of 2002 to $3.55 billion by July 2004.  Nelnet Resp. to Interrog. No. 1 (chart reflecting NELF Average Daily Balances by Quarter) (Mills Dec., Ex. 1).

[13]    Nelnet publicly confirmed its reservations regarding whether it was entitled to the 9.5% SAP - acknowledging in its SEC filings that it "<u>may</u> be entitled to receive special allowance payments on these loans" and that it had "asked [DEd] to confirm" whether it was "allowed to recognize the income based on the 9.5% minimum rate of return."  *See* Nelnet, Inc., Annual Report (Form 10-K), at 15 (Dec. 31, 2003) (emphasis added) (McMahon Dec., Ex. II.37); Nelnet, Inc., Quarterly Report (Form 10-Q), at 6-7 (Mar. 31, 2004) (McMahon Dec., Ex. II.38).

On July 2, 2004, DEd's response (dated June 30, 2004) to Nelnet's May 29, 2003 letter was faxed to Mike Dunlap, after Cameron had voluntarily forwarded an unsigned draft to Nelnet. Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82); *see also* Heimes Ex. 44 (Soni Dec., Ex. 81). The Department's letter did not purport to validate Nelnet's practices as requested.  Instead, it referred Nelnet to the appropriate regulations and the 1996 Dear Colleague Letter.  Heimes Ex. 45 (Soni Dec., Ex. 82).  In an attempt to put a positive spin on the five sentence letter, Nelnet now asserts that it was "positive" because it confirmed that Nelnet was "looking at the right guidance."  Heimes Tr. 284:2-10 (Soni Dec., Ex. 4); Kaplan Tr. 167:21-168:3 (Soni Dec., Ex. 6). The letter, however, merely referred Nelnet to 34 C.F.R. §§ 682.302(c) and (e), and the March 1996 DCL – regulations that also include post-1993 SAP limitations and the commercial SAP rate formulas.  Indeed, Dan Kaplan admitted in a contemporaneous email to several Nelnet officers, including Messrs. Heimes, Dunlap, and Noordhoek, that the June 30, 2004 letter was "subject to some interpretation."  Kaplan Ex. 80 (Soni Dec., Ex. 84).  Nelnet's outside lobbyist was less equivocal, calling it a "nonresponse."  Dean Tr. 234:19-235:3 (Soni Dec., Ex. 19).

The Department's letter created at least two problems for Nelnet.  First, Nelnet wanted to take into income the $79 million in excess SAP sitting in escrow.  Nelnet's Escrow Agreement, however, required "a copy of a written directive or position statement from the United States Department of Education which indicates which person or entities are the rightful owner of the escrowed funds."  Heimes Ex. 25 at N29642 (Soni Dec., Ex. 67).[14]  As Nelnet recognized, DEd's

---

[14]     The Escrow Agreement signed by Nelnet on August 14, 2003 recited that "there are currently outstanding issues" regarding entitlement to 9.5% SAP funds.  Heimes Ex. 25 at N0029642 (Soni Dec., Ex. 67). Nelnet entered into several escrow agreements, pursuant to which the 9.5% SAP funds were segregated from other trust funds.  This language remained in a similar escrow agreement dated as late as April 1, 2004.  Kaplan Ex. 78 (Soni Dec., Ex. 83).   Kaplan confirmed that rightful ownership and entitlement to the additional 9.5% SAP were not clear to Nelnet during the time Nelnet escrowed 9.5% SAP payments.  Kaplan Tr. 151:1-18 (Soni Dec., Ex. 6).

letter did not meet those criteria.  Kaplan Tr. 148:1-149:7, 150:18-22 (Soni Dec., Ex. 6).  Thus, Nelnet was required to obtain a legal certification by its outside counsel, Dan Kaplan, to access the funds.  Heimes Tr. 215:17-217:8 (Soni Dec., Ex. 4).  Fortunately for Nelnet, the Agreement expressly stated that escrow agent had "no obligation to investigate the legal sufficiency of any of the above-described disbursement instructions and opinions."  Heimes Ex. 25 at N0029643 (Soni Dec., Ex. 67).

Although willing to give the opinion necessary to permit the release of the $79 million to his largest client, Kaplan recognized that DEd could still come after the now-distributed excess SAP.  Accordingly, Kaplan suggested that Tone implement the favored Nelnet tactic of the masked "thank you" to Tim Cameron, with the following proposed text:

> "Tim, I just received the fax of the Department's response to our inquiry on the 9.5% billing issue.  I wanted to let you know how much I appreciate all of your help in getting our inquiry resolved.  Thanks again."

Heimes Ex. 44 (Soni Dec., Ex. 81).  As Kaplan explained:

> Such an email would help to frame the DOE letter as a positive response, and hopefully might make it more difficult (but certainly not impossible) for the DOE to assert a subsequent challenge.

*Id.* (emphasis added).

Because Nelnet had become a publicly-traded company, the impending release of funds created yet another problem: disclosure under SEC requirements.  Nelnet's SEC lawyer was adamant that the amount had to be disclosed.  Dunlap Ex. 55, N0001137-39 (Soni Dec., Ex. 58). Once again, however, Paul Tone was opposed:  "We HAVE to figure out how NOT  to include the actual dollar amount in the press release."  Heimes Ex. 43 at N0001194 (emphasis in original) (Soni Dec., Ex. 80).  In response to a subsequent question as to why Nelnet did not include the dollar amount of earnings recognized, Dunlap stated that it was in the 8K but admitted "we did not want to encite [sic] the doe."  Dunlap Ex. 56 at N0001260 (emphasis

added) (Soni Dec., Ex. 101).  If the Department had been fully and knowingly on board with

Nelnet, as asserted in Nelnet's papers, it is unclear how mere disclosure of Nelnet's ill-gotten

gains (which represented only a fraction of the $322.6 million excess SAP benefit ultimately

calculated by Terry Heimes, per Heimes Ex. 46 at N0018688 (Mills Dec., Ex. 37)) could have

"encited" the Department.[15]

Nelnet's duplicity with DEd continued even after the release of funds from escrow.  In a

letter dated September 10, 2004, Don Bouc, then President of Nelnet, purported to address a DEd

program reviewer's request for "some background" information about the growth of 9.5 SAP

loans in its portfolio.[16]  Bouc claimed that:

> There have been two primary factors that stimulated the growth in the loans in the
> one half SAP and 9.5% IR category.  The first of these relates very directly to
> Nelnet's growth.  Less than four years ago, Nelnet held approximately $4 billion
> in total assets while today Nelnet has over $13.5 billion in total assets.  That said,
> the loans Nelnet holds that are subject to one half SAP and a 9.5% IR have only
> grown from 10% of our assets to approximately 25% of our assets – a much
> slower rate of increase than in our overall asset growth which has been
> approximately 340% over the past four years.

Dunlap Ex. 57 (Soni Dec., Ex. 102).  Bouc's transparently bogus comparison of the 25% and

340% figures evidences an obvious intent to mislead DEd, and reveals Nelnet's purported policy

of "open and public communication" as exactly what it is: a fraud.  Bouc's letter appears to

---

[15]     Dan Kaplan weighed in at this point as well, arguing for the deletion of language in the press release stating that Nelnet had "received additional information clarifying its previously disclosed position" and changing it to the more indefinite "Nelnet has completed steps in the earnings process . . ." Kaplan Ex. 80 at N0001144 (Soni Dec., Ex. 84).  Kaplan elaborated on his reasoning for the change, advising Nelnet officers that he wanted to "reduce the chances of someone arguing that Nelnet's statement that it 'ha[d] received additional information clarifying its previous position' mislead anyone to believe that Nelnet has received clarification of Nelnet's position from the DOE, as the DOE letter is subject to some interpretation.  My concern arises from the fact that we have previously disclosed that we requested clarifying information from the DOE on this matter."  *Id*.  Kaplan's contemporaneous thoughts confirm that he did not believe the letter was sufficiently clear to be publicly cited as the basis for releasing the escrowed funds.

[16]     The mere fact that the question was posed in this way belies any suggestion that the program review had meaningfully examined Nelnet's 9.5% SAP growth.

suggest that Nelnet's 9.5% SAP loan portfolio had grown more slowly then Nelnet's overall portfolio; the truth was precisely the opposite, as Nelnet was well aware. Applying the figures stated in Bouc's letter, 10% of the original $4 billion portfolio would be $400 million; 25% of the final $13.5 billion portfolio would $3.375 billion.  This represents a growth rate of the 9.5% SAP portfolio of 843% as compared to the overall growth rate of 340%.  Of course, this is omitted from Bouc's "open and public" communication, in favor of the blatantly misleading comparison in the letter.  From all of this evidence, a reasonable jury could find that Nelnet acted with the requisite scienter in obtaining more than $300 million in inflated 9.5% SAP payments.

**B.**     **Panhandle**

Apart from Nelnet, which was in a league of its own, Panhandle's 2003-2004 expansion of its 9.5% SAP portfolio was among the most egregious of the Defendants.  Panhandle admitted that it engaged in transactions for the sole purpose of increasing its 9.5% SAP claims.  J. Parker I Tr. 280:22-281:5 (Soni Dec., Ex. 7).  Panhandle's vast expansion of its 9.5% SAP portfolio – from $148 million to over $500 million – occurred despite its awareness that the 1993 OBRA cut off 9.5% SAP for loans funded by post-1993 fundraising:

Q.     . . . You know that Congress changed the SAP law in 1993.  Right?

A.     Yes, sir.

*       *       *

Q.     If you raised new money [after 1993], you weren't going to get 9.5 even if you raised it tax-exempt.  Right?

A.     Yes, sir.

*       *       *

Q.     Okay.  You had $148 million approximately in -- in old money in 2002. Right?

A.     Yes, sir.

Q.     And then you raised new money in 2003 and [2004]. Right?

A.     Yes, sir.

- 22 -

> Q.   And through these -- these transfers, you ended up with over $500 million in loans for which you were claiming 9.5 SAP.  Right?
>
> A.   Yes, sir.
>
> Q.   Okay.  So by the end of 2004, you had over $500 million of loans on which you were claiming 9.5 SAP.  Right?
>
> A.   Yes, sir.
>
> Q.   And that's -- even though most of those were funded with new money. Right?
>
> A.   Yes, sir.

Wright Tr. 66:11-69:7 (emphasis added; objections omitted) (Soni Dec., Ex. 8).  Inexplicably, and in a demonstration of its recklessness, Panhandle claims to have never questioned why this massive post-OBRA inflation of its 9.5% SAP claims made any sense.  Wright Tr. 69:17-21 (Soni Dec., Ex. 8).

Despite its awareness of OBRA limitations and the fact that it would be raising hundreds of millions of new money dollars to expand its 9.5% SAP claims, Panhandle admits that it did not approach the Department to obtain authorization for its program.  J. Parker I Tr. 123:3-11 (Soni Dec., Ex. 7); Wright Tr. 43:8-11 (Soni Dec., Ex. 8).  Indeed, according to Panhandle's witnesses, Panhandle never considered seeking Department approval.  J. Parker I Tr. 123:16-18 (Soni Dec., Ex. 7); Wright Tr. 43:8-22 (Soni Dec., Ex. 8).  Panhandle admitted that no benefit was conferred on taxpayers by moving loans out of the tax-exempt trusts and refilling them with new money as opposed to directly buying loans with the new money.  Wright Tr. 73:18-74:9 (admitting no additional benefit conferred "on taxpayers by running the loans through the [tax-exempt] 91AB [trust] before they end up in the 2003 bond as opposed to just lending straight out of the 2003") (Soni Dec., Ex. 8).  Panhandle also admitted that its internal calculations showed that – notwithstanding the lack of any benefit to taxpayers – Panhandle would receive 100 times

as much SAP from DEd if a loan received 9.5% SAP as opposed to "full SAP."[17]  Thus, Wright

calculated that the annual "increase in gross revenue" to Panhandle would be between $7.7 and

$8.6 million based on a loan value of $143 million, depending on whether the loans were in

grace or repayment.  Baker Ex. 29 at PPHEA_045870 (Soni Dec., Ex. 51).  By tripling the

volume of loans on which it claimed 9.5% SAP, Panhandle increased these amounts even more.

The recklessness of Panhandle's 9.5% SAP claiming is exemplified by John Wright's

testimony:

> Q.    <u>In your view, did it matter how long a loan was in your tax-exempt bond
>        to qualify for -- for 9.5?</u>
>
> A.    <u>No, sir.</u>
>
> *   *   *
>
> Q.    So you could -- you could shoot it in and shoot it out and it would still
>        qualify for 9.5?
>
> A.    Once branded, always branded until you sold it to -- to someone else.
>
> Q.    <u>So even if it was just in there for a second, that's good enough . . . to
>        qualify for 9.5 for potentially the rest of the life of the loans?</u>
>
> A.    <u>Yes, sir.</u>
>
> Q.    <u>So a ten-year loan, it's in the -- in your tax-exempt for ten seconds, and
>        the other nine years and 364 days and whatever, it's -- it's in a regular
>        taxable bond.  In your view, after the ten seconds it keeps getting 9.5 for
>        the whole rest of the time?</u>
>
> A.    <u>Correct.  Yes, sir.</u>
>
> Q.    And that makes sense to you?
>
> A.    Yes.  The way the -- the way the law was written, the way the regulations
>        were written, they didn't put any stipulation on time.
>
> Q.    Putting aside the way the law is written, does that make any sense?  <u>The
>        way you say the law's written, does that make any sense to you?</u>
>
> *   *   *

---

[17]    Baker Ex. 29 at PPHEA_045870 (Soni Dec., Ex. 51); Wright Tr. 99:2-101:14 (for loans in school or grace period, government would pay 5 basis points/0.05% for full SAP versus 599 basis points or 5.99% for 9.5% SAP; same calculation in the repayment period would be 5 basis points/0.05% versus 539 basis points/5.39%) (Soni Dec., Ex. 8).

> A.     I will tell you this. . . . <u>If I were a Con- -- a Congressman, and I were a
> Department of Education official, and were sit down -- sitting down to
> draft something like this, I sure wouldn't have done it this way</u>.

Wright Tr. 138:17-140:15 (objections omitted; emphasis added) (Soni Dec., Ex. 8).  Wright

made clear that, the 1993 OBRA's restrictions on new money notwithstanding, Panhandle was

free to make any loan in its portfolio a 9.5% SAP loan:  "I viewed it as <u>if we had wanted to go in

there and take our entire portfolio, existing portfolio, and make it nine-and-a-half we could

have</u>."  Wright Tr. 130:11-131:23 (emphasis added) (Soni Dec., Ex. 8).

Panhandle now claims that it has a "reasonable interpretation" that the use of the plural

"interests" in 20 U.S.C. § 1087-1(b)(2)(B)(i) permitted its unlimited expansion of its 9.5% SAP

portfolio at taxpayer expense.  Panhandle Mem. at 9.  But Panhandle never explains how this

view can be reconciled with Wright's admission that he knew the 1993 OBRA was intended to

cut off 9.5% SAP for loans funded with new money.  Wright Tr. 66:11-25 (Soni Dec., Ex. 8).

More fundamentally, however, there is nothing in the discovery evidence that suggests that this

"reasonable interpretation" was ever considered by Panhandle until after this lawsuit was filed.

None of Panhandle's production documents – including the opinion letters discussed *infra* –

places any particular significance on the plural "interests."  Likewise, none of the declarations

filed by Panhandle in support of its motion suggests any reliance upon or even knowledge of this

supposed construction, which is unsupported by any evidence or even detailed legal argument.[18]

*See* Wright Dec. (McMahon Dec., Ex. V.2), James Parker Dec. (McMahon Dec., Ex. V.1), Glenn

Parker Dec. (McMahon Dec., Ex. V.3).  Thus, even putting aside the lack of merit, Panhandle

cannot deny scienter based on an entirely after-the-fact statutory interpretation.

---

[18]     As just one example, Panhandle does not explain why the supposedly critical plural term
"interests" does not appear in the corresponding regulation.  34 C.F.R. § 682.302(c)(3)(i)(c).

Panhandle also claims reliance on an opinion letter it obtained from Saul Moskowitz. But as Panhandle admitted, and putting aside other deficiencies discussed *infra*, that letter had a glaring omission.  As Panhandle was well aware, there was no point in only moving loans out of the tax-exempt bond trust absent refilling that trust (as Panhandle did, multiple times) and claiming 9.5% SAP on the newly acquired loans:

> Q.    Had you decided at this point whether or not you were going to claim 9.5 on the loans that you refilled the tax-exempt with?
>
> A.    Yes, sir.  No doubt.  I mean, we sent these options -- just -- but, I mean, I think it's pretty clear here that the proposed plan of action here is to -- you know, if we weren't going to claim the floor on both of them, there wouldn't be even a -- a need to do it.
>
> Q.    Because it -- it really wouldn't increase --
>
> A.    No.  I mean, it --
>
> Q.    -- your --
>
> A.    -- would be a -- a non-business transaction.  It would just be moving loans for the sake of moving loans, so, I mean, there was no need to do it.
>
> Q.    So achieving the goal, you wanted to receive -- achieve required both parts; moving it out and then moving -- moving loans out of the tax-exempt to the taxable, then refilling the tax-exempt and claiming the 9.5?
>
> A.    Yes, sir.
>
> Q.    That's the way you built up the portfolio of 9.5?
>
> A.    Yes, sir.

