**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **FILED UNDER SEAL** |
| *ex. rel.* JON H. OBERG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Civil No.  1:07-CV-960-CMH-JFA |
| ) | |
| NELNET, INC., *et. al.,* ) | |
| ) | |
| Defendants. ) | |

**RELATOR'S RESPONSE TO DEFENDANTS'**
**JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS**

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C.  20006
Phone :  202.261.2806
Fax :  202.261.2835
soswald@employmentlawgroup.com
dscher@employmentlawgroup.com

Bert W. Rein (admitted *pro hac vice*)
Thomas W. Queen (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
tqueen@wileyrein.com
msturm@wileyrein.com

Christopher M. Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102
Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

July 12, 2010

*Attorneys for Qui Tam Relator Jon H. Oberg*

## INTRODUCTION

Following are Relator's responses to Defendants' Statement of Undisputed Materials Facts (Doc. 327).  Relator presents certain additional facts and supporting evidence applicable to some or all Defendants, identified by Relator's Undisputed Facts "RF."  Following that, Relator has responded to each of Defendants' proposed undisputed material facts.

To avoid the filing of duplicate exhibits, Relator cites, in certain circumstances, to the Declaration of Susan McMahon, and the exhibits thereto, as filed by Defendants on June 18, 2010 in support of their Motion for Summary Judgment ("McMahon Dec.") (Doc. 330) and the Mills Declaration, and the exhibits thereto, filed by Relator on June 18, 2010 in support of Relator's Motion for Partial Summary Judgment ("Mills Dec.") (Doc. 334-1).  New exhibits cited herein and in Relator's Opposition to Defendants' Motion for Summary Judgment are included as exhibits to the Declaration of Lina Soni ("Soni Dec.") filed concurrently herewith.

In instances in which Defendants have merely cited certain language from a document or deposition, Relator may not have disputed that the proposed fact accurately quotes the language, but reserves the right to dispute the underlying truth, accuracy or completeness of any statement made in any document or any statement made in a deposition.  Further, to the extent statements not made under oath are presented by the Defendants that are relied upon for the truth of the matter asserted, they are hearsay.  Relator preserves all objections regarding authenticity and admissibility for any of the cited documents.

References to deposition transcripts are made per the following key:

| Soni Declaration Ex. No. | Deponent |
|---|---|
| 1 | Deposition Transcript of Larry Buckmeier – "Buckmeier Tr." |
| 2 | Deposition Transcript of A. Norgrin Sanderson – "Sanderson Tr." |
| 3 | Deposition Transcript of Steve J. Kohles – "Kohles Tr." |
| 4 | Deposition Transcript of Terry Joe Heimes – "Heimes Tr." |
| 5 | Deposition Transcript of Michael S. Dunlap – "Dunlap Tr." |
| 6 | Deposition Transcript of Daniel F. Kaplan – "Kaplan Tr." |
| 7 | Deposition Transcript of James Parker, Vol. I  – "J. Parker I Tr." |
| 8 | Deposition Transcript of John Amos Wright, II – "Wright Tr." |
| 9 | Deposition Transcript of Ricky L. Turman – "Turman Tr." |
| 10 | Deposition Transcript of Murray Watson, Jr. – "Watson Tr." |
| 11 | Deposition Transcript of Michael S. Chesin – "Chesin Tr." |
| 12 | Deposition Transcript of Vincent Roig – "V. Roig Tr." |
| 13 | Deposition Transcript of Lisa Renee Jacobson– "Jacobson Tr." |
| 14 | Deposition Transcript of Richard J. Chapin – "Chapin Tr." |
| 15 | Deposition Transcript of Carol Rakatansky – "Rakatansky Tr." |
| 16 | Deposition Transcript of Jason Wheeler – "Wheeler Tr." |
| 17 | Deposition Transcript of Richard Nickel – "Nickel Tr." |
| 18 | Deposition Transcript of Saul L. Moskowitz – "Moskowitz Tr." |
| 19 | Deposition Transcript of John Dean – "Dean Tr." |
| 20 | Deposition Transcript of Terri Shaw – "Shaw Tr." |
| 21 | Deposition Transcript of Sally Stroup – "Stroup Tr." |
| 22 | Deposition Transcript of Kristie Hansen – "Hansen Tr." |
| 23 | Deposition Transcript of Jerry Wallace – "Wallace Tr." |
| 24 | Deposition Transcript of Clifford Boyd Baker – "Baker Tr." |
| 25 | Deposition Transcript of Glenn Parker – "G. Parker Tr." |
| 26 | Deposition Transcript of Richard Criswell – "Criswell Tr." |
| 27 | Deposition Transcript of Patricia Trubia – "Trubia Tr." |
| 28 | Deposition Transcript of Benjamin F. McPherson – "McPherson Tr." |
| 29 | Deposition Transcript of Sheila Ryan-Macie – "Ryan-Macie Tr." |
| 30 | Deposition Transcript of Jason H. P. Kravitt – "Kravitt Tr." |
| 31 | Deposition Transcript of James Parker, Vol. II – "J. Parker II Tr." |
| 32 | Deposition Transcript of Jon H. Oberg – "Oberg Tr." |
| 33 | Deposition Transcript of Jane LaRocca Roig – "J. Roig Tr." |

## <u>CERTAIN FACTS APPLICABLE TO MULTIPLE DEFENDANTS</u>

**RF1.   The Defendants did not obtain approval from the Department of Education ("Department" or "DEd") for their loan growth programs.**

(a)      Defendants Nelnet, Inc. ("Nelnet") and Nelnet Education Loan Funding, Inc. ("NELF") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program.  *See* Relator's Responses to JS61-62, *infra*.  The Department did not sign Nelnet's May 29, 2003 letter to concur in the activities it set out in the letter.  Heimes Ex. 31 (McMahon Dec., Ex. II.32); Heimes Tr. 246:13-247:2 (Soni Dec., 4). *See* Relator's Response to JS65, *infra*.

(b)      Defendants Brazos Higher Education Authority ("BHEA") and Brazos Higher Education Service Corporation ("BHESC") (collectively, "Brazos") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. Turman Tr. 328:20-329:15 (Soni Dec., Ex. 9); Watson Tr. 83:12-19, 86:10-15 (Soni Dec., Ex. 10).

(c)      Defendants Education Loans, Inc. ("EdLinc") and Student Loan Finance Corporation ("SLFC") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. Sanderson Tr. 46:10-17, 96:18-97:6 (Soni Dec., Ex. 2); Kohles Tr. 164:22-165:6 (Soni Dec., Ex. 3).

(d)      Defendants Panhandle-Plains Higher Education Authority ("PPHEA") and Panhandle Plains Management and Servicing Corporation ("PPMSC") (collectively "Panhandle") did not obtain approval from the Department for their 9.5% SAP eligible loan growth program. J. Parker I Tr. 123:3-18 (Soni Dec., Ex. 7); Wright Tr. 43:8-11 (Soni Dec., Ex. 8).

(e)      Defendant Southwest Student Services Corporation ("Southwest") did not obtain approval from the Department for its 9.5% SAP eligible loan growth program.  J. Roig Tr. 71:11-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16); *see also* V. Roig Tr. 79:1-10  (Soni Dec., Ex. 12) (expressing his view that Southwest made decisions based on its own review of the 9.5% SAP regulations without asking for approval from others).

**RF2.   The Defendants did not affirmatively and fully disclose their 9.5% loan growth programs to the Department.**

(a)      Defendants Nelnet and NELF did not affirmatively and fully disclose their 9.5% loan growth programs to the Department.  Nelnet's meeting with Department personnel in 2002 and 2003 were not full disclosures to the Department of its "Project 950" and related plans for 9.5% SAP eligible loan growth. Dunlap Ex. 47 at N0124998 (Soni Dec., Ex. 54); Heimes Tr. 222:13-225:9 (Soni Dec., Ex. 4). The May 29, 2003 letter from Nelnet to the Department was only a partial disclosure of its "Project 950" and related plans for 9.5% SAP eligible loan growth. *See* Relator's Response to JS65, *infra*.

(b)      Defendants BHEA and BHESC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006. Watson Tr. 83:12-19 (Soni Dec., Ex. 10); Turman Tr. 328:20-330:13 (Soni Dec., Ex. 9).

(c)      Defendants EdLinc and SLFC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006. Buckmeier Tr. 247:5-249:5 (Soni Dec., Ex. 1).

(d)     Defendants PPHEA and PPMSC did not affirmatively disclose their 9.5% loan growth programs to the Department at any time prior to 2006.  G. Parker Tr. 19:17-25 (Soni Dec., Ex. 25).

(e)     Defendant Southwest did not affirmatively disclose its 9.5% loan growth programs to the Department at any time prior to 2006. J. Roig Tr. 71:11-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).

**RF3.   Each Defendant used "new money" – *i.e.*, taxable or tax-exempt financings issued after 1993 – as a key component of its loan growth programs.**

(a)     NELF issued numerous financings that constituted new money, including one taxable issuance in 2003 and two taxable issuances in 2004, each exceeding or approaching $1 billion.  *See* Heimes Tr. 149:2-152:16, 160:2-161:18 (Soni Dec., Ex. 4); Heimes Ex. 23 (Mills Dec., Ex. 33).  Billions of dollars of 9.5% SAP eligible loans ended up securitizing these issuances.  Nelnet Supp. Resp. to Interrog. No. 1 (compare Average Daily balance of NELF for 4Q 2002 of $369.9 million to 2Q 2004 balance of $3.55 billion) (Mills Dec., Ex. 1); Heimes Tr. 42:5-11 (Soni Dec., Ex. 4).

(b)     BHEA issued a new taxable financing in January 2004 to, in part, support its plan for 9.5% SAP eligible loan growth.  Turman Tr. 90:22-91:4 (Soni Dec., Ex. 9).  BHEA had numerous other "new money" issuances that held loans for which it was billing 9.5% SAP.  *Id.* at 90:22-91:4, 110:10-20, 118:1-119:13, 133:18-134:13, 144:9-147:2, 173:14-20, 179:17-180:6, 181:12-18 (Soni Dec., Ex. 9); Final Transfer Spreadsheets for January, April and August transfers (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).

- 3 -

(c)      EdLinc used taxable bonds issued in 1999, 2000, 2001 and 2002, issued in conjunction with its 1999-1 trust, to support its 9.5% loan growth program.  Buckmeier Tr. 60:20-62:3 (Soni Dec., Ex. 1).  Over $100 million in loans for which EdLinc billed 9.5% SAP securitized these issuances.  EdLinc Resp. to Interrog. No. 3 at 9-10 (Mills Dec., Ex. 2).

(d)      Panhandle issued taxable and tax-exempt financings in 2003 and 2004 to support its 9.5% SAP eligible loan growth program.  PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4); Wright Tr. 67:25-68:3 (Soni Dec., Ex. 8).  These issuances resided within the same trust as the pre-1993 9.5% SAP eligible financings.  J. Parker I Tr. 173:2-8 (Soni Dec., Ex. 7).  Almost $400 million in loans for which PPHEA and PPMSC claimed 9.5% SAP securitized the 2003 and 2004 financings.  PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4).

(e)      Southwest issued taxable and tax-exempt financings in 2001, 2002, 2003, and 2004, and transferred loans into them on which Southwest claimed 9.5% SAP.  Southwest and SLM Corporation Response to Interrog. No. 3 (Mills. Dec., Ex. 5); Wheeler Ex. 13 at SLMA_P0003643-50 (Mills Dec., Ex. 43) (listing, from September 2003-04, taxable and post-1993 tax exempt bonds into which 9.5% SAP loans had been transferred); Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 22:19-23:14, 25:19-27:13, 28:20-29:4, 56:18-60:21, 104:20-106:3, 113:16-119:20 (Soni Dec., Ex. 16).  By 2004, Southwest had over $400 million securitizing these new money financings.  Wheeler Ex. 13 at SLMA_P0003643 (Mills Dec., Ex. 43) (giving a balance of approximately $459 million in taxable and post-1993 tax exempt financing as of September 30, 2004).

**RF4.   Each Defendant's transfers from its 9.5% SAP eligible financings to its "new money" (not eligible for 9.5% SAP) financings did not carry the characteristics of a sale.**

(a)     Nelnet's transfers were made at face value for each loan.  No attempt was made to determine or set a market price for the value of the loans.  Nelnet effectively reversed many of its transactions by moving loans to the 1985A trust and then, the next day, back to the financing it originated.  The swapping of collateral between trusts did not result in gains or losses for tax purposes.  The swaps occurred at the direction of NELF, which held the beneficial interest in both trusts at issue in the swaps. The swaps occurred between trust estates "within the same consolidated entity" and were "all part of the same successor in interest." Heimes Tr. 117:11-118:12  (Soni Dec., Ex. 4); Kaplan Tr. 191:19-192:2; 194:21-199:8 (Soni Dec., Ex. 6); *see also* Heimes Ex. 19 (Mills Dec., Ex. 33).

(b)     The transfers were fully controlled by Brazos, with BHESC setting the transfer prices.  The transfers out of the BHEA Eligible Financings were made to other trusts controlled by BHEA.  There were no negotiations regarding the price of these transfers of loans and Brazos set the transfer price at face value plus accrued interest plus, in some cases, unamortized purchase premium.  Brazos could have reversed the transfers if it so desired.  It was part of BHESC's plan to hold the loans in the BHEA Eligible Financing only temporarily.  Turman Tr. 85:11-86:18; 129:3-130:2; 134:14-22; 139:19-141:3; 141:14-142:15; 144:21-146:5 (Soni Dec., Ex. 9).

(c)     For EdLinc, the transfer of loans was not documented with purchase agreements; did not involve arms length negotiations; was not treated as a taxable event; and no valuation process of the collateral was undertaken after the first transfers.  EdLinc was the beneficial owner of both the 1998-1 Trust to the 1999-1 Trust and the trusts had the same trustee.  EdLinc similarly could have discretionarily reversed any of the transactions.  Buckmeier Tr. 145:22-148:18; 149:3-21; 150:1-18 (Soni Dec., Ex. 1).

(d)     PPHEA did not treat the transfers as if they were genuine sales to or a purchase from a third party, and all of the transfers of loans between "bonds" were made within the same indenture.  J. Parker I Tr. 186:12-18; 173:2-8 (Soni Dec., Ex. 7).  In each instance, Panhandle gave unilateral direction to the trustee regarding the movement of loan balances, sometimes orally, and could reverse any transfer.  *Id.* at 183:6-21; 185:14-22; 202:10-203:21.  Transfers were all done at face value, despite the fact that purchases of replacement loans required a premium.  *Id.* at 180:1-16; 184:6-22.  No due diligence review of the loan portfolio was done; no arms length price negotiations took place; no real valuation process of the collateral was undertaken; and no gain or loss was recognized.  *Id.* at 180:1-186:18.

(d)     Southwest's personnel could not identify purchase and sales agreements governing Southwest's transfers of loans between the 9.5% eligible and ineligible bonds. Jacobson Tr. 80:11-21 (Soni Dec., Ex. 13).  Southwest could not identify a process to value the transferred loans; they were transferred at face value.  *Id*. at 79:22-80:5;  V. Roig Tr. 84:4-12 (Soni Dec., Ex. 12); Chesin Tr. 117:1-118:10 (Soni Dec., Ex. 11). The direction for these transfers from one trust to another came from Southwest's treasurer or controller.  Chapin Tr. 79-80 (Soni Dec., Ex. 14).  The transfers were not taxable events.  Chesin Tr. 117:1-118:1 (Soni Dec., Ex. 11).  The company's former director of finance testified that a "purchase" would not include intra-company transfers.  Jacobson Tr. 37:3-13 (Soni Dec., Ex. 13).  Southwest could have reversed any of the transactions if it so desired.  Wheeler Tr. 111:12-19 (Soni Dec., Ex. 16).

**RF5.  Several Defendants interpreted the applicable statute and regulations to allow for infinite growth of their 9.5% SAP loan pools.**

(a)     Nelnet believed that the statutes and regulations did not put any limits on the volume of loans that could be tagged.  Heimes Tr. 144:20-146:9, 119:14-122:16 (Soni Dec., Ex. 4). Dunlap Tr. 217:22-218:16 (Soni Dec., Ex. 5).

(b)     Defendants BHEA and BHESC believed that they could grow their 9.5% SAP loan pool infinitely, and that there was no limit to the number of loans they could transfer through their tax-exempt indentures. Watson Tr. 127:13-128:16 (Soni Dec., Ex. 10); Turman Tr. 250:3-19 (Soni Dec., Ex. 9).

(c)     EdLinc believed that there was no limit to the potential growth of their 9.5% loan pool.  Buckmeier Tr. 176:10-177:1 (Soni Dec., Ex. 1); Sanderson Tr. 89:12-15 (Soni Dec., Ex. 2); Kohles Tr. 64:9-65:18 (Soni Dec., Ex. 3).

(d)     Panhandle interpreted the applicable statutes and regulations as having no limit on the growth of Panhandle's 9.5% SAP loan portfolio.  Wright Tr. 132:14-133:4, 134:15-18 (Soni Dec., Ex. 8).

(e)     The only limitation that Southwest imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).

**RF6.   Several Defendants interpreted the applicable statute and regulations to allow them to turn every loan they could purchase into 9.5% SAP eligible loans.**

(a)     Nelnet believed that the statutes and regulations did not put any limits on the volume of loans that could be tagged.  The only limits mentioned were bond indenture requirements and operating system requirements.  Heimes Tr. 144:20-146:9 (bond indenture

requirements as the only limiting factor), 119:14-122:16 (operating system required minimum of one day before swapping again) (Soni Dec., Ex. 4). Dunlap Tr. 217:22-218:16 (operating limitations) (Soni Dec., Ex. 5).

(b)     The only limitation that BHEA and BHESC imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to Texas.  Watson Tr. 127:13-17 (Soni Dec., Ex. 10); Turman Tr. 91:15-92:21 (Soni Dec., Ex. 9).

(c)     The only limitation that EdLinc imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to South Dakota.  Buckmeier Tr. 174:10-176:8 (Soni Dec., Ex. 1); Kohles Tr. 62:8-63:5; 163:15-22 (Soni Dec., Ex. 3).

(d)     Panhandle believed that it could convert its entire portfolio into 9.5% SAP loans. Wright Tr. 130:11-131:23 (Soni, Dec., Ex. 8).

(e)     The only limitation that Southwest imposed on the growth of its 9.5% SAP loan pools is that loans must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).

**RF7.   Several Defendants interpreted the applicable statute and regulations to allow them to turn every loan that was financed by a pre-October 1, 1993 tax-exempt financing ("old money"), no matter how long that loan was financed by the "old money," into a loan for which they could bill 9.5% SAP.**

(a)     Nelnet believed the loans could have been in their indenture for as little as a millisecond to qualify for 9.5 SAP.  Heimes Tr. 119:14-122:16 (Soni Dec., Ex. 4).

(b)     Panhandle believed that a loan was eligible for 9.5% SAP if it was financed by a pre-October 1, 1993 tax-exempt financing for one second.  Wright Tr. 138:17-139:20 (Soni Dec., Ex. 8)

(c)     Southwest did not have "any requirement that loans had to stay within a bond for any specified period of time."  Wheeler Tr. 72:14-20 (Soni Dec., Ex. 16).

**RF8.   Each Defendant was motivated by the potential revenue from the 9.5% subsidy.**

(a)     The only reason Nelnet sought to increase its loans eligible for 9.5% SAP was because this increased its revenue.  Heimes Tr. 257:7-258:14 (Soni Dec., Ex. 4); Dunlap Tr. 169:11-173:14 (Soni Dec., Ex. 5).

(b)     The goal of Brazos' 9.5% loan program was to maximize its SAP payments. Turman Tr. 31:14-32:10 (Soni Dec., Ex. 9); Watson Tr. 64:6-13 (Soni Dec., Ex. 10).

(c)     The goal of EdLinc's 9.5% loan program was to increase its bottom line. Buckmeier Tr. 155:8-156:6 (Soni Dec., Ex. 1); Sanderson Tr. 88:7-11 ("Q So what you cared about was whether he could get additional dollars in the door? A Yes. Q And that's all you cared about? A   Yes."), 116:3-122:8 (Soni Dec., Ex. 2).

(d)     Panhandle's purpose in issuing new bonds and transferring loans was to increase its revenue.  J. Parker I Tr. 174:3-5, 280:22-281:5 (Soni Dec., Ex. 7).

(e)     Southwest's transfers of loans were for the purpose of maximizing the yield on such loans.  Jacobson Ex. 13 at SLMA_EF00000700 (describing "[t]he profitability impact of

9.5% floor bonds [as] significant") (Soni Dec., Ex. 145); V. Roig Tr. 103:8-106:5 (explaining

that the purpose of the transfers was that it provided the company with a "financial advantage"

which "help[ed] the -- the -- the return on the loans") (Soni Dec., Ex. 12); Chapin Tr. 36:6-10

(Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16).

**RF8.   Each Defendant failed to sufficiently vet the legality of their plans for the growth of their 9.5% loan pools.**

(a)      Nelnet obtained its opinions from its lobbyist.  Dean Exs. 2, 9, 12, 14 (Soni Dec.,

Exs. 120, 122, 124, 123); Dean Tr. 54:3-55:3 (Soni Dec., Ex. 19).  Furthermore, the opinions

spoke of conflicting department guidance and did not address subsection (c).  Dean Ex. 9 at

N0127090 (Soni Dec., Ex. 122); Dean Tr. 131:14-132:22 (Soni Dec., Ex. 19).

The May 29, 2003 letter was grossly deficient in revealing Nelnet's plan and the Bateman

letter in response was insufficient on its face, which Nelnet admitted. Dunlap Tr. 182:10-187:5

(Soni Dec., Ex. 5);  *compare* Heimes Ex. 31 N0003047-50, at 31 (Soni Dec., Ex. 71) (May 29,

2003 letter omitting any reference to amount of increased claims) *with* Heimes Ex. 22 N0097043

(Soni Dec., Ex. 65) (internal plan); s*ee also* Heimes Tr. 201 (Soni Dec., Ex. 4) (admitting that

Nelnet had done internal projections as of the date of the letter); *see* Relator's Responses to

JS61-62, *infra*.  The Department did not sign Nelnet's May 29, 2003 letter to concur in the

activities it set out in the letter.  Heimes Ex. 31 (McMahon Dec., Ex. II.32); Heimes Tr. 246:13-

247:2 (Soni Dec., Ex. 4).

(b)      Brazos failed to sufficiently vet the legality of its plans for the growth of its 9.5%

loan pools.  For instance, Brazos sought an opinion of counsel, but then failed to read the

provided opinion.  The company's General Counsel only read one paragraph of the final opinion,

and only cared if the opinion stated that Brazos could proceed with its plan to inflate its 9.5 SAP loan holdings, testifying that "I paid him for the opinion, not how he got there."  Also, Brazos did not read the applicable Department of Education regulations.  Brazos also failed to get approval from the Department of Education for its program, noting that dealing with the Department was a "joke."  *See* Relator's Response to BR7, *infra* (explaining more fully Brazos actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

(c)     EdLinc failed to sufficiently vet the legality of its plans for the growth of its 9.5% loan pools.  For instance, EdLinc failed to seek out an opinion from an attorney regarding its 9.5% loan program, despite the fact that the architect of its program urged them to do so.  EdLinc also failed to obtain approval of its program from the Department of Education.  *See* Relator's Responses to EL14-15, *infra* (explaining more fully EdLinc's actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

(d)     Panhandle failed to sufficiently vet the legality of its plans for the growth of its 9.5% loan pools.  *See* Relator's Responses to PH6-11, *infra* (explaining more fully Panhandle's actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

(e)     Southwest failed to sufficiently vet the legality of its plans for the growth of its 9.5% loan pools.  For instance, the Southwest employee who drafted a series of memoranda which formed the basis of Southwest's 9.5% SAP expansion could not identify a source for her understanding of the requirements for billing for 9.5 SAP, and could not remember reading either the 1993 Omnibus Budget Reconciliation Act ("OBRA") or the regulations governing 9.5% SAP.  The Southwest employee who made quarterly certifications to the government that the company's claims for 9.5% SAP "conform[ed] to applicable laws, regulations, and policies

relating to the Federal Family Education Loan Program" could not identify a source for his understanding of the requirements for billing for 9.5 SAP.  The company's CEO explained that he "wasn't in the habit of asking 'mother may I' or any of that activity."  *See* Relator's Responses to SW5, 8, 16, *infra* (explaining more fully Southwest's actions and inactions concerning vetting the legality of its plans to grow its 9.5% SAP loan pool).

**RESPONSES TO DEFENDANTS STATEMENT OF
MATERIAL UNDISPUTED FACTS**

I.     **THE RELEVANT LAW, REGULATIONS AND GUIDANCE DURING THE
       PERIOD OF ALLEGED FALSE CLAIMS**

    A.     **The Higher Education Act and Special Allowance Payments**

    **JS1.**     In 1965, Congress passed the Higher Education Act. Pub. L. No. 89-329. The

Act sought to encourage lenders to provide low-interest loans to students for post-secondary

education. To encourage lending at sub-market rates set by Congress, the government provided

guarantees in the event of default as well as interest-rate subsidies. This guaranteed loan

program eventually became known as the Federal Family Education Loan Program ("FFELP").

    **RESPONSE TO NO. JS1.   Disputed.  The special allowance payment subsidy was
not introduced until 1969. *State Profits on Tax-Exempt Student Loan Bonds:  Analysis and
Options,* Congressional Budget Office Report (March 1980) (CBO Report) at 1 (Soni Dec.,
Ex. 49).**

    **JS2.**     Among participants in the FFELP in its early years were non-profit authorities

established by state governments. Those authorities raised money to purchase student loans

originated by banks by issuing non-taxable bonds. The authorities pledged student loans as

collateral to secure payment of the bond obligations.

    **RESPONSE TO NO. JS2.   Disputed.  At the inception of the program, most loans
were made by commercial banks; state and local government agencies and non-profit
corporations did not make student loans in any significant volume until many years later.
CBO Report at 1-2 (Soni Dec., Ex. 49).**

**JS3.**    Monies collected through servicing the loans (principal payments, interest payments, collections from guarantors) as well as investment income earned on assets held within the bond estate were used by the authority either to repay bondholders or to purchase new student loans to pledge as collateral, according to the terms of the bond indenture agreements. [McMahon Decl., Ex. II.1 (Reicher Decl. ¶¶ 31, 47).]

**RESPONSE TO NO. JS3.    Disputed.  Reicher's disclosure is not a declaration under oath and, therefore, is not admissible evidence in conjunction with Defendants' Motions for Summary Judgment.**

**JS4.**    From the outset of the FFELP, the Department of Education ("ED") made "Special Allowance Payments" ("SAP") for each qualifying loan. Lenders collected SAP as a quarterly payment to supplement the interest owed by the borrower.  Beginning in 1976, Congress set the interest rate that each FFEL lender could collect on a loan. The SAP was the difference between the guaranteed rate and the rate paid by the student borrower. 20 U.S.C. § 1087-1(a)(1).

**RESPONSE TO NO. JS4.    Disputed and incomplete.  The first sentence is incorrect, as noted above.  *See* Response to JS1, *supra*.  It is unclear what historical version of the statute is being cited.**

**The purpose of SAP is to provide lenders with an amount of money that, when added to the interest paid by the student on a loan, would cover the lender's reasonable administrative fees and cost of funds.  *Guaranteed Student Loan Program*, 50 Fed. Reg. 5,506, 5,512-13 (Feb. 9, 1985) (to be codified at 34 C.F.R. pt. 682).**

The Department has made clear that SAP is discretionary and only properly payable where a lender has met the statutory and regulatory requirements for SAP, regardless of whether those statutory and regulatory criteria match up with a lender's ordinary or preferred business practices. *Id.* at 5,511 ("[T]he Secretary concedes that an Authority retains the legal autonomy to stand on its prerogative to manage its business affairs in all details according to its discretion and not that of its creditors. An Authority which seeks to qualify . . . for Federal special allowance payments, however, is no longer free to conduct its business entirely according to its preferences."). Loans that receive SAP will only receive SAP as long as they meet the relevant statutory and regulatory criteria. *See id.* at 5528-29. A lender is always free to forego SAP. *See id.* at 5515.

## B.    The Higher Education Act ("HEA") Amendments of 1980

JS5.    In the late 1970s, interest rates increased. In 1979, student loan holders were receiving an interest rate of approximately 16% on student loans, combining the borrower-paid interest and government-paid SAP. [McMahon Decl., Ex. II.2 (CBO Report at 13); McMahon Decl., Ex. II.3 (Delisle Report at 11); Ex. II.1 (Reicher Decl.¶ 28); McMahon Decl., Ex. II.4 (Ryan-Macie Report at 4).]

RESPONSE TO NO. JS5.   Disputed.  The expert reports filed by Defendants are not declarations under oath and, therefore should not be considered as admissible evidence in conjunction with the Defendants' Motions for Summary Judgment.

JS6.    In March 1980, the Congressional Budget Office ("CBO") described "unanticipated profits" being accumulated by state and local governments during this period of high prevailing interest rates. [McMahon Decl., Ex. II.2 (CBO Report at ix).] Because tax-

exempt issuers obtained financing at lower cost than taxable financing vehicles commanded, non-taxable entities could earn higher returns on student loan portfolios than commercial lenders. The CBO identified a number of possible alternatives to address this issue, including "[r]educing the federal interest subsidy on loans financed with tax-exempt bonds." [Ex. II.2 (CBO Report at xii).] In making cash flow projections under various SAP scenarios, the CBO Report made no distinction between the initial cash received upon issuance and the cash received through investment. [Ex. II.2 (CBO Report at 55-58).]

**RESPONSE TO NO. JS6.   Disputed and incomplete. The first three sentences are undisputed but incomplete.  The CBO was asked to prepare the report because "states began earning unexpected profits from tax-exempt bonds that they had issued to raise funds for loans to college students" in 1979.  CBO Report at iii (Soni Dec., Ex. 49).  One of the options the report set out to address these windfall earnings was lowering the special allowance for student loans financed by tax-exempt bonds.  *Id.* at 30.  That approach "would involve setting up a two-tier yield structure, so that the yield on loans held by private lenders would exceed the yield on loans held by tax-exempt bond authorities.  If the yield on student loans were set at a level just high enough to make the loans a sound investment for bond authorities, the yield reduction would produce almost no cutback in loan availability.  Student loan bond issuers are state agencies and nonprofit corporations, whose motivation should not be to make a profit, but rather to provide a service, in this case making loans available to students.  As long as they can cover their costs in providing this service, the prospect of earning no profits should not affect their decisions about bond issuance."  *Id.* at 31.  The report went on to note that one way of cutting the yield would be to give "bond authorities a lower special allowance than that given to private lenders," and**

that this would result in significant savings for the government.  *Id.* at 32.  It stated that, "[i]f calculated at today's interest rates, the special allowance produced by a formula tied to tax-exempt interest rates would be just half the special allowance produced by the present formula.  In fact, this 1:2 ratio holds under most projections of tax-exempt and taxable interest rates.  . . . Thus, if the Congress wanted to achieve basically the same result as establishing a separate special allowance formula for bond-financed loans, it could set the special allowance on these loans at half the special allowance given to commercial lenders."  *Id.* at 33.  A footnote added that the National Council of Higher Education Loan Programs ("NCHELP") endorsed this approach along with "a floor of 2.5 percent on the tax-exempt special allowance" such that the yield would not fall below 9.5% where the student interest rate was 7%.  *Id.* at n.6; *see also id.* at 37 & n.14.

The last sentence is disputed; the tables to which the statement refers list three sources of income for non-profit lenders: (1) program income (principal and interest payments made by students plus claims made on defaulted loans), (2) investment income (interest earned on balances in reserve accounts), and (3) special allowance payments.  CBO Report at Tables A-1 & A-2.  The tables do not account for proceeds of bond issuances as "income" at all or refer to movement of loans between bonds for SAP arbitrage as "investment."  *Id.*

JS7.    In 1980, Congress amended the HEA to set a different SAP amount for loans made or purchased on or after October 1, 1980, with funds obtained from tax-exempt obligations. This provision (often referred to as "1/2 SAP," "Floor SAP" or "9.5 SAP") reduced the SAP payment by half for such student loans, but guaranteed that the total interest received by the loan holder would not fall below a floor of 9.5%:

(D)(i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation

under the Internal Revenue Code of 1954 shall be one-half the quarterly rate the special allowance established under subparagraph (A), (B), or (C). Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds. This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.

(ii)     The rate set under division (i) shall not be less than (I) 2.5 per centum per annum in the case of loans for which the applicable interest rate is 7 per centum per annum, (II) 1.5 per centum per annum in the case of loans for which the applicable interest rate is 8 per centum per annum, or (III) 0.5 per centum in the case of loans for which the applicable rate is 9 per centum per annum.

(iii)     No special allowance may be paid under this subparagraph unless the issuer of such obligations complies with section 420(b) of the Education Amendments of 1980.

Education Amendments of 1980, Pub. L. No. 96-374, § 420(a), 94 Stat. 1367, 1425-1427 (1980)

(codified at 20 U.S.C. § 1087-1(b)(2)(D)(i)-(iii); currently codified as amended at 20 U.S.C. §

1087-1(b)(2)(B)(i)-(iii)).

**RESPONSE TO NO. JS7.    No dispute.**

**C.     Regulatory Guidance Pertaining To ½ SAP Provision**

**JS8.**     In December 1980, ED issued guidance to loan holders regarding the 1/2

SAP/Floor provision through Department of Education Bulletin #R-109, G-45, *New Provisions*

*Affecting Entities that Make or Purchase Guaranteed Loans With Funds Received From Issuing*

*Obligations, the Income From Which Is Exempt From Taxation Under the IRS Code of*

*1954* (Dec. 18, 1980). The December 18, 1980 Bulletin explained the new provision as follows:

> Entities Covered by the Special Allowance Limit
>
> The limit on special allowance applies to any entity which makes or purchases loans with funds obtained:
>
> (1)      from the issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1954, or
>
> (2)      from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in item 1, or
>
> (3)      from income on the investment of funds described in item 1.

[McMahon Decl., Ex. II.5 (ED Bulletin #R-109, G-45).]

**RESPONSE TO NO. JS8.    No dispute.**

**JS9.**    The December 18, 1980 Bulletin instructed holders of loans "made or purchased with funds obtained from obligations exempt from Federal income tax" to develop systems to "differentiate between loans disbursed prior to October 1, 1980, and those disbursed on or after October 1, 1980."  [*Id.*]  Similar guidance was provided in a bulletin issued on December 16, 1980, which instructed a "lender [who] makes new loans .. using tax exempt funds after [HEA's effective date]" to bill at the 9.5 SAP rate.  Department of Education Bulletin #G-44, R-108, *To All Guarantee Agencies Effects of the Education Amendments of 1980* (Dec. 16, 1980) [McMahon Decl., Ex. II.6 (ELI-HC-00000192-194, at ELI-HC00000194).]

**RESPONSE TO NO. JS9.    No dispute.**

**JS10.**  In 1985, ED issued regulations to implement the 1/2 SAP/Floor provision of the Education Amendments of 1980. The 1985 regulations provided:

(2)(i) Subject to paragraph (c)(2)(ii) of this section [listing the floor rate], the percentage rate for the special allowance is one-half the rate determined under paragraph (c)(1) for a loan disbursed on or after October 1, 1980 and made or purchased with funds obtained by the holder from—

(1)      Issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code;

(2)      Funds obtained from collections or payments by a guarantor on a loan described in paragraph (c)(2)(i); and

(3)      Interest or special allowance payments on a loan described in paragraph (c)(2)(i).

Guaranteed Student Loan Program Final Regulations, 50 Fed. Reg. 5,506, 5,523-24 (Feb. 8, 1985), codified at 34 C.F.R. § 682.302(c)(2)(i).  *See also* Guaranteed Student Loan Program and PLUS Program Final Regulations, 51 Fed. Reg. 40,886, 40,900-01 (Nov. 10, 1986), codified at 34 C.F.R. § 302(c)(3) (1990).

**RESPONSE TO NO. JS10.  No dispute that the language is cited correctly.  The 1985 regulations, like the 1980 CBO report, made clear that windfall payments of SAP are inconsistent with Departmental policy.  "Congress recognized that a party raising loan acquisition funds by means of tax-exempt borrowings had a financing cost well below that incurred by parties using other sources of funds . . . .  A party using taxable financing to make or acquire student loans has a higher cost of funds[.]"  *Guaranteed Student Loan Program Final Regulations*, 50 Fed. Reg. at 5,512.  The Department recognized that congressional intent with regard to "section 438(b)(2) of the HEA [is] to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.  These regulations tie the rate of special allowance to the source of the funds used to acquire or maintain the Authority's interest in a loan, and more particularly, to the financing costs incurred in securing those funds."  *Id.* (stating that "the**

**1980 amendments to section 438 of the HEA . . . reduced the special allowance to tax-exempt borrowers [to] reflect a Congressional judgment of the subsidy appropriate to their reduced borrowing costs");** *id.* **at 5,513 ("Congress clearly intended the amount of subsidy paid in the form of special allowance to bear a reasonable relation to the cost of borrowing the capital used to finance acquisition of student loans.");** *id.* **at 5,514 ("The formulas used to calculate special allowances payable where taxable and tax-exempt financing are used have been adopted by Congress based on its judgment of the amount of subsidy needed to meet the differing costs of capital under those two kinds of borrowing.").  The Department specifically noted that the 1980 amendments "sought to prevent" a "windfall" of SAP to holders of loans made or purchased with tax-exempt funds.** *Id.* **at 5,513.**

**JS11.**   ED amended these regulations again in December 1992:

(3)(i) Subject to paragraph (c)(3)(ii) of this section [listing the floor rate], the special allowance rate is one-half the rate calculated under paragraph (c)(1)(iii)(C) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from —

(A)     The issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1986;

(B)     Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(C)     Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(D)     The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or

(E)     The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

*Family Federal Education Loan Programs Final Regulations, 57* Fed. Reg. 60,280, 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302 (c)(3).

**RESPONSE TO NO. JS11.  No dispute.**

**JS12.**  ED's 1990 Notice of Proposed Rulemaking preceding the 1992 amendment to the regulations contained detailed explanations for changes pertaining to other FFEL provisions, but contained no comment describing the reason for, purpose of, or intent of this change to the regulation. *Part II, Department of Education 34 CFR 682 Guaranteed Student Loan Programs, Proposed Rules,* 55 Fed. Reg. 48,324 (Nov. 20, 1990).

**RESPONSE TO NO. JS12.  No dispute.**

**JS13.**  The 1992 regulations also revised a 1985 regulatory provision relating to the SAP applicable to a 1/2 SAP/Floor loan "pledged or otherwise transferred in consideration of funds derived from sources other than" those described in the regulation as a source of funds for 1/2 SAP/Floor loans. *Federal Family Education Loan Programs Final Regulations,* 57 Fed. Reg. 60,280, 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302(e)(2). The regulation specified that such transferred loan would be paid at the Full SAP rate if the loan holder retains a legal or equitable interest in the loan and:

> (A)    The prior tax-exempt obligation is retired; or
>
> (B)    The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bear a [specified] yield[.]

**RESPONSE TO NO. JS13.  Disputed and incomplete.  Misstates the language of the regulation.  The revised regulation provided:**

> **(e)(2) The Secretary pays a special allowance to an Authority at the [ordinary SAP rate] on a loan [ordinarily entitled to Half-SAP/9.5% Floor]—**

**(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than [sources of funds eligible to make or purchase loans subject to Half-SAP/9.5% Floor]; and**

**(ii) If the authority retains a legal or equitable interest in the loan—**

**(A) The prior tax-exempt obligation is retired; or**

**(B) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bear [a certain yield].**

*Federal Family Education Loan Programs Final Regulations*, 57 Fed. Reg. at 60,343.

In the 1985 rulemaking, in order to align SAP payment and the cost of the funds financing eligible loans, DEd provided that SAP treatment generally should be determined by the loan's current financing source. *See Guaranteed Student Loan Program*, 50 Fed. Reg. at 5,512. Thus, a loan transferred from a tax-exempt Half-SAP/9.5% Floor collateral pool to another lender's taxable ordinary SAP pool would yield ordinary SAP. *Id.* Similarly, if a tax-exempt funding was "refunded," so that prior bondholders were paid out and replaced by new bondholders, the tax treatment of the new bonds would govern the SAP. *Id.* Thus, a tax-free collateral pool could be refunded with taxable bonds and become eligible for ordinary SAP treatment. *See* 34 C.F.R. § 682.302(e)(2) (1986). Even apart from a refunding, individual loans could be transferred between collateral pools with changed SAP treatment. *Id.*

In 1990, DEd recognized that lenders in a high interest rate environment were manipulating loan transfers to increase SAP without incurring additional financing costs. Specifically, a tax-exempt lender (or "authority") could swap a loan bearing a low student interest rate, and thus a high SAP, from a Half-SAP/9.5% Floor pool to an ordinary SAP pool, thus doubling the SAP payable. *See* Ryan-Macie Tr. 150:12-153:22 (Soni Dec., Ex. 29). In exchange, the Half-SAP/9.5% Floor pool would receive a loan of comparable face

value with a higher student interest rate and a smaller SAP, thus reducing SAP only by 50% ("Half-SAP") of a smaller amount. *Id.* Because this loan swap manipulation served no program purpose, DEd sought to disincentivize it by revising subsection (e)(2) as set forth above. *See* **Moskowitz Tr. 71:12-73:2 (Soni Dec., Ex. 18); Ryan-Macie Tr. 141:18-142:7 (Soni Dec., Ex. 29).**

    **D.**    **The 1993 OBRA's Amendments to the HEA**

    **JS14.**  On August 10, 1993, Congress amended the HEA through the Omnibus Budget and Reconciliation Act of 1993 ("OBRA"). The OBRA revised the 1/2 SAP/Floor provision by adding the following new provision:

> (iv) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance for holders of loans which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986, shall be the quarterly rate of the special allowance established under subparagraph (A), (E), or (F), as the case may be [full SAP]. Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds.

Pub. L. No. 103-66, § 4105, 107 Stat. 312, 368 (1993), codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv).

    **RESPONSE TO NO. JS14.  No dispute.**

    **JS15.**  OBRA directed payment of Full SAP for loans financed with tax-exempt bonds "originally issued" on or after October 1, 1993, as well as for loans made or purchased with certain earnings from loans and investments. The OBRA did not amend the language of 20

U.S.C. § 1087-1(b)(2)(B)(i)-(iii), which describes the sources of funds within a student loan

obligation that could be used to make or purchase 1/2 SAP/Floor loans.  *Id.*

**RESPONSE TO NO. JS15.  Disputed.  Although the language of Subsection (ii) was**

**not directly modified, the addition of Subsection (iv) by the OBRA inherently altered the**

**scope of Subsection (ii).**

**JS16.**   There are no conference or Committee reports from the House of

Representatives or the Senate, or statements by members of Congress prior to the enactment of

OBRA, that describe the reason for, purpose of, or intent of § 4105 of the OBRA. [Ex. II.1

(Reicher Decl.¶ 64).]

**RESPONSE TO NO. JS16.  No dispute that the language is correctly cited, but**

**incomplete.  The Department first put lenders on notice of the import of the OBRA in Dear**

**Colleague Letter 93-L-161 (Nov. 1993).  The Department explained that:**

> **The minimum special allowance rate 'floor' on new loans made or**
> **purchased, in whole or in part, with funds derived from tax-exempt**
> **obligations has been repealed.  Accordingly, loans made or purchased**
> **with funds obtained by the holder from the issuance of obligations**
> **<u>originally issued on or after October 1, 1993</u>, or with funds derived**
> **from default reimbursements, collections, interest, or other income**
> **related to eligible loans made or purchased with such tax-exempt**
> **funds, no longer qualify to receive the minimum special allowance.**

**DCL 93-L-161 at 13 (Nov. 1993) (emphasis in original) (Mills Dec., Ex. 26).[1]**

**A few months later, in a letter from Leo Kornfeld, Deputy Assistant Secretary for**

**Student Financial Assistance Programs, to Larry O'Toole, then-President of Nellie Mae,**

---

[1] Relator inadvertently filed only one page of this document referenced in Mills Declaration, Ex. 26.  Soni Declaration, Ex. 38 replaces Mills Declaration, Ex. 26.

Kornfeld wrote that the 1993 OBRA had made a distinction between what he termed "old money," meaning funds from "tax-exempt debt originally issued prior to October 1, 1993," and "new money," meaning funds from "tax-exempt debt originally issued on or after October 1, 1993."  Letter from Leo Kornfeld to Larry O'Toole, ED-B-001226-27 (March 14, 1994) (Soni Dec., Ex. 40).  He noted that, following the OBRA, "loans made or purchased with new money clearly are not subject to the reductions that apply to loans made or purchased with old money" – referring to the half-SAP "reduction" applicable to loans made with funds obtained by the holder from tax-exempt obligations issued between October 1, 1980 and October 1, 1993.  *Id.*  Kornfeld also stated that, "generally, the special allowance formula has been 'set' at the time the loan is made and has not changed as a result of subsequent transfers."  *Id.*  Reicher's disclosure is not a declaration under oath and therefore should not be considered as admissible evidence in conjunction with Defendants' Motions for Summary Judgment.

   E.   **Post-1993 Regulatory Guidance Regarding Half-SAP Provisions and the Effect of Loan Transfers**

   **JS17.**   Industry representatives requested clarification of 34 C.F.R. § 682.302(e)(2), as amended in 1992, noting that they believed ED had unintentionally changed prior practice when the 1992 regulation implied that 1/2 SAP loans would continue to be billed at 1/2 SAP after being pledged or transferred to taxable indentures, so long as the tax-exempt issue from which the loan was transferred had not been retired. [Ex. II.4 (Ryan-Macie Report at 8-9, Exhibits L and M).]

   **RESPONSE TO NO. JS17.  Disputed.  Exhibits L and M ask only that the Department change Form 799 billing instructions to conform to the rule change and clarify**

**the effective date of the change.  They do not say anything about believing that the Department had made a mistake.**

**Ryan-Macie's report is not a declaration under oath and should not be considered admissible evidence in conjunction with Defendants' Motions for Summary Judgment. Ryan-Macie's recollection was not that the Department was warned that lenders would intentionally convert full-SAP loans to half-SAP loans in a low interest rate environment, but rather simply that a situation might arise in which the 9.5% floor might be a preferable rate.  Ryan-Macie Tr. 173:1-14 (Soni Dec., Ex. 29).**

**JS18.**  ED indicated that it would provide clarification by way of a Dear Colleague Letter, which it issued in March 1996. ED stated that the 1992 regulation "changed" its prior policy regarding refinancing of loans financed with tax-exempt obligations with proceeds of a taxable obligation. The 1996 Letter stated:

> [I]f a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, *the loan remains subject to the tax-exempt special allowance provisions* [1/2 SAP] if the authority retains legal interest in the loan. If however, the original tax- exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

> This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

[McMahon Decl., Ex. II.7 (Dear Colleague Letter 96-L-186 at Q 30 (March 1, 1996) (NCHELP 00002-00007) (emphasis added)).]

**RESPONSE TO NO. JS18.  Incomplete.  *See* Response to JS13 (last paragraph, *supra.***

- 27 -

**JS19.**  In 1999, ED further amended the regulations regarding the SAP provisions applicable to loans made or purchased by the issuance of tax-exempt obligations. In addition to incorporating the distinction set out in OBRA between tax-exempt obligations originally issued before October 1, 1993, versus after that date, it also revised the language describing the source of funds from which 1/2 SAP Loans could be derived.

> (3)(i) Subject to paragraphs (c)(3)(ii) and (iii) of this section [listing the floor rate], the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(D) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from —
>
> (A)   The *proceeds* of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);
>
> (B)   Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (C)   Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (D)   The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
>
> (E)   The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.
>
> […](iii)(4) Loans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, and loans made with funds derived from default reimbursement collections, interest, or other income related to eligible loans made or purchased with those tax-exempt funds, do not qualify for the minimum special allowance rate specified in paragraph (c)(3)(iii) of this section [the floor rate], and are not subject to the 50 percent limitation on the maximum rate otherwise applicable to loans made with tax-exempt funds.

*Federal Family Education Loan (FFEL) Program Final Rules,* 64 Fed. Reg. 58,622, 58,626-58,627 (Oct. 29, 1999) (to be codified at 34 C.F.R. § 682.302(c)(4) (2000)) (emphasis added).

**RESPONSE TO NO. JS19.  Disputed.  The 1999 regulations modified the "source of funds" language to incorporate the distinction made by the 1993 OBRA, as Defendants state, but the modification to the "source of funds" language setting forth specific categories (A) through (E) was made in 1992.  *See Federal Family Education Loan Programs Final Reuglations*, 57 Fed. Reg. at 60,343 (Dec. 18, 1992), codified at 34 C.F.R. § 682.302(c)(3).**

JS20.   In 2001, Saul Moskowitz, a former attorney in ED's Office of General Counsel, sent an email to Pam Moran, a policy official within OPE. In this email,  Moskowitz asked Ms. Moran:

> Consider the following series of transactions: Loans acquired with taxable proceeds are transferred into the Authority's pre-October 1993 tax-exempt indenture in a swap exchange for loans currently in the tax-exempt indenture. Very shortly thereafter, the loans swapped into the tax-exempt indenture are swapped back out to the taxable indenture in exchange for additional loans acquired with taxable proceeds. This second 'installment' of loans swapped back out in exchange for a third 'installment' of loans acquired with taxable bond proceeds. Assuming that the tax-exempt obligation is not retired or defeased, are we correct in our understanding that, under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture.

[McMahon Decl., Ex. II.8 (MOSKOWITZ_000095-99, at MOSKOWITZ_000098).]

Ms. Moran responded, "Under the swapping scenario that you outlined in your question, we would agree that the reduced [9.5%] SAP/floor yield treatment would continue to apply even when swapped out again." [*Id*. at MOSKOWITZ_000097.]

**RESPONSE TO NO. JS20.  Disputed and incomplete.  To the extent that Moran's response is offered for the truth of the matter asserted, it is hearsay.**

The email asked a limited question:  if ordinary SAP loans are swapped with loans in a pre-October 1, 1993 tax-exempt bond, and then back out, and ordinary SAP loans are swapped in again, etc., whether "under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture."  MOSKOWITZ_000095-99 at 000098 (McMahon Dec, Ex. II.8).  Moran replied that the loans "swapped out again" would be subject to "the reduced SAP/floor yield treatment."  *Id*. at 000097.  Moskowitz did not provide Moran with any information on the source of funds being used by the pre-October 1, 1993 tax-exempt bond estate to effectuate the swaps, and only asked about the effect of subsection (e)(2), which governs transfers <u>out of</u> the pre-October 1, 1993 tax-exempt bond estate.  Moran never commented on the source of funds and only commented on the effect of subsection (e)(2).  *Id.*  Moreover, the email was written in July 2001, <u>before</u> interest rates had decreased to the point where "dipping" became substantially profitable. *See* Response to JS56, *infra*.

## F.    The Taxpayer-Teacher Protection Act ("TTPA") of 2004

**JS21.**  In 2004, Congress amended the 1/2 SAP provisions of the HEA to eliminate prospectively the payment of 1/2 SAP for several categories of loans obtained from the issuance of tax-exempt obligations originally issued before October 1, 1993, including loans obtained by refunding bonds or transferred to taxable or other tax-exempt financing vehicles after the effective date of the Act. The Act stated:

> (v) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance shall be the [Full SAP], for a holder of loans that
>
> (I)      were made or purchased with funds -

(aa) obtained from the issuance of obligations the income from which is excluded from gross income under the Internal Revenue Code of 1986 and which obligations were originally issued before October 1, 1993; or

(bb) obtained from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in division (aa), or from income on the investment of such funds; and

(II)    are —

(aa) financed by such an obligation that, after September 30, 2004, and before January 1, 2006, has matured or been retired or defeased;

(bb) refinanced after September 30, 2004, and before January 1, 2006, with funds obtained from a source other than funds described in subclause (I) of this clause; or

(cc) sold or transferred to any other holder after September 30, 2004, and before January 1, 2006.

Pub. Law No. 108-409 § 2, 118 Stat. 2299, 2299-300 (2004), codified at 20 U.S.C. § 1087-1(b)(2)(B)(v).

**RESPONSE TO NO. JS21.  Incomplete.  *See* Responses to JS22, JS89, *infra.***

**G.    The Higher Education Reconciliation Act ("HERA") of 2005**

**JS22.**  In 2006, Congress made permanent the 1/2 SAP Amendments introduced in the TTPA and restricted the prospective ability to claim 1/2 SAP on any loans made or purchased after the effective date of the Act:

(vi) notwithstanding clauses (i), (ii) and (v), but subject to clause (vii), the quarterly rate of the special allowance shall be [Full SAP], for a holder of loans—

(I)     that were made or purchased on or after the date of enactment of the Higher Education Reconciliation Act of 2005; or

(II)     that were not earning [1/2 SAP] as of the date of enactment of the Higher Education Reconciliation Act of 2005.

Pub. L. No. 109-171, § 8013(a) & (b), 120 Stat. 4, 166-67 (2006), codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv),(v),(vi),(vii).

**RESPONSE TO NO. JS22.  Incomplete.  In 2007, the Department issued a Dear Colleague Letter that "restate[d] the requirements of the [HEA] and the Department's regulations that control whether FFELP loans made of acquired with funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum return rate."  Dear Colleague Letter FP-07-01 (Jan. 23, 2007) (McMahon Dec., Ex. II.97).  After quoting the applicable statute and regulation, the Department, referring to the change made by the 1993 OBRA (the last substantive change of interest to the statute) noted that these requirements have been in effect since 1993.  Only the loans described in these statutory and regulatory provisions are eligible for SAP at the 9.5 percent minimum return rate.  Each of the five categories (paragraphs (c)(3)(1)(A) through (c)(3)(i)(E)) includes funds separate and distinct from the funds in any other category.  Each category of funds includes only those funds obtained directly from the specific source named in that paragraph.  The letter specified that the "proceeds of the tax-exempt obligation" are those "obtained directly from the issuance of the tax-exempt obligation" and that the other enumerated sources in subsection (c)(3)(i) are "funds obtained directly from" loans made with the original proceeds of the obligation.  *Id.* at 2.**

## II.   THE STRUCTURE OF ED

**JS23.**   The 1998 Reauthorization of the Higher Education Act established a performance-based organization known as Federal Student Aid ("FSA") to administer the Federal Student Aid programs at ED.

[http://www2.ed.gov/about/offices/list/fsa/index.html?src=oc]

**RESPONSE TO NO. JS23.  No dispute.**

**JS24.**   FSA at all periods relevant to this matter was responsible for managing all Title IV programs involving the delivery of financial aid for post-secondary education, including the FFELP and the Federal Direct Loan Program ("FDLP"). [McMahon Decl., Ex. II.118 (Shaw Dep. 21:1-21:17).]

**RESPONSE TO NO. JS24.  No dispute.**

**JS25.**   FSA's operations are managed by a Chief Operating Officer. Terri Shaw served as COO of FSA from September 2002 through June 2007. [Ex. II.118 (Shaw Dep. 13:4-13:8).]

**RESPONSE TO NO. JS25.  Incomplete.  Immediately prior to becoming COO of FSA, Shaw was the executive vice president and chief operating officer of a small technology firm called eNumerate.  Shaw Tr. 13:15-20 (Soni Dec., Ex. 20) .  Prior to that, Shaw was employed for nearly 20 years by Sallie Mae, where she held "probably dozens of positions," and eventually rose to the rank of vice president and chief information officer. *Id.* at 14:20-15:2, 255:8-12.  In a two-year period between 1986 and 1988, Shaw was employed by both Fairchild Industries and University Support Services, a private education loan company.  *Id.* at 14:7-19.**

**Immediately following her time at FSA, Shaw worked for Educational Credit Management Corporation, first as a consultant and eventually as chief operating officer. *Id.* at 11:8-12:15.  Currently, she is the chief operating officer at Scantron Corporation.  *Id.* at 10:15-21.  Her coworkers there include Sally Stroup, former Assistant Secretary for the**

Office of Postsecondary Education, and Bill Hansen, former Deputy Secretary of Education. *Id.* at 330:1-14 (Soni Dec., Ex. 20); Stroup Tr. 10:11-15 (Soni Dec., Ex. 21).

Matteo Fontana, whom Shaw had appointed head of Financial Partners after Kristie Hansen, eventually pleaded guilty to Making a False Writing and Acts Affecting a Personal Financial Interest for falsely reporting financial connections to lenders that he supervised at Financial Partners. (*See* www2.ed.gov/print/about/offices/list/oig/invtreports/dc102009.html).

Later DEd-OIG opened an investigation into potential conflicts of interest at DEd to determine whether they resulted in lax oversight of the student loan industry; Shaw was one of the insiders mentioned by the New York Times in its article on the subject. (*See* www.nytimes.com/2007/05/05/washington/05loans.html?_r=2&pagewanted=print).

**JS26.**   FSA is responsible for, among other things, ensuring that lenders participating in the FFELP comply with ED regulations governing the program. [Ex. II.118 (Shaw Dep. 28:7-28:12).]

**RESPONSE TO NO. JS26.  Incomplete.  Shaw testified that FSA was the "operational arm of the Federal Student Aid programs."  Shaw Tr. 19:2-9 (Soni Dec., Ex. 20).  As COO of FSA, it was "not [her] job" to interpret the laws, regulations and policies of the FFELP, and she was "[i]n fact . . . specifically prohibited from interpreting.  That was not the role, statutory role of the chief operating officer."  *Id.* at 309:16-310:9.**

A 2006 DEd-OIG audit found that Financial Partners was in disarray during the time of the 9.5% Loan scandal.  *See* Shaw Ex. 49 at OBERG00000063-113 (Soni Dec., Ex.

111).  In a 2006 audit report issued on the same day as the Nelnet audit report DEd-OIG found several weakness.

DEd-OIG's first finding was that there existed at Financial Partners a "Weak Control Environment for Monitoring and Oversight."  *Id.* at OBERG000073.  One aspect of this finding was that "[i]n its mission and functional statements, Financial Partners emphasized partnership over compliance in dealing with guaranty agencies, lenders, and servicers.  Weaknesses we identified confirmed that stated emphasis on partnership. . . . Our finding that Financial Partners emphasized partnership over compliance relates to key factor one - integrity and ethical values, and key factor four - agency and organizational structure."  *Id.* at OBERG00000075.

DEd-OIG's second finding was that there existed a "Lack of Effective Information and Communication Process Related to Policy Issues." *Id.* at OBERG00000091.  With respect to this finding, DEd-OIG determined that (1) "Financial Partners does not have a reliable process to obtain timely guidance on proper application of the HEA and program regulations or how to resolve issues consistent with Department policy," *id.* at OBERG00000091; (2) "Financial Partners does not have a documented process to regularly obtain OGC review and advice on program reviews or other significant program determinations," *id.* at OBERG0000092; and (3) "Financial Partners does not have a clear and effective process for staff to obtain policy assistance from OPE or FSA's Policy Liaison and Implementation Staff and for management's communication of policy decisions and advice to staff," such that "Financial Partners' regional offices and management may not correctly and consistently resolve compliance and other program issues," and "the guidance provided may be incorrect, or different guidance may be given to different

- 35 -

reviewers which could result in inconsistent interpretation and application between reviewers and regional offices," *id.* at OBERG00000094.

With respect to Finding 3, DEd-OIG recommended that FSA's COO (1) "[d]evelop written policies and procedures for obtaining timely guidance for resolution of program issues and for communicating the results and decisions" and (2) "[d]evelop written policies and procedures for regular review by OGC of program reviews and other significant program determinations." *Id.* at OBERG00000095. In response to DEd's refusal to accept the second recommendation, DEd-OIG responded: "We have not changed our recommendation, which, if followed, could ensure that all Financial Partners' program reviews and significant program decisions are legally supportable, and consistent with the HEA, program regulations, and agency precedent. A desire to limit legal review does not reflect positively on management's philosophy and its operating style. It also accepts too much unnecessary risk, which impacts the control environment reported in Finding 1." *Id.* at OBERG00000096.

Shaw testified that "overall" the 2006 audit of Financial Partners "was quite critical of the operation of and supervision of the enforcement program." Shaw Tr. 290:10-13 (Soni Dec., Ex. 20).

A 2008 audit by DEd-OIG found significant deficiencies in the way program reviews were conducted in 2006 and 2007. DEd-OIG found, *inter alia*, that the reviewers had incorrectly calculated loan sample sizes, thereby jeopardizing the accuracy of the reports. 2008 OIG Audit (A09H0015) at 13-14 (Soni Dec., Ex. 50). The report also stated:

> **FSA's review process for lender payments did not include verification of all components of the special allowance category code, which is used to calculate the special allowance subsidy payable by the Department.  The selection of the appropriate special allowance category code is determined by four loan characteristics:  loan type, date, borrower status, and funding source (*i.e.*, from either taxable or tax-exempt sources).  The review process included verification of the first three loan characteristics, but did not include verification of the funding source.  FSA management stated that it was not practical to verify the funding source, because funding documentation is maintained at the lender whereas most of the reviews were conducted at the lender servicer.  Additionally, FSA management stated that the funding sources were not confirmed because FSA reviewers had knowledge of the type of funding source generally used by a lender and that separate on going reviews were examining the funding source used to support special allowance invoicing.  Thus, FSA's review of sampled loans would not have identified improper payments that could have occurred from lenders placing loans in an inappropriate special allowance category for the funding source.  The OIG audit report (ED OIG/A05E0017), which was included in the methodology used for the FY2006 PAR, identified a substantial amount of improper payments that resulted from a lender's use of the inappropriate special allowance category for the funding source.**

*Id.* at 15-16.

> *See also* **Response to JS26,** *supra.*

**JS27.**  The Financial Partners ("FP") unit of FSA, with various regional offices, was responsible for performing program reviews of lenders as part of FSA's efforts to monitor compliance by lenders. [Ex. II.118 (Shaw Dep. 28:17-29:7).]

> **RESPONSE TO NO. JS27.  Incomplete.  After October 2005, Financial Partners began to conduct "special allowance" program reviews that focused specifically on a lender's compliance with the Taxpayer Teacher Protection Act.  Criswell Tr. 233:19-234:7. (Soni Dec., Ex. 26).**

**JS28.**   During the period 2002-2007, FSA included a policy office to act as a liaison between FSA and the Office of Post-Secondary Education ("OPE"). [Ex. II.118 (Shaw Dep. 39:10-40:7).]

**RESPONSE TO NO. JS28.  No dispute.**

**JS29.**   OPE serves as ED's policy-making arm with respect to post-secondary education issues, including the federal student aid programs. [Ex. II.118 (Shaw Dep. 18:21-19:9).] OPE is headed by an Assistant Secretary of ED, which is a position that requires confirmation by the Senate. [McMahon Decl., Ex. II.119 (Stroup Dep. 17:11-17:14).] Sally Stroup was confirmed as Assistant Secretary for OPE in March of 2002 and served in that position until March of 2006. [Ex. II.119 (Stroup Dep. 12:9-12:14, 17:8-17:14).]

**RESPONSE TO NO. JS29.  Incomplete.  Immediately prior to becoming Assistant Secretary for OPE, Stroup was employed for 10 months at the University of Phoenix.  Prior to that, Stroup worked for seven years as a professional staff member on the House Education and Labor Committee.  Prior to that, Stroup worked for eleven years for the Pennsylvania Higher Education Assistance Authority ("PHEAA").  Stroup Tr. 12:15-13:3 (Soni Dec., Ex. 21).  Stroup is currently employed at Scantron Corporation.  Her coworkers there include Terri Shaw, former Chief Operating Officer of FSA, and Bill Hansen, former Deputy Secretary of Education.  Hansen Tr. 330:1-14 (Soni Dec., Ex. 22).**

**JS30.**   OPE makes policy with respect to post-secondary financial aid programs and FSA enforces that policy. [Ex. II.118 (Shaw Dep. 19:10-19:12).]

**RESPONSE TO NO. JS30.  Incomplete.  Stroup did not have "ultimate authority" in DEd for "interpreting the regulations that apply to 9.5 SAP," and she was never**

delegated that authority by the Secretary.  Stroup Tr.  213:12-214:1 (Soni Dec., Ex. 21).

Nor did she represent to lenders that she had such authority, and she never told lenders

that she "could authorize them to make certain claims on 9.5 SAP."  *Id.* at 214:2-7.

JS31.  The Office of General Counsel within ED provides legal advice to FSA and

OPE with respect to Title IV programs. [*See, e.g.,* Ex. II.119 (Stroup Dep. 19:11-19:20); Ex.

II.118 (Shaw Dep. 19:18-20:2).] The Postsecondary Education Division of OGC provides legal

services for postsecondary education programs administered by the Assistant Secretary for

Postsecondary Education. [http://www2.ed.gov/about/offices/list/om/fs_po/ogc/prs.html]

**RESPONSE TO NO. JS31.  No dispute.**

JS32.  The Office of the Inspector General is under the direction of the Inspector

General and is an office within ED that reports to the Deputy Secretary and Secretary of

Education. The IG serves as the principal advisor to the Secretary on matters related to

promoting economy, efficiency and effectiveness, and preventing and detecting fraud and

abuse in the administration of Departmental programs and operations.

[http://ww2.ed.gov/about/offices/list/om/fs_po/oig/intro.html]

**RESPONSE TO NO. JS32.  No dispute.**

**III.    ED STATEMENTS CONCERNING THE RELEVANT LAW, REGULATIONS AND GUIDANCE**

**A.    Early ED Detection and Investigation of 9.5 SAP Growth**

JS33.  As interest rates fell in 2001 and 2002, auditors employed in the regional

offices of the FSA noticed that the outstanding balance of loans on which certain lenders were

claiming 9.5% SAP was growing. The auditors investigated the cause for such growth in

connection with a program review undertaken in July 2002 at the Iowa Student Liquidity

Corporation ("Iowa") and prepared a draft audit report in October 2002. [McMahon Decl., Ex. II.9 (ISLLC000035-42); Ex. III.119 (Stroup Dep. 50:11-50:15) (recalling discussions "within the Department of Education as of October 30, 2002, on the eligibility of loans for the minimum special allowance rate").] According to Mirek Halaska, the head of the Southern Regional Office based in Texas,[2] the regional offices had been "looking at proper billing for special allowance prior to raising this issue in 2002," but viewed the Iowa review as a "pivital [sic] point," being the "first time" a region tried to "stop the practice." [McMahon Decl., Ex. II.10 (OBERG00000129-30).]   Halaska described the attempt to stop the practice as an attempt to "modify the guidance."  [*Id.*]

**RESPONSE TO NO. JS33.  Disputed.  The first sentence incorrectly suggests that multiple Financial Partners regional offices had become aware of 9.5% Loan growth in 2001 and 2002.  The cited evidence reflects that only program reviewers in the Southern Region had noticed the growth during the program review of Iowa Student Liquidity Corporation in 2002.  Wallace Ex. 2 at ISLLC-000049-50 (Mills Dec., Ex. 44).**

**To the extent statements by Halaska are offered for the truth of the matter asserted, they are hearsay.**

JS34.   The regional offices undertook to gather information concerning the amount of bonds eligible to acquire 9.5 loans that FFELP participants held. [Ex. II.10 (OBERG00000130).] By the summer of 2003, the regional offices assembled data to identify all lenders who submitted claims for 9.5 SAP (designated on ED's 799 forms using an X-code). [*Id.;* Ex. II.119 (Stroup Dep. 60:18-62:12, 165:4-165:6); Ex. II.118 (Shaw Dep. 118:18- 119:4).]

---

[2]        Mr. Halaska was deceased at the time this action was unsealed.

They continued to gather information about 9.5 SAP eligibility during program reviews "by looking at the bond totals and the genealogy of refunded/refinanced bonds." [Ex. II.10 (OBERG00000130).]

**RESPONSE TO NO. JS34.  Disputed.  The Halaska email refers only to the Southern Region's investigation into the 9.5% Loan issue.  *See* OBERG00000130 ("Our regional perspective on the issue is that it costs the Department hundreds of millions of dollars that these entities are not entitled to.") (McMahon Dec., Ex. II.10).**

**To the extent statements by Halaska are offered for the truth of the matter asserted, they are hearsay.**

### B.     The August 2003 CRS Request for Information

**JS35.**  On August 13, 2003, Adam Stoll of the Congressional Research Service e-mailed Ann Clough at ED to obtain information on behalf of a Congressional requester "pertaining to the so called '9.5% floor loans' . . . ." One of the requests was for an explanation of "how the overall outstanding balance of 9.5% floor loans may have grown in recent years...." [McMahon Decl., Ex. II.11 (ED-B-004570).]

**RESPONSE TO NO. JS35.  Incomplete.  Relator's investigation into the 9.5% Loan scandal led to the CRS Request for Information.  As a result of his conversations with Relator, James Kvaal, a member of the minority staff for the House Committee on Education and the Workforce, raised the 9.5% Loan growth issue with Michael Dannenberg, who was at the time senior legal counsel for the Senate Health, Education, Labor and Pensions Committee.  Relator's Resp. to Nelnet Interrog. 1 (Soni Dec., Ex. 112). Dannenberg then solicited from the Congressional Research Service ("CRS") - and more**

specifically, Adam Stoll - a memorandum outlining the history of industry-wide 9.5% loan holdings and SAPs, which was forwarded to Relator by either Kvaal or Dannenberg on or about October 2003.  October 8, 2003 Memorandum from Adam Stoll to Michael Dannenberg, OBERG00005993 (Soni Dec., Ex. 202).  *See also* Relator's Opposition to the Motion to Dismiss by Educations Loans, Inc. and Student Loan Finance Corporation (Doc. 314), pp. 4-5 (and supporting documentation cited therein).

JS36.   On August 27, 2003, Ms. Clough forwarded Mr. Stoll's requests and a draft response to, among others, Pam Moran of OPE. [McMahon Decl., Ex. II.12 (ED-B-004567-68).] Ms. Moran responded by e-mail to Ms. Clough on August 27, 2003. She wrote:

> As to the explanation as to how these billings are growing based on the DCL Q&A #30 guidance [*see supra* ¶ JS18], here is an explanation of what can go on under that guidance that leads to growth . . .
>
> 1.      Step One — There is a tax-exempt bond issuance prior to 10/1/93 for $10,000 that doesn't expire until 2012.
>
> 2.      Step Two — Student Loans are originated with these tax exempt funds. They are all subject to the "floor."
>
> 3.      Step Three — Under the #30 Q&A guidance the $10,000 of tax-exempt loans that were originated are refinanced with taxable monies. Prior to ED's changed policy, that would have ended their identity as tax-exempt loans and they would no longer have qualified for the "floor." Under the new policy, they can be refinanced with taxable monies and still retain their eligibility for the "floor."
>
> 4.      The refinancing of the original tax-exempt loans frees up the $10,000 of tax-exempt funds.
>
> 5.      New tax-exempt loans are made with those freed up tax-exempt funds. Now you have $20,000 worth of student loans eligible for the floor.
>
> 6.      *Repeat these steps many time* [*sic*] *over.* As long as you retain legal title to the loans, the bond issuance doesn't expire, and the loans are not otherwise "retired" or "defeased," as the regs say, your pool of loans eligible for the "floor" continues to grow.

[Ex. II. 12 at (ED-B-004567) (emphasis added).]

**RESPONSE TO NO. JS36.  Disputed.  This document is redacted and a full understanding of Moran's thoughts on this matter is not ascertainable. Furthermore, Moran's email is descriptive and does not purport to interpret these regulations or guidance.**

**To the extent Moran's statements are offered for the truth of the matter asserted, they are hearsay.**

**JS37.**   Senior ED officials Sally Stroup, Terri Shaw and Kristie Hansen agreed with Pamela Moran's explanation of how tax-exempt billings could grow under the applicable regulations. [Ex. II.119 (Stroup Dep. 120:17-121:2); Ex. II.118 (Shaw Dep. 101:17-102:6); McMahon Decl., Ex. II.120 (Hansen Dep. 176:7-177:21).]

**RESPONSE TO NO. JS37.  Disputed.  *See* Response to JS36, *supra*.**

**Kristie Hansen was general manager of Financial Partners from July 2002 to January 2004.  Hansen Tr. 11:1-3 (Soni Dec., Ex. 22).  Shaw testified that she "made [Hansen] change responsibilities at Federal Student Aid in part, in large part because of her lack of attention to her duties."  Shaw further testified that "when [she] asked Victoria Bateman to step in to act in that role temporarily there was quite a bit of unattended to work that was in Hansen's office that nobody, including myself, knew about."  Shaw Tr. 57:10-58:18 (Soni Dec., Ex. 20).**

**Prior to joining DEd, Hansen was "assistant president" at the National Council of Higher Education Loan Programs ("NCHELP") from May 1999 until July 2002.  Hansen**

Tr. 11:7-17 (Soni Dec., Ex. 22).  Hansen testified that NCHELP was "a type of trade association whose members were lenders and guarantors and servicers."  In her position as assistant president, acted as "an advocate on their behalf."  *Id*. at 231:11-232:8 (Soni Dec., Ex. 22).  To the extent Moran's statements are offered for the truth of the matter asserted, they are hearsay.

Hansen testified that she did not study the laws when the 9.5% Loan issue arose between 2002 and 2004.  *Id*. at 200:13-21 (Soni Dec., Ex. 22) ("Q: What I'm asking you is in the period 2002 to 204, there was intense interest in the 1996 DCL, did you go back and study the . . . 1992 rule to determine for yourself whether the 1996 DCL was either accurate or a mandatory interpretation of the 1992 rule? . . . A: I don't recall doing that study.") (Soni Dec., Ex. 22).  Hansen also testified that she was unaware of whether "there were regulations that specified which funds could be used to acquire loans and qualify them for 9.5 minimum SAP."  *Id.* at 248:6-249:12.  She did not recall "receiving guidance on the issue . . . whether the refilling of the pre-1993 trust was with 9.5 minimum loans was authorized."  *Id.* at 249:18-250:20.  Hansen also testified that the letter did not provide sufficient information to understand exactly what Nelnet was doing.  *See* Response to JS64, *supra*.

Hansen testified that the question of "refilling" a pre-1993 trust after a loan is transferred to a taxable obligation is not addressed in the 1996 DCL.  Hansen Tr. 211:21-213:3 (Soni Dec., Ex. 22).

Hansen testified that when she left Financial Partners in December 2003, she "wouldn't have any specifics" about 9.5% Loan growth.  Hansen Tr. 121:21-122:4 (Soni

Dec., Ex. 21).  Hansen also testified: "<u>[I]n hindsight I'd say in some situations we may not</u> <u>have fully grasped what was happening in the actions of the lenders in working the loans</u>." Hansen Tr. 151:20-152:11 (Soni Dec., Ex. 22) (emphasis added). Hansen further testified that DEd lacked the "experts" to understand the "complexity" of the lenders' "transactions."  Hansen Tr. 158:9-159:11 (Soni Dec., Ex. 22).

Shaw had not studied the 1993 OBRA and had no view with respect to its meaning. Shaw Tr. 258:5-259:7, 260:16-21 (Soni Dec., Ex. 20) ("I don't have a view.  I relied on the Office of General Counsel and the Office of Postsecondary Education to render interpretations of language for me to then follow through and enforce or take action against or implement if it was new language.") (Soni Dec., Ex. 20).  Shaw testified that she did not recall getting "any letter, memo, e-mail, other written guidance from OPE or anybody else on how to look at the sources of funds, the proceeds, in other words, the same issue of what loans are the proceeds."  *Id.* at 280:2-10.  Shaw testified that she did not recall receiving any written guidance from OGC with respect to the 9.5% SAP prior to the Nelnet audit.  *Id.* at 295:15-297:5.  Shaw testified that she did not understand what the term "cash management needs" meant and never discussed it with anyone.  *Id.* at 328:14-19.

Stroup did not have "ultimate authority" in DEd for "interpreting the regulations that apply to 9.5 SAP," and she was never delegated that authority by the Secretary. Stroup Tr. 213:12-214:1 (Soni Dec., Ex. 21).  Nor did she represent to lenders that she had such authority, and she never told lenders that she "could authorize them to make certain claims on 9.5 SAP."  *Id.* at 214:2-7 (Soni Dec., Ex. 21).  Stroup also testified that she had little independent understanding of the pertinent statutes and regulations.  Stroup testified

that she did not "personally" "undertake a study of the pertinent statutes and regulations." *Id.* at 200:5-13 (Soni Dec., Ex. 21); *see also id.* at 212:9-17.

Regarding the 1996 DCL, Stroup testified that she never looked at it to determine whether it authorized using funds obtained from the transfer of 9.5% Loans to create additional 9.5% Loans, but rather had assumed that was correct because "[t]hat's how it always worked." Stroup Tr. 243:5-15 (Soni Dec., Ex. 21). Stroup also testified that she did not "go behind the 96 DCL and determine whether the underlying regulations supported the DCL." *Id.* at 252:1-9. She further testified that DEd "honored whatever was published" by the Clinton Administration – including the 1996 DCL – "whether or not it might independently be sustainable under the regulations." *Id.* at 253:15-254:6. Stroup did not "know if question and answer 30 was designed to address the situation of lenders moving loans from the nine and a half percent SAP earning to a full commercial SAP earning rate." *Id.* at 27:7-31:18. Stroup did not understand why, as mentioned in the 1996 DCL, the "department changed its policy in the 1992 regulations." *Id.* at 27:7-31:18). Regarding the regulations, Stroup testified that she did not have a "personal opinion with respect to the individual subsections" of Section 682.302. *Id.* at 213:9-11.

Stroup testified about the 1993 OBRA as follows: "Q: As I understand it, you've said in your personal view that the purpose of Congress here was to use a different rule post-1993 tax-free issuances from the rules that applied pre-1993? A: To the best of my knowledge, I think that was Congress' intent. Through the device which called dipping and the 1996 DCL, you thought that was perfectly permissible, perfectly legal to essentially stand that intent on its head? Correct." Stroup Tr. 226:3-13 (Soni Dec., Ex. 21).

Stroup testified that she believed that the large 9.5% SAP payments made between 2002 and 2005 "were too high in the current interest rate environment" and were "bad policy."  *Id.* at 198:1-9.  She also testified that the 1996 DCL was a "bad decision" by DEd. *Id.* at 151:10-18.  And she testified that "my colleague at FSA and I both looked at it and said it was bad for the taxpayer and we were trying to save money for the government."  *Id.* at 233:9-11.

Stroup testified that she "had a general understanding of the growth of the 9.5 loan portfolio," but that she never "investigate[d] the specific mechanisms and transactions by which the claimants were growing . . . their portfolio," and she never "personally look[ed] at any of the transactions to see whether [the] limitations [in the 1996 DCL] had been breached."  Stroup Tr. 260:17-261:12 (Soni Dec., Ex. 21).

JS38.   On October 3, 2003, attorney John Dean sent a letter to the Secretary's Chief of Staff, David Dunn, explaining that "[f]or the past two years, a number of FFEL loan providers have been using the existing legislative and regulatory authority to transfer loans into pre-October 1993 bond estates to secure preferential yields. The practice has become sufficiently widespread that it has attracted notice within the Department of Education and in the FFEL loan community." [McMahon Decl., Ex. II.13 (unnumbered document).]

RESPONSE TO NO. JS38.  No dispute that the language is quoted accurately. Dean was writing as special counsel to the Consumer Bankers Association, a trade group of commercial lenders of which Defendant Nelnet was a member.  Dean Ex. 18 at 1 (McMahon Dec., Ex. II.13).  He was also a lobbyist for the Consumer Bankers Association and Nelnet.  Dean Exs. 1, 2 (Soni Dec., Exs. 140, 141).  He wrote the letter to advocate for a

legislative solution to what he considered the 9.5% SAP "loophole" because that solution would allow the Department to be given credit for the resulting budgetary savings (under the way budget scoring is done by the CBO) and it would therefore have room in the budget to implement other programs that CBA members, including Nelnet, wanted to see enacted.  Dean Ex. 18 at 2, 5 (McMahon Dec., Ex. II.13); Dean Tr. 268:10-269:9, 285:13-15, 290:21-291:11, 291:22-292:3 (Soni Dec., Ex. 19).  Clarification of the law through purely regulatory action, however, would not, even if it in actuality saved the same amount of money.  Dean Ex. 18 at 2, 5 (McMahon Dec., Ex. II.13); Dean Tr. 297:6-15 (Soni Dec., Ex. 19).

C.   **The October 2003 *U.S. News & World Report* Article and ED's Public Response**

**JS39.**   In its October 27, 2003 issue, *US. News & World Report* published an investigative report entitled "Big Money on Campus: How Taxpayers are Getting Scammed by Student Loans.˙ Among other things, the article described a "windfall" being provided to lenders:

> Where does the windfall come from? The subsidy guarantees lenders a return of 9.5 percent on certain loans; that's quite a bonus at a time when most students are paying only about 3.5 percent in interest. Lawmakers thought they had done away with the subsidy a decade ago, but some lenders discovered that by exploiting an Education Department ruling and using creative refinancing, they could issue a nearly infinite number of subsidized loans ... .

> Education Department officials told U.S. News that they are now reviewing the loophole but caution against any quick fix.

[McMahon Decl., Ex. II.14 (OBERG00006104-13, at 000013) (emphasis added).]

**RESPONSE TO NO. JS39.  No dispute that the language is quoted accurately.  The article also states "It's a windfall that has no benefit to taxpayers or students."**

**OBERG00013 (McMahon Dec., Ex. 11.14).  Shaw testified that she became aware of the 9.5% Loan issue at about the same time the *U.S. News & World Report* article was published.  Shaw Tr. 70:4-18 (Soni Dec., Ex. 20).  Relator was a source for this article.**

JS40.   In its November 5, 2003 issue, the *EFC Exchange,* a newsletter circulated by a lender trade organization, reported that ED had conducted a "town hall meeting" as part of an ED Electronic Access Conference ("EAC") that week and that a questioner had sought comment on the *U.S. News & World Report* article. According to the article, Assistant Secretary of Education Sally Stroup "had this to say about half SAP/9.5% floor loans: 'This is perfectly legal . . . it is not illegal and there is no fraud and abuse and people are following the DCL. It may be bad policy in a low interest rate environment but there is no fraud and abuse and we knew about this well before the *U.S. News & World Report* article.'"  [McMahon Decl., Ex. II.8 (PPHEA_026290-91).]

**RESPONSE TO NO. JS40.  No dispute that the language is quoted accurately.  The question posed to Stroup has not been reported and she could not remember this exchange.  Stroup Tr. 69:1-5 (Soni Dec., Ex. 21).  The full context of this comment is not available.**

JS41.   Ms. Stroup testified that she believed she said in substance what was quoted in the *EFC Exchange,* and that she "was speaking on behalf of the Department of Education." [Ex. II.119 (Stroup Dep. 246:10-249:5).] Ms. Stroup's view was that it "was the opinion of the Department of Education" that if "loans governed by regular SAP" were "run through" a pre-October 1, 1993 tax-exempt bond, that "dipped them and blessed them" for 9.5% SAP. That view was based on discussions with the Department's General Counsel, Deputy General Counsel and discussions with "[h]alf of the people in OPE." Ms. Shaw also testified that

"discussions across the department were happening with some regularity" with respect to the subject of growth in 9.5 SAP portfolios. [Ex. II. 118 (Shaw Dep. 186:7-186:14); *see also* Ex. II.119 (Stroup Dep. 224:21-225:8, 235:10-236:9, 240:4-240:19, 241:13-242:1, 251:9-251:15, 258:1-259:19).]

**RESPONSE TO NO. JS41.  Disputed and incomplete.  *See* Responses to JS37, *supra*. Stroup also testified had no recollection of even making the statement.  Stroup Tr. 69:1-5 (Soni Dec., Ex. 21).  To the extent statements by government personnel not made under oath are being offered for the truth of the matter asserted, they are hearsay.  She further testified that she had not cleared the response through formal channels.  *Id.* at 248:16-19. Shaw's testimony that "discussions across the department were happening with some regularity" refers to discussions in and around August 2004 when *Money for Nothing* was published.  Shaw Tr. 186:4-12 (Soni Dec., Ex. 20).**

**See Response to JS37, *supra*, regarding Stroup's understanding of the relevant laws and regulations.**

### D.    The December 2003 Iowa Program Review Report

**JS42.**   On October 31, 2002, Mirek Halaska circulated an October 30, 2002 draft of his region's report of a July 2002 program review of Iowa to Kristie Hansen and others within ED. [Ex. II.9 (ISLLC 000035-42).] The draft report included a finding entitled "Incorrect Billing for Special Allowance Benefits." [*Id.* at (ISLLC 000039).] The draft finding noted that Iowa had approximately $168 million in tax-exempt bonds, that Iowa's "total of original bonds issued prior to 1993, including refinancing" was approximately $327 million, that the total ending balance of Iowa's 9.5%/half-SAP loans for the quarter ending June 30, 2001, was

approximately $380 million, and that ED had asked Iowa to explain the approximately $53 million difference. [*Id.*] The draft reported that Iowa had explained that its system "was designed so that if a loan is financed using tax-exempt old money bonds and is later transferred to a taxable or tax-exempt new money financing then this loan will retain the 9.5% SAP floor," and had referenced ED's 1996 DCL [*see supra* ¶ JS18] as support for billing the transferred loans at the 9.5%/half-SAP rate. [Ex. II.9 (ISLLC 000035-42).]

**RESPONSE TO NO. JS42.  No dispute that the language is quoted accurately.  In their depositions, Stroup, Hansen, and Shaw each testified to having little or no recollection of the events surrounding the ISLLC program review.  Stroup Tr. 32:12-16 (Q:  "Are you familiar with the program review conducted by FSA concerning the Iowa Student Loan Liquidity Corporation?  A:  I know one was done.  I'm not at all familiar what was in it."), 42:11-43:2 ("Q:  In your mind what was this issue? A:  This is about how loans got moved back and forth and whether or not they remained their eligibility versus refunding which was to me a different issue.  Q:  So this involved an issue of transferring loans within bonds, from one bond to another?  A:  Yes.  Q:  That was the subject of the Iowa program review that appears? . . . I don't actually know.");  43:20-21 ("I still don't remember what the Iowa-specific issues were.");  54:9-11 ("Q:  Do you know if as of April 15, 2003 the report regarding Iowa was still in draft form?  A:  I don't know.") (Soni Dec., Ex. 21); Hansen Tr. 27:20-28:7, 29:9-29:21, 68:20-69:7, 73:15-74:5, 93:18-95:13 (stating, in describing the progression of the Iowa reports, that "[t]his is all just my opinion on this because I don't recall these documents specifically" and that "[h]onestly, I cannot recall discussions about these three documents specifically and that shift at this point.") (Soni Dec., Ex. 22); Shaw Tr. 45:18-46:1 ("Q:  Are you familiar with a program review of the**

Iowa Student Loan Liquidity Corporation that was conducted in 2002?  A:  Not off the top of my head, I couldn't tell you exactly what it was about."); 49:3-50:3 (Soni Dec., Ex. 20)

*See also* **Response to JS43,** *infra*.

**JS43.**   The draft report provided:

> The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issuance to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate.

[Ex. II.9 at (ISLLC 000040).]

The report noted, however, that "[a]s a result of ongoing discussions with the Department of Education on the eligibility of loans for the minimum special allowance rate, the refund of special allowance interest will not be enforced until discussions have concluded." [*Id.*]

**RESPONSE TO NO. JS43.  No dispute that the language is quoted accurately. Program reviewers began raising questions about ISLLC's billing practices in July 2002. Wallace Ex. 2 at ISLLC-000048-49 (Mills Dec., Ex. 44).  In particular, Jerry Wallace, after taking into account pre-1993 tax-exempt bonds that had been refunded, determined that ISLLC still had approximately $52 million in unaccounted for 9.5% Loan growth.  Wallace Tr. 300:1-7 (Soni Dec., Ex. 23).  At the time, Jerry Wallace was a "Senior Guarantor and Lender Review Specialist," and today he is the head of the Southern Regional Office of Financial Partners.  *See* Iowa Draft Report at  ISLLC-000042  (McMahon Dec., Ex. II.4). Wallace emailed George Harris at OPE to ask about the $52 million:**

> After comparing their old money and the refinanced money (considered as old money), I still had a gap of about $52,000,000 portfolio balance that didn't match the ED Form 799 numbers for old tax-exempt. The [sic] have come back with an explanation that the PHEAA system considers any loans originated with "old money" to remain as "old money", even when it is changed to a new money bonds.
>
> They have told me that some of their peers are actually originating all of their loans with "old money" bonds then transferring them immediately to "new money" bonds so they are able to get the "old money" returns from special allowance. That doesn't sound right [sic] me.

Wallace Ex. 2 (Mills Dec., Ex. 44). Wallace testified that the transferring scheme he described did not "sound right" because "[i]t didn't seem like it was a practice that met the legislative intent" of the "Higher Education Act of 1993 followed by the regulatory changes that were resultant." Wallace Tr. 302:4-13 (Soni Dec., Ex. 23).

Harris responded that he could not "give [Wallace] an answer now" because the question was "[t]oo complicated," and Wallace responded by stating, "I see this as a real problem, if this is allowed to continue as common practice." Wallace Ex. ISLLC-000048 (Mills Dec., Ex. 44). Wallace testified that he was referring to "[t]he unlimited transferring of loans from an eligible funding source to other – both to what I would call new money and taxable funding sources." The "real problem," as he saw it, was that he could not at the time "understand a congressional mandate to eliminate a process and at the same time allowing lenders to, in essence, convert their entire portfolio to tax [exempts] should they choose to do so." He was "concerned that as [he] understood the regulations or the intent of the regulations at the time, that there should be constraints on growth." Wallace Tr. 303:4-304:18 (Soni Dec., Ex. 23).

Not long thereafter, Wallace received a more thorough explanation of ISLLC's billing process from one of the company's officers, Ron Foresman.  At that point, Wallace again emailed Harris:

> [ISLLC] now [sic] taxable money to buy all of their new loans. At some point, about 30 days later, the loans are transferred to a bond issue.  At some point later loans may be transferred to yet another bond issue.
>
> The PHEAA software tags the loan as tax-exempt (old money) if the loan is ever held in [sic] old-money tax-exempt bond. They have provided me with a list with $47 million of loans that at some point in the past had been held in an old-money bond, but are now held in new-money tax-exempt bonds and taxable bonds.   I calculate that these bonds cost [sic] government about an additional 10% of the value to the loan, in this case about $4.7 million in additional special allowance expenses over the last 5 years.  This could add up to some real money, if all of the secondary markets were to start manipulating the system to make all of their loans "old-money".
>
> Ron Foresman has told me that they do not try to manipulate this system, but that other secondary markets do.  If this is acceptable, then ISLC [sic] could simply pass the rest of their $360 million new-money and taxable money through an old money bond, then their entire $750 million portfolio becomes old-money, which would allow them to double their return on special allowance from $2.7 million per quarter to $5.4 per quarter.  Somehow, this just doesn't seem right to me. . . .
>
> It would seem that Congressional intent back in 1992 was to eliminate these bonds with a floor [sic] not to allow extreme expansion of old money.

Wallace Ex. 2 (Mills Dec., Ex. 44).

Wallace testified that by "manipulating the system," he meant "dipping [ineligibible loans] simply to get the 9.5 status."  Wallace Tr. 322:7-323:8 (Soni Dec., Ex. 23).  He explained that he understood ISLLC's point to be that it was not "manipulating the system" because until this program review, it was unaware that the PHEAA compass

system was "tagging" ineligible loans as 9.5% Loans.  In other words, ISLLC was not at the time engaged in loan transactions simply to create 9.5% Loans, while other entities were allegedly "intentionally dipping to pick up the 9.5."  *Id.* at 323:9-326:5.

Wallace was "concerned about the potential for unlimited growth" if lenders could "mov[e] a loan to a tax exempt bond simply for the purpose of tagging it as tax exempt," which "didn't seem to be within what [he] presumed to be the mandate of the payment of tax exempt benefits."  That is, "if you moved a [9.5% Loan] over, there was some reasonability to bill on it, [but] filling back behind it, moving up and filling behind it again and again didn't seem kosher."  Wallace further explained that "[e]ven if you moved some of it out it didn't create more room in the pool, much as a swimming pool.  You start dipping cups of water out, there is so . . . much in the pool and so much wherever you move it but, you know, you move back and forth,  you should have a similar amount of water in the pool, accounting for a little bit of evaporation, a little bit of rainfall, but you don't just keep refilling the pool over and over again as you empty it."  *Id.* at 327:8-330:5.

Wallace followed up with yet another email to Harris providing even more details about the ISLLC situation:

> Lenders move loans from one bond issue to another as a matter of routine, for a variety of business purposes.  ISLC [sic] contends that if a loan has ever been held in one of their "old-money" bond issues, then is transferred to a bond issue that is not an old-money bond issue, then that loan [sic] forever be considered "old-money" for special allowance billing.
>
> Here are examples:
>
> 1. If ISLC [sic] purchase [sic] a $3,000 loan with a tax-exempt bond issued prior to 10/1/93, then they bill us with special

allowance code X, indicating that the loan qualifies for an old-money billing category. At some point they decide to change the financing to another bond issue (that is not an old money bond). For the life of the loan, they continue to bill the Department as if the loan was still financed with an old-money bond.

2. ISLC [sic] purchases loans with taxable money. They bill us showing [sic] loan is financed with taxable money. The loan transfers into an old-money bond and stays there for a few months. They change the billing indicating the loan is now financed with old-money. A few months later, the loan transfers back to a taxable bond issue. For the life of the loan, they continue to bill the Department as if the loan was still financed with an old-money bond.

I guess part of the question related to 682.302(c)(4) could rest on the definition of purchase. Should the transfer of a loan from one bond fund to another held by the same lender, be considered as a purchase?

Wallace Ex. 2 (Mills Dec., Ex. 44). Harris responded as follows:

There is nothing wrong with ISLC's contention that you described in your first paragraph. That's ok, and it agrees with what I said in my July 18 email to you where I said "As a general rule, if a loan is made with 'old money' it remains eligible for the 'old money' special allowance, even if it gets transferred and is included in another financing instrument. But, you should also consider compliance with 34 CFR 682.302(e)."

However, what you described in your second example appears to be a shell game that goes like this:

1. ISLC purchases a loan with taxable money.

2. They bill us showing the loan is financed with taxable money.

3. They transfer the loan to an "old-money" bond for a few months.

4. They change the billing to show that the loan is now financed with "old money."

5. The loan gets quickly transferred back to a taxable bond.

- 56 -

> **6. ISLC continues to bill us as if the loan was financed with "old money."**
>
> **You know what?  Transferring a dead dog into a freezer full of filet mignon for a few days doesn't mean that the dead dog turns into filet mignon, right?**

Wallace Ex. 2 (Mills Dec., Ex. 44).

Wallace testified that in his view, Harris considered the transactions described in part (1) of Wallace's email to be lawful, but that with respect to part (2), "[i]f you merely move a loan into and out of a bond just merely to gain an additional tax exempt portfolio, he did not view that as permissible activity."  Wallace Tr. 335:9-341:11 (Soni Dec., Ex. 23).  Wallace also testified that in his view, a "[s]hell game is where you have three shells on the table and you keep moving them around and you make people guess where the bean is underneath one of the shells.  The point is, it's for the dealer to win more times, and oftentimes to hide what's going on underneath the shells . . . .  Maybe not to have anything underneath any of the shells."  *Id.* at 341:21-342:16.

Regarding the draft report, Wallace testified that the "unlimited growth" finding had been lifted from an email he sent to the review leader, Earl Crisp.  Wallace Tr. 343:19-346:5 (Soni Dec., Ex. 23).  He explained the finding as follows: "[T]here was a finite amount of money that could be committed.  . . .  [A]s you committed funding to a particular loan in a bond, . . . when you moved it, that . . . had the effect of reserving that money and didn't create a new hold to create a new loan behind that because you had reserved those funds and committed the funds for the bond out of that source."  He further testified that the 2007 DCL ultimately confirmed what he had written for this initial draft – there were limits to how much a pre-1993 tax-exempt bond could be refilled with 9.5% loans, and in fact, the 2007 DCL was even "more limiting."  *Id.* at 348:2-350:11.

Hansen could not recall what she had done as a result of the 2002 draft report. Hansen Tr. 53:3-16 ("Q: What did you do as a result of receiving [the October 2002 Iowa] draft report?  A:  I can't specifically remember."); 59:20-60:2 ("Q:  At the time that you received [the 2002 Iowa] draft report had you formed an opinion on whether the finding was correct or incorrect?  A:  I don't recall.") (Soni Dec., Ex. 22).  Stroup also did not recall reviewing the draft report, Stroup Tr. 49:14-16 ("Q:  Did you receive a copy of the October 30, 2002 draft report on or about October 30, 2002?  A:  I don't know.") (Soni Dec., Ex. 21), and Stroup did not know "who was responsible within the department for determining whether to accept the conclusions in the [2002 Iowa] draft report." *Id.* at 52:7-10.

JS44.  Mr. Halaska's October 31, 2002 e-mail to Ms. Hansen and others forwarding the draft report stated: "It was our interpretation that the regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. It is our opinion that we need a clear legal interpretation on this issue in order to resolve this finding." [Ex. II.9 at (ISLLC 000035).]

RESPONSE TO NO. JS44.  No dispute that the language is quoted accurately.  To the extent statements of individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.

JS45.  In a November 6, 2003 e-mail to Assistant Secretary Sally Stroup, the President and CEO of Iowa asked Ms. Stroup to "clear the release of the report from the [ED] review of [Iowa] conducted in July 2002. I have made numerous attempts, through the Dallas office and through Kristy [sic] Hansen, to get this released. The only sticking point was our treatment of

9.5% floors . . . . I noted in the EFC Exchange today that you reiterated at the EAC meeting what you told me on the phone: that our treatment of 9.5% floor loans was in accordance with the 96 DCL. So could we please have our clean review report?" [McMahon Decl., Ex. II.16 (ISLLC-000018-19, at 000019).]

**RESPONSE TO NO. JS45.  No dispute that the language is quoted accurately.  To the extent statements of individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.**

JS46.   On November 7, 2003, Assistant Secretary Stroup forwarded the above e-mail to Ms. Hansen, writing that "there should be no issue with 9.5% floor unless something is going on different from people passing loans thru existing deals and extending times thru refinancing both of which look legal under the DCL." [Ex. II.16 at (ISLLC 000019).]  Ms. Hansen agreed that multigenerational transferring was permitted as reviewed in the ISLLC program review. [Ex. II.120 (Hansen Dep. 93:18-94:8, 96:17-97:11).]

**RESPONSE TO NO. JS46.  Disputed and incomplete.  Stroup's statement in full included: "kristie, I don't know exactly what report he is talking about, but there should be no issue … ."  ISLLC–000019 (McMahon Dec., Ex. II.16) (emphasis added).  In the testimony cited, Hansen did not address "multigenerational" transferring.**

JS47.   That same day, Ms. Hansen forwarded Ms. Stroup's e-mail to Mr. Halaska, whose region had issued the October 2002 draft report. On November 8, 2003, Mr. Halaska responded to Ms. Hansen that his region could "issue the report by stating that ED guidance is pending in regards to the 9.5% and once resolved we will notify the entity as to what the ED Guidance will be on the 9.5%." [Ex. II.16 at (ISLLC 000018).]

**RESPONSE TO NO. JS47.  No dispute that the language is quoted accurately.  To the extent statements from Halaska are relied upon for the truth of the matter asserted, they are hearsay.**

**JS48.**  On November 10, 2003, ED issued another draft report for the July 2002 Iowa program review.  Unlike the October 30, 2002 draft report, the November 10 report did not contain a finding of improper special allowance billing. Instead, it included an "Observation: Questionable Billing for Special Allowance Benefits." The Observation stated:

> The Department of Education is currently reviewing the applicable legislation and Dear Colleagues [sic] Letters with particular interest concerning the March 1996 Dear Colleague Letter DCL-96-L-186. *In particular, the wording is vague enough to allow more than one interpretation of the content with respect to growing the Tax Exempt Bond base.* It was originally the opinion, of the team, that this interpretation that allowed for growing the base is not the implied intent of DCL-96-L-186.  This has been brought to the attention of Headquarters policy staff for final determination and it appears that an amendment to clarify the existing Dear Colleague Letter will be introduced within the coming months . . . .

[McMahon Decl., Ex. II.17 (ISLLC-000011-17, at 000014) (emphasis added).]

The November 10, 2003 draft report repeated the discussion of the October 30, 2002 draft concerning Iowa's 9.5%/half-SAP loan growth and Iowa's explanation. It eliminated, however, the October 30, 2002 draft's paragraph (quoted *supra* at ¶ JS43) that started: "The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issuance to another." [Ex. II.17 (ISLLC 000011-17).]

**RESPONSE TO NO. JS48.  No dispute that the language is quoted accurately. Neither Stroup nor Hansen recalled reviewing this draft.  Stroup Tr. 70:16-18 ("[D]o you recall receiving a copy of the [Iowa] draft report dated November 10, 2003?  I don't."), 72:6-10 ("Do you know if this November 10, 2003 report was the final report?  I don't know.  Is this another draft?  I have no idea.") (Soni Dec., Ex. 21); Hansen Tr. 93:18-95:13, 78:6-20 (testifying that she "didn't study" the November Iowa draft report) (Soni Dec., Ex.**

22).  Hansen also testified that she did not know how the "Finding" from the 2002 draft became an "Observation" in the November 2003 draft or who was involved with making that decision.  *Id.* at 81:1-82:1; *see also id.* at 83:20-85:4.

Wallace testified, however, that at least as of May 2003, the Southern Region's position on the 9.5% Loan issue continued to be the same as the position stated in the October 2002 draft of the report.  Wallace Tr. 386:7-11 (Soni Dec., Ex. 23).

Wallace received no explanation for how unlimited growth was legal.  Wallace Tr. 399:6-21 (Soni Dec., Ex. 23), and he still believed it was contrary to Congressional intent.  *Id.* at 397:17-399:4

Wallace stated that the Southern Region "still wished to pursue the issue."  *Id.* at 388:21-389:11.  Regarding the sentence in the draft that stated that "[i]t was originally the opinion, of the team, that this interpretation that allowed for growing the base is not the implied intent of the DCL-96-L-186," ISLLC-000014 (McMahon Dec., Ex. II.17), Wallace explained that "Question 30 was very limited in its scope and, again, I think this sort of skirts the issue to some extent.  . . .  In one way you can say that the DCL allowed for the loans to move but the DCL did not give the authority to grow the base.  So it's not implied in there but, like I say, there's other controlling regulations, more so than just the DCL that come into play."  Wallace Tr. 391:21-393:1 (Soni Dec., Ex. 23).  Wallace testified that the "other controlling authority" was  Section 682.302(c).  *Id.* at 393:6-397:15.

**JS49.**  On December 9, 2003, ED issued the final report of its program review of Iowa.  The final report replaced the "Observation" section of the November 10, 2003 draft report with a "[n]ote of interest regarding billing for Special Allowance" (italics omitted). In contrast to

the earlier versions of the report, ED's final report concluded: "The process described above is considered within compliance when consideration is given to the [1996 DCL]." [McMahon Decl., Ex. II.18 (ISLLC000002-08).] Assistant Secretary Stroup agreed that Nelnet's May 29, 2003 letter raised the same issues as the ISLLC program review. [Ex. II.119 (Stroup Dep. 87:9-87:11).] Stroup also testified that she agreed with the statement that the wording of the DCL was vague. [Ex. II.119 (Stroup Dep. 73:3-73:21).] Hansen similarly agreed that the "tax-exempt issue" was confusing. [Ex. II.120 (Hansen Dep. 62:8-62:12).]

**RESPONSE TO NO. JS49.  Disputed and incomplete.  *See* Responses to JS42-48, *supra*.  Stroup testified that Nelnet's May 29, 2003 letter "generally" raised the same issues as the ISLLC program review.  DEd never mentioned the ISLLC program review in its communications with Nelnet, and Nelnet was unaware of the final ISLLC report until this litigation.  Nelnet Audit Report at 57 (Soni Dec., Ex. 199).**

**At their depositions, neither Stroup nor Hansen recalled receiving a copy of the final draft report.  Hansen Tr. 90:5-7 ("Q:  Do you recall receiving [the final Iowa] report and reviewing it when it came out?  A:  Not specifically.") (Soni Dec., Ex. 22);  Stroup Tr. 79:3-6 ("Q:  Do you remember whether you received a copy of the final program review on or about December 9, 2003?  A:  I don't remember.") (Soni Dec., Ex. 21).  Stroup did not know who authorized the language in the final report.  *Id*. at 79:18-80:7 ("Q:  Who made the decision to conclude that the Iowa process was considered within compliance?  A:  I don't remember.  Q:  Did you have a role in that as Assistant Secretary?  A:  I don't remember.  Q:  Do you remember any discussions that you had concerning the change in the language from the two prior versions to the final report as it relates to element twelve?**

A:  No.").  Wallace received no explanation for why the changes to the final draft had been made.  Wallace Tr. 403:7-10 (Soni Dec., Ex. 23).

Neither Hansen, Shaw nor Wallace had ever seen a "Note of interest."  Hansen Tr. 90:1-4 (Soni Dec., Ex. 22); Shaw Tr. 61:16-62:2 (Soni Dec., Ex. 20); Wallace Tr. 403:16-19 (Soni Dec., Ex. 23).  Hansen testified that the final Iowa report did not authorize the refilling of pre-1993 trusts after loan transfers.  Hansen Tr. 251:7-254:13 ("Q: Mr. Foresman didn't discuss the italicized text, did he, the question about what eligible funds were being used within the 1993 trust?  Does he talk about that at all?  A: I don't see a specific reference to that.") (Soni Dec., Ex. 22).  Similarly, Wallace testified that the final report did not discuss 9.5% Loan growth.  Wallace Tr. 404:2-11 (Soni Dec., Ex. 23).  *See also* Response to JS37, *supra*, regarding Stroup's understanding of the applicable laws and regulations.

Shaw did not recall why changes were made to the various report drafts.  Shaw Tr. 55:20-56:12, 56:21-57:4 (Soni Dec., Ex. 20).  Shaw did not "know who was responsible, who made the decision to conclude that the Iowa Student Loan Liquidities process was considered within compliance," *id.* at 62:11-62:17, and she did not "remember any discussions within the department concerning how the Iowa process in October of 2002 was considered out of compliance but in December of 2003 was considered in compliance."  *Id.* at 62:18-63:2.  *See also* Response to JS37 regarding Shaw's understanding of the applicable laws and regulations.

JS50.  Ms. Shaw testified that the conclusion reached by the Department following deliberation about the outcome of program reviews in late 2003 was "that current billing

practices by lenders on 9.5 were within the statute." [Ex. II.118 (Shaw Dep. 75:4-75:11).] She testified that the decision was made by OPE and OGC that no action would be taken in response to Oberg's OIG complaint because "all 9.5 interest and special allowance billings were being submitted in compliance with existing statute, regulation and department policy." [Ex. II.118 (Shaw Dep. 108:1-108:16).]

**RESPONSE TO NO. JS50. Disputed and incomplete. Shaw does not state in the referenced testimony that this was the conclusion reached by the Department. To the extent statements of individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.**

### E. The July 2004 Mirek Halaska Summary of ED Policy

**JS51.** In a July 14, 2004 e-mail to various persons within ED, Mirek Halaska "summarized" ED's "approach" to the issue of growth in lenders' portfolios of 9.5%/half-SAP loans as follows:

> c. [T]he issue related to DCL-96-L-186, Question 30 came into play . . . .
>
> d. Then the policy interpretation of the DCL came back with the question of whether the practice of moving loans thru tax-exempt bonds to make them eligible was legal or not. The guidance was that it was legal and as long as a loan had ever been financed by an eligible tax exempt bond then an entity could bill the loan at the tax-exempt special allowance rate as long as the bond had not been defeased . . . .
>
> g. During our reviews in the Southwest region, we recovered $1.1 million for loans improperly billed as being eligible for tax-exempt benefits . . . . [T]hese loans had never been in a bond eligible for tax-exempt billing . . . . *Had the loans passed thru an eligible bond prior to billing, then they would be* [*sic*] *been eligible under current guidance."*

[Decl. II.10 at (OBERG00000129) (emphasis added).]

**RESPONSE TO NO. JS51.  No dispute that the language is quoted accurately.  To the extent Halaska statements are offered for the truth of the matter asserted, they are hearsay.**

JS52.  Ms. Stroup and Ms. Shaw both testified that Mr. Halaska's recitation of the history of events "accurately described the policy interpretation of the DCL that was given to FSA." [Ex. II.119 (Stroup Dep. 132:4-132:17); Ex. II.118 (Shaw Dep. 132:19-133:11).]

**RESPONSE TO NO. JS52.  No dispute that the language is quoted accurately.  *See* Response to JS37, *supra*, with respect to Stroup's and Shaw's understanding of the applicable laws and regulations.**

### F.    Nelnet's Communications with ED and Public Disclosures[3]

JS53.  Nelnet, Inc. ("Nelnet") is the parent company of Nelnet Education Loan Funding, Inc. ("NELF").

**RESPONSE TO NO. JS53.  No dispute.**

JS54.  In 1998, Nelnet Education Loan Funding, Inc. ("NELF"), a wholly owned subsidiary of Nelnet, acquired the student loan assets and liabilities of Nebraska Higher Education Loan Program, Inc. ("NebHELP"), a non-profit corporation that has previously operated as a qualified scholarship finding corporation under Section 150(d) of the Internal Revenue Code. In connection with that transaction, NELF assumed the obligations of NebHELP to pay the principal and interest due on its outstanding student loan revenue

---

[3]    Paragraphs JS53 to JS55 provide background information about Nelnet and NELF that is necessary to understand the facts relating to Nelnet's communications with ED and public disclosure.

bonds. [McMahon Decl., Ex. II.19 (N0093523-52 at N0093539).] Prior to its conversion to for-profit status, NebHELP issued a series of tax-exempt bonds in November of 1985 to fund the acquisition of federally backed student loans, including its 1985 Trust. [McMahon Decl., Ex. II.20 (ED-A003480-3516, at ED-A-003481-82).] NELF used proceeds of those bonds to purchase or originate student loans. The Series 1985A bonds were issued under an indenture, in relation to which NELF entered into an eligible lender trust agreement, with Wells Fargo bank, an eligible lender trustee under the Higher Education Act. [McMahon Decl., Ex. II.21 (ED-A-001310-1342 at ED-A-001315).]

**RESPONSE TO NO. JS54.  Incomplete.  NELF had $463,175,000 in Eligible Financings (including $143,050,000 in its 1985A bond series).  Heimes Tr. 149:2-152:16, 153:14-154:10, 160:2-161:18 (Soni Dec., Ex. 4).**

**JS55.**  NELF was also the beneficiary of several eligible lender trust agreements relating to financing programs that issued various taxable obligations. Wells Fargo was the eligible trustee for these "Purchasing Trusts," which included: (i) a securitization program created by a Trust Indenture dated as of June 1, 1993, between NELF, as grantor and beneficiary, and Wells Fargo, as trustee that relates to a Student Loan Trust and Agency Agreement dated as of June 1, 1993 (the "1993A Trust"); (ii) an Eligible Lender Trustee Agreement dated as of June 1, 2003, that relates to a securitization program created by an Indenture of Trust as of June 1, 2003, between NELF, as grantor and beneficiary, and Wells Fargo, as trustee (the "NELF 2003-1 Trust"); (iii) a Student Loan Trust and Agency Agreement dated as of May 1, 1997, that related to a securitization program trust created by a Trust Indenture dated as of May 1, 1997, between NELF, as a grantor and beneficiary, and Wells Fargo as trustee (the "SLM CP Trust"); (iv) an Eligible Lender Trust Agreement dated as

of May 1, 2003, that related to a securitization program trust created by the Warehouse Note Purchase and Security Agreement dated as of May 1, 2003, among NELF as borrower, Wells Fargo as trustee, and various other parties (the "BofA Trust"); and (v) an Eligible Lender Trustee dated as of April 28, 2003, among NELF as borrower, Zions First National Bank, as trustee, and various other parties (the "RBC Trust). Most of these trust arrangements are, by their terms, governed by Nebraska law; the remainder are governed by Minnesota law. [Ex. II.21 at (ED-A-001316-17).]

**RESPONSE TO NO. JS55.  No dispute.**

**JS56.**   After the events of September 11, 2001, the Federal Reserve began decreasing interest rates. [McMahon Decl., Ex. II.121 (Dunlap Dep. 27:8-27:19).] As of the fall of 2002, Nelnet began to hear about a number of competitors that had expanded their portfolios of loans that qualified for 9.5% SAP. [Ex. II.121 (Dunlap Dep. 111:4-111:14); McMahon Decl., Ex. II.122 (Heimes Dep. 25:17-26:6).] Nelnet personnel, Jeff Noordhoek and Mike Pohl, had discussions on this point with Paul Sheldon, an investment banker with Citibank. [McMahon Decl., Ex. II.22 (N0108371); Ex. II.122 (Heimes Dep. 25:11-25:16).] Mr. Sheldon indicated to Nelnet that a number of people were recently taking advantage of the 9.5 floor. [Ex. II.22 (N0108371).] At that time, Nelnet believed that half SAP subject to the 9.5% floor would return more than loans billing at full commercial SAP although there was risk that if interest rates spiked up, the 9.5% SAP loans could earn less at certain points than full SAP loans. [Ex. II.122 (Heimes Dep. 98:7-98:13).]

**RESPONSE TO NO. JS56.  Incomplete.  Dunlap did not name any competitors. Dunlap Tr. 111:1-112:5  (Soni Dec., Ex. 5).  The reference to discussions with  Sheldon are**

in internal Nelnet emails and to the extent such statements are relied upon for the truth of the matter asserted, they are hearsay.

During the relevant time period, the 9.5% SAP loans did not earn less than the full SAP loans.  Heimes Tr. 17:6-18 (Soni Dec., Ex. 4).  Nelnet had numerous options to mitigate any risk associated with climbing interest rates.  Nelnet could retire or defease the 1985A Trust, which would have resulted in the 9.5% SAP no longer applying to loans funded by the 1985A trust.  Nelnet could sell the loans to a third party and the loans would have then received commercial SAP rates.  *Id*. at 289:21-290:14.

JS57.  In December 2002, after hearing that other lenders were qualifying loans for 9.5% SAP given the low interest rate environment, Nelnet decided to seek guidance from ED as part of its effort to understand what other lenders were doing with respect to their 9.5% SAP loan portfolios and to determine the propriety of these practices. [Ex. II.121 (Dunlap Dep. 158:13-159:9); McMahon Decl., Ex. II.123 (Kaplan Dep. 29:11-30:3).]

RESPONSE TO NO. JS57.  Disputed and incomplete.  The Dunlap Dep. 158:13-159:9 and Kaplan Dep. 29:11-30:3 citations do not support the proposition that Nelnet sought guidance from the Department of Education to "understand" what other lenders were doing.

Mike Dunlap, Chairman and CEO, stated repeatedly that the $300 million plus in inflated 9.5% SAP claimed by Nelnet "provide[d] no additional value to the students, families and schools" that Nelnet purported to serve.  Heimes Ex. 29 at N0001001 (Mills Dec., Ex. 36).  (emphasis added).  In December 2002, shortly after what came to be known

as "Project 950" began to be discussed, Dunlap asked his executive colleagues, "Has anyone here given a deposition besides me??"  Heimes Ex. 3 at N0120999 (Soni Dec., Ex. 59).

JS58.   On December 23, 2002, Paul Tone, Executive Director of Government Relations for Nelnet, had a telephone call with Kristie Hansen to set up a face-to-face meeting to discuss issues relating to the 9.5% floor earnings on loans moved from certain tax-exempt financings to taxable financings.  [McMahon Decl., Ex. II.23 (Tone Decl. ¶ 5).] As General Manager of Financial Partners, Ms. Hansen was the head person of the division of FSA that supervised lenders and guarantee agencies participating in the FFELP. During this preliminary conversation, Ms. Hansen indicated that she was enthusiastic about meeting with Nelnet staff on the 9.5% issue; she mentioned that she had done some research on the issue, including a call to Sheila Ryan, formerly with Nellie Mae; and she mentioned the March 1996 DCL as being relevant to the issue and reinforcing the contention that loans moved from certain tax exempt issues also carried the floor earnings characteristic of 9.5% if loans were then moved into the taxable financings. [*Id.*] During the December 23, 2002 telephone call, Tone arranged for a face-to-face meeting to be held with Ms. Hansen in early January 2003. [*Id.*]

RESPONSE TO NO. JS58.  Disputed and incomplete.  This is Nelnet's characterization contained in an internal email from  Tone.  Dunlap Ex. 47 (Soni Dec., Ex. 54).  To the extent statements from individuals not under oath are offered for the truth of the matter asserted, they are hearsay.

Incomplete in that in December 2002, Nelnet first approached Kristie Hansen at the Department of Education.  Hansen "was a contact that Paul [Tone of Nelnet] had within the Department," that came to the Department directly from NCHELP, an industry trade

association of which Nelnet was a member, and worked in a non-policy job as general manager of the "Financial Partners" Section of the Department's Office of Federal Student Aid ("FSA") until relieved of her duties by her supervisor.  Hansen Tr. 10:11-13:3 (jobs at DEd, NCHELP), 14:11-15:4 (FSA is not responsible for policy) (Soni Dec., Ex. 22); Heimes Tr. 220:16-22 (Soni Dec., Ex. 4) (Hansen was a contact known by Tone; Shaw Tr. 58:1-18 (Soni Dec., Ex. 20) (decision to relieve Hansen of responsibilities).  Tone spoke with Hansen on the phone in December 2002.

Hansen's position was a policy-implementing, not a policy-making position or a legal position.  The question of the appropriateness of Nelnet's Project 950 raised policy and legal questions, not implementing questions.  *See* Response to 121, *infra*.  Hansen indicated that she had not thought much about this issue.  *See* Response to JS59, *infra*.  To the extent  statements of individuals not under oath are relied upon for the truth of the matter asserted, they are hearsay.  What was recounted above is from a memo written on January 5, 2003 after the face-to-face meeting with Hansen and Tone's Declaration made for this Motion.  *See* January 5, 2003 Email from Paul Tone at N0002360 (Soni Dec., Ex. 182).

At her deposition, Hansen did not recall a 2002 phone call with Nelnet or Tone.  Hansen Tr.  104:4-9.

JS59.   On January 3, 2003, Don Bouc (President of NELF), Paul Tone, Ed Martinez (General Counsel of Nelnet) and Gary Schlueger (Mr. Tone's deputy in Nelnet's government relations group reporting to Mr. Tone) met with Kristie Hansen at the Department of Education to discuss whether loans transferred through a tax exempt obligation originally issued before

October 1, 1993, to a taxable financing qualified for 9.5% SAP after leaving the tax exempt obligation. [Ex. II.23 (Tone Decl. ¶ 6).] Ms Hansen stated that the Department could not immediately preclude the practice of moving loans between tax-exempt and taxable financings for the purpose of increasing the number of loans entitled to earn the 9.5% SAP given the 1996 DCL. [*Id.*]  Ms. Hansen agreed that there was no legal argument prohibiting a process of transferring loans through a pre-October 1, 1993 tax-exempt financing into a taxable financing. [McMahon Decl., Ex. II.24 (N0124992).] During this meeting, Ms. Hansen indicated that while the Department was looking at ways to limit or control the movement of loans between tax-exempt financings and taxable financings for the purpose of increasing the number of loans entitled to earn the 9.5% SAP, the Department could not immediately preclude such practices given the 1996 DCL. [Ex. II.23 (Tone Decl. ¶ 6).] She further acknowledged that at some points the half SAP return has had and may have in the future an adverse effect on lenders depending on interest rate movements and that the current 9.5% floor opportunity may be balancing those losses. [*Id.*] Ms. Hansen also agreed that the 1996 DCL was silent on how frequently loans could be moved in and out of a tax-exempt financing, or how long such loans must remain financed by pre-October 1, 1993 tax-exempt obligations. [*Id.*] Ms. Hansen acknowledged that, at the time of this meeting, she was aware that other lenders were engaged in such transferring practices and that this had resulted in an increase in the volume of 9.5% loans. [*Id.*]

**RESPONSE TO NO. JS59.  Disputed and incomplete.  To the extent statements made by individuals not under oath are relied upon for the truth of the matter asserted, they are hearsay.**

**Hansen did not have a policy making position.  *See* Response to JS58, *supra*.**

Don Bouc, Ed Martinez, Paul Tone and Gary Schleuger met with Hansen on January 3, 2003. Hansen recalls virtually nothing of the meeting. *See* Hansen Tr. 112:18-113:21 (Soni Dec., Ex. 22). The new Declaration of Paul Tone (McMahon Dec., Ex. II.23), reflects that Nelnet focused its presentation on the continuation of 9.5% SAP following transfers of loans out of tax-exempt bonds to taxable bonds. Dunlap Ex. 47 at N0124998 (Soni Dec., Ex. 54).

Internal Nelnet emails document that Hansen had not thought about the practices Nelnet discussed with her. In response to an email from Dunlap that posed a question, "do the loans have to be owned by the same authority?? Nebhelp, Melmac, etc???" Bouc wrote, "She was not definite on this, I don't think she had thought about it before." N0002362 (Soni Dec., Ex. 182). In another email, Bouc wrote, "It was also very obvious that she wants to 'put a fence around this,' but is not sure how to approach it." *Id.* Hansen did not recall using the "fence" language. Hansen Tr. 114:20-115:10, 272:8-10 (Soni Dec., Ex. 22).

After the January meeting, Mike Pohl emailed a group of Nelnet executives that "I smell $20 million." Heimes Ex. 26 at N0125904 (Mills Dec., Ex. 35). In early 2003, Nelnet adopted "Project 950" to grow its 9.5% eligible loan pools. Heimes Tr. 18:1-2 (Soni Dec., Ex. 4); Heimes Ex. 19 at N0018269-73 (Mills Dec., Ex. 33). Multiple internal documents state that swaps were "backdated" to January 2003. *See* Heimes Ex. 12 at N0102843, Heimes Ex. 17 at N0119109 (Soni Dec., Ex. 61, 63). Terry Heimes, Nelnet's CFO, denied that any backdating had taken place, but was unable to explain the express references to backdating in the documents prepared by his own department. Heimes Tr. 82-85, 109-11 (Soni Dec., Ex. 4).

At her deposition, Hansen corroborated very little of Nelnet's own characterizations of the meeting as she could recall very little about it.  Hansen Tr. 106:21-107:14; 109:19-113:21 ("Q: In essence, do you recall anything other than the fact that Nelnet came in to discus 9.5 percent and having the feeling that they said if you don't tell us we can't do it, we're going to do it?  . . . A: I believe every lender was talking about this at the time but I don't remember any specifics out of that conversation except the exploration of 9.5."); 114:16-[li]5:19 (Soni Dec., Ex. 22).  She recalled generally that "[i]t appeared that Nelnet was interested in . . .  getting a determination of whether certain practices would be approved for the 9.5 billing.  I'm saying 'certain practices.'  <u>I don't even know if we talked about specifics of what they were proposing</u>.  Both in this meeting and the larger meeting that I know we're going to talk about . . . there was a sense of Nelnet tattling on other lenders who were doing this billing and saying, if I could characterize this, tell us no or we're going to do it because everyone else is doing it.  Completely my opinion."  *Id*. at 107:20-108:13 (Soni Dec., Ex. 22) (emphasis added).

**JS60.**  Based on the review of the regulations, the 1996 DCL, the telephone call between Paul Tone and Kristie Hansen on December 23, 2002, and the January 3, 2003 meeting between the Nelnet executives and Ms. Hansen, Nelnet drafted a summary entitled "Project 950" to describe a three-step operational process to qualify loans for 9.5% SAP under which student loans financed on a taxable basis through various NELF financings were to be transferred to the NELF 1985A tax-exempt financings; temporarily warehoused in the 1985A financing; and then transferred from the 1985A financing to another taxable financing within NELF. [McMahon Decl., Ex. II.25 (N0018269-18273).] Project 950 was an operational overview to ensure that the movement of loans through sales and ultimate financing with tax-exempt and taxable

- 73 -

financings were accomplished effectively from an operational standpoint. [Ex. II.122 (Heimes Dep. 48:648:21).] On January 10, 2003, John Dean of the law film Dean Blakey issued a draft written legal opinion addressed to Mike Dunlap, Chairman and President of Nelnet Loan Services, Inc. and on January 20, 2003, Mr. Dean issued a final signed opinion with the same conclusion as the draft. [McMahon Decl., Ex. II.26 (N0000400-04).] The legal opinion stated that "[g]iven that the language of the Dear Colleague letter is unambiguous and that Departmental officials have informally confirmed our interpretation of 34 C.F.R. 682.302, we have concluded that Nelnet may transfer loans into the tax-exempt bond estates it acquired as a result of acquisition of converted qualified scholarship funding organizations established pursuant to section 150(d)(3) of the Internal Revenue Code, and receive floor-yield/half SAP treatment on such loans while they are held in the tax-exempt estate and thereafter, provided that the original tax-exempt obligation has not be retired or defeased." [*Id.* at (N0000404).] John Dean provided additional legal opinions to Nelnet regarding the floor-yield/half SAP treatment with the same conclusions on March 4, 2003 [McMahon Decl., Ex. II.27 (N0127090-94)]; July 7, 2003 [McMahon Decl., Ex. II.28 (N02667-72)]; January 30, 2004 [McMahon Decl., Ex. II.29 (N0017677-90)]; and April 29, 2004 [McMahon Decl., Ex. II.30 (JED202-10).]

**RESPONSE TO NO. JS60.  Disputed and incomplete.  No support is provided for the assertion that Nelnet's "Project 950" summary was based on a review of the regulations, the 1996 DCL, the telephone call between Paul Tone and Kristie Hansen on December 23, 2002, and the January 3, 2003 meeting between the Nelnet executives and Hansen.**

John Dean is a lobbyist and lawyer who has counted Nelnet and its predecessors as a client since the early 1990s.  Dean Tr. 54:3-55:3 (Soni Dec., Ex. 19).  In 2002, he was affiliated with the firm of Dean, Blakey & Moskowitz (with Saul Moskowitz), which broke up during that year; he then restructured his operations to create a lobbying firm called Washington Partners LLP and a law office called Dean Blakey.  *Id.* at 13:22-14:20.  In 2003 and 2004,  Dean estimated that his business was approximately 65% lobbying and 35% legal work.  *Id.* at 15:6-11, 15:20-16:2.  However,  Dean's law firm was a registered lobbyist for Nelnet in 2003 and 2004.  Dean Ex. 2 (Soni Dec., Ex. 141); Dean Tr. 20:22-23:18 (Soni Dec., Ex. 19).  Dean claimed that his law firm did not do any lobbying for Nelnet in 2003 and 2004, but admitted that he personally conducted the lobbying efforts and that his law firm took in lobbying fees and then assigned certain of those fees to the lobbying firm based on "an arbitrary split."  *Id.* at 20:7-16, 23:13-18.  Dean was on a monthly retainer for lobbying and legal work that could be terminated by either party at any time.  *Id.* at 27:13-21.

As of December 18, 2002, Nelnet understood that it could go to John Dean to get the opinion that it wanted supporting its transfer activities.  In its initial "white paper" on what was later dubbed "Project 950," under the heading "strategy and discussion points," Nelnet queried:  "Do we need to get an opinion from Saul Moskowitz (our friend) or can we pursue John Dean, etc?  Has John Dean provided any opinions for this cause?  Would Saul's opinion bring more credibility than John's?  Evidently Saul has been giving opinions to a number of the secondary markets for approximately $5000-$10,000.  Paul [Tone] also noted that John Keohene (spelling) from Orrick has provided opinions as well.  Do we need an opinion at all?"  "White Paper" N0117977-79 at 78 (Soni Dec., Ex. 187).  Under the

heading "Strategy- (Let's roll- God Bless George Bush)," Nelnet listed "Get opinion from either Saul M or possibly John Dean.  Probably not from Saul because of the recent developments."  *Id*. at N0117979.  Paul Tone, Nelnet's in-house lobbyist, spoke with  Dean in early January 2003 and reported back to several people at Nelnet that  Dean would "do the opinion for $5000."  Heimes Ex. 5 at N0125008 (Soni Dec., Ex. 60).  Jeff Noordhoek replied to the group advocating getting the opinion "for the belt and suspenders protection."  Ed Martinez, then Nelnet's general counsel, also replied to the group, reporting that they had indeed decided on that approach, "especially if the opinion were to cost $5000."  *Id.*

Dean provided Nelnet with a draft opinion on January 10, 2003.  January 13, 2003 Email from Ed Martinez at N0125331 (Soni Dec., Ex. 197)  Dean provided a signed opinion on January 20, 2003 that was almost identical to the January 10 draft.  Dean Ex. 8 at JED214 (Soni Dec., Ex. 121).  However, this January 20 opinion is not one of the opinions that Nelnet has cited as providing advice on which it relied.  *See* Nelnet Resp. to Relator's Interrog. No. 9 (providing that it relied on March 4 and July 7, 2003 opinions and January 30 and April 29, 2004 opinions as advice of counsel) (Mills Dec., Ex. 1); Dean Ex. 16 at 45 (Soni Dec., Ex. 125).  The first signed opinion of counsel on which Nelnet has claimed reliance was signed on March 4, 2003.  Dean Ex. 9 at N01270901-94 ((McMahon Dec., Ex. II.27).  Dean confirmed that his recollection was that the March 4 opinion was the first one formally delivered to Nelnet and that any prior opinions were drafts.  Dean Tr. 170:14-22 (Soni Dec., Ex. 19).

Nelnet paid John Dean $5000 for his "sheep dipping" opinion in January 2003, N0125789 (Soni Dec., Ex. 198), and an extra $3000 so that the Royal Bank of Canada could

rely on it as well.  *See* N0125018 (Soni Dec., Ex. 194).  Subsequent opinions cost between $4000 and $7000.  June 3, 2004 letter to Ed Martinez from John Dean at JED167, February 12, 2004 letter to Ed Martinez from John Dean at JED173 (Soni Dec., Ex. 211, 210).

Dean stated that his opinions were based on his understanding that any loan that secured a pre-October 1, 1993 tax-exempt bond was eligible for 9.5% SAP.  Dean Tr. 103:13-105:18 (Soni Dec., Ex. 19).  He believed that if a pre-October 1, 1993 tax-exempt bond estate went out and borrowed money in 1995 and used that money to purchase loans, those loans would be subject to 9.5% SAP.  *Id.* at 112:14-116:5.

The informal conversations with department personnel to which Dean referred in his opinions consisted of a single conversation with Kristie Hansen of the FSA section of DEd; he never spoke with anyone from OPE or the DEd general counsel's office.  Dean Tr. 183:17-184:22 (Soni Dec., Ex. 19).  He never informed Nelnet of the fact that he spoke with Hansen.  *Id* at. 184:22-185:8.

Dean confirmed that he did not in fact know the specifics of what Nelnet planned to do with the opinions, *id*. at 164:3-12, and did not know that Nelnet's business plans involved multiplying 9.5% SAP loan holdings many times over.  *Id*. at 97:13-98:5.

Dean admitted that although Section 682.302(c)(3)(i)(A)-(E) dictates the sources of funds that can be used to make or purchase loans and have them be subject to 9.5% SAP, he did not specifically analyze whether the loans that Nelnet sought to qualify for 9.5% SAP fell within any of those sources.  Dean Tr. 131:14-133:13 (Soni Dec., Ex. 19).  The reason that he gave for not performing this analysis was that he did not believe that DEd was pointing lenders towards this subsection of the regulation, so he did not think it

mattered.  *Id.* at. 134:14-135:12.  Dean also stated that he did not need to perform the analysis because the proper financing of the loans was an assumed fact provided by Nelnet (*id.* at 222:5-223:10), and that Nelnet did not give him enough information to determine whether the loans had been properly financed in any event.  *Id.* at 155:14-156:5.

Dean understood that the 1996 Dear Colleague Letter did not address the issue of how to bill for loans transferred in to a pre-October 1, 1993 tax-exempt bond estate and addressed only the transfer out of such a bond.  Dean Tr. 148:12-14 (Soni Dec., Ex. 19).

Dean confirmed that his opinions did not consider whether the transactions would be consistent with policy and that he was not asked to consider policy.  Dean Tr. 96:3-97:12, 102:12-16, 125:7-126:12 (Soni Dec., Ex. 19).  He understood the policies behind the 1993 OBRA.  *Id.* at 111:17-112:7.

Nelnet paid its lawyer and expert witness Jason Kravitt "hundreds of thousands of dollars" for opinions regarding the single issue of whether the transfers of loans between NELF bond estates were "sales" under the Uniform Commercial Code, which were submitted to DEd in opposition to the Inspector General audit findings.  Kravitt Tr. 36:9-37:4 (Soni Dec., Ex. 30).

**JS61.**  Mike Dunlap, Nelnet's Chief Executive Officer, made the decision to approve the Transferring process described in the Project 950 summary memorandum after the December 23, 2002 phone call between Mr. Tone and Ms. Hansen, the January 3, 2003 meeting between Nelnet executives and Department of Education officials, and after Nelnet received an opinion from Mr. Dean. [Ex. II.121 (Dunlap Dep. 60:17-61:10).]

**RESPONSE TO NO. JS61.  Disputed and incomplete.  Hansen testified that "I don't recall exactly what was said but I don't recall I said yes, no or maybe.  I probably said it's under discussion."  Hansen Tr. 108:17-21 (Soni Dec., Ex. 22);** *id.* **at 108:17-21 ("I don't even know if we talked about specifics of what they were proposing.")).** *See* **Responses to JS58 and JS59,** *supra.*

**Numerous facts reflect that Nelnet had reservations about Project 950 and its 9.5% SAP eligible loan growth.  Although not a full disclosure, Nelnet sent the Department of Education a letter on May 29, 2003, asking for written confirmation.  Heimes Ex. 31 at N003047-49 (McMahon Dec., Ex II.32).  While Nelnet began swapping loans between taxable and tax-exempt trusts, also known within Nelnet as "sheep-dipping" the loans, Nelnet escrowed the surplus 9.5% SAP received from the Department.  Heimes Tr. 208:9-18 (Soni Dec., Ex. 4).** *See also* **JS71, JS72 and Responses thereto,** *infra.*

**On March 5, 2003, Jeff Noordhoek, who was directly involved in Project 950 as head of Nelnet's Capital Markets Group, and who was later promoted to be (and still serves as) President of Nelnet, stated:**

> **All bankers who are helping us to achieve the 9.5% tagging issue are coming back with similar questions about "Headline risk," and if it sounds too good to[] be true, it usually is, etc.**
>
> **To help further protect Nelnet from such future DOE staff questioning our practices, I have asked Ed to draft a letter to [Kristie Hansen] at the DOE describing the meeting they had, including the topic of 9.5 floors and what was said by both parties, and to have a signature line that she agrees with what was discussed at the meeting.  This would be for our files, if the DOE ever came back and tried to take back any floor earnings.  Ed will draft it and circulate internally so we can debate the potential ramifications of sending it to DOE.  My goal would not to wait to get it to go forward, but hopefully get it eventually to paper our files.**

**Heimes Ex. 15 at N0118352 (Soni Dec., Ex. 62).**

At virtually the same time, Nelnet sent a letter to Hansen requesting Department acquiescence on a less significant matter.  Heimes Ex. 33 at N0039677-78 (Soni Dec., Ex. 73).  Nelnet asked her to sign in concurrence.  In that situation Nelnet received the requested concurrence in writing from Hansen.  *Id.*

Heimes admitted in a memo in November 2003, after Project 950 was well underway, that "Although there have been positive comments made related to the concept of billing the 9.5% floor SAP by officials within the DE, these comments have not specifically addressed our situation, nor have we received specific communication to confirm our application of the process and rules."  Heimes Ex. 38 at N0000336-37 (Soni Dec., Ex. 78).

Numerous public SEC filings made by Nelnet state that Nelnet "**may** be entitled" to the additional 9.5% SAP it was receiving as part of its Project 950.  *See* JS73-75.

JS62.   On April 7, 2003, Nelnet submitted its first billing to ED for 9.5% SAP on loans that had been qualified for that rate through Nelnet's transferring process. [McMahon Decl., Ex. II.31 (Heimes Decl. ¶ 6). Nelnet continued to submit such billings in each consecutive quarter thereafter through the third quarter of 2006. [Ex.II.31 (Heimes Decl. ¶ 7).] ED processed and paid all of Nelnet's billings for 9.5% SAP from the first quarter of 2003 through the second quarter of 2006. [Ex. II.31 (Heimes Decl. ¶¶ 9-10).]

RESPONSE TO NO. JS62.  Disputed that the loans were "qualified" for the 9.5% SAP rate.  Rather, Nelnet certified that the loans met the 9.5% SAP rules and regulations.  Heimes Tr. 203:17-206:19 (Soni Dec., Ex. 4).  Nelnet submitted certifications and billings

for a total of $322.6 million of "excess SAP."  Heimes Ex. 46 at N0018688-89 (McMahon Dec. Ex. 37).  This submission on April 7, 2003, is before Nelnet's.

Nelnet acquired loans from third parties, placed them in taxable "warehouse" financings, and billed them for ordinary SAP.  These loans were then swapped for loans in the tax-exempt 1985A trust.  Nelnet continued to claim 9.5% SAP on loans transferred out of the 1985A trust and began claiming 9.5% SAP on each loan that was temporarily swapped into the 1985A trust.  Loans were transferred to the 1985A trust for as little as one day (Nelnet's systems could not swap the loans more quickly) and then transferred either back to "warehouse" financing or other NELF financing.  After the loans were passed through the 1985A trust, NELF claimed 9.5% SAP on them on a permanent basis.  Heimes Ex. 19 at N0018269-73 (Mills Dec., Ex. 33); Nelnet Resp. to Interrog. No. 3 (Chart) (Mills Dec., Ex. 1); Heimes Tr. 119:7-13, 127:9-134:7 (Soni Dec., Ex. 4).

Nelnet's intra-company transfers were made at face value for each loan.  No attempt was made to determine or set a market price for the value of the loans.  Nelnet effectively reversed many of its transactions by moving loans to the 1985A trust and then, the next day, back to the financing where they originated.  The swapping of collateral between trusts did not result in gains or losses for tax purposes.  The swaps occurred at the direction of NELF, which held the beneficial interest in both trusts at issue in the swaps.  The swaps occurred between trust estates "within the same consolidated entity" and were "all part of the same successor in interest."  Heimes Tr. 117:11-118:12 (Soni Dec., Ex. 4); Kaplan Tr. 191:19-192:2, 194:21-199:8 (Soni Dec., Ex. 6); *see also* Heimes Ex. 19 (Mills Dec., Ex. 33).

Nelnet admits that the sole purpose of the transfers engaged in was to generate increased 9.5% SAP to enhance income.  "Nelnet states that the business purpose of the transactions described in Interrogatory No. 4 [sic] included obtaining additional revenues . . . . in order to finance the significant increase in Consolidation loans that Nelnet made or acquired; to enable Nelnet to effectively compete with other lenders and secondary markets, including entities that were receiving 9.5% SAP on loan portfolios . . . ." Nelnet Resp. to Interrog. No. 4 (emphasis added) (Mills Dec., Ex. 1); *see also* Heimes Ex. 19  at N0018269-73 (Mills Dec., Ex. 33).

**JS63.**   On April 22, 2003, Mike Dunlap, Paul Tone and Gary Schlueger met with Terri Shaw (Chief Operating Officer of FSA), Debbie Price, Kristie Hansen (General Manager of FSA's Financial Partners division), and Jeff Baker of FSA. [Ex. II.23 (Tone Decl. ¶ 7); Ex. II.118 (Shaw Dep. 77:1-78:17).] During this meeting, Mr. Dunlap outlined Nelnet's legislative proposal to eliminate the 9.5% SAP. [Ex. II.121 (Dunlap Dep. 134:15-136:14).] Mr. Dunlap also specifically mentioned that the savings could amount to billions of dollars and that, absent some legislative change, Nelnet as the owner of NELF could earn hundreds of millions of dollars by moving loans among pre-October 1, 1993 tax-exempt financings and taxable financings to increase the number of loans earning 9.5% SAP. [Ex. II.121 (Dunlap Dep. 164:11-164:19); Ex. II.23 (Tone Decl. ¶ 7).] He indicated that other lenders were engaged in this transferring process and that if ED did not stop the practice, Nelnet would engage in it. [Ex. II.120 (Hansen Dep. 289:8-289:15).]

**RESPONSE TO NO. JS63.  Disputed and incomplete.  Dunlap said that Nelnet could make "hundreds of millions of dollars" but did not say that this would be "by moving**

loans among pre-October 1, 1993 tax-exempt financings and taxable financings."  Dunlap Tr. 164:11-164:19 (Soni Dec., Ex. 5).

Hansen testified that she had little recollection of the substance of those meetings, Hansen Tr. 117:4-17; 122:5-20 (Soni Dec., Ex. 22), but that she generally recalled that Nelnet was "tattling" on other lenders who were already increasing their 9.5% Loan portfolios and threatening to do the same.  *Id*. at 107:15-108:13.  Hansen testified: "As I recall, Dunlap came in to outline the expansive use of the 9.5 percent billing and to explain that other lenders were going far afield, that is were using – going further and further . . . [a]nd basically saying Nelnet hasn't done this but we're going to be forced to for competitive reasons unless you explain. He also volunteered to be part of the legislative effort to put a stop to – to clarify what the extent of 9.5 billing should be."  *Id*. at 117:21-118:11.  She then testified that she did not recall herself or anyone else saying anything in response to Nelnet.  *Id.* at 119:13-119:16.  Hansen also recalled suggesting to Nelnet at the April 22, 2003 meeting that it should make the same presentation to Stroup and Andrade "[b]ecause any clarification of policy would happen at the Office of Postsecondary Education."  *Id.* at 125:3-12.

At the April 22, 2003 meeting, Mike Dunlap reiterated the policy reasons that 9.5% SAP made no sense (*see* Dunlap Ex. 50 at N0002187-88 (Soni Dec., Ex. 55)).

Shaw testified as follows about the April 22, 2003 meeting with Nelnet: "[T]he Nelnet folks were coming in to walk us through a Power Point paper slide presentation that discussed the 9.5 issue and my recollection is they were bringing it to the department's attention that, you know, with interest rates kind of flipping, that this 9.5 special allowance

payment could grow exponentially and was the department aware of that I think was one of their points and I believe they were seeking guidance from the department ultimately." Shaw Tr. 78:19-79:13 (Soni Dec., Ex. 20).  Shaw testified that she did not recall Hansen saying anything at the meeting and that she generally did not speak much at those types of meetings.  *Id.* at 80:15-20.  She did not recall Nelnet mentioning that other lenders were increasing their 9.5% Loan portfolios, and she did not recall a discussion of "tagging."  *Id.* at 82:6-19.

Noordhoek recommended that the meeting participants draft "a memo to file which outlines what was discussed and providing it to Dan Kaplan and Ed Martinez.  I think this might really helps us years down the road if any government authority were to question our past practices as it relates to this matter.  Just a thought."  Email from Jeff Noordhoek at N0119122.  (Soni Dec., Ex. 191).

In the April 23, 2003 memo to file, Gary Schleuger wrote that, "The purpose of the meetings was to offer for discussion Nelnet's top three reauthorization proposals, and to explain our goal for paying for these proposals by eliminating the floor income currently earned by lenders/holders."  Dunlap Ex. 50, N0002187-191 at 187 (Soni Dec., Ex. 55).  In the same memo, Schleuger wrote, "…we could make hundreds of millions of dollars by running loans through this process, but there would be no added value being provided to students, families, schools or the financial aid programs in general."  *Id.*  "They seemed intrigued by the offer to eliminate floor earnings, and asked that we work directly with them in drafting legislative language that could affect these changes."  *Id.* at N0002188.

The Dunlap Dep. 134:15-136:14 cite does not lay out a legislative proposal, but instead just states the government could save money.

Nelnet executives debated whether or not to send a follow-up letter to Hansen. Noordhoek communicated with Paul Tone, Nelnet's in-house lobbyist, who argued that sending a letter would "put a severe chill on our ability to have future meetings with Hanson" to advance Nelnet's interests.  Noordhoek replied, suggesting that "the key is to very delicately word the letter so it is factual, yet does not [pin] them down to a decision." Heimes Ex. 27 at 35 (Soni Dec., Ex. 68).  When Tone appeared to acquiesce, Noordhoek added "you are awesome, Paul.  I know you can walk the fine political tightrope and come out a winner with Nelnet's rear end protected!  I have faith in you Brother Tone!  Bring us to the promise[d] land.  Amen."  Heimes Ex. 28 at N125030-31, at 30 (Soni Dec., Ex. 69). Don Bouc, then-president of Nelnet, weighed in on the side of silence:  "I think this is a very bad idea.  Kristie will resist signing, as she would fear it was a 'commitment' by DOE without her first taking it through proper channels."  Heimes Ex. 27 at N125034 (Soni Dec., Ex. 68).  Noordhoek replied that "[i]t is a bad idea."  *Id.*

After the meeting, Nelnet still did not believe it had the necessary authorization for the billing, so it sought out further confirmation from the Department of Education.  *See* JS65, *infra*, and Response thereto.

**JS64.**  In this time period, Mr. Dunlap had decided that Nelnet would seek to become a publicly traded company. Therefore, he determined that it would be prudent to obtain written confirmation from ED of the oral confirmations that Nelnet officials had received

from ED officials regarding the transferring of loans to increase the number of loans earning 9.5% SAP. [Ex. 11.121 (Dunlap Dep. 130:8-131:12; 158:13-159:9).]

**RESPONSE TO NO. JS64.  Disputed that Nelnet had received oral confirmations from ED officials regarding the transferring of loans to increase Nelnet's number of loans earning 9.5% SAP.  *See* Responses to JS58, 59, 63, *supra*, and incomplete.  To the extent Nelnet is relying upon oral conversations from Hansen, she did not have the authority to change the policy or determine a legal interpretation of the Department of Education. Hansen explained that "Office of Postsecondary Education is responsible, as it relates to FSA, is responsible for establishing policy and as I think I said before, FSA is basically the implementation unit of that policy.  There is naturally a crossover and discussion and so forth but basically OPE is responsible for establishing the policies."  Hansen Tr. 14:11-15:1 (Soni Dec., Ex. 22).**

**JS65.**  On May 29, 2003, Terry J. Heimes, President of NELF, sent a letter to Angela Roca-Baker, the ED official in charge of processing lenders' SAP billings, and copied various high-ranking officials at ED, including Terri Shaw (Chief Operating Officer of FSA), Kristie Hansen (General Manager of FSA's Financial Partners Division), Frank Ramos (Ms. Roca-Baker's supervisor) and Sally Stroup (Assistant Secretary of Education). [McMahon Decl., Ex. II.32 (N0003047-49).] The letter furnished Department officials with details surrounding the transferring process that Nelnet had initiated and intended to follow. The letter explained that "NELF is purchasing portfolios of FFEL loans with funds obtained from the proceeds of the tax exempt 1985 Indenture in a series of acquisitions." [*Id.* at (N0003047).] The letter further explained that the loans financed within the 1985 Indenture would be held "for a period of time depending upon cash management needs and other internal concerns, but in any event

for at least one day or longer. Thereafter, the loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 Indenture." [*Id.*]

**RESPONSE TO NO. JS65.  Disputed and incomplete.  After the April 2003 meeting, the perceived need for the appearance of written authorization from the Department resurfaced at Nelnet, culminating in a May 29, 2003 letter.  Instead of sending the letter to Hansen, with whom Nelnet had earlier conversations, or to OPE, where Hansen had suggested raising their issues, the letter was sent to Angela Roca-Baker.  Heimes Tr. 255:4-21 (Soni Dec., Ex. 4).  According to Nelnet's internal emails, this allowed the letter to be "given the 'feel' of a more technical question," rather than the major policy change that it was.  Heimes Ex. 30 at N0000074-75 at 74 (Soni Dec., Ex. 70).**

**Hansen testified that Angela Roca-Baker "was the person in charge of the SAP billing unit if you'll call it, I believe it's two people.  It was actually Angela who had the day to day contact with lenders about their billing from an operational standpoint."  Hansen Tr. 129:4-9 (Soni Dec., Ex. 22).  Hansen testified further that Nelnet was "asking basically for approval by Angela Roca-Baker of billing practices associated with 9.5 which begs the question of the interpretation of law. . . . But Angela wouldn't really be in a position to approve that, I believe, because it crossed over the issues of interpretation, I think."  *Id.* at 130:12-131:2.  Stroup, the head of OPE, which was tasked with creating and implementing policy, testified that "[a]ll [she] knew" about Angela Roca-Baker was that "she worked in FSA;" she did not know her personally or what her responsibilities were.  Stroup Tr. 89:7-15 (Soni Dec., Ex. 21).**

Several alterations were made to the May 29, 2003 letter during the drafting process.  As initially drafted, the letter concerned a "billing statement question" and suggested "[a] question has arisen" concerning the supposed billing procedures.  Heimes Ex. 32 at N0001015-16 (Soni Dec., Ex. 72).  In the next draft, the "question" became a "confirmation" and Nelnet's plan to bill for 9.5% SAP became a reference to a formula.  Rather than referring to billing for the 9.5% floor, as in the initial draft, the revised letter included the "half-SAP" calculations.  The draft letter originally suggested that "[i]f you feel our analysis is incorrect or deficient in any manner, please advise us as soon as possible." *Id.* at N0001016.  That language was omitted, however, replaced by the statement that Nelnet would "assume [the] correctness" of its position "unless otherwise directed by you."  Heimes Ex. 34 at N0001009 (Soni Dec., Ex. 74).  This change was made because the original language "gives them an out." *Id.* at N0001011.  Mike Dunlap, Chairman and CEO, was directly involved in the drafting process, even to the extent of personally selecting who at the Department would receive a "cc" of the letter.  Heimes Ex. 35 N0001011 (Soni Dec., Ex. 75).

In the final letter, Nelnet never mentioned the amount of money involved or the fact that it had plans in place internally to "tag" between $700 million and $2.2 billion in loans in 2003 alone.  *Compare* Heimes Ex. 31 at N0003047-50 (Soni Dec., Ex. 71) (May 29, 2003 letter omitting any reference to amount of increased claims) *with* Heimes Ex. 22 N0097043 (Soni Dec., Ex. 65) (internal plan); *see also* Heimes Tr. 261:12-18 (Soni Dec., Ex. 4) (admitting that Nelnet had done internal projections as of the date of the letter).  Nor did Nelnet disclose its plan to increase its 9.5% SAP claims in 2003 by up to $92 million. *Id.*

The May 29, 2003 letter claimed that the transfers were "part of NELF's overall cash flow management plan" not increased 9.5% SAP.  Heimes Tr. 258:11-18 (Soni Dec., Ex. 4) (Q: "...the contribution that tagging made to your overall cash flow management was that you got more revenue from 9.5 SAP, right?  A: Yes.").

Hansen confirmed that, in her view, the letter did not fully disclose the details of the actual transactions undertaken by Nelnet.  Hansen Tr. 259:1-8, 261:21-262:13, 264:1-17 (Soni Dec., Ex. 22).  She testified that the letter provided few details about what Nelnet was in fact doing with its 9.5% Loans, and agreed that "this might have been one of those situations where more information about the actual mechanics of the transaction might have been helpful to the department." *Id.* at 262:5-264:17.  Hansen also testified that she did not have an opinion as to whether "Nelnet's letter followed ED guidance." *Id.* at 138:17-21.  She also testified that she did not view Nelnet's letter as "straightforward." *Id.* at 139:1-10.

In a June 2003 email chain regarding the letter, both George Harris of OPE and Brian Siegel of OGC likewise concluded that the letter lacked sufficient detail for DEd to issue a decision.  Oberg Ex. 15 at OBERG00004978-79 (Soni Dec., Ex. 87).  Moreover, in a 2006 email to David Dunn, Kristin Conklin, a senior advisor to the Office of the Undersecretary, stated that "Nelnet was not explicit about what it intended to do in its inquiry of [DEd]."  November 3, 2006 Email from David Dunn at ED-D-000578 (Soni Dec., Ex. 47).  Similarly, DEd-OIG stated in its 2006 audit report:

> Nelnet's documentation . . . including Nelnet's letter of May 29, 2003, to FSA . . . does not appear to reflect a comprehensive disclosure by Nelnet of the nature or effect of Project 950.  For

> example, Nelnet's May 29, 2003, letter and its accompanying flow chart described only the basic process.  The letter did not identify the eligible source of funds that would be used to purchase and qualify loans for the 9.5 percent floor, did not state directly that the process would be repeated many times, and did not state that the process would result in a substantial increase in the amount of loans billed under the 9.5 percent floor.

Nelnet Audit Report N0016967-17036 at 978 (Soni Dec., Ex. 199).  And in 2007, Jeff Taylor from OGC emailed an internal DEd memorandum to Sam Dillon at the New York Times which stated:

> Nelnet's own description of its Project 950 led the Department to understand that they were transferring eligible loans to taxable financing sources.  These transfers occurred before Congress changed the law in 2004.  If Project 950 actually only involved transferring, the actions would have been permissible under the existing law at the time.  <u>However, what was not comprehended until the September 2006 OIG audit report of Nelnet was that Project 950 also resulted in many loans being claimed eligible by Nelnet that were not eligible under existing law</u>.

OBERG0006390-91 (emphasis added).

No one at the Department ever countersigned and returned Nelnet's May 29, 2003 letter concerning 9.5% SAP.  Heimes Exs. 31 at N0003047, 33 at N0039677-78 (Soni Dec., Ex. 71, 73); Hansen Tr. 276:10-277:9 (Soni Dec., Ex. 22).  Less than five months before sending the May 29 letter, Nelnet had sent the Department a letter asking for a Department official to sign above the statement "I concur with the above."  Heimes Ex. 33 at N0039678 (Soni Dec., Ex. 33).  Hansen signed and returned the earlier letter.

Regarding Nelnet's invitation to countersign its letter, Hansen testified:  "In the past, this technique had been used for other interpretations.  I remember seeing a few, for

example, from Pam Moran who was working in FFELP policy, but Angela Roca-Baker wouldn't be authorized to do such a thing, and <u>this was complex enough and under such discussion, you would never approve something like this by a letter back.  It would have to be more generally distributed.  . . .  It also gives the view that this could be done in ten minutes after reading it.  As far as I know, that was not done in this case.</u>"  Hansen Tr. 276:10-277:5 (Soni Dec., Ex. 22) (emphasis added); *see also id*. at 277:16-279:2 ("Q: Do I understand that this kind of concurring signature was done when you had the authority to concur, correct?  A: Yes.  Q:  And when the issue appeared straightforward and you concurred with it?  . . . A: Yes, there could have been consultations with other people before signing it.  I would also say that generally speaking, it was an issue specific to that inquirer, nothing broadly applicable, perhaps, or – because that would be addressed usually in a Dear Colleague letter . . . .").

Stroup testified that Nelnet was the "only lender that actually wrote to the department with questions on the nine and a half percent SAP" prior to enactment of the TTPA.  Stroup Tr. 101:9-13 (Soni Dec., Ex. 21).  Shaw testified that prior to reading the Nelnet letter, no "other lender directly asked FSA for guidance on the proper interpretation of the rules governing billing of 9.5 percent SAP."  Shaw Tr. 89:11-15 (Soni Dec., Ex. 20).

JS66.  The letter further explained that Nelnet had "discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices." [Ex. II.32 at (N0003047).] Citing the relevant statute (20 U.S.C. Section 1087-1(b)(2)(B) and regulation, [34 CFR Section 682.302(c)(3)], Nelnet expressly explained that it intended to bill special allowance on

such loans at the 9.5% rate. Nelnet further explained that "[w]e have based this upon 34 CFR Section 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q & A No. 30), and our previous discussions with the Department on this matter." [*Id.* at (N0003048).] Nelnet invited ED to pose any questions it may have had about the described process, and requested verification that its intended billing procedure and practices conformed to existing law and guidance at the time. The letter included a diagram of Nelnet's process to supplement the explanation. [*Id.* at (N0003049).] The letter stated that Nelnet intended to proceed under the analysis described above and assume its correctness unless otherwise directed by ED. [*Id.* at (N0003048).]

**RESPONSE TO NO. JS66.  Disputed and incomplete.  The letter a signature line at the bottom where a DEd official could sign above the statement, "I concur with the above," and date it.  Heimes Ex. 31, N0003047 (McMahon Dec., Ex. II.32).  Nelnet had used this method before and received a signed response.  Also, the subject matter of the letter was changed from requesting the answer to a "Question" to requesting "Confirmation." Heimes Ex. 32 at N001015 (Soni Dec., Ex. 72).**

**Hansen testified that the Nelnet letter did not discuss the refilling of pre-1993 trusts after loan transfers.  Hansen Tr. 254:20-262:4  ("Q: This flow chart . . . doesn't tell you what is going to be done with the indenture itself, that is to say apart from transferring loans out to long term financing, there's nothing in there that tells you what's happening inside the indenture box? A: Correct.") (Soni Dec., Ex. 22); *id.* ("Q: Did you at any time after looking at this letter get an understanding of what transactions were going to take place other than the transfer out within the 1985 indenture?  A: No, I don't recall.").  (Soni Dec., Ex. 22).**

In May 2004 email exchange with Hansen's assistant, Tim Cameron, Pam Moran, a policy analyst at OPE, asked whether Nelnet had been billing as it described in its letter. OBERG00007694 (Soni Dec., Ex 204) ("Have they been billing us as they outline in the letter or are they waiting for our determination on this?").  When Cameron responded that it had, Moran responded, "I think it is always a bad idea for any program participant to begin billing us or taking some other action in advance of hearing definitively from us." ED-B-002658 (Soni Dec., Ex. 34).

JS67.   On June 9, 2003, NELF's President, Terry Heimes contacted ED to follow up regarding the May 29, 2003 letter. [McMahon Decl., Ex. II.33 (N0000156-157); Ex. II.121 (Dunlap Dep. 56:22-57:5).] From the time Mr. Heimes sent the letter until July 1, 2004, no ED official ever contacted him or raised any questions regarding the letter. [Ex. II.122 (Heimes Dep. 293:21-294:18).]

RESPONSE TO NO. JS67.  Incomplete.  No DEd official confirmed the practices at issue in the letter were acceptable.  *See* Response to JS69, *supra*.

During this same time period, Nelnet proceeded with numerous loan swaps to increase its 9.5% loan pools.  For thirteen straight business days in 2003 (May 27 – June 13), Nelnet transferred batches of approximately $50 million in loans in and out of its 1985A Trust every day.  After the foregoing series of transfers, NELF transferred the loans to three new taxable financings, each with a value in excess of $1 billion (raised on a taxable basis), that were completed in June 2003, January 2004, and April 2004 for the specific purpose of housing the swapped loans.  *See* Heimes Tr. 149:2-152:16, 160:2-161:18 (Soni Dec., Ex. 4); Heimes Ex. 23 at N0018269-18273 (Mills Dec., Ex. 33).  The proceeds from

these new financings funded Project 950 and permitted Nelnet to increase the loan holdings on which it claimed 9.5% SAP by over 800%.  Nelnet Supp. Resp. to Interrog. No. 1 (compare Average Daily balance of NELF for 4Q 2002 of $369.9 million to 2Q 2004 balance of $3.55 billion) (Mills Dec., Ex. 1); Heimes Tr. 42:5-11 (Soni Dec., Ex. 4).

JS68.   When Terri Shaw reviewed the letter sent to Ms. Roca-Baker she understood Nelnet intended to transfer multiple portfolios of loans from a tax-exempt trust to another financing after the loans had spent as little as 24 hours in the tax-exempt financing. [Ex. II.118 (Shaw Dep. 90:10-90:14).] She also understood that this could result in the government paying a significant amount in special allowance to Nelnet [*Id.* (Shaw Dep. 95:6-95:9)], and that Nelnet's SAP billings would increase substantially. [*Id.* (Shaw Dep. 117:6-117:10).] She was not directed to stop payment of Nelnet's quarterly 799 billings and did not instruct anyone on her staff to stop payments of Nelnet's quarterly 799 billings. [*Id.* (Shaw Dep. 94:15-95:5).] Sally Stroup, the Assistant Secretary of OPE, understood from the letter that Nelnet's 9.5% SAP billings would increase. [Ex. II.119 (Stroup Dep. 85:9-85:12).] Kristie Hansen understood that Nelnet intended to engage in multiple transfers of loans through the NELF 1985A Indenture. [Ex. II.120 (Hansen Dep. 288:19-289:20).]

RESPONSE TO NO. JS68.  Disputed and incomplete.  Shaw testified that she did not have knowledge of lenders' specific loan transactions.  Shaw Tr. 333:16-334:16, 337:3-18 (Soni Dec., Ex. 20) ("I was watching at the gross level."). Shaw stated in an email to herself, "While it is not specifically known how the increases in epb for each lender was realized, it is known that xxxx engaged in the practice of recycling, refunding or transfers." Email from Terri Shaw "Re: Nelnet Q's," ED-A-000954 (Soni Dec., Ex. 39).

Stroup testified that she "had a general understanding of the growth of the 9.5 loan portfolio," but that she never "investigate[d] the specific mechanisms and transactions by which the claimants were growing . . . their portfolio," and she never "personally look[ed] at any of the transactions to see whether [the] limitations [in the 1996 DCL] had been breached." Stroup Tr. 260:17-261:12 (Soni Dec., Ex. 21).

Hansen testified that when she left Financial Partners in December 2003, she "wouldn't have any specifics" about 9.5% Loan growth. Hansen Tr. 121:21-122:4 (Soni Dec., Ex. 22). Hansen also testified: "I have to clarify something. At the same time it is correct that the tax exempt financing questions were seen at that time, <u>I think were, extremely complex and that in hindsight I'd say in some situations we may not have fully grasped what was happening in the actions of the lenders in working the loans</u>. . . . I think the matter was of such complexity until we head for the guidance, precise guidance – I'm not sure I would have ever said it like this but it would certainly not be a definitive answer." *Id*. at 151:20-152:11. Hansen further testified that DEd lacked the "experts" to understand the "complexity" of the lenders' "transactions." *Id*. at 158:9-159:11 (emphasis added).

*See also* **Response to JS37,** *supra***, regarding Stroup's, Shaw's and Hansen's understanding of the applicable laws and regulations.**

JS69.   In June of 2003, the NELF May 29, 2003 letter was discussed within ED by various employees of Financial Partners as well as Ms. Roca-Baker and an attorney within ED's Office of General Counsel. [McMahon Decl., Ex. II.34 (OBERG00004976-84).] Various options were discussed, including the possibility of performing a focused review to answer the

questions raised in NELF's letter. [*Id.* at (OBERG00004977).] Ms. Roca-Baker stated that the NELF letter seemed straight forward and Linda Elrod, the director of the Financial Partners Division San Francisco office stated that "except for the PLUS and SLS exception. . . . Nelnet's letter follows DOE guidance." [*Id.* at (OBERG00004979-80).] Ms. Stroup understood without question from the letter that Nelnet's 9.5% SAP claims would increase. She believed that multigenerational loan transferring was permissible and that the transferred loans freed up new cash that could be used to purchase new 9.5 SAP loans. [Ex. II.119 (Stroup Dep. 235:16-236:9, 240:4-240:18).] Ms. Stroup discussed the Nelnet letter with others in ED, including the Office of General Counsel, and was of the opinion that the Nelnet letter followed ED's guidance. [*Id.* (Stroup Dep. 89:16-91:2).] She would have recommended countersigning Nelnet's letter. [*Id.* (Stroup Dep. 257:4-257:9).]

**RESPONSE TO NO. JS69.  Disputed and incomplete.  In response to Elrod's and Roca-Baker's comments, George Harris, a policy analyst at OPE, stated:**

> **OPE recently declined to answer a question from another party about tax-exempt financing and special allowance billing, saying that "...questions relating to tax-exempt financing can be of such complexity that it is best not to respond unless we are provided with documentation of the specific situation."**
>
> **I don't know what NELF means when it says "Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed by a different NELF financing prior to being placed into the 1985 Indenture."**
>
> **"Different NELF financing" in what respect?  This is an example of where specific documentation could help. . . .**
>
> **Given the absence of documentation and the uncertainty about what kind of decision Financial Partner intends to make concerning the ISLC review (and perhaps other reviews), I**

think the OPE answer that I quoted in the first paragraph is appropriate.

Email from George Harris, "Re: Reporting Tax-exempt obligations," at OBERG00004979

(Soni Dec., Ex. 147).

> Brian Siegel from DED Office of General Counsel then responded:
>
> Just to close the loop – I agree with George's advice.  Any advice we would give would have to be accompanied by a clearly stated disclaimer that it is based solely on the information provided and is not binding on the Department. There are too many complexities in these financing deals to give an opinion without reviewing all of the documents and financial agreements in detail.

*Id.* at OBERG00004978.  Elrod then forwarded the email chain to Halaska and stated that

Hansen agreed that there should be no approval:

> Kristie and I talked briefly about this Nelnet, Nebraska, letter while I was in WDC earlier this week.  Considering Nelnet's letter and the subsequent email traffic, what I suggested is that we not approve anything based on the letter which does not provide enough detail.  Rather, we could take one of two approaches: (1) Reiterate the regulatory/letter guidance and state that we cannot render a decision based on only the facts in the letter; or (2) perform a focused review (limited to the special allowance billing only) and get a first-hand understanding of the documents that they have and issue a report thereafter addressing their questions.

*Id.* at OBERG00004978.

"[I]n connection with Nelnet's letter," Stroup did not "at any time look into the specifics of how Nelnet was affecting the transactions described in the letter."  Stroup Tr. 261:16-20 (Soni Dec., Ex. 21).  With respect to the reference to "cash management needs," she testified: "I didn't sit and study the Nelnet letter so I don't know what they meant and didn't really think about what they meant."  She stated further that she did not "have any

- 97 -

understanding of what cash management would mean within the context of a bond portfolio and a loan portfolio." *Id.* at 261:16-262:11 (Soni Dec., Ex. 21).  In any event, Stroup also testified that she had little independent understanding of the pertinent statutes and regulations.  *See also* Response to JS37, *supra*.

The May 29, 2003, letter did not fully disclose Nelnet's activities.  *See* Responses to JS65-66, *supra*.

A 2006 email from James Manning, acting Assistant Secretary for OPE, to Terri Shaw and Kristin Conklin revealed that OGC had "recently affirmed that no career OGC staff ha[d] previously endorsed past practice on the 9.5 issue."  Oct. 13, 2006 Email from James Manning "Re: talking points," at ED-F-001260 (Soni Dec., Ex. 36).

Although Stroup said she would have countersigned the letter, she did not.  And in fact, although Stroup denied any recollection of it, Stroup Tr. 105:14-19, 256:16 ("I didn't write it.") (Soni Dec., Ex. 21), Shaw testified unequivocally that Stroup drafted DEd's ultimate response.  Shaw Tr. 116:8-15 (Soni Dec., Ex. 20).

JS70.  On June 26, 2003, NELF issued a Prospectus Supplement for $1,030,000,000 Student Loan Asset-Backed Notes, Series 2003-1. The notes were secured by a pool of student loans originated under the FFELP, a cash reserve fund, and the other money and investments pledged to the trustee. [Ex. II.19 (N0093523-52).] The Prospectus Supplement stated that NELF expected that all or substantially all of the notes will be financed by pre-October 1, 1993 tax-exempt obligations. [*Id.* at (N0093535).] The Prospectus Supplement stated the belief that each of these student loans would be entitled to receive half SAP subject to the 9.5 % floor, and that "the Secretary of Education may change these regulations and

interpretations." [*Id.* at (N00093535-36).] The Prospectus Supplement also set out as risk factors that Congressional actions may affect student loan portfolios and that Congress may elect not to reauthorize ED's ability to provide interest subsidies and federal insurance for loans. [*Id.* at (N0093536).] It also noted that "in a rising interest environment the net loan rate may limit the interest rates on the notes in circumstances where the net loan rate would not apply if the student loans received regular special allowance payments." [*Id.*]

**RESPONSE TO NO. JS70.  Disputed and incomplete.  The 2003-1 issuance was taxable and not eligible to make or purchase 9.5 loans.  Heimes Tr. 161:9-18 (Soni Dec., Ex. 4).  Approximately $1 billion in 9.5% SAP loans ended up in this financing after being moved through the 1985A Trust.  Heimes Ex. 23 (Mills Dec., Ex. 34).**

**In conjunction with issuing this securitization, Nelnet's Hannah Smitterberg wrote:**

> **I think we all need to think about what our response is going to be when this book [prospectus] hits the street next week. Certain people will figure out what we are doing by reading it. We can only assume that it will just be a matter of time until someone who we don't much care for and who is able to put two and two together gets a copy.  It has the potential to be a top-shelf conversation and controversy piece, and I think we need to decide what the party line will be and what spin we are going to put on it.**

**Heimes Ex. 36 at N0001028 (Soni Dec., Ex. 76) (emphasis added).  Noordhoek agreed:  "It is a good point.  Essentially, the world will know that we are securitizing a billion $ in 9.5% floor loans.  We should have a company line."  *Id.* (Soni Dec., Ex. 76).  In response, Nelnet's communications group developed a communications plan, including:**

> **Step 2:  We will issue a letter to the Department of Education that outlines the steps we took to confirm the viability of the**

> 9.5% utilization, masked as a thank-you to them for their
> guidance and a statement of our commitment to the student
> loan industry as a funder.  A copy of this letter could then be
> provided to anyone we would feel appropriate (*i.e.*, a reporter,
> etc.) as proof that we have been overly cautious to follow all
> procedures, etc.

Heimes Ex. 37 at N0001025 (Soni Dec., Ex. 77).  Ultimately, the communications plan does

not appear to have been fully implemented, due to internal objections.  Heimes Ex. 36 at

N0001028 (Soni Dec., Ex. 76) ("To reference these people [with whom Nelnet had

communicated] and to send another letter would destroy our relationship with ED").

    While Nelnet was submitting escalating claims, Nelnet continued to escrow (and not

take into earnings) its excess SAP through all of 2003 and the first two quarters of 2004.

Heimes Tr. 208:15-212:18 (Soni Dec., Ex. 4).  Terry Heimes, Nelnet's CFO, explained the

reasons that the excess SAP was not taken into income in a November 16, 2003

memorandum:

> Although there have been positive comments made related to
> the concept of billing the 9.5% floor SAP by officials within the
> DE, these comments have not specifically addressed our
> situation, nor have we received specific communication to
> confirm our application of the process and rules.  Accordingly,
> we will continue to defer recognition of such income.

Heimes Ex. 38 at N0000336 (Soni Dec., Ex. 78).  Heimes' memo is dated November 16,

2004, but Heimes testified based on context that it actually was prepared in November

2003.  Heimes Tr. 291:18-21 (Soni Dec., Ex. 4).  Thus, as of November 2003, Nelnet admits

that it had nothing from the Department specifically addressing or authorizing its

activities.  *Id.*; *see also* Heimes Tr. 268:1-269:16 (Soni Dec., Ex. 4) (conceding truth of

Exhibit 38 statement at that time). By the end of 2003, Nelnet had grown its allegedly 9.5%

**SAP eligible loan pools from $370 million at the end of 2002 to over $3.5 billion by mid-2004.  Nelnet Resp. to Interrog. No. 1 (Mills Dec., Ex. 1).**

JS71.  Nelnet had not yet received confirmation from ED in response to the May 29, 2003 letter. As a result, it determined that it would escrow the funds representing the additional income due to the receipt of 9.5% SAP until it received a response. Nelnet was concerned about investors using the earnings from the 9.5% SAP floor loans and putting a multiple on those numbers to assess the value of the company. [Ex. II.121 (Dunlap Dep. 197:7-198:13).]

**RESPONSE TO NO. JS71.  Disputed that this was the only reason Nelnet escrowed the funds.  *See* Response to JS61, regarding Nelnet's reservations about increasing its 9.5% SAP loan portfolio.  Nelnet entered into several escrow agreements, including August 14, 2003; January 1, 2004; and April 1, 2004.  Kaplan Tr. 144:16-145:16.  Each escrow agreement contains language that requires, "a copy of a written directive or position statement from the United States Department of Education which indicates which person or entities are the rightful owner of the escrowed funds."  Heimes Ex. 25 at N0029642 (Soni Dec., Ex. 67).  Each escrow agreement also contains language that "there are currently outstanding issues related to the rightful owner and entitlement of said funds."  Kaplan Tr. 147:7-19, 151:1-18 (confirming that it was Nelnet's view that "rightful ownership and entitlement" to the 9.5% SAP were not clear without a response from the Department to Nelnet's May 29, 2003 letter").**

JS72.  On July 10, 2003, Nelnet and Wells Fargo, as escrow agent, entered into an Escrow Reserve Agreement, pursuant to which Wells Fargo holds that portion of the income from the 9.5% Loans that exceeds ordinary allowance payment rate. Such escrowed funds were

only to be released upon (a) receipt by the escrow agent of a "copy of a written directive or position statement from the U.S. Department of Education which indicates which persons or entities are the rightful owner of the Escrowed Funds; or (b) the Escrow Agent receives an opinion from outside counsel to the Issuer [NELF], currently Perry, Guthery, Haase & Gessford, P.C., L.L.O., stating that said firm has conducted a sufficient factual and legal investigation to give an opinion on which persons or entities have a reasonably sufficient legal claim to the Escrowed Funds, said opinion shall only be required to identify the party having such a claim to the Escrowed Funds and provide disbursement instructions to the Escrow Agent." [Ex. II.31 (Heimes Decl. ¶ 8).]

**RESPONSE TO NO. JS72.  Incomplete.  Nelnet personnel agreed that release condition was never satisfied as the Department of Education never agreed in writing to Nelnet's position.  *See* Responses to JS82-84, *infra*.**

**JS73.**  On August 19, 2003, Nelnet filed a Form S-1 Registration Statement with the Securities and Exchange Commission which set forth that:

> A portion of our FFELP loan portfolio, with an outstanding balance of $925.2 million as of June 30, 2003, is comprised of loans which were previously financed with tax-exempt obligations issued prior to October 1, 1993. Based upon provisions of the Higher Education Act and related interpretations by the DOE, we believe that we may be entitled to receive special allowance payments on these loans providing us with a 9.5% minimum rate of return. To date, we have not recognized interest income generated by these loans based on the 9.5% minimum rate of return. We have asked the DOE to confirm that we are allowed to recognize the income based on the 9.5% minimum rate of return. We have deferred recognition of this excess interest income pending satisfactory resolution of this issue. As of June 30, 2003, the amount of excess interest income deferred totaled approximately $5.9 million. Since we did not refinance loans with the aforementioned tax-exempt obligations until 2003, all of this deferred income was recorded this year.

It further stated that:

> A portion of our student loan portfolio is comprised of loans which have been previously financed with the proceeds of tax-exempt obligations issued prior to October 1, 1993. Based upon provisions of the Higher Education Act and related interpretations by the DOE, we believe that, for each of these student loans, we will receive partial special allowance payments, subject to the 9.5% minimum rate of return. However, the DOE may change its regulations or its interpretations of existing regulations, or the Higher Education Act may be amended, to eliminate this special allowance payment treatment. In this event, we would receive regular special allowance payments, but with no minimum rate of return.
>
> In the current low interest rate environment, we generally receive partial special allowance payments and the minimum 9.5% rate of return with respect to our eligible student loans originated or acquired with qualifying tax-exempt proceeds. In a higher interest rate environment, however, the regular special allowance payments on loans not originated or acquired with qualifying tax-exempt proceeds may exceed the total subsidy to holders of eligible loans originated or acquired with qualifying tax-exempt proceeds. Thus, in a higher interest rate environment, these loans could have an adverse effect upon our earnings.

[McMahon Decl., Ex. II.35 (Nelnet, Inc. S-1 Registration Statement at 12-13, 25, filed Aug. 19, 2003).]

**RESPONSE TO NO. JS73.  No dispute that the language is quoted accurately.**

**JS74.**   On December 10, 2003, Nelnet filed a Prospectus pursuant to Rule 424(b)(1), Registration No. 333-108070, for 8,000,000 shares of Nelnet Class A Common Stock (the "Prospectus"). [McMahon Decl., Ex. II.36 (Nelnet, Inc. Prospectus (filed Dec. 10, 2003).] This was the initial public offering of Nelnet's Class A common stock. The prospectus included a risk factor stating that "future changes [in the Higher Education Act] could result in further negative impacts on our business," and that "Congress . . . may elect not to . . . provide special allowance payments . . . ." [*Id.* at 10-11.] A risk factor was also included about Senator Kennedy's proposed legislation that would eliminate the 9.5% Floor. [*Id.* at

111.]  The Prospectus disclosed that Nelnet held $1.4 billion of 9.5% Loans as of September 30, 2003. [*Id*. at 30.]  With respect to the 9.5% Loans, the MD&A of the prospectus stated:

> A portion of our FFELP loan portfolio, with an outstanding balance of $1.4 billion as of September 30, 2003, is comprised of loans which were previously financed with tax exempt bonds issued prior to October 1, 1993. Based upon provisions of the Higher Education Act and related interpretations by the Department of Education, we believe that we may be entitled to receive special allowance payments on these loans providing us with a 9.5% minimum rate of return. To date, we have not recognized interest income generated by these loans based on the 9.5% minimum rate of return. We have asked the DOE to confirm that we are allowed to recognize the income based on the 9.5% minimum rate of return. We have deferred recognition of this excess interest income pending satisfactory resolution of this issue. As of September 30, 2003, the amount of excess interest income deferred totaled approximately $20.3 million. Since we did not refinance loans with the aforementioned tax obligations until 2003, all of this deferred income was recorded this year."

[*Id*. at 30.] Stroup testified that she read at least some of Nelnet's disclosures as early as 2003. [Ex. II.119 (Stroup Dep. 98:21-99:6).] Oberg himself has called Nelnet's disclosures "wonderfully transparent about its 9.5 growth." [McMahon Decl., Ex. II.124 (Oberg Dep. 306:8-306:15).]

**RESPONSE TO NO. JS74.  Disputed and incomplete.  Stroup testified that she did not remember the date of when she read this document.  Stroup Dep. 98:21-99:6. (Soni Dec., Ex. 21).**

**The Prospectus offers no insight into the methodology Nelnet employed to achieve its $1.4 billion in loans.  (Nelnet, Inc. Prospectus (filed Dec. 10, 2003)) (McMahon Dec., Ex. II.36).**

**JS75.**  On March 29, 2004, Nelnet filed its Form 10-K for the fiscal year ended December 31, 2003. [McMahon Decl., Ex. II.37 (Nelnet 10-K for the Fiscal Year Ending December 31, 2003 (filed Mar. 29, 2004)).] Nelnet stated in the Foul] 10-K that a portion of its

FFELP loan portfolio, with an outstanding balance of $2.6 billion as of December 31, 2003, may be entitled to receive special allowance payments at the 9.5% floor rate. Nelnet noted that it had asked ED to confirm that Nelnet was allowed to recognize the income based on the 9.5% rate of return and deferred recognition of the excess interest income, which totaled approximately $42.9 million. Nelnet further stated that legislation had been proposed to eliminate variable rate floor income and the 9.5% interest rate. [*Id.* at 16.] In early May 2004, Nelnet made the decision to stop transferring loans since it supported legislation that had been introduced that ultimately was passed as the Taxpayer Teacher Protection Act. [Ex. II.121 (Dunlap Dep. 147:13-148:12).]

**RESPONSE TO NO. JS75.  Incomplete.  Nelnet supported the government taking affirmative action as a way to stop their competitors from taking advantage of it.  Mar. 14, 2003 Email from Jeff Noordhoek, "Re:  Mike D Reauth Priority," at N0118987 ("I just spoke to Mike and as you know he is pretty adamant about trying to get the loophole killed so the less competitive players within the industry can not use it as a competitive advantage in the long run.") (Soni Dec., Ex. 189).**

**JS76.**   On, May 17, 2004, Nelnet filed its Form 10-Q report for the quarterly period ended March 31, 2004. [McMahon Decl., Ex. II.38 (Nelnet, Inc. 10-Q filed May 17, 2004).] Nelnet stated in the 10-Q that a portion of the FFELP loan portfolio, with an outstanding balance of $3.1 billion as of March 31, 2004, may be entitled to receive special allowance payments at the 9.5% floor rate. [*Id*. at 7.] Nelnet also noted that it had asked ED to confirm that it was allowed to recognize this income and that as of March 31, 2004, the amount of excess interest income deferred totaled approximately $79 million. [*Id*. at 8.] Lastly, Nelnet noted that

legislation was introduced to prospectively eliminate floor loan income, but that Nelnet could not predict whether the pending legislation would pass and, if so, only apply prospectively. [*Id.*]

**RESPONSE TO NO. JS76.  Incomplete.  Nelnet did not receive the confirmation it sought.  *See* Responses to JS82-84, *infra*.**

JS77.   On May 20, 2004, Paul Tone of Nelnet received an email from Ms. Hansen informing him that Tim Cameron, then Chief of Staff to the General Manager of the Financial Partners division of FSA, was the point person at ED on the May 29, 2003 Nelnet letter. [McMahon Decl., Ex. II.39 (N0000560-563 at 560); Ex. II.23 (Tone Decl. ¶ 9).] On May 20, 2004, Mr. Tone sent an e-mail to Mr. Cameron asking for a response to the May 29, 2003 request for confirmation on billing for 9.5% SAP. [Ex. II.39 at (N0000562-63).] On May 24, 2004, Mr. Cameron responded to Mr. Tone's e-mail, indicating that he had received a copy of the letter that and that he would review it and respond. [*Id*. at (N000560).]

**RESPONSE TO NO. JS77.  Incomplete.  In 2004, Nelnet continued to work to obtain a letter from the Department that would permit release of the escrowed SAP funds. On May 20, 2004, Hansen contacted Tone at Nelnet and advised that "Tim [Cameron] is your point person now on this issue – that makes you lucky!"  Heimes Ex. 39 at N0000559 (Soni Dec., Ex. 79).  Hansen signed her email "Cheers, k."  *Id.*  Cameron was similarly collegial with Nelnet:  "I hope we can close this out this week!  Will keep you posted."  *Id.* at N0000558.  Cameron also asked Nelnet whether it had already begun billing for excess 9.5% SAP, indicating that at least some at the Department still did not know that Nelnet had already billed for – and been paid – tens of millions of dollars in excess SAP over the course of nearly a year.  *See* Heimes Ex. 40 at N0000562 (McMahon Dec., Ex. II.39) (May**

- 106 -

25, 2004 email from Cameron); Heimes Ex. 43 at N0001194 (Soni Dec., Ex. 80) ($79 million already in escrow through March 2004). To the extent that statements made by individuals not under oath are offered for the truth of the matter asserted, they is hearsay.

Tim Cameron came to DEd with Hansen from NCHELP.  *See* Notes regarding 9.5 student loan scandal, at OBERG00002758 (Soni Dec., Ex. 201).  Hansen testified that Cameron "had no policy input but was an assistant, more of a facilitator." Hansen Tr. 163:3-4 (Soni Ex. 22).

JS78.   On May 24, 2004, Mr. Cameron e-mailed Mr. Tone that OGC and OPE were reviewing the request and that he hoped to close it out that week. [Ex. II.39 at (N000560), Ex. 11.23 (Tone Decl ¶ 9).]

RESPONSE TO NO. JS78.  No dispute.

JS79.   On May 25, 2004, Mr. Cameron also sent an e-mail to Brian Siegel, an attorney at ED's OGC, and Pam Moran that he was working with Nelnet on resolving outstanding issues on LARS. Ms. Moran asked him if Nelnet was still seeking a policy reading on this and asked if Nelnet had been billing for 9.5% SAP. Mr. Cameron told Ms. Moran that they had been billing as stated. [McMahon Decl., Ex. II.40 (OBERG00006522-23).]

RESPONSE TO NO. JS79.  Incomplete.  Cameron did not know if Nelnet was continuing to bill for 9.5% SAP.  *See* Response to JS77, *supra*.

JS80.   On June 10, 2004, Terry Heimes asked Paul Tone if he had had further conversations with ED on the 9.5% floor. Mr. Tone responded that he had only had e-mail follow-up with those trying to help secure a response. Mr. Heimes wanted to know how they

could push it as it was becoming an issue from a reporting standpoint. Mr. Tone said he was pushing it, [McMahon Decl., Ex. II.41 (N0000627).]

      **RESPONSE TO NO. JS80.  No Dispute.**

    **JS81.**   On the morning of June 30, 2004, Mr. Tone received a telephone call from Tim Cameron in response to Mr. Tone's voice mail and email inquiries regarding NELF's May 29, 2003 letter. [McMahon Decl., Ex. II.42 (N0002674).] During the call, Mr. Cameron stated that the May 29, 2003 letter had been forwarded to ED's OPE and OGC, as well as to Sally Stroup, the Assistant Secretary of Postsecondary Education. [*Id.*] Mr. Cameron indicated to Mr. Tone that the letter that would be sent by ED in response to the May 29, 2003 letter may not be as direct a response as NELF might have expected. [*Id.*] Mr. Cameron summarized a meeting held on Monday, June 28, that he attended with Assistant Secretary Stroup and her boss regarding the May 29, 2003 letter from NELF at which ED determined that it would be inappropriate to endorse a specific lender's process. [*Id.*] Mr. Cameron further told Mr. Tone that nothing arose during this meeting that challenged or questioned the process for billing 9.5% SAP as outlined in NELF's May 29, 2003 letter. [*Id.*] Mr. Cameron concluded by noting that he thought ED's letter to NELF was a positive letter. [*Id.;* Ex. II.23 (Tone Decl. ¶ 10).]

      **RESPONSE TO NO. JS81.  Incomplete.  Cameron was a low-level FSA "assistant" with "no policy input."  Hansen Tr. 163:3-4 (Soni Dec., Ex. 22).  One email in Relator's production indicates that Cameron may have been let go by DEd because of the manner in which he handled DEd's letter to Nelnet.  Oct. 28, 2004 Email from Daniel Pollard "Re: Annual PSA all hands meeting," at OBERG00007491 (Soni Dec., Ex. 203).**

To the extent the statements from individuals not made under oath are relied upon for the truth of the matter asserted, they are hearsay.

JS82.   On June 30, 2004, Victoria Bateman, the Chief Financial Officer for the Financial Aid Services Unit of ED sent a letter to Nelnet in response to Nelnet's May 29, 2003 correspondence. [McMahon Decl., Ex. II.43 (N0000054).] The letter referred Nelnet to 34 C.F.R. § 682.302(c) and (e) as well as the Dear Colleague Letter. [*Id.*] Assistant Secretary Stroup did not believe that the letter gave Nelnet or NELF any indication that ED disagreed with Nelnet's intended procedures. [Ex. II.119 (Stroup Dep. 107:18-107:21).]

**RESPONSE TO NO. JS82.  Disputed and incomplete.  This was Stroup's personal opinion, which she admitted.  Stroup Tr. 107:18-21 (Soni Dec., Ex. 21).  Stroup also testified that the Bateman Letter did not say "Nelnet, you are correct."  *Id.* at 256:1-6.**

**On July 2, 2004, the Department's response (dated June 30, 2004) to Nelnet's May 29, 2003 letter was faxed to Dunlap, after Cameron had voluntarily forwarded an unsigned draft to Nelnet.  Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82); *see also* Heimes Ex. 44 at N0001247-48 (Soni Dec., Ex. 81).  After receiving Nelnet's May 29, 2003 letter the Department waited thirteen months before responding.  When DEd sent a letter to Nelnet on June 30, 2004, it contained no language indicating that Nelnet's activities were lawful or that DEd was content with Nelnet's 9.5% Loan growth.  *See* July 2, 2004 letter (McMahon Dec., Ex. II.43); *see also* Stroup Tr. 256:1-6 (Soni Dec., Ex. 21) (testifying that the letter did not say "Nelnet, you are correct").  DEd did not countersign the letter, but referred Nelnet to the applicable regulations.  Hansen testified that approving activities as complex as Nelnet's would have been inappropriate in a countersigned letter and would have required**

a more formal and general legal and policy pronouncement.  Hansen Tr. 276:10-277:9

(Soni Dec., Ex. 22).  She also testified that she had not approved Nelnet's 9.5% loan growth

during the January 3, 2003 or April 22, 2003 meetings with Nelnet.  *Id.*

The Department's letter did not purport to approve or endorse the May 29, 2003

letter.  Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82).  Instead, it referred Nelnet to the

appropriate regulations and the 1996 Dear Colleague Letter.  The letter said, in its entirety:

> Dear Mr. Tone,
>
> This letter is in response to Nelnet's May 29, 2003 correspondences with regard to confirmation of the proper way for a lender to submit the Lender's Request for Payment of Interest and Special Allowance (LaRS) as it relates to portfolios funded from the proceeds of the tax-exempt 1985 Indenture.
>
> 34 C.F.R. Section 882.302(e) provides guidance with regard to special allowance payments for loans financed by proceeds of tax-exempt obligations.  Additionally, the formulas for the calculations are provided in 34 C.F.R. Section 682.302(c). You can also refer to Dear Colleague Letter 98-L-186 for additional information.
>
> Please let me know if you have any questions or concerns.

Heimes Ex. 45 at N0001251 (Soni Dec., Ex. 82).

Kaplan testified that he did not rely on the letter, by itself, in issuing his opinion to

release the escrowed funds.  Kaplan Tr. 168:20-169:18.

Stroup testified that she did not know who wrote the Bateman Letter, and she could

not remember whether she participated in drafting it.  Stroup Tr. 105:14-19, 256:16 (Soni

Dec., Ex. 21) ("I didn't write it") (Soni Dec., Ex. 21).  Shaw testified that it was not her

responsibility to respond to the letter, but she was responsible for making sure that a

response was issued.  She explained: "OPE was the one to respond.  From my perspective it

was what is the response going to be from a policy perspective, OPE?  Tell me and we will

carry it out."  Shaw Tr. 93:8-94:4 (Soni Dec., Ex. 20).  Shaw testified that she did not

participate in the drafting of the Bateman letter, but she testified unequivocally that Stroup drafted it.  *Id.* at 116:8-15.

Multiple authorities – including the Department itself – have concluded that Nelnet never received authorization to increase its 9.5% loan portfolios.  In a November 18, 2004 letter responding to questions raised by Senator Kennedy about 9.5% loan growth, Secretary Paige stated that "[t]he Department did not approve or disapprove of the methods that Nelnet and other lenders were using."  Nov. 18, 2004 Letter from Rod Paige to Senator Edward Kennedy, at ED-G-000858 (Soni Dec., Ex. 37).  Moreover, in its report of Nelnet's 9.5% Loan scheme, DEd-OIG stated that its review of Nelnet's documentation did not identify any direct or explicit approval by the Department of Project 950.  OBERG00001018-87 at OBERG00001029 (Soni Dec., Ex. 208).  And the White House's Domestic Policy Counsel, in reviewing the Department's response to DEd-OIG's findings that Nelnet had billed unlawfully, stated in a memorandum summarizing Project 950 that "the Department never officially approved of Nelnet's multiple transfers."  Shaw Ex. 26 at ED-F-000142 (Soni Dec., Ex. 110).

In emails to Nelnet, Kaplan said that the Department's letter was open to interpretation.  Kaplan Tr. 173:9-174:19 (Soni Dec., Ex. 6).  Kaplan argued for the deletion of language in the Nelnet press release recognizing its funds from the escrow account as income stating that Nelnet had "received additional information clarifying its previously disclosed position . . ." and changing it to the more indefinite "Nelnet has completed steps in the earnings process . . ."  Kaplan Ex. 80 at N0001144-45(Soni Dec., Ex. 84).  Kaplan elaborated on his reasoning for the change, advising Nelnet officers that he wanted to "reduce the chances of someone arguing that Nelnet's statement that it 'ha[d] received

- 111 -

additional information clarifying its previous position' mislead anyone to believe that Nelnet has received clarification of Nelnet's position from the DOE, as the DOE letter is subject to some interpretation.  My concern arises from the fact that we have previously disclosed that we requested clarifying information from the DOE on this matter." *Id.*

**JS83.**   On July 2, 2004, the law firm of Perry, Guthery, Haase & Gessford, P.C. issued a written legal opinion addressed to Wells Fargo Bank, N.A. In the letter, the law firm opined that NELF was the party that had a reasonably sufficient claim to the funds held in escrow by Wells Fargo. [McMahon Decl., Ex. II.44 (N0000722-24).]

**RESPONSE TO NO. JS83.  No dispute that Perry Guthery offered the opinion. Kaplan testified that he has worked on Nelnet matters for at least seventy-five percent of his time for the past decade.  Kaplan Tr. 15:3-22 (Soni Dec., Ex. 6).  Several other attorneys from Perry Guthery work on Nelnet matters.  *Id.* at 15:21-16:6.  The firm also does work for Michael Dunlap's family, which owns stock in Nelnet.  *Id.* at 16:17-17:11.  The firm does work for Union Bank & Trust, in which Dunlap's family has an equitable interest.  *Id.* at 16:14-16, 17:4-11.  Since 2003, Kaplan has owned stock in Nelnet.  *Id.* at 17:12-20.**

**At this time, Kaplan recognized that the Department could still come after the now-distributed excess SAP.  Kaplan Tr. 179:17-180:16 (Soni Dec., Ex. 6).  Kaplan suggested that Tone send a "thank you" to the Department following the July 2, 2009 letter, with the following proposed text:**

> **"Tim, I just received the fax of the Department's response to our inquiry on the 9.5% billing issue.  I wanted to let you know how much I appreciate all of your help in getting our inquiry resolved.  Thanks again."**

**Heimes Ex. 44 at N0001247-1248 (Soni Dec., Ex. 81).  As Kaplan explained:**

> **Such an email would help to frame the DOE letter as a positive response, and hopefully might make it more difficult (but certainly not impossible) for the DOE to assert a subsequent challenge.**

*Id.*

**JS84.**  On August 16, 2004, Nelnet filed its 10-Q report for the quarterly period ended June 30, 2004. In its 10-Q, Nelnet stated that:

> [w]hile pending satisfactory resolution of [the issue of whether Nelnet was allowed to recognize the income] with the Department, the Company deferred recognition of the interest income that was generated by these loans in excess of income based upon the standard special allowance rate. In June 2004, after consideration of certain clarifying information received in connection with the guidance it had sought, including written and verbal communications with the Department, the Company concluded that the earnings process had been completed related to the special allowance payments on these loans and recognized $124.3 million of interest income. At December 31, 2003 and March 31, 2004, the amount of deferred excess interest income on these loans was $42.9 million and $78.8 million, respectively.

[McMahon Decl., Ex. II.45 (Nelnet, Inc. 10-Q at 6 (filed Aug. 16, 2004)).]  Nelnet also noted that in future periods, Nelnet would recognize the income. [*Id.*]

**RESPONSE TO NO. JS84.  No dispute that the language is quoted accurately.  This decision was based on the receipt of the Bateman letter and the Cameron discussions.  *See Response to JS82.  Kaplan testified that the Bateman letter was open to some interpretation.  See Response to JS82.***

**Nelnet was required to disclose the newly-recognized earnings under SEC requirements.  Nelnet's SEC lawyer was adamant that the amount needed to be disclosed.  Dunlap Ex. 55 at N0001137-39 (Soni Dec., Ex. 58).  Tone was opposed:  "We HAVE to figure out how NOT  to include the actual dollar amount in the press release."  Heimes Ex.**

**43 (Soni Dec., Ex. 80) (emphasis in original).  In response to a subsequent question as to why Nelnet did not include the dollar amount of earnings recognized, Dunlap stated that it was in the 8K but admitted "we did not want to encite [sic] the doe."  Dunlap Ex. 56 at N0001260 (Soni Dec., Ex. 101).**

JS85.  From June to August of 2004, ED's Financial Partners Division of FSA conducted a Program Review of Nelnet Loan Services, Inc. for the time period of March 1, 2000 through 2004. [McMahon Decl., Ex. II.46 (N0017099-123, at 0017099); [McMahon Decl., Ex. II.47 (ED-D-000232-34).] The Review Team from ED included Mercedes Zajicek (Team Lead and Senior Guarantor and Lender Review Specialist), Michael Duffin (CPA and IT Specialist from the Chicago Office), Ben McPherson (Senior Guarantor and Lender Review Specialist), Peter Sweet (Senior Guarantor and Lender Review Specialist), Leslie Richards (Guarantor and Lender Review Specialist), and Mark Taylor (Guarantor and Lender Review Specialist). [*Id.* at (N0017101).]

**RESPONSE TO NO. JS85.  No dispute.**

JS86.  On September 1, 2004, Nelnet personnel attended an exit conference with the Financial Partners review team. [Ex. II.47 (ED-D-000232-34).] ED personnel attending the Exit Conference included Mercedes Zajicek, Mike Duffin, Ben McPherson, Peter Sweet, and Mark Taylor. [*Id.* at (ED-D-000232).]  Attendees from Nelnet included Don Bouc, Matt Hall (Loan Servicing), Jim Kruger (Financial and Accounting), Jeff Jobes (Loan Origination), and via telephone Todd Eicher (Loan Origination). [*Id.*]  Nelnet Audit Services personnel included Brad Walcher, Chris Callan, and Gina Robley. [*Id.*] At the Exit Conference, Ben McPherson indicated that he was collecting data on the 9.5% floor bond issues for inclusion within the report, but he stated that Nelnet was complying with the regulations and

- 114 -

was working within 9.5% floor regulations and directions from ED. [*Id.* at (ED-D-000233).] Mr. McPherson noted that the issue was not specific to Nelnet, but was industry-wide. [*Id.*] Mr. McPherson testified that at the time of the exit conference, he understood that Nelnet was complying with the 9.5 rules and directions from ED. [McMahon Decl., Ex. II.125 (McPherson Dep. 82:14-82:20).] Also on this date, Jerry Wallace, a Senior Guarantor and Lender Review Specialist, had noted that Nelnet's 9.5% bond base had grown over eight-fold in one year. [McMahon Decl., Ex. II.117 (Wallace Dep. Ex. 19) (unnumbered document) (emphasis added).] Mr. Wallace stated "[a]s long as we *allow* them to consider loans that get dipped in the tax-exempt bond pool to carry to tax-exempt status for the life of the loan, then they will be able to dip their *entire portfolio,* if they choose to do so." [*Id.* (emphasis added).]

**RESPONSE TO NO. JS86.  Disputed and incomplete.  In a letter dated September 10, 2004, Don Bouc, then President of Nelnet,  purported to address a question that arose as part of the Department's program review of Nelnet.  Dunlap Ex. 57 at N0002116 (Soni Dec., Ex. 102).  Specifically, Nelnet was asked to provide "some background" information about the growth of loans in its portfolio subject to 9.5% SAP.  *Id.*  Bouc claimed that:**

> **There have been two primary factors that stimulated the growth in the loans in the one half SAP and 9.5% IR category.  The first of these relates very directly to Nelnet's growth.  Less that four years ago, Nelnet held approximately $4 billion in total assets, while today Nelnet has over $13.5 billion in total assets.  That said, the loans Nelnet holds that are subject to one half SAP and a 9.5% IR have only grown from 10% of our assets to approximately 25% of our assets – a much slower rate of increase than in our overall asset growth which has been approximately 340% over the past four years.**

*Id.*  **Applying the figures stated in Bouc's letter, 10% of the original $4 billion portfolio would be $400 million; 25% of the final $13.5 billion portfolio would be $3.375 billion.  This**

represents a growth rate of the 9.5% SAP portfolio of 843% as compared to the overall growth rate of 340%.

"Observation 3" in the 2004 Program Review Report noted an "[i]ncrease in portfolio size and earnings for loans purchased with tax exempt bonds" and contained a table tracking Nelnet's 9.5% Loan growth between 2000 and 2004.  McPherson Ex.  10 at ED-B-004654 (Soni Dec., Ex. 763).  As McPherson testified, the report said nothing about the lawfulness of this growth.  McPherson Tr. 112:10-13 (Soni Dec., Ex. 28).

Wallace testified as follows regarding his September 1, 2004 email chain with Halaska and Sutphin: "Q: So this is an extension of the same issue that you ran into in Iowa and I remember correctly, is this the same issue that the finding was removed?  . . . A:  This is a similar concern.  Without having done the review it's hard to say that it's the same issue.  Presumably yes, but not reviewed or – this review, as far as I know, this review did not look at the source of funds or the movement of funds.  <u>This was a question that was asked on site, not validated during the review</u>."  Wallace Tr. 260:2-16 (Soni Dec., Ex. 23) (emphasis added).  He testified further: "What happened at the same time that this issue came up there was an ongoing review of Nelnet as servicer.  Basically through my boss to Ben McPherson, I tasked him to ask Nelnet on site their understanding of what was going on, not as part of the review process itself.  So if it got peripherally mentioned in the review report it's maybe side up."  *Id*. at 261:7-15 (Soni Dec., Ex. 23).

McPherson testified that Nelnet had failed to divulge many significant details about its 9.5% loan scheme:

> **Q.** When you were on this review of Nelnet, did Nelnet tell you that they had an internal plan to increase their 9.5 loan loan [sic] holdings?
>
> **A.** No.
>
> **Q.** Did Nelnet explain the nature of its transactions in order to increase its 9.5% loan holdings?
>
> **A.** No.
>
> **Q.** Did it, did Nelnet ever tell you that some of the loans and funds moved between Nelnet's own bonds and corporate entities? . . .
>
> **A.** No. . . .
>
> **Q.** Did it ever explain that the loans would simply be swapped between warehouse financings and tax-exempt indenture for as little as a day?
>
> **A.** No.
>
> **Q.** Did Nelnet every tell you how much it could increase its 9.5 loans?
>
> **A.** No.

McPherson Tr. 117:15-119:17 (Soni Dec., Ex. 28).  McPherson also testified that he has no authority to interpret difficult policy issues.  *Id.* at 100:22-102:4; *see also* Criswell Tr. 206:9-20 (Soni Dec., Ex. 26); Wallace Tr. 390:18-391:3 (Soni Dec., Ex. 23) ("[T]he southern region doesn't determine policy nor can we provide a legal opinion because that comes from policy or General Counsel and if policy or General Counsel tells us that it's an approved activity, it's not my office's position that I can say hey, I can overrule General Counsel or Policy's decision on there.").

JS87.  On November 15, 2004, Nelnet filed its 10-Q report for the quarterly period ended September 30, 2004. [McMahon Decl., Ex. II.48 (Nelnet, Inc. 10-Q (filed Nov. 15, 2004)).] In its 10-Q, Nelnet summarized the prior information provided to the SEC, including the fact that Nelnet had sought confirmation from ED, and that Nelnet had deferred recognition of the interest income pending the resolution of this matter in the "recent

developments" section. [*Id.* at 6.] Nelnet also provided the following disclosure concerning deferred income from the 9.5% loan portfolio:

> In June 2004, after consideration of certain clarifying information received in connection with the guidance it had sought, including written and verbal communications with the Department, the Company concluded that the earnings process had been completed related to the special allowance payments on these loans and recognized $124.3 million of interest income. At December 31, 2003, the amount of deferred excess interest income on these loans was $42.9 million and was included in other liabilities on the Company's consolidated balance sheet.

**RESPONSE TO NO. JS87.  No dispute that the language is quoted accurately.**

**JS88.**   On March 4, 2005, the Nelnet Final Program Report resulting from the review commencing in June 2004 was issued. [Ex. II.46 (N0017099-123).] Observation 3 of the report indicated there was an increase in the portfolio size and earnings for loans purchased with tax-exempt bonds. [*Id.* at (N0017105).] A chart was included in the Report that showed the increasing earnings and loan portfolio between the quarters ending March 31, 2000 and March 31, 2004. [*Id.*] No action was recommended by ED in connection with this observation. [*Id.*].

**RESPONSE TO NO. JS88.  No dispute.**

**G.        ED Statements Concerning the TTPA**

**JS89.**   On or about September 30, 2004, following the release of a GAO Report regarding 9.5% SAP growth, *see infra* ¶¶ JS133-140, Secretary Rod Paige and Joshua Bolten (OMB) sent an email to Representative John Boehner, explaining that "[t]he prior administration's interpretation [of relevant law] expressly permitted lenders to extend [9.5% SAP] payments indefinitely" and urged Rep. Boehner to "close this loophole . . . through legislation." [McMahon Decl., Ex. II.49 (ED-B-000808).] They added that legislation was the

preferred approach because the Secretary of Education had concluded, after careful review, that ED would need to go through negotiated rulemaking in order to change what it considered to be a definitive policy statement about 9.5% SAP practices as expressed through the 1996 DCL. [*Id.*]

**RESPONSE TO NO. JS89.  No dispute that the language is quoted accurately.  DEd restated its position in the 2007 DCL that unlimited growth is prohibited, demonstrating that neither negotiated rulemaking nor legislation had ever been necessary.  *See* Responses to JS163-64.**

**According to Stroup, the legislation option was superior because negotiated rule-making "could take a fair amount of time" and because of "budget scoring."  Stroup Tr. 113:3-11 (Soni Dec., Ex. 21); *see also id*. at 77:17-78:2 (testifying that changing the 9.5% rules through legislation as opposed to clarification would result in positive "budget scoring consequences").  Hansen also agreed that legislation offered attractive cost savings. Hansen 285:12-19 (Soni Dec., Ex. 22).**

**Stroup did not "go behind the 96 DCL and determine whether the underlying regulations supported the DCL."  Stroup 252:1-9 (Soni Dec., Ex. 21).  She further testified that DEd "honored whatever was published" by the Clinton Administration – including the 1996 DCL – "whether or not it might independently be sustainable under the regulations." *Id.* at 253:15-254:6.**

JS90.  On October 5, 2004, Pam Moran e-mailed George Harris of OPE that the TTPA, which was soon to be passed, "grandfathers all the loans [the lenders] have already converted

and just prevents any new loans being made and run through the 'conversion' process."
[McMahon Decl., Ex. II.50 (ED-B-000309-10).]

**RESPONSE TO NO. JS90.  No dispute that the language is quoted accurately.  To
the extent statements not made under oath are relied upon for the truth of the matter
asserted, they are hearsay.**

JS91.   On or about October 7, 2004, Secretary Paige, in a statement on the passage of
TTPA, explained "the loophole was not the making of this administration" and that the law
"allows lenders to receive special allowance payments on FFEL loans permitting a return of
9.5%." He also stated that ED would have had to engage in negotiated rulemaking in order to
achieve the same result as the TTPA. [McMahon Decl., Ex. II.51 (ED-B-000809).]

**RESPONSE TO NO. JS91.  Disputed in that the prior administration did not create
a "loophole" with respect to the eligibility of funds to create 9.5% Loans.  *See also*
Response to J89.**

JS92.   On or about November 18, 2004, Secretary Paige wrote a letter to Senator
Kennedy, discussing the "loophole" that was prospectively closed by the TTPA. [McMahon
Decl., Ex. II.52 (ED-B-006306-07, at 006306).] He explained that ED did not "approve or
disapprove" of the historical 9.5% SAP portfolio growth, but had rather "implemented the
requirements" of the existing laws and regulations that "expressly permit[ed] lenders to
extend the excessive special allowance payments indefinitely." [*Id.*] Paige also repeated his
characterization of the 1996 DCL as an "authoritative interpretation," and explained that
negotiated rulemaking would be required to close the loophole that allowed for 9.5% SAP loan
portfolio expansion. [*Id.*]

**RESPONSE TO NO. JS92.  No dispute that the language is quoted accurately.  *See* Responses to J89, 91, *supra*.  Moreover, the letter says in full that "[t]he Department did not approve or disapprove <u>of the methods that Nelnet and other lenders were using</u>." Letter from Secretary Paige at ED-G-000858  (Soni Dec., Ex. 37) (emphasis added).**

### H.   ED Statements Following the TTPA

**JS93.**   On October 28, 2004, Daniel Pollard at ED e-mailed Oberg that "[i]n response to a question, [FSA] COO Terry [sic] Shaw is saying that all the lenders were following the letter of the law in growing their 9.5% portfolios, and a statutory change is the preferred approach...." [McMahon Decl., Ex. 11.53 (OBERG00006974-75, at 00006975).] Terri Shaw testified that, although she did not specifically recall making the statement described in Daniel Pollard's email, the statement was consistent with her understanding of ED's position as of October 2004. [Ex. II.118 (Shaw Dep. 150:7-151:9).]

**RESPONSE TO NO. JS93.  No dispute that the language is quoted accurately.  *See* Responses to JS26, JS37.**

**JS94.**   On September 9, 2005, attorney Saul Moskowitz e-mailed George Harris of OPE to ask for guidance on the following question:

> A . . . group of loans are currently financed by non floor-eligible bonds and are not floor eligible. Our client would like to transfer those loans from the existing bond indenture to one of its floor bond indentures. We would contend that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond.

[McMahon Decl., Ex. II.54 (ED-B-003298-99, at 003299).]

**RESPONSE TO NO. JS94.**  No dispute that the language is quoted accurately.

**Moskowitz's full question demonstrates that he was attempting to distinguish "dipping" of loans:**

> A second group of loans are currently financed by non floor-eligible bonds and are not floor eligible. Our client would like to transfer those loans from the existing bond indenture to one of its floor bond indentures. Once again, both bond indentures have the same trustee and beneficial owner.  We would contend that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond.  <u>Nothing in P.L. 108-409 (as distinguished from certain pending bills before the Congress (e.g. HR 609)) was intended to prevent new eligible floor loans from being created through new acquisitions of loans by floor bond indentures.  Instead the focus was on so-called "tagging" transactions, whereby a non-floor eligible loan would be moved briefly into a floor bond indenture, thereby becoming floor eligible, and then moved from there into a non floor-eligible bond indenture but (under ED regulations) retaining floor eligibility.  No such "tagging" transaction is involved here</u>.

**Email between Saul Moskowitz and George Harris at ED-B-003298-99 (emphasis added) (McMahon Dec., Ex. II.54).**

**JS95.**  On October 31, 2005, Mr. Harris responded to Mr. Moskowitz: "The Department concurs with your analysis that this transaction would result in the loans becoming floor eligible for as long as they continue to be financed by the floor bond." [Ex. II.54, at 003298.] Before sending this response, Harris sent it in draft to Pam Moran, who replied that she had "checked with" Assistant Secretary Sally Stroup and that "she agrees." [McMahon Decl., Ex. II.55 (ED-B-000177).]

**RESPONSE TO NO. JS95.  No dispute that the language is quoted accurately.  To the extent statements not made under oath are being offered for the truth of the matter asserted, they are hearsay.**

JS96.  On October 13, 2005, attorney John Dean e-mailed Pamela Moran and Dan Madzelan of ED to ask the following question concerning implementation of the TTPA:

"Prior to 9/30/04[:]

(1)     a loan was originated with post-1993 bond estate funds,
(2)     then the loan was 'tagged' by selling it to a 9.5% floor eligible bond estate.
(3)     This loan was subsequently, (but prior to 9/30/04) sold to a post-1993 bond estate.
(4)     After 10/1/04, the loan was sold again to a different post-1993 bond estate.

Does this loan continue to receive the 9.5% floor yield?"

[McMahon Decl., Ex. II.56 (ED-B-000174-75, at ED-B-000175).]

**RESPONSE TO NO. JS96.  No dispute that the language is quoted accurately.**

JS97.  On October 17, 2005, Moran replied that the TTPA "says that the loan loses coverage if it is 'sold or transferred to another holder after September 30, 2004, and before January 1, 2006.' As you describe it below, the loans in question were sold after October 1, 2004 . . . Therefore, the 9.5% ceases *as of the post-October 1, 2004 transfer or sale* to another holder." [Ex. II.56 (ED-B-000174-75) (emphasis added).]

**RESPONSE TO NO. JS97.  No dispute that the language is quoted accurately. To the extent statements not made under oath are being offered for the truth of the matter asserted, they are hearsay.**

JS98.  On October 17, 2005, Dean clarified that "the holder remained the same through the time of the initial origination [of the loan] through the final financing."  [Ex. II.56 at (ED-B-

000174).]  On October 27, 2005, Moran replied that the loan still was not eligible for the 9.5%

floor yield post-TTPA, but for a different reason:  "We would consider these *eligible 9.5%*

*loans* to have been refinanced after September 30, 2004 from funds obtained from a source"

other than a source of 9.5% floor eligible funds.  [*Id.*  (emphasis added).]

**RESPONSE TO NO. JS98.  No dispute that the language is quoted accurately.**

**Moran also specified that the "holder" of a loan is not the bond estate that possesses legal**

**title in the loan, but the authority that controls it.  ED-B-000174 (McMahon Dec., Ex.**

**II.56).  To the extent statements not made under oath are being offered for the truth of the**

**matter asserted, they are hearsay.**

JS99.   In May 2007 congressional testimony, Secretary of Education Spellings

testified that:  "[I]n the summer of 2003, Department staff noted an alarming increase in special

allowance payments made to loan holders on certain FFEL loans made or purchased with tax-

exempt funds.  The Department's staff determined that these claims for the higher payment were

being made under a loophole in the rules written during the previous administration that allowed

certain loans financed with tax-exempt funds to qualify for a 9.5% special allowance subsidy,

minus the applicable rate of interest on such loans.  This led the Administration to include a

proposal in the President's FY 2005 Budget that would stop the increase in 9.5% special

allowance payments."  http://www2.ed.gov/news/speeches/2007/05/05102007.html

**RESPONSE TO NO. JS99.  No dispute that the language is quoted accurately.  The**

**Secretary also indicated that DEd had not previously grasped the problem exposed by the**

**DEd-OIG audit.  ("While the IG's report highlighted another dimension to the problem,**

our work on the 9.5% payments began well before the report's release.").  *See* **Response to JS65,** *supra*.

I.      **ED Statements in Program Reviews and Review Guides**

**JS100.**           In 2005, the Financial Partners office of FSA prepared a Program Review Schedule which listed a schedule for conducting Program Reviews of various lenders, schools acting as lenders under the FFEL Program, and guaranty agencies, with site visits planned for 2005 and 2006. The schedule indicated that the primary review focus for a number of the lenders identified on the schedule was "Tax-Exempt Bonds." [McMahon Decl., Ex. II.57 (OBERG00004503).]

**RESPONSE TO NO. JS100.           No dispute.  Shaw testified that "FSA monitor[ed] compliance of lenders participating in the FFELP program" through a program review process.  Shaw Dep. Tr. 28:13-16 (Soni Dec., 20).  Shaw described the process as follows: "There were dedicated Federal Student Aid staff who did program reviews . . . of all entities participating in the programs, including lenders.  So staff would have a regular review cycle and go visit entities, sometimes on site, sometimes things were not done on site.  A variety of depth of review types were performed and reports drafted and submitted and reviewed and finalized."  *Id*. at 28:17-29:7.  The "review process also include[d] analyzing data submitted by lenders and other participants in the FFELP program."  *Id.* 29:8-11.**

**Shaw testified as follows about program reviews: "Federal Student Aid staff would go to a participant in the programs and conduct a variety of types of reviews.  Some could be very focused, they could be very broad, it could be situational and issue and they would**

do a review to ensure that the entity was complying with the laws and regulations." Shaw Tr. 45:4-13 (Soni Dec., Ex. 20).

After October 2005, Financial Partners began to conduct "special allowance" program reviews that focused specifically on a lender's compliance with the Taxpayer Teacher Protection Act.  Criswell Tr. at 217:12-21 (Soni Dec., Ex. 26).  Shaw testified about the 2005 and 2006 reviews: "There was then special purpose audits directed to TTPA? Specifically for that, I believe, yes."  Shaw Tr. 339:19-340:11 (Soni Dec., Ex. 20).  Shaw testified that the 2005 and 2006 program reviews did not specifically address funds eligibility under Section 682.302(c): "Q: In other words, you've talked a little bit about audits and audit guidelines and what you had or hadn't been looking for in the audits conducted in the program between 2005 and 2006 and I'm asking, to your knowledge, were the auditors charged with looking at these categories to determine . . . whether 9.5 loans were generated by funds that are described in those categories [in Section 682.302(c)], do you remember an instruction of that kind?  A: I did not personally given any such instruction, no.  Q: Do you remember any guidance being given to the auditors with respect to the interpretation of this regulation?  A: Not from me directly, no." *Id.* at 261:8-263:9 (Soni Dec., Ex. 20).

Each program review contained the following explicit disclaimer:

> Absence of statements in this report regarding specific practices and procedures followed by [the lender] should not be construed as acceptance, approval or endorsement of these specific practices or procedures.  The specific nature of this report does not limit or lessen [the lender's] obligation to comply with all other provisions of the Federal Family Education Loan (FFEL) programs.

June 8, 2008 Letter from T. Langenhenning at PPHEA_000027 (Soni Dec., Ex. 157) (emphasis added).  Wallace testified about this language as follows: "This is standard language that's in all of our reports that says if we didn't look at it we're not condoning or approving something we didn't look at."  Wallace Tr. 407:14-20 (Soni Dec., Ex. 23).

Program reviews do not constitute formal adjudication of lenders' billing practices, nor do they result in legally binding decisions that affect all lenders.  *See* Stroup Tr. 250:12-251:8 (Soni Dec., Ex. 21).  Both Richard Criswell and Ben McPherson testified that they lacked authority to issue findings with respect to difficult legal and policy questions.  *See* Response to JS86, *supra*.

JS101.        On July 26, 2005, the Southern Region of ED's Financial Partners unit issued a report of its July 2005 program review of LoanStar Funding Group. [McMahon Decl., Ex. II.58 (ED-B-001447-55).] The report noted that LoanStar's quarterly SAP billing for the period ending December 31, 2004 included net billing increase adjustments for prior quarters of nearly $25 million. In response to the reviewers' inquiry on this subject, LoanStar stated:

> Beginning in March 2000, LoanStar transferred certain loans that had been financed with pre-October 1, 1993 tax-exempt bond proceeds to other financings, in exchange for cash. This cash, *which, after the transfer, now constituted proceeds of pre-October 1, 1993 tax-exempt bonds,* were [sic] then used to acquire additional FFEL loans. However, *we determined in late 2003 that LoanStar had erroneously failed to treat the newly acquired loans as subject to "Floor/Half SAP" treatment,* due to a misunderstanding of the provisions of 34 CFR 682.302. LoanStar immediately began to work to correct prior billings to comply with the regulations. The majority of these billing adjustments occurred in the 3rd and 4th quarters of 2004.

[*Id*. at (ED-B-001452).]

**RESPONSE TO NO. JS101.** **No dispute that the language is quoted accurately.** *See* **Responses to JS26, JS100,** *supra.*

**JS102.** Based on its sampling review, the review team reached the following "conclusion": "Verified that the loans were associated with tax-exempt bonds and the funds could be tied to tax exempt funding originally issued prior to Oct. 1, 1993." [Ex. II.58 at (ED-B001453).]

**RESPONSE TO NO. JS102.** **No dispute that the language is quoted accurately.** *See* **Responses to JS26, JS100,** *supra.*

**JS103.** In February 2006, ED's Financial Partners unit of FSA promulgated a fourth version of a "Special Allowance Billing Review Program" Lender/Servicer Review Guide to provide "guidance and tools to review lenders' implementation and enforcement of the provisions of the" TTPA. [McMahon Decl., Ex. II.59 (ED-B-001541-96).] The Review Guide noted that, prior to TTPA, there were "three primary ways that a lender could maintain or increase its 9.5% loan volume":

    1.    Recycling earnings to make or purchase loans. This allows lenders to maintain or slightly increase 9.5% loan volume;

    2.    Refunding, which is the process of issuing a new bond to pay the principal, interest, and other costs of an outstanding bond issue; the refunding bond finances the 9.5% loans and may have a later maturity date than the original loan, allowing lenders to maintain their 9.5% loan volume for a longer time; and

    3.    Transferring loans from pre-October 1, 1993 tax-exempt bond financing to taxable bond financing, which allows lenders to increase their 9.5% loan volume. Lenders can use the proceeds from the sale of loans previously financed by the pre-10/1/93 tax-exempt bond to make or buy additional loans, which are also guaranteed a 9.5% yield. Transferring accounted for the largest

increase in eligible 9.5% loans, compared to recycling and refunding, prior to the implementation of the TTPA.

[*Id.* at (ED-B-001542).]

**RESPONSE TO NO. JS103.         No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra*.**

JS104.         The Special Allowance Review program was an automated tool that was to be used by Financial Partners' personnel in performing on-site reviews, included "step-by-step procedures for performing a SAP review," and consisted of checklists and procedures "to assist in completing the review." [Ex. II.59 at (ED-B-001543).] The checklists instructed program reviewers to "test sample loans for attributes of eligibility for 9.5% SAP" and "trace the floor eligibility for the sample loan population that is billed with an 'X' Code [*i.e.*, ED's code for 9.5%/half-SAP billing]. A loan may have been transferred as few as zero times or more than six times . . . . All loans should have been 'dipped' at one time in a floor eligible (tax-exempt) bond so the confirmation of the floor eligibility (tax exempt) status is important." [*Id.* at (ED-B-001582-83) (emphasis added).]

**RESPONSE TO NO. JS104.         No dispute that the language is quoted accurately.  The Special Allowance Billing Review Program FPS Lender/Servicer Review Guide ("Guide") makes clear that those reviews were focused on compliance with the TTPA.  The Guide states: (1) "[t]he purpose of the FPS Lender Servicer Review Guide is to provide guidance and tools to review lenders' implementation and enforcement of the provisions of the Taxpayer-Teacher Protection Act of 2004 (TTPA), which was passed by Congress and signed into law on October 30, 2004," Special Allowance Billing Review Program, ED-B-001542 (McMahon Dec., Ex. II. 59); and (2) "[t]he purpose of a special**

allowance review is verify a lender's implementation and compliance with the provisions of the Taxpayer-Teacher Protection Act of 2004 (TTPA), which became effective October 1, 2004. . . . ," *Id.* at ED-B-001554.  The Guide also instructs reviewers to "specifically indicat[e] that the review is limited to confirming the agency's compliance with the TTPA of 2004."  *Id.* at ED-B-001570.

       **JS105.**       An Appendix C to the Review Guide provided "additional information .. . related to reviewing tax-exempt bonds." [McMahon Decl., Ex. II.60 (ED-B-001639-43, at 001639).] With respect to "[l]oans transferred from eligible tax-exempt bond to an ineligible tax-exempt bond or to a taxable funding source," Appendix C stated as follows:

> *Policy has determined that a loan is eligible* for tax-exempt special allowance benefits from *the time that it enters an eligible bond issue* (including refunding bonds). Loans retain their eligibility for tax-exempt billing as long as the eligible bond has not been defeased (presumably the bond would not be considered to be defeased if had been refunded) . . . . Loans transferred to taxable funding sources and post October 1, 1993 tax-exempt bonds remain eligible for tax-exempt billing as long as the eligible (and subsequent refunding) have not been defeased. Most controversial of these is a practice by a major lender to move loans into an eligible bond for the period of one day then moving the loans to what would otherwise be ineligible for tax-exempt special allowance. Lenders must be able to provide documentation to support billing. This should include the ability to provide documentation showing that all loans currently held by an otherwise ineligible sources [sic] *had spent time in an eligible bond.*

[*Id.* at (ED-B-001641) (emphasis added).]

       **RESPONSE TO NO. JS105.**       **Disputed and incomplete.  The documents does not indicate on its face that it is an appendix to Version 4 of the Guide, and Criswell did not recall when this document was in use.  Criswell Tr. 74:2-25 (Soni Dec., Ex. 26).  The "[p]olicy" determination above does not address the eligibility of funds issue.**

**JS106.**          On May 11, 2006, the Southern Region of Financial Partners issued a
report of an October 2005 program review of the Kentucky Higher Education Student Loan
Corporation (KHESLC). [McMahon Decl., Ex. II.61 (ED-B-001437-1446).] "The review
focused on the management of the tax-exempt FFEL portfolio and compliance with the Higher
Education Act of 1965, as amended, including the Omnibus Budget Reconciliation Act of 1991,
the Taxpayer Teacher Protection Act of 2004 and the regulations of the FFEL Program." [*Id.* at
(ED-B-001437).] The report noted the following:

> Eligible Bonds: ...The total outstanding [tax-exempt] bond debt as of June
> 2005 was $81,800,000. Prior to January 2004, KHESLC had not routinely
> transferred loans from bond issues to take advantage of the regulatory
> interpretation allowing the loans to retain the 9.5% floor eligibility.
> Based on legal opinion provided on the application of the Higher
> Education Act, and applicable Department of Education administrative
> guidance to student loans made or acquired through such pre October 1,
> 1993 tax-exempt bond estates KSHESLC initiated its 9.5% floor project
> on January 16, 2004 to purchase all loans not subject to the 9.5%
> special allowance floor with funds obtained from the issuance of tax-
> exempt obligations which were originally issued prior to October 1, 1993.
>
> 9.5% Floor Project: KHESLC used the Senior Series 2003A-2 bond issue
> as the refinancing mechanism. Starting January 16, 2004 and
> continuing through September 2004, KHESLC refinanced in excess of
> $800,000,000 of loans that were not eligible for the 9.5% floor. We
> reviewed all of the bond issues that were refinanced and audited the
> financial transactions supporting the re-funding. KHESLC tracks the bond
> issue using accounting codes and they monitored the re-funding by
> changing the accounting code when the loans were re-financed.
> KHESCL ceased re-funding to comply with the Taxpayer Teacher
> Protection Act of 2004.

[*Id.* at (ED-B-001444).]

          **RESPONSE TO NO. JS106.          No dispute that the language is quoted
accurately.  *See* Responses to JS26, JS100, *supra*.**

JS107.        The KHESLC program review Report also contained a finding that

KHESLC had *underbilled* ED for 9.5% SAP:

> If a loan was eligible for the 9.5% special allowance floor prior to October 1, 2004, then loans made or acquired on or after October 1, 2004 with proceeds from such loan ("re-cycling") are also eligible for the 9.5% special allowance floor. This applies to loans made or acquired with re-cycled funds from a 9.5% special allowance floor loan that resides in a bond issue that is not a pre-October 1, 1993 tax-exempt bond estate as long as the original loan was not subject to the lapsing events listed in the Taxpayer-Teacher Protection Act of 2004. KHESLC believed that the re-cycled loans were not eligible for the 9.5% special allowance floor because these loans were made or acquired on or after October 1, 2004 from proceeds of loans eligible for the 9.5% special allowance floor, but no longer held in a pre-October 1, 1993 tax-exempt bond estate. There were 12 loans in the sample that were in this category and are identified in the attached spreadsheet as (c) and (d).

[Ex. II.61 at (ED-B-001444).]

**RESPONSE TO NO. JS107.        No dispute that the language is quoted**

**accurately.  *See* Responses to JS26, JS100, *supra*.**

JS108.        On July 26, 2006, the Western Region of Financial Partners issued a report

of a May 2006 program review of CollegeInvest. [McMahon Decl., Ex. II.62 (ED-A-000937-

49).] "The scope [of the review] was a comprehensive examination of CollegeInvest and

its management of operations associated with tax-exempt and taxable bond issues used for

financing 9.5% floor eligible loans." [*Id*. at (ED-A-000939).] The report noted the following:

> Transferred Loans. As stated earlier, a loan may be eligible for Floor SAP billing if it is acquired with proceeds of Pre-1993 Bonds *or is otherwise pledged to a Floor SAP Financing Vehicle.* Such loans continue to be eligible for Floor SAP billing, even if transferred to a non-Floor SAP Financing Vehicle, so long as the transfer occurred prior to October 1, 2004 [the effective date of the TTPA], and the Floor SAP Financing Vehicle remained outstanding or had been refunded with tax-exempt obligations. CollegeInvest has transferred loans between its outstanding bonds and bills for Floor SAP on those loans which, at some point prior to

October 1, 2004, *had been pledged to* a Floor SAP Financing Vehicle so long as that Floor SAP Financing Vehicle remains outstanding or has been refunded with tax-exempt obligations.

[*Id.* at (ED-A-000942) (emphasis added).]

**RESPONSE TO NO. JS108.       No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra.***

**JS109.**       The Report also contained a finding that CollegeInvest had *underbilled* ED for 9.5%/half-SAP:

> [In around March 1999, 'loans were transferred from certain existing series to new series and also among existing series' [sic] of bonds. As a result of those transfers, CollegeInvest transferred some loans from existing Floor SAP Financing Vehicles to non-Floor SAP Financing Vehicles. According to its policy at the time, CollegeInvest did not bill floor SAP for those loans that were originally acquired into a Floor SAP Financing Vehicle and subsequently transferred to a non-Floor SAP Financing Vehicle. As a result, the Floor SAP billing which took these transfers into account declined materially . . . . This resulted in underbillings for special allowance payments in the estimated amount of $13,570,112.

[Ex. II.62 at (ED-A-000947).]

**RESPONSE TO NO. JS109.       No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra.***

**JS110.**       The report included the following "Required Action" concerning this filing:  "CollegeInvest management stated during the on-site review that it would report increase adjustments to the LaRS to recoup the special allowance payments underbilled for the quarters of March 31, 1999 to the present."  [Ex. II.62 at (ED-A-000947).]

**RESPONSE TO NO. JS110.       No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra.***

JS111.        In an internal ED e-mail of October 24, 2006, Terri Shaw (COO of FSA) acknowledged that the CollegeInvest report's "finding is that CollegeInvest UNDERBILLED for 9.5% based on their recycling/refunding/transferring practices." [McMahon Decl., Ex. II.63 (ED-A-002120).]

**RESPONSE TO NO. JS111.        No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra*.**

### J.        The Nelnet IG Report and ED Settlement

JS112.        From July 2005 through July 2006, the Office of Inspector General of ED ("OIG") conducted an audit focused on Nelnet's billing of 9.5 SAP loans for the time period of January 1, 2003 through June 30, 2005. [McMahon Decl., Ex. II.64 (OBERG00000397-464).]

**RESPONSE TO NO. JS112.        No dispute.**

JS113.        On August 9, 2006, the OIG released a Draft Audit Report "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations" (the "Draft Report"). [McMahon Decl., Ex. II.65 (ED-G-000672-93).] The Draft Report concluded that Nelnet's Project 950 did not fund loans from an eligible source in compliance with the HEA, regulations and other guidance issued by ED. [*Id*. at (ED-G-000675).] The Draft report noted that Nelnet's internal documentation characterized Project 950 transactions as transfers or sales; that sales of loans may result in an eligible source for 9.5% floor funding, but that the Project 950 transfers could not be considered sales for the purposes of these requirements. [*Id*. at (ED-G-000682).]

**RESPONSE TO NO. JS113.        Incomplete.  On the day the draft was released, there was a "deputies meeting on Nelnet . . . and 9.5 percent floor loans with the**

Department of Education and OMB."  White House Email, ED-F-000140-41 at ED-F-000140 (Soni Dec., Ex. 110).  The meeting included individuals from various offices in the White House, DEd, and OMB.  Among the participants from DEd was Terri Shaw.  *Id.*

Attached to the meeting notice was a "Summary of Nelnet 950" memorandum drafted by White House Domestic Policy Council.  Deputies Meeting Summary, ED-F-000142-43 at ED-F-000142 (Soni Dec., Ex. 110).  The memorandum provided a brief background of the FFELP and 9.5% Loans, as well as an overview of Project 950.  With respect to Project 950, the memorandum states:

> Nelnet began its Project 950 in 2003.  Under Project 950, Nelnet transferred loans from the initial 1985 offering out of the tax-exempt bond to a taxable bond.  In essence, it sold those loans to the taxable bond.  Since the tax-exempt bond still existed and continuing payments were required to satisfy the bond, Nelnet purchased other loans to replace the ones it sold out of the tax-exempt bond (Loan Set #2).  Both sets of loans qualified for 9.5% SAP.
>
> After the initial transfer, Nelnet began a series of subsequent loan transfers in order to increase their 9.5% portfolio.  This series of transfers continued until Nelnet increased their initial loan portfolio billed as 9.5% SAP from $558 million to nearly $3.7 billion.  <u>The subsequent transfers do not qualify for the 9.5% SAP because they were not purchased with funds obtained from tax-exempt obligations made prior to October 1, 1993</u>.

*Id.* at ED-F-000142-43 (emphasis added).  The memorandum further stated that Nelnet justified Project 950 under the 1996 DCL, but concluded that "[t]he DCL was silent on the possibility of repeated transfers such as those undertaken by Nelnet in Project 950."  *Id.* at ED-F-000143.  The memorandum then states:

> Nelnet also appears to base its justification on the absence of any statement from the Department that the proposed

**transfers were legally impermissible.  Furthermore, Nelnet's counsel <u>provided two opinion letters that simply confirmed the DCL's guidance as applicable to Nelnet's plan, but did not address the regulatory requirement of whether loans involved in Project 950 would be acquired using legally permitted sources of funds so as to be eligible for the 9.5% SAP.  In short, the Department never officially approved of Nelnet's multiple transfers</u>.**

*Id.* **(emphasis added).**

JS114.        Terri Shaw was designated as the action official within ED for the draft audit report. [McMahon Decl., Ex. II.66 (ED-A-001367); Ex. II.118 (Shaw Dep. 188:5-188:15).]

**RESPONSE TO NO. JS114.        No dispute.**

JS115.        On or before September 5, 2006, on behalf of ED, Ms. Shaw prepared a draft memorandum to Helen Lew, Assistant Inspector General for Audit Services, responding to the OIG's draft audit report concerning Nelnet. The draft memorandum had been reviewed by ED's General Counsel, Kent Talbert. [Ex. II.118 (Shaw Dep. 191:8-191:17).] In the draft memorandum, Ms. Shaw stated that FSA did not agree with the OIG position that loans under Project 950 did not qualify as sales, and that it was the legal opinion of ED's Office of General Counsel that they did qualify as sales. The draft memorandum further stated:

> In response to the OIG's determination that loans may not have been funded from eligible sources, the Department has *re-evaluated its interpretation* of the Higher Education Act (HEA) and regulations regarding eligible sources of tax exempt funds and those loans that are eligible for the 9.5 minimum return. As a result of the re-evaluation, the Department will publish guidance in the near future on 'eligible sources'. In particular this guidance will *clarify* which generations of loans qualify for the 9.5 percent minimum return SAP rate, effective beginning with the quarterly lender billing cycle ending December 31, 2006.

[McMahon Decl., Ex. II.67 (Shaw Dep. Ex. 31 (unnumbered document) (emphasis added); Ex. 11.118 (Shaw Dep. 192:12-193:5).]

**RESPONSE TO NO. JS115.          No dispute that the language is quoted accurately.  No explanation is provided to support Shaw's position with respect to sales.**

JS116.          Ms. Shaw's draft letter further stated that FSA "made no determination on the recommendation in the draft audit report to retroactively recover potential overpayments that were made to Nelnet." *Id.*  Ms. Shaw used the term re-evaluation in her draft letter to mean "absolutely" a change from the Department's prior interpretation of the regulations. [Ex. II.118 (Shaw Dep. 193:9-193:11).]

**RESPONSE TO NO. JS116.          No dispute that the language is quoted accurately.  *See* Responses to JS163, JS164, *infra*, regarding the Department's January 2007 Dear Colleague Letter.**

JS117.          On September 5, 2006, Kristin Conklin, Counselor to the Undersecretary of Education, sent David Dunn, the Secretary of Education's chief of staff, an e-mail regarding Ms. Shaw's draft letter to OIG. Ms. Conklin stated that the Office of Management of Budget ("OMB") and the White House, Domestic Policy Council ("DPC") wanted two changes in the letter: (1) to delete the language that ED "re-evaluated its interpretation," and (2) to spell out that ED had the right to recover past payments. [McMahon Decl., Ex. II.68 (ED-E-000428).]

**RESPONSE TO NO. JS117.          No dispute.**

JS118.          On September 7, 2006, Erin McNeese of OMB sent a revised version of Ms. Shaw's draft letter, which changed the language ED has "re-evaluated its' interpretation" of the regulations to the phrase ED "concurs with the OIG's interpretation" of the regulations. The revised draft also replaced the term "re-evaluation" with the tell "legal analysis," and

stated that "as a result of the Department's legal analysis, the Department will publish guidance in the near future clarifying eligible sources." [McMahon Decl., Ex. II.69 (ED-X-00001-3); Ex. II.118 (Shaw Dep. 201:12-203:15).]

**RESPONSE TO NO. JS118.         No dispute that the language is quoted accurately.  Shaw testified that the draft letter was sent to OIG and subsequently recalled "to change the language in the last paragraph of the draft."  Shaw Tr. 195:10-196:15;199:13-2016 (Soni Dec., Ex. 20).  According to Shaw, "[L]ots and lots of entities including the White House were involved and that had never ever ever taken place with respect to any other issue that I was involved with at the Department of Education and through all those entities' involvement this is the language they wanted and this was the language it was going to be."  *Id.* at 282:5-18.**

JS119.         On September 7, 2006, Terry Heimes sent a letter to Richard Dowd, Regional Inspector of the OIG, in response to the draft audit report, which also enclosed the September 6, 2006 memorandum from Dan Kaplan which concluded that the text of the relevant regulations and official pronouncements of ED supported the eligibility of loans funded by subsequent generation proceeds of a tax-exempt obligation issued prior to October 1, 1993 for the 9.5% floor. [McMahon Decl., Ex. II.70 (ED-A-001303-09); Ex. II.29 (N0017677-90).] Nelnet also provided the OIG with a memorandum from the law firm Mayer, Brown, Rowe and Maw LLP that addressed the issue of whether the transfer of student loans from the NELF 1985A Trust to the Transferee Trusts, described in section "I. Description of the Transactions," constituted sales of such student loans by the 1985A Trust to the applicable Transferree Trust under general commercial law principles. [Ex. II.20 (ED-A-003480-3516).]

**RESPONSE TO NO. JS119.**        **No dispute that the language is quoted accurately.**

**JS120.**        On September 8, 2006, Terri Shaw sent a revised version of the draft memorandum to Helen Lew. [Ex. II.118 (Shaw Dep. 199:13-201:1).] As in the draft memorandum, Ms. Shaw noted that FSA did not agree with the OIG position that loans under Project 950 did not qualify as sales, and that it is the legal opinion of OGC that they did qualify as sales. The final memorandum adopted the language contained in the draft from Ms. McNeece from OMB. Ms. Shaw believed that it was "highly unusual" to have OMB and DPC edit a response to a draft OIG report, and memorialized that the draft letter was recalled. [McMahon Decl., Ex. II.71 (ED-F-000367); (Ex. II.118 (Shaw Dep. 204:4-204:18).]

**RESPONSE TO NO. JS120.**        **Disputed and incomplete.  Shaw testified that the September 8, 2006 memorandum was in fact sent to DEd-OIG.  Shaw Tr.  203:5-15 (Soni Dec., Ex. 20).  However, the final DEd-OIG Nelnet audit report did not include a copy of the letter.  Nor does the report make reference to DEd's analysis, and it states with respect to sales that "[w]e have been unable to obtain the views of responsible Department officials on whether the regulations and the HEA preclude Nelnet's Project 950 transactions, as described in our report, from qualifying as sales under 34 C.F.R. § 682.302(c)(3)(i)(D)." OBERG00000411 (McMahon Dec., Ex. II.64)**

**JS121.**        On September 29, 2006, the OIG's Final Audit Report "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations" (the "Final Report") was released. In the Final Report, the OIG found that "Project 950 did not fund loans in compliance with the HEA, regulations or other guidance issued by the Department." [Ex. II.64 at OBERG

00000399.] The OIG's contention from the Draft Report that the transfers were not sales was not included in the Final Report. [Ex. II.62 (ED-A-000937-49).]

       **RESPONSE TO NO. JS121.**       **Incomplete.  The final DEd-OIG Nelnet audit report summarized its findings as follows:**

> **Nelnet's use of Project 950 was not in compliance with requirements in the HEA, regulations, and the Department's guidance.  The increased amount of loans billed under the 9.5 percent floor that resulted from Project 950 was not funded by any eligible source listed in 34 C.F.R. § 682.302(c)(3)(i).**

**OBERG00000404 (McMahon Dec., Ex. II.64).**

       **In explaining its finding that "The Increase in Nelnet's Special Allowance Payments under the 9.5 Percent Floor Was Based on Ineligible Loans," DEd-OIG explained, *inter alia*, that "Nelnet implemented Project 950 in April 2003 to increase the amount of loans that it billed for special allowance payments under the 9.5 percent floor."  *Id.* at DEd-OIG further explained that "[t]he Project 950 transactions were unrelated to Nelnet's ability to meet its 1985A bond obligations.  Nelnet sold the 2004-1 and 2004-2 bonds to investors with the express condition that 9.5 percent special allowance payments would not become part of the trust estates; only an amount equal to regular special allowance payments would be pledged toward repayment of the bonds.  The excess would be payable to Nelnet for its own purposes."  *Id.* at OBERG00000405.**

       **DEd-OIG also found that the June 30, 2004 letter from Vickie Bateman – "[t]he only written guidance specific to Project 950 indentified by Nelnet" – "did not approve or disapprove of Nelnet's use of Project 950: it only referred Nelnet to existing authorities."  *Id.*  Ultimately, DEd-OIG stated that its "review of Nelnet's documentation did not identify**

any direct or explicit approval by the Department of Project 950." *Id.* at

OBERG00000406.  Moreover,

> [T]he documentation, including Nelnet's letter of May 29, 2003, to FSA . . . does not appear to reflect a comprehensive disclosure by Nelnet of the nature or effect of Project 950.  For example, Nelnet's May 29, 2003, letter and its accompanying flow chart described only the basic process.  The letter did not identify the eligible source of funds that would be used to purchase and qualify loans for the 9.5 percent floor, did not state directly that the process would be repeated many times, and did not state that the process would result in a substantial increase in the amount of loans billed under the 9.5 percent floor.

*Id.*  The report further stated with respect to that letter that "[t]he Department did not sign

or indicate its concurrence, and the Department's written response to Nelnet did not

provide approval of Nelnet's billing procedure."  *Id.* at OBERG00000411.  The report also

stated that the November 18, 2004 Paige letter to Kennedy "confirm[ed] this understanding

by stating, 'The Department did not approve or disapprove of the methods that Nelnet and

other lenders were using.'"  *Id.*

> Regarding "sales," DEd-OIG stated:

> The evidence we reviewed was mixed as to whether the transactions qualified as sales.  According to Nelnet, each of its trusts is a separate legal entity, and an exchange of loans from one holder trust to another was sufficient to qualify as a sale.  However, Nelnet's internal documentation varied in its characterization of the Project 950 transactions as transfers or sales.

*Id.* at OBERG00000407.

JS122.        On September 29, 2006, Terri Shaw was formally designated as the action

official responsible for the resolution of the findings and recommendations in the final report.

[McMahon Decl., Ex. II.72 (ED-A-001407).]

**RESPONSE TO NO. JS122.          No dispute.**

**JS123.**          On October 11, 2006, Scott Walter, from the White House Office of Domestic Policy, advised David Dunn, Secretary Spellings' Chief of Staff, of reports that "[n]obody knows (and the IG has admitted to Hill folks) how to track 'generations of loans' such as the IG report's view of a loan's eligibility would require." [McMahon Decl., Ex. II.73 (ED-E000329).] Ms. Shaw testified that prior to the OIG's report with respect to Nelnet, FSA had never looked at generations of loans" in processing and approving 799 bills for special allowance on tax exempt 9.5 floor loans. [Ex. II.118 (Shaw Dep. 208:12-208:20).] She further testified that for a number of years, FSA paid 9.5 percent SAP on loans that would be classified as third or later generation loans. [*Id.*]

**RESPONSE TO NO. JS123.          No dispute that the language is quoted accurately.  To the extent statements not made under oath are offered for the truth of the matter, they are hearsay.**

**JS124.**          On December 13, 2006, Terri Shaw wrote in an internal ED e-mail that certain completed program review reports included "[f]indings . . . related to recycling and include both under and over billing scenarios (totaling $26M and $15.6M, respectively for a net UNDER billing of $10.3M) *based on the understanding of statue* [*sic*]*, regulations and policy prior to the issuance of the Nelnet report and the issues presented therein."* [McMahon Decl., Ex. II.74 (ED-A-003343) (emphasis added).]

**RESPONSE TO NO. JS124.          No dispute that the language is quoted accurately.**

JS125.        On December 21, 2006, Terri Shaw noted in an internal ED e-mail that certain review reports already issued had "findings of both under and over billings of 9.5% SAP. Would applying the *new interpretation* to these already issued reports be 'retroactive?'" [McMahon Decl., Ex. II.75 (ED-A-003342) (emphasis added).] In her deposition, Terri Shaw stated, "I testified in response to the question of the multi-generational issue that that was absolutely a new interpretation and the term had never been used in my experience at the department." [Ex. II.118 (Shaw Dep. 272:12-272:18).]

**RESPONSE TO NO. JS125.        No dispute that the language is quoted accurately.**

JS126.        Sally Stroup testified that she "would argue that the Department had never used the phrases [first generation, second generation] in the history of the program until [the January 2007] Dear Colleague." [Ex. II.119 (Stroup Dep. 208:18-209:1).]

**RESPONSE TO NO. JS126.        Disputed and incomplete.  Stroup had previously testified on direct examination that she believed that individuals in OGC first used the term "third generation loans."  Stroup Tr. 175:2-6 (Soni Dec., Ex. 21).  She had her the phrase some time before she left DEd in March 2006 – *i.e.*, before the DEd-OIG Nelnet audit report.  *Id.* at 181:6-182:5 (Soni Dec., Ex. 21).**

JS127.        On January 23, 2007, Nelnet and ED entered into a Settlement Agreement. The Settlement Agreement resolved any dispute as to the validity of Nelnet's 9.5 SAP billings. The Settlement Agreement followed the extensive audit of and reports regarding Nelnet by ED's own OIG. Under the Settlement Agreement, ED permitted Nelnet to retain all

9.5 SAP previously billed to and received from ED, and released Nelnet thereon. [McMahon Decl., Ex. II.76 (ED-A-003533-42, at ED-A-003537).]

**RESPONSE TO NO. JS127.**      **Disputed and incomplete.  The settlement did not "resolve any dispute as to the validity of Nelnet's 9.5 SAP billings," but rather resolved claims against Nelnet with respect to loans "that are not first-generation or second-generation loans."  Settlement Agreement at ED-A-003537 (McMahon Dec., Ex. II. 76). Similarly, Nelnet was permitted to retain all previous 9.5% SAP billings "regardless of whether such payments were made on loans other than first- or second-generation loans."** *Id.*

**Moreover, the final agreement contained a provision expressly permitting False Claims Act suits: "The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present, or future violations by Nelnet, its officers, or employees of the criminal laws of the United States or any action against Nelnet, its officers or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33."  ED-A-003540 (McMahon Dec., Ex. II. 76).**

**By including this provision, DEd rejected Nelnet's attempts to foreclose a Department of Justice case.  *See* Email from Nelnet's Counsel at ED-A-003406 (Soni Dec., Ex. 45).  A redline of the agreement provided by Nelnet's counsel had contained the following language: "The Department is not presently aware of any investigation, proceedings or actions currently contemplated by, or pending before the Department or any other Federal agency that relate to Nelnet's billing for or receipt of SAP payments at the 9.5 percent floor, nor will the Department urge the same."  Draft Settlement Agreement**

**at ED-A-003379-89 at ED-A-003387 (Soni Dec., Ex. 46). That language was not included in the final draft.**

JS128.        ED agreed in the Settlement Agreement that "[t]o avoid further costs and risks of litigation . . . the parties have entered into this Agreement to resolve the issue of Nelnet's past receipt of SAP payments under the 9.5 percent floor calculation on Project 950 loans and loans other than first-generation or second generation loans, as well as its rights with respect to future claims for SAP at the 9.5 percent floor calculation for such loans." [Ex. II.76 (ED-A-00353637).]

   **RESPONSE TO NO. JS128.          Incomplete.  *See* Response to JS127, *supra*.**

JS129.        In the Settlement Agreement, ED acknowledged that Nelnet had billed 9.5% SAP on certain loans through June of 2006, and agreed that "Nelnet considers it was authorized to do so." [Ex. II.76 at (ED-A-003534).] ED further agreed that "[t]he OIG interpretation of the Higher Education Act and its implementing regulations differs from that of Nelnet" and that "Nelnet and the Department agree that *bona fide,* good faith disputes and controversies exist between them concerning the matters described above." [*Id.* at (ED-A-003534, ED-A-003536).]

   **RESPONSE TO NO. JS129.          No dispute that the language is quoted accurately.  Nelnet's counsel attempted to include language that "each party's interpretation was *reasonable* and adopted in good faith," but DEd rejected the "reasonable" language in the final version of the agreement.  *See* Email from Nelnet's Counsel at ED-A-003402-04 (Soni Dec., Ex. 44).**

   ***See* Response to JS127, *supra*.**

**JS130.**        Prior to the OIG audit report with respect to Nelnet, FSA never looked at generations of loans in processing and approving 799 bills from lenders for 9.5% SAP. [Ex. II.118 (Shaw Dep. 208:12-208:17).]

> **RESPONSE TO NO. JS130.**        **No dispute.**

**JS131.**        On July 6, 2007, ED responded to written questions submitted to Secretary Spellings by the House Committee on Education and Labor. [McMahon Decl., Ex. II.77 (ED-E000001-38.] Secretary Spellings wrote the following concerning the Nelnet OIG audit report and settlement with ED:

> The disputed statute and regulations at issue in the IG Audit Report involved novel and complex questions of law. No court has rendered any decision interpreting this specific statutory provision or regulation. Upon a thorough review of the IG Audit Report, the statute and regulations in question, and Department practices, and considering potential litigation risks and costs, the inherent uncertainty pending a definitive court decision (and any appeals), and the potential for an unfavorable decision, the Department settled its claims against Nelnet.

[*Id*. at (ED-E-000020) (emphasis added).]

> **RESPONSE TO NO. JS131.**        **No dispute that the language is quoted accurately.**

**JS132.**        Secretary Spellings further stated that ED agreed that "neither individual taxpayers nor the Department of Justice has authority to challenge the Department's settlement with Nelnet." [Ex. II.77 at (ED-E-000021).] She noted that the Department of Justice is not foreclosed from pursuing, as appropriate, separate remedies under other applicable provisions of the law, including the False Claims Act. [*Id*.]

**RESPONSE TO NO. JS132.** **No dispute that the language is quoted accurately.** *See* **Response to JS127,** *supra.*

IV. **STATEMENTS BY CONGRESSIONAL MEMBERS AND BODIES**

A. **The September 2004 GAO Report**

JS133.       On or about September 21, 2004, the Government Accountability Office ("GAO") issued a report detailing the processes used by lenders to qualify loans for 9.5% SAP payments. [McMahon Decl., Ex. II.78 (ED-G-001021-62).]

**RESPONSE TO NO. JS133.** **No dispute.**

JS134.       In response to a Congressional request, the GAO "examine[d] special allowance payments for 9.5 percent loans." [Ex. II.78 at (ED-G-001025).] Among other things, GAO examined ED data, interviewed ED officials and "12 lenders that reported holding 9.5 percent loans in fiscal year 2003" while conducting its examination.  [*Id.*]

**RESPONSE TO NO. JS134.** **Incomplete.  GAO was not tasked with analyzing the legality or propriety of 9.5% Loan growth.** *See* **November 25, 2003 Letter from Cynthia M. Fagnoni, to Philip S. Link, at OBERG00006115 (Soni Dec., 209) ("Our objectives include examining . . . the extent to which the tax-exempt bonds referenced above are used to finance student loans.").  And in fact, GAO provided none.**

JS135.       Among the processes by which lenders were growing their 9.5% SAP loan balances, GAO described the following:

> [U]nder Education regulations, a lender can significantly increase its 9.5 percent loan volume by issuing a taxable bond and using the proceeds to purchase 9.5 percent loans financed by a pre-October 1, 1993 tax-exempt bond. The lender then uses the cash available from the pre-October 1, 1993 tax-exempt bond to make or buy additional loans, which are

guaranteed the minimum 9.5 percent yield. Under regulations issued in 1992, the loans transferred to the taxable bond continue to be guaranteed the minimum 9.5 percent lender yield, so long as the original bond is not retired or defeased.

[Ex. II.78 at (ED-G-001027).]

**RESPONSE TO NO. JS135.**        No dispute that the language is quoted accurately.  In its Nelnet audit report, DEd-OIG found that the GAO report did not address funds eligibility:

> **Nelnet asserted that the draft report was inconsistent with the HEA, regulations, and authoritative guidance.  Nelnet places particular emphasis on a letter from former Secretary Rod Paige to Senator Edward M. Kennedy, dated November 18, 2004; a press release issued by Secretary Paige; Dear Colleague Letter 96-L-186; a report issued by the Government Accountability Office in 2004 (GAO-04-1070); and records of Congressional debate on the Taxpayer-Teacher Protection Act of 2004.  According to Nelnet, implementing the OIG recommendations would violate established law, which can be modified only through regulatory or statutory change.**
>
> **\*        \*        \***
>
> **Our report acknowledges that Department guidance in Dear Colleague Letter 96-L-186 permits lenders to continue to bill loans under the 9.5 percent floor after a transfer from a tax-exempt obligation to a taxable obligation.  We do not recommend recovery because of Nelnet's process of transferring loans out of the 1985A trust estate disqualified the loans from billing under that floor.  We question whether the Project 950 loans qualified for the 9.5 percent floor prior to being transferred.  We have reviewed the Department guidance and statements cited by Nelnet and do not agree that they provide authorization for the increase in Nelnet's billings that resulted from its Project 950.  <u>Neither the guidance nor statements cited specifically addressed whether the loans qualified for the 9.5 percent floor prior to the transfer</u>.**

**Nelnet Final Audit Report at N0016982 (Soni Dec., Ex. 199) (emphasis added).**

JS136.        The GAO Report included a circular diagram of a five-step process by which lenders could increase their holdings of 9.5 loans:

1.      Start. Lender issued a tax-exempt bond prior to 10/1/93, and used proceeds to make or buy 9.5% loans.

2.      Lender issues a taxable bond and uses proceeds to buy 9.5% loans originally financed by a pre-10/1/93 tax-exempt bond.

3.      When loans are moved, the guaranteed minimum 9.5% yield remains with loan, and lender has cash available in tax-exempt bond.

4.      Lender uses cash from pre-10/1/93 tax-exempt bond to make or buy additional loans that are guaranteed the minimum 9.5% yield. Lender has increased 9.5% loan volume.

5.      Lender can continue to transfer so long as the pre-10/1/93 tax-exempt bond is not retired or defeased.

[Ex. II.78 at (ED-G-001055).]

**RESPONSE TO NO. JS136.        No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS137.        The GAO Report stated that "[a]t the time the regulation was promulgated, Education anticipated that interest rates would rise," which would have resulted in "a higher yield for loans financed with taxable bonds than for loans financed with tax-exempt bonds." [Ex. II.78 at (ED-G-001027-28, ED-G-001057).] Thus the GAO Report noted that "[i]ronically…  [a Department of] Education regulation over 10 years old and originally intended to limit the government's exposure to increased special allowance payments has today presented lenders with an extraordinary opportunity to generate additional loans that earn a 9.5 percent yield. As we have shown, lenders are taking advantage of these opportunities." [Ex. II.78 at (ED-G001030).]

**RESPONSE TO NO. JS137.          No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS138.          GAO recommended that ED "change its regulations so that 9.5% loans transferred from a pre-10/1/93 tax-exempt bond no longer receive a minimum 9.5% yield. Education agrees that special allowance payments should be reduced, but believes it has limited options to do so. GAO believes that Education has other options it can explore." [Ex. II.78 at (ED-G-001022).]

**RESPONSE TO NO. JS138.          No dispute that the language is quoted accurately.  *See* Responses to JS134, JS135, *supra*.**

JS139.          Sally Stroup testified that she agreed that the five-step process described in the GAO report accurately reflected her understanding of how the regulations and guidance worked prior to the enactment of the TTPA. [Ex. II.119 (Stroup. Dep. 158:7-161:4).] In a September 14, 2004 letter from ED to GAO commenting on a draft of the GAO Report (which letter was attached to the final GAO report), Sally Stroup wrote:

> In general, under the Department's regulations, loans that are eligible for the special 9.5 percent subsidy retain that eligibility as long as the tax-exempt bond whose proceeds were used to make or purchase the loans remains open. In other words, absent a change in the law, unless and until the original financing instrument is retired or defeased, the *loans it supports* qualify for the special subsidy . . . . [T]he Department believes that negotiated rulemaking is required for changes of regulatory interpretation, like changes to the 1996 interpretation at issue here, just as it is required for new legislative rules.

[McMahon Decl., Ex. II.79 (ED-G-001016-18) (emphasis added).]

**RESPONSE TO NO. JS139.          Disputed and incomplete.  When presented with the diagram described in JS136, Stroup testified that she was having difficulty reading the**

words, and when she was first asked, "Does this page, EDG001055, essentially a method by which lenders could convert all of their loans to nine and a half percent SAP loans," she responded, "I don't know."  Stroup Tr. 158:7-159:7 (Soni Dec., Ex. 21).

Shaw testified that Stroup's letter to GAO did not contain language addressing Subsection (c) or the eligibility of funds to create 9.5% Loans.  Shaw Tr. 264:14-268:10, 271:7-13 (Soni Dec., Ex. 20).  Shaw also testified that the Secretary's letter to the Comptroller General did not address Subsection (c) or the eligibility of funds to create 9.5% Loans.  *Id.* at 275:16-276:15.

*See* Response to JS37 regarding Stroup's understanding of the applicable laws and regulations.

JS140.        On December 2, 2004, Secretary of Education Rod Paige responded to the GAO Report in a letter to Comptroller General David M. Walker. The letter stated:

> In March 1996, the prior administration issued an authoritative interpretation of Department regulations that provided "if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions." The Bush Administration proposed to change this policy in the President's fiscal year 2005 Budget, and, on October 30, the President signed into law the Taxpayer-Teacher Protection Act of 2004, which closes the loophole and passes the savings on to math, science, and special education teachers in the form of increased student loan forgiveness. Although we would have preferred an even quicker fix to close the loophole, some actions taken by the Administration legally require notice to the public and an opportunity to comment pursuant to the Administrative Procedure Act (APA).

[McMahon Decl., Ex. II.80 (ED-G-000899-90).]

RESPONSE TO NO. JS140.        No dispute that the language is quoted accurately.  *See* Responses to JS135, JS139, *supra*.

**B.      Comments from Congressional Members**

**JS141.**      On or about August 26, 2004, Senator Kennedy and Representatives Chris Van Hollen and Dale Kildee sent a letter to the Secretary of Education expressing concern that ED "is allowing banks to exploit a loophole in the student loan program" with respect to 9.5% loans, and that ED "has allowed the use of this loophole to grow." [McMahon Decl., Ex. II.81 (OBERG00003450-3451, at OBERG00003450).]

**RESPONSE TO NO. JS141.**      **No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  _See_ Response to JS135, _supra_.**

**JS142.**      On September 9, 2004, Rep. Kildee stated the growth of 9.5% happened "through a regulatory loophole." [McMahon Decl., Ex. II.82 (OBERG00003416-18, at OBERG00003416).]

**RESPONSE TO NO. JS142.**      **No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  _See_ Response to JS135, _supra_.**

**JS143.**      In October 6, 2004 floor statements during debate on the TTPA, Rep. Boehner stated:

> For more than 10 years, a _complex_ Federal policy known as the 9.5 percent "special allowance" has resulted in excess taxpayer subsidies for some student loan providers. This policy was adopted under the Clinton administration, and while some would call it a loophole, the loan

providers were told by the Clinton administration that it was perfectly legal and legitimate.

The excess taxpayer subsidies being paid under this policy have in recent years begun to balloon, and if we fail to act, billions of dollars in excess taxpayer subsidies will be paid to student loan providers *legally.* Now, this may be *technically legal* but I think it is unfair to taxpayers and unfair to students, and it is unfair to the schools, people who should be the beneficiaries of this funding. When you boil it down, it is just plain bad policy.

[McMahon Decl., Ex. II.83 (150 Cong. Rec. H8319, H8320 (2004) (statement of Rep. Boehner) (emphasis added)).]

**RESPONSE TO NO. JS143.        No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

**JS144.**        In October 6, 2004 floor statements during debate on the TTPA, Rep. Kildee stated:

[TTPA] makes an improvement over *current law which has been providing lenders excessive subsidies,* but it also fails to address a large share of this subsidy and only enacts this change for about 1 year. The loophole, which this bill only partially closes, has increased lender profits by nearly $1 billion in fiscal year 2004.

[Ex. II.83, at H8322 (emphasis added).]

**RESPONSE TO NO. JS144.        No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

JS145.    In October 9, 2004 floor statements during debate on the TTPA, Senator

Kennedy stated:

> In 1993, Congress passed legislation intended to phase-out of existence the 9.5 percent bank guarantee. *But two key loopholes have kept that subsidy alive and well. The legislation before the Senate closes one.*
>
> The first loophole - the one that isn't closed by this legislation-allows for what is called 9.5 percent loan "recycling." A lender makes a loan to a student-"Student A." Over the course of the next 10 to 25 years, the lender is repaid by Student A and the lender gets a subsidy payment guaranteeing a 9.5 percent rate of return.
>
> Under the 1993 law, after one loan, there should be an end to that 9.5 percent guarantee. But lenders have been recycling Student A payments and the attached Government subsidy into a new loans issued to new students - "Student B" - and claiming a 9.5 percent guarantee on those loans as well. So, 9.5 loans haven't been phased out at all. They've being [sic] maintained. And the Department of Education has done nothing about it.
>
> Worse, 18 months ago, lenders started growing the number of 9.5 percent loans through a process called 'transferring.' A lender shifts a loan out of its tax-exempt bond estate into its taxable bond estate. When the loan shifts, the 9.5 percent guarantee shifts with it *and the tax-exempt bond estate then has money available to it to issue new 9.5 percent loans.* As a result of 'transferring,' 9.5 percent loan bank subsidy payments have *more than doubled in the last 18 months."*

[McMahon Decl., Ex. II.84 (150 Cong. Rec. S10918, S10919 (2004) (emphasis added)).]

**RESPONSE TO NO. JS145.    No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

JS146.    In October 9, 2004 floor statements during debate on the TTPA, Senator

Dodd stated:

Mr. President, I would like to commend Senator Gregg for taking what I hope is one of many steps in closing what most, if not all of us agree, is an *egregious loophole in current law* relating to student loans ...

Exploiting a loophole in current law, some lenders . . . have been rolling new loans into old accounts, *sometimes for as little as a day,* to qualify for the subsidy ... .

From January 2004 to June 2004, one bank alone amassed over $3.2 billion in 9.5 percent loans by exploiting this loophole . .

In response to this discovery, the Department of Education has been asked to issue new rules clarifying that the practice in question is, in fact, not within the intent of the current law. They have refused to do so. They claim that their hands are tied, that only Congress can close the current loophole . . . .

Mr. President, in response to this crisis, Senator Gregg has proposed a bill to close the 9.5 percent loophole. There is just one problem with his bill. It does not close the loophole completely and it does not close the loophole

permanently. The loophole should be completely and permanently closed .

The Federal Government is paying hundreds of million [sic] of dollars in unnecessary subsidies to student loan companies. The bill before us allows this practice to continue, even if it is to a lesser extent. I hope we will have an opportunity in the near future to take definitive action to correct this egregious *short-coming in the law.*

[Ex. II.84, at S10919 (emphasis added).]

**RESPONSE TO NO. JS146.** **No dispute that the language is quoted accurately. The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings). *See* Response to JS135, *supra.***

**JS147.** In October 9, 2004 floor statements during debate on the TTPA, Senator Reed stated:

> Mr. President, I support the limited effort before us today to close *a loophole in Federal student loan policy* that has cost taxpayers billions of dollars over the past decade . . . .
>
> [In 1993], a grandfather clause was enacted for outstanding 9.5 percent return, tax-exempt bond generated student loan funds. Rather than end the 9.5-percent loans, this grandfather clause has worked as a loophole.
>
> Owners of 9.5 percent guaranteed loans continually recycle proceeds from tax-exempt bonds originally issued before 1993 — *creating in effect a revolving loan fund* — and the Federal Government continues to guarantee a 9.5-percent rate of return . . . .

[Ex. II.84, at S10920 (emphasis added).]

**RESPONSE TO NO. JS147.        No dispute that the language is quoted accurately.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*.**

JS148.        On or about October 12, 2004, the *EFC Exchange* published various Congressional members' remarks on the passage of TTPA -- including Senator Kennedy's statements. These members of Congress uniformly stated that the TTPA would prospectively close a loophole that had allowed for 9.5% loan growth. [McMahon Decl., Ex. II.85 (PPHEA_000325-56).]

**RESPONSE TO NO. JS148.        Incomplete.  The Nelnet Audit Report determined that statements by Congressional members did not address funds eligibility (refilling of pre-October 1, 1993 tax-exempt financings).  *See* Response to JS135, *supra*. The TTPA, by its own language, only prospectively stops the practice of refunding of pre-October 1, 1993 financings for purposes of 9.5% SAP billing and the practice of continuing to bill for 9.5% SAP after a loan is transferred.**

**JS149.**          In a February 6, 2006 letter from Senators Tom Carper and Tom Coburn to Secretary of Education Margaret Spellings, the Senators recognized that 9.5% SAP growth was due to "faulty regulations in the past, which have produced undesirable results." [McMahon Decl., Ex. II.86 (ED-A-002785-87, at ED-A-002786).]

**RESPONSE TO NO. JS149.          Disputed.  The entire letter is couched in terms of addressing illicit payments, *see, e.g.*, February 6, 2006 Letter from Tom Carper and Tom Coburn to Hon. Margaret Spellings, at ED-A-002785 ("[OMB] recently released improper payment estimates for fiscal year 2006 showing that federal agencies made more than $41 billion in payment errors last year.") (McMahon Dec. Ex. II.86), and the quote in full is: "We are well aware that this controversy has been <u>in part due to</u> faulty regulations in the past, which have produced undesirable results."  *Id.* at ED-A-002786 (emphasis added).**

## V.          MEDIA AND PUBLIC INTEREST GROUP STATEMENTS

### A.          The April 2004 *Fitch Ratings* Article

**JS150.**          In its quarterly student loan report card for April 2004, *Fitch Ratings* included a "Discussion Topic" on "9.5% Floor Loans." [McMahon Decl., Ex. II.87 (ED-B-000265-66).] In this discussion, *Fitch* noted that there was "a fair degree of controversy throughout the higher education community and on Capitol Hill." [*Id.* at (ED-B-000265).] *Fitch* noted that the "issue stems from the ability of corporations to finance the present and future acquisition of student loans through the use of pre-October 1993 tax-exempt bond estates and have those loans retain the higher tax-exempt SAP eligibility even when subsequently being transferred out of the pre-October 1993 tax-exempt bond estate to a taxable estate." [*Id.*] The report noted that by following ED regulations, "an entity can continually repeat the process of rolling over the available financing provided by the pre-October 1993 tax-exempt

debt obligations to purchase loans into the pre-October 1993 tax-exempt bond estate by simply retaining a legal or equitable interest in the loans and not redeeming the outstanding pre-October 1993 tax-exempt obligations, regardless of the transfer of the half SAP loans out of the trust." [*Id.* at (ED-B-000266).] The report concluded by observing that opponents of FFELP had criticized the government "for allowing the rule to be exploited at a steep cost to the government," and predicted that the issue was likely to be addressed in the final reauthorization bill. [*Id.*]

**RESPONSE TO NO. JS150.        No dispute that the language is quoted accurately.  While conducting his investigation, Relator came across a Fitch Ratings Report for Nelnet in May 2004.  OBERG00007683 (Soni Dec., Ex. 206).  He decided to call Fitch Ratings (from his home) regarding a Nelnet securitization that was made up of 9.5% Loans, to ask if the rating would be less favorable if the 9.5% SAP had to be returned. Oberg Tr. 36:2-14.  Cherry Allen from Fitch Ratings advised Relator that although the company's legal staff had internally raised the question of how Nelnet had acquired its 9.5% Loans, there would be no adverse effect because the questionable DEd payments were on Nelnet's books already as a liability.  Relator described the conversation as fairly in depth, and it included a discussion of how Nelnet was increasing its 9.5% Loan holdings. In 2006, Fitch issued a new report following the Nelnet audit to confirm that Nelnet's rating had not changed.  OBERG00010145 (Soni Dec., Ex. 207).**

**JS151.**        Sally Stroup testified that the process that *Fitch* described above was one of the loopholes that ED could not close without changes to its regulations. [Ex. II.119 (Stroup Dep. 145:9-146:2).]

**RESPONSE TO NO. JS151.** **Incomplete. Stroup testified that this was her personal opinion. Stroup Tr. 145:9-146:8 (Soni Dec., Ex. 21).** *See also* **Response to JS37,** *supra***, regarding Stroup's understanding of the laws and regulations.**

**B.      The August 2004 TICAS Report**

**JS152.**      In or about August, 2004, The Institute for College Access and Success ("TICAS") released a report called "Money for Nothing" (the "TICAS Report") by Robert Shireman and James Kvaal. [McMahon Decl., Ex. II.88 (OBERG00000378-90).]

**RESPONSE TO NO. JS152.**      **No dispute.**

**JS153.**      Before publication of the TICAS Report, Oberg received a draft copy and made suggested edits. Oberg's notes still exist, and nowhere on that copy did he change the authors' description of the 9.5% SAP issue as involving a "loophole." Nor did Oberg's notes suggest that TICAS use the word "fraud" with respect to the lenders. [McMahon Decl., Ex. II.89 (OBERG00006031-42).]

**RESPONSE TO NO. JS153.**      **Incomplete. At his deposition, Relator explained the "loophole" language as follows:**

> **We would have to look here at what they mean by "loopholes."
> If they are referring to refunding and transferring, that would
> be one thing. If they are referring to the serial over and over
> recycling through many generations, that would be another
> interpretation, so I don't know what they are referring to here
> as loopholes.**

**Oberg Tr. 286:8-288:3 (Soni Dec., Ex. 32)**

**JS154.**      The TICAS Report stated:

> Lenders are exploiting a federal rule that says even if a pre-1993 bond
> finances a loan only temporarily, that loan earns a 9.5 percent guaranteed

> return for life. Lenders use the bond funds to finance a set of loans for as
> little as one day, then shift them into other portfolios where they still earn
> the 9.5 percent interest. This allows a new set of loans to be financed with
> the bond funds and then shifted, as the process repeats over and over and
> over."

[Ex. II.88 at (OBERG00000380) (emphasis added).]

**RESPONSE TO NO. JS154.        No dispute that the language is quoted**

**accurately.  The Report also states that the 9.5% Loan growth is contrary to Congressional**

**intent.  Money for Nothing at OBERG00000384 (McMahon Dec., Ex. II.88).**

JS155.        The TICAS Report also stated that "Department officials knew of lenders'

plans to take advantage of the growth loophole." [Ex. II.88 at (OBERG00000380).]

**RESPONSE TO NO. JS155.        No dispute that the language is quoted**
**accurately.**

JS156.        The TICAS report continued:

> The rules that the Education Department wrote are now having the
> opposite effect of what Congress intended in 1993. *It is the agency's
> rules that created the loopholes; it is the agency's responsibility to fir
> them.* Waiting for Congress to overturn the Department of Education is
> unnecessary, irresponsible, and costly.

[Ex. II.88 at (OBERG00000387) (emphasis added).]

**RESPONSE TO NO. JS156.        No dispute that the language is quoted**

**accurately.**

JS157.        TICAS stated that "clarifying the rules is the first step" and recommended

that the Secretary of Education "publish a clarification  –  tomorrow  –  that prohibits the serial

refinancing of loans and limits the volume of 9.5 percent loans to the size of the original tax-

exempt bond." [Ex. II.88 at (OBERG00000387-88).]

**RESPONSE TO NO. JS157.** **No dispute that the language is quoted accurately.**

JS158.      The TICAS report did not suggest that ED should attempt to recover previous payments of 9.5% SAP from lenders. It did, however, also recommend that "Congress and the Administration should restructure the student loan program," specifically mentioning the "Direct Student Loan Program" *(i.e.,* the government's direct-loan competitor to Defendants' FFELP business) as "one such approach." [Ex. II.88 at (OBERG00000388).]

**RESPONSE TO NO. JS158.** **No dispute that the language is quoted accurately.**

JS159.      Terri Shaw reviewed the TICAS report shortly after it came out. She testified that the data on lender growth in the TICAS report was not a surprise to FSA since it had been charting the quarter to quarter growth of 9.5 SAP loan holdings by lender. [Ex. II.118 (Shaw Dep. 133:20-135:18).]

**RESPONSE TO NO. JS159.** **Disputed.  Shaw did not testify that FSA had been charting "quarter to quarter" growth.**

C.      **Other Media Statements**

JS160.      On September 4, 2004, the *Los Angeles Times* published a story with the headline "Student Loan Subsidies Questioned." The *L.A. Times* story stated that Bob Shireman, a co-author of the TICAS Report [*see supra* ¶¶ JS152-JS159], had explained that 9.5% SAP loans had grown because "the Department of Education issued a directive aimed at clarifying the law that instead opened up a gaping loophole." [McMahon Decl., Ex. II.90 (NCHELP-

00199- 00201, at NCHELP-00200).] The article then described how 9.5% SAP claims had

grown:

> The directive allows lenders to 'recycle' new loans into old tax-exempt pools, Shireman said. That process gives these newly issued loans the favorable subsidy, even if they remain in the tax-exempt pool for only a day. Department of Education officials confirmed. That allowed lenders to issue billions in new loans, and briefly cycle them through the tax-exempt pools. When the loans were pulled out of the pool, they still would be eligible for that favorable 9.5% subsidy.

[*Id.*]

**RESPONSE TO NO. JS160.        No dispute that the language is quoted accurately.  The article also states that the 9.5% Loan growth is contrary to Congressional intent.**

**JS161.        On September 21, 2004,** *The Chronicle of Higher Education* **published a story with the headline, "Critics Fault Bush Administration For Failing to Close a Loophole Worth Billions to Lenders." [McMahon Decl., Ex. II.91 (NCHELP-00208-00210).] The** *Chronicle* reported that "Education Department officials say they want to close the loophole and have proposed legislation to do so. But they say they cannot take immediate action because they have determined that the loan companies' actions are legal, based on explanations of the law that the Clinton administration offered in guidance to lenders in the 1990s." [*Id.* at (NCHELP-00209).] The article describes the October 2002 draft audit report of the Iowa Student Loan Liquidity Corporation (*see supra* ¶ JS42-50) as evidence that "[s]ome Education Department officials have read the guidance differently," but then noted that "the department overruled those draft findings." [*Id.*]

**RESPONSE TO NO. JS161.** **No dispute that the language is quoted accurately. The article also suggests that the 9.5% Loan growth is contrary to Congressional intent.**

JS162.        On October 18, 2005, the *Washington Post* published a letter from ED General Counsel Brian W. Jones, which was responding to the *Post's* criticism of ED's handling of "the 9.5 percent student loan loophole." [McMahon Decl., Ex. II.92 (NCHELP-00203-00204, at 00203).] Jones wrote that "The Post ... neglected to note that the loophole is the result of a prior administration's interpretation of a department regulation," and wrote that the "most appropriate and quickest place to end this practice is the halls of Congress[.]" [*Id.* at (NCHELP-00203-04).]

**RESPONSE TO NO. JS162.** **No dispute that the language is quoted accurately.**

## VI.    THE JANUARY 2007 DEAR COLLEAGUE LETTER

JS163.        In a Dear Colleague Letter issued on January 23, 2007, ED publicly took the position for the first time that, under its regulations, only those loans "acquired using . . . funds obtained directly from the issuance of [an eligible] tax-exempt obligation" ("first-generation loans") or "acquired using funds obtained directly from first-generation loans" ("second-generation loans") qualified for 9.5 SAP. [McMahon Decl., Ex. II.93 (Dear Colleague Letter FP-07-01 (Jan. 23, 2007)).]

**RESPONSE TO NO. JS163.** **Disputed and incomplete. The 2007 DCL provides:**

> **Recent examination of the activities involving tax-exempt financing of Federal Family Education Loan Program (FFELP) loans indicates that it is appropriate to <u>restate</u> the requirements of the Higher Education Act of 1965, as amended (HEA) and the Department's regulations that control whether FFELP loans made or acquired funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum rate.**

DCL-07-01 at 1 (McMahon Dec., Ex. II.93) (emphasis added).  The 2007 DCL further states that the requirements in Section 682.302(c)(3)(i) with respect to eligible sources of funds for 9.5% Loans "have been in effect since 1993."  *Id*. at 2.

JS164.      In a January 24, 2007 letter from ED "that was sent to all lenders," the stated "purpose" of which was "to provide guidance to [lenders] on the requirements applicable to claims for SAP at the 9.5 percent minimum return rate," ED set forth an audit or review process that lenders would be required to follow, and a management certification that lenders would be required to make to ED, in order to claim 9.5 SAP in the future consistent with the new DCL. ED also wrote that it was

> committed to resolving without protracted dispute any potential objections both to the meaning and application of the statutory and regulatory requirements as restated in this letter, and to ensuring that SAP is paid at the 9.5 percent minimum return rate only on eligible loans. Therefore, the Department will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with or accept, as applicable, the following —
>
> 1.      The statutory and regulatory requirements for eligibility for SAP at the 9.5 percent minimum return rate as restated in this letter;
>
> 2.      The requirement that a request for payment of SAP at the 9.5 percent rate be supported by the management certification described above; and

3.     The Department's payment of all SAP claims at the standard rate, rather than the 9.5 percent minimum return rate, until the Department receives, accepts and evaluates the results of the audit or review described here, and determines, after our consideration of any objection you present, which of the loans on which you currently claim SAP at the 9.5 percent rate are eligible for payment at that rate.

[Ex. II.93, Attachment at 1, 4.]

**RESPONSE TO NO. JS164.          No dispute that the language is quoted accurately.  In addition to containing identical language with respect to "restat[ing]" the Department's position on funds eligibility, the letter sent to lenders also provides:**

> **On the 'request for payment' form (Form LaRS 799) that you and other lenders submit to the Department, the certifying official represents that the data on the form conforms to the laws, regulations and policies applicable to the Federal Family Education Loan Program.  By so certifying, the lender represents to the Department that no claim is made on that request for payment of 9.5 percent SAP on any loans that are not first-generation or second-generation loans.**

**DCL-07-01 (Attachment at 2-3) (McMahon Dec., Ex. II.93).**

**JS165.          In July 6, 2007 responses to questions from the House Committee on Education and Labor, Secretary Spellings wrote the following concerning the January 2007 DCL:**

> The Department . . . offered lenders the opportunity to *resolve any liability* for the return of previously received 9.5 percent SAP for loans other than first- or second-generation loans. To do so, lenders were required to take the steps specified in the Dear Colleague letter and forego asserting any claim to continued receipt of 9.5 percent SAP for loans other than first- or second-generation loans . . . . The [January 2007 DCL] to individual lenders sets forth the steps that must be followed for lenders to . . . *settle* any potential Department claims on previous overpayments. Therefore, the Department does not expect, or require, a lender to execute any document to memorialize acceptance of the *offer*. A lender can accept the Department's *offer* simply by the conduct described in that *offer*.

[Ex. II.77 at (ED-E-000020-21) (emphasis added).]

**RESPONSE TO NO. JS165.** **No dispute that the language is quoted accurately. Later in the testimony, Spellings suggested that the letters sent to individual lenders following the 2007 DCL did not constitute formal settlements akin to Nelnet's:**

> **Q. Have any additional settlements been reached and . . . [d]o you still intend to offer forgiveness on a case-by-case basis in accordance to the audit results?**
>
> **A. The only written settlement agreement entered into by the Department regarding 9.5 percent SAP is with Nelnet. The other "settlements" will occur by practice on the part of the lenders.**

**Responses to May 16, 2007 Written Questions at ED-E-000020-21 (McMahon Dec., Ex. II.77). DEd's Rule 30(b)(6) witness, Patricia Trubia, confirmed that DEd lacks any authority to settle FCA suits. *See* Trubia Tr. 53:8-16 ("My understanding is the department does not handle False Claims Act. That's handled by Justice under title 31.") (Soni Dec., Ex. 27); *see also id.* at 54:16-19, 55:13-56:7, 74:13-16. Trubia also testified that DEd's offer to refrain from seeking past excess 9.5% SAP was contingent upon the lenders' continuing obligation to agree with DEd's "restatement" of applicable law and regulations. *See id.* at 73:19-74:9, 78:19-79:5, 81:20-82:12, 83:11-84:5, 107:1-9. *See also* Response to BR33, *infra*.**

## VII.   OBERG'S PRIOR STATEMENTS AND ACTIONS

### A.   Concerning Whether Lenders' Claims Were Fraudulent

**JS166.** Oberg's initial complaint to the OIG on August 7, 2003 stated his view that "[f]or ED to pay [9.5%] SAPs on increases in the amounts [of tax-exempt bonds] outstanding represents waste, abuse and mismanagement." [McMahon Decl., Ex. II.94

(OBERG00000027- 28, at OBERG00000027).] Although Oberg wrote that he did "not believe there is any legal justification for it," he did not allege fraud on the part of lenders, which was an option available to him on the OIG's form. [*Id.*]

      **RESPONSE TO NO. JS166.**      **Disputed.  Relator testified that he checked the "Fraud," "Waste," "Abuse" and "Mismanagement" boxes on the complaint form below the question "Which best describes the subject of your allegations?"  Oberg Tr. 105:16-107:14 (Soni Dec., Ex. 32).**

      **As a result of Relator's complaints to DEd-OIG, Hansen sent a memorandum to the Hotline Operations Director of the Office of Inspector General on September 12, 2003, stating:**

> **As stated in the complaint, ED regulations provide for special allowance payments that provide an overall minimum return of 9.5% for student loans made after October 1, 1980 that are financed with tax-exempt debt issued through September 30, 1993.**
>
> **The Financial Partner Regional Services staff identified several months ago that the <u>potential for abuse existed under these regulations</u>.  As a result, lenders claiming special allowance payments under this regulation have been reviewed.  In cases where the lenders had incorrectly interpreted the regulation and submitted incorrect billings to ED, reimbursements of funds have been requested.**
>
> **FSA is also working with the Office of Post Secondary Education (OPE) to understand the full scope of the regulation and its impacts.  Together we are seeking regulatory changes that will <u>eliminate the potential for waste, fraud, and abuse that has come about since the original regulation was enacted</u>.**

**Hansen Ex. 19 at OBERG00005999 (Soni Dec., Ex. 146) (emphasis added).  Hansen testified with respect to the "potential for waste, fraud and abuse" mentioned in the**

memorandum as follows: "I am certain that, you know, this could be taken to an absurd point and expansion, perhaps."  Hansen Tr. 271:19-272:2 (Soni Dec., Ex. 22).

JS167.        On November 21, 2003, Oberg sent a complaint through his chain of command at ED concerning "what appears to be significant federal waste . . . . In essence, the Department is expanding the base amount of Stafford loans on which a return of 9.5% — well above market — is guaranteed to certain loan holders, when there is no reason to do so." [McMahon Decl., Ex. II.95 (OBERG00000024-25, at OBERG00000024).] Oberg wrote:

> The Secretary could issue a Dear Partner/Colleague letter that would *clarify* the 1996 [DCL], to disallow future increases in the amounts of 9.5% floor loans outstanding . . . . The above discussion deals only with the growth of the amounts of 9.5% floor loans outstanding, not with the existing base of approximately $13 billion. The existing loans could be dealt with as well, however, were the Secretary to ask Congress for authority to contact student borrowers and offer to replace such loans with loans on which the borrowers would pay less interest.

[*Id.* at (OBERG00000025).] Oberg's complaint did not mention fraud by lenders, or suggest that ED should pursue lenders for repayment of previously paid 9.5%/halfSAP.

RESPONSE TO NO. JS167.        No dispute that the language is quoted accurately.  Relator's complaint also stated that lenders were implementing their processes for increasing 9.5% Loan holdings "with little legal authority for the increase beyond a trade association's interpretation of a 1996 ED letter," and that some lenders believed the processes were "questionable."  November 21, 2003 Letter from Dr. Jon Oberg to DEd at OBERG0000024.  (McMahon Dec., Ex. II.95).

JS168.        On January 11, 2004, Oberg wrote GAO with "essentially the same" complaint as the one sent through his ED chain of command on November 21, 2003. [McMahon

Decl., Ex. II.96 (OBERG00003757-58, at OBERG00003757).] Like that complaint, Oberg did not mention fraud by lenders or suggest that ED should pursue lenders for repayment of previously paid 9.5%/half-SAP.

**RESPONSE TO NO. JS168.      Incomplete.  This complaint contained the same "little legal authority" and "questionable" language from the November 21, 2003 complaint.  January 11, 2003 Letter from Dr. Jon H. Oberg to GAO at OBERG00003757 (McMahon Dec., Ex. II.96).**

JS169.      On June 18, 2004, Oberg wrote John Higgins, ED's IG, to inform him of his prior communications with the OIG's hotline concerning "what I consider not only a waste of money (as even recipients do as well) but *perhaps* an illegal financial procedure designed to get higher SAP payments from ED." [McMahon Decl., Ex. II.97 (OBERG00005965) (emphasis added).]

**RESPONSE TO NO. JS169.      No dispute that the language is quoted accurately.**

JS170.      On August 27, 2004, Oberg e-mailed numerous individuals within ED, writing that "ED seems to have changed the interpretation in 2002 or 2003 to allow 9.5% growth." [McMahon Decl., Ex. II.98 (OBERG00006786-89, at OBERG00006786.] In response, Jeff Baker of FSA wrote: "Back when there was some question about, what I call, the 'roll-over' of these funds into new loans. I think the Dept. took a position that the law was not clear so we approved it." [*Id.*].

**RESPONSE TO NO. JS170.**          No dispute that the language is quoted accurately.  The full email exchange demonstrates that it is difficult to determine to what Baker is referring.  Relator emailed several individuals, including Baker, Brian Siegel, Pam Moran, and Fred Marinucci (OGC), asking several questions:

> **What law is it that requires us to make these payments based on 9.5% growth?  I am not aware of any.  Back when I was doing the HEA 98 reauthorization for OLCA, there was disagreement between the Department and the Hill that 9.5% SAP would be phased out over time with no change in law.  As late as 2002, I thought, ED program reviewers were not allowing the kinds of claims that Nelnet and others are now asking.  What changed?**

> **I have heard it said that ED cannot change or even clarify a policy set by a 1996 Dear Colleague on this subject.  But ED seems to have changed the interpretation in 2002 or 2003 to allow 9.5% growth.  Moreover, ED clarifies and even reverses Dear Colleagues frequently, including yesterday on the single holder rule.  What is different about the 1996 Dear Colleague?**

Baker responded:

> **Note that I am replying just to you.  While I have not carefully reviewed the history here, I think I agree with you.  Back when . . . .  Thus, I agree that saying that we cannot do anything about it seems strange.**

> **Please keep my comments confidential.**

**Email Exchange Between Dr. Jon H. Oberg and Brian Siegel, *et. al*, OBERG00006786 (McMahon Dec., Ex. II.98).**

**JS171.**          In his September 13, 2004 complaint to ED's Inspector General's Hotline concerning 9.5% SAP issues, Oberg listed the "alleged violator" as the "Department of Education." [McMahon Decl., Ex. II.99 (OBERG00007726-28, at OBERG00007726).] Oberg did not list any of the Defendants as an "alleged violator." [*Id.*]

**RESPONSE TO NO. JS171.**        **No dispute.**

**JS172.**        On June 10, 2005, Oberg wrote Secretary Spellings "as a long time department employee who is concerned about the negative publicity and the unnecessary waste of Department monies on . . . the Department ... subsidizing — needlessly — a guaranteed 9.5% return to lenders of billions of dollars in federally guaranteed student loans." [McMahon Decl., Ex. II.99 (OBERG00000061-62, at OBERG00000061.] Oberg wrote:

> I believe that, as Secretary, you could put an end to this now . . . by contacting all borrowers who have taken out the loans in question and offering them incentives to consolidate their loans into other loans on which the Department does not guarantee lenders a 9.5% return . . . . Thereafter, you could acknowledge that *the Department did not have a coherent policy, forgo attempts to recover past overpayments,* and avoid wasting further time and money in the courts.

[*Id.* (emphasis added).]

Oberg did not suggest to the Secretary that any lenders were engaged in fraud, or that she should pursue any repayment of previously paid 9.5%/half-SAP from lenders (to the contrary, Oberg advocated that the Secretary "forgo attempts to recover past overpayments"). [*Id.*]

**RESPONSE TO NO. JS172.**        **No dispute that the language is quoted accurately.  Relator also makes mention of "the obvious intent of Congress in 1993 to put an end to [9.5% Loan] guarantees."  June 10, 2005 Letter from Dr. Jon H. Oberg to Hon. Margaret Spellings, at OBERG0000061 (McMahon Dec., Ex. II.100).**

**JS173.**        In an earlier draft of this letter to Secretary Spellings, Oberg wrote: "Thereafter, you could concede that the Department did not have a coherent policy, not attempt to recover past overpayments, and avoid wasting further time and money *in court cases the Department may lose."* [McMahon Decl., Ex. II.101 (OBERG00003325) (emphasis added).]

**RESPONSE TO NO. JS173.** **No dispute that the language is quoted accurately.**

**JS174.** On February 24, 2006, Oberg purchased approximately $7,500 worth of Nelnet stock because he thought the price of that stock would appreciate. [McMahon Decl., Ex. II.102 (OBERG00009750); Ex. II.124 (Oberg Dep. 804:10-804:15, 807:12-807:14).]

**RESPONSE TO NO. JS174.** **No dispute.**

**JS175.** In or about early 2006, Oberg first contacted counsel to explore the possibility of filing an FCA lawsuit based on growth in 9.5%/half-SAP loan balances. [Ex. II.124 (Oberg Dep. 38:21-39:8, 48:8-48:10).]

**RESPONSE TO NO. JS175.** **No dispute; however, the cited testimony is not clear that it was "early" 2006.**

**JS176.** On or about September 21, 2007, Oberg filed a complaint alleging that the Defendants' 9.5 SAP claims violated the False Claims Act. [*See* Docket No. 1.]

**RESPONSE TO NO. JS176.** **No dispute.**

**JS177.** In a May 17, 2008 e-mail, Oberg acknowledged that, with respect to 9.5% SAP eligibility, the "facts" were that "the Department gave contradictory verbal advice over the years. The Department's program reviews were inconsistent and took too long to resolve." [McMahon Decl., Ex. II.103 (NAF0098).]

**RESPONSE TO NO. JS177.** **No dispute that the language is quoted accurately.**

### B.    Concerning Whether ED Knew About Defendants' Practices

JS178.        On May 15, 2007, Oberg wrote an e-mail describing ED's claim that it did not have prior knowledge about Nelnet's activities as "a damnable lie. If the Secretary had been under oath last week, some of her statements would have been perjury. The 2002 draft [Iowa] program review by Earl Crisp (he signed it; Jerry Wallace seems to have been the principal author) shows ED knew what was going on." [McMahon Decl., Ex. II.104 (NAF0066).] Continuing, Oberg referred to the 2002 Iowa draft report as the "Rosetta Stone" "because it explained who knew what in ED when." [*Id.*]

**RESPONSE TO NO. JS178.        No dispute that the language is quoted accurately.**

JS179.        On May 17, 2007, Oberg wrote that ED's position that it had not fully understood what Nelnet was doing was an "incredibly bad spin job, because there are many documents that show ED knew full well what is going on. . . . Internal ED documents, most notably the Earl Crisp [ISLLC] program review, shows ED knew in 2002(!)" about the transferring and recycling practices and that other lenders were involved. [McMahon Decl., Ex. 11.105 (NAF0067).] Oberg then explained that he had "other internal ED documents that show ED lawyers and program officials knew of these schemes as they were starting to develop." [*Id.*]  Oberg also testified that the TICAS Report, *supra* ¶ JS152, "described the whole Nelnet process." [Ex. II.124 (Oberg Dep. 763:1-763:5).]

**RESPONSE TO NO. JS179.        No dispute that the language is quoted accurately.**

JS180.        Oberg asserted in a May 17, 2007 e-mail that Mirek Halaska's July 14, 2004 email, *see supra* ¶¶JS51-52, was "another piece of evidence that shows ED knew what was going on." [McMahon Decl., Ex. II.106 (OBERG00006375); *see also* McMahon Decl., Ex. 11.107 (OBERG00005907-44).]

RESPONSE TO NO. JS180.        No dispute that the language is quoted accurately.

JS181.        In an undated e-mail, Oberg wrote that, in 2004, the "GAO agreed with my analysis that ED could have stopped the payments at any time, but chose not to." [McMahon Decl., Ex. II.108 (OBERG00007404).] He wrote that emails from within ED "demonstrate that there was never any approval from ED under either the Clinton Administration or the subsequent Bush administration, *until 2003,* to allow 9.5 SAPs to grow." [*Id.*] (emphasis added).]

RESPONSE TO NO. JS181.        No dispute that the language is quoted accurately.

JS182.        On March 12, 2007, Oberg suggested to Thomas Culligan, a Congressional staffer for Representative Thomas Petri of Wisconsin, various questions for ED that could be asked at a House Committee on Education and Labor hearing, including: "Why didn't ED cut off the illegal 9.5 loan growth gimmick back in 2002 and 2003, when it was first discovered?" [McMahon Decl., Ex. II.109 (NAF0316).]

RESPONSE TO NO. JS182.        No dispute that the language is quoted accurately.

**JS183.**          In a September 13, 2008 e-mail (almost a year after filing his complaint), Oberg wrote that Mr. Dean's letter to ED concerning lenders' 9.5% SAP practices (cited above at ¶ JS60) undermines the credibility of the Department when the Department claims it didn't know what was going on until the Nelnet audit." [McMahon Decl., Ex. II.110 (NAF0073).]

**RESPONSE TO NO. JS183.          No dispute that the language is quoted accurately.**

**JS184.**          In a September 19, 2008 e-mail, Oberg claimed that in 2003 ED officials "knew what was at stake in the Nelnet decision" and that "[f]oia'd documents ... show that ED officials knew a great deal all along" and further stated that it was "total nonsense" to suggest that ED did not know "what was going on." [McMahon Decl., Ex. II.111 (NAF0078).]

**RESPONSE TO NO. JS184.          No dispute that the language is quoted accurately.**

**VIII.   INTRA-PORTFOLIO TRANSFERS AS "SALES" FOR PURPOSES OF 34 C.F.R. § 682.302(C)(3)(I)(D)**

**JS185.**          On September 8, 2006, Terri Shaw wrote Helen Lew of the OIG to respond to OIG's draft audit report of Nelnet. [McMahon Decl., Ex. II.112 (ED-A-002945-46).] Ms. Shaw wrote: "After review of the draft audit report, Federal Student Aid finds it does not agree with the OIG's position that the transfer of loans under [Nelnet's] Project 950 do not qualify as sales. Based upon the legal opinion of the Office of General Counsel, these transfers qualify as sales . . . ." [*Id*. at (ED-A-002945).]

**RESPONSE TO NO. JS185.** **No dispute that the language is quoted accurately.**

JS186.         In its January 2007 Dear Colleague Letter, ED publicly took the position that "[t]he term 'sale' as used in paragraph (c)(3)(i)(D) includes both a sale to a third party and an intra-portfolio transfer of loans." [Ex. II.93 at n.1.] ED has never announced a change of its position on this issue.

**RESPONSE TO NO. JS186.** **No dispute that the language is quoted accurately.**

## IX.    REFUNDINGS OF PRE-OCTOBER 1, 1993 TAX-EXEMPT BONDS

JS187.         On October 14, 1993, David M. Reicher, a lawyer at Foley & Lardner, wrote ED on behalf of the Alabama Higher Education Loan Corporation to confirm that 9.5%/half-SAP rate would continue to apply to loans transferred from tax-exempt obligations originally issued prior to October 1, 1993 (the "Original Obligations") to newly issued tax-exempt refunding bonds used to redeem or retire the Original Obligations, as well as to loans made or purchased with funds transferred from the Original Obligations to the newly issued refunding bonds. [McMahon Decl., Ex. II.113 (ED-B-001229-31).] Mr. Reicher wrote that because the loans "were or will be financed with funds obtained by the holder from the issuance of tax-exempt obligations originally issued prior to October 1, 1993, they would not be eligible for the full special allowance rate" but instead would receive the 9.5%/half-SAP rate. [*Id.* at (ED-B001230).]

**RESPONSE TO NO. JS187.** **No dispute that the language is quoted accurately.  *See* Response to JS188, *infra*.**

- 176 -

**JS188.**         On November 24, 1993, ED responded to Mr. Reicher's letter, saying that ED "concur[red] that the special allowance rates" applicable to the refunding bonds would continue to be the 9.5%/half-SAP rates. [McMahon Decl., Ex. II.114 (ED-B-001228).]

**RESPONSE TO NO. JS188.**         **Disputed and incomplete.  DEd responded to Reicher's letter by concurring that the "refunding" of the pre-October 1, 1993 tax-exempt bonds would "redeem or otherwise retire" the original obligations and that the loans that were directly transferred to the refunding bond or loans made or purchased with funds that were transferred to the refunding bond as part of the refunding transaction would be subject to Half-SAP/9.5% Floor treatment.  November 24, 1993 Letter from Pamela A. Moran to David M. Reicher at ED-B-001228 (McMahon Dec., Ex. II.114).  Nothing in DEd's response mentioned Half-SAP/9.5% Floor treatment applying "to the refunding bonds," as Defendants state.**

**JS189.**         In a June 1995 Dear Colleague Letter, ED provided specific instructions for reporting the changes required by the 1993 OBRA when filing SAP claims, and distinguished between "new money" and "old money" as follows:

> A new special allowance category (SH) has been added for loans made or purchased with funds obtained by the holder for (sic) the issuance of obligations originally issued on or after October 1, 1993 ("new money") ...
>
> Tax exempt loans made or purchased with funds obtained by the holder from the issuance, *or refinancing,* of obligations originally issued prior to October 1, 1993 ("old money") will continue to be calculated by taking the greater of one-half the annual special allowance rate using 3.5% in the formula, or using the floor of 9.5% less the applicable interest rate.

[McMahon Decl., Ex. II.115 (ED-B-001298-99) (emphasis added).]

**RESPONSE TO NO. JS189.**        **No dispute that the language is quoted accurately.**

**JS190.**        On July 16, 2002, Jerry Wallace, a field reviewer in FSA's Financial Partners division, e-mailed George Harris of OPE. [McMahon Decl., Ex. 11.116 (ED-B-001010).]  Wallace was conducting a review at Iowa Student Loan Liquidity Corporation ("Iowa") and noted that the average daily balance of Iowa's 9.5%/half-SAP loans for the quarter ended March 31, 2002 was approximately $372 million, even though Iowa had only approximately $168 million in tax-exempt bonds "that were actually issued prior to 10/1/93." [*Id.*]  Mr. Wallace stated that Iowa had informed him that, in addition to this approximately $168 million in tax- exempt bonds, it had issued approximately $158 million in bonds to refinance bonds issued prior to October 1, 1993. [*Id.*]  Iowa contended that these funds were "originally issued prior to 10/1/93" and thus were eligible to fund loans that billed at the 9.5%/half-SAP rate. [*Id.*]  Mr. Wallace sought Mr. Harris' guidance as he believed the issue "require[d] a policy or legal decision." [*Id.*]

**RESPONSE TO NO. JS190.**        **No dispute that the language is quoted accurately.**

**JS191.**        On July 17, 2002, Mr. Harris responded to Mr. Wallace that "if the refinancing does not alter the tax-exempt nature of the obligation, the refinanced bond should still be included" among the sources of funds eligible to fund loans that billed at the 9.5%/half-SAP rate. [Ex. II.116 (ED-B-001010).]

**RESPONSE TO NO. JS191.**        **No dispute that the language is quoted accurately.**

JS192.　　In a July 14, 2004 e-mail to various persons within ED, Mirek Halaska "summarized" ED's "approach" to the issue, *inter alia,* of whether refundings of pre-October 1, 1993 tax-exempt bonds were eligible sources of funding for 9.5%/half-SAP loans:

> a.　　During June 2002, we attempted to approach the issue during a review by limiting the amount that a lender could bill for tax-exempt special allowance to the amount of eligible bonds that they held and allowed for growth as permitted by 682.302 of the pre-October 1993 eligible tax-exempt bonds.
>
> b.　　Then we were advised by policy to include refunding/refinancing of eligible bonds that occurred after September 1993.

[Ex. II.10 at (OBERG00000129).]

**RESPONSE TO NO. JS192.**　　**No dispute that the language is quoted accurately.**

JS193.　　The February 2006 SAP Review Tool (*see supra* ¶¶ JS103-105) included a checklist with following statement and procedure concerning refunding bonds:

> *Policy has deemed that it is acceptable* for lenders to refund bonds issued prior to 1993 and the loans created and held within these bonds remain eligible for tax-exempt special allowance as long as the pre-1993 bond existed or the bond created by the refunding exists or has not reached defeasance. *It appears that lenders could refund bonds that had previously been refunded and the loans remained eligible. The lenders were allowed to create new loans that were eligible under the same rules that applied to pre-1993 bond issues.* As part of the verification [process], obtain documentation that bonds issued after October 1, 1993 and billing for tax-exempt special allowance benefits are indeed a refunding of a pre-1993 bond.

[Ex. II.59 at (ED-B-001576) (emphasis added).]

**RESPONSE TO NO. JS193.**　　**No dispute that the language is quoted accurately.**

JS194.          On July 26, 2006, the Western Region of Financial Partners issued a report of a May 2006 program review of CollegeInvest. [Ex. II.62 (ED-A-000937-49).] "The scope [of the review] was a comprehensive examination of CollegeInvest and its management of operations associated with tax-exempt and taxable bond issues used for financing 9.5% floor eligible loans." [*Id.* at (ED-A-000939).] The report noted the following:

> Recycling. Recycling amounts available under each of the Master Indentures have been used by CollegeInvest to the extent permitted there under [sic] to acquire additional loans in to the related trust estates. The loans so acquired have been considered as eligible for a special allowance payment rate of 9.5% (Floor SAP) treatment when such loans have been acquired with the recycling amounts relating to loans pledged to a Floor SAP Financing Vehicle (as described below). A Floor SAP Financing Vehicle includes tax-exempt obligations originally issued prior to 10/1/93 (Pre-1993 Bonds), and also includes tax-exempt refunding bonds so long as the proceeds of the refunding bonds are used to pay, defease or redeem — and thereby retire — Pre-1993 Bonds or any tax-exempt bonds that refunded such Pre-1993 Bonds . . . .

[*Id.* at (ED-A-000941).]

**RESPONSE TO NO. JS194.          No dispute that the language is quoted accurately.  *See* Responses to JS26, JS100, *supra*.**

## X.    OBERG'S FAILURE TO PRESERVE RELEVANT DOCUMENTS

JS195.          Oberg first contacted a lawyer in 2006 to discuss the possibility of bringing an FCA action based on 9.5% SAP issues. [Ex. II.124 (Oberg Dep. 39:2-39:8, 46:9-48:16).]

**RESPONSE TO NO. JS195.          No dispute.  Dr. Oberg did not retain an attorney until June 2007.**

JS196.        By the spring of 2007, Oberg had retained counsel for the purpose of pursuing an FCA action based on 9.5% SAP issues. [Ex. II.124 (Oberg Dep. 58:8-59:12, 428:1-428:2).]

**RESPONSE TO NO. JS196.        No dispute.  For clarity Dr. Oberg did not retain an attorney until June 2007.**

JS197.        A production made by the New America Foundation ("NAF") in response to a subpoena in this case contains e-mails sent from Oberg using his AOL account about the general topics involved in this lawsuit from the 2007, 2008 and 2009 timeframe. Those e-mails were not preserved by Oberg and are not in his document production in this case. Oberg did not take any steps to preserve these e-mails. [Ex. II.124 (Oberg Dep. 543:10-544:15, 780:18-781:9, 795:8-795:13, 797:4-797:11, 798:10-799:3, 809:16-810:5, 820:5-820:11, 821:15-822:11, 823:3-823:8, 825:5-825:10, 826:7-826:12, 828:8-828:21, 832:18-833:2, 834:15-834:20, 836:8-836:13, 837:20-839:4, 839:11-839:16, 841:9-841:15, 846:7-846:12).]

**RESPONSE TO NO. JS197.        Incomplete.  As Defendants are aware, Dr. Oberg has produced thousands of pages of documents in this matter, dating as far back as the late 1990s.  Upon retiring from the Department of Education Relator was able (with the Department's permission) to obtain the available emails and other electronic records from his work computer which he retained and those were searched for responsive documents, which were produced.  In March 2009, Dr. Oberg's computer drives were imaged and searched for responsive materials in this case.  Oberg Tr. 619:11-15 (Soni Dec., Ex. 32).**

**Documents from 2007-2009 are outside the time period of the Defendants' improper claims.  During the discovery process, all Defendants but the Panhandle-Plains entities**

**objected to producing documents after late 2006 / early 2007 as not relevant (Southwest, SLM and EdLinc – December 31, 2006; Nelnet – January 17, 2007; Brazos – September 30, 2006).**

**Defendants have had plenty of opportunity to explore the facts in this case and Dr. Oberg's thoughts and opinions, having cross-examined Dr. Oberg for nineteen hours. Defendants have been able to recover emails from the New America Foundation as JS197 states.  After a further search on the subject, Relator discovered files that are AOL email draft files, which were reviewed and responsive files were produced.**

JS198.    NAF produced certain e-mails that were replies by Oberg to, or e-mails from Oberg to NAF personnel. For certain of these e-mails, Oberg's production does not contain the corresponding e-mails sent to Oberg to which he was replying, or any e-mail replies to Oberg. Oberg testified at his deposition: "If it's not in my production, I wouldn't have it." [Ex. II.124 (Oberg Dep. 545:8-545:17).]

**RESPONSE TO NO. JS198.    Incomplete.  *See* Response to JS197, *supra*.**

JS199.    Oberg did not make a studied effort to retain everything that involved a communication about the Defendants' 9.5% SAP practices in the 2006 and 2007 time period. [Ex. II.124 (Oberg Dep. 542:21-543:4).] After filing his original Complaint on September 21, 2007, Oberg did not have any particular protocols to make sure that any e-mails he exchanged on topics relevant to the lawsuit were preserved, other than whether he chose to save the e-mail. [*Id*. (Oberg Dep. 568:9-568:21).] According to Oberg's deposition testimony, "whether or not I saved something would be somewhat hit or miss . . ." [*Id*.  (Oberg Dep. 629:21-630:8).]

**RESPONSE TO NO. JS199.**          **Incomplete.** *See* **Response to JS197,** *supra***.**

**JS200.**          Oberg also testified: "I communicated with everyone from my home computer on my AOL system and, as I understand it, AOL handles that elsewhere and it expires if I don't take some action affirmatively to retain those and save them, they are gone." [Ex. II.124 (Oberg Dep. 623:1-623:17).]

**RESPONSE TO NO. JS200.**          **Incomplete.** *See* **Response to JS197,** *supra***.**

**XI.   UNDISPUTED FACTS CONCERNING CERTAIN DEFENDANTS**

    **A.   Undisputed Facts Concerning Brazos**

        **1.   Background**

**BR1.**   BHEA was formed in the mid-1970s in response to difficulties that students were encountering in receiving student loans from banks. [McMahon Decl., Ex. III.11 (Watson Dep. 14:1-14:11).] It incorporated as a non-profit entity, authorized by state and local governments to issue tax-exempt debt. [*Id.* (Watson Dep. 18:20-19:3).] BHEA raised funds to purchase student loans through the issuance of debt, including tax-exempt debt originally issued before October 1, 1993.

**RESPONSE TO NO. BR1.   No dispute.**

**BR2.**   BHESC is a separate non-profit entity that operates under a master servicing agreement and provides personnel and back office support for, among other non-profit entities, BHEA, which has no employees of its own. [McMahon Decl., Ex. III.12 (Turman Dep. 13:11-

13:16); Ex. III.1 (Watson Dep. 9:16-10:8).] Both BHESC and BHEA are separate 501(c)(3)

standalone entities. [Ex. III.12 (Turman Dep. 15:14-16:4)[4]

**RESPONSE TO NO. BR2.   Incomplete.  BHESC is in charge of all of the "day-to-day operations for all" of the Brazos entities.  BHESC "runs" all of the Brazos entities and "[e]verything in those other companies is controlled by BHESC."  Watson Tr. 10:3 -11:1 (Soni Dec., Ex. 10).**

**BR3.**   Brazos was not aware of the potential to increase BHEA's portfolio of 9.5% loans until 2002 when Murray Watson, the President and General Counsel of BHESC, heard general discussions on this topic at student loan lender conferences. [Ex. III.11 (Watson Dep. 55:9-55:15).] Brazos was also approached on this subject in mid 2002 by investment bankers including Paul Sheldon of Citibank and Scott Kaysen of Bank of America. [Ex. III.12 (Turman Dep. 26:1-28:5).]

**RESPONSE TO NO. BR3.   No dispute.**

**BR4.**   Underwriters also raised this issue with Brazos, mentioning that 9.5% loans could help with cash flows on financings. [Ex. III.11 (Watson Dep. 55:9-55:19).] When another Texas entity substantially outbid Brazos on a group of loans, which occurred before Brazos engaged in any transferring activities, the underwriter informed Mr. Watson Dep. that the other entity had used income from the 9.5% loans to pay higher premiums. [*Id*.  (Watson Dep. 55:9-56:9).] The underwriter told him that the competitor was running loans through

---

[4] For ease of reference, this statement of facts will refer to BHEA and BHESC collectively as "Brazos."

eligible tax-exempt financings and that this was a common practice in the industry. [*Id.* (Watson Dep. 60:3-60:14, 89:2-89:11).]

**RESPONSE TO NO. BR4.   Incomplete.  Watson's characterization of Paul Sheldon's statement that the other Texas entity, "Panhandle Plains," was running loans through eligible tax-exempt financings was that they were "whitewashing" them.  Watson Tr. 60:3-9 (Soni Dec., Ex. 10).  Watson also testified, in the same context, that "Panhandle Plains" increased its net worth by $5 million in a short period of time.  *Id.* at 55:20-56:4.  Watson stated that because other lenders were using the 9.5% SAP to their competitive advantage, Brazos should as well.  *Id.* at 89:1-11.**

**BR5.**   Before it took steps to increase its portfolio of 9.5% loans, Brazos had a business objective of increasing BHEA's eligibility for Texas cap allocation. [Ex. III.11 (Watson Dep. 146:4-146:11); Ex. III.12 (Turman Dep. 26:10-27:1).] Texas caps the amount of tax-exempt debt that it allows non-profit student loan lenders to issue. [Ex. III.12 (Turman Dep. 26:10-27:1).] After a 2003 change in Texas law, a particular lender's cap allocation is determined by its need for tax-exempt debt, which in turn is determined by its total Texas Nexus loan volume. [*Id.*  (Turman Dep. 68:14-69:9, 194:3-8); Ex. III.11 (Watson Dep. 144:16-145:15).] Texas Nexus loans are loans made to Texas residents or students attending school in Texas. [Ex. III.12 (Turman Dep. 44:13-44:18).] Prior to the 2003 change, cap allocation was distributed on a first-to-file basis. [*Id.*  (Turman Dep. 235:9-236:12).] As only loans held within BHEA financings qualified for the Texas cap allocation, Brazos looked at ways to increase BHEA's loan volume to increase its cap allocation. [*Id.*  (Turman Dep. 68:14-69:9).] Obtaining a larger cap allocation of tax-exempt debt carried with it a much lower

cost of funds and allowed BHEA to better compete with other nonprofit entities. [*Id.* (Turman Dep. 237:2-238:13).]

**RESPONSE TO NO. BR5.   Disputed.   It is unclear what "[b]efore it took steps" means in the first sentence.   Neither the referenced testimony from Watson nor Turman establish that before Brazos began planning to increase its portfolio of 9.5% SAP loans, which went as far back as mid-2002, that Brazos already had a business objective of increasing BHEA's eligibility for the Texas cap allocation.   *See also* Response to BR6, *infra*.**

BR6.   The fact that most of these transfers could also result in 9.5% SAP floor yield on the loans was a byproduct rather than the primary goal. [Ex. III.11 (Watson Dep. 146:4-147:15); Ex. III.12 (Turman Dep. 26:10-27:1).]

**RESPONSE TO NO. BR6.   Disputed and incomplete.   By its own statements, Brazos was exploring the 9.5% SAP issue as far back as October 2002.   *See, e.g.*, BR3; BR7 (citing McMahon Dec., Ex. III.1 (B9007790-91, B9007778-79, B9007803, B9007810, B0270412, B0270425)) (E-mails between Turman and Moskowitz dating as far back as October 2002).   According to Brazos, the change in the law relevant to the Texas tax-exempt cap allocation was in September 2003 (*see* Brazos Resp. to Rel. Interrog. No. 4), more than a year after Brazos began planning for its 9.5% SAP loan growth.   (Mills Dec., Ex. 3).**

**Some of the loan transfers made as part of Brazos' 2004 transactions did not qualify for the Texas cap allocation because they were transfers made solely between BHEA entities; however, Brazos did bill these loans for the 9.5% SAP.   Turman Tr. 240:9-241:11 (Soni Dec., Ex. 9).   The 9.5% SAP generated by these transferred loans, which totaled over**

$50 million in value, could not be a "by-product" of the Texas cap allocation because they did not qualify for the Texas cap allocation. Brazos Resp. to Rel. Interrog. No. 4 (Mills Dec., Ex. 3).

Brazos waited to complete the 2004 transfers until it received its opinion from Saul Moskowitz regarding 9.5% SAP applicable to the transferred loans; however, Brazos could have made the transfers regardless of when the opinion from Moskowitz was received. Turman Tr. 194:9-196:17, 242:19-243:3 (Soni Dec., Ex. 9).

Testimony from Watson reveals that Brazos was very interested in the additional potential income from the 9.5% SAP. Watson testified that after he learned of the additional "floor income" allowing one of his competitors to pay premiums for certain loans, he had his investment banker make a presentation to the company. Watson Tr. 55:9-56:15 (Soni Dec., Ex. 10). The stated purpose of this presentation to BHEA was, at least in part, to obtain higher special allowance payments and more income. *Id.* at 63:22-64:11. Watson stated that because other lenders were using 9.5% SAP to their competitive advantage, Brazos should as well. *Id.* at 89:1-11. Watson also testified regarding the increased net worth Panhandle Plains was experiencing in a short period of time. *Id.* at 55:9-56:15.

### 2. Obtaining a Legal Opinion

**BR7.** Starting in late 2002 and continuing through 2003, Ricky Turman, the Chief Financial Officer of BHESC, and Adele Williams, Manager of the Asset Liability Management Committee, had a series of discussions and communications with Saul Moskowitz, an outside attorney who advised Brazos on issues relating to the student loan program, to understand

what was permissible under ED regulations and guidance with respect to 9.5% SAP billing. [McMahon Decl., Ex. III.1 (B9007790-91, B9007778-79, B9007803, B9007810, B0270412, B0270425).] Brazos then drafted a proposed policy and procedure to transfer student loans purchased with tax-exempt debt into a taxable financing with the transferred loans retaining the 9.5% floor, and to use the proceeds of those transfers to acquire new student loans into the tax exempt financing to replace the transferred loans where the acquired loans would also be subject to the 9.5% floor. [McMahon Decl., Ex. III.2 (B0270006-08).]

**RESPONSE TO NO. BR7.   Disputed and incomplete.   In a phone conversation between Brazos representatives, Moskowitz gave a brief overview of his opinion and the history of Section 682.302(e).   Moskowitz Ex. 5 at B9000508 (Soni Dec., Ex. 114).   He also advised Brazos not to "get greedy" and to defend the transactions with a "public purpose." *Id.*; Moskowitz Tr. 188:16-189:10 (Soni Dec., Ex. 18).**

**The correspondence between Turman and Moskowitz concerned "the swapping of loans into a tax-exempt issue for SAP characterization."   B9007778-79 (McMahon Dec., Ex. III.1).   Turman asked Moskowitz on November 13, 2002: "If I only have 5 million of old bonds outstanding, am I really able to swap 20 million or more of loans thru the old indenture, thus giving me 20 million of loans located in numerous issues and only 5 million in old debt?"   Turman Ex. 22 at B90007778-79 (Soni Dec., Ex. 96). Turman also asked questions about the effect of retiring pre-October 1, 1993 debt on loans that had previously been transferred.   *Id.*   Moskowitz responded to Turman's "am I really" question by stating that, "theoretically there's no limit on the volume of loans you can swap, but I advise against overdoing this to the point it appears greedy and/or abusive."   *Id.*   Moskowitz explained in his deposition that he advised his clients against "going overboard" as a piece**

of "political/PR advice."  Moskowitz Tr. 178:21-179:10 (Soni Dec., Ex. 18).  He added that

by advising against being greedy and abusive, "bad things could happen to you because of

this in the real world."  *Id*. at 179:18-180:1 (Soni Dec., Ex. 18).  By this, he meant that the

Department of Education, the media, or Congress could learn about the practice and "bad

things could happen to you if you go overboard."  Moskowitz Tr. 182:2-8 (Soni Dec., Ex.

18).  Turman interpreted this response to mean that they should "be careful from a public

perception standpoint."  Turman Tr. 251:5-11 (Soni Dec., Ex. 9).

     Moskowitz also responded that the two questions regarding refunding were "new

ones" to him.  B9007778-79 (McMahon Dec., Ex. III.1).  He said that he could "ask [the

Department of Education] for their view, but I suspect they will be unwilling to respond

given the current deliberations that they are conducting on these issues."  *Id.*  Turman was

surprised that these were "new" questions for Moskowitz.  Turman Tr. 252:14-254:18

(Soni Dec., Ex. 9).

     Over one year after initially contacting Moskowitz on 9.5% Floor issues, Brazos sent

Moskowitz a "summary of what Brazos" intentions are with regard to swapping or

transferring tax-exempt loans into taxable deals and replacing them with other eligible

loans."  Email from Adele Williams to Saul Moskowitz at B0270006 (McMahon Dec., Ex.

III.2).  This statement of "policy and procedures," drafted by Brazos, noted that "it is

permissible to sell, swap, or transfer student loans purchased with tax-exempt debt into a

taxable bond issue and those student loans will retain their 'floor' status.  It is also possible

to acquire new student loans to replace those that have been transferred out of the tax-

exempt bond issues."  *Id.* at B0270007.  The legal authority for such practices was left

blank.  *Id.*  This practice was cited as "permissible" in these policies and procedures despite

the fact that this document was created to enable Moskowitz to provide an opinion on the legality of the transactions contemplated in the document. *Id.* The plan generally called for using taxable funds to "purchase" loans earning the 9.5% floor and then use the funds transferred to the pre-October 1, 1993 bond to purchase loans from third parties. *Id.* Once those loans were purchased into the pre-October 1, 1993 bond, the loans would be "sold, swapped, or transferred to a taxable [Brazos] bond issue and, once again, the proceeds will be used to purchase additional non-floor earning Texas-Nexus loans." *Id.* Brazos also attached several questions that were raised in the course of putting together its policies and procedures. Turman Ex. 25 at B0270003, B0270005 (Soni Dec., Ex. 103). Those questions included how "defeasance, maturity, and/or refunding impact[ed] the loan transfer process" and whether loans can be "transferred from the tax-exempt debt into any taxable issue of a Brazos company *i.e.* BSFC or even a line of credit or do the loans have to be transferred to a BHEA bond issue?" *Id.* at B0270005.

Watson did not know what documents had been provided to Watson. Watson Tr. 81:5-81:13. Turman likewise did not know what materials Moskowitz reviewed. Turman Tr. 311:10-312:8, 326:4-16 (Soni Dec., Ex. 9).

Moskowitz responded the next day saying that "the description looks pretty straightforward. However, while you're not legally required to do so, I recommend the volume of loans that you put through this process in a way that you can defend politically as reasonable." Turman Ex. 25 at B0270003 (Soni Dec., Ex. 103). Moskowitz also responded to particular questions that Brazos posed. He said he did not "have the expertise to be able to determine whether a particular transaction is a refunding, defeasance, retirement or maturity. I need to rely on you to tell me which one we're

dealing with." *Id.* at B0270005.  On the other question, he said that "the answer probably is that the floor still applies even if the transfer is to a Brazos affiliate." *Id.*

Brazos also consulted with Mark Westergard, its bond counsel, during this period. In November 2004, Westergard advised Brazos that although the 1996 Dear Colleague Letter could be read as supporting the view that, under limited circumstances, loans properly subject to 9.5% SAP would retain that status following a transfer to a taxable bond, "[t]here is no direct authority expressly authorizing a program pursuant to which loans are 'dipped' in a pre-October 1, 1993, trust estate in order to give them the floor and, pursuant to an on-going program of dipping, then transferred to a taxable trust estate." Turman Ex. 26 at B0246473 (Soni Dec., Ex. 97).  He added, "[m]y advice is, and has been, to proceed cautiously and within the clear bounds of the guidance provided by the Regulations and the [1996 Dear Colleague] Letter." *Id.*  He further stated that "[t]he Regulations and the Letter indicate, rather clearly, that only bond issues originally issued before October 1, 1993, and that have been neither retired nor defeased, might be available for giving loans the floor characteristic." *Id.*  He advised that only the 93A and 93C issuances met this requirement.  *Id.*

BR8.   Brazos' proposed policy and procedure called for BHEA to use recycling proceeds from taxable bond issues to purchase loans housed in BHEA's qualifying tax-exempt obligations that were earning the 9.5% floor. [Ex. III.2, at (B0270007).] The proceeds generated by the transferor tax exempt bond issue were to be used by the tax exempt bond issue to purchase Texas Nexus (loans made to a resident of Texas or a student enrolled in an institution in Texas) from third party sellers or taxable BHEA bond issues. [*Id.*] Once the Texas Nexus loans had been acquired with tax exempt funds, the loans were to be sold or

transferred to a taxable BHEA bond issue and once again the proceeds would be used to purchase to additional Texas Nexus loans not currently earning the 9.5% floor. [*Id.*]

**RESPONSE TO NO. BR8.   Incomplete.   This statement of "policy and procedures," drafted by Brazos, also noted that "it is permissible to sell, swap, or transfer student loans purchased with tax-exempt debt into a taxable bond issue and those student loans will retain their 'floor' status."   Email from Adele Williams to Saul Moskowitz at B0270007 (McMahon Dec., Ex. III.2).   The legal authority for such practices was left blank.   *Id.   See also* Response to BR 7.**

**BR9.**   Before implementing the proposed policy and procedure explained above, Brazos asked Mr. Moskowitz for a written legal opinion on whether the proposed policy and procedures were permissible under the Higher Education Act and the regulations. [Ex. III.12 (Turman Dep. 40:14-43:3); Ex. III.11 (Watson Dep. 71:17-72:2, 78:22-79:4).] This was consistent with Brazos' general practice in interpreting ED regulations. [Ex. III.12 (Turman Dep. 41:16-42:3).]

**RESPONSE TO NO. BR9.   Disputed in that the cited testimony provides no support for the notion that Brazos' regular practice was to get opinions; it says only that "[t]here's always concerns dealing with the federal government" and they have concerns with "making sure that everything that we do always complies with the federal government." Turman Tr. 40:8-41:12 (Soni Dec., Ex. 9).**

**These facts are incomplete with respect to communications with Moskowitz.   *See* Response to BR7, *supra*.**

Brazos did not disclose or seek approval of input from the Department of Education on its plan.  Watson Tr. 83:16-19.  Watson thought dealing with the Department was a "joke."  Watson Tr. 86:10-15 (Soni Dec., Ex. 10).

BR10.  Mr. Moskowitz held himself out as an attorney with expertise in the federal student loan program and the applicable regulations governing the program. [McMahon Decl., Ex. III.13 (Moskowitz Dep. 20:9-21:22); [McMahon Decl., Ex. III.14 (Williams Dep. 117:6-117:12); Ex. III.12 (Turman Dep. 29:5-29:15, 40:14-41:15).] Before moving to private practice, Mr. Moskowitz had worked as an attorney in ED's Office of General Counsel, Post-Secondary Education Division, where, among other things, he drafted proposed legislation and regulations as well as subregulatory guidance. [Ex. III.13 (Moskowitz Dep. 30:10-32:14).] Mr. Moskowitz also served as Branch Chief of the Guaranteed Student Loan Branch of the Office of Post-Secondary Education, Office of Student Financial Assistance, Division of Policy and Program Development, [*Id.*  (Moskowitz Dep. 35:12-35:17)], where he ran the loan program from the policy side. [*Id.* (Moskowitz Dep. 35:18-35:21).] In that role, Mr. Moskowitz was responsible for drafting statutes and regulations and responding on a day-to day basis to questions from regional offices and the student loan industry on the meaning and application of the HEA, its implementing regulations and subregulatory guidance. [*Id.* (Moskowitz Dep. 35:22-36:13).]

RESPONSE TO NO. BR10.  Incomplete.  Mr. Moskowitz provided opinions concerning 9.5% SAP issues to lenders for approximately $5000.  Wright Ex. 35 (Soni Dec., Ex. 99); Moskowitz Tr. 267:12-14 (Soni Dec., Ex. 18).  Nelnet was told as of December 13, 2002 that Mr. Moskowitz was providing opinions to "most of the secondaries" that were engaging in the transferring process and that such opinions were being priced in the $5000-

$10,000 range. N0134075; N0117978 (Soni Dec., Exs. 200, 187). This information was confirmed when both Brazos and Panhandle paid Mr. Moskowitz sums in this range for their respective opinions. J. Parker I Tr. 97:21-98:10, 271:16-22 (Soni Dec., Ex. 7). Moskowitz has also served as an advisor to certain Defendants with regard to this action. Moskowitz Tr. 12:22-15:9 (Soni Dec., Ex. 18).

**BR11.** Mr. Moskowitz, after reviewing the Brazos proposed policy and procedures plan, concluded that the transactions that Brazos described to him were permissible under the applicable regulations, and that the loans transferred from a BHEA pre October 1, 1993 tax exempt financing would be entitled to 9.5% SAP until the tax exempt financing was retired or defeased. [McMahon Decl., Ex. III.3 (B0005324-35); Ex. III.2 (B0270006-08).] He provided a signed opinion letter dated January 8, 2004 that concluded "it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions." [Ex. III.3 at (B0005325).]

**RESPONSE TO NO. BR11. Disputed and incomplete. Moskowitz submitted a draft opinion to Brazos on November 13, 2003. Moskowitz Ex. 8 at B0005437-43 (Soni Dec., Ex. 86); Moskowitz Tr. 199:9-200:1 (Soni Dec., Ex. 18). Ricky Turman provided comments to Mr. Moskowitz on that opinion on November 16, 2003. Turman Ex. 29 at B0005438 (Soni Dec., Ex. 754). On the second-to-last page of that draft, Moskowitz wrote that the condition specified in Section 682.302(e)(2)(ii) "is not met in each of the proposed transactions because the tax-exempt obligation that previously financed the loans is not being retired or defeased." Mr. Turman made a hand-written note on this sentence saying: "Per Mark: This is not true. Saul's opinion needs to protect us from False Claims and**

thus go to prison." *Id.* at B0005442.  Turman testified that one of the attorneys – either Mark Westergard or Saul Moskowitz – told them that False Claims Act liability was a possibility.  Turman Tr. 294:14-295:1 (Soni Dec., Ex. 9).  The note specified that it was "not true" "because they [the bonds at issue] have been refunded." *Id.*  Turman testified that this comment was made as a result of a conversation with Mark Westergard, Brazos' bond counsel.  Turman Tr. 291:15-293:5 (Soni Dec., Ex. 9).  Watson confirmed that Moskowitz was asking questions of Brazos concerning the terms retirement, refunding, and defeasance as those terms are used in the regulations when he was developing his opinion.  Watson Tr. 76:16-77:15 (Soni Dec., Ex. 10).

In December 2003, Moskowitz again noted that he did not have the expertise to give an opinion on whether a retirement or defeasance of a bond would occur.  Turman Ex. 33 (Soni Dec., Ex. 106).  Turman did not know how or whether Mr. Moskowitz ever ended up making a determination as to whether a retirement or defeasance had occurred, though he understood that it was a very important issue under the regulations.  Turman Tr. 311:10-312:8 (Soni Dec., Ex. 9).  Moskowitz provided Turman with a revised opinion on January 6, 2004.  Email and Opinion from S. Moskowitz at B0270425 (McMahon Dec., Ex. III.1).

Watson only read one paragraph of the final opinion, did not review any drafts and only cared if Moskowitz said they could go through with the transaction.  Watson Tr. 73:1-8, 74:4-11, 74:22-75:15 (Soni Dec., Ex. 10).  Watson testified that, "I paid him for the opinion, not how he got there." *Id.* at 79:8-11 (Soni Dec., Ex. 10).  This is despite the fact that he was then the general counsel of BHESC and was the addressee of the opinion.  *Id.* at 79:12-17.  Watson testified that his company accepted subsidies from the government, but did not pay attention to the laws that determined what the subsidies were.  *Id.* at 115:6-8.

Turman likewise did not pay attention to anything in the opinion other than "the four lines where he gives the opinion" that said they could go forward with the transaction; he did not "get into the underlying research or work that Mr. Moskowitz did to come up with that position."  Turman Tr. 278:15-279:3; 327:1-18 (Soni Dec., Ex. 9).  Turman later reiterated that he relied entirely on one sentence in the opinion, saying, "[t]hat's what we paid the attorney for was to provide an opinion" and that it was not his job "to go in and analyze his rationale for how he arrived at his opinion."  *Id.* at 334:9-17.

Moskowitz delivered a final, signed opinion on January 8, 2004.  Moskowitz Ex. 9 at B9005756-68 (Soni Dec., Ex. 115); Moskowitz Tr. 203:12-204:4 (Soni Dec., Ex. 18).  Mr. Moskowitz relied on "the FFELP statute and regulations, email correspondence between this firm and the Department of Education officials on these issues, published guidance from the Department, and other materials we deemed appropriate."  Moskowitz Ex. 9 at B9005757 (Soni Dec., Ex. 115).  Moskowitz specifically warned that "the guidance we have received from the Department by email has been confusing, and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations."  *Id.*  Watson stated that this fact bothered him.  Watson Tr. 82:15-83:3 (Soni Dec., Ex. 10).  Moskowitz instructed that "[s]ubsections (c) and (e) of the Regulation [Section 682.302] set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums."  Moskowitz Ex. 9 at B9005758 (Soni Dec., Ex. 115).  Moskowitz then discussed subsection (e)(2) of the regulation, specifically noting that it was designed to "make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal

government money under then-existing market conditions." *Id.* at B9005759.  He wrote

that in enacting this subsection of the regulation in 1992, "the Department 'chose its

poison' – *i.e.*, it chose to make it harder to convert loans from floor yield/half sap to full sap

treatment, thus making it easier to avoid such a conversion today." *Id.* at B9005760.  Mr.

Moskowitz then examined whether the transactions contemplated by Brazos would meet

the conditions specified in subsection (e)(2) and thus be subject to ordinary SAP.  *Id.* at

B9005761-62.  The two sources that he analyzed were the 1996 Dear Colleague Letter and

an email from a Department of Education employee from 2001.  *Id.*; Moskowitz Tr. 131:13-

132:5 (Soni Dec., Ex. 18).  Mr. Moskowitz also characterized the transactions at issue as

"involv[ing] what are essentially refinancing, rather than sale, transactions."  Moskowitz

Ex. 9 at B9005762 (Soni Dec., Ex. 115).  The discussion of Section 682.302(e)(2)(ii) was

changed to account for Turman's comment, "Per Mark," that the bonds at issue had been

refunded by saying that that the condition specified in Section 682.302(e)(2) "is not met in

each of the proposed non-refunding transactions because the tax-exempt obligation that

previously financed the loans is not being retired or defeased." *Id.* at B9005762 (emphasis

in original).  A new paragraph was added, saying that the condition specified in Section

682.302(e)(2)(ii) "is met in the refunding transactions since, by definition, the purpose of a

refunding is to retire or defease the existing bonds.  This would suggest that these

transactions would indeed cause the loans involved to lose half sap/floor treatment." *Id.*

Mr. Moskowitz came to the opposite conclusion when asked about the effect of refunding

on the ability to transfer loans in his deposition.  Moskowitz Tr. 139:10-141:5, 143:7-21

(Soni Dec., Ex. 18).  The final substantive paragraph of the opinion addressed one of the

questions Brazos had asked Mr. Moskowitz months earlier regarding the effect on SAP of a

subsequent maturity of the underlying pre-October 1, 1993 tax-exempt bond. Moskowitz Ex. 9 at B9005762 (Soni Dec., Ex. 115). The opinion advised that, "[a]s we have discussed, this Firm is not sufficiently expert in the intricacies of tax-exempt bond law to advise you as to whether a particular event constitutes retirement, defeasance, or maturity." *Id.* at B9005762-63. The opinion was addressed to Murray Watson of BHESC, but the body of the opinion provided that it could be relied on only by BHEA. *Id.* at B9005757, B9005763; Moskowitz Tr. 162:2-16 (Soni Dec., Ex. 18).

The opinion recognized that the SAP treatment of a loan depends on the source of funds used to make or purchase that loan, (Moskowitz Ex. 9 at B9005758 (Soni Dec., Ex. 115); Moskowitz Tr. 227:3-228:4 (Soni Dec., Ex. 18)), but did not "address that specific issue," Moskowitz Tr. 227:21-228:4, 229:7-10 (Soni Dec., Ex. 18). Mr. Moskowitz did not believe it was his job to provide advice on policy compliance and did not do so. *Id.* at 114:9-115:9.

Mr. Moskowitz attached to his opinion a redacted form of an email exchange with Pamela Moran of the Department of Education in which Mr. Moskowitz poses certain hypothetical questions to Moran. Moskowitz Ex. 9 at B9005764-68 (Soni Dec., Ex. 115); Moskowitz Tr. 131:18-132:5 (Soni Dec., Ex. 18). Moskowitz was not sure why he redacted a particular back-and-forth that also appears in Moskowitz Dep. Exhibit 1 before attaching the email to the Brazos and Panhandle opinion letters, but testified that it might be because of a client confidence. Moskowitz Tr. 204:18-205:14, 207:14-208:6 (Soni Dec., Ex. 18). Moskowitz nevertheless testified that he relied on the redacted exchange in forming the opinions he provided to Brazos and Panhandle. *Id.* at 130:21-132:5.

Mr. Moskowitz admitted that, under his reading of the law, a lender that had access to a pre-October 1, 1993 tax-exempt bond estate could convert its entire portfolio to Half-SAP/9.5% Floor status, as well as any loans that it would purchase from third parties into the pre-October 1, 1993 tax-exempt bond estate.  Moskowitz Tr. 127:9-128:20 (Soni Dec., Ex. 18).  He also recognized that, under his reading of the law, a lender with two pools of loans, one taxable (receiving ordinary SAP) and one tax-exempt (receiving Half-SAP/9.5% Floor), could swap the pools, swap them back the next day, and claim the 9.5% floor on all of them.  *Id.* at 115:14-117:9.

Mr. Moskowitz nevertheless recognized that money residing in a pre-October 1, 1993 tax-exempt bond estate is not necessarily eligible to make or purchase loans subject to Half-SAP/9.5% Floor simply by virtue of its being pledged to that bond; its status as "old money" or "new money" determined eligibility for 9.5% SAP.  *Id.* at  88:18-90:13, 91:3-93:22.  He agreed that the relevant questions to be asked in determining whether a loan should be subject to ordinary SAP or Half-SAP/9.5% Floor are whether it was made or purchased with "old money" or "new money," and if it was purchased with "new money," whether it was part of a transfer process under Section 682.302(e).  *Id.* at 94:19-95:4.

He understood that the purpose of SAP is "[t]o induce lenders to make loans they otherwise might not make on the terms that the statute would like them to make them on," and that the SAP rate is tied to the cost of funds used to make or purchase loans.  *Id.* at 98:20-99:3, 101:8-12.  He did not think it mattered whether a particular transaction was done for no purpose other than to obtain increased SAP, and did not consider whether the transactions had any independent business purpose.  *Id.* at 118:19-22.  He did not consider whether the transactions were conducted at arms-length.  *Id.* at 123:22-16; 258:1-4.

**Mr. Moskowitz understood that the 1992 rule change to Section 682.302(e) was prompted by the Department's "concern[] that transfers from tax-free estates to taxable estates would increase yields above the level necessary to serve the purposes of the program."** *Id.* **at 104:11-17.  He also understood that the judgment of Congress in 1993 was that loans would continue to be made based on ordinary SAP rates and that the 9.5% floor was not necessary for the purpose of the program going forward.** *Id.* **at 109:17-21, 111:21-112:4.**

**BR12.** Among the sources upon which Mr. Moskowitz relied to reach his opinion were the 1996 DCL and a 2001 email from Pam Moran, a policy official within OPE. [Ex. III.13 (Moskowitz Dep. 130:21-131:21); *supra* at TJS20.]

**RESPONSE TO NO. BR12.   Incomplete.  *See* Response to BR11, *supra*.  The email asked a limited question:  if ordinary SAP loans are swapped with loans in a pre-October 1, 1993 tax-exempt bond, and then back out, and ordinary SAP loans are swapped in again, etc., whether "under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture."  Moskowitz Ex. 1 (Soni Dec., Ex. 116). Moran replied that the loans "swapped out again" would be subject to "the reduced SAP/floor yield treatment." *Id.*  Moskowitz did not provide Moran with any information on the source of funds being used by the pre-October 1, 1993 tax-exempt bond estate to effectuate the swaps, and only asked about the effect of subsection (e)(2), which governs transfers <u>out of</u> the pre-October 1, 1993 tax-exempt bond estate.  Moran never commented on the source of funds and only commented on the effect of subsection (e)(2).**

**BR13.** Mr. Moskowitz understood that Ms. Moran's conclusions in this e-mail were made after ongoing discussions with ED's Office of General Counsel. [Ex. III.13 (Moskowitz Dep. 137:10-137:18).] Mr. Moskowitz also understood that Ms. Moran's job involved providing ED interpretations of regulations to lenders in the FFEL Program. [*Id.* (Moskowitz Dep. 138:3- 138:11, 217:6-217:19).] Mr. Moskowitz further understood that Ms. Moran has always been conscientious about consulting within the Office of Postsecondary Education prior to advising outside parties about ED interpretations of its regulations. [*Id.* (Moskowitz Dep. 217:6-217:19).]

**RESPONSE TO NO. BR13.  No dispute; however, Moran's conscientiousness is neither material nor admissible evidence.  Incomplete; *see* Response to BR12, *supra*.**

**BR14.** Brazos relied on the conclusion in Mr. Moskowitz's opinion to go forward with the transfers described in the proposed policy and procedures memo. [Ex. III.12 (Turman Dep. 278:15-279:3); Ex. III.11 (Watson Dep. 74:22-75:15, 95:4-95:12).] Brazos would not have performed  this activity without Mr. Moskowitz's opinion. [Ex. III.12 (Turman Dep. 42:14-43:3, 74:12-74:16); Ex. III.14 (Williams Dep. 71:13-72:1).]

**RESPONSE TO NO. BR14.   Disputed in that some of the "purchases" of new loans into BHEA's tax-exempt 9.5% SAP eligible financings were not contemplated by the opinion.  Turman Tr. 331:5-333:4 (opinion contemplated that purchases of new loans would be from "third parties;" however, over $53 million in loans from intra-company BHEA transfers were counted as purchases by Brazos.) (Soni Dec., Ex. 9); Brazos Financing Grid (April 2004) (Over $53 million in loans moved "purchased" by BHEA**

**9.5% eligible financings from ineligible BHEA financings in April 2004 transactions) (Mills Dec., Ex. 47).**

### 3.    2004 Transfers

**BR15.** Brazos undertook three separate transactions in 2004 that had the effect of increasing BHEA's 9.5% SAP loan portfolio. [Ex. III.12 (Turman Dep. 82:22-83:11).] These transactions affected a small portion of BHEA's overall portfolio, estimated in testimony as between three to seven percent. [*Id.* (Turman Dep. 82:22-83:11, 187:10-187:12).]

**RESPONSE TO NO. BR15.   Incomplete.  The "portion" of BHEA's portfolio affected by these transactions is not material.  Incomplete in that these were three sets of transactions (starting in January 2004, April 2004 and August 2004) in which Brazos moved approximately $463 million out of its Eligible Financings into other BHEA taxable and tax-exempt financings (that were not independently eligible for 9.5% SAP).  In January 2004, BHEA issued a new taxable financing, a portion of which was designated for its 9.5% SAP loan growth plan and was used in part to fund the January and April 2004 transfers (*i.e.*, this newly raised money was moved into the trust securing the Eligible Financings in exchange for loans).  Using the funds generated by these transfers out of its Eligible Financings, BHEA in January, April and August 2004, directed another Brazos entity to transfer loans into the Eligible Financings to replace the loans sent to the new January 2004 financing and the other BHEA ineligible financings.  Turman Tr. 90:22-91:4, 110:10-20, 118:1-119:13, 133:18-134:13, 144:9-147:2, 173:14-20, 179:17-180:6, 181:12-18 (Soni Dec., Ex. 9); Final Transfer Spreadsheets for January, April and August transfers (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).  Brazos eventually financed at least $560 million in loans on which it claimed 9.5% SAP.  *See* Brazos Resp. to Interrog. No. 1**

**(December 2004 Quarterly Balances for Lender Ids 834086 ($52.9 million) and 833806 ($512.7 million)) (Mills Dec., Ex. 3); Watson Tr. 86:16-22 (testifying that the total was in the low $600 million) (Soni Dec., Ex. 10).**

**BR16.** Each of these transactions involved BHEA selling loans from a pre-10/1/93 tax-exempt bond estate to a taxable financing and using the proceeds of that sale to purchase Texas Nexus loans which would become subject to the 9.5% floor. [Ex. III.2 at (B027007-08).] These loans were then sold by the BHEA qualifying tax-exempt obligation to a taxable BHEA bond issuance and the proceeds of this sale could be used to purchase additional loans which became subject to the 9.5% floor. [*Id.*]

**RESPONSE TO NO. BR16.   Disputed that the loans were "sold" from the BHEA qualifying tax-exempt obligation to a taxable BHEA bond.  The transfers were fully controlled by Brazos, with BHESC setting the transfer prices.  The transfers out of the BHEA Eligible Financings were made to other trusts controlled by BHEA.  There were no negotiations regarding the price of these transfers of loans and Brazos set the transfer price at face value, plus accrued interest, plus, in some cases, unamortized purchase premium. Brazos could have reversed the transfers if it so desired.  It was part of BHESC's plan to hold the loans in the BHEA Eligible Financing only temporarily.  Turman Tr. 85:11-86:18, 129:3-130:2, 134:14-22, 139:19-141:3, 141:14-142:15, 144:21-146:5 (Soni Dec., Ex. 9); *see also* (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).  When asked about maintaining an interest in the loans with respect to keeping "floor eligibility" after transferring, Mr. Turman testified "[t]he Authority was the owner of the loans when they first became eligible for floor.  The Authority continues to maintain ownership in a taxable facility as well."  Turman Tr. 143:2-21 (Soni Dec., Ex. 9).**

The money raised in the January 2004 taxable financing facilitated these transfers. *See* **BR17,** *infra.* **Monies from this offering started the process, as proceeds from this offering were exchanged for loans from the BHEA Eligible Financings, which then purchased new loans.**

**BR17.** The first transaction occurred in January 2004. [Ex. III.12 (Turman Dep. 178:19-179:14).] This transaction involved the issuance of new debt. [*Id.* (Turman Dep. 180:7180:15).] The investment bankers involved with the deal were all represented by counsel, and Brazos apprised both the bankers and their counsel of the planned floor project via financing grids. [*Id.* (Turman Dep. 342:9-343:4).] Neither the bankers nor their counsel raised any objections or concerns about the floor project. [*Id.* (Turman Dep. 343:5-343:10).]

**RESPONSE TO NO. BR17.   Incomplete in that the first transaction in January 2004 involved the issuance of new taxable debt.  Turman Tr. 90:10-91:2 (Soni Dec., Ex. 9). This was actually a series of transactions involving over $200 million in loans.  (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).**

**BR18.** The second transaction occurred in April 2004. [Ex. III.12 (Turman Dep. 116:13-116:16).] This transaction did not involve a new issuance of debt, but rather used recycling proceeds to purchase new loans. [*Id.* (Turman Dep. 117:3-117:8).] The third transaction occurred in August 2004. [*Id.* (Turman Dep. 134:9-134:13).]

**RESPONSE TO NO. BR18.   Disputed in that both the April and August 2004 "transactions" were each a series of transactions involving transfers of loans of approximately $138 million and $117 million respectively.  (B0009519; B0009537; B0009549) (Mills Dec., Ex. 47).  Further, while neither involved the issuance of new debt,**

- 204 -

the January 2004 taxable financing appears to have funded some of the April transfers. *See id.* All of the transfers out of the BHEA Eligible Financings were funded by financings that were not eligible for 9.5% SAP. *See id.*

**BR19.** All of the transactions were affected through loan purchase agreements between the selling entity and the purchasing entity, pursuant to which the transferee trust paid full principal, accrued interest and unamortized premiums. [Ex. III.12 (Turman Dep. 125:3-125:19, 129:3-129:16).]

**RESPONSE TO NO. BR19. Disputed that these were sales.** *See* **Response to BR16. Brazos set these prices to be the minimum price as a general rule. Turman Tr. 129:17-130:2 (Soni Dec., Ex. 9). In some cases the agreements were signed by the same Trustee.** *Id.* **at 135:1-5.**

**BR20.** All loans that were sold into an eligible pre-10/1/93 tax-exempt bond remained in that bond issuance until at least the end of the fiscal quarter. [Ex. III.12 (Turman Dep. 322:4-322:20).] This allowed for a clean audit trail and proper reporting on the quarterly LaRS 799s. [*Id.* (Turman Dep. 323:11-323:16); Ex. III.11 (Watson Dep. III:5-111:15).]

**RESPONSE TO NO. BR20. Disputed. These loans were not reported properly on the quarterly filings.**

### 4.     2006 Program Review

**BR21.** In November 2005, ED initiated a Program Review to focus on Brazos' tax exempt special allowance billings scheduled for March 2006. [McMahon Decl., Ex. III.4 (B0004965-67); McMahon Decl., Ex. III.15 (Criswell Dep. 155:1-155:13).]

**RESPONSE TO NO. BR21.   No dispute.**

**BR22.** Richard Criswell, a Senior Guarantor and Lender Review Specialist from the Souther Region of FSA, was the team leader of the March 2006 Program Review. [Ex. III.15 (Criswell Dep. 8:2-8:22, 158:10-159:4).] As lead reviewer, Mr. Criswell had the responsibility to draft the program review report. [*Id.* (Criswell Dep. 209:2-210:10).]

**RESPONSE TO NO. BR22.   No dispute.**

**BR23.** In Mr. Criswell's twenty years of personal experience, "almost all of the [lender] entities without exception are trying their best to do a benefit to the borrowers and do their best to meet the regulations as near as they can interpret them." [Ex. III.15 (Criswell Dep. 224:5-224:22).]

**RESPONSE TO NO. BR23.   Disputed.   This testimony is both irrelevant and inadmissible.   Furthermore, it does not address the activities of any specific Defendant in this case.**

**BR24.** BR25. Mr. Criswell viewed the applicable regulations as "at best sometimes hard to interpret." [Ex. III.15 (Criswell Dep. 224:5-225:5).] He has never come across an entity that he "felt was not doing the best they could to meet the regulatory requirements." [*Id.*]

**RESPONSE TO NO. BR24.   Disputed.   This testimony is both irrelevant and inadmissible.   Furthermore, it does not address the activities of any specific Defendant in this case.   Moreover, Criswell testified that he lacked authority to resolve policy issues.   *See also* Criswell Tr. 206:9-20 (Soni Dec., Ex. 26)**.

**BR25.**  During the March 2006 site visit, Mr. Criswell was able to request whatever documentation he wished from Brazos employees, and they always complied with his requests and provided him with the information. [Ex. III.15 (Criswell Dep. 173:15-173:21).]

**RESPONSE TO NO. BR25.   Disputed.   The testimony does not establish that Mr. Criswell was able to request "whatever" documentation he wished, but rather he was able to request "particular documents."   Criswell Tr. 173:15-173:21 (Soni Dec., Ex. 26).**

**BR26.**  Mr. Criswell had already participated in a tax-exempt special allowance billing review of a Kentucky entity prior to visiting Brazos. [Ex. III.15 (Criswell Dep. 159:25-160:5).]

**RESPONSE TO NO. BR26.   No dispute.**

**BR27.**  The scope of the Brazos Program Review included both compliance with the Taxpayer Teacher Protection Act as well as Brazos's adherence to regulations regarding tax-exempt debt. The 2006 Program Review Report states that, in addition to evaluating TTPA compliance, the review included "the policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form" from September 1993 through September 2005. [McMahon Decl., Ex. III.5 (ED-B-001390-1397, at ED-B-001392); Ex. III.14 (Williams Dep. 150:18-151:1, 161:8-162:17); Ex. III.15 (Criswell Dep. 250:6-250:25, 254:6-254:19).]

**RESPONSE TO NO. BR27.   Disputed and incomplete.   The Brazos Program Review does not mention the TTPA "in addition to" the "the policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form," but rather states that the review was**

to evaluate the lender's compliance with the TTPA and goes on to say that the "review was limited to the policies and procedures policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form."  McMahon Dec., Ex. III.5 (ED-B¬001390-1397, at ED-B-001392).  In the same section, the report also states that a "statistical random sample of borrowers was extracted to verify compliance with the Federal requirements."  ED-B¬001390-1397 at ED-B-001392).  (McMahon Dec., Ex. III.5)

The Program Review contained the "Disclaimer" that: "Absence of statements in this report about specific practices or procedures followed by BHEA should not be construed as acceptance, approval, or endorsement of those practices or procedures.  The specific nature of this report does not limit or lessen BHEA's obligations to comply with all provisions of the Family Federal Education Loan Programs."  ED-B¬001390-1397 at ED-B-001393.  McMahon Dec., Ex. III.5  This disclaimer is in most all program review reports. *See* Criswell Tr. 251:13-252:20 (Soni Dec., Ex. 26).

All of the Program Reviews findings were actually disclosed to Mr. Criswell by Brazos, rather than discovered by the Department.  Criswell Tr. 255:2-7 (Soni Dec., Ex. 26).

**BR28.** The Program Review Report stated that, "Recycling, Refunding and Transferring activities with bonds and loans were validated through the review of IRS Forms 8038, Tax Regulatory Agreements (Bond Amounts and Arbitrage Disclosures), Bond Official Statements, bond genealogy spreadsheets, loan/bond activity charts, and 9.5 percent floor loan samples." [Ex. III.5 at (ED-B-001393); Ex. III.15 (Criswell Dep. 175:17-177:2).]

**RESPONSE TO NO. BR28.   Disputed in that no context is provided for this quote, but the quote is correct.   Incomplete in that the Program Review also states that "[w]ith the use of 50 loan samples from  the September 2005 LaRS, loans were tracked from there present issues to the pre-10/1/93 tax-exempt issues by using the loan/bond activity charts." ED-B-001393 (McMahon Dec., Ex. III.5).**

**BR29.** Part of this review process was to validate the transferring activities to ensure that 9.5% SAP loans had spent time in an eligible tax-exempt bond. [Ex. III.15 (Criswell Dep. 175:17-177:2).]

**RESPONSE TO NO. BR29.   Incomplete.   Sampling methodology was used as part of this review.   *See* Response to BR28, *supra*.**

**BR30.** Two of the findings in the program review report related to overbilling for 9.5% SAP. [Ex. III.5, at (ED-B-001395); Ex. III.15 (Criswell Dep. 179:22-181:13).] These overbillings were inadvertent coding errors identified by Brazos prior to the review. [*Id.*] Brazos repaid the overbilled amounts through a quarterly adjustment on their LaRS 799. [*Id.*]

**RESPONSE TO NO. BR30.   Incomplete.   *See* Response to BR27, *supra*.**

**BR31.** The third finding related to an underbilling of 9.5% SAP by Brazos. [Ex. III.5 at (ED-B-001396); Ex. III.15 (Criswell Dep. 182:16-182:21).] A Brazos 2002 bond collapse designed to ease the administrative burden of the trusts resulted in a lack of a separate cash account for recycled funds from loans financed with 9.5% SAP. [Ex. III.5 at (ED-B-001396).] As stated in the Program Review Report, "[c]onsequently, BHEA has billed on some loans acquired with eligible re-cycled funds at the non-floor rate resulting in under-billing." [*Id.*] The principal amount of loans acquired with floor eligible funds from December 31, 2002

through September 30, 2005 totaled over $65 million. [*Id.*] The Program Review Report, under "Required Action" for the third finding, states, "BHEA may, if it chooses, determine the amount of special allowance under billed and make the necessary adjustments on LaRS Form." [*Id.*]

**RESPONSE TO NO. BR31.   Incomplete.  *See* Response to BR27, *supra*.  Brazos chose not to proceed with billing for these amounts.  Watson Tr. 183:10-184:6 (Soni Dec., Ex. 10).**

5.     **2007-2008**

**BR32.** Brazos filed a LaRS 799 for the quarter ending September 2006 claiming, among other monies, 9.5% SAP on loans. [Ex. III.12 (Turman Dep. 229:8-230:1).] Based on a subsequent ruling by ED, this was the final quarter for which the Department paid 9.5% SAP claims to Brazos. [*Id.*] Brazos did not claim 9.5% SAP after settling with ED as mentioned below. [*Id.*]

**RESPONSE TO NO. BR32.   No dispute.**

**BR33.** ED issued a Dear Colleague Letter designated DCL FP-07-01 that attached a template letter to lenders that had billed for 9.5% SAP. [McMahon Decl., Ex. III.16 (Trubia Dep. 20:13-21:5).] In a version of this template letter dated January 24, 2007, ED offered Brazos a settlement that would comprehensively resolve issues related to the source of funds used to secure loans billing 9.5% SAP. [McMahon Decl., Ex. III.6 (B9000232-35); Ex. III.16 (Trubia Dep. 15:12-16:1).]

**RESPONSE TO NO. BR33.  Disputed** that ED "offered Brazos a settlement that would comprehensively resolve issues related to the source of funds used to secure loans billing 9.5% SAP."  The letter does not include the words "settle" or "settlement."

The Higher Education Act does not grant DEd authority to settle claims but only limited authority to compromise claims "with respect to[] the functions, powers, and duties, vested in him by this part" – *i.e.*, the part of Title 20 entitled "Federal Family Education Loan Program."  *See* 20 U.S.C. § 1082(a) (emphasis added).

The agreement between Nelnet and the Department provided:

> The Department does not have the authority to, and this Agreement does not, waive, compromise, restrict or settle any past, present, or future violations by Nelnet, its officers, or employees of the criminal laws of the United States or any action against Nelnet, its officers, or employees for civil fraud against the United States under 31 U.S.C. §§ 3729-33.

Trubia Ex. 9, at 8 ¶ K (Nelnet-DEd Jan. 19, 2007 Settlement Agreement) (Soni Dec., Ex. 129).  Similarly, during a deposition of DEd, DEd's corporate witness, Patricia Trubia, confirmed that her "understanding is the department does not handle False Claims Act. That's handled by Justice under title 31."  Trubia Tr. 53:8-16 (Soni Dec., Ex. 27).  DEd's corporate witness affirmed that this "settlement" was not "trying to do something more for the other lenders than [DEd was] doing for Nelnet" but was merely "trying to put them on a level playing field."  *Id*. at 52:3-9 (Soni Dec., Ex. 27).

In official written responses to questions posed during a 2007 congressional hearing, the Secretary of Education directly stated with respect to its asserted settlement that "the Department of Justice is not foreclosed from pursuing, as appropriate, separate remedies under other applicable provisions of the law, including the False Claims Act."  Trubia Ex.

**7 at 20 (DEd's July 6, 2007 official responses to May 16, 2007 written questions from the House Committee on Education and Labor to Education Secretary Spellings) (Soni Dec., Ex. 128);** *see also* **Trubia Tr. 54:16-19 ("Q.  Do you know of anything that's specified to these other lenders that they were released from claims under the False Claims Act?  A. Not that I'm aware of.") (Soni Dec., Ex. 27), 74:13-16 (confirming that asserted settlement with lenders "did not control the False Claims Act administered by the Department of Justice").  DEd's corporate witness confirmed that this written response "state[s] the official position of the department."  *Id.* at 55:13-56:10, 94:19-95:5.**

BR34.  If a holder of 9.5% SAP loans complied with or accepted the ED's interpretation of the statutory and regulatory requirements for eligibility for 9.5% SAP contained in the letter, then ED released all claims against the lender to recoup historic 9.5% SAP based on source of funding. [Ex. III.6 at (B9000235); Ex. III.16 (Trubia Dep. 17:18-18:5, 20:13-21:5).]

**RESPONSE TO NO. BR34.  Disputed that ED "released all claims."  *See* Response to BR 33, *supra*.**

BR35.  A holder of 9.5% SAP loans could accept ED's settlement offer simply by not billing for 9.5% SAP past September 30, 2006. [Ex. III.16 (Trubia Dep. 45:3-45:12).] A holder of 9.5% SAP loans did not need to execute a document memorializing acceptance of the ED's offer. [*Id*. (Trubia Dep. 46:6-47:6); Ex. II.77 at (ED-E-000021).]

**RESPONSE TO NO. BR35.  Disputed and incomplete.  *See* Response to BR 33, *supra*.**

**BR36.** ED believed that neither individual taxpayers nor the Department of Justice had the authority to challenge ED's settlement with other lenders via DCL FP-07-01, although the Department of Justice was not precluded from pursuing other "appropriate" remedies, including the False Claims Act. [Ex. III.16 (Trubia Dep. 100:2-100:15, 55:13-56:7); Ex. II.77 at (ED-E-000021).]

**RESPONSE TO NO. BR36.   Incomplete.  *See* Response to BR 33, *supra*.**

**BR37.** Patricia Trubia, testifying as ED's Federal Rule 30(b)(6) designee on the settlement issue, agreed that if Brazos stopped billing 9.5% SAP after September 30, 2006, she had no doubt that ED had released any claims it had against Brazos related to historical 9.5% SAP billing based on funding source prior to September 30, 2006. [Ex. III.16 (Trubia Dep. 99:14-99:21).]

**RESPONSE TO NO. BR37.   Disputed and incomplete.  Trubia also testified that False Claims Act based claims were not being released.  *See* Response to BR 33, *supra*.**

### 6.      Results of 2004 Transfers

**BR38.** All special allowance payments received by BHEA were allocated by BHESC employees to the applicable BHEA bond issue. [Ex. III.12 (Turman Dep. 231:1-231:18).] These monies had to trickle through the "waterfall," or prioritized disbursements, before any residual cash could accrue to Brazos. [Ex. III.11 (Watson Dep. 156:5-156:21).] Brazos has never taken 9.5% money out of a bond even when there were residuals after running through the waterfall. [*Id*.]  (Watson Dep. 170:3-170:8, 185:19-186:1).] Any revenue accrued from the transfers was paid to individual bond issues or went to borrower benefits. [Ex. III.12 (Turman Dep. 31:1432:10).]

**RESPONSE TO NO. BR38.  Disputed and incomplete.  Revenue also went to the purchase of additional loans as well as to payment of costs.  Watson Tr. 158:22-160:22 (Soni Dec., Ex. 10).  Increasing 9.5% Loan revenues permitted Brazos to issue more debt and more loans.  This directly resulted in the potential for employees to obtain higher compensation under the company's management incentive program.  *Id.* at 164:11-167:3 (Soni Dec., Ex. 10).  Payments were made to by BHEA to BHESC for its services.  *Id.* at 163:18-164:2 (Soni Dec., Ex. 10).**

### 7.    Original Source

**BR39.** Prior to filing his original complaint, Oberg obtained various spreadsheets from Congressional offices relating to 9.5% SAP. [McMahon Decl., Ex. III.17 (Oberg Dep. 357:2-358:4, 361:5-366:10).] Oberg obtained a draft spreadsheet dated May 6, 2004 from James Kvaal showing the top 20 holders of 9.5 Loans by quarter (including Brazos). [McMahon Decl., Ex. III.7 (OBERG0007690, OBERG00008352); Ex. III.17 (Oberg Dep. 362:15-363:1; 734:2-736:4).] The spreadsheet was provided to Mr. Kvaal by ED. [Ex. III.7 (OBERG0007690, OBERG00008352); Ex. III.17 (Oberg Dep. 362:15-363:14).]

**RESPONSE TO NO. BR39.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR40.** On or about August 15, 2004, Oberg received spreadsheets from Michael Dannenberg, Senior Counsel to the Senate's Health, Education, Labor and Pensions ("HELP") Committee. [Ex. III.1 7 (Oberg Dep. 376:20-380:20).] The spreadsheets provided the amount paid on 9.5 SAP claims and total 9.5 Loan holdings for all 9.5 Loan holders (including BHEA).

[McMahon Decl., Ex. III.8 (OBERG00007702-10).] Mr. Dannenberg obtained the spreadsheets from ED and provided them to Oberg at his request. [Ex. III.17 (Oberg Dep. 380:21-381:10, 386:12-387:19).]

**RESPONSE TO NO. BR40.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR41.**   On or about March 2007, Oberg received a spreadsheet from Claudette David, a staff assistant on the Senate Subcommittee on Federal Financial Management, showing 9.5% loan holdings and 9.5% SAP claims by lender. [McMahon Decl., Ex. III.9 (OBERG00007772-73); Ex. III.17 (Oberg Dep. 392:15-394:3).] Senators Coburn and Carper obtained this spreadsheet from the Secretary of Education. [Ex. III.17 (Oberg Dep. 396:14-396:19).]

**RESPONSE TO NO. BR41.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR42.**   Approximately two months before filing his initial complaint, Oberg obtained spreadsheets from the office of Representative Thomas E. Petri. [Ex. III.1 7 (Oberg Dep. 422:15-423:13, 427:3-428:19).] The Petri Spreadsheets provided 9.5 SAP claims and principal balances of 9.5 Loans. [McMahon Decl., Ex. III.1 0 (OBERG00007760-71); Ex. III.17 (Oberg Dep. 427:3-428:19).] Representative Petri's office obtained the spreadsheets from ED, which had provided the spreadsheets to the House Committee in response to a question from Representative Petri in the course of the House Committee's public hearing and investigation. [Ex. III.17 (Oberg Dep. 429:1-429:9).]

**RESPONSE TO NO. BR42.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR43.**  Oberg lifted the data relating to BHEA in the Petri spreadsheets and used them in his complaint. [Ex. III.17 (Oberg Dep. 742:7-743:8).] The data lifted from the Petri spreadsheets relating to BHEA's 9.5% loan balances was included in paragraph 58(d) of Oberg's original complaint and has appeared in all subsequent complaints. [*Id.*]

**RESPONSE TO NO. BR43.   Disputed and incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**BR44.** Prior to filing his initial complaint, Oberg knew nothing about BHEA's 9.5 SAP practices other than the data contained in the spreadsheets he obtained from Congress described above. [Ex. III.17 (Oberg Dep. 757:17-758:2).]

**RESPONSE TO NO. BR44.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed) for additional related facts.**

**Relator requested and received a spreadsheet from a Congressional staff member, James Kvaal.  *Id.* (Ex. 8 thereto).  Dated May 6, 2004, the spreadsheet showed the top twenty holders of 9.5% Loans in rank order by quarter, starting with the third quarter of 2002 and ending with the first quarter of 2004.  During this time, Brazos, (i.e., "USB TRUSTEE FOR BHEA INC") went from being unranked in Q3 2002, to being fifth in Q4**

2003, and back to being thirteenth in Q1 2004.  The increase between Q3 of 2002 and Q4 of 2003 was a minimum of $521 million, or 317%.  *See* Relator's Resp. to Brazos' Interrog. No. 1  (Soni Dec., Ex. 112).

In April of 2004, DEd-OIG, which was preparing to audit lenders in response to Relator's earlier complaints, contacted Relator for any further information he might have regarding his investigation.  On May 14, 2004, based on the spreadsheet from Kvaal and other analysis, Relator decided to report Brazos to ED-OIG as of the "Texas entities" that exhibited a significant, rapid and unlawful increase in their 9.5% loan pools over a short period of time.  *See* OBERG0008723 (Soni Dec., Ex. 205); Oberg Tr. 713:9-714:1 (Soni Dec., Ex. 32).  Thus, by this time, Relator had formed a view that Brazos had submitted improper claims in 9.5% SAP.  Documents referenced in B39-43 merely confirmed Relator's conclusion at that time.  *See* Relator's Resp. to Brazos' Interrog. No. 1  (Soni Dec., Ex. 112).

## B.      Undisputed Facts Concerning Education Loans Inc. and Student Loan Finance Corp.

### 1.      Background

**EL1.**    Education Loans Inc. (EdLinc) is a wholly owned subsidiary of Student Loan Finance Corp. (SFLC). SLFC is the corporate successor to a not-for-profit entity (also called SLFC) that was incorporated in 1978 and authorized to issue tax-exempt debt in furtherance of its activity as a secondary market buyer of loans made to students (or parents of students) residing or attending school in South Dakota, *i.e.,* South Dakota "nexus" loans. SLFC and EdLinc were incorporated when the not-for-profit SLFC converted to a for-profit

corporation through a series of transactions in 1997 and 1998. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 3).]

**RESPONSE TO NO. EL1.   Incomplete.  EdLinc has no independent employees, and SLFC employees perform all of EdLinc's operations.  Buckmeier Tr. 19:8-9, 21:20-22:16 (Soni Dec., Ex. 1); Sanderson Tr. 186:3-11 (Soni Dec., Ex. 2).**

2.     **EdLinc's 1998-1 and 1999-1 Bond Indentures**

**EL2.**   At the time SLFC converted to a for-profit corporation, it issued its series 1998-1 bond obligations. The 1998-1 bond obligations refunded various SLFC obligations, including several tax-exempt bond issuances that had been originally issued by SLFC prior to October 1, 1993. EdLinc assumed liability for the 1998-1 bond obligation and correspondingly acquired student loan and other assets that were refinanced by the 1998-1 bond obligation. The tax-exempt portion of the 1998-1 bond obligation had not matured or been retired or defeased as of December 31, 2006. Such assets and debt are held in an indenture of trust. U.S. Bank National Association serves as the trustee for the 1998-1 indenture of trust. SLFC is the servicer and administrator of the 1998-1 indenture of trust. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 4); Ex. IV.2 (Relator's Resp. to Request for Admission #7).]

**RESPONSE TO NO. EL2.   No dispute.**

**EL3.**   $57,270,000 of the tax-exempt obligations in the 1998-1 indenture refunded prior tax-exempt obligations that were originally issued prior to October 1, 1993. SLFC recorded and tracked funds in a series of general ledger accounts, including one that used the SLFC bond code of 24 ("Bond Code 24"). The initial deposit recorded into Bond Code 24 was a tax-exempt portion of the proceeds of the 1998-1 bond obligation, which was then used to refund

tax-exempt debt issued by SLFC's predecessor that had been originally issued prior to October 1, 1993, and to acquire their remaining unused acquisition funds. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶ 7); Ex. IV.2 (Relator's Resp. to Request for Admission #7).]

**RESPONSE TO NO. EL3.   No dispute.**

EL4.   The $57,270,000 in Bond Code 24 was eligible to make or purchase student loans eligible for 9.5% SAP. The 1998 obligations that generated the $57,270,000 had not matured, or been retired or defeased, as of December 31, 2006. [McMahon Decl., Ex. IV.2 (Relator's Resp. to Requests for Admission #7-8).]

**RESPONSE TO NO. EL4.   Disputed that the 1998 obligations had not been retired or defeased.**

EL5.   In 1999, EdLinc issued its series 1999-1 taxable bond obligations and subsequently acquired student loan and other assets with the proceeds of the 1999-1 bond issuance, all of which are held in its 1999-1 indenture of trust. U.S. Bank National Association serves as the trustee for the 1999-1 indenture of trust. SLFC is the servicer and administrator of the 1999-1 indenture of trust. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 5).]

**RESPONSE TO NO. EL5.   Incomplete.  Using its 1999-1 indenture of trust, EdLinc issued four SLABS (Student Loan Asset Backed Securities) offerings, the Series 1999-1, Series 2000-1, Series 2001-1 and Series 2002-1, which it used in connection with its 9.5% program.  Buckmeier Tr. 60:20-62:3 (Soni Dec., Ex. 1).**

EL6.   Both the 1998-1 and 1999-1 indentures permit earnings from loans and other investments held as collateral to be "recycled," or reinvested, to purchase new loans within the indenture. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 6).]

**RESPONSE TO NO. EL6.   No dispute, but for clarity, the purchase of new loans with indenture "earnings" did not necessarily qualify such loans for 9.5% SAP eligibility. EdLinc's methods for generating cash in the 1998-1 indenture are set forth in Responses to EL9-11, *infra.***

EL7.   As of August 31, 2003, EdLinc held loans with an outstanding principal balance of $57,791,30.44 that were eligible for 9.5% SAP, and had $5,554,977.08 in cash and $2,570,503.89 in accrued interest and special allowance payments receivable as collateral within Bond Code 24. At that time, EdLinc's holdings of student loans that were held as collateral for all its taxable and tax-exempt bond issuances totaled $1,261,852,100.12. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶ 8); Ex. IV.2 (Relator's Resp. to Request for Admission #9).]

**RESPONSE TO NO. EL7.   No dispute; however, EdLinc's total holdings of student loans is not a material fact.**

### 3.    EdLinc's Purchase of Loans

EL8.   EdLinc increased its holdings of 9.5 SAP loans between September 2003 and September 2004 through a series of purchases of South Dakota nexus loans. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 72:17-72:20; 82:14-86:4; 168:3-170:9).]

**RESPONSE TO NO. EL8.   Disputed that the loans purchased were 9.5% SAP eligible.  EdLinc more than tripled the dollar amount of loans on which it claimed 9.5 SAP by transferring loans from its tax-exempt 1998-1 indenture to its taxable 1999-1 indenture and replacing loans in its 1998-1 indenture.  EdLinc increased its 9.5% SAP loan pools from $57.79 million dollars to $169.97 million dollars in one year's time.  *See* EdLinc's Resp. to Interrog. No. 3 (Chart of Floor Loan History, pp. 8, 10) (Mills Dec., Ex. 2).  *See also* Responses to EL9-11, *infra*.**

EL9.   In September 2003, EdLinc transferred $28.4 million in South Dakota nexus loans that its 1998-1 bond indenture had purchased as a buyer in the secondary market over time to its 1999-1 bond indenture. The 1999-1 indenture paid cash to the 1998-1 indenture in the amount of the outstanding principal balance of the loans, accrued interest, plus a premium estimated to be what a fair value sale in the current market would command. The 1998-1 indenture used the cash proceeds obtained in consideration of the transfer to purchase new South Dakota nexus loans from independent lenders. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 79:12-79:22; 82:14-83:14; 138:18-142:2); Ex. IV.1 (Buckmeier Decl. at ¶ 10).]

**RESPONSE TO NO. EL9.   Incomplete.  EdLinc first transferred loans to SLFC's GOAL Funding II financing vehicle from its 1999-1 indenture, thereby leaving funds available in the 1999-1 indenture.  Buckmeier Tr. 125:19-127:11; 134:14-135:4 (Soni Dec., Ex. 1).  The 1999-1 indenture then replaced the loans it transferred to GOAL Funding II with loans from the 1998-1 indenture (transferring cash from the 1999-1 indenture to the 1998-1 indenture, and loans from the 1998-1 indenture to the 1999-1 indenture).  *Id.*  The**

**1998-1 indenture then used the cash that it received from the 1999-1 indenture to purchase replacement loans from third parties.** *Id.*

EL10.  Between September 2003 and September 2004, EdLinc made 10 more periodic transfers of 9.5 SAP loans from its 1998-1 to its 1999-1 indenture. Each time, the 1999-1 indenture paid cash in the amount of EdLinc's cost basis, which was determined to represent fair market value, for the loans purchased. Each time, the 1998-1 indenture used the proceeds of the transaction to invest in collateral pledged to the 1998-1 indenture in the form of new South Dakota nexus loans purchased from independent lenders. EdLinc claimed 9.5 SAP for all loans transferred to the 1999-1 indenture, as well as all new loans purchased by the 1998-1 indenture using consideration obtained in the transactions. [McMahon Decl., Ex. IV.2 (Relator's Resp. to Request for Admission #11); Ex. IV.15 (Buckmeier Dep. at 138:15-142:2; 168:3-170:9); Ex. IV.1 (Buckmeier Decl. at ¶¶10-11); Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL10.   Disputed and incomplete.  Buckmeier testified that some of the new loans in the 1998-1 indenture were consolidation loans that EdLinc originated.  Buckmeier Tr. 77:21-78:14 (Soni Dec., Ex. 1).  EdLinc's first move of loans, $28.43 million in September 2003, was initially transferred from the 1998-1 Indenture to EdLinc's GOAL Funding II facility.  However, EdLinc shortly thereafter changed its plans and reversed the transaction, moving the loans back to the 1998-1 Indenture and then on to the 1999-1 indenture.  *Id.* at 80:8-81:14.  Buckmeier testified that EdLinc similarly could have reversed any of the later transactions had it wanted.  *Id.* at 150:1-18.  The transfer of loans from the 1998-1 indenture to the 1999-1 indenture was not documented with purchase agreements.  *Id.* at 145:22-147:2.  The transfer of loans from the 1998-1 indenture**

to the 1999-1 indenture did not involve arms length negotiations, the transactions were not taxable events, and no detailed valuation process of the collateral was undertaken after the first transfer. *Id.* at 149:3-21. After the first transfer, the transfer of loans from the 1998-1 indenture to the 1999-1 indenture was made at the cost to the 1998-1 indenture for purchasing the loans and no gain or loss was recognized. *Id.* at 148:1-18. EdLinc was the beneficial owner of both the 1998-1 indenture to the 1999-1 indenture, and the 1998-1 indenture and the 1999-1 indenture had the same trustee. *Id.* at 147:15-22.

**EL11.** EdLinc did not swap loans from its own portfolio, or from portfolios or related entities, to convert existing Full-SAP loans to 9.5 SAP loans. All proceeds from the transfers were used to purchase loans from independent sellers with no corporate relationship to EdLinc or SLFC. [McMahon Decl., Ex. IV.15 (Buckmeier Dep. at 77:21-79:7, 83:9-86:4, 153:15-154:4); Ex. IV.1 (Buckmeier Decl. at ¶ 11); Ex. IV.16 (Kohles Dep. at 88:16-89:17).]

**RESPONSE TO NO. EL11.** Disputed and incomplete. *See* **Response to EL10,** *supra*. It is unclear what is meant by "swap" in the asserted fact; however if it is proposed that EdLinc did not exchange loans from it 1998-1 indenture for loans from its 1999-1 indenture with the purpose of gaining 9.5% SAP eligibility for all such loans, no dispute. EdLinc was the beneficial owner of both the 1998-1 and the 1999-1 Trust and did transfer loans from the 1998-1 indenture to the 1999-1 indenture to maximize its 9.5 SAP returns. *See* **EL10 and Response thereto,** *supra*.

**EL12.** EdLinc increased its holdings of 9.5 SAP loans from $67,452,345.63 in September 2003 to $169,968,655.95 in September 2004. [McMahon Decl., Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL12.   Incomplete.  EdLinc's 9.5 SAP loan balance peaked at $186,924,549.58 by March of 2005.  *See* EL13.**

EL13.   EdLinc's 9.5 SAP loan balance increased to a high of $186,924,549.58 in March 2005. This additional growth resulted from the reinvestment of interest, principal payments, and other income from the loans that were in the 1998-1 indenture before the TTPA was enacted. At its apex, the outstanding balance of EdLinc's 9.5 SAP loan portfolio represented 11.6% of its entire student loan portfolio held as collateral for all its outstanding debt, taxable and tax-exempt. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. at ¶¶14-15); Ex. IV.3 (EdLinc's Resp. to Interrog. #3).]

**RESPONSE TO NO. EL13.   Disputed that this loan balance actually qualified for 9.5 SAP.  The percentage of EdLinc's total loan portfolio that its 9.5 SAP loans represented is not a material fact.**

### 4.    The Proposal to Manage EdLinc's Portfolio To Increase 9.5 SAP Loans

EL14.   The proposal to increase EdLinc's 9.5 SAP loan holdings originated with an industry consulting firm, Aurora Consulting Group LLP. One of Aurora's principals, Larry O'Toole, was a lawyer and member of SLFC's board of directors who had extensive experience in the student loan industry as former CEO of Nellie Mae. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 164:10-165:18); Ex. IV.17 (Sanderson Dep. at 49:11-50:7; 70:8-70:17).]

**RESPONSE TO NO. EL14.   Incomplete.  Mr. O'Toole did not represent himself as giving legal advice in his capacity as a consultant for Aurora Consulting Group LLP**

("Aurora"), and in fact encouraged EdLinc to seek the advice of an attorney before implementing the proposal.  *See* Sanderson Ex. 1 at ELI-HC00000043 (McMahon Dec., Ex. IV.4).  Neither EdLinc nor SLFC sought the advice of counsel.  Sanderson Tr. 174:13-17 (Soni Dec., Ex. 2).  Also, Mr. O'Toole, who was a paid director SLFC, had a strong financial interest in this proposal, as he entered into a fee agreement with EdLinc to receive 2% of the "take" of EdLinc's loan transfers, a sum ultimately totaling $1,013,534.97.  *See* EdLinc's Resp. to Interrog. No. 20 (Soni Dec., Ex. 148); Kohles Tr. 214:10-215:19 (Soni Dec., Ex. 3).

**EL15.**  On April 21, 2003, Mr. O'Toole proposed that Aurora develop portfolio management strategies for SLFC to increase the yield on EdLinc's loan portfolio in conformity with DOE regulations and interpretative guidance. [McMahon Decl., Ex. IV.4 (ELI-HC00000043 — ELI-HC00000046, at ELI-HC00000045).]

**RESPONSE TO NO. EL15.**  Incomplete.  Norg Sanderson, SLFC's Chief Executive Officer, immediately passed the faxed proposal along to Steve Kohles, SLFC's Chief Operating Officer, with a handwritten note on the cover of the proposal directing: "Great idea.  Needs to be done."  Facsimile from Larry O'Toole to Norg Sanderson of April 23, 2003 at ELI-HC00000043 (McMahon Dec., Ex. IV.4); Sanderson Tr. 64:21-65:22; 67:3-6 (Soni Dec., Ex. 2); Kohles Tr. 47:3-7 (Soni Dec., Ex. 3).  Sanderson did not follow up with Kohles, but understood that Kohles was planning for the implementation of the program.  Sanderson Tr. 90:3-22 (Soni Dec., Ex. 2).  *See* Responses to EL16, 17, *infra*.

EdLinc's decision to engage in the above-described series of loan transfers was motivated by its desire to increase its profitability.  Sanderson Tr. 88:7-11 ("Q.  So what

you cared about was whether he could get additional dollars in the door?  A.  Yes.  Q.  And

that's all you cared about?  A.  Yes.") (Soni Dec., Ex. 2); Buckmeier Tr. 47:12-17, 155:8-18

("Q.  Well, I take it the whole purpose of the process was for the SAP payments to go up,

right?  MS. KRIS:  Objection.  Buckmeier: The whole purpose, as I understood it, was to

improve our profitability; to make the best with what we have to, you know, increase our

bottom line so that we could survive and continue in the secondary market and fulfill our –

fulfill function.") (Soni Dec., Ex. 1).

EL16.  On August 5, 2003, Aurora provided a detailed memorandum, *Memorandum on*

*Indenture Planning and Special Allowance Management,* that set forth DOE regulatory

developments since the 1980 creation of the 9.5 SAP/half SAP regime, and provided specific

recommendations for action by SLFC to transfer and purchase loans to increase EdLinc's 9.5

SAP loan holdings. [McMahon Decl., Ex. IV.5 (ELI-HC00000178 — ELI-HC00000230).] The

memo explained:

> The types of transfers described ... are representative of asset-liability
> management strategies that have been in use by other FFELP loan
> holders for several years. These lenders have active programs to refinance
> loans pledged to their tax-exempt financings with taxable financing in an
> effort to 'bank' earnings from increased SAP as an offset to past and
> future yield limitations in a high interest rate environment. The clarity of
> Section 302(e) [34 C.F.R. § 682.302(e)] language itself, consistent
> regulatory interpretive guidance and the adaption of billing forms to
> accommodate the revised regulatory language provide ample support for
> the increased SAP billing received as a result of these strategies. [*Id.* at
> ELI-HC00000182.]

**RESPONSE TO NO. EL16.**  Incomplete.  Mr. Sanderson, EdLinc's CEO, testified

that he never read the August 5, 2003 memorandum ("Aurora Memo"), nor did he care

what it contained, but immediately forwarded the Aurora Memo and a fee agreement to

the Compensation Committee of SLFC's Board recommending approval. Sanderson Ex. 4

(Soni Dec., Ex. 94); Sanderson Tr. 93:5-22, 94:15-95:1, 103:8-11 (Soni Dec., Ex. 2).  SLFC's Compensation Committee recommended approval to the Board on September 17, 2003 and the Board approved the Aurora fee agreement and plan the next day.  Sanderson Ex. 6 (Soni Dec., Ex. 95); Sanderson Tr. 112:2-21 (Soni Dec., Ex. 2).  Mr. Sanderson did not read the Aurora Memo.  *Id*. at 95:2-97:2.  Mr. Sanderson instead turned the project over to Kohles, and gave no further oversight of the program at the CEO level.  *Id*. at 123:8-24:9. Sanderson had only a "very general" understanding of the laws governing student loans. *Id.* at 35:14-36:20, 43:4-44:11 (unsure of special allowance payment applicability to tax-exempt and taxable financings); 45:13-46:17 (no understanding of the 1993 OBRA implications on SAP); 46:10-47:12.  Sanderson relied upon his bond counsel to provide legal advice in these types of matters.  *Id.* at 46:10-17.  ("Let's just make it real clear.  I did not follow the rules and regulations of the Department of Education.  I depended on our financing attorneys to make sure we were compliant with the law.  That's my personal understanding of how this worked.").  The Aurora Memo itself, in a letter from Sheila Ryan, an employee of Aurora, notes that the Department took a position on 9.5 SAP loans because it did "not want non-profit entities to move loans to various debts to maximize yield."  Memorandum on Indenture Planning and Special Allowance of August 5, 2003 at ELI-HC00000209 (McMahon Dec., Ex. IV.5); *see also* Responses to EL17, 24-26, *infra*.  The Aurora Memo specifically states that "Aurora Consulting, LLC is not a law firm and is not offering legal advice to SLFC on any matters.  To the extent any legal issues are raised or implicated by the information provided in this memorandum, <u>SLFC should seek legal advice from its advisors</u>."  Memorandum on Indenture Planning and Special Allowance of

August 5, 2003 at ELI-HC00000180 (emphasis added) (McMahon Dec., Ex. IV.5).  No such legal opinion was obtained.  Sanderson Tr. 174:13-17 (Soni Dec., Ex. 2).

EL17.  SLFC's Chief Operating Officer and Chief Financial Officer, Steve Kohles, read the Aurora memo and understood the proposal to be legal—a determination he based on the documentation contained in the memo itself, as well as on Mr. O'Toole's experience in the industry and familiarity with the Department's regulations. Larry Buckmeier, a member of SLFC's accounting department who managed the implementation of the proposal, also read the Aurora memo and understood the program to be legal. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 84:13-85:3; 164:10-165:18); Ex. IV.1 (Buckmeier Decl. at ¶¶ 9-10); *see also* Ex. IV.15 (Buckmeier Dep. at 104:2-105:11).]

**RESPONSE TO NO. EL17.   Disputed and incomplete.  Kohles is not an attorney, and did not vet the proposal with an attorney.  Kohles Tr. 78:18-79:6, 80:4-13 (Soni Dec., Ex. 3).  Buckmeier has testified to the same.  Buckmeier Tr.  107:9-108:4 (Soni Dec., Ex. 1). Kohles testified that his recollection of the scope of outside advice sought with respect to the Aurora plan was to ask bond counsel if the trust indentures allowed the contemplated transactions.  Kohles Tr. 78:18-79:6, 80:4-13 (Soni Dec., Ex. 3).  He testified that he had no recollection of conversations regarding whether the program should be implemented, stating that Sanderson and the Board thought it was a good idea.  Kohles Tr. 74:4-77:1 (Soni Dec., Ex. 3).  Neither Kohles nor Buckmeier, the officer who had principal responsibility for effectuating the loan transfers to carry out the plan, had discussions with O'Toole regarding the Aurora Memo or plan.  Kohles Tr. 73:13-74:3 (Soni Dec., Ex. 3); Buckmeier Tr. 107:22-08:4 (Soni Dec., Ex. 1).  Buckmeier testified that he understands a "little bit" of the statutory developments but is not an expert on them.  *Id.* at 33:21-34:6**

(Soni Dec., Ex. 1).  Buckmeier's involvement was related to implementation only and he was not consulted on whether the plan should be adopted.  *Id.* at 45:16-46:5.  *See* **Responses to EL16,** *supra***, with respect to the Aurora Memorandum's recommendation to seek legal advice.**

EL18.  Steve Kohles and Larry Buckmeier believed the transfer of loans from one indenture to another in exchange for cash to be a "sale," rather than a "transfer" of those loans. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 83:14-22, 173:7-174:5); Ex. IV.15 (Buckmeier Dep. at 151:5-19).]

**RESPONSE TO NO. EL18.   Disputed and incomplete.  *See* Response to EL10,** *supra***.**

**5.      SLFC Officers and Employees' Belief in the Legality of Their Actions**

EL19.  SLFC began to implement the Aurora recommendations in September 2003 under the direction of Larry Buckmeier. In coordinating the plan with SLFC's information technology staff (whose assistance was needed to select and transfer loans, and to assure that proper SAP codes were applied), Mr. Buckmeier explained: "ED currently allows us to move these loans and retain floor treatment (earn 9.5% return), but they may close this 'loophole' soon, so we want to keep current on having loans acquired into Bond 24 [EdLinc's eligible pre-1993 tax-exempt bond code], moved on to another fund shortly thereafter." [McMahon Decl., Ex. IV.6 (EL100018266 – ELI00018267); Ex. IV.1 (Buckmeier Decl. ¶ 10).]

**RESPONSE TO NO. EL19.   Incomplete.  Buckmeier is not an attorney and testified as to the limited nature of his knowledge of the applicable regulations.  Buckmeier Tr. 33:21-34:6 (Soni Dec., Ex. 1).  Neither SLFC nor EdLinc obtained an opinion regarding the**

legality of the Aurora recommendations.  Sanderson Tr.  174:13-17 (Soni Dec., Ex. 2).
Buckmeier did not do an in depth analysis of the Aurora Memo.  Buckmeier Tr. 104:18-
105:11 ("And I remember looking at [the Aurora memo], and I don't remember retaining a
copy, but I do remember looking at it at the time and thinking, Well, it looks like it's pretty
well documented.  That was about the extent of it.") (Soni Dec., Ex. 1).

      **EL20.**  SLFC officers and employees tracked potential changes in the governing law and
guidance, including as they related to 9.5 SAP eligibility for transferred loans, over the course of
the next year. Industry newsletters and conferences were a source of compliance guidance for
SLFC. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 28:16-30:4; 31:22-33:1; 35:9-36:16; 153:11-
156:9); Ex. IV.1 (Buckmeier Decl. at If 12).]

      <u>**RESPONSE TO NO. EL20.**</u>  **Incomplete.  *See* Responses to EL15-19, *supra*.**

      **EL21.**  On January 13, 2004, Mr. Kohles wrote to Mr. Buckmeier and SLFC's CEO
(Mike Gort) to update them on legislative developments that might impact 9.5 SAP eligibility on
transferred loans: "I talked to Larry O'Toole about 302.e (the code that allows the current
treatment of floor loans). It is being discussed in the House and it appears from the
discussion that the bond deals themselves will not be impacted but only the individual loans.
Therefore, the loans that have been moved will continue to get floor treatment and only future
loans (after they amend 302e.) will not get the same treatment." [McMahon Decl., Ex. IV.7
(ELI00028067).]

      <u>**RESPONSE TO NO. EL21.**</u>   **No dispute that the language is quoted accurately.**

      **EL22.**  SLFC's April 30, 2004 CFO Report states: "Legislation has been submitted to
prohibit floor loans in Taxable Financings. To date we have moved $145,000,000. Looks like we

are done 5/5/04." [McMahon Decl., Ex. IV.8 (ELI00034883).] However, the legislation what ultimately became the TTPA—was not enacted until some five months later (October 30, 2004), with an effective date of September 30, 2004.

**RESPONSE TO NO. EL22.   No dispute that the language is quoted accurately.**

**EL23.**   In 2004, SLFC was made aware that the Government Accountability Office had concluded that Department regulations permitted 9.5 SAP eligibility for transferred and recycled loans. A September 23, 2004 email from SLFC's compliance analyst (Loren Jerde) to its CEO (Mr. Gort), COO/CFO (Mr. Kohles), and Mr. Buckmeier, forwarded an industry newsletter about the GAO Report; the newsletter reported: "The GAO acknowledges that Education regulations allow lenders to transfer 9.5 percent loans to taxable bonds and post-1993 tax-exempt bonds." [McMahon Decl., Ex. IV.9 (ELI00054312); Ex. IV.16 (Kohles Dep. at 185:9-186:17).]

**RESPONSE TO NO. EL23.   Disputed and incomplete.  This insertion mischaracterizes the GAO report.  *See* Responses to 134-35 *supra*.**

**EL24.**   Larry Buckmeier understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.1 (Buckmeier Decl. ¶16); Ex. IV.15 (Buckmeier Dep. at 104:18-105:11).]

**RESPONSE TO NO. EL24.   Disputed and incomplete.  *See* Responses to EL15-19, *supra*, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

**EL25.** Steve Kohles understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 83:13-85:3; 164:16-169:6).]

**RESPONSE TO NO. EL25.  Disputed and incomplete.  *See* Responses to EL15-19, *supra*, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

**EL26.** Norg Sanderson understood the law to permit the transfer and recycling of loans at the time that SLFC and EdLinc engaged in those practices. [McMahon Decl., Ex. IV.17 (Sanderson Dep. at 146:13-146:15; 168:12-169:14).]

**RESPONSE TO NO. EL26.  Disputed and incomplete.  The deposition testimony of Sanderson reveals that he could have no knowledge of the legality of EdLinc's practices as it relates to the Aurora Memo because he did not read the Aurora Memo, possessed a limited knowledge of FFELP regulations, and made no attempt to consult with outside counsel to determine the legality of the proposal.  Sanderson Tr. 95:2-97:2, 35:14-36:20, 46:10-17.  ("Let's just make it real clear.  I did not follow the rules and regulations of the Department of Education.  I depended on our financing attorneys to make sure we were compliant with the law.  That's my personal understanding of how this worked.")  (Soni Dec., Ex. 2).  Buckmeier Tr. 43:5-46:12 (Soni Dec., Ex. 1); Kohles Tr. 78:18-80:13 (Soni Dec., Ex. 3); Sanderson Tr. 46:10-17 (Soni Dec., Ex. 2).  *See* Responses to EL15-19, *supra*, regarding SLFC's and EdLinc's vetting of the legality of their practices.**

6.      **The Decision to Stop Transferring Loans After the Effective Date of the Taxpayer-Teacher Protection Act of 2004**

**EL27.**  When Congress amended the Higher Education Act to prohibit 9.5 SAP eligibility on loans transferred after September 30, 2004, Mr. Kohles understood the amendment as implicit confirmation that his prior understanding of the law up until that point had been correct. [McMahon Decl., Ex. IV.16 (Kohles Dep. at 176:22-177:22; 180:5-181:2).]

**RESPONSE TO NO. EL27.   Disputed and incomplete.  *See* Responses to EL15-18, 25, *supra*.  The Taxpayer-Teacher Protection Act prohibited the billings of 9.5% SAP on loans transferred from tax-exempt to taxable financings.  *See*  JS21 and Response thereto, *supra*.**

**EL28.**  As momentum built behind the TTPA in the early fall of 2004, *The Chronicle of Higher Education* reported:

> Education Department officials say they want to close the loophole, and have proposed legislation to do so. But they say they cannot take immediate action because they have determined that the loan companies' actions are legal, based on interpretations of the law that the Clinton administration offered in guidance to lenders in the 1990s. The officials say they cannot reverse those interpretations without proposing a new regulation and receiving public comment on it, a process that can take up to two years. [McMahon Decl., Ex. IV.10 (ELI00014764 — ELI00014766, at ELI00014765.]

SLFC's CEO (Mike Gort) forwarded the article to SLFC personnel on September 21, 2004, with clear instructions:

> The controversy between Republicans and Democrats over the 9.5% floor loans continues to build. We hold a number of such loans and will continue to hold and add to our holdings so long as the law allows such investment. Some larger organizations have taken great advantage of this provision.  *When congress acts to limit the exception, we will, of course, follow the law to the letter.*

[*Id*. at ELI00014764 (emphasis added); *see also* Ex. IV.16 (Kohles Dep. at 182:13-184:16).]

**RESPONSE TO NO. EL28.** **No dispute that the language is quoted accurately. No context is provided with respect to the referenced "actions". To the extent the article is offered for the position of Department of Education personnel, it is hearsay.**

EL29. Ten days later, when an industry newsletter reported that the TTPA had been introduced in the House and would end 9.5% SAP eligibility for loans transferred after September 30, 2004, Mr. Gort instructed the responsible SLFC personnel: "Given the proposed effective date of this legislation, *we need to stop all floor loan transfers immediately."* [McMahon Decl., Ex. IV.11 (ELI00018691) (emphasis added).]

**RESPONSE TO NO. EL29.** **No dispute that the language is quoted accurately. *See* Response to EL27, *supra*.**

EL30. The last of the 11 periodic transfers occurred before September 30, 2004, the effective date of the TTPA. EdLinc made three subsequent transfers (totaling $18,092.75), which arose when a small number of 9.5% SAP loans were consolidated by students after the effective date of the TTPA. EdLinc self-identified the potential compliance problem and attempted to address it through corrective actions by reducing its net floor loan billings by the amount of these transfers. [McMahon Decl., Ex.IV.3 (EdLinc's Resp. to Interrog. #3); Ex. IV.15 (Buckmeier Dep. at 210:10-213:21, 213:15-21); Ex. IV.1 (Buckmeier Decl. ¶ 13); Ex. IV.16 (Kohles Dep. at 176:22-177:15).]

**RESPONSE TO NO. EL30.** **No dispute.**

### 7.   EdLinc's Settlement with the Department

**EL31.**  On January 24, 2007, Theresa Shaw, Chief Operating Officer of the

Department's Federal Student Aid program, wrote to Norg Sanderson, President of EdLinc, to

propose a settlement with the Department. The letter stated:

> The Department is committed to resolving without protracted dispute any potential objections both to the meaning and application of the statutory and regulatory requirements as restated in this letter, and to ensuring that SAP is paid at the 9.5 percent minimum return rate only on eligible loans. Therefore, the Department will not seek to recoup [9.5] SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with or accept, as applicable, the following--
>
> 1.      The statutory and regulatory requirements for eligibility for SAP at the 9.5 percent minimum rate as restated in this letter;
>
> 2.      The requirement that a request for payment of SAP at the 9.5 percent rate be supported by [a] management certification[;]
>
> 3.      The Department's payment of all SAP claims at the standard rate, rather than the 9.5 percent minimum return rate, until the Department receives, accepts, and evaluates the results of the audit or review described here, and determines, after our consideration of any objection you present, which of the loans on which you currently claim SAP at the 9.5 percent rate are eligible for payment at that rate.

[McMahon Decl., Ex. IV.12 (ELI-HC00015124 – ELI-HC00015130, at ELI-HC00015127).]

**RESPONSE TO NO. EL31.**   **Disputed and incomplete.  *See* Responses to JS165,**

**BR33, *supra.***

**EL32.**  EdLinc accepted the Department's offer. It accepted regular SAP pending the

audit (beginning with the fourth quarter of 2006); agreed to support claims with management

certifications; and retained an outside auditor—Grant Thornton LLP—to audit its portfolio to

determine which loans qualified for continued receipt of 9.5 SAP payments under the

January 2007 guidance. [*See* McMahon Decl., Ex. IV.13 (ELI00021373 – ELI00021382).] The audit concluded that $37,341,122 of EdLinc's 9.5 loan portfolio as of December 2006 was eligible to continue receiving 9.5 SAP according to the guidance provided in the Department's January 2007 letter. EdLinc submitted the auditors' report to the Department on October 31, 2007. [*Id.*]

**RESPONSE TO NO. EL32.   Disputed and incomplete.  *See* Responses to JS165, BR33, *supra*.  The audit concluded that $37,341,122 of EdLinc's 9.5 loan portfolio as of December 2006 was eligible to continue receiving 9.5 SAP according to the guidance provided in the Department's January 2007 letter; however, based on its own records, EdLinc was tracking over $125 million in "floor" loans as a result of its 9.5% SAP eligible loan growth program for this same period in time.  *See* EdLinc's Response to Interrog. No. 3 (Interrogatory No. 3 Chart, p. 14 or 16, "Total end-of-month balance of all floor loans" for December 2006) (Mills Dec., Ex 2).  Sanderson signed the results of this audit.  ELI00021382 (McMahon Dec., Ex. IV.13)**

**EL33.**   The Department accepted the Grant Thornton LLP audit report by letter to Mr. Sanderson on February 5, 2008, and agreed to pay 9.5 SAP on the portion of the audited portfolio deemed eligible under the Department's 2007 guidance beginning with the quarter ending December 31, 2006. The letter stated: "We have determined that the audit report is acceptable and that it properly identifies ... eligible first-generation or second-generation loans." The letter did not seek to recover for any 9.5 SAP payments made in prior quarters. [*See* McMahon Decl., Ex. IV.14 (ELI-HC00015120-ELIHC00015123, at ELI-HC00015121). ]

**RESPONSE TO NO. EL33.   Incomplete.  *See* Response to EL32, *supra*.**

PH1.   Panhandle Plains Higher Education Authority ("PPHEA") is a nonstock Texas corporation exempt from taxation under Internal Revenue Code §501(c)(3). [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 2); Ex. V.2 (Wright Decl. ¶ 2); Ex. V.3 (G. Parker Decl. ¶ 2); Ex. V.4 at PPHEA_111368, PPHEA_111394-96); *see also* Third Amended Complaint ("TAC"), Docket No. 228 at ¶ 26.] It was organized to help students obtain a college education, particularly persons from in and around the panhandle of Texas. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 3); Ex. V.2 (Wright Decl. ¶ 3); Ex. V.3 (G. Parker Decl. ¶ 3); Ex. V.4 (PPHEA_111370, PPHEA_111368); Ex. V.26 (Baker Dep. 8:8-20, 11:20-12:14).]

**RESPONSE TO NO. PH1.   No dispute.**

PH2.   Since its inception, PPHEA has assisted thousands of students with obtaining college degrees. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 4); Ex. V.2 (Wright Decl. ¶ 4); Ex. V.3 (G. Parker Decl. ¶ 4).] PPHEA pays a fee to Panhandle Plains Management and Servicing Corporation ("PPMSC") to handle the logistics of servicing its student loans and to manage its day-to-day operations, as PPHEA has no employees. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 5); Ex. V.2 (Wright Decl. ¶ 5); Ex. V.3 (G. Parker Decl. ¶ 5).] The servicing fees paid to PPMSC by PPHEA were set before the increase of PPHEA's 9.5% SAP-eligible portfolio. In fact, there was a reduction in servicing fees charged over the time period that PPHEA was billing ED for 9.5% SAP. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 4) Ex. V.2 (Wright Decl. ¶ 54); Ex. V.3 (G. Parker Decl. ¶ 53).] PPHEA income in excess of expenses is used to provide borrower benefits (such as loan forgiveness or lower interest rates) or to purchase additional student loans. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.E1 5); Ex. V.2 (Wright Decl. ¶5); Ex. V.3 (G. Parker Decl. ¶ 5 Ex. V.27 (Wright Dep. 23:24-25:12, 32:11-33:3); *see also* Ex. V.28 (G. Parker Dep. 134:19-25).]

**RESPONSE TO NO. PH2.   Disputed and incomplete.  The number of students with PPHEA student loans and whether PPHEA paid a reduced servicing fee to PPMSC are not material facts.  PPMSC serviced most of PPHEA's student loans and received a percentage of the loan balance as a fee for these services.  Wright Tr. 44:17-45:9 (Soni Dec., Ex. 8). PPHEA's purchase of additional student loans would increase PPMSC's revenue.  *Id.* Panhandle used excess interest to make higher bids for desired loan portfolios and compete better with other secondary lenders.  *Id.* at 206:11-207:16.**

**PPMSC "manage[s] the day-to-day operations [of PPHEA]."  Specifically, John Wright, Glenn Parker, and Jimmy Parker – all PPMSC employees – ran PPHEA's day-to-day operations.  Wright Tr. 14:5-15:8 (Soni Dec., Ex. 8); J. Parker I Tr. 32:17-33:7 (Soni Dec., Ex. 7).  In fact, Wright testified that he spent 90-95 percent of his time on PPHEA matters despite being a PPMSC employee.  Wright Tr. 14:5-23 (Soni Dec., Ex. 8).  John Wright, Glenn Parker, and Jimmy Parker also frequently attended PPHEA Board Meetings.  J. Parker I Tr. 80:1-12 (Soni Dec., Ex. 7); Wright Tr. 143:13-144:7 (Soni Dec., Ex. 8).  Cliff Baker served as the Executive Director of PPHEA while also being employed by PPMSC.  Baker Tr. 19:1-14 (Soni Dec., Ex. 24).  Currently, Neal Combs serves as Executive Director of PPHEA while also being employed by PPMSC.  J. Parker I Tr. 28:16-20 (Soni Dec., Ex. 7).**

**PH3.**   Both PPHEA and PPMSC (collectively herein, "Panhandle") are governed by independent boards of directors. [*See, e.g.,* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 6); Ex. V.2 (Wright Decl. ¶ 6); Ex. V.3 (G. Parker Decl. ¶ 6); Ex. V.29 (J. Parker Dep. 8:5-14).] These persons are generally professionals from in and around Canyon and Amarillo, Texas or in West Texas who donate their time to PPHEA without compensation, with the exception of

reimbursed travel expenses. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 7); Ex. V.2 (Wright Decl. ¶ 7); Ex. V.3 (G. Parker Decl. ¶ 7).] The members on PPMSC's board are also generally professionals who, in most cases, are from, around or connected to Amarillo and Canyon, Texas. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 8); Ex. V.2 (Wright Decl. ¶ 8); Ex. V.3 (G. Parker Decl. ¶ 8).]

**RESPONSE TO NO. PH3.   No dispute.**

**PH4.**   As of December 31, 2002, PPHEA had bond series 1991AB, 1992AB, and 1993AB, which were outstanding pre-October 1, 1993 tax-exempt bonds (the "Patriarch Bonds"). Together, the Patriarch Bonds had a collective face value of $148,300,000. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶9); Ex. V.2 (Wright Decl. ¶9); Ex. V.3 (G. Parker Decl. ¶ 9); Ex. V.5 (PPHEA_045099-102).] These Patriarch Bonds were not retired or defeased until the end of 2009. [McMahon Decl., Ex. V.2 (Wright Decl. ¶9).] All of the loans securing these Patriarch Bonds were eligible to receive, and did receive, so-called 9.5% SAP each quarter. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 10); Ex. V.2 (Wright Decl. ¶10); Ex. V.3 (G. Parker Decl. ¶ 10); *see also* Ex. V.6 (PPHEA_038800).] PPHEA also had, and always continued to have, other 9.5% SAP-eligible and non-9.5% SAP-eligible bond estates and related loans. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶11); Ex. V.2 (Wright Decl. ¶11); Ex. V.3 (G. Parker Decl. ¶ 11).] Indeed, 9.5% SAP-eligible loans only constituted approximately 50% of PPHEA's loan portfolio at their highest amount. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 12); Ex. V.2 (Wright Decl. ¶ 12); Ex. V.3 (G. Parker Decl. ¶  12).] PPMSC never issued any bonds related to this case and never owned any loans related to this case. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 13); Ex. V.2 (Wright Decl. ¶ 13); Ex. V.3 (G. Parker Decl. ¶ 13).]

**RESPONSE TO NO. PH4.  Disputed.  Panhandle's contention that "[a]ll of the loans securing these Patriarch Bonds were eligible to receive, and did receive, so-called 9.5% SAP each quarter" is unclear.  It is not disputed that <u>prior to 2003</u> this was the case. Panhandle's contention that "PPHEA also had, and always continued to have, other 9.5% SAP-eligible and non-9.5% SAP-eligible bond estates and related loans" is also unclear. Whether PPHEA had loans in other bond estates which either were or were not eligible for 9.5% SAP is not material.**

**Although 9.5% SAP-eligible loans at most ever constituted 50% of PPHEA's loan portfolio, 9.5% SAP was a major source of revenue for PPHEA.  Panhandle estimated that in 2003 the increase in 9.5% SAP-eligible loans created new annual net income for PPHEA of more than $8 million while Panhandle's total annual revenue in 2003 was less than $50 million.  Baker Ex. 32 at PPHEA_045537 (Soni Dec., Ex. 52); PPHEA 2003 Financials, J. Parker Ex. 3 at PPHEA_045347 (Soni Dec., Ex. 127).**

**Although "PPMSC never issued any bonds related to this case and never owned any loans related to this case," PPMSC controlled the day-to-day operations of PPHEA.  *See* PH2, *supra*.**

**The 1991AB, 1992AB, and 1993AB bond series (the "Patriarch Bonds") were also under the same indenture and had the same trustee.  J. Parker I Tr. 173:2-11 (Soni Dec., Ex. 7).**

**PH5.**  By in or about the fall of 2002, PPHEA was continuing to expand its operations in furtherance of its Section 501(c)(3) purposes. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 14); Ex. V.2 (Wright Decl. ¶ 14); Ex. V.3 (G. Parker Decl. ¶ 14).] Accordingly, in or about

November 2002, Panhandle senior staff considered whether it would be feasible for

PPHEA to issue new bonds, use the proceeds from the issuance of those new bonds to

purchase the 9.5% SAP-eligible loans that resided in the Patriarch Bond estates, transfer

them to secure the new bonds, and then cause the Patriarch Bonds to purchase new student

loans in the open market. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 15); Ex. V.2 (Wright

Decl. ¶ 15); Ex. V.3 (G. Parker Decl. ¶15); *see also* Ex. V.6 (PPHEA_038800, PPHEA_

038835).] A question was whether, upon the completion of this exercise (hereinafter, the process

will be referred to as "Transfers"), all of the loans transferred out of the Patriarch Bond

estates and those purchased into the Patriarch Bond estates to replace those transferred out

would be considered eligible to receive quarterly 9.5% SAP payments. [McMahon Decl., Ex.

V.1 (J. Parker Decl. ¶  16); Ex. V.2 (Wright Decl. ¶ 16); Ex. V.3 (G. Parker Decl. ¶ 16); Ex.

V.6 (PPHEA_038835, PPHEA_045872).].

**RESPONSE TO NO. PH5.   No dispute, but incomplete.**

**The New Bonds were created solely to allow transfers to increase 9.5% SAP.**

**Wright Tr. 107-108 (Soni Dec., Ex. 8).  The sole purpose of the transfers was to increase**

**Panhandle's revenue.  J. Parker I Tr. 60, 174, 281 (Soni Dec., Ex. 7); Wright Tr. 62-63**

**(Soni Dec., Ex. 8), PPHEA Response to Interrog. No. 4 (Mills Dec., Ex. 4).  Panhandle**

**testified that the Transfers offered no benefit to taxpayers.  Wright Tr. 73-74 (Soni Dec.,**

**Ex. 8).**

**A loan receiving 9.5% SAP allowed Panhandle to receive a much higher interest**

**rate on the loan.  Wright Tr. 62:12-24 (Soni Dec., Ex. 8); J. Parker I Tr. 58:21-60:11 (Soni**

**Dec., Ex. 7).  In the early 2000s, a loan subject to full SAP would accrue interest at a rate of**

**approximately four or five percent.  Wright Tr. 61:18-69:17 (Soni Dec., Ex. 8).**

Panhandle's calculations show that it would receive 5.99 or 5.39 percentage points more (depending upon whether the student loan was in grace or repayment status) in special allowance interest payments from DEd for a 9.5% SAP-eligible loan than for a full SAP loan.  Baker Ex. 29 at PPHEA_045870 (Soni Dec., Ex. 51); Wright Tr. 100-01 (Soni Dec., Ex. 8).

PH6.   The Panhandle senior staff charged with examining issues relating to Transfers included James B. Parker, Glenn E. Parker and John Amos Wright II. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶17); Ex. V.2 (Wright Decl. ¶ 17); Ex. V.3 (G. Parker Decl. ¶ 17); Ex. V.28 (G. Parker Dep. 20:4-23).] All of these individuals had spent almost all of their entire working careers in either university financial student aid offices, at organizations similar to Panhandle or at Panhandle itself. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶1); Ex. V.2 (Wright Decl. ¶ 1); Ex. V.3 (G. Parker Decl. ¶ 1); Ex. V.27 (Wright Dep. 8:24-25, 13:14-22); Ex.V.28 (G. Parker Dep. 10:4-9); Ex. V.29 (J. Parker Dep. 13:20-14:15).]

**RESPONSE TO NO. PH6.**   **Incomplete.  Glenn Parker is an accountant with a background in business and public accounting including a degree in Accounting.  G. Parker Tr. 9-10 (Soni Dec., Ex. 25).  After leaving Panhandle, he worked in business offices for school districts and public high schools.  *Id*. at 8:14-9:17.  Similarly, Jimmy Parker worked in a university's financial aid office until January 2001.  J. Parker I Tr. 13:18-14:15 (Soni Dec, Ex. 7).**

PH7.   Based on their experience in the student loan business, their experience dealing with ED, and their first-hand knowledge of the 1996 DCL, Messrs. Parker and Mr. Wright believed that both the loans transferred into the new bonds and the new loans purchased into the

Patriarch Bond estates would be eligible to receive 9.5% SAP. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 18); Ex. V.2 (Wright Decl. ¶ 18); Ex. V.3 (G. Parker Decl. ¶ 18); Ex. V.28 (G. Parker Dep. 48:2-12); Ex. V.27 (Wright Dep. 26:22-27:1).] They had also heard, through trade organizations, that other lenders were growing their 9.5% SAP-eligible loan portfolios pursuant to the 1996 DCL. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 19); Ex. V.2 (Wright Decl. ¶ 19); Ex. V.3 (G. Parker Decl. ¶ 19); Ex. V.27 (Wright Dep. 28:17-29:13); Ex. V.28 (G. Parker Dep. 22:5-23:22).]

**RESPONSE TO NO. PH7.** **Incomplete. Beginning in late 2002, John Wright, Glenn Parker and Jimmy Parker investigated various approaches to increase the volume of Panhandle's 9.5% SAP eligible loans. Wright Tr. 25:16-26:7, 28:4-6 (Soni Dec., Ex. 8); J. Parker I Tr. 26:15-27:4 (Soni Dec., Ex. 7).**

**Panhandle considered several approaches to increase 9.5% SAP. Panhandle considered a plan to only bill for 9.5% SAP on loans transferred out of the Patriarch Bonds and not to bill 9.5% SAP on loans purchased from third parties to refill the Patriarch Bonds. Wright Tr. 53:17-55:10 (Soni Dec., Ex. 8). This idea was identified as the "conservative approach." Wright Ex. 35 at PPHEA_045871 (Soni Dec., Ex. 99); Wright Tr. 53:17- 55:10 (Soni Dec., Ex. 8). Panhandle ultimately rejected this approach. Wright Tr. 55:6-56:2 (Soni Dec., Ex. 8); G. Parker Tr. 32:13-17 (Soni Dec., Ex. 25).**

**Panhandle also considered a plan to double its portfolio of loans receiving 9.5% SAP from approximately $143 million to $286 million. Wright Tr. 91:20-92:2 (Soni Dec., Ex. 8); Baker Ex. 29 at PPHEA_045867-870 (Soni Dec., Ex. 51). Panhandle rejected this approach as well. G. Parker Tr. 42:8-9 (Soni Dec., Ex. 25). Ultimately, Panhandle's**

**Transfers more than tripled its portfolio of loans receiving 9.5% SAP from $148 million to over $500 million.  Wright Tr. 68:4-69:3 (Soni Dec., Ex. 8); G. Parker Tr. 77:21-25 (Soni Dec., Ex. 25).**

PH8.   Messrs. Parker and Mr. Wright undertook a due diligence effort to confirm whether their understanding was accurate. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 20); Ex. V.2 (Wright Decl. ¶ 20); Ex. V.3 (G. Parker Decl. ¶ 20); Ex. V.28 (G. Parker Dep. 47:5-13); *see, e.g.,* Ex. V.6 (PPHEA_038835).] Among them, they read, among other things, applicable laws pertaining to 9.5% SAP and, in or about November 2002, sought legal advice from their regular bond counsel, Kathleen Ellison of Fulbright & Jaworski, LLP. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 20); Ex. V.2 (Wright Decl. ¶ 20); Ex. V.3 (G. Parker Decl. ¶ 20); Ex. V.27 (Wright Dep. 43:1-7).] Ms. Ellison was, and still is, a partner at the Fulbright firm. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 21); Ex. V.2 (Wright Decl. ¶ 21); Ex. V.3 (G. Parker Decl. ¶ 21).].

**<u>RESPONSE TO NO. PH8.</u>   Disputed.  John Wright testified that eligibility for 9.5% SAP was not in Kathleen Ellison's area of expertise.  Wright Tr. 59:21-60:19 (Soni Dec., Ex. 8).**

**Panhandle was aware that the 1993 OBRA prevented new issuances from being eligible for 9.5% SAP.  Wright Tr. 66:28-67:8 (Soni Dec., Ex. 8); J. Parker I Tr. 155:15-156:4 (Soni Dec., Ex. 7).  Panhandle also knew that the 1996 regulations were intended to prevent lenders from receiving increased SAP.  Wright Tr. 105:1-10 (Soni Dec., Ex. 8).  Panhandle believed that no statutory, regulatory, or policy limit existed on Panhandle's ability to grow its 9.5% SAP eligible loans.  Wright Tr. 133:5-134:19 (Soni Dec., Ex. 8); G.**

Parker Tr. 49:22-50:2 (Soni Dec., Ex. 25).  Wright testified that a loan in a Patriarch Bond for even one second was eligible for 9.5% SAP.  Wright Tr. 139:7-12 (Soni Dec., Ex. 8). Despite the 1993 OBRA, Panhandle increased its 9.5% SAP-eligible loans from $148.3 million to over $500 million.  Wright Tr. 68:4-69:3 (Soni Dec., Ex. 8); G. Parker Tr. 77:21-25 (Soni Dec., Ex. 25).

Nobody at Panhandle raised the issue of why moving loans to different bonds would result in millions of dollars in additional SAP.  J. Parker I Tr. 94:18-95:11 (Soni Dec., Ex. 7).  Panhandle never questioned how it could grow 9.5% SAP eligible loans from $148.3 million to over $500 million even though Congress banned new issuances from receiving 9.5% SAP.  Wright Tr. 69:10-21 (Soni Dec., Ex. 8).  Further, Panhandle never sought approval or guidance from the U.S. Department of Education.  J. Parker I Tr. 123:3-123:18 (Soni Dec., Ex. 8); Wright Tr. 43:8-11 (Soni Dec., Ex. 8).

PH9.   Ms. Ellison referred PPHEA to Saul Moskowitz, Esq., then an attorney with Moskowitz Strickland Brockington Lewis, PLLC. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 22); Ex. V.2 (Wright Decl. ¶ 22); Ex. V.3 (G. Parker Decl. ¶ 22); *see also* Ex. V.7 (PPHEA 000185).] Mr. Moskowitz specialized in federal education law. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 23-24); Ex. V.2 (Wright Decl. ¶ 23-24); Ex. V.3 (G. Parker Decl. ¶ 23); Ex. V.30 (Moskowitz Dep. 20:9-15, 21:13-20).] He had worked in ED's Office of General Counsel from 1979-1986 before moving to the Office of Post-Secondary Education, until he left ED in 1990. [McMahon Decl., Ex. V.30 (Moskowitz Dep. 30:8-21, 34:6-19, 35:13-21, 36:22; *see also* Ex. V.1 (J. Parker Decl. ¶ 24); Ex. V.2 (Wright Decl. ¶ 24); Ex. V.3 (G. Parker Decl. ¶ 23).] He had served as Branch Chief of OPE's Guaranteed Student Loan division,

which was responsible for administering FFELP (including policy and development). [See McMahon Decl., Ex. V.30 (Moskowitz Dep. 35:13-36:12).].

**RESPONSE TO NO. PH9.   No dispute; however, Mr. Moskowitz did not have the expertise to be able to determine whether a "particular transaction is a refunding, defeasance, retirement or maturity."  November 4, 2003 Email from S. Moskowitz at B0270005 (Soni Dec., Ex. 155).  *See also* Responses to BR7, BR10.**

PH10.   The two Parkers and Mr. Wright had a number of teleconferences with Ms. Ellison and Mr. Moskowitz to explain PPHEA's proposed transactions and to specifically discuss whether those transactions were legal under applicable law. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 25); Ex. V.2 (Wright Decl. ¶ 25); Ex. V.3 (G. Parker Decl. ¶ 24); *see also* Ex. V.6 (PPHEA 045872, PPHEA_045877); Ex. V.30 (Moskowitz Dep. 244:16-20).] With Ms. Ellison's assistance, the Panhandle staff also provided Mr. Moskowitz with detailed descriptions of the transactions that PPHEA proposed to undertake in order to grow its 9.5% SAP-eligible portfolios. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶26); Ex. V.2 (Wright Decl. ¶ 26); Ex. V.3 (G. Parker Decl. ¶ 25); Ex. V.27 (Wright Dep. 165:11-166:4).].

**RESPONSE TO NO. PH10.   Incomplete.  Panhandle officials appear to have had their first conversation with Moskowitz on November 18, 2002.  Moskowitz Ex. 12 at PPHEA_045871-72 (Soni Dec., Ex. 159).  Panhandle had never utilized Moskowitz's services prior to consulting with him on these Half-SAP/9.5% Floor issues.  G. Parker Tr. 33:23-34:4 (Soni Dec., Ex. 25).  Moskowitz advised that an opinion would be approximately $5,000.  Moskowitz Ex. 12.  (Soni Dec., Ex. 159).  Wright took notes of this conversation. *Id.*; G. Parker Tr. 46:14-22 (Soni Dec., Ex. 25); Wright Tr. 103:3-10 (Soni Dec., Ex. 8).**

Wright understood from this conversation with Moskowitz that the regulation and the 1996 Dear Colleague Letter represented an attempt to prevent authorities from transferring loans to take advantage of interest rate differentials.  Wright Tr. 105:1-10 (Soni Dec., Ex. 8).

They spoke with Moskowitz again a week later and discussed whether PPHEA could transfer loans to an affiliate company and keep the 9.5% floor; Moskowitz opined that they could, but Panhandle's bond counsel disagreed.  Handwritten and Typed Notes of John Wright at PPHEA_045877 (McMahon Dec., Ex. V.6).  Wright again took notes. Wright Tr. 109:2-7 (Soni Dec., Ex. 8).  Despite the "guidance" Moskowitz received from Pam Moran at the Department (*see* Response to BR12), Moskowitz advised Panhandle that the cleanest and easiest way to engage in the transactions would be to not swap loans. Handwritten and Typed Notes of John Wright at PPHEA_045877 (McMahon Dec., Ex. V.6).  He also advised of "non-legal considerations" akin to those he provided to Brazos. *Id.*  Wright confirmed that the notes accurately represented information Moskowitz provided.  Wright Tr. 116:23-121:9 (Soni Dec., Ex. 8).

PH11.  In forming his legal opinions, Mr. Moskowitz drew upon his long experience with ED officials and the HEA and related laws, which included detailed knowledge of the 1996 DCL and the reasoning behind it. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 27); Ex. V.2 (Wright Decl.¶ 27); Ex. V.3 (G. Parker Decl. ¶ 26); Ex. V.30 (Moskowitz Dep. 21:13-20, 50:8-18, 63:18-22, 87:1-10, 95:5-22, 98:1-18, pp. 30-36, 64-86, 96-97).] He also had numerous personal, contemporary discussions with ED policy personnel regarding the transferring and recycling of 9.5% loans. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 28); Ex. V.2 (Wright Decl. ¶ 28); Ex. V.3 (G. Parker Decl.¶27); Ex. V.10 (Moskowitz 000095-99).]

Mr. Moskowitz concluded that PPHEA's proposed plan to grow its 9.5% SAP-eligible loan portfolio was well within the applicable laws, regulations, and policy, and communicated this in his conversations with Messrs. Parker and Mr. Wright prior to the issuance of any written opinions. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 29); Ex. V.2 (Wright Decl.¶ 29); Ex. V.3 (G. Parker Decl. ¶ 28); Ex. V.6 (PPHEA_045872, PPHEA_047877); Ex. V.7 (PPHEA_000185-95); Ex. V.8 (PPHEA 000196-206); Ex. V.9 (PPHEA_000207-218).] To memorialize his analyses, Mr. Moskowitz issued three opinion letters dated January 27, 2003, June 24, 2003, and February 4, 2004, respectively. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 30); Ex. V.2 (Wright Decl.¶ 30); Ex. V.3 (G. Parker Decl.¶ 29); Ex. V.7 (PPHEA_000185-95); Ex. V.8 (PPHEA_000196- 206); Ex. V.9 (PPHEA_000207-18).] Confirmation by Mr. Moskowitz that PPHEA's plans were legal was a prerequisite to PPHEA's willingness to engage in the Transfers associated with the New Bond transactions in the first instance. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 32); Ex. V.2 (Wright Decl.¶ 32); Ex. V.3 (G. Parker Decl. ¶ 31).]. In fact, Messrs. Parker and Mr. Wright would have never been a part of something they felt was not legal. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 56); Ex. V.2 (Wright Decl. ¶ 56); Ex. V.3 (G. Parker Decl.¶ 55).].

**RESPONSE TO NO. PH11.  Disputed and incomplete.  Whether Messrs. Parker and Wright would have been a part of something they felt was not legal is not a material fact.**

**Panhandle's bond counsel was specifically concerned with the issue of whether any loan that was ever pledged to a pre-October 1, 1993 tax-exempt bond estate would receive the 9.5% Floor.  Handwritten and Typed Notes of John Wright at PPHEA_045899 (McMahon Dec., Ex. V.6).  Moskowitz's draft or final opinions never addressed the issue.**

*See* PPHEA 000185-95 (McMahon Dec., Ex. V.7); PPHEA_000196- 206 (McMahon Dec., Ex. V.8); PPHEA 000207-18 (McMahon Dec., Ex. V.9).

Moskowitz provided PPHEA with a draft opinion sometime late in 2002. Moskowitz Ex. 14 (PPHEA_045883-88) (Soni Dec., Ex. 88); Wright Tr. 168:12-24 (Soni Dec., Ex. 8). In that draft, Moskowitz wrote the following: "AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to the taxable estate in this manner would become remain subject to the 'floor yield/half sap' special allowance calculation at purchase and remain subject to such calculation after completion of the transfer." Moskowitz Ex. 14 at PPHEA_045884 (Soni Dec., Ex. 88). The word "become" was crossed off by Wright. Wright Tr. 174:4-16 (Soni Dec., Ex. 8). Also in that draft was a statement that, as a matter of policy, Panhandle "would not engage in such transactions" such that more than $150 million in Half-SAP/9.5% floor loans would reside in a taxable estate at the completion of the transactions. Moskowitz Ex. 14 at PPHEA_045884. (Soni Dec., Ex. 88). Wright also crossed this out, and assumed it was a vestige of a draft that Moskowitz had prepared for another client. Wright Tr. 171:5-7, 171:22-172:2 (Soni Dec., Ex. 8).

The substance of the three opinion letters Moskowitz provided to Panhandle was the same as that contained in the Brazos letter with regards to Section 682.302(e). Moskowitz Tr. 268:7-12 (Soni Dec., Ex. 18); *see compare* Moskowitz Ex. 9 (Soni Dec., Ex. 115) *with* Moskowitz Ex. 13 (Soni Dec., Ex. 87), Moskowitz Ex. 15 (Ex. 89), Moskowitz Ex. 16 (Soni Dec., 90). Jimmy Parker agreed that the transactions at issue were "refinancing" rather than "sale" transactions. J. Parker II Tr. 40:18-41:4 (Soni Dec., Ex. 31).

Panhandle officials understood that the opinion did not address the issue of whether the loans that came in to the pre-October 1, 1993 tax-exempt bond estate should become subject to Half-SAP/9.5% Floor.  Wright Tr. 178:10-180:1 (Soni Dec., Ex. 8).  Wright testified that it was an "oversight" on their part as well as Moskowitz's and that it was something they "didn't dot the 'i's on, cross the t's on."  *Id.* 180:2-10.  Wright testified that he only cared about whether the opinion said that they could do the transaction and get 9.5% SAP on all of the loans.  *Id.* at 181:15-21.

Moskowitz advised Panhandle, as he did Brazos, that he was not giving an opinion on "whether a retirement or defeasance is in fact occurring," PPHEA_045924.  (Soni Dec., Ex. 167); *see also* Responses to BR7, BR10, *supra*.

An additional paragraph was added to the opinions to address a particular concern of Panhandle's:  "whether the same analysis would apply if the loans were transferred to a post-October 1, 1993 tax-exempt bond estate, rather than to a taxable estate." PPHEA_000201 (McMahon Dec., Ex. V. 8).  Moskowitz opined that "it would.  There is no distinction made in the regulation or the Dear Colleague on this point, and we see no reasoned basis for concluding that such a distinction exists."  *Id.*  Moskowitz did not mention that there was no reason for subsection (e) of the regulation or the 1996 Dear Colleague Letter to address this issue because they did not deal with the distinction between pre-October 1, 1993 money and money raised on or after that date.

As of October 2004, long after he finished providing opinions to Brazos and Panhandle, Moskowitz was unsure of when a loan is considered to be transferred to the same or a different "holder."  October 19, 2004 Email from Saul Moskowitz at B0005209-

10 (Soni Dec., Ex. 150); November 3, 2004 Email from Saul Moskowitz at B0004972 (Soni Dec., Ex. 153). Moskowitz was advised in 2005 that a "refunded" bond had been "retired" and thus met one of the conditions under subsection (e)(2) and making any loans pledged to such a bond ineligible for transfer while maintaining 9.5% Floor status. Email from George Harris at ED-B-003930 (Soni Dec., Ex. 35). He did not amend his opinions or go back to Brazos or Panhandle to alert them to this fact, however.

PH12. PPHEA issued new bonds related to proposed Transfers on February 25, 2003, March 21, 2003, and February 9, 2004 (collectively, the "New Bonds"). [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 31); Ex. V.2 (Wright Decl. ¶ 31); Ex. V.3 (G. Parker Decl. ¶ 30); *see* Ex. V.11.] PPHEA used proceeds from these New Bond issuances to buy 9.5% SAP-eligible loans from the Patriarch Bond estates at a price equal to the par value of the loans plus accrued interest. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 33); Ex. V.2 (Wright Decl. ¶ 33); Ex. V.3 (G. Parker Decl. ¶ 32); *see, e.g.,* Ex. V.7 (PPHEA_000186).] All 9.5% SAP-eligible loans that were so transferred into the New Bond estates related to this action, at any time, were purchased from the Patriarch Bonds. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 33); Ex. V.2 (Wright Decl. ¶ 33); Ex. V.3 (G. Parker Decl. ¶ 32); *see, e.g.,* Ex. V.7 (PPHEA_000186).] Those Patriarch loans were transferred into the New Bond estates, and the cash consideration received by the Patriarch Bond estates was used to purchase new loans into the Patriarch Bond estates. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 34); Ex. V.2 (Wright Decl. ¶ 34); Ex. V.3 (G. Parker Decl. ¶ 33).] PPHEA billed ED at 9.5% SAP rates for all of these loans, and in doing so, certified that its submissions "conform[] to the laws, regulations, and policies applicable to" FFELP. [*See, e.g.,* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 35); Ex. V.2

(Wright Decl.¶ 35); Ex. V.3 (G. Parker Decl. ¶ 34); Ex. V.12 (Organization Participation

Agreement, and ED-X-000122).].

**RESPONSE TO NO. PH12.   Incomplete.   Panhandle's first issuance of the New**

**Bonds was the February 25, 2003 taxable issuance.  PPHEA Supp. Resp. to Rel. Interrog.**

**No. 3 (Mills Dec., Ex. 4).   This new issuance was not eligible for 9.5% SAP. Wright Tr. 66-**

**69 (Soni Dec., Ex. 8).   After creating the issuance, Panhandle emptied nearly all loans in its**

**Patriarch Bonds into the new issuance.  PPHEA Supp. Resp. to Rel. Interrog. No. 3 (Mills**

**Dec., Ex. 4); J. Parker I Tr. 173:21-174:2 (Soni Dec., Ex. 7); Select Pages from J. Parker**

**Ex. 11, Portfolio Balances at PPHEA_045103-045107 (Mills Dec., Ex. 41).**

**To transfer a loan from a Patriarch Bond to a new issuance, Panhandle gave a**

**unilateral direction to the trustee regarding the movement of a loan, and this direction was**

**sometimes done orally.  J. Parker I Tr. 183:6-21 (Soni Dec., Ex. 7).  Wright explained that**

**loans were transferred by "flip[ping] the switch" on a computer system.  Wright Tr.**

**200:11-201:5 (Soni Dec., Ex. 8).  Panhandle had the right to reverse these transfers.  J.**

**Parker I Tr. 185:14-22 (Soni Dec., Ex. 7).  These transfers were done at face value, despite**

**the fact that purchases of replacement loans required a premium.  *Id.* at 180:1-16, 184:6-22.**

**No due diligence review of the loan portfolio was done; no arms length price negotiations**

**took place; no real valuation of the collateral was undertaken; and no gain or loss was**

**recognized.  *Id.* at 180:1-186:18.  Wright testified that the movement of a loan from a**

**Patriarch Bond to a new issuance was not a sale because Panhandle controlled both the**

**Patriarch Bonds and the new issuance.  Wright Tr. 159:9-160:22 (Soni Dec., Ex. 8).  Both**

**the Patriarch Bonds and the New Issuances were under the same indenture and same trust.**

**J. Parker I Tr. 173:2-11 (Soni Dec., Ex. 7).**

After moving its loans from the Patriarch Bonds to the New Bonds, Panhandle purchased loans from third parties.  PPHEA Supp. Resp. to Rel. Interrog. 3 (Mills Dec., Ex. 4).  These newly purchased loans were not receiving 9.5% SAP before Panhandle's purchase.  Wright Tr. 55:15-17 (Soni Dec., Ex. 8).

Panhandle determined that the newly purchased loans were eligible for 9.5% SAP immediately upon purchase and immediately began billing 9.5% SAP for these loans.  J. Parker I Tr. 132:15-133:4 (Soni Dec., Ex. 7); G. Parker Tr. 33:8-11 (Soni Dec., Ex. 25).  Thus, Panhandle billed 9.5% SAP on loans transferred out of the Patriarch Bonds as well as loans purchased from third parties used to refill the Patriarch Bonds.  G. Parker Tr. 33:8-11 (Soni Dec., Ex. 25).

Panhandle repeated this process in March 2003 when it used a new taxable issuance.  Panhandle Supp. Resp. to Rel. Interrog. No. 3 (Mills Dec., Ex. 4); Panhandle Undisputed Facts, PH12.  Panhandle once again repeated this process in February 2004 by issuing taxable and tax-exempt financings.  *Id.*  (Mills Dec., Ex. 4).

**PH13.**  From or about September 23 through September 26, 2003, ED conducted a review of PPMSC's operations. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 36); Ex. V.2 (Wright Decl. ¶ 36); Ex. V.3 (G. Parker Decl. ¶ 35); Ex. V.13 (PPHEA 110794).] Since PPMSC was PPHEA's servicer, this review necessarily included an analysis of PPHEA's 9.5% SAP-eligible loan portfolios. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 37); Ex. V.2 (Wright Decl. ¶ 37); Ex. V.3 (G. Parker Decl. ¶ 36); *see, e.g.,* Ex. V.13 (PPHEA 110797, PPHEA 110802).] By that time, of course, two of the New Bonds had been issued and, as a result of the transferring and purchasing described above, PPHEA's 9.5% SAP-eligible loan

portfolio had grown. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 38); Ex. V.2 (Wright Decl. ¶ 38); Ex. V.3 (G. Parker Decl. ¶ 37); *see, e.g.,* Ex. V.11; Ex. V.13 (PPHEA 110802).] This fact was not lost upon 2003 ED reviewers Jerry Wallace and Vincent Clark. Mr. Wallace, along with others in his office, had observed similar practices at the Iowa Student Loan Liquidity Corporation ("Iowa") in 2002. Although his office had formed a view that these practices were impermissible, they had been overruled by ED officials in Washington, who declared them legal. [*See* JSUF ¶ ¶ JS33, JS42-50, JS190.].

**RESPONSE TO NO. PH13.  Disputed and incomplete.  Panhandle has repeatedly stated that the only reviews of it's 9.5% SAP loan portfolios took place during a DEd Program Review in September 2006 and an independent audit required by DEd on October 31, 2007.  PPHEA Resp. to Rel. Interrog. No. 11 (Mills Dec., Ex. 4).  At each of their depositions, Glenn Parker, Jimmy Parker and John Wright offered no memory of any details regarding such a 2003 Program Review nor did they provide any materials surrounding the Program Review.  All three witnesses identified details surrounding the 2006 Program Review and 2007 Audit, but made no reference to an earlier audit or review. G. Parker Tr. 19:17-21 (Soni Dec., Ex. 25); J. Parker I Tr. 159:19-160:4 (Soni Dec., Ex. 7); Wright Tr. 222:24-223:18 (Soni Dec., Ex. 8).**

**With respect to the Iowa Student Loan Liquidity Corporation program review, *see* Responses to JS33, JS42-50, JS190, *supra*.**

PH14.  Mr. Wallace did, in fact, take specific note of PPHEA's increased 9.5% SAP-eligible loan portfolios in an "observation" contained within the final program review and noted that PPHEA's loans had grown from $207,775,000 in tax-exempt bonds issued prior to

October 1, 1993 (and thus eligible for 9.5% SAP) to $374,833,433 in 9.5% SAP coded billing. [McMahon Decl., Ex. V.13 (PPHEA 110802).] Mr. Wallace, along with Vincent Clark, specifically asked Glenn Parker whether this growth had occurred pursuant to the 1996 DCL. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 39; Ex. V.2 (Wright Decl.¶  39); Ex. V.3 (G. Parker Decl. ¶ 38); *see also* Ex. V.13 (PPHEA_110802); Ex. V.14 (PPHEA_111419).] When told yes, the ED reviewers indicated in their final report that this method of portfolio growth was under review and that, as a result, "no further action is required at this time." [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 40); Ex. V.2 (Wright Decl. ¶ 40); Ex. V.3 (G. Parker Decl.¶ 39); *see also* Ex. V.13 (PPHEA 110802, PPHEA_110787).] In addition, the 2003 Program Review was circulated to numerous ED policy personnel by the Southern Region's Director, Mirek Halaska, on July 14, 2004. [*See* JSUF ¶ JS51; McMahon Decl., Ex. II.10 (OBERG00000129-30); Ex. V.31 (Wallace Dep. 96:21-97:17).].

**RESPONSE TO NO. PH14.**        **Disputed and incomplete.  When asked in deposition when he spoke with the DEd regarding PPHEA's 9.5% SAP billing, Glenn Parker stated that he spoke with the DEd during the 2006 and 2007 time frame; Glenn Parker never mentioned speaking with Clark or others at the Department in response to the 2003 Program Review.  G. Parker Tr. 19:17-20:2 (Soni Dec., Ex. 25).  Glenn Parker stated that he did not speak with the DEd about eligibility for 9.5% SAP in 2002, 2003 or 2004 time period:**

> **Q.    Okay.  You never talked to the department about eligibility for 9.5 SAP in this 2002, 2003, 2004 time period, did you?**

> **A.    No.  I would have talk to them later when they were out doing their reviews.**

Q.     Back -- when they were doing the audits in --

A.     '06.

Q.     -- 2006 or '07?

A.     '06.  And then we had another one in '08.

G. Parker Tr. 19:17-19:25 (Soni Dec., Ex. 25).  Similarly, neither James Parker nor John

Wright testified that such a conversation took place during their depositions.  *See* Response

to PH13, *supra*.  Futher, PPHEA cites to no facts showing the substance of that discussion.

*See* PH14.

Moreover, PPHEA cites to no facts establishing that the discussion that took place

between itself and DEd regarding 9.5% SAP, if any, examined whether all of PPHEA's

actions were permissible under DEd regulations.  *See* PH14.  Instead, the proposed fact

alleges that PPMSC believed it was allowed "to bill tax-exempt status for loans funded by

the February 2003 bond issue" pursuant to the 1996 Dear Colleague Letter (McMahon

Dep., Ex. V.13).  At most, PPMSC discussed whether loans transferred out of the pre-1993

trusts were 9.5% SAP eligible.  *Id.*  The 2003 Program Review does not state and

Panhandle does not allege that PPMSC informed DEd of its practice of refilling the pre-

1993 issuances with new loans to replace those that had been transferred out en masse.  *Id.*

The 2003 Program Review does not establish any discussion between DEd and Panhandle

regarding whether the loans purchased into the pre-1993 trust would be eligible for 9.5%

SAP.  *Id.*

In addition, the 2003 Program Review states: "the absence of statements in this

report about specific practices or procedures of the Servicer should not be construed as

acceptance, approval or endorsement of those practices or procedures.  The findings cited

in this report do not limit nor lessen the Servicer's obligations to comply with all other provisions of the Federal Family Education Loan Programs."  Letter from Vincent Clark, Senior Guarantor and Lender Review Specialist Financial Services, to Clifford Baker at PPHEA_110800 (McMahon Dec., Ex. V.13).

Finally, by Panhandle's own admission the practice was "under review" at the time that the 2003 Program Review findings were issued.  *See* PH14.  Nevertheless, Panhandle, less than a year later executed additional transactions of type that were "under review," resulting in an even greater windfall of ineligible 9.5% SAP earnings, without obtaining any resolution from DEd.  *See* Response to PH12, *supra.*

PH15.  PPHEA consistently billed for 9.5% SAP throughout the time periods in question in this case, including every quarter after the Transfers associated with each respective New Bond. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 41); Ex. V.2 (Wright Decl.¶ 41); Ex. V.3 (G. Parker Decl. ¶ 40).] However, no new 9.5% SAP billing occurred with respect to any new transaction until PPHEA was satisfied that it was legal. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 42); Ex. V.2 (Wright Decl.¶ 42); Ex. V.3 (G. Parker Decl. ¶ 41).] At no time prior to January 2007 did ED tell PPHEA (or PPMSC on PPHEA's behalf) that it was required to stop billing for 9.5% SAP with respect to its New Bonds or Transfers related to New Bonds, or that such billing was improper. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 43); Ex. V.2 (Wright Decl. ¶ 43); Ex. V.3 (G. Parker Decl. ¶ 42).] On the contrary, the Panhandle staff read a newsletter published by *EFC Exchange* in which Assistant Secretary Sally Stroup stated that lenders' 9.5% SAP practices related to the 1996 DCL were "perfectly legal"; Mr. Wright took note of this, and believing it was further confirmation of Mr. Moskowitz's advice, preserved the document in his records and provided it for this

litigation. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 44); Ex. V.2 (Wright Decl. ¶ 44).] The Panhandle staff believed that ED would have brought anything it considered to be improper or illegal to its attention. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 40); Ex. V.2 (Wright Decl. ¶ 40); Ex. V.3 (G. Parker Decl.¶ 39).]

**RESPONSE TO NO. PH15.   Disputed.   PPHEA billed new 9.5% SAP after it secured an opinion that addressed only a portion of Panhandle's  9.5% loan growth practices.  *See* Response to PH 11, *supra*.  Whether DEd ever instructed Panhandle to stop its 9.5% SAP practices or that there actions were improper is immaterial where, as here, Panhandle certified that its 9.5% SAP submissions conformed to the "laws, regulations, and policies" applicable to FFELP.  *See* PH12, *supra*.**

*See* **Responses to JS40, 68, *supra*, with respect to statements by Stroup.**

**PH16.** From on or about September 12 through September 14, 2006, ED conducted another Program Review of PPHEA that specifically focused on its 9.5% SAP practices. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 45); Ex. V.2 (Wright Decl.¶ 45); Ex. V.3 (G. Parker Decl.¶ 43); Ex. V.15 (PPHEA_000023). One of the reviewers, Vincent Clark, had previously conducted the 2003 Program Review of PPMSC and had observed the growth in PPHEA's 9.5% loan portfolio. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 46); Ex. V.2 (Wright Decl.¶ 46); Ex. V.3 (G. Parker Decl. ¶ 44); *compare* Ex. V.15 (PPHEA_000023) *with* Ex. V.13 (PPHEA 110796).] Upon conclusion of the 2006 review, PPHEA staff was informed that there were no 9.5% SAP issues with regard to the New Bonds. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶  47); Ex. V.2 (Wright Decl.¶ 47); Ex. V.3 (G. Parker Decl. ¶  45).] Further, the reviewers indicated that they were surprised that PPHEA had not billed for even more 9.5% SAP. [McMahon Decl., Ex. V.3 (G. Parker Decl. ¶ 46).] Mr. Wallace, who had become ED's

Southern Region Director, reviewed the 2006 program review and signed off on it. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 48); Ex. V.2 (Wright Decl. ¶ 48); Ex. V.3 (G. Parker Decl. ¶ 48); Ex. V.15 (PPHEA 000023); Ex. V.31 (Wallace Dep. 13:5-16, 171:12-172:21).]

**RESPONSE TO NO. PH16.  Incomplete.  The 2006 program review examined PPHEA's 9.5% SAP billing for a sample of loans that may have been refinanced with ineligible funds.  PPHEA_000031 (McMahon Dec., Ex. V.15).  More specifically, DEd examined whether the taxable bridge financing that PPHEA utilized to temporarily secure 9.5% SAP loans before refinancing the loans made the loans ineligible for 9.5% SAP.  *Id.* DEd's findings centered around this element of PPHEA's 9.5% SAP billing and not the repeated wholesale transfer of pre-1993 loans to a newly created trust in order to purchase new loans that could be dipped into the pre-1993 trust and billed at 9.5% SAP.  *See* Response to PH12, *supra*.  This review relied on a sample of loans and does not purport to be a comprehensive study of every aspect of Panhandle's 9.5% SAP billing practices. PPHEA_000027 (McMahon Dec., Ex. V.15).**

**    *See* Responses to JS26, 100, *supra*, with respect to the Department's 2006 program reviews.**

    **PH17.** As discussed in JSUF ¶¶  JS163-65, ED announced a new "restated" policy regarding 9.5% SAP on or about January 23, 2007. In addition, ED also offered to settle with lenders and to not seek to recoup any historical 9.5% SAP if the lenders would agree to certain terms. [*See* McMahon Decl., Ex. V.1 (J. Parker Decl.¶  49); Ex. V.2 (Wright Decl. ¶ 49); Ex. V.3 (G. Parker Decl.¶ 48); JSUF ¶ JS164.] A January 24, 2007 letter from Teresa S. Shaw to Terry D. Langehennig, President and Chief Executive Officer of PPMSC and Executive

Director of PPHEA, memorialized ED's offer. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 50); Ex. V.2 (Wright Decl.¶ 50); Ex. V.3 (G. Parker Decl. ¶ 49); Ex. V.16 (PPHEA_026353-56).]

**RESPONSE TO NO. PH17.   Disputed and incomplete.   *See* Responses to JS165, BR32, *supra*.**

PH18.   The Panhandle entities accepted ED's settlement offer. [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶ 51); Ex. V.2 (Wright Decl.¶ 51); Ex. V.3 (G. Parker Decl. ¶ 50); Ex. V.17 (PPHEA 037925); Ex. V.32 (Trubia Dep. 34:18-35:3, 38:20-39:10, 97:13-21).]

**RESPONSE TO NO. PH18.   Disputed and incomplete.   *See* Response to JS165, BR32, *supra*.**

PH19.   The results of PPHEA's audit were submitted to ED on or about October 30, 2007. [McMahon Decl., Ex. V.1 (J. Parker Decl.¶ 52); Ex. V.2 (Wright Decl.¶ 52); Ex. V.3 (G. Parker Decl.¶ 51); Ex. V.18 (PPHEA_037435-49).] ED accepted PPHEA's audit on or about August 7, 2008 [McMahon Decl., Ex. V.1 (J. Parker Decl. ¶  53); Ex. V.2 (Wright Decl.¶ 53); Ex. V.3 (G. Parker Decl.¶ 52); Ex. V.19 (PPHEA_000001-04)], but only after it had confirmed that there were no 9.5% SAP issues stemming from the 2006 program review [*see* McMahon Decl., Ex. V.20 (PPHEA_033132)].

**RESPONSE TO NO. PH19.   Disputed and incomplete.   As a result of the 2007 Audit PPHEA drastically reduced the total amount of loans on which it could claim 9.5% SAP from $300 million to approximately $122 million.  J. Parker I Tr. 209:1-9 (Soni Dec., Ex. 7).  Terry Langehenning signed this audit.  PPHEA_00899 (Soni Dec., Ex. 166).**

**Further, Panhandle improperly cites to an email between Patricia Trubia and John Wallace, PPHEA_033132, (McMahon Dec., Ex. V.20), for the alleged fact that ED accepted PPHEA's 2007 Audit "only after [ED] had confirmed that there were no 9.5% SAP issues stemming from the 2006 program review." As discussed above, the 2006 Program Review did not address the 9.5% SAP billing activity at issue in this case, but rather a discrete 9.5% SAP issue regarding improper refinancing.  *See* Response to PH16, *supra*.**

**Similar to the 2003 Program Review, the 2006 Review clearly states: "absence of statements in this report regarding specific practices or procedures followed by Panhandle-Plains Higher Education Authority (PPHEA) should not be construed as acceptance, approval or endorsement of those practices or procedures.  The specific nature of this report does not limit or lessen PPHEA's obligations to comply with all other provisions of the Federal Family Education Loan Programs."  Moskowitz Ex. 16 at PPHEA_000027 (Soni Dec., Ex. 90).**

PH20. Mr. Wallace, who Relator credited with helping to uncover and spotlight the 9.5% SAP practices he is challenging in this case, and who was deeply involved in PPHEA's 2003 and 2006 program reviews, made the following statement in response to a question about how ED goes about assessing risk:

> I believe that most lenders, in my opinion, try to do what they feel they should be doing and most guarantors are doing what they believe they should be doing within the program and that there's really not -- there's very few entities that are involved in fraud. In general we find recoveries, and we do find recoveries, that, you know, there's misinterpretations of the regulations or the law.

Mr. Wallace was then asked the obvious follow-up question of whether he believed Panhandle was among the "very few entities . . . involved in fraud":

- 261 -

Q.   Did you ever feel that Mr. John Wright, Mr. Jimmy Parker, Mr. Glenn Parker and Mr. Terry Langehenning [*i.e.*, Panhandle's personnel who dealt with 9.5% SAP issues] were trying to defraud the federal government in the times that you dealt with them?

A.   No.

MR. OBERMEIER: Objection. BY MR. McEVOY:

Q.   You are welcome to answer. A. No.

Q.   Did you find those gentlemen to be responsive and forthcoming when you made either initial requests or followup requests for information or data?

MR. OBERMEIER: Objection.

THE WITNESS: I believe that they provided me everything that I asked for.

BY MR. McEVOY:

Q.   Did you ever get any sense -- let me back up a minute. You are physically in Canyon[, Texas] on occasion, is that correct, to —

A.   Earlier reviews, not in the most recent review that was conducted there. Q. But you've been in Canyon, in [Panhandle's] facility, and actually looked at documents from these folks and program reviews, is that right? A. That's correct.

Q.   Did you ever get the sense that any of those gentlemen or their colleagues were trying to conceal things from you or not produce things that you requested to look at?

A.   I did not.

[McMahon Decl., Exh. V.31 (Wallace Dep. 34:18-21, 35:1-11, 36:1-6).]

**RESPONSE TO NO. PH20.**  No dispute that the language is quoted accurately, but the testimony is mischaracterized.  Wallace was asked whether PPHEA was trying to defraud the government during the course of the program reviews, not when performing its 9.5% SAP scheme.  Whether Wallace believed that PPHEA was trying to conceal things from him during the review period is not a material fact.  PPHEA's actions with respect to

the audits or program review is not at issue in this case; their actions with respect to the proper billing for 9.5% SAP is at issue.  Moreover, Wallace is asked to give his personal opinion about lenders, not how the ED "goes about assessing risk" as PPHEA suggests. Wallace believed that the scheme performed by Panhandle and others was contrary to congressional intent.  Wallace Tr. 398:21-399:4 (Soni Dec., Ex. 23).

PH21.  In forming his opinion that Panhandle had committed fraud, Relator looked at certain spreadsheets that included PPHEA and "induced or deducted" that the growth was illegal. [McMahon Decl., Ex. V.33 (Oberg Dep. 658:17-659:16, 660:3-661:13) (Relator testified he used his "knowledge of the industry" to deduce what PPHEA might have done).] While he also reviewed the applicable statute Relator admitted in his deposition that there was at least one significant element to 20 U.S.C. Section 1087-1 that he had never considered before the date he was deposed, and that was Congress' use of the word "interests" in §1(b)(2)(B)(i) of the statute but not in §§1(b)(2)(B)(iv) and 1(b)(2)(B)(5). [McMahon Decl., Ex. V.33, Oberg Dep. 604:8-607:20).] Relator admitted that he conducted no independent investigation of the Panhandle entities whatsoever other than looking at loan balances in publicly-disclosed materials:

a.          Among other things, Relator could not identify key people associated with PPHEA's day-to-day operations and its 9.5% SAP activities. The key people included, among others, Messrs. Parker, Mr. Wright, and Clifford Baker, the founder of Panhandle. [McMahon Decl., Ex. V.33 (Oberg Dep. 632:7-633:6); *see also* Ex. V.1 (J. Parker Decl. ¶ 3); Ex. V.2 (Wright Decl.¶ 3); Ex. V.3 (G. Parker Decl.¶ 3).]

b.        Relator admitted that he never spoke to anyone involved with PPHEA's day-to-day operations, nor has he spoken with anyone about those people. [McMahon Decl., Ex. V.33 (Oberg Dep. 634:3-17); *see also* Ex. V.1 (J. Parker Decl. ¶ 55); Ex. V.2 (Wright Decl.¶ 55); Ex. V.3 (G. Parker Decl. ¶ 54).]

c.        Relator had no knowledge of PPHEA's board of directors or what any Panhandle board member knew or considered in connection with 9.5% SAP. [McMahon Decl., Ex. V.33 (Oberg Dep. 638:14-639:20, 340:1-3).]

d.        Relator did not know how many student loans PPHEA has ever held, knew nothing of its bond issuances, and knew nothing of its other business dealings. [McMahon Decl., Ex. V.33 (Oberg Dep. 641:4-16, 656:4-12).]

e.        Relator admitted that he did not know whether he had sued PPMSC. [McMahon Decl., Ex. V.33 (Oberg Dep. 644:4-10).] He also admitted that he knew nothing about it or what role it might have in the case. [McMahon Decl., Ex. V.33 (Oberg Dep. 643:17-644:8).]

**RESPONSE TO NO. PH21.   Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation.  (Doc. 314) at 1-11.**

PH22.  The particular sources of information relied on by Relator to form the basis for his Complaint against PPHEA were as follows:

a.        *First* was the draft spreadsheet Relator received from James Kvaal, then a Congressional staffer, that was given to Mr. Kvaal by an ED official upon request. [McMahon

Decl., Ex. V.21 (OBERG00007690, OBERG00008351); Ex. V.33 (Oberg Dep. 353:13-358:19, 361:5-366:10).] In response to Panhandle's questioning in his deposition, Relator acknowledged that he relied on this spreadsheet with respect to Panhandle. [McMahon Decl., Ex. V.21 (OBERG00007690); Ex. V.33 (Oberg Dep. 664:6-665:20).] Those spreadsheets did not contain the data that Relator used in his initial Complaint against Panhandle.

b.   *Second* was the information contained in the spreadsheets that Relator received from Michael Dannenberg, then Senior Counsel to the Senate's Health, Education, Labor and Pensions Committee, that he obtained from ED. [McMahon Decl., Ex. V.22 (OBERG00007702-10); Ex. V.33 (Oberg Dep. 377:12-388:9).] Those spreadsheets did not contain the data that Relator used in his initial Complaint against Panhandle.

c.   *Third* was the information Relator received from Representative Thomas Petri (the "Petri Spreadsheets"). The Petri Spreadsheets showed PPHEA's 9.5% SAP loan balances at the end of each fiscal year from 2001 through 2006. [McMahon Decl., Ex. V.23 (OBERG00007760-71); Ex. V.33 (Oberg Dep. 422:15-423:18).] Relator admitted that he used these spreadsheets as the source for his specific allegations against Panhandle. [McMahon Decl., Ex. V.33 (Oberg Dep. 697:18-698:12).] He also used the Petri Spreadsheets to create his own spreadsheet in August 2007 entitled "Estimates of Illegal 9.5 Floor SAP Claims Forgiven by U.S. Department of Education, by Year, by Loan Holder, 2002-2006." [McMahon Decl., Ex. V.24 (OBERG0007780); Ex. V.33 (Oberg Dep. 429:14-434:4).]

**RESPONSE TO NO. PH22.**  Disputed and incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation (Doc. 314) at 1-11 (and supporting documentation filed).

Relator requested and received a spreadsheet from a Congressional staff member, James Kvaal.  *Id*. at Doc. 314, Ex. 8.  Dated May 6, 2004, the spreadsheet showed the top twenty holders of 9.5% Loans in rank order by quarter, starting with the third quarter of 2002 and ending with the first quarter of 2004.  In analyzing the spreadsheet, Relator realized that PPHEA was ranked eleventh in the first quarter of 2004,despite not ranking among the top twenty 9.5% loan holders in 2002.  Relator's Resp. to PPHEA Interrog. No. 1 (Soni Dec., Ex. 112).  Relator determined that PPHEA's 9.5% Loan pool increased, at a minimum $253 million dollars in approximately an 18 month period.  This conservative estimate represented the difference between the amount of 9.5% loans held by the twentieth-place entity in the third quarter of 2002 (PPHEA was not ranked in 2002 and would, therefore, have had a lower amount of 9.5% loans than the twentieth place loan holder on the spreadsheet).  PPHEA had experienced, at a minimum, a 153% increase in approximately an 18 month period.

In April of 2004, DEd-OIG, which was preparing to audit lenders in response to Relator's earlier complaints, contacted Relator for any further information he might have regarding his investigation.  On May 14, 2004, based on the spreadsheet from Kvaal and other analysis, Relator decided to report PPHEA to ED-OIG as of the "Texas entities" that exhibited a significant, rapid and unlawful increase in their 9.5% loan pools over a short period of time.  OBERG00008723 1 (Soni Dec., Ex. 205). Oberg Tr. 713:9-714:1 (Soni Dec., Ex. 32).  Thus, by this time, Relator had formed a view that PPHEA had

submitted improper claims in 9.5% SAP.  Documents referenced in PH21 merely confirmed Relator's conclusion at that time. Relator's Resp. to PPHEA Interrog. No. 1 (Soni Dec., Ex. 112).

PH23.  PPHEA was specifically identified in an article by Paul Basken that appeared in the *Chronicle of Higher Education* on September 7, 2007, based on the Petri Spreadsheets. [McMahon Decl., Ex. V.25.]

**RESPONSE TO NO. PH23.  Incomplete.  *See* Relator's Opposition to the Motion to Dismiss by Education Loans, Inc. and Student Loan Finance Corporation  (Doc. 314) at 1-11.**

SW1.  Southwest Student Services Corporation ("Southwest") was formed in May 1992 as an Arizona nonprofit corporation. Through its nonprofit affiliates the Arizona Educational Loan Marketing Corporation ("AELMAC") and the Florida Educational Loan Marketing Corporation ("FELMAC"), Southwest financed the acquisition of federal student loans through the issuance of tax-exempt and taxable debt obligations. [McMahon Decl., Ex. VI.1 (SLMA_P0001133-34).]

**RESPONSE TO NO. SW1.  Incomplete.  Southwest exercised complete control over AELMAC and FELMAC's student loan operations, as it provided all of AELMAC and FELMAC's management services and administered their student loan portfolios. Southwest Student Services Corporation and Subsidiaries Consolidated Financial Report at 7, SLMA_EF00000150 (Mills Dec., Ex. 50).  Further, Southwest's officers also served as AELMAC and FELMAC's officers, and some of Southwest's directors also served as AELMAC and FELMAC's directors.  *Id.*  When Southwest converted to for-profit status,**

the federal student loan business, assets, and liabilities of AELMAC and FELMAC were transferred to Southwest. *Id.* at 8.  AELMAC and FELMAC had no employees.  Chapin Tr. 15:10-16:22 (Soni Dec., Ex. 14).

SW2.   In February 2004, Southwest reorganized as a for-profit corporation. [McMahon Decl., Ex. VI.1 (SLMA_P0001133-34).]

**RESPONSE TO NO. SW2.  No Dispute.**

SW3.   At all times relevant to this litigation through early 2005, Southwest used the proceeds of transfers of loans from Floor Bonds to other bonds to originate or purchase new student loans to borrowers who resided or went to school in Arizona or Florida, and treated those newly acquired loans as eligible to receive 9.5 SAP. [McMahon Decl., Ex. VI.2 (SLMA_PO027348-52); Ex. VI.29 (V. Roig Dep. at 41:22-42:8); Ex. VI.3 (SLMA_P0027981); Ex. VI.4 (Southwest and SLM's Responses to Relator's First Set of Interrogatories; Amended Response to Interrogatory No. 3).]

**RESPONSE TO NO. SW3.  Disputed and incomplete.  In October 2001, Southwest began transferring loans from pre-1993 tax exempt 9.5% SAP eligible bonds to post-1993 tax exempt 9.5% ineligible and taxable bonds.  Southwest and SLM Resp. to Interrog. No. 3 (Mills Dec., Ex. 5); Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 22:19-23:14, 28:20-29:4 (Soni Dec., Ex. 16).  Southwest used the cash generated from those transfers to refill the original pre-1993 tax exempt 9.5% SAP eligible bonds with additional loans, acquired either by purchasing existing or originating new student loans.  Southwest and SLM Resp. to Interrog. No. 3 (Mills Dec., Ex. 5); Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 25:19-27:13 (Soni Dec., Ex. 16).  Starting in 2003, Southwest billed**

9.5% SAP for both the transferred loan and (if it had a nexus to either Arizona or Florida) the newly originated or purchased loan.  Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 56:18-60:21, 104:20-106:3 (Soni Dec., Ex. 16).  The only limitation that Southwest imposed on billing 9.5% SAP on both the transferred loan and the newly originated or purchased loan is that the newly originated or purchased loan must have a nexus to either Arizona or Florida.  Wheeler Tr. 59:15-60:21 (Soni Dec., Ex. 16).  In this way, Southwest grew the principal balance of its loans billing 9.5% SAP.  *Id.* at 31:12-32:7.

Southwest implemented this in stages.  Until 2003, Southwest only billed 9.5% SAP on loans residing in pre-1993 tax exempt 9.5% SAP eligible bonds, including those originated or purchased after 1993, but not on loans that had been transferred out of pre-1993 tax exempt 9.5% SAP eligible bonds into other types of bonds.  Wheeler Tr. 28:20-29:15, 53:7-54:22, 56:18-58:7 (Soni Dec., Ex. 16).  At some point in or before 2003, Southwest decided to retroactively bill the government for 9.5% SAP on the loans that had been transferred since 2001; at the same time, Southwest continued to bill 9.5% SAP on loans that had been originated or purchased out of its pre-1993 tax exempt 9.5% SAP eligible bonds since October 2001.  *Id.* at 19:17-20:3, 24:12-25:12, 64:2-6.  Southwest began the retroactive billing once its servicing system had been modified for that purpose.  *Id.* at 40:19-41:22, 47:21-48:10.

To carry out its efforts, Southwest established a cross-functional task force that operated in 2003 to implement and monitor its 9.5% SAP transfers, consisting of at least the company's controller along with representatives of the business technology department, the operations department, and possibly the finance department.  Chesin Tr. 36:20-37:22, 160:8-10 (Soni Dec., Ex. 11); Wheeler Tr. 47:21-48:18 (Soni Dec., Ex. 16).  The task force

identified and tracked the loans for which it claimed 9.5% SAP.  Chesin Tr. 34:15-40:3, 60:1-8 (Soni Dec., Ex. 11).  Southwest established a process whereby loans were assigned "dummy" bond numbers to keep track of which loans would be retroactively billed for 9.5% SAP.  Wheeler Tr. 66-68:18 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000355-59 (Mills Dec., Ex. 39).  Southwest started retroactively billing the government in either the third quarter of 2003, or one quarter before or after that.  Wheeler Tr. 70:19-71:1 (Soni Dec., Ex. 16).

Using these processes, Southwest's 9.5% SAP loan growth for the 2003-2004 time period was at least $243,630,094.00, rising from $478,451,261 on September 30, 2003, to $722,081,355 on September 30, 2004.  9.5 Floor Detail at SLMA_P0003643-3650 (Mills Dec., Ex. 43); Wheeler Tr. 113:16-119:20 (Soni Dec., Ex. 16).  *See also* Response to SW7, *infra* (reflecting that Southwest's loan balance had grown to $799,252,025 by March 2005).

SW4.  Starting in November 2002, Southwest developed an internal system to track loans originally acquired using its pre-October 1, 1993 tax-exempt bonds (or tax-exempt bonds that refunded or were in a series of refundings of such bonds) (collectively, "Floor Bonds") and transferred to its other tax-exempt or taxable obligations, so that such transferred loans would continue to be billed at the 9.5% SAP rate following their transfer. Southwest developed this system so that it could "determine what loans in either the non-floor tax exempt bonds or taxable bonds should, per the regulations, be receiving the 9.5% floor." [McMahon Decl., Ex. VI.5 (SLMA_EF00000115 at 115.003); Ex. VI.6 (SLMA_EF00000114 at 114.0004); Ex. VI.7 (SLMA_EF00000699 at 699.0002).]

**RESPONSE TO NO. SW4.  Disputed and incomplete.  As explained more fully in Relator's response to SW 3, a cross-functional task force operated in 2003 to design and implement a process whereby Southwest assigned "dummy" bond numbers to transferred loans, allowing Southwest to keep track of them for purposes of retroactively billing 9.5% SAP on those transferred loans.  Chesin Tr. 36:20-37:22, 160:8-10 (Soni Dec., Ex. 11); Wheeler Tr. 47:21-48:18, 66-68:18 (Soni Dec., Ex. 16); SLMA_P0000355-59 (Mills Dec., Ex. 39).**

**Further, Southwest's purpose for creating the "dummy" bonds was not merely a form of housekeeping: Southwest's purpose in creating "dummy" bonds and transferring loans between different types of financing vehicles was to maximize the yield of 9.5% SAP in its portfolio.  V. Roig Tr. 103:8-106:5 (explaining that the purpose of the transfers was that it provided the company with a "financial advantage" which "help[ed] the -- the -- the return on the loans") (Soni Dec., Ex. 12); Chapin Tr. 36:6-10 ("Q.  Okay.  So AELMAC engaged in moving loans from floor bonds to taxable bonds?  A.  In some instances.  Q. Okay.  Why would the company do that?  A.  To optimize the trust estate.") (Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000358-359 (seeking confirmation "that we always utilize a 9.5% floor bond" for acquisitions out of the AELMAC indentures; expressing concern that if Southwest originates out of an AELMAC bond with an early maturity date then "we may lose a lot of 9.5% floor loans in the future") (Mills Dec., Ex. 39).**

SW5.  As of September 2003, Southwest was "systematically track[ing] a loan that is eligible for the 9.5% floor when the loan is transferred from one bond to another. If the loan was originated in a 9.5% floor bond and then transferred to a non-floor bond, the loan would

continue to receive the 9.5% floor." [McMahon Decl., Ex. VI.8 (SLMA_EF00000701 at 701.0003); Ex. VI.9 (SLMA_EF00000324).]

**RESPONSE TO NO. SW5.  Incomplete.  Starting in 2003, Southwest billed 9.5% SAP for both the transferred loan and (if it had a nexus to either Arizona or Florida) the newly originated or purchased loan.  Jacobson Tr. 38:15-41:18 (Soni Dec., Ex. 13); Wheeler Tr. 19:5-20:3, 56:18-60:21, 104:20-106:3 (Soni Dec., Ex. 16).  At some point in or before 2003, Southwest decided to retroactively bill the government for 9.5% SAP on the loans that had been transferred since 2001; at the same time, Southwest continued to bill 9.5% SAP on loans that had been originated or purchased out of its pre-1993 tax exempt 9.5% SAP eligible bonds since October 2001.  Wheeler Tr. 19:17-20:3, 24:12-25:12, 64:2-6 (Soni Dec., Ex. 16).  Southwest's purpose in doing so was to maximize the yield of 9.5% SAP in its portfolio.  V. Roig Tr. 103:8-106:5 (Soni Dec., Ex. 12); Chapin Tr. 36:6-10 (Soni Dec., Ex. 14); Wheeler Tr. 35:21-36:4 (Soni Dec., Ex. 16); Jacobson Ex. 1 at SLMA_P0000358-359 (Mills Dec., Ex. 39).**

**The Southwest employees who implemented this tracking and billing process could not identify any basis for believing that Southwest could legitimately bill 9.5% SAP for both transferred and originated or purchased loans.  For instance, a series of memoranda by Southwest's Director of Finance, Lisa Jacobson, formed the basis for developing the "dummy" bonds, by explaining what she thought the 9.5% SAP regulations allowed and laying out the company's position that the company could bill 9.5% SAP on transferred loans.  Wheeler Tr. 45:12-21 (Soni Dec., Ex. 16); Jacobson Tr. 16:9-17 (Soni Dec., Ex. 13); Jacobson Ex. 1 at SLMA_P0000355 (Mills Dec., Ex. 39).  Yet Jacobson, who had no legal training, could not identify a source for her understanding of the requirements for billing**

- 272 -

for 9.5% SAP expressed in those memoranda.  Jacobson Tr. 13:8-14:2, 134:2-135:2 (Soni Dec., Ex. 13).  Jacobson could not remember reading either the 1993 OBRA or the regulations governing 9.5% SAP, even though her memoranda opined that the statute and regulations allowed for billing on transferred loans.  *Id.* at 21:19-21, 32:14-22.

The transfers did not have the characteristics of a sale.  The transfers were not recorded as a taxable event.  Chesin Tr. 117:1-118:1 (Soni Dec., Ex. 11); Wheeler Tr. 110:14-111:11 (Soni Dec., Ex. 16).  The company's former director of finance testified that a "purchase" would not include intra-company transfers.  Jacobson Tr. 37:3-13 (Soni Dec., Ex. 13).  The transfer of loans between bonds was considered a "loan transfer," not a "purchase" or "sale."  Jacobson Tr. 37:3-13, 78:19-79:2 (Soni Dec., Ex. 13); V. Roig Tr. 45:18-46:3 (Soni Dec., Ex. 12).  Southwest's loan transfers were at par.  V. Roig Tr. 83:22-84:12 (Soni Dec., Ex. 12); Wheeler Tr. 102:6-13 (Soni Dec., Ex. 16).  The documentation recording the transfers were not contracts for the sale or purchase of loans, being instead the equivalent of instructions to the trustee to move money from one bond to the other in exchange for the transferred loans.  Wheeler Tr. 107:8-22 (Soni Dec., Ex. 16).  There was no internal requirement that the loans had to stay in a pre-1993 tax exempt 9.5% SAP eligible bond for any specific period of time before being transferred.  *Id.* at 72:14-20.  Such transfers could not have occurred without Southwest's approval.  Wheeler Tr. 108:1-13 (Soni Dec., Ex. 16); Chapin Tr. 79:13-80:14 (Soni Dec., Ex. 14).  Southwest retained the power to reverse the transfers.  Wheeler Tr. 111:12-19 (Soni Dec., Ex. 16).

SW6.  The last processing run for Southwest's tracking process was September 30, 2004. After that date, Southwest did not treat loans transferred from Floor Bonds to another tax-exempt

bond or taxable bond as eligible to receive 9.5 SAP. [McMahon Decl., Ex. VI.9 (SLMA_EF00000324.0004); Ex. VI.10 (SLMA_EF00000116).]

**RESPONSE TO NO. SW6.  Incomplete.  Southwest did not treat loans transferred after September 30, 2004 as being eligible to receive 9.5 SAP, but continued to treat loans that had been transferred prior to that date as being eligible for 9.5 SAP.  Taxpayer-Teacher Protection Act at SLMA_EF00000116 (referencing the change as prospective in nature) (McMahon Dec., Ex. VI.10).**

SW7.   As of the below dates, Southwest's approximate total principal balances of loans for which it was billing at the 9.5 SAP rate were as follows [McMahon Decl., Ex. VI.11 (OBERG00007760-71)]:

| Date | 9.5 Loan Balance |
|---|---|
| September 30, 2001 | $316 million |
| September 30, 2002 | $340 million |
| September 30, 2003 | $489 million |
| September 30, 2004 | $743 million |
| September 30, 2005 | $711 million |
| September 30, 2006 | $449 million |

**RESPONSE TO NO. SW7.  Disputed.  The chart identifies the total principal balance of loans for which Southwest was billing at the 9.5 SAP rate on September 30, 2002 as approximately $321,00,000.  9.5 SAP Summary at OBERG00007762 (McMahon Dec., Ex VI.11).**

**Incomplete to the extent it does not include periods of time where Southwest's approximate average daily balance of loans for which it was billing at the 9.5% SAP rate were higher than this chart reflects, as reflected in the below chart:**

- 274 -

| Date | 9.5 Average Daily Balance |
|---|---|
| March 2001 | $307,195,609 |
| September 2001 | $326,956,097 |
| March 2002 | $329,480,312 |
| September 2002 | $343,884,551 |
| March 2003 | $371,180,191 |
| September 2003 | $476,215,128 |
| March 2004 | $620,136,205 |
| September 2004 | $734,175,185 |
| March 2005 | $799,252,025 |
| September 2005 | $727,177,832 |
| March 2006 | $574,605,627 |
| September 2006 | $339,163,118 |

**Wheeler Ex. 15 at SLMA_P0027981 (McMahon Dec., Ex. VI.3).**

SW8.   Each quarter from January 1, 2002 through September 30, 2006, Southwest

submitted claims to ED for 9.5 SAP on the basis of the average daily principal balance of its 9.5

Loans during the quarter. For each such quarter, ED paid Southwest 9.5 SAP on the basis of

Southwest's claims. [Third Amended Complaint ("TAC") (Docket No. 228) ¶¶ 60-63, 89.]

ED has never demanded that Southwest repay any 9.5 SAP that it received for those quarters.

**RESPONSE TO NO. SW8.   Disputed and incomplete.   Disputed that all of the loans**

**qualified as "9.5 Loans."   DEd paid Southwest on the basis of its quarterly certifications**

**that its 9.5% SAP claims were "correct to the best of [its] knowledge" and "conform[ed] to**

**applicable laws, regulations, and policies relating to the Federal Family Education Loan**

**Program."**  *See, e.g.*, **Chesin Ex. 11 at SLMA_P0007741-50 (example of a signed Lender's**

**Interest and Special Allowance Request and Report (Form 799) from AELMAC) (Soni**

**Dec., Ex. 143).   Southwest's Controller, Michael Chesin, made these quarterly**

**certifications, despite not having knowledge of the laws governing student loans and**

**specifically of the 1993 OBRA limiting 9.5 SAP eligibility to pre-1993 tax exempt financing.**

**Chesin Tr. 32:4-11 ("Q.   As corporate controller, was it part of your responsibility to be**

- 275 -

aware of laws, rules, and regulations that might affect the financial business of Southwest Corporation? A.  I was --  Well, that's – that's a tough question.  I had knowledge of the environment, not necessarily knowledge of – of all laws and – and so forth that affected student loans.") (Soni Dec., Ex. 11); *see also id.* at 20:9-19, 30:10-12, 34:15-35:20, 42:12-43:13, 119:21-120:1, 150:9-152:22, 157:13-17, 189:9-11; *see also* Chesin Ex. 11, SLMA_P0007741-50 (example of a Lender's Interest and Special Allowance Request and Report (Form 799) signed by Chesin)  (Soni Dec., Ex. 143).

Chesin did not take steps to educate himself about those laws, did not know how he could have learned the requirements to properly bill for 9.5% SAP and did not have the knowledge about such laws to be able to say whether certain proceeds could give rise to valid 9.5% SAP billing.  Chesin Tr. 178:22-179:4, 191:17-192:12 (Soni Dec., Ex. 11).  Like Jacobson, Chesin could not identify a source for his understanding of the requirements for billing for 9.5% SAP, speculating that his knowledge of what Southwest could lawfully bill may have come from "a news flash or something like that" or "a lot of talk."  *Id.* at 32:4-34:13.

Southwest did not disclose to DEd that it was billing 9.5% SAP on both transferred loans and loans newly acquired or purchased out of the pre-1993 tax exempt 9.5% SAP eligible bond from cash generated by the transfers.  J. Roig Ex. 2 at SLMA_P0027363-65 (McMahon Dec., Ex. VI.14); J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).

**SW9.**   In October 2001, Jane Stewart,[5] then Senior Vice President of Government Relations at Southwest, received a letter with attachments from Sheila Ryan-Macie (the "Ryan-Macie Letter"). [McMahon Decl., Ex. VI.12 (SLMA_P0027274-347.)] Ms. Stewart had asked Ms. Ryan-Macie for assistance in developing a chronological review of communications relating to ED's "policy" under "1992 regulatory changes," and "[g]uidance" on those regulations "issued in March 1996," "whereby the source of funds used to acquire a loan now determines special allowance billing." The Ryan-Macie Letter provided "a review of discussions and guidance on this topic." [McMahon Decl., Ex. VI.12 (SLMA-P0027274); Ex. VI.28 (J. Roig Dep. at 24:17-26:6).]

**RESPONSE TO NO. SW9.   Not disputed, but incomplete.   Ryan-Macie is not a lawyer.   Ryan-Macie Tr. 38:7-17 (Soni Dec., Ex. 29).   Ryan-Macie worked at Aurora Consulting Group, LLC ("Aurora").   During her tenure at Aurora, Aurora advised a number of the defendants in this case – Nelnet, Student Loan Finance Corporation ("SLFC"), Education Loans Inc. ("EdLinc") (a wholly owned subsidiary of SLFC), and Southwest Student Services Corporation.   *Id.* at 16:15-22, 21:15-22; Buckmeier Tr. 18:2-8 (Soni Dec., Ex. 1).   Her firm's advice to Nelnet, SLFC, and EdLinc was on the very 9.5% SAP issue at the core of this proceeding.   Ryan-Macie Tr. 17:9-18, 21:15-24:12, 34:7-36:14. Ryan-Macie was personally "involved in preparing a report" for EdLinc on the 9.5% SAP issue that "propose[d] a strategy to optimize SLFC's use of its tax-exempt sources of financing" (although she claims not to recall whether she prepared the strategic portion of the report).   *Id.* at 17:9-18, 18:1-19:3, 34:7-36:14.   Ryan-Macie's firm received a share of**

---

[5]        Ms. Stewart subsequently married and changed her last name to Roig. [McMahon Dec., Ex. VI.27 (Nickel Dep. at 44:1-6).]

SLFC's and EdLinc's gains from implementing the strategy that Aurora had recommended.  *Id.* at 29:18-30:22, 36:1-37:6.  *See also* EdLinc Resp. to Rel. Interrog. No. 20 (Soni Dec., Ex. 148).  Ryan-Macie herself received not only a salary from Aurora but a year-end bonus based on Aurora's profits.  *Id.* at 28:10-16, 29:6-8, 29:18-31:9.  EdLinc paid over $1 million – $1,013,534.97, to be precise – to Ryan-Macie's former employer in connection with its implementation of the company's advice on maximizing its 9.5% SAP claims.  *See* EdLinc Resp. to Rel. Interrog. No. 20 (Soni Dec., Ex. 148).

Ryan-Macie's letter in response to Jane Roig's request did not address whether the program in which Southwest eventually engaged (using cash generated from loan transfers to purchase or originate new student loans for which Southwest would bill 9.5% SAP in addition to the transferred loans) would be valid.  J. Roig Ex. 1 at SLMA_P0027274-76 (McMahon Dec., Ex. VI.12).  It did not state that loans originated or purchased after 1993, the cutoff date for new 9.5% SAP loans in the 1993 OBRA, would be eligible for 9.5% SAP.  *Id.*  (McMahon Dec., Ex. VI.12).  The letter stated that Section 682.303 "was intended to curtail authorities from moving loans from one financing source to another." *Id.* at SLMA_P0027276 (McMahon Dec., Ex. VI.12).  Further, Jane Roig could not recall giving details of Southwest's 9.5% SAP billing practices to Ryan-Macie before receiving the letter.  J. Roig Tr. 75:2-10 (Soni Dec., Ex. 33).

SW10.  Ms. Stewart reached out to Ms. Ryan-Macie because the two had served together on the Program Regulations Committee ("PRC") of the National Council of Higher Education Loan Programs ("NCHELP"), a student-loan industry group, for about ten years, and Ms. Stewart considered Ms. Ryan-Macie the most knowledgeable person on this topic. Ms. Stewart recalled from her time on the PRC that ED had proposed a regulation in a 1990

notice, the wording of which suggested "that the original source of funding of the loan basically stamped that loan for its lifetime [of the debt outstanding] as far as eligibility for [9.5% SAP]." Ms. Stewart was trying to recall the sequence of events and documentation of discussions with ED on this topic. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 26:7-28:11).]

**RESPONSE TO NO. SW10.** **Not disputed, but incomplete.** *See* **Response to SW9,** *supra***, regarding Ryan-Macie's qualifications and objectivity. Whether a loan remains eligible for 9.5% SAP after it is transferred out of a 9.5% SAP eligible bond does not address whether a lender can grow its pool of 9.5% SAP loans by also billing for newly originated or purchased student loans, a practice that DEd warned Southwest violated the 9.5% SAP regulations.** *See* **Responses to SW14-15,** *infra***.**

> **SW11.** In the Ryan-Macie Letter, Ms. Ryan-Macie wrote to Southwest:
>
> > In developing the policy, ED staff failed to consider the consequences of their policy change in low interest rate environments. While this may have initially been an oversight for ED, it was not without comment and concern raised by the FFELP community. You will find from the documentation, numerous references to the FFELP community's objection to the policy.
> >
> > Despite our comments and our clear statements that the policy would result in loans permanently being subject to the 1/2 SAP provisions **as well as the 9.5% floor provisions,** ED declined to revert to its original policy on this matter. *This appears to fall into the We told you so. Now we must comply" category of regulations.*

[McMahon Decl., Ex. VI.12 (SLMA_P0027276 (bold in original, italics added)).]

**RESPONSE TO NO. SW11.** **Not disputed, but incomplete.** *See* **Response to SW9,** *supra***, regarding Ryan-Macie's qualifications and objectivity.**

Ryan-Macie's letter in response to Jane Roig's request did not address whether the program in which Southwest eventually engaged (using cash generated from loan

transfers to purchase or originate new student loans for which Southwest would bill 9.5% SAP in addition to the transferred loans) would be valid.  **J. Roig Ex. 1, at SLMA_P0027274-76 (McMahon Dec., Ex. VI.12).**  It did not state that loans originated or purchased after 1993, the cutoff date for new 9.5% SAP loans in the 1993 OBRA, would be eligible for 9.5% SAP.  ***Id.***  In fact, the letter suggested otherwise, noting that Section 682.303 "was intended to curtail authorities from moving loans from one financing source to another."  ***Id.*** at  **SLMA_P0027276.  Further, Jane Roig could not recall giving details of Southwest's 9.5% SAP billing practices to Ryan-Macie before receiving the letter.  J. Roig Tr. 75:2-10 (Soni Dec., Ex. 33).**

SW12.  Ms. Stewart understood the italicized sentence above to mean "[t]hat despite advising the Department of Education . . . that this policy change would result in a change in billing[,] loan holders were required to comply with the regulations." [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 30:5-12).]

**RESPONSE TO NO. SW12.**          **Incomplete.  *See* Response to SW9, *supra*, regarding Ryan-Macie's qualifications and objectivity.  *See* Response to SW11, *supra*, regarding whether the referenced letter fully addressed Southwest's practices.**

SW13.  Vince Roig, Southwest's Chief Executive Officer and Chairman of the Board, consulted with Jean Frohlicher, then President of the National Council of Higher Education Loan Programs ("NCHELP"), on whether the use of proceeds received from the transfer of loans out of 9.5 Eligible Bonds could be used to acquire new loans eligible for 9.5% SAP.  Roig recalls that Ms. Frohlicher "indicated to [him] that all of the literature, all of the regulations — nothing spoke to the issue, and that it was not — it was not contrary to any regulation that

was out there and published." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 35:10-36:3; 38:7-40:11).]

**RESPONSE TO NO. SW13.** **Disputed and incomplete. Vince Roig did not disclose to Frohlicher the details of Southwest's 9.5% billing. V. Roig Tr. 55:15-56: 5 ("Q. Did you give her the details of the activities that Southwest was engaged in? A. No, not precisely . . . I don't specifically remember going, you know, 'This is our issue, Jean.'") (Soni Dec., Ex. 12). According to the quotation cited by Southwest in this Statement of Undisputed Fact, Frohlicher told Vince Roig that there was nothing to support 9.5% SAP recycling activities. *Id.* at 39:22-40:6 (explaining that Frohlicher told him that "nothing spoke to the issue"). Frohlicher did not work for the DEd. *Id.* at 10-36:3. DEd advised Southwest in 2003 that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP – the very practice in which Southwest was then engaging to expand its 9.5% SAP billing. *Id.* at 38:7-22, 42:9-21; J. Roig Ex. 2 at SLMA_P0027358 (McMahon Dec., Ex. VI.13). *See also* SW15, *infra*.**

**SW14.** In July 2003, the Northern Region of ED's Financial Partners unit conducted a program review of Southwest's FFELP portfolio. [McMahon Decl., Ex. VI.13 (SLMA_P0027353-62).] The report included a finding of "Incorrect Billing for Special Allowance Benefits" on loans held by the University of Miami and serviced by Southwest. The report stated that the University of Miami had billed ED for 9.5%/half-SAP, but did not meet the criteria for issuing tax-exempt debt, resulting in an overbilling of approximately $350,000. [*Id.* (SLMA_P0027358).]

**RESPONSE TO NO. SW14.**       Not disputed, but incomplete.  As explained more fully in SW15, the report also found that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP.  J. Roig Ex. 2 at SLMA_P0027358 (McMahon Dec., Ex. VI.13).  *See* **SW15 and Response to SW15,** *infra.*

SW15. The report continued with the exact language of the October 30, 2002 Iowa report that was removed from the final report in favor of a finding of compliance [*see supra* ¶¶ JS42-50]:

> The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate. [McMahon Decl., Ex. VI.13 (SLMA_P0027358).]

**RESPONSE TO NO. SW15.**       No dispute that the language is quoted accurately.  Any comparison to the Iowa audit is irrelevant.  *See* **Responses to JS33, 42-50,** *supra*.  In Southwest's own interpretation of the program review's findings quoted herein, DEd was informing Southwest that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP.  V. Roig Tr. 38:7-22.  ("Q. Okay. What do you understand to be the issue that the government is raising here? A. The – And, again, I – I – I can't speak for the government, but there was – it's clear that in the writing, they are suggesting that – that they have regulation in place or something in place – whatever that

- 282 -

might be – that prohibits a tax-exempt bond that's eligible for 9 and a half floor SAP payments to receive recycling funds and then re-lend those and have them also qualify for special allowance payments. Q. And it is that issue – A. I'm sorry. 9 and a half are special allowance payments.") (Soni Dec., Ex. 12).  The practice identified in the program review as being contrary to the 9.5% SAP regulations – transferring loans from a 9.5% SAP eligible to a 9.5% SAP ineligible bond and using the cash generated thereby to purchase or acquire new 9.5% SAP loans – was the same as Southwest's process for growing its 9.5% SAP loan pools.  *Id.* at 42:9-21 (Q. "So going back to this Finding 2 in Exhibit 1, this – in this Finding 2, the government is asserting, anyway, that 9.5 recycling is illegal, correct? . . . A. I think it's asserting that it has regulations and it has guidance in certain forms that's out there and that – that our actions were contrary to their guidance."); Wheeler Tr. 142:10-147:5 (Soni Dec., Ex. 16).

**SW16.** Vince Roig, Southwest's Chief Executive Officer and Chairman of the Board, believed that "[t]here was no basis in the law[,] in interpretation of the law, in regulation, or in any guidance that we had received" for ED's comment. [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 33:21-34:15).]

**RESPONSE TO NO. SW16.**        Disputed and incomplete.  Roig attributed his understanding of what it was legal to bill for 9.5% SAP to the company's "opinion" and "information we had gathered in discussion with our colleagues," but the only colleagues he could identify were Jean Frohlicher (the former president of the National Council of Higher Education Loan Programs) and Barbara Ryan (Southwest's general counsel).  Roig did not disclose to Frohlicher the details of Southwest's 9.5% SAP billing practices.  V. Roig Tr. 55:15-56: 5 (Soni Dec., Ex. 12).  Roig could not remember details about his

consultation with Ryan, which may have involved something as fleeting as, in his description, "me wandering down to get a cup of coffee and pok[ing] my head in her office." *Id.* at 40:12-41:10.  Ryan did not produce a written report to Southwest on the legality of their 9.5% SAP billing.  *Id.* at 55:12-56:13, 64:2-10.  Roig testified that his consultations with others in the industry was not "necessarily specifically about 9.5, but in general" about the topic of special allowance payments.  *Id.* at 38:10-39:21.  In response to a question regarding whether he asked  O'Toole if 9.5% SAP recycling was acceptable, Roig testified that "I wasn't in the habit of asking 'mother may I' or any of that activity." *Id.* at 79:1-10.

SW17.   Jane Stewart, then Southwest's Chief Operating Officer, believed that ED's comment was "incorrect" because "there was nothing in writing from them that said that." [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 34:11-35:11).]

**RESPONSE TO NO. SW17.**        Disputed and incomplete.  The program review (*see* SW15) was itself a "writing from [DEd] that said" that a lender could not transfer a loan from a 9.5% SAP eligible to a 9.5% SAP ineligible bond, and then use the cash generated from the transfer to generate new loans eligible for 9.5% SAP, which was how Southwest interpreted the program review's finding at the time.  V. Roig Tr. 38:7-22, 42:9-21 (Soni Dec., Ex. 12).  The practice identified in the program review as being contrary to the 9.5% SAP regulations – transferring loans from a 9.5% SAP eligible to a 9.5% SAP ineligible bond and using the cash generated thereby to purchase or acquire new 9.5% SAP loans – was the same as Southwest's process for growing its 9.5% SAP loan pools.  *Id.* at 42:9-21; Wheeler Tr. 142:10-147:5 (Soni Dec., Ex. 16).

*See* **Response to SW18,** *infra,* **regarding Southwest not disclosing its 9.5% SAP loan growth practices to DEd in response to the 2003 program review.**

**SW18.**   In a January 12, 2004 letter, Jane Stewart responded for Southwest to ED's findings and comments. [McMahon Decl., Ex. VI.14 (SLMA_PO027363-65); Ex. VI.28 (J. Roig Dep. at 35:12-36:10).] The response acknowledged that "an incorrect special allowance flag was set due to a manual error," that "this error resulted in an overbilling of special allowance by the University of Miami," and that "reimbursement occurred to the Department of Education well before this review report was issued by the Department."   Southwest, however, went on to "disput[e] several statements made in the context of special allowance billing on tax-exempt loans":

> The suggestion that proceeds received from the sale or transfer of loans cannot be treated as proceeds of tax-exempt debt is incorrect. *There is no basis for the position, and, in fact, recycling of financing proceeds is a common practice among all bond issuers and permitted under rules governed by Treasury.* We also understand that Assistant Secretary for Post Secondary Education Sally Stroup commented on this issue in early November at the Department of Education's Electronic Access Conference by saying that although it may be bad policy in a low interest rate environment, these activities are not illegal and do not constitute fraud and abuse. We are requesting that these irrelevant statements be removed from the finding and that the finding simply address the specific violation (the overbilling of special allowance due to a coding error) and the remedy. [McMahon Decl., Ex. VI.14 (SLMA_P0027365).]

**RESPONSE TO NO. SW18.**        **No dispute that the language is quoted accurately.  Although Southwest submitted a letter in response to the program review, SLMA_P0027363-65 (McMahon Dec., Ex. VI.14), Southwest did not disclose to DEd that it was engaging in the practice identified in the program review as contrary to the 9.5% SAP regulations.  *Id.;* J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16).  Instead, Southwest limited its response to general statements of**

disagreement with the program review's findings. *Id.* at SLMA_P0027365. A few months prior to the January 2004 Stewart letter, in September 2003, Southwest completed its project for retroactively tagging previous loan transfers with 9.5% SAP to allow for an expansion of its 9.5% SAP claims. Wheeler Tr. 19:17-20:3, 24:12-25:12, 40:19-41:22, 47:21-48:10, 64:2-6 (Soni Dec., Ex. 16).

*See* Response to SW21, *infra*, regarding DEd's response to the Stewart's January 2004 letter.

SW19. Jane Stewart read the EFC Exchange in the normal course of her work at Southwest. Although she did not recall reading the November 5, 2003 issue of EFC Exchange, she was sure that she did read it, and believed that issue of EFC Exchange was the source of her information concerning the Sally Stroup comments referenced in Southwest's response to ED. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 39:19-40:2, 41:14-44:9); *see supra* ¶¶ JS40-41.]

**RESPONSE TO NO. SW19.**        Incomplete. Stroup's comments did not mention Southwest specifically, or Southwest's 9.5% SAP billing practices specifically. J. Roig Tr. 81:6-83:4 (Soni Dec., Ex. 33). *See* Responses to JS39-41, *supra*, regarding Stroup's comments. Southwest employees responsible for billing for 9.5% SAP did not attend the Electronic Access Conference where Sally Stroup spoke in 2003. Chesin Tr. 193:15-20 (Soni De., Ex. 11); V. Roig Tr. 57:21-59:21 (Soni Dec., Ex. 12); J. Roig Tr. 39:2-5 (Soni Dec., Ex. 33). Chesin did not even know who Sally Stroup was. Chesin Tr. 194:2-3 (Soni Dec., Ex. 11).

**SW20.**   According to Vince Roig, Southwest's response was meant to convey to ED "that they were absolutely flat wrong in their position." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 34:15-17).]

**RESPONSE TO NO. SW20.**        **Disputed and incomplete.  The record is not clear whether Roig's comment concerned Southwest's response letter.  *See* Response to SW16, *supra*, regarding Roig's understanding of the legality of Southwest's 9.5% SAP practices.  Roig was not aware "at all" of the details of the 1993 OBRA limiting 9.5% SAP eligibility to pre-1993 tax exempt financing.  *Id.* at 37:16-38:5, 63:3-11.**

**SW21.** On May 21, 2004, ED replied to Southwest's January 12, 2004 letter as follows:

> Due to a manual error, an incorrect special allowance flag was set which resulted in an over-billing of special allowance by the University of Miami. This error was immediately corrected by [Southwest] and the Department was reimbursed. *We agree that statements in the review report relating to the sale or transfer of tax-exempt loans are irrelevant to this finding,* which occurred solely as a result of a coding error. [Southwest] has sufficiently resolved this error and no further action is required. You may now consider this program review <u>closed</u>." [McMahon Decl., Ex. VI.15] (SLMA_P0027366 (italics added, underlining in original)).]

**RESPONSE TO NO. SW21.**        **No dispute that the language is quoted accurately.  DEd did not withdraw or disagree with its earlier conclusion that the growth of 9.5% SAP loan pools through loan transfers – through the exact process in which Southwest was engaged – was invalid.  *See* J. Roig Ex. 2 at SLMA_P0027366-67 (McMahon Dec., Ex. VI.15).  While DEd noted that such a finding was irrelevant to the precise issue at hand, "which occurred solely as the result of a coding error," DEd did not express approval of the growth of 9.5% SAP loan pools, or cast doubt on its earlier finding that unlimited growth of 9.5% SAP loan pools through transfers between 9.5% SAP eligible**

and ineligible bonds was contrary to the applicable laws and regulations. *See id.* Thereafter, Southwest continued to engage in the precise activity that DEd told Southwest was invalid and Southwest continued to certify on a quarterly basis its compliance with "applicable laws, regulations, and policies relating to the Federal Family Education Loan Program." Southwest and Sallie Mae Responses to Interrogatory No. 3 (Mills Dec., Ex. 5).

SW22. Vince Roig "[a]bsolutely" interpreted ED's response to be "their way of telling us that . . . they had no business putting that in their report to start with." [McMahon Decl., Ex. VI.29 (V. Roig Dep. at 45:8-17).]

**RESPONSE TO NO. SW22.** No dispute that the language is quoted accurately. *See* Response to SW21, *supra*, regarding DEd's response letter of May 21, 2004.

SW23. Jane Stewart interpreted ED's response to mean that "[t]hat they weren't requiring any further action on our part." Ms. Stewart did not recall anyone from ED following up with her to discuss the position Southwest had taken in its January 12, 2004 letter. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 49:14-50:13).]

**RESPONSE TO NO. SW23.** No dispute that the language is quoted accurately. Although Roig disagreed with the finding, she did not disclose to the Department that Southwest was engaged in the very practice the Department determined was improper in its finding. J. Roig Ex. 2 at SLMA_P0027365 (McMahon Dec., Ex. VI.14); J. Roig Tr. 72:18-73:8 (Soni Dec., Ex. 33); Wheeler Tr. 142:10-147:22 (Soni Dec., Ex. 16). *See also* Response to SW18, *supra*.

**SW24.**   At some point following March 31, 2004, GAO contacted Southwest with questions for an interview concerning a "study of various FFELP Provisions." Southwest prepared written responses to GAO's questions, which Jane Stewart, Southwest's Chief Operating Officer, conveyed to GAO telephonically. [McMahon Decl., Ex. VI.2 (SLMA_P0027348-52); Ex. VI.28 (J. Roig Dep. at 50:21-53:2).]

**RESPONSE TO NO. SW24.**       No dispute.

**SW25.**   Southwest's responses to the GAO's questions included the following statements:

> We have issued over $968 million in tax-exempt bonds between 1981 and September 30, 1993 . . . . $30.1 million of the $968 million remains outstanding in their original bond series . . . .The Corporation has attempted to keep as much tax-exempt debt outstanding as possible to retain favorable characteristics of the debt such as the 9.5% floor or 1.50% arbitrage rules. We have done that by refunding the debt into new issuances .... Of the current tax-exempt debt outstanding ($751 million), $366.5 million are 9.5% floor bonds based upon refundings of previous debt . . . . [McMahon Decl., Ex. VI.2 (SLMA_P0027349).]

> The Corporation has always strived to take receipts from the loans and reinvest in additional FFELP loans . . . . Since we continually recycle and also transfer loans, the loans in tax-exempt bonds will be originally disbursed as recently as yesterday and the bonds could also have loans in them that were originated 10 years ago . . . . As the bonds are loaned-up and when we do not have a plethora of liquidity in tax-exempt bonds, we will transfer loans out to continue to be able to acquire loans into a tax-exempt bond . . . . The money for these loans either came from new tax-exempt issuances, available money in tax-exempt bonds due to loan receipts (in other words, recycling) or the money came from transferring loans out of a tax-exempt bond to free up cash for additional acquisitions. [*Id.* (SLMA_P0027350).]

> As a Corporation, we now follow the guidance of [the 1996 DCL]. Therefore, if a loan was originally acquired in a 9.5% floor bond, and subsequently transferred to a tax-exempt no floor bond or a taxable bond (both considered a taxable obligation from a special allowance standpoint), the loan continues to be subject to the 9.5% floor tax-exempt special allowance provisions. [*Id.* (SLMA_P0027351).]

As of March 31, 2004, the Corporation has $583.6 million in loans that are subject to the 9.5% floor special allowance provisions. $295.8 million of these loans reside in a 9.5% floor tax-exempt bond. $163.8 million of these loans reside in a no floor tax-exempt bond and $124.0 million of these loans reside in a taxable bond. The Corporation has been following the administrative guidance since October 2003. For the September 2003 799, the Corporation retroactively submitted for additional special allowance for loans that should have been receiving the 9.5% floor since they were originated in a 9.5% floor bond and transferred to a taxable bond, since the December 2001 quarter. [*Id.* (SLMA_P0027351).]

[A]ll loans in a 9.5% floor tax-exempt bond receive the 9.5% floor. In following the administrative guidance mentioned above, we created programming that looks at where each loan was originally originated. If a loan was originated in a 9.5% floor bond, and subsequently transferred to a no floor tax-exempt bond or a taxable bond (both consider [sic] Taxable for special allowance purposes), our system moves that loan to an 'Affiliate Bond'. This 'Affiliate Bond is set up on the system as Tax-Exempt. Each no floor tax-exempt bond and taxable bond has an 'Affiliate Bond' where only loans that were originated in a 9.5% floor bond reside. [*Id.* (SLMA_P0027352).]

**RESPONSE TO NO. SW25.**        **No dispute that the language is quoted accurately. Southwest's answer did not disclose that it was billing 9.5% SAP for both loans transferred from pre-1993 tax exempt 9.5% SAP eligible bonds to post-1993 tax exempt 9.5% ineligible and taxable bonds, and loans originated or purchased with cash generated from the transfer, disclosing only that it continued to bill 9.5% SAP for the transferred loan.** *See* **J. Roig Ex. 4 at SLMA_P0027348-52 (McMahon Dec., Ex. VI.2).**

**SW26.**   Jane Stewart did not recall anyone from the GAO raising any concerns that, based upon Southwest's answers to its questions, Southwest's 9.5% SAP practices were unlawful, improper, or even questionable. [McMahon Decl., Ex. VI.28 (J. Roig Dep. at 53:22-55:8).]

**RESPONSE TO NO. SW26.**        **Incomplete.** *See* **Response to SW25,** *supra***.**

**SW27.**   On February 27, 2007, SLM's General Counsel responded on behalf of its subsidiaries to ED's January 2007 Dear Colleague Letter, in which ED offered to forego attempts to recover historical payments of 9.5 SAP from lenders if they agreed not to submit new 9.5 SAP claims that did not comply with the January 2007 DCL's statement of eligibility for such claims, as follows:

> While we respectfully disagree with the interpretation set forth in the [January 2007 DCL] concerning eligibility for special allowance payment (SAP) at the 9.5% minimum return rate, we agree, subject to the conditions described below, as follows. First, we agree to make no further claims for SAP at the 9.5 percent minimum rate. Second, we agree to accept payment on our recently submitted requests for special allowance payments for the fourth quarter of 2006 at the standard SAP rate . . . . [W]e reserve the right to reevaluate these agreements if Congress, the Executive branch or any governmental entity takes any action that is materially adversely different from the Department of Education's resolution of this matter.

[McMahon Decl., Ex. VI.16 (ED-H-000629).]

**RESPONSE TO NO. SW27.**          **No dispute that the language is quoted accurately.** *See* **Responses to  JS163-64,** *supra***, regarding the January 2007 DCL and DEd's position regarding recovery of historical 9.5% SAP payments.**

> **8.** **Undisputed Facts Concerning Relator's Alter-Ego Claim Against SLM Corporation.**

**SW28.**   On October 15, 2004, SLM acquired Southwest. [McMahon Decl., Ex. VI.17 (SLM Corp., Yearly Report (Form 10-K) (Mar. 16, 2005)) at 27-28.]

**RESPONSE TO NO. SW28.**          **No dispute.**

**SW29.**   After the first calendar quarter of 2005, the average daily principal balance of Southwest's 9.5 Loans (not including the impact of prior-period adjustment amounts) decreased in each quarter through the end of 2006. [McMahon Decl., Ex. VI.3 (SLMA_P0027981).]

**RESPONSE TO NO. SW29.**        Incomplete.  Southwest's 9.5% SAP loan growth for the March 2001-March 2005 time period was from approximately $307 million to $799 million.  SLMA_P0027981 (McMahon Dec., Ex. VI.3).

SLM was fully aware of Southwest's 9.5% SAP portfolio when considering purchasing Southwest.  Project Troy Update at SLMA_EF0000249 (Soni Dec., Ex. 169); Project Troy Update at SLMA_EF00000163 (Soni Dec., Ex. 168).  Before its acquisition of Southwest, SLM determined the volume of 9.5% SAP loans Southwest then held.  *Id.*  SLM calculated the additional possible revenue from 9.5% SAP loans.  Project Troy Update at SLMA_EF0000249 (Soni Dec., Ex. 169).

At the time of SLM's acquisition of Southwest, Sallie Mae, Inc. officials conducted a due diligence review of Southwest's 9.5% SAP loans and met with Southwest officials and reviewed Southwest documents.  Wheeler Tr. 135:22-136:13, 139:2-12 (Soni Dec., Ex. 16).  After this review, SLM allowed Southwest to continue to bill 9.5% SAP.  *Id.* at 135:22-136:13.

Following the acquisition, Sallie Mae monitored Southwest's entire loan portfolio, including 9.5% SAP loans.  Nickel Tr. 117:14-21 (Soni Dec., Ex. 17).  In this time period, Sallie Mae management made decisions about Southwest's loan portfolio.  V. Roig Tr. 107:11-108:2 (Soni Dec., Ex. 12).  In at least one instance, a Sallie Mae, Inc. official gave a specific order to Southwest to cease recycling and Southwest obeyed the order.  Wheeler Tr. 138:5-140:9 (Soni Dec., Ex. 16).  Sallie Mae, Inc. took over as servicer of Southwest's loans in the Fall of 2005.  *Id.* at 114:19-115:6.  Sallie Mae, Inc. took over the 9.5% SAP claims submission process.  *Id.* at 132:21-133:12.

SLM also requested information about Southwest's 9.5% SAP loans and Southwest provided information when requested.  Nickel Tr. 101:3-14 (Soni Dec., Ex. 17); Nickel Ex. 5, at SLMA_EF00001234 (Soni Dec., Ex. 135); Nickel Ex. 7, SLMA_EF0001235 (Soni Dec., Ex. 136); Jacobson Tr. 91:21-93:10 (Soni Dec., Ex. 13); Jacobson Ex. 6, at SLMA_P0004356-57 (Mills Dec., Ex. 38).

Southwest did not treat loans transferred after September 30, 2004 as being eligible to receive 9.5% SAP but continued to treat loans that had been transferred prior to that date as being eligible for 9.% SAP.  SLMA_EF00000116 (referencing the change as prospective in nature) (McMahon Dec., Ex. VI.10).

SW30.  Following the acquisition, Southwest signed an intercompany agreement pursuant to which a separate SLM subsidiary, Sallie Mae, Inc., provided certain administrative services to Southwest for a fee. [McMahon Decl., Ex. VI.18 (SLMA_P0027850).] The services provided by Sallie Mae, Inc. (not SLM Corp.) included accounting, finance, human resources, information technology, and legal. Aspects of many of these functions continued to be handled by Southwest management for some time after the acquisition. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 112:6-15, 114:10-13, 119:1-120:3, 126:22-129:18, 131:14-132:18, 138:22-141:1, 145:17-146:3, 235:12-236:5, 257:22-258:7).]

**RESPONSE TO NO. SW30.**        Disputed and incomplete.  Sallie Mae, Inc. is a wholly owned subsidiary of SLM.  Nickel Tr. 273:4-8 (Soni Dec., Ex. 17); SLM Corp., Yearly Report (10-K) (Mar. 16, 2005) at 18 (http://salliemae.com/NR/rdonlyres/A0450B59-A4A0-4586-9B4C-253FF335008B/10705/W052931620N.pdf.)  SLM had Sallie Mae, Inc. officials conduct a due diligence review of Southwest's portfolio at the time SLM acquired

Southwest.  Wheeler Tr. 135:22-136:13, 139:2-140:5 (Soni Dec., Ex. 16).  SLM also ordered Southwest to obtain authority from Sallie Mae, Inc. officials for certain transactions. Southwest needed Sallie Mae, Inc.'s Managing Director/Vice President of Facilities approval before entering into leases of facilities, property, or equipment of any amount. Rakatansky Tr. 41:5-13 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 16).  Similarly, Southwest needed the approval of Sallie Mae, Inc.'s Managing Director/Vice President Corporate Finance before engaging in a number of types of transactions - such as investment/hedge portfolio transactions, debt/swap transactions, leveraged lease transactions, equity premium payments, and debt issuances. Rakatansky Tr. 41:15-18 (Soni Dec., Ex. 15); Rakatansky Ex. 4 SLMA_P0027870-871 (Soni Dec., Ex. 16).

Following the acquisition SLM and its subsidiaries provided many services to Southwest involving employee benefits, a stock option program in Sallie Mae stock, legal services, human resources/training, a Sallie Mae 401(k) plan and Sallie Mae stock purchase plan, payroll processing, a Sallie Mae employee stock purchase plan, internal audit services, information technology services, finance and accounting services, servicing of student loans, and processing of loan payment services.  Nickel Tr. 56:16-57:4, 132:11-21, 56:12-19, 113:2-114:12, 134:12-135:10, 120:13-121:3, 135:17-19, 122:2-123:17, 132:22-133:7, 133:8-18, 134:12-135:10, 137:14-142:9, 146:17-147:3, 167:6-13, 183:3-185:2 (Soni Dec., Ex. 17); Chesin Tr. 168:7-169:5 (Soni Dec., Ex. 11); Wheeler Tr. 153:17-155:2 (Soni Dec., Ex. 16).

Richard Nickel testified that he was unaware of payments between Sallie Mae and Southwest for the servicing of student loans.  Nickel Tr. 171:21-172:20, 202:20-203:5 (Soni

Dec., Ex. 17).  Nickel, Southwest's former President, was unaware of the specifics of the administrative services agreement and could not state whether such documents were even in written form and indicated that he did not review such documents.  Nickel Tr. 174:1-14, 115:10-116:11, 142:11-143:4 (Soni Dec., Ex. 17).  Further, Southwest has never asserted that it actually paid SLM or Sallie Mae, Inc. for any services.

SW31. Following the acquisition, Southwest's core business operations — the sale and marketing of, and provision of customer service for, Southwest loan products — continued at Southwest. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 148:13-150:2).] The day-to-day responsibility for overseeing those operations remained the responsibility of Southwest management. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 46:9-17, 92:12-19).]

**RESPONSE TO NO. SW31.** **Disputed and incomplete.  Following SLM's acquisition, Southwest sold Sallie Mae loan products, including signature loans and Sallie Mae's consolidation program in addition to Southwest products.  Nickel Dep. Tr. 151:11-152:4 (Soni Dec., Ex. 17).  Similarly, Southwest also offered call center support to Sallie Mae customers.  *Id.* at 192:2-194:9.  While some sales and marketing functions remained under the control of Southwest, numerous functions that formally had been performed by Southwest employees migrated to SLM and other SLM subsidiaries.  *See* Response to SW 30, *supra*.  As senior officials at Southwest departed from their positions, Southwest did not hire new people for those positions.  Nickel Tr. 250:8-251:8 (Soni Dec., Ex. 17).  Southwest did not create or maintain balance sheets or income statements for the time period after March 2005.  Wheeler Tr. 155:4-10 (Soni Dec., Ex. 16); Nickel Tr. 209:2-15; 210:15-211:9 (Soni Dec., Ex. 17).**

SW32.   Following the acquisition, Southwest's President hired and fired employees without the need to consult with SLM or obtain its approval. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 98:7-15).] Southwest's President made the decision to shut down Southwest's Miami office, and to let go its employees and one officer, without receiving a directive from SLM. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 259:16-260:16).]

**RESPONSE TO NO. SW32.**        **Disputed and incomplete.  Southwest's President testified that Southwest's sole Director, a SLM employee, had the authority to hire and fire Southwest officers.  Nickel Tr. 88:10-89:1 (Soni Dec., Ex. 17).  Further, this Director and SLM employee had the authority to overrule Southwest's President, gave strategic direction to Southwest, conferred with Southwest's President about Southwest's business plan and its higher level financial decisions, and approved amendments to Articles of Incorporation, Bylaws, and the appointment of officers.  Nickel Tr. 48:19-49:7 (Soni Dec., Ex. 17); Rakatansky Tr. 18:19-19:11, 19:17-20:2 (Soni Dec., Ex. 15).**

**In other areas, Southwest was required to obtain approval of SLM and its subsidiaries for certain actions.  SLM adopted and Southwest was required to follow a Signature Authorization Policy.  Rakatansky Tr. 24:9-17 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).  This document required a certain level of approval before a Southwest employee purchased goods and services.  Rakatansky Tr. 25:17-26:5 (Soni Dec., Ex. 15).  Sallie Mae, Inc.'s finance organization ensured compliance with this policy and only SLM's CEO, COO, Executive Vice President of Finance, or the Executive Vice President of Accounting and Risk Management could make exceptions to this policy.  Rakatansky Tr. 28:8-29:7 (Soni Dec., Ex. 15); Rakatansky Ex. 3, SLMA_P0027861-864 (Soni Dec., Ex. 130).**

**SLM adopted and Southwest was also required to follow a Signature Authority Approval Matrix.  Rakatansky Tr. 23:20-24:17 (Soni Dec., Ex. 15); Rakatansky Ex. 4, SLMA_P0027865-871 (Soni Dec., Ex. 131).  Southwest purchases above a certain dollar amount required the approval of SLM's COO or CEO.  Rakatansky Ex. No. 4 (Soni Dec., Ex. 131); Rakatansky Tr. 34:16-18, 36:17-20 (Soni Dec., Ex. 15).  In addition to SLM officers needing to approve Southwest's purchases above a certain dollar amount, other types of purchases, regardless of dollar amount, required SLM or its subsidiaries to review and approve the purchase.  Rakatansky Tr. 54:21-55:16 (Soni Dec., Ex. 15).  For example, Sallie Mae, Inc's Managing Director/Vice President of Facilities would need to review and approve the leases of facilities, property, and equipment. Rakatansky Tr. 41:5-13 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 131).  Sallie Mae, Inc.'s Managing Director/Vice President, Corporate Finance would need to review and approve investment/hedge portfolio transactions, debt/swap transactions, leveraged lease transactions, equity premium payments, and debt issuances.  Rakatansky Tr. 41:15-18 (Soni Dec., Ex. 15); Rakatansky Ex. 4 at SLMA_P0027870-871 (Soni Dec., Ex. 131).**

**SW33.**   Following the acquisition, Southwest began to sell primarily Southwest products in new markets and added sales and customer service staff to do so. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 148:13-150:2, 265:22-268:2).]

**RESPONSE TO NO. SW33.**          **Incomplete.  Many other functions of Southwest migrated to SLM.  *See* Responses to SW30-31, *supra*.  Southwest sold Sallie Mae products and provided customer service support to Sallie Mae customers.  *See* Response to SW31, *supra*.  Southwest's President at that time, Richard Nickel, testified that he was not sure**

whether Southwest was compensated for these services.  Nickel Tr. 194:21-195:12 (Soni Dec., Ex. 17).

SW34.   As of the end of 2006, Southwest's sales force numbered about 30 or 40. These Southwest employees visited schools within their assigned territory and promoted primarily Southwest loan products. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 262:19263:22).] These sales personnel used marketing materials generated by Southwest employees. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 264:16-265:1).]

RESPONSE TO NO. SW34.          Incomplete.  See Responses to SW30-31, 33, supra.  Overall staffing at Southwest dropped by approximately one quarter from the time of SLM's acquisition to the end of 2006.  See Nickel Tr. 179:4-11 (Soni Dec., Ex. 17); Nickel Ex. 13 at SLMA_EF00000163 (Soni Dec., Ex. 133).

SW35. As of the end of 2006, Southwest had 50 to 60 employees who were working in customer service, primarily for Southwest loan products. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 268:3-269:19).]

RESPONSE TO NO. SW35.          Incomplete.  See Responses to SW30-31, 33-34, supra.

SW36. As of the end of 2006, Southwest had a collections operation that was focused primarily on Southwest loans. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 269:21-270:11).]

RESPONSE TO NO. SW36.          Incomplete.  See Responses to SW30-31, 33-34, supra.

SW37. In total, about 200 Southwest employees were working in various capacities at Southwest at the end of 2006. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 261:11-262:18).]

**RESPONSE TO NO. SW37.**      **Incomplete.  Southwest had reduced its staff by approximately one quarter from the time of SLM's acquisition to the end of 2006.  *See* Nickel Tr. 179:4-11 (Soni Dec., Ex. 17); Project Troy Update (Soni Dec., Ex. 168).**

SW38.  Following the acquisition, SLM (as Southwest's sole shareholder) replaced Southwest's pre-acquisition Board of Directors with a sole director, June McCormack, who was an officer of SLM. [McMahon Decl., Ex. VI.19 (SLMA_P0002385).] Southwest's Board issued written consents in lieu of meetings. [McMahon Decl., Ex. VI.20 (SLMA_P0002362, 2370-73, 2379, 2383-84).]

**RESPONSE TO NO. SW38.**      **Disputed and incomplete.  Following SLM's acquisition of Southwest, Southwest's Board of Directors never held a single meeting. Rakatansky Tr. 17:13-19 (Soni Dec., Ex. 15).**

**Southwest's Board of Directors immediately was reduced from at least six individuals to one individual.  Nickel Tr. 72:16-74:12 (Soni Dec., Ex. 17).  The first Director of Southwest appointed by SLM was John Remondi, who served as Director from October 2004 – March 2005.  Rakatansky Tr. 14:10-21 (Soni Dec., Ex. 15).  Remondi, while serving as Director of Southwest, simultaneously served as Executive Vice President of SLM.  *Id.* at 14:22-15:4.  June McCormack replaced Jack Remondi as Southwest's Director in March 2005.  *Id.* at 15:5-9.  June McCormack also held the title of Executive Vice President of SLM while serving as Southwest's Director.  *Id.* at 15:10-13.  Barry Goulding replaced June McCormack as Southwest's Director in 2007.  *Id.* at 16:1-12.  Barry Goulding**

concurrently served as Director of Southwest, President of Southwest, and Senior Vice President of SLM.  *Id.* at 56:10-57:7.

Following the SLM acquisition of Southwest, SLM set business plans for Southwest in an annual business plan and as part of a three-year planning document.  *Id.* at 52:12-53:21.

Nickel testified that he believed Southwest remained profitable for a period of time because otherwise he "would have heard about it."  Nickel Tr. 245:14-16 (Soni Dec., Ex. 17).

SW39.   Following the acquisition, SLM as Southwest's sole shareholder issued written consents in lieu of meetings. [McMahon Decl., Ex. VI.21 (SLMA_P0002359, 2367-69, 2378).]

**RESPONSE TO NO. SW39.**          **Incomplete.  After SLM's acquisition of Southwest, no Southwest shareholder meetings were held.  Rakatansky Tr. 18:5-14 (Soni Dec., Ex. 15).  Southwest paid no dividends to SLM.  Nickel Tr. 196:2-5 (Soni Dec., Ex. 17); Wheeler Tr. 169:16-20 (Soni Dec., Ex. 16).**

SW40.   Southwest's President from May 2005 through the end of 2006 reported to Ms. McCormack as Southwest's single Board member and consulted with her on major decisions and strategic issues, but did not need her approval for the day-to-day activities of Southwest. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 46:9-17, 92:12-19).] During the time he was President, Ms. McCormack never hired or fired, or directed him to hire or fire, a Southwest officer. [McMahon Decl., Ex. VI.27 (Nickel Dep. at 259:16-261:10).]

**RESPONSE TO NO. SW40.**          Incomplete.  Southwest's President testified that Southwest's sole Director had the authority to hire and fire Southwest officers.  Nickel Tr. 88:10-89:1 (Soni Dec., Ex. 17).  Further, Southwest's sole Director had the authority to overrule Southwest's President, gave strategic direction to Southwest, conferred with Southwest's President about Southwest's business plan and its higher level financial decisions, and approved amendments to Articles of Incorporation, Bylaws, and the appointment of officers.  *Id.* at 48:19-49:7 (Soni Dec., Ex. 17); Rakatansky Tr. 18:19-19:11, 19:17-20:2 (Soni Dec., Ex. 15).

Employees that continued working at Southwest following SLM's acquisition could not state whether their employer in this post-acquisition period was Southwest or Sallie Mae, Inc.  Lisa Jacobson testified that she believed that she was employed by Sallie Mae after SLM merged with Southwest.  Jacobson Tr. 125:15-16 (Soni Dec., Ex. 13).  Vince Roig considered himself to be employed by Sallie Mae following the acquisition.  V. Roig Tr. 15:15-19 (Soni Dec., Ex. 12).  Vince Roig identified Southwest as a "division" of Sallie Mae after the acquisition.  *Id.* at 53:6-16.

Nickel did not know about the administrative services agreement with Sallie Mae for services Sallie Mae provided to Southwest.  Nickel Tr. 174:1-14, 115:19-116-11, 142:11-143:4 (Soni Dec., Ex. 17).  Nickel similarly did not know whether Southwest received compensation for services it was providing to Sallie Mae.  *Id.* at 194:21-195:12.  Nickel did not know whether rent was paid to Southwest for Sallie Mae employees housed in Southwest's headquarters.  *Id.* at 202:20-203:5.  Nickel did not know about compilation of Southwest's financial statements – he declared "he had no understanding of that process."  *Id.* at 207:18-208:22.  When asked to explain his lack of knowledge about  Southwest's

financial statements, Nickel testified that he relied on the "Sallie Mae financial contingent"
along with Southwest financial staff to handle such matters. *Id.* at 215:12-216:4.

SW41.   Following the acquisition, SLM provided Southwest with a $5 billion
unsecured line of credit. [McMahon Decl., Ex. VI.22 (SLMA_P0002852).] Southwest was
obligated to pay interest to SLM on disbursements made to it under this credit line [*Id.* § 2.4]
and made periodic repayments to SLM with interest. [McMahon Decl., Ex. VI.23
(SLMA_EF00000835).]

**RESPONSE TO NO. SW41.**        **Incomplete.  SLM gave Southwest a $5 billion
unsecured line of credit memorialized in an eight page agreement.  Nickel Ex. 20, at
SLMA_P0002852-2859 (McMahon Dec., Ex. VI.22);  Wheeler Tr. 159:13-161:19 (Soni Dec.,
Ex. 16).  The agreement contained no payable due date.  *Id.* at 159:13-160:20.  The
agreement did not require any regular payments.  Nickel Ex. 20 (McMahon Dec. Ex.
VI.22).  The agreement did, however, require Southwest to produce to SLM monthly
financial statements consisting of a balance sheet and statement of income.  Nickel Ex. 20,
SLMA_P0002852-2859 (McMahon Dec., Ex. VI.22).**

**Before SLM acquired Southwest, Southwest had a $375 million line of credit with
SLM.  Wheeler Ex. 19 at SLMA_P0000652-55(Soni Dec., Ex. 137); Wheeler Tr. 157:20-
158:22 (Soni Dec., Ex. 16).  This line of credit was secured by the loans purchased with the
funds.  *Id.* at 158:19-22.**

SW42.   As of October 15, 2004, Southwest had approximately $5.3 billion in assets and
$223 million in equity (*i.e.,* assets in excess of its liabilities). [McMahon Decl., Ex. VI.24
(SLMA_EF00000150).]

**RESPONSE TO NO. SW42.**          No dispute.

SW43.  Southwest had positive net income in each year following its acquisition by

SLM. [McMahon Decl., Ex. VI.25 (SLMA_EF00000832); Ex. VI.27 (Nickel Dep. at 244:9-

16).]

**RESPONSE TO NO. SW43.**          **Disputed and incomplete.  Southwest and SLM**

**sought and obtained from the Court limitations regarding the relevant time period for the**

**alter ego question.  Information presented in SLMA_EF00000832 is outside that time**

**period and Wheeler testified that he believed they were prepared in the last six months.**

**Wheeler Tr. 152:21-153:7 (Soni Dec., Ex. 16).  Southwest did not create or maintain**

**balance sheets or income statements for the time period after March 2005.  *Id.* at 155:4-10;**

**Nickel Tr. 209:2-15, 210:15-211:9 (Soni Dec., Ex. 17).**

SW44.  From time to time following the acquisition, SLM has made capital contributions

to Southwest. [McMahon Decl., Ex. VI.26 (SLMA_PO002613-43).]

**RESPONSE TO NO. SW44.**          **Incomplete.  SLM made these contributions for**

**its own tax planning purposes.  Wheeler Tr. 166:13-167:16 (Soni Dec., Ex. 16).**

SW45.  As of the end of 2009, Southwest had almost $100 billion in assets (including

approximately $310 million in cash and investments) and approximately $4.6 billion in equity.

[McMahon Decl., Ex. VI.25 (SLMA_EF00000832).]

**RESPONSE TO NO. SW45.**          **Disputed and incomplete.  *See* Response to**

**SW43, *supra.***

Respectfully submitted,


/s/ Michael L. Sturm
Bert W. Rein (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
Thomas W. Queen (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
msturm@wileyrein.com
tqueen@wileyrein.com

Christopher Mills (VSB #44358)
WILEY REIN LLP
7925 Jones Branch Drive
Suite 6200
McLean, VA  22102
Phone:  703.905.2800
Fax:  703.905.2820
cmills@wileyrein.com

R. Scott Oswald (VSB #41770)
David Scher (VSB #47634)
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C.  20006
Phone :  202.261.2806
Fax :  202.261.2835
*Attorneys for Qui Tam Relator Jon H. Oberg*


July 12, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of July 2010, a true and correct copy of the foregoing Relator's Response to Defendants' Joint Statement of Undisputed Material Facts was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

| | |
|---|---|
| Gerard Mene, Esq.<br>Assistant United States Attorney<br>2100 Jamieson Ave<br>Alexandria, VA 22314<br>*Counsel for the United States* | W. Neil Eggleston, Esq.<br>Debevoise & Plimpton LLP (DC)<br>555 13th Street, NW, Suite 1100 East<br>Washington, D.C. 20004<br>*Counsel for SLM Corporation*<br>*and Southwest Student Services*<br>*Corporation* |
| Don Bradford Hardin Jr., Esq.<br>Wilmer Hale LLP<br>1875 Pennsylvania Avenue, NW<br>Washington, D.C. 20006<br>*Counsel for Education Loans*<br>*Inc/SD* | Timothy J. McEvoy, Esq.<br>Christine Crudgington Owen, Esq.<br>Cameron McEvoy, PLLC<br>11325 Random Hills Road, Suite 200<br>Fairfax, VA 22030<br>*Counsel for Panhandle Plains*<br>*Higher Education Authority* |
| David Michael Kopstein, Esq.<br>Kopstein & Perilman<br>8633 Cross Chase Court<br>Fairfax Station, VA 22039<br>*Counsel for Brazos Higher Education*<br>*Service Corporation and Nelnet, Inc.* | Sean T. Beller, Esq.<br>Powers Pyles Sutter & Verville PC<br>1501 M Street NW, Seventh Floor<br>Washington, D.C. 20005-1700<br>*Counsel for Brazos Higher Education Service*<br>*Corporation, Brazos Higher Education*<br>*Authority, Nelnet, Inc., and Nelnet Education*<br>*Loan Funding, Inc.* |
| Nathaniel Thomas Connally III, Esq.<br>Hogan & Hartson LLP<br>7930 Jones Branch Drive<br>McLean, VA 22102-3302<br>*Counsel for Arkansas Student*<br>*Loan Authority* | Jill Marie Dennis, Esq.<br>Hunton & Williams<br>1751 Pinnacle Drive, Suite 1700<br>McLean, VA 22102<br>*Counsel for Pennsylvania*<br>*Higher Education Assistance Agency* |
| Thomas L. Appler, Esq.<br>Heather Austin Jones, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>8444 Westpark Drive, Suite 510<br>McLean, VA 22102<br>*Counsel for Kentucky Higher Education*<br>*Student Loan Corporation* | Mark E. Nagle, Esq.<br>Tameka M. Collier, Esq.<br>Troutman Sanders LLP<br>401 9th Street, NW, Suite 1000<br>Washington, D.C. 20004-2134<br>*Counsel for Vermont Student*<br>*Assistance Corporation* |

| John Stone West, Esq.<br>Megan Conway Rahman, Esq.<br>Troutman Sanders LLP<br>1001 Haxall Point<br>Richmond, VA 23219<br>*Counsel for Vermont Student Assistance<br>Corporation* | |

A copy of the above-referenced document was sent via first class mail, postage prepaid, to the following counsel:

Jay Majors, Esq.
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044

/s/ Michael L. Sturm
Bert W. Rein (admitted *pro hac vice*)
Michael L. Sturm (VSB # 27533)
Thomas W. Queen (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, D.C. 20006
Phone:  202.719.7000
Fax:  202.719.7049
brein@wileyrein.com
msturm@wileyrein.com
tqueen@wileyrein.com