Exhibit 51

# CONFIDENTIAL

# FILED UNDER SEAL

## John Wright

**From:** "John Wright" <johnw@ppslc.com>
**To:** "Kathleen Ellison" <kellison@fulbright.com>; "Paul Sheldon" <paul.b.sheldon@ssmb.com>; "Jimmy Parker" <jimmyp@ppslc.com>; "Glenn Parker" <glennp@ppslc.com>; "Clifford Baker" <clifford@ppslc.com>
**Sent:** Friday, November 15, 2002 2:48 PM
**Attach:** Consolidation.xls; 9.5% Floor.doc; 9.5% Floor Loans 2.xls
**Subject:** Floor Bonds

The attachments relate to our strategy concerning the use of our floor bonds. Document 1 details our consolidation loans with rates at 5% or less. Whether we swap loans around to maximize yields will depend on which option we choose. Document 2 setsforth various options and questions. Document 3 shows the financial impact to the Authority by having the floor on loans in a taxable issue. I used the September quarter end rates.



EXHIBIT NO. 29
K. MORRIS

11/18/2002

PPHEA_045867

HIGHLY CONFIDENTIAL

## Consolidation Loans 5% or Less

| Int. Rate | SFC | 91AB | 92AB | 93AB | 97X | 99A-1 | 99A-2 | 01A-3 | 01A-5 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.250 | | | | | | 40,729 | | | | 40,729 |
| 3.375 | 36,678 | | | | | 72,468 | | 35,513 | 6,468 | 78,659 |
| 3.500 | 815,264 | | | | 250,410 | 112,484 | | 368,801 | 412,189 | 1,919,132 |
| 3.625 | 965,715 | | 22,383 | | 273,571 | 76,822 | | 433,260 | 642,497 | 2,449,930 |
| 3.750 | 990,017 | | | | 96,166 | 209,348 | | 200,044 | 99,238 | 1,432,287 |
| 3.875 | 948,076 | | | | 37,979 | 219,393 | | 161,884 | 276,281 | 1,633,568 |
| 4.000 | 865,369 | | | | 116,625 | 108,326 | | 120,874 | 244,399 | 1,566,680 |
| 4.125 | 2,181,295 | | 67,817 | | 33,112 | 227,745 | | 452,418 | 465,443 | 3,308,411 |
| 4.250 | 2,466,657 | | 38,783 | | 30,056 | 195,887 | | 598,477 | 370,745 | 3,730,463 |
| 4.375 | 1,785,710 | | 107,664 | | 164,958 | 227,745 | | 528,332 | 423,974 | 3,206,525 |
| 4.500 | 1,618,542 | | 31,515 | | 78,307 | 339,924 | | 622,390 | 352,403 | 3,043,081 |
| 4.625 | 1,639,236 | | 50,029 | | 68,253 | 163,243 | | 546,084 | 314,941 | 2,781,798 |
| 4.750 | 1,265,334 | | 13,728 | | 155,495 | 165,593 | | 396,759 | 446,396 | 2,443,305 |
| 4.875 | 1,709,903 | | 59,666 | | 133,267 | 529,893 | | 390,984 | 629,136 | 3,452,849 |
| 5.000 | 838,313 | | 18,586 | | 2,635 | 40,077 | | 311,888 | 224,903 | 1,436,402 |
| | | | 410,171 | | | | | | | |
| *4.86 | 18,096,111 | 11,412,965 | 4,097,616 | 1,163,624 | 1,440,834 | 2,501,832 | 489,410 | 5,165,728 | 4,909,013 | |

| | Total |
|---|---|
| Total Fixed Rate | 32,523,789 |
| Total Variable Rate | 17,163,615 |
| Total booked as of 10/31/02 | 49,687,404 |

| | |
|---|---|
| ** Nov. 2002 | 5,600,000 |
| ** Dec. 2002 | 5,500,000 |
| ** Jan. 2002 | 5,500,000 |
| ** Feb. 2002 | 5,500,000 |
| ** Mar. 2002 | 6,000,000 |
| Total | 77,787,404   Grand Total as of March, 2003 |

*Variable rate consolidation loans originated between and including 11/13/97-9/30/98. Borrower rate is the bond equivalent rate of the 91-day Treasury bills auctioned at the final auction before June 1, plus 3.1%, not to exceed 8.25%. Borrower rate is effective July 1 of current year through June 30 of the following year. Rate for July1, 2002 through June 30, 2003 is 4.86% (1.76% plus 3.10%).

**The majority of the new consolidation loans should be fixed rate 4.06%.

HIGHLY CONFIDENTIAL

PPHEA_045868

## OPTIONS REGARDING 9.5% FLOOR

1. Do nothing.

2. Use the tax-exempt floor issues to make all of our portfolio 9.5% loans.

3. Use the tax-exempt floor issues to make all future acquisitions 9.5% loans.

3. Issue taxable bonds, purchase existing loans subject to 9.5%, claim 9.5% in the taxable issue on existing portfolio, do not claim floor on loans purchased with recycled funds of taxable issue, and don't claim floor on future loans purchased in tax exempt issues. We would fill tax-exempt issues with low interest rate loans to reduce excess interest liability.

4. Same as #3 except claim 9.5% floor on all current and future loans in both issues.

5. Swap fixed rate low interest loans into tax exempt issues, purchase into taxable issue to maximize spread, claim 9.5% floor on loans in both issues but never more than twice the original amount of 9.5% loans, currently $143MM which would allow us to have $286MM of floor loans.

## Questions

1. If the loans retain the 9.5% characteristic when purchased into the taxable issue, could DOE take the position that the yield restriction also transfers?

2. If interest rates start rising and the lender rate exceeds 9.5%, we would only get ½ the SAP which is over the floor, i.e. the lender rate rises to 11%, SAP over 9.5% is 1.5%, we would only get .75%. This could put us in a bind on the taxable bond. We need to determine at what point during rising interest rates would we need to do a swap?

3. How will rating agencies look at the transaction and what stress factors will they require?

4. Do we have to add any notes to our audit?

5. Do we have to disclose any risk in our official statement ?

6. Are there any 15( c ) 2-12 disclosure requirements?

7. Will the IFA system be able to make accurate prior period adjustments to the 799? If a loan goes from a taxable issue with no floor, to the tax-exempt issue with floor, and then to a taxable issue with floor, can IFA track adjustments across different SAP codes?

HIGHLY CONFIDENTIAL

PPHEA_045869

## EFFECT OF 9.5% LOANS IN TAXABLE ISSUES

|  | CP | Add on | | Yield |
|---|---|---|---|---|
| Current Lender Yield on Grace and In-school Loans | 1.77% | 1.74% | | 3.51% |
| Current Lender Yield on Repayment Loans | 1.77% | 2.34% | | 4.11% |
| Student Rate--Grace and In-school (lender's floor) | | | | 3.46% |
| Student Rate --Repayment (lender's floor) | | | | 4.06% |

|  | Grace | | Repay | |
|---|---|---|---|---|
| Floor on loans purchased from | | | | |
| Bond Series 91AB,92AB,93AB | | 9.50% | | 9.50% |
| Lender Yield | | 3.51% | | 4.11% |
| Increase in Yield | | 5.99% | | 5.39% |
| Funds available in above Bonds | $ | 143,000,000 | $ | 143,000,000 |
| Increase in Yield | | 5.99% | | 5.39% |
| Increase in Gross Revenue | $ | 8,565,700 | $ | 7,707,700 |

HIGHLY CONFIDENTIAL

PPHEA_045870

Exhibit 52

# CONFIDENTIAL

# FILED UNDER SEAL

# Introduction

In October 2002, the board of Panhandle Plains Higher Education Authority (PPHEA) was approached by NELNET with the possibility of converting and selling the authority. NELNET's offer, excluding the purchase of Panhandle Plains Management and Servicing Corporation (PPMSC aka PPSLC), was estimated at $70 million, composed of a set amount of $54 million and an additional "kicker" of approximately $16 million paid over the subsequent five-year period. The value of the kicker was speculative and based on future loan volume. In essence, the offer by NELNET was for the existing net worth plus an amount based on future loan volume. (Note: One risk in the transaction as shown is that NELNET might somehow limit future loan volume. This could have the effect of negating any future payments. New loan volume is required to be in excess of $50 million annually before any additional payments were made.)

At the time, an internal group explored the pros and cons of a conversion and Paul Sheldon, with Citigroup, made a presentation to the board about the potential value of PPHEA. A decision to consider a sale was postponed until two activities could be completed.

First, it was decided to issue new debt to take advantage of the 9.5% floor ruling. This process was completed in March 2003 and, in today's interest rate environment, has created new annual net income for PPHEA in excess of $8 million. Even if rates were to increase by 2%, the annual value of this transaction should exceed $6 million. It was felt that this step would add significant value to the net worth of PPHEA over the next few years that was not considered by NELNET.

Second, an independent committee was formed to review the servicing contract between PPHEA and PPMSC. The board felt that it was important that an independent committee review the servicing contract in the event an agreement was reached to convert and sell PPHEA. The committee has completed its work and will present a new servicing contract for approval in the near future.

It was in this context that a committee of the board was formed to investigate and report to the PPHEA authority board the various conversion issues. This report is a result of the committee's review and discussion. For purposes of this report, the committee assumed that the servicing corporation would be sold to the buyer of PPHEA if a sale to an unrelated third party occurred. Further, we assumed that the price paid for the servicer would be set independently of the price set for PPHEA and would be based on a business appraisal.

The committee met on two occasions. In the first meeting, Paul Sheldon and Patrick Belica with Citigroup, attended and made a presentation on the conversion process. They also presented an estimated value of PPHEA as an ongoing entity, as well as if converted and sold to a third party. Also attending were Clifford Baker and Glenn Parker both with PPHEA. In the second meeting, Clifford Baker, Glenn Parker and Jimmy Parker attended. All committee members were present at both meetings. The committee met in executive session (excluding John Wright) for part of both meetings.

A notebook of information was prepared for review by the committee and is included with this report for review by the entire board of PPHEA. It is anticipated that a presentation on conversion and review of the notebook will be presented at the July 31, 2003 board meeting of PPHEA.

Exhibit 54

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| | |
|---|---|
| **From:** | Tone, Paul |
| **Sent:** | Sunday, January 05, 2003 9:22 AM |
| **To:** | Dunlap, Michael (UBT); Bouc, Don; Heimes, Terry; Bottegal, Dave; Pohl, Mike; Pohl, Mike; Schleuger, Gary; Butterfield, Steve; Martinez, Ed; Noordhoek, Jeff; Sabo, Tim (MAINE); Tone, Paul |
| **Subject:** | 9.5% Floor |

*Following Gary's quick summary of the meeting last Friday, I promised to summarize the preceding phone conversation with Kristie as well as our follow-up meeting. My apologies for any duplication that may occur.*

In conversation with Kristie Hansen on the 23rd of December, she was enthusiastic about a meeting with Nelnet staff to discuss the 9.5% floor earnings issue on loans moved from certain tax-exempt financings to taxable financings. She noted that ED's reviewers had raised the issue.. and had expressed concern about the growing number of loans in this particular category.

She said that in response to their concerns she had done some research already.. part of which included a call to Shelia Ryan - formerly with Nellie Mae. Shelia reminded Kristie that the Department had initially taken the position that loans moved from certain tax exempt financings to taxable financings had to carry the characteristics of the tax exempt financing to preclude holders from moving loans to avoid the ½ SAP characteristics of the tax exempt issue. Shelia recalls that the FFEL community attempted to convince the Department that while such an opinion might be to its advantage at the time - it might be to its disadvantage in another interest rate environment. The Department was not convinced.. and later issued the March 1986 DCL that re-enforced the contention that loans moved from certain tax exempt issues also carried the floor earnings characteristic of 9.5% if loans were then moved into the taxable financings.

Our conversation with Kristie on the 23rd further supported the belief that it would be legal for us to bill under a 9.5% floor for loans moved from certain tax exempt financings to taxable financings. Our meeting with her planned for either the 2nd or 3rd of January will be to further solidify that perception. In addition, we expect that she will want to discuss what ED can and should do about the on-going nature of their position.

---

As Gary and others have described, our meeting on the 3rd confirmed that from Kristie's perspective, the movement of certain loans from tax-exempt issues to taxable issues while retaining the 9.5% floor was not precluded. Given her awareness of the issues and her receptivity to our thoughts, we raised the issue of the possible frequency of the movement of loans through the tax-exempt financings to taxable financings. While there seemed to be common agreement that the DCL does not put limits timing, Kristie seemed most uncomfortable expressing an opinion that confirmed no limits on timing. As a result, we would expect the Department to focus on the timing issue even before they do a more studied analysis of the larger practice.

In that regard, the Department is clearly concerned about the practice but can't immediately preclude it given the March DCL. As Gary has suggested, the Department is very likely to consider ways to limit or control the activity but will first look carefully at a continuum of the effects on lenders/holders of both the issues of ½ SAP and the 9.5% floor. She acknowledged that the ½ SAP issue has had and may again have an adverse effect on lenders and that the current 9.5% floor opportunity may be balancing those losses. Kristie indicated interest also in the possible structural limits of the effects of the activity - given the need first to have tax-exempt financings, the nexus requirements of those financings as well as the fact that the pre '93 tax-exempt financings will expire in time. Simply, the opportunity posed by the March DCL is largely limited to tax-exempt secondary markets… for nexus loans.. for a limited period of time. Kristie indicated an interest in talking with Wall Street folks.. like Wozniak about the issue and its effects.

1

Confidential

Exhibit 47
Date 5-19-10
Julie Pell, RPR, CRR, CSR, CCR

N0124998

Kristie further noted that Bill Hansen is very aware of the issue and any change in ED policy will be vetted through his office.

2

# Exhibit 55

# CONFIDENTIAL

# FILED UNDER SEAL

## MEMORANDUM

TO:       File

FROM:     Gary Schleuger

DATE:     April 23, 2003

RE:       Meeting with Hill Staff and ED Staff re Floor Income Issues

On April 22, 2003, Mike Dunlap, Paul Tone and myself met with the following staff from the House Educations and the Workforce Committee: Paula Nowakowski and Kathleen Smith, and with the following staff from the FSA Division of the U.S. Department of Education: Terri Shaw, Debbie Price, Kristie Hansen and Jeff Baker.

The purpose of the meetings was to offer for discussion Nelnet's top three reauthorization proposals, and to explain our goal for paying for these proposals by eliminating the floor income currently earned by lenders/holders. The floor income sources offered to cover the costs of our reauthorization proposals are: (1) floor earnings resulting from the difference in timing of the reset of borrower and lender rates, and (2) the 9.5% floor on certain tax-exempt financings.

In each of these separate meetings, Mike gave a brief description of Nelnet's origins and development into the company that now exists. We then provided the staff with a synopsis of our three reauthorization priorities: (1) increased loan limits, (2) extended repayment terms, and (3) variable interest rates.

Following this discussion, Mike explained that Nelnet proposes that these HEA changes be paid for by eliminating the two sources of floor earnings noted above. We discussed the fact that the CBO has already scored the elimination of "interest rate reset" floor income at a savings to the government of roughly $12 Billion. Additionally, Mike estimated that the savings from the elimination of the 9.5% floor earnings would be in the multi-billions of dollars depending on the length of the scoring period. Mike explained that Nelnet might be in the position to benefit more than any other company from these floor earnings, but that we did not feel it was right – we could make hundreds of millions of dollars by running loans through this process, but there would be no added value being provided to students, families, schools or the financial aid programs in general. We readily agreed that there will be others in the industry that will be adamantly opposed to our proposal for the elimination of floor earnings.

As Mike stated, our legislative proposal for the 9.5% floor would preserve that floor only for loans that are currently held in the pre-93 financings. All other loans that have been moved through those financings would prospectively revert to their previous status. The change would immediately diminish the extraordinary spread on all outstanding loans that have been "tagged" since the practice began.



Exhibit 50
Date 5-14-10
Julie Pell, RPR, CRR, CSR, CCR

Paula and Kathleen expressed appreciation to us for coming forward with reauthorization proposals and also for a way to pay for them. They seemed intrigued by the offer to eliminate floor earnings, and asked that we work directly with them in drafting legislative language that could affect these changes. Gary will work with Kathleen on the legislative drafting.

ED staff was also please with the presentation and agreed to look further into the floor income issues. They understood the need to "fix" these issues through the legislative process, rather than the administrative process, so that savings could be scored by CBO and used to promote our reauthorization proposals. ED will take our proposals into consideration in developing their reauthorization document. Both Kristie and Jeff stated that the presentation of the materials was impressive and was greatly enhanced by having the in-person support of Nelnet's President/CEO. They suggested that we make the same presentation to Sally Stroup and Jeff Andrade in OPE. We have taken that suggestion under advisement.

Confidential

N0002188

# Exhibit 58

# CONFIDENTIAL

# FILED UNDER SEAL

**From:** Heimes, Terry
**Sent:** Thursday, July 01, 2004 6:31 PM
**To:** Munn, Bill
**Subject:** FW: 9.5% release - urgent review needed

fyi, CHANGE IN PLANS.  LOOKS LIKE WE MAY PUSH THIS OUT TOMORROW AM.  MAY WANT TO BE PREPARED FOR A CALL EARLY.  WHAT NUMBERS ETC CAN WE REACH YOU AT, IE. HOME, CELL ETC.

-----Original Message-----
From: Tone, Paul
To: Heimes, Terry; Kruger, Jim; Odom, Sheila; Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Noordhoek, Jeff; Martinez, Ed; Kaplan, Dan (PERRY); 'GTanenbaum@Cahill.com'; 'jlarish@cahill.com'
Sent: 7/1/2004 4:42 PM
Subject: Re: 9.5% release - urgent review needed

Very sorry to hear that....  Best to have our "helmets" ready...!

-----Original Message-----
From: Heimes, Terry <Terry.Heimes@nelnet.net>
To: Kruger, Jim <Jim.Kruger@nelnet.net>; Tone, Paul <paul.tone@nelnet.net>; Odom, Sheila <Sheila.Odom@nelnet.net>; Dunlap, Mike <Mike.Dunlap@nelnet.net>; Butterfield, Steve <stephen.butterfield@nelnet.net>; Watson, Cheryl <Cheryl.Watson@nelnet.net>; Noordhoek, Jeff <jeff.noordhoek@nelnet.net>; Martinez, Ed <ed.martinez@nelnet.net>; Kaplan, Dan (PERRY) <dkaplan@perrylawfirm.com>; ''GTanenbaum@Cahill.com' '
<GTanenbaum@Cahill.com>; ''jlarish@cahill.com' ' <jlarish@cahill.com>
Sent: Thu Jul 01 16:39:27 2004
Subject: RE: 9.5% release - urgent review needed

SEE MY ATTACHED COMMENTS.  BASED ON DISCUSSIONS WITH MIKE AND HIS DISCUSSIONS WITH GERALD TANENBAUM, WE DO NOT HAVE A CHOICE OR OPTION TO EXCLUDE THE ECONOMIC IMPACT.  THE REPORTING OF THE ECONOMIC IMPACT HAS MORE TO DO WITH SEC COMPLIANCE AS OPPOSED TO SHORT TERM GAIN.  I HAVE CAPITALIZED MY CHANGES.

Nelnet recognizes deferred income

(Lincoln, NE) — Today, Nelnet announced that, effective June 30, 2004, it has recognized deferred income related to student loan portfolios funded from the proceeds of tax-exempt bonds.

Based on provisions of the Higher Education Act of 1965, and related interpretations, education lenders may receive special allowance payments providing a 9.5% rate on loans previously financed with tax-exempt obligations issued prior to October 1, 1993.  Nelnet has received additional information clarifying its previously disclosed position and allowing the completion of the earnings process and recognition of the related income in the current and subsequent periods.
The RECOGNITION OF THE deferred income OF APPROXIMATELY $79 MILLION BEFORE TAX AT March 31, 2004, which was previously included in other liabilities on Nelnet's balance sheet, TOGETHER WITH THE ADDIONAL EARNINGS IN THE SECOND QUARTER ended June 30, 2004, WILL RESULT IN ADDITIONAL NET INCOME OF APPROXIMATELY 60-65 MILLION DURING THE CURRENT PERIOD.  The company does not expect THE IMPACT ON future PERIODS to be as significant as those recognized to date.

Recently named to the Russell 3000 index and awarded the Exceptional Performance designation by the U.S. Department of Education, Nelnet is one of the leading educational finance companies in the United States.
With over $12 billion in total assets, Nelnet originates in excess of $2 billion for itself and its service partners annually, and its servicing software is used by 35 clients, including Nelnet, to service over $49 billion in student loans. Nelnet ranks among the nation's leaders in terms of total student loan assets.

FOIA-CONFIDENTIAL TREATMENT REQUESTED BY NELNET, INC.



Exhibit 55
Date 5-19-10
Julie Perl, RPR, CRR, CSR, CCR

NNI 00137

Confidential

N0001137

itself and its service partners annually, and its servicing software is used by 35 clients, including Nelnet, to service over $49 billion in student loans. Nelnet ranks among the nation's leaders in terms of total student loan assets. Additional information is available at www.nelnet.net.
###
Nelnet offers a broad range of student loan and financial services and technology-based products, including student loan origination and lending, guarantee servicing, and a suite of software solutions. Our products are designed to simplify the student loan process by automating financial aid delivery, loan processing, and funds disbursement. Our services help to facilitate and streamline education finance for all involved in the industry, including student and parent borrowers, lenders, financial aid officers, and guaranty agencies, governmental agencies, servicers, and the capital markets.
(code #: nnif)

Sheila Odom
Corporate and Marketing Communications
402.458.2329
nelnetcommunications@nelnet.net

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00139

N0001139

Exhibit 59

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| From: | Martinez, Ed |
|---|---|
| Sent: | Friday, December 20, 2002 2:35 PM |
| To: | Pohl, Mike; Dunlap, Michael (UBT) |
| Cc: | Bottegal, Dave; Noordhoek, Jeff; Tone, Paul; Heimes, Terry; Kruger, Jim; Butterfield, Steve; Pierce, Dick (MAINE); Bouc, Don; 'tsabo@melmac.com'; Kern, Bud; Kaplan, Dan (PERRY); Watson,Cheryl -nelnet.net |
| Subject: | RE: 9.5 floor loans from te to taxable |

If Don and Paul need me to assist, I am available.

