Exhibit 114

# CONFIDENTIAL

# FILED UNDER SEAL

Saul M.                    9/30/93  Trigger Date

Tax Exempt / Floor :

2 Stage :   ① can client do what they want : - Regs
            ② DOE  Guidance - ok              - Disclosure.

- Rescission not being considered.

- Process :  originally focused on ½ SAP
             ↳ + wanting FULL SAP.
   3.02 (e) + e (2)   "and means or"
   ↳ made it hard; if move loans
      in + out of tax exempt, to a
      taxable. (hard to shed ½ SAP
      + Floor)

* was B&C created to
  - allow shedding of ½ SAP.

→ Old Indenture still exists
  + Old Indentures   Authority retains
      equitable or legal   (authority + wholly owned
         but in Regs.                        sub.)
→ Holding Period :  none reqd (may do
                                     it a ¼)
→ SWAP process :  old + new
→ Don't get Greedy;  Defend as Public Purpose

Moskowitz
5
5/14/10      88

- of generating additional revenue

NEEDED
① structure of indentures
② prease of description of transaction?
③            of companies?

CONFIDENTIAL

B9000509

# Exhibit 115

# CONFIDENTIAL

# FILED UNDER SEAL

*3647

## MOSKOWITZ & AUSTIN
### LLC

1100 Wayne Avenue
Suite 1111
Silver Spring, MD 20910

PH: 301-562-0600
FAX: 301-562-0635

### FACSIMILE TRANSMITTAL MEMORANDUM

TO: ~~Murray Watson~~ Kelli Villarrial Rick _and_ Turman

FROM: Dave Moskowitz

DATE: 1/8/04

PAGES SENT: (including cover sheet) 13

If you do not receive all of the following pages, or they are illegible,
call (301) 562-0600

MESSAGE: _____

_____

_____

_____

Transmitted by: Charlotte       Fax/Client Code: _____

Information intended only for the use of addressees. If you are not the intended recipient,
or the employee or agent responsible for delivering it to the intended recipient, any
dissemination or copying of this facsimile is strictly prohibited. If you have received it in
error, please contact us at (301) 562-0600. Thank you.

Moskowitz
9
5/14/10       85

CONFIDENTIAL

B9005756

# MOSKOWITZ & AUSTIN
## LLC

SAUL L. MOSKOWITZ
PRINCIPAL
moskowitz@mblaw.com

1100 WAYNE AVENUE, SUITE 1111
SILVER SPRING, MD 20910
PH: 301-562-0600
FAX: 301-562-0635

January 8, 2004

Mr. Murray Watson
Brazos Higher Education Service Corporation
2600 Washington Avenue
P.O. Box 1308
Waco, TX 76703-0267

Re:   Request for Opinion

Dear Mr. Watson:

This is in response to your request for our opinion regarding various proposed transactions involving the transfer of Federal Family Education Loan Program (FFELP) loans located in pre-October 1, 1993 Brazos Higher Education Authority, Inc. (hereinafter "AUTHORITY") tax-exempt bond estates to other taxable financing facilities of AUTHORITY. For each proposed transaction, you ask whether the special allowance paid by the Department of Education on such loans after the transactions are completed would be calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds issued before October 1, 1993, or, alternatively, under the rules applicable to other FFELP loans.

In preparing this opinion, we have reviewed the FFELP statute and regulations, email correspondence between this firm and the Department of Education (Department) officials on these issues, published guidance from the Department, and other materials we deemed appropriate. We note that the guidance we have received from the Department by email has been confusing, and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations. As you will note from our discussion, this has significantly complicated our analysis.

## Facts

The proposed transactions are described in detail in the enclosed memorandum prepared by AUTHORITY. They essentially involve the transfer, in exchange for cash, of FFELP loans from existing pre-October 1, 1993 tax-exempt financing facilities of AUTHORITY. AUTHORITY intends this process to result in the transferred loans

CONFIDENTIAL

B9005757

Mr. Murray Watson
January 8, 2004
Page Two

remaining subject to the "floor yield/half sap" special allowance calculation described below after completion of the transaction.

After completion of such a transfer, the funds received by the tax-exempt bond estate would be used to purchase loans from third parties. Some or all of those loans would subsequently be transferred to a taxable bond estate of AUTHORITY in exchange for cash or other loans of comparable value. AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to a taxable estate in this manner would remain subject to the "floor yield/half sap" special allowance calculation at purchase and remain subject to such calculation after completion of the transfer.

### Opinion

For the reasons set forth below, it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions.

### Analysis

#### I.    The Regulation, Its History, and Intent

The Federal regulation governing this issue is 34 CFR 682.302 (the "Regulation"). Under the Regulation, special allowance is paid when the interest payable on an FFEL loan by the borrower (or the Department on the borrower's behalf) falls below statutory levels deemed to represent a market level yield for the holder. Under subsection (c) of the Regulation, the special allowance rate is calculated quarterly by determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for that loan, and adding a certain percentage, which varies with the type of loan and when it was made. Subsections (c) and (e) of the Regulation set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums.

B9005758

Mr. Murray Watson
January 8, 2004
Page Three

According to paragraph (c)(3) of the Regulation, the special allowance rate is one-half of the full sap rate for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from the proceeds of tax-exempt obligations originally issued prior to October 1, 1993, subject to certain minimum floors. This is referred to throughout this memorandum as "floor yield/half sap treatment". This treatment also applies to loans made with certain moneys derived from such loans and from the investment of proceeds of such tax-exempt obligations.

Paragraph (e)(2) of the Regulation provides that, notwithstanding paragraph (c)(3), the Department will pay a special allowance to an authority at the full sap rate for a loan which has been made or purchased with the proceeds of tax-exempt obligations originally issued prior to October 1, 1993 –

 (1) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations; and

 (2) If the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

In 1992, when paragraph (e)(2) of the Regulation was issued in its current form, the interest rate environment was such that the floor yield was not applicable, while the half sap calculation significantly reduced the yield on loans subject to floor yield/half sap treatment. This had created a substantial incentive for holders of such loans to find ways to convert them to full sap treatment through refinancing with taxable bonds and similar transactions. Existing Department guidance had exacerbated this problem by interpreting the prior regulations in a way that facilitated those activities.

According to later statements by the Department, the Regulation was issued in 1992 to make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal government money under then-existing market conditions. Specifically, in Question 30 of Dear Colleague Letter 96-L-186, the Department stated as follows—

> The [prior] regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions–if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the

CONFIDENTIAL

B9005759

Mr. Murray Watson
January 8, 2004
Page Four

proceeds of a taxable obligation, the taxable special allowance rules applied.

In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

(Emphasis added.)1

Now, of course, market interest rates are considerably lower than in 1992. As a result, a holder of loans subject to floor yield/half sap treatment is loath to take any action that would convert the loan to full sap treatment and lose the benefit of the floor. However, in 1992 the Department "chose its poison" -- i.e., it chose to make it harder to convert loans from floor yield/ half sap to full sap treatment, thus making it easier to avoid such a conversion today.

**II.    Conditions for Floor Yield/Half Sap Treatment of the Loans at Issue**

Paragraph (e)(2) as explained by the Dear Colleague, requires that eligible loans financed with the proceeds of a tax-exempt obligation originally issued prior to October 1, 1993 remain subject to the tax-exempt special allowance provisions (i.e., receive floor yield/half sap treatment) unless two conditions are met:

---

1 In fact, the predecessor provision of paragraph (e)(2) closely resembled the revised language, save that the predecessor provision did not include the current language regarding the authority's retention of a legal or equitable interest in the loan. See 34 CFR 682.302(e)(3)(1988). The new language seems to clarify only that, if an authority does not retain an interest in a loan, the transfer of the loan to another party that is using taxable (or post-October 1, 1993 tax-exempt) financing results in the loan losing half sap/floor treatment. Moreover, the revised language is as susceptible to the same interpretation that the Department adopted with respect to the prior language—i.e., that it is silent on what special allowance treatment applies when the conditions in the paragraph are not met. We do not believe such an interpretation is particularly plausible, and, in any case, the Dear Colleague is clear in saying that the Department believes the new language does not allow for such an interpretation.

CONFIDENTIAL

Mr. Murray Watson
January 8, 2004
Page Five

(1) the loans have been pledged or otherwise transferred in consideration of funds derived from sources other than tax-exempt obligations originally issued prior to October 1, 1993; and

(2) if the Authority retains a legal or equitable interest in the loans, the tax-exempt obligations which previously financed the loans are retired or defeased. 2

Pamela Moran of the Department has informed us by email correspondence of August 8, 2001 (Appendix B), that the required pledge or transfer described in the Regulation does not occur when an authority engages in a transaction that is more akin to a "refinancing" than a "sale". Specifically, Ms. Moran indicated that the requisite pledge or transfer was lacking in a situation where an authority purchased a loan out of a tax-exempt indenture by the use of monies held in the authority's general fund. Ms. Moran's rationale was that "nothing has changed about the loan except where it is held by the authority".

In the Dear Colleague passage quoted above, the Department stated that both paragraph (e)(2) and its predecessor, old paragraph (e)(3), applied to instances where a loan made with tax-exempt bond proceeds is "refinanced" by taxable bond proceeds, and the last sentence appears to imply that it also applies where the refinancing source is tax-exempt bonds. This creates some doubt as to the vitality of Ms. Moran's guidance on this point. However, Ms. Moran's interpretation is in accord with the clear intent of the statute with regard to the treatment of tax-exempt refunding transactions. In particular, the 1993 amendments to the FFELP statute (Public Law 103-66) apply half sap/floor treatment to all loans financed with tax-exempt bonds, unless such bonds were bonds "originally issued on or after October 1, 1993." 20 U.S.C. 1087-1(b)(2)(b)(B)(i), (iv). The word "originally" was included at the behest of various tax-exempt issuers specifically to ensure that loans financed with post-October 1, 1993 tax-exempt bonds issued to refund pre-October 1, 1993 tax-exempt bonds would continue to receive half sap/floor treatment. Since that provision was enacted, authorities all over the country have financed billions of dollars in loans with tax-exempt refunding bonds in reliance on the applicability of half sap/floor treatment to those loans. Under Ms. Moran's interpretation of the phrase "pledged or otherwise transferred" – which excludes refunding and other refinancing transactions – the intent of the statute and 10 years of industry-wide practice is protected. Under the contrary view implicitly suggested by the Dear Colleague, it is not.

---

2 We believe the issue of whether floor yield/half sap treatment applies to a loan does not depend at all on whether it came to reside in the tax-exempt bond estate by direct purchase from a third party or by transfer from another financing vehicle of the Authority. Were this not the case, an Authority could easily have circumvented the intent of the 1992 regulations by purchasing loans with taxable financing and then immediately transferring them into a tax-exempt estate.

CONFIDENTIAL

B9005761

Mr. Murray Watson
January 8, 2004
Page Six

Each of the transfers at issue here involves what are essentially refinancing, rather than sale, transactions. Thus, if a court were to follow the Department's current interpretation, it would conclude that each of the transactions described in your email would not satisfy Condition (1), above.

However, Ms. Moran sent the undersigned an email on October 10, 2001 interpreting the word "and" in paragraph (e)(2)(i) as meaning, in effect, "or". Thus, under Ms. Moran's emails, satisfaction of Condition (1) is not a prerequisite for full sap treatment of a loan originally financed with tax-exempt funds. Under Ms. Moran's interpretation, the special allowance treatment of the loans at issue would depend on whether Condition (2) is satisfied. The issue of Condition (2) would also become dispositive if Ms. Moran's interpretation of Condition (1) did not prevail in court. Accordingly, we now turn to an analysis of Condition (2).

Condition (2) is not met if the authority retains a legal or equitable interest in the loan and the relevant tax-exempt bond is not retired or defeased. In each of the proposed transactions involving the movement of loans among AUTHORITY facilities, it is clear that the first element exists, in that AUTHORITY retains an interest in the loan.

The second element of Condition (2) is not met in each of the proposed non-refunding transactions because the tax-exempt obligation that previously financed the loans is not being retired or defeased. Therefore, given the clear statement in the Dear Colleague that tax-exempt loans refinanced by taxable funds retain tax-exempt special allowance treatment if the authority retains an interest in the loans and the prior tax-exempt obligation is not retired or defeased, we believe that a court would find that the loans at issue retain floor yield/half sap treatment after their transfer to the taxable estate.

The second element of Condition (2) is met in the refunding transactions since, by definition, the purpose of a refunding is to retire or defease the existing bonds. This would suggest that these transactions would indeed cause the loans involved to lose half sap/floor treatment. However, as noted above, this would conflict with the intent of the statute and 10 years of industry-wide practice involving billions of dollars in loans. Accordingly, we do not believe that Ms. Moran's "and"-means-"or" interpretation would be upheld by a court in the tax-exempt refunding context.[3]

Finally, you have asked whether the loans at issue would lose half sap/floor treatment when, after the transactions have been completed, the pre-October 1, 1993 bonds reach maturity. In her email guidance to us, Ms. Moran drew a distinction between obligations that are retired and those that "merely matured." As we have discussed, this Firm is not sufficiently expert in the intricacies of tax-exempt bond law to advise you as

---

[3] However, the treatment of taxable refunding bonds may differ, given that, on its face, the FFELP statute does not appear to require that loans financed with taxable bonds receive half sap/floor treatment.

CONFIDENTIAL

Mr. Murray Watson
January 8, 2004
Page Seven

to whether a particular event constitutes retirement, defeasance, or maturity. We believe, however, that the appropriate characterization of a given transaction under established bond law principles would apply in determining the treatment the transaction should be accorded under Condition (2), above. In addition, we believe a cogent argument can be made that the intent of the Regulation was to examine the effects of the transaction in which a particular loan is transferred out of a pre-October 1, 1993 tax-exempt bond estate to determine whether, *in connection with that transaction*, the pre-October 1, 1993 tax-exempt obligations were retired or defeased, and not to look at whether, in future independent transactions, such a retirement or defeasance occurred.

The above opinion is limited to the specific issues discussed herein under the FFELP statute and regulations. We express no opinion with regard to any other issue or any other laws. This opinion may be relied on only by AUTHORITY, in connection with the proposed transactions described above. It may not be relied upon by any other party or for any other purpose without our express written consent.

Please let us know if you would like to discuss any of the above issues in further detail

Sincerely,

MOSKOWITZ & AUSTIN LLC

By: _____
Saul L. Moskowitz
Principal

Enclosures

Cc: Kelli Villarrial, Esq.
Rick Turman

CONFIDENTIAL

B9005763

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: RE: Tax-exempt bond issues
Cc: brian.siegel@ed.gov
Bcc:
Attached:

Pam: Thanks. FYI, I spoke to Brian after you left for gay Paris to clarify #1.  He indicated that the key issue is control, i.e., if the two sister companies are both owned and controlled by the Authority, then they would be treated as alter egos of the Authority for purposes of the Section 682.302(e).  Saul.

At 02:34 PM 10/10/01 -0400, you wrote:
I discussed this with Brian.  On question #1, we think that if the companies are truly "sister" related companies, we would probably not treat the Authority as continuing to hold an interest in the loan.  The Department, of course, still has the right to look at any transaction to assure itself that the transaction is really a transfer and not a paper transaction between one company and a sham sister.

On #3, we think that (e)(2)(i) and (ii) are intended to address two different circumstances even though separated by an "and."  Therefore, we don't think that both requirements have to be met.

Hope this helps.
——Original Message——
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Wednesday, October 03, 2001 11:39 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: RE: Tax-exempt bond issues

Pam:  Following up on this one and my voicemail, have you heard back from Brian?  If not, would you mind prodding him on it?  I think it's pretty simple, and we now have two clients anxious for a response so they can proceed with transactions that have been on hold since as long ago as July waiting for clarification.  Thanks, Saul
Date: Wed, 26 Sep 2001 13:10:59 -0400
To: "Moran, Pamela" <Pamela.Moran@dbmlaw.com>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: Tax-exempt bond issues

Thanks for the update.  At 12:27 PM 9/26/01 -0400, you wrote:
Sorry I haven't been able to get back to you on this but we have been doing almost nothing but disaster related meetings and relief since the 11th.  I have a suggested answer into Brian Siegel and I hope to hearing somethim from him today...otherwise it won't be until after Yom Kippur.
——Original Message——
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Friday, September 07, 2001 9:58 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: Tax-exempt bond issues

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                                    1

CONFIDENTIAL

B9005764

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond Issues

Pam: Can you update me on the status of this one? Thanks. Saul
Date: Mon, 13 Aug 2001 09:58:30 -0400
To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: Tax-exempt bond issues
Pam: Thank you for your response on the tax-exempt bond issues. I wonder
if I could get a bit of clarification on two of your answers, as follows:

1. My first question dealt with a situation where a loan was
transferred from the Authority to another company owned by the same parent
corporation that controls the Authority, i.e., a sister corporation. Your
response dealt with the situation in which the transferee was a subsidiary
of the Authority. As long as the Authority and the sister corporation are
controlled by the same entity, would your answer be the same, i.e., the
loans would remain subject to the tax-exempt special allowance rules?

3. Your response to number 3 (the first one) was a little
confusing. Is this a correct statement of your interpretation
of the reg:
"If a loan migrates from a tax-exempt indenture to the Authority's
general fund as a result of the indenture reaching maturity (not
being retired), the loan remains subject to the tax-exempt special allowance rules,
because it has not been "pledged or otherwise transferred in consideration of
[taxable] funds" as

required by subsection (e)(2)(i). Moreover, even if it were deemed to
be "pledged or otherwise transferred in consideration of
[taxable] funds", it would still remain subject to tax-exempt special
allowance rules because the prior tax-exempt obligation has not been
retired or defeased as required by subsection (e)(2)(ii)."

I'm asking because your prior answer could be read as saying that
subparagraph (ii) still applies even if subparagraph (i) is not satisfied,
even though the reg seems to say that both subparagraphs must be satisfied
in order for the taxable special allowance rules to apply.

Thanks as always for your help. Saul

At 03:59 PM 8/6/01 -0400, you wrote:
Sorry it has taken me a while to get back to you. I was able to chat with Brian Siegel on this before
he went away on vacation and before I had to head off to COHEAO.

#1. We think that if the Authority controls the subsidiary, it has the necessary control over
the loan to meet the standard set by the regulations. Brian did think, however, that it could

---

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                    2

CONFIDENTIAL                              B9005765

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

depend upon the individual circumstances of the corporate arrangement, and that in every case the relationship between the two organizations should be evaluated to determine whether the Authority has sufficient control over the subsidiary to treat the loan as passing through the Authority for purposes of the regulations.

#2.  We think that the "purchase" of the loan as described in the question appears more akin to a "refinancing" than a "sale" because nothing has changed about the loan except where it is held by the authority.  So it would appear that the tax-exempt provisions apply. However, depending upon the result of your "evaluation" in #1 above, it could, under certain circumstances, be more accurately characterized as a "sale" than a "refinancing."

#3.  The tax-exempt rules would not apply if the tax-exempt obligation is "retired."   It is unclear from the question whether the loan is retired or it has instead merely matured. The situation wouldn't qualify for a change of treatment under section 682.302(e)(2)(i) because the loans have not been "pledged or otherwise transferred in consideration of funds"...rather, they have become part of the general fund by default, as you pointed out. So, unless the obligation is retired, the lower special allowance payments would apply.

-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Monday, July 30, 2001 11:36 AM
To: pamela.moran@ed.gov
Subject: Tax-exempt bond issues

Pam:  Per my voicemail, our client, an issuer of tax-exempt bonds used to purchase FFELP loans, has asked us the following questions on which your guidance would be much appreciated:

Under 34 CFR 682.302(e)(2), a loan made or purchased with pre-October 1, 1993 tax-exempt bond proceeds that is transferred out of the tax-exempt indenture into a taxable bond indenture continues to be subject to the reduced SAP and floor yield provisions applicable to pre-1993 tax-exempt bond related loans if the Authority "retains a legal or equitable interest in the loan" and the tax-exempt obligation is not retired or defeased.  See also Dear Colleague 96-L-186 (Question 30).  This has resulted in the following questions:

1.  If an affiliate under common ownership and control of the Authority retains a legal and/or equitable interest in the loan, but the Authority does not, is the Authority deemed to "retain a legal or equitable interest" for purposes of subsection (e)(2)?

2.  If instead of being transferred to a taxable bond indenture, the loan is purchased out of the tax-exempt indenture by monies held in the Authority's General

CONFIDENTIAL                                     B9005766

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

Fund,  is the loan considered to have been transferred "in consideration of funds derived from sources other than tax-exempt bonds within the meaning of paragraph (e)(2)(i)?

  3. For a maturing pre-October 1993 tax-exempt bond indenture, would loans remaining in the trust estate after satisfaction of all trust obligations retain the half SAP/floor treatment. These loans would become part of the authority's general fund not by purchase but by "default".

I'd be happy to discuss these issues with you at your convenience.  As I mentioned, the client is currently working on a series of transactions with tight timeframes, so anything you can do to expedite your review would be greatly appreciated.  Thanks as always, Saul.