Wright Tr. 107:25-108:21 (emphasis added) (Soni Dec., Ex. 8).  Yet, as Wright also admitted, the key step of increasing the SAP on the "refilling" loans (which, prior to acquisition by Panhandle, would not be receiving 9.5% SAP) was not addressed in the 1996 DCL (Wright Tr. 228:16-19) (Soni Dec., Ex. 8) and was not discussed in the opinion letter either:

> Q.    -- the prior owner wasn't getting 9.5.  Right?
>
> A.    Oh, okay.  No.  The -- the bank that we bought the loans [from] was not.  I thought you were meaning -- that you were making the case that loans that came through 91, 92, 93.  In other words, once that group of loans was transferred to the tax-exempt -- you know, I thought you were making the

case that this opinion does not specifically say that once that 91, 92 and 93 is refilled that the loans in that pre-93 bond issue get the floor.

Q.      Well, where -- <u>where does the opinion say that when you buy loans into the 91, 92 [tax-exempt trust] that you can claim half SAP or claim 9.5 SAP when the previous owner didn't -- didn't get that?</u>

A.      I would not say that this -- this -- this opinion generally accepts that. <u>I think it's clear from the regs, and I think that was a oversight on not only on my sight -- side, but everyone's. I think there was too much assumption involved in there.</u> I mean, I think it's pretty clear that a pre-October 1st, '93 bond -- you know, any loans that reside in that get the -- the floor, and I would think that if you had a Department of Ed official here sitting in my place they would tell you the same thing; but that goes to -- back to an issue -- <u>that's one deal we didn't dot the "i's" on, cross the "t's" on.</u>

Wright Tr. 179:11-180:10 (emphasis added) (Soni Dec., Ex. 8).  Thus, as Wright concedes, the opinion is silent on the key point.  Moreover, whatever Wright may think about what the Department might have said had it been asked, this testimony is entirely speculative because it is undisputed that Panhandle never sent in a request or disclosed its plans to the Department. Wright Tr. 43:8-11 (Soni Dec., Ex. 8); J. Parker I Tr. 123:3-11 (Soni Dec., Ex. 7).

Finally, Panhandle attempts to rely on 2003 and 2007 program reviews.  Panhandle Mem. at 14-16.  As discussed *infra*, the 2003 review did not purport to validate any 9.5% SAP claims. DEd Letter to Clifford Baker of May 17, 2004 at 110802 (McMahon Dec., Ex. V.13).  Moreover, Panhandle cites language that its practices were "under review," but fails to mention that, several months later and without approval from DEd, Panhandle engaged in another series of similar transactions.  *See* Panhandle Mem. at 19-20; Panhandle Supplemental Response to Interrogatory No. 3 (Mills Dec., Ex. 4).  The 2007 review was limited to the specific issue of first- and second-generation loans.  As stated in the letter:

<u>This audit process was to examine only whether the loans on which SAP was claimed at the 9.5 percent rate</u> for the quarter ending December 31, 2006, <u>qualified as first or second generation loans and not whether any of those loans</u>

initially met or continued to meet other requirements for eligibility for SAP and for SAP at the 9.5 percent minimum return rate.

Aug. 7, 2008 Letter to Terry D. Langehenning at 1-2 (emphasis added) (McMahon Dec., Ex. V.9). Wright confirmed that this text was fully consistent with his understanding of the limited scope of the review. Wright Tr. 223:8-18 (Soni Dec., Ex. 8).

### C.    EdLinc/SLFC

A reasonable jury could also find that EdLinc/SLFC – which obtained neither an opinion letter of counsel nor approval from the Department – acted recklessly in submitting inflated 9.5% SAP claims. SLFC implemented its plan to increase 9.5% claims and payments pursuant to a proposal by a consulting firm, headed by an SLFC director, that received "2 percent of the take," Kohles Tr. 213:14-15 (Soni Dec., Ex. 3), the "take" being the difference between the yield on loans otherwise achievable in the normal course and the yield received based on 9.5% SAP payments after the loans were washed through a tax-exempt bond trust. Despite the obvious self-interest of the consulting firm – which ultimately was paid more than $1 million as its 2% share – SLFC proceeded without any meaningful analysis of the plan's propriety under the pertinent statutes or regulations.

In April 2003, Aurora Consulting, a firm headed by an SLFC director, Larry O'Toole, proposed a plan related to "loan and indenture management to utilize loan characteristics and the differences in subsidized loan yields between taxable and tax-exempt indentures." Sanderson Ex. 1 at ELI-HC00000044 (Soni Dec., Ex. 91). O'Toole's proposal suggested that, with his guidance (to be paid for by SLFC), SLFC and its subsidiary EdLinc could reap an additional five percent yield on a portion of its loan assets by increasing its 9.5% SAP subsidy. *See id*. Norg Sanderson, SLFC's Chief Executive Officer, immediately passed the faxed proposal along to Steve Kohles, SLFC's Chief Operating Officer, with a handwritten note on the cover of the

proposal directing: "Great idea.  Needs to be done."  *Id*. at ELI-HC00000043.  The final fee agreement provided Aurora with a 2% bounty on the net present value of the projected portfolio gain.  Sanderson Ex. 2 (Soni Dec., Ex. 92); Kohles Tr. 119:18-124:7 (Soni Dec., Ex. 3).  This was over and above O'Toole's substantial annual director's fee of $96,000.  Sanderson Tr. 77:2-79:3 (Soni Dec., Ex. 2).

The speedy adoption of the Aurora Plan proposed by a potential beneficiary reflects SLFC's reckless approach, which included no meaningful vetting of legality.  For example, Sanderson admits that, although he recommended approval, he did not bother to read the more detailed Aurora memorandum that accompanied the formal proposal.  Sanderson Tr. 94:15-95:1 (Soni Dec., Ex. 2).  After he turned the project over to Kohles for implementation, there was no further oversight of the program at the CEO level.  Sanderson Tr. 123:8-24:9 (Soni Dec., Ex. 2).  Sanderson had only a "very general" understanding of the laws governing student loans.  *Id*. at 35:14-36:20, 43:4-44:11 (unsure of special allowance payment applicability to tax-exempt and taxable financings); 45:13-46:17 (no understanding of the 1993 OBRA implications on SAP); 46:10-47:12 (Soni Dec., Ex. 2).  He relied upon his bond counsel to provide legal advice in these types of matters yet neither legal nor financial advisors were consulted with respect to the regulatory aspects of the Aurora Plan.  Sanderson Tr. 97:7-12, 46:10-17.  ("Let's just make it real clear.  I did not follow the rules and regulations of the Department of Education.  I depended on our financing attorneys to make sure we were compliant with the law.  That's my personal understanding of how this worked.") (Soni Dec., Ex. 2).

Kohles confirmed that the only outside advice sought with respect to the Aurora plan was to ask bond counsel if the trust indentures allowed the contemplated transactions.  Kohles Tr. 78:10-79:6; 80:4-13 (Soni Dec., Ex. 3).  Despite conclusory statements by Larry Buckmeier in

his declaration, generated in connection with this motion, that he "understood" the law to allow

the practices SLFC and EdLinc adopted, the deposition testimony of Sanderson, Kohles, and

Buckmeier reveals no effort on the part of SLFC or EdLinc to make an informed determination

as to whether the Aurora Memo plan complied with the laws, regulations and policies applicable

to the FFELP.  This is the epitome of recklessness.  Moreover, the Aurora Memo, endorsed by

the SLFC Board, expressly warned:

> Aurora Consulting, LLC is not a law firm and is not offering legal
> advice to SLFC on any matters.  To the extent any legal issues are
> raised or implicated by the information provided in this
> memorandum, SLFC should seek advice from its legal advisors.

August 5, 2003 Memorandum at ELI-HC00000180 (emphasis added) (McMahon Dec., Ex.

IV.5).  The cover letter transmitting the Aurora Memo likewise warned that SLFC was

"encourage[d]  to consult your own financial and legal advisors."  Sanderson Ex. 2 at ELI-

HC00000176 (Soni Dec., Ex. 92).  This advice was ignored.  Despite the obvious statutory and

regulatory risks of what Aurora proposed, no such legal advice was obtained by SLFC or

EdLinc.  Sanderson Tr. 97:7-12, 174:13-17 (Soni Dec., Ex. 2);  Kohles Tr. 77:7-80:13 (Soni

Dec., Ex. 3).

        The intra-EdLinc loan transactions had no business purpose other than to obtain increased

9.5% SAP subsidies.  Buckmeier Tr. 47:12-17; 155:8-18 (Soni Dec., Ex. 1).  Moreover, under

EdLinc's view, it could take every loan it was qualified to purchase, using funds generated by

post-1993 taxable bond offerings, and still wash those loans into 9.5% SAP subsidized status.

Kohles Tr. 64:12-18 (Soni Dec., Ex. 3); Buckmeier Tr. 57:5-18 (Soni Dec., Ex. 1).  EdLinc did

not disclose its plans to DEd, nor did EdLinc see any reason to verify that its absurd result passed

legal muster.  Sanderson Tr. 96:13-97:6 (Soni Dec., Ex. 2).  A reasonable jury could (and almost

certainly would) find that SLFC and EdLinc recklessly proceeded with the Aurora Plan to boost

9.5% SAP, and thereby increase profitability, without regard to lawfulness of that plan under the laws, regulations and policies applicable to the FFEL program.

### D.   Southwest/SLM

There is also more than ample evidence from which the jury could make a determination that Southwest proceeded with the requisite scienter.  While claiming massive 9.5% SAP loan growth in the face of a law that had changed nearly a decade earlier, Southwest never disclosed its practices to the Department, never sought the Department's guidance on the regulations, and never sought a an informed legal analysis of what it planned.  Moreover, as discussed below, despite specific written guidance from the Department's Northern Region that Southwest's practices were improper, Southwest merely assumed the Department was wrong and proceeded recklessly with its own plans, ultimately drawing over $30 million in excess 9.5% SAP from the Department.  SLMA_P0027358 (McMahon Dec., Ex. VI.13); J. Roig Tr. 31:17-35:8 (Soni Dec., Ex. 33); Jacobson Ex. 6 at SLMA_P0004357 (providing figures for "9.5% Floor Sap at Risk" adding up to over $30 million) (Mills Dec., Ex. 38).  During the entire time it was billing for this additional 9.5% SAP, Southwest continued to certify that it was in compliance with the laws, regulations and policies applicable to the FFEL program.

Beginning as early as October 2001, Southwest transferred loans from its tax-exempt 9.5% SAP eligible financings to non-9.5% eligible financings (both taxable and tax-exempt).  In 2003, Southwest began retroactively claiming previously transferred loans as 9.5% eligible loans.  Wheeler Tr. 19:17-20:3, 24:12-25:12, 64:2-6 (Soni Dec., Ex. 16).  Southwest continued this practice going forward, billing 9.5% SAP on all transferred loans and those loans purchased to re-fill the pre-1993 tax-exempt eligible financings.  Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 31:12-32:7, 56:18-60:21, 104:20-106:3 (Soni Dec., Ex. 16).  This more than doubled Southwest's 9.5% SAP eligible loan pools and hugely increased its 9.5% SAP

receipts.  Jacobson Ex. 6 at SLMA_P0004357 (Mills Dec., Ex. 38);  SLMA_P0027981

(demonstrating growth in the average daily balance of 9.5% SAP loans from approximately $307

million of March 2001 to at least $799 million in March 2005) (McMahon Dec., Ex. VI.3);

Wheeler Tr. 125:12-127:7 (Soni Dec., Ex. 16).

No serious effort was made to determine the legality of Southwest's 9.5% SAP project.

Vincent Roig, CEO of Southwest, attributed his understanding of what it was legal to bill for 9.5

SAP to the company's "opinion" and "information we had gathered in discussion with our

colleagues," but the only colleagues he could identify were Jean Frohlicher (the former president

of NCHELP) and Barbara Ryan (Southwest's general counsel).  But Roig did not disclose to

Frohlicher the details of Southwest's 9.5 billing.  V. Roig Tr. 55:15-56: 5 (Soni Dec., Ex.12).

And Roig could not even remember details about any consultations with Ryan, which may have

involved something as fleeting as, in his description, "me wandering down to get a cup of coffee

and pok[ing] my head in her office."  *Id*. at 40:12-41:10.  Further, Roig's consultations with

others in the industry was not "necessarily specifically about 9.5, but in general" about the topic

of special allowance payments.  *Id*. at 38:10-39:21.  Indeed, Roig expressed his contempt for

determining whether Southwest's 9.5 SAP billing was legal, explaining that "I wasn't in the

habit of asking 'mother may I' or any of that activity."  *Id*. at 79:1-10.  Even without the benefit

of the reasonable inferences to which Relator is entitled, a jury could easily conclude that this

conduct was reckless.[19]

---

[19]     There is also nothing in the record suggesting that anyone at Southwest explored the
legality of the program in any rigorous or meaningful way.  Southwest cites to a letter from
Sheila Ryan-Macie in October 2001 which Southwest argues examines Department "policy"
under the "1992 regulatory changes," and "[g]uidance" on those regulations "issued in March
1996."  Defs. Undisputed Facts SW9.  This letter, however, did not address whether Southwest's
program (using cash generated from loan transfers to purchase or originate new student loans for
which Southwest would bill 9.5 SAP in addition to the transferred loans) would be valid.
Moreover, the letter indicated that internal shifting of loans amongst tax-exempt and taxable
financings was against Department policy, noting that Section 682.302(e) "was intended to

Southwest also cannot escape a finding of recklessness by invoking contacts initiated by the Department.  In July 2003, the Northern Region of ED's Financial Partners unit conducted a program review of Southwest's FFELP portfolio.  SLMA_P0027353-62 (McMahon Dec., Ex. VI.13).  The report included a finding of "Incorrect Billing for Special Allowance Benefits" on loans held by the University of Miami and serviced by Southwest.  *Id*. at SLMA_P0027358.  The report stated that the University of Miami had billed ED for 9.5%/half-SAP, but did not meet the criteria for issuing tax-exempt debt, resulting in an overbilling of approximately $350,000. *Id.*  The Program Review report included the following language:

> The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue.  However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate.

*Id*.[20]  In a January 12, 2004 letter, Jane Stewart, Southwest's Chief Operating Officer, responded by acknowledging the problem and asserting that it resulted from a coding error that had already been corrected.  SLMA_P0027365 (McMahon Dec., Ex. VI.14).  The Department then agreed that its previous statements were not relevant to the finding "which occurred solely as a result of a coding error."  *Id.* at SLMA_P0027366 (McMahon Dec., Ex. VI.15).

Strangely, Southwest appears to take the view that the Department was backing off of its loan growth comments, when in fact it is clear that the Department was merely removing the

---

curtail authorities from moving loans from one financing source to another."  SLMA_P0027276 (McMahon Dec., Ex. VI.12).  Thus, to the extent that Southwest had any informed view, which is not clear from the record, it was converting an anti-evasion regulation into a basis for evading the 1993 OBRA.

[20]     Southwest suggests that this same language later was changed as part of the Iowa report, discussed *infra*.  Southwest Mem. at 18 n.4.  There is nothing suggesting that Southwest personnel were aware of the Iowa audit or its findings or conclusions.

language based on Southwest's representation that growth arose from a coding error.  Tellingly, Stewart asserted that the Department was wrong in its view, but never disclosed that Southwest was engaged on its own behalf in the very same practice the program review found improper. Wheeler Tr. 142:10-147:5 (agreeing that Southwest's practices were contrary to the Department's position in the program review) (Soni Dec., Ex. 16).  A jury could reasonably interpret this failure to disclose as Southwest's attempt to hide its practices.  Indeed, in September 2003, just prior to Jane Roig's January 2004 letter, Southwest had completed its project for retroactively tagging previous loan transfers with 9.5% SAP and establishing its 9.5% tagging plan going forward.  Wheeler Tr. 19:17-20:3, 24:12-25:12 (Soni Dec., Ex. 16).

Southwest's arguments appear to suggest that after its letter of January 2004 that the Department had been placed on notice and it was the Government's burden to come catch Southwest.  This position is irreconcilable with the tenets of the FCA and Southwest's quarterly certifications by which it obtained payment.  A jury could readily conclude that Southwest acted recklessly when it submitted inflated claims for 9.5% SAP.

### E.  Brazos

Like Panhandle, EdLinc/SLFC, and Southwest, Brazos began its 9.5% SAP loan growth program in January 2004 without ever consulting the Department or obtaining formal guidance or approval.  Watson Tr. 83:12-19 (no approval) (Soni Dec., Ex. 10); Turman Tr. 90:22-91:4 (began in Jan. 2004) (Soni Dec., Ex. 9).  Prior to engaging in the transactions at issue, Ricky Turman, the CFO of Brazos, consulted with Brazos' bond counsel, Mark Westergard of Fulbright and Jaworski.  Turman Tr. 274:7-22 (Soni Dec., Ex. 9).  Westergard advised extreme caution with respect to Brazos' plans.  In November 2002,  Westergard advised Brazos that, although the 1996 Dear Colleague Letter could be read as supporting the view that, under limited circumstances, loans properly subject to 9.5% SAP would retain that

status following a transfer to a taxable bond, "[t]here is no direct authority expressly authorizing a program pursuant to which loans are 'dipped' in a pre-October 1, 1993, trust estate in order to give them the floor and, pursuant to an on-going program of dipping, then transferred to a taxable trust estate."  Turman Ex. 26 at B0246473 (Soni Dec., Ex. 97).  He added, "[m]y advice is, and has been, to proceed cautiously and within the clear bounds of the guidance provided by the Regulations and the [1996 Dear Colleague] Letter."  *Id*.  He further stated that "[t]he Regulations and the Letter indicate, rather clearly, that only bond issues originally issued before October 1, 1993, and that have been neither retired nor defeased, might be available for giving loans the floor characteristic."  *Id*.  Brazos was warned of the possibility of False Claims Act liability "and thus go to prison" for its activities.  *See* Turman Ex. 29 at B0005442 (Soni Dec., Ex. 104); Turman Tr. 294:14-295:1 (Soni Dec., Ex. 9).