-----Original Message-----
| From: | mike.pohl@verizon.net [mailto:mike.pohl@verizon.net] |
|---|---|
| Sent: | Friday, December 20, 2002 2:35 PM |
| To: | Dunlap, Michael (UBT) |
| Cc: | Bottegal, Dave; Noordhoek, Jeff; Martinez, Ed; Tone, Paul; Heimes, Terry; Kruger, Jim; Butterfield, Steve; Pierce, Dick (MAINE); Bouc, Don; tsabo@melmac.com; Kern, Bud; Kaplan, Dan (PERRY); Watson,Cheryl -nelnet.net |
| Subject: | Re: 9.5 floor loans from te to taxable |

Don and Terry I believe you have talked to mike about this issue. It appears
that mike wants to have Don and Paul go to the department and get either a
written letter or verbal response. wanted to get group together to discuss when
don and paul will be going (sooner the better) and start the ball running
internally at the same time. pohlcat
Mike Dunlap wrote:

> Has anyone here given a deposition besides me??
>
> -----Original Message-----
> From: dave.bottegal@nelnet.net [mailto:dave.bottegal@nelnet.net]
> Sent: Wednesday, December 18, 2002 2:16 PM
> To: mike.pohl@verizon.net; jeff.noordhoek@nelnet.net;
> ed.martinez@nelnet.net; paul.tone@nelnet.net; Terry.Heimes@nelnet.net;
> Jim.Kruger@nelnet.net; Mike.Dunlap@ubt.com;
> stephen.butterfield@nelnet.net; rpierce@mesfoundation.com;
> Don.Bouc@nelnet.net; tsabo@melmac.com; bud.kern@nelnet.net;
> dkaplan@perrylawfirm.com
> Cc: cheryl.watson@nelnet.net
> Subject: RE: 9.5 floor loans from te to taxable
>
> Folks
>
> This shouldn't take much discussion. Do it. I'd rather make millions
> rather than spend millions fighting others doing it. Roll.
>
> -----Original Message-----
> From:  mike.pohl@verizon.net [mailto:mike.pohl@verizon.net] Sent:
> Wednesday, December 18, 2002 3:11 PM
> To:    Noordhoek, Jeff; Martinez, Ed; Tone, Paul; Heimes, Terry; Kruger,
> Jim; Dunlap, Michael (UBT); Butterfield, Steve; Pierce, Dick (MAINE); Bouc,
> Don; tsabo@melmac.com; Kern, Bud; Bottegal, Dave; Kaplan, Dan (PERRY)
> Subject:    9.5 floor loans from te to taxable
>
> Noordy and I have put together a white paper laying out a potential
> strategy and discussion points regarding loans that are purchased with
> new money (taxable) continue to qualify for special allowance calculated
> using the formula applicable at the time the loan was made. Please see
> below
>
> I have setup a call at 5:00 est tomorrow Dec 19 to discuss.
> 303-696-3699 ext 0  under mike pohl Please let me know if this is not a

1



Confidential

N0120999

> good time and we could reset if for friday.  We believe there is a real
> opportunity here and our objective tomorrow is to discuss points and
> layout a strategy as soon as possible.  As most of you know, the DOE
> could easily come back shortly changing the language/rules and all would
> be lost.
>
> << File: taxexstrat.doc >>
> ***************************************************************
> The information contained in this message is
> confidential proprietary property of Nelnet, Inc. and
> its affiliated companies (Nelnet) and is intended
> for the recipient only. Any reproduction, forwarding,
> or copying without the express permission of Nelnet
> is strictly prohibited. If you have received this
> communication in error, please notify us immediately
> by replying to this e-mail.
> ***************************************************************
> --------------------------------------------------------------------------------
> ---------------------
>
> The information in this email is confidential and if you are not the
> intended recipient be advised that you have received this email in error and
> any use, dissemination, forwarding, printing or copying of it is strictly
> prohibited. If you have received this email in error you should notify the
> sender by return email and delete this message from your computer system. It
> is the responsibility of the addressee to scan this mail and any attachments
> for computer viruses or other defects. The sender does not accept liability
> for any loss or damage of any nature, however caused, which may result
> directly or indirectly from this email or any file attached.
>
> --------------------------------------------------------------------------------
> ---------------------

<< File: ENVELOPE.TXT >>

2

# Exhibit 60

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| | |
|---|---|
| **From:** | Martinez, Ed |
| **Sent:** | Wednesday, January 08, 2003 9:51 AM |
| **To:** | Noordhoek, Jeff; Tone, Paul; Bouc, Don; Schleuger, Gary; Dunlap, Michael (UBT) |
| **Subject:** | RE: 9.5% Floor Opinion |

I think we did decide to do that yesterday especially if the opinion were to cost $5,000.

-----Original Message-----
| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Wednesday, January 08, 2003 10:47 AM |
| **To:** | Tone, Paul; Bouc, Don; Martinez, Ed; Schleuger, Gary; Dunlap, Michael (UBT) |
| **Subject:** | RE: 9.5% Floor Opinion |

I say do it for the belt and suspenders protection.

-----Original Message-----
| | |
|---|---|
| **From:** | Tone, Paul |
| **Sent:** | Tuesday, January 07, 2003 3:16 PM |
| **To:** | Bouc, Don; Martinez, Ed; Schleuger, Gary; Noordhoek, Jeff; Dunlap, Michael (UBT) |
| **Subject:** | 9.5% Floor Opinion |

John will do the opinion for $5,000

1



Confidential

N0125008

Exhibit 61

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| From: | Scott, Dana |
|---|---|
| Sent: | Thursday, February 13, 2003 7:14 AM |
| To: | Aversman, Carol |
| Cc: | Kruger, Jim |
| Subject: | RE: Sheep Dipping Strategy |

Yes, I have the transfers that will run on 2/14 backdated to 1/1/03, if this is not correct, please let me know so that I can have this changed.

Thanks.

-----Original Message-----
| From: | Aversman, Carol |
|---|---|
| Sent: | Wednesday, February 12, 2003 6:21 PM |
| To: | Scott, Dana |
| Cc: | Kruger, Jim |
| Subject: | FW: Sheep Dipping Strategy |

Dana
Is the transfer described in Phase 1, #3, that will happen this Friday being backdated to 1/1/03?
And, if not, should it (Jim?)

Thanks.
Carol

-----Original Message-----
| From: | Kruger, Jim |
|---|---|
| Sent: | Wednesday, February 12, 2003 3:11 PM |
| To: | Pohl, Mike; Smitterberg, Hannah; Butterfield, Steve; Heimes, Terry; Noordhoek, Jeff |
| Cc: | Aversman, Carol; Scott, Dana |
| Subject: | Sheep Dipping Strategy |

Attached is a draft document which outlines the strategy and steps to implement the strategy related to the 9.50% floor issue. This is the first draft and it still need some work but I think it summarizes most of the issues and prioritizes such issues. Lets discuss in the near future.

<< File: 9.5%floorREV.doc >>

1



Confidential

N0102843

# Exhibit 62

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| From: | Noordhoek, Jeff |
|---|---|
| Sent: | Wednesday, March 05, 2003 9:47 AM |
| To: | Butterfield, Steve; Dunlap, Mike; Heimes. Terry; Kruger, Jim; Pohl, Mike; Smitterberg, Hannah; Watson, Cheryl |
| Subject: | memo/letter to Christie Hanson |

All bankers who are helping us to achieve the 9.5% tagging issue are coming back with similar questions about "Headline risk" and if it sounds too good too be true it usually is, etc.

To help further protect Nelnet from some future DOE staff questioning our practices, I have asked Ed to draft a letter to Christie Hanson at the DOE describing the meeting they had including the topic of 9.5% floors and what was said by both parties and to have a signature line that she agrees with the what was discussed at the meeting. This would be for our files if the DOE ever came back and tried to take back any floor earnings.

Ed will draft it and circulate internally so we can debate the potential ramifications of sending it to DOE. My goal would not to wait to get it to go forward, but hopefully get it eventually to paper our files.

This letter will not be an approval by the DOE to do what we want just an acknowledgement of what they talked about on how the law was written and can be interpreted. Hopefully this will not take a long time to get back from them and will give some comfort to our bankers.

Noordy

1



Confidential

N0118352

Exhibit 63

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Scott, Dana |
| **Sent:** | Wednesday, April 16, 2003 9:55 AM |
| **To:** | Kruger, Jim |
| **Subject:** | 9 1/2 Floor Transfers |

On 1/17 we swapped approximately $57M between NEBHELP 93A and 93A5A6 (backdated to 1/1/03)

On  1/24 we swapped approximately $8M between MELMAC 94-A and 99T (backdated to 1/1/03)

On 2/14 we swapped approximately $24M between NEBHELP 93A and 85A

Let me know if you need any additional information on these.

Thanks.

**Dana Scott**
**Nelnet**
**(402)458-2307**

1

EXHIBIT

Heimes (17)
3.9.10 mv

Confidential

N0119109

Exhibit 64

# CONFIDENTIAL

# FILED UNDER SEAL

Date

[Wacovia Letter]
[address]
[address]

Dear_____

The following is a confidential proposal for your consideration. This letter is for discussion purposes only and is subject to credit approval, due diligence and documentation. This does not represent a commitment by Nelnet, Inc., or any of its affiliates. Further, this letter is not intended to define or describe all of the terms and conditions of the proposed transactions described herein. Where discrepancies between this summary and final documentation exist, the final documentation shall govern. Each party acknowledges that certain information provided in connection with the proposed transactions, including this letter, is confidential. Each party agrees that it will not disclose such information to any other party except as required by its regulators, or by its legal and/or accounting advisors, and as otherwise required by law.

Nelnet routinely acquires and finances student loan assets in the ordinary course of business. As part of our ongoing operations, we use a variety of financing vehicles to fund loans, including certain tax-exempt obligations issued prior to October 1, 1993. Loans financed or previously financed with proceeds from the issuance of tax-exempt bonds prior to October 1, 1993 effectively qualify for a 9.5% floor interest rate through certain Special Allowance Payment ("SAP") provisions of the Higher Education Act (the "Act") and related interpretations by the U.S. Department of Education (the "Department").

We believe that we may be entitled to receive 9.5% floor SAP on loans that we periodically finance and refinance with these tax-exempt obligations. We have asked the Department to acknowledge the process we are using to refinance certain loans and confirm that we are allowed to recognize the income. To date we have deferred recognition of this excess interest income generated based on the 9.5% floor, pending satisfactory resolution of this issue.

Nelnet's capacity to finance and refinance loans using tax-exempt obligations is currently greater than the supply of loans being generated through its existing sources. Accordingly, Nelnet wishes to generate additional loan supply to supplement its regular business operations through acquisitions of loan portfolios from certain strategic partners. The proposed transactions described below will consist of a loan purchase agreement with Nelnet Education Loan Funding Inc., a special purpose lending subsidiary of Nelnet, and a Deferred Premium Agreement with Nelnet Inc.

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.



NNI 00457

Confidential

N0001457

Insert page header

*Loan Purchase Agreement*: Seller will enter into a standard Loan Purchase Agreement ("LPA") with Nelnet Education Loan Funding, Inc. for the sale of the subject portfolio. Significant provisions of the LPA would include:

    a) Portfolio balance of at least $_____
    b) purchase price of 103.5%, subject to minimum abi and borrower incentive criteria
    c) purchase date of May 1, 2004
    d) standard representations and warranties for transactions of this nature

*Deferred Premium Agreement*: Seller will enter into a Deferred Premium Agreement with Nelnet, Inc. under which Nelnet Inc. will pay a Deferred Premium to the seller on the subject portfolio based on the following terms and conditions:

    a)    Calculation of Deferred Premium shall be based on the period beginning on the later of sixty (60) days following the purchase date as defined in the LPA or such date as Nelnet is able to refinance the subject portfolio with tax-exempt obligations issued prior to October 1, 1993 (the "Start Date") and ending on the sooner of (i) thirty-six (36) months from the Start Date or (ii) such date as either a material change in law reduces or eliminates the 9.5% floor, or interest rates increase to a level where the 9.5% SAP formula would result in a lower SAP than if the loans had not been previously funded by pre-1993 debt obligations.

    b)    Deferred Premium shall be equal to fifty percent (50%) of the actual excess spread between the 9.50% SAP and the weighted average borrower interest rate of the subject portfolio adjusted for borrower incentives.

    c)    Deferred Premium due shall be reduced by direct costs incurred by Nelnet associated with the preparation of the subject portfolio to allow for the financing of the portfolio with tax-exempt debt issued prior to October 1, 1993. Such costs to include deconversion or transfer fees and costs associated with retention of appropriate guarantee agreements.

    d)    Conditions Precedent -- No payments will be due under the Deferred Premium Agreement unless and until:

        (i)    Nelnet can refinance subject portfolio with proceeds of tax-exempt obligations issued prior to October 1, 1993.

        (ii)    Such time as Nelnet receives affirmative acknowledgement and approval of the process from the Department or the issue is further clarified in legislation to Nelnet's reasonable satisfaction. Given the complex nature of the transfers, the process and the fact that application of provisions of the Act are subject to interpretation, Nelnet will not recognize the income and

FOIA-CONFIDENTIAL TREATMENT REQUESTED BY NELNET, INC.

NNI 00458

N0001458

Insert page header

the Deferred Premium will not be due to seller until such events occur.

If the foregoing preliminary terms meet with your approval, please sign below to indicate the same in order that we may proceed with negotiation of the more detailed documents. We look forward to your response.

Sincerely,

_____
_____

Agreed and Acknowledged

[Seller]

By: _____

Name: _____

Title: _____

Date: _____

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00459

Exhibit 65

# CONFIDENTIAL

# FILED UNDER SEAL

## Projected Additional Earnings from "Tagging" Project

| | Netset Portfolio 12/31/2002 | % of total | Wtd Ave Int Rate |
|---|---|---|---|
| Weighted Average Interest Rate-Variable Rate Loans | $ 5,400,000,000 | 63.53% | 4.462% |
| Weighted Average Interest Rate-Fixed Rate Loans | $ 3,100,000,000 | 36.47% | 6.924% |
| | $ 8,500,000,000 | 100.000% | 5.34% |

Fiscal Earnings Rate: 9.900%
Estimated Excess Spread from Tagging: 4.176%

| Effective Date | Authority/Bond Used to Tag Losses | Authority/Bond Funding Losses | LOW Amount Tagged | MODERATE Amount Tagged | HIGH Amount Tagged | Estimated Spread Increase | # of Months | 2003 Earnings | LOW Impact in 2003 | MODERATE Impact in 2003 | HIGH Impact in 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/2003 | NEBHELP 1985A | NEBHELP 1993A | $ 65,000,000 | $ 65,000,000 | $ 65,000,000 | 4.176% | 12 | | $ 2,714,652 | $ 2,714,652 | $ 2,714,652 |
| 2/1/2003 | MEL-MAC 1994A | MEL-MAC 1999T | $ 15,000,000 | $ 15,000,000 | $ 15,000,000 | 4.176% | 12 | | $ 626,458 | $ 626,458 | $ 626,458 |
| 2/14/2003 | NEBHELP 1985A | NEBHELP 1991A | $ 25,000,000 | $ 25,000,000 | $ 25,000,000 | 4.176% | 10 | | $ 870,081 | $ 870,081 | $ 870,081 |
| 4/1/2003 | NEBHELP 1985A | NEBHELP Warehouse | $ - | $ 50,000,000 | $ 100,000,000 | 4.176% | 9 | | $ - | $ 1,566,146 | $ 3,132,291 |
| 5/1/2003 | NEBHELP 1985A | NEBHELP Warehouse | $ 75,000,000 | $ 125,000,000 | $ 250,000,000 | 4.176% | 8 | | $ 2,088,194 | $ 3,480,324 | $ 6,960,647 |
| 6/1/2003 | NEBHELP 1985A | NEBHELP Warehouse | $ 75,000,000 | $ 135,000,000 | $ 250,000,000 | 4.176% | 7 | | $ 1,827,170 | $ 3,045,283 | $ 6,090,566 |
| 7/1/2003 | NEBHELP 1985A | NEBHELP Warehouse | $ 75,000,000 | $ 135,000,000 | $ 250,000,000 | 4.176% | 6 | | $ 1,566,146 | $ 2,610,243 | $ 5,220,485 |
| 8/1/2003 | NEBHELP 1985A | ?? | $ 75,000,000 | $ 125,000,000 | $ 250,000,000 | 4.176% | 5 | | $ 1,305,121 | $ 2,175,202 | $ 4,350,404 |
| 9/1/2003 | NEBHELP 1985A | ?? | $ 75,000,000 | $ 125,000,000 | $ 250,000,000 | 4.176% | 4 | | $ 1,044,097 | $ 1,740,162 | $ 3,480,324 |
| 10/1/2003 | NEBHELP 1985A | ?? | $ 75,000,000 | $ 125,000,000 | $ 250,000,000 | 4.176% | 3 | | $ 783,073 | $ 1,305,121 | $ 2,610,243 |
| 11/1/2005 | NEBHELP 1985A | ?? | $ 75,000,000 | $ 135,000,000 | $ 250,000,000 | 4.176% | 2 | | $ 522,049 | $ 870,081 | $ 1,740,162 |
| 12/1/2003 | NEBHELP 1985A | ?? | $ 75,000,000 | $ 135,000,000 | $ 250,000,000 | 4.176% | 1 | | $ 261,024 | $ 435,040 | $ 870,081 |
| Total Losses Tagged | | | $ 705,000,000 | $ 1,155,000,000 | $ 2,265,000,000 | | | 2003 Earnings | $ 13,666,065 | $ 21,438,793 | $ 38,666,394 |
| | | | | | | | | Annualized Earnings | $ 29,443,537 | $ 48,337,284 | $ 92,885,341 |

NOTE: This analysis does not consider the impact of paydowns on the portfolio which would reduce the estimated earnings.

Confidential

PENGAD 800-631-6989

EXHIBIT

NP0097043

Exhibit 66

# CONFIDENTIAL

# FILED UNDER SEAL

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### August 31, 2003

| | Actual/Projected Principal Balance Tagged | | |
|---|---|---|---|
| | **Monthly** | **Quarterly** | **Yearly** |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| **1st Quarter Total** | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| **2nd Quarter Total** | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September, projected | 200,000,000.00 | | |
| **3rd Quarter Total - estimate** | | 446,664,992.27 | |
| October, projected | 250,000,000.00 | | |
| November, projected | 200,000,000.00 | | |
| December, projected | 200,000,000.00 | | |
| **4th Quarter Total - estimate** | | 650,000,000.00 | |
| **TOTAL LOANS PROJECTED FOR 950 TAGGING** | | 850,000,000.00 | |
| **FY 2003 TOTAL*** | | | 2,036,729,853.91 |

*Includes projected amounts for the month of September and the 4th quarter.