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                       4

CONFIDENTIAL

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues



Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>

CONFIDENTIAL

B9005768

Exhibit 116

# CONFIDENTIAL

# FILED UNDER SEAL

**Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues**

To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: RE: Tax-exempt bond issues
Cc: brian.siegel@ed.gov
Bcc:
Attached:

Pam: Thanks. FYI, I spoke to Brian after you left for gay Paris to clarify #1. He indicated that the key issue is control, i.e., if the two sister companies are both owned and controlled by the Authority, then they would be treated as alter egos of the Authority for purposes of the Section 682.302(e). Saul

At 02:34 PM 10/10/01 -0400, you wrote:
I discussed this with Brian. On question #1, we think that if the companies are truly "sister" related companies, we would probably not treat the Authority as continuing to hold an interest in the loan. The Department, of course, still has the right to look at any transaction to assure itself that the transaction is really a transfer and not a paper transaction between one company and a sham sister.

On #3, we think that (e)(2)(i) and (ii) are intended to address two different circumstances even though separated by an "and." Therefore, we don't think that both requirements have to be met.

Hope this helps.
-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Wednesday, October 03, 2001 11:39 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: RE: Tax-exempt bond issues

Pam: Following up on this one and my voicemail, have you heard back from Brian? If not, would you mind prodding him on it? I think it's pretty simple, and we now have two clients anxious for a response so they can proceed with transactions that have been on hold since as long ago as July waiting for clarification. Thanks, Saul
Date: Wed, 26 Sep 2001 13:10:59 -0400
To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: Tax-exempt bond issues

Thanks for the update. At 12:27 PM 9/26/01 -0400, you wrote:
Sorry I haven't been able to get back to you on this but we have been doing almost nothing but disaster related meetings and relief since the 11th. I have a suggested answer into Brian Siegel and I hope to hearing somethim from him today...otherwise it won't be until after Yom Kippur.
-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Friday, September 07, 2001 9:58 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: Tax-exempt bond issues

*Moskowitz*
*2*
*5/14/10*   *86*

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>

1

CONFIDENTIAL

MOSKOWITZ_000095

**Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues**

Pam: Can you update me on the status of this one? Thanks. Saul
Date: Mon, 13 Aug 2001 09:58:30 -0400
To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: Tax-exempt bond issues
Pam: Thank you for your response on the tax-exempt bond issues. I wonder
if I could get a bit of clarification on two of your answers, as follows:

1. My first question dealt with a situation where a loan was
transferred from the Authority to another company owned by the same parent
corporation that controls the Authority, i.e., a sister corporation. Your
response dealt with the situation in which the transferee was a subsidiary
of the Authority. As long as the Authority and the sister corporation are
controlled by the same entity, would your answer be the same, i.e., the
loans would remain subject to the tax-exempt special allowance rules?

3. Your response to number 3 (the first one) was a little
confusing. Is this a correct statement of your interpretation
of the reg:
"If a loan migrates from a tax-exempt indenture to the Authority's
general fund as a result of the indenture reaching maturity (not
being retired), the loan remains subject to the tax-exempt special allowance rules,
because it has not been "pledged or otherwise transferred in consideration of
[taxable] funds" as

required by subsection (e)(2)(i). Moreover, even if it were deemed to
be "pledged or otherwise transferred in consideration of
[taxable] funds", it would still remain subject to tax-exempt special
allowance rules because the prior tax-exempt obligation has not been
retired or defeased as required by subsection (e)(2)(ii)."

I'm asking because your prior answer could be read as saying that
subparagraph (ii) still applies even if subparagraph (i) is not satisfied,
even though the reg seems to say that both subparagraphs must be satisfied
in order for the taxable special allowance rules to apply.

Thanks as always for your help. Saul

At 03:59 PM 8/8/01 -0400, you wrote:
Sorry it has taken me a while to get back to you. I was able to chat with Brian Siegel on this before
he went away on vacation and before I had to head off to COHEAO.

#1. We think that if the Authority controls the subsidiary, it has the necessary control over
the loan to meet the standard set by the regulations. Brian did think, however, that it could

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                    2

CONFIDENTIAL                                    MOSKOWITZ_000096

**Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues**

depend upon the individual circumstances of the corporate arrangement, and that in every case the relationship between the two organizations should be evaluated to determine whether the Authority has sufficient control over the subsidiary to treat the loan as passing through the Authority for purposes of the regulations.

#2. We think that the "purchase" of the loan as described in the question appears more akin to a "refinancing" than a "sale" because nothing has changed about the loan except where it is held by the authority. So it would appear that the tax-exempt provisions apply. However, depending upon the result of your "evaluation" in #1 above, it could, under certain circumstances, be more accurately characterized as a "sale" than a "refinancing."

#3. The tax-exempt rules would not apply if the tax-exempt obligation is "retired." It is unclear from the question whether the loan is retired or it has instead merely matured. The situation wouldn't qualify for a change of treatment under section 682.302(e)(2)(i) because the loans have not been "pledged or otherwise transferred in consideration of funds"...rather, they have become part of the general fund by default, as you pointed out. So, unless the obligation is retired, the lower special allowance payments would apply.

#4 (your second #3). Under the "swapping" scenario that you outlined in your question, we would agree that the reduced SAP/floor yield treatment would continue to apply even when swapped out again. The loan swap is an exchange of one loan obligation, not a "transfer of a loan in consideration of funds" as specified in section 682.302(e)(2)(i).

-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Monday, July 30, 2001 11:36 AM
To: pamela.moran@ed.gov
Subject: Tax-exempt bond issues

Pam: Per my voicemail, our client, an issuer of tax-exempt bonds used to purchase FFELP loans, has asked us the following questions on which your guidance would be much appreciated:

Under 34 CFR 682.302(e)(2), a loan made or purchased with pre-October 1, 1993 tax-exempt bond proceeds that is transferred out of the tax-exempt indenture into a taxable bond indenture continues to be subject to the reduced SAP and floor yield provisions applicable to pre-1993 tax-exempt bond related loans if the Authority "retains a legal or equitable interest in the loan" and the tax-exempt obligation is not retired or defeased. See also Dear Colleague 96-L-186 (Question 30). This has resulted in the following questions:

1. If an affiliate under common ownership and control of the Authority retains a legal and/or equitable interest in the loan, but the Authority does not, is the Authority deemed to "retain a legal or equitable interest" for purposes of subsection (e)(2)?

2. If instead of being transferred to a taxable bond indenture, the loan is purchased out of the tax-exempt indenture by monies held in the Authority's General

---

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                    3

CONFIDENTIAL                                                MOSKOWITZ_000097

**Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues**

Fund, is the loan considered to have been transferred "in consideration of funds derived from sources other than" tax-exempt bonds within the meaning of paragraph (e)(2)(i)?

3. For a maturing pre-October 1993 tax-exempt bond indenture, would loans remaining in the trust estate after satisfaction of all trust obligations retain the half SAP/floor treatment. These loans would become part of the authority's general fund not by purchase but by "default".

3. Consider the following series of transactions: Loans acquired with taxable proceeds are transferred into the Authority's pre-October 1993 tax-exempt indenture in a swap exchange for loans currently in the tax-exempt indenture. Very shortly thereafter, the loans swapped into the tax-exempt indenture are swapped back out to the taxable indenture in exchange for additional loans acquired with taxable proceeds. This second "installment" of loans swapped into the tax-exempt indenture are then swapped back out in exchange for a third "installment" of loans acquired with taxable bond proceeds. Assuming that the tax-exempt obligation is not retired or defeased, are we correct in our understanding that, under subsection (e)(2), all loans swapped into the tax-exempt indenture retain the reduced SAP/floor yield treatment applicable to tax-exempt related loans after being swapped back out to the taxable indenture ?

I'd be happy to discuss these issues with you at your convenience. As I mentioned, the client is currently working on a series of transactions with tight timeframes, so anything you can do to expedite your review would be greatly appreciated. Thanks as always, Saul.

CONFIDENTIAL

MOSKOWITZ_000098

**Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues**

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

**Printed for Saul Moskowitz <moskowitz@dbmlaw.com>**                                    **5**

CONFIDENTIAL

MOSKOWITZ_000099

Exhibit 117

# CONFIDENTIAL

# FILED UNDER SEAL

**Unknown**

| | |
|---|---|
| **From:** | Ricky Turman [ricky.turman@bhesc.org] |
| **Sent:** | Monday, January 20, 2003 7:06 PM |
| **To:** | moskowitz@msbllaw.com |
| **Subject:** | RE: more questions |

Saul,
Hope you had a happy new year.

Thanks.
Ricky

-----Original Message-----
**From:** Saul Moskowitz [mailto:moskowitz@msbllaw.com]
**Sent:** Wednesday, December 18, 2002 9:27 AM
**To:** ricky.turman@bhesc.org
**Subject:** RE: more questions

Moskowitz
6
5/14/10

CONFIDENTIAL

B9007795

Saul Moskowitz, Esq.
MOSKOWITZ STRICKLAND BROCKINGTON LEWIS PLLC
1225 I St, N.W.
Suite 500
Washington, D.C. 20005
202-354-6060
Fax-202-354-6066
email: moskowitz@msbllaw.com

The information contained in this email may be confidential and privileged attorney-client information or work product and is intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify this firm immediately.

Moskowitz Strickland Brockington Lewis PLLC believes that this E-mail and any attachments were free of any virus, worm, or Trojan horse when sent. However, this message and its attachments could have been infected during transmission. By reading the message and opening any attachments, the recipient accepts full responsibility for taking remedial action about viruses and other defects. Moskowitz Strickland Brockington Lewis PLLC is not liable for any loss or damage arising in any way from this message or its attachments.

-----Original Message-----
From: Ricky Turman [mailto:Ricky.turman@bhesc.org]
Sent: Sunday, December 15, 2002 10:36 AM
To: Saul Moskowitz
Subject: more questions

Hi Saul,

I also need to get with you, probably after the first of the year, to finalize a plan and get your concurrence with moving loans in and out of tax exempt issues to give them floor status.

Have a happy holiday season.

B9007796

Page 3 of 3

Ricky

This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.

BHESC-Brazos Higher Education Service, Corp.

This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you. BHESC-Brazos Higher Education Service, Corp.

3/16/2010

CONFIDENTIAL

B9007797

Exhibit 118

# CONFIDENTIAL

# FILED UNDER SEAL



June 26, 2006

RECEIVED BY

JUL 03 2006

BHESC INTERNAL AUDIT

Rick Lovell
Director of Internal Audit
Brazos Higher Education Services Corporation
P.O. Box 1308
Waco, Texas 76703-1308

Dear Mr. Lovell:

During the week of March 6, 2006, a team from Partner Services, Southern Region conducted a program review of the Federal Family Education Loan (FFEL) program at the Brazos Higher Education Authority (BHEA). The review focused on the management of the tax-exempt FFEL portfolio and compliance with the Higher Education Act of 1965, as amended, including the Omnibus Budget Reconciliation Act of 1991, the Taxpayer-Teacher Protection Act of 2004 and the regulations of the FFEL Program.

The enclosed report represents the observations and findings of the review, references to Federal regulations or instructions, and actions required correcting program deficiencies. Please review the report and respond to each finding by describing the actions that have been taken. Your response to this report, including a description of actions you have taken, should be sent within 45 days of receipt of the report to me at the Atlanta address listed below. In the event you wish to appeal any finding(s) in this report, your appeal must be forwarded within 30 days to the following address:

> Mirek Halaska, Director
> U. S. Department of Education
> Partner Services – Southern Region
> 1999 Bryan Street, Suite 2720
> Dallas, Texas 75201

You must include with your appeal a copy of this report and indicate (1) the findings, issues, and facts you dispute, (2) your organization's position, relevant facts, and any documentation to support your position, and (3) the Program Review Control Number (PRCN).

Federal Student Aid / Financial Partner Southern Region * Atlanta Field Office
Sam Nunn Federal Center * Room 18T20b * 61 Forsyth Street * Atlanta, GA 30303-8931
Main Line: 214-661-9520 * Fax: 214-661-9581
www.FederalStudentAid.ed.gov
1-800-4-FED-AID

FEDERAL STUDENT AID ▓▓▓START HERE. GO FURTHER.

**EXHIBIT**
Criswell 14
4-26-10  DW

We appreciate your courtesy and cooperation and that of your staff during the visit. If you have any questions, please contact me at the telephone number or e-mail address listed below.

Sincerely,

*Richard Criswell*

Richard Criswell
Senior Guarantor & Lender Review Specialist
Partner Services, Southern Region
Atlanta Field Office
Telephone: 404-562-6287
E-mail: richard.criswell@ed.gov

**RECEIVED BY**

JUL 23 2006

**BHESC INTERNAL AUDIT**

Enclosure

cc:   Mirek Halaska, Regional Director
      Southern Region

Federal Student Aid / Financial Partner Southern Region * Atlanta Field Office
Sam Nunn Federal Center * Room 18T20b * 61 Forsyth Street * Atlanta, GA 30303-8931
Main Line: 214-661-9520 * Fax: 214-661-9581
www.FederalStudentAid.ed.gov
1-800-4-FED-AID

FEDERAL STUDENT AID START HERE. GO FURTHER.

Confidential

B0004935



**START HERE
GO FURTHER**
FEDERAL STUDENT AID

### TAX-EXEMPT REVIEW REPORT

# Brazos Higher Education Authority
# (BHEA)

## UNITED STATES DEPARTMENT OF EDUCATION
*Financial Partner Southern Region*

June 26, 2006

**RECEIVED BY**

JUL 03 2006

**BHESC INTERNAL AUDIT**

Confidential

B0004936

NAME: Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Review Information

## Data Sheet

**Secondary Market Information**

PRCN: 20062065000 – 20062065002 -
20062065003 – 20062065004 - 20062065005
- 20062065006
Brazos Higher Education Authority
2600 Washington Ave.
Waco, TX 76710

**Secondary Market Officials Contacted**

Murray Watson
President

Ricky Thurman
Senior Vice President

Suzanne Young
Vice President, Asset Management

Richard Lovell
Director of Internal Audit

Adele Knight Williams
Manager, ALMAC & Indenture Compliance

**Department of Education Officials**

Richard Criswell – Lead
Senior Guarantor & Lender Review Specialist
Financial Partner Eligibility & Oversight
Southern Region

Ben McPherson
Senior Guarantor & Lender Review Specialist
Financial Partner Eligibility & Oversight
Southern Region

Bob Bridgman
Senior Guarantor & Lender Review Specialist
Financial Partner Eligibility & Oversight
Northern Region

Page 1

Confidential

B0004937

NAME:  Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Review Information

# Introduction

## Background:

Brazos Higher Education Authority, Inc. (BHEA) is a Texas not-for-profit public benefit corporation, which was created to support the City of Waco, Texas.  BHEA was incorporated in May 1975 for the purpose of providing funds for the acquisition and servicing of student loans insured by the U.S. Department of Education and guaranteed by various national guarantors under the Federal Family Education Loan Program (FFELP) as provided for in the Higher Education Act of 1965, as amended. Their mission is to provide supporting programs and initiatives to finance educational opportunities through all available means while delivering premier services to all their constituents. BHEA finances the purchase of student loans by issuing taxable and tax-exempt debt. This combined debt structure enables BHEA to purchase loans both within Texas and nationwide.

BHEA's primary source of revenue is interest on student loans and investment income.  BHEA obtains financing through short-term lines of credit, notes payable, and issuance of student loan revenue bonds to fund its student loan purchase program. All borrowings on the lines of credit, notes payable and bonds are expected to be repaid from funds derived from student loan principal repayments, interest, special allowance payments, interest subsidy payments, guarantee payments on defaulted notes, proceeds from sales of student loan notes, proceeds from bonds or notes secured by student loans, and investment income.

To maintain the insurance and guarantee of student loans, BHEA was required to comply with the servicing, collecting, accounting, and reporting requirements of the FFELP.  Beginning in 1980, these and all other administrative, operational and technical support services were provided directly to BHEA by Brazos Higher Education Service Corporation, Inc., as a master servicer and as the facilitator of sub-servicer relationships with various third party student loan servicing organizations.

## Purpose and Scope

This review was to evaluate the lender's compliance with the relevant requirements of the Taxpayer Teacher Protection Act of 2004 (TTPA). The review was limited to the policies and procedures applicable to the funding of the student loans through bond obligations and their eligibility for the 9.5% floor billing on LaRS Form.  The scope of the review covered the period from September 1993 through September 2005.  A statistical random sample of borrowers was extracted to verify compliance with the Federal requirements.

Page 2

B0004938

NAME:  Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Review Information

---

## Disclaimer:

Absence of statements in this report about specific practices or procedures followed by BHEA should not be construed as acceptance, approval, or endorsement of those practices or procedures. The specific nature of this report does not limit or lessen BHEA's obligation to comply with all provisions of the Federal Family Education Loan Programs.

## Tax Exempt Funding Analysis:

Eligible Bonds

BHEA held $527,870,000 in 9.5% floor eligible tax-exempt bonds as of September 30, 1993. Per BHEA's financial documents on September 2005 there were no pre-October 1, 1993 bonds that had not been refunded and still outstanding. The total outstanding bond debt as of September 2005 was $263,800,000 of 9.5% floor eligible bonds and $5,850,641,000 of non-floor eligible bonds for a total of $6,114,441,000. Re-cycling, Refunding and Transferring activities with bonds and loans were validated through the review of IRS Forms 8038, Tax Regulatory Agreements (Bond Amounts and Arbitrage Disclosures), Bond Official Statements, bond genealogy spreadsheets, loan/bond activity charts and 9.5% floor loan samples. With the use of the bond genealogy spreadsheets all BHEA bonds were tracked back to eligible pre-10/1/93 tax-exempt bonds. With the use of 50 loan samples from the September 2005 LaRS, loans were tracked from their present issues to the pre-10/1/93 tax-exempt issues by using the loan/bond activity charts.

Controls For Mixed Funding Bonds

Bond issue identification is a trust account code that controls tax-exempt eligibility and funding. BHEA management will determine which bond issue or which series within a bond issue is eligible for the 9.5% floor. BHEA then notifies the servicer whether the bond issue or series is non-floor eligible or floor eligible. The servicer will then set their system to bill at the appropriate special allowance rate based on that bond issue and/or serial identification. At settlement, funds are withdrawn from the appropriate acquisition account (either floor eligible or non-floor eligible) to fund the purchase of loans. All bond proceeds are deposited into the bond account at the Trustee. Income generated from the bond proceeds or from the loans acquired with bond proceeds are deposited in a bond income account. Each bond issue has a bond income account and the funds are used to acquire additional loans (re-cycling) or make the bond payments.

Other Information

BHEA earns excess interest (arbitrage) in its tax-exempt financing. Currently, BHEA has borrower benefit programs that offer a reduction in loan fees and reductions of interest. The arbitrage balance as of September 30, 2005, was $7,183,240.

Confidential

B0004939

NAME:  Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Review Information

## History of Tax Exempt Funding

ED's Data Mart was utilized to track the LaRS tax-exempt special allowance principal balances from the quarters ending December 31, 1993 to September 30, 2005. The results show that BHEA's portfolio balance fluctuated up and down but remained steady until the quarter ending 12/31/03 when it increased by $494,568,362. This increase was due to a variety of billing errors due to mis-identification of bond issues. All required adjustments were made to LaRS Form prior to the review. The 9.5% floor balance decreased for each quarter after TTPA.

## Compliance With Taxpayer-Teacher Protection Act of 2004 (TTPA)

The procedures used to implement the TTPA were reviewed and we interviewed the appropriate staff about implementation of the new changes. We reviewed the process for monitoring cash value of each bond, and the entry process to the general ledger. BHEA's procedure for tracking bond activity and entering it into the general ledger appears to be adequate. They have stopped using re-cycled funds to make or acquire loans until they can make the changes to their procedures and systemic changes.

Page 4

Confidential

B0004940

NAME: Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Report

# Findings

## FINDING 1:  Incorrect Billing on Purchases Serviced by Sallie Mae

Due to an over-sight by BHEA's Acquisitions Department, a portfolio of 757 loans totaling $18,765,195.65 in principal purchased in August 2004 with non-floor eligible funds were transferred to an incorrect branch code originally setup for floor eligible loans.  As a result, these loans were incorrectly billed at the 9.5% special allowance floor rate.

**Citation:** The Higher Education Act of 1986, Title IV – Student Assistance, Part B–Federal Family Education Loan Program, the Taxpayer-Teacher Protection Act of 2004, and 34 CFR §682.302(c).

**Required Action:**  BHEA has reviewed the identified loans and made the necessary prior quarter adjustments on the March 31, 2005 LaRS to correct the over billing to the Department. All supporting documentation reflecting the adjustments must be forwarded to the Atlanta Office.  In addition, BHEA must provide its assurances that they have reviewed the controls and management procedures to ensure that loans will be associated with the correct bond issue and are billed at the correct special allowance rate in the future.

## FINDING 2:  Incorrect Billing on Purchases Serviced by Great Lakes Higher Education Corporation

BHEA had several purchases in 2004 that were incorrectly coded for special allowance payments.  The total principal for the incorrectly coded loans is $11,025,860.00. The loans were originally coded correctly at the non-floor special allowance rate; however, it was determined that the special allowance codes on the identified loans were changed to the 9.5% special allowance floor rate.  This error was a result of a series of miscommunications with Great Lakes Higher Education Corporation, who is the servicer.