Revealing his own incredulity, Turman asked attorney Saul Moskowitz in a November 13, 2002 email: "If I only have 5 million of old bonds outstanding, <u>am I really able to swap 20 million or more of loans thru the old indenture, thus giving me 20 million of loans located in numerous issues and only 5 million in old debt?</u>"  Turman Ex. 22 at B9007778-79 (emphasis added) (Soni Dec., Ex. 96).  Also early in the planning stages, Turman's notes from conversations with EFC's Marc Powden reveal that Turman was paying attention to what other industry players were doing with respect to 9.5% SAP.  Although he could not recall this conversation, it should have raised red flags.  For example, his notes reflect conversations with Powden regarding Nelnet's increased 9.5% SAP activity and that Nelnet "set aside" certain profits while awaiting on a "ruling" from the Department.  Turman Ex. 32 at B9000512 (Soni Dec., Ex. 98).  Also, it reflects notes regarding "past participants" getting a "slap on the wrists"

for what appears to be increasing their loan pools to 105-110% of their outstanding 9.5% eligible debt.  *See id*.

Because it failed to approach the Department, Brazos relies heavily on the opinion it received from Saul Moskowitz.  Brazos Mem. at  11-13.  The deficiencies in the Moskowitz opinion are discussed *infra*, at Section V.D; however, Brazos' claimed reliance was plainly uninformed.  Murray Watson, BHESC's CEO and General Counsel, only read one paragraph of the final opinion, and only cared if  Moskowitz said they could go through with the transaction.  Watson Tr. 74:4-11; 74:22-75:15 (Soni Dec., Ex. 10).  Watson testified that, "I paid him for the opinion, not how he got there."  *Id*. at. 79:8-11.  Watson testified that his company accepted subsidies from the government, but did not pay attention to the laws that determined what the subsidies were.  *Id*. at 115:6-8.  Turman likewise did not pay attention to anything in the opinion other than "the four lines where he gives the opinion" that said they could go forward with the transaction; he did not "get into the underlying research or work that Moskowitz did to come up with that position."  Turman Tr. 278:15-279:3; 327:1-18 (Soni Dec., Ex. 9).  There is ample evidence from which the jury could determine that Brazos acted with the requisite scienter.

## V.     A RATIONAL JURY COULD FIND THAT DEFENDANTS ACTED WITH THE REQUISITE SCIENTER.

Defendants' principal contentions in seeking summary judgment are that they could not have acted with the requisite scienter where:  (1) they acted under a "reasonable interpretation" of ambiguous law; (2) the government knew that they were submitting false claims; (3) the government approved the false claims; and (4) they relied in good faith on advice of counsel. We now demonstrate that Defendants are wrong on both the law and the facts in each instance.

A.    Defendants' "Reasonable Interpretation" Arguments Provide No Legal Or Factual Basis For Summary Judgment.

All Defendants contend that their swollen 9.5% SAP claims were based on a "reasonable interpretation of the HEA and DEd regulations and thus could not have been submitted with the "scienter" or falsity" necessary to sustain an FCA action.  Defendants' contentions[21] both

---

[21]      A minority view among Defendants appears to be that this "reasonable interpretation" argument goes to the issue of whether the claim was "false" rather than to scienter.  *See* EdLinc Mem. at 8 (EdLinc and SLFC arguing that a claim cannot be "objectively false" if based on a "reasonable interpretation" of the law); Panhandle Mem. at 7 (PPHEA and PPMSC making same argument), *but see id.* at 17-18 (arguing issue as one of scienter).  The remaining defendants appear to disagree and argue the issue as a matter of scienter only.

The majority view among Defendants is correct:  a claim can be "false" even if it is based on an objectively reasonable interpretation of the contract or law.  An incorrect interpretation of a contractual or legal duty, no matter how reasonable or plausible, is still wrong, and a claim based on that interpretation is "false."  Even a district court case the Defendants cite liberally, *United States ex rel. K&R Ltd. P'ship v. Massachusetts Housing Fin. Agency*, 456 F. Supp. 2d 46 (D.D.C. 2006), reaches this conclusion:  "The reasonableness of [the defendant's] interpretation goes to the scienter prong, not falsity. . . . One wrong interpretation of a contract may be more plausible and thus more reasonable than another wrong interpretation, but they are both wrong and claims based on either would be false."  *Id.* at 56 n.6.  Similarly, in *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999), the Ninth Circuit rejected the contention that the defendant's reasonable interpretation of an ambiguous federal cost accounting standard precluded a finding that its assertion of compliance with the regulation was "false."  *See id.* at 462-63.  The Ninth Circuit explained that, under the defendant's view, it "could submit a claim, knowing it was false or at least with reckless disregard as to its falsity, thus meeting the intent element, but nevertheless avoid liability by successfully arguing that its claim reflected a 'reasonable interpretation' of the requirements" – a position the court found untenable.  *Id.* at 463 n.3.

Defendants EdLinc and SLFC appear to rely on *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008) as support for their novel theory.  But that case made no such finding.  Instead, the court stated only that to submit a "false" claim, "the statement or conduct alleged must represent an objective falsehood," *id.* at 376; it explicitly contrasted such an "objective falsehood" with allegations of poor and inefficient management of contractual duties," *id.* at 377 (internal citation and quotation omitted), and other instances in which the only means of determining whether a violation had occurred would be to apply a "subjective interpretation," *id.*  Indeed, the *Wilson* court cited the Fourth Circuit's earlier decision in *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) favorably; in that case, the court determined that a defendant submits an objectively "false" claim where "the government has conditioned payment of a claim upon a claimant's certification of compliance with . . . a statute or regulation, [and the claimant] falsely certifies compliance with that statute or regulation."  *Id.* at 787.  Decisions from this Court are in accord.  *See, e.g.*, *Newport News*, 276 F. Supp. 2d at 551 (determining whether the defendant submitted a "false" claim by interpreting the relevant regulation as a matter of law).  Thus, where the question of falsity turns on the proper interpretation of  regulations "that, while unquestionably technical and

misstate the governing law and ignore the evidence demonstrating that the statutory and regulatory premises on which their claims were made were blatantly unreasonable.  Indeed, it is remarkable that Defendants, who seized on a supposed "loophole" in order to evade the express limitations of the 1993 OBRA and sought to use DEd's prior prophylactic limitation on increasing SAP through sham loan transfers to "poison" the government, would now seek a summary determination that they were merely seeking to *comply* with DEd regulations.  If Defendants had any real desire to comply with HEA law and policy, they could have not undertaken the transactions at issue and limited SAP claims arising from loans made or purchased with the new money they raised to the regular SAP Congress authorized.  No regulatory provision nor business necessity precluded straightforward compliance and no rational jury could conclude that Defendants' false claims arose from the necessity of applying a complex regulatory regime to conduct encouraged by or required by government needs or FFEL policies.

> **1.  Even Reasonable Regulatory Interpretations Are Insufficient To Oust The Jury From Determining Whether Defendants Acted With The Requisite Scienter.**

The alleged objective reasonableness of a defendant's regulatory position has consistently been held insufficient to negate FCA scienter.  Courts recognize that defendants proceeding with knowledge of, or reckless disregard for, the regulatory impropriety of their claims cannot summarily defeat an FCA claim by presenting a "reasonable," if erroneous, legal argument to justify their actions.  *See Newport News*, 276 F. Supp. 2d at 564 (rejecting a defendant's argument that it could not have had the requisite scienter because it adopted a reasonable interpretation of the regulation at issue); *Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (reversing grant of summary judgment on the

---

complex, are not discretionary," *Oliver*, 195 F.3d at 463, the question of "falsity" is one for the court because "[t]heir meaning is ultimately the subject of judicial interpretation."  *Id.*

ground that a reasonable interpretation alone cannot negate scienter); *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at \*10 (S.D. Ohio Dec. 18, 2008) (denying motion to dismiss where "defendant's interpretation of the allegedly ambiguous regulation was so unreasonable that it failed to "pass the smell test" and holding that "the question of Defendants' intent is a factual question properly within the province of the jury"); *United States v. Chen*, No. 2:04CV00859, 2006 WL 1554546, at \*10 (D. Nev. May 30, 2006) (denying summary judgment because the reasonableness of defendant's regulatory interpretation was a factual dispute for the jury to decide).  To hold otherwise, as the Department of Justice has recognized,[22] would permit the *post hoc* ingenuity of counsel to overcome a defendant's actual state of mind.

## 2.      *Safeco* Does Not Compel A Different Result.

Defendants mistakenly argue that the decisions in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007) and *United States ex rel. K&R Ltd. P'ship v. Massachusetts Housing Fin. Corp.*, 530 F.3d 980 (D.C. Cir. 2008) support their "reasonable interpretation" position.  In *Safeco*, the Supreme Court held that a company misinterpreting the disclosure obligations of the Fair Credit Reporting Act had not acted "willfully" or "recklessly" when its misreading of the Act was "merely careless."  *Id.* at 69.  Unlike this case, *Safeco* did not involve evidence of "willfulness" apart from the misreading of statutory obligations nor evidence that the defendant's actions were designed to extract an undeserved benefit from the government.  Moreover, at least one court has found *Safeco* inapplicable to FCA cases.[23]  And the cases Defendants cite to

---

[22]      *See* Brief of the United States Department of Justice at 10-13 in *United States ex rel. K&R Limited Partnership v. Massachusetts Housing Finance Corp.*, 530 F.3d 980 (D.C. Cir. 2008) ("DOJ Br.") (Soni Dec., Ex. 48).

[23]      *See United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, No. 1:03-cv-00167, 2008 WL 5282139, at \*9 (S.D. Ohio Dec. 18, 2008) (agreeing with government that *Safeco* does not apply in FCA cases); *United States ex rel. Fry v. Health Alliance of Greater*

demonstrate judicial acceptance of *Safeco* as an FCA standard simply do not support their position.  *See United States ex rel. Hixson v. Health Mgt. Sys., Inc.*, 657 F. Supp. 2d 1039, 1057 (S.D. Iowa 2009) (citing to and quoting *Safeco* as a *cf.* cite, but never analyzing whether it should be applied in a FCA case and not clearly using the *Safeco* analysis); *United States ex rel. Pritsker v. Sodexho, Inc.*, Civ. No. 03-6003, 2009 WL 579380, *17 (E.D. Pa. Mar. 6, 2009) (citing to *Safeco* as a *cf.* cite).  There is simply no support in the wording, case law or legislative history of the FCA to require proof that a claim made with knowledge of or reckless disregard for its falsity, must additionally be shown to be objectively unreasonable.  *See* 31 U.S.C. § 3729(b)(1)(A) (scienter based on "deliberate ignorance"); H.R. Rep. No. 99-660 (intent to hold liable those who "deliberately choose to remain ignorant," "ignore 'red flags'" or, "play 'ostrich'"); S. Rep. No. 99-345 (1986) (claimants' duty to "ensure the claims they submit are accurate.").

The *K&R* case, upon which Defendants heavily rely, properly analyzes the issue of "reasonable interpretation" under the FCA.  Per the D.C. Circuit, the *K&R* relator sought to establish "scienter" solely on the basis of an alleged "unreasonable interpretation" of certain mortgage notes.  This approach failed because:  (1) "the unreasonableness of [the defendant's] interpretation is merely evidence, the absence of which does not preclude a finding of knowledge," but (2) the relator "never explain[ed] why [the defendant's] interpretation of the mortgage notes was unreasonable, much less why its interpretation constituted reckless disregard," and (3) the relator "point[ed] to nothing else that might have warned [the defendant] away from the view it took."  *See also id*. at 983 (quoting *Safeco*).  The *K&R* court affirmed the district court's finding that a defendant can be liable under the FCA where it submitted a claim

---

*Cincinnati*, No. 1:03-cv-00167, 2009 WL 485501, at *5 (S.D. Ohio 2009) (reaffirming earlier conclusion).

"based on a plausible but erroneous . . . interpretation" if other indicia of recklessness are present.  456 F. Supp. 2d at 62.[24]  Thus, even if the Court were to believe that Defendants made their 9.5% SAP claims based on an erroneous but reasonable interpretation of DEd regulations – and the evidence proves that they did not – it is for the jury to decide whether, taking that contention into account, Defendants acted with the requisite scienter under the FCA.

### B.      Defendants' Regulatory Interpretations Are Far From Reasonable.

The hugely inflated 9.5% floor SAP claims at issue necessarily implicated Section 438 of the HEA, 20 U.S.C. § 1087-1, and 34 C.F.R. §§ 682.302(c)(3)(i) and (e).  Defendants allegedly interpreted Section 682.302(e) to authorize the transfer of loans previously made or purchased with pre-1993 tax-free "old money" into trusts financed by "new money" without modifying their 9.5% floor status.  Defendants at least implicitly interpreted Section 682.302(c)(3)(i) to permit 9.5% SAP to be claimed on any loan held within a trust originally funded from the proceeds of a pre-1993 tax free issuance.  Combining these two interpretations, Defendants claimed 9.5% SAP on loans made or purchased with "new money" either by swapping those loans into an "old money" trust or by first transferring the "new money" into the "old money" trust and then using it to purchase new loans.[25]  These newly acquired loans were deemed 9.5% floor eligible by Defendants at the instant they entered the "old money" trust and without regard to how long they stayed.  *See e.g.*, Wright Tr. 139:13-20 (ten seconds out of ten years qualifies),

---

[24]      Similarly, and contradicting Defendants' claim that the district court's decision in *K&R* required an "essentially frivolous" interpretation to sustain an FCA claim, Doc. 319 at 14, the District Court actually held that an interpretation bordering on the frivolous, without more, could suffice to establish FCA scienter and said nothing about the converse proposition that Defendants espouse.  *United States ex rel. K&R Limited Partnership v. Massachusetts Housing Fin. Corp.*, 456 F. Supp. 2d at 62.  *See also United States v. Science Applications International Corp.*, 653 F. Supp. 2d 87 (D.D.C. 2009) (denying summary judgment under *K&R*).

[25] The undisputed mechanics of Defendants' processes are set out in the Memorandum in Support of Relator's Motion for Partial Summary Judgment (Doc. 334) at 13-24.

175:5-21 (Soni Dec., Ex. 8); Heimes Tr. 122:10-16 (one millisecond) (Soni Dec., Ex. 4); *but see* Watson Tr. 122:3-6 ("I just don't think – it's just taking this and dipping it in water and bringing it out gets it wet.  If I want to get it wet, I stick it in there and leave it for a period of time and then take it out.") (Soni Dec., Ex. 10).  Moreover, Defendants also deemed these new 9.5% SAP loans immediately available for outward transfer from the "old money" trust under Section 682.302(e), permitting further inward transfer of "new money" loans or "new money" to the "old money" trust and allowing further (and unlimited) expansion of 9.5% floor SAP eligibility fueled by 9.5% SAP-ineligible "new money."

The record evidence discussed in Section IV, *supra*, unequivocally demonstrates that each Defendant was aware of, and consciously endeavored to evade, the 9.5% SAP limitation of HEA Section 438(b)(2)(B) by slipping through a regulatory "loophole."  Defendants understood that their "loophole" interpretation would permit unlimited growth of 9.5% floor SAP loan portfolios and effectively nullify Section 438(b)(2)(B).  As a matter of law and common sense, these sophisticated Defendants had to be aware that a regulatory interpretation giving them a "blank check" to multiply SAP payments by a factor of ten or more, while providing no additional value to the government or the intended beneficiaries of the FFEL program, could not be sustained.  *See, e.g., Wis. Dep't of Revenue v. William Wrigley, Jr. Co.*, 505 U.S. 214, 227 (1992) (rejecting broad interpretation of the term "solicitation of orders" under 15 U.S.C. § 381(a) that would render the limitations of the statute "toothless," permitting it to mean "whatever a particular industry wants"); *Newport News*, 276 F. Supp. 2d at 557 ("any reading of the phrase 'required in the performance of a contract' which renders IR & D charges essentially unbounded must be rejected"); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F. Supp. 218, 222 (D. Md. 1995) (holding in an FCA case that "[t]he Government's  . . . needs

- 42 -

cannot give rise to blank checks held by the contractors"); *Mass. v. Mylan Labs.*, 608 F. Supp. 2d 127, 144 (D. Mass. 2008) (where defendant allegedly interpreted the term "wholesale acquisition cost" as allowing it to set any price that it wanted and to bill the state accordingly, the court rejected the interpretation because it would lead to an "absurd result" and would give "the defendants a virtual blank check") (citing *Summit Inv. and Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir. 1995) ("'Literal' interpretations which lead to absurd results are to be avoided")).

At a bare minimum, the absurd result of that interpretation raised a "red flag" that should have required the thorough and careful review of its statutory and regulatory foundation that would have exposed its numerous weaknesses:

First, it was unassailable that the source of funds used to make or purchase a qualifying loan determined the loan's SAP status.  That principle was codified in the HEA and 34 C.F.R. § 682.302(c) and, as the Department had previously explained, was essential to correlate DEd's SAP obligations to the likely cost of raising the funds necessary to permit private student lending.  G*uaranteed Student Loan Program; Final Rule and Proposed Rulemaking*, 50 Fed. Reg. 5505, 5512 (Feb. 8, 1985).  Thus, any interpretation that broke the essential link between the source of funds used to make or purchase a loan and its SAP categorization was inherently suspect, especially when its result was to nullify the 1993 congressional restriction that DEd had moved promptly to implement.[26]  To argue that any loan whose title is held in a pre-1993 tax-free trust warranted 9.5% SAP is untenable.