**ACTUAL LOANS TAGGED - 8/31/03**  1,186,729,853.91

**Consolidation Loans Available for Tagging as of 8/31/2003**  247,318,733.79

**Projected Consolidation Originations for 2003***
| | |
|---|---|
| September | 181,150,000.00 |
| October | 198,100,000.00 |
| November | 154,900,000.00 |
| December | 188,400,000.00 |
| | 722,550,000.00 |

*excludes estimated ineligible guarantors per BOA Takeout

## Nelnet Project 950
### Tagged Loans by Financing and Loan Type
### as of 8/31/03

| **NELF FINANCING** | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | 1,264,976.92 |
| Plus/SLS | 400,902.71 |
| Consolidation | 221,020,832.05 |
| **NELF BOA Total** | 222,686,714.68 |
| **NELF RBC Warehouse** | |
| Stafford | 47,166,400.28 |
| Consolidation | 23,523,936.89 |
| **NELF RBC Total** | 70,690,337.17 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 62,263,966.53 |
| Plus/SLS | 118,378.22 |
| Consolidation | 565,472.97 |
| **NELF 1993A Total** | 62,947,817.72 |
| **NELF 2003-1 Securitization** | |
| Stafford | 138,794,384.99 |
| Consolidation | 653,497,936.65 |
| **NELF 2003-1 Total** | 792,292,321.64 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 249,489,731.72 |
| PLUS/SLS | 519,280.93 |
| Consolidation | 898,608,178.56 |
| **NELF TOTAL AS OF 8/31/2003** | 1,148,617,191.21 |

| **MELMAC FINANCING** | |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 1,712,334.00 |
| PLUS/SLS | 100,889.81 |
| Consolidation | 5,831,865.74 |
| **MELMAC 1999 Total AS OF 8/31/2003** | 7,645,089.55 |

| **NELNET FINANCINGS COMBINED** | |
|---|---|
| Stafford | 251,202,065.72 |
| PLUS/SLS | 620,170.74 |
| Consolidation | 904,440,044.30 |
| **COMBINED TOTALS** | 1,156,262,280.76 |



EXHIBIT

Confidential

**Nelnet Project 950 Actual Tagged Loans**
**Monthly, Quarterly and Yearly Summary**
October 27, 2003

| | Principal Monthly | Principal Quarterly | Principal Yearly | Interest Monthly | Interest Quarterly | Interest Yearly | P&I Combined Monthly | P&I Combined Quarterly | P&I Combined Yearly |
|---|---|---|---|---|---|---|---|---|---|
| January | 65,173,121.91 | | | 1,004,916.47 | | | 66,178,032.38 | | |
| February | 23,141,360.22 | | | 648,082.42 | | | 24,990,482.64 | | |
| March | | | | 0.00 | | | 0.00 | | |
| **1st Quarter Total** | | 89,114,502.13 | | | 1,653,992.89 | | | 90,768,495.02 | |
| April | 68,149,171.97 | | | 2,540,188.43 | | | 70,689,360.40 | | |
| May | 304,681,952.61 | | | 3,243,563.99 | | | 308,125,483.70 | | |
| June | 447,919,236.93 | | | 2,265,736.64 | | | 450,184,593.57 | | |
| **2nd Quarter Total** | | 850,950,359.51 | | | 8,049,458.16 | | | 858,999,817.67 | |
| July | 50,057,477.67 | | | 721,479.06 | | | 50,778,956.73 | | |
| August | 196,113,514.60 | | | 785,141.30 | | | 196,898,655.90 | | |
| September week 1 | 50,302,462.14 | | | 153,487.06 | | | 50,455,949.20 | | |
| **3rd Quarter Total** | | 296,967,454.41 | | | 1,194,107.42 | | | 296,161,591.83 | |
| October | | | | | | | | | |
| November | | | | | | | | | |
| December | | | | | | | | | |
| **4th Quarter Total** | | | | | | | | 0.00 | |
| **YEAR TO DATE 2003 TOTAL** | | | 1,237,032,316.05 | | | 10,897,558.47 | | | 1,247,929,874.52 |

**Nelnet Project 950**
**Tagged Loans by Financing and Loan Type as of 9/30/03**

| NELF FINANCING | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| **NELF BOA Warehouse** | | | |
| Stafford | | | |
| PlusSLS | | | |
| Consolidation | 1,264,979.92 | 12,674.06 | 1,277,653.98 |
| **NELF BOA Total** | | | |
| **NELF RBC Warehouse** | | | |
| Stafford | 409,902.71 | 1,260.23 | 402,162.94 |
| Consolidation | 221,020,802.05 | 1,077,033.29 | 222,097,865.33 |
| **NELF RBC Total** | 222,680,714.68 | 1,030,967.57 | 223,711,682.25 |
| **NELF 1993A Taxable Financing** | | | |
| Stafford | 47,166,400.28 | 1,086,657.52 | 48,252,057.80 |
| PlusSLS | 23,523,936.89 | 241,001.95 | 23,765,838.84 |
| Consolidation | | | |
| **NELF 1993A Total** | 70,690,337.17 | 1,327,559.47 | 72,017,896.64 |
| **NELF 2003-1 Securitization** | | | |
| Stafford | 62,265,968.53 | 1,234,621.32 | 63,489,587.85 |
| PlusSLS | 118,378.22 | 3,042.00 | 121,420.22 |
| Consolidation | 565,472.97 | 10,315.67 | 575,788.64 |
| **NELF 1993A Total** | 62,947,817.72 | 1,237,978.99 | 64,185,796.71 |
| **NELF FINANCINGS COMBINED** | | | |
| Stafford | 139,794,384.99 | 3,429,540.14 | 142,223,925.13 |
| PlusSLS | 653,497,936.65 | 4,087,574.71 | 657,585,511.36 |
| Consolidation | 792,292,321.54 | 7,517,114.85 | 799,809,436.49 |
| **NELF 2003-1 Total** | | | |
| **NELF FINANCINGS COMBINED** | | | |
| Stafford | 249,469,731.72 | 5,792,493.04 | 255,242,224.76 |
| PlusSLS | 518,260.63 | 4,302.23 | 523,083.16 |
| Consolidation | 698,928,178.56 | 6,416,825.61 | 904,025,004.17 |
| **NELF TOTAL AS OF 9/30/2003** | 1,148,617,191.21 | 11,173,420.88 | 1,159,790,812.09 |

**MELMAC FINANCING**

| | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| **MELMAC 1999 Taxable Financing** | | | |
| Stafford | 1,712,354.00 | 20,674.60 | 1,733,008.60 |
| PLUS/SLS | 100,889.81 | 3,319.12 | 104,208.93 |
| Consolidation | 5,831,955.74 | 116,427.12 | 5,948,382.86 |
| **MELMAC 1999 Total AS OF 9/30/2003** | 7,644,999.55 | 140,420.84 | 7,785,610.39 |

**NELNET FINANCINGS COMBINED**

| | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| Stafford | 251,202,265.72 | 5,773,187.64 | 256,975,233.36 |
| PLUS/SLS | 630,170.74 | 7,621.35 | 637,792.09 |
| Consolidation | 904,440,044.30 | 5,533,259.73 | 909,973,397.03 |
| **COMBINED TOTALS** | 1,156,352,080.76 | 11,314,041.72 | 1,167,576,322.49 |

**Consolidation Loans Available for Tagging as of 9/30/2003    247,318,733.79**

**Projected Consolidation Originations for 2003***

| | |
|---|---|
| October | 198,100,000.00 |
| November | 154,000,000.00 |
| December | 188,400,000.00 |

| | |
|---|---|
| September | 200,000,000.00 * |
| October | 200,000,000.00 * |
| November | 200,000,000.00 * |
| December | 200,000,000.00 * |
| | 850,000,000.00 * |

*excludes estimated ineligible guarantees per BOA Takeout

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### October 31, 2003

| | Actual/Projected Principal Balance Tagged | | |
|---|---|---|---|
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| 1st Quarter Total | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| 2nd Quarter Total | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.68 | | |
| 3rd Quarter Total | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November, projected** | 300,000,000.00 | | |
| December, projected** | 200,000,000.00 | | |
| 4th Quarter Total - estimate | | 688,428,670.70 | |
| TOTAL LOANS PROJECTED FOR 950 TAGGING** | | | 500,000,000.00 |
| FY 2003 TOTAL* as of 10/31/03 | | | 2,075,852,567.29 |

*includes projected amounts for the months of November and December

**These projections are based on a 30-60 day extension of the Standby Letter of Credit, allowing for CSLP guaranteed loans to be tagged.

Consolidation Loans Available for Tagging as of 10/31/2003

319,871,025.75

Projected Consolidation Originations for 2003*

| November | 260,000,000.00 |
|---|---|
| December | 260,000,000.00 |
| | 520,000,000.00 |

*excludes estimated ineligible guarantors per BOA Takeout

## Nelnet Project 950
### Tagged Loans by Financing and Loan Type
### as of 10/31/03

| NELF FINANCING | Current Principal Balance |
|---|---|
| NELF BOA Warehouse | |
| Stafford | 1,246,141.04 |
| Plus/SLS | 363,236.49 |
| Consolidation | 471,018,105.42 |
| NELF BOA Total | 472,627,482.95 |
| NELF RBC Warehouse | |
| Stafford | 44,994,329.15 |
| Consolidation | 23,340,623.17 |
| NELF RBC Total | 68,334,952.32 |
| NELF 1993A Taxable Financing | |
| Stafford | 57,611,186.13 |
| Plus/SLS | 109,943.60 |
| Consolidation | 561,015.22 |
| NELF 1993A Total | 58,282,144.95 |
| NELF 2003-1 Securitization | |
| Stafford | 132,023,252.25 |
| Consolidation | 790,506,567.43 |
| NELF 2003-1 Total | 922,529,819.68 |
| NELF FINANCINGS COMBINED | |
| Stafford | 235,874,908.57 |
| PLUS/SLS | 473,180.09 |
| Consolidation | 1,285,426,311.24 |
| NELF TOTAL AS OF 9/30/2003 | 1,521,774,399.90 |
| MELMAC FINANCING | |
| MELMAC 1999 Taxable Financing | |
| Stafford | 1,597,664.07 |
| PLUS/SLS | 99,194.71 |
| Consolidation | 5,686,525.42 |
| MELMAC 1999 Total AS OF 8/31/2003 | 7,383,384.20 |
| NELNET FINANCINGS COMBINED | |
| Stafford | 237,472,572.64 |
| PLUS/SLS | 572,374.80 |
| Consolidation | 1,291,112,836.66 |
| COMBINED TOTALS | 1,529,157,784.10 |

Confidenti

.15586-2

Case 1:07-cv-00960-CMH-JFA  Document 1040-3  Filed 10/04/24  Page 51 of 153 PageID# 33952

## Nelnet Project 950 Actual Tagged Loans
### Monthly, Quarterly and Yearly Summary
### November 30, 2003

| | Principal | | | Interest | | | Principal and Interest Combined | | |
|---|---|---|---|---|---|---|---|---|---|
| | Monthly | Quarterly | Yearly | Monthly | Quarterly | Yearly | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | | 1,004,962.27 | | | 66,178,082.38 | | |
| February | 23,941,380.22 | | | 648,982.42 | | | 24,590,462.64 | | |
| March | | | | | | | 0.00 | | |
| 1st Quarter Total | | 89,114,502.13 | | | 1,653,992.69 | | | 90,768,495.02 | |
| April | 98,149,171.97 | | | 2,540,196.43 | | | 100,689,340.40 | | |
| May | 304,681,950.61 | | | 3,243,533.09 | | | 305,124,483.70 | | |
| June | 447,919,236.93 | | | 2,265,726.64 | | | 450,184,963.57 | | |
| 2nd Quarter Total | | 850,950,359.51 | | | 8,049,456.16 | | | 856,999,817.67 | |
| July | 50,551,477.87 | | | 225,479.06 | | | 50,776,956.73 | | |
| August | 196,113,514.60 | | | 785,141.30 | | | 196,898,655.90 | | |
| September | 200,694,042.68 | | | 735,660.96 | | | 201,429,703.64 | | |
| 3rd Quarter Total | | 447,359,034.95 | | | 1,746,281.32 | | | 449,105,316.27 | |
| October | 188,428,670.70 | | | 672,555.53 | | | 189,101,226.23 | | |
| November | | | | | | | | | |
| December | | | | | | | | | |
| 4th Quarter Total | | 188,428,670.70 | | | 672,555.53 | | | 189,101,226.23 | |
| YEAR TO DATE 2003 TOTAL | | | 1,575,852,567.29 | | | 12,122,287.90 | | | 1,587,974,855.19 |

### Nelnet Project 950
### Tagged Loans by Financing and Loan Type as of 10/31/03

| NELF FINANCING | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| NELF BOA Warehouse | | | |
| Stafford | 1,248,141.04 | 14,374.85 | 1,260,515.89 |
| PLUS/SLS | 363,236.49 | 1,000.22 | 364,236.71 |
| Consolidation | 471,016,105.42 | 2,189,297.08 | 473,207,402.50 |
| NELF BOA Total | 472,627,482.95 | 2,204,672.15 | 474,832,155.10 |
| NELF RBC Warehouse | | | |
| Stafford | 44,994,328.15 | 1,913,431.11 | 46,907,760.26 |
| Consolidation | 23,340,623.17 | 255,771.43 | 23,596,394.60 |
| NELF RBC Total | 68,334,963.32 | 1,269,202.54 | 69,604,155.86 |
| NELF 1993A Taxable Financing | | | |
| Stafford | 57,611,186.13 | 1,130,662.73 | 58,741,848.86 |
| PLUS/SLS | 109,945.80 | 2,097.46 | 112,041.06 |
| Consolidation | 561,015.22 | 11,832.76 | 572,847.98 |
| NELF 1993A Total | 58,280,144.95 | 1,144,592.95 | 59,425,737.90 |
| NELF 2003-1 Securitization | | | |
| Stafford | 132,023,252.25 | 3,244,215.13 | 135,267,467.38 |
| Consolidation | 790,506,967.43 | 5,141,915.98 | 795,648,483.41 |
| NELF 2003-1 Total | 922,505,619.68 | 8,386,131.11 | 930,915,950.79 |
| NELF FINANCINGS COMBINED | | | |
| Stafford | 235,871,936.67 | 5,402,933.82 | 241,277,592.39 |
| PLUS/SLS | 473,180.09 | 3,097.68 | 476,277.77 |
| Consolidation | 1,285,426,311.24 | 7,599,617.25 | 1,293,025,128.49 |
| NELF TOTAL AS OF 10/31/2003 | 1,521,774,399.90 | 13,004,586.76 | 1,534,778,986.65 |
| MELMAC FINANCING | | | |
| MELMAC 1998 Taxable Financing | | | |
| Stafford | 1,597,664.07 | 18,538.53 | 1,616,202.60 |
| PLUS/SLS | 99,194.71 | 3,024.82 | 102,219.53 |
| Consolidation | 5,696,535.42 | 105,782.08 | 5,782,317.50 |
| MELMAC 1998 Total AS OF 10/31/2003 | 7,393,394.20 | 137,345.43 | 7,530,739.63 |
| NELNET FINANCINGS COMBINED | | | |
| Stafford | 237,472,572.64 | 5,421,222.35 | 242,893,794.99 |
| PLUS/SLS | 572,374.80 | 6,122.50 | 578,497.30 |
| Consolidation | 1,291,112,836.66 | 7,704,609.33 | 1,298,817,445.99 |
| COMBINED TOTALS | 1,529,167,784.10 | 13,131,954.18 | 1,542,289,738.28 |

Consolidation Loans Available for Tagging as of 10/31/2003  319,371,026.75

Projected Consolidation Originations for 2003*

| | |
|---|---|
| November | 280,000,000.00 |
| December | 520,000,000.00 |

*Excludes estimated ineligible guarantees per BOA Takeout

Projected 950 Tagging for 2003*

| | | |
|---|---|---|
| November | 300,000,000.00 ; | 200,000,000.00 |
| December | 500,000,000.00 ; | 200,000,000.00 |

*Principal and Interest Combined

These projections are based on a 30-60 day extension of the Standby Letter of Credit, allowing for CSU guaranteed loans to be tagged.

# Nelnet Project 950 Actual Tagged Loans
## Monthly, Quarterly and Yearly Summary
### December 31, 2003

| | Principal | | | Interest | | | Principal and Interest Combined | | |
|---|---|---|---|---|---|---|---|---|---|
| | Monthly | Quarterly | Yearly | Monthly | Quarterly | Yearly | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | | 1,034,910.47 | | | 66,178,032.38 | | |
| February | 23,941,980.22 | | | 649,092.42 | | | 24,590,462.64 | | |
| March | | | | | | | 0.00 | | |
| 1st Quarter Total | | 89,114,502.13 | | | 1,653,992.89 | | | 90,768,495.02 | |
| April | 98,149,171.97 | | | 2,540,168.43 | | | 100,689,340.40 | | |
| May | 304,881,950.61 | | | 3,243,533.09 | | | 308,125,483.70 | | |
| June | 447,919,226.93 | | | 2,265,756.64 | | | 450,184,983.57 | | |
| 2nd Quarter Total | | 850,950,359.51 | | | 8,049,458.16 | | | 858,999,817.67 | |
| July | 90,551,477.67 | | | 225,479.06 | | | 90,776,956.73 | | |
| August | 196,113,514.60 | | | 785,141.30 | | | 196,898,655.90 | | |
| September | 200,094,042.88 | | | 735,660.96 | | | 201,429,703.84 | | |
| 3rd Quarter Total | | 447,359,034.95 | | | 1,746,281.32 | | | 449,105,316.27 | |
| October | 188,028,670.70 | | | 672,555.53 | | | 188,701,226.23 | | |
| November | 289,756,911.08 | | | | | | 289,756,911.08 | | |
| December | 198,955,045.57 | | | | | | 198,955,045.57 | | |
| 4th Quarter Total | | 667,040,627.35 | | | 672,555.53 | | | 687,713,182.88 | |
| YEAR TO DATE 2003 TOTAL | | | 2,074,464,523.94 | | | 12,122,287.90 | | | 2,086,586,811.84 |

## Nelnet Project 950
### Tagged Loans by Financing and Loan Type as of 10/31/03

| NELF FINANCING | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| **NELF BOA Warehouse** | | | |
| Stafford | 1,246,141.04 | 14,374.65 | 1,260,515.69 |
| PLUS/SLS | 363,258.49 | 1,003.22 | 364,256.71 |
| Consolidation | 471,018,105.42 | 2,189,297.29 | 473,207,402.60 |
| NELF BOA Total | 472,627,482.95 | 2,204,672.15 | 474,832,155.10 |
| **NELF RBC Warehouse** | | | |
| Stafford | 44,994,329.15 | 1,013,431.11 | 46,007,760.26 |
| Consolidation | 23,340,623.17 | 255,771.43 | 23,596,394.60 |
| NELF RBC Total | 68,334,952.32 | 1,269,202.54 | 69,604,154.86 |
| **NELF 1993A Taxable Financing** | | | |
| Stafford | 57,511,166.13 | 1,130,682.73 | 58,741,848.86 |
| PLUS/SLS | 109,304.60 | 2,697.46 | 112,041.06 |
| Consolidation | 591,015.22 | 11,832.76 | 572,847.98 |
| NELF 1993A Total | 58,252,144.95 | 1,144,592.95 | 59,426,737.90 |
| **NELF 2001-1 Securitization** | | | |
| Stafford | 132,023,252.25 | 3,244,215.13 | 135,267,467.38 |
| Consolidation | 790,506,567.43 | 5,141,915.98 | 795,648,483.41 |
| NELF 2001-1 Total | 922,530,819.68 | 8,386,131.11 | 900,915,950.79 |
| **NELF FINANCINGS COMBINED** | | | |
| Stafford | 236,574,908.57 | 5,422,660.82 | 241,277,592.39 |
| PLUS/SLS | 471,190.09 | 3,097.68 | 475,277.77 |
| Consolidation | 1,285,426,311.24 | 7,598,817.25 | 1,293,025,128.49 |
| NELF TOTAL AS OF 10/31/2003 | 1,521,774,199.90 | 13,024,598.75 | 1,534,778,998.64 |

| MELMAC FINANCING | Current Principal Balance | Current Interest Balance | Combined Total |
|---|---|---|---|
| **MELMAC 1999 Taxable Financing** | | | |
| Stafford | 1,597,684.07 | 18,538.53 | 1,616,202.60 |
| PLUS/SLS | 96,194.71 | 3,024.82 | 102,219.53 |
| Consolidation | 5,696,925.42 | 105,792.08 | 5,792,317.50 |
| MELMAC 1999 Total AS OF 10/31/2003 | 7,383,304.26 | 127,355.43 | 7,510,739.63 |
| **MELMAC FINANCINGS COMBINED** | | | |
| Stafford | 237,472,572.64 | 5,421,222.35 | 242,893,794.99 |
| PLUS/SLS | 572,374.80 | 6,122.50 | 578,497.30 |
| Consolidation | 1,291,112,996.66 | 7,704,609.33 | 1,298,817,445.99 |
| COMBINED TOTALS | 1,529,157,784.10 | 13,131,954.18 | 1,542,289,739.28 |

### Consolidation Loans Available for Tagging as of 10/31/2003
319,871,025.75

### Projected Consolidation Originations for 2003*
| | |
|---|---|
| November | 200,000,000.00 |
| December | 260,000,000.00 |
| | 520,000,000.00 |

*excludes estimated ineligible guarantors per BOA Takeout

### Projected 950 Tagging for 2003*
| | |
|---|---|
| November | 200,000,000.00 * |
| December | 500,000,000.00 * |
| | 500,000,000.00 * |

*Principal and Interest Combined
These projections are based on a 30-60 day extension of the Standby Letter of Credit, allowing for CSLF guaranteed loans to be tagged.

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
#### January 9, 2004

| | Principal Balance at Time of Tagging | | |
|---|---|---|---|
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| **2003 - 1Q Total** | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| **2003 - 2Q Total** | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 198,113,514.60 | | |
| September | 200,694,042.68 | | |
| **2003 - 3Q Total** | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,756,911.08 | | |
| December | 202,622,693.66 | | |
| **2003 - 4Q Total** | | 690,808,275.44 | |
| **TOTAL FOR 2003** | | | 2,078,232,172.03 |
| January | 49,710,968.69 | | |
| February | - | | |
| March | - | | |
| **2004 - 1Q** as of 1/09 | | 49,710,968.69 | |
| **YTD TOTAL FOR 2004** | | | 49,710,968.69 |
| **TOTAL TAGGED LOANS** as of 1/9/04 | | | 2,127,943,140.72 |

### Projected Consolidation Originations for 2004*

| | |
|---|---|
| 1st Quarter** | 804,252,960.00 |
| 2nd Quarter** | 963,557,280.00 |
| 3rd Quarter*** | 1,005,180,480.00 |
| 4th Quarter** | 876,440,160.00 |
| | 3,649,430,880.00 |

*Based on consolidation origination projections.
**Includes Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or ineligible guarantors per the BOA takeout agreement.

Estimated Consolidation Loans Eligible for Tagging as of 12/31/03
$369,633,917.84*

*Excludes estimated ineligible guarantors and interest rates greater than or equal to 6.0%.