**Citation:** The Higher Education Act of 1986, Title IV – Student Assistance, Part B–Federal Family Education Loan Program, the Taxpayer-Teacher Protection Act of 2004, and 34 CFR §682.302(c).

**Required Action:** BHEA has reviewed the identified loans and made the necessary prior quarter adjustments on the March 31, 2005 LaRS to correct the over billing to the Department.  All supporting documentation reflecting the adjustments must be forwarded to the Atlanta Office.  In addition, BHEA must provide its assurances that they have reviewed the controls and management procedures to ensure that loans will be associated with the correct bond issue and are billed at the correct special allowance rate in the future.

1

B0004941

NAME: Brazos Higher Education Authority
Review Dates: March 6-10, 2006
Report

---

**FINDING 3   Under billing on loans made with "re-cycled" funds**

On December 12, 2002, BHEA combined and renamed bond accounts (both taxable and tax-exempt issues). The purpose of the combinations was to group bonds with similar debt structures into fewer bond accounts for ease of administration, monitoring, costs, and to assist with loan serialization. As a result of the reduction, the number of cash accounts required at the trustee level were also reduced. The original bonds still exist as obligations, but are referenced and tracked as part of a renamed group of bonds. As a result of the review process it was discovered that for those floor eligible bonds that had been combined, a separate cash account was not created at the trustee level to identify the amount of eligible funds that were being deposited as a result of income from loans financed with 9.5% special allowance floor debt (re-cycled income). The lack of a separate cash account for re-cycled funds prevented BHEA from tracking how much of the new purchases were acquired using the re-cycled proceeds that were eligible for the 9.5% special allowance floor rate. Consequently, BHEA has billed on some loans acquired with eligible re-cycled funds at the non-floor rate resulting in under-billing.

**Citation:** The Higher Education Act of 1986, Title IV – Student Assistance, Part B-Federal Family Education Loan Program, the Taxpayer-Teacher Protection Act of 2004, and 34 CFR §682.302(e).

**Required Action:** BHEA has completed the re-cycling evaluation project and identified the loans that were acquired using the re-cycled proceeds that were eligible for the 9.5% special allowance floor rate. The principal amount of loans that were acquired with floor eligible funds from December 31, 2002 thorough September 30, 2005 totaled $65,099,634.88. BHEA may, if it chooses, determine the amount of special allowance under billed and make the necessary adjustments on LaRS Form. All supporting documentation reflecting the adjustments must be forwarded to the Atlanta Office before any adjustments are made. Once the Department has approved the required special allowance adjustments, they must appear on the next regularly filed LaRS Form. If BHEA decides to not recover the under billed special allowance, please provide the Atlanta Office with a written statement that BHEA is choosing not to recover this special allowance. This declaration is permanent and BHEA may not decide later to recover this special allowance.

2

Appendices

## Observations

NONE

Report prepared by

_____
Richard Criswell, Senior Guarantor & Lender Review Specialist

_____
Date

A-1

B0004943

Exhibit 122

# CONFIDENTIAL

# FILED UNDER SEAL

**CONFIDENTIAL**

**DEAN BLAKEY**
ATTORNEYS AT LAW

SUITE 400
1101 VERMONT AVE., N.W.
WASHINGTON, D.C. 20005-3586

(202) 289-3900
FAX: (202) 371-0197
e-mail: deanblakey@deanblakey.com

March 4, 2003

Mike Dunlap
Chairman and President
Nelnet Loan Services, Inc.
121 South 13th Street, Suite 301
Lincoln, NE 68508

Re: Request for Opinion

Dear Mr. Dunlap:

This letter is in response to the request made through Ed Martinez for an opinion relating to anticipated transactions involving the transfer of Federal Family Education Loan Program (FFEL) loans into or from tax-exempt bond estates created prior to October 1, 1993. Specifically, you have asked us to opine on a transaction involving the transfer of loans currently financed through means other than tax-exempt bond estates created prior to October 1, 1993 into such estates and whether the special allowance paid by the U.S. Department of Education ("Education") on the loans involved would be calculated under the rules applicable to loans made or purchased with the proceeds of such tax-exempt bonds.

This letter reflects our review of the Higher Education Act, applicable regulations, correspondence with the Department of Education, and other information sources, including informal discussions with current Department of Education staff. Importantly, while we are advising you that loans held under tax-exempt bond estates created prior to October 1, 1993 are eligible for special allowance applicable to loans made or purchased with the proceeds of such tax-exempt bonds, Education guidance on this subject has been unclear and at times contradictory. Education's sometimes conflicting guidance reflects, we believe, a sense that current policy is producing results that were unanticipated and not, in the view of some, in the best interests of the Department.

Background

In requesting this opinion, Nelnet, Inc. ("Nelnet") has not provided us with details of any specific transaction. You have provided us with a general description of loan transactions being considered by Nelnet. The transactions involved would be based, in part, on the 1996 amendment to the Internal Revenue Code, section 150(d)(3), a provision that allows the private, nonprofit student loan secondary market companies (generally referred to as

Dean 9

5/12/10 &b

N0127090

"qualified scholarship funding corporations") to convert to for-profit corporations and retain the tax-exempt status of their outstanding bonds under specified circumstances. Because Nelnet has acquired two such qualified scholarship funding corporations, it now has the opportunity to use the pre-October 1, 1993 tax exempt bond estates as a financing means for student loans acquired after that date or otherwise not previously involving financing through such bonds (hereinafter "non-qualifying loans").

Nelnet is considering transferring non-qualifying loans into a pre-October 1, 1993 bond estate so as to qualify such loan for special allowance as calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds issued prior to October 1, 1993 (hereinafter "higher SAP rates"). After qualifying for higher SAP rates, such loans would be transferred out the pre-1993 tax-exempt bond estate. Nelnet intends for the combined transaction to result in the loans involved to remain eligible for "higher SAP rates."

Opinion

As explained in this memo, it is our opinion that "non-qualifying loans" transferred into a pre-October 1, 1993 tax-exempt bond estate would be made eligible for "higher SAP rates" both while held under the pre October 1, 1993 tax-exempt bond estate and after transfer out of such estate provided that the authority that issued the tax-exempt bond retained legal interest in the loan and tax-exempt obligation involved has not been retired or defeased.

Discussion

Section 438(b)(1)(i) and (ii) of the Higher Education Act (20 U.S.C. 1087-1(b)(1)(i) and (ii)) read as follows:

"(1)(i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under title 26 shall be one-half the quarterly rate of the special allowance established under subparagraph (A), except that, in determining the rate for the purpose of this division, subparagraph (A)(iii) shall be applied by substituting "3.5 percent" for "3.10 percent". Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds. This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.

"(ii) The quarterly rate of the special allowance set under division (i) of this subparagraph shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4."

2

N0127091

The regulations implementing the statutory provision are found at 34 C.F.R. 682.302 (the "Regulation"). Under 682.302, special allowance is paid on an FFEL loan by Education when return to the lender falls below a level considered to reflect a market return to the holder of the loan. Section 682.302(c) provides that the special allowance rate is calculated quarterly by determining the bond equivalent average rates of 91 day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for the loan, and adding a additional percentage as specified in the regulation by the type of FFEL loan involved. Subsections 682.302(c) and (e) specify when Education will pay the holder of a qualifying student loan full special allowance ("full SAP") and when the holder is to be paid reduced SAP, subject to specified minimums. A copy of 34 C.F.R. 682.302 is attached to this memo.

Under paragraph (c)(3) of the Regulation, SAP paid on loans made or guaranteed on or after October 1, 1980 that were made or purchased with funds obtained by the holder from the proceeds of a tax-exempt obligation issued prior to October 1, 1993 is one-half of the full SAP rate otherwise payable, subject to certain minimum floors. Paragraph (e) (2) of the Regulation provides that the Department will pay a special allowance at full SAP for a loan which was made or purchased with the proceeds of a tax-exempt obligation issued prior to October 1, 1993 after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax exempt obligations and, if the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

The Regulation created the unanticipated opportunity under the current rate environment for holders such as Nelnet to substantially increase the SAP paid on certain loans by transferring them to a pre-October 1, 1993 tax-exempt bond estate even if such loans are subsequently transferred out of the bond estate, provided that Nelnet retained a legal or equitable interest in the loan and provided that the involved tax-exempt obligation has not been retired or defeased.

It is this circumstance that has, in our opinion, contributed to contradictory guidance reportedly being provided by Education on this issue. The history of 34 C.F.R. 682.302 suggests, however, that Education wrote the Regulation as it did without appreciating the possibility of the current financial results of it. In 1992, when the Regulation was promulgated, floor yield was not applicable on loans because of the prevailing interest rate environment. At the time, half SAP significantly reduced the yield on loans. This circumstance encouraged FFEL loan providers to explore means of converting loans to full SAP eligibility through refinancing loans with taxable bonds and through other means.

In part, the Regulation appears to have been written with the intention of making such transactions more difficult. By curtailing the conversion of loans from floor yield/half SAP to full SAP, Department of Education costs associated with such loans were substantially reduced.

3

N0127092

The Department's rationale for the Regulation was explained in Questions and Answers included as part of a "Dear Colleague" letter issued in March, 1996 entitled, "Summary: Clarification and interpretative guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992. The letter is designated as 96-L-186, 96-G-287. It is accessible on the Internet at: www.ifap.ed.gov/dpcletters/doc0628_bodyoftext.htm.

Question and Answer 30 of the "Dear Colleague Letter" reads as follows:

> "30. Section 682.302(e), which pertains to eligibility for special allowance for loans made or acquired with obligations on which the interest is exempt from taxation (tax-exempt obligations), has been revised in the 1992 regulations. What is the significance of the change?

> "Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations. The regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligations remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions—if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

> "In the December 18, 1992 regulations, the Department changed this policy. *Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.* If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

> "This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

4

Confidential

N0127093

> "Adjustments to ED 799 billings and current billings for any loans
> covered by this policy should be made using the applicable tax-exempt
> special allowance codes for the periods that the holder retains legal
> interest in the loan and the original tax-exempt obligation has not been
> retired or defeased." (Emphasis added).

## Conclusion

Given that the language of the Dear Colleague letter is unambiguous and that
Departmental officials have informally confirmed our interpretation of 34 C.F.R.
682.302, we have concluded that Nelnet may transfer loans into the tax-exempt bond
estates it acquired as a result of acquisition of converted qualified scholarship funding
organizations established pursuant to section 150(d)(3) of the Internal Revenue Code, and
receive floor-yield/half SAP treatment on such loans while they are held in the tax-
exempt estate and thereafter, provided that the original tax-exempt obligation has not
been retired or defeased.

We hope this memo is useful to you as your consider this matter. As noted above, we are
providing you with an opinion based on our review of the statute, regulations, and
applicable interpretative bulletins and have not been asked to review specific transactions
that Nelnet may be considering. This opinion is also limited to our review of the
applicable sections of the Higher Education Act of 1965, as amended, and regulations
issued pursuant to it. We express no opinion with regard to any other law or issue.

This opinion may be relied upon only by Nelnet and its affiliates and by the Royal Bank
of Canada exclusively in transactions with Nelnet and its affiliates. It may not be relied
upon by any other party or for any other purpose without our express written consent.

Please let us know if this memo meets your needs. We would be pleased to discuss this
matter with you in additional detail.

Sincerely,

DEAN BLAKEY

By:

John E. Dean
Partner

ATTACHMENT

5

Exhibit 123

# CONFIDENTIAL

# FILED UNDER SEAL

**DEAN BLAKEY**
ATTORNEYS AT LAW

SUITE 400
1101 VERMONT AVE., N.W.
WASHINGTON, D.C. 20005-2586

(202) 289-3900
FAX: (202) 371-0197
e-mail: deanblakey@deanblakey.com
January 30, 2004

Mike Dunlap
Chairman and Co-CEO, Nelnet, Inc.
121 South 13th Street, Suite 201
Lincoln, NE 68508

Re: Request for Opinion

Dear Mr. Dunlap:

This letter is in response to the request made through Hannah Smitterberg for an opinion relating to the transfer of certain Federal Family Education Loan Program (FFEL) loans to a trust estate securing the issuance by Nelnet Education Loan Funding, Inc. ("Nelf") of $1,010,000,000 of its Series 2004-1 Notes (the "Series 2004-1 Notes"). Specifically, you have asked us to opine on whether FFEL loans which were originated or financed through means other than tax-exempt bond estates created prior to October 1, 1993 and/or were originated, sold, acquired or otherwise transferred to a pre-October 1, 1993 tax-exempt trust estate of Nelf prior to their transfer into the trust estate securing the Series 2004-1 Notes, would be entitled to the special allowance paid by the U.S. Department of Education (the "Department") under the rules applicable to loans made or purchased with the proceeds of such tax-exempt bonds as calculated pursuant to section 438(b)(2)(B)(i) and (ii) of the Higher Education Act of 1965, as amended (the "Higher Education Act").

This letter reflects our review of the Higher Education Act, applicable regulations, correspondence with the Department, and other information sources, including informal discussions with the Department's current staff. Importantly, while we are advising you that loans held under tax-exempt bond estates created prior to October 1, 1993 are eligible for special allowance applicable to loans made or purchased with the proceeds of such tax-exempt bonds, the Department's guidance on this subject has been unclear and at times contradictory. The Department's sometimes conflicting guidance reflects, we believe, a sense that current policy is producing results that were unanticipated and not, in the view of some, in the best interests of the Department.

Deon 14

5/12/10

Mike Dunlap
January 30, 2004
Page 2

Assumptions of Fact

In rendering this opinion, we have not made any independent investigation of the facts referred to below, but have relied solely on certifications received by Nelf and its parent, Nelnet, Inc. ("Nelnet"), confirming that the facts and assumptions below are true. We understand such facts to be as follows:

     1.    Nelf was a private, non-profit qualified scholarship funding corporation as described in section 150(d)(2) of the Internal Revenue Code of 1986, as amended (the "Code") that issued certain tax-exempt bonds. Nelf was converted to a for-profit corporation on April 1, 1998, pursuant to the provisions of section 150(d)(3) of the Code.

     2.    Nelf is issuing the Series 2004-1 Notes pursuant to an Indenture of Trust dated as of January 1, 2004, and a related supplemental indenture (collectively, the "Indenture").

     3.    The Series 2004-1 Notes are not tax-exempt bonds.

     4.    All of the Identified Loans (as defined below) will have been originated by, sold or otherwise transferred by Nelf into one or more pre-October 1, 1993 tax-exempt trust estates of Nelf with proceeds from the related tax-exempt bond obligations or from collections on FFEL loans securing such tax-exempt bond obligations, prior to their transfer into the trust estate securing the Series 2004-1 Notes. "Identified Loans" means loans identified by Nelnet to (i) in the case of FFEL loans transferred on the date of the initial issuance of the Series 2004-1 Notes (a) Credit Suisse First Boston LLC and Deutsche Bank Securities Inc., as representatives of the initial purchasers of the Series 2004-1 Notes, and (b) the rating agencies rating the Series 2004-1 Notes, and (ii) in the case of FFEL loans transferred during the Revolving Period (as defined in the Indenture), those loans specified in the related Loan Transfer Addendum, in each case, as being eligible for the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act.

     5.    The Trust Estate (as defined in the Indenture) securing the Series 2004-1 Notes will acquire the Identified Loans with the net proceeds from the offering of the Series 2004-1 Notes and, during the Revolving Period, with certain collections on FFEL loans securing the Series 2004-1 Notes.

     6.    None of the pre-October 1, 1993 tax-exempt trust estates to which the Identified Loans were originated, sold or otherwise transferred have been retired or defeased in full.

          All of the Identified Loans were made or insured on or after October 1980.

Confidential

N0017678

Mike Dunlap
January 30, 2004
Page 3

8.    Nelf, at all times since the Identified Loans were originated, sold or otherwise transferred to a pre-October 1, 1993 Nelf tax-exempt trust estate, acting through its eligible lender trustee, has retained an interest in the Identified Loans.

9.    Nelf intends for the Identified Loans to be eligible for the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act.

Opinion

Based on the assumptions of fact specified above, it is our opinion that Identified Loans to be refinanced and transferred into the trust estate securing the Series 2004-1 Notes would be made eligible for the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act both while owned and pledged under a pre-October 1, 1993 tax-exempt bond estate and after transfer out of such estate to the trust estate securing the Series 2004-1 Notes provided that (i) Nelf issued the related tax-exempt bond obligations, (ii) Nelf, acting through its eligible lender trustee, retains legal interest in the Identified Loans, and (iii) the related tax-exempt obligations involved have not been retired or defeased in full.

Discussion

Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act (20 U.S.C. 1087-1(b)(2)(B)(1)(i) and (ii)) read as follows:

> (i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1954 shall be one-half the quarterly rate of the special allowance established under subparagraph (A), except that, in determining the rate for the purpose of this division, subparagraph (A)(iii) shall be applied by substituting "3.5 percent" for "3.10 percent". Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds. This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.

> (ii) The quarterly rate of the special allowance set under division (i) of this subparagraph shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4."

The regulations implementing the statutory provision are found at 34 C.F.R. 682.302 (the "Regulation"). Under 682.302, special allowance is paid on an FFEL loan by the

N0017679

Mike Dunlap
January 30, 2004
Page 4

Department when the return to the lender falls below a level considered to reflect a market return to the holder of the loan. Section 682.302(c) provides that the special allowance rate is calculated quarterly by determining the bond equivalent average rates of 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for the loan, and adding an additional percentage as specified in the regulation by the type of FFEL loan involved. Subsections 682.302(c) and (e) specify when the Department will pay the holder of a qualifying student loan full special allowance ("full SAP") and when the holder is to be paid reduced SAP, subject to specified minimums. A copy of 34 C.F.R. 682.302 is attached to this letter.

Under paragraph (c)(3) of the Regulation, SAP paid on loans made or guaranteed on or after October 1, 1980 that were made or purchased with funds obtained by the holder from the proceeds of a tax-exempt obligation issued prior to October 1, 1993 is one-half of the full SAP rate otherwise payable, subject to certain minimum floors. Paragraph (e)(2) of the Regulation provides that the Department will pay a special allowance at full SAP for a loan which was made or purchased with the proceeds of a tax-exempt obligation issued prior to October 1, 1993 after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations if either the authority no longer retains a legal or equitable interest in the loan, or the tax-exempt obligation is retired or defeased.

The Regulation created the unanticipated opportunity under the current rate environment for holders such as the Nelf to substantially increase the SAP paid on certain loans by transferring them to a pre-October 1, 1993 tax-exempt bond estate even if such loans are subsequently transferred out of the bond estate, provided that Nelf, acting through its eligible lender trustee, retained a legal or equitable interest in the loan and provided that the involved tax-exempt obligation has not been retired or defeased.

It is this circumstance that has, in our opinion, contributed to contradictory guidance reportedly being provided by the Department on this issue. The history of 34 C.F.R. 682.302 suggests, however, that the Department wrote the Regulation as it did without appreciating the possibility of the current financial results of it. In 1992, when the Regulation was promulgated, floor yield was not applicable on loans because of the prevailing interest rate environment. At the time, half SAP significantly reduced the yield on loans. This circumstance encouraged FFEL loan providers to explore means of converting loans to full SAP eligibility through refinancing loans with taxable bonds and through other means.

In part, the Regulation appears to have been written with the intention of making such transactions more difficult. By curtailing the conversion of loans from floor yield/half SAP to full SAP, the Department's costs associated with such loans were substantially reduced.

The Department's rationale for the Regulation was explained in Questions and Answers included as part of a "Dear Colleague" letter issued in March, 1996 entitled, "Summary:

N0017680

Mike Dunlap
January 30, 2004
Page 5

Clarification and interpretative guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992." The letter is designated as 96-L-186, 96-G-287. It is accessible on the Internet at: www.ifap.ed.gov/dpcletters/doc0628_bodyoftext.htm.

Question and Answer 30 of the "Dear Colleague Letter" reads as follows

"30. Section 682.302(e), which pertains to eligibility for special allowance for loans made or acquired with obligations on which the interest is exempt from taxation (tax-exempt obligations), has been revised in the 1992 regulations. What is the significance of the change?

"Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations. The regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligations remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions—if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

"In the December 18, 1992 regulations, the Department changed this policy. *Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.* If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

"This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

"Adjustments to ED 799 billings and current billings for any loans covered by this policy should be made using the applicable tax-exempt special allowance codes for the periods that the holder retains legal interest in the loan and the original tax-exempt obligation has not been retired or defeased." (Emphasis added).

Confidential

N0017681

Mike Dunlap
January 30, 2004
Page 6

Discussion of Legislative Risk

In considering this transaction, the possibility of the Department or Congress changing the treatment of loans held currently or in the past in pre-October 1, 1993 bond estates must be kept in mind. Revision of regulations, or a legislative change in the Higher Education Act, could result in loans transferred into bond estates created prior to October 1, 1993 and subsequently transferred out being no longer subject to the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act. Such a change would, in our view, most likely entail a determination that loans held in a qualifying pre-October 1, 1993 tax-exempt bond estate would cease to be subject to the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act if they are transferred out of that bond estate after a specified future date. We do not believe it legally possible for the Department or Congress to retroactively determine that loans formerly held in a pre-October 1, 1993 tax-exempt bond estate that were not eligible for the special allowance payments calculated pursuant to Section 438(b)(2)(B)(i) and (ii) of the Higher Education Act or that any special allowance received prior to the date of such a legislative or regulatory change would have to be refunded to the Department.