---

[26]     *See* Dear Colleague Letter 93-L-161 at 13 (Nov. 1993) (ED-B-004277 (Mills Decl. Ex. 26)) ("[L]oans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance."); ED-B-001226-27 (Mills Decl. Ex. 27) (SAP status based on whether the loan was made or purchased with "old money" or "new money"); Dear Colleague Letter 95-L-181 (ED-B-001298-1301) (June 1, 1995) (Mills Decl. Ex. 29) (reiterating the distinction between "old money" and "new money").  *See* 34 C.F.R. § 682.302(c)(3)(i) (2000) (providing for Half-SAP/9.5% Floor for loans

Second, Section 682.302(e), on which Defendants and their advisors placed principal reliance, is a prophylactic rule designed to foreclose the very kind of SAP growth through self-contained, easily reversible loan transfers without business purpose in which Defendants engaged.  Section 302(e) focuses on pledging or transferring loans from tax-free trusts to commonly controlled taxable trusts and denies those transfers recognition for SAP purposes.  In other words, where an Authority transfers a loan but retains an interest in it without eliminating by retirement (immediate pay out) or defeasance (deferred pay out) the original tax-free financing source, Section 682.302(e) denies that loan the ordinary (and, at the time of proposal, highly desirable) SAP treatment accorded to loans made or purchased with taxable funds.

Defendants knew that the purpose of Section 682.302(e) was to disincentivize transfers designed only to maximize SAP payments by disregarding them for SAP purposes – *i.e.*, the same treatment the IRS gives to a sham transaction.  Moskowitz Tr. 71:12-73:2 (Soni Dec., Ex. 18), Ryan-Macie Tr. 141:18-142:7 (Soni Dec., Ex. 29); *see also* Doc. 334 at 31-33 (citing decisions rejecting sham transactions).  Defendants accepted the benefit of that SAP non-recognition by continuing to treat loans transferred out of their pre-1993 tax-free trusts as 9.5% SAP eligible.  But Defendants then proceeded on the contrary premise that the same transfers should be treated as *bona fide* sale transactions for the purpose of permitting their pre-1993 tax free trusts to generate "proceeds" of the original tax-free financing.  That blatant inconsistency further condemns Defendants' claim of "reasonable interpretation.[27]

---

"made or purchased with funds obtained by the holder from . . . [t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993" and other enumerated sources), (c)(4) (providing for ordinary SAP for loans "made or purchased with funds obtained by the holder from the issuance of [tax-exempt] obligations originally issued on or after October 1, 1993" and other enumerated sources).

[27]    Defendants' own legal advisors agreed that Defendants could not simply put "new money" into a pre-October 1, 1993 tax-exempt bond estate, buy loans with that money, and claim 9.5% SAP on those loans.  *See* Moskowitz Tr. 75:20-76:18, 88:18-90:13 (Mills Decl. Ex.

Third, Section 682.302(c)(3)(i), of which Defendants and their legal advisors had to be cognizant but declined to consider when engaging in sham transactions to expand their 9.5% floor claims, cannot be expanded to support Defendants' position.  Defendants argue, after the fact, that funds or loans moved into pre-1993 trusts as part of Section 682.302(e) transfers were "proceeds" of the pre-1993 financing under Section 682.302(c)(3)(i)(A) or proceeds from the "sale" of a 9.5% floor qualified loan under Section 682.302(c)(3)(i)(D) and thus qualified as, or as eligible to purchase, additional 9.5% SAP floor loans.[28]

Defendants' argument that the term "proceeds" in Section 682.302(c)(2)(i) includes any funds or loans whose lineage, however remotely, traces to a pre-1993 tax-free financing flies in the face of the Department's longstanding interpretation of "proceeds."  DEd has consistently limited "proceeds" to funds obtained directly from purchasers of tax-free instruments.  *See, e.g.*, 50 Fed. Reg. at 5506.[29]  And additional sources of funds qualifying for purchase of 9.5% floor eligible loans are exclusively enumerated in Section 682.302(c)(3)(i)(B)-(E).[30]  Thus, Defendants' "proceeds" position is not reasonable.

---

20); Dean Tr. 122:12-124:1 (Mills Decl. Ex. 21); *see also* Moskowitz Tr. 88:18-90:13, 94:10-14 (stating that "new money" pledged as security for a pre-October 1, 1993 tax-exempt bond is still "new money") (Mills Decl. Ex. 20).

[28]    Defendants EdLinc/SLFC (at 11-15), PPHEA/PPMSC (at 8-10), and Southwest/SLM (at 11-13) all make a cursory argument that the loans were funded from proper sources.  Notably, Defendants Nelnet and NELF have not made any argument that their loans were made or purchased with an eligible source of funds, but instead referred the Court to an advocacy piece drafted by one of Nelnet's lawyers during Nelnet's battle with the DEd Inspector General as containing its argument on this point.  *See* Nelnet Mem. at 6 n.5.

[29]    DEd reconfirmed in 2007 that "proceeds" as used in the regulation include only the original proceeds of the bond issuance.  *See* DCL-FP-07-01 (Mills Decl., Ex. 28).

[30]    The "proceeds of proceeds" interpretation is also irreconcilable with the clear intent of the 1993 OBRA to cut off "old money" as a funding source for loans and to provide only the SAP necessary to allow a lender to raise capital to make or purchase loans.  *See Newport News*, 276 F. Supp. 2d at 556-57 (the reasonableness of an interpretation must be determined based on the legislative purpose of the provision at issue).  Congress is presumed not to enact a legislative nullity.  *See Trichilo v. Sec'y of Health & Human Servs.*, 823 F.2d 702, 706 (2d Cir. 1987)

Defendants' contention that the inward flow of new loans and "new money" should be considered as "sale" proceeds from Section 682.302(e) transfers is clearly inapplicable to inward transferred loans and equally invalid as applied to cash infusions.  The transfers at issue were between trusts under Defendants' common control, were reversible (and in some cases reversed) at Defendants' discretion, were arbitrarily "priced" at loan value plus accrued interest rather than market value and, in most cases, lacked normal arm's-length sale documentation.  *See* Doc. 334 at 18-20.  To treat these transfers as "sales" under Section 682.302(c)(3)(i)(D), rather than the singular "pledges" or "transfers" identified in Section 682.302(e), would only facilitate the kind of schemes in which Defendants engaged and elevate form over substance.  *See* Moskowitz Ex. 9 at 6 ("Each of the transfers at issue here involves what are essentially refinancing, rather than sale, transactions.") (Soni Dec., Ex. 115).  Absent a regulatory purpose for such a broad construction, Defendants' position cannot be reasonable.

To actually have acted with the good-faith compliance disposition they now claim, Defendants had access to several unpursued avenues.  First, Defendants could have accepted the rule of the 1993 OBRA and refrained from claiming 9.5% floor SAP on any loan made or purchased with funds raised after October 1, 1993 regardless of the trust into which those funds were shuffled.  Complying with Congressional wording and intent would not have violated any applicable law, regulation or policy and would not have limited Defendants' ability to further the educational goals of the FFEL program.  The fundamental principle of claiming funds from the government simply is that honesty is the best policy.[31]

---

("[W]e will not interpret a statute so that some of its terms are rendered a nullity."); *In re Sanders*, 551 F.3d 397, 402 (6th Cir. 2008) ("[W]e are reluctant to construe a statute in a way that renders it a nullity or, worse, an absurdity.").

[31]     *See Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920) ("Men must turn square corners when they deal with the Government."); *Heckler v. Cmty. Health Servs. of*

Second, if Defendants could not resist an impulse to pursue excess SAP, they could have sought a formal interpretation of Sections 682.302(c)(3)(i) and 682.302(e) from DEd and proceeded only after receiving a favorable interpretation.  Nelnet alone approached the Department, but its approach was after the fact, replete with lies and half truths, and sought "confirmation" on what were called routine "billing issues" rather than a potential billion dollar "loophole."  *See* Section IV.A, *supra*; *Commercial Contractors v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998) (contractor has duty to raise implausible interpretations with government); *Newport News*, 276 F. Supp. 2d at 564 (failure to disclose fully to government may make tenuous interpretation reckless).

Third, Defendants could have sought guidance from their numerous legal advisors on the obvious collision between the windfall arising from their transfer scheme and the prohibitions of the 1993 OBRA and Section 682.304(c)(4).  Faced with carefully coded warnings from their legal advisors to recognize "legislative risk," Dean Ex. 14 at N0017682 (Soni Dec., Ex. 123), and avoid "greed" and "abuse," Turman Ex. 22 at B9007778-79 (Soni Dec., Ex. 96), in executing their schemes, Defendants should have made every effort to deal with the elephant in the room before repeatedly certifying to DEd as a precondition of SAP payment that their claims conformed to law, regulation and policy.

Fourth, Defendants could at least have ensured that they could squeeze through the technical parameters of their perceived loophole, but instead chose to ignore significant technical issues.  *See United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 447 (S.D.N.Y.

---

*Crawford County, Inc.*, 467 U.S. 51, 63 (1984) ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds."); *Harris v. State Farm Fire and Cas. Co.*, No. Civ. A 4:05-CV-5, 2006 WL 73602 (E.D. Va. Jan. 11, 2006) (citing and quoting *Heckler*).

1999) (need to certify creates duty "to conduct a proper investigation.").  For example,

Defendants neither sought nor received written guidance from their legal advisors or DEd on the

proper interpretation of Section 682.302(c)(3)(i) despite its critical relationship to their 9.5%

floor SAP claims.  Moreover, even Defendants' bedrock reliance on Section 682.302(e) had to

be premised on retention by an Authority (Defendants) of a legal or equitable interest in the

transferred loans.  But under the sophisticated "bankruptcy remote" bond issuances Defendants

employed, Defendants were able to disavow *any* interest in loans held within the trusts securing

the bonds and shield their bondholders from bankruptcy risk to the collateral by claiming only a

contractual interest in the trust itself.  *See* Kravitt Tr. 65:2-67:2; 69:1-9 (Soni Dec., Ex. 30).

Similarly, some of the pre-1993 trusts from which Defendants made outward transfers had been

refunded prior to the transfers.  *See* Doc. 334 at 15.  In a refunding, new bond holders replace

pre-existing bond holders without disruption of the underlying trust arrangements.  Refunding, as

explained to DEd in an October 14, 1993 letter to DEd from Defendants' expert witness David

Reicher, retired the original bond issuance, thus disqualifying the transferor trust under Section

682.302(e).  *See* Moskowitz Ex. 2 (B9005808) (Soni Dec., Ex. 85).[32]  Defendants apparently

never took note of this fact.

Taken in isolation, any individual analytical gap or technical deficiency might not

mandate a finding of scienter.  However, in the aggregate, and coupled with the "I smell $20

million," Heimes Ex. 26 at N0125904 (Mills Dec., Ex. 35), and numerous other indicia of

Defendants' raw greed, they plainly suffice for a rational jury to conclude that rather than

seeking to pursue a course of action based on a reasonable interpretation of governing law and

---

[32]  While DEd interpreted the "originally issued" language in the 1993 OBRA to preserve the
9.5% SAP status of loans held by a refunded trust at the time of refunding, DEd did not modify
Section 682.302(e) to allow 9.5% SAP to be claimed on loans transferred out of trusts whose
pre-1993 bond financings had necessarily been retired.

regulation in good faith, Defendants were content with any fig leaf appearing to justify their extraordinary enrichment at government expense and a prediction that DEd enforcement would be, at best, slow to develop and encumbered by a politically sympathetic management.

### C.   Defendants' "Government Knowledge Defense" Cannot Defeat Scienter As A Matter Of Law.

Defendants also contend that government (1) knowledge of the fact that they submitted false claims, and (2) failure to take enforcement action against them with respect to those claims, negates a finding of scienter.  Defendants, however, offer little legal support for their theory – indeed, they have not cited a single case holding that government knowledge or acquiescence alone undermines scienter as a matter of law.

As this Court has held, "it is clear that government knowledge of a misrepresentation does not shield a contractor from liability."  *X Corp. v. Doe*, 816 F. Supp. 1086, 1094 (E.D. Va. 1993); *see also Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000) ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action.").  "Before the 1986 amendments to the FCA, full government knowledge of the facts underlying a *qui tam* action precluded the district court's jurisdiction to hear the suit." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 & n.5 (4th Cir. 2002) (citing 31 U.S.C. § 3730(b)(4) (1982)).  Those amendments, however, explicitly removed the government knowledge defense in an effort to encourage FCA suits.  *See United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 729 (1st Cir. 2007).  Defendants thus must show something more than government knowledge to negate scienter.  *See, e.g.*, *United States v. Southland Mgt. Corp.*, 326 F.3d 669, 682 (5th Cir. 2003) (describing the "government knowledge defense" as "inaptly-named").  Indeed, "government knowledge" alone says nothing about a *defendant's* state of mind when submitting a claim to the government for payment, but

speaks only to the state of mind of the recipient.  And alleged government acquiescence in the form of a discretionary failure to respond or enforce does not suffice to establish affirmative approval.

Fourth Circuit case law is clear that a defendant seeking refuge in the "government knowledge defense" must furnish admissible evidence conclusively establishing that: (1) its disclosures to the government provided "'full knowledge of the material facts' relating" to the allegedly fraudulent conduct; and (2) based upon that disclosure, the government explicitly directed – or at a minimum, approved of – the submission of a technically false claim.  *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 920 n.14 (4th Cir. 2003) (quoting *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 543 (7th Cir. 1999)). This framework properly focuses not on what the government knew, but rather, how what the government knew bore on a defendant's intent.  And only in the most limited circumstances can such knowledge and approval negate a defendant's scienter at summary judgment.  *See United States v. Dynamics Research Corp.*, No. 03-cv-11965, 2008 WL 886035, at *17 (D. Mass. Mar. 31, 2008) (finding that government knowledge of a false certification constitutes a "very narrow exception" to the general rule that there is no government knowledge bar to an FCA action).

Here, Defendants have utterly failed to satisfy the Fourth Circuit's "government knowledge" defense requirements.  Defendants cannot demonstrate that they fully disclosed their actions to the government, that the government undertook a detailed review of any such disclosures, or that the government approved their claims with full understanding of how they did not comply with the governing terms of the FFEL statute and regulation.  Moreover, Defendants have not shown that the Department affirmatively approved their actions, let alone directed them.  At most, Defendants have demonstrated that they accurately predicted that

existing DEd management would not take action against them, at least not quickly.  Far from *negating* scienter, Defendants' actions – especially when one considers that Defendants certified all the while that they complied with the "laws, regulations, and policies" of the FFELP – affirmatively demonstrate that Defendants purposely (or at least recklessly) took advantage of DEd's inefficiency and confusion to the tune of hundreds of millions of dollars in excess 9.5% SAP.  Accordingly, summary judgment with respect to this government knowledge defense should be denied.

### 1.    Defendants Made No Qualifying Disclosures To The Government.

Government knowledge of the falsity of a claim has a bearing on scienter only where a defendant makes a disclosure that provides the government with "*full knowledge* of the material facts underlying any representations implicit in [the defendant's allegedly fraudulent] conduct." *Becker*, 305 F.3d at 289 (emphasis added); *see also Harrison*, 352 F.3d 908, 920 n.14.  As this Court has explained, a defendant's "disclosure of its [allegedly fraudulent] practices is relevant, not because government knowledge of a misrepresentation shields a [defendant] from liability, but because evidence of disclosure may point[ ] persuasively away from any conclusion that [the contractor] made a knowing misrepresentation."  *Newport News*, 276 F. Supp. 2d at 565 (internal quotation omitted).  Summary adjudication requires a defendant to "conclusively establish that [it] made a full, forthright disclosure" to the government.  *Id.* at 565.  That standard is not remotely satisfied here.

First, apart from Nelnet's contrived disclosures, no Defendant voluntarily reached out to the government to discuss the propriety of taking advantage of what they viewed as a regulatory loophole; rather, each Defendant maintained silence while submitting bloated 9.5% SAP claims. Defendants Southwest, Brazos, Panhandle, and EdLinc therefore cannot avail themselves of a

"government knowledge" defense at all; there is no case granting an FCA defendant a free pass

on scienter where it did not make a voluntary, affirmative disclosure.

As discussed in full in Section IV.A, Nelnet's internal documents demonstrate that its

communications with the Department were carefully crafted to *avoid* the "full, forthright

disclosure" contemplated by Judge Ellis in *Newport News*.  *See supra* Section II.A.  DEd's

Inspector General was able to reach this conclusion even without access to the damning internal

correspondence in the discovery record here:

> Nelnet's documentation . . . including Nelnet's letter of May 29, 2003, to FSA . . .
> does not appear to reflect a comprehensive disclosure by Nelnet of the nature or
> effect of Project 950.  For example, Nelnet's May 29, 2003, letter and its
> accompanying flow chart described only the basic process.  The letter did not
> identify the eligible source of funds that would be used to purchase and qualify
> loans for the 9.5 percent floor, did not state directly that the process would be
> repeated many times, and did not state that the process would result in a
> substantial increase in the amount of loans billed under the 9.5 percent floor.

Nelnet Audit at OBERG00001029 (emphasis added) (Soni Dec., Ex. 208).  Nelnet therefore

equally has no basis for relying on a "government knowledge" defense.  *See Newport News*, 276

F. Supp. 2d at 565 (evidence of disclosure insufficient to negate scienter where disclosure made

in a "somewhat convoluted manner").  Here, Nelnet's "disclosure" was not just "somewhat

convoluted"; it was intentionally obfuscatory and the record evidence shows that it was

calculated to mislead.