## Tagged Loans
### By Financing and Loan Type
#### as of 12/31/03

| NELF FINANCING | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | 1,233,311.28 |
| Plus/SLS | 342,480.28 |
| Consolidation | 782,366,854.59 |
| NELF BOA Total | 783,942,646.15 |
| **NELF RBC Warehouse** | |
| Stafford | 42,011,256.74 |
| Plus/SLS | 1,260.00 |
| Consolidation | 225,534,628.92 |
| NELF RBC Total | 267,547,145.66 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 53,068,037.67 |
| Plus/SLS | 107,975.07 |
| Consolidation | 560,517.48 |
| NELF 1993A Total | 53,736,530.22 |
| **NELF 2003-1 Securitization** | |
| Stafford | 124,159,884.46 |
| Plus/SLS | 11,031.46 |
| Consolidation | 790,296,535.41 |
| NELF 2003-1 Total | 914,467,451.33 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 220,472,490.15 |
| Plus/SLS | 462,746.81 |
| Consolidation | 1,798,758,536.40 |
| NELF TOTAL as of 12/31 | 2,019,693,773.36 |

| MELMAC FINANCING | Current Principal Balance |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 4,361,300.26 |
| Plus/SLS | 884,023.08 |
| Consolidation | 5,546,379.81 |
| MELMAC 1999 Total as of 12/31 | 10,791,703.15 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
|---|---|
| Stafford | 224,833,790.41 |
| Plus/SLS | 1,346,769.89 |
| Consolidation | 1,804,304,916.21 |
| Total CPB of Tagged Loans (as of 12/31/03) | 2,030,485,476.51 |

Confidential

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### January 16, 2004

| | Principal Balance at Time of Tagging | | |
|---|---|---|---|
| | Monthly | Quarterly | Yearly |
| January | | | |
| February | 65,173,121.91 | | |
| March | 23,941,380.22 | | |
| **2003 - 1Q Total** | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| **2003 - 2Q Total** | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 190,113,514.60 | | |
| September | 200,094,042.68 | | |
| **2003 - 3Q Total** | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,756,911.08 | | |
| December | 202,622,693.66 | | |
| **2003 - 4Q Total** | | 690,808,275.44 | |
| **TOTAL FOR 2003** | | | 2,078,232,172.03 |
| January | 99,432,291.54 | | |
| February | - | | |
| March | - | | |
| **2004 - 1Q Total** as of 1/16 | | 99,432,291.54 | |
| **YTD TOTAL FOR 2004** | | | 99,432,291.54 |
| **TOTAL TAGGED LOANS** as of 1/16/04 | | | 2,177,664,463.57 |

**Projected Consolidation Originations for 2004***

| | |
|---|---|
| 1st Quarter* | 804,252,960.00 |
| 2nd Quarter** | 963,557,280.00 |
| 3rd Quarter** | 1,005,180,480.00 |
| 4th Quarter** | 876,440,160.00 |
| | 3,649,430,880.00 |

*Based on consolidation origination projections.
**Includes Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or ineligible guarantors per the BOA takeout agreement.

*Estimated Consolidation Loans Eligible for Tagging as of 12/31 $ 359,633,917
Tagged as of 1/16/04 $ (99,432,291)
Remaining 2003 Consol Originations to be Tagged: $ 260,201,626.30

Confidential

## Tagged Loans
### By Financing and Loan Type
### as of 12/31/03

| NELF FINANCING | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | 1,233,311.28 |
| Plus/SLS | 342,480.28 |
| Consolidation | 782,366,854.59 |
| NELF BOA Total | 783,942,646.15 |
| **NELF RBC Warehouse** | |
| Stafford | 42,011,256.74 |
| Plus/SLS | 1,260.00 |
| Consolidation | 225,534,628.92 |
| NELF RBC Total | 267,547,145.66 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 53,068,037.67 |
| Plus/SLS | 107,975.07 |
| Consolidation | 580,517.48 |
| NELF 1993A Total | 53,736,530.22 |
| **NELF 2003-1 Securitization** | |
| Stafford | 124,159,884.46 |
| Plus/SLS | 11,031.46 |
| Consolidation | 790,296,535.41 |
| NELF 2003-1 Total | 914,467,451.33 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 220,472,490.15 |
| Plus/SLS | 462,746.81 |
| Consolidation | 1,798,758,536.40 |
| NELF TOTAL as of 12/31: | 2,019,693,773.36 |

| MELMAC FINANCING | Current Principal Balance |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 4,361,300.26 |
| Plus/SLS | 884,023.08 |
| Consolidation | 5,546,379.81 |
| MELMAC 1999 Total as of 12/31 | 10,791,703.15 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
|---|---|
| Stafford | 224,833,790.41 |
| Plus/SLS | 1,346,769.89 |
| Consolidation | 1,804,304,916.21 |
| Total CPB of Tagged Loans (as of 12/31/03) | 2,030,485,476.51 |

N0015689

# PROJECT 950 MONTHLY REPORT

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### January 31, 2004

| | Principal Balance at Time of Tagging | | |
|---|---|---|---|
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| 2003 - 1Q Total | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,238.93 | | |
| 2003 - 2Q Total | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.66 | | |
| 2003 - 3Q Total | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,755,911.08 | | |
| December | 202,622,693.66 | | |
| 2003 - 4Q Total | | 690,808,275.44 | |
| **TOTAL FOR 2003** | | | **2,078,232,172.03** |
| January | 348,094,380.02 | | |
| February | - | | |
| March | - | | |
| 2004 - 1Q Total as of 1/31 | | 348,094,380.02 | |
| **YTD TOTAL FOR 2004** | | | **348,094,380.02** |
| **TOTAL TAGGED LOANS as of 1/31/04** | | | **2,426,326,552.05** |

### Projected 2004 Consolidation Originations To Be Tagged*

| | New Volume | Existing Volume | Total Origination Volume |
|---|---|---|---|
| Feb 1 - March 31 | 208,026,250.00 | 187,337,042.00 | 395,363,292.00 |
| April 1 - June 30 | 358,837,534.00 | 294,726,406.00 | 653,563,940.00 |
| July 1 - Sept 30 | 376,534,133.00 | 295,465,848.00 | 672,049,981.00 |
| Oct 1 - Dec 31 | 338,639,272.00 | 282,114,726.00 | 620,753,998.00 |
| | 1,282,087,189.00 | 1,059,644,022.00 | 2,341,731,211.00 |

*Includes Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or ineligible guarantors per the BOA takeout agreement.

| | | |
|---|---|---|
| Estimated Eligible Consolidation Loans in Warehouse Lines as of 2/9: | 129.3 ~ | 71.88 |
| Estimated Eligible Stafford & Plus Loans in Warehouse Lines as of 2/9: | 206.2... | ..99.92 |
| Total Estimated Warehouse Loans Eligible to be Tagged: | | 335,619,081.80 |

## Tagged Loans
### By Financing and Loan Type
### as of 1/31/04

| NELF FINANCING | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 387,276,384.12 |
| NELF BOA Total | 387,276,384.12 |
| **NELF RBC Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 37,082,554.15 |
| NELF RBC Total | 37,082,554.15 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 50,824,763.25 |
| Plus/SLS | 107,597.51 |
| Consolidation | 517,355.06 |
| NELF 1993A Total | 51,449,715.82 |
| **NELF 2003-1 Securitization** | |
| Stafford | 120,410,251.46 |
| Plus/SLS | - |
| Consolidation | 786,687,835.85 |
| NELF 2003-1 Total | 907,098,087.31 |
| **NELF 2004-1 Securitization** | |
| Stafford | 41,818,135.74 |
| Plus/SLS | 339,145.43 |
| Consolidation | 938,840,063.88 |
| NELF 2004-1 Total | 980,997,345.05 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 213,053,160.45 |
| Plus/SLS | 446,742.94 |
| Consolidation | 2,150,404,193.06 |
| NELF TOTAL | 2,363,904,096.45 |

| MELMAC FINANCING | Current Principal Balance |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 4,175,712.53 |
| Plus/SLS | 823,205.72 |
| Consolidation | 5,488,969.69 |
| MELMAC 1999 Total | 10,487,887.94 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
|---|---|
| Stafford | 217,228,862.98 |
| Plus/SLS | 1,269,948.r |
| Consolidation | 2,155,893,162.7~ |
| Total CPB of Tagged Loans | 2,374,391,974.39 |

N0036050

# PROJECT 950 MONTHLY REPORT

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### February 29, 2004

| | Principal Balance at Time of Tagging | | |
| --- | --- | --- | --- |
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | | | |
| 2003 - 1Q Total | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| 2003 - 2Q Total | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.68 | | |
| 2003 - 3Q Total | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,756,911.08 | | |
| December | 202,622,693.66 | | |
| 2003 - 4Q Total | | 690,808,275.44 | |
| **TOTAL FOR 2003** | | | 2,078,232,172.03 |
| January | 348,094,380.02 | | |
| February | 397,647,669.98 | | |
| March | | | |
| 2004 - 1Q Total as of 2/29 | | 745,742,050.00 | |
| **YTD TOTAL FOR 2004** | | | 745,742,050.00 |
| **TOTAL TAGGED LOANS as of 2/29/04** | | | 2,823,974,222.03 |

### Projected 2004 Consolidation Originations To Be Tagged*

| | New Volume | Existing Volume | Total Origination Volume |
| --- | --- | --- | --- |
| March 1 - March 31 | 104,013,125.00 | 93,668,521.00 | 197,681,646.00 |
| April 1 - June 30 | 358,837,534.00 | 294,726,406.00 | 653,563,940.00 |
| July 1 - Sept 30 | 376,584,133.00 | 295,465,848.00 | 672,049,981.00 |
| Oct 1 - Dec 31 | 338,639,272.00 | 282,114,726.00 | 620,753,998.00 |
| | 1,178,074,064.00 | 965,975,501.00 | 2,144,049,565.00 |

*Includes Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or ineligible guarantors per the BOA takeout agreement.

| | | |
| --- | --- | --- |
| Estimated Eligible Consolidation Loans in Warehouse Lines as of 2/29: | 98,34. | 98.95 |
| Estimated Eligible Stafford & Plus Loans in Warehouse Lines as of 2/29: | 190,7. | .1.93 |
| Total Estimated Warehouse Loans Eligible to be Tagged: | | 289,082,390.88 |

Confidential

## Tagged Loans
### By Financing and Loan Type
### as of 2/29/04

| NELF FINANCING | Current Principal Balance |
| --- | --- |
| **NELF BOA Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 787,083,340.97 |
| NELF BOA Total | 787,083,340.97 |
| **NELF RBC Warehouse** | |
| Stafford | 6,020.00 |
| Plus/SLS | |
| Consolidation | 37,017,989.92 |
| NELF RBC Total | 37,024,009.92 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 48,910,977.08 |
| Plus/SLS | 106,586.60 |
| Consolidation | 514,441.22 |
| NELF 1993A Total | 49,532,004.90 |
| **NELF 2003-1 Securitization** | |
| Stafford | 115,747,772.85 |
| Plus/SLS | - |
| Consolidation | 783,323,374.98 |
| NELF 2003-1 Total | 899,071,147.83 |
| **NELF 2004-1 Securitization** | |
| Stafford | 40,249,285.44 |
| Plus/SLS | 308,580.68 |
| Consolidation | 955,565,476.02 |
| NELF 2004-1 Total | 995,123,342.14 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 204,914,055.37 |
| Plus/SLS | 415,167.28 |
| Consolidation | 2,562,504,623.11 |
| NELF TOTAL | 2,767,833,845.76 |

| MELMAC FINANCING | Current Principal Balance |
| --- | --- |
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 3,999,012.89 |
| Plus/SLS | 776,735.08 |
| Consolidation | 5,459,716.94 |
| MELMAC 1999 Total | 10,235,464.91 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
| --- | --- |
| Stafford | 208,913,068.26 |
| Plus/SLS | 1,191,902.3 |
| Consolidation | 2,567,964,340.0. |
| Total CPB of Tagged Loans | 2,778,069,310.67 |

N00155591

# PROJECT 950 MONTHLY REPORT

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### March 31, 2004

| | Monthly | Quarterly | Yearly |
|---|---|---|---|
| | **Principal Balance at Time of Tagging** | | |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| **2003 - 1Q Total** | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| **2003 - 2Q Total** | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.68 | | |
| **2003 - 3Q Total** | | 447,359,034.95 | |
| October | 188,426,670.70 | | |
| November | 299,756,911.08 | | |
| December | 202,622,693.66 | | |
| **2003 - 4Q Total** | | 690,806,275.44 | |
| **TOTAL FOR 2003** | | | 2,078,232,172.03 |
| January | 348,094,380.02 | | |
| February | 397,647,669.98 | | |
| March | 348,418,748.53 | | |
| **2004 - 1Q Total** | | 1,094,160,798.53 | |
| **YTD TOTAL FOR 2004** | | | 1,094,160,798.53 |
| **TOTAL TAGGED LOANS** as of 3/31/04 | | | 3,172,392,970.56 |

### Projected 2004 Consolidation Originations To Be Tagged*

| | New Volume | Existing Volume | Total Origination Volume |
|---|---|---|---|
| April 1 - June 30 | 358,837,534.00 | 294,726,406.00 | 653,563,940.00 |
| July 1 - Sept 30 | 376,584,133.00 | 295,465,848.00 | 672,049,981.00 |
| Oct 1 - Dec 31 | 338,639,272.00 | 282,114,726.00 | 620,753,998.00 |
| | 1,074,060,939.00 | 872,306,980.00 | 1,946,367,919.00 |

### Estimated Consolidation Loans Eligible for Tagging as of 3/31/04

| | | |
|---|---|---|
| NHELP-II | $ 2,811,441.62 | |
| NELF-RBC | $ 4,717,555.23 | Total Eligible for Taggi'.. |
| NELF-BOA | $ 8,226,813.16 | $15,755,810.00 |

*Includes Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or
ineligible guarantors per the BOA takeout agreement.

---

## Tagged Loans
### By Financing and Loan Type
### as of 3/31/04

| NELF FINANCING | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 1,153,621,294.04 |
| **NELF BOA Total** | 1,153,621,294.04 |
| **NELF RBC Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 36,647,678.18 |
| **NELF RBC Total** | 36,647,678.18 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 46,439,150.61 |
| Plus/SLS | 105,879.76 |
| Consolidation | 512,216.08 |
| **NELF 1993A Total** | 47,057,246.45 |
| **NELF 2003-1 Securitization** | |
| Stafford | 111,294,566.06 |
| Plus/SLS | - |
| Consolidation | 776,982,782.53 |
| **NELF 2003-1 Total** | 888,277,348.59 |
| **NELF 2004-1 Securitization** | |
| Stafford | 38,573,467.51 |
| Plus/SLS | 266,138.89 |
| Consolidation | 952,771,155.18 |
| **NELF 2004-1 Total** | 991,610,761.58 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 196,307,184.18 |
| Plus/SLS | 372,018.65 |
| Consolidation | 2,920,636,126.01 |
| **NELF TOTAL** | 3,117,214,328.84 |

| MELMAC FINANCING | Current Principal Balance |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 3,798,605.46 |
| Plus/SLS | 744,294.38 |
| Consolidation | 5,389,882.53 |
| **MELMAC 1999 Total** | 9,932,782.37 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
|---|---|
| Stafford | 200,105,789.64 |
| Plus/SLS | 1,116,313.( |
| Consolidation | 2,925,925,008.5.. |
| **Total CPB of Tagged Loans** | 3,127,147,111.21 |

Confidential

N0015605

# PROJECT 950 MONTHLY REPORT

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
#### April 30, 2004

| | Principal Balance at Time of Tagging | | |
|---|---|---|---|
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | - | | |
| **2003 - 1Q Total** | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| **2003 - 2Q Total** | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.68 | | |
| **2003 - 3Q Total** | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,766,911.08 | | |
| December | 202,622,693.66 | | |
| **2003 - 4Q Total** | | 690,808,275.44 | |
| **TOTAL FOR 2003** | | | 2,078,232,172.03 |
| January | 348,094,380.02 | | |
| February | 397,647,669.98 | | |
| March | 348,418,748.53 | | |
| **2004 - 1Q Total** | | 1,094,160,798.53 | |
| April | 149,439,615.93 | | |
| May | - | | |
| June | - | | |
| **2004 - 2Q Total** | | 149,439,615.93 | |
| **YTD TOTAL FOR 2004** | | | 1,094,160,798.53 |
| **TOTAL LOANS TAGGED as of 4/30/04** | | | 3,172,392,970.56 |

## Projected 2004 Consolidation Originations To Be Tagged*

| | New Volume | Existing Volume | Total Origination Volume |
|---|---|---|---|
| April 1 - June 30 | 358,837,534.00 | 294,726,406.00 | 653,563,940.00 |
| July 1 - Sept 30 | 376,584,133.00 | 295,465,848.00 | 672,049,981.00 |
| Oct 1 - Dec 31 | 338,639,272.00 | 282,114,726.00 | 620,753,998.00 |
| | 1,074,060,939.00 | 872,306,980.00 | 1,946,367,919.00 |

*Indicates Loans that will not be tagged due to Borrower Interest Rate greater than or equal to 6.0% and/or ineligible guarantors per the DOA tagout agreement.

## Tagged Loans
### By Financing and Loan Type
#### as of 4/30/04

| NELF FINANCING | Current Principal Balance |
|---|---|
| **NELF BOA Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 330,526,123.20 |
| NELF BOA Total | 330,526,123.20 |
| **NELF RBC Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 36,168,347.08 |
| NELF RBC Total | 36,168,347.08 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 44,302,156.45 |
| Plus/SLS | 105,210.67 |
| Consolidation | 511,086.49 |
| NELF 1993A Total | 44,918,453.61 |
| **NELF 2003-1 Securitization** | |
| Stafford | 107,811,251.06 |
| Plus/SLS | - |
| Consolidation | 771,580,691.18 |
| NELF 2003-1 Total | 879,391,942.24 |
| **NELF 2004-1 Securitization** | |
| Stafford | 37,433,021.05 |
| Plus/SLS | 238,495.50 |
| Consolidation | 948,879,547.96 |
| NELF 2004-1 Total | 985,551,064.51 |
| **NELF FINANCINGS COMBINED** | |
| Stafford | 189,546,428.56 |
| Plus/SLS | 343,706.17 |
| Consolidation | 2,087,665,795.91 |
| NELF TOTAL | 2,277,555,930.64 |

| MELMAC FINANCING | Current Principal Balance |
|---|---|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 3,872,444.69 |
| Plus/SLS | 707,409.47 |
| Consolidation | 5,230,983.62 |
| MELMAC 1999 Total | 9,810,837.78 |

| NELNET FINANCINGS | Current Principal Balance |
|---|---|
| **COMBINED TOTALS** | |
| Stafford | 193,418,873.25 |
| Plus/SLS | 1,051,115.64 |
| Consolidation | 2,092,896,779.53 |
| Total CPB of Tagged Loans | 2,287,366,768.42 |

Confidential

N0036040

# PROJECT 950 MONTHLY REPORT

## Nelnet Project 950 Tagged Loans
### Monthly, Quarterly and Yearly Summary
### April 30, 2004

| | Principal Balance at Time of Tagging | | |
| --- | --- | --- | --- |
| | Monthly | Quarterly | Yearly |
| January | 65,173,121.91 | | |
| February | 23,941,380.22 | | |
| March | | | |
| 2003 - 1Q Total | | 89,114,502.13 | |
| April | 98,149,171.97 | | |
| May | 304,881,950.61 | | |
| June | 447,919,236.93 | | |
| 2003 - 2Q Total | | 850,950,359.51 | |
| July | 50,551,477.67 | | |
| August | 196,113,514.60 | | |
| September | 200,694,042.66 | | |
| 2003 - 3Q Total | | 447,359,034.95 | |
| October | 188,428,670.70 | | |
| November | 299,756,911.08 | | |
| December | 202,622,693.66 | | |
| 2003 - 4Q Total | | 690,808,275.44 | |
| TOTAL FOR 2003 | | | 2,078,232,172.03 |
| January | 348,094,380.02 | | |
| February | 397,647,669.98 | | |
| March | 348,418,748.53 | | |
| 2004 - 1Q Total | | 1,094,160,798.53 | |
| April | 149,439,615.93 | | |
| May | - | | |
| June | - | | |
| 2004 - 2Q Total | | 149,439,615.93 | |
| YTD TOTAL FOR 2004 | | | 1,094,160,798.53 |
| TOTAL LOANS TAGGED as of 5/31/04 | 3,172,392,970.56 | | 3,172,392,970.56 |

## Tagged Loans
### By Financing and Loan Type
### as of 5/31/04

| NELF FINANCING | Current Principal Balance |
| --- | --- |
| NELF BOA Warehouse | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 336,433,323.92 |
| NELF BOA Total | 336,433,323.92 |
| NELF RBC Warehouse | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 35,907,745.89 |
| NELF RBC Total | 35,907,745.89 |
| NELF 1993A Taxable Financing | |
| Stafford | 43,215,648.83 |
| Plus/SLS | 104,508.27 |
| Consolidation | 510,025.95 |
| NELF 1993A Total | 43,830,183.05 |
| NELF 2003-1 Securitization | |
| Stafford | 106,278,385.38 |
| Plus/SLS | |
| Consolidation | 768,644,531.08 |
| NELF 2003-1 Total | 874,922,916.46 |
| NELF 2004-1 Securitization | |
| Stafford | 37,014,105.75 |
| Plus/SLS | 209,674.13 |
| Consolidation | 944,738,873.79 |
| NELF 2004-1 Total | 981,962,653.67 |
| NELF 2004-2 Securitization | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 991,036,481.49 |
| NELF 2004-1 Total | 991,036,481.49 |
| NELF FINANCINGS COMBINED | |
| Stafford | 186,508,139.96 |
| Plus/SLS | 314,182.40 |
| Consolidation | 3,077,270,982.12 |
| NELF TOTAL | 3,264,093,304.48 |

| MELMAC FINANCING | Current Principal Balance |
| --- | --- |
| MELMAC 1999 Taxable Financing | |
| Stafford | 3,872,444.69 |
| Plus/SLS | 707,409.47 |
| Consolidation | 5,230,983.62 |
| MELMAC 1999 Total | 9,810,837.78 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
| --- | --- |
| Stafford | 190,380,584.6 |
| Plus/SLS | 1,021,591.87 |

Confidential

**PROJECT 950 MONTHLY REPORT**

## Tagged Loans
### By Financing and Loan Type
### as of 5/31/04

| NELF FINANCING | Current Principal Balance |
|---|---:|
| **NELF BOA Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 336,433,323.92 |
| **NELF BOA Total** | 336,433,323.92 |
| **NELF RBC Warehouse** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 35,907,745.89 |
| **NELF RBC Total** | 35,907,745.89 |
| **NELF 1993A Taxable Financing** | |
| Stafford | 43,215,648.83 |
| Plus/SLS | 104,508.27 |
| Consolidation | 510,025.95 |
| **NELF 1993A Total** | 43,830,183.05 |
| **NELF 2003-1 Securitization** | |
| Stafford | 106,278,385.38 |
| Plus/SLS | - |
| Consolidation | 768,644,531.08 |
| **NELF 2003-1 Total** | 874,922,916.46 |
| **NELF 2004-1 Securitization** | |
| Stafford | 37,014,105.75 |
| Plus/SLS | 209,674.13 |
| Consolidation | 944,738,873.79 |
| **NELF 2004-1 Total** | 981,962,653.67 |
| **NELF 2004-2 Securitization** | |
| Stafford | - |
| Plus/SLS | - |
| Consolidation | 991,036,481.49 |
| **NELF 2004-1 Total** | 991,036,481.49 |
| | |
| **NELF FINANCINGS COMBINED** | |
| **Stafford** | 186,508,139.96 |
| **Plus/SLS** | 314,182.40 |
| **Consolidation** | 3,077,270,982.12 |
| **NELF TOTAL** | 3,264,093,304.48 |

| MELMAC FINANCING | Current Principal Balance |
|---|---:|
| **MELMAC 1999 Taxable Financing** | |
| Stafford | 3,809,074.11 |
| Plus/SLS | 700,455.19 |
| Consolidation | 5,207,161.65 |
| **MELMAC 1999 Total** | 9,716,690.95 |

| NELNET FINANCINGS COMBINED TOTALS | Current Principal Balance |
|---|---:|
| **Stafford** | 190,317,214.07 |
| **Plus/SLS** | 1,014,637.59 |
| **Consolidation** | 3,082,478,143.77 |
| **Total CPB of Tagged Loans** | 3,273,809,995.43 |

N0015610

Confidential

Exhibit 67

# CONFIDENTIAL

# FILED UNDER SEAL

WELLS FARGO CORP TRUST Fax:612-667-2149          NOV 18 2005  12:50     P.02

## AMENDED ESCROW AGREEMENT

This Agreement, dated the 14th day of August, 2003 by and between Nelnet Education Loan Funding, Inc. (the "Issuer") and Wells Fargo Bank Minnesota, National Association ("Escrow Agent"), AS AMENDED, AS OF the 22nd day of August, 2003.