We believe that if the Department attempted to revise the relevant policies relating to pre-October 1, 1993 tax-exempt bond estates without formal regulatory action, the resulting policies would be subject to legal challenge.

This firm has no opinion on the probability of the Department or Congress taking such action or other action that could result in a prospective change in the treatment of the loans involved, but advise you that legislative risk must be considered in evaluating this transaction.

As noted above, we are providing you with an opinion based on our review of the statute, regulations, and applicable interpretative bulletins. This opinion is also limited to our review of the applicable sections of the Higher Education Act of 1965, as amended, and regulations issued pursuant to it. We express no opinion with regard to any other law or issue.

This opinion may be relied upon only by Nelnet and its affiliates, by Credit Suisse First Boston, LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Morgan Stanley & Co. Incorporated, and McKee Nelson LLP exclusively in connection with issuance of the Series 2004-1 Notes. It may not be relied upon by any other party or for any other purpose without our express written consent.

N0017682

Mike Dunlap
January 30, 2004
Page 7

Please let us know if this memo meets your needs. We would be pleased to discuss this matter with you in additional detail.

Sincerely,

DEAN BLAKEY

By: _____
John E. Dean
Partner

ATTACHMENT

Confidential

N0017683

EXHIBIT A

## CERTIFICATE OF NELNET EDUCATION LOAN FUNDING, INC.

The undersigned officer of Nelnet Education Loan Funding, Inc. (the "Company") hereby certifies that he/she has reviewed the facts assumed under the headings "Assumptions of Fact" contained in the opinion of Dean Blakey dated the date hereof with respect to certain matters regarding the refinancing of certain student loans and hereby certifies that the facts assumed therein, as they relate to the Company, are correct.



NELNET EDUCATION LOAN FUNDING, INC.

By: _____
Terry J. Heimes
President

Date: January 30, 2004

Confidential

N0017684

EXHIBIT B

## CERTIFICATE OF NELNET, INC.

The undersigned officer of Nelnet, Inc. (the "Company") hereby certifies that he/she has reviewed the facts assumed under the headings "Assumptions of Fact" contained in the opinion of Dean Blakey dated the date hereof with respect to certain matters regarding the refinancing of certain student loans and hereby certifies that the facts assumed therein, as they relate to the Company, are correct.

NELNET, INC.

By: _____
      Terry J. Heimes
      Executive Director

Date: January 30, 2004

Confidential

N0017685



THIS DATA CURRENT AS OF THE FEDERAL REGISTER DATED JANUARY 8, 2004

## 34 CFR - CHAPTER VI - PART 682

View Part

§ 682.302 Payment of special allowance on FFEL loans.

Link to an amendment published at 68 FR 75429, December 31, 2003.

(a) *General.* The Secretary pays a special allowance to a lender on an eligible FFEL loan. The special allowance is a percentage of the average unpaid principal balance of a loan, including capitalized interest, computed in accordance with paragraph (c) of this section.

(b) *Eligible loans.* (1) Except for non-subsidized Federal Stafford loans disbursed on or after October 1, 1981, for periods of enrollment beginning prior to October 1, 1992, FFEL loans that otherwise meet program requirements are eligible for special allowance payments as provided in paragraphs (b)(2), (b)(3), and (e) of this section.

(2) For a loan made under the Federal SLS or Federal PLUS Program on or after July 1, 1987 and prior to July 1, 1994, and for any Federal PLUS loan made on or after July 1, 1998 or under § 682.209(e) or (f), no special allowance is paid for any period for which the interest rate calculated prior to applying the interest rate maximum for that loan does not exceed —

(i) 12 percent in the case of a Federal SLS or PLUS loan made prior to October 1, 1992;

(ii)  1 percent in the case of a Federal SLS loan made on or after October 1, 1992;

(iii) 10 percent in the case of a Federal PLUS loan made on or after October 1, 1992; or

(iv) 9 percent in the case of a Federal PLUS loan made on or after July   , 1998.

(3) In the case of a subsidized Stafford loan disbursed on or after October 1, 1992, the Secretary does not pay special allowance on a disbursement if —

(i) The disbursement check is returned uncashed to the lender or the lender is notified that the disbursement made by electronic funds transfer or master check will not be released from the restricted account maintained by the school; or

(ii) The check for the disbursement has not been negotiated before the 120th day after the date of disbursement or the disbursement made by electronic funds transfer or master check has not been released from the restricted account maintained by the school before that date.

(c) *Rate.* (1) Except as provided in paragraph (c)(2) of this section, the special allowance rate for an eligible loan during a 3-month period is calculated by --

(i) Determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the 3-month period;

(ii) Subtracting the applicable interest rate for that loan;

(iii) Adding --

(A)(*1*) 2.8 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1998; or

(*2*) 2.2 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1998 during the borrower's in-school, grace, and authorized period of deferment;

(B) 2.5 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1995 for interest that accrues during the borrower's in-school, grace, and authorized period of deferment;

(C) Except as provided in paragraph (c)(1)(iii)(B) of this section, 3.1 percent to the resulting percentage for a Federal Stafford Loan made on or after October 1, 1992 and prior to July 1, 1998, and for any Federal SLS, Federal PLUS, or Federal Consolidation Loan made on or after October 1, 1992;

(D) 3.25 percent to the resulting percentage, for a loan made on or after November 16, 1986, but before October 1, 1992;

(E) 3.25 percent to the resulting percentage, for a loan made on or after October 17, 1986 but before November 16, 1986, for a period of enrollment beginning on or after November 16, 1986;

(F) 3.5 percent to the resulting percentage, for a loan made prior to October 17, 1986, or a loan described in paragraph (c)(2) of this section; or

(G) 3.5 percent to the resulting percentage, for a loan made on or after October 17, 1986 but before November 16, 1986, for a period of enrollment beginning prior to November 16, 1986;

N0017687

(iv) Rounding the result upward to the nearest one-eighth of   percent, for a loan made prior to October 1, 1981; and

(v) Dividing the resulting percentage by 4.

(2) The special allowance rate determined under paragraph (c)(1)(iii)(F) of this section applies to loans made or purchased from funds obtained from the issuance of an obligation of the --

(i) Maine Educational Loan Marketing Corporation to the Student Loan Marketing Association pursuant to an agreement entered into on January 31, 1984; or

(ii) South Carolina Student Loan Corporation to the South Carolina National Bank pursuant to an agreement entered into on July 30, 1986.

(3)(i) Subject to paragraphs (c)(3) (ii) and (iii) of this section, the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from --

(A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);

(B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

(ii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that are made prior to October 1, 1992, may not be less than --

(A) 2.5 percent per year on eligible loans for which the applicable interest rate is 7 percent;

(B)   5 percent per year on eligible loans for which the applicable interest rate is 8 percent; or

(C) One-half of   percent per year on eligible loans for which the applicable rate is 9 percent.

N0017688

(iii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that are made on or after October 1, 1992, may not be less than 9 1/2 percent minus the applicable interest rate.

(4) Loans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued on or after October 1, 1993, and loans made with funds derived from default reimbursement collections, interest, or other income related to eligible loans made or purchased with those tax-exempt funds, do not qualify for the minimum special allowance rate specified in paragraph (c)(3)(iii) of this section, and are not subject to the 50 percent limitation on the maximum rate otherwise applicable to loans made with tax-exempt funds.

(d) *Termination of special allowance payments on a loan.* (1) The Secretary's obligation to pay special allowance on a loan terminates on the earliest of --

(i) The date a borrower's loan is repaid;

(ii) The date a borrower's loan check is returned uncashed to the lender;

(iii) The date a lender receives payment on a claim for loss on the loan;

(iv) The date a loan ceases to be guaranteed or ceases to be eligible for reinsurance under this part, with respect to that portion of the loan that ceases to be guaranteed or reinsured, regardless of whether the lender has filed a claim for loss on the loan with the guarantor;

(v) The 60th day after the borrower's default on the loan, unless the lender files a claim for loss on the loan with the guarantor together with all required documentation, on or before the 60th day;

(vi) The 120th day after the date of disbursement, if -

(A) The loan check has not been cashed on or before that date; or

(B) the loan proceeds disbursed by electronic funds transfer or master check in accordance with § 682.207(b)(1)(ii) (B) and (C) have not been released from the restricted account maintained by the school on or before that date; or

(vii) The 30th day after the date the lender received a returned claim from the guaranty agency on a loan submitted by the deadline specified in (d)(1)(v) of this section for loss on the loan to the lender due solely to inadequate documentation unless the lender files a claim for loss on the loan with the guarantor, together with all required documentation, prior to the 30th day.

(2) In the case of a loan disbursed on or after October  , 1992, the Secretary does not pay special allowance on a loan if --

Confidential

N0017689

(i) The disbursement check is returned uncashed to the lender or the lender is notified that the disbursement made by electronic funds transfer or master check will not be released from the account maintained by the school; or

(ii) The check for the disbursement has not been negotiated before the 120th day after the date of disbursement or the disbursement made by electronic funds transfer or master check has not been released from the account maintained by the school before that date.

(3) Section 682.413 sets forth the circumstances under which a lender may be required to repay the special allowance received on a loan guaranteed by a guaranty agency.

(e) *Special allowance payments for loans financed by proceeds of tax-exempt obligations.* (1) The Secretary pays a special allowance on a loan described in paragraph (c)(3)(i) of this section that is held by or on behalf of an Authority only if the loan meets the requirements of § 682.800.

(2) The Secretary pays a special allowance to an Authority at the rate prescribed in paragraph (c)(1) of this section on a loan described in paragraph (c)(3)(i) of this section --

(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section; and

(ii) If the authority retains a legal or equitable interest in the loan --

(A) The prior tax-exempt obligation is retired; or

(B) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bear a yield that does not exceed the yield permitted under Internal Revenue Service regulations, 26 CFR 1.103-14, with regard to investments of proceeds of a tax-exempt refunding obligation. (Authority: 20 U.S.C. 1077, 1078, 1078-1, 1078-2, 1078-3, 1082, 1087-I)

[57 FR 60323, Dec. 18, 1992, as amended at 59 FR 25746, May 17, 1994; 59 FR 33353, June 28, 1994; 59 FR 61428, Nov. 30, 1994; 64 FR 18978, Apr. 16, 1999; 64 FR 58626, Oct. 29, 1999; 66 FR 34763, June 29, 2001]

The online version of this can be found at:
http://www.access.gpo.gov/nara/cfr/cfrbtml_00/Title_34/34cfr682_00.html.

N0017690

Exhibit 124

# CONFIDENTIAL

# FILED UNDER SEAL

**DEAN BLAKEY**
ATTORNEYS AT LAW

SUITE 400
1101 VERMONT AVE., N.W.
WASHINGTON, D.C. 20005-2586

(202) 289-3900
FAX: (202) 371-0197
e-mail: deanblakey@deanblakey.com

July 7, 2003

Mike Dunlap
Chairman and President Nelnet Loan Services, Inc.
121 South 13ᵗʰ Street, Suite 301
Lincoln, NE 68508

Re:     Request for Opinion

Dear Mr. Dunlap:

This letter is in response to the request made through Ed Martinez for an opinion relating to anticipated transactions involving the transfer of Federal Family Education Loan Program (FFEL) loans into or from tax-exempt bond estates created prior to October 1, 1993. Specifically, you have asked us to opine on a transaction involving the transfer of loans currently financed through means other than tax-exempt bond estates created prior to October 1, 1993 into such estates and whether the special allowance paid by the U.S. Department of Education ("Education") on the loans involved would be calculated under the rules applicable to loans made or purchased with the proceeds of such tax-exempt bonds.

This letter reflects our review of the Higher Education Act, applicable regulations, correspondence with the Department of Education, and other information sources, including informal discussions with current Department of Education staff. Importantly, while we are advising you that loans held under tax-exempt bond estates created prior to October 1, 1993 are eligible for special allowance applicable to loans made or purchased with the proceeds of such tax-exempt bonds, Education guidance on this subject has been unclear and at times contradictory. Education's sometimes conflicting guidance reflects, we believe, a sense that current policy is producing results that were unanticipated and not, in the view of some, in the best interests of the Department.

Background

In requesting this opinion, Nelnet, Inc. ("Nelnet") has provided us with a general description of loan transactions being considered by the Nelnet. The transactions involved would be based, in part, on the 1996 amendment to the Internal Revenue Code, section 150(d)(3), a provision that allows the private, nonprofit student loan secondary market companies (generally referred to as "qualified scholarship funding corporations") to convert to for-profit corporations and retain the tax-exempt status of their outstanding bonds under specified circumstances. Because Nelnet has

Confidential

Dean 12

5/12/10   50

N0002667

Mike Dunlap
July 7, 2003
Page Two

acquired two such qualified scholarship funding corporations, (the "FunCos"), it now has the opportunity to use the pre-October 1, 1993 tax exempt bond estates as a financing means for student loans acquired after that date or otherwise not previously involving financing through such bonds (hereinafter "non-qualifying loans").

In particular, Nelnet Education Loan Funding, Inc. ("NELF"), one of the FunCos, is issuing $1,030,000,000 of its Series 2003-1 Notes (the "Series 2003-1 Notes") pursuant to an Indenture of Trust dated as of June 1, 2003, and a related terms supplement. The net proceeds of the offering of the Series 2003-1 Notes will be used by NELF to re-finance non-qualifying loans that will have been transferred into and out of pre-October 1, 1993 tax-exempt bond estates established by NELF.

Nelnet is considering having the FunCos transfer non-qualifying loans into one or more pre-October 1, 1993 bond estates so as to qualify such loans for special allowance as calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds issued prior to October 1, 1993 (hereinafter "higher SAP rates"). After qualifying for higher SAP rates, such loans would be transferred out of the pre-1993 tax exempt bond estate to taxable bond estates established by the applicable FunCo, including transfers by NELF to the trust estate securing the Series 2003-1 notes. Nelnet intends for the combined transaction to result in the loans involved to remain eligible for "higher SAP rates."

## Opinion

As explained in this letter, it is our opinion that "non-qualifying loans" transferred into a pre-October 1, 1993 tax-exempt bond estate would be made eligible for "higher SAP rates" both while held under the pre October 1, 1993 tax-exempt bond estate and after transfer out of such estate provided that the FunCo that issued the tax-exempt bond, acting through its eligible lender trustee, retains legal interest in the loans, and the tax-exempt obligations involved have not been retired or defeased in full.

## Discussion

Section 438(b)(1)(i) and (ii) of the Higher Education Act (20 U.S.C. 1087-1(b)(1)(i) and (ii)) read as follows:

"(1)(i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under title 26 shall be one-half the quarterly rate of the special allowance established under subparagraph (A), except that, in determining the rate for the purpose of this division, subparagraph (A)(iii) shall be applied by substituting "3.5 percent" for "3.10 percent". Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from

N0002668

Mike Dunlap
July 7, 2003
Page Three

collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds. This subparagraph shall not apply to loans which were made or insured prior to October 1, 1980.

"(ii) The quarterly rate of the special allowance set under division (i) of this subparagraph shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4."

The regulations implementing the statutory provision are found at 34 C.F.R. 682.302 (the "Regulation"). Under 682.302, special allowance is paid on an FFEL loan by Education when the return to the lender falls below a level considered to reflect a market return to the holder of the loan. Section 682.302(c) provides that the special allowance rate is calculated quarterly by determining the bond equivalent average rates of 91 day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for the loan, and adding an additional percentage as specified in the regulation by the type of FFEL loan involved. Subsections 682.302(c) and (e) specify when Education will pay the holder of a qualifying student loan full special allowance ("full SAP") and when the holder is to be paid reduced SAP, subject to specified minimums. A copy of 34 C.F.R. 682.302 is attached to this letter.

Under paragraph (c)(3) of the Regulation, SAP paid on loans made or guaranteed on or after October 1, 1980 that were made or purchased with funds obtained by the holder from the proceeds of a tax-exempt obligation issued prior to October 1, 1993 is one-half of the full SAP rate otherwise payable, subject to certain minimum floors. Paragraph (e) (2) of the Regulation provides that the Department will pay a special allowance at full SAP for a loan which was made or purchased with the proceeds of a tax-exempt obligation issued prior to October 1, 1993 after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax exempt obligations and, if the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

The Regulation created the unanticipated opportunity under the current rate environment for holders such as the FunCos to substantially increase the SAP paid on certain loans by transferring them to a pre-October 1, 1993 tax-exempt bond estate even if such loans are subsequently transferred out of the bond estate, provided that the FunCo, acting through its eligible lender trustee, retained a legal or equitable interest in the loan and provided that the involved tax-exempt obligation has not been retired or defeased.

It is this circumstance that has, in our opinion, contributed to contradictory guidance reportedly being provided by Education on this issue. The history of 34 C.F.R. 682.302 suggests, however, that Education wrote the Regulation as it did without appreciating the possibility of the current financial results of it. In 1992, when the Regulation was promulgated, floor yield was not applicable on loans because of the prevailing interest rate environment. At the time, half SAP

N0002669

Mike Dunlap
July 7, 2003
Page Four

significantly reduced the yield on loans. This circumstance encouraged FFEL loan providers to explore means of converting loans to full SAP eligibility through refinancing loans with taxable bonds and through other means.

In part, the Regulation appears to have been written with the intention of making such transactions more difficult. By curtailing the conversion of loans from floor yield/half SAP to full SAP, Department of Education costs associated with such loans were substantially reduced.

The Department's rationale for the Regulation was explained in Questions and Answers included as part of a "Dear Colleague" letter issued in March, 1996 entitled, "Summary: Clarification and interpretative guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992. The letter is designated as 96-L-186, 96-G-287. It is accessible on the Internet at: www.ifap.ed.gov/dpcletters/doc0628_bodyoftext.htm.

Question and Answer 30 of the "Dear Colleague Letter" reads as follows:

"30. Section 682.302(e), which pertains to eligibility for special allowance for loans made or acquired with obligations on which the interest is exempt from taxation (tax-exempt obligations), has been revised in the 1992 regulations. What is the significance of the change?

"Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations. The regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligations remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions—if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

"In the December 18, 1992 regulations, the Department changed this policy. *Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.* If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

Confidential

N0002670

Mike Dunlap
July 7, 2003
Page Five

> "This change is effective as of the effective date of the 1992 regulations, February 1,
> 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable
> obligation on or after that date.

> "Adjustments to ED 799 billings and current billings for any loans covered by this policy
> should be made using the applicable tax-exempt special allowance codes for the periods
> that the holder retains legal interest in the loan and the original tax-exempt obligation has
> not been retired or defeased." (Emphasis added).

Discussion of Legislative Risk

In considering this transaction, the possibility of the Department of Education or Congress
changing the treatment of loans held currently or in the past in pre-October 1993 bond estates
must be kept in mind. Revision of regulations, or a legislative change in the Higher Education
Act, could result in loans transferred into bond estates created prior to October 1, 1993 and
subsequently transferred out being no longer subject to "higher SAP rates." Such a change
would, in our view, most likely entail a determination that loans held in a qualifying pre-October,
1993 bond estate would cease to be subject to "higher SAP rates" if they are transferred out of
that bond estate after a specified future date. We do not believe it legally possible for the
Department or Congress to retroactively determine that loans formerly held in a pre-October
1993 bond estate were not eligible for "higher SAP rates" or that any special allowance received
prior to the date of such a legislative or regulatory change would have to be refunded to the
Department.

We believe that if the Department of Education attempted to revise the relevant policies relating
to pre-October, 1993 bond estates without formal regulatory action, the resulting policies would
be subject to legal challenge.

This firm has no opinion on the probability of the Department of Education or Congress taking
such action or other action that could result in a prospective change in the treatment of the loans
involved, but advise you that legislative risk must be considered in evaluating this transaction.

Conclusion

Given that the language of the Dear Colleague letter is unambiguous and that Departmental
officials have informally confirmed our interpretation of 34 C.F.R. 682.302, we have concluded,
subject to the discussion of legislative risk above with respect to prospective changes, that a
FunCo may transfer loans into its tax-exempt bond estates and receive floor-yield/half SAP
treatment on such loans while they are held in the tax-exempt estate and thereafter, provided that
the original tax-exempt obligation has not been retired or defeased in full.

            N0002671

Mike Dunlap
July 7, 2003
Page Six

We hope this letter is useful to you as your consider this matter. As noted above, we are
providing you with an opinion based on our review of the statute, regulations, and applicable
interpretative bulletins. This opinion is also limited to our review of the applicable sections of
the Higher Education Act of 1965, as amended, and regulations issued pursuant to it. We
express no opinion with regard to any other law or issue.

This opinion may be relied upon only by Nelnet and its affiliates, and by Banc of America
Securities, LLC, and Deutsche Bank Securities, Inc. exclusively in transactions with Nelnet and
its affiliates. It may not be relied upon by any other party or for any other purpose without our
express written consent.

Please let us know if this memo meets your needs. We would be pleased to discuss this matter
with you in additional detail.