Defendants' fallback position on disclosure gets them no further.  By suggesting that the

simple submission of ever-increasing 9.5% SAP claims constituted a "full, forthright disclosure"

of all that made their claims "false," Defendants take the "government knowledge" defense well

outside any reasonable bounds.  Indeed, it is difficult to imagine how any defendant could ever

be found to have had the requisite scienter under such a theory, as the actual "presentment" of a

false claim is an aspect of FCA liability and "presentment" alone appears to be Defendants'

backup scienter defense here.  In contrast to cases where the falsity of a claim is apparent on its face, *see, e.g.*, *United States ex rel. Bennett v. Genetics & IVF Inst., Inc.*, 199 F.3d 1328, 1999 WL 978881, at *3 (4th Cir. Oct. 28, 1999) (unpublished disposition), nothing in the quarterly electronic data submissions that constituted the claims in this case indicated the nature of Defendants' sham transactions, Defendants' intentions to increase 9.5% SAP payments as much as possible, or their tenuous legal justifications – all of which would be required for a "full, forthright disclosure"[33] sufficient to put DEd on full notice of the "falsity" of their claims.

> **2.     Defendants Have Not Met The Stringent Requirements For Demonstrating That The Government Approved Of Or Directed The Submission Of Objectively False Claims.**

Defendants also attempt to defeat a showing of scienter by arguing – or at least suggesting – that the government explicitly approved of their false claims.  But the facts they cite in support of this argument demonstrate conclusively that this case is unlike those rare cases in which government approval permits scienter to be resolved on summary judgment.

> **a.     DEd Never Instructed Defendants To Increase Their 9.5% Loan Holdings.**

The Fourth Circuit has stated that the agency at issue must not simply approve a false claim, but must *direct* that it be filed, for the "government knowledge" defense to scienter to be satisfied at the summary judgment stage.  *See Becker*, 305 F.3d at 289 ("We decline to hold [defendant] liable for defrauding the government by following the government's explicit directions[.]").  In *Harrison*, the Fourth Circuit specifically found the defense unavailable where

---

[33]     This is especially so considering that the nature of the claims at issue precludes DEd's ability to review them prior to payment and, as Nelnet's own evidence establishes, payment is typically made within days of the submission of the claim.  *See* Heimes Decl. ¶ 10 (McMahon Decl., Ex. II.31).

the defendant "clearly was not following [government] directions when it" submitted its false claims, distinguishing *Becker*.  352 F.3d at 920 n.14.

Defendants make no attempt to meet this demanding requirement, such as by arguing that DEd directed them to increase their 9.5% SAP loan holdings because of the benefits that would inure to students or the FFEL program.  *Cf. United States ex rel. Werner v. Fuentez Sys. Concepts, Inc.*, 319 F. Supp. 2d 682, 685 (N.D. W. Va. 2004) (finding no scienter where officials "not only . . . ha[d] full knowledge of the defendants' billing practices, those officials directed the defendants to [so] bill"), *affirmed*, 115 Fed. App'x 127 (4th Cir. 2004).  No Department witness testified that Defendants' 9.5% floor loan growth was desirable or beneficial in any way, and Defendants have not attempted to justify that growth as such, repeatedly decrying the windfall subsidies as providing "no additional value to the students, families and schools" that Defendants purport to serve.  Heimes Ex. 29 at N0001001 (Mills Dec., Ex. 36).  Defendants' self-initiated and directed activities likewise were not compelled in any way through statutory or regulatory imperative.  Rather, Defendants by their own admission sought to exploit a "loophole" for their own – rather than DEd's or the taxpayers' – benefit, a situation unlike any in which a "government knowledge" defense has succeeded.  *Cf. United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995) (defense applicable only where the government and the contractor have "completely cooperated and shared all information").

> **b.**    **The Evidence Does Not Demonstrate Government Approval Of Defendants' Schemes To Increase Their 9.5% Loan Holdings.**

Defendants' final salvo is an attempt to take advantage of case law providing that scienter can be negated in situations where "the government knows *and approves* of the particulars of a claim for payment before that claim is presented."  *Becker*, 305 F.3d at 289 (emphasis added); *see also Bennett*, 199 F.3d 1328, 1999 WL 978881 at *3 (upholding summary judgment where

"evidence conclusively established that the [defendant] did not possess the requisite intent to deceive" because "officials fully approved" of the challenged conduct).  No case suggests, however, the defense Defendants propose here:  generalized government "knowledge" that potentially false claims are being submitted, combined with the relevant agency's failure to take enforcement action to stop the further submission of such claims, negates any contention that a party acted "knowingly" in continuing to submit false claims to the government for payment.  Such an argument, which focuses entirely on the agency's state of mind rather than the defendant's, has no basis in post-1986 law.  *See United States v. Krizek*, 111 F.3d 934, 939-40 (D.C. Cir. 1997) (stating that "the focus is on the conduct of the defendant" and "not on how the government chooses to process the claim").[34]  And the concept that bad motive can be overcome by government inaction in the face of clearly abusive conduct is a tenuous one, to say the least.

Nevertheless, it is instructive to consider how such government inaction might relate to Defendants' state of mind.[35]  At the most, Defendants' contend that either (1) DEd's actions and statements convinced Defendants that, despite their claims' technical deficiencies and gross violation of the intent of the 1993 OBRA, DEd had determined that the claims were in fact beneficial to the program and thus invited their continued submission; or (2) DEd's actions and public statements convinced Defendants that DEd would not take enforcement action against them.  The first proposition could conceivably have a role in the jury's determination of whether

---

[34]     The Department of Justice has consistently noted that an agency's exercise of its enforcement discretion says nothing about a FCA defendant's state of mind.  *See* DOJ Br. at 13-16 (Soni Dec., Ex. 48).

[35]     For purposes of addressing this argument, it is necessary to assume that DEd had full knowledge of the falsity and extent of Defendants' claims for payment, as this argument only considers the reasonableness of Defendants' conduct in light of DEd's reaction to such purported knowledge.  As discussed above, however, there is no indication whatsoever that the Defendants put DEd on full notice of the falsity of their claims or that DEd was otherwise informed of such through other channels.

the Defendants acted with the requisite "knowledge," but the second relates only to Defendants'

comfort level in submitting false claims.  In any event, none of the actions or statements

Defendants highlight constituted advice or urging of Defendants' abusive schemes.

(1)     Public Statements Of Department Officials.

The only DEd actions on which all Defendants might theoretically rely are the public

statements of DEd officials purporting to speak on behalf of DEd in an official capacity.  Only

two such statements are at issue.

**Stroup Town Hall Meeting Comments:** In November 2003, an industry newsletter

reported:

> The Department of Education conducted a "town hall" meeting led by Assistant
> Secretary for Postsecondary Education Sally Stroup and Chief Operating Officer
> Terri Shaw as part of its Electronic Access Conference (EAC) this week.  One of
> the first questions posed to Stroup and Shaw sought comment on the recent *U.S.
> News & World Report* article on student loans.  In her response, Assistant
> Secretary Stroup had this to say about half SAP/9.5% floor loans: "This is
> perfectly legal . . . it is not illegal and there is no fraud and abuse and people are
> following the DCL.  It may be bad policy in a low interest rate environment but
> there is no fraud and abuse and we knew about this well before the *US News and
> World Report* article."

PPHEA_026290 (McMahon Dec., Ex. II.15).  As Nelnet itself recognized at the time, these

informal remarks could not be construed as authorization for the submission of claims.  *See*

Dunlap Ex. 52 (in forwarding email with Stroup comments, conceding that "we have not

received anything directly from [DEd] that would allow us to book this [excess 9.5% SAP] into

earnings") (Soni Dec., Ex. 56); Heimes Ex. 38 (Soni Dec., Ex. 78) (writing well after Stroup's

comments and noting "positive comments" but nothing that "specifically addressed our

situation" and that Nelnet had seen no "specific communication to confirm our application of the

process and rules").  A statement that "this" is "perfectly legal," even if accurately quoted, would

relate only to 9.5% SAP claims on outward transfers "following the DCL."  Even if a reader

sought to interpret Ms. Stroup's comment in light of the *U.S. News* article, that article generally criticized 9.5% SAP growth and did not focus on 9.5% SAP claims based on inward transfers. OBERG00006112-13 (McMahon Decl., Ex. II.14).  Thus, as Nelnet concluded, Stroup's alleged remark was far more significant as an indicator of DEd's enforcement intent than as a statement of legal position.

Stroup also testified that she did not have "ultimate authority" in DEd for "interpreting the regulations that apply to 9.5 SAP," and she was never delegated that authority by the Secretary.  Stroup Tr. 213:12-214:1 (Soni Dec., Ex. 21).  Nor did she represent to lenders that she had such authority, and she never told lenders that she "could authorize them to make certain claims on 9.5 SAP."  *Id.* at 214:2-7.  Furthermore, Stroup testified that she had not vetted her statement through formal agency clearance procedures.  *Id.* at 248:16-19.  Accordingly, (i) it would have been patently unreasonable for Defendants to rely on Stroup's statements, and (ii) in fact they did not.[36]

***Paige Letter:*** Defendants take language from a letter written in November 2004, when Defendants' schemes had long been in place, out of context as supporting their activities.  This letter, written to Senator Kennedy about the general subject of 9.5% SAP loan growth, is clearly a political document written long after DEd had decided to pursue a prospective legislative "fix" to the 9.5% SAP "issue" generally in order to be credited with budget savings – precisely the outcome that Nelnet and its lawyer/lobbyist John Dean had promoted.[37]  McMahon Decl., Ex.

---

[36]     There is no evidence that any Defendant changed its behavior based on Stroup's comments.  Nelnet, for example, was "sheep dipping" loans and escrowing the proceeds for months before and months after Stroup's comments.

[37]     As early as March 2003, before Nelnet had submitted its first quarterly claim for increased SAP as a result of its "sheep dipping" efforts, Nelnet was already looking for ways to use the practice to reap other benefits.  Mike Dunlap and Gary Schleuger were both of the mind that increased loan limits was Nelnet's first priority for the reauthorization of the Higher Education Act, and that the perfect way to pay for it, given the way congressional budget scoring

II.52 at ED-B-006306-07.  References to the existence of a "loophole" with no explanation whatsoever as to what that "loophole" is or how it operates are vague enough, but repeated references to an "interpretation by the prior administration" as the cause of the problem – referring to the 1996 Dear Colleague Letter – make clear that the document should have had no value in determining Defendants' state of mind.  No mention is made of the "source of funds" issue that Defendants must address in order to show that their claims were legitimate, and Defendants conveniently ignore that Paige expressly disavowed any DEd approval of "the methods that Nelnet and others were using."  The DEd Inspector General recognized this in its audit of Nelnet and reiterated that it was not an approval.  Nelnet Audit at OBERG00001033-34 (Soni Dec., Ex. 208).  If Defendants relied upon this statement for continuing to make their false claims, or for believing that their claims were actually allowed, they did so unreasonably (and after the fact).

*Other Statements:*  Defendants also rely on non-agency reactions to DEd actions or statements, or references to the 9.5% SAP issue generally, as demonstrating the legality of their claims and thus justifying their continued submission.  Such statements include those made by congressmen who were told that legislative action was required to close the "loophole" and a

---

is done, would be to "get rid of 'sheep dip'" legislatively.  N0118988-89 (Soni Dec., Ex. 184). There was some back-and-forth among the Policy Committee about why Nelnet would possibly want to eliminate "tagging" because it could be a "huge beneficiary" of the process.  *Id.* Schleuger noted that the feeling was that the practice would be eliminated administratively anyway, so they might as well try to get some benefit out of it by proposing a legislative, rather than administrative, change.  *Id.*  Jeff Noordhoek in particular was adamant that "the economics of tagging are enormous" but relented, yielding to a "higher power" – Nelnet's in-house lobbyist, Paul Tone.  *Id.* at N0118989.  This plan was ultimately put into motion, with Nelnet's outside lobbyist John Dean writing to the Secretary's Chief of Staff, David Dunn, proposing elimination of "tagging" in order for the administration to realize budget savings and use those prospective savings for other purposes.  Dean Ex. 18 (Soni Dec., Ex. 53).  Nelnet executives also met with DEd representatives to discuss a legislative solution that would allow Nelnet's legislative priorities to be funded with the savings.  Dunlap Tr. 134:15-136:14 (Soni Dec., Ex. 5); Dunlap Ex. 50 at N0002187 (Soni Dec., Ex. 55).  The Department "seemed intrigued by the offer to eliminate floor earnings, and asked that [Nelnet] work directly with [it] in drafting legislative language that could affect these changes."  *Id.* at N0002188.

report from the Government Accountability Office, itself an arm of the Congress that looked for ways to realize those budget savings.  None of these statements, including the independent TICAS report on which Defendants also rely, provides any legal rationale for the belief that a viable "loophole" existed or that Defendants' claims were proper or authorized by DEd.  *See Becker*, 305 F.3d at 289.  The most that can be said for any one of these non-agency reactions is that they recognized that something needed to be done to stop Defendants and others from capitalizing on lax enforcement and fleecing the government, hardly a ringing endorsement of Defendants' claimed compliance with law, regulation and policy.  *Cf. Newport News*, 276 F. Supp. 2d at 562 & n.29, 564 ("considerable debate" amongst "governmental agencies," including GAO, about the meaning of the disputed regulation prior to and while the defendant was submitting its false claims did not negate scienter as a matter of law because the "plain language of the disputed provision and its legislative history" signaled a violation).

(2)     Private Statements And Actions.

In addition to the public "approvals" discussed above, Defendants claim that DEd representatives at one time or another privately accepted their claims, and thus allowed them to continue submitting them.

***Response to Nelnet Letter:***  Nelnet contends that the Department's July 2004 letter in response to Nelnet's incomplete and misleading May 2003 disclosure, combined with comments made by FSA employee Tim Cameron, constitute DEd approval of its claims.  First, an "approval" based on an incomplete and inaccurate disclosure is not a lawful approval.  Second, DEd did not countersign the letter as Nelnet requested.[38]  Nelnet's own lawyer and lobbyist

---

[38]     Hansen had previously countersigned a letter from Nelnet requesting a regulatory interpretation as to another matter.  Heimes Ex. 33 (Soni Dec., Ex. 73).  But she explained in her deposition that the intended recipient of Nelnet's letter, Angela Roca-Baker, had no authority to countersign such a letter.  Hansen Tr. 276:10-277:5 (Soni Dec., Ex. 22).  Moreover, Hansen

referred to DEd's letter as being "a nonresponse."  Dean Tr. 234:19-235:3 (Soni Dec., Ex. 19).

The letter simply referred Nelnet to the applicable regulations and contained no language

indicating that Nelnet's activities were lawful or that DEd was content with Nelnet's 9.5% Loan

growth.  Heimes Ex. 45 (Soni Dec., Ex. 82); *see* Stroup Tr. 256:1-6 (testifying that the letter did

not say "Nelnet, you are correct") (Soni Dec., Ex. 21).

      Nelnet argues that even if the letter was ambiguous, comments from FSA employee Tim

Cameron that the letter was "positive" suggested that the Department had no problem with

Nelnet's 9.5% loan growth.  But Cameron's comment does not cure the problem of the original,

misleading request.  In any event, Cameron was a low-level FSA "assistant" with "no policy

input."  Hansen Tr. 162:14-163:4 (Soni Dec., Ex. 22), and a former industry insider and friend of

Nelnet's.  *See* OBER00002758 (Soni Dec., Ex. 201).  It would be a strange legal proposition, to

say the least, to say that an FCA defendant lacked the requisite scienter because it obtained after-

the-fact, off-the-record verbal acquiescence from low-level, sympathetic agency contacts.  *See*

*United States ex rel. Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00-C-3289, 2004 WL 1093784,

at *3 (N.D. Ill. May 7, 2004) (stating that "knowledge and even acquiescence on the part of a

government employee is not a defense to a False Claims Act case because, if that were so, a

contractor in cahoots with a government official would be insulated from a False Claims Act

suit").  Nelnet itself did not consider the response sufficient to even allow it to release funds from

escrow, and actively strategized about how to spin it positively, and nobody else apparently

thought that it constituted an approval, either.[39]

---

testified that approving activities as complex as Nelnet's would have been inappropriate in a
countersigned letter and would have required more a formal and general legal and policy
pronouncement.  *Id.*

[39]     In its report of Nelnet's 9.5% scheme, DEd-OIG stated that "its review of Nelnet's
documentation did not identify any direct or explicit approval by the Department of Project 950."

***Various Program Reviews:*** Defendants Nelnet, Southwest/SLM, and Panhandle contend that because low-level DEd employees did not find overbillings of 9.5% SAP during routine program reviews, the Department approved of their false claims.[40]  This argument is contrary to the explicit disclaimer found in each program review report, which states:

> Absence of statements in this report regarding specific practices and procedures followed by [the lender] *should not be construed as acceptance, approval or endorsement of these specific practices or procedures*.  The specific nature of this report does not limit or lessen [the lender's] obligation to comply with all other provisions of the Federal Family Education Loan (FFEL) programs.

*See, e.g.* Criswell Ex. 14 at B0004939 (emphasis added) (Soni Dec., Ex. 118).  Indeed, it is perverse to think that the "catch-me-if-you-can" attitude Defendants espouse with this argument could simultaneously demonstrate that Defendants reasonably believed that the claims they were submitting were lawful.  Defendants know full well that program reviews, which last only a few days, do not provide DEd with all of the information it would have needed to fully comprehend the nature and scope of Defendants' false claims.  And the unequivocal message that Defendants received from the Department following each review was not 'everything you're doing is legal, and by the way, keep doing it,' but rather, 'you have a duty to follow the law, so do it.'  *See* Wallace Tr. 407:4-408:13 (Soni Dec., Ex. 23).

***Nelnet's 2004 Program Review:*** The final report from Nelnet's 2004 program review was issued on March 4, 2005, long after Nelnet had ceased execution of Project 950 and after it had claimed much of its unlawful 9.5% SAP.  That report included an "Observation" of an

---

Nelnet Audit at OBERG00001029 (Soni Dec., Ex. 208).  And the White House's Domestic Policy Counsel, in reviewing the Department's response to DEd-OIG's findings that Nelnet had billed unlawfully, stated in a memorandum summarizing Project 950 that "the Department never officially approved of Nelnet's multiple transfers."  Shaw Ex. 26 at ED-F-000142 (Soni Dec., Ex. 110).