**1. Receipt of Escrow Funds, IS HEREBY AMENDED AS FOLLOWS:**
Escrow Agent shall receive funds consisting of Special Allowance Payments made by the Department of Education under a program establishing a minimum rate of return of 9.5% on certain FFELP loans previously financed with tax-exempt obligations, and there currently are outstanding issues related to the rightfull owner and entitlement of said funds and thus said funds should be segregated within the various trust estates: pursuant to the Indenture of Trust between Nelnet Education Loan Funding, Inc. and Wells Fargo Bank Minnesota, National Association, as Trustee, dated as of June 1, 2003; the Trust Indenture between Nebraska Higher Education Loan Program, Inc. and Wells Fargo Bank Minnesota, National Association, as Trustee, dated as of June 1, 1993; the Warehouse Note Purchase and Security Agreement between Nelnet Education Loan Funding, Inc. and Wells Fargo Bank Minnesota, National Association, as Trustee, dated as of May 1, 2003; and the Amended and Restated Warehouse Loan and Security Agreement between Nelnet Education Loan Funding, Inc. and Wells Fargo Bank Minnesota, National Association, as Eligible Lender Trustee, dated as of April 28, 2003, (the "Escrow Funds") from time to time until the terms of disbursement under this Agreement have been satisfied. Accordingly, from time to time, the Issuer shall be responsible for properly identifying and ensuring that the Special Allowance Payments to be held in this escrow are actually segregated within the various trust estates and held by the Escrow Agent in accordance with this Agreement.

**2. Investments.** The Escrow Funds shall be invested by the Escrow Agent in the Wells Fargo Funds, a money market mutual fund, until disbursed according to Section 4.

**3. Interest.** Any interest income earned from the investment of the Escrow Funds shall be credited to the Issuer's account and considered part of the Escrow Funds.

**4. Disbursement of Funds.** The Escrowed Funds shall be immediately released on any of the following conditions: 1. the Escrowed Funds shall be used to the extent they are needed to pay any debt services payments as may be required under the terms of the Indenture of Trust; or 2. the Escrow Agent receives a disbursal request signed by the Chief Financial Officer of the Issuer, which encloses a copy of a written directive or position statement from the United States Department of Education which indicates which persons or entities are the rightful owner of the escrowed funds; or 3. the Escrow Agent receives an opinion letter from outside counsel to the Issuer, currently Perry, Guthery, Haase & Gessford, P.C., L.L.O., stating that said firm has conducted a sufficient factual and legal investigation to give an opinion on which persons or entities have a reasonably sufficient legal claim to the escrowed funds, said opinion shall only be



Confidential                    N0029642

required to identify the party having such a claim to the funds and provide disbursement instructions to the Escrow Agent. It is expressly agreed that the Escrow Agent has no obligation to investigate the legal sufficiency of any of the above-described disbursement instructions and opinions.

This Escrow Agreement shall terminate upon disbursement of all Escrow Funds in accordance with the terms as set forth above, including any interest income earned, upon receipt of a disbursal request in accordance with the terms as set forth above.

Escrow Agent is not responsible and does not warrant, convey or guarantee in any form or manner that the disbursed Escrow Funds will be used by Issuer for the purposes herein stated or stated elsewhere.

5. **Duty of the Escrow Agent.** The sole duty of Escrow Agent is to receive the Escrow Funds and invest the same pursuant to Section 2, pending disbursement pursuant to Section 4 of the Escrow Agreement. Escrow Agent is not responsible for accounting or maintaining any records other than to document the wires received, Escrow Funds disbursed and interest earned.

6. **Documents.** The Escrow Agent may conclusively rely upon and shall be protected in acting upon any statement, certificate, notice, request, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall have no duty or liability to verify any such statement, certificate, notice, request, consent, or order or other document and its sole responsibility shall be to act only as expressly set forth in this Escrow Agreement. The Escrow Agent shall be under no obligation to institute or defend any action, suit or proceeding in connection with this Escrow Agreement unless first indemnified to its satisfaction by the Issuer.

7. **Fees, IS HEREBY AMENDED AS FOLLOWS:** The Escrow Agent is entitled to compensation in accordance with "Schedule A", as Amended, attached hereto and incorporated herein by reference and shall be payable by the Issuer. Escrow Agent may in its discretion deduct said fees from the interest earned on the Escrow Funds if said compensation is not paid by the Issuer.

8. **Tax Related Terms.** (a) Tax Reporting. The Issuer agrees that, for tax reporting purposes, all interest or other taxable income earned from the investment of the Escrow Funds in any tax year shall be taxable to the Issuer.

(b)    Certification of Tax Identification Number  Issuer agrees to provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and other forms and documents that the Escrow Agent may reasonably request. Issuer hereto understand that if such tax reporting documentation is not so certified to the

N0029643

WELLS FARGO CORP TRUST Fax:612-667-2149          NOV 18 2005  12:51     P.04

Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the investment of monies or other property held by the Escrow Agent pursuant to this Agreement.

(c)    Taxes  The Issuer agree to indemnify and hold the Escrow Agent harmless from and against any taxes, additions for late payment, interest, penalties and other expenses that may be assessed against the Escrow Agent on or with respect to any payment or other activities under this Agreement.

9. **Indemnification of Escrow Agent:** The Issuer hereby indemnifies and holds harmless the Escrow Agent from and against, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable counsel fees, which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent arising out of or relating in any way to this Agreement or any transaction to which this Agreement relates unless such action, claim or proceeding is the result of the willful misconduct of the Escrow Agent. The Escrow Agent may consult counsel in respect of any question arising under the Escrow Agreement and the Escrow Agent shall not be liable for any acting taken or omitted in good faith upon advice of such counsel.

10. **Notices.**  All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given, (b) on the day of transmission if sent by facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission, (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service, or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, and properly addressed, return receipt requested, to the party as follows:

If to the Issuer:

    Terry J. Heimes, President
    Nelnet Education Loan Funding, Inc.
    121 South 13th Street, Suite 201
    Lincoln, NE 68508
    Phone: 402-458-2303
    Fax: 402-458-2399

WELLS FARGO CORP TRUST Fax:612-667-2149          NOV 18 2005  12:31     P.03

If to Escrow Agent:

> Wells Fargo Bank Minnesota, N.A.
> Attn: Scott Ulven, Corporate Trust Officer
> MAC N9303-110
> Sixth Street and Marquette Avenue
> Minneapolis, MN  55479
> Phone: 612-667-4802
> Fax: 612-667-2149

Wires to Escrow Agent should be directed to the following (if applicable):

> Wells Fargo Bank Minnesota, National Association
> ABA #121000248
> Trust Clearing Account # 0001038377
> For Credit to: NELF Escrow Account

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above.

11. **Successors and Assigns.** Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent to the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

12. **Governing Law; Jurisdiction.** This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the internal laws of the State of Minnesota, without giving effect to the principles of conflicts of laws thereof. Each party hereby consents to the personal jurisdiction and venue of any United States District Court for the District of Minnesota located in Hennepin County, Minnesota.

13. **Severability.** In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void, or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

14. **Amendments; Waivers.** This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation, or warranty of this Agreement.

Confidential

N0029645

15. **Entire Agreement.** This Agreement contains the entire understanding among the parties hereto with respect to the escrow contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such escrow.

16. **Section Headings.** The section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

17. **Counterparts.** This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

18. **Resignation.** Escrow Agent may resign upon 30 days advance written notice to the Issuer. If a successor Escrow Agent is not appointed within the 30-day period following such notice, Escrow Agent may petition any court of competent jurisdiction to name a successor Escrow Agent.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first set forth above.

Nelnet Education Loan Funding, Inc.

By:

Its:

WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION

By:

Its: Corporate Trust Officer

N0029646

WELLS FARGO CORP TRUST  Fax:612-667-2149          Nov 18 2005  12:32     P.01

## Amended Schedule of Escrow Agent Fees
### Schedule "A"

All inclusive fee                                                      $1,250

Exhibit 68

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Thursday, March 06, 2003 9:25 AM |
| **To:** | Bouc, Don; Tone, Paul |
| **Cc:** | Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike |
| **Subject:** | RE: Re: 9.5% Floor |

I yield to greater intellect than mine. It is a bad idea.

Jeff

-----Original Message-----
From: Bouc, Don
Sent: Wednesday, March 05, 2003 5:34 PM
To: Tone, Paul; Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike
Subject: RE: Re: 9.5% Floor

I agree with Paul...I think this is a very bad idea. Kristie will resist signing it as
she would fear it was a "committment" by DE without her first taking it through
"channels". I think we had the meeting and got the result we desired, now we should
proceed and leave well enough alone. We will likely need future meetings on other issues
and don't want these limited due to fear of another "summarization" letter...

-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 5:39 PM
To: Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike;
Bouc, Don
Subject: RE: Re: 9.5% Floor

Understood..  but be prepared - despite our best efforts to soft sell it..  that they
will realize that we are putting them on the spot - for them to want to avoid that in the
future..

In the federal bureaucracy..  one of the most difficult things to maintain is to be a
decision maker..  someone who is perceived to be decisive will be challenged by the
bureaucracy..  memorializing the meeting with a formal memo will cause folks to see that
Kristie made a decision..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Wednesday, March 05, 2003 4:26 PM
To: Tone, Paul
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike;
Bouc, Don
Subject: RE: Re: 9.5% Floor

Paul:

The idea is not to get them to accept or commit in writing to our plan, but to acknowledge
the meeting and the tenor and concepts discussed in the meeting.  We would want you (or
someone) to contact Kristie first and let her know that we would like to send her the
letter and get her ok long before we sent it.  This would hopefully keep you safe from
being excluded from future "informal" meetings.

Our fear is that 3-5 years down the road no one that was in the meeting is left at the DOE
to acknowledge that it occurred and what was discussed if future staff wanted to make a
claw back claim to Nebhelp.

1

EXHIBIT
Heimes (27)
3.9.10  mv

Confidential

N0125034

If they are not even willing to acknowledge the discussion then how can we proceed without real fear about the future?

I believe the key is to very delicately word the letter so it is factual yet does not pen them down to a decision.

Jeff


-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:15 PM
To: Noordhoek, Jeff
Subject: Fw: Re: 9.5% Floor


-----Original Message-----
From: Tone, Paul <paul.tone@nelnet.net>
To: Martinez, Ed <ed.martinez@nelnet.net>
CC: 'Mike.Dunlap@ubt.com' <Mike.Dunlap@ubt.com>; Butterfield, Steve
<stephen.butterfield@nelnet.net>; 'noordhoek@UFSCorp.com' <noordhoek@UFSCorp.com>; Bouc,
Don <Don.Bouc@nelnet.net>; Schleuger, Gary <gary.schleuger@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>
Sent: Wed Mar 05 16:11:51 2003
Subject: Re: 9.5% Floor

I'm not sure that we should do that..   I believe that it will put a severe chill on our
ability to have additional meetings with her.

-----Original Message-----
From: Martinez, Ed <ed.martinez@nelnet.net>
To: Tone, Paul <paul.tone@nelnet.net>; Bouc, Don <Don.Bouc@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed Mar 05 14:59:14 2003
Subject: 9.5% Floor

The Capital Markets Group has asked that I prepare a letter to Kristie Hansen that
memorializes our meeting on the above matter this past January. They would like me to
include an acknowlegment space for her to sign on the correspondence. I will send to you,
Gary and Don for accuracy.

My new e-mail address is: ed.martinez@nelnet.net

2

# Exhibit 69

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| From: | Noordhoek, Jeff |
|---|---|
| Sent: | Wednesday, March 05, 2003 4:18 PM |
| To: | Tone, Paul |
| Cc: | Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don |
| Subject: | RE: Re: 9.5% Floor |

You are awesome Paul. I know you can walk the fine political tight rope and come out a
winner with Nelnet's rear end protected! I have faith in you brother Tone! Bring us to
the promise land.

-Amen

-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:39 PM
To: Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don
Subject: RE: Re: 9.5% Floor

Understood.. but be prepared - despite our best efforts to soft sell it.. that they
will realize that we are putting them on the spot - for them to want to avoid that in the
future..

In the federal bureaucracy.. one of the most difficult things to maintain is to be a
decision maker.. someone who is perceived to be decisive will be challenged by the
bureaucracy.. memorializing the meeting with a formal memo will cause folks to see that
Kristie made a decision..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Wednesday, March 05, 2003 4:26 PM
To: Tone, Paul
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike;
Bouc, Don
Subject: RE: Re: 9.5% Floor

Paul:

The idea is not to get them to accept or commit in writing to our plan, but to acknowledge
the meeting and the tenor and concepts discussed in the meeting. We would want you (or
someone) to contact Kristie first and let her know that we would like to send her the
letter and get her ok long before we sent it. This would hopefully keep you safe from
being excluded from future "informal" meetings.

Our fear is that 3-5 years down the road no one that was in the meeting is left at the DOE
to acknowledge that it occurred and what was discussed if future staff wanted to make a
claw back claim to Nebhelp.

If they are not even willing to acknowledge the discussion then how can we proceed without
real fear about the future?

I believe the key is to very delicately word the letter so it is factual yet does not pen
them down to a decision.

Jeff

-----Original Message-----

1



Confidential

N0125030

From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:15 PM
To: Noordhoek, Jeff
Subject: Fw: Re: 9.5% Floor


-----Original Message-----
From: Tone, Paul <paul.tone@nelnet.net>
To: Martinez, Ed <ed.martinez@nelnet.net>
CC: 'Mike.Dunlap@ubt.com' <Mike.Dunlap@ubt.com>; Butterfield, Steve
<stephen.butterfield@nelnet.net>; 'noordhoek@UFSCorp.com' <noordhoek@UFSCorp.com>; Bouc,
Don <Don.Bouc@nelnet.net>; Schleuger, Gary <gary.schleuger@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>
Sent: Wed Mar 05 16:11:51 2003
Subject: Re: 9.5% Floor

I'm not sure that we should do that..   I believe that it will put a severe chill on our
ability to have additional meetings with her.

-----Original Message-----
From: Martinez, Ed <ed.martinez@nelnet.net>
To: Tone, Paul <paul.tone@nelnet.net>; Bouc, Don <Don.Bouc@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed Mar 05 14:59:14 2003
Subject: 9.5% Floor

The Capital Markets Group has asked that I prepare a letter to Kristie Hansen that
memorializes our meeting on the above matter this past January.  They would like me to
include an acknowlegment space for her to sign on the correspondence.  I will send to you,
Gary and Don for accuracy.

My new e-mail address is: ed.martinez@nelnet.net

2

Confidential                        N0125031

Exhibit 72

# CONFIDENTIAL

# FILED UNDER SEAL

[NELF Letterhead]

[Date]

United States Department of Education
Attention: ———————————Angela Roca-Baker
[Insert Address]
[Insert Address]

Re:   799LaRS Billing Statement QuestionConfirmation

Dear ————-:Ms. Roca-Baker:

A question has arisen as This letter is being written to confirm the proper way to submit 799 billing statements Lender's Request for special allowance payments Payment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. [Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed fromby a different NELF financing prior to being placed into the 1985 Indenture.] As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture, under 20 U.S.C.  § 1087-1(b)(1)(ii) and  34 C.F.R.  § 682.302(c)(3), we intend to bill for special allowance at the quarterly rate of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, NELF will maintain its

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

Confidential

NNI 00015

N0001015

EXHIBIT
Heimes 32
3.9.10   mv



...neficial ownership interest in the loans previously purchased with proceeds of the 1985 indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to your view at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter 799'sLaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. If you feel our analysis is incorrect or deficient in any manner, please advise us as soon as possible. Thank you for your consideration of this matter.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.

_____                    _____
I concur with the above                              Date

cc: Rod Paige
____ William Hansen
____ Kristie Hansen
____ Sally Stroup
____ Jeff Andre

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00016

N0001016



FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00017

N0001017

# Exhibit 73

# CONFIDENTIAL

# FILED UNDER SEAL

FSA/Financial Partners Channel
UCP – 112I4
830 First Street, NE
Washington, DC 20202
Phone: 202.377.3528
Fax: 202.275.9000
E-mail: Frank.X.Miller@ed.gov

**U.S. Department of Education**
**Federal Student Aid**

# Fax

| To: | Elise Nowikowski | From: | Frank X. Miller |
|---|---|---|---|
| | Nelnet – Policy Support Services | | |
| Fax: | 904.281.1774 | Pages: | 2 (including cover) |
| Phone: | 904.281.7074 | Date: | 2/14/2003 |
| Re: | Hansen Response | CC: | |

☐ Urgent     ☐ For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Process

Elise,

I am transmitting this document to you for Kristie Hansen.



EXHIBIT
Hermes 33
3.9.10  mV

Confidential

N0039677

 **nelnet**          5620 SOUTHPOINT PARKWAY          p 904-285-7100          www.nelnet.net
                      JACKSONVILLE, FL 32216                                  NELNET CORPORATION

February 6, 2003

Kristie Hansen, FSA General Manager
U.S. Department of Education
830 First Street NE, MS 5144
Washington, DC 20202-5144

Dear Ms. Hansen:

As we have discussed extensively, Nelnet has an outstanding audit finding cited by the
Department of Education. In order to resolve this finding, Nelnet will modify the language
included in the notice sent to borrowers during the delinquency period as required by
682.411(b)(3). The revised language will be as follows:

"If you dispute the terms or status of your account, please contact us immediately to resolve the
situation. If necessary, we will refer you to your Guaranty Agency for additional assistance. If
together we are unable to resolve your dispute, we will provide you with the contact information
for the U.S. Department of Education's Office of the Ombudsman for further consideration."

I believe that this language supports the dispute resolution process, is compliant with the
requirements as prescribed in 682.208(c)(3), and addresses your concerns conveyed to me in
our phone conversation. Those concerns were - first, not all guaranty agencies have an
individual designated as an Ombudsman, and second, that if a borrower's dispute cannot be
resolved by Nelnet, the Department of Education's Ombudsman contact information described
in DCL GEN-00-04 will be provided to the borrower. Additionally, Debra Wiley, the FSA
Ombudsman for the Department of Education agreed with our process by stating, "the agency is
to demonstrate how it notifies student loan borrowers of the availability of the Office of the
Ombudsman in Federal Student Aid, U.S. Department of Education. Contact information can be
provided, but is not required, in the written notice of availability of the office. If not provided in
the written notice of availability, the agency must demonstrate how it provides borrowers with
the contact information to ensure that borrowers can choose the contact mechanism most
convenient for them."