Sincerely,

DEAN BLAKEY

By:
John E. Dean
Partner

ATTACHMENT

Confidential

N0002672

Confidential

N0002673

# Exhibit 125

# CONFIDENTIAL

# FILED UNDER SEAL

*Dean 16*
*5/12/10*

Chronological History of 9.5% Loan Issue

1.   1965. Higher Education Act was enacted, providing for "special allowance payments" to be paid by the Federal government to holders of student loans made and guaranteed pursuant to that legislation.

2.   1980. Congress passed reforming legislation that provided only a half rate of special allowance payments to issuers of tax-exempt obligations. In order to protect tax-exempt issuers on long-term bond commitments, however, Congress guaranteed a minimum return of 9.5% per annum (the "9.5% Floor").

3.   1993. As interest rates fell in the early 1990s, Congress realized that, during prevailing low interest rate environments, it had created an unintended result of providing an artificially high special allowance payment rate to tax-exempt issuers who were guaranteed the 9.5% Floor. Therefore, Congress eliminated the 9.5% Floor for loans financed with new tax-exempt bonds issued after October 1, 1993. In order to maintain stability for outstanding tax-exempt bonds, however, Congress continued the 9.5% Floor in the 1993 legislation for loans made or purchased with proceeds of existing tax-exempt bonds (issued prior to October 1, 1993), until such bonds were retired or defeased.

4.   3/14/94. Nellie Mae, the Massachusetts tax-exempt secondary market that later converted to for-profit status, received a letter from the Department of Education indicating that the process of refinancing student loans subject to the 9.5% Floor with funds from taxable financings may result in the loans retaining the 9.5% Floor.

5.   1996. In response to questions from tax-exempt lenders in 1996, the Department of Education, under the Clinton administration, clarified with a Dear Colleague Letter that if a loan made or acquired with proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, such loan remains subject to the tax-exempt special allowance payment provisions (including the 9.5% Floor) if the authority (meaning the tax-exempt issuer) retains legal interest in the loan.

6.   October 2002. Auditors from the Department of Education issued a draft report (Exhibit 4) challenging Iowa Student Loan Liquidity Corporation's billings for tagged loans which claimed eligibility for the 9.5% Floor.

7.   1/3/03. Senior Nelnet employees met with Kristie Hansen of the Department of Education. Based upon the 1996 Dear Colleague Letter (Exhibit 3), Ms. Hansen orally agreed with Nelnet that there was no legal argument prohibiting a process of passing loans through a tax-exempt issuance and then into a taxable financing, while permanently retaining the 9.5% Floor. She acknowledged that other lenders were engaged in tagging and that there was an increase in the volume of 9.5% Loans. Ms. Hansen also stated that any change from the 1996 Dear Colleague Letter would have to be prospective in nature.

1

D:\CW\V50\scratch\temp\esadb\attCacheDir\dataStore_case_70320138_559800391707204 7480\netit\0.7.14.74297_
1\1\1.doc

Confidential                                              N0132944

8.  January 2003. Nelnet began tagging efforts, which accelerated in March 2003, but deferring income until it felt it had satisfactorily resolved issues on eligibility for the 9.5% Floor.

9.  3/4/03. Nelnet obtained an opinion from the Washington, D.C. law firm Dean Blakey affirming Nelnet's eligibility for the 9.5% Floor on its 9.5% Loans.

10. 4/22/03. Mike Dunlap and other senior Nelnet employees met with Kathleen Smith (members of the staff from the House Education and Workforce Committee) and staff from the Department of Education. At the meeting, Nelnet proposed several initiatives for re-authorization, and proposed to pay for such initiatives by prospectively eliminating the 9.5% Floor. Mike Dunlap estimated that savings from elimination of the 9.5% Floor would amount to multi-billions of dollars. It was disclosed that Nelnet had begun tagging 9.5% Loans.

11. April 2003. Nelnet submitted its first billing for tagged 9.5% Loans to the Department of Education, and such billing was paid without question or objection, and has billed and been paid every quarter since this date.

12. 5/1/03. Mike Dunlap sent a letter to the House committee on Education and the Workforce reiterating the call for prospective elimination of the 9.5% Floor. Mike Dunlap stated "these floor earnings provide no additional value to the students, families and schools that we serve. Elimination of the floor earnings is the right thing to do. . . ."

13. 5/29/03. NELF sent a letter (Exhibit 10) to the Department of Education detailing its process to tag loans, resulting in eligibility for the 9.5% Floor, and asking for confirmation from the Department of Education that its billing at the 9.5% rate was proper under such circumstances.

14. December 2003. The Department of Education overruled the auditors' draft report on ISLLC (See Chronology entry no. [] above) and a final report not raising an objection with respect to billing for the 9.5% Floor was issued.

15. 6/30/04. The Department of Education issued its response to Nelnet's May 2003 letter.

16. 8/26/04. Senator Kennedy sent a letter (Exhibit 35) to the Secretary of Education urging the Department of Education to investigate the practice of tagging 9.5% Loans and suggesting that Nelnet's receipt of 9.5% Floor income was questionable.

17. 9/1/04. In an exit review with Department of Education auditors, those auditors explained that they felt Nelnet was in compliance with 9.5% Floor regulations and regulatory interpretations.

2

D:\CW\V50\scratch\temp\essdb\attCacheDir\dataStore_case_70320138_5598003917072047480\netit\0.7.14.74297_
1\1\1.doc

N0132945

18.     9/21/04. The US Government Accountability Office (GAO) issued its report recommending the elimination of the 9.5% Floor.

19.     9/21/04. Senator Kennedy (Exhibit 41) requested the SEC to investigate Nelnet.

20.     9/23/04. The GAO orally clarified that its recommendations for elimination of the 9.5% Floor would be only prospective, and analysts determined that recent events should not impact the status of Nelnet's 9.5% Loans.

21.     [10/04] A bill was passed in the House and Senate providing for prospective elimination of the 9.5% Floor loan "tagging" on a prospective basis for one year.

22.     Multiple bills were introduced by the Democrats in the House and Senate to eliminate the 9.5% permanently and close the other perceived loophole of "recycling" new 9.5% loans.

23.     OIG issues a controversial audit report claiming the New Mexico authority owes a 5 year refund for over billing on 9.5% floor loans funded by tax-exempt bonds that have been "re-funded" after 1993.

24.     New Mexico authority files lawsuit against the OIG and DOE relating to the audit

25.     OIG notifies Nelnet and others of pending audits.

26.

3

D:\CW\V50\scratch\temp\esadb\attCacheDir\dataStore_case_70320138_559800391707204748(\netit\0.7.14.74297_
1\1\1.doc

                                                    N0132946

Exhibit 126

# CONFIDENTIAL

# FILED UNDER SEAL

(713)651-3612    (239)593-2000 Rm 501↑

11/25/2002 Kathleen, John, Jimmy, Sol, & Mr. Baker

1. Loans can be transferred immediately.

2. Sol thinks loans transferred to PPSFC might have the floor. Alter ego.

3. Cleanest & easiest way would be to not swap loans.

4. Non-legal consideration

5. Need opinion for specific bond issue.

6. Sol does not know of any one disclosing this in the OS.

Jimmy, Glenn & I need to get plan formulated and send to Sol for review. Kathleen is going to check to see if PPSFC an alter ego of PPHEA.

11/27/2002 Kathleen does not think PPSFC is alter ego.



Baker
EXHIBIT NO. 31
K. MORRIS

HIGHLY CONFIDENTIAL

PPHEA_045877

Exhibit 130

# CONFIDENTIAL

# FILED UNDER SEAL

**Attachment A**

# SallieMae

## Signature Authorization Policy
## Approval and Authorization Requirements

Prepared By:  Kelli McWhorter
              Leah Lutz
Approved By:  _____
Revision Date: _____
Effective Date: December 1, 2004   (amended April 1, 2005)

**PURPOSE:** To define the minimum signature approval required prior to the purchase of goods and services for most categories, on behalf of SLM Corporation and its subsidiaries and affiliates.

**POLICY:**
This Policy documents the approval and authorization requirements necessary to commit Company funds or assets for the purchase of certain goods and services.   Appropriate authorization must be obtained prior to ordering such goods and services (**Refer to Purchasing Policy section 7.0**) and, in no event will payment be made prior to receiving proper authorization.  Any misconduct or fraudulent activity with regard to signature approvals is strictly prohibited and will result in disciplinary actions, including termination of employment.  This Policy is intended to apply to SLM Corporation and all subsidiaries, effective December 1, 2004.

It is the policy of SLM Corporation to allow only those personnel who have direct departmental budget responsibility, project budget responsibility or have been identified as a designated financial signatory to commit resources on behalf of SLM Corporation. By their signature, the signatory is certifying that SLM Corporation has granted them the authority to do so. The authorized signatory is also certifying that they have reviewed the transaction and all related documentation and that it conforms to Company policy and goals as well as all applicable laws. **By his/her signature the signatory is also certifying that  (1) the transaction is within his/her approval limits', (2) the accounting information on the document is correct, (3) the transaction is budgeted; unbudgeted transactions must be indicated as such and signatory authority must be consistent with the Unbudgeted Purchases section of the Signature Authority Approval Matrix (Attachment B) and (4) that he/she is authorized to sign for the indicated department. Under no circumstance shall an authorized signatory both initiate and approve the same transaction.  Also, authorized signatories may not approve payments of any kind to themselves or on their own behalf.** Company attorneys who review and approve the contract are signifying that they have reviewed the legal terms of the contract.

Approvals by authorized signatories to commit resources on behalf of SLM Corporation are also accepted via email. It is the responsibility of the authorized signatory to ensure strict security of their email account. Sharing of email passwords is strictly prohibited and will result in disciplinary actions, including termination of employment.

Ra Katonsky
3
6/23/10

05/27/10                                                                                              1

CONFIDENTIAL                                                    SLMA_P0027861

## Attachment A

Signature Authorization Policy
Approval and Authorization Requirements

### SPECIFIC GUIDELINES RELATED TO THIS POLICY INCLUDE:

1.0 All employees must be aware of and adhere to their signature authority approval limits.

2.0 The Finance organization is responsible for ensuring compliance with these guidelines. Either the CEO, COO, Executive Vice President of Finance or Executive Vice President of Accounting & Risk Management may approve exceptions to this Policy but not beyond the limits of their authority.

3.0 All signature approvals must include: the approver's full printed name, title, the approver's full signature, and the date of approval.

### APPROVALS / DOCUMENTATION:

1.0 All commitments require appropriate documentation and approval prior to submission for processing. The requisition/payment request documentation will include: the requestor's name/signature, the business unit being charged for the goods/services, a brief description of the goods/service being requested, the cost of the request, acknowledgement if the commitment is budgeted or non-budgeted and the printed name and signature of the individual approving the request
   - All requisitions/requests for payment require two signatures.
   - The first signature will be the signature of the requestor and the second signature must be an approver with the appropriate authorization limits.

2.0 The originator of the requisition is responsible for obtaining all authorizing signatures. The Purchasing Department/Accounts Payable Department will confirm that the authorizing signatures are appropriate prior to processing a purchase order/payment request.

3.0 The Company's Signature Authority Approval Matrix (**Attachment B**), contains a listing of the most common types of commitments and expenditures for the purchase of goods and services and the appropriate signature level required. Each requisition/payment request must have the signature of an individual with the appropriate level of authorization.

4.0 Expense reports will be approved by the employees' immediate supervisor, within the supervisor's authorization limit. No employee shall approve his/her own expenditures. **Refer to section 7.0 for further information.**

5.0 Employees are strictly prohibited from requesting that a vendor issue more than one invoice in order to meet the approval limits of this Policy.
   - During an authorized signer's absence from the office, signature authorization may **only** be obtained from an individual in the same Authorized Category level or at the next **higher** level, as indicated on the Signature Authority Approval Matrix (**Attachment B**)

6.0 **Non-Budgeted Expenditures** - Validation of the department budget is required by the authorized signatory when completing a requisition or a payment request. In those instances whereby a non-budgeted item is to be purchased, additional signature authorization at the **Category D level or above** is mandatory.

05/27/10                                                                    2

CONFIDENTIAL                                                SLMA_P0027862

## Attachment A

Signature Authorization Policy
Approval and Authorization Requirements

# REDACTED

8.0 Detailed Corporate Policy information for **Purchasing** can be located on the intranet at::
http://salliemaecentral.com/humanres/adminpolicy/COG/Purchasing.htm

Detailed Corporate Policy information for **Information Technology** can be located on the intranet at:
http://salliemaecentral.com/is/techwrit/Policies/Index.htm#Procedures

Detailed Corporate Policy information for **Travel & Entertainment** can be located on the intranet at:
http://salliemaecentral.com/finance/travel/Policy.htm

Detailed Corporate Policy information for **Cash Disbursement** can be located on the intranet at:
http://salliemaecentral.com/humanres/adminpolicy/COG/CashDisbursements.htm

Detailed Corporate Policy information for **Legal Review of Contracts** can be located on the intranet
at:  http://salliemaecentral.com/legal/contracts/index.htm

8.1 This policy does not apply to the expenditure of funds specifically granted by the Board of Directors of
of SLM Corporation or its subsidiaries, such as specific Board approval for a merger or acquisition,
transferring client funds from a trust account to the client, the purchase of real property, collection
disbursements, or the company's corporate finance activities which shall be under the approval of the
Executive Vice President, Finance.

05/27/10

3

CONFIDENTIAL

SLMA_P0027863

## Attachment A

Signature Authorization Policy
Approval and Authorization Requirements

### FREQUENTLY ASKED QUESTIONS:

*When is this policy effective?*
This Policy is effective December 1, 2004. and was first amended April 1, 2005.

*How many signatures do I need for my requisition/payment request?*
At least two signatures are required -- one from the requestor and one from the appropriate authorized approver in accordance with the Signature Authority Approval Matrix.

*Where can I find a purchase requisition form?*
The Sallie Mae Purchase Requisition can be found on the on the Sallie Mae Intranet; Policies and Procedures/Corporate Operations Guide/Purchasing Policy.

*Where can I find a check request form?*
The Sallie Mae Request for Check Disbursement can be found on the Sallie Mae Intranet; Policies and Procedures/Corporate Operations Guide/Cash Disbursement Policy

*Is just my signature sufficient?*
No, as many signatures are illegible, it is required that you print your full name, title, and approval date.

*Are the use of Delegation of Authority forms still permitted for the purchase of goods and services?*
No, as approval authority limits for the purchase of goods and services are based on the Signature Authority Approval Matrix the Delegation of Authority form will no longer be used.

*How do I delegate my signature authorization if I plan to be out of the office?*
Other than by the Board of Directors of SLM Corporation and in the Corporate Finance area, Delegations will not be utilized for the purchase of goods and services. During a signatory authority's absence, signature authorization may **only** be obtained from an individual in the same Authorized Category level or at the next **higher** level, as indicated on the Signature Authority Approval Matrix (**Attachment B**)

*How are unbudgeted requests handled?*
In those instances whereby a non-budgeted item is to be purchased, additional signature authorization at the **Category D level or above** is mandatory.

CONFIDENTIAL                                        SLMA_P0027864

Exhibit 131

# CONFIDENTIAL

# FILED UNDER SEAL

## Attachment B

### SLM Corporation and Subsidiaries
### Signature Authority Approval Matrix
#### Amended 9/14/2005

**CATEGORY KEY**

A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

Footnote Key - Page 7

**EXPENDITURE TYPE**    **AUTHORIZATION CATEGORIES**

| | A | B | C | D | E | EVP | COO/CEO |
|---|---|---|---|---|---|---|---|
| **Salary and Benefits** | | | | | | | |
| Tuition Assistance (3A) | | 1,000 | 5,250 | 10,000 | 20,000 | 50,000 | (1) |
| Relocation (3) | | | | 10,000 | 25,000 | 50,000 | (1) |
| Employee Awards Cash | | | | 7,000 | 10,000 | 25,000 | (1) |
| Employee Awards Non-Cash | | | | 7,000 | 10,000 | 25,000 | (1) |
| Employee Discretionary Benefits (mementos of nominal value) | | | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Health, Life & Dental Insurance (3) | | | 200,000 | 300,000 | 5,000,000 | 10,000,000 | (1) |
| **Personnel & Development** | | | | | | | |
| Recruiting (3) | | 1,000 | 5,000 | 10,000 | 25,000 | 200,000 | (1) |
| Temporary Employment (3) | 1,000 | 2,000 | 5,000 | 10,000 | 20,000 | 75,000 | (1) |
| Seminars & Conferences | 1,000 | 2,000 | 5,000 | 25,000 | 150,000 | 500,000 | (1) |
| Dues & Subscriptions | 250 | 1,000 | 2,500 | 5,000 | 10,000 | 25,000 | (1) |
| **Travel & Entertainment** | | | | | | | |
| Travel Advances | | 500 | 1,000 | 2,000 | 5,000 | 5,000 | (1) |
| Expense Reports | 1,000 | 2,000 | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Employee Discretionary Benefits (mementos of nominal value) | | | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Official Corporate Functions | | | | 100,000 | 150,000 | 300,000 | (1) |

9/15/2005

1

CONFIDENTIAL    SLMA_P0027865



## SLM Corporation and Subsidiaries
## Signature Authority Approval Matrix

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| BUDGETED PURCHASES | AUTHORIZATION CATEGORIES | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Capital Asset** | | | | | | | |
| All Categories | | | 25,000 | 500,000 | 1,000,000 | 2,500,000 | (1) |
| | | | | | | | |
| **Professional Fee & Service** | | | | | | | |
| Legal Fees (2) | | 30,000 | 30,000 | 300,000 | 500,000 | 1,000,000 | (1) |
| Accounting Fees (7) | | | | 300,000 | 500,000 | 1,000,000 | (1) |
| Other Professional Fees | | | | 300,000 | 500,000 | 1,000,000 | (1) |
| | | | | | | | |
| **Advertising & Promotion** | | | | | | | |
| Advertising Media & Production | | | | 50,000 | 500,000 | 1,000,000 | (1) |
| Promotion Exhibit & External | | | | 25,000 | 50,000 | 100,000 | (1) |
| | | | | | | | |
| **Computer Operation** | | | | | | | |
| Computer Data Service (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Hardware and Software Maintenance (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Computer Rent & Purchase (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Supply Mainframe Computer | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| | | | | | | | |
| **Office Occupancy** | | | | | | | |
| Rent (4) | | | 50,000 | 400,000 | 500,000 | 10,000,000 | (1) |
| Utilities | | | 100,000 | 150,000 | 300,000 | 350,000 | (1) |
| Building Repair & Maint. (includes janitorial and breakroom supplies) | | | 15,000 | 30,000 | 50,000 | 300,000 | (1) |
| Furniture & Equipment | | | 25,000 | 100,000 | 200,000 | 300,000 | (1) |
| Telephone Service | | | 100,000 | 150,000 | 300,000 | 350,000 | (1) |

9/15/2005

2

CONFIDENTIAL

SLMA_P0027866

## SLM Corporation and Subsidiaries
## Signature Authority Approval Matrix

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| BUDGETED PURCHASES | AUTHORIZATION CATEGORIES | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Office Occupancy (cont.)** | | | | | | | |
| Printing Promotional | | | 100,000 | 500,000 | 1,000,000 | 4,000,000 | (1) |
| Postage and Delivery | | | 100,000 | 500,000 | 1,000,000 | 4,000,000 | (1) |
| Printing Office | | | 25,000 | 100,000 | 200,000 | 500,000 | (1) |
| Office Supplies | 500 | 1,000 | 2,500 | 5,000 | 10,000 | 50,000 | (1) |
| **Other** | | | | | | | |
| Charitable Contributions | | | | | 50,000 | 100,000 | 2,000,000 |
| Corporate Aviation (4) | | | | 40,000 | 50,000 | 75,000 | (1) |
| Award Payment - Non-employee | | | | | | 50,000 | (1) |

| UNBUDGETED PURCHASES | | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Capital Asset** | | | | | | | |
| All Categories | | | | 100,000 | 500,000 | 1,000,000 | 5,000,000(13) |
| **Professional Fee & Service** | | | | | | | |
| Legal Fees (2) | | | | | 300,000 | 500,000 | 10,000,000 |
| Accounting Fees | | | | | 300,000 | 500,000 | 10,000,000 |
| Other Professional Fees | | | | | 300,000 | 500,000 | 10,000,000 |