[40]     Brazos does not discuss its 2006 program review in the context of its government knowledge defense.

"[i]ncrease in portfolio size and earnings for loans purchased with tax-exempt bonds" and contained a table tracking Nelnet's 9.5% Loan growth between 2000 and 2004.  McPherson Ex. 10 (Soni Dec., Ex. 119).  The report said nothing about the lawfulness of this growth, and the fact that it was even mentioned suggests that something "unusual" was occurring.  McPherson Tr. 112:2-13 (Soni Dec., Ex. 28).  Far short of condoning any claims, the report, if anything, should have indicated to Nelnet that DEd did not look favorably on them.

Nelnet also invokes a Tim Cameron-like comment allegedly made by a program reviewer at the review's exit conference to the effect that Nelnet had acted lawfully.  Nelnet knew full well, though, that the review had missed significant facts that might have caused DEd to think much differently about the propriety of its actions, including the fact that Nelnet had an affirmative plan to increase its 9.5% loan holdings, the sham nature of its transactions, and the scope of Nelnet's plans to increase its SAP payments.  McPherson Tr. 117:15-119:17 (Soni Dec., Ex. 28).  Moreover, given the fact that, following the review, the then-president of Nelnet was misrepresenting the reasons for Nelnet's 9.5% SAP growth (*see* Dunlap Ex. 57 (Soni Dec., Ex. 102), discussed *supra* Section II.A), the jury could reasonably determine that any positive reviewer comments arose from acceptance of Nelnet's continuing misrepresentations.

***Southwest's 2003 Program Review:*** This review, explained in detail above, included a finding of "Incorrect Billing for Special Allowance Benefits" on loans held by the University of Miami and serviced by Southwest, along with an unrelated statement that infinite growth of 9.5% SAP is not permissible or possible under the regulations.  J. Roig Ex. 2 at SLMA_P0027353-62 (Soni Dec., Ex. 142).  Southwest understood this letter as prohibiting the very practice in which Southwest was then engaging.  V. Roig Tr. 38:7-22, 42:9-21 (Soni Dec., Ex. 12); Wheeler Tr. 142:10-147:5 (Soni Dec., Ex. 16).  Southwest responded by noting its

disagreement, but never disclosed that it was in fact transferring loans in the same way that DEd had just condemned.  J. Roig Ex. 2 at SLMA_P0027365 (Soni Dec., Ex. 142).  DEd never retracted this warning, but merely recognized that Southwest was prepared to reverse the coding error relating to the University of Miami finding.  *Id.* at SLMA_P0027366.  Southwest argues that the fact that DEd never argued with it about its expressed "disagreement" with DEd's statement means that DEd invited continued claims.  This is facially absurd, as Southwest did not disclose that it was even submitting such claims or engaging in such transactions.  To take this course of events as somehow affirming the "legality" of a complex practice or inviting future claims is beyond reasonable boundaries.

*Panhandle's 2003 Program Review:* Panhandle claims that this review included an analysis of PPHEA's 9.5% SAP-eligible loan portfolios, yet points to no documents regarding the scope and breadth of the review outside the DEd letter itself.  Panhandle further claims that during this review, DEd officials specifically asked Glenn Parker about whether the growth in the 9.5% SAP portfolio had occurred pursuant to the 1996 Dear Colleague Letter and he responded "yes."  *See* Defs. Undisputed Fact at PH14.  That assertion is controverted by other record evidence.[41]  The Program Review report states only that Panhandle told DEd officials that it was allowed "to bill tax-exempt status for loans funded by the February 2003 bond issue" pursuant to the 1996 Dear Colleague Letter.  PPHEA_110802 (McMahon Decl., Ex. V.13).  Given the nature of the Dear Colleague Letter, this statement is easily interpreted as meaning that

---

[41]   When asked in his deposition to identify the occasions on which he spoke with DEd regarding PPHEA's 9.5% SAP billing, Parker stated that he spoke with the ED during the 2006 and 2007 time frame only.  G. Parker Tr. 19:17-20:2 (Soni Dec., Ex. 25).  In fact, he definitively stated that he did not speak with DEd about eligibility for 9.5% SAP in 2002, 2003 or 2004 time period.  *Id.*  Parker's suddenly enhanced recollections are proper fodder for cross-examination.  Similarly, neither James Parker nor John Wright testified that such a conversation took place during their depositions.  J. Parker I Tr. 159:19-160:4 (Soni Dec., Ex. 7); J. Wright Tr. 222:24-223:18 (Soni Dec., Ex. 8).

Panhandle believed that loans transferred <u>out of</u> the pre-October 1, 1993 trusts were still 9.5%

SAP eligible, and says nothing about Panhandle's program of "re-filling" those trusts.  DEd

certainly never articulated a justification for Panhandle's actions, so Panhandle could not have

believed that the claims were legally justified, and DEd certainly did not express to Panhandle

that future increased 9.5% SAP claims would be welcome.  At most, this is one piece of evidence

that the jury could consider, along with the unreasonableness of Panhandle's position and its

failure to obtain a complete opinion letter.

(3)      Non-Communicated DEd Activity.

Defendants also discuss the Department's handling of a program review of the Iowa

Student Loan Liquidity Corporation ("ISLLC") – not a defendant in this case – as suggesting that

the Department generally became aware that some lenders were increasing 9.5% loan volume

through "transferring" and "recycling" and approved of the practice.  Although documents

associated with this program review are almost all inadmissible hearsay that cannot be

considered on summary judgment, they may suggest that the Department generally became

aware in the 2002-2004 time period that at least some lenders were increasing 9.5% loan volume

through transferring and recycling.

As discussed *supra*, such generalized government knowledge has been legally

insufficient to state a "government knowledge" defense since 1986.  *See Becker*, 305 F.3d at 289

& n.5; *Shaw*, 213 F.3d at 534; *X Corp.*, 816 F. Supp. at 1094.  Thus, regardless of what

individual DEd employees may or may not have known, Defendants' scienter is not implicated

unless they can show that some public action of the government affected their view regarding the

legality or acceptability of their claims.

The only "public"[42] manifestation of the review was the issuance of the final review report to ISLLC.  Thus, while program reviewers had both examined 9.5% loan growth firsthand and determined with little trouble that it was illegal as early as 2002 during the ISLLC program review, the final draft of the ISLLC program review report stated in a "Note of interest" the unremarkable conclusion that transferring loans out of a pre-October 1, 1993 tax-exempt bond estate and continuing to claim the 9.5% floor on such transferred loans complied with the 1996 DCL.  Wallace Ex. 2 at ISLLC–000001-8 (Soni Dec., Ex. 108).  As both Kristie Hansen and program reviewer Jerry Wallace testified, however, the final report was completely silent on the use of funds obtained from transfers to finance new 9.5% loans, and thus did not comment on the issue of unlimited loan growth.  Hansen Tr. 251:7-254:13 (Soni Dec., Ex. 22); Wallace Tr. 404:2-11 (Soni Dec., Ex. 23).  Such limited facts fail to provide any reasonable reader with (1) any articulable basis for determining that Iowa had acted lawfully; or (2) any reason to believe that DEd's final position on the matter was that inflated 9.5% SAP claims were permissible.  The most that could be gleaned from DEd's ultimate response is that it had not resolved the issue and was not in a position to begin taking enforcement action.

A deeper examination of DEd's internal communications, which obviously could not have influenced Defendants' state of mind, does not paint a different picture.  Unlike Defendants, ISLCC apparently stumbled into its loan growth accidentally, Wallace Tr. 322:7-326:5 (Soni Dec., Ex. 23), so Defendants would have had no occasion to rely on an Iowa finding.

---

[42]      The ISLLC program review report was not a public document.  For example, at the time of its response to the OIG report finding that it had unlawfully overbilled the Department on 9.5% SAPs, Nelnet possessed only the 2002 draft of the ISLLC program review report, which explicitly took issue with ISLLC's billing practices, and had not been aware of the final resolution on which Nelnet now relies.  Nelnet Audit at OBERG00001078 (Soni Dec., Ex. 208).  Similarly, the Halaska email was produced in response to a FOIA request by James Kvaal in 2005, and nothing in the record establishes that any of the Defendants had seen it prior to this litigation.

DEd officials acknowledged that they never fully grasped what Iowa or any other lender was doing to grow their 9.5% loan portfolios.  *See* ED-A-00000954 (Soni Dec., Ex. 43) (Shaw stating in email to herself that "it is not specifically known how the increases in [9.5% Loan ending principal balance] for each lender was realized."); *see also* Stroup Tr. 260:17-261:15 (Soni Dec., Ex. 21) (stating that she never "investigate[d] the specific mechanisms and transactions by which the claimants were growing . . . their portfolio," and she never "personally look[ed] at any of the transactions to see whether [the] limitations [in the 1996 DCL] had been breached"); Hansen Tr. 151:20-152:12 (Soni Dec., Ex. 22) ("[I]n hindsight I'd say in some situations we may not have fully grasped what was happening in the actions of the lenders in working the loans.").

> **c.**   **The Evidence Demonstrates No More Than Defendants' Belief That DEd Would Not Take Immediate Enforcement Action Against Their False Claims.**

None of the facts discussed above demonstrates that Defendants – as a matter of law – did not act with indifference or reckless disregard in submitting their claims because, for example, they reasonably understood that DEd had interpreted the law as permitting the claims as a technical matter or that DEd believed that such claims, even if not technically justified, were otherwise officially approved or directed.  Instead, the most that can be gleaned from these facts is that DEd was unable or unwilling to take action to prevent them from submitting false claims.

Defendants, for instance, could reasonably have believed that DEd was struggling internally to determine its official response.  Granting Defendants' motions for summary judgment on the issue of scienter based only on the fact that DEd moved slowly in taking enforcement action would set a precedent that would put many federal funding programs at serious risk, as agencies are slow-moving bureaucracies by nature.  *See, e.g.*, *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 404 (4th Cir. 1985) (stating, in reference to the FDA,

that "[t]he wheels of government bureaucracy may, at times, seem to turn at a frighteningly slow pace").

By all accounts, the aptly named "Financial Partners" branch of DEd was particularly subject to lax oversight. A 2006 DEd Inspector General audit found that:

- In dealing with lenders, Financial Partners had "emphasized partnership over compliance," thereby affecting "integrity and ethical values and . . . organizational structure." Shaw Ex. 49 at OBERG00000075 (Soni Dec., Ex. 111); and

- "Financial Partners does not have a clear and effective process for staff to obtain policy assistance from OPE or FSA's Policy Liaison and Implementation Staff and for management's communication of policy decisions and advice to staff," such that "Financial Partners' regional offices and management may not correctly and consistently resolve compliance and other program issues," and "the guidance provided may be incorrect, or different guidance may be given to different reviewers which could result in inconsistent interpretation and application between reviewers and regional offices," *id.* at OBERG00000094.

Within the confines of this cozy relationship, in which coherent policy was scant, Defendants were able to deceive DEd into thinking (or at least saying) that a "loophole" existed where one actually did not by simply pointing to a "Clinton-era" interpretation,[43] and gave it a reason not to investigate the issue any further by providing the "intriguing" solution of a legislative "fix" to the problem that simultaneously benefited Defendants and made DEd look like it took decisive action. Such manipulation, far from negating scienter, affirmatively demonstrates that Defendants knew what they were doing all along, and used DEd's inefficiencies and lack of knowledge as an affirmative part of their schemes.

---

[43] What is clear is that when DEd finally did undertake a comprehensive review of 9.5% loan growth in response to the Inspector General's audit of Nelnet and issued an authoritative interpretation of Section 682.302(c), it found that unlimited loan growth was unlawful. *See* 2007 DCL (Mills Dec., Ex. 28).

**D.    The Jury Must Resolve The Issues Of Material Fact Relating To Certain Defendants' "Advice Of Counsel" Contentions.**

The Brazos and Panhandle Defendants contend that FCA scienter cannot be found as a matter of law because they obtained favorable opinion letters from attorney Saul Moskowitz before initiating their sham transactions.  Nelnet briefly argues the same based on opinions it obtained from Moskowitz's former partner, John Dean.[44]

For an "advice of counsel" defense to succeed summarily in this Court, a defendant must establish that it sought independent advice from qualified counsel before making its claims, disclosed all pertinent facts to counsel, and reasonably relied upon and followed counsel's advice.  *Newport News*, 276 F. Supp. 2d at 565-66; *United States v. Butler*, 211 F.3d 826, 833 (4th Cir. 2000).[45]  Those boundaries are essential to ensure that the government's protection against false claims cannot be stripped by the mere participation or concurrence of an attorney in the claim, by "papering the file" with a conclusory opinion not sought for good-faith decisional purposes, or by an opinion that could not have been relied upon reasonably by the defendant. Where, as here, a defendant is not a lay neophyte traversing uncharted legal waters but a large, sophisticated, long-regulated enterprise with an independent duty to certify compliance with law, regulation and policy, the facts and inferences relating to an "advice of counsel" defense must be analyzed with particular care.

The facts of record raise serious questions as to whether any Defendant sought legal advice for the purpose of deciding whether to engage in the actions at issue.  Brazos and

---

[44]    Nelnet's entire "advice of counsel" argument consists of one paragraph noting that opinions were obtained.  *See* Nelnet Mem. at 9.

[45]    Defendants' out of circuit citations are in accord.  *See United States ex rel. Bidani v. Lewis*, 2001 WL 32868 (N.D. Ill. 2001) (good-faith reliance on qualified attorneys for interpretation of ambiguous regulatory provision one factor that goes to scienter); *United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 843 (C.D. Ill. 2003) (good-faith consultation with counsel in drafting contracts one factor going to scienter).

Panhandle engaged Moskowitz to help plan their challenged transactions and then to opine on the validity of their legality.  Turman Exs. 22, 25 (Soni Dec., Exs. 96, 103); Moskowitz Ex. 6 (Soni Dec., Ex. 117); Moskowitz Tr. 253:20-255:3 (Soni Dec. Ex. 18).  Nelnet turned to Dean despite doubts whether his opinion, as opposed to an opinion from the more expert Moskowitz, might carry with it the necessary "credibility."  Nelnet White Paper at N0117978 (Soni Dec., Ex. 187).  Nelnet could have no doubt that Dean's opinion would endorse its scheme-in-progress because Dean was a long-time registered lobbyist both for Nelnet and for the Consumer Bankers Association, of which Nelnet was a member.  Dean Ex. 2 (Soni Dec., Ex. 141); Dean Tr. 54:3-55:3 (Soni Dec., Ex. 19).  A reasonable jury could readily infer, therefore, that Defendants were seeking only endorsement, rather than guidance, with respect to their false claims.

Defendants engaged Moskowitz and Dean to provide their opinions for a modest $5,000 fixed fee which necessarily limited their level of analytical effort.[46]  By early 2003, Nelnet was aware that their "friend" Moskowitz was offering opinions to other secondary markets for $5,000 - $10,000, and it is a fair inference that Panhandle and Brazos were equally well-informed when they engaged Moskowitz.  *See* N0117978 (Soni Dec., Ex. 187).  Dean acknowledged that he viewed his opinion as providing a form of "insurance" to Nelnet, enabling him to demand an additional $3,000 fee when Nelnet sought to permit its banks and bond counsel to rely on his opinion.  Dean Tr. 195:2-196:1 (Soni Dec., Ex. 19).

Defendants' pursuit of what were essentially *pro forma* opinions appears to have been motivated more by the need to provide comfort to the bankers and bond counsel participating in

---

[46]     Compare, for example, Nelnet's payment of $5,000 for Dean's opinion with the "hundreds of thousands of dollars" it paid Jason Kravitt to opine on a single sub-issue of regulatory interpretation in connection with Nelnet's response to DEd's Inspector General's challenge to Nelnet's billing practices.  Kravitt Tr. 36:9-37:4 (Soni Dec., Ex. 30); N0117977 (Soni Dec., Ex. 187).

their "new money" fundraising than by an honest interest in regulatory compliance.  Bond

counsel for Panhandle and Brazos were apprehensive about the legality of claiming expanded

9.5% SAP, as were Nelnet's bankers.  *See* Turman Ex. 26 at B0246473 (Soni Dec., Ex. 97);

March 19, 2003 Email from Kathleen Ellison at PPHEA_045899 (Soni Dec., Ex. 161); Dean Tr.

187:9-192:10 (Soni Dec., Ex. 19) (meeting with bankers at Nelnet's request).  Thus, Defendants'

after-the-fact effort to claim that the opinions obtained from Moskowitz and Dean establish the

absence of scienter for FCA purposes requires a jury to resolve the threshold issue of good-faith

pursuit of independent legal advice.

Defendants' efforts to show the reasonableness of the Moskowitz and Dean opinions fare

no better.  Nether Moskowitz nor Dean investigated whether the transactions they were

addressing had any business purpose, Moskowitz Tr. 118:19-22 (Soni Dec., Ex. 18); Dean Tr.

164:3-12 (Soni Dec., Ex. 19), whether the transfers would be priced at arms-length, or how

frequently they would occur.  Moskowitz Tr. 123:22-124:16, 258:1-4 (Soni Dec., Ex. 18); Dean

Tr. 96:3-97:12, 97:13-98:5; 102:12-16 (Soni Dec., Ex. 19).  This was curious in the case of

Moskowitz because a 2001 email exchange with a DEd official attached to his opinion letters

included a caveat that, "[t]he Department, of course, still has the right to look at any transaction

to assure itself that the transaction is really a transfer and not a paper transaction between one

company and a sham sister."  Moskowitz Ex. 1 at MOSKOWITZ_000095 (Soni Dec., Ex. 116).