Please indicate your agreement below that the contact information for the Ombudsman is not
required as part of the notice sent during the delinquency period and that Nelnet's process for
providing the contact information is compliant with the federal regulations.

Nelnet is very anxious to resolve these audit findings cited independently and jointly by
Department of Education and guaranty agency auditors. Consequently, I would appreciate a
quick response to this matter. Please fee free to contact me at 904.281.7074 or via e-mail at
elise.nowlkowski@nelnet.net.

Sincerely,

Elise A. Nowlkowski, Director
Policy Support Services

I concur with the above                                   Date  2/10/03

Exhibit 74

# CONFIDENTIAL

# FILED UNDER SEAL

Message

Page 1 of 1

l.

**From:** Daniel F. Kaplan [dkaplan@perrylawfirm.com]

**Sent:** Wednesday, May 28, 2003 10:36 AM

**To:** Dunlap, Mike; Helmes, Terry; Watson, Cheryl; Noordhoek, Jeff; Tone, Paul; Nowikowski, Eliso; Pohl, Mike; Martinez, Ed; Munn, Bill; Schleuger, Gary

**Subject:** DOE letter

Attached please find the redlined and clean draft of the letter to the DOE on Project 950, together with the enclosure (the flow chart). Let me know if you have changes, comments or questions, thanks.

10/25/2004

FOIA-CONFIDENTIAL TREATMENT REQUESTED BY NELNET, INC.



NNI 00005

Confidential

N0001005

**Nelnet Education Loan Funding, Inc.**
121 South 13th Street, Suite 201
Lincoln, Nebraska 68508
402.458.2303

May 28, 2003

United States Department of Education
Attention: Angela Roca-Baker
600 Independence Avenue S.W.
Washington, DC 20202

Re:   **LaRS Billing Statement Confirmation**

Dear Ms. Roca-Baker:

This letter is being written to confirm the proper way to submit Lender's Request for Payment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed by a different NELF financing prior to being placed into the 1985 Indenture. As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings that are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture, under 20 U.S.C. § 1087-1(b)(2)(B) and 34 C.F.R. § 682.302(e)(3), we intend to bill for special allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00006

N0001006

Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, NELF will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (one-half of 91-day Treasury bill plus 3.5%, divided by 4, subject to the minimum of 9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to existing applicable laws and regulatory guidance at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. We intend to proceed under the analysis described above and assume its correctness, unless we are otherwise directed by you. Thank you for your consideration of this matter.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.

_____                    _____
I concur with the above.                              Date

cc: Kristie Hansen
    Frank Ramos
    Sally Stroup
    Jeff Andrade

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00007

N0001007

[NELF Letterhead]

[Date]

United States Department of Education
Attention: Angela Roca-Baker
600 Independence Avenue, S.W.
Washington, DC 30202

Deleted: [Insert Address]¶
[Insert Address]¶

Re:   LaRS Billing Statement Confirmation

Dear Ms. Roca-Baker:

This letter is being written to confirm the proper way to submit Lender's Request for Payment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed by a different NELF financing prior to being placed into the 1985 Indenture. As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture, under 20 U.S.C. § 1087-1(b)(2)(B) and 34 C.F.R. § 682.302(c)(3), we intend to bill for special allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable

Deleted: i)ii

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00008

Confidential                              N0001008

financing, NELF will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (one-half of 91-day Treasury bill plus 3.5%, divided by 4, subject to the minimum of 9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(c)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to existing applicable laws and regulatory guidance at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. We intend to proceed under the analysis described above and assume its correctness, unless we are otherwise directed by you. Thank you for your consideration of this matter.

Deleted: your view

Deleted: If you find our analysis is incorrect or deficient in any manner, please advise us as soon as possible.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.

I concur with the above.                                                Date

cc: Kristie Hansen
    Frank Ramos
    Sally Stroup
    Jeff Andrade

Deleted: Rod Baert
William Hansen¶

Deleted: Andre

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00009

N0001009



FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00010

N0001010

Exhibit 75

# CONFIDENTIAL

# FILED UNDER SEAL

| From: | Mike Dunlap [Mike.Dunlap@ubt.com] |
|---|---|
| Sent: | Thursday, May 29, 2003 7:49 AM |
| To: | Nowikowski, Elise; Kaplan, Dan (PERRY); Dunlap, Mike; Butterfield, Steve; Heimes, Terry; Bouc, Don; Kruger, Jim; Martinez, Ed; Tone, Paul; Munn, Bill; Pohl, Mike; Schleuger, Gary |
| Subject: | RE: DOE letter and chart |

Terry cc her boss also. Thanks


-----Original Message-----
From: Nowikowski, Elise <elise.nowikowski@nelnet.net>
To: Kaplan, Dan (PERRY) <dkaplan@perrylawfirm.com>; Dunlap, Mike <Mike.Dunlap@nelnet.net>;
Butterfield, Steve <stephen.butterfield@nelnet.net>; Heimes, Terry
<terry.heimes@nelnet.net>; Bouc, Don <don.bouc@nelnet.net>; Kruger, Jim
<jim.kruger@nelnet.net>; Martinez, Ed <ed.martinez@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>; Munn, Bill <bill.munn@nelnet.net>; Pohl, Mike
<mike.pohl@nelnet.net>; Nowikowski, Elise <elise.nowikowski@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed May 28 07:26:49 2003
Subject: RE: DOE letter and chart

Dan,
I agree with Gary that Angela Roca-Baker is the expert but I question her authority to
sign this letter.  In the very least, her boss, Frank Ramos should be copied.  Angela
reports to Frank who reports to Kristie.  If Bill Hansen is being copied, perhaps Terry
Shaw (Kristie's boss) should be as well - then you have the entire FSA chain of command
covered.  Jeff's last name is spelled Andrade.  I presume that Gary is the best person to
have all the correct addresses.

I also recommend deleting the next to the last sentence of the last paragraph, "If you
feel our analysis is incorrect . . . .".  It gives them an out.

Elise
-----Original Message-----
From: Daniel F. Kaplan [mailto:dkaplan@perrylawfirm.com]
Sent: Tuesday, May 27, 2003 5:56 PM
To: Dunlap, Mike; Steve Butterfield; Heimes, Terry; Don Bouc; Kruger, Jim; Martinez, Ed;
Tone, Paul; Munn, Bill; Pohl, Mike; Nowikowski, Elise; Gary Schleuger
Subject: DOE letter and chart


Attached please find a revised draft of the letter to the DOE with respect to Project 950;
one version has been blacklined to reflect the changes, and one is clean.  Please note
that we have added a long list of people to receive copies of the letter; I'm sure that I
have butchered up spellings of names, so someone please help me with this.  Also, can
someone please furnish me with the correct addresses for all of these people?  I'll
apologize in advance if I left anyone off of this email that should have been included.
Please respond with comments/questions as soon as possible since we intend to get this out
Wednesday.  Thanks.  dfk



------------------------------------------------------------
The information contained in this message is confidential proprietary property of Nelnet,
Inc. and its affiliated
companies (Nelnet) and is intended for the recipient only.
Any reproduction, forwarding, or copying without the express permission of Nelnet is
strictly prohibited. If you have received this communication in error, please notify us
immediately by replying to this e-mail.

1

OIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

Confidential

EXHIBIT
Heimes 35
3.4.10  mv

NNI 00011

N0001011

Exhibit 76

# CONFIDENTIAL

# FILED UNDER SEAL

**From:** Tone, Paul
**Sent:** Thursday, June 19, 2003 1:30 PM
**To:** Odom, Sheila; Noordhoek, Jeff; Smitterberg, Hannah; Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Heimes, Terry; Kruger, Jim; Bouc, Don
**Subject:** RE: Getting prepared for NELF

I would strongly discourage us from including names of those in the Department with whom we've been in communication.. I would similarly discourage another letter to ED... To reference those people and to send another letter would destroy our relationship with ED.

-----Original Message-----
**From:** Odom, Sheila
**Sent:** Thursday, June 19, 2003 11:07 AM
**To:** Noordhoek, Jeff; Smitterberg, Hannah; Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Heimes, Terry; Kruger, Jim; Bouc, Don; Tone, Paul
**Subject:** RE: Getting prepared for NELF
**Importance:** High

Please be advised of the attached communication plan regarding this issue. As the steps necessary in this plan need to take place asap, I ask for any comments by 11:30am tomorrow (Fri). Paul, may I ask you for the dates of the prior communications with the Department and the correct names related with such? Thank you. << File: 9.5% floor use communication plan.doc >>

Sheila Odom
Corporate Communications
402-458-2329
nelnetcommunications@nelnet.net

-----Original Message-----
**From:** Noordhoek, Jeff
**Sent:** Thursday, June 19, 2003 10:06 AM
**To:** Smitterberg, Hannah; Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Heimes, Terry; Kruger, Jim
**Cc:** Odom, Sheila; Bouc, Don; Tone, Paul
**Subject:** RE: Getting prepared for NELF

It is a good point. Essentially the world will know that we are securitizing a billion $ in 9.5% floor loans. We should have a company line. I cc'd Sheila, Don, and Paul so they are aware that this might be an issue.

Jeff

-----Original Message-----
**From:** Smitterberg, Hannah
**Sent:** Wednesday, June 18, 2003 9:23 PM
**To:** Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Noordhoek, Jeff; Heimes, Terry; Kruger, Jim
**Subject:** Getting prepared for NELF

I think we all need to think about what our response is going to be when this book hits the street next week. Certain people will figure out what we are doing by reading it. We can only assume that it will just be a matter of time until someone who we don't much care for and who is able to put two and two together gets a copy. It has the potential to be a top shelf conversation and controversy piece, and I think we need to decide what the party line will be and what spin we are going to put on it.

**Hannah Smitterberg**
**Nelnet Capital Markets**
6991 East Camelback Road
Suite B-290
Scottsdale, AZ 85251
Ph: 480-947-7703
Fax: 480-947-5452
E-mail: hannah.smitterberg@nelnet.net

1

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

Confidential

NNI 0002f

N0001028

EXHIBIT Heimes 36 3.9.10

Exhibit 77

# CONFIDENTIAL

# FILED UNDER SEAL

**Communication plan for Nelnet's use of the 9.5% floor**

**Overview:** While Nelnet has conducted a full review of the availability and legitimacy of utilizing the 9.5% floor earnings, we believe our actions could come under scrutiny in the student loan industry and will therefore lay the foundation for a prepared response. This plan outlines the activities that will take place to best position Nelnet to not only respond to such scrutiny, but to better enhance its own industry image as a guardian of best practices.

**Background:** Prior to entering into any transaction related to such floor earnings, Nelnet performed its own "due diligence" on such practices through multiple communications with the Department of Education. These communications were in both personal and written form to 1.) confirm the allowance of such practices; 2.) notify the Department of Nelnet's intent to utilize the earnings opportunity; 3.) further notify the Department of Nelnet's intent to submit for payment.

Throughout this time, no communication was met with a negative response from the Department, and in fact, personal communications with Kristie Hansen and (NAME), Nelnet provided Nelnet with confirmation that utilization of 9.5% floor earnings was indeed allowable.

**Method:** Nelnet will take four immediate steps to brace for any negative backlash from our book hitting the street next week.

Step one: We will post a press release to *our Web site only* to take a proactive position in summarizing our "statement" as shown below and focusing on two or three ways Nelnet supports its commitment as a student loan funder. The release will not just focus on the 9.5% issue but it will allow us the ability to say that we openly presented the information to any of our borrowers, customers, schools. By placing it just on our Web site and not doing an external release, we will not draw much attention but can also take a proactive position in how we explain our actions.

Step two: We will issue a letter to the Department of Education that outlines the steps we took to confirm the viability of the 9.5% utilization, masked as a thank you to them for their guidance and a statement of our commitment to the student loan industry as a funder. A copy of this letter could then be provided to anyone we would feel appropriate (i.e. a reporter, etc) as proof that we have been overly cautious to follow all procedures, etc.

Step three: We will prep Don Bouc with the statement below and the timeline/detail of our communications to ED so he is well equipped and comfortable in responding to any inquiries – both positive and negative.

Step four: We will notify Nelnet's Executive Communication committee with a brief details regarding these plans to assure a consistent understanding throughout Nelnet leadership of our actions and key message of supporting our commitment to the industry as a funder.

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

EXHIBIT
Heimes 37
3-9-10 m v

Confidential

NNI 00025

N0001025

**STATEMENT:** (in brief) Nelnet has provided funding for student loans since 1978. These 25 years of experience have taught us that we must exercise sound financial practices to continue to meet the ever increasing need for student aid. That includes utilizing benefits provided to student loan funders by the Department of Education, such as the 9.5% floor earnings option.

We maintain a strong relationship with the Department of Education and have had multiple contacts with Department leadership to assure our access to this type of opportunity was conducted correctly and appropriately. The financial benefits of this type of funding will provide a valuable infusion to the education finance industry at a time when students and schools both face higher costs and greater needs.

(in detail)
Nelnet has a 25 year origin in student loan funding. Meaning, that since 1978, we have been in the business of purchasing the student loans issued by banks across the nation, freeing their capital to make additional loans. However, to effectively infuse the student loan marketplace with these funds, Nelnet must exercise sound financial practices to both protect our loan portfolio and grow our funding capacity to meet the needs of our lender partners.

Once such financial opportunity presented to student loan organizations by the Department of Education allows "secondary market" student loans to be placed in a tax-exempt bond at an interest rate of 9.5%. Should those loans be transferred out of this tax-exempt status, they are allowed to maintain the 9.5% rate, which provides a favorable financial gain to the loan holder.

While Nelnet was aware others in the industry were utilizing this option, our organization did not pursue the opportunity until fully investigating its legitimacy as detailed below. Upon a satisfactory review of the allowance, Nelnet has begun to use the method in addition to our competitors.

In this day of rising tuition costs and increased demand for student aid, Nelnet is pleased to continue the funding we have provided for over two decades and are confident that our sound financial management will continue to provide a direct benefit to the students, schools, and lenders we serve.

Detail of contact with Department of Education:

| Date | Action |
|------|--------|
| WHEN | WHO? Conducted a personal conversation with Kristie Hansen to confirm allowability of 9.5% floor usage. Received verbal confirmation that this was an allowed practice. |
| WHEN | Mike Dunlap, Chairman of Nelnet, and WHO conducted a personal meeting with Kristie Hansen and (NAME OF HER BOSS) to readdress allowability of 9.5% floor usage and again received confirmation that this was an allowed practice. |
| WHEN | Nelnet issued written correspondence to the Department recognizing the prior two discussions and providing notification that the company intended to submit for payment. |

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00826

N0001026

Mon. June 23, 2003

Nelnet issued written correspondence to the Department thanking Kristie Hansen for her guidance in the process and noting Nelnet's commitment to continue to seek opportunities to support its role as a student loan funder, thus supporting the industry as a whole.

**Conclusion:** While Nelnet cannot stop scrutiny of this or any of its business practices, the above communication plan will minimize any repercussions of such and provides Nelnet a forum to accentuate the company's role as a long-term student loan funder and trusted relationship with the Department.

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00027

Confidential

N0001027

Exhibit 80

# CONFIDENTIAL

# FILED UNDER SEAL

| From: | Tone, Paul |
|---|---|
| Sent: | Thursday, July 01, 2004 10:30 PM |
| To: | Odom, Sheila; Heimes, Terry; Kruger, Jim; Dunlap, Mike; Butterfield, Steve; Watson, Cheryl; Noordhoek, Jeff; Martinez, Ed; Kaplan, Dan (PERRY): 'GTanenbaum@Cahill.com'; 'jlarish@cahill.com' |
| Subject: | Re: 9.5% release - urgent review needed |

My apologies..    We HAVE to figure out how NOT to include the actual
dollar impact in this press release..

-----Original Message-----
From: Odom, Sheila <Sheila.Odom@nelnet.net>
To: Heimes, Terry <Terry.Heimes@nelnet.net>; Kruger, Jim
<Jim.Kruger@nelnet.net>; Tone, Paul <paul.tone@nelnet.net>; Dunlap, Mike
<Mike.Dunlap@nelnet.net>; Butterfield, Steve
<stephen.butterfield@nelnet.net>; Watson, Cheryl
<Cheryl.Watson@nelnet.net>; Noordhoek, Jeff <jeff.noordhoek@nelnet.net>;
Martinez, Ed <ed.martinez@nelnet.net>; Kaplan, Dan (PERRY)
<dkaplan@perrylawfirm.com>; ''GTanenbaum@Cahill.com' '
<GTanenbaum@Cahill.com>; ''jlarish@cahill.com' ' <jlarish@cahill.com>
Sent: Thu Jul 01 18:55:00 2004
Subject: RE: 9.5% release - urgent review needed

Thanks all for the comments.  I've revised the below so take a look. In
addition to Terry's edits and Gerald's comment, I've reworked the phrase
talking about the add'l clarification.  I believe we have determined a
7:15am Central time call for the morning on the number Cheryl provided.
(Sorry Ed...)  If you want to fire some add'l thoughts to me on the
below tonight, I'll issue one more revision prior to the call in the am.
What is the final on the phrase about future periods?

Nelnet recognizes deferred income

(Lincoln, NE) – Today, Nelnet announced that, effective June 30, 2004,
it has recognized deferred income related to student loan portfolios
funded from the proceeds of tax-exempt bonds.

Based on provisions of the Higher Education Act of 1965, and related
interpretations, education lenders may receive special allowance
payments providing a 9.5% rate on loans previously financed with
tax-exempt obligations issued prior to October 1, 1993.  After an
additional review to clarify its previously disclosed
position, Nelnet has completed the earnings process and has
recognized the related income for the current and subsequent periods.

The deferred interest income OF APPROXIMATELY $79 MILLION BEFORE TAX AT
March 31, 2004, previously included in other liabilities on Nelnet's
balance sheet, combined with related EARNINGS IN THE SECOND QUARTER
ended June 30, 2004, has RESULTed IN ADDITIONAL NET INCOME OF
APPROXIMATELY $60-65 MILLION DURING THE CURRENT PERIOD.  The company
does not expect THE IMPACT ON future PERIODS to be as significant as
those recognized to date.

Recently named to the Russell 3000 index and awarded the Exceptional
Performance designation by the U.S. Department of Education, Nelnet is
one of the leading educational finance companies in the United States.
With over $12 billion in total assets, Nelnet originates in excess of $2
billion for itself and its service partners annually, and its servicing
software is used by 35 clients, including Nelnet, to service over $49
billion in student loans. Nelnet ranks among the nation's leaders in

1

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00194

Confidential

EXHIBIT
Heimes 43
3.9.10 mv

N0001194

terms of total student loan assets.

Additional information is available at www.nelnet.net.

###

Nelnet offers a broad range of student loan and financial services and
technology-based products, including student loan origination and
lending, guarantee servicing, and a suite of software solutions. Our
products are designed to simplify the student loan process by automating
financial aid delivery, loan processing, and funds disbursement. Our
services help to facilitate and streamline education finance for all
involved in the industry, including student and parent borrowers,
lenders, financial aid officers, guaranty agencies, governmental
agencies, servicers, and the capital markets.

2

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00195

N0001195

Exhibit 81

# CONFIDENTIAL

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Daniel F. Kaplan [dkaplan@perrylawfirm.com] |
| **Sent:** | Friday, July 02, 2004 10:06 AM |
| **To:** | Dunlap, Mike; Butterfield, Steve; Heimes, Terry; Noordhoek, Jeff; Watson, Cheryl; ed.martinez@nelnet.net; Tone, Paul; Tanenbaum, Gerald S.; Jim Larish (E-mail) |
| **Subject:** | FW: Summary of Phone Conversation |

I am forwarding to you Paul's email that I think is very helpful in placing the DOE's anticipated letter into proper context.

I would recommend that Paul send a short, informal email to Tim Cameron after the DOE letter is received, along the following lines:

"Tim, I just received the fax of the Department's response to our inquiry on the 9.5% billing issue. I wanted to let you know how much I appreciate all of your help in getting our inquiry resolved. Thanks again."

Such an email would help to frame the DOE letter as a positive response, and hopefully might make it more difficult (but certainly not impossible) for the DOE to assert a subsequent challenge.

-----Original Message-----
From: Tone, Paul [mailto:paul.tone@nelnet.net]
Sent: Thursday, July 01, 2004 5:13 PM
To: Daniel F. Kaplan; Martinez, Ed
Subject: Summary of Phone Conversation

On June 30, 2004, at approximately 9:30 AM, Tim Cameron from the Financial Partner Services channel of FSA in the Department of Education called in response to recent VM and EM inquiries I had left re: the status of a response to our letter concerning the appropriate process to be followed to bill I/SAP on 9.5% floor loans. Our letter to ED had been mailed in May of 2003.

Tim advised that as a result of the  earlier inquiries of several weeks prior to the most recent one - he had located the letter... and forwarded it to the Office of Postsecondary Education and to the Office of General Counsel. He said that he understood that given the nature of the letter it had been forwarded to Sally Stroup the Assistant Secretary of Postsecondary Education.

The letter apparently stayed in Sally's area until Monday when she, Tim (and perhaps others) met with Sally's "boss" - I don't recall his/her name nor title. Tim then observed that the letter that would be sent to us may not be as direct a response as we might have expected. He explained by summarizing the meeting - during which it was determined that it would be inappropriate for the Department to endorse a specific entities process
-
however, they would respond by referring us to the regulatory guidance and DCL which addressed the issue.

Tim noted that nothing came up in the meeting that challenged or questioned the process that we had outlined in our letter. He concluded by noting that he thought it was a positive letter.