9/15/2005

3

CONFIDENTIAL

SLMA_P0027867

**SLM Corporation and Subsidiaries**
**Signature Authority Approval Matrix**

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| UNBUDGETED PURCHASES | A | B | C | D | E | EVP | COO/CEO |
|---|---|---|---|---|---|---|---|
| | | | | **AUTHORIZATION CATEGORIES** | | | |
| **Advertising & Promotion** | | | | | | | |
| Advertising Media & Production | | | | | 100,000 | 500,000 | 10,000,000 |
| Promotion Exhibit & External | | | | | 25,000 | 50,000 | 10,000,000 |
| | | | | | | | |
| **Computer Operation** | | | | | | | |
| Computer Data Service (6) | | | | 100,000 | 200,000 | 500,000 | 10,000,000 |
| Hardware and Software Maintenance (6) | | | | 100,000 | 200,000 | 500,000 | 10,000,000 |
| Computer Rent & Purchase (6) | | | | 100,000 | 200,000 | 500,000 | 5,000,000 |
| Supply Mainframe Computer | | | | 100,000 | 200,000 | 500,000 | 5,000,000 |
| | | | | | | | |
| **Office Occupancy** | | | | | | | |
| Rent (4) | | | | 100,000 | 150,000 | 500,000 | 10,000,000 |
| Utilities | | | | 100,000 | 150,000 | 300,000 | 10,000,000 |
| Building Repair & Maint. (includes janitorial and breakroom supplies) | | | | 15,000 | 30,000 | 50,000 | 5,000,000 |
| Furniture & Equipment | | | | 25,000 | 100,000 | 200,000 | 10,000,000 |
| Telephone Service | | | | 100,000 | 150,000 | 300,000 | 10,000,000 |
| Printing Promotional | | | | | 100,000 | 500,000 | 10,000,000 |
| Postage and Delivery | | | | | 100,000 | 500,000 | 10,000,000 |
| Printing Office | | | | | 25,000 | 200,000 | 10,000,000 |
| Office Supplies | | | | 2,500 | 5,000 | 10,000 | 5,000,000 |

9/15/2005

4

CONFIDENTIAL

SLMA_P0027868

## SLM Corporation and Subsidiaries
## Signature Authority Approval Matrix

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| UNBUDGETED PURCHASES | AUTHORIZATION CATEGORIES | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Other** | | | | | | | |
| Charitable Contributions | | | | | | | 2,000,000 |
| Corporate Aviation (4) | | | | 40,000 | 50,000 | 75,000 | 5,000,000 |
| Award Payment - Non-employee | | | | | | 50,000 | (1) |

9/15/2005                                                                    5

CONFIDENTIAL                                                    SLMA_P0027869

### Attachment C
#### Amended April 1, 2005
### SLM Corporation and Subsidiaries
### Establishment of Contracts / Miscellaneous Transactions

| Type | Footnote |
|---|---|
| Financings | 2 |
| Loan Purchases or Loan Disbursements/Contracts | 14 |
| Loan Purchase Funding/Post settlement transactions | 8 |
| Investment/Hedge Portfolio Transactions | 5 |
| Swap/Debt Transactions | 5 |
| Leveraged Lease Transactions | 5 |
| Leases of facilities, property, equipment | 4 |
| Acquisitions | 2 |
| Formation/Capitalization of subsidiaries | 2 |
| Licensing and Royalty Arrangements | 2 |
| Insurance Policies | 2 |
| Intercompany funds transfers | 5 |
| Offset fees | 9 |
| Consolidation lender fees | 9 |
| ED799 payments | 9 |
| Servicing Invoices | 9 |
| Buybacks/Unclaimed Property | 10 |
| Consolidation loan rebate fees | 9 |
| Consolidation funding wires | 9 |
| Warehousing advances | 2 |
| Commitments and reserve account payments | 9 |
| Common/preferred stock dividend payments | 11 |
| Money market funds transfers | 5 |
| Futures equity payments | 5 |
| Expenses related to drawdowns on credit line | 5 |
| College Credit Trust transactions | 11 |
| Equity premium payments | 5 |
| Debt issuances | 5 |
| Guarantor Insurance premiums | 12 |
| Vital Statistics Professional Fees | 15 |
| Third Party Servicing Related Invoices | 16 |
| State and Federal Tax payments | 17 |

9/15/2005

6

CONFIDENTIAL

SLMA_P0027870

## Footnote Key
**Amended 4/1/2005**

| | |
|---|---|
| 1 | Up to Board approved Annual Business Plan. |
| 2 | Requires General Counsel's office review/approval |
| 3 | Requires Managing Director/Vice President Human Resources review/approval |
| | **New hires/positions of SVP level & above require Board approval |
| 3A | Requires HR Department Location Head/Director HR review/approval |
| 4 | Requires Managing Director/Vice President of Facilities review/approval |
| 5 | Requires Managing Director/Vice President Corporate Finance review/approval |
| 6 | Requires IT review/approval |
| 7 | Requires Accounting Risk Management review/approval |
| 8 | Requires Loan Acquisition Department review/approval |
| 9 | Requires Corporate Loan Accounting review/approval |
| 10 | Requires Servicing Accounting review/approval |
| 11 | Requires Subsidiary Accounting review/approval |
| 12 | Requires Servicing review/approval |
| 13 | Requires Finance Committee approval for amounts over $5,000,000 |
| 14 | Approval Authority as detailed in June McCormack memo dated 12/09/2004 |
| 15 | Requires Director Claims review/approval |
| 16 | Requires Manager Accounts Receivable/Third Party Servicing review/approval |
| 17 | Requires Tax department review/approval |

9/15/2005

7

CONFIDENTIAL

SLMA_P0027871

# Exhibit 134

# CONFIDENTIAL

# FILED UNDER SEAL

## REVOLVING CREDIT AGREEMENT

THIS REVOLVING CREDIT AGREEMENT dated as of February 1, 2005, is made by and between SLM CORPORATION, a Delaware corporation (the "Lender") and SOUTHWEST STUDENT SERVICES FINANCE CORPORATION, a Delaware CORPORATION (the "Borrower").

### ARTICLE I. DEFINITIONS

SECTION 1.1 <u>Defined Terms</u>. All capitalized terms used in this Agreement shall have the meaning ascribed to them in this Section 1.1. Such meanings are equally applicable to both the singular and plural forms of the terms defined. The following terms have the following meanings:

"Advance" means each advance of funds made to the Borrower by the Lender pursuant to Section 2.1.

"Agreement" means this Revolving Credit Agreement, as may be amended or supplemented from time to time.

"Borrower" means Southwest Student Services Finance Corporation, together with its successors and permitted assigns.

"Business Day" means any day (i) on which commercial banks located in New York, New York are not required or authorized to close, (ii) which is not a Saturday, Sunday or other legal holiday and (iii) which is not any other day of the year on which the Lender is closed.

"Event of Default" means any event of default specified in Section 5.1.

"Expiration Date" means the earlier to occur of (i) the date designated as such in writing by the Borrower and the Lender from time to time and (ii) the date this Agreement is terminated by the Lender pursuant to Section 5.2.

"Lender" means SLM Corporation, together with its successors and assigns.

"London Business Day" means any Business Day on which commercial banks are open for international business (including dealings in dollar deposits) in London, England.

"LIBOR Rate" means (a) the offered rate for dollar deposits for a period of three (3) months which appears on the display page designated as page "3750" on the Moneyline Telerate service (or such other page as may replace page "3750" on the Moneyline Telerate service or such other service as may be nominated by the British Bankers' Association to be the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollar Deposits) ("Telerate Page 3750") as of 11:00 A.M. (London



CONFIDENTIAL

SLMA_P0002852

time) on the day which is two (2) London Business Days prior to each Reset Date, (b) if, as of 11:00 A.M. (London time) on any such date, such rate does not appear on Telerate Page 3750, the arithmetic mean (rounded to the nearest $1/100^{th}$ of 1%) of the offered rates for dollar deposits, for a period of three (3) months, as such rates appear on the display designated "LIBO" on the Reuters Money Rates Service (or such other page as may replace the "LIBO" page on that service for the purpose of displaying London interbank offered rates of major banks) ("Reuters Screen LIBO Page") as of 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date, or (c) if neither of the above rates is available on such date, the average (rounded upward, if necessary, to the next higher $1/100^{th}$ of 1%) of the respective rates per annum at which deposits in dollars are offered to each of the Reference Banks in the London interbank market at approximately 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date in an amount approximately equal to the principal amount of the Advances outstanding as of such Reset Date for a period of three (3) months.

"Reference Banks" means four (4) major banks in the London interbank market as selected by the Lender.

"Reset Date" means (a) the date of this Agreement and (b) thereafter, the third Wednesday of each September, December, March and June during the term of this Agreement; provided, if such day is not a Business Day, the Reset Date for such period shall be the Business Day immediately following such day.

"Spread" means (a) for the period from the date first written above to the first Reset Date occurring thereafter, fifty (50) basis points (0.50%) and (b) and for each interest period thereafter, such rate as may be designated as such in writing by the Borrower and the Lender from time to time.

"Subsidiary" means, with respect to any person, (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees is at such time owned directly or indirectly by such person or one or more of such person's Subsidiaries, (ii) any partnership of which such person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries, (iii) any limited liability company of which such person is a member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such person or one or more of such person's Subsidiaries.

SECTION 1.2 Headings. The various headings used in this Agreement are inserted for convenience only and in no way define, limit, amplify, modify, restrict or describe the scope or intent of, or otherwise affect the meaning of this Agreement or any provision of this Agreement.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev. 03/04

CONFIDENTIAL

SLMA_P0002853

## ARTICLE II. AMOUNT AND TERMS OF COMMITMENT

SECTION 2.1 Lender's Commitment. Subject to the terms and conditions of this Agreement and in reliance on the representations and warranties set forth herein, the Lender agrees to make Advances to the Borrower, from time to time from the date of this Agreement to but excluding the Expiration Date, in an aggregate principal amount outstanding at any one time not to exceed FIVE BILLION AND NO/100 DOLLARS ($5,000,000,000.00). The obligation of the Lender to make an Advance is subject to the condition that no event has occurred and is continuing, or would occur by the borrowing of the Advance, which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both, would constitute an Event of Default.

SECTION 2.2 Borrower's Obligations. The Borrower hereby promises to pay in full the unpaid principal balance of the Advances on the Expiration Date and any and all accrued and unpaid interest on the Advances as more fully set forth in Section 2.4 below. The obligation of the Borrower to pay the principal of, and interest on, the Advances shall be absolute and unconditional, shall be binding and, to the fullest extent permitted by law, enforceable in all circumstances whatsoever and shall not be subject to setoff, recoupment or counterclaim. The Lender shall maintain on its books and records a register on which it will record each Advance made and each repayment of any Advance and interest thereon. Any such recordation by the Lender shall be presumptively correct, absent manifest error. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations hereunder.

SECTION 2.3 Requests for Advances. The Borrower will give the Lender notice of a request for an Advance at least one (1) Business Day prior to the day on which the Borrower wishes an Advance. Subject to the terms and conditions of this Agreement, the Lender will make the requested Advance on the Business Day specified in the notice in immediately available funds in accordance with the Borrower's payment instructions.

SECTION 2.4 Interest. Interest will accrue on the average daily balance of the unpaid principal amount of the Advances, for each day from the date such Advances are made until they become due or are paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate then in effect plus (ii) the Spread. Should any principal of, or accrued interest on, an Advance not be paid when due, such amount will bear interest from its due date until paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate plus the Spread, in each case, then in effect plus (ii) one hundred (100) basis points (1.00%). The interest rate and the Spread applicable to all Advances hereunder shall be adjusted on each Reset Date during the term hereof. The Lender shall give the Borrower notice of changes to the Spread and the Reset Date on which such change will be effective. Any requests for an Advance and acceptance of an Advance thereafter shall be deemed to be an acceptance by the Lender of such new Spread.

Interest shall be payable prior to the day that is five (5) business days after each Reset Date occurring during the term of this Agreement and on the Expiration Date. Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day). In no event will the rate of interest hereunder exceed the maximum rate allowed by law. A certificate of the Lender as to determination of the LIBOR Rate,

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev. 03/04

CONFIDENTIAL

SLMA_P0002854

the Spread, the calculation of the interest rate therefrom and the calculation of any interest due and payable will be, absent manifest error, conclusive and binding on the Borrower.

SECTION 2.5 Repayment and Prepayment of the Advances. The outstanding principal amount of all Advances and all accrued and unpaid interest thereon will be due and payable in full on the Expiration Date. The Borrower may prepay any outstanding Advance, in whole or in part, at any time without penalty. The proceeds of any prepayment made in accordance with this Section 2.5 shall be applied entirely to the outstanding principal balance due from the Borrower on the Advances and accrued interest owing on such prepayment(s) shall be paid as more fully set forth in Section 2.4 above. Any amounts prepaid may be reborrowed.

SECTION 2.6 Payments. All payments of principal of and interest on the Advances will be made in lawful money of the United States, in immediately available funds, to the agent of Lender (as may be designated in writing by the Lender from time to time). If any such payment falls due on a day which is not a Business Day, such payment will be due on the next following Business Day. Except as set forth in Section 2.5 above, payments received by the Lender will be applied: first, to accrued and unpaid interest on the Advances, and second, to the principal of the Advances. Any excess amounts remaining shall be repaid to the Borrower.

### ARTICLE III. REPRESENTATIONS AND WARRANTIES

3.1. Representations and Warranties. To induce the Lender to extend this Agreement and to make Advances hereunder, the Borrower represents and warrants as follows:

(a) It is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on;

(b) It has full power and authority to enter into the transactions provided for in this Agreement and has been duly authorized to do so by all necessary and appropriate action and when executed and delivered by it, this Agreement executed and delivered pursuant hereto will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms; and

(c) There does not exist any default or violation by it of or under any of the terms, conditions or obligations of: (i) its organizational documents; (ii) any material agreement or other instrument to which it is a party or by which it is bound; or (iii) any law, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon it by any law or by any governmental authority, court or agency.

### ARTICLE IV. COVENANTS

SECTION 4.1 Compliance with Laws. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, comply with all applicable laws, rules and regulations in all material respects.

CONFIDENTIAL

SLMA_P0002855

SECTION 4.2 <u>Keeping of Records and Books of Account</u>. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, maintain and keep proper books and records and account which enable the Borrower to prepare and issue financial statements in accordance with generally accepted accounting principles and as otherwise may be required by any applicable law, rule or regulation and in which full, true and correct entries shall be made of all of their respective dealings and business and financial affairs. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, permit the Lender to examine and make excerpts from such books and records at such times and as often as the Lender may reasonably request. The Borrower shall permit, upon the request of the Lender, an audit to be conducted of the Borrower's financial statements and books and records. Any such audit shall be at the Borrower's expense and shall be conducted by independent accountants selected by the Lender.

SECTION 4.3 <u>Monthly Financial Statements</u>. The Borrower will furnish or cause to be furnished to the Lender, as soon as available and in any event within fifteen (15) calendar days after the end of each calendar month, the Borrower's financial statements, consisting of a consolidated and consolidating balance sheet as of the end of such month and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the month then ended and the fiscal year through that date, all in reasonable detail, prepared in accordance with GAAP, consistently applied, and setting forth in comparative form financial statements for the corresponding date and period in the previous fiscal year.

### ARTICLE V. EVENTS OF DEFAULT

SECTION 5.1 <u>Events of Default</u>. Each of the following shall constitute an Event of Default:

(a) the Borrower fails to pay, within five (5) Business Days after it is due, any principal of or interest on any of the Advances or any other amount outstanding hereunder; or

(b) the Borrower fails to perform or observe any other term or condition of any of this Agreement applicable to it and such event or circumstance, if capable of being cured, is not cured within 30 days after written notice thereof is given by the Lender to the Borrower; or

(c) the Borrower applies for or consents to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property or admits in writing its inability to pay its debts as they mature; or such a receiver, trustee or similar officer is appointed without the application or consent of the Borrower and such appointment continues undischarged for a period of 60 days; or the Borrower institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding is instituted (by petition, application or otherwise) against the Borrower and remains undismissed for a period of 60 days; or the Borrower makes a general assignment for the benefit of creditors.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev. 03/04

CONFIDENTIAL

SLMA_P0002856

SECTION 5.2 <u>Remedies</u>. Upon the occurrence of an Event of Default, the Lender may do any one or more of the following (without presentment, protest or notice of protest, all of which are expressly waived by the Borrower): (i) terminate this Agreement and declare the principal of and interest on the Advances and all other sums owing by the Borrower to the Lender under this Agreement forthwith due and payable, whereupon this Agreement will terminate and the principal of, and interest on, the Advances and all such other sums will become forthwith due and payable; and (ii) exercise all rights granted pursuant to this Agreement, in such order and in such manner as the Lender may, in its sole and exclusive judgment, determine.

## ARTICLE VI. MISCELLANEOUS

SECTION 6.1 <u>Notices</u>. All notices, requests, demands, and other communications herein shall be in writing, and, except as otherwise specifically provided in this Agreement, shall be deemed given (i) if sent by fax, when sent to the appropriate fax number, (ii) if hand delivered or delivered by nationally recognized courier, when delivered to the appropriate notice address, or (ii) if mailed by first class mail, postage prepaid, three (3) Business Days after deposit in the United States mail addressed to the appropriate notice address. The parties listed below may, by notice given hereunder, designate any further or different fax numbers or addresses to which subsequent notices, certificates or other communications shall be sent. Any notice required or permitted hereunder shall be directed to the following notice address:

(a)     If to the Lender:

SLM Corporation
11600 Sallie Mae Drive
Reston, VA 20193
Attention: Jack Remondi, Executive Vice President, Finance
Telephone number: (703) 810-7815

(b)     If to the Borrower:

Southwest Student Services Finance Corporation
3993 Howard Hughes Parkway, Suite 250
Las Vegas, Nevada 89109
Telephone number: 480-461-9830

SECTION 6.2 <u>Severability</u>. If any provision in this Agreement shall be declared or found to be invalid, illegal or unenforceable in any jurisdiction, such provision will be severable from the remainder thereof as to such jurisdiction and the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired in any jurisdiction.

SECTION 6.3 <u>Assignability</u>. This Agreement will be binding upon the parties hereto and their respective successors and assigns, and will inure to the benefit of the parties hereto and the successors and assigns of the Lender. The Borrower may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lender.

6
SLM Corporation/AMS Education Loan Trust - Credit Agreement -- 2004_
Form Rev. 03/04

CONFIDENTIAL

SECTION 6.4  Modification. This Agreement may not be amended, waived or modified in any manner without the prior written consent of the Lender and the Borrower. Any such amendment, modification or waiver will be effective only in the specific instance and for the specific purpose for which given.

SECTION 6.5  Miscellaneous. No delay or omission of the Lender to exercise any right or power arising hereunder shall impair any such right or power or be considered to be a waiver of any such right or power or any acquiescence therein, nor shall the action or inaction of the Lender impair any such right or power. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 6.6  Counterparts and Integration. This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which taken together will constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart. This Agreement constitutes the entire agreement and understanding of the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 6.7  Governing Law. This Agreement will be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia without reference to any provisions thereof regarding choice of law.

CONFIDENTIAL

SLMA_P0002858

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

**SOUTHWEST STUDENT SERVICES FINANCE CORPORATION,**
  as the borrower

By: 
Name:    Barbara Ryan
Title:     Secretary

**SLM CORPORATION,**
  as the Lender

By: 
Name:    John F. Remondi
Title:     Executive Vice President, Finance

CONFIDENTIAL

SLMA_P0002859

Exhibit 137

# CONFIDENTIAL

# FILED UNDER SEAL

## PRELIMINARY MEMORANDUM OF TERMS AND CONDITIONS FOR

### PROJECT TROY

#### August 4, 2004

**Borrower:** Southwest Student Services Corporation or an affiliate (the "Borrower")

**Lender:** SLM Corporation or an affiliate (the "Lender")

**Commencement
Date:** September 1, 2004

**Credit Facility:** Up to $375,000,000 in secured revolving credit.

**Purpose:** Provide funding for on-going acquisitions by the Borrower of eligible FFELP (SLS, PLUS, Stafford and consolidation) student loans. The definition of "eligible student loan" shall be set forth in the Loan Documents. The Borrower will submit a weekly certificate detailing the eligible student loans purchased during the week.

**Amortization:** Available daily for borrowing, re-paying and re-borrowing until maturity or demand in minimum amounts of $5,000,000.

**Maturity:** November 30, 2004.

**Interest Rate:** LIBOR plus the Spread.

Interest will be calculated on the daily outstandings on a 360 day year for the actual number of days elapsed and will be due monthly in arrears.

"LIBOR Rate" means (a) the offered rate for dollar deposits for a period of one (1) month which appears on the display page designated as page "3750" on the Moneyline Telerate service (or such other page as may replace page "3750" on the Moneyline Telerate service or such other service as may be nominated by the British Bankers' Association to be the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollar Deposits) ("Telerate Page 3750") as of 11:00 A.M. (London time) on the day which is two (2) New York and London Business Days prior to each Reset Date, (b) if, as of 11:00 A.M. (London time) on any such date, such rate does not appear on Telerate Page 3750, the arithmetic mean (rounded to the nearest $1/100^{th}$ of 1%) of the offered rates for dollar deposits, for a period of one (1) month, as such rates appear on the display designated "LIBO" on the Reuters Money Rates Service (or such other page as may replace the "LIBO" page on that service for the purpose of



Wheeler
19
6/22/10

CONFIDENTIAL

SLMA_P0000652

displaying London interbank offered rates of major banks) ("Reuters Screen LIBO Page") as of 11:00 A.M. (London time) on the day which is two (2) New York and London Business Days prior to such Reset Date, or (c) if neither of the above rates is available on such date, the average (rounded upward, if necessary, to the next higher $1/100^{th}$ of 1%) of the respective rates per annum at which deposits in dollars are offered to each of the Reference Banks in the London interbank market at approximately 11:00 A.M. (London time) on the day which is two (2) New York and London Business Days prior to such Reset Date in an amount approximately equal to the principal amount of the Advances outstanding as of such Reset Date for a period of one (1) month.