It was equally curious in the case of Dean, who considered it necessary to caution Nelnet about

the "legislative risk" and the fact that the transactions were producing results not "in the view of

some, in the best interests of the Department."  Dean Ex. 9 at N0127090 (Soni Dec., Ex. 122).

The absence of advice on whether the absurd results of the contemplated (or in-progress)

transactions could be in conformance with law, regulation and policy – as Defendants were

required to certify – is a second factor that could readily lead a reasonable jury to question Defendants' good-faith reliance.  *See* Moskowitz Tr. 114:9-115:9 (Soni Dec., Ex. 18); Dean Tr. 96:3-97:12, 102:12-16, 125:7-126:12 (Soni Dec., Ex. 19).

An equally glaring omission from the Moskowitz and Dean letters is the absence of any "source of funds" analysis under Section 682.302(c)(3)(i) to support the critical conclusion that "new money" loans or funds transferred into Defendants' pre-October 1, 1993 tax-free trusts could generate 9.5% SAP.  Dean's opinions avoided the issue by accepting, without independent confirmation, Nelnet's representation that "[a]ll of the identified loans (as defined below [as loans transferred out]) will have been originated by, sold or otherwise transferred by Nelf into one or more pre-October 1, 1993 tax-exempt trust estates of NELF with underlined proceeds from the related tax-exempt bond obligations or from collections on FFEL loans securing such tax-exempt bond obligations, prior to their transfer into the trust estate securing the series 2004-1 Notes." *See, e.g.*, Dean Ex. 14 at N0017678 (Soni Dec., Ex. 123).  Thus, Nelnet advised Dean with respect to Section 682.302(c)(3)(i) issues rather than vice versa and bears sole responsibility for claiming that inward transfers qualify for 9.5% SAP treatment.  Dean declared as much in his deposition, stating that he did not consider whether the loans were properly financed, Dean Tr. 131:14-133:13 (Soni Dec., Ex. 19), and did not attempt to confirm the truth of the stated facts, Dean Tr. 155:14-156:5, 222:5-223:10 (Soni Dec., Ex. 19).

Moskowitz's letters also limited analysis to 34 C.F.R. § 682.302(e), *see* Moskowitz Exs. 9, 13, 15, 16 (Soni Dec., Exs. 115, 87, 89, 90), and Moskowitz admitted in deposition that he did not consider the "source of funds" issue.  Moskowitz Tr. 227:21-229:10 (Soni Dec., Ex. 18). Any reasonable reader in Defendants' position would have noted this deficiency and, indeed, one of the few witnesses who actually read Moskowitz's opinions, Panhandle's John Wright,

acknowledged this was an "oversight."  Wright Tr. 178:10-180:10 (Soni Dec., Ex. 8).  The failure of the opinions to address a central issue (indeed, *the* central issue) relating to Defendants' SAP claims further calls the reasonableness of any alleged reliance into question.  A reasonable jury could find that reliance on an opinion letter that ignores one of two major legal issues was not done in good faith.

Both Moskowitz and Dean also acknowledged that their opinions were not free from doubt.  Moskowitz advised Brazos and Panhandle "that the guidance we have received from the Department by email has been confusing and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations."  Moskowitz Exs. 9, 13, 15, 16 (Soni Dec., Exs. 151, 87, 89, 90).  Dean advised that, "[i]mportantly . . . [DEd's] guidance on this subject has been unclear and at times contradictory."  Dean Exs. 9, 12, 14 (Soni Dec., Exs. 122, 124, 123).  It is for the jury to determine whether, given this equivocation and the certainty required by the certification, a reasonable lender would have sought clarifying guidance from the Department before making claims that so clearly led to swollen payments unrelated to the cost of raising funds and in direct conflict with the purpose of the statutory limit they were attempting to evade.

The uncertainty reflected in the Moskowitz and Dean letters was emphasized by their recognition that the resultant SAP explosion could cause problems.  Dean framed this concern as "legislative risk" and sought to comfort Nelnet's bankers by arguing that the Department could not change its position retroactively.  *See, e.g.*, Dean Ex. 14 at 6 (Soni Dec., Ex. 123); Dean Tr. 187:9-192:10 (Soni Dec., Ex. 19).  Moskowitz advised his clients not to be "greedy" or "abusive" and to seek to justify their actions with a "public purpose."  Moskowitz Ex. 5 (Soni Dec., Ex. 114); Turman Exs. 22, 25 (Soni Dec., Exs. 96, 103); Baker Ex. 31 (Soni Dec., Ex. 126).  Once again, these "red flags" were ignored.

Finally, both Moskowitz and Dean acknowledged their inability to analyze the key term "retired or defeased" in Section 682.302(e).  Moskowitz's letter to Brazos stated that his "[f]irm is not sufficiently expert in the intricacies of tax-exempt bond law to advise you as to whether a particular event constitutes retirement, defeasance or maturity," although he believed that "bond law principles would apply" under DEd regulations.  Moskowitz Ex. 9 at 6-7 (Soni Dec., Ex. 115).  Dean testified that he was equally unable to opine on retirement or defeasance but relied instead on Nelnet's representations.  Dean Tr. 73:18-74:6, 75:3-8 (Soni Dec., Ex. 19).  Despite the fact that Nelnet, Brazos and Panhandle all had sophisticated bond counsel, none obtained an opinion on those issues[47] nor on the question of continuing legal interest in the loans which the 1996 DCL expressed as a "legal interest in the loan."  Had Defendants sought this guidance, they would have been advised that refunded pre-October 1, 1993 tax-free trusts had been retired and that ensuring "bankruptcy remote" status for the loans precluded their holding a "legal interest." *See supra* Section V.B.  A reasonable jury could properly determine that Defendants' failure to obtain a complete opinion made any reliance on advice of counsel to engage in what were at least eyebrow-raising claims unreasonable.

In short, there is no basis for summarily determining that Defendants' efforts to paper the record with partial opinions from compliant counsel can determine the issue of scienter.  Brazos had been warned by its own bond counsel that there was no authority supporting 9.5% SAP eligibility through dipping, Turman Ex. 26 (Soni Dec., Ex. 97), and that FCA liability was a

---

[47]     Ricky Turman, the CFO of Brazos, consulted with Brazos' bond counsel, Mark Westergard of Fulbright and Jaworski, prior to obtaining an opinion from Moskowitz.  Turman Tr. 274:7-22 (Soni Dec., Ex. 9).  Westergard advised that "[t]he Regulations and the Letter indicate, rather clearly, that only bond issues originally issued before October 1, 1993, and that have been neither retired nor defeased, might be available for giving loans the floor characteristic," and provided Brazos with information on which bond issues had not been retired or defeased.  Turman Ex. 26 (Soni Dec., Ex. 97).  But there are no indications that Brazos ever went back to Westergard to obtain retirement/defeasance advice with regard to the transactions actually performed.

possibility.  Turman Ex. 29 (Soni Dec., Ex. 104).  Panhandle equally was on notice that its bond

counsel specifically questioned whether all loans within a pre-1993 tax-exempt bond trust were

entitled to 9.5% SAP.  March 19, 2003 Email from Kathleen Ellison at PPHEA_045899 (Soni

Dec., Ex. 161).  To no avail, Nelnet continued to press for DEd confirmation long after receiving

Dean's opinion.  *See supra* Section IV.A.  Given the obvious red flags Defendants faced, and the

obvious limitations of the Moskowitz and Dean opinions, scienter remains a jury question.  *See*

*Newport News*, 276 F. Supp. 2d at 566.

## VI.    DED'S PURPORTED SETTLEMENT OF TITLE 20 HIGHER EDUCATION ACT ISSUES DID NOT AFFECT TITLE 31 FALSE CLAIMS ACT ACTIONS OR DAMAGES.

Defendants' memoranda incorporate variations of the same argument – that DEd's

purported settlement of issues under the HEA in Title 20, bars claims under the FCA, found in

Title 31.  But as an overarching matter of Federal law, the HEA and the FCA are different

statutory regimes administered by different agencies, with different elements of proof and

different damages provisions.  DEd lacks authority to settle or compromise FCA claims; that

authority is vested exclusively in the Department of Justice ("DOJ"), which was not and is not

alleged to have been a party to any settlement.  Defendants ignore DEd's express testimony,

consistent with the statutory limitation on its authority, that the 2007 settlement did not extend to

FCA claims.  They also overlook that the "settled" claims are not the same as the claims now

being litigated.  The "settlement offer" by its terms was limited to a particular issue:  excess SAP

previously claimed on "third-generation" and later loans.  Such third-generation loans could have

arisen from, *inter alia*, continued recycling within a single tax-exempt trust.  By contrast, the

present FCA claims challenge Defendants' intentional, unlawful growth of 9.5% SAP through

sham loan transfers and purported "sales" between taxable and tax-exempt trusts.  Thus, no

matter the theory – whether standing, accord and satisfaction, damages, or the like – Defendants

cannot evade the established restrictions on DEd's authority or the limited scope of the settlement.

Defendants' settlement arguments are premised on equating HEA and FCA violations and thus fundamentally misunderstand the differences between these two regimes.  The HEA and the FCA are found in different titles of the United States Code and are administered by different agencies, with DEd administering the HEA under 20 U.S.C. § 1082 and related authorities and DOJ administering the FCA under 31 U.S.C. § 3730 and related authorities.  While a violation of the HEA exists where a defendant engages in any conduct in derogation of that Act, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim' for payment," which the relator must show was "knowingly present[ed], or cause[d] to be presented [to the Government]" and "false or fraudulent."  *See Harrison*, 176 F.3d at 785 (citation and quotation marks omitted); 31 U.S.C. § 3729(a)(1).

Courts have recognized the consequences of these differences for any argument that a settlement of a program claim precludes a later FCA action.  *See United States v. Woodbury*, 359 F.2d 370, 377 (9th Cir. 1966) (reversing a finding that the government had waived FCA claims through its prior settlement of a contract case).  The court reasoned:

> [W]e cannot find in the Completion Agreement or the circumstances surrounding its execution any indication that the present claims were compromised or settled. It is quite true that they arose out of certain things that Woodbury did in connection with the project to which the Completion Agreement relates.  But their legal basis is not breach of contract or any of the matters to which the Completion Agreement relates.  Their legal basis is an intentional violation of the False Claims Act.  They are in addition to, and separate from, any claims that the government might have for breach of contract.

*Woodbury*, 359 F.2d at 377 (emphasis added); *see also United States v. Greenberg*, 237 F. Supp. 439, 444 (S.D.N.Y. 1965) (finding that settlement of breach of contract case did not bar later FCA action where counterclaims in earlier case "did not include a cause of action under the False

Claims Act").  In light of the fundamental differences between the HEA and FCA regimes, and judicial recognition that FCA claims are unique, Defendants' arguments that FCA claims are extinguished by any purported settlement of HEA claims are without merit.

Moreover, the FCA expressly provides that only the Attorney General is permitted to sue under the FCA and, thus, only the Attorney General may settle such claims.  *See* 31 U.S.C. § 3730(a); *see also id.* § 3711(a), (b)(1) (barring agencies from compromising any government "claim that appears to be fraudulent, false, or misrepresented by a party with an interest in the claim").  Federal courts have confirmed DOJ's exclusive FCA settlement authority.  *See*, *e*.g., *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 547-48 (Fed. Cir. 1988) (observing that "Congress could not have stated more clearly its intent to give the Attorney General specific authority to 'administer, settle, or determine' claims or disputes under the False Claims Act" and that "[n]o other agency is empowered to act under the [FCA]"); *United States ex rel. Haskins v. Omega Inst., Inc.*, 11 F. Supp. 2d 555, 561 (D.N.J. 1998) ("In this case the [Department of Education] has not investigated false or fraudulent claims and lacks authority to do so.  The exclusive authority to adjudicate FCA and fraud claims rests with the Department of Justice and the Attorney General."  (footnote omitted)).[48]

DEd itself also has confirmed that it could not – and did not – settle the FCA claims at issue here.  In its settlement agreement with Nelnet of HEA claims, DEd confirmed that:

> The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present, or future violations by Nelnet, its officers, or employees of the criminal laws of the United States or any action against Nelnet, its officers, or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33.

---

[48]    The settlement cases cited by Defendants do not contradict this proposition, as they involve settlements by the Department of Justice or the relator of FCA claims – not settlements of other actions by other agencies.

Trubia Ex. 9, at 8 ¶ K (Nelnet-DEd Jan. 19, 2007 Settlement Agreement) (emphasis added) (Soni Dec., Ex. 129).  Similarly, during a deposition of DEd, DEd's designated witness, Patricia Trubia, confirmed that her "understanding is the department does not handle False Claims Act. That's handled by Justice under title 31."  Trubia Tr. 53:8-16 (Soni Dec., Ex. 27).  DEd has been equally clear that the asserted HEA "settlement" reflected in the 2007 DCL that forms the centerpiece of Defendants' settlement argument did not, in fact, settle FCA claims.  DEd's designated witness affirmed that this "settlement" was not "trying to do something more for the other lenders than [DEd was] doing for Nelnet" but was merely "trying to put them on a level playing field."  Trubia Tr. 52:3-9 (Soni Dec., Ex. 27); *see also* Trubia Tr. 54:16-19 ("Q.  Do you know of anything that's specified to these other lenders that they were released from claims under the False Claims Act?  A.  Not that I'm aware of."); *id.* at 74:13-16 (confirming that asserted settlement with lenders "did not control the False Claims Act administered by the Department of Justice").  Defendants ignore this testimony.  Similarly, where a settling agency has no authority to settle fraud claims, those claims are not barred under an accord and satisfaction theory:

> An accord and satisfaction is enforceable only to the extent that the parties have authority to settle disputes.  *See Edwards v. United States*, 22 Cl. Ct. 411, 421 (1991).  Under statute, the Government's contracting officer for this contract had no authority to settle fraud claims.  41 U.S.C.A. § 605(a) (West 1988).  Thus, fraud claims are not affected by the agreement, and the Government can raise them now.

*Martin Marietta*, 894 F. Supp. at 224.

Defendants' challenge to Relator's standing on the basis of the Government's alleged lack of standing also does not advance their position.  *See*, *e.g.*, Southwest Mem. at 21-23; Brazos Mem. at 27-28.  The Supreme Court has made clear that the injury to the United States arising from a violation of the FCA is twofold – "both the injury to its sovereignty arising from

violation of its laws … and the proprietary injury resulting from the alleged fraud." *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 771 (2000).  The Government's standing arises from the violation of the FCA itself and is not tied solely to the monetary damage it suffered from Defendants' wrongful conduct.  Thus, the United States' continued standing to bring these FCA claims provides Relator with the requisite standing as well.

In addition to the fundamental differences between the HCA and the FCA, Defendants ignore that the challenged conduct in this case and issue generally "settled" with the industry are not the same.  Under the 2007 offer by DEd relied upon by Defendants:

> The <u>Department will not seek to recoup SAP already received</u> in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans <u>that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with or accept, as applicable the following</u> . . . .

Mills Dec. Ex. 28 at ED-E-000702 (emphasis added).  Claims for 9.5% SAP on third generation and later loans for which DEd conditionally agreed not to seek recovery may or may not overlap the loans on which Defendants falsely claimed 9.5% by inter-trust transfers.  As explained by the DEd letter (Mills Ex. 28 at ED-E-000700), "generational" violations could occur through recycling within a pre-October 1, 1993 trust.[49]  This defect is different from the false claiming alleged in the Complaint, which involves intentional manipulation and sham transfers ideally suited for FCA enforcement.  Thus, in addition to the dispositive legal flaws in Defendants' argument, there is a plain but unacknowledged disconnect between the allegedly settled misconduct and the unlawful conduct at issue in the present case.  Among other things, this

---

[49]   As the letter explains, the "first generation" of loans is funded directly from the issuance of the bond.  The second (and last permissible generation for obtaining 9.5% SAP) is funded by interest, repayment of principal, and SAP payments from the first generation loan.  Interest, SAP payments, or repayment of principal on the second generation loan could not be used to fund another ("third generation") loan on which the holder would claim 9.5% SAP.

precludes any claim (which would be legally unavailing in any event in light of the distinct regimes) that government recovery for 9.5% SAP overcharges on the loans at issue has been waived so that only civil penalties are available.

## VII.   THE PANHANDLE AND BRAZOS DEFENDANTS ARE NOT ENTITLED TO DISMISSAL UNDER RULE 12.

The Panhandle and Brazos Defendants raise "me too" arguments with respect to whether Relator is precluded from bringing this case by alleged public disclosure.  Relator hereby adopts the arguments presented in his oppositions to the Rule 12 motions filed by Defendants EdLinc/SLFC and Southwest/SLM.  *See* Doc. Nos. 311, 314.

With regard to one issue raised at argument, Relator notes that Defendants' reliance on *Rockwell International Corporation v. United States*, 549 U.S. 457 (2007) is misplaced.  The central problem in *Rockwell* was that the relator attempted to use his original source status on one claim as the basis for original source status on related but separate claims of which he had no independent knowledge and was not an original source.  *Id.* at 476.  The Supreme Court held that the relator was not an original source as to the claims on which he had no independent knowledge.  *Id.* at 473, 475-76.  The Court reasoned that "Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim."  *Id.* at 476.  The statute "does not permit such claim smuggling," and a relator's "decision to join all of his . . . claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action."  *Id.* (internal quotation marks omitted).