He then offered to EM the draft asking that we appreciate the fact that it could change since it was not yet signed.

--------------------------------------------------------------------
The information contained in this message is confidential proprietary property of Nelnet, Inc. and its affiliated
companies (Nelnet) and is intended for the recipient only.

1

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

Confidential

NNI 00247

**EXHIBIT**
Heimes (44)
3.9.10 mv

N0001247

Any reproduction, forwarding, or copying without the express permission of Nelnet is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail.
------------------------------------------------------------------------

2

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00248

Confidential

N0001248

# Exhibit 82

# CONFIDENTIAL

# FILED UNDER SEAL

02/02/2004 13:24 FAX 202 275 0913          FSA FP Services                    @001

UNITED STATES DEPARTMENT OF EDUCATION
THE OFFICE OF STUDENT FINANCIAL ASSISTANCE
WASHINGTON, D.C. 20202

## FAX COVER SHEET

**U.S. Department of Education**
**Financial Partners**
Union Center Plaza, 11th Floor
400 Maryland Avenue, SW, Mail Stop 5138
Washington, DC 20202-5138
Phone (202) 377-3300    Fax (202) 275-0913

Date:  7/2/04

Number of pages including cover sheet:  2

TO:  Mike Dunlap

Department/Agency:

Phone:

Fax:  402-458-2294

FROM:  Mike Sophian

Phone:  202-377-3624

Fax:  Above

Message:  Mike —> Paul Tone requested that the attached letter be faxed to your attention.

*We help put America through school.*

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.



Confidential

NNI 00250

N0001250

07/02/2004 13:24 FAX 202 275 0813          FSA FP Services                          @002



Mr. Paul Tone                                          JUN 3 0 2004
Government and Industry Relations
Nelnet
3015 South Parker Road, Suite 400
Aurora, CO 80014

Dear Mr. Tone,

This letter is in response to Nelnet's May 29, 2003 correspondence with regard to
confirmation of the proper way for a lender to submit the Lender's Request for Payment of
Interest and Special Allowance (LaRS) as it relates to portfolios funded from the proceeds of
the tax-exempt 1985 Indenture.

34 C.F.R. Section 682.302(e) provides guidance with regard to special allowance payments
for loans financed by proceeds of tax-exempt obligations. Additionally, the formulas for the
calculations are provided in 34 C.F.R. Section 682.302(c).  You can also refer to Dear
Colleague Letter 96–L–186 for additional information.

Please let me know if you have any questions or concerns.

Sincerely,

Victoria L. Bateman, CPA, CGFM
Chief Financial Officer and
Acting General Manager, Financial Partner Services, FSA

830 First Street, NE, Washington, D.C. 20202
1-800-4-FED-AID
www.studentaid.ed.gov

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00251

Confidential                                          N0001251

Exhibit 83

# CONFIDENTIAL

# FILED UNDER SEAL

## ESCROW RESERVE AGREEMENT

This Escrow Reserve Agreement, dated as of April 1, 2004 (this "Agreement"), is entered into by and between **NELNET EDUCATION LOAN FUNDING, INC.**, a Nebraska corporation (the "Issuer"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as escrow agent (the "Escrow Agent).

**Section 1. Receipt of Escrowed Funds.** The Escrow Agent shall receive, from time to time from the Issuer, funds which are subject to release pursuant to Sections 5.03(c)(xviii) and 5.10 of the Indenture of Trust, dated as of April 1, 2004 (the "Indenture"), among the Issuer, Wells Fargo Bank, National Association, as eligible lender trustee, and Wells Fargo Bank, National Association, as trustee (the "Trustee"). Said funds will be transferred to the Escrow Agent from the Trustee at the direction of the Issuer or the Administrator (as defined in the Indenture) acting on its behalf and consist of that portion, if any, of Special Allowance Payments made by the Department of Education under a program establishing a minimum rate of return of 9.5% per annum on certain student loans previously financed with tax-exempt obligations which rate of return exceeds Special Allowance Payments payable with respect to such student loans if such student loans were not subject to such minimum Special Allowance Payment rate of 9.5% per annum (the "Escrowed Funds"). There currently are outstanding issues related to the rightful ownership and entitlement of the Escrowed Funds and thus the Issuer desires to segregate the Escrowed Funds until such time as the terms of disbursement for the Escrowed Funds have been satisfied pursuant to Section 4 hereof.

**Section 2. Investments.** The Escrowed Funds shall be invested by the Escrow Agent in Investment Securities (as defined in the Indenture) designated by the Issuer or, if the Issuer fails to designate an Investment Security, in Wells Fargo Funds, a money market mutual fund, until disbursed according to Section 4 hereof. The Escrow Agent may purchase or sell securities only as authorized herein, through itself or a related subsidiary as principal or agent, and the Escrow Agent shall not be liable or responsible for any loss resulting from any such investments

**Section 3. Interest.** Any interest income earned from the investment of the Escrowed Funds shall be credited to the Issuer's account and considered part of the Escrowed Funds.

**Section 4. Disbursement of Funds.** The Escrowed Funds shall be immediately released to the Issuer on either of the following conditions: (a) the Escrow Agent receives a disbursal request signed by the Chief Financial Officer of the Issuer, which encloses a copy of a written directive or position statement from the United States Department of Education which indicates which persons or entities are the rightful owner of the Escrowed Funds; or (b) the Escrow Agent receives an opinion letter from outside counsel to the Issuer, currently Perry, Guthery, Haase & Gessford, P.C., L.L.O., stating that said firm has conducted a sufficient factual and legal investigation to give an opinion on which persons or entities have a reasonably sufficient legal claim to the Escrowed Funds, said opinion shall only be required to identify the party having such a claim to the Escrowed Funds and provide disbursement instructions to the Escrow Agent. It is expressly agreed that the Escrow Agent has no obligation to investigate the legal sufficiency of any of the above described disbursement instructions and opinions.

02-170067.3

Exhibit 78
Date 5-20-10
Julie Pell, RPR, CRR, CSR, CCR

Confidential

N0003033

This Agreement shall terminate upon disbursement of all of the Escrowed Funds in accordance with the terms as set forth above, including any interest income earned, upon receipt of a disbursal request in accordance with the terms as set forth above.

The Escrow Agent is not responsible and does not warrant, convey or guarantee in any form or manner that the disbursed Escrowed Funds will be used by Issuer for the purposes herein stated or stated elsewhere.

**Section 5. Duty of the Escrow Agent.** The sole duty of the Escrow Agent is to receive the Escrowed Funds and invest the same pursuant to Section 2 hereof, pending disbursement pursuant to Section 4 hereof. The Escrow Agent is not responsible for accounting or maintaining any records other than to document the wires received, the Escrowed Funds disbursed and interest earned.

**Section 6. Documents.** The Escrow Agent may conclusively rely upon and shall be protected in acting upon any statement, certificate, notice, request, consent, order or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall have no duty or liability to verify any such statement, certificate, notice, request, consent, or order or other document and its sole responsibility shall be to act only as expressly set forth in this Agreement. The Escrow Agent shall be under no obligation to institute or defend any action, suit or proceeding in connection with this Agreement unless first indemnified to its satisfaction by the Issuer.

**Section 7. Fees.** The Escrow Agent is entitled to $500 as compensation for its services rendered as escrow agent under this Agreement. Said fee shall be payable by the Issuer. The Escrow Agent may in its discretion deduct said fees from the interest earned on the Escrowed Funds if said compensation is not paid by the Issuer.

**Section 8. Tax Related Terms.**

    (a)    *Tax Reporting.* The Issuer agrees that, for tax reporting purposes, all interest or other taxable income earned from the investment of the Escrowed Funds in any tax year shall be taxable to the Issuer.

    (b)    *Certification of Tax Identification Number.* Issuer agrees to provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and other forms and documents that the Escrow Agent may reasonably request. The Issuer understands that if such tax reporting documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the investment of moneys or other property held by the Escrow Agent pursuant to this Agreement.

    (c)    *Taxes.* The Issuer agrees to indemnify and hold the Escrow Agent harmless from and against any taxes, additions for late payment, interest, penalties and other expenses that may be assessed against the Escrow Agent on or with respect to any payment or other activities under this Agreement.

Confidential          N0003034

**Section 9. Indemnification of Escrow Agent.** The Issuer hereby indemnifies and holds harmless the Escrow Agent from and against, any and all loss, liability, cost, damage and expense, including, without limitation, reasonable counsel fees, which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent arising out of or relating in any way to this Agreement or any transaction to which this Agreement relates unless such action, claim or proceeding is the result of the willful misconduct of the Escrow Agent. The Escrow Agent may consult counsel in respect of any question arising under this Agreement and the Escrow Agent shall not be liable for any acting taken or omitted in good faith upon advice of such counsel.

**Section 10. Notices.** All notices, requests, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) on the date of service if served personally on the party to whom notice is to be given; (b) on the day of transmission if sent by facsimile transmission to the facsimile number given below, and telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first-class mail, registered or certified, postage prepaid, and properly addressed, return receipt requested, to the party as follows:

To the Issuer:

> Terry J. Heimes, President
> Nelnet Education Loan Funding, Inc.
> Suite 201
> 121 South 13th Street
> Lincoln, NE 68508
> Telephone: (402) 458-2303
> Facsimile: (402) 458-2399

To the Escrow Agent:

> Wells Fargo Bank, National Association
> MAC N9303-110
> Sixth Street and Marquette Avenue
> Minneapolis, MN 55479
> Telephone: (612) 667-4802
> Facsimile: (612) 667-2149
> Attention: Scott Ulven, Corporate Trust Officer

Wires to the Escrow Agent should be directed to the following, if applicable:

> Wells Fargo Bank, National Association
> ABA #121000248
> Trust Clearing Account # 0001038377
> For Credit to: NELF 2004-2 Escrow Account

02-170067.3

3

N0003035

Any party may change its address for purposes of this paragraph by giving the other party written notice of the new address in the manner set forth above,

**Section 11. Successors and Assigns**. Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent to the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect. Any corporation into which the Escrow Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Escrow Agent shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Escrow Agent, shall be the successor of the Escrow Agent hereunder, provided such corporation shall be otherwise qualified and eligible under this Agreement, without the execution or filing of any paper of any further act on the part of any other parties hereto. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

**Section 12. Governing Law; Jurisdiction**. This Agreement shall be construed, performed and enforced in accordance with, and governed by, the internal laws of the State of Minnesota, without giving effect to the principles of conflicts of laws thereof. Each party hereby consents to the personal jurisdiction and venue of any United States District Court for the District of Minnesota located in Hennepin County, Minnesota.

**Section 13. Severability**. In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect.

**Section 14. Amendments; Waivers**. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties hereto, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 15. Entire Agreement**. This Agreement contains the entire understanding among the parties hereto with respect to the escrow contemplated hereby and supersedes and replaces all prior and contemporaneous agreements and understandings, oral or written, with regard to such escrow.

**Section 16. Section Headings**. The section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 17. Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

**Section 18. Resignation**. The Escrow Agent may resign upon 30 days' advance written notice to the Issuer. If a successor Escrow Agent is not appointed within the 30-day period

02-170067.3                                     4

Confidential                        N0003036

following such notice, the Escrow Agent may petition any court of competent jurisdiction to ne a successor Escrow Agent.

**15**

Confidential

N0003037

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Reserve Agreement to be executed the day and year first set forth above.

NELNET EDUCATION LOAN FUNDING, INC.

By _____
     Terry J. Heimes, President

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By _____
     Scott E. Ulven, Assistant Vice President

1

02-170067.3

6

N0003038

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Reserve _reement to be executed the day and year first set forth above.

NELNET EDUCATION LOAN FUNDING, INC.

By _____
        Terry J. Heimes, President

WELLS   FARGO   BANK,   NATIONAL ASSOCIATION, as Escrow Agent

By _____
        Scott E. Ulven, Assistant Vice President

**15**

02-170067.3                           6

Confidential

N0003040

Exhibit 84

# CONFIDENTIAL

# FILED UNDER SEAL

| | |
|---|---|
| **From:** | Daniel F. Kaplan [dkaplan@perrylawfirm.com] |
| **Sent:** | Thursday, July 01, 2004 6:37 PM |
| **To:** | . Odom, Sheila; Dunlap, Mike; Butterfield, Steve; Tone, Paul; Watson, Cheryl; Noordhoek, Jeff; Heimes, Terry; Martinez, Ed |

**Subject:** RE: 9.5% release - urgent review needed

Terry confirmed that the funds do not need to be released from escrow in order for them to be recognized, so I am OK with the proposed timing of the release.

I would suggest changing the 2nd sentence of the 2nd paragraph of the release to something along the following lines: "Nelnet has completed steps in the earnings process necessary to recognize the related income in the current and subsequent periods." I want to reduce the chances of someone arguing that Nelnet's statement that it "has received additional information clarifying its previous position" misled anyone to believe that Nelnet has received clarification of Nelnet's position from the DOE, as the DOE letter is subject to some interpretation. My concern arises from the fact that we have previously disclosed that we requested clarification from the DOE on this matter.

-----Original Message-----
From: Odom, Sheila [mailto:Sheila.Odom@nelnet.net]
Sent: Thursday, July 01, 2004 4:54 PM
To: Dunlap, Mike; Butterfield, Steve; Tone, Paul; Watson, Cheryl; Noordhoek, Jeff; Heimes, Terry; Martinez, Ed; Daniel F. Kaplan; 'Tanenbaum, Gerald S.'; 'Larish, James'
Subject: 9.5% release - urgent review needed
Importance: High

Below is the draft press release which Gerald and Jim will review tonight. I would ask all parties to submit comment by 9pm Central tonight as this release will issue prior to market open (9:30am Eastern) tomorrow if the faxed letter is received prior to that time. You can call me on my cell at 402.480.0410 or at my home office of 402.780.5708 after 7pm. Terry - Mike and I discussed an "after tax" reference to the total amount, please check the range and tighten if at all possible. Gerald was comfortable with our not . specifically naming a correspondence from the Dept of Ed.

**Nelnet recognizes deferred income**

(Lincoln, NE) - Today, Nelnet announced that, effective June 30, 2004, it has recognized deferred income related to student loan portfolios funded from the proceeds of tax-exempt bonds.

Based on provisions of the Higher Education Act of 1965, and related interpretations, education lenders may receive special allowance payments providing a 9.5% rate on loans previously financed with tax-exempt obligations issued prior to October 1, 1993. Nelnet has received additional information clarifying its previously disclosed position and allowing the completion of the earnings process and recognition of the related income in the current and subsequent periods. The deferred income as of March 31, 2004, which was previously included in other liabilities on Nelnet's balance sheet, and additional income recognized at the quarter ended June 30, 2004, have resulted in after-tax revenues of approximately $65 million. The company does not expect future proceeds to be as significant as those recognized to date.

Recently named to the Russell 3000 index and awarded the Exceptional Performance designation by the U.S. Department of Education, Nelnet is one of the leading educational finance companies in the United States. With over $12 billion in total assets, Nelnet originates

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.



Exhibit 80
Date 5-20-10
Julie Pell, RPR, CRR, CSR, CCR

NNI 00143

N0001144

in excess of $2 billion for itself and its service partners annually, and its servicing software is used by 35 clients, including Nelnet, to service over $49 billion in student loans. Nelnet ranks among the nation's leaders in terms of total student loan assets.

Additional information is available at www.nelnet.net.

### ###

Nelnet offers a broad range of student loan and financial services and technology-based products, including student loan origination and lending, guarantee servicing, and a suite of software solutions. Our products are designed to simplify the student loan process by automating financial aid delivery, loan processing, and funds disbursement. Our services help to facilitate and streamline education finance for all involved in the industry, including student and parent borrowers, lenders, financial aid officers, guaranty agencies, governmental agencies, servicers, and the capital markets.

(code #: nnif)

Sheila Odom
Corporate and Marketing Communications
402.458.2329
nelnetcommunications@nelnet.net

The information contained in this message is confidential proprietary property of Nelnet, Inc. and its affiliated companies (Nelnet) and is intended for the recipient only. Any reproduction, forwarding, or copying without the express permission of Nelnet is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail.

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNi 00144

Exhibit 85

# CONFIDENTIAL

# FILED UNDER SEAL



### UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

NOV 2 4 1993

Mr. David M. Reicher, Esq.
Foley & Lardner
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5367

Dear Mr. Reicher:

Thank you for your letter of October 14 regarding the statutory special allowance rates that would be applicable to the refunding of three outstanding "tax-exempt" bond issues.

You indicated that the Alabama Higher Education Loan Corporation (the Corporation) intends to issue "tax-exempt" refunding bonds to redeem or otherwise retire the three original obligations, specified in your letter, each of which was issued prior to October 1, 1993. Based on the facts presented in your letter, we concur that the special allowance rates will continue to be determined pursuant to §§438(b)(2)(B)(i) and (ii) of the Higher Education Act of 1965, as amended.

Please do not hesitate to contact me should you have further questions.

Sincerely,

Pamela A. Moran
Acting Chief, Loans Branch
Division of Policy Development
Policy, Training, and Analysis Service

Moskowitz
2
5/14/10

400 MARYLAND AVE., S.W. WASHINGTON, D.C. 20202

Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation.

CONFIDENTIAL

B9005808

FOLEY & LARDNER

FIRSTAR CENTER
777 EAST WISCONSIN AVENUE
MILWAUKEE, WISCONSIN 53202-5367
TELEPHONE (414) 271-2400
TELEX 26-849
(FOLEY LARD MIL)
FACSIMILE (414) 289-3791
WRITER'S DIRECT LINE

414-289-3544

MADISON, WISCONSIN
CHICAGO, ILLINOIS
WASHINGTON, D.C.
ANNAPOLIS, MARYLAND
JACKSONVILLE, FLORIDA
ORLANDO, FLORIDA
TALLAHASSEE, FLORIDA
TAMPA, FLORIDA
WEST PALM BEACH, FLORIDA

A MEMBER OF GLOBALEX
WITH MEMBER OFFICES IN

LONDON, ENGLAND
PARIS, FRANCE
BERLIN, GERMANY
STUTTGART, GERMANY
DRESDEN, GERMANY
SINGAPORE
TAIPEI, TAIWAN

October 14, 1993

Mr. Ralph Madden
Program Specialist
FFELP Loans Branch
Division of Policy and Program Development
Policy, Training, and Analysis Service
United States Department of Education
7th and D Street, S.W.
ROB-3, Room 4310
Mailstop 5343
Washington, D.C.  20202

Re:  Payment of Special Allowance on Eligible Loans
     Financed by Refunding Obligations

Dear Mr. Madden:

We have been requested by Alabama Higher Education Loan Corporation (the "Corporation") to obtain written confirmation from the Department of Education (the "Department") of the Corporation's understanding of the special allowance rate that will apply to certain eligible loans.  In particular, the Corporation wishes to confirm that, following the refunding transaction described below, the special allowance rate for these eligible loans will be determined under clauses (i) and (ii) of Section 438(b)(2)(B) of the Higher Education Act of 1965, as amended (the "Higher Education Act").  In considering your response to this letter, you may assume that all loans will be "eligible loans" as defined in Section 438(b)(5) of the Higher Education Act.

The Corporation intends to refund three outstanding bond issues, the income from which is exempt from taxation under the Internal Revenue Code of 1986, as amended (the "Code", which term includes its predecessor, the Internal Revenue Code of 1954, as amended) (the "Original Obligations").  The Original Obligations, each issued prior to October 1, 1993, include:

CONFIDENTIAL

B9005809

United States Department of Education
October 14, 1993
Page 2

1.   Approximately $12,765,000 outstanding principal amount of Student Loan Revenue Bonds, 1986 Series A and B originally issued on April 8, 1986 in the aggregate principal amount of $63,500,000;

2.   Approximately $19,615,000 outstanding principal amount of Student Loan Revenue Bonds, 1987 Series A originally issued on March 5, 1987 in the aggregate principal amount of $40,000,000; and

3.   Approximately $34,450,000 outstanding principal amount of Weekly Adjustable/Fixed Rate Student Loan Revenue Bonds, Series 1992-B, originally issued on June 25, 1992 in the aggregate principal amount of $35,000,000.

The Corporation intends to issue refunding bonds, the income from which will be excluded from gross income under the Code (the "Refunding Bonds"), in early December 1993 and to immediately apply the proceeds to redeem or to otherwise retire the Original Obligations within 90 days.   Upon the issuance of the Refunding Bonds and the deposit of the proceeds thereof under the trust indentures for each of the Original Obligations, eligible loans and certain cash and proceeds currently held under those indentures will be transferred to the trustee (the "Trustee") under the indenture for the Refunding Bonds. In considering your response to this letter, you may assume that the Trustee will be an "eligible lender" under the Higher Education Act and the holder of the loans.

The Corporation believes that the special allowance rate applicable to eligible loans transferred to the Trustee, or made or purchased by the Trustee with funds transferred to the Trustee, from the indentures relating to the Original Obligations should be the rate based on Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act.   This rate, which includes the minimum floor, also should apply to eligible loans which are made or purchased by the Trustee with funds obtained by the Trustee from collections or default reimbursements on, or interest or other income pertaining to, eligible loans described in or made or purchased with funds described in the preceding sentence or from income on the investment of such funds.

Because the eligible loans described herein were or will be financed with funds obtained by the holder from the issuance of tax-exempt obligations originally issued prior to October 1, 1993, they would not be eligible for the full special allowance rate (without a floor) provided for in Section 438(b)(2)(B)(iv) of the Higher Education Act.