"Reference Banks" means four (4) major banks in the London interbank market as selected by the Lender.

"Reset Date" means (a) the date of this Agreement and (b) thereafter, the first day of each month thereafter during the term of this Agreement; provided, if such day is not a Business Day, the Reset Date for such period shall be the Business Day immediately following such day.

"Spread" means fifty (50) basis points (0.50%).

Reasonable and customary yield protection and prepayment cost recovery provisions will be included in the definitive loan documents.

| | |
|---|---|
| **Default Rate:** | 2.0% over the effective interest rate |
| **Collateral:** | The Credit Facility will be secured by first priority perfected security interests in all the Borrower's student loans purchased with the proceeds of the Credit Facility, from time to time, including without limitation, all accounts, instruments, documents, chattel paper, general intangibles, payment intangibles and products and proceeds arising therefrom or related thereto. |
| **Prepayment Penalty:** | $100,000 in the event that Helios Education Foundation terminates the Stock Purchase Agreement. |
| **Expenses:** | All expenses incurred by the Lender, including accounting, appraisal, environmental, audit, searches, recording of UCC filings and other security interests, and reasonable legal fees (inside and outside), and any other expenses in reference to structuring, documenting, closing, monitoring or enforcing the Credit Facility, shall be for the account of the Borrower and payable at closing and not to exceed $15,000 in aggregate. |

- 2 -

CONFIDENTIAL

**Conditions Precedent:**  Including, but not limited to, the following, with all documents to be satisfactory in form and substance to the Lender:

(a)  No material adverse change in the condition, financial or otherwise, operations, properties, assets or prospects of the Borrower.

(b)  No material threatened or pending litigation or material contingent obligations.

(c)  Execution of documentation and evidence of due authorization, execution, enforceability and no conflicts.

(d)  Evidence that all actions necessary or, in the opinion of the Lender, desirable, to perfect and protect the security interest of the Lender have been taken.

(e)  Evidence of any and all waivers of any events of defaults or covenant violations under any loan agreements with Bank of America or other lenders to the Borrower or any of its affiliates, together with all UCC-3 releases reasonably requested by the Lender in order for the Lender to perfect its first priority security interest in the collateral securing the Credit Facility

**Reporting Covenants:**  (a)  Monthly unaudited consolidated and consolidating financial statements of Borrower within 15 business days of month end.

(b)  Annual audited consolidated and consolidating financial statements of Southwest Student Services Corporation within 120 calendar days of fiscal year end.

**Covenants:**  Affirmative and negative covenants will be specified by the Lender for inclusion in the Loan Documents. Covenants are expected to include but may not be limited to (a) limitation on sale of assets; (b) reasonable limitation on additional indebtedness, liens and leases; (c) prohibition on change in business; (d) prohibition on mergers and acquisitions other than the acquisition of the Borrower by the lender or any subsidiary; (f) prohibition against distributions to shareholders; and (g) limitation on loans and advances.

- 3 -

CONFIDENTIAL

SLMA_P0000654

**Loan Advance Rate:** The Lender will advance up to 102% of principal and 100% of accrued interest for loans acquired at a premium.

**Documentation:** Loan Documents in form and substance satisfactory to the Lender must be executed and delivered containing representations, warranties, covenants, indemnities, conditions to lending, events of default and other provisions as are appropriate in the Lender's opinion and specified by the Lender.

**Governing Law:** Virginia (submit to Virginia jurisdiction)

**Miscellaneous:** Waiver of jury trial.

This Preliminary Memorandum of Terms and Conditions is not a commitment or an offer to lend and does not create any obligation on the part of the Lender. The Lender will not be deemed to extend any commitment to the Borrower unless and until a formal commitment letter is issued. This outline is only a brief description of the principal terms of suggested facilities and is intended for discussion purposes only.

- 4 -

Exhibit 138

# CONFIDENTIAL

# FILED UNDER SEAL

## REVOLVING CREDIT AGREEMENT

THIS REVOLVING CREDIT AGREEMENT dated as of February 1, 2005, is made by and between SLM CORPORATION, a Delaware corporation (the "Lender") and SOUTHWEST STUDENT SERVICES FINANCE CORPORATION, a Delaware CORPORATION (the "Borrower").

## ARTICLE I. DEFINITIONS

SECTION 1.1  Defined Terms.  All capitalized terms used in this Agreement shall have the meaning ascribed to them in this Section 1.1.  Such meanings are equally applicable to both the singular and plural forms of the terms defined.  The following terms have the following meanings:

"Advance" means each advance of funds made to the Borrower by the Lender pursuant to Section 2.1.

"Agreement" means this Revolving Credit Agreement, as may be amended or supplemented from time to time.

"Borrower" means Southwest Student Services Finance Corporation, together with its successors and permitted assigns.

"Business Day" means any day (i) on which commercial banks located in New York, New York are not required or authorized to close, (ii) which is not a Saturday, Sunday or other legal holiday and (iii) which is not any other day of the year on which the Lender is closed.

"Event of Default" means any event of default specified in Section 5.1.

"Expiration Date" means the earlier to occur of (i) the date designated as such in writing by the Borrower and the Lender from time to time and (ii) the date this Agreement is terminated by the Lender pursuant to Section 5.2.

"Lender" means SLM Corporation, together with its successors and assigns.

"London Business Day" means any Business Day on which commercial banks are open for international business (including dealings in dollar deposits) in London, England.

"LIBOR Rate" means (a) the offered rate for dollar deposits for a period of three (3) months which appears on the display page designated as page "3750" on the Moneyline Telerate service (or such other page as may replace page "3750" on the Moneyline Telerate service or such other service as may be nominated by the British Bankers' Association to be the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollar Deposits) ("Telerate Page 3750") as of 11:00 A.M. (London



Wheeler
20
6/22/10

CONFIDENTIAL

SLMA_P0002852

time) on the day which is two (2) London Business Days prior to each Reset Date, (b) if, as of 11:00 A.M. (London time) on any such date, such rate does not appear on Telerate Page 3750, the arithmetic mean (rounded to the nearest $1/100^{th}$ of 1%) of the offered rates for dollar deposits, for a period of three (3) months, as such rates appear on the display designated "LIBO" on the Reuters Money Rates Service (or such other page as may replace the "LIBO" page on that service for the purpose of displaying London interbank offered rates of major banks) ("Reuters Screen LIBO Page") as of 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date, or (c) if neither of the above rates is available on such date, the average (rounded upward, if necessary, to the next higher $1/100^{th}$ of 1%) of the respective rates per annum at which deposits in dollars are offered to each of the Reference Banks in the London interbank market at approximately 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date in an amount approximately equal to the principal amount of the Advances outstanding as of such Reset Date for a period of three (3) months.

"Reference Banks" means four (4) major banks in the London interbank market as selected by the Lender.

"Reset Date" means (a) the date of this Agreement and (b) thereafter, the third Wednesday of each September, December, March and June during the term of this Agreement; provided, if such day is not a Business Day, the Reset Date for such period shall be the Business Day immediately following such day.

"Spread" means (a) for the period from the date first written above to the first Reset Date occurring thereafter, fifty (50) basis points (0.50%) and (b) and for each interest period thereafter, such rate as may be designated as such in writing by the Borrower and the Lender from time to time.

"Subsidiary" means, with respect to any person, (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees is at such time owned directly or indirectly by such person or one or more of such person's Subsidiaries, (ii) any partnership of which such person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries, (iii) any limited liability company of which such person is a member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such person or one or more of such person's Subsidiaries.

SECTION 1.2 Headings. The various headings used in this Agreement are inserted for convenience only and in no way define, limit, amplify, modify, restrict or describe the scope or intent of, or otherwise affect the meaning of this Agreement or any provision of this Agreement.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev. 03/04

CONFIDENTIAL

SLMA_P0002853

## ARTICLE II. AMOUNT AND TERMS OF COMMITMENT

SECTION 2.1 Lender's Commitment. Subject to the terms and conditions of this Agreement and in reliance on the representations and warranties set forth herein, the Lender agrees to make Advances to the Borrower, from time to time from the date of this Agreement to but excluding the Expiration Date, in an aggregate principal amount outstanding at any one time not to exceed FIVE BILLION AND NO/100 DOLLARS ($5,000,000,000.00). The obligation of the Lender to make an Advance is subject to the condition that no event has occurred and is continuing, or would occur by the borrowing of the Advance, which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both, would constitute an Event of Default.

SECTION 2.2 Borrower's Obligations. The Borrower hereby promises to pay in full the unpaid principal balance of the Advances on the Expiration Date and any and all accrued and unpaid interest on the Advances as more fully set forth in Section 2.4 below. The obligation of the Borrower to pay the principal of, and interest on, the Advances shall be absolute and unconditional, shall be binding and, to the fullest extent permitted by law, enforceable in all circumstances whatsoever and shall not be subject to setoff, recoupment or counterclaim. The Lender shall maintain on its books and records a register on which it will record each Advance made and each repayment of any Advance and interest thereon. Any such recordation by the Lender shall be presumptively correct, absent manifest error. Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations hereunder.

SECTION 2.3 Requests for Advances. The Borrower will give the Lender notice of a request for an Advance at least one (1) Business Day prior to the day on which the Borrower wishes an Advance. Subject to the terms and conditions of this Agreement, the Lender will make the requested Advance on the Business Day specified in the notice in immediately available funds in accordance with the Borrower's payment instructions.

SECTION 2.4 Interest. Interest will accrue on the average daily balance of the unpaid principal amount of the Advances, for each day from the date such Advances are made until they become due or are paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate then in effect plus (ii) the Spread. Should any principal of, or accrued interest on, an Advance not be paid when due, such amount will bear interest from its due date until paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate plus the Spread, in each case, then in effect plus (ii) one hundred (100) basis points (1.00%). The interest rate and the Spread applicable to all Advances hereunder shall be adjusted on each Reset Date during the term hereof. The Lender shall give the Borrower notice of changes to the Spread and the Reset Date on which such change will be effective. Any requests for an Advance and acceptance of an Advance thereafter shall be deemed to be an acceptance by the Lender of such new Spread.

Interest shall be payable prior to the day that is five (5) business days after each Reset Date occurring during the term of this Agreement and on the Expiration Date. Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day). In no event will the rate of interest hereunder exceed the maximum rate allowed by law. A certificate of the Lender as to determination of the LIBOR Rate,

CONFIDENTIAL

SLMA_P0002854

the Spread, the calculation of the interest rate therefrom and the calculation of any interest due and payable will be, absent manifest error, conclusive and binding on the Borrower.

SECTION 2.5 <u>Repayment and Prepayment of the Advances</u>. The outstanding principal amount of all Advances and all accrued and unpaid interest thereon will be due and payable in full on the Expiration Date. The Borrower may prepay any outstanding Advance, in whole or in part, at any time without penalty. The proceeds of any prepayment made in accordance with this Section 2.5 shall be applied entirely to the outstanding principal balance due from the Borrower on the Advances and accrued interest owing on such prepayment(s) shall be paid as more fully set forth in Section 2.4 above. Any amounts prepaid may be reborrowed.

SECTION 2.6 <u>Payments</u>. All payments of principal of and interest on the Advances will be made in lawful money of the United States, in immediately available funds, to the agent of Lender (as may be designated in writing by the Lender from time to time). If any such payment falls due on a day which is not a Business Day, such payment will be due on the next following Business Day. Except as set forth in Section 2.5 above, payments received by the Lender will be applied: <u>first</u>, to accrued and unpaid interest on the Advances, and <u>second</u>, to the principal of the Advances. Any excess amounts remaining shall be repaid to the Borrower.

## ARTICLE III. REPRESENTATIONS AND WARRANTIES

3.1. <u>Representations and Warranties</u>. To induce the Lender to extend this Agreement and to make Advances hereunder, the Borrower represents and warrants as follows:

(a) It is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on;

(b) It has full power and authority to enter into the transactions provided for in this Agreement and has been duly authorized to do so by all necessary and appropriate action and when executed and delivered by it, this Agreement executed and delivered pursuant hereto will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms; and

(c) There does not exist any default or violation by it of or under any of the terms, conditions or obligations of: (i) its organizational documents; (ii) any material agreement or other instrument to which it is a party or by which it is bound; or (iii) any law, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon it by any law or by any governmental authority, court or agency.

## ARTICLE IV. COVENANTS

SECTION 4.1 <u>Compliance with Laws</u>. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, comply with all applicable laws, rules and regulations in all material respects.

CONFIDENTIAL

SLMA_P0002855

SECTION 4.2 Keeping of Records and Books of Account. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, maintain and keep proper books and records and account which enable the Borrower to prepare and issue financial statements in accordance with generally accepted accounting principles and as otherwise may be required by any applicable law, rule or regulation and in which full, true and correct entries shall be made of all of their respective dealings and business and financial affairs. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, permit the Lender to examine and make excerpts from such books and records at such times and as often as the Lender may reasonably request. The Borrower shall permit, upon the request of the Lender, an audit to be conducted of the Borrower's financial statements and books and records. Any such audit shall be at the Borrower's expense and shall be conducted by independent accountants selected by the Lender.

SECTION 4.3 Monthly Financial Statements. The Borrower will furnish or cause to be furnished to the Lender, as soon as available and in any event within fifteen (15) calendar days after the end of each calendar month, the Borrower's financial statements, consisting of a consolidated and consolidating balance sheet as of the end of such month and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the month then ended and the fiscal year through that date, all in reasonable detail, prepared in accordance with GAAP, consistently applied, and setting forth in comparative form financial statements for the corresponding date and period in the previous fiscal year.

## ARTICLE V. EVENTS OF DEFAULT

SECTION 5.1 Events of Default. Each of the following shall constitute an Event of Default:

(a) the Borrower fails to pay, within five (5) Business Days after it is due, any principal of or interest on any of the Advances or any other amount outstanding hereunder; or

(b) the Borrower fails to perform or observe any other term or condition of any of this Agreement applicable to it and such event or circumstance, if capable of being cured, is not cured within 30 days after written notice thereof is given by the Lender to the Borrower; or

(c) the Borrower applies for or consents to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property or admits in writing its inability to pay its debts as they mature; or such a receiver, trustee or similar officer is appointed without the application or consent of the Borrower and such appointment continues undischarged for a period of 60 days; or the Borrower institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding is instituted (by petition, application or otherwise) against the Borrower and remains undismissed for a period of 60 days; or the Borrower makes a general assignment for the benefit of creditors.

CONFIDENTIAL

SLMA_P0002856

SECTION 5.2 Remedies. Upon the occurrence of an Event of Default, the Lender may do any one or more of the following (without presentment, protest or notice of protest, all of which are expressly waived by the Borrower): (i) terminate this Agreement and declare the principal of and interest on the Advances and all other sums owing by the Borrower to the Lender under this Agreement forthwith due and payable, whereupon this Agreement will terminate and the principal of, and interest on, the Advances and all such other sums will become forthwith due and payable; and (ii) exercise all rights granted pursuant to this Agreement, in such order and in such manner as the Lender may, in its sole and exclusive judgment, determine.

## ARTICLE VI. MISCELLANEOUS

SECTION 6.1 Notices. All notices, requests, demands, and other communications herein shall be in writing, and, except as otherwise specifically provided in this Agreement, shall be deemed given (i) if sent by fax, when sent to the appropriate fax number, (ii) if hand delivered or delivered by nationally recognized courier, when delivered to the appropriate notice address, or (ii) if mailed by first class mail, postage prepaid, three (3) Business Days after deposit in the United States mail addressed to the appropriate notice address. The parties listed below may, by notice given hereunder, designate any further or different fax numbers or addresses to which subsequent notices, certificates or other communications shall be sent. Any notice required or permitted hereunder shall be directed to the following notice address:

(a)     If to the Lender:

SLM Corporation
11600 Sallie Mae Drive
Reston, VA 20193
Attention: Jack Remondi, Executive Vice President, Finance
Telephone number: (703) 810-7815

(b)     If to the Borrower:

Southwest Student Services Finance Corporation
3993 Howard Hughes Parkway, Suite 250
Las Vegas, Nevada 89109
Telephone number: 480-461-9830

SECTION 6.2 Severability. If any provision in this Agreement shall be declared or found to be invalid, illegal or unenforceable in any jurisdiction, such provision will be severable from the remainder thereof as to such jurisdiction and the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired in any jurisdiction.

SECTION 6.3 Assignability. This Agreement will be binding upon the parties hereto and their respective successors and assigns, and will inure to the benefit of the parties hereto and the successors and assigns of the Lender. The Borrower may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lender.

6

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev. 03/04

CONFIDENTIAL

SECTION 6.4  Modification. This Agreement may not be amended, waived or modified in any manner without the prior written consent of the Lender and the Borrower. Any such amendment, modification or waiver will be effective only in the specific instance and for the specific purpose for which given.

SECTION 6.5  Miscellaneous. No delay or omission of the Lender to exercise any right or power arising hereunder shall impair any such right or power or be considered to be a waiver of any such right or power or any acquiescence therein, nor shall the action or inaction of the Lender impair any such right or power.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 6.6  Counterparts and Integration.  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which taken together will constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  This Agreement constitutes the entire agreement and understanding of the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 6.7  Governing Law.  This Agreement will be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia without reference to any provisions thereof regarding choice of law.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002858

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

SOUTHWEST STUDENT SERVICES FINANCE CORPORATION,
  as the borrower

By:

Name:    Barbara Ryan
Title:     Secretary

SLM CORPORATION,
  as the Lender

By:

Name:    John F. Remondi
Title:     Executive Vice President, Finance

8

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002859

Exhibit 142

# CONFIDENTIAL

# FILED UNDER SEAL



**United States Department of Education**
**Financial Partner Services – Northern Region**
**111 North Canal Street, Room 830**
**Chicago, Illinois 60606**
**(312) 886 – 8768**

F E D E R A L
STUDENT AID
*We Help Put America Through School*

Mr. Vincent Roig
Chairman of the Board & CEO
Southwest Student Services Corporation
P.O. Box 41150
Mesa, Arizona 85274-1150

Dear Mr. Roig:

On July 21– 25, 2003, we reviewed your Federal Family Education Loan Program (FFELP) portfolio. The review focused on lender codes 828477, DM Federal Credit Union; 826651, University of Miami; 833923, College Loan Corporation; 832330, National College of Naturopathic Medicine; 833731, Southwest College of Naturopathic Medicine and Health; 830630, AELMAC; and 831245, FELMAC compliance with the Higher Education Act of 1965, as amended and the regulations of the FFELP program.

The enclosed report represents the observations and findings of the review, references to Federal regulations or instructions, and actions required correcting program deficiencies. Please review the report and respond to each finding by describing the actions that have been taken. Your response to this report, including a description of actions you have taken, should be sent within 45 days of receipt of the report to me at the above address. In the event you wish to appeal any finding(s) in this report, your appeal must be forwarded within 45 days to the following address:

Roberta Russo, Director
U. S. Department of Education
Partner Services – Northern Region
111 North Canal Street – Room 830
Chicago, Illinois 60606

You must include with your appeal a copy of this report and indicate (1) the findings, issues, and facts you dispute, (2) your organization's position, relevant facts, and any documentation to support your position, and (3) the Program Review Control Number (PRCN).

We appreciate your courtesy and cooperation and that of your staff during the visit. If you have any questions, please contact me at (312) 886-8760.

Sincerely,

Martha Shine
Senior Guarantor & Lender Review Specialist

Enclosure

cc:    Roberta Russo, Director       Partner Services – Northern Region

CONFIDENTIAL

Exhibit: 2
Name: J. Roig
Date: 5-18-10
Meri Coash CCR, RMR

SLMA_P0027353

# SOUTHWEST STUDENT SERVICES CORPORATION
# REVIEW REPORT

| | |
|---|---|
| Servicer Name and Address: | Southwest Student Services Corporation<br>P.O. Box 41150<br>Mesa, Arizona 85274-1150 |
| Servicer ID Number | 70000800 |
| Lender ID Numbers | 828477 - DM Federal Credit Union<br>826651 - University of Miami<br>833923 - College Loan Corporation<br>833920 - National College of Naturopathic Medicine<br>833731 - Southwest College of Naturopathic Medicine and Health Science<br>830630 - AELMAC<br>831245 - FELMAC |
| Program Review Control Number (PRCN): | 2003-4-05-5000<br>828477 -- 2003-4-05-5002<br>826651 -- 2003-4-05-5003<br>833923 -- 2003-4-05-5004<br>833920 -- 2003-4-05-5005<br>833731 -- 2003-4-05-5006<br>830630 -- 2003-4-05-5007<br>831245 -- 2003-4-05-5008 |
| Dates of Review: | July 21 – 25, 2003 |
| Review Period: | October 1, 1998 Through September 30, 2002 |
| Primary Contact Person: | Dana Dewes |
| Telephone Number: | (480) 461-6573 |
| Fax Number | (480) 461-6599 |

CONFIDENTIAL

SLMA_P0027354

**Personnel Contacted:**

Jane L. Stewart, Executive Vice President & COO
Barbara Ryan, Esq., Sr. Vice President and General Counsel
Dana Dewes, Director, Quality Assurance
Stacy Tucker, Vice President, Borrower Services
Richard Chapin, Senior Vice President & CFO
Erin McCabe
Terry LaValle, NSLDS
Lucinda Turvo
Lisa Bolton, Acquisitions
Grew Schrock, Collections Manager
Kelli More, Supervisor – Account Maintenance/Claims
Julie Howie, Recovery Unit Supervisor

**Department of Education Representatives**

Martha Shine, Lead
Senior Guarantor & Lender Review Specialist
Partner Services – Northern Region
Chicago, Illinois

Marjorie Stroud
Guarantor & Lender Review Specialist
Partner Services – Northern Region
Chicago, Illinois

Judi Charlton
Guarantor & Lender Review Specialist
Partner Services – Western Region
San Francisco, California

Leslie Richards
Guarantor & Lender Review Specialist
Partner Services – Western Region
San Francisco, California

Yolanda Marshall
Management & Program Analyst
Partner Services Group – Headquarters
Washington, D.C.