*Rockwell* is irrelevant to this case for two reasons.  First, Defendants inappropriately rely on *Rockwell* to support their argument on "public disclosure" – but *Rockwell* interprets "original source" and has no bearing on the threshold question of whether Relator's allegations were in

fact publicly disclosed (they were not).  Second, and more important, Dr. Oberg does not rely

upon his status as an original source with respect to one claim or one defendant to support

jurisdiction over other claims or other defendants.  Rather, his investigation uncovered the

process of recycling and transferring used by all Defendants to illegally grow their 9.5% Loan

portfolios.  Unlike the relator in *Rockwell*, Relator here did not strategically join claims or

defendants in order to "smuggle" in other claims or defendants.  Indeed, had he filed individual

suits against the various Defendants in this case, each complaint would have contained precisely

the same information (regarding his initial findings of aggregate loan growth, his investigation,

etc.) – except that the data illustrating the growth in particular Defendants' holdings would have

been included only in the complaint against the relevant Defendant.  In short, this is not a case of

"claim smuggling."  Relator's decision to join similar claims against multiple defendants "should

not result in the dismissal of claims that would . . . otherwise survive[]" the public disclosure bar.

*Id.* at 476 (internal quotation marks omitted).

## VIII.   FACTUAL DISPUTES PRECLUDE SUMMARY JUDGMENT FOR SLM AS SOUTHWEST'S ALTER EGO.

SLM Corp. has moved for summary judgment on the alter ego claims against it.  The

distinction between a corporation and its single shareholder is "a fiction of the law and it is now

well settled, as a general principle, that the fiction should be disregarded when it is urged with an

intent not within its reason and purpose, and in such a way that its retention would produce

injustices or inequitable consequences."  *Kinney Shoe Corp. v. Polan*, 939 F.2d 209, 211 (4th

Cir. 1991) (citation and internal quotation marks omitted) (applying West Virginia law); *see also*

*DeWitt Truck Brokers*, *Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976).

Thus, "courts will not hesitate to [pierce the corporate veil] when justice so requires."  *Keffer v.*

*H.K. Porter Co.*, 872 F.2d 60, 64 (4th Cir. 1989).

Specifically, "when substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced 'little difficulty' and have shown no hesitancy in applying what is described as the 'alter ego' or 'instrumentality' theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder." *DeWitt*, 540 F.2d at 685.[50]  Such factors include the absence of corporate records, the failure to observe corporate formalities, the non-functioning of other officers or directors, the non-payment of dividends, the degree of undercapitalization of the subsidiary, the insolvency of the debtor corporation at the time, the siphoning of funds by the dominant stockholder, and whether the corporation is merely a facade for the dominant stockholder's operations.  *Id.* at 685-87.  No one factor is dispositive; the determination rests instead on an analysis of the totality of the circumstances.  *Id.* at 687; *Kinney Shoe Corp.*, 939 F.2d at 211.  Courts also examine whether there is "present an element of injustice or fundamental unfairness."  *DeWitt*, 540 F.2d at 687.

In October 2004, SLM acquired Southwest and remained its sole shareholder through 2007.  Rakatansky Tr. 11:16-18, 18:5-8 (Soni Dec., Ex. 15).  Because application of the *DeWitt* factors and an examination of injustice and fundamental unfairness create genuine issues of material fact as to whether SLM is the alter ego of Southwest, the Court should deny SLM summary judgment on the alter ego issue.

---

[50]     While *DeWitt* was itself decided under South Carolina law, it is considered "[t]he leading case in the Fourth Circuit on the imposition of individual liability on an officer/shareholder of a corporation."  *In re Powers*, No. 98-32172, 1999 WL 33114276, at *1 (Bankr. E.D. Va. Dec. 17, 1999).

A. **The Fourth Circuit's *DeWitt* Factors Support Piercing The Corporate Veil And Holding SLM Responsible For Southwest's Fraudulent Scheme To Bill Unnecessary 9.5 SAP.**

Following its acquisition by SLM, Southwest failed to observe the basic corporate formalities that would sustain the legal fiction of two separate companies.  Post-merger, Southwest's Board of Directors was reduced from at least six directors to one, Nickel Tr. 71-73 , 72:17-74:12 (Soni Dec., Ex. 17); Rakatansky Tr. 15:8-22 (Soni Dec., Ex. 15); the sole director was always an SLM official, Rakatansky Tr. 14:10-15:4, 15:10-13; 56:16-57:7 (Soni Dec., Ex. 15).  And far from being a passive bystander in Southwest's affairs, that SLM official possessed expansive authority to overrule Southwest's President, and to hire and fire Southwest officers with no apparent limits.  Nickel Tr. 47:14-48:7; 88:10-89:1 (Soni Dec., Ex. 17).  In fact, Southwest's former President characterized the SLM official as his "superior" with whom he felt the need to discuss "most decisions I thought were important to the company." *Id*. at 93:21-94:8.  This SLM official gave strategic direction to Southwest and conferred with Southwest's President about Southwest's business plan and its significant level financial decisions.  Rakatansky Tr. 18:19-19:11 (Soni Dec., Ex. 15).

Southwest never held a Board meeting or a shareholder meeting following the acquisition. *Id.* at 17:13-19, 18:5-16.  Less than six months after the acquisition, Southwest ceased maintaining its own separate financial statements, such as balance sheets and income statements.  Wheeler Tr. 155:4-10 (Soni Dec., Ex. 16); Nickel Tr. 207:15-208:15; 209:9-210:10 (Soni Dec., Ex. 17).  Southwest did not pay dividends to SLM.  Wheeler Tr. 169:16-20 (Soni Dec., Ex. 16); Nickel Tr. 196:2-5 (Soni Dec., Ex. 17).

Members of the public would find it difficult to differentiate between Southwest and SLM.  For instance, Richard Nickel held the title of Vice President with Sallie Mae at the same time he served as President of Southwest.  Nickel Tr. 47:5-13 (Soni Dec., Ex. 17).  His Sallie

Mae corporate title involved no additional responsibilities. *Id*. at 47: 1-13. Barry Goulding simultaneously served as Senior Vice President of SLM Corporation, President of Southwest, and sole Southwest Director. Rakatansky Tr. 56:16-57:7 (Soni Dec., Ex. 15). Vince Roig served as Senior Vice President of Sallie Mae at the same time he served as President of Southwest. V. Roig Tr. 53:6-16 (Soni Dec., Ex. 12). Ron Duvall headed Southwest's information technology office while also having a Sallie Mae title. Nickel Tr. 143:22-144:15 (Soni Dec., Ex. 17). Following the acquisition, at least two newly appointed officers of Southwest – Mary Eure and Carol Rakatansky – simultaneously held titles with Sallie Mae. *Id*. at 88:6-88:22.

Further, SLM held a firm grip over Southwest's operations, imposing strict limits on Southwest's independent scope of action. Most importantly in this regard, SLM required Southwest to follow a Signature Authorization Policy that significantly curtailed Southwest's authority to purchase goods and services. Rakatansky Tr. 24:9-26:5 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130). Under this policy, a Signature Authority Approval Matrix prohibited Southwest from making purchases in certain categories above a certain dollar amount without the approval of SLM's COO or CEO. Rakatansky Ex. 4 (Soni Dec., Ex. 131); Rakatansky Tr. 34:16-18, 36:17-20 (Soni Dec., Ex. 15). In addition, Southwest was prohibited from making purchases in other specified categories at all, regardless of dollar amount, unless SLM or its subsidiaries first reviewed and approved the purchase. Rakatansky Tr. 54:21-55:16 (Soni Dec., Ex. 15). For all other purchases, the Policy set tight guidelines dictating which Southwest officials could approve purchases. Rakatansky Ex. 4 (Soni Dec., Ex. 131).

Sallie Mae, Inc.'s finance organization enforced this policy, and only SLM's CEO, COO, Executive Vice President of Finance, or the Executive Vice President of Accounting and Risk

Management could make exceptions.  Rakatansky Tr. 28:8-16; 28:17-29:7 (Soni Dec., Ex. 15);

Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).  Further, under this policy, Sallie

Mae, Inc.'s Purchasing Department/Accounts Payable Department had to confirm the

authorization signatures before processing a purchase order/payment request.  Rakatansky Tr.

30:3-9 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).

Southwest could not enter into leases of facilities, property, or equipment of any amount

without review and approval by Sallie Mae, Inc.'s Managing Director/Vice President of

Facilities.  Rakatansky Tr. 41:5-13 (Soni Dec., Ex. 15); Rakatansky Ex. 4, SLMA_P0027865-

871 (Soni Dec., Ex. 131).  Similarly, Southwest was blocked from whole categories of

transactions – such as investment/hedge portfolio transactions, debt/swap transactions, leveraged

lease transactions, equity premium payments, and debt issuances – without approval by Sallie

Mae, Inc.'s Managing Director/Vice President Corporate Finance.  Rakatansky Tr. 41:15-18

(Soni Dec., Ex. 15); Rakatansky Ex. 4, SLMA_P0027865-871 (Soni Dec., Ex. 131).

Thus, after SLM's acquisition, SLM and Southwest became intertwined that they

constituted a single, highly integrated entity to carry out SLM's purposes.  SLM subsidiaries

provided Southwest a variety of services and benefits to Southwest including employee benefits,

retirement benefits, legal services, human resources/training, payroll processing, information

technology, and financial/accounting services.  Nickel Tr. 131:9-132:1, 120:13-121:15, 111:15-

113:15, 119:15-120:11, 131:20-132:6, 136:10-141:9, 145:18-147:16 (Soni Dec., Ex. 17).  A

SLM subsidiary also serviced all of Southwest's federal student loans, apparently without

compensation.  *Id*. at 166:3-167:13; Nickel Ex. 11, SLMA_EF0001193 (Soni Dec., Ex. 132);

Nickel Tr. 170:17-171:19; 201:16-202:11 (Soni Dec., Ex. 17).  Further, Southwest offered Sallie

Mae loan products, including signature loans and Sallie Mae's consolidation program.  *Id*. at

150:10-152:4.  In addition, Southwest offered call center support to Sallie Mae customers.  *Id*. at
191:5-193:10.

Southwest's workforce dropped by nearly a quarter from the time of SLM's acquisition
through 2006.  Nickel Tr. 179:7-180:4, 261:11-263:18 (Soni Dec., Ex. 17).  As officers left
Southwest after the acquisition, they were not replaced.  *Id*. at 250:8-252:21.  Individuals that
continued working at Southwest following SLM's acquisition believed that their employer in the
post-acquisition period was Sallie Mae.  Jacobson Tr. 125:15-16 (Soni Dec., Ex. 13); V. Roig Tr.
15:15-19 (Soni Dec., Ex. 12).  Vince Roig, former president of Southwest, labeled Southwest as
a "division" of Sallie Mae after the acquisition.  V. Roig Tr. 53:6-16 (Soni Dec., Ex. 12).

Finally, Southwest and SLM signed a $5 billion unsecured line of credit representing a
sweetheart deal between closely connected companies.  Wheeler Ex. 20 (Soni Dec., Ex. 138);
Nickel Ex. 20, SLMA_P0002852-2859 (Soni Dec., Ex. 134); Wheeler Tr. 159:13-161:19 (Soni
Dec., Ex. 16).  This eight-page agreement contained no payable due date and required no regular
payments by Southwest even though it potentially funneled billions of dollars into Southwest.
Wheeler Tr. 159:13-160:20, 161:11-19 (Soni Dec., Ex. 16).  Expressing the obvious, a former
Southwest official testified that it is highly unusual for a $5 billion loan to not include a security
interest, yet the line of credit was completely unsecured.  Chapin Tr. 105:12-21 (Soni Dec., Ex.
14).  To the extent that SLM made capital contributions, it did so only for the tax advantages it
provided to SLM.  Wheeler Tr. 166:13-167:16 (Soni Dec., Ex. 16).  Under *DeWitt*, genuine
issues of material fact remain on the issue of alter ego.

**B.     Injustice And Fundamental Unfairness Would Result If SLM Were Not Held
        Liable As Southwest's Alter Ego.**

Further, genuine issues of material fact exist as to whether allowing SLM to be dismissed
from this case would pose a risk of injustice and fundamental unfairness.  SLM's attempt to

disassociate itself from Southwest's 9.5% SAP claims is belied by the record.  For instance, SLM was aware of Southwest's 9.5% SAP portfolio when purchasing Southwest and even calculated possible additional revenue from 9.5% SAP loans, noting that there was "some potential upside if any new [9.5 SAP] loans can be created after mid-2005 and interest rates stay relatively low." Project Troy Update, SLMA_EF00000249 (Soni Dec., Ex. 169); Project Troy Update, SLMA_EF00000163 (Soni Dec., Ex. 168).  As the acquisition was occurring, Sallie Mae officials conducted a due diligence review of Southwest's 9.5% SAP policies and, armed with the knowledge of those policies, allowed Southwest to continue to bill 9.5% SAP.  Wheeler Tr. 125:22-136:13, 135:22-136:13, 139:2-12 (Soni Dec., Ex. 16).

This pattern continued after the acquisition.  SLM monitored and maintained control over Southwest's loan portfolio, while Sallie Mae maintained control over Southwest's portfolio and bond transactions generally.  Nickel Tr. 116:14-21 (Soni Dec., Ex. 17); V. Roig Tr. 106:6-108:2 (Soni Dec., Ex. 12).  SLM officials had the power to order Southwest to stop or change its 9.5% SAP billing practices, as evidenced by the fact that on at least one occasion an SLM employee ordered Southwest to cease recycling – and it obeyed.  Wheeler Tr. 138:5-139:1 (Soni Dec., Ex. 16).  In addition, SLM's Vice President met with Southwest's Chief Financial Officer shortly after the merger specifically to discuss, among other topics, 9.5% SAP loans.  Chapin Ex. 12 at SLMA_EF00000174 (listing "9 ½ loans" as a topic) (Soni Dec., Ex. 139); *see also* Nickel Tr. 101:3-14; (Soni Dec., Ex. 17) Nickel Ex. 5, SLMA_EF00001234 ("We have supplied information to Corporate regarding the breakdown of Sap received from pre 10/1/93 9.5% floor bonds versus all other loans receiving the 9.5% floor for the past 5 years.") (Soni Dec., Ex. 135); Nickel Ex. 7, SLMA_EF00001235 ("We now have supplied information on the associated replacement of Sap calculated on a taxable basis.  We believe our requirements are now

complete.") (Soni Dec., Ex. 136); Jacobson Tr. 91:11-93:10 (Soni Dec., Ex. 13); Jacobson Ex. 6

(Soni Dec., Ex. 144).  Last, but certainly not least, Sallie Mae, Inc. took over as servicer of

Southwest's loans in the Fall of 2005 and was thereafter responsible for the 9.5%% SAP claims

submission process on behalf of Southwest.  Wheeler Tr. 114:19-115:6, 132:21-133:12 (Soni

Dec., Ex. 16).

> Thus, SLM knew about Southwest's 9.5 program before the purchase, had the power to
>
> stop Southwest from continuing to bill 9.5% SAP fraudulently (going so far as to exercise that
>
> power with regard to a particular kind of transaction), requested and received detailed
>
> information about the scheme, and allowed the 9.5% SAP claiming to continue.  Under these
>
> circumstances, a jury should determine whether SLM should be held responsible as Southwest's
>
> alter ego.

## IX.   <u>CONCLUSION</u>

> For the foregoing reasons, Defendants' motions for summary judgment should be denied.

July 12, 2010                          Respectfully submitted,


/s/ Michael L. Sturm                    _____
Bert W. Rein (admitted *pro hac vice*)
Thomas W. Queen (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
tqueen@wileyrein.com
msturm@wileyrein.com

Christopher M. Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102

Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C.  20006
Phone :  202.261.2806
Fax :  202.261.2835
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

*Attorneys for Qui Tam Relator Jon H. Oberg*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of July, 2010, a true and correct copy of the foregoing Memorandum in Support of Relator's Motion for Partial Summary Judgment was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Gerard Mene, Esq.
Assistant United States Attorney
2100 Jamieson Ave
Alexandria, VA 22314
*Counsel for the United States*

W. Neil Eggleston, Esq.
Debevoise & Plimpton LLP (DC)
555 13th Street, NW, Suite 1100 East
Washington, D.C. 20004
*Counsel for SLM Corporation
and Southwest Student Services
Corporation*

Don Bradford Hardin Jr., Esq.
Wilmer Hale LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
*Counsel for Education Loans
Inc/SD*

Timothy J. McEvoy, Esq.
Christine Crudgington Owen, Esq.
Cameron McEvoy, PLLC
11325 Random Hills Road, Suite 200
Fairfax, VA 22030
*Counsel for Panhandle Plains
Higher Education Authority*

David Michael Kopstein, Esq.
Kopstein & Perilman
8633 Cross Chase Court
Fairfax Station, VA 22039
*Counsel for Brazos Higher Education
Service Corporation and Nelnet, Inc.*

Sean T. Beller, Esq.
Powers Pyles Sutter & Verville PC
1501 M Street NW, Seventh Floor
Washington, D.C. 20005-1700
*Counsel for Brazos Higher Education Service
Corporation, Brazos Higher Education
Authority, Nelnet, Inc., and Nelnet Education
Loan Funding, Inc.*

Nathaniel Thomas Connally III, Esq.
Hogan & Hartson LLP
7930 Jones Branch Drive
McLean, VA 22102-3302
*Counsel for Arkansas Student
Loan Authority*

Jill Marie Dennis, Esq.
Hunton & Williams
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102
*Counsel for Pennsylvania
Higher Education Assistance Agency*

Thomas L. Appler, Esq.
Heather Austin Jones, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102
*Counsel for Kentucky Higher Education
Student Loan Corporation*

Mark E. Nagle, Esq.
Tameka M. Collier, Esq.
Troutman Sanders LLP
401 9th Street, NW, Suite 1000
Washington, D.C. 20004-2134
*Counsel for Vermont Student
Assistance Corporation*

John Stone West, Esq.
Megan Conway Rahman, Esq.
Troutman Sanders LLP
1001 Haxall Point
Richmond, VA 23219
*Counsel for Vermont Student Assistance Corporation*

/s/ Michael L. Sturm
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
msturm@wileyrein.com