CONFIDENTIAL

B9005810

United States Department of Education
October 14, 1993
Page 3

      The Corporation intends to sell the Refunding Bonds in the first or second week of December 1993, and therefore, we respectfully request your expeditious response. Please do not hesitate to call me with any legal or factual questions that you may have in responding to this letter. I would also appreciate discussing the matter with you if the Department disagrees with the Corporation's conclusion regarding the applicable special allowance rate.

                            Very truly yours,

                            David M. Reicher

cc: Tom Roberson

C:\WP51\DOCS\DEPAOFED.LET[101499]MH.WEDMH.htw

CONFIDENTIAL

B9005811

Exhibit 86

# CONFIDENTIAL

# FILED UNDER SEAL

**Ricky Turman**

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Sunday, November 16, 2003 8:53 PM |
| **To:** | ricky.turman@bhesc.org |
| **Subject:** | RE: Draft Floor Opinion |

Yes, let's discuss.  I don't anticipate a problem, but I'll need to be clear
on the relationship between BHESC and the affiliate, and will need to add
some discussion on affiliates to the document.  Let's talk tomorrow.

*N/A - since only BHEA issues will buy the floor loans*

Saul Moskowitz
Moskowitz & Austin LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:   301.562.0600
Fax: 301.562.0635
Email:  moskowitz@msbllaw.com <mailto:moskowitz@msbllaw.com>

The information contained in this email may be confidential and privileged
attorney-client information or work product and is intended only for the
individual or entity to whom it is addressed. Any unauthorized use,
distribution or copying of this communication is strictly prohibited. If you
have received this communication in error, please notify this firm
immediately.  Moskowitz & Austin LLC believes that this E-mail and any
attachments were free of any virus, worm, or Trojan horse when sent.
However, this message and its attachments could have been infected during
transmission. By reading the message and opening any attachments, the
recipient accepts full responsibility for taking remedial action about
viruses and other defects. Moskowitz & Austin LLC is not liable for any loss
or damage arising in any way from this message or its attachments.

-----Original Message-----
From: Ricky Turman [mailto:ricky.turman@bhesc.org]
Sent: Sunday, November 16, 2003 6:25 PM
To: Saul L. Moskowitz; Adele Williams; Kelli Villarrial
Subject: FW: Draft Floor Opinion

Saul,
I have made a couple of comments that I want to make sure the facts and your
opinion can support. Please review my comments and give me a call.
Thanks.
Ricky

Ricky Turman
Secretary-Treasurer
Brazos Higher Education Service Corporation, Inc.
2600 Washington Ave.
Waco, TX 76710

phone: (254) 299-2154
fax:      (254) 753-2977
email: Ricky.Turman@bhesc.org

*Can it go into later dated*
*Tax-Exempt issues o*

*Moskowitz*
*8*
*5/14/10*
*8b*

-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@msbllaw.com]
Sent: Thursday, November 13, 2003 1:43 PM
To: Adele Williams (E-mail); Ricky Turman (E-mail)
Cc: Kelli Villarrial (E-mail)

1

Confidential

B0005437

*TAF EXEMPT LOAN SWAPS*

*550*
*394*
*944*

_____, 2003

[Brazos Address Block]

Re:    Request for Opinion

Dear _____:

This is in response to your request for our opinion regarding various proposed transactions involving the transfer of Federal Family Education Loan Program (FFELP) loans located in pre-October 1, 1993 Brazos Higher Education Authority, Inc. (hereinafter "AUTHORITY") tax-exempt bond estates to other taxable financing facilities of AUTHORITY.    For each proposed transaction, you ask whether the special allowance paid by the Department of Education on such loans after the transactions are completed would be calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds issued before October 1, 1993, or, alternatively, under the rules applicable to other FFELP loans.

In preparing this opinion, we have reviewed the FFELP statute and regulations, email correspondence between this firm and the Department of Education (Department) officials on these issues, published guidance from the Department, and other materials we deemed appropriate. We note that the guidance we have received from the Department by email has been confusing, and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations. As you will note from our discussion, this has significantly complicated our analysis.

## Facts

The proposed transactions are described in detail in the enclosed memorandum prepared by AUTHORITY. They essentially involve the transfer, in exchange for cash, of FFELP loans from existing pre-October 1, 1993 tax-exempt financing facilities of AUTHORITY to existing taxable bond financing facilities of AUTHORITY.

B0005438

AUTHORITY intends this process to result in the transferred loans remaining subject to the "floor yield/half sap" special allowance calculation described below after completion of the transaction. *or affiliates*.

After completion of such a transfer, the funds received by the tax-exempt bond estate would be used to purchase loans from third parties. Some or all of those loans would subsequently be transferred to a taxable bond estate of AUTHORITY in exchange for cash or other loans of comparable value. AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to a taxable estate in this manner would remain subject to the "floor yield/half sap" special allowance calculation at purchase and remain subject to such calculation after completion of the transfer.

## Opinion

For the reasons set forth below, it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions.

## Analysis

### I.      The Regulation, Its History, and Intent

The Federal regulation governing this issue is 34 CFR 682.302 (the "Regulation"). Under the Regulation, special allowance is paid when the interest payable on an FFEL loan by the borrower (or the Department on the borrower's behalf) falls below statutory levels deemed to represent a market level yield for the holder. Under subsection (c) of the Regulation, the special allowance rate is calculated quarterly by determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for that loan, and adding a certain percentage, which varies with the type of loan and when it was made. Subsections (c) and (e) of the Regulation set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums.

According to paragraph (c)(3) of the Regulation, the special allowance rate is one-half of the full sap rate for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from the proceeds of tax-exempt obligations originally issued prior to October 1, 1993, subject to certain minimum floors. This is referred to throughout this memorandum as "floor yield/half sap treatment". This treatment also applies to loans made with certain moneys derived from such loans and from the investment of proceeds of such tax-exempt obligations.

B0005439

Paragraph (e)(2) of the Regulation provides that, notwithstanding paragraph (c)(3), the Department will pay a special allowance to an authority at the full sap rate for a loan which has been made or purchased with the proceeds of tax-exempt obligations originally issued prior to October 1, 1993 –

    (1)    After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations; and

    (2)    If the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

In 1992, when paragraph (e)(2) of the Regulation was issued in its current form, the interest rate environment was such that the floor yield was not applicable, while the half sap calculation significantly reduced the yield on loans subject to floor yield/half sap treatment. This had created a substantial incentive for holders of such loans to find ways to convert them to full sap treatment through refinancing with taxable bonds and similar transactions. Existing Department guidance had exacerbated this problem by interpreting the prior regulations in a way that facilitated those activities.

According to later statements by the Department, the Regulation was issued in 1992 to make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal government money under then-existing market conditions. Specifically, in Question 30 of Dear Colleague Letter 96-L-186, the Department stated as follows--

> The [prior] regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions--if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.
>
> In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

B0005440

(Emphasis added.)1

Now, of course, market interest rates are considerably lower than in 1992. As a result, a holder of loans subject to floor yield/half sap treatment is loath to take any action that would convert the loan to full sap treatment and lose the benefit of the floor. However, in 1992 the Department "chose its poison" -- <u>i.e.</u>, it chose to make it harder to convert loans from floor yield/ half sap to full sap treatment, thus making it easier to avoid such a conversion today.

## II.    Conditions for Floor Yield/Half Sap Treatment of the Loans at Issue

Paragraph (e)(2) as explained by the Dear Colleague, requires that eligible loans financed with the proceeds of a tax-exempt obligation originally issued prior to October 1, 1993 remain subject to the tax-exempt special allowance provisions (<u>i.e.</u>, receive floor yield/half sap treatment) unless two conditions are met:

(1) the loans have been pledged or otherwise transferred in consideration of funds derived from sources other than tax-exempt obligations originally issued prior to October 1, 1993; and

(2) if the Authority retains a legal or equitable interest in the loans, the tax-exempt obligations which previously financed the loans are retired or defeased. 2

Pamela Moran of the Department has informed us by email correspondence of August 8, 2001 (Appendix B), that the required pledge or transfer described in the Regulation does not occur when an authority engages in a transaction that is more akin to a "refinancing" than a "sale". Specifically, Ms. Moran indicated that the requisite pledge or transfer was lacking in a situation where an authority purchased a loan out of a tax-exempt indenture by the use of monies held in the authority's general fund. Ms. Moran's rationale was that "nothing has changed about the loan except where it is held by the

---

1 In fact, the predecessor provision of paragraph (e)(2) closely resembled the revised language, save that the predecessor provision did not include the current language regarding the authority's retention of a legal or equitable interest in the loan. See 34 CFR 682.302(e)(3)(1988). The new language seems to clarify only that, if an authority does not retain an interest in a loan, the transfer of the loan to another party that is using taxable (or post-October 1, 1993 tax-exempt) financing results in the loan losing half sap/floor treatment. Moreover, the revised language is as susceptible to the same interpretation that the Department adopted with respect to the prior language—i.e., that it is silent on what special allowance treatment applies when the conditions in the paragraph are not met. We do not believe such an interpretation is particularly plausible, and, in any case, the Dear Colleague is clear in saying that the Department believes the new language does not allow for such an interpretation.

2 We believe the issue of whether floor yield/half sap treatment applies to a loan does not depend at all on whether it came to reside in the tax-exempt bond estate by direct purchase from a third party or by transfer from another financing vehicle of the Authority. Were this not the case, an Authority could easily have circumvented the intent of the 1992 regulations by purchasing loans with taxable financing and then immediately transferring them into a tax-exempt estate.

*— assuming one floor always floor.*
*(unless transaction @ true eliminates floor).*

authority". However, in the Dear Colleague, the Department clearly stated that both paragraph (e)(2) and its predecessor, old paragraph (e)(3), applied to instances where a loan made with tax-exempt bond proceeds is "refinanced" by taxable bond proceeds.

This creates some doubt as to the vitality of Ms. Moran's guidance on this point. Nevertheless, the Department's current interpretation of its regulations might receive considerable deference from a court. Each of the transfers at issue here involves what are essentially refinancing, rather than sale, transactions. Thus, if a court were to follow the Department's current interpretation, it would conclude that each of the transactions described in your email would not satisfy Condition (1), above.

However, Ms. Moran sent the undersigned an email on October 10, 2001 interpreting the word "and" in paragraph (e)(2)(i) as meaning, in effect, "or". Thus, under Ms. Moran's emails, satisfaction of Condition (1) is not a prerequisite for full sap treatment of a loan originally financed with tax-exempt funds. Under Ms. Moran's interpretation, the special allowance treatment of the loans at issue would depend on whether Condition (2) is satisfied. The issue of Condition (2) would also become dispositive if Ms. Moran's interpretation of Condition (1) did not prevail in court. Accordingly, we now turn to an analysis of Condition (2).

Condition (2) is not met if the authority retains a legal or equitable interest in the loan and the relevant tax-exempt bond is not retired or defeased. In each of the proposed transactions involving the movement of loans among AUTHORITY facilities, it is clear that the first element exists, in that AUTHORITY retains an interest in the loan.

*Because they have been refunded*

The second element of Condition (2) is not met in each of the proposed transactions because the tax-exempt obligation that previously financed the loans is not being retired or defeased. Therefore, given the clear statement in the Dear Colleague that tax-exempt loans refinanced by taxable funds retain tax-exempt special allowance treatment if the authority retains an interest in the loans and the prior tax-exempt obligation is not retired or defeased, we believe that a court would find that the loans at issue retain floor yield/half sap treatment after their transfer to the taxable estate.

*for mark.*
*This is not true. Sault opinion needs to protect us from false claims to prisons.*

The above opinion is limited to the specific issues discussed herein under the FFELP statute and regulations. We express no opinion with regard to any other issue or any other laws. This opinion may be relied on only by AUTHORITY, in connection with the proposed transactions described above. It may not be relied upon by any other party or for any other purpose without our express written consent.

Please let us know if you would like to discuss any of the above issues in further detail

*Retired*
Sincerely,

*① Maturity — Scheduled / Payoffs*   MOSKOWITZ & AUSTIN LLC
*② Refunding — maturity.*

Confidential                                                        B0005442

By: _____
     Saul L. Moskowitz
     Principal

Enclosures

Confidential

B0005443

Exhibit 88

# CONFIDENTIAL

# FILED UNDER SEAL

November 1, 200①

Mr. Clifford Baker, Executive Director
Panhandle-Plains Higher Education Authority, Inc.
1403 23rd Street
Canyon, Texas 79015

Re:     Request for Opinion

Ladies and Gentlemen:

        This is in response to your request for our opinion regarding various proposed
transactions involving the transfer of Federal Family Education Loan Program (FFELP)
loans from a pre-October 1, 1993 Panhandle-Plains Higher Education Authority, Inc.,
(hereinafter "AUTHORITY") tax-exempt bond estate to another financing facility of
AUTHORITY. For each proposed transaction, you ask whether the special allowance
paid by the Department of Education on such loans after the transactions are completed
would be calculated under the rules applicable to loans made or purchased with the
proceeds of tax-exempt bonds or, alternatively, under the rules applicable to other FFELP
loans.

        In preparing this opinion, we have reviewed the FFELP statute and regulations,
email correspondence between this firm and the Department of Education officials on
these issues, and other materials we deem appropriate. We note that the guidance we
have received from the Department by email has been confusing, and in some ways
inconsistent with prior guidance and/or the unambiguous language of the regulations. As
you will note from our discussion, this has significantly complicated our analysis.

<u>Facts</u>

        The first proposed transaction involves the transfer of approximately $150 million
in loans now held in AUTHORITY's tax-exempt bond estate created prior to October 1,

HIGHLY CONFIDENTIAL

1993, to a taxable bond estate to be created by the Authority, in exchange for a payment to the tax-exempt bond estate from the taxable estate of an amount equal to the then-outstanding principal and interest on the transferred loans. AUTHORITY intends this process to result in the transferred loans remaining subject to the "floor yield/half sap" special allowance calculation described below after completion of the transaction.

After completion of this transaction, the funds received by the tax-exempt bond estate would be used to purchase loans from third parties. To the extent that such purchases result in loans in excess of $150 million residing in the tax-exempt estate, those loans would be transferred to the taxable estate in exchange for cash, as with the initial transaction. AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to the taxable estate in this manner would become remain subject to the "floor yield/half sap" special allowance calculation at purchase and remain subject to such calculation after completion of the transfer.

As a matter of policy, AUTHORITY would not engage in such transactions to the extent that the resulting volume of outstanding loans held by the Authority in the taxable estate that remain subject to the "floor yield/half sap" special allowance calculation would exceed $150 million.

### Opinion

For the reasons set forth below, it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap"special allowance treatment at the conclusion of those transactions.

### Analysis

#### I. The Regulation, Its History, and Intent

The Federal regulation governing this issue is 34 CFR 682.302 (the "Regulation"). Under the Regulation, special allowance is paid when the interest payable on an FFEL loan by the borrower (or the Department on the borrower's behalf) falls below statutory levels deemed to represent a market level yield for the holder. Under subsection (c) of the Regulation, the special allowance rate is calculated quarterly by determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for that loan, and adding a certain percentage, which varies with the type of loan and when it was made. Subsections (c) and (e) of the Regulation set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums.

HIGHLY CONFIDENTIAL

PPHEA_045884

According to paragraph (c)(3) of the Regulation, the special allowance rate is one-half of the full sap for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from the proceeds of tax-exempt obligations issued prior to October 1, 1993, subject to certain minimum floors. This is referred to throughout this memorandum as "floor yield/half sap treatment". This treatment also applies to loans made with certain moneys derived from such loans and from the investment of proceeds of tax-exempt obligations.

Paragraph (e)(2) of the Regulation provides that, notwithstanding paragraph (c)(3), the Department will pay a special allowance to an authority at the full sap rate for a loan which has been made or purchased with the proceeds of tax-exempt obligations issued prior to October 1, 1993 –

(1)     After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations; and

(2)     If the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

In 1992, when paragraph (e)(2) of the Regulation was issued in its current form, the interest rate environment was such that the floor yield was not applicable, while the half sap calculation significantly reduced the yield on loans subject to floor yield/half sap treatment. This had created a substantial incentive for holders of such loans to find ways to convert them to full sap treatment through refinancing with taxable bonds and similar transactions. Existing Department guidance had exacerbated this problem by interpreting the prior regulations in a way that facilitated those activities.

The Regulation was issued in 1992 to make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal government money under then-existing market conditions. As the Department explained in Question 30 of Dear Colleague Letter 96-L-186--

The [prior] regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions–if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the

HIGHLY CONFIDENTIAL

> proceeds of a tax-exempt obligation is refinanced with proceeds of a
> taxable obligation, the loan remains subject to the tax-exempt special
> allowance provisions if the authority retains legal interest in the loan. If,
> however, the original tax-exempt obligation is retired or defeased, special
> allowance is paid based on the rules applicable to the new funding source
> (taxable or tax-exempt).

(Emphasis added.)[1]

Now, of course, market interest rates are considerably lower than in 1992. As a result, a holder of loans subject to floor yield/half sap treatment is loath to take any action that would convert the loan to full sap treatment and lose the benefit of the floor. However, in 1992 the Department "chose its poison" -- i.e., it chose to make it harder to convert loans from floor yield/ half sap to full sap treatment, thus making it easier to avoid such a conversion today.

## II.  Conditions for Floor Yield/Half Sap Treatment of the Loans at Issue

Paragraph (e)(2) as explained by the Dear Colleague, requires that eligible loans financed with the proceeds of a tax-exempt obligation originally issued prior to October 1, 1993 remain subject to the tax-exempt special allowance provisions (i.e., receive floor yield/half sap treatment) unless two conditions are met:

(1) the loans have been pledged or otherwise transferred in consideration of funds derived from sources other than tax-exempt obligations; and

(2) if the Authority retains a legal or equitable interest in the loans, the tax-exempt obligations which previously financed the loans are not retired or defeased.

Pamela Moran of the Department has informed us by email correspondence of August 8, 2001 (Appendix B), that the required pledge or transfer described in the Regulation does not occur when an authority engages in a transaction that is more akin to a "refinancing" than a "sale". Specifically, Ms. Moran indicated that the requisite pledge or transfer was lacking in a situation where an authority purchased a loan out of a tax-

---

[1] In fact, the predecessor provision of paragraph (e)(2) closely resembled the revised language, save that the predecessor provision did not require the authority to retain a legal or equitable interest in the loan. See 34 CFR 682.302(e)(3)(1988). Thus, the revised language is susceptible to the same interpretation that the Department adopted with respect to the prior language—i.e., that it is silent on what special allowance treatment applies when the conditions in the paragraph are not met. From the Dear Colleague, however, it is clear that the Department did not intend the revised language to allow for such an interpretation, sAuthoritye the result would then be to frustrate the stated purpose of the revised language to require tax-exempt special allowance treatment to continue on a loan refinanced with taxable funds if the authority retains an interest in the loan, absent retirement or defeasance of the prior tax-exempt obligation.

HIGHLY CONFIDENTIAL

exempt indenture by the use of monies held in the authority's general fund. Ms. Moran's rationale was that "nothing has changed about the loan except where it is held by the authority". However, in the Dear Colleague, the Department clearly stated that both paragraph (e)(2) and its predecessor, old paragraph (e)(3), applied to instances where a loan made with tax-exempt bond proceeds is "refinanced" by taxable bond proceeds.

This creates considerable doubt as to the vitality of Ms. Moran's guidance on this point. Nevertheless, the Department's current interpretation of its regulations might receive considerable deference from a court. Each of the transfers from the tax-exempt estate to the taxable estate at issue here involve what are essentially refinancing, rather than sale, transactions. Thus, if a court were to follow the Department's current interpretation, it would conclude that each of the transactions described in your email would not satisfy Condition (1), above.

However, Ms. Moran sent the undersigned an email on October 10, 2001 interpreting the word "and" in paragraph (e)(2)(i) as meaning, in effect, "or". Thus, under Ms. Moran's emails, satisfaction of Condition (1) is not a prerequisite for full sap treatment of a loan originally financed with tax-exempt funds. Under Ms. Moran's interpretation, the special allowance treatment of the loans at issue would depend on whether Condition (2) is satisfied. The issue of Condition (2) would also become dispositive if Ms. Moran's interpretation of Condition (1) did not prevail in court. Accordingly, we now turn to an analysis of Condition (2).

Condition (2) is not met if the authority retains a legal or equitable interest in the loan and the relevant tax-exempt bond is not retired or defeased. In each of the proposed transactions involving the movement of loans among AUTHORITY facilities, it is clear that the first element exists, in that AUTHORITY retains an interest in the loan.

The second element of Condition (2) is not met in each of the proposed transactions because the tax-exempt obligation which previously financed the loans is not being retired or defeased. Therefore, given the clear statement in the Dear Colleague that tax-exempt loans refinanced by taxable funds retain tax-exempt special allowance treatment if the authority retains an interest in the loans and the prior tax-exempt obligation is not retired or defeased, we believe it is more likely than not that a court would find that the loans at issue retain floor yield/half sap treatment after their transfer to the taxable estate.

The above opinion is limited to the specific issues discussed herein under the FFELP statute and regulations. We express no opinion with regard to any other issue or any other laws. This opinion may be relied on only by AUTHORITY, in connection with the proposed transactions described above. It may not be relied upon by any other party or for any other purpose without our express written consent.

Please let us know if you would like to discuss any of the above issues in further detail

HIGHLY CONFIDENTIAL

PPHEA_045887

Sincerely,

MOSKOWITZ STRICKLAND BROCKINGTON
LEWIS  PLLC

By: _____
Saul L. Moskowitz
Principal

Enclosures

Cc:  Kathleen Ellison, Esq.

HIGHLY CONFIDENTIAL

PPHEA_045888