CONFIDENTIAL

## *INTRODUCTION*

### Background:

Southwest Student Services Corporation was formed in May 1992, as an Arizona nonprofit corporation organized and operated exclusively to enhance access of individuals and groups to education. Southwest Student Services Corporation ("Southwest") is the sole member of Arizona Educational Loan Marketing Corporation ("AELMAC"). Southwest also provides administrative and management services to Arizona Educational Loan Marketing Corporation ("AELMAC"). Southwest employs approximately 260 people.

In accordance with Southwest's articles of incorporation and by-laws, as well as the by-laws of the Corporation, Southwest's prior approval is required of the Corporation to validly issue bonds, notes or other evidences of indebtedness. Southwest provides administrative and management services to the Corporation under the terms of a management services agreement, which became effective February 19, 1997 and was subsequently amended, and restated on August 13, 2002. Southwest also provides administrative and management services to Florida Educational Loan Marketing Corporation ("FELMAC") and other services to fill the needs of individual and groups whose needs are not met by the Corporation's loan origination or acquisitions programs.

### Purpose and Scope:

The purpose of this review was to evaluate Southwest's compliance with Federal regulations governing the Federal Family Education Loan programs. The review covered all servicer functions performed during the period of October 1, 1998 through September 30, 2002, as described in the Review Methodology, below.

### Review Methodology:

The team interviewed Southwest's officers and staff regarding the functions performed for its client lenders. The team members identified the business systems, including combined automated and manual systems, used to administer the FFEL program. The team tested processes and assessed compliance through analysis of statistical samples drawn from loans in a variety of loan statuses and from the entire serviced FFEL portfolio.

The team reviewed to determine accuracy and compliance for the following elements: Disbursement procedures, Conversion To Repayment, Deferments and Forbearance, Collection Due Diligence and Cures, Claim Reimbursement, Payment Application and Rate Changes, Purchases/Sales/Transfers, Reconciliation of ED Form 799 to Lender's books and records, Reporting to Guarantee Agency and NSLDS, Credit Bureau Reporting, and Consolidation Loans. A random sample was also selected to verify accuracy of interest and average daily balance calculations and amounts on reports generated by the Southwest for Federal interest and special allowance billing.

CONFIDENTIAL

The team observed Southwest's processing of documents, correspondence and payments received in the mailroom.   Judgmental samples were pulled to verify timeliness and accuracy in application of borrower payments and for internal loan transfers for sales and purchases.

The team also reviewed the following reports of Independent Auditors. These reports did not contain any adverse opinions or material findings.

- KPMG *Compliance Audit (Attestation Engagement) for Lender Servicers Participating in the Federal Family Education Loan Program* for the year ending September 1999.  There were two findings that were closed.
- Eide Baily *Compliance Audits (Attestation Engagements) for Lenders and Lender Servicers in the Federal Family Education Loan Program* for the years ending September 30, 2000, and 2001.  These reports are a result of Independent Accountants examination of management's assertions and was conducted in accordance with Government Auditing Standards, issued by the Comptroller General of the United States; attestations standards established by the AICPA and the 1996 Audit Guide:  Compliance Audits (Attestation Engagements) for Lenders and Lender Servicers participating the Federal Family Education Loan Program, issued by ED, Office of the Inspector General.  There were no findings.

## Disclaimer:

The absence of statements in this report about specific practices or procedures of the servicer should not be construed as acceptance, approval or endorsement of those practices or procedures. The findings cited in this report do not limit nor lessen the servicer's obligation to comply with all other provisions of the Federal Family Education Loan programs.

### Findings

*Finding 1:*   **Failure to Forward Borrower Payments on Filed Claims**

Southwest stated that borrower loan payments received on unpaid, filed claims, that do not reduce the delinquency sufficient to avert the default, are held until the claim is paid by the guaranty agency.  The payments are then forwarded to the guaranty agency for application to the borrower's account within thirty days of receipt of claim payment.

The "holding" of payments results in a larger claim payment, more interest capitalized on the borrower's loan and the borrower payment treated as an item collected by the guaranty agency and from which its collection retention is taken.  Generally, a guaranty agency is permitted to keep a percentage of all payments it receives as a result of its collection activities.  By handling the payment in this manner, the lender is allowing the guarantor to retain a percentage of funds to which it is not entitled, overcharges the borrower on interest that continues to accrue on the withheld payment and overcharged ED in the amount of reinsurance requested.

CONFIDENTIAL

*Citation:* 34 CFR 682.414 (a)

*Required Action*:

Southwest must provide certification that it has a method of forwarding payment information to the guarantor within 48 hours of receipt to prevent claim overpayment.

*Finding 2:* _Incorrect Billing for Special Allowance Benefits_

The University of Miami has maintained a tax-exempt portfolio of about $600,000 until December 2001, when the portfolio climbed to over $2 million dollars. A review of loans reported to the NSLDS payment system for Southwest Student Services showed that LID 826651 for University of Miami had no tax-exempt portfolio in 1994. It appears that this lender has over billed the Department by $243,000 as of June 2002. It would appear that the over billed amount would be greater since June 2002. An estimate is around $350,000. The University of Miami does not appear to meet the criteria set forth in Section 150 of the 1986 Tax Code, which states, "The term "qualified scholarship funding bond" means a bond issued by a corporation which is a corporation not for profit established and operated exclusively for the purpose of acquiring student loan notes incurred under the Higher Education Act of 1965.

Loans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued on or after October 1, 1993, and loans made with funds derived from default reimbursement collections, interest, or other income related to eligible loans made or purchased with those tax-exempt funds, do not qualify for the minimum special allowance rate specified in paragraph ©(3)(iii) of section 682.302, and are not subject to the 50 percent limitation on the maximum rate otherwise applicable to loans made with tax-exempt funds.

The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. Growth from tax-exempt bonds should only occur from interest earnings, special allowance earnings, and investment earnings that are reinvested back into the bond issue. If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate. Lenders must be able to provide documentation to support tax-exempt billing to the Department, particularly when quarterly billing on ED Form 799 (LaRS) exceeds aggregate amounts supported by tax-exempt bonds issued prior to October 1, 1993.

The lender did not accurately categorized loans eligible for the minimum tax-exempt special allowance rate for loans made or purchased with tax-exempt funds after October 1, 1992. Therefore, average daily balances and ending balances in Part IV: Special Allowance in the Lender's Interest and Special Allowance Request and Report (ED Form 799) appears to be overstated for loans in the tax-exempt reporting category.

CONFIDENTIAL

**Citations:** 34 CFR 682.302 (e); § 438 of the Higher Education Act (HEA) of 1965, as amended by the Higher Education Amendments of 1992 and 1998; DCL-96-L-186 issued March 1996. The SAP issue is addressed in question #30.

*Required Action:*

University of Miami must recalculate special allowance billings for quarters where aggregate special allowance billings for tax-exempt loans exceeded amounts supported by tax-exempt bonds issued prior to October 1, 1993 (including issues that were subsequently refinanced). The lender must determine if the inaccurate balances previously reported resulted in an overpayment of special allowance interest by the U. S. Department of Education.

Adjustments must be made to refund the overpayment of special allowance interest in Part IV: Special Allowance of the next Lender Reporting System (LaRS) submitted to the U. S. Department of Education.

Email me at Martha.Shine@ed.gov with the Year/Quarter when the required adjustments are made and I will check the LaRS System or send a written acknowledgement of the transactions to the U. S. Department of Education, Northern Region, Partner Services, 111 North Canal Street, Room 830, Chicago, Illinois 60606, Attn: Martha Shine.

Appendix A

CONFIDENTIAL

<u>Borrower Accounts Reviewed for Collections/Claims</u>

| | Name | SSN | Loan Type | Claim Type |
|---|---|---|---|---|
| 1. | Moore, Brian S. | | CL | Default |
| 2. | Temple, Andrew P. | | SF | Death |
| 3. | Mason, Tiffany L. | | CL | Default |
| 4. | Cabezas, Roxana E. | | SF | Default |
| 5. | Marcus, Susan C. | | SF | Default |
| 6. | Allen, Rodger | | CL | Default |
| 7. | Brooks, Antionette | | SF | Default |
| 8. | Sage, Darrell W. | | CL | Default |
| 9. | Worrell, Jane L. | | CL | Default |
| 10. | Scott, Terry G. | | SU | Default |
| 11. | Slongwhite, Wayne | | CL | Default |
| 12. | Brunson Jr., Jack D | *REDACTED* | SF | Default |
| 13. | Scheuerman, Mary A. | | CL | Default |
| 14. | Polynice, Dominique | | SU | Default |
| 15. | Guillaume, Ducarmel, A. | | SU | Default |
| 16. | Byrd Jr., Robert | | CL | Default |
| 17. | Montoya, Wendy C. | | SF | Default |
| 18. | Hester, Tabitha | | SU | Default |
| 19. | Fadaei, Beatrice M. | | CL | Default |
| 20. | Sanchez, Patricia | | CL | Default |
| 21. | Rusch, Mikal J. | | SF | Default |
| 22. | Wilson, Melissa L. | | CL | Default |

**Appendix B**
**Southwest Student Services Corporation (SSSC) - Servicing Agreements**

| Lender ID | Lender Name | Services Provided | Start Date |
|---|---|---|---|
| | | | |

SLMA_P0027360

| 828477 | DM Credit Union | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | August 1999 |
|---|---|---|---|
| 826651 | University of Miami | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | August 17, 2001 |
| 833731 | Southwest Naturopathic | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | May 2000 |
| 833290 | National College of Naturopathic Medicine | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | March 2002 |
| 832330 | Royal Credit Union | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | April 2001 |
| 833923 | College Loan Corporation | 1. Loan Origination<br>2. Servicing until fully disbursed<br>3. Purchase loans after fully disbursed | February 2002 |
| 830630 | AELMAC | Administration, Servicing, and Collection of all Loans. | February 19, 1997 |
| 831245 | FELMAC | Administration, Servicing, and Collection of all Loans. | February 19, 1997 |

Cc:   Jane Stewart, Executive V. P. and COO
      Barbara Ryan, Sr. Vice President & General Counsel
      Stacy Tucker, Vice President, Borrower Services

CONFIDENTIAL

SLMA_P0027361

Dana Dewes, Director, Quality Assurance

CONFIDENTIAL

SLMA_P0027362

January 12, 2004

Ms. Roberta Russo, Director
U. S. Department of Education
Partner Services – Northern Region
111 North Canal Street – Room 830
Chicago, IL  60606

RE:    PRCN 2003-4-05-5000
           828477-2003-4-05-5002
           826651-2003-4-05-5003
           833923-2003-4-05-5004
           833920-2003-4-05-5005
           833731-2003-4-05-5006
           830630-2003-4-05-5007
           831245-2003-4-05-5008

Dear Ms. Russo:

I am writing in response to your recent Program Review Report regarding the servicer review of Southwest Student Services Corporation, conducted July 21-25, 2003. Pursuant to this report, we are notifying you of our intent to appeal certain findings and statements contained within that report. A copy of the Program Review Report is attached.

Specifically, we are appealing *Finding 1:   Failure to Forward Borrower Payments on Filed Claims*, along with the irrelevant language contained in the narrative of Finding 2. Our detailed comments are noted below.

*Finding 1:  Failure to Forward Borrower Payments on Filed Claims*

This finding relates to payments received on claims that have been filed but not yet paid. Although the reviewers found no instances where this has occurred, my staff indicated to the reviewers that such payments are held until claim payment, and subsequently forwarded to the guarantor within 30 days following receipt of the claim payment.

The reviewers took exception to this practice, but were unable to cite regulatory language that conflicted with our practice when asked while they were on site. The Program Review Report indicates that Southwest is required to forward payment information to the guarantor within 48 hours of receipt of the borrower's payment, and cites 34 CFR 682.414(a) as the supporting regulation requiring this remedy.

CONFIDENTIAL

SLMA_P0027363

Ms. Roberta Russo, Director
U.S. Department of Education
January 12, 2004
Page 2

We have been unable to locate any regulatory or statutory provision that supports this required action. Nothing in the regulation requires a 48-hour turnaround time. In fact, the regulation cited does not even address this issue, other than a general requirement for documentation.

The issue is, however, explicitly discussed in *The Common Manual, Unified Student Loan Policy,* the manual to which all lenders must adhere in order to maintain insurance on its loan portfolio. Section 12.6.A of the Common Manual states, "If the lender receives a payment after a default claim has been filed but before the claim has been purchased, the lender must determine whether the claim should be recalled. If the claim is not recalled, the payment should be held until the claim payment is received and then forwarded to the guarantor within 30 days of receiving the claim payment." (See Section 12.6.A of the Common Manual attached hereto.)

Section 12.2.B of the Common Manual addresses claim recall requirements. This section requires a lender to recall a claim if a payment is received after claim filing and the loan would be brought 210 or fewer days delinquent. (See Section 12.2.B of the Common Manual attached hereto.) Therefore, the violation cited in the Program Review Report relates to a hypothetical situation in which a payment is received on a claim that would have to be more than 240 days delinquent, because a payment received on anything less than 240 days delinquent would require a claim recall in accordance with *The Common Manual.* Further, as I understand it, the Department of Education's process would suggest the guarantor would post a payment on a loan it does not yet own. The guarantee agencies I have talked with have indicated that they cannot process payments until after they have paid the claim, which is why *The Common Manual* specifically instructs lenders to hold the payment until such time.

Southwest's procedure is consistent with guarantor requirements specified in *The Common Manual.* The Common Manual Governing Board routinely submits the Common Manual policies to the Department of Education in accordance with 34 CFR 682.401(d)(2), which requires the agency to promptly submit to the Secretary its regulations and statements of procedures and standards, and authorizes the agency to use such materials unless and until the Secretary disapproves them. Since the Department of Education did not disapprove *The Common Manual,* the Southwest policy is compliant with existing guarantor requirements and presumably the Department of Education's as well. It does not seem fair to cite our practice when it is completely consistent with what the guarantors require us to do.

In summary, we are appealing this finding since it was made on the basis of a requirement that does not exist in federal regulation. Additionally, our practice fully complies with guarantor requirements specified in *The Common Manual.*

CONFIDENTIAL

SLMA_P0027364

Ms. Roberta Russo, Director
U.S. Department of Education
January 12, 2004
Page 3

**Finding 2:   *Incorrect Billing for Special Allowance Benefits***

We are not disputing that an incorrect special allowance flag was set due to a manual error, and this error resulted in an overbilling of special allowance by the University of Miami.   In fact, the review team was aware that the error had been corrected, the proper flag was set immediately and reimbursement occurred to the Department of Education well before this review report was issued by the Department. Copies of the Corrective Action Plan and notification to the University of Miami are attached.

We are, however, disputing several statements made in the context of special allowance billing on tax-exempt loans.   The suggestion that proceeds received from the sale or transfer of loans cannot be treated as proceeds of tax-exempt debt is incorrect. There is no basis for the position, and, in fact, recycling of financing proceeds is a common practice among all bond issuers and permitted under rules governed by Treasury.   We also understand that Assistant Secretary for Post Secondary Education Sally Stroup commented on this issue in early November at the Department of Education's Electronic Access Conference by saying that although it may be bad public policy in a low interest rate environment, these activities are not illegal and do not constitute fraud and abuse.   We are requesting that these irrelevant statements be removed from the finding and that the finding simply address the specific violation (the overbilling of special allowance due to a coding error) and the remedy.

I trust we have supplied you with enough information to consider our appeal. Please contact me at (502) 227-2353 if you have additional questions.

Sincerely,

Jane L. Stewart
Executive Vice President
Chief Operating Officer

cc:    Martha Shine
Kristie Hansen
Tim Cameron

Enclosures

CONFIDENTIAL

SLMA_P0027365



**UNITED STATES DEPARTMENT OF EDUCATION**
Financial Partner Services - Northern Region
111 North Canal Street, Suite 830
Chicago, Illinois 60606

May 21, 2004

Ms. Jane L. Stewart
Executive Vice President
Chief Operating Officer
Southwest Student Services Corporation
1555 N. Fiesta Blvd.
Gilbert, AZ 85233-1020

Dear Ms. Stewart:

This letter is to advise you of our decision concerning your appeal of the findings related to the July 21 – 25, 2003 program review of Southwest Student Services Corporation (SSSC).

Finding 1 - <u>Failure to Forward Borrower Payments on Filed Claims</u>

The review report cited SSSC for its practice of holding payments received on unpaid, filed claims that do not reduce delinquency sufficient to avert default, until the claim is paid by the guaranty agency. The payment is then forwarded to the guarantor within thirty days of receipt of claim payment. SSSC was required to provide certification that it had a method of forwarding payments to the guarantor within 48 hours of receipt.

The Department has determined that there is no basis in statute or regulation to require a payment received by a lender or lender servicer after a claim has been filed, yet prior to the claim being paid, to be submitted to the guarantor within 48 hours of receipt. Based upon this determination, this finding has been dismissed.

Finding 2 – <u>Incorrect Billing for Special Allowance Benefits</u>

Due to a manual error, an incorrect special allowance flag was set which resulted in an over-billing of special allowance by the University of Miami. This error was immediately corrected by SSSC and the Department has been reimbursed. We agree that statements in the review report relating to the sale or transfer of tax-exempt loans are irrelevant to this finding, which occurred solely as a result of a coding error. SSSC has sufficiently resolved this error and no further action is required.

You may now consider this program review <u>closed</u>.

OUR MISSION IS TO ENSURE EQUAL ACCESS TO EDUCATION AND TO PROMOTE EDUCATIONAL EXCELLENCE THROUGHOUT THE NATION

CONFIDENTIAL

Ms. Jane L. Stewart – page 2

We appreciate the courtesy and cooperation of your staff during the review.  Please feel free to contact me at (312) 886 – 8747 should you have any additional questions.

Regards,

Roberta V. Russo, Director
U.S. Department of Education
Financial Partner Services, Northern Region

cc:    Tim Cameron
       Mike Sutphin

OUR MISSION IS TO ENSURE EQUAL ACCESS TO EDUCATION AND TO PROMOTE EDUCATIONAL EXCELLENCE THROUGHOUT THE NATION

CONFIDENTIAL

SLMA_P0027367

# Exhibit 144

# CONFIDENTIAL

# FILED UNDER SEAL

Page 1 of 1

## LISA JACOBSON - Replacement of Potential loss of 9.5% floor sap with Taxable Sap

| | |
|---|---|
| **From:** | LISA JACOBSON |
| **To:** | MARK DALY;  SOMSAK CHIVAVIBUL |
| **Date:** | 06/13/2005 10:10:01 AM |
| **Subject:** | Replacement of Potential loss of 9.5% floor sap with Taxable Sap |

Good Morning...

Attached is an updated file.  The first worksheet is the file we discussed previously (you can ignore the other two worksheets).  At the bottom of the first worksheet, I have added a box.  This states the amount of 9.5% floor sap at risk (total 9.5% floor sap minus pre 10/1/93 9.5% floor sap) and the amount of replacement sap with the taxable rules.  We went back 6 quarters.  We could go back further but as you can see and as we expected, the amount of taxable sap replacement is minimal.  Our working files did allow us to calculate the taxable sap utilizing the composition of loans, so this should be a pretty good estimate.  The main shortfall in this (and the prior) analysis is the allocation of sap to the loophole loans.

Please let me know when you would like to discuss.  And as a fyi, I will be on vacation starting this Friday.

Thanks - Lisa



Exhibit: 6
Name: 4-9-10
Meri Coash Jacobson

file://C:\Documents%20and%20Settings\LJacobso\Local%20Settings\Temp\GW}00002....   06/13/2005

CONFIDENTIAL

CONFIDENTIAL

SLMA_P0004357

SAP Receipts

| Company | 9.5 bond | Type | Sap Rule | Bond | 12/31/2000 | 03/31/2001 | 06/30/2001 | 09/30/2001 | 12/31/2001 | 03/31/2002 | 06/30/2002 | 09/30/2002 | 12/31/2002 | 03/31/2003 | 06/30/2003 | 09/30/2003 | 12/31/2003 | 03/31/2004 | 06/30/2004 | 09/30/2004 | 12/31/2004 | 03/31/2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Total**