Exhibit 149

# CONFIDENTIAL

# FILED UNDER SEAL

*FLOOR*

## Ricky Turman

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Wednesday, November 03, 2004 10:18 AM |
| **To:** | Kelli Villarrial; Ricky Turman |
| **Subject:** | FW: Floor Bill |

Actually, the transfer has to occur during fy 04.  Sorry about that.  This is still an issue for you, though, I would imagine.

**From:** Saul Moskowitz [mailto:moskowitz@msbllaw.com]
**Sent:** Wednesday, November 03, 2004 11:17 AM
**To:** Kelli Villarrial (kelli.villarrial@bhesc.org); Ricky Turman (ricky.turman@bhesc.org)
**Subject:** Floor Bill

Kelli, Ricky:  The President finally signed the 9.5% floor fix bill on Saturday, 10/30.  I recommend that we now proceed with assembling and submitting questions to ED, including the questions we've discussed about multiple tranches with different maturity dates.  Also, the bill seems to withdraw floor for any loan transferred to a new "holder", regardless of when that transfer occurred or occurs.  That raises the question as to what "holder" means, particularly in the context of financings and of the movement of loans among affiliates.  We should discuss this issue, given the significance of the term "holder" in the Single Holder Rule context.

Saul Moskowitz, Esq.
MOSKOWITZ & AUSTIN LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:  301.562.0600
Fax: 301.562.0635
email: moskowitz@msbllaw.com

The information contained in this email may be confidential and privileged attorney-client information or work product and is intended only for the individual or entity to whom it is addressed.  Any unauthorized use, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify this firm immediately.

Moskowitz & Austin LLC believes that this E-mail and any attachments were free of any virus, worm, or Trojan horse when sent. However, this message and its attachments could have been infected during transmission. By reading the message and opening any attachments, the recipient accepts full responsibility for taking remedial action about viruses and other defects. Moskowitz & Austin LLC is not liable for any loss or damage arising in any way from this message or its attachments.

11/4/2004

B0004972

Exhibit 150

# CONFIDENTIAL

# FILED UNDER SEAL

*1~200R*

# Ricky Turman

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Tuesday, October 19, 2004 12:37 PM |
| **To:** | ricky.turman@bhesc.org |
| **Cc:** | 'Kelli Villarrial' |
| **Subject:** | RE: Final Floor Bill Language and Matured Bonds |

Ricky/Kelli:  See responses in caps below.  Feel free to give me a call if you'd like to discuss.

Saul Moskowitz, Esq.
MOSKOWITZ & AUSTIN LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:  301.562.0600
Fax: 301.562.0635
email: moskowitz@msbllaw.com

The information contained in this email may be confidential and privileged attorney-client information or work product and is intended only for the individual or entity to whom it is addressed.  Any unauthorized use, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify this firm immediately.

Moskowitz & Austin LLC believes that this E-mail and any attachments were free of any virus, worm, or Trojan horse when sent. However, this message and its attachments could have been infected during transmission. By reading the message and opening any attachments, the recipient accepts full responsibility for taking remedial action about viruses and other defects. Moskowitz & Austin LLC is not liable for any loss or damage arising in any way from this message or its attachments.

**From:** Ricky Turman [mailto:ricky.turman@bhesc.org]
**Sent:** Sunday, October 17, 2004 10:41 AM
**To:** moskowitz@msbllaw.com
**Cc:** Kelli Villarrial
**Subject:** RE: Final Floor Bill Language and Matured Bonds

Saul,
After reading this, I just want to clarify a few points.

1.  Existing floor loans, no matter where they are held will continue to receive floor treatment (subject to Maturity, retirement, or defeasance after 9/30/04—to discuss later).  CORRECT.

2.  Existing pre 10/1/93 bonds and those refunding bonds issued prior to 9/30/04 can continue to recycle for floor treatment (again subject to Maturity, retirement, or defeasance after 9/30/04—to discuss later).  CORRECT.

10/19/2004

B0005209

3. Any refunding debt of pre 10/1/93 debt issued after 9/30/04 will not get floor treatment. CORRECT.

4. The prior law already referenced Retired or Defeased and we determined that language did not impact us in issuing Refunding debt or if debt was paid off due to normal activities such as student loan payments or scheduled debt retirement. But it appears that the new law addresses the effects of normal collections of student loan payments and scheduled debt retirement by using the term Matured. Do you agree? YES.

5. If Matured now picks up the normal collection and debt payment as referenced in my #4, then we have an issue in determining how to apply the provision. For example, a $100 million in pre 10/1/93 debt was issued and the original debt has been paid down to $20 million. We have also refunded some of the debt and have $10 million outstanding. We have also "dipped" loans to gain floor treatment and we now have $5 million of floor loans held in taxable debt (the loans were originally part of either the original debt or the refunding debt). So I have $35 million in floor loans with $30 million in floor eligible debt. I now have a scheduled debt payment of $15 of my original debt – what is the effect on my student loans? Do I do a reduction in floor eligible treatment prorata among all 3 loan pools or what? I HAVE NO EARTHLY IDEA. THIS IS ONE WHERE WE NEED TO DEVISE AN ANSWER WE CAN LIVE WITH AND DEFEND AND THEN (AFTER BUSH SIGNS THE BILL) ASK ED TO SIGN OFF.

6. The last new provision (cc) says if sold or transferred to another holder.... How is holder defined? If I sell current floor loans to another BHEA bond issue (that could be the same or different Lender ID number), do the sold loans retain the floor and generate recycling money back in the selling pre 10/1/93 bond issue? IF THE TRUSTEE/BENEFICIAL OWNER COMBINATION DOESN'T CHANGE, THEN THE TRANSFER FROM ONE BOND INDENTURE TO ANOTHER WOULDN'T BE A CHANGE IN HOLDER (REGARDLESS OF ID NUMBER). IF NOT, THE ANSWER IS UNCLEAR. THIS MAY ALSO NEED TO BE BROUGHT TO ED. BE AWARE, THOUGH: THE DEFINITION OF "HOLDER" HAS IMPLICATIONS FOR THE SINGLE HOLDER RULE, INCLUDING AS IT MAY BE INTERPRETED IN THE CLC V. SLMA LITIGATION, SO MY INVOLVEMENT IN ANY REQUEST TO ED ON THIS QUESTION MAY NEED TO BE IN THE BACKGROUND ONLY.

Let me know if you come up with other ambiguities and let me know when you are able to spend a few minutes discussing my points.

Thanks.
Ricky

-----Original Message-----
**From:** Saul Moskowitz [mailto:moskowitz@msbllaw.com]
**Sent:** Monday, October 11, 2004 7:09 AM
**To:** 'Kelli Villarrial'; ricky.turman@bhesc.org
**Subject:** Final Floor Bill Language and Matured Bonds

Kelli/Ricky: Looking at the language that passed the House and Senate on the floor yield, they added language making the maturity trigger for loss of floor apply only prospectively, so prior maturity would not change floor eligibility. This is the language that the President will be signing (if he hasn't already).

Interestingly, the language also says you lose floor if the bonds have been retired or defeased after September 30, 2004. Under traditional rules of statutory construction, this would mean that loans for which the relevant old money t-e bonds were retired or defeased PRIOR to that date would now be eligible for floor, since the Congress has now spoken in this area and the regulations would be superseded. However, I don't see ED taking this view of the law.

10/19/2004

Exhibit 151

# CONFIDENTIAL

# FILED UNDER SEAL

*3647*

# MOSKOWITZ & AUSTIN
## LLC

1100 Wayne Avenue
Suite 1111
Silver Spring, MD  20910

PH: 301-562-0600
FAX: 301-562-0635

## FACSIMILE TRANSMITTAL MEMORANDUM

**TO:** Murray Watson, Kelli Villasrial Rick and Turman

**FROM:** Dave Moskowitz

**DATE:** 1/8/04

**PAGES SENT:** (including cover sheet) _13_

**If you do not receive all of the following pages, or they are illegible,
call (301) 562-0600**

**MESSAGE:** _____

_____

_____

_____

**Transmitted by:** _Charlotte_          **Fax/Client Code:** _____

Information intended only for the use of addressees. If you are not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, any dissemination or copying of this facsimile is strictly prohibited. If you have received it in error, please contact us at (301) 562-0600. Thank you.

# MOSKOWITZ & AUSTIN
## LLC

SAUL L. MOSKOWITZ
PRINCIPAL
moskowitz@msbllaw.com

1100 WAYNE AVENUE, SUITE 1111
SILVER SPRING, MD 20910
PH: 301-562-0600
FAX: 301-562-0635

January 8, 2004

Mr. Murray Watson
Brazos Higher Education Service Corporation
2600 Washington Avenue
P.O. Box 1308
Waco, TX  76703-0267

Re:    Request for Opinion

Dear Mr. Watson:

This is in response to your request for our opinion regarding various proposed transactions involving the transfer of Federal Family Education Loan Program (FFELP) loans located in pre-October 1, 1993 Brazos Higher Education Authority, Inc. (hereinafter "AUTHORITY") tax-exempt bond estates to other taxable financing facilities of AUTHORITY.   For each proposed transaction, you ask whether the special allowance paid by the Department of Education on such loans after the transactions are completed would be calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds issued before October 1, 1993, or, alternatively, under the rules applicable to other FFELP loans.

In preparing this opinion, we have reviewed the FFELP statute and regulations, email correspondence between this firm and the Department of Education (Department) officials on these issues, published guidance from the Department, and other materials we deemed appropriate.  We note that the guidance we have received from the Department by email has been confusing, and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations.  As you will note from our discussion, this has significantly complicated our analysis.

### Facts

The proposed transactions are described in detail in the enclosed memorandum prepared by AUTHORITY.  They essentially involve the transfer, in exchange for cash, of FFELP loans from existing pre-October 1, 1993 tax-exempt financing facilities of AUTHORITY.  AUTHORITY intends this process to result in the transferred loans

B9005757

Mr. Murray Watson
January 8, 2004
Page Two

remaining subject to the "floor yield/half sap" special allowance calculation described below after completion of the transaction.

After completion of such a transfer, the funds received by the tax-exempt bond estate would be used to purchase loans from third parties. Some or all of those loans would subsequently be transferred to a taxable bond estate of AUTHORITY in exchange for cash or other loans of comparable value. AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to a taxable estate in this manner would remain subject to the "floor yield/half sap" special allowance calculation at purchase and remain subject to such calculation after completion of the transfer.

## Opinion

For the reasons set forth below, it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions.

## Analysis

### I.   The Regulation, Its History, and Intent

The Federal regulation governing this issue is 34 CFR 682.302 (the "Regulation"). Under the Regulation, special allowance is paid when the interest payable on an FFEL loan by the borrower (or the Department on the borrower's behalf) falls below statutory levels deemed to represent a market level yield for the holder. Under subsection (c) of the Regulation, the special allowance rate is calculated quarterly by determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for that loan, and adding a certain percentage, which varies with the type of loan and when it was made. Subsections (c) and (e) of the Regulation set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums.

B9005758

Mr. Murray Watson
January 8, 2004
Page Three

According to paragraph (c)(3) of the Regulation, the special allowance rate is one-half of the full sap rate for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from the proceeds of tax-exempt obligations originally issued prior to October 1, 1993, subject to certain minimum floors. This is referred to throughout this memorandum as "floor yield/half sap treatment". This treatment also applies to loans made with certain moneys derived from such loans and from the investment of proceeds of such tax-exempt obligations.

Paragraph (e)(2) of the Regulation provides that, notwithstanding paragraph (c)(3), the Department will pay a special allowance to an authority at the full sap rate for a loan which has been made or purchased with the proceeds of tax-exempt obligations originally issued prior to October 1, 1993 –

      (1)     After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations; and

      (2)     If the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

In 1992, when paragraph (e)(2) of the Regulation was issued in its current form, the interest rate environment was such that the floor yield was not applicable, while the half sap calculation significantly reduced the yield on loans subject to floor yield/half sap treatment. This had created a substantial incentive for holders of such loans to find ways to convert them to full sap treatment through refinancing with taxable bonds and similar transactions. Existing Department guidance had exacerbated this problem by interpreting the prior regulations in a way that facilitated those activities.

According to later statements by the Department, the Regulation was issued in 1992 to make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal government money under then-existing market conditions. Specifically, in Question 30 of Dear Colleague Letter 96-L-186, the Department stated as follows--

    The [prior] regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions–if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the

CONFIDENTIAL

B9005759

Mr. Murray Watson
January 8, 2004
Page Four

proceeds of a taxable obligation, the taxable special allowance rules applied.

In the December 18, 1992 regulations, the Department changed this policy.  Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.  If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

(Emphasis added.)1

Now, of course, market interest rates are considerably lower than in 1992.  As a result, a holder of loans subject to floor yield/half sap treatment is loath to take any action that would convert the loan to full sap treatment and lose the benefit of the floor.  However, in 1992 the Department "chose its poison" -- i.e., it chose to make it harder to convert loans from floor yield/ half sap to full sap treatment, thus making it easier to avoid such a conversion today.

II.    **Conditions for Floor Yield/Half Sap Treatment of the Loans at Issue**

Paragraph (e)(2) as explained by the Dear Colleague, requires that eligible loans financed with the proceeds of a tax-exempt obligation originally issued prior to October 1, 1993 remain subject to the tax-exempt special allowance provisions (i.e., receive floor yield/half sap treatment) unless two conditions are met:

---

1 In fact, the predecessor provision of paragraph (e)(2) closely resembled the revised language, save that the predecessor provision did not include the current language regarding the authority's retention of a legal or equitable interest in the loan.  See 34 CFR 682.302(e)(3)(1988).  The new language seems to clarify only that, if an authority does not retain an interest in a loan, the transfer of the loan to another party that is using taxable (or post-October 1, 1993 tax-exempt) financing results in the loan losing half sap/floor treatment.  Moreover, the revised language is as susceptible to the same interpretation that the Department adopted with respect to the prior language—i.e., that it is silent on what special allowance treatment applies when the conditions in the paragraph are not met.  We do not believe such an interpretation is particularly plausible, and, in any case, the Dear Colleague is clear in saying that the Department believes the new language does not allow for such an interpretation.

CONFIDENTIAL

B9005760

Mr. Murray Watson
January 8, 2004
Page Five

(1) the loans have been pledged or otherwise transferred in consideration of funds derived from sources other than tax-exempt obligations originally issued prior to October 1, 1993; and

(2) if the Authority retains a legal or equitable interest in the loans, the tax-exempt obligations which previously financed the loans are retired or defeased. 2

Pamela Moran of the Department has informed us by email correspondence of August 8, 2001 (Appendix B), that the required pledge or transfer described in the Regulation does not occur when an authority engages in a transaction that is more akin to a "refinancing" than a "sale". Specifically, Ms. Moran indicated that the requisite pledge or transfer was lacking in a situation where an authority purchased a loan out of a tax-exempt indenture by the use of monies held in the authority's general fund. Ms. Moran's rationale was that "nothing has changed about the loan except where it is held by the authority".

In the Dear Colleague passage quoted above, the Department stated that both paragraph (e)(2) and its predecessor, old paragraph (e)(3), applied to instances where a loan made with tax-exempt bond proceeds is "refinanced" by taxable bond proceeds, and the last sentence appears to imply that it also applies where the refinancing source is tax-exempt bonds. This creates some doubt as to the vitality of Ms. Moran's guidance on this point. However, Ms. Moran's interpretation is in accord with the clear intent of the statute with regard to the treatment of tax-exempt refunding transactions. In particular, the 1993 amendments to the FFELP statute (Public Law 103-66) apply half sap/floor treatment to all loans financed with tax-exempt bonds, unless such bonds were bonds "originally issued on or after October 1, 1993." 20 U.S.C. 1087-1(b)(2)(b)(B)(i), (iv). The word "originally" was included at the behest of various tax-exempt issuers specifically to ensure that loans financed with post-October 1, 1993 tax-exempt bonds issued to refund pre-October 1, 1993 tax-exempt bonds would continue to receive half sap/floor treatment. Since that provision was enacted, authorities all over the country have financed billions of dollars in loans with tax-exempt refunding bonds in reliance on the applicability of half sap/floor treatment to those loans. Under Ms. Moran's interpretation of the phrase "pledged or otherwise transferred" – which excludes refunding and other refinancing transactions – the intent of the statute and 10 years of industry-wide practice is protected. Under the contrary view implicitly suggested by the Dear Colleague, it is not.

---

2 We believe the issue of whether floor yield/half sap treatment applies to a loan does not depend at all on whether it came to reside in the tax-exempt bond estate by direct purchase from a third party or by transfer from another financing vehicle of the Authority. Were this not the case, an Authority could easily have circumvented the intent of the 1992 regulations by purchasing loans with taxable financing and then immediately transferring them into a tax-exempt estate.

CONFIDENTIAL

Mr. Murray Watson
January 8, 2004
Page Six

Each of the transfers at issue here involves what are essentially refinancing, rather than sale, transactions. Thus, if a court were to follow the Department's current interpretation, it would conclude that each of the transactions described in your email would <u>not</u> satisfy Condition (1), above.

However, Ms. Moran sent the undersigned an email on October 10, 2001 interpreting the word "and" in paragraph (e)(2)(i) as meaning, in effect, "or". Thus, under Ms. Moran's emails, satisfaction of Condition (1) is not a prerequisite for full sap treatment of a loan originally financed with tax-exempt funds. Under Ms. Moran's interpretation, the special allowance treatment of the loans at issue would depend on whether Condition (2) is satisfied. The issue of Condition (2) would also become dispositive if Ms. Moran's interpretation of Condition (1) did not prevail in court. Accordingly, we now turn to an analysis of Condition (2).

Condition (2) is not met if the authority retains a legal or equitable interest in the loan and the relevant tax-exempt bond is not retired or defeased. In each of the proposed transactions involving the movement of loans among AUTHORITY facilities, it is clear that the first element exists, in that AUTHORITY retains an interest in the loan.

The second element of Condition (2) is not met in each of the proposed non-refunding transactions because the tax-exempt obligation that previously financed the loans is not being retired or defeased. Therefore, given the clear statement in the Dear Colleague that tax-exempt loans refinanced by taxable funds retain tax-exempt special allowance treatment if the authority retains an interest in the loans and the prior tax-exempt obligation is not retired or defeased, we believe that a court would find that the loans at issue retain floor yield/half sap treatment after their transfer to the taxable estate.

The second element of Condition (2) is met in the refunding transactions since, by definition, the purpose of a refunding is to retire or defease the existing bonds. This would suggest that these transactions would indeed cause the loans involved to lose half sap/floor treatment. However, as noted above, this would conflict with the intent of the statute and 10 years of industry-wide practice involving billions of dollars in loans. Accordingly, we do not believe that Ms. Moran's "and"-means-"or" interpretation would be upheld by a court in the tax-exempt refunding context.3

Finally, you have asked whether the loans at issue would lose half sap/floor treatment when, after the transactions have been completed, the pre-October 1, 1993 bonds reach maturity. In her email guidance to us, Ms. Moran drew a distinction between obligations that are retired and those that "merely matured." As we have discussed, this Firm is not sufficiently expert in the intricacies of tax-exempt bond law to advise you as

---

3 However, the treatment of taxable refunding bonds may differ, given that, on its face, the FFELP statute does not appear to require that loans financed with taxable bonds receive half sap/floor treatment.

CONFIDENTIAL

B9005762

Mr. Murray Watson
January 8, 2004
Page Seven

to whether a particular event constitutes retirement, defeasance, or maturity. We believe, however, that the appropriate characterization of a given transaction under established bond law principles would apply in determining the treatment the transaction should be accorded under Condition (2), above. In addition, we believe a cogent argument can be made that the intent of the Regulation was to examine the effects of the transaction in which a particular loan is transferred out of a pre-October 1, 1993 tax-exempt bond estate to determine whether, *in connection with that transaction*, the pre-October 1, 1993 tax-exempt obligations were retired or defeased, and not to look at whether, in future independent transactions, such a retirement or defeasance occurred.

The above opinion is limited to the specific issues discussed herein under the FFELP statute and regulations. We express no opinion with regard to any other issue or any other laws. This opinion may be relied on only by AUTHORITY, in connection with the proposed transactions described above. It may not be relied upon by any other party or for any other purpose without our express written consent.

Please let us know if you would like to discuss any of the above issues in further detail

Sincerely,

MOSKOWITZ & AUSTIN LLC

By: _____
Saul L. Moskowitz
Principal

Enclosures

Cc: Kelli Villarrial, Esq.
Rick Turman

CONFIDENTIAL

B9005763

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: RE: Tax-exempt bond issues
Cc: brian.siegel@ed.gov
Bcc:
Attached:

Pam: Thanks.  FYI, I spoke to Brian after you left for gay Paris to clarify #1.  He indicated that
the key issue is control, i.e., if the two sister companies are both owned and controlled by the
Authority, then they would be treated as alter egos of the Authority for purposes of the Section
682.302(e).  Saul.

At 02:34 PM 10/10/01 -0400, you wrote:
I discussed  this with Brian.  On question #1, we think that if the companies are truly "sister" related
companies, we would probably not treat the Authority as continuing to hold an interest in the loan.  The
Department, of course, still has the right to look at any transaction to assure itself that the transaction is
really a transfer and not a paper transaction between one company and a sham sister.

On #3, we think that (e)(2)(i) and (ii) are intended to address two different circumstances even though
separated by an "and."  Therefore, we don't think that both requirements have to be met.

Hope this helps.
-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Wednesday, October 03, 2001 11:39 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: RE: Tax-exempt bond issues

Pam:  Following up on this one and my voicemail, have you heard back from Brian?  If
not, would you mind prodding him on it?  I think it's pretty simple, and we now have two
clients anxious for a response so they can proceed with transactions that have been on
hold since as long ago as July waiting for clarification.  Thanks, Saul
Date: Wed, 26 Sep 2001 13:10:59 -0400
To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: RE: Tax-exempt bond issues

Thanks for the update.  At 12:27 PM 9/26/01 -0400, you wrote:
Sorry I haven't been able to get back to you on this but we have been doing almost nothing but
disaster related meetings and relief since the 11th.  I have a suggested answer into Brian Siegel
and I hope to hearing somethim from him today...otherwise it won't be until after Yom Kippur.
-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Friday, September 07, 2001 9:58 AM
To: pamela.moran@ed.gov
Subject: Fwd: RE: Tax-exempt bond issues

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                        1

600

CONFIDENTIAL

B9005764

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

Pam:  Can you update me on the status of this one?  Thanks. Saul
Date: Mon, 13 Aug 2001 09:58:30 -0400
To: "Moran, Pamela" <Pamela.Moran@ed.gov>
From: Saul Moskowitz <moskowitz@dbmlaw.com>
Subject: RE: Tax-exempt bond issues
Pam:  Thank you for your response on the tax-exempt bond issues.  I wonder
if I could get a bit of clarification on two of your answers, as follows:

1.  My first question dealt with a situation where a loan was
transferred from the Authority to another company owned by the same parent
corporation that controls the Authority, i.e., a sister corporation.  Your
response dealt with the situation in which the transferee was a subsidiary
of the Authority. As long as the Authority and the sister corporation are
controlled by the same entity, would your answer be the same, i.e., the
loans would remain subject to the tax-exempt special allowance rules?

3.  Your response to number 3 (the first one) was a little
confusing.  Is this a correct statement of your interpretation
of the reg:
"If a loan migrates from a tax-exempt indenture to the Authority's
general fund as a result of the indenture reaching maturity (not
being retired), the loan remains subject to the tax-exempt special allowance rules,
because it has not been "pledged or otherwise transferred in consideration of
[taxable] funds" as

required by subsection (e)(2)(i).  Moreover, even if it were deemed to
be "pledged or otherwise transferred in consideration of
[taxable] funds", it would still remain subject to tax-exempt special
allowance rules because the prior tax-exempt obligation has not been
retired or defeased as required by subsection (e)(2)(ii)."

I'm asking because your prior answer could be read as saying that
subparagraph (ii) still applies even if subparagraph (i) is not satisfied,
even though the reg seems to say that both subparagraphs must be satisfied
in order for the taxable special allowance rules to apply.

Thanks as always for your help.  Saul

At 03:59 PM 8/8/01 -0400, you wrote:
   Sorry it has taken me a while to get back to you.  I was able to chat with Brian Siegel on this before
   he went away on vacation and before I had to head off to COHEAO.

   #1.  We think that if the Authority controls the subsidiary, it has the necessary control over
   the loan to meet the standard set by the regulations.  Brian did think, however, that it could

Printed for Saul Moskowitz <moskowitz@dbmlaw.com>                                        2

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

depend upon the individual circumstances of the corporate arrangement, and that in every case the relationship between the two organizations should be evaluated to determine whether the Authority has sufficient control over the subsidiary to treat the loan as passing through the Authority for purposes of the regulations.

#2. We think that the "purchase" of the loan as described in the question appears more akin to a "refinancing" than a "sale" because nothing has changed about the loan except where it is held by the authority. So it would appear that the tax-exempt provisions apply. However, depending upon the result of your "evaluation" in #1 above, it could, under certain circumstances, be more accurately characterized as a "sale" than a "refinancing."

#3. The tax-exempt rules would not apply if the tax-exempt obligation is "retired." It is unclear from the question whether the loan is retired or it has instead merely matured. The situation wouldn't qualify for a change of treatment under section 682.302(e)(2)(i) because the loans have not been "pledged or otherwise transferred in consideration of funds"...rather, they have become part of the general fund by default, as you pointed out. So, unless the obligation is retired, the lower special allowance payments would apply.

-----Original Message-----
From: Saul Moskowitz [mailto:moskowitz@dbmlaw.com]
Sent: Monday, July 30, 2001 11:36 AM
To: pamela.moran@ed.gov
Subject: Tax-exempt bond issues

Pam:  Per my voicemail, our client, an issuer of tax-exempt bonds used to purchase FFELP loans, has asked us the following questions on which your guidance would be much appreciated:

Under 34 CFR 682.302(e)(2), a loan made or purchased with pre-October 1, 1993 tax-exempt bond proceeds that is transferred out of the tax-exempt indenture into a taxable bond indenture continues to be subject to the reduced SAP and floor yield provisions applicable to pre-1993 tax-exempt bond related loans if the Authority "retains a legal or equitable interest in the loan" and the tax-exempt obligation is not retired or defeased. See also Dear Colleague 96-L-186 (Question 30). This has resulted in the following questions:

  1. If an affiliate under common ownership and control of the Authority retains a legal and/or equitable interest in the loan, but the Authority does not, is the Authority deemed to "retain a legal or equitable interest" for purposes of subsection (e)(2)?

  2. If instead of being transferred to a taxable bond indenture, the loan is purchased out of the tax-exempt indenture by monies held in the Authority's General

CONFIDENTIAL
B9005766

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

Fund, is the loan considered to have been transferred "in consideration of funds derived from sources other than' tax-exempt bonds within the meaning of paragraph (e)(2)(i)?

3. For a maturing pre-October 1993 tax-exempt bond indenture, would loans remaining in the trust estate after satisfaction of all trust obligations retain the half SAP/floor treatment. These loans would become part of the authority's general fund not by purchase but by "default".

I'd be happy to discuss these issues with you at your convenience.  As I mentioned, the client is currently working on a series of transactions with tight timeframes, so anything you can do to expedite your review would be greatly appreciated.  Thanks as always, Saul.

CONFIDENTIAL

B9005767

Moran, Pamela, 04:05 PM 10/10/01 -0400, RE: RE: RE: Tax-exempt bond issues

Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)


Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)


Saul L. Moskowitz
Dean Blakey & Moskowitz
1101 Vermont Avenue, NW, Suite 400
Washington, DC 20005
202/289-3900 (p)
202/371-0197 (f)

CONFIDENTIAL                                                      B9005768

Exhibit 152

# CONFIDENTIAL

# FILED UNDER SEAL

*~200R*

# Ricky Turman

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Tuesday, October 19, 2004 12:37 PM |
| **To:** | ricky.turman@bhesc.org |
| **Cc:** | 'Kelli Villarrial' |
| **Subject:** | RE: Final Floor Bill Language and Matured Bonds |

Ricky/Kelli:  See responses in caps below.  Feel free to give me a call if you'd like to discuss.


Saul Moskowitz, Esq.
MOSKOWITZ & AUSTIN LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:  301.562.0600
Fax: 301.562.0635
email: moskowitz@msbllaw.com

The information contained in this email may be confidential and privileged attorney-client information or work product and is intended only for the individual or entity to whom it is addressed.  Any unauthorized use, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify this firm immediately.

Moskowitz & Austin LLC believes that this E-mail and any attachments were free of any virus, worm, or Trojan horse when sent. However, this message and its attachments could have been infected during transmission. By reading the message and opening any attachments, the recipient accepts full responsibility for taking remedial action about viruses and other defects. Moskowitz & Austin LLC is not liable for any loss or damage arising in any way from this message or its attachments.


**From:** Ricky Turman [mailto:ricky.turman@bhesc.org]
**Sent:** Sunday, October 17, 2004 10:41 AM
**To:** moskowitz@msbllaw.com
**Cc:** Kelli Villarrial
**Subject:** RE: Final Floor Bill Language and Matured Bonds

Saul,
After reading this, I just want to clarify a few points.


1.  Existing floor loans, no matter where they are held will continue to receive floor treatment (subject to Maturity, retirement, or defeasance after 9/30/04—to discuss later).  CORRECT.


2.  Existing pre 10/1/93 bonds and those refunding bonds issued prior to 9/30/04 can continue to recycle for floor treatment (again subject to Maturity, retirement, or defeasance after 9/30/04—to discuss later).  CORRECT.

10/19/2004

B0005209

3. Any refunding debt of pre 10/1/93 debt issued after 9/30/04 will not get floor treatment.  CORRECT.

4. The prior law already referenced Retired or Defeased and we determined that language did not impact us in issuing Refunding debt or if debt was paid off due to normal activities such as student loan payments or scheduled debt retirement. But it appears that the new law addresses the effects of normal collections of student loan payments and scheduled debt retirement by using the term Matured. Do you agree?  YES.

5. If Matured now picks up the normal collection and debt payment as referenced in my #4, then we have an issue in determining how to apply the provision. For example, a $100 million in pre 10/1/93 debt was issued and the original debt has been paid down to $20 million. We have also refunded some of the debt and have $10 million outstanding.  We have also "dipped" loans to gain floor treatment and we now have $5 million of floor loans held in taxable debt (the loans were originally part of either the original debt or the refunding debt).  So I have $35 million in floor loans with $30 million in floor eligible debt. I now have a scheduled debt payment of $15 of my original debt – what is the effect on my student loans? Do I do a reduction in floor eligible treatment prorata among all 3 loan pools or what?  I HAVE NO EARTHLY IDEA. THIS IS ONE WHERE WE NEED TO DEVISE AN ANSWER WE CAN LIVE WITH AND DEFEND AND THEN (AFTER BUSH SIGNS THE BILL) ASK ED TO SIGN OFF.

6. The last new provision (cc) says if sold or transferred to another holder…. How is holder defined? If I sell current floor loans to another BHEA bond issue (that could be the same or different Lender ID number), do the sold loans retain the floor and generate recycling money back in the selling pre 10/1/93 bond issue?  IF THE TRUSTEE/BENEFICIAL OWNER COMBINATION DOESN'T CHANGE, THEN THE TRANSFER FROM ONE BOND INDENTURE TO ANOTHER WOULDN'T BE A CHANGE IN HOLDER (REGARDLESS OF ID NUMBER).  IF NOT, THE ANSWER IS UNCLEAR.  THIS MAY ALSO NEED TO BE BROUGHT TO ED.  BE AWARE, THOUGH:  THE DEFINITION OF "HOLDER" HAS IMPLICATIONS FOR THE SINGLE HOLDER RULE, INCLUDING AS IT MAY BE INTERPRETED IN THE CLC V. SLMA LITIGATION, SO MY INVOLVEMENT IN ANY REQUEST TO ED ON THIS QUESTION MAY NEED TO BE IN THE BACKGROUND ONLY.

Let me know if you come up with other ambiguities and let me know when you are able to spend a few minutes discussing my points.

Thanks.
Ricky

       -----Original Message-----
       **From:** Saul Moskowitz [mailto:moskowitz@msbllaw.com]
       **Sent:** Monday, October 11, 2004 7:09 AM
       **To:** 'Kelli Villarrial'; ricky.turman@bhesc.org
       **Subject:** Final Floor Bill Language and Matured Bonds

       Kelli/Ricky:  Looking at the language that passed the House and Senate on the floor yield, they added language making the maturity trigger for loss of floor apply only prospectively, so prior maturity would not change floor eligibility.  This is the language that the President will be signing (if he hasn't already).

       Interestingly, the language also says you lose floor if the bonds have been retired or defeased after September 30, 2004.  Under traditional rules of statutory construction, this would mean that loans for which the relevant old money t-e bonds were retired or defeased PRIOR to that date would now be eligible for floor, since the Congress has now spoken in this area and the regulations would be superseded.  However, I don't see ED taking this view of the law.

10/19/2004

Exhibit 153

# CONFIDENTIAL

# FILED UNDER SEAL

Page 1 of 1

*Floor*

## Ricky Turman

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Wednesday, November 03, 2004 10:18 AM |
| **To:** | Kelli Villarrial; Ricky Turman |
| **Subject:** | FW: Floor Bill |

Actually, the transfer has to occur during fy 04. Sorry about that. This is still an issue for you, though, I would imagine.

---

**From:** Saul Moskowitz [mailto:moskowitz@msbllaw.com]
**Sent:** Wednesday, November 03, 2004 11:17 AM
**To:** Kelli Villarrial (kelli.villarrial@bhesc.org); Ricky Turman (ricky.turman@bhesc.org)
**Subject:** Floor Bill

Kelli, Ricky:  The President finally signed the 9.5% floor fix bill on Saturday, 10/30. I recommend that we now proceed with assembling and submitting questions to ED, including the questions we've discussed about multiple tranches with different maturity dates. Also, the bill seems to withdraw floor for any loan transferred to a new "holder", regardless of when that transfer occurred or occurs. That raises the question as to what "holder" means, particularly in the context of financings and of the movement of loans among affiliates. We should discuss this issue, given the significance of the term "holder" in the Single Holder Rule context.

Saul Moskowitz, Esq.
MOSKOWITZ & AUSTIN LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:  301.562.0600
Fax: 301.562.0635
email: moskowitz@msbllaw.com

The information contained in this email may be confidential and privileged attorney-client information or work product and is intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify this firm immediately.

Moskowitz & Austin LLC believes that this E-mail and any attachments were free of any virus, worm, or Trojan horse when sent. However, this message and its attachments could have been infected during transmission. By reading the message and opening any attachments, the recipient accepts full responsibility for taking remedial action about viruses and other defects. Moskowitz & Austin LLC is not liable for any loss or damage arising in any way from this message or its attachments.

11/4/2004

Confidential

B0004972

Exhibit 154

# CONFIDENTIAL

# FILED UNDER SEAL



**Wednesday,**
**August 9, 2006**

**Part III**

# Department of Education

**34 CFR Parts 600, 668, 673, et al.**
**Federal Student Aid Programs; Final Rule**

## DEPARTMENT OF EDUCATION

**34 CFR Parts 600, 668, 673, 674, 675, 676, 682 and 685**

**RIN 1840–AC87**

### Federal Student Aid Programs

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Interim final regulations; request for comments.

**SUMMARY:** The Secretary is amending the Federal Student Aid Program regulations to implement the changes to the Higher Education Act of 1965, as amended (HEA), resulting from the Higher Education Reconciliation Act of 2005 (HERA), Public Law No. 109–171, and other recently enacted legislation. These interim final regulations reflect the provisions of the HERA that affect students, borrowers and program participants in the Federal student aid programs authorized under Title IV of the HEA.

Interim final regulations for the two new Title IV grant programs created by the HERA, the Academic Competitiveness Grant Program and the National Science and Mathematics Access to Retain Talent (SMART) Grant Program, are being published in a separate notice in the **Federal Register**.

**DATES:** *Effective date:* These interim final regulations are effective September 8, 2006.

*Comment date:* The Department must receive any comments on or before September 8, 2006.

Information collection compliance date: Affected parties do not have to comply with the information collection requirements in Sections 600.7, 600.10, 668.3, 668.8, 668.10, 668.22, 668.173, 673.5, 674.34, 682.102, 682.200, 682.207, 682.209, 682.210, 682.211, 682.215, 682.305, 682.401, 682.402, 682.404, 682.405, 682.406, 682.410, 682.415, 682.601, 682.604, 685.102, 685.204, 685.208, 685.215, 685.217 and 685.220 until the Department publishes in the **Federal Register** the control numbers assigned by the Office of Management and Budget (OMB) to these information collection requirements. Publication of the control numbers notifies the public that OMB has approved these information collection requirements under the Paperwork Reduction Act of 1995.

**ADDRESSES:** Address all comments about these interim final regulations to: Gail McLarnon, U.S. Department of Education, P.O. Box 33185, Washington, DC 20033–3185.

If you prefer to deliver your comments by hand or by using a courier service or commercial carrier, address your comments to: Gail McLarnon, 1990 K Street, NW., room 8026, Washington, DC 20006–8542.

If you prefer to send your comments through the Internet, you may address them to us at: *HERAComments@ed.gov.* Or you may send them to us at the U.S. Government Web site: *http://www.regulations.gov.* You must include the term "HERA Interim Final Comments" in the subject line of your electronic message.

**FOR FURTHER INFORMATION CONTACT:** Ms. Gail McLarnon, U.S. Department of Education, 1990 K Street, NW., 8th Floor, Washington, DC 20006. Telephone: (202) 219–7048 or via the Internet at: *Gail.McLarnon@ed.gov.*

If you use a telecommunications device for the deaf (TDD), you may call the Federal Relay Service (FRS) at 1–800–877–8339.

Individuals with disabilities may obtain this document in an alternative format (e.g., Braille, large print, audiotape, or computer diskette) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

**SUPPLEMENTARY INFORMATION:** These interim final regulations reflect most of the changes made to the HEA by the HERA, enacted as part of the Deficit Reduction Act of 2005 (Pub. L. 109–171), as well as some changes made by other recently enacted legislation. The changes made by the HERA include:

• An increase in certain FFEL and Direct Loan Program loan limits,

• A reduction of origination fees in the FFEL and Direct Loan Programs,

• The creation of a deferment for FFEL, Direct Loan and Perkins Loan Program borrowers who serve on active duty military service during times of war or national emergency, and a reduction of subsidies paid to lenders,

• Changes to the definition of an academic year for programs measured in clock hours,

• Changes and additions to provisions related to distance education and direct assessment academic programs,

• Modifications to the regulations on the eligibility for Title IV, HEA program assistance for students with convictions for drug-related offenses, specifying that a student or parent who has not repaid fraudulently obtained Title IV, HEA program funds is ineligible for additional Title IV, program assistance,

• Changes to the requirements for the treatment of Title IV, HEA program funds when a student withdraws, and

• The re-institution of the previously expired FFEL and Direct Loan

disbursement flexibilities provided to institutions with low cohort default rates. Effective February 8, 2006, institutions with official cohort default rates of less than 10 percent for each of the three most recent years do not need to comply with the "30-day disbursement delay" requirement for first time, first year students nor with the multiple disbursement requirements if the loan period is one term or four months or less.

The HERA also modified several Title IV, HEA provisions that are not addressed in these interim final regulations. The HERA made changes to the rules governing Cost of Attendance calculations, the determination of an applicant's dependency status, and the calculation of an applicant's expected family contribution. In accordance with section 478(a) of the HEA, the Secretary does not issue regulations in this area.

The HERA also modified and made permanent the provisions of the Taxpayer-Teacher Protection Act of 2004 (Pub. L. 108–409) which (1) changed the calculation of special allowance payments for certain FFEL Program loans made with proceeds of tax-exempt obligations and (2) increased teacher loan forgiveness amounts for FFEL and Direct Loan borrowers teaching in certain areas.

In addition to the changes mandated by the HERA, these interim final regulations also incorporate the provisions of Pub. L. 107–139, which changed the formula for calculating special allowance payments in the FFEL Program for loans made on or after July 1, 2000 and set interest rates for FFEL and Direct Loans first disbursed on or after July 1, 2006 at fixed interest rates.

These interim final regulations also incorporate the statutory changes made to the HEA by the Pell Grant Hurricane and Disaster Relief Act (Pub. L. 109–66) and the Student Grant Hurricane and Disaster Relief Act (Pub. L. 109–67). These laws authorize the Secretary to waive the requirement that a student repay a Title IV, HEA grant if the student withdrew from an institution because of a major disaster. The Secretary initially exercised this waiver authority through publication of Dear Colleague Letter GEN–05–17 on November 9, 2005.

These interim final regulations also incorporate the statutory changes made to the HEA by The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 (Pub. L. 109–234). The Emergency Supplemental Appropriations Act amended section 428C(b)(1)(A) of the HEA by repealing the single holder rule with respect to

B0270231

any FFEL Consolidation loan for which an application is received by an eligible lender on or after June 15, 2006. This law also repealed section 8009(a)(2) of the HERA and reinstated the current statutory provisions under which a borrower may consolidate outstanding FFEL Program loans into the Federal Direct Consolidation Loan Program.

**Significant Regulations**

We discuss substantive issues under the sections of the regulations to which they pertain. Generally, we do not address regulatory changes that are technical or otherwise minor in effect.

*Distance Education (§§ 600.2, 600.7, 600.51, 668.8 and 668.38)*

*Statute:* Section 8020 of the HERA modified the institutional eligibility requirements in section 102(a)(3) of the HEA that generally make institutions offering more than 50 percent of their courses by correspondence, or a combination of correspondence and telecommunications, or enrolling 50 percent or more of their students in correspondence courses, ineligible for Title IV, HEA program assistance. The HERA also modified the student eligibility requirements of section 484(l)(1) of the HEA, by removing telecommunications courses from being considered as correspondence courses. Under the amended HEA, courses offered by telecommunications that meet certain conditions are no longer considered correspondence courses, and students enrolled in telecommunications courses are no longer considered to be correspondence students.

The HERA also modified section 481(b) of the HEA to reflect certain restrictions on the eligibility of programs that are offered by telecommunications. Consistent with prior law, the institution, including its distance education programs, must hold current accreditation from an accrediting agency recognized by the Secretary that has the evaluation of distance education in its scope of recognition. However, under the HERA, programs offered by foreign institutions that include instruction delivered by telecommunication are not eligible.

*Current Regulations:* The current regulations reflect the previous statutory limitations on institutional and student eligibility based on the percentage of correspondence courses offered by the institution and the percentage of students enrolled in correspondence courses, and the relation of telecommunications courses to correspondence courses.

*New Regulations:* We have amended the regulations in § 600.2 by removing from the definition of *correspondence course* the paragraph that describes the conditions under which a telecommunications course is considered a correspondence course and by revising the definition of *telecommunications course.* The definition of *telecommunications course* now specifies that a telecommunications course is one that uses one or a combination of technologies to deliver instruction to students who are separated from the instructor and to support regular and substantive interaction between these students and the instructor, either synchronously or asynchronously. We have amended the regulations relating to institutional ineligibility in § 600.7 to delete the references to telecommunications courses from the provisions relating to calculation of the percentage of correspondence courses offered by an institution. We also amended student eligibility regulations in § 668.38 to provide that students who are enrolled in certificate programs offered through telecommunications are no longer considered to be correspondence students. This change applies to institutions regardless of the percentage of degree programs offered by the institution.

We have amended the eligible program regulations in § 668.8 to include programs that are offered in whole or in part through telecommunications by domestic institutions and that are accredited by an accrediting agency recognized by the Secretary for accreditation of distance education. As in the past, the accrediting agency's scope of recognition must include the accreditation of distance education. Interpreting the HEA as amended by the HERA, we have also amended § 668.8 and the regulations related to the eligibility of foreign schools in § 600.51 to specify that programs offered by foreign schools through telecommunications or correspondence are not eligible programs. Recognizing, however, that telecommunications technologies are frequently used in conjunction with classroom instruction, we have included a provision acknowledging that participating foreign schools are free to use telecommunications technologies to supplement and support instruction offered in the foreign classroom.

*Reasons:* The interim final regulations in § 600.7 will now reflect the statutory changes modifying the current institutional eligibility requirements which provide that institutions offering

more than 50 percent of their courses via correspondence, or a combination of correspondence and telecommunications, or enrolling 50 percent or more of their students in correspondence courses are ineligible to participate in Title IV, HEA programs. Under the HERA, courses offered by telecommunications are no longer considered correspondence courses, and students enrolled in telecommunications courses are no longer considered to be correspondence students. As a result, otherwise eligible institutions that offer over 50 percent of their courses by telecommunications, or have 50 percent or more of their regular students enrolled in telecommunications courses, are now eligible to participate in the Title IV, HEA programs. The 50 percent limitations continue to apply to correspondence courses and students.

Because of the different statutory treatment of telecommunications and correspondence, we are changing the definition of *telecommunications course.* We believe that it is critical to differentiate between the two delivery modes. A definition of telecommunications course that focused exclusively on technologies could be erroneously interpreted to allow an institution to qualify for full participation in Title IV, HEA programs upon introduction of minor e-mail contact between students and a grader or instructional assistant (who may or may not have subject matter expertise) into what is essentially a correspondence course. Similarly, a course outline or course notes posted to an Internet Web site might also meet the current definition of a *telecommunications course.* Quality standards for electronically-delivered education emphasize the importance of interaction between the instructor and student. The amended definition of a *telecommunications course* acknowledges the importance of interactivity in electronically-delivered instruction and clearly distinguishes telecommunications from correspondence.

The interim final regulations in § 668.8 also reflect the statutory changes to the requirements for an eligible program to include programs offered in whole or in part through telecommunications by domestic institutions with appropriate accreditation. Because the HEA provides that telecommunications programs offered by foreign schools are not eligible programs, and the HEA provides that foreign schools are schools "outside the United States," and since Congress has not lifted the limitations

Confidential

B0270232

on the eligibility of foreign institutions that offer correspondence study, we believe that Congress did not intend for correspondence programs offered by foreign schools to be eligible programs. The purpose of eligibility for foreign schools, which is to permit students from the United States to experience life and education in foreign countries, is not served through correspondence study.

*Direct Assessment Programs (§§ 600.2, 600.10, 600.21, 600.51, 668.8, and 668.10)*

*Statute:* Section 8020 of the HERA adds a new type of eligible program to section 481(b) of the HEA—an instructional program that uses direct assessment of student learning, or recognizes the direct assessment of student learning by others, in lieu of measuring student learning in credit hours or clock hours. The assessment must be consistent with the institution's or program's accreditation. The HERA also provides that the Secretary will determine initially whether each program for which an institution proposes to use direct assessment is an eligible program.

*Current Regulations:* There are no current regulations that reflect the use of direct assessment instead of credit hours or clock hours as a measure of student learning.

*New Regulations:* We have amended the regulations in § 600.2 to include in the definition of *educational program* the statutory language describing direct assessment programs.

In addition, we have amended the definition to provide that merely giving credit for direct assessments does not constitute instruction. We have also amended § 668.8 to indicate that a direct assessment program approved by the Secretary is considered an eligible program as defined in § 668.8.

These interim final regulations also include a new § 668.10, that provides a definition of the term *direct assessment programs* and discusses how key Title IV, HEA program requirements apply to direct assessment programs. The section also includes the information that an institution must submit for the Secretary to make an eligibility determination of a direct assessment program.

We have amended the regulations related to the eligibility of foreign schools in § 600.51 to specify that direct assessment programs offered by foreign schools are not eligible programs. In addition, we have amended §§ 600.10(c)(2) and 600.21(a)(4) to require that an institution must apply to the Secretary for approval whenever it adds a direct assessment program.

*Reasons:* In amending the HEA to provide for the Title IV eligibility of programs using direct assessment, Congress specifically used the term "instructional program" to clarify what types of programs would be eligible. Thus, the statute requires that the program include "instruction," as well as "assessment." To meet this requirement, programs that measure student learning by direct assessment must provide some means for students to supplement their existing knowledge to pass the assessments. An institution that is merely conducting direct assessments of a student's knowledge and skills, without providing any resources to fill those gaps, is not providing instruction.

In new § 668.10, we have adopted a definition of *direct assessment program* that reflects common usage by assessment experts and the accreditation community. In developing this definition, we recognized that many of the key requirements of the Title IV, HEA programs rely on both credit and clock hour measurements. By definition, direct assessment programs do not use credit or clock hours as a measure of student learning, but nothing in the HEA, as amended by the HERA, exempts direct assessment programs from the other credit and clock hour requirements. To apply the Title IV requirements to direct assessment programs, it is necessary to determine the equivalent number of credit or clock hours to the amount of student learning being directly assessed.

Because many of the statutory requirements for Title IV, HEA program eligibility are stated in terms of time and/or credit or clock hours, we determined that the time-based requirements can and must be applied to direct assessment programs to ensure that students receive comparable amounts of Title IV, HEA program assistance for comparable work. This approach ensures that while one student in a direct assessment program may acquire the knowledge and skills necessary to pass assessments more quickly than does another student, and, as a result, may progress more quickly through the program, both students would receive the same amount of Title IV, HEA program assistance for the same payment period. However, the student who remained in attendance for more payment periods to complete the program because he or she entered the program with less knowledge or learned at a slower rate, might receive more Title IV, HEA program assistance based on the additional payment periods he or she attended. Likewise, students in direct assessment programs should

receive no more Title IV, HEA program assistance in an academic year than would students in credit and clock hour programs that are comparable in terms of student learning. We applied this approach throughout these interim final regulations.

The statute requires an institution to apply to the Secretary to have a direct assessment program determined to be an eligible program. Section 668.10(b) specifies the information an institution must provide in its application. We recognize that there is no single model for direct assessment programs and therefore have provided that institutions must provide detailed information about the approach they are using. In addition, institutions must indicate equivalencies to credit or clock hours in terms of instructional time, and to provide a factual basis for the claim of equivalence. These equivalencies are essential because, as mentioned previously, many applicable Title IV, HEA program requirements use time and/or credit or clock hours.

We also considered that some students would have acquired skills and knowledge prior to their enrollment in the direct assessment program. Title IV, HEA program funds are provided to help cover the student's cost of obtaining an education. Accordingly, Title IV, HEA program funds should be used only for learning that occurs after a student has enrolled in an educational program. Therefore, we have amended the regulations to require institutions to provide information in the application for approval of a direct assessment program about how they assess a student's knowledge upon entering the program.

We recognized that institutions offering direct assessment programs might use courses or learning materials developed by other entities, such as training and professional development organizations and other educational institutions, to assist students in preparing for the assessments. We considered whether the use of outside resources could be considered contracting out a portion of an educational program and determined that it could be. Therefore, we included in the direct assessment regulations a provision that exempts direct assessment programs from the limitations of contracting for part of an educational program.

We considered whether remedial courses using direct assessment of student learning in lieu of credit or clock hours could be supported with Title IV, HEA program funds.

We determined that remedial courses taken in preparation for enrollment in a

direct assessment program could be paid for with Title IV, HEA program funds only if they were offered in credit or clock hours. Our conclusion is based on the fact that the HERA modified the definition of eligible program to include direct assessment programs, but did not change the fact that remedial coursework is not itself a program or part of a program. We applied similar reasoning to instruction needed for a professional credential or certification from a State that is required for employment as a teacher in an elementary or secondary school.

The HERA specifies that the assessment an institution uses in its direct assessment program must be consistent with the accreditation of the institution or program. Foreign schools are not accredited by nationally recognized accrediting agencies recognized by the Department and accordingly cannot meet this program eligibility requirement. In the future, the Secretary may consider developing eligibility criteria that are comparable to the accreditation requirement to permit direct assessment programs offered by foreign schools to qualify for Title IV, HEA program eligibility.

The discussion of regulatory alternatives considered in the Regulatory Impact Analysis provides additional details on the factors the Secretary considered in developing the direct assessment regulations.

*Academic Year (§ 668.3)*

*Statute:* Section 8020 of the HERA amended the definition of *academic year* in section 481(a) of the HEA. The revised definition requires a minimum of 30 weeks of instructional time for a program that measures its program length in credit hours or a minimum of 26 weeks of instructional time for a program that measures its program length in clock hours, rather than a minimum length of 30 weeks of instructional time for both credit hour and clock-hour programs.

*Current Regulations:* The current regulations reflect the previous statutory definition of an academic year requiring a minimum of 30 weeks of instructional time for all programs regardless of the way in which the program was measured.

*New Regulations:* Section 668.3(a) of the regulations has been amended to reflect the change in the statutory definition of an academic year. In addition, we have modified the definition so that *academic year* is no longer defined as a period beginning on the first day and ending on the last day of classes.

*Reasons:* The regulations are modified to reflect the change made by the HERA to the definition of an academic year. Because all programs must define an academic year that conforms to the minimum requirements even if the program itself is shorter than those minimum requirements, we modified the definition so that an academic year is no longer defined as a period of time that begins on the first day of classes and ends on the last day of classes or examinations.

*Treatment of Title IV Funds When a Student Withdraws (§§ 668.22, 668.35, and 668.173)*

Program Applicability

*Statute:* Section 8022 of the HERA amended section 484B(a)(3)(C)(i) of the HEA to change the applicability of section 484B of the HEA (commonly referred to as the Return of Title IV Funds requirements). Under prior law, the Return of Title IV Funds rules applied to all Title IV, HEA grant and loan assistance other than Federal Work Study (FWS) funds. Under the HERA, the rules will now apply only to funds from the Pell Grant, Federal Supplemental Educational Opportunity Grant (FSEOG), FFEL, Direct Loan, and Perkins Loan programs, and to the new Academic Competitiveness Grant (ACG) and National Science and Mathematics Access to Retain Talent (SMART) Grant programs.

*Current Regulations:* Section 668.22(a)(1) provides that the Return of Title IV Funds requirements apply to all Title IV, HEA grant and loan assistance disbursed or that could have been disbursed to a withdrawn student, not including FWS or the non-Federal share of FSEOG awards if an institution meets its FSEOG matching share by the individual recipient method or the aggregate method.

*New Regulations:* We have revised § 668.22(a)(2) to reflect the more limited applicability of the Return of Title IV Funds rules as provided in the HERA. Under the revised regulations, an institution must perform a Return of Title IV Funds calculation when a student who withdraws was disbursed, or could have been disbursed, funds from the following programs: Pell Grant, FSEOG, FFEL, Direct Loan, Perkins Loan, ACG, or SMART Grant. The Return of Title IV Funds requirements do not apply to funds from the Gaining Early Awareness and Readiness for Undergraduate Program (GEAR UP), Student Support Services (SSS) or Leveraging Educational Assistance Partnerships (LEAP) Programs. In addition, the interim final regulations

retain the exemption from the Return of Title IV Funds rules for the non-Federal share of FSEOG awards if an institution meets its FSEOG matching share by the individual recipient method or the aggregate method.

*Reasons:* These changes are made to implement the provisions of the HERA. The current regulatory exemption from the Return of Title IV Funds requirements of the non-Federal share of FSEOG awards is retained as these funds are not considered Federal funds and, therefore, are not subject to the Federal Return of Title IV Funds requirements.

Post-Withdrawal Disbursement Counseling

*Statute:* Section 8022 of the HERA amended section 484B(a)(4) of the HEA to require an institution to contact a borrower before making a late disbursement or post-withdrawal disbursement of Title IV loan funds. During this contact, the institution must confirm with the borrower that the loan funds are still required by the student, or parent in the case of a parent PLUS loan, and explain to the borrower his or her obligation to repay the funds if disbursed. An institution must document in the student's file the result of the contact and the final determination made concerning the disbursement.

*Current Regulations:* Current § 668.22(a)(4)(i)(B) requires an institution to provide a student, or parent in the case of a parent PLUS loan, an opportunity to cancel some or all of a loan disbursement credited to the student's account by providing notice to the student or parent when the institution credits the account with Direct Loan, FFEL, or Federal Perkins Loan program funds. In addition, § 668.22(a)(4)(ii) provides that an institution must offer any amount of a post-withdrawal disbursement (loan and grant) that is not credited to the student's account to the student, or parent in the case of a parent PLUS loan, as a direct disbursement.

Current regulations do not require institutions to explain to students, or parents for a parent PLUS loan, the obligation to repay disbursed loan funds, nor do they specify the documentation an institution must keep.

*New Regulations:* The existing regulations, as redesignated in § 668.22(a)(5), have been modified as a result of the changes made by the HERA.

While current regulations already require an institution to obtain confirmation from a student, or parent

Confidential

B0270234

**45670**   **Federal Register** / Vol. 71, No. 153 / Wednesday, August 9, 2006 / Rules and Regulations

for a parent PLUS loan, before making a direct disbursement of loan or grant funds from a post-withdrawal disbursement, the regulations have been revised to make clear that an institution must now obtain this confirmation before crediting a student's account with loan funds. As in the past, an institution may credit a student's account with any post-withdrawal disbursement of grant funds without confirmation from the student.

Thus, the interim final regulations require an institution to include in the written notification it must provide to a student, or parent for a parent PLUS loan, notice of any post-withdrawal disbursement of loan funds that it wishes to credit to the student's account. As currently required for direct disbursements of a post-withdrawal disbursement, the notice must identify the type and amount of the loan funds the institution wishes to credit to the student's account, and explain that a student, or parent for a parent PLUS loan, may accept or decline all or a portion of the funds. The notice must also make clear that a student, or parent for a parent PLUS loan, may not receive as a direct disbursement loan funds that the institution wishes to credit to the student's account unless the institution agrees to do so. If the student, or parent for a parent PLUS loan, does not wish to accept some or all of the loan funds that the institution wishes to credit to the student's account, the institution must not disburse those funds. As required by the HERA, institutions are now required to explain to the student, or parent for a parent PLUS loan, the obligation to repay any loan funds accepted as a post-withdrawal disbursement.

The 14-day deadline (from the date the institution sent the notification) for a student, or parent for a parent PLUS loan, to accept some or all of a direct disbursement of a post-withdrawal disbursement, now applies to confirmation of loan disbursements that an institution wishes to credit to a student's account. The interim final regulations permit an institution to establish a later deadline, provided the later deadline applies to both confirmation of loan disbursements to the student's account and to direct disbursements of a post-withdrawal disbursement. In accordance with current regulations, the institution's notice to the student, or parent for a parent PLUS loan, must advise the student or parent of this deadline, making clear that a late response to the notice is honored only at the institution's discretion. Under the interim final regulations, an institution

that chooses to honor a late response must disburse all the funds accepted by the student, or parent for a parent PLUS loan; for example, it cannot credit loan funds to the student's account in accordance with the student's request, but decline to disburse directly post-withdrawal funds accepted by the student. As currently required when an institution declines to honor a late response for direct disbursements of a post-withdrawal disbursement, the interim final regulations require an institution that declines to honor a late response accepting loan funds to be credited to the student's account to inform the student, or parent for a parent PLUS loan, in writing that it will not be honoring the late response.

As with current regulatory requirements for making a direct disbursement of a post-withdrawal disbursement, an institution must make a disbursement by crediting a student's account with a post-withdrawal disbursement of loan funds within 120 days of the date of the institution's determination that the student withdrew, as that term is defined in § 668.22(l)(3).

Finally, new paragraph § 668.22(a)(5)(iv) has been added to codify the HERA requirement that an institution document in the student's file the result of the contact and the final determination made concerning a post-withdrawal disbursement of loan funds.

*Reasons:* These changes are made to implement the provisions of the HERA. We have modified the current regulations that require confirmation of any post-withdrawal disbursements made as a direct disbursement to reflect the new statutory requirements.

A new regulatory provision requires the institution to make clear in the written notice that a student, or parent for a parent PLUS loan, may not receive as a direct disbursement loan funds that the institution wishes to credit to the student's account, unless the institution concurs. This reflects current requirements that permit an institution to credit Title IV funds to a student's account before disbursing any remaining amount to the student, or parent for a parent PLUS loan.

The Secretary has made other changes to the regulations with the goal of easing implementation of the new requirements. The Secretary believes it should not be the institution's decision to determine that it is acceptable for a student to incur debt and/or use up Title IV, HEA program eligibility to cover a debt to the institution, but not to cover non-institutional educational expenses. That decision must be left to

the student, or parent for a parent PLUS loan. Thus, institutions are required to use the same deadline for responses for both types of confirmations and, if the institution acts on a late response, it must honor all the confirmations in the response.

In addition, the Secretary now permits an institution to establish a deadline for confirmation responses beyond the 14-day minimum in current regulations to ease institutional administrative burden. Some institutions may desire to give all students and parents more time to respond now that confirmation of disbursement is needed for crediting the student's account with loan funds. Also, a later deadline may be beneficial as a late confirmation response can now result in a student owing a debt to the institution for unpaid charges on his or her account.

Withdrawals From Clock Hour Programs

*Statute:* The HERA changed section 484B(d)(2) of the HEA, to provide that only scheduled hours, not completed hours, will be used to determine the percentage of the payment period or period of enrollment completed by a student withdrawing from a clock hour program. Prior to this change, the law provided that scheduled hours, rather than completed hours, were used only if the hours completed by the student were equal to a percentage, determined by the Secretary in regulations, of the hours scheduled to be completed when the student withdrew.

The HERA made a conforming change to section 484B(a)(3)(B)(ii) to make clear that a student withdrawing from a clock hour program earns 100 percent of his or her aid if the student's withdrawal date occurs after the point when he or she was scheduled to complete 60 percent of the scheduled hours in the payment period or period of enrollment.

*Current Regulations:* The current regulations in § 668.22(f)(1)(ii) use actual hours to determine the percentage of the period completed by a student withdrawing from a clock hour program, unless the student's actual hours of attendance were at least 70 percent of the hours the student was scheduled to have completed at the time they withdrew. If so, scheduled hours are used.

Section 668.22(e)(2)(ii)(B) of the current regulations provides that a student earns 100 percent of his or her aid only if he or she actually completed 60 percent or more of the hours in the payment period or period of enrollment scheduled to be completed when he or she withdrew.

Confidential

*New Regulations:* Section 668.22(f)(1)(ii) has been amended to reflect the statutory change to section 404B(d)(2) requiring the use of scheduled clock hours in all calculations of earned Title IV, HEA program funds for students who withdraw from clock-hour programs. That is, for a student withdrawing from a clock-hour program, the "percentage of the payment period or period of enrollment completed" is determined by dividing the total number of clock hours comprising the period into the number of clock hours scheduled to be completed as of the student's withdrawal date. In addition, the regulations have been amended to require that the scheduled clock hours used for a student must be those established by the institution prior to the student's beginning class date for the payment period or period of enrollment, and must have been established in accordance with any requirements of the State or the institution's accrediting agency. These hours must be consistent with the published materials describing the institution's programs. However, if an institution modified the scheduled hours in a student's program prior to his or her withdrawal, and in accordance with any State or accrediting agency requirements, the new scheduled hours must be used.

New § 668.22(e)(2)(ii)(B) implements the statutory change in section 484B(a)(3)(B)(ii) by clarifying that a student withdrawing from a clock-hour program earns 100 percent of his or her aid if the student's withdrawal date is after the point when he or she was scheduled to complete 60 percent of the scheduled hours in the payment period or period of enrollment.

*Reasons:* These changes are made to implement the provisions of the HERA. To limit the possibility of abuse of this rule, the regulations provide that the scheduled hours used must be those that are part of a schedule that was established prior to a student's withdrawal, and must meet any applicable State or accrediting agency standards.

Grant Overpayment Requirements

*Statute:* Section 8022 of the HERA amended section 484B(b)(2)(C) of the HEA to change the amount of a grant overpayment that must be repaid by a student who withdraws from school. The amount of a grant overpayment due from a student is limited to the amount by which the original overpayment amount exceeds 50 percent of the total grant funds received by the student for the payment period or period of

enrollment. In addition, the HERA amended the HEA to specify that a student does not have to repay a grant overpayment of $50 or less for grant overpayments resulting from the student's withdrawal.

*Current Regulations:* The current regulations in § 668.22(h)(3)(ii) provide that a student is not required to repay 50 percent of the withdrawn student's original grant overpayment amount.

Under § 668.35(e)(3), an otherwise eligible student maintains eligibility and does not have to repay a Perkins Loan, FSEOG, or Pell Grant overpayment of less than $25—resulting from withdrawal or otherwise provided that the overpayment amount is not a remaining balance nor a result of applying the overaward threshold for the campus-based programs.

*New Regulations:* Revised § 668.22(h)(3) reflects the new statutory limitation on the amount of a grant overpayment that a student is required to return. To illustrate the effect of the new law, we provide the following example: A student who received $2,000 in Title IV, HEA grant funds for a payment period withdraws from school. The institution uses the Return of Title IV Funds calculation and determines that the student has an original grant overpayment of $1,200. Under current regulations, the student would owe $600 (50 percent of the original overpayment amount of $1,200). Under the interim final regulations, the student owes $200 (the amount by which the original overpayment amount ($1,200) exceeds half of the total grant funds received, ($1,000) or $1,200–$1,000. In this same scenario, if the student's grant overpayment was originally $800, under current regulations the student owes $400 (50 percent of $800). Under the interim final regulations, the student owes nothing because the overpayment amount ($800) is less than half of the total grant funds received ($1,000).

Section 668.22(h)(3) also reflects the statutory provision that a student is not obligated to return a grant overpayment of $50 or less. As a result, a grant overpayment of $50 or less will not make the student ineligible to receive Title IV, HEA program assistance should the student return to school. An institution is not required to attempt recovery of that overpayment, report it to the Department's National Student Loan Data System (NSLDS), or refer it to the Secretary. Consistent with § 668.35(e)(3), this new standard does not apply to remaining grant overpayment balances; that is, a student must repay a grant overpayment that has

been reduced to $50 or less because of payments made.

A conforming change is also being made to § 668.35(e) to make it clear that the overpayment threshold and eligibility requirements of § 668.35(e) do not apply to an overpayment resulting from the application of the Return of Title IV Funds requirements. The less-than-$25 threshold and eligibility requirements specified in § 668.35(e)(3) continue to apply to all other overpayments.

*Reasons:* These changes are made to implement the provisions of the HERA.

Waiver of Grant Overpayment for Students Affected by a Disaster

*Statute:* The Pell Grant Hurricane and Disaster Relief Act (Pub. L. 109–66) and the Student Grant Hurricane and Disaster Relief Act (Pub. L. 109–67) amended section 484B(b)(2) of the HEA to permit the Secretary to waive a student's Title IV grant repayment if the student withdrew from an institution because of a major disaster.

*Current Regulations:* Current regulations do not address this issue.

*New Regulations:* New § 668.22(h)(5) incorporates the statutory changes. The interim final regulations provide that the Secretary may waive grant overpayment amounts for individuals whose withdrawal ended within the award year during which the designation of a major disaster area occurred, or the subsequent award year. On November 9, 2005, the Secretary exercised this waiver authority through publication of Dear Colleague Letter GEN–05–17. It is important to note that this waiver authority applies to a grant overpayment due from a student and not to the required return of unearned funds to a grant program by an institution.

*Reasons:* These changes are made to implement the provisions of the Pell Grant Hurricane and Disaster Relief Act and the Student Grant Hurricane and Disaster Relief Act. The interim final regulations apply the waivers on an award year basis to reflect the fact that Pell and FSEOG Grants are awarded on an award year basis.

Order of Return of Grant Funds

*Statute:* Section 484B(b)(3)(B) of the HEA requires that unearned Title IV, HEA grant funds be returned to awards under subpart 1 of part A of the HEA (for the Pell Grant Program) before they are returned to awards under subpart 3 of part A of the HEA (for the FSEOG Program). Under prior law, the Pell Grant program was the only program in subpart 1 of part A of the HEA. The HERA has added the ACG and the

B0270236

National SMART Grant programs to subpart 1 of part A of the HEA. As a result, unearned funds must be returned to the Pell Grant, ACG and National SMART Grant programs before they are returned to the FSEOG program. The statute does not require that unearned funds be returned to one subpart 1 program before another.

Also, as noted previously, the HERA limited the application of the Return of Title IV funds requirements to funds from the Pell Grant, FSEOG, FFEL, Direct Loan, and Perkins Loan programs, as well as the new ACG and National SMART Grant programs.

*Current Regulations:* Section 668.22(i)(2) currently requires an institution or student to return unearned funds to the grant programs in the following order: (1) The Federal Pell Grant Program; (2) the FSEOG Program; (3) other Title IV, HEA grant or loan assistance programs.

*New Regulations:* New § 668.22(i)(2) reflects the addition of the new ACG and National SMART Grant programs and requires that unearned funds be returned to those programs before unearned funds are returned to the FSEOG program. The interim final regulations also specify an order of return for the three grant programs in subpart 1 of part A of the HEA, requiring an institution or student to return unearned funds to the subpart 1 grant programs in the following order: (1) The Pell Grant Program; (2) the ACG Program, and (3) the National SMART Grant Program. The interim final regulations no longer require an institution to return funds to "other Title IV, HEA grant or loan assistance programs."

*Reasons:* These changes are made to implement the provisions of the HERA. The interim final regulations specify that an institution or student return unearned funds to the Pell Grant Program before they are returned to the ACG or National SMART Grant programs because this approach is the most beneficial for students. Returning funds to the Pell Grant Program ensures that the student's eligibility for a Pell Grant is maintained, which is beneficial should the student return to school within the same award year and again seek an ACG or National SMART Grant.

Return of Funds Within 45 Days

*Statute:* Section 8022 of the HERA amended section 484B(b)(1) of the HEA to add the requirement that an institution return unearned funds for which it is responsible no later than 45 days from the determination of a student's withdrawal.

*Current Regulations:* Section 668.22(j) of the current regulations requires an institution to return the unearned funds for which it is responsible as soon as possible, but no later than 30 days after the date of the institution's determination that the student withdrew.

Section 668.173(b) establishes the specific criteria an institution must meet to be in compliance with the 30-day deadline in § 668.22(j).

*New Regulations:* The interim final regulations in § 668.22(j) incorporate the HERA provision by changing the maximum amount of time an institution has to return the unearned funds for which it is responsible from 30 days to 45 days. The interim final regulations continue to specify that an institution must return those funds as soon as possible.

We are also making conforming changes to § 668.173(b) to extend the deadlines specified in that regulation by 15 days. An institution will be considered to have returned funds timely if the institution does one of the following no later than 45 days (rather than the current 30 days) after the date it determines that the student withdrew: (1) Deposits or transfers the funds into the bank account it is required to maintain; (2) initiates an electronic funds transfer (EFT); (3) initiates an electronic transaction that informs the FFEL lender to adjust the borrower's loan account for the amount returned; or (4) issues a check. The institution is considered to have issued a check timely if the institution's records show that the check was issued no more than 45 days after the date the institution determined that the student withdrew, or the date on the cancelled check shows that the bank endorsed that check no more than 60 days (instead of the current 45 days) after the date the institution determined that the student withdrew.

*Reasons:* These changes are made to implement the provisions of the HERA. The interim final regulations retain the requirement that an institution return funds for which it is responsible as soon as possible. The return of funds by an institution may result in a decrease in the amount of a Title IV loan that the student must repay and reduces that interest that accrues on the loan. In addition, the sooner funds are returned, the sooner an otherwise eligible student may regain eligibility for those funds should the student return to school within the same academic period.

*Student Eligibility—General and Student Debts Under the HEA and to the U.S. (§§ 668.32, 668.35, 674.39, 682.405, and 685.211)*

*Statute:* Section 8021(a) of the HERA amended section 484(a) of the HEA by adding a new student eligibility requirement. The new requirement provides that students who have been convicted of, or have pled nolo contendere or guilty to a crime involving fraud in obtaining Title IV, HEA program assistance are not eligible for additional Title IV assistance unless they have repaid the fraudulently obtained Title IV, HEA program assistance funds to the Secretary or to the holder of a loan made under the Title IV, HEA programs.

*Current Regulations:* Current regulations do not address the Title IV eligibility of students who have obtained Title IV, HEA Program assistance through fraud.

*New Regulations:* Sections 668.32 and 668.35 have been amended by adding new paragraphs (m) and (i), respectively, to provide that a student who has been convicted of or has pled nolo contendere or guilty to a crime involving fraud in obtaining Title IV, HEA program assistance is ineligible for additional assistance unless he or she has repaid the fraudulently obtained Title IV, HEA program assistance funds to the Secretary or to the holder of a loan made under the Title IV, HEA programs. In addition, § 682.401(b)(4) has been amended to cross-reference the new § 668.35(i).

Sections 674.39(a), 682.405(a)(1), and 685.211(f) have been amended to specify that a Perkins, FFEL, or Direct Loan Program loan that was fraudulently obtained, and for which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraudulently obtained Title IV, HEA program assistance, is not eligible for rehabilitation.

*Reasons:* These regulations have been amended to reflect the changes made by the HERA.

*Conviction for Possession or Sale of Illegal Drugs (§ 668.40)*

*Statute:* Section 8021(c) of the HERA amended section 484(r) of the HEA to modify the requirements regarding the suspension of eligibility for students convicted of drug-related offenses. As amended, the HEA now provides that a student becomes ineligible for Title IV, HEA program assistance only if the conviction for a Federal or State offense involving the possession or sale of a controlled substance is for conduct that occurred during a period of enrollment

B0270237

for which the student was receiving Title IV, HEA program assistance. The period of ineligibility and provisions for regaining eligibility were not changed by the HERA.

*Current Regulations:* The current regulations reflect the previous statutory requirements that provided that a student became ineligible to receive Title IV, HEA program assistance if the student was convicted of an offense involving the possession or sale of illegal drugs without regard to when the offense occurred.

*New Regulations:* Section 668.40(a)(1) has been revised to reflect the statutory change to section 484(r) of the HEA that limits the loss of student eligibility to students convicted of drug-related offenses to offenses that occurred during a period of enrollment for which the student was receiving Title IV, HEA program assistance.

The revised student eligibility criterion applies to the 2006–2007 award year for the Pell Grant, ACG, National SMART Grant, and campus-based programs and for periods of enrollment beginning on or after July 1, 2006 for the FFEL and Direct Loan Programs.

The period of ineligibility remains unchanged and is triggered by the date of the conviction. The provisions for regaining eligibility also remain unchanged.

*Reasons:* These regulations have been changed to reflect the changes to the HEA made by the HERA.

*Estimated Financial Assistance (§§ 673.5, 673.6, 674.16, 675.26, 682.200 and 685.102)*

*Statute:* Section 8019 of the HERA added two new grant programs by creating a new HEA section 401A and modified the definition of *Other Financial Assistance* in HEA section 480(j). The two new grant programs are considered other financial assistance under section 480(j) of the HEA. In changing the definition of *Other Financial Assistance,* the HERA added a new section to the definition that states, "Notwithstanding paragraph (1) and section 472, assistance not received under this title may be excluded from both estimated financial assistance and cost of attendance, if that assistance is provided by a State and is designated by such State to offset a specific component of the cost of attendance. If that assistance is excluded from either estimated financial assistance or cost of attendance, it shall be excluded from both."

The Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (Pub. L. 108–375) amended Title 10 of the United States Code to add a new veterans' education benefit in chapter 1607. Veterans' education benefits are considered other financial assistance under section 480(j) of the HEA. These chapter 1607 benefits, which are known as the Reserve Educational Assistance Program, benefit military reservists called to active duty after September 11, 2001 and are designated to pay for postsecondary education expenses.

*Current Regulations:* The current regulations do not include the two new grant programs, the change in the definition of *Other Financial Assistance,* or the added veterans' educational benefit in the regulatory definitions of *resources* and *estimated financial assistance.*

*New Regulations:* We have amended §§ 673.5, 682.200 and 685.102 to reflect the creation of the two new grant programs and the new veterans' education benefit, as well as the modification of the statutory definition of *Other Financial Assistance.* In addition, we have made technical changes to clarify the existing regulatory language, to standardize the definitions of *resources* and *estimated financial assistance* used in §§ 673.5(c), 673.6(a), 674.16(c), 675.26(a), 682.200(b) and 685.102(b), to adopt a single regulatory term to describe other financial assistance, and to make conforming changes.

Historically, the campus-based General Provisions have used the term *resources* rather than *estimated financial assistance* in reference to the same components. However, the statute repeatedly uses the term *estimated financial assistance,* and we believe it is necessary to use this term in the interim final regulations. Accordingly, the interim final regulations in §§ 673.6(a)(1), 674.16(c), 675.26(a)(4) and 676.16(b) have been amended to change the defined term *resources* to the defined term *estimated financial assistance.*

We have also made some technical changes to the regulations. We have modified the regulations to provide for the consistent use of names for the different loan types for each of the loan programs. We also clarified that the loans that can be used to replace the expected family contribution (EFC) include non-federal, non-need-based loans that come from private, state, or institutional sources. We have revised the definition of *estimated financial assistance* in §§ 682.200 and 685.102 of the FFEL and Direct Loan programs, respectively, to reflect our longstanding policy that estimated financial assistance includes "Any educational benefits paid because of enrollment in a postsecondary education institution, or to cover postsecondary education expenses" and by adding the same language to § 673.5(c) for the campus-based programs.

We added non-need-based employment as an exclusion to the definition of estimated financial assistance in §§ 682.200 and 685.102 of the FFEL and Direct Loan program regulations, respectively.

In § 673.5 of the campus-based General Provisions, we made a technical correction to clarify that fellowships and assistantships must be counted as estimated financial assistance, except those portions that are non-need-based employment. The current regulation states that non-need-based employment is not considered estimated financial assistance, but fellowships and assistantships may include portions that are non-need-based employment, but are not labeled separately as such. We made a technical change to § 673.5 to clarify the rules for the consideration of these fellowships and assistantships.

We added to the definition of *estimated financial assistance* in §§ 682.200(b) and 685.102(b) two items that are in the same definition under § 673.5(c). Those two items are insurance programs for the student's education and fellowships and assistantships, except non-need-based employment portions of such awards. This inclusion ensures the three sections have similar language.

Another technical change made for consistency was made in §§ 682.200(b) and 685.102(b) in which the word "AmeriCorps" was added parenthetically following each instance of national service education awards or post-service benefits paid under title I of the National and Community Service Act of 1990 because that is the term used in § 673.5(c).

*Reasons:* The regulations need to be changed to reflect the new grant programs and the new veterans' educational benefits under 10 U.S.C. Chapter 1607. As a technical change, we have parenthetically inserted the names of each of the chapters of eligible veterans' education benefits listed to make it easier for the public to identify these benefits. We also deleted the entries for programs that are obsolete and updated the names of programs that have been changed. We have also made technical changes to clarify the existing language and standardize the definitions among the regulatory sections referencing the definition of estimated financial assistance.

B0270238

**45674**   **Federal Register** / Vol. 71, No. 153 / Wednesday, August 9, 2006 / Rules and Regulations

*Military Deferment (§§ 674.34, 682.210, and 685.204)*

*Statute:* Section 8007 of the HERA amended sections 428, 455, 464 and 481 of the HEA to create a new deferment for borrowers who are serving on active duty in the U.S. Armed Forces, or who are performing qualifying National Guard duty, during a war or other military operation or national emergency. The deferment is effective July 1, 2006, for loans for which the first disbursement is made on or after July 1, 2001.

*Current Regulations:* The current deferment regulations do not reflect this new deferment for military service. This new deferment is different from the military service deferment available to Perkins Loan, FFEL and Direct Loan Program borrowers who took out loans prior to July 1, 1993.

*New Regulations:* Section 674.34 of the Perkins regulations, § 682.210 of the FFEL regulations, and § 685.204 of the Direct Loan regulations have been amended to reflect the new military service deferment created by the HERA. The interim final regulations specify the types of active duty service and National Guard service that qualifies a borrower for the deferment, and define *active duty, military operation,* and *national emergency* for purposes of a military deferment. The types of qualifying service and the definitions are provided in the HERA.

A borrower may qualify for the military deferment if the first disbursement of the borrower's Perkins, FFEL, or Direct Loan was made on or after July 1, 2001. If the borrower has some loans disbursed before July 1, 2001 and some loans disbursed on or after July 1, 2001, the borrower may receive a military deferment for the loans disbursed on or after July 1, 2001, but may not receive a military deferment on the loans disbursed before July 1, 2001. The period of eligible military service must have occurred after the borrower received the loan. A borrower consolidating loans first disbursed on or after July 1, 2001, is eligible for the new deferment on the entire Consolidation Loan only if all of the borrower's Title IV loans included in the Consolidation Loan were first disbursed on or after July 1, 2001. The HERA does not authorize a loan holder to refund payments made during a period covered by a retroactive deferment.

*Reasons:* The regulations are amended to reflect changes made by the HERA.

**FFEL and Direct Loan Program Changes**

*Graduate and Professional Student Eligibility for PLUS Loans (§§ 668.2, 682.102, 682.201, 685.102, 685.200, and 685.201)*

*Statute:* Section 8005 of the HERA amended section 428B of the HEA, to provide that graduate and professional students are eligible for PLUS Loans. In addition, section 8014 of the HERA added a new eligibility requirement for PLUS Loan borrowers. Under this requirement, a PLUS Loan borrower who has been convicted of, or pled nolo contendere or guilty to, a crime involving fraud in obtaining Title IV, HEA program funds must complete repayment of the fraudulently obtained funds to be eligible to receive a PLUS loan.

*Current Regulations:* Under the current regulations, only parents of eligible students are eligible for PLUS Loans.

*New Regulations:* The terms *Federal Direct PLUS Program* and *Federal PLUS Program* are defined in §§ 668.2 and 685.102 to include graduate and professional students as eligible borrowers. Section 682.102 of the FFEL Program regulations and § 685.201 of the Direct Loan Program regulations have been amended to describe the application process for graduate or professional students to obtain a PLUS loan. Sections 682.201 of the FFEL Program regulations and 685.200 of the Direct Loan Program regulations have been amended to specify that a graduate or professional student PLUS borrower must meet the same eligibility criteria as a student Stafford borrower. This includes the new requirement in § 668.32 that a student convicted of fraud in obtaining Title IV, HEA program funds, or who has pled nolo contendere or guilty to such a crime, must complete repayment of the fraudulently obtained funds. In addition, the student PLUS borrower must have received a determination of his or her annual loan maximum eligibility under the Subsidized and Unsubsidized Stafford Loan program. A student PLUS borrower, like a parent PLUS borrower, must not have an adverse credit history to be eligible for a PLUS Loan.

We have also amended § 682.201(c) to reflect that a parent borrower convicted of fraud in obtaining Title IV, HEA program funds, or who has pled nolo contendere or guilty to such a crime, must complete repayment of the fraudulently obtained funds in order to be eligible for a PLUS loan.

*Reasons:* The regulations are amended to reflect changes made by the HERA.

*Joint Consolidation Loans (§§ 682.102, 682.201, and 685.220)*

*Statute:* Section 8009 of the HERA amended section 428C(a)(3)(C) of the HEA by eliminating the ability of a married couple to jointly consolidate their eligible student loans.

*Current Regulations:* Current regulations permit a married couple to consolidate their eligible student loans into a joint FFEL or Direct Consolidation Loan.

*New Regulations:* Sections 682.102(d), 682.201(c)(2), 682.201(e), and 685.220(d)(2) have been modified to eliminate the possibility of joint consolidation of loans by a married couple for applications received on or after July 1, 2006.

*Reasons:* These regulations are amended to reflect changes made by the HERA.

*Interest Rates (§§ 682.202 and 685.202)*

*Statute:* Public Law 107–139 amended section 427A of the HEA to establish fixed interest rates for FFEL and Direct Stafford and PLUS loans first disbursed on or after July 1, 2006, at 6.8 percent for Stafford loans and 7.9 percent for PLUS loans. The HERA did not change these interest rates for Stafford loans or Direct PLUS loans but did increase the interest rate for PLUS loans made under the FFEL Program to 8.5 percent. For FFEL and Direct Consolidation loans, the interest rate remains a fixed rate, calculated at the time the consolidation loan is made, as the weighted average of interest rates on the loans consolidated, rounded up to the nearest higher ¼th of 1 percent, not to exceed 8.5 percent.

*Current regulations:* Current regulations do not reflect the changed interest rates on Stafford and PLUS loans made under the FFEL and Direct Loan programs. Interest rates on FFEL and Direct Consolidation loans are correctly reflected in the current regulations.

*New regulations:* Sections 682.202 and 685.202 of the FFEL and Direct Loan program regulations, respectively, have been amended to reflect a fixed interest rate of 6.8 percent for Stafford Loans first disbursed on or after July 1, 2006. The regulations have also been amended to reflect a fixed interest rate of 8.5 and 7.9 percent, respectively, for FFEL and Direct PLUS loans first disbursed on or after July 1, 2006.

*Reasons:* The regulations are amended to reflect changes made by Public Law 107–139 and the HERA.

*Origination Fees (§§ 682.202 and 685.202)*

*Statute:* Section 8008(c) of the HERA amended section 438(c)(2) of the HEA to

Confidential

reduce and eventually eliminate the 3 percent origination fee that is paid by FFEL Program lenders and that the lenders may charge to FFEL Stafford Loan borrowers. Section 8008(c) of the HERA also amended section 455(b)(8)(A) of the HEA to reduce the 4 percent origination fee that may be charged to Stafford Loan borrowers in the Direct Loan Program. The 4 percent Direct Stafford Loan origination fee is equivalent to the combined 3 percent FFEL Stafford Loan origination fee plus the 1 percent insurance premium (now the Federal default fee) that is authorized in the FFEL Program. Origination fees currently charged to FFEL and Direct PLUS Loan borrowers are not changed by the HERA. FFEL and Direct Consolidation Loan borrowers are also not charged origination fees.

*Current Regulations:* The current regulations authorize lenders in the FFEL Program to charge borrowers an origination fee of up to 3 percent of the amount of a Stafford Loan and the Secretary to charge a fee of up to 4 percent of the amount of a Direct Stafford Loan. Lenders in the FFEL Program are required to pay the full amount of the origination fee to the Secretary whether or not they charge the fee to the borrower.

*New regulations:* The FFEL Program regulations have been amended in § 682.202(c) to reduce origination fees as follows: Beginning with loans for which the first disbursement of principal is made on or after July 1, 2006, and before July 1, 2007, the maximum origination fee that a lender may charge a borrower will be 2 percent. The maximum origination fee that may be charged to an FFEL Stafford loan borrower drops to 1.5 percent on July 1, 2007, 1.0 percent on July 1, 2008, and 0.5 percent on July 1, 2009. The lender must pay the specified maximum fee for each period to the Secretary whether or not it is charged to the borrower. The fee will be eliminated as of July 1, 2010.

Section 685.202(c) of the Direct Loan Program regulations has been amended to reduce origination fees as follows: Beginning with loans for which the first disbursement of principal is made on or after February 8, 2006, and before July 1, 2007, the maximum origination fee that may be charged to Direct Stafford Loan borrowers is 3 percent. The maximum origination fee that may be charged drops to 2.5 percent on July 1, 2007, 2.0 percent on July 1, 2008, 1.5 percent on July 1, 2009, and 1.0 percent on July 1, 2010.

*Reasons:* The regulations are amended to reflect the changes made by the HERA.

### Loan Limits (§§ 682.204 and 685.203)

*Statute:* Section 8005 of the HERA amended sections 425(a)(1)(A), 428(b)(1)(A), and 428H(d) of the HEA to increase loan limits for certain Stafford Loan borrowers. The higher loan limits are effective in the FFEL Program for loans certified on or after July 1, 2007, and, in the Direct Loan Program, for loans originated on or after July 1, 2007. The HERA did not increase aggregate loan limits in either program.

*Current Regulations:* Under the current regulations, the base subsidized/ unsubsidized combined annual loan limit for first-year undergraduates is $2,625 and $3,500 for second year undergraduates. For graduate or professional students, the additional unsubsidized annual loan limit is $10,000. For students who have obtained a baccalaureate degree and are enrolled in coursework necessary for enrollment in a graduate or professional program, the additional unsubsidized annual loan limit is $5,000. For students who have obtained a baccalaureate degree, and are enrolled in coursework necessary for a professional credential or certification from a State required for employment as a teacher in an elementary school, the additional unsubsidized annual loan limit is $5,000.

*New Regulations:* Under the interim final regulations, for FFEL loans certified on or after July 1, 2007 and for Direct Loans originated on or after July 1, 2007:
• For first-year undergraduates, the base subsidized/unsubsidized combined annual loan limit is $3,500;
• For second year undergraduates, the base subsidized/unsubsidized combined annual loan limit is $4,500;
• For graduate or professional students, the additional unsubsidized annual loan limit is $12,000;
• For students who have obtained a baccalaureate degree and are enrolled in coursework necessary for enrollment in a graduate or professional program, the additional unsubsidized annual loan limit is $7,000; and
• For students who have obtained a baccalaureate degree, and are enrolled in coursework necessary for a professional credential or certification from a State required for employment as a teacher in an elementary school, the additional unsubsidized annual loan limit is $7,000.

The HERA did not increase the base subsidized/unsubsidized combined loan limits for third year and above undergraduate students and for graduate students. The HERA also did not change the limits on the additional amount of unsubsidized loans that are available to all undergraduate students.

*Reasons:* These regulations are amended to reflect changes made by the HERA.

### Elimination of Option of Early Entrance Into Repayment (§§ 682.209 and 685.220)

*Statute:* Section 8009 of the HERA amended sections 428(b)(7)(A), 428C(a)(3), and 428C(b)(5) to eliminate the ability of FFEL Stafford Loan borrowers to request to enter repayment on their loans early. Early conversion to repayment allows a borrower to consolidate FFEL loans while still enrolled at least half-time.

Section 8009 of the HERA also amended sections 455(a), 455(d), and 455(g) of the HEA to require that Direct Consolidation Loans have the same terms and conditions as FFEL Consolidation Loans. For both FFEL Stafford Loan and Direct Stafford Loan borrowers, the repayment period is now defined as the period beginning 6 months and one day after the date the student ceases to carry at least one-half the normal full-time academic workload, as determined by the institution.

*Current Regulations:* Section 682.209(a)(5) of the FFEL program regulations permits FFEL Stafford Loan borrowers to request and be granted a repayment schedule prior to the end of their grace period and therefore enter repayment on their loans. Current Direct Loan regulations in § 685.220(d)(1)(ii)(A) permit borrowers in an in-school period with loans made under both the FFEL program and the Direct Loan program to obtain a Direct Consolidation loan. Also, under § 685.220(d)(1)(ii)(B), a borrower with FFEL loans only, in an in-school period at a school participating in the Direct Loan program is eligible to consolidate these loans into the Direct Loan program.

*New Regulations:* To implement the HERA, section 682.209(a)(5) of the FFEL regulations has been removed. FFEL Stafford Loan borrowers may no longer request to enter repayment early on their loans. Section 685.220(d)(1)(ii)(A) of the Direct Loan regulations has been removed so that Direct Stafford Loan borrowers are no longer able to consolidate while in an in-school status.

*Reasons:* The regulations were modified to reflect the changes made by the HERA to the HEA.

### Teacher Loan Forgiveness (§§ 682.215 and 685.217)

*Statute:* Section 8013(c) of the HERA eliminated the previous termination date of October 1, 2005, for the increased teacher loan forgiveness

amounts of up to $17,500 for highly-qualified teachers in certain specialties as originally provided under the Taxpayer-Teacher Protection Act of 2004 (TTPA). In addition, the HERA established an alternative method for teachers in private non-profit schools to qualify for the same forgiveness benefits as "highly qualified" teachers in public schools.

*Current Regulations:* Sections 682.215 and 685.217 of the FFEL and Direct Loan Program regulations, respectively, do not reflect the eligibility requirements for teacher loan forgiveness established in the TTPA, the increased loan forgiveness amount that are available for certain teachers, or the alternative method for teachers in private, non-profit schools to qualify for teacher loan forgiveness.

*New Regulations:* Sections 682.215 and 685.217 continue to reflect the original eligibility requirements for teacher loan forgiveness, and have been amended to reflect the eligibility requirements, and increased forgiveness amounts, established by the TTPA and the HERA.

A borrower whose five, consecutive, complete years of qualifying teaching service began before October 30, 2004 may qualify for up to $5,000 of teacher loan forgiveness under the original eligibility criteria for teacher loan forgiveness.

"Highly qualified" teachers whose teaching service begins on or after October 30, 2004 may qualify for forgiveness of up to:

• $5,000 if the borrower taught full-time in an eligible elementary or secondary school;

• $17,500 if the borrower taught mathematics or science on a full-time basis in an eligible secondary school;

• $17,500 if the borrower taught as a special education teacher on a full-time basis, the borrower's primary responsibility was to provide special education to children with disabilities in either an eligible elementary or secondary school, if the borrower's special education training corresponded to the children's disabilities and the borrower demonstrated knowledge and teaching skills in the content areas of the elementary or secondary school curriculum that the borrower is teaching.

*Highly qualified* teachers whose teaching service began before October 30, 2004, may also qualify for $17,500 of loan forgiveness if they meet the applicable eligibility requirements. To qualify for loan forgiveness based on being a "highly qualified" teacher, the borrower must have been a "highly

qualified" teacher for each of the five consecutive years of teaching service.

Teachers in private, non-profit schools who are exempt from State certification requirements may qualify for the same forgiveness benefits as "highly qualified" public school teachers, if the private school teacher is otherwise eligible for teacher loan forgiveness and:

• The private school teacher is permitted to and does satisfy rigorous subject knowledge and skills tests by taking competency tests in applicable grade levels and subject areas;

• The competency tests taken by the private school teacher are recognized by five or more States for the purposes of fulfilling the highly qualified teacher requirements of the Elementary and Secondary Education Act of 1965, as amended; and

• The private school teacher achieves a score on each test that equals or exceeds the average passing score for those five States.

*Reasons:* These regulations are amended to reflect changes made by the TTPA and the HERA.

*Loan Discharge for False Certification as a Result of Identity Theft (§§ 682.402 and 685.215)*

*Statute:* Section 8012 of the HERA amended section 437(c) of the HEA to authorize a discharge of a FFEL or Direct Loan Program loan if the borrower's eligibility to borrow was falsely certified because the borrower was a victim of the crime of identity theft. This change is effective July 1, 2006.

*Current Regulations:* FFEL and Direct Loan Program regulations in §§ 682.402 and 685.215 do not explicitly authorize the discharge of a FFEL or Direct Loan Program loan if the borrower's eligibility was falsely certified because the borrower was the victim of the crime of identity theft.

*New Regulations:* Sections 682.402 and 685.215 of the FFEL and Direct Loan Program regulations, respectively, have been amended to authorize a discharge of an FFEL or Direct Loan Program loan if the borrower's eligibility to receive the loan was falsely certified because the borrower was a victim of the crime of identity theft. The interim final regulations provide that the borrower's obligation is discharged if the borrower provides the holder of a loan, or the Secretary in the case of a Direct Loan, with a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is the named borrower of the loan was the victim of the crime of identity theft, and the borrower

demonstrates that the loan in question was made as a result of that identity theft. Discharge relief is available to the victim of the proven crime of identity theft, whether or not the prosecution was based on, or expressly referred to, the loan in question. If the conviction or judgment did not expressly reference that loan, the individual must provide authentic examples of his or her other identification credentials, and an explanation of facts that demonstrate that this criminal conduct resulted in the school certifying that individual's eligibility to borrow, and, as a result, in the loan being made.

In addition, because the statute authorizes discharge for individuals who are *victims* of the crime of identity theft, the interim final regulations provides relief only to individuals who did not knowingly accept the benefit of the falsely-certified loan, and require individuals who claim relief to certify that they did not, with knowledge that the loan had been made, receive or accept the benefits of the loan.

Where discharge relief is provided to an injured borrower, or where a borrower receives FFEL benefits based on providing false or erroneous information, the HEA and the current regulations generally require the Secretary and the guarantor, as applicable, to pursue claims against the responsible party. Approval of an identity theft discharge claim will rest on a judicial determination that a named individual committed the crime of identity theft and at very least a presentation by the victim of a persuasive statement showing that the identified perpetrator was responsible for the loan obligation. The Secretary interprets the enforcement language in section 437 of the HEA to include enforcement action against the identified perpetrator of the identity theft.

By adding this discharge authority, the Secretary in no way suggests that unless a crime of identity theft has been successfully prosecuted, individuals are liable for a loan for which they did not execute or authorize another to execute a promissory note, from which they received no benefits, and which they have not ratified by later conduct. To the contrary, a person is ordinarily not liable on an instrument, such as a promissory note or check, unless that person signed that instrument or authorized another to sign on his or her behalf. Section 682.402(e)(1)(i)(B) of the FFEL Program regulations provide that FFEL program benefits are payable to the holder of the loan only where the lender obtained a legally-enforceable promissory note to evidence the loan,

B0270241

and § 682.406(a)(1) provides that reinsurance may be received only with respect to a claim on a legally-enforceable loan. Because a forged promissory note is not an enforceable obligation of the named borrower, FFEL Program benefits can not lawfully be claimed on a loan evidenced by such a note, absent conduct by the individual named as borrower that applicable law would regard as a ratification of knowing acceptance of the loan by the individual.[1] In § 682.402(e)(1)(i)(B) of the FFEL Program regulations that implement the discharge authority in section 437(c) of the HEA for false certification of eligibility to borrow, the Secretary carved out a narrow exception to this rule to authorize both discharge relief to individuals named as borrowers and reimbursement to the loan holders if the loan application or promissory note had been forged by the school. No regulation grants relief to those individuals who demonstrate that their signatures were forged on the note, but who cannot credibly assert that the forger was a person affiliated with the school, because that relief is already available for those individuals under the common law (and in many instances, State law) defense of forgery. That defense has applied to FFEL Program loans as to any other contracts, and therefore no regulations were needed, or are now needed, to create relief from liability on a forged FFEL Program note.

Moreover, the rights of the lender, and any subsequent holder, have always been subject to the obligation of the lender to exercise due diligence in making the loan in accordance with § 682.206(a)(2). A lender whose employee or agent either committed the crime of identity theft of that individual, or knew at the time the loan was made of the identity theft of that individual, has not relied in good faith on representations made by the borrower or the school in the loan application process, and is not held harmless under FFEL Program regulations from the consequences of the making of a loan that is not legally enforceable against the individual named as borrower. In this instance, as with forged or unauthorized endorsements on disbursement instruments or authorizations, the holders of the loan must refund to the Secretary any FFEL Program benefits received on that loan.

*Reasons:* The regulations are amended to reflect changes made by the HERA.

---

[1] The Department applied this same principle in DCL 93–L–156, July 1993, with respect to FFEL Program loans disbursed by checks on which the borrower's endorsement had been forged.

*Loan Rehabilitation Agreement (§§ 682.405 and 685.211)*

*Statute:* Section 8014(h) of the HERA amended section 428F(a) of the HEA to modify the requirements for a borrower to rehabilitate a defaulted loan under the FFEL and Direct Loan Programs. Under the HERA, a borrower will only need to make nine payments within 20 days of the due date during a period of 10 consecutive months to rehabilitate a defaulted loan(s). This change does not apply to the Federal Perkins Loan Program.

*Current Regulations:* Current regulations require a defaulted FFEL or Direct Loan borrower to make 12 consecutive monthly payments on the defaulted loan to rehabilitate the loan.

*New Regulations:* Sections 682.405 and 685.211 of the FFEL and Direct Loan Program regulations, respectively, have been amended to provide that a borrower meets the requirements for rehabilitation if that borrower makes at least nine of the ten payments required under a monthly repayment, if each payment is received within 20 days of the scheduled due date for that payment, and notwithstanding the 20-day grace period otherwise applicable, if all nine of those payments are received within a period of no more than 10 consecutive calendar months that begins no earlier than the first scheduled due date of the nine payments and ends no later than the scheduled due date in the tenth month following that first due date. This change is effective on July 1, 2006. For a loan rehabilitation agreement that began prior to July 1, 2006, a guaranty agency may consider the borrower to have met the new rehabilitation standard if at least one of the borrower's payments is due to be made on or after July 1, 2006, even if that payment is received prior to July 1, 2006, but within 20 days of the required due date in July. The guaranty agency must treat all borrowers in this situation equally. On defaulted loans held by the Department, we will consider the borrower to have met the new rehabilitation standards if the borrower makes payments as required under the existing agreement, and at least one of the nine payments made by the borrower was due on or after July 1, 2006, even if that specific payment was received prior to July 1, 2006, but within 20 days of the July due date.

*Reasons:* These regulations are amended to reflect changes made by the HERA.

FFEL Program Changes

*Single Holder Rule (§§ 682.102 and 682.201)*

*Statute:* Section 7015 of The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 (Pub. L. 109–234) amended section 428C(b)(1)(A) of the HEA by repealing the single holder rule with respect to any FFEL Consolidation Loan for which an application is received by an eligible lender on or after June 15, 2006. The single holder rule required that a borrower with FFEL loans held by a single lender could only consolidate his or her loans with that lender.

*Current Regulations:* Sections 682.102(d) and 682.201(d) provide that a borrower who is applying for a Consolidation Loan must certify that the lender making the Consolidation Loan holds at least one outstanding loan that is being consolidated unless the borrower has multiple holders of FFEL Program loans, or the borrower's single loan holder declines to make a Consolidation Loan, or declines to make one with income-sensitive repayment terms.

*New Regulations:* Sections 682.102(d) and 682.201(d) have been amended to remove these requirements.

*Reasons:* The interim final regulations are necessary to reflect the changes made to the HEA by The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006.

*Federal Default Fee (§§ 682.202, 682.401 and 682.419)*

*Statute:* Effective for loans guaranteed on or after July 1, 2006, section 8014 of the HERA amended section 428(b)(1)(H) of the HEA to eliminate the optional 1 percent insurance premium fee that guaranty agencies could charge to lenders and that lenders could charge to borrowers and establishes a Federal default fee equal to 1 percent of the principal amount of the loan. The default fee must be collected by the guaranty agency and deposited into the Federal Fund held by a guaranty agency under section 422A of the HEA. The default fee may be deducted and collected by the lender from the proceeds of the loan and paid to the guaranty agency or paid from other non-Federal sources. If the fee is charged to the borrower, it must be deducted proportionally from each disbursement of the loan proceeds.

A guaranty agency must ensure that the proceeds of the Federal default fee will not be used for incentive payments

Confidential

to lenders. The Secretary is prohibited from waiving these provisions for guaranty agencies that have Voluntary Flexible Agreements under section 428A of the HEA.

*Current Regulations:* Section § 682.401(b)(10) of the current regulations provides that a guaranty agency may charge the lender an insurance premium equal to 1 percent of the principal balance of each Stafford, SLS, or PLUS loan it guarantees. Under § 682.202(d) of the current regulations, a lender may pass the cost of the insurance premium along to the borrower by deducting the amount of the premium from the borrower's loan proceeds. Section 682.419(b) requires the guaranty agency to deposit into its Federal Fund the total amount of insurance premiums collected from lenders.

*New Regulations:* Section 682.401(b)(10) has been amended to reflect that insurance premiums will no longer be charged on Stafford or PLUS loans guaranteed on or after July 1, 2006. The regulations have been amended to reflect the new requirement for a Federal default fee. In accordance with the HERA, the interim final regulations require, for loans guaranteed on or after July 1, 2006, that the guaranty agency must collect, from the borrower or from any non-Federal source, a Federal default fee equal to one percent of the principal amount of the loan. The guaranty agency must deposit the proceeds of the default fee into its Federal Fund and ensure that the proceeds of such fees are not used for incentive payments to lenders. Section 682.202 has also been amended to provide that a lender may pass the cost of the Federal default fee along to the borrower. If the borrower is charged the Federal default fee, the amount of the default fee must be deducted proportionately from each disbursement of the loan. The lender or guaranty agency may also use other non-Federal sources to pay the default fee that must be deposited into the agency's Federal Fund.

Section 682.419, which regulates the guaranty agency Federal Fund, has also been amended to require the guaranty agencies to deposit Federal default fees into the Federal Fund and to use assets of the Federal Fund as those assets relate to the Federal default fee only as directed.

*Reasons:* The regulations are modified to reflect the change made by the HERA.

*Loan Disbursement Through an Escrow Agent (§§ 682.207 and 682.408)*

*Statute:* Section 8014(j) of the HERA amended section 428(i)(1) of the HEA to

reduce the amount of time before disbursement to the borrower that a lender may transfer loan funds to an escrow agent. Under the HERA, a lender may now transfer funds to the escrow agent no more than 10 days prior to the date the funds are disbursed to the borrower.

*Current Regulations:* The current regulations permit lenders to transfer funds to an escrow agent no more than 21 days prior to the date the funds are disbursed to the borrower.

*New Regulations:* The regulations in §§ 682.207(b)(1)(iv) and 682.408(c) have been amended to permit lenders to transfer funds to an escrow agent no more than 10 days prior to the date the funds are disbursed to the borrower.

*Reasons:* The regulations were modified to reflect the changes made by the HERA to the HEA in reducing this time period.

*Due Diligence in Disbursing a Loan (§§ 682.207 and 682.604)*

*Statute:* Section 8008 of the HERA amended section 428(b)(1)(N) of the HEA to provide that, for U.S. students attending an eligible foreign school, FFEL Stafford Program loans will be disbursed directly to the borrower only if the foreign school requests this method. Prior to the change, a disbursement could be made directly to a student enrolled in a foreign school at the request of the student. No change was made to the requirement that a disbursement be made directly to a student enrolled in a study-abroad program that is approved for credit by the student's home institution upon the request of the student. However, for both borrowers enrolled at a foreign school and borrowers enrolled in a study-abroad program, section 8008 of the HERA specifies that a lender or guaranty agency must verify the borrower's enrollment at the foreign school before making a disbursement of FFEL Stafford funds directly to a borrower. Under section 428B of the HEA, a lender may not make a disbursement of PLUS loans (including loan funds for graduate and professional student PLUS borrowers) directly to the borrower. These changes are effective for loans first disbursed on or after July 1, 2006.

*Current Regulations:* The current regulations in § 682.207(b)(1)(v)(C) and (D) provide that, for both students enrolled in an eligible foreign school and students enrolled in a study-abroad program, FFEL Program loans are disbursed directly to the borrower by the lender only upon the request of the student. Section 682.207(b)(1)(v)(E) requires a lender to notify the foreign

school when the lender makes a disbursement directly to a student enrolled at the foreign school.

*New Regulations:* Section 682.207 has been amended to reflect the statutory change that provides that a lender may disburse FFEL Stafford Loan funds directly to a U.S. student attending an eligible foreign school only if the school requests this method. Without a request from the school, lenders must disburse loan funds directly to an office of the foreign school designated by the school to receive them. A foreign school may make a single request to a lender to disburse all FFEL Stafford Loans directly to eligible students who attend the foreign school.

In addition, the interim final regulations incorporate the HERA change that provides that a lender may not make a direct disbursement to a borrower enrolled at a foreign school or in a study-abroad program until the lender or guaranty agency verifies the borrower's enrollment at the foreign school. A guaranty agency or lender must verify enrollment before each disbursement, including second and subsequent disbursements, of a Stafford loan. If the lender or guaranty agency has verified a borrower's enrollment, the lender must honor the student's or school's request, as appropriate, that a direct disbursement be made. As foreign schools may not participate in the Direct Loan Program and Direct Loan funds are disbursed to the borrower in a study-abroad program directly by the school, these provisions are not applicable to the Direct Loan Program.

In new paragraph 682.207(b)(2) we have listed the requirements a lender or guaranty agency must follow to verify a student's enrollment at a foreign school or enrollment in a study-abroad program. These requirements are based on the guaranty agency program requirements in Dear Colleague Letter (DCL) G–03–348 (August 2003). To verify enrollment in a foreign school, a guaranty agency must confirm that the foreign school the student is to attend is currently certified to participate in the FFEL Program. To do this, the guaranty agency must access the Department's Postsecondary Education Participants System (PEPS) Database. As noted in DCL G–03–348, schools that have an eligibility status of "Eligible/Loan Deferment" and a certification status of "Not Certified" in the PEPS Database are eligible for FFEL loan deferment purposes only. They are not certified to participate in the FFEL programs and students attending those schools are not eligible to receive FFEL program funds.

After confirming that a school is certified to participate in the FFEL

B0270243

Program, the lender or guaranty agency must contact the foreign school by telephone or e-mail to verify the borrower's enrollment at the school.

The interim final regulations have different standards for verifying enrollment at a foreign school for a new student and for verifying enrollment for a continuing student. For a new student, the lender or guaranty agency must verify that the student has been admitted to the foreign school. For a continuing student, the lender or guaranty agency must verify that the student is still enrolled as "enrolled" is defined in 34 CFR 668.2. Specifically, the lender or guaranty agency must confirm that the student is admitted/enrolled for the period for which the loan is intended at the enrollment status for which the loan was certified. Finally, the lender or guaranty agency must document the student's file with information on the contact.

Similarly, for a student enrolled in a study-abroad program, the lender or guaranty agency must contact the home institution by telephone or e-mail to confirm the student's admission to the program, for a new student, or continuing enrollment in the program, for a continuing student, for the period for which the loan is intended at the enrollment status for which the loan was certified.

Guaranty agencies and lenders must coordinate their activities to ensure that the requirements for verifying the borrower's enrollment are met before any disbursement may be made.

New paragraph § 682.604(b) also incorporates the requirements formerly found in § 682.207(b)(1)(v)(E) for lender notification to the foreign school when the lender makes a direct disbursement to a student enrolled at a foreign school. The interim final regulations now require lenders to notify the school when the lender makes a disbursement directly to a student enrolled in a study-abroad program. In the case of a student enrolled in a study-abroad program, the lender must notify the home institution when the lender makes the disbursement directly to the student. Section 682.604(b)(1) is amended to require that, upon receipt of such a notice, a foreign school, or the home institution for a student enrolled in a study-abroad program, must immediately notify the lender if the student is no longer eligible to receive the disbursement.

*Reasons:* These changes are made to implement the provisions of the HERA. To ensure proper implementation of the statutory changes, the interim final regulations include procedures issued in DCL G–03–348.

In the past, the Department's Office of the Inspector General and the Government Accountability Office have found that FFEL funds have been disbursed directly to students for attendance at foreign schools that either did not exist, or that were not participating in the FFEL Programs. To avoid this problem in the future, verification of a student's enrollment at a foreign school must include confirmation of the foreign school's certification to participate in the FFEL Programs, as currently required by DCL G–03–348.

As a lender may still make an FFEL disbursement directly to a student in a study-abroad program at the student's request, these regulations require that the lender or guaranty agency confirm the student's enrollment in a study-abroad program with the student's home institution prior to any disbursement of funds.

Finally, for consistency in the verification of enrollment procedures, we have extended the requirement that a lender notify a foreign school when the lender makes a direct disbursement to a student enrolled at the foreign school, to require the lender to notify the home institution when it makes a direct disbursement to a student enrolled in a study-abroad program. The change to § 682.604(b)(1) is made to make clear that an institution that is notified by the lender of a disbursement directly to a borrower must inform the lender if the student is no longer eligible. Under § 682.610(c)(2), an institution is already required to notify a guaranty agency or lender if it discovers that a loan has been made to or on behalf of a student who enrolled at that school, but who has ceased to be enrolled on at least a half-time basis. However, § 682.610(c) refers to the submission of such information in terms of the submission of student status confirmation reports (SSCRs). The new requirement makes clear that all institutions, including those that now report data through the Department's National Student Loan Data System instead of SSCRs, must respond to a lender's notification of a direct disbursement if the student is no longer eligible.

Forbearance (§ 682.211)

*Statute:* Section 8014(e) of the HERA amended section 428(c)(3) of the HEA to require that lenders confirm any non-written forbearance agreement by recording the terms of the agreement in the borrower's file.

*Current Regulations:* The current regulations state that a lender may grant forbearance if the lender and the borrower or endorser agree to the terms of the forbearance and, unless the agreement was in writing, the lender sends, within 30 days, a notice to the borrower or endorser confirming the terms of the forbearance.

*New Regulations:* Section 682.211(b)(1) of the FFEL Program regulations has been amended to require a lender to record the terms of the forbearance in the borrower's file. This change is effective for agreements entered into or renegotiated with a borrower on or after July 1, 2006.

*Reasons:* The regulations are modified to reflect the change made by the HERA.

Loans Disbursed Through an Escrow Agent (§ 682.300)

*Statute:* Section 8014(j) of the HERA amended section 428(a)(3)(A) of the HEA to provide that a lender may first receive interest subsidy payments on loans disbursed by an escrow agent on behalf of the lender three days prior to the first day of the period of enrollment, or if the loan is disbursed after the first day of the period of enrollment, three days after disbursement.

*Current Regulations:* Current regulations do not include specific rules for interest subsidy payments on loans disbursed by an escrow agent.

*New Regulations:* Section 682.300(c)(3) has been amended to provide for the payment of interest subsidies on loans disbursed through an escrow agent no sooner than three days prior to the first day of the period of enrollment or, if the loan is disbursed after the first day of the period of enrollment, three days after disbursement.

*Reasons:* The regulations are modified to reflect the change made by the HERA.

*Special Allowance Rates for Loans First Disbursed on or After January 1, 2000 (§ 682.302)*

*Statute:* Prior to enactment of the HERA, section 438(b)(2)(I)(v) of the HEA provided that special allowance payments (SAPs) were not paid to lenders for any PLUS loans that were first disbursed on or after January 1, 2000, unless a calculation using the bond equivalent rates of certain 3-month commercial paper (financial) plus a spread of 3.1 percent, exceeded 9.0 percent. This provision of the HEA has been struck by the HERA effective April 1, 2006, for claims that accrued on or after that date.

*Current Regulations:* Current regulations do not reflect the changes made by the HERA.

*New Regulations:* Section 682.302(c) of the regulations has been amended to reflect the changes made by the HERA

Confidential

B0270244

regarding special allowance to provide for a special allowance payment on PLUS loans that were first disbursed on or after January 1, 2000 beginning with payments made after July 1, 2006. This change acknowledges that lenders began earning special allowance payments April 1, 2006.

*Reasons:* The regulations are modified to reflect the changes made by the HERA.

*Special Allowance Payments on Loans Funded by Tax-Exempt Obligations (§ 682.302)*

*Statute:* Effective on February 8, 2006, the HERA made the special allowance payment provisions of the Taxpayer-Teacher Protection Act of 2004 (TTPA) permanent by eliminating its January 1, 2006 sunset provisions. The TTPA provided that upon the occurrence of specified events after September 30, 2004 and before January 1, 2006, the special allowance paid on loans made or purchased with funds from particular sources derived by the holder from tax-exempt obligations originally issued prior to October 1, 1993, would revert to the usual rates paid on other loans, instead of the otherwise applicable rate of not less than 9.5 percent minus the applicable interest rate. This change affected loans that had qualified for the minimum 9.5 percent special allowance rate, but were:

1. Financed by a tax-exempt obligation that, after September 30, 2004, and before January 1, 2006, has matured or been refunded, retired or defeased;

2. Refinanced after September 30, 2004, and before January 1, 2006, with funds obtained from a source other than those described in section 438(b)(2)(B)(v)(I) of the HEA; or

3. Sold or transferred to any other holder after September 30, 2004, and before January 1, 2006.

The HERA eliminated the ending dates on these limitations. In addition, the HERA added two provisions that prohibit a loan from acquiring eligibility for the 9.5 percent minimum special allowance rates under 438(b)(2)(B) of the HEA. These new provisions state that special allowance is computed at the normal, rather than the 9.5 percent minimum return rate for any loan:

• Made or purchased on or after February 8, 2006 (the date of enactment of the HERA); or

• Not earning on February 8, 2006 a quarterly rate of special allowance determined under section 438(b)(2)(B)(i) or (ii) of the HEA.

The HERA delays these new requirements for certain holders by providing that they take effect later—

substituting "December 31, 2010," for February 8, 2006—for a holder that:

• Was, as of February 8, 2006, and during the quarter for which the special allowance is paid, a unit of State or local government or a nonprofit private entity;

• Was, as of February 8, 2006, and during such quarter, not owned or controlled by, or under common ownership or control with, a for-profit entity; and

• Held, directly or through any subsidiary, affiliate, or trustee, a total unpaid balance of principal equal to or less than $100 million on loans for which special allowances were paid under section 438(b)(2)(B) of the HEA in the most recent quarterly payment prior to September 30, 2005.

*Current Regulations:* Current regulations in § 682.302(c)(3) provide that special allowance rates for loans that were made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued prior to October 1, 1993, or from other sources listed there that were derived from those bond proceeds, receive a special allowance at a rate that is generally one-half of the rate established for other loans, but not less than 9.5 percent minus the applicable interest rate on such loans and, in § 682.302(e), that the issuer of such obligations receives special allowance payments on these loans at the usual rate if the issuer retires the tax-exempt obligation or defeases it by means of yield-restricted obligations. Current regulations refer to obligations "originally issued" before or after specified dates, but do not define that term, which derives directly from section 438(b)(2)(B) of the HEA. Current regulations do not incorporate the Department's interpretation of the term "originally issued" nor do they incorporate the Department's longstanding interpretation of the statute and regulations as applicable to the treatment of loans acquired from the tax-exempt funding sources listed in the statute and in § 682.302(c)(3)(i), if the "originally issued" obligation is later refunded by a tax-exempt refunding obligation.

*New Regulations:* Section 682.302(e) has been amended and new paragraph § 682.302(f) has been added to reflect the provisions of the HERA and, as pertinent, of the TTPA as described above and the Department's interpretation of terms found in current regulations as necessary for the proper implementation of provisions added by the HERA and TTPA. In addition, § 682.302(c) has been amended to incorporate the various statutory

changes in special allowance rate calculations.

*Reasons:* The regulations are modified to reflect the changes made by the HERA, and as necessary to reflect those changes, the changes made by the TTPA and the interpretations by the Department of terms found in current regulations affected by those enactments.

*Interest Repayment From Lenders (§ 682.305)*

*Statute:* Section 8006(b) of the HERA amended section 438(b)(2)(C)(v) of the HEA to require payment by the lender of excess interest received by the lender when the applicable interest rate on a loan for any quarter exceeds the special allowance support level for the loan.

Under the HERA, excess interest is calculated each quarter by subtracting the "special allowance support level" from the applicable interest, multiplying the result by the average daily principal balance of the loan (not including unearned interest added to principal) during the quarter, and dividing by four.

*Current Regulations:* Current regulations do not provide for the recapture of excess interest by the Secretary.

*New Regulations:* Section 682.305 of the regulations has been amended by adding a new paragraph (d) that provides for the recovery of excess interest from a lender in accordance with the provisions added by the HERA.

Section 682.305(d) requires the payment by a lender of excess interest when the applicable interest rate on a loan for any quarter exceeds the special allowance support level for the loan. This requirement applies to loans for which the first disbursement of principal is made on or after April 1, 2006, but does not apply with respect to any special allowance payment made under section 438 of the HEA before April 1, 2006. The Secretary will collect the excess interest from lenders quarterly.

The interim final regulations require that excess interest is calculated each quarter by subtracting the special allowance support level from the applicable interest rate, multiplying the result by the average daily principal balance of the loan (not including unearned interest added to principal) during the quarter and dividing by four. For example, if the average daily principal balance of a loan was $1,000, and the applicable interest rate and special allowance support level were 6.8 percent and 5.8 percent, respectively, the excess interest to be rebated would be: $1,000 × 1.0 percent/4 = $2.50.

Confidential

*Reasons:* The regulations are modified to reflect the changes made by the HERA.

Lender Insurance (§ 682.401)

*Statute:* Section 8014(a) of the HERA amended section 428(b)(1)(G) of the HEA to require a guaranty agency to reduce the amount of insurance to a lender to 97 percent of a loan's unpaid principal.

*Current Regulations:* Section 682.401(b)(14)(ii) of the FFEL Program regulations provides that a guaranty agency insures 98 percent of a loan's unpaid principal.

*New Regulations:* The regulations are amended by adding new paragraph § 682.401(b)(14)(iii) to require a guaranty agency to insure 97 percent of the unpaid principal balance on loans first disbursed on or after July 1, 2006.

*Reasons:* The regulations are modified to reflect the change made by the HERA.

*Default Collection (§ 682.401)*

*Statute:* Section 8014(d) of the HERA amended section 428(c) of the HEA to require each guaranty agency to ensure that consolidation loans are not an excessive proportion of the agency's recoveries on defaulted loans. In addition, under the HERA, if a borrower repays a defaulted loan through a Federal Consolidation Loan on or after October 1, 2006, a guaranty agency may not charge the borrower collection costs in an amount in excess of 18.5 percent of the outstanding principal and interest of the defaulted loan. Also on or after October 1, 2006, when returning proceeds to the Secretary from the consolidation of a defaulted loan, a guaranty agency that charged the borrower collection costs must remit an amount that equals the lesser of the actual collection costs charged or 8.5 percent of the outstanding principal and interest of the loan. On or after October 1, 2009, when returning proceeds to the Secretary from the consolidation of a defaulted loan that is paid off with excess consolidation proceeds, a guaranty agency must remit the entire collection cost charged. The HERA defines the term *excess consolidation proceeds* to mean, for any federal fiscal year beginning on or after October 1, 2009, the amount of proceeds from the consolidation of defaulted loans under the FFEL Program that exceed 45 percent of the agency's total collections on defaulted loans in that Federal fiscal year.

*Current Regulations:* Current regulations in § 682.401(b)(27) allow a guaranty agency to charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and

interest of a defaulted FFEL Program loan that is repaid by a Federal Consolidation loan. When returning the proceeds from the consolidation of a defaulted loan to the Secretary, a guaranty agency may retain only the actual amount of collection costs charged to the borrower on the loan repaid by the consolidation loan (which may not exceed 18.5 percent).

*New Regulations:* Section 682.401(b)(27) has been amended to reflect the new statutory requirements regarding the consolidation of defaulted FFEL loans and excess consolidation proceeds described above.

*Reasons:* The regulations are modified to reflect the changes made by the HERA.

*College Access Initiative (§ 682.401)*

*Statute:* Section 8023 of the HERA amended section 485D of the HEA to establish a new College Access Initiative. As part of the Initiative, each guaranty agency must establish a plan to promote access to postsecondary education. The HERA requires each guaranty agency to provide the Secretary and the public with information on access to a comprehensive listing of postsecondary education opportunities, programs and publications available in the State or States for which the agency is the designated guaranty agency. A guaranty agency must also promote and publicize information for students and traditionally underrepresented populations on how to plan, prepare and pay for college. The guaranty agency must pay for these activities from its Operating Fund or from remaining funds in restricted accounts established pursuant to section 422(h)(4) of the HEA. Finally, a guaranty agency must ensure that this information is free and available in printed format by November 5, 2006.

*Current Regulations:* Current regulations do not provide for the College Access Initiative.

*New Regulations:* Section 682.401 has been amended to reflect the requirements of the College Access Initiative.

*Reasons:* The regulations are modified to reflect the changes made by the HERA.

*Reinsurance Claims From Guaranty Agencies—Exempt Claims (§ 682.404)*

*Statute:* Section 8014(c) of the HERA amended section 428(c)(1) of the HEA to provide that, for loans on which the first disbursement of principal is made on or after July 1, 2006, a guaranty agency will receive 100 percent insurance from the Department for exempt claims under

new section 428(c)(1)(G) of the HEA. The statute defines the term *exempt claims* to mean claims with respect to loans for which it is determined that the borrower (or student on whose behalf a parent has borrowed), without the lender's or institution's knowledge at the time the loan was made, provided false or erroneous information or took actions that caused the borrower or the student to be ineligible for all or a portion of the loan or for interest benefits on the loan. The new statutory definition is the same definition used in § 682.412(a).

*Current Regulations:* Current regulations have addressed exempt claims in § 682.412(a). Under prior regulations these claims were paid the regular reinsurance percentage.

*New Regulations:* Section 682.404(a) has been amended to provide 100 percent reinsurance for exempt claims and to include the statutory definition of exempt claims.

*Reasons:* The regulations are modified to reflect the changes made by the HERA.

*Submission of Reinsurance Claims for Payment by the Secretary (§ 682.406)*

*Statute:* Section 8014(j) of the HERA amended section 428(c)(1) of the HEA by reducing the amount of time a guaranty agency is allowed for filing a reinsurance claim with the Department.

*Current Regulations:* The current regulations allow guaranty agencies 45 days following the date it paid a lender's claim to file a reinsurance claim with the Department.

*New Regulations:* The regulations in § 682.406(a) have been amended to allow guaranty agencies 30 days following the date a lender's claim has been paid to file a reinsurance claim with the Department.

*Reasons:* The regulations were modified to reflect the changes made by the HERA to the HEA in reducing this time period.

*Wage Garnishment (§ 682.410)*

*Statute:* Section 8024 of the HERA amended section 488A(a)(1) of the HEA to increase the amount of a borrower's disposable pay that can be garnished from 10 percent to 15 percent effective July 1, 2006.

*Current Regulations:* Currently, the regulations allow a borrower's disposable pay to be garnished at a rate of 10 percent.

*New Regulations:* Section 682.410(b)(9)(i)(A) has been amended to allow a borrower's wages to be garnished in an amount that does not exceed 15 percent of the borrower's disposable pay. If a guaranty agency

B0270246

decides to increase the withholding rate for a borrower already being garnished at the lesser rate based on a garnishment proceeding pre-dating July 1, 2006, the agency must notify the borrower that: (1) He or she can obtain a hearing upon request if he or she objects to the increased withholding amount on the basis of undue hardship; and (2) a borrower who has new information not presented at the initial garnishment hearing may request a reconsideration of the existence or amount of the debt.

In general, a guaranty agency must follow the procedures in § 682.410(h)(9) for sending notices to borrowers and employers and for scheduling a hearing for a borrower who chooses to have one.

*Reasons:* The regulations were revised to reflect changes made by the HERA.

*Exceptional Performers (§ 682.415)*

*Statute:* Section 8014 of the HERA amended section 428(I) of the HEA to decrease from 100 percent to 99 percent the insurance percentage paid to lenders or lender servicers who are designated as exceptional performers.

*Current Regulations:* Section 682.415(a)(1) of the FFEL Program regulations provides for reimbursement of 100 percent of the unpaid principal and interest.

*New Regulations:* Section 682.415(a)(1) is amended to provide for reimbursement to a loan holder of 99 percent of the unpaid principal and interest for default claims submitted to a guaranty agency on or after July 1, 2006.

*Reasons:* The regulations are modified to reflect the change made by the HERA.

*School as Lender (§ 682.601)*

*Statute:* Section 8011 of the HERA amends section 435(d)(2) of the HEA by replacing the existing school-as-lender requirements with a new set of requirements. In addition, to be a school lender, a school must have met the school-as-lender requirements as they existed on February 7, 2006 and must have made FFEL loans as a lender on or before April 1, 2006.

*Current Regulations:* Section 682.601 of the FFEL Program regulations reflects the school-as-lender requirements as they existed on February 7, 2006. The current regulations stipulate the requirements for establishing loan denial by a commercial lender, and the requirements for qualifying for a waiver of the 50 percent lending limit.

*New Regulations:* Section 682.601 is amended by replacing the existing school-as-lender requirements with the school-as-lender requirements established by the HERA. Under the new regulations, a school lender must

have met the requirements in effect as of February 7, 2006, and must have made loans on or before April 1, 2006. In addition, the school must not.

• Be a home study school;

• Make a loan to any undergraduate student;

• Make a loan other than Federal Stafford loan to a graduate or professional student; or

• Make a loan to a borrower who is not enrolled at the school.

The school must:

• Employ at least one person whose full-time responsibilities are limited to the administration of the programs of financial aid for students attending that school;

• Award any contract for financing, servicing, or administration of FFEL loans on a competitive basis;

• Offer loans with an origination fee and/or interest rate that is less than the applicable statutory fee or rate for any loan first disbursed on or after July 1, 2006;

• Maintain a cohort default rate that is not greater than 10 percent;

• Submit an annual lender compliance audit, in accordance with the requirements of 34 CFR 682.305(c)(2), to the Department for any fiscal year beginning on or after July 1, 2006, in which the school engages in activities as an eligible lender; and

• Use any special allowance payments, interest payments from borrowers, interest subsidy payments from the Department, and any proceeds from the sale or other disposition of loans (exclusive of return of principal, any financing costs incurred by the school to acquire funds to make the loans, and the cost of charging origination fees or interest rates at less than the fees or rates authorized under the HEA) for need-based grants. However, school lenders may use a portion of these payments or proceeds for reasonable and direct administrative expenses. Such expenses are those that are incurred by the school that are directly related to the school's performance of an administrative requirement in the FFEL Program, and do not include the cost the school pays to obtain funding, the cost of paying Federal default fees on behalf of borrowers, or the cost of providing origination fees or interest rates at less than the fee or rate authorized under the provisions of the Act.

• Funds for need-based grants must supplement, not supplant, non-federal funds the school would otherwise use for need-based grants.

Because schools may no longer make loans to undergraduate students, the requirements for establishing loan

denial from another lender and for qualifying for a waiver of the 50 percent lending limit on making loans to undergraduates have been removed from the regulations.

The HERA modified the existing requirements for audits of school lenders. The new requirements will apply to audits of lending activities for any fiscal year beginning on or after July 1, 2006. All school lenders are required to submit a lender compliance audit without regard to the amount of loans the lender makes or holds. The Department will be issuing further guidelines for the lender compliance audits that must be submitted by school lenders. School lenders subject to the Single Audit Act, 31 U.S.C. 7502, will be required to include the lending activities in the annual audit and to include information on those activities in the audit report. Other school lenders will have to arrange for a separate audit of their lending activities. School lenders must submit audits for fiscal years beginning before July 1, 2006, in accordance with current requirements.

*Reasons:* The regulations include rules for determining how schools may use the proceeds of loan making activities for need based grants and reasonable and direct administrative costs. These rules reflect the Secretary's interpretation of the new statutory language added by the HERA.

*Disbursement Exemptions for Foreign Schools (§ 682.604)*

*Statute:* Section 8010 of the HERA amended sections 428G(a)(3), (b)(1), and (e) of the HEA to end the exemption from the multiple disbursement requirements for eligible foreign institutions.

*Current Regulations:* Section 682.604(c) of the FFEL Program regulations reflects the previous statutory provision exempting eligible foreign institutions from the multiple disbursement requirements in section 428G of the HEA.

*New Regulations:* The regulations in § 682.604(c) have been amended to remove the exemption from the multiple disbursement requirements for eligible foreign institutions.

*Reasons:* The regulations were modified to reflect the changes made by the HERA to the HEA.

Direct Loan Program Changes

*Repayment Plans (§ 685.208)*

*Statute:* Section 8008(b) of the HERA amended section 455(d)(1) of the HEA to provide the same repayment plans in the Direct Loan program as in the FFEL program (except for income contingent repayment).

B0270247

**Federal Register** / Vol. 71, No. 153 / Wednesday, August 9, 2006 / Rules and Regulations      **45683**

*Current Regulations:* Section 685.208 of the Direct Loan Program regulations permits a Direct Loan borrower to choose between the standard, extended, graduated, income contingent, and if appropriate, an alternative repayment plan as determined by the Secretary. Implementation of the HERA does not require any changes to the standard, income contingent, or alternative repayment plan regulations.

Under the extended repayment plan, a borrower makes fixed monthly payments over a period of time that varies with the total amount of the borrower's loans. Under the graduated repayment plan a borrower makes payments at two or more levels within a period of time determined by the amount of the borrower's loans. The repayment schedule used for these two repayment plans is as follows. If the total amount of the borrower's Direct Loans is:

• Less than $10,000, the borrower must repay the loans within 12 years of entering repayment;

• Greater than or equal to $10,000 but less than $20,000, the borrower must repay the loans within 15 years of entering repayment;

• Greater than or equal to $20,000 but less than $40,000, the borrower must repay the loans within 20 years of entering repayment;

• Greater than or equal to $40,000 but less than $60,000, the borrower must repay the loans within 25 years of entering repayment; and

• Greater than or equal to $60,000, the borrower must repay the loans within 30 years of entering repayment.

*New Regulations:* Section 685.208 has been modified to conform the terms of the extended and graduated repayment plans offered in the Direct Loan program to reflect the similar repayment plans available in the FFEL Program. Under the graduated repayment plan a borrower is required to repay a loan in full over a fixed period of time not to exceed ten years. Borrowers with outstanding loans totaling more than $30,000 that had no outstanding principal or interest balances on a Direct Loan program loan as of October 7, 1998, or on the date the borrower obtains a Direct Loan program loan after October 7, 1998, are eligible for the extended repayment plan. Under this plan, borrowers are required to repay either a fixed annual or graduated repayment amount over a period of time not to exceed 25 years.

Changes were also made to the repayment plans available to Direct Consolidation Loan borrowers to reflect the terms of the similar repayment plans in the FFEL program. Under the revised

regulations, Direct Loan borrowers must repay their loans under the following schedule. If the sum of the amount of the consolidation loan and the unpaid balance on other student loans to the applicant:

• Is less than $7,500, the borrower must repay the consolidation loan in not more than 10 years;

• Is equal to or greater than $7,500 but less than $10,000, the borrower must repay the consolidation loan in not more than 12 years;

• Is equal to or greater than $10,000 but less than $20,000, the borrower must repay the consolidation loan in not more than 15 years;

• Is equal to or greater than $20,000 but less than $40,000, the borrower must repay the consolidation loan in not more than 20 years;

• Is equal to or greater than $40,000 but less than $60,000, the borrower must repay the consolidation loan in not more than 25 years; or

• Is equal to or greater than $60,000, the borrower must repay the consolidation loan in not more than 30 years.

Conforming amendments were also made to § 685.220(2)(i) regarding the repayment of Direct Consolidation loans.

*Reasons:* The regulations were modified to reflect the changes made to the HEA by the HERA.

*Eligibility of a FFEL Borrower for a Federal Direct Consolidation Loan (§§ 685.100 and 685.220)*

*Statute:* Section 8009 of the HERA amended section 428C(a)(3)(B)(i) of the HEA and added a provision providing limited eligibility for a Direct Consolidation Loan to certain FFEL Consolidation Loan borrowers.

*Current Regulations:* The current regulations allow borrowers with FFEL Consolidation Loans to obtain a Direct Consolidation Loan if they are unable to obtain a FFEL Consolidation Loan with income-sensitive repayment terms acceptable to the borrower.

*New Regulations:* The interim final regulations implement the HERA and modify §§ 685.100(c) and 685.220(d) to provide that a borrower with a FFEL Consolidation Loan is eligible to receive a Direct Consolidation Loan if the loan has been submitted to the guaranty agency by the lender for default aversion, and the borrower wants to consolidate the FFEL Consolidation Loan into the Direct Loan Program for the purpose of obtaining an income contingent repayment plan.

*Reasons:* The regulations were modified to reflect changes made by the HERA to the HEA.

*Federal Direct Consolidation Loans (§§ 685.102 and 685.220)*

*Statute:* Section 8009 of the HERA amended section 455(a) of the HEA to designate that Federal Direct Consolidation Loans have the same terms, conditions, and benefits as FFEL Consolidation Loans, except as otherwise provided in the HEA. Previously, the HEA did not require Federal Direct Consolidation Loans to have the same terms and conditions as FFEL Consolidation Loans.

*Current Regulations:* Under current regulations, the Federal Direct Consolidation Loan Program does not have the same terms, conditions and benefits as the FFEL Consolidation Loan Program.

*New Regulations:* To ensure that Direct Consolidation Loans and FFEL Consolidation Loans have the same terms, conditions and benefits (except as otherwise provided in the HEA), the definition of *Federal Direct Consolidation Loan Program* in § 685.102 has been revised. The prior regulations established three types of Direct Consolidation Loans. Under the interim final regulations, there is only a single Direct Consolidation Loan, but it may include up to three separate components representing subsidized, unsubsidized, and PLUS loans that were repaid by the consolidation loan. This more accurately reflects operational processes and is consistent with processes in the FFEL Program. We have also revised the definition to reflect that effective for consolidation applications received on or after July 1, 2006, a borrower may not consolidate loans that are in an in-school status. In addition, the regulations in § 685.220 have been changed to eliminate the provision that provided for an interest subsidy on Direct Subsidized Consolidation Loans during in-school and grace periods.

*Reasons:* The regulations were revised to reflect changes made by the HERA.

*Borrowers Subject to a Judgment or Wage Garnishment (§ 685.220)*

*Statute:* Section 8009 of the HERA amended section 455(a)(1), (2), and (g) of the HEA to conform the program borrower eligibility requirements and the terms of Federal Direct Consolidation loans to those of FFEL Consolidation loans.

*Current Regulations:* Generally, the borrower eligibility requirements for these two programs are similar. However, the Direct Consolidation Loan program has allowed borrowers to obtain a Direct Consolidation Loan while the borrower is in school. In addition, the two programs have had

B0270248

**45684**   **Federal Register** / Vol. 71, No. 153 / Wednesday, August 9, 2006 / Rules and Regulations

different rules for borrowers with loans on which a judgment has been obtained. The regulations for both programs also provide for certain situations in which a borrower may add loans to an existing consolidation loan or obtain a subsequent Consolidation Loan.

*New Regulations:* Section 685.220(d) of the Federal Direct Consolidation Loan regulations have been amended to reflect program borrower eligibility requirements that have been in the FFEL Program for loans on which a judgment has been obtained and for which wage garnishment has been initiated.

*Reasons:* The regulations were modified to reflect the changes made by the HERA.

*Reconsolidation in the Direct Loan Program (§ 685.220)*

*Statute:* Section 8009 of the HERA modified section 455(g) of the HEA to require borrowers seeking a Direct Consolidation Loan to meet the same eligibility criteria as borrowers seeking a FFEL Consolidation Loan. One of these criteria provides that an FFEL borrower's eligibility to consolidate is terminated upon receipt of a FFEL Consolidation loan, except that an individual who receives eligible student loans after the date of receipt of the consolidation loan may receive a subsequent consolidation loan.

*Current Regulations:* The current regulations permit Direct Loan borrowers to reconsolidate a Direct Consolidation loan into a new Direct Loan Consolidation loan without including any additional loans.

*New Regulations:* The regulations in § 685.220 have been modified by adding new paragraph (d)(2), which requires a Direct Loan borrower seeking to include an existing Direct Consolidation loan in a new Direct Consolidation loan to include at least one additional eligible loan for consolidation.

*Reasons:* The regulations were modified to reflect the changes made by the HERA to the HEA.

**Executive Order 12866**

*Regulatory Impact Analysis*

Under Executive Order 12866, the Secretary must determine whether this regulatory action is "significant" and therefore subject to the requirements of the Executive order and subject to review by the OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may (1) have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities in a material way (also referred to as an "economically significant" rule); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive order.

Pursuant to the terms of the Executive order, it has been determined this regulatory action will have an annual effect on the economy of more than $100 million. Therefore, this action is "economically significant" and subject to OMB review under section 3(f)(1) of Executive Order 12866. The Secretary accordingly has assessed the potential costs and benefits of this regulatory action and has determined the benefits justify the costs.

*Need for Federal Regulatory Action*

These interim final regulations are needed to implement provisions of the HERA that affect students, borrowers and program participants in the Federal student aid programs authorized under Title IV of the HEA.

These interim final regulations also implement provisions of the HERA that modify and make permanent the provisions of the Taxpayer-Teacher Protection Act of 2004 (Pub. L. 108–409). This Act changed the calculation of special allowance payments for certain FFEL Program loans made with proceeds of tax-exempt obligations and increased teacher loan forgiveness amounts for FFEL and Direct Loan borrowers teaching in certain areas.

These interim final regulations are also needed to incorporate into the regulations the provisions of Public Law 107–139, which changed the formula for calculating special allowance payments in the FFEL Program for loans made on or after July 1, 2000 and set interest rates for FFEL and Direct Loans first disbursed on or after July 1, 2006 at fixed interest rates.

These interim final regulations are also needed to implement the statutory changes made to the HEA by the Pell Grant Hurricane and Disaster Relief Act (Pub. L. 109–66) and the Student Grant Hurricane and Disaster Relief Act (Pub. L. 109–67). These laws authorize the Secretary to waive the requirement that a student repay a Title IV, HEA grant if the student withdrew from an institution because of a major disaster.

These interim final regulations also change the Department's regulations to reflect changes made to the HEA by the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Hurricane Recovery, 2006 (Pub. L. 109–234). The Supplemental Appropriations Act amended section 428C(b)(1)(A) of the HEA to eliminate the single holder rule with respect to any FFEL Consolidation Loan for which an application is received by an eligible lender on or after June 15, 2006. This Act also repealed section 8009(a)(2) of the HERA and added back to the HEA the previous statutory conditions under which a borrower may consolidate outstanding FFEL Program loans into the Federal Direct Consolidation Loan Program.

The Secretary has limited discretion in implementing most of the HERA provisions. The majority of the changes included in these interim final regulations simply modify the Department's regulations to reflect statutory changes made by the HERA and the other laws mentioned earlier. These statutory provisions are either already effective or will be effective shortly.

The Secretary has exercised limited discretion in implementing the HERA provisions in the following areas:

• *Direct Assessment:* The HERA extends eligibility for Title IV, HEA programs to instructional programs using or recognizing the use by others of direct assessment of student learning;

• *Identity Theft:* The HERA authorizes a discharge of a FFEL or Direct Loan Program loan if the borrower's eligibility to borrow was falsely certified because the borrower was a victim of the crime of identity theft; and

• *Special Allowance Payments:* The HERA modifies the conditions under which a loan holder qualifies for special allowance interest benefits related to PLUS loans the first disbursement of which was made on or after January 1, 2000.

The following section addresses the alternatives that the Secretary considered in implementing these discretionary portions of the HERA provisions.

*Regulatory Alternatives Considered*

*Direct Assessment Alternatives:* In developing the direct assessment regulations, the Secretary drew upon the Department's experience with Western Governors University (WGU), the only institution currently participating in the Title IV student financial assistance programs that uses direct assessment, in lieu of credit or clock hours, as a

Confidential

B0270249

measure of student learning. WGU became an eligible institution by participating in the Distance Education Demonstration Program.

The Secretary looked at how the Title IV student financial aid rules had been applied in both the nonterm and non-standard term models employed by WGU and identified basic principles on which to base the regulations. One principle is that institutions that use direct assessment would need to develop equivalencies in credit or clock hours in terms of instructional time for the amount of student learning being assessed. This was necessary because many applicable Title IV, HEA program requirements use time and/or credit or clock hours to measure things other than student learning. In addition, institutions would have to define enrollment status, payment periods, and satisfactory academic progress.

A second principle is tied to the statutory language that characterizes direct assessment programs as instructional programs. The Secretary determined that institutions must provide a means for students to fill in the gaps in their knowledge and that Title IV, HEA program funds should only be used to pay for learning that occurs while the student is enrolled in the program.

The Secretary considered what should constitute "instruction" in a direct assessment program. The word "instruction" is not specifically defined in the Department's regulations and, in its ordinary meaning the word connotes teaching. There are several other ways, however, in which an institution might assist students to prepare for assessments. The Secretary considered whether the definition of instructional time in § 668.8(b)(3), which is used for other types of programs, could be used for direct assessment programs and determined that the definition was not sufficiently broad to be used in this context.

The Secretary recognized that institutions offering direct assessment programs might use courses or learning materials developed by other entities, such as training and professional development organizations and other educational institutions, to assist students in preparing for the assessments. The Secretary considered whether the use of outside resources could be considered contracting out a portion of an educational program and determined that it could be. Therefore, the Secretary included in the direct assessment regulations a provision that exempts direct assessment programs from the limitations on contracting for part of an educational program.

*Identity Theft Alternatives:* Section 8012 of the HERA authorizes a discharge of a FFEL or Direct Loan Program loan under section 437(c) of the HEA if the eligibility of the borrower was falsely certified as a result of the crime of identity theft. In developing regulations to implement section 8012, we sought to reflect the statutory language that requires the Department to discharge the borrower's responsibility to repay the loan when a "crime of identity theft" has occurred. The interim final regulations require that to receive a discharge on a loan, an individual must provide the holder of the loan, a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is the named borrower of the loan was the victim of the crime of identity theft. We adopted this standard as an inexpensive and reliable way to implement the new discharge provision. If the perpetrator of an identity theft is never prosecuted, and no judicial determination that a crime occurred is rendered, a borrower can still be relieved of any responsibility to repay the loan under the common law (and in many instances, State law) defense of forgery. We stress this consideration in the preamble to the regulations.

One alternative we considered was to authorize a discharge for "identity theft" based on representations from the individual, much as is now done for closed school discharge relief, that the crime of identity theft had been committed, and that the claimant was the victim of that criminal act. We rejected this alternative as costly, unworkable, and unnecessary to provide relief to the individuals who may be victims of this crime. Under this alternative, the claimant and/or the lender would be required to submit evidence needed to establish whether conduct has occurred that would constitute the crime of identity theft. That evidence may be voluminous, difficult to obtain, and would likely include witness testimony. Amassing and transmitting that evidence would be difficult and costly for lenders and claimants. Furthermore, determining whether a crime has been committed requires discerning the identity of the perpetrator and determining the state of mind of that person. Neither the Department nor the guaranty agency is authorized to determine whether that evidence shows that a crime has been committed. That determination is routinely and reliably made through the judicial process, which is designed to perform this function. Moreover, there

is no need to ignore the judicial process in order to give relief to those individuals who did not in fact take out the loans for which they are listed as borrowers. Under State statutes and common law, individuals whose signatures have been forged on loan documents are not liable for those debts. Individuals who show that their signatures have been forged on loan documents, and that they neither authorized nor received a loan made in their name, are not held liable by the Department. For these reasons, we rejected the alternative that would entail an extra-judicial proof of a crime. Instead, we simply require the claimant to submit a copy of a judicial verdict that identity theft was committed.

*Special Allowance Payment Alternatives:* The Department considered a number of alternatives related to the effective date for implementation of Section 8006 of the HERA, which eliminates the limitation that special allowance payments on PLUS loans for which the first disbursement was made on or after January 1, 2000, only be paid if the formula for determining the borrower interest rate produces a rate that exceeds the statutory maximum borrower rate of 9 percent.

The first alternative was to make this provision retroactive to January 1, 2000, an approach that would result in substantial additional special allowance payments to many PLUS loan holders. Although this option was suggested by some members of the student loan industry, the Department determined that this approach was inconsistent with the statute.

Other alternatives considered reflected differing interpretations of the provision's effective date. Section 8006 states that "amendments made by this subsection shall not apply with respect to any special allowance payment made under section 438 of the Higher Education Act of 1965 (20 U.S.C. 1087–1) before April 1, 2006." Since special allowance payments are made on a quarterly basis, the Department had to determine whether the statute's intent was to remove the limitation on PLUS special allowance payments for the quarter of January–March 2006—the first quarter for which bills were submitted, verified, and paid after April 1, 2006 or for the quarter of April–July 2006, the first full quarter after the HERA's enactment. The Department estimated Federal costs would increase by $53 million if the limitation was removed for the January–March quarter. This estimate was based on data on special allowance rates and balances for the affected quarter. After a careful

Confidential

B0270250

review of the statutory language, the Department determined that the statute's likely intent was to remove the limitation for the January–March 2006 quarter, since this was the first quarter for which payments would be made after April 1, 2006. The interim final regulations reflect this determination.

*Benefits*

Given the breadth of these regulations, the discussion of benefits and costs will be limited in most cases to provisions with an economic impact of $100 million or more in any one year. By facilitating the implementation of changes made in the HERA and other recent student aid-related statutes, these interim final regulations will support the provision of a broad range of student benefits. In general, these benefits reduce the costs of higher education to students, increase the amount of Federal student aid or increase the number of students eligible for Federal student aid. The economic benefits of any specific change are difficult to discern, as they have direct benefit to the individual aid recipient and broader societal benefits resulting from the economic impact and tax-paying potential of a well-educated population. Research indicates that reductions in the cost of higher education are correlated to increased student enrollment, retention, and completion. The U.S. Census Bureau has found people with a bachelor's degree realize as much as 75 percent higher lifetime earnings than those whose education is limited to a high school degree. ("The Big Payoff: Educational Attainment and Synthetic Estimates of Work-Life Earnings," July 2002.)

Specific benefits provided to student borrowers in these interim final regulations include increases in certain FFEL and Direct Loan Program loan limits; reduced origination fees in the FFEL and Direct Loan Programs; broadened eligibility for PLUS loans to include graduate and professional students; expanded access to distance education programs; permanently expanded loan forgiveness for highly qualified math, science, and special education teachers at low-income schools; and a new deferment for FFEL, Direct Loan and Perkins Loan Program borrowers who serve on active duty military service during times of war or national emergency. These benefits are projected to increase Federal outlays by $5.2 billion for loans originated in FY 2006–2010. This estimate was developed using projected interest rate, loan volume, and borrower demographic data used in preparing the FY 2007 President's Budget. Projected

loan volume and borrower data are based on trend analyses of actual program activity, primarily drawn from the National Student Loan Data System (NSLDS) and other Department systems.

The expansion of distance education made possible by the regulation's changes to the "50 percent rule" and the definition of correspondence courses will allow institutions to more aggressively pursue new communication technologies to provide students significantly greater flexibility in the scheduling and location of academic programs. The Department estimates this expanded flexibility will increase the pool of students eligible for Federal student aid by 30,000 students a year in 2006 and 2007, of whom 17,000 per year will be eligible to receive a Pell Grant. These additional Pell Grant recipients will receive an estimated $196 million in Pell Grant aid over 2006–2010. This estimate is based on a trend analysis of Pell Grant program data and projections of institutional and program eligibility for Federal student aid derived through the use of accreditation data.

Lastly, the regulation's teacher loan forgiveness provisions offer incentives to help address longstanding national and regional elementary and secondary school staffing problems. Many studies (Boe, Bobbitt, & Cook, 1997; Grissmer & Kirby, 1992; Murnane et al., 1991; Rumberger, 1987; and extensive research prepared for the National Commission on Mathematics and Science Teaching) have found math, science, and special education to be fields with especially high turnover and those predicted most likely to suffer shortages. More than tripling the teacher loan forgiveness amount—from $5,000 to $17,500—for qualifying teachers in these fields should offer a powerful incentive for recruitment and retention, especially given the additional eligibility requirement that recipients teach for five consecutive years before receiving the benefit. The Department estimates this expanded benefit will increase Federal loan subsidy costs in the FFEL and Direct Loan programs by $825 million for loans originated in 2007–2010. (The additional benefits were available for loans made in 2006 as a result of the Taxpayer-Teacher Protection Act of 2004, so for the purposes of this analysis benefits have only been considered for 2007 and beyond.) This estimate was developed using projected interest rate, loan volume, and borrower demographic data used in preparing the FY 2007 President's Budget. Estimates of borrower eligibility were based on program data—primarily from NSLDS—

and demographic information from the National Center for Education Statistics' Schools and Staffing Survey.

In addition to implementing expanded borrower benefits, these interim final regulations also implement a number of provisions intended to improve the cost-effectiveness and efficiency of the FFEL and Direct Loan programs, streamline program operations for participating institutions, and standardize loan terms and conditions across the two programs. These changes are estimated to reduce Federal outlays by $7.0 billion for loans made in FY 2006–2010, freeing up resources for other urgent requirements. This estimate was also developed using projected interest rate, loan volume, and borrower demographic data used in preparing the FY 2007 President's Budget. Projected loan volume, guaranty agency and lender information, and borrower data are based on trend analyses of actual program activity, primarily drawn from the National Student Loan Data System (NSLDS) and other Department systems.

Provisions intended to enhance loan program efficiency include a number of changes intended to promote risk-sharing by FFEL participants through reduced program subsidies, including: Restrictions on higher-than-standard special allowance payments for loans funded through tax-exempt securities; provisions under which the Department will recover excess interest paid to loan holders when student interest payments exceed the special allowance level set in statute; and a reduction in loan holder's insurance against default from 98 percent to 97 percent of a loan's principle and accrued interest. Given the broad availability of FFEL program loans—over 4,000 lenders provided more than $43 billion in new loans and an additional $53 billion in consolidation loans in FY 2005—these changes are not expected to reduce student and parent access to loan capital.

The student loan industry features high competition among loan providers, using an array of interest rate discounts and other borrower benefits to attract volume. The overwhelming majority of student loans are sold by the originating lender in the secondary market. The impact on individual lenders of HERA provisions reducing Federal subsidies are inestimable; a substitution of subsidies for student interest rate cuts may occur or the secondary market price of securitized loans may be revalued. Given the high level of government guaranty on these loans, as well as the guaranteed rate of return, continued access to loan capital for all

B0270251

borrowers should be assured. The impact on individual loan holders may be mitigated by investment and tax considerations from their investment portfolios as a whole. Higher borrower loan limits and standardized repayment terms may increase long-term interest income to some loan holders under these regulations.

Lastly, the interim final regulations include a number of provisions intended to standardize terms and conditions and broaden borrower choices, particularly for consolidation loans. These changes include the repeal of the single holder rule, which limits the ability of FFEL borrowers whose loans are held by a single holder to consolidate with other lenders, and the standardization of graduated and extended repayment plans—previously different for Direct Loans and FFEL—on the FFEL model. The repeal of the single holder rule should give all borrowers access to interest rate discounts and other benefits available through the highly competitive consolidation loan market. The standardization of repayment plan terms will eliminate a possible source of confusion for borrowers and promote equity across the two loan programs. These provisions also are expected to improve market transparency and remove transaction barriers for loan borrowers, improving market openness and efficiency for both borrowers and loan providers.

### Costs

These interim final regulations include a number of provisions that will impose increased costs on some borrowers, such as an increase in the loan interest rate for FFEL PLUS borrowers, the elimination of in-school and joint consolidation loans, and the mandatory imposition of the previously optional 1 percent guaranty agency default insurance premium. (At the same time, these provisions will reduce the Federal costs of these programs and, in the case of the guaranty fee, improve the financial stability of guaranty agencies.) Prior to the HERA, these

provisions allowed loan providers or guaranty agencies to discriminate among borrowers through the unequal distribution of borrower costs. While some borrowers may lose unearned benefits through these statutory and regulatory changes, market equitability and transparency are improved.

These interim final regulations also authorize the Secretary to waive a student's Title IV grant repayment if the student withdrew from an institution of higher education because of a major disaster as declared by the President in accordance with the Robert T. Stafford Disaster Relief and Emergency Assistance Act. The Secretary will exercise this waiver authority on a case-by-case basis after determining that a major disaster has significantly affected recipients of Title IV grant aid.

Because entities affected by these regulations already participate in the Title IV, HEA programs, these lenders, guaranty agencies, and schools must have already established systems and procedures in place to meet program eligibility requirements. These regulations generally involve discrete changes in specific parameters associated with existing guidance—such as changes in origination fees, loan limits, or reinsurance percentages—rather than wholly new requirements. Accordingly, institutions wishing to continue to participate in the student aid programs have already absorbed most of the administrative costs related to implementing these interim final regulations. Marginal costs over this baseline are primarily related to one-time system changes that, while possibly significant in some cases, are an unavoidable cost of continued program participation. The Department is particularly interested in comments on possible administrative burdens related to these system or process changes.

### Assumptions, Limitations, and Data Sources

Because these interim final regulations largely restate statutory

requirements that would be self-implementing in the absence of regulatory action, cost estimates provided above reflect a prestatutory baseline in which the HERA and other statutory changes implemented in this regulation do not exist. In general, these estimates should be considered preliminary; they will be reevaluated in the final rule, based on comments received and additional program data that may be available at that time. Costs have been quantified for five years, as over time this has been a typical period between reauthorizations of the Higher Education Act.

In developing these estimates, a wide range of data sources were used, including the National Student Loan Data System, operational and financial data from Department of Education systems, and data from a range of surveys conducted by the National Center for Education Statistics such as the 2004 National Postsecondary Student Aid Survey, the 1994 National Education Longitudinal Study, and the 1996 Beginning Postsecondary Student Survey.

Elsewhere in this **SUPPLEMENTARY INFORMATION** section we identify and explain burdens specifically associated with information collection requirements. See the heading Paperwork Reduction Act of 1995.

### Accounting Statement

As required by OMB Circular A–4 (available at *http://www.Whitehouse.gov/omb/Circulars/a004/a–4.pdf*), in Table 2 below, we have prepared an accounting statement showing the classification of the expenditures associated with the provisions of these interim final regulations. This table provides our best estimate of the changes in Federal student aid payments as a result of these interim final regulations. Expenditures are classified as transfers to postsecondary students; savings are classified as transfers from program participants (lenders, guaranty agencies).

TABLE 2.—ACCOUNTING STATEMENT: CLASSIFICATION OF ESTIMATED EXPENDITURES

[In millions]

| Category | Transfers |
|---|---|
| Annualized Monetized Transfers ............................................ | $976. |
| From Whom To Whom? ............................................ | Federal Government To Postsecondary Students; Student Aid Program Participants to Federal Government. |

### Waiver of Proposed Rulemaking

Under the Administrative Procedure Act (5 U.S.C. 553), the Department is

generally required to publish a notice of proposed rulemaking and provide the public with an opportunity to comment on proposed regulations prior to issuing a final rule. In addition, all Department regulations for programs authorized

under title IV of the HEA are subject to the negotiated rulemaking requirements of section 492 of the HEA.[2] However, both the APA and HEA provide for exemptions from these rulemaking requirements. The APA provides that an agency is not required to conduct notice-and-comment rulemaking when the agency for good cause finds that notice and comment are impracticable, unnecessary or contrary to the public interest. Similarly, section 492 of the HEA provides that the Secretary is not required to conduct negotiated rulemaking for a title IV, HEA program regulation if the Secretary determines that applying that requirement is impracticable, unnecessary or contrary to the public interest within the meaning of the HEA.

Although these regulations are subject to the APA's notice-and-comment and the HEA's negotiated rulemaking requirements, the Secretary has determined that it is unnecessary and impracticable to either conduct negotiated rulemaking or notice-and-comment rulemaking on these regulations. Most of the changes made by the HERA were effective no later than July 1, 2006. To ensure proper implementation of these statutory changes. they need to be reflected in the Department's regulations. Waiver of rulemaking under the impracticability exemption in the APA and HEA is warranted because it would not be possible for the Department to comply with the APA's and HEA's rulemaking mandates and execute its statutory duties under the HERA.[3]

Even on an extremely expedited timeline, the Department could not have feasibly conduct negotiated or notice-and-comment rulemaking and then promulgated these regulations before the provisions of the HERA became effective on July 1, 2006. Negotiated rulemaking requires the Department to solicit nominations for negotiators to participate in the negotiated rulemaking sessions, select a committee of negotiators, conduct a series of negotiating sessions, publish a notice of

proposed rulemaking, review public comments. and issue final regulations. Normally this process would take at least 12 months and possibly longer. The Department cannot both implement the provisions in the HERA and conduct negotiated or notice-and-comment rulemaking.

In addition, most of the changes included in these regulations simply modify the Department's regulations to reflect statutory changes made by the HERA. These statutory provisions are either already effective or will be effective within a short period of time. The Secretary does not have discretion in implementing these changes. Thus, negotiated rulemaking and notice-and-comment rulemaking are unnecessary.

Other changes in these regulations make technical corrections, remove obsolete regulatory provisions or references or align related regulatory provisions as required by the HERA and other laws. These latter changes do not establish or affect substantive policy. Negotiated rulemaking and notice-and-comment rulemaking on these provisions is unnecessary.

Therefore, under 5 U.S.C. 553(b)(B), the Secretary has determined that conducting notice-and-comment rulemaking is unnecessary and impracticable. For the same reasons, the Secretary has determined, under section 492(b)(2) of the Higher Education Act of 1965, as amended, that these regulations should not be subject to negotiated rulemaking.

These regulations are final and in effect as published, thirty days after publication in the **Federal Register**. Although the Department is adopting these regulations on an interim final basis, the Department requests public comment on these regulations. After full consideration of public comments, the Secretary will publish final regulations with any necessary changes to be effective July 1, 2007.

As discussed above, all Department regulations for programs authorized under the title IV, HEA programs are subject to the negotiated rulemaking requirements of section 492 of the HEA. In addition, section 482 of the HEA requires that any title IV regulations that have not been published in final form by November 1 prior to the start of an award year cannot become effective until the beginning of the second award year following the November 1 date.

Therefore, the Secretary has determined that although it may be feasible to conduct notice-and-comment rulemaking for the regulations that would be effective July 1, 2007, it would be impracticable to conduct negotiated rulemaking to implement the provisions

of the HERA contained in these interim final regulations.

### Regulatory Flexibility Act Certification

The Secretary certifies that these regulations will not have a significant economic impact on a substantial number of small entities.

### Paperwork Reduction Act of 1995

Sections 600.7, 600.10, 668.3, 668.8, 668.10, 668.22, 668.173, 673.5, 674.34, 682.102, 682.200, 682.207, 682.209, 682.210, 682.211, 682.215, 682.305, 682.401, 682.402, 682.404, 682.405, 682.406, 682.410, 682.415, 682.601, 682.604, 685.102, 685.204, 685.208, 685.215, 685.217 and 685.220 contain information collection requirements. As required by the Paperwork Reduction Act of 1995 (44 U.S.C. 3507(d)), the Department of Education is required to submit a copy of these sections to the Office of Management and Budget (OMB) for its review. In many cases, the burden associated with the above provisions is associated with forms and applications currently approved for use under existing OMB control numbers. The Department will revise the existing information collection packages for the following sections: §§ 674.34, 682.102, 682.210, 682.402, 685.204, and 685.220. The Department is working with its major stakeholders to develop the forms and applications necessary to implement these provisions and will submit these revised packages for OMB review soon after publication of the interim final regulations and solicit comment at that time.

The Department plans to submit a full information collection package for OMB review to account for the burden associated with §§ 682.207 and 682.401 upon publication of these interim final regulations. We invite comments on these information collection sections at this time.

Lastly, the Department has increased the burden hours for the existing OMB-approved collections associated with §§ 682.215 and 685.217 to account for the increased burden. OMB approved this burden increase on June 16, 2006.

*Collection of Information:* Institutional Eligibility Under the Higher Education Act of 1965, as amended; Student Assistance General Provisions; General Provisions for the Federal Perkins Loan Program; Federal Work-Study Program; and Federal Supplemental Educational Opportunity Grant Program; Federal Perkins Loan Program; Federal Family Education Loan Program; and William D. Ford Federal Direct Loan Program.

---

[2] Section 492 provides specifically that any regulations issued for the title IV, HEA programs shall be subject to negotiated rulemaking to obtain the advice of and recommendations from individuals and groups involved in the student financial assistance programs.

[3] *See Riverbend Farms, Inc. v. Madigan,* 958 F.2d 1479, 1484, n.2 (9th cir. 1992). The term "impracticable" has also been described as meaning "a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking rulemaking proceedings. *Zhang v. Slattery,* 55 F.3d 732, 746 (2d Cir. 1995) *citing National Nutritional Foods Ass'n v. Kennedy,* 572 F.2d 377, 385 (2d Cir. 1978) *citing* S. Rep. No. 752, 79th Cong., 1st Sess. (1945).

Confidential

*Sections 600.7 and 600.10—Modification of the 50 Percent Rules*

The definition of "telecommunications course" is revised, and the references to telecommunications courses pertaining to calculating the percentage of correspondence courses offered by an institution are deleted so that an otherwise eligible institution that offers over 50 percent of its courses by telecommunications is now eligible to participate in the title IV, HEA programs. However, institutions that offer over 50 percent of their courses through correspondence, and foreign institutions that provide any of their programs by telecommunications or correspondence, continue to be ineligible to participate. There is no burden associated with the change in the definition of telecommunications course.

*Section 668.3—Academic Year*

The definition of academic year is amended to reduce from 30 to 26 the number of weeks of instructional time for a program that measures its length in clock hours. There is no burden associated with the reduction in the number of weeks of instructional time.

*Section 668.8—Eligible Program*

An otherwise eligible program that is offered in whole or in part through telecommunications is an eligible program for title IV, HEA program purposes. The eligible telecommunications program must be offered by an institution in the United States. The institution must have been evaluated and determined to have the capability to effectively deliver distance education programs by an accrediting agency or association. The accrediting agencies are currently reviewing telecommunications programs consistent with the scope of their authority. Therefore there is no additional burden associated with this provision.

*Section 668.10—Direct Assessment Programs*

The interim final regulations provide that "direct assessment programs" are eligible programs for Title IV purposes. A direct assessment program is an instruction program that, in lieu of credit hours or clock hours as a measure of student learning, utilizes direct assessment of student learning, or recognizes the direct assessment of student learning by other measures. This assessment must be consistent with the accreditation of the institution or program utilizing the results of the assessment.

In the short-term, we expect no additional burden to be associated with direct assessment programs. We are currently aware of only one institution that utilizes such programs. Therefore, this section is not subject to the Paperwork Reduction Act of 1995.

*Sections 668.22 and 668.173—Treatment of Title IV Funds When a Student Withdraws*

Under these interim final regulations, the following provisions apply to title IV, HEA program funds when a student withdraws:

• The amount of a grant overpayment due from a student is limited to the amount by which the original grant overpayment amount exceeds half of the total title IV grant funds received by the student.

• When the original amount of a student's title IV grant overpayment amount is $50 or less, it is considered "de minimis" and does not have to be repaid or reported.

• An institution must contact a withdrawn student prior to making a post-withdrawal disbursement of a title IV loan. The institution must explain the obligation to repay the loan funds, if the post-withdrawal disbursement is accepted by the borrower. If the borrower's acceptance of the post-withdrawal disbursement is received by the institution after the deadline date for the return of the acceptance of the disbursement, and the institution chooses not to make the post-withdrawal disbursement, the institution is required to notify the borrower of the institution's action.

• Only scheduled hours, not completed hours, are used to determine the percentage of the period completed by a student withdrawing from a clock hour program.

• A student withdrawing from a clock hour program earns 100 percent of his or her aid if the student's withdrawal date occurs after the point when he or she was scheduled to complete 60 percent of the scheduled hours in the payment period or period of enrollment.

• An institution must return unearned funds no later than 45 days after a student withdraws.

• An institution may grant more than one leave of absence.

• The return of title IV funds provisions no longer apply to LEAP, SLEAP, GEAR UP and Student Support Services funds.

The burden associated with the requirement that an institution must contact and counsel a withdrawn student before making a late disbursement is offset by the requirements that simplify and facilitate the return of title IV program funds. Consequently, these changes do not increase burden.

*Sections 673.5 and 682.200—Estimated Financial Assistance*

Under the interim final regulations, the term "resources" is changed to *estimated financial assistance* for the purposes of the Federal Perkins Loan program, the Federal Work-Study program, and the FSEOG program. The term *estimated financial assistance* has also been modified to include the two new grant programs created by the HERA, and the new chapter 1607 veterans education benefits established under the Ronald W. Reagan National Defense Authorization Act for 2005. The interim final regulations also make technical changes to help clarify the existing regulatory language and to standardize the similar definitions used in the Federal Perkins Loan program, the Federal Work-Study programs, the FSEOG program, and the FFEL and Direct Loan programs. There is no burden associated with these provisions.

*Section 674.34, 682.210, and 685.204—Active Duty Military Deferments*

A new military deferment is established for FFEL, Direct and Perkins Loan Program borrowers who are serving on active duty, or are performing qualifying National Guard duty during a war or other military operation or national emergency. The addition of a new deferment will increase the burden hours associated with two existing OMB Control Numbers, 1845–0005—FFEL Deferment Requests and 1845–0011—Direct Loan Program Deferment Request Forms. These forms will be submitted for OMB review by November 2006. Until new forms are approved, borrowers may submit documentation to the loan holder demonstrating their eligibility for the new deferment.

*Section 682.102—Obtaining and Repaying a Loan*

Under the interim final regulations, this section is amended to repeal the single holder rule and to add graduate and professional students as eligible borrowers of a PLUS Loan. Repeal of the single holder rule will allow borrowers to apply to any eligible lender when consolidating their loans and will not increase or decrease the actual burden associated with obtaining a Consolidation Loan. The burden associated with the addition of the new graduate/professional PLUS Program will be reflected in the collection of information under modified OMB

B0270254

Control Numbers 1845–0068—Federal Direct PLUS Loan Application and MPN and Endorser Addendum and 1845–0069—Federal PLUS Loan Application and MPN, endorser Addendum and School Certification. Borrowers may use these temporary forms until revised forms are submitted for OMB review. That submission will occur no later than October 2006.

*Section 682.207—Due Diligence in Disbursing a Loan for Attendance at a Foreign School*

The Department currently has the paperwork requirements in this section approved under OMB control number 1845–0020 which will be modified to reflect the burden associated with this provision. For a U.S. student attending an eligible foreign institution, FFEL program funds may be disbursed directly to the student only if the institution requests this method. For a student enrolled at a foreign institution, and a student enrolled in a study-abroad program, the lender must verify the student's enrollment at the foreign school before making a direct disbursement of FFEL funds. These new requirements represent an increased burden that will be reflected in OMB Control No. 1845–0020.

*Section 682.209—Repayment of a Loan*

An FFEL Stafford loan borrower may no longer request to enter repayment early on her loans. There is no additional burden associated with this provision.

*Section 682.211—Forbearance*

Under these interim final regulations, a lender must confirm any non-written forbearance agreement by recording the terms of the agreement in the borrower's file. There is no additional burden associated with this provision as the current regulations already permit this practice under OMB Control Number 1845–0020.

*Section 682.215 and 685.217—Teacher Loan Forgiveness*

Under these interim final regulations, increased teacher loan forgiveness in the amount of $17,500 is made permanent for teachers in certain specialties as originally authorized by the Taxpayer-Teacher Protection Act (TTPA) of 2004. The regulations also provide that teachers in private non-profit schools may qualify for the same forgiveness benefits if they are "highly qualified." The current teacher loan forgiveness form, as currently approved by OMB under Control Number 1845–0059, reflects all of the new teacher loan forgiveness requirements of the TTPA

with the exception of criteria for teachers in a private non-profit school. The current form will be revised to reflect the new criteria, but we expect no additional burden because most applicants for forgiveness are employed in public elementary and secondary schools, not private non-profit schools.

*Section 682.305—Procedures for Payment of Interest and Special Allowance*

These interim final regulations require the repayment by a lender of excess interest paid by the Department when the applicable interest rate on a loan for any quarter exceeds the special allowance support level for the loan. The Secretary will collect the excess interest from lenders quarterly. This change represents no increase in burden. The Secretary will make the calculation of excess interest owed by a lender. The lender will pay excess interest to the Secretary under existing processes.

*Section 682.401—Basic Program Agreement*

The HERA establishes a new College Access Initiative for guaranty agencies to create and carry out a plan to promote access to postsecondary education for each State. While most of the agencies and/or other State government entities already offer this information, we expect this requirement will affect the 35 existing guaranty agencies by 100 hours each, creating a total burden of 3500 hours. The Department will amend OMB Control Number 1845–0020—Federal Family Education Loan Program Regulations to reflect this increase in burden hours.

The following other provisions are being amended but will not produce additional burden. The amount of lender insurance paid to lenders as reimbursement for defaulted loans will decrease. This will not require additional burden since it is merely a change in the percentage used in the calculation of the payment to the lender. Each guaranty agency must now establish procedures to ensure that consolidation loans are not an excessive proportion of its recoveries on defaulted loans. In addition, a guaranty agency must now remit to the Secretary 8.5% of the collection costs it recovers from the borrower or, if the amount of the proceeds from the consolidation of defaulted loans exceeds 45 percent of the agency's total collections on defaulted loans in that Federal fiscal year, all of the collection costs recovered by payment from the consolidation loan. Remitting part or all of the collection costs will not result in

additional burden to the guaranty agency since it is already calculated for other purposes. The interim final regulations eliminate the current, optional 1 percent insurance premium fee that guaranty agencies may charge the lender, and replace it with a mandatory 1 percent Federal default fee deducted and collected from the proceeds of the loan or from other non-federal sources. This will not result in additional burden since the prior fee calculation is eliminated and the new fee replaces it.

*Sections 682.402 and 685.215—Identity Theft*

Under these interim final regulations, the regulations have been amended to authorize discharge of a FFEL or Direct Loan Program loan if the borrower's eligibility was falsely certified because the borrower was a victim of the crime of identity theft. The regulations provide that the borrower's obligation is discharged if the borrower provides the holder of a loan, or the Secretary in the case of a Direct Loan, a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is the named borrower was the victim of the crime of identity theft. If the judgment or conviction did not expressly reference that loan, the individual must provide authentic examples of his other identification credentials, and an explanation of facts that demonstrate that this criminal conduct resulted in the school certifying that individual's eligibility to borrow, and, as a result, in the loan being made.

The additions do not change the burden hours associated with this section of the regulations. The burden associated with the new requirements will be accounted for under OMB Control Number 1845–0015—FFEL, Direct Loan and Perkins Loan Discharge Applications. These forms will be submitted for OMB review by December 2006. Until new forms are approved, borrowers may submit documentation to the loan holder demonstrating their eligibility for the discharge.

*Section 682.404—Federal Reinsurance Agreement*

Under these interim final regulations, for loans on which the first disbursement of principal is made on or after July 1, 2006, a guaranty agency will receive 100 percent reinsurance from the Department on "exempt claims." The interim final regulation simply increases the amount of reinsurance paid to guaranty agencies on these claims. This provision does not increase burden because payment of these claims

B0270255

is already part of the process under which the Secretary pays reinsurance to the guaranty agencies.

*Section 682.405—Rehabilitation of a Defaulted Loan*

The regulations have been amended to require a FFEL borrower to make 9 payments within 20 days of the due date during a period of 10 consecutive months to rehabilitate a defaulted loan. Previously, the regulations required the borrower to make 12 consecutive on-time monthly payments. The new requirement that the borrower make fewer payments will not change the burden associated with the rehabilitation of a defaulted FFEL loan. The requirements that a borrower must request rehabilitation, and that a guaranty agency must attempt to secure a lender to purchase the loan after it has been successfully rehabilitated, remain unchanged.

*Section 682.406—Conditions for Claim Payments From the Federal Fund and Reinsurance Coverage*

The amount of time a guaranty agency is allowed for filing a reinsurance claim with the Department is reduced from 45 days to 30 days. However, the process under which the guaranty agency is required to submit a reinsurance claim is unchanged. Consequently, there is no change in burden.

*Section 682.410—Fiscal, Administrative and Enforcement Procedures*

The amount of a borrower's disposable pay that can be garnished is increased from 10 to 15 percent effective July 1, 2006. There is no burden associated with this change because it has no impact on the manner in which any borrower's wages are currently garnished.

*Section 682.415—Special Insurance and Reinsurance*

The insurance percentage applicable to lenders or lenders servicers who are designated as exceptional performers is decreased from 100 percent to 99 percent. There is no burden associated with this change. All other factors of reimbursement remain the same.

*Section 682.601—School-as-Lender*

The current regulations are replaced with an expanded set of requirements for participation as a school-as-lender. The primary requirement to be designated as school-as-lender is that the institution met the requirements in effect as of February 7, 2006, and made loans on or before April 1, 2006. There is no additional burden for institutions since the new requirements are based on

data already collected by the institution, reports that are already required, and/or procedures of standard use at institutions.

*Section 682.604—Processing Loan Proceeds and Counseling the Borrower*

The exemption from the multiple disbursement requirements for eligible foreign institutions is removed. Lenders and guaranty agencies are now required to disburse the proceeds of a loan in two or more installments, neither of which exceeds one-half of the loan. This change will not increase burden. In the vast majority of cases, the lender or guaranty agency is already required to disburse a loan in two installments as a regular business practice under the requirements of the HEA and the FFEL Program regulations.

*Section 685.220—Consolidation*

Under these interim final regulations, the borrower eligibility requirements of the FFEL and Federal Direct Consolidation Loan programs are harmonized to eliminate program differences and to reflect the repeal of section 8009(a)(2) of the HERA, which restricted the conditions under which a FFEL borrower could obtain a Federal Consolidation Loan. The burden associated with the collection of information will be reflected in the modified OMB Control Number 1845–0036—FFEL Consolidation Loan Application and Promissory Note and OMB Control Number 1845–0053—Federal Direct Consolidation Loan Program Application Documents.

If you want to comment on the information collection requirements, please send your comments to the Office of Information and Regulatory Affairs, OMB, room 10235, New Executive Office Building, Washington, DC 20503; Attention: Desk Officer for U.S. Department of Education. You may also send a copy of these comments to the Department representative named in the **FOR FURTHER INFORMATION CONTACT** section of this preamble.

We consider your comments on these proposed collections of information in—
• Deciding whether the proposed collections are necessary for the proper performance of our functions, including whether the information will have practical use;
• Evaluating the accuracy of our estimate of the burden of the proposed collections, including the validity of our methodology and assumptions;
• Enhancing the quality, usefulness, and clarity of the information we collect; and
• Minimizing the burden on those who must respond. This includes

exploring the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology; e.g., permitting electronic submission of responses.

OMB is required to make a decision concerning the collection of information contained in these interim final regulations between 30 and 60 days after publication of this document in the **Federal Register**. Therefore, to ensure that OMB gives your comments full consideration, it is important that OMB receives the comments within 30 days of publication.

**Assessment of Educational Impact**

Based on our own review, we have determined that these interim final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Electronic Access to This Document**

You may view this document, as well as all other Department of Education documents published in the **Federal Register**, in text or Adobe Portable Document Format (PDF) on the Internet at the following site: *http://www.ed.gov/news/Fedregister.*

To use PDF you must have Adobe Acrobat Reader, which is available free at this site. If you have questions about using PDF, call the U.S. Government Printing Office (GPO), toll free, at 1–888–293–6498; or in the Washington, DC, area at (202) 512–1530.

**Note:** The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available on GPO Access at: *http://www.gpoaccess.gov/nara/index.html.*

(Catalog of Federal Domestic Assistance Numbers: 84.032 Federal Family Education Loan Program; 84.038 Federal Perkins Loan Program; 84.268 William D. Ford Federal Direct Loan Program)

**List of Subjects**

*34 CFR Parts 600 and 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Education, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Student Aid, Vocational education.

*34 CFR Parts 673, 675 and 676*

Administrative practice and procedure, Colleges and universities, Consumer protection, Education, Employment, Grant programs—education, Loan programs—education,

B0270256

Case 1:07-cv-00960-CMH-JFA   Document 1041-1   Filed 10/04/24   Page 59 of 84 PageID# 34387

Reporting and recordkeeping requirements. Student aid, Vocational education.

*34 CFR Parts 674, 682, and 685*

Administrative Practice and Procedure, Colleges and universities, Education, Loans program—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

Dated: August 1, 2006.

**Margaret Spellings,**
*Secretary of Education.*

■ For the reasons discussed in the preamble, the Secretary amends parts 600, 668, 673, 674, 675, 676, 682, and 685 of title 34 of the Code of Federal Regulations as follows:

## PART 600—INSTITUTIONAL ELIGIBILITY UNDER THE HIGHER EDUCATION ACT OF 1965, AS AMENDED

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 20 U.S.C. 1001, 1002, 1003, 1088, 1091, 1094, 1099b, and 1099(c), unless otherwise noted.

■ 2. Section 600.2 is amended by:
■ A. In the definition of *Correspondence course,* removing paragraph (3) and redesignating paragraph (4) as paragraph (3);
■ B. Adding a definition of *Direct assessment program;*
■ C. Revising the definitions of *Educational program* and *Telecommunications course.*

The revisions and addition read as follows:

### § 600.2   Definitions.

\*   \*   \*   \*   \*

*Direct assessment program:* A program as described in 34 CFR 668.10.
*Educational program:* (1) A legally authorized postsecondary program of organized instruction or study that:

(i) Leads to an academic, professional, or vocational degree, or certificate, or other recognized educational credential; and

(ii) May, in lieu of credit hours or clock hours as a measure of student learning, utilize direct assessment of student learning, or recognize the direct assessment of student learning by others, if such assessment is consistent with the accreditation of the institution or program utilizing the results of the assessment and with the provisions of § 668.10.

(2) The Secretary does not consider that an institution provides an educational program if the institution does not provide instruction itself (including a course of independent study) but merely gives credit for one or more of the following: Instruction provided by other institutions or schools; examinations or direct assessments provided by agencies or organizations; or other accomplishments such as "life experience."

\*   \*   \*

*Telecommunications course:* A course offered principally through the use of one or a combination of technologies including television, audio, or computer transmission through open broadcast, closed circuit, cable, microwave, or satellite; audio conferencing; computer conferencing; or video cassettes or discs to deliver instruction to students who are separated from the instructor and to support regular and substantive interaction between these students and the instructor, either synchronously or asynchronously. The term does not include a course that is delivered using video cassettes or disc recordings unless that course is delivered to students physically attending classes at the institution providing the course during the same award year. If the course does not qualify as a telecommunications course, it is considered to be a correspondence course.

\*   \*   \*   \*   \*

■ 3. Section 600.7 is amended by:
■ A. Removing paragraph (b)(1).
■ B. Redesignating paragraphs (b)(2) and (b)(3) as paragraphs (b)(1) and (b)(2), respectively;
■ C. Revising the heading of the newly redesignated paragraph (b)(1) to read as set forth below;
■ D. In the newly redesignated paragraph (b)(2)(i), removing the words "section 521(4)(C)" and adding in their place the words "section 3(3)(C)" and adding at the end of the sentence the words "of 1995."

### § 600.7   Conditions of institutional ineligibility.

\*   \*   \*   \*   \*

(b) \*   \*   \*
(1) *Calculating the number of correspondence courses.* \*   \*   \*

\*   \*   \*   \*   \*

### § 600.10   [Amended]

■ 4. Section 600.10(c)(2) is amended by adding the words "except as provided in 34 CFR 668.10" after the words "eligible program of that institution".

### § 600.21   [Amended]

■ 5. Section 600.21(a)(4) is amended by adding at the beginning of the paragraph, the words "Except as provided in 34 CFR 668.10,".

■ 6. Section 600.51 is amended by adding a new paragraph (d) to read as follows:

### § 600.51   Purpose and scope.

\*   \*   \*   \*   \*

(d)(1) A program offered by a foreign school through any use of a telecommunications course, correspondence course, or direct assessment program is not an eligible program;

(2) *Correspondence course* has the meaning given in § 600.2;

(3) *Direct assessment program* has the meaning given in § 668.10(a)(1) of this chapter;

(4) *Telecommunications course* is a course offered through any one or a combination of the technologies listed in the definition of telecommunications course in § 600.2, except that telecommunications technologies may be used to supplement and support instruction that is offered in a classroom located in the foreign country where the students and instructor are physically present.

\*   \*   \*   \*   \*

## PART 668—STUDENT ASSISTANCE GENERAL PROVISIONS

■ 7. The authority citation for part 668 continues to read as follows:

**Authority:** 20 U.S.C. 1001, 1002, 1003, 1085, 1091b, 1092, 1094, 1099c, and 1099c–1, unless otherwise noted.

■ 8. Section 668.2(b) is amended by removing the word "parent" from the definition of *Federal Consolidation Loan Program* and by revising the definitions of *Federal Direct PLUS Program* and *Federal PLUS program.* The authority citations for these definitions remain unchanged.

The revisions read as follows:

### § 668.2   General definitions.

\*   \*   \*   \*   \*

(b) \*   \*   \*

*Federal Direct PLUS Program:* A loan program authorized by title IV, Part D of the HEA that is one of the components of the Direct Loan Program. The Federal Direct PLUS Program provides loans to parents of dependent students attending schools that participate in the Direct Loan Program. The Federal Direct PLUS Program also provides loans to graduate or professional students attending schools that participate in the Direct Loan Program. The borrower is responsible for the interest that accrues during any period.

\*   \*   \*   \*   \*

*Federal PLUS program:* The loan program authorized by Title IV–B,

Confidential

B0270257

section 428B, of the HEA, that encourages the making of loans to parents of undergraduate students. Before October 17, 1986, the PLUS Program also provided for making loans to graduate, professional, and independent undergraduate students. Before July 1, 1993, the PLUS Program also provided for making loans to parents of dependent graduate students. Beginning July 1, 2006, the PLUS Program provides for making loans to graduate and professional students.

*　*　*　*　*

■ 9. Section 668.3 is amended by revising paragraph (a) to read as follows:

### § 668.3   Academic year.

(a) *General.* Except as provided in paragraph (c) of this section, an academic year for a program of study must include—

(1)(i) For a program offered in credit hours, a minimum of 30 weeks of instructional time; or

(ii) For a program offered in clock hours, a minimum of 26 weeks of instructional time; and

(2) For an undergraduate educational program, an amount of instructional time whereby a full-time student is expected to complete at least—

(i) Twenty-four semester or trimester credit hours or 36 quarter credit hours for a program measured in credit hours; or

(ii) 900 clock hours for a program measured in clock hours.

*　*　*　*　*

■ 10. Section 668.8 is amended by adding new paragraphs (m) and (n) to read as follows:

### § 668.8   Eligible program.

*　*　*　*　*

(m) An otherwise eligible program that is offered in whole or in part through telecommunications is eligible for title IV, HEA program purposes if the program is offered by an institution, other than a foreign institution, that has been evaluated and is accredited for its effective delivery of distance education programs by an accrediting agency or association that—

(1) Is recognized by the Secretary under subpart 2 of part H of the HEA; and

(2) Has accreditation of distance education within the scope of its recognition.

(n) For title IV, HEA program purposes, the term *eligible program* includes a direct assessment program approved by the Secretary under 34 CFR 668.10.

*　*　*　*　*

■ 11. New Section 668.10 is added to read as follows:

### § 668.10   Direct assessment programs.

(a)(1) A *direct assessment program* is an instructional program that, in lieu of credit hours or clock hours as a measure of student learning, utilizes direct assessment of student learning, or recognizes the direct assessment of student learning by others. The assessment must be consistent with the accreditation of the institution or program utilizing the results of the assessment.

(2) Direct assessment of student learning means a measure by the institution of what a student knows and can do in terms of the body of knowledge making up the educational program. These measures provide evidence that a student has command of a specific subject, content area, or skill or that the student demonstrates a specific quality such as creativity, analysis or synthesis associated with the subject matter of the program. Examples of direct measures include projects, papers, examinations, presentations, performances, and portfolios.

(3) All regulatory requirements in this chapter that refer to credit or clock hours as a measurement apply to direct assessment programs. Because a direct assessment program does not utilize credit or clock hours as a measure of student learning, an institution must determine the number of credit or clock hours that the program (or portion of the program, as applicable) is equivalent to in credit hours or clock hours in order to demonstrate compliance with the regulatory requirements in this chapter. The institution must provide a factual basis satisfactory to the Secretary for its claim that the program is equivalent to a specific number of credit or clock hours.

(i) An academic year in a direct assessment program is a period of instructional time that consists of a minimum of 30 weeks of instructional time during which, for an undergraduate educational program, a full-time student is expected to complete the equivalent of at least 24 semester or trimester credit hours, 36 quarter credit hours or 900 clock hours.

(ii) A payment period in a direct assessment program for which equivalence in credit hours has been established must be determined under the requirements in § 668.4(a) or (b), as applicable, using the academic year determined in accordance with paragraph (a)(3)(i) of this section (or the portion of that academic year comprising or remaining in the program). A payment period in a direct assessment program for which equivalence in clock hours has been established must be determined under

the requirements in § 668.4(c), using the academic year determined in accordance with paragraph (a)(3)(i) of this section (or the portion of that academic year comprising or remaining in the program).

(iii) A week of instructional time in a direct assessment program is any seven-day period in which at least one day of educational activity occurs. Educational activity in a direct assessment program includes regularly scheduled learning sessions, faculty-guided independent study, consultations with a faculty mentor, development of an academic action plan addressed to competencies identified by the institution, or, in combination with any of the foregoing, assessments. It does not include credit for "life experience."

(iv) A full-time student in a direct assessment program is an enrolled student who is carrying a full-time academic workload as determined by the institution under a standard applicable to all students enrolled in the program. However, for an undergraduate student, the institution's minimum standard must equal or exceed the minimum full-time requirements specified in the definition of *full-time student* in § 668.2 based on the credit or clock hour equivalency established by the institution for the direct assessment program.

(v) A half-time student in a direct assessment program is an enrolled student who is carrying half of the academic workload of a full-time student in that program.

(vi) A three-quarter-time student in a direct assessment program is an enrolled student who is carrying three-quarters of the academic workload of a full-time student in that program.

(b) An institution that offers a direct assessment program must apply to the Secretary to have that program determined to be an eligible program for title IV, HEA program purposes. The institution's application must provide information satisfactory to the Secretary that includes—

(1) A description of the educational program, including the educational credential offered (degree level or certificate) and the field of study;

(2) A description of how the assessment of student learning is done;

(3) A description of how the direct assessment program is structured, including information about how and when the institution determines on an individual basis what each student enrolled in the program needs to learn;

(4) A description of how the institution assists students in gaining the knowledge needed to pass the assessments;

B0270258

(5) The number of semester or quarter credit hours, or clock hours, that are equivalent to the amount of student learning being directly assessed for the certificate or degree, as required by paragraph (b)(3) of this section;

(6) The methodology the institution uses to determine the number of credit or clock hours to which the program is equivalent;

(7) The methodology the institution uses to determine the number of credit or clock hours to which the portion of a program and individual student will need to complete is equivalent;

(8) Documentation from the institution's accrediting agency indicating that the agency has evaluated the institution's offering of direct assessment program(s) and has included the program(s) in the institution's grant of accreditation;

(9) Documentation from the accrediting agency or relevant state licensing body indicating agreement with the institution's claim of the direct assessment program's equivalence in terms of credit or clock hours; and

(10) Any other information the Secretary may require to determine whether to approve the institution's application.

(c) To be an eligible program, a direct assessment program must meet the requirements in § 668.8 including, if applicable, minimum program length and qualitative factors.

(d) Notwithstanding paragraphs (a) through (c) of this section, no program offered by a foreign institution that involves direct assessment will be considered to be an eligible program under § 668.8.

(e) A direct assessment program may use learning resources (e.g., courses or portions of courses) that are provided by entities other than the institution providing the direct assessment program without regard to the limitations on contracting for part of an educational program in § 668.5(c)(3).

(f) Title IV, HEA program funds may be used only for learning that results from instruction provided, or overseen, by the institution, not for the portion of the program that the student has demonstrated mastery of prior to enrollment in the program or tests of learning that are not associated with educational activities overseen by the institution.

(g) Title IV, HEA program eligibility with respect to direct assessment programs is limited to direct assessment programs approved by the Secretary. Title IV, HEA program funds may not be used for—

(1) the course of study described in § 668.32(a)(1)(ii) and (iii) if offered by direct assessment, or

(2) remedial coursework described in § 668.20 offered by direct assessment. However, remedial instruction that is offered in credit or clock hours in conjunction with a direct assessment program is eligible for title IV, HEA program funds.

(h) The Secretary's approval of a direct assessment program expires on the date that the institution changes one or more aspects of the program described in the institution's application submitted under paragraph (b) of this section. To maintain program eligibility, the institution must obtain prior approval from the Secretary through reapplication under paragraph (b) of this section that sets forth the revisions proposed.

### § 668.15  [Amended]

■ 12. Section 668.15 is amended by:
■ A. In paragraph (d)(1)(i)(C) removing the parentheticals "(j)(4)" and adding, in their place, the parenthetical "(j)".
■ B. In paragraph (d)(1)(ii)(B) removing the figure "§ 668.22(h)" and adding, in its place, the figure "§ 668.22(i)".
■ 13. Section 668.22 is amended by:
■ A. Revising paragraph (a)(1).
■ B. Redesignating paragraphs (a)(2), (a)(3), and (a)(4) as paragraphs (a)(3), (a)(4), and (a)(5), respectively.
■ C. Adding a new paragraph (a)(2).
■ D. In newly redesignated paragraph (a)(4) removing the parenthetical "(a)(4)" and adding, in its place, the parenthetical "(a)(5)".
■ E. Revising newly redesignated paragraph (a)(5).
■ F. Revising paragraph (e)(2).
■ G. Revising paragraph (f)(1)(ii).
■ H. In paragraph (h)(3) in the introductory text, adding the word "parent" after the words "funds due to a".
■ I. Revising paragraph (h)(3)(ii).
■ J. Adding a new paragraph (h)(5).
■ K. Revising paragraph (i)(2).
■ L. In paragraph (j)(1), removing the figure "30" and adding, in its place, the figure "45".
The revisions and additions read as follows:

### § 668.22  Treatment of title IV funds when a student withdraws.

(a) *General.* (1) When a recipient of title IV grant or loan assistance withdraws from an institution during a payment period or period of enrollment in which the recipient began attendance, the institution must determine the amount of title IV grant or loan assistance that the student earned as of the student's withdrawal date in accordance with paragraph (e) of this section.

(2) For purposes of this section, "title IV grant or loan assistance" includes only assistance from the Federal Perkins Loan, Direct Loan, FFEL, Federal Pell Grant, Academic Competitiveness Grant, National SMART Grant, and FSEOG programs, not including the non-Federal share of FSEOG awards if an institution meets its FSEOG matching share by the individual recipient method or the aggregate method.

\*      \*      \*      \*      \*

(5)(i) A post-withdrawal disbursement must be made from available grant funds before available loan funds.

(ii)(A) If outstanding charges exist on the student's account, the institution may credit the student's account up to the amount of outstanding charges with all or a portion of any—

(1) Grant funds that make up the post-withdrawal disbursement in accordance with § 668.164(d)(1) and (d)(2); and

(2) Loan funds that make up the post-withdrawal disbursement in accordance with § 668.164(d)(1), (d)(2) and (d)(3) only after obtaining confirmation from the student or parent, in the case of a parent PLUS loan, that they still wish to have the loan funds disbursed in accordance with paragraph (a)(5)(iii) of this section.

(B)(1) The institution must offer to disburse directly to a student, or parent in the case of a parent PLUS loan, any amount of a post-withdrawal disbursement that is not credited to the student's account, or for which the institution is not required to obtain confirmation to credit to the student's account, to the student, or the parent in the case of a parent PLUS loan, in accordance with paragraph (a)(5)(iii) of this section.

(2) The institution must make a direct disbursement of any grant or loan funds that make up the post-withdrawal disbursement only after obtaining the student's, or parent's in the case of a parent PLUS loan, confirmation that they still wish to have the grant or loan funds disbursed in accordance with paragraph (a)(5)(iii).

(iii)(A) The institution must provide within 30 days of the date of the institution's determination that the student withdrew, as defined in paragraph (l)(3) of this section, a written notification to the student, or parent in the case of parent PLUS loan, that—

(1) Requests confirmation of any post-withdrawal disbursement of loan funds that the institution wishes to credit to the student's account in accordance with paragraph (a)(5)(ii)(A)(2),

Confidential

B0270259

identifying the type and amount of those loan funds and explaining that a student, or parent in the case of a parent PLUS loan, may accept or decline some or all of those funds;

(2) Requests confirmation of any post-withdrawal disbursement of grant or loan funds that the student, or parent in the case of a parent PLUS loan, can receive as a direct disbursement, identifying the type and amount of these title IV funds and explaining that the student, or parent in the case of a parent PLUS loan, may accept or decline some or all of those funds;

(3.) Explains that a student, or parent in the case of a parent PLUS loan, who does not confirm that a post-withdrawal disbursement of loan funds may be credited to the student's account may not receive any of those loan funds as a direct disbursement unless the institution concurs;

(4) Explains the obligation of the student, or parent in the case of a parent PLUS loan, to repay any loan funds he or she chooses to have disbursed; and

(5) Advises the student, or parent in the case of a parent PLUS loan, that no post-withdrawal disbursement will be made, unless the institution chooses to make a post-withdrawal disbursement based on a late response in accordance with paragraph (a)(5)(iii)(C) of this section, if the student or parent in the case of a parent PLUS loan, does not respond within 14 days of the date that the institution sent the notification, or a later deadline set by the institution.

(B) The deadline for a student, or parent in the case of a parent PLUS loan, to accept a post-withdrawal disbursement under paragraph (a)(5)(iii)(A)(4) must be the same for both a confirmation of a direct disbursement of the post-withdrawal disbursement and a confirmation of a post-withdrawal disbursement of loan funds to be credited to the student's account;

(C) If the student, or parent in the case of a parent PLUS loan, submits a timely response that confirms that they wish to receive all or a portion of a direct disbursement of the post-withdrawal disbursement, or confirms that a post-withdrawal disbursement of loan funds may be credited to the student's account, the institution must disburse the funds in the manner specified by the student, or parent in the case of a parent PLUS loan, within 120 days of the date of the institution's determination that the student withdrew, as defined in paragraph (l)(3) of this section.

(D) If a student, or parent in the case of a parent PLUS loan, submits a late response to the institution's notice requesting confirmation, the institution may make the post-withdrawal disbursement as instructed by the student, or parent in the case of a parent PLUS loan (provided the institution disburses all the funds accepted by the student, or parent in the case of a parent PLUS loan), or decline to do so.

(E) If a student, or parent in the case of a parent PLUS loan, submits a late response to the institution and the institution does not choose to make the post-withdrawal disbursement, the institution must inform the student, or parent in the case of a parent PLUS loan, electronically or in writing of the outcome of the post-withdrawal disbursement request.

(F) If the student, or parent in the case of a parent PLUS loan, does not respond to the institution's notice, no portion of the post-withdrawal disbursement of loan funds that the institution wishes to credit to the student's account, nor any portion that would be disbursed directly to the student, or parent in the case of a parent PLUS loan, may be disbursed.

(iv) An institution must document in the student's file the result of any notification made in accordance with paragraph (a)(5)(iii) of this section of the student's right to cancel all or a portion of loan funds or of the student's right to accept or decline loan funds, and the final determination made concerning the disbursement.

*   *   *   *   *

(e) * * *

(2) *Percentage earned.* The percentage of title IV grant or loan assistance that has been earned by the student is—

(i) Equal to the percentage of the payment period or period of enrollment that the student completed (as determined in accordance with paragraph (f) of this section) as of the student's withdrawal date, if this date occurs on or before—

(A) Completion of 60 percent of the payment period or period of enrollment for a program that is measured in credit hours; or

(B) Sixty percent of the clock hours scheduled to be completed for the payment period or period of enrollment for a program that is measured in clock hours; or

(ii) 100 percent, if the student's withdrawal date occurs after—

(A) Completion of 60 percent of the payment period or period of enrollment for a program that is measured in credit hours; or

(B) Sixty percent of the clock hours scheduled to be completed for the payment period or period of enrollment for a program measured in clock hours.

*   *   *   *   *

(f) * * *

(1) * * *

(iii)(A) In the case of a program that is measured in clock hours, by dividing the total number of clock hours in the payment period or period of enrollment into the number of clock hours scheduled to be completed as of the student's withdrawal date.

(B) The scheduled clock hours used must be those established by the institution prior to the student's beginning class date for the payment period or period of enrollment and must be consistent with the published materials describing the institution's programs, unless the schedule was modified prior to the student's withdrawal.

(C) The schedule must have been established in accordance with requirements of the accrediting agency and the State licensing agency, if such standards exist.

*   *   *   *   *

(h) * * *

(3) * * *

(ii) Any title IV grant program as an overpayment of the grant; however, a student is not required to return the following—

(A) The portion of a grant overpayment amount that is equal to or less than 50 percent of the total grant assistance that was disbursed (and that could have been disbursed, as defined in paragraph (l)(1) of this section) to the student for the payment period or period of enrollment.

(B) A grant overpayment amount, as determined after application of paragraph (h)(3)(ii)(A) of this section, of 50 dollars or less that is not a remaining balance.

*   *   *   *   *

(5) The Secretary may waive grant overpayment amounts that students are required to return under this section if the withdrawals on which the returns are based are withdrawals by students—

(i) Who were residing in, employed in, or attending an institution of higher education that is located in an area in which the President has declared that a major disaster exists, in accordance with section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5170);

(ii) Whose attendance was interrupted because of the impact of the disaster on the student or institution; and

(iii) Whose withdrawal ended within the award year during which the designation occurred or during the next succeeding award year.

*   *   *   *   *

(i) * * *

(2) *Remaining funds.* If unearned funds remain to be returned after

Confidential

B0270260

repayment of all outstanding loan amounts, the remaining excess must be credited to any amount awarded for the payment period or period of enrollment for which a return of funds is required in the following order:

(i) Federal Pell Grants.
(ii) Academic Competitiveness Grants.
(iii) National SMART Grants.
(iv) FSEOG Program aid.

\* \* \* \* \*

■ 14. Section 668.32 is amended by:
■ A. In paragraph (k)(7), removing the word "and" after the punctuation ";" at the end of the paragraph.
■ B. In paragraph (l), removing the punctuation "." at the end of the paragraph and adding, in its place, the words "; and".
■ C. Adding a new paragraph (m).
The addition reads as follows:

### § 668.32   Student eligibility—general.

\* \* \* \* \*

(m) In the case of a student who has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance, has completed the repayment of such assistance to:
(1) The Secretary; or
(2) The holder, in the case of a title IV, HEA program loan.

\* \* \* \* \*

■ 15. Section 668.35 is amended by:
■ A. Revising the introductory text in paragraph (e).
■ B. In paragraph (h)(2)(ii), removing the punctuation "." at the end of the paragraph and adding, in its place, the words "; and".
■ C. Adding new paragraph (i).
The revisions and additions read as follows:

### § 668.35   Student debts under the HEA and to the U.S.

\* \* \* \* \*

(e) Except as provided in 34 CFR 668.22(h), a student who receives an overpayment under the Federal Perkins Loan Program, or under a title IV, HEA grant program, may nevertheless be eligible to receive title IV, HEA program assistance if—

\* \* \* \* \*

(i) In the case of a student who has been convicted of, or has pled nolo contendere or guilty to a crime involving fraud in obtaining title IV, HEA program assistance, has completed the repayment of such assistance to:
(1) The Secretary; or
(2) The holder, in the case of a title IV, HEA program loan.

\* \* \* \* \*

■ 16. Section 668.38 is amended by:
■ A. Removing paragraph (b)(3); and

■ B. Revising paragraphs (b)(1) and (b)(2).
The revisions read as follows:

### § 668.38   Enrollment in telecommunications and correspondence courses.

\* \* \* \* \*

(b) \* \* \*
(1) For purposes of this section, a student enrolled in a telecommunications course at an institution of higher education is not enrolled in a correspondence course.
(2) For purposes of paragraph (b)(1) of this section, an institution of higher education is one that is not an institute or school described in section 3(3)(C) of the Carl D. Perkins Vocational and Applied Technology Act of 1995.

\* \* \* \* \*

■ 17. Section 668.40(a)(1) is revised to read as follows:

### § 668.40   Conviction for possession or sale of illegal drugs.

(a)(1) A student is ineligible to receive title IV, HEA program funds, for the period described in paragraph (b) of this section, if the student has been convicted of a crime under any Federal or State law involving the possession or sale of illegal drugs for conduct that occurred during a period of enrollment for which the student was receiving title IV, HEA program funds. However, the student may regain eligibility before that time period expires under the conditions described in paragraph (c) of this section.

\* \* \* \* \*

### § 668.164   [Amended]

■ 18. Section 668.164 is amended by, in paragraph (g)(3)(i), removing the parentheticals "(a)(4)" and adding, in their place, the parentheticals "(a)(5)" and removing the parentheticals "(a)(3)" and adding, in their place the parentheticals "(a)(4)".
■ 19. Section 668.173 is amended by revising paragraph (b) to read as follows:

### § 668.173   Refund reserve standards.

\* \* \* \* \*

(b) *Timely return of title IV, HEA program funds.* In accordance with procedures established by the Secretary or FFEL Program lender, an institution returns unearned title IV, HEA program funds timely if—
(1) The institution deposits or transfers the funds into the bank account it maintains under § 668.163 no later than 45 days after the date it determines that the student withdrew;
(2) The institution initiates an electronic funds transfer (EFT) no later

than 45 days after the date it determines that the student withdrew;
(3) The institution initiates an electronic transaction, no later than 45 days after the date it determines that the student withdrew, that informs a FFEL lender to adjust the borrower's loan account for the amount returned; or
(4) The institution issues a check no later than 45 days after the date it determines that the student withdrew. An institution does not satisfy this requirement if—
(i) The institution's records show that the check was issued more than 45 days after the date the institution determined that the student withdrew; or
(ii) The date on the cancelled check shows that the bank used by the Secretary or FFEL Program lender endorsed that check more than 60 days after the date the institution determined that the student withdrew.

\* \* \* \* \*

### PART 673—GENERAL PROVISIONS FOR THE FEDERAL PERKINS LOAN PROGRAM, FEDERAL WORK-STUDY PROGRAM, AND FEDERAL SUPPLEMENTAL EDUCTIONAL OPPORTUNITY GRANT PROGRAM

■ 20. The authority citation for part 673 continues to read as follows:

**Authority:** 20 U.S.C. 421–429, 1070b–1070b–3, and 1087aa–1087ii; 42 U.S.C. 2751–2756b, unless otherwise noted.

■ 21. Section 673.5 is amended by revising paragraphs (a), (b), (c) and (d) to read as follows:

### § 673.5   Overaward.

(a) *Overaward prohibited*—(1) *Federal Perkins Loan and FSEOG Programs.* An institution may only award or disburse a Federal Perkins loan or an FSEOG to a student if that loan or the FSEOG, combined with the other estimated financial assistance the student receives, does not exceed the student's financial need.
(2) *FWS Program.* An institution may only award FWS employment to a student if the award, combined with the other estimated financial assistance the student receives, does not exceed the student's financial need.
(b) *Awarding and disbursement.* (1) When awarding and disbursing a Federal Perkins loan or an FSEOG or awarding FWS employment to a student, the institution shall take into account those amounts of estimated financial assistance it—
(i) Can reasonably anticipate at the time it awards Federal Perkins Loan funds, an FSEOG, or FWS funds to the student;
(ii) Makes available to its students; or

B0270261

(iii) Otherwise knows about.

(2) If a student receives amounts of estimated financial assistance at any time during the award period that were not considered in calculating the Federal Perkins Loan amount or the FWS or FSEOG award, and the total amount of estimated financial assistance including the loan, the FSEOG, or the prospective FWS wages exceeds the student's need, the overaward is the amount that exceeds need.

(c) *Estimated financial assistance.* (1) Except as provided in paragraphs (c)(2) and (c)(3) of this section, the Secretary considers that "estimated financial assistance" includes, but is not limited to, any—

(i) Funds a student is entitled to receive from a Federal Pell Grant;

(ii) William D. Ford Federal Direct Loans;

(iii) Federal Family Education Loans;

(iv) Long-term need-based loans, including Federal Perkins loans;

(v) Grants, including FSEOGs, State grants, Academic Competitiveness Grants, National SMART Grants, and ROTC subsistence allowances;

(vi) Scholarships, including athletic scholarships and ROTC scholarships;

(vii) Waivers of tuition and fees;

(viii) Fellowships or assistantships, except non-need-based employment portions of such awards;

(ix) Veterans educational benefits paid under Chapters 30 (Montgomery GI Bill–Active Duty), 31 (Vocational Rehabilitation and Employment Program), 32 (Veterans' Educational Assistance Program), and 35 (Dependents' Educational Assistance Program) of title 38 of the United States Code, and Chapters 31 (National Call to Service), 1606 (Montgomery GI Bill-Selected Reserve), and 1607 (Reserve Educational Assistance Program) of title 10 of the United States Code;

(x) National service education awards or post-service benefits paid for the cost of attendance under title I of the National and Community Service Act of 1990 (AmeriCorps);

(xi) Net earnings from need-based employment;

(xii) Insurance programs for the student's education; and

(xiii) Any educational benefits paid because of enrollment in a postsecondary education institution, or to cover postsecondary education expenses.

(2) The Secretary does not consider as estimated financial assistance—

(i) Any portion of the estimated financial assistance described in paragraph (c)(1) of this section that is included in the calculation of the student's expected family contribution (EFC);

(ii) Earnings from non-need-based employment;

(iii) Those amounts used to replace EFC, including the amounts of any unsubsidized Federal Stafford or Direct Loans, Federal PLUS or Federal Direct PLUS Loans, and non-federal non-need-based loans, including private, state-sponsored, and institutional loans. However, if the sum of the loan amounts received that are being used to replace the student's EFC actually exceed the EFC, the excess amount must be treated as estimated financial assistance; and

(iv) Assistance not received under this part if that assistance is designated to offset all or a portion of a specific component of the cost of attendance and that amount is excluded from the cost of attendance as well. If that assistance is excluded from either estimated financial assistance or cost of attendance, that amount must be excluded from both.

(3) The institution may also exclude as estimated financial assistance any portion of a subsidized Federal Stafford or Direct Loan that is equal to or less than the amount of a student's veterans education benefits paid under Chapter 30 of title 38 of the United States Code (Montgomery GI Bill—Active Duty) and national service education awards or post service benefits paid for the cost of attendance under title I of the National and Community Service Act of 1990 (AmeriCorps).

(d) *Treatment of estimated financial assistance in excess of need—General.* An institution shall take the following steps if it learns that a student has received additional amounts of estimated financial assistance not included in the calculation of Federal Perkins Loan, FWS, or FSEOG eligibility that would result in the student's total amount of estimated financial assistance exceeding his or her financial need by more than $300:

(1) The institution shall decide whether the student has increased financial need that was unanticipated when it awarded financial aid to the student. If the student demonstrates increased financial need and the total amount of estimated financial assistance does not exceed this increased need by more than $300, no further action is necessary.

(2) If the student's total amount of estimated financial assistance still exceeds his or her need by more than $300, as recalculated pursuant to paragraph (d)(1) of this section, the institution shall cancel any undisbursed loan or grant (other than a Federal Pell Grant).

(3) *Federal Perkins loan and FSEOG overpayment.* If the student's total

amount of estimated financial assistance still exceeds his or her need by more than $300, after the institution takes the steps required in paragraphs (d)(1) and (2) of this section, the institution shall consider the amount by which the estimated financial assistance amount exceeds the student's financial need by more than $300 as an overpayment.

\*   \*   \*   \*   \*

■ 22. Section 673.6 is amended by revising paragraph (a) to read as follows:

**§ 673.6   Coordination with BIA grants.**

(a) *Coordination of BIA grants with Federal Perkins loans, FWS awards, or FSEOGs.* To determine the amount of a Federal Perkins loan, FWS compensation, or an FSEOG for a student who is also eligible for a Bureau of Indian Affairs (BIA) education grant, an institution shall prepare a package of student aid—

(1) From estimated financial assistance other than the BIA education grant the student has received or is expected to receive; and

(2) That is consistent in type and amount with packages prepared for students in similar circumstances who are not eligible for a BIA education grant.

\*   \*   \*   \*   \*

**PART 674—FEDERAL PERKINS LOAN PROGRAM**

■ 23. The authority citation for part 674 continues to read as follows:

**Authority:** 20 U.S.C. 1087aa–1087hh and 20 U.S.C. 421–429, unless otherwise noted.

**§ 674.9   [Amended]**

■ 24. Section 674.9 is amended in paragraph (a) by removing the words "34 CFR 666.32" and adding, in its place, the words "34 CFR part 668".

■ 25. Section 674.16 is amended by revising paragraph (c) to read as follows:

**§ 674.16   Making and disbursing loans.**

\*   \*   \*   \*   \*

(c) If a student incurs uneven costs or estimated financial assistance amounts during an academic year and needs additional funds in a particular payment period, the institution may disburse loan funds to the student for those uneven costs.

\*   \*   \*   \*   \*

■ 26. Section 674.34 is amended by:
■ A. In paragraph (a), adding the words "paragraphs (b), (c), (d), (e), (f), and (g) of" immediately after the words "described in".
■ B. Redesignating paragraphs (h) and (i) as paragraphs (i) and (j), respectively.
■ C. Adding a new paragraph (h).

B0270262

■ D. In newly redesignated paragraph (i), removing the word "and" immediately after the parenthetical "(f)", adding the words ", and (h)" immediately after the parenthetical "(g)," and removing the words "paragraph (i)" and adding, in their place, the words "paragraph (j)".

■ E. In newly redesignated paragraph (j), removing the word "and" immediately after the parenthetical "(f)", and adding the words ", and (h)" immediately after the parenthetical "(g)".

■ F. The addition reads as follows:

### § 674.34  Deferment of repayment—Federal Perkins loans, NDSLs and Defense loans.

*    *    *    *    *

(h)(1) The borrower need not pay principal and interest does not accrue on a Federal Perkins Loan made on or after July 1, 2001, for any period not to exceed 3 years during which the borrower is—

(i) Serving on active duty during a war or other military operation or national emergency; or

(ii) Performing qualifying National Guard duty during a war or other military operation or national emergency.

(2) *Serving on active duty during a war or other military operation or national emergency* means service by an individual who is—

(i) A Reserve of an Armed Force ordered to active duty under 10 U.S.C. 12301(a), 12301(g), 12302, 12304, or 12306;

(ii) A retired member of an Armed Force ordered to active duty under 10 U.S.C. 688 for service in connection with a war or other military operation or national emergency, regardless of the location at which such active duty service is performed; or

(iii) Any other member of an Armed Force on active duty in connection with such emergency or subsequent actions or conditions who has been assigned to a duty station at a location other than the location at which the member is normally assigned.

(3) *Qualifying National Guard duty during a war or other operation or national emergency* means service as a member of the National Guard on full time National Guard duty, as defined in 10 U.S.C. 101(d)(5), under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under 32 U.S.C. 502(f) in connection with a war, other military operation, or national emergency declared by the President and supported by Federal funds.

(4) As used in this section—

(i) *Active duty* means active duty as defined in 10 U.S.C. 101(d)(1) except

that it does not include active duty for training or attendance at a service school;

(ii) *Military operation* means a contingency operation as defined in 10 U.S.C. 101(a)(13); and

(iii) *National emergency* means the national emergency by reason of certain terrorist attacks declared by the President on September 14, 2001, or subsequent national emergencies declared by the President by reason of terrorist attacks.

(5) These provisions do not authorize the refunding of any payments made by or on behalf of a borrower during a period for which the borrower qualified for a military service deferment.

*    *    *    *    *

### § 674.39  [Amended]

■ 27. Section 674.39 is amended in paragraph (a) by adding the words "or loans obtained by fraud for which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance." after the word "secured".

## PART 675—FEDERAL WORK STUDY PROGRAM

■ 28. The authority citation for part 675 continues to read as follows:

**Authority:** 42 U.S.C. 2751–2756b, unless otherwise noted.

■ 29. Section 675.26 is amended by revising paragraph (a)(4) to read as follows:

### § 675.26  FWS Federal share limitations.

(a) *    *    *

(4) An institution may not use FWS funds to pay a student after he or she has, in addition to other estimated financial assistance, earned $300 or more over his or her financial need.

*    *    *    *    *

## PART 676—FEDERAL SUPPLEMENTAL EDUCATIONAL OPPORTUNITY GRANT PROGRAM

■ 30. The authority citation for part 676 continues to read as follows:

**Authority:** 20 U.S.C. 1070b–1070b–3, unless otherwise noted.

■ 31. Section 676.16 is amended by revising paragraph (b) to read as follows:

### § 676.16  Payment of an FSEOG.

*    *    *    *    *

(b) If a student incurs uneven cost or estimated financial assistance amounts during an academic year and needs additional funds in a particular payment period, the institution may pay FSEOG

funds to the student for those uneven costs.

*    *    *    *    *

## PART 682—FEDERAL FAMILY EDUCATION LOAN (FFEL) PROGRAM

■ 32. The authority citation for part 682 continues to read as follows:

**Authority:** 20 U.S.C. 1071 to 1087–2, unless otherwise noted.

■ 33. Section 682.100 is amended in paragraph (a)(3), by adding a sentence to the end of the paragraph to read as follows:

### § 682.100  The Federal Family Education Loan program.

*    *    *    *    *

(3) *    *    * The PLUS Program also provides for making loans to graduate and professional students on or after July 1, 2006.

*    *    *    *    *

■ 34. Section 682.101 is amended in paragraph (c) by adding a sentence to the end of the paragraph to read as follows:

### § 682.101  Participation in the FFEL programs.

*    *    *    *    *

(c) *    *    * The PLUS Program also provides for making loans to graduate and professional students on or after July 1, 2006.

*    *    *    *    *

■ 35. Section 682.102 is amended by:

■ A. In paragraph (a), by removing the words "or contacting" and adding, in their place, the words "and contacting".

■ B. Revising paragraphs (c) and (d).

■ C. In paragraph (e)(1), in the third sentence removing the words "The borrower's obligation to repay a PLUS Loan" and adding, in their place, the words "A parent borrower's obligation to repay a PLUS loan".

The revision reads as follows:

### § 682.102  Obtaining and repaying a loan.

*    *    *    *    *

(c) *PLUS loan application.* (1) For a parent to obtain a PLUS loan, the parent completes an application and submits it to the school for certification. After the school certifies the application, the application is submitted to a participating lender. If the lender decides to make the loan, the lender obtains a loan guarantee from a guaranty agency or the Secretary. Prior to loan disbursement, the parent completes a PLUS MPN, unless the parent has previously completed a PLUS MPN that the lender may use for the new loan.

(2) For a graduate or professional student to obtain a PLUS loan, the

B0270263

student applies for a PLUS Loan by completing a Free Application for Federal Student Aid (FAFSA) and contacting the school, lender or guarantor. The school determines and certifies the student's eligibility for the PLUS loan. After the school certifies the application, the application is submitted to a participating lender. If the lender decides to make the loan, the lender obtains a loan guarantee from a guaranty agency or the Secretary. Prior to loan disbursement, the student completes a PLUS MPN, unless the student has previously completed a PLUS MPN that the lender may use for the new loan.

(d) Consolidation loan application. Generally, to obtain a Consolidation loan, a borrower completes an application and submits it to a lender participating in the Consolidation Loan Program. If the lender decides to make the loan, the lender obtains a loan guarantee from a guaranty agency or the Secretary.

\*   \*   \*   \*   \*

■ 36. Section 682.200(b) is amended by revising the definition of *estimated financial assistance* to read as follows:

### § 682.200   Definitions

\*   \*   \*   \*   \*

(b) \* \* \*

*Estimated financial assistance.* (1) The estimated amount of assistance for a period of enrollment that a student (or a parent on behalf of a student) will receive from Federal, State, institutional, or other sources, such as, scholarships, grants, the net earnings from need-based employment, or loans, including but not limited to—

(i) Except as provided in paragraph (2)(iii) of this definition, national service education awards or post-service benefits under title I of the National and Community Service Act of 1990 (AmeriCorps) and veterans' educational benefits paid under chapters 30 (Montgomery GI Bill—Active Duty), 31 (Vocational Rehabilitation and Employment Program), 32 (Veterans' Educational Assistance Program, and 35 (Dependents' Educational Assistance Program) of title 38 of the United States Code;

(ii) Educational benefits paid under Chapters 31 (National Call to Service), 1606 (Montgomery GI Bill-Selected Reserve), and 1607 (Reserve Educational Assistance Program) of Title 10 of the United States Code;

(iii) Reserve Officer Training Corps (ROTC) scholarships and subsistence allowances awarded under Chapter 2 of Title 10 and Chapter 2 of Title 37 of the United States Code;

(iv) Benefits paid under Pub. L. 96–342, section 903: Educational Assistance Pilot Program;

(v) Any educational benefits paid because of enrollment in a postsecondary education institution, or to cover postsecondary education expenses;

(vi) Fellowships or assistantships, except non-need-based employment portions of such awards;

(vii) Insurance programs for the student's education; and

(viii) The estimated amount of other Federal student financial aid, including but not limited to a Federal Pell Grant, Academic Competitiveness Grant, National SMART Grant, campus-based aid, and the gross amount (including fees) of subsidized and unsubsidized Federal Stafford Loans or subsidized and unsubsidized Federal Direct Stafford/Ford Loans, and Federal PLUS or Federal Direct PLUS Loans.

(2) Estimated financial assistance does not include—(i) Those amounts used to replace the expected family contribution, including the amounts of any unsubsidized Federal Stafford or Federal Direct Stafford/Ford Loans, Federal PLUS or Federal Direct PLUS Loans, and non-federal non-need-based loans, including private, state-sponsored, and institutional loans. However, if the sum of the loan amounts received that are being used to replace the student's EFC exceed the EFC, the excess amount is treated as estimated financial assistance;

(ii) Federal Perkins loan and Federal Work-Study funds that the student has declined;

(iii) For the purpose of determining eligibility for a subsidized Stafford loan, veterans' educational benefits paid under chapter 30 of title 38 of the United States Code (Montgomery GI Bill—Active Duty) and national service education awards or post-service benefits under title I of the National and Community Service Act of 1990 (AmeriCorps);

(iv) Any portion of the estimated financial assistance described in paragraph (1) of this definition that is included in the calculation of the student's expected family contribution (EFC);

(v) Non-need-based employment earnings; and

(vi) Assistance not received under this title, if that assistance is designated to offset all or a portion of a specific amount of the cost of attendance and that component is excluded from the cost of attendance as well. If that assistance is excluded from either estimated financial assistance or cost of attendance, it must be excluded from both.

\*   \*   \*   \*   \*

■ 37. Section 682.201 is amended by:
■ A. In paragraph (a), revising the paragraph heading to read as set forth below.
■ B. Removing paragraph (e).
■ C. Redesignating paragraphs (b), (c), and (d) as paragraphs (c), (d), and (e), respectively.
■ D. Adding a new paragraph (b).
■ E. In newly redesignated paragraph (c), revising the paragraph heading to read as set forth below and adding a new paragraph (c)(1)(viii).
■ F. In newly redesignated paragraph (d)(1)(i)(B), removing the word "or".
■ G. Adding new paragraph (d)(1)(i)(D).
■ H. In newly redesignated paragraph (d)(1)(ii), adding the word "and" after the punctuation ";".
■ I. In newly redesignated paragraph (d)(1)(iii), removing the words "; and" and inserting, in their place, the punctuation ".".
■ J. In newly redesignated paragraph (d), removing paragraphs (d)(1)(iv)(A) and (B).
■ K. Revising newly redesignated paragraph (d)(2).
■ L. In newly redesignated paragraph (e)(2), adding the words "before or" immediately after the words "eligible loan" and removing the word "and".
■ M. In newly redesignated paragraph (e)(3), removing the word "only", removing the punctuation "." and adding in its place the punctuation ";", and adding the word "and" immediately after the punctuation ";".
■ N. Adding a new paragraph (e)(4).
The additions read as follows:

### § 682.201   Eligible borrowers.

(a) *Student Stafford borrower.* \* \* \*

\*   \*   \*   \*   \*

(b) *Student PLUS borrower.* A graduate or professional student who is enrolled or accepted for enrollment on at least a half-time basis at a participating school is eligible to receive a PLUS Loan on or after July 1, 2006, if the student—

(1) Meets the requirements for an eligible student under 34 CFR 668;

(2) Meets the requirements of paragraphs (a)(4), (a)(5), (a)(6), (a)(7), (a)(8), and (a)(9) of this section, if applicable;

(3) Has received a determination of his or her annual loan maximum eligibility under the Federal Subsidized and Unsubsidized Stafford Loan Program; and

(4) Does not have an adverse credit history in accordance with paragraphs (c)(2)(i) through (c)(2)(v) of this section,

Confidential

B0270264

or obtains an endorser who has been determined not to have an adverse credit history, as provided for in paragraph (c)(1)(vii) of this section.

\*   \*   \*   \*   \*

(c) *Parent PLUS borrower.*

(1) \*   \*   \*

(viii) Has completed repayment of any title IV, HEA program assistance obtained by fraud, if the parent has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance.

\*   \*   \*   \*   \*

(d) \*   \*   \*

(1) \*   \*   \*

(i) \*   \*   \*

(D) Not in default status resulting from a claim filed under § 682.412.

\*   \*   \*   \*   \*

(2) A borrower may not consolidate a loan under this section for which the borrower is wholly or partially responsible.

(e) \*   \*   \*

(4) If the consolidation loan has been submitted to the guaranty agency for default aversion, the borrower may obtain a subsequent consolidation loan under the Federal Direct Consolidation Loan Program for purposes of obtaining an income contingent repayment plan.

\*   \*   \*   \*   \*

■ 38. Section 682.202 is amended by:

■ A. In paragraph (a)(1)(viii), by adding after the words "July 1, 1998," the words " and prior to July 1, 2006,".

■ B. Adding a new paragraph (a)(1)(ix).

■ C. In paragraph (a)(2)(vi)(A), adding after the words "July 1, 2001," the words "and prior to July 1, 2006,".

■ D. Adding a new paragraph (a)(2)(vii).

■ E. Revising paragraph (c)(1).

■ F. Revising paragraph (d).

The revisions and additions read as follows:

§ 682.202   **Permissible charges by lenders to borrowers.**

(a) \*   \*   \*

(1) \*   \*   \*

(ix) For a Stafford loan for which the first disbursement is made on or after July 1, 2006, the interest rate is 6.8 percent.

(2) \*   \*   \*

(vii) For a PLUS loan first disbursed on or after July 1, 2006, the interest rate is 8.5 percent.

\*   \*   \*   \*   \*

(c) *Fees for FFEL Program loans.* (1)(i) For Stafford loans first disbursed prior to July 1, 2006, a lender may charge a borrower an origination fee not to exceed 3 percent of the principal amount of the loan.

(ii) For Stafford loans first disbursed on or after July 1, 2006, but before July 1, 2007, a lender may charge a borrower an origination fee not to exceed 2 percent of the principal amount of the loan.

(iii) For Stafford loans first disbursed on or after July 1, 2007, but before July 1, 2008, a lender may charge a borrower an origination fee not to exceed 1.5 percent of the principal amount of the loan.

(iv) For Stafford loans first disbursed on or after July 1, 2008, but before July 1, 2009, a lender may charge a borrower an origination fee not to exceed 1 percent of the principal amount of the loan.

(v) For Stafford loans first disbursed on or after July 1, 2009, but before July 1, 2010, a lender may charge a borrower an origination fee not to exceed .5 percent of the principal amount of the loan.

(vi) For Stafford loans first disbursed on or after July 1, 2010, a lender may not charge a borrower an origination fee.

(vii) Except as provided in paragraph (c)(2) of this section, a lender must charge all borrowers the same origination fee.

\*   \*   \*   \*   \*

(d) *Insurance premium and Federal default fee.*

(1) For loans guaranteed prior to July 1, 2006, a lender may charge the borrower the amount of the insurance premium paid by the lender to the guarantor (up to 1 percent of the principal amount of the loan) if that charge is provided for in the promissory note.

(2) For loans guaranteed on or after July 1, 2006, other than an SLS or PLUS loan refinanced under § 682.209(e) or (f), a lender may charge the borrower the amount of the Federal default fee paid by the lender to the guarantor (up to 1 percent of the principal amount of the loan) if that charge is provided for in the promissory note.

(3) If the borrower is charged the insurance premium or the Federal default fee, the amount charged must be deducted proportionately from each disbursement of the borrower's loan proceeds, if the loan is disbursed in more than one installment.

(4) The lender shall refund the insurance premium or Federal default fee paid by the borrower in accordance with the circumstances and procedures applicable to the return of origination fees, as described in paragraph (c)(7) of this section.

\*   \*   \*   \*   \*

§ 682.204   **[Amended]**

■ 39. Section 682.204 is amended by:

■ A. In paragraph (a)(1)(i), adding the words ", or, for a loan certified on or after July 1, 2007, $3,500," immediately after the figure "$2,625".

■ B. In paragraph (a)(1)(ii), adding the words ", or, for a loan certified on or after July 1, 2007, $3,500," immediately after the figure "$2,625".

■ C. In paragraph (a)(1)(iii), adding the words ", or, for a loan certified on or after July 1, 2007, $3,500" immediately after the figure "$2,625".

■ D. In paragraph (a)(2)(i), adding the words ", or, for a loan certified on or after July 1, 2007, $4,500," immediately after the figure "$3,500".

■ E. In paragraph (a)(2)(ii), adding the words ", or, for a loan certified on or after July 1, 2007, $4,500," immediately after the figure "$3,500".

■ F. In paragraph (d)(5), adding the words ", or, for a loan certified on or after July 1, 2007, $12,000," immediately after the figure "$10,000".

■ G. In paragraph (d)(6)(ii), adding the words ", or, for a loan certified on or after July 1, 2007, $7,000," immediately after the figure "$5,000".

■ H. In paragraph (d)(6)(iii), adding the words ", or, for a loan certified on or after July 1, 2007, $7,000," immediately after the figure "$5,000".

■ I. In paragraph (h), removing the words "that parents may borrow on behalf of each dependent student" and adding, in their place, the words "that a parent or student may borrow".

■ 40. Section 682.205 is amended by revising paragraph (a)(2)(xix) to read as follows:

§ 682.205   **Disclosure requirements for lenders.**

(a) \*   \*   \*

(2) \*   \*   \*

(xix) In the case of a Stafford or student PLUS loan, a statement that the loan proceeds will be transmitted to the school for delivery to the borrower;

\*   \*   \*   \*   \*

■ 41. Section 682.207 is amended by:

■ A. In paragraph (b)(1)(iv), removing the figure "21" and adding, in its place, the figure "10".

■ B. Revising paragraph (b)(1)(v)(B), (C), and (D), and removing paragraph (b)(1)(v)(E).

■ C. Redesignating paragraph (b)(2) as paragraph (b)(3).

■ D. Adding new paragraph (b)(2).

The revisions and addition read as follows:

§ 682.207   **Due diligence in disbursing a loan.**

(b) \*   \*   \*

(1) \*   \*   \*

(v) \*   \*   \*

(B) In the case of a Federal PLUS loan —

(1) By electronic funds transfer or master check from the lender in

B0270265

accordance with the disbursement schedule provided by the school to an account maintained in accordance with § 668.163 by the school as trustee for the lender. A disbursement made by electronic funds transfer or master check must be accompanied by a list of the names, social security numbers, and loan amounts for the parent or student borrowers who are receiving a portion of the disbursement and the names and social security numbers of the students on whose behalf the parents are borrowing parent PLUS loans.

(2) By a check from the lender that is made co-payable to the institution and the parent borrower, for a parent PLUS loan, or student borrower, for a student PLUS loan, directly to the institution of higher education.

(C) In the case of a student enrolled in a study-abroad program approved for credit at the home institution in which the student is enrolled, if the student requests—

(1) A Stafford loan directly to the student only after verification of the student's enrollment by the lender or guaranty agency; or

(2) To the home institution if the borrower provides a power-of-attorney to an individual not affiliated with the institution to endorse the check or complete an electronic funds transfer authorization.

(D) In the case of a student enrolled in an eligible foreign school, if the foreign school requests, a Stafford loan directly to the student only after verification of the student's enrollment by the lender or guaranty agency.

* * * * *

(2)(i) A lender or guaranty agency must verify a borrower's enrollment at the foreign school, or a borrower's enrollment in a study-abroad program, prior to each disbursement of Stafford loan funds directly to a student by—

(A) For a student enrolled at a foreign school—

(1) The guaranty agency accessing the Department's Postsecondary Education Participants System (PEPS) Database (or any successor system) and confirming that the foreign school the student is to attend is certified to participate in the FFEL program.

(2) For a new student, contacting the foreign school the student is to attend by telephone or e-mail to verify the student's admission to the foreign school for the period for which the loan is intended at the enrollment status for which the loan was certified.

(3) For a continuing student, contacting the foreign school the student is to attend by telephone or e-mail to verify that the student is still

enrolled at the foreign school for the period for which the loan is intended at the enrollment status for which the loan was certified.

(B) For a student enrolled in a study-abroad program, contacting the home institution in which the student is enrolled by telephone or e-mail to verify—

(1) For a new student, the student's admission to the study-abroad program for the period for which the loan is intended at the enrollment status for which the loan is certified.

(2) For a continuing student, that the student is still enrolled in the study-abroad program for the period for which the loan is intended at the enrollment status for which the loan is certified.

(ii) The lender or guaranty agency that is verifying enrollment at the institution the student is to attend must maintain the following information in the student's file:

(A) The name and telephone number of the school representative contacted;

(B) The date of the contact;

(C) The enrollment period;

(D) Whether enrollment was verified at the enrollment status for which the loan was certified; and

(E) Any other pertinent information received from the school.

(iii) Guaranty agencies and lenders must coordinate their activities to ensure that the requirements of this paragraph are met prior to making any direct disbursement to a student.

(iv) If a lender disburses a Stafford loan directly to the borrower for attendance at an eligible foreign school, or to a borrower enrolled in a study-abroad program approved for credit at the home institution, as provided in paragraphs (b)(1)(v)(C)(1) and (b)(1)(v)(D)(1) of this section, the lender must, at the time of disbursement, notify the foreign school, for a borrower attending a foreign school, or the home institution in which the student is enrolled, for a borrower enrolled in a study-abroad program, of—

(A) The name and social security number of the student;

(B) The type of loan;

(C) The amount of the disbursement, including the amount of any fees assessed the borrower;

(D) The date of the disbursement; and

(E) The name, address, telephone and fax number or electronic address of the lender, servicer, or guaranty agency to which any inquiries should be addressed.

* * * * *

### § 682.208   [Amended]

■ 42. Section 682.208 is amended by:

■ A. In paragraph (c)(2), adding the words "or a student PLUS loan borrower" immediately after the words "Stafford loan borrower".

■ B. In paragraph (d)(2), adding the words ", as authorized and if practicable," immediately after "repayment schedule".

■ C. In paragraph (f)(1) introductory text, adding the words "has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance," immediately after the word "borrowed".".

### § 682.209   [Amended]

■ 43. Section 682.209 is amended by:

■ A. In paragraph (a)(3)(i) introductory text, removing the words "paragraphs (a)(4) and (5)" and adding, in their place, the words "paragraph (a)(4)".

■ B. Removing paragraph (a)(5) and redesignating paragraphs (a)(6) through (a)(9) as paragraphs (a)(5) through (a)(8), respectively.

■ C. In newly-redesignated paragraph (a)(6)(v), removing the parentheticals "(a)(7)(vi)" and adding, in their place, the parentheticals "(a)(6)(vi)".

■ D. In newly-redesignated paragraphs (a)(6)(vii)(A)(2) and (a)(6)(viii)(A)(2), removing the parentheticals "(a)(7)(i)" and adding, in their place, the parentheticals "(a)(6)(i)".

■ E. In newly-redesignated paragraph (a)(6)(viii)(E), removing the parentheticals "(a)(8)" and adding, in their place, the parentheticals "(a)(7)".

■ F. In newly-redesignated paragraph (a)(7)(i), removing the parentheticals "(a)(7)(ix)" and adding, in their place, the parentheticals "(a)(6)(ix)".

■ G. In newly-designated paragraph (a)(7)(i), removing the parentheticals "(a)(8)(ii)" and adding, in their place, the parentheticals "(a)(7)(ii)".

■ H. In paragraph (e)(2)(ii), removing the parentheticals "(a)(8)(i)" and adding, in their place, the parentheticals "(a)(7)(i)".

■ I. In paragraph (e)(3), adding the words "or Federal default fee" after the word "premium".

■ J. In paragraph (f)(2)(ii), removing the parentheticals "(a)(8)(i)" and adding, in their place, the parentheticals "(a)(7)(i)".

■ 44. Section 682.210 is amended by adding a new paragraph (t) to read as follows:

### § 682.210   Deferment.

* * * * *

(t) Military service deferments for loans for which the first disbursement is made on or after July 1, 2001—(1) A borrower who receives an FFEL Program loan first disbursed on or after July 1,

Confidential

2001, may receive a military service deferment for such loans for any period not to exceed 3 years during which the borrower is—

(i) Serving on active duty during a war or other military operation or national emergency; or

(ii) Performing qualifying National Guard duty during a war or other military operation or national emergency.

(2) *Serving on active duty during a war or other military operation or national emergency* means service by an individual who is—

(i) A Reserve of an Armed Force ordered to active duty under 10 U.S.C. 12301(a), 12301(g), 12302, 12304 or 12306;

(ii) A retired member of an Armed Force ordered to active duty under 10 U.S.C. 688 for service in connection with a war or other military operation or national emergency, regardless of the location at which such active duty service is performed; or

(iii) Any other member of an Armed Force on active duty in connection with such emergency or subsequent actions or conditions who has been assigned to a duty station at a location other than the location at which member is normally assigned.

(3) *Qualifying National Guard duty during a war or other operation or national emergency* means service as a member of the National Guard on full-time National Guard duty, as defined in 10 U.S.C. 101(d)(5), under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under 32 U.S.C. 502(f) in connection with a war, other military operation, or national emergency declared by the President and supported by Federal funds.

(4) Payments made by or on behalf of a borrower during a period for which the borrower qualified for a military service deferment are not refunded.

(5) A borrower is eligible for a military service deferment on a Federal Consolidation Loan only if the borrower meets the conditions described in this section and all of the title IV loans included in the Consolidation Loan were first disbursed on or after July 1, 2001.

(6) As used in this section—

(i) *Active duty* means active duty as defined in 10 U.S.C. 101(d)(1) except that it does not include active duty for training or attendance at a service school;

(ii) *Military operation* means a contingency operation as defined in 10 U.S.C. 101(a)(13); and

(iii) *National emergency* means the national emergency by reason of certain terrorist attacks declared by the President on September 14, 2001, or subsequent national emergencies declared by the President by reason of terrorist attacks.

\*     \*     \*     \*     \*

■ 45. Section 682.211 is amended by:

■ A. Revising paragraph (b)(1).

■ B. In paragraph (f)(6) adding the word "parent" immediately after the words "in the case of".

The revisions read as follows:

### § 682.211  Forbearance

\*     \*     \*     \*     \*

(b) \*     \*     \*

(1) The lender and the borrower or endorser agree to the terms of the forbearance and, unless the agreement was in writing, the lender sends, within 30 days, a notice to the borrower or endorser confirming the terms of the forbearance and records the terms of the forbearance in the borrower's file; or

\*     \*     \*     \*     \*

■ 46. Section 682.215 is amended by:

■ A. Revising paragraph (a).

■ B. In paragraph (b), adding, in alphabetical order, a new definition for *Highly qualified*.

■ C. Revising paragraph (c)(1)(iii).

■ D. Revising paragraph (c)(3).

■ E. Revising paragraph (c)(4).

■ F. Redesignating paragraphs (c)(5), (c)(6), (c)(7), (c)(8), and (c)(9) as paragraphs (c)(7), (c)(8), (c)(9), (c)(10), and (c)(11), respectively.

■ G. Adding a new paragraph (c)(5).

■ H. Adding a new paragraph (c)(6).

■ I. Removing the parentheticals "(c)(5)" and adding, in their place, the parentheticals "(c)(7)" in newly redesignated paragraph (c)(8).

■ J. Revising paragraph (d)(1).

■ K. Revising paragraph (d)(2).

■ L. In paragraph (f)(3)(ii), removing the figure "$5,000" and adding, in its place, the figure "$17,500".

■ M. In paragraph (f)(3)(ii), removing the parentheticals "(c)(9)" and adding, in its place, the parentheticals "(c)(11)".

■ N. In paragraph (g), adding the words ", or up to $17,500," immediately after the figure "$5,000".

The revisions and additions read as follows:

### § 682.215  Teacher loan forgiveness program.

(a) *General.* The teacher loan forgiveness program is intended to encourage individuals to enter and continue in the teaching profession. For new borrowers, the Secretary repays the amount specified in this paragraph on the borrower's subsidized and unsubsidized Federal Stafford Loans, Direct Subsidized Loans, Direct Unsubsidized Loans, and in certain cases, Federal Consolidation Loans or Direct Consolidation Loans. The forgiveness program is only available to a borrower who has no outstanding loan balance under the FFEL Program or the Direct Loan Program on October 1, 1998 or who has no outstanding loan balance on the date he or she obtains a loan after October 1, 1998. The borrower must have been employed as a full-time teacher for five consecutive complete academic years, at least one of which was after the 1997–1998 academic year, in certain eligible elementary or secondary schools that serve low-income families. All borrowers eligible for teacher loan forgiveness may receive loan forgiveness of up to a combined total of $5,000 on the borrower's eligible FFEL and Direct Loan Program loans. If the borrower taught for five consecutive years as a highly qualified mathematics or science teacher in an eligible secondary school or as a special education teacher in an eligible elementary or secondary school, the borrower may receive loan forgiveness of up to a combined total of $17,500 on the borrower's eligible FFEL and Direct Loan Program loans. The loan for which the borrower is seeking forgiveness must have been made prior to the end of the borrower's fifth year of qualifying teaching service.

\*     \*     \*     \*     \*

(b) \*     \*     \*

*Highly qualified* means highly qualified as defined in section 9101 of the Elementary and Secondary Education Act of 1965, as amended.

\*     \*     \*     \*     \*

(c) \*     \*     \*

(1) \*     \*     \*

(iii) Is listed in the *Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits*. If this directory is not available before May 1 of any year, the previous year's directory may be used. The Secretary considers all elementary and secondary schools operated by the Bureau of Indian Affairs (BIA) or operated on Indian reservations by Indian tribal groups under contract with the BIA to qualify as schools serving low-income students.

\*     \*     \*     \*     \*

(3) In the case of a borrower whose five consecutive complete years of qualifying teaching service began before October 30, 2004, the borrower—

(i) May receive up to $5,000 of loan forgiveness if the borrower—

(A) Demonstrated knowledge and teaching skills in reading, writing,

mathematics, and other areas of the elementary school curriculum, as certified by the chief administrative officer of the eligible elementary school in which the borrower was employed; or

(B) Taught in a subject area that is relevant to the borrower's academic major as certified by the chief administrative officer of the eligible secondary school in which the borrower was employed.

(ii) May receive up to $17,500 of loan forgiveness if the borrower—

(A) Taught mathematics or science on a full-time basis in an eligible secondary school and was a highly qualified mathematics or science teacher; or

(B) Taught as a special education teacher on a full-time basis to children with disabilities in either an eligible elementary or secondary school and was a highly qualified special education teacher whose special education training corresponded to the children's disabilities and who has demonstrated knowledge and teaching skills in the content areas of the elementary and secondary school curriculum.

(4) In the case of a borrower whose five consecutive years of qualifying teaching service began on or after October 30, 2004, the borrower—

(i) May receive up to $5,000 of loan forgiveness if the borrower taught full time in an eligible elementary or secondary school and was a highly qualified elementary or secondary school teacher.

(ii) May receive up to $17,500 of loan forgiveness if the borrower—

(A) Taught mathematics or science on a full-time basis in an eligible secondary school and was a highly qualified mathematics or science teacher; or

(B) Taught as a special education teacher on a full-time basis to children with disabilities in either an eligible elementary or secondary school and was a highly qualified special education teacher whose special education training corresponded to the children's disabilities and who has demonstrated knowledge and teaching skills in the content areas of the elementary or secondary school curriculum.

(5) To qualify for loan forgiveness as a highly qualified teacher, the teacher must have been a highly qualified teacher for all five years of eligible teaching service.

(6) For teacher loan forgiveness applications received by the loan holder on or after July 1, 2006, a teacher in a private, non-profit elementary or secondary school who is exempt from State certification requirements (unless otherwise applicable under State law) may qualify for loan forgiveness under

paragraphs (c)(3)(ii) or (c)(4) of this section if—

(i) The private school teacher is permitted to and does satisfy rigorous subject knowledge and skills tests by taking competency tests in applicable grade levels and subject areas;

(ii) The competency tests are recognized by 5 or more States for the purposes of fulfilling the highly qualified teacher requirements under section 9101 of the Elementary and Secondary Education Act of 1965; and

(iii) The private school teacher achieves a score on each test that equals or exceeds the average passing score for those 5 states.

*      *      *      *      *

(d) Forgiveness amount. (1) A qualified borrower is eligible for forgiveness of up to $5,000, or up to $17,500 if the borrower meets the requirements of paragraphs (c)(3)(ii) or (c)(4)(ii) of this section. The forgiveness amount is deducted from the aggregate amount of the borrower's subsidized or unsubsidized Federal Stafford or Federal Consolidation Loan obligation that is outstanding after the borrower completes his or her fifth consecutive complete academic year of teaching as described in paragraph (c) of this section. Only the outstanding portion of the consolidation loan that was used to repay an eligible subsidized or unsubsidized Federal Stafford loan, an eligible Direct Subsidized Loan, or an eligible Direct Unsubsidized Loan qualifies for loan forgiveness under this section.

(2) A borrower may not receive more than a total of $5,000, or $17,500 if the borrower meets the requirements of paragraphs (c)(3)(ii) or (c)(4)(ii) of this section, in loan forgiveness for outstanding principal and accrued interest under both this section and under section 34 CFR 685.217.

*      *      *      *      *

■ 47. Section 682.300 is amended by:
■ A. In paragraph (c)(3)(i), removing the word "or" at the end of the paragraph.
■ B. In paragraph (c)(3)(ii), removing the punctuation "." and adding, in its place, the words "; or".
■ C. Adding new paragraph (c)(3)(iii).
The addition reads as follows:

§ 682.300   Payment of interest benefits on Stafford and Consolidation Loans.

*      *      *      *      *

(c) *      *      *

(3) *      *      *

(iii) In the case of a loan disbursed through an escrow agent, 3 days prior to the first day of the period of enrollment or, if the loan is disbursed after the first

day of the period of enrollment, 3 days after disbursement.

*      *      *      *      *

■ 48. Section 682.302 is amended by:
■ A. Revising paragraph (b)(1).
■ B. In paragraph (b)(2), adding the words "or on or after January 1, 2000 for any period prior to April 1, 2006," after the words "on or after July 1, 1998".
■ C. Revising paragraph (c).
■ D. Revising paragraph (e).
■ E. Adding a new paragraph (f).
The revisions and addition read as follows:

§ 682.302   Payment of special allowance on FFEL Loans.

*      *      *      *      *

(b) *      *      *

(1) Except for non-subsidized Federal Stafford loans disbursed on or after October 1, 1981, for periods of enrollment beginning prior to October 1, 1992, or as provided in paragraphs (b)(2), (b)(3), or (e)(1) of this section, FFEL loans that otherwise meet program requirements are eligible for special allowance payments.

*      *      *      *      *

(c) Rate. (1) Except as provided in paragraph (c)(2), (c)(3), or (e) of this section, the special allowance rate for an eligible loan during a 3-month period is calculated by—

(i) Determining the average of the bond equivalent rates of—

(A) The quotes of the 3-month commercial paper (financial) rates in effect for each of the days in such quarter as reported by the Federal Reserve in Publication H–15 (or its successor) for such 3-month period for a loan for which the first disbursement is made on or after January 1, 2000; or

(B) The 91-day Treasury bills auctioned during the 3-month period for a loan for which the first disbursement is made prior to January 1, 2000;

(ii) Subtracting the applicable interest rate for that loan;

(iii) Adding—

(A)(1) 2.34 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after January 1, 2000;

(2) 2.64 percent to the resulting percentage for a Federal PLUS loan for which the first disbursement is made on or after January 1, 2000;

(3) 2.64 percent to the resulting percentage for a Federal Consolidation Loan that was made based on an application received by the lender on or after January 1, 2000;

(4) 1.74 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after January 1, 2000 during the

Confidential

B0270268

borrower's in-school, grace, and authorized period of deferment;

(5) 2.8 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1998 and prior to January 1, 2000;

(6) 2.2 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1998 and prior to January 1, 2000, during the borrower's in-school, grace, and authorized period of deferment;

(7) 2.5 percent to the resulting percentage for a Federal Stafford loan for which the first disbursement is made on or after July 1, 1995 and prior to July 1, 1998 for interest that accrues during the borrower's in-school, grace, and authorized period of deferment;

(B) 3.1 percent to the resulting percentage for—

(1) A Federal Stafford Loan made on or after October 1, 1992 and prior to July 1, 1998, except as provided in paragraph (c)(1)(iii)(A)(7) of this section;

(2) A Federal SLS Loan made on or after October 1, 1992;

(3) A Federal PLUS Loan made on or after October 1, 1992 and prior to July 1, 1998;

(4) A Federal PLUS loan made on or after July 1, 1998 and prior to October 1, 1998, except that no special allowance shall be paid during any quarter unless the average of the 91-day Treasury bills auctioned during that quarter, plus 3.1 percent, exceeds the rate determined under § 682.202(a)(2)(v);

(5) A Federal PLUS loan made on or after October 1, 1998 and prior to January 1, 2000, except that no special allowance shall be paid during any quarter unless the rate determined under § 682.202(a)(2)(v) exceeds 9 percent;

(6) A Federal Consolidation Loan for which the application was received by the lender prior to January 1, 2000, except that no special allowance shall be paid during any quarter on a loan for which the application was received on or after October 1, 1998 unless the average of the bond equivalent rate of the 91-day Treasury bills auctioned during that quarter, plus 3.1 percent, exceeds the rate determined under Section 682.202(a)(4)(iv);

(C) 3.25 percent to the resulting percentage, for a loan made on or after November 16, 1986, but prior to October 1, 1992;

(D) 3.25 percent to the resulting percentage, for a loan made on or after October 17, 1986 but prior to November 16, 1986, for a period of enrollment

beginning on or after November 16, 1986;

(E) 3.5 percent to the resulting percentage, for a loan made prior to October 17, 1986, or a loan described in paragraph (c)(2) of this section; or

(F) 3.5 percent to the resulting percentage, for a loan made on or after October 17, 1986 but prior to November 16, 1986, for a period of enrollment beginning prior to November 16, 1986;

(iv) Rounding the result upward to the nearest one-eighth of 1 percent, for a loan made prior to October 1, 1981; and

(v) Dividing the resulting percentage by 4.

(2) The special allowance rate determined under paragraph (c)(1)(iii)(E) of this section applies to loans made or purchased from funds obtained from the issuance of an obligation of the—

(i) Maine Educational Loan Marketing Corporation to the Student Loan Marketing Association pursuant to an agreement entered into on January 31, 1984; or

(ii) South Carolina Student Loan Corporation to the South Carolina National Bank pursuant to an agreement entered into on July 30, 1986.

(3)(i) Subject to paragraphs (c)(3)(iii), (c)(3)(iv), and (e) of this section, the special allowance rate is that provided in paragraph (c)(3)(ii) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from—

(A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993;

(B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

(ii) The special allowance rate for a loan described in paragraph (c)(3)(i) is one-half of the rate calculated under paragraph (c)(1) of this section, except that in applying paragraph (c)(1)(iii), 3.5 percent is substituted for the percentages specified therein.

(iii) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that

are made prior to October 1, 1992, may not be less than—

(A) 2.5 percent per year on eligible loans for which the applicable interest rate is 7 percent;

(B) 1.5 percent per year on eligible loans for which the applicable interest rate is 8 percent; or

(C) One-half of 1 percent per year on eligible loans for which the applicable rate is 9 percent.

(iv) The special allowance rate applicable to loans described in paragraph (c)(3)(i) of this section that are made on or after October 1, 1992, may not be less than 9.5 percent minus the applicable interest rate.

(4) Loans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued on or after October 1, 1993, and loans made with funds derived from default reimbursement collections, interest, or other income related to eligible loans made or purchased with those tax-exempt funds, do not qualify for the minimum special allowance rate specified in paragraph (c)(3)(iii) or (iv) of this section, and are not subject to the 50 percent limitation on the maximum rate otherwise applicable to loans made with tax-exempt funds.

(5) For purposes of paragraphs (c)(3) and (c)(4), a loan is purchased with funds described in those paragraphs when the loan is refinanced in consideration of those funds.

\*   \*   \*   \*   \*

(e) *Limits on special allowance payments on loans made or purchased with funds derived from tax-exempt obligations.*

(1) *General.* (i) The Secretary pays a special allowance on a loan described in paragraph (c)(3) or (c)(4) of this section that is held by or on behalf of an Authority only if the loan meets the requirements of § 682.800.

(ii) The Secretary pays a special allowance at the rate prescribed in paragraph (c)(1) or (c)(3) of this section on a loan described in paragraph (c)(3)(i) of this section that is held by or on behalf of an Authority in accordance with paragraphs (e)(2) through (e)(5) of this section, as applicable. References to "loan" or "loans" in paragraphs (e)(2) through (e)(5) include only loans described in paragraph (c)(3)(i).

(2) *Effect of Refinancing on Special Allowance Payments.* Except as provided in paragraphs (e)(3) through (e)(5) of this section—

(i) The Secretary pays a special allowance at the rate prescribed in paragraph (c)(3) of this section to an Authority that holds a legal or equitable

B0270269

interest in the loan that is pledged or otherwise transferred in consideration of—

(A) Funds listed in paragraph (c)(3)(i) of this section;

(B) Proceeds of a tax-exempt refunding obligation that refinances a debt that—

(1) Was first incurred pursuant to a tax-exempt obligation originally issued prior to October 1, 1993;

(2) Has been financed continuously by tax-exempt obligation.

(ii) The Secretary pays a special allowance to an Authority that holds a legal or equitable interest in the loan that is pledged or otherwise transferred in consideration of funds other than those specified in paragraph (e)(2)(i) of this section either—

(A) At the rate prescribed in paragraph (c)(1) of this section, if

(1) The prior tax-exempt obligation is retired; or

(2) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bears a yield that does not exceed the yield restrictions of section 148 of the Internal Revenue Code and the regulations thereunder, or

(B) At the rate prescribed in paragraph (c)(3) of this section.

(3) *Loans affected by transactions or events after September 30, 2004.* The Secretary pays a special allowance to an Authority at the rate prescribed in paragraph (c)(1) of this section if, after September 30, 2004—

(i) The loan is refinanced with funds other than those listed in paragraph (e)(2)(i) of this section;

(ii) The loan is sold or transferred to any other holder; or

(iii)(A) The loan is financed by a tax-exempt obligation included in the sources in paragraph (e)(2)(i), and

(B) That obligation matures, is refunded, is defeased, or is retired, whichever occurs earliest.

(4) *Loans Affected by Transactions After February 7, 2006.* Except as provided in paragraph (e)(5) of this section, the Secretary pays a special allowance at the rate prescribed in paragraph (c)(1) of this section on any loan—

(i) That was made or purchased on or after February 8, 2006, or

(ii) That was not earning, on February 8, 2006, a quarterly rate of special allowance determined under paragraph (c)(3) of this section.

(5) *Loans affected by transactions after December 30, 2010.* (i) The Secretary pays a special allowance to a holder described in paragraph (e)(5)(ii) of this section at the rate prescribed in paragraph (c)(3) of this section only on a loan—

(A) That was made or purchased prior to December 31, 2010, or

(B) That was earning, before December 31, 2010, a quarterly rate of special allowance determined under paragraph (c)(3) of this section.

(ii) A holder for purposes of this paragraph is an entity that—

(A) On February 8, 2006 and during the quarter for which special allowance is determined under this paragraph—

(1) Is a unit of State or local government or a private nonprofit entity, and

(2) Is not owned or controlled by, or under common ownership or control by, a for profit entity; and

(B) In the most recent quarterly special allowance payment prior to September 30, 2005, held, directly or through any subsidiary, affiliate, or trustee, a total unpaid balance of principal of $100,000,000 or less for which special allowance was determined and paid under paragraph (c)(3) of this section.

(f) As used in this section—

(1) A tax-exempt obligation is an obligation the income of which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);

(2) An obligation is originally issued at the time that an Authority issues the obligation to obtain funds to make loans or to purchase loans that an Authority does not hold or have any interest in;

(3) A loan is refinanced when an Authority that has pledged the loan as collateral for an obligation of that Authority retains an interest in the loan, but causes the loan to be released from the lien of that obligation and pledged as collateral for a different obligation of that Authority.

(4) References to an Authority include a successor entity that may not qualify as an Authority under § 682.200(b).

\*    \*    \*    \*    \*

■ 49. Section 682.305 is amended by:
■ A. In paragraph (a)(3)(i)(A)(2), removing the punctuation "." at the end of the paragraph and adding, in its place, the words "; and".
■ B. Adding a new paragraph (a)(3)(i)(A)(3).
■ C. Revising paragraph (c)(1).
■ D. Adding a new paragraph (d).
The revisions and additions read as follows:

### § 682.305   Procedures for payment of interest benefits and special allowance and collection of origination and loan fees.

(a) \*    \*    \*
(3)(i)(A) \*    \*    \*
(3) The amount of excess interest, as calculated in accordance with paragraph (d) of this section.

\*    \*    \*    \*    \*

(c) *Independent audits.* (1) A lender (other than a school lender) originating or holding more than $5 million in FFEL loans during its fiscal year, and a school lender under § 682.601 that originates or holds any FFEL loans during its fiscal year, must submit an independent annual compliance audit for that year, conducted by a qualified independent organization or person. The Secretary may, following written notice, suspend the payment of interest benefits and special allowance to a lender that does not submit its audit within the time period prescribed in paragraph (c)(2) or this section.

\*    \*    \*    \*    \*

(d) *Recovery of excess interest paid by the Secretary.*

(1) For any loan for which the first disbursement of principal is made on or after April 1, 2006, the Secretary collects the amount of excess interest paid to a lender on a quarterly basis when the applicable interest rate on a loan for each quarter exceeds the special allowance support level in paragraph (d)(2) of this section for the loan. Excess interest is calculated and recovered each quarter by subtracting the special allowance support level from the applicable interest, multiplying the result by the average daily principal balance of the loan (not including unearned interest added to principal) during the quarter, and dividing by four.

(2) The term *special allowance support level* means a number expressed as a percentage equal to the sum of—

(i) The average of the bond equivalent rates of the quotes of the 3-month commercial paper (financial) rates in effect for each of the days in such quarter as reported by the Federal Reserve in Publication H–15 (or its successor) for such 3-month period; plus

(ii) 2.34 percent for a Federal Stafford loan in repayment;

(iii) 1.74 percent for a Federal Stafford loan during the in-school, grace, and deferment periods; or

(iv) 2.64 percent for a Federal PLUS or Consolidation Loan.

\*    \*    \*    \*    \*

■ 50. Section 682.401 is amended by:
■ A. In paragraph (b)(3)(i), removing the word "SLS" and inserting, in its place, the words "PLUS Loan".
■ B. Amending the first sentence of paragraph (b)(4) by adding the words "and § 668.35(i) for a borrower who fraudulently obtained title IV, HEA program assistance" after the word "obtained".
■ C. In paragraph (b)(4)(iv), removing the figure "six" and inserting, in its place, the figure "three".

B0270270

■ D. In paragraph (b)(5)(ii) introductory text, by inserting the word "parent" before the word "PLUS".

■ E. Revising paragraphs (b)(10)(i), (ii), (iii), (iv) (v), (vi) introductory text, (vi)(A), and (vi)(B) introductory text.

■ F. In paragraph (b)(14)(i), removing the word "and".

■ G. In paragraph (b)(14)(ii), removing the punctuation "." and adding the words "and before July 1, 2006; and" immediately after the date "October 1, 1993".

■ H. Adding a new paragraph (b)(14)(iii).

■ I. In paragraph (b)(19)(i)(F), by adding the words "unpaid refunds, identity theft" after the word "certification,".

■ J. Revising paragraph (b)(27).

■ K. Adding a new paragraph (b)(29).

■ L. Adding a new paragraph (f).

The revisions and additions read as follows:

### § 682.401   Basic program agreement.

\*      \*      \*      \*      \*

(b) \* \* \*

(10) *Insurance premiums and Federal default fees.* (i) Except for a Consolidation Loan or SLS or PLUS loans refinanced under § 682.209 (e) or (f), a guaranty agency:

(A) May charge the lender an insurance premium for Stafford, SLS, or PLUS loans it guarantees prior to July 1, 2006; and

(B) Must collect, either from the lender or by payment from any other non-Federal source, a Federal default fee for any Stafford or PLUS loans it guarantees on or after July 1, 2006, to be deposited into the Federal Fund under § 682.419.

(ii) The guaranty agency may not use the Federal default fee for incentive payments to lenders, and may only use the insurance premium or the Federal default fee for costs incurred in guaranteeing loans or in the administration of the agency's loan guarantee program, as specified in § 682.410(a)(2) or § 682.419(c).

(iii) If a lender charges the borrower an insurance premium or Federal default fee, the lender must deduct the charge proportionately from each disbursement of the borrower's loan proceeds.

(iv) The amount of the insurance premium or Federal default fee, as applicable—

(A) May not exceed 3 percent of the principal balance for a loan disbursed on or before June 30, 1994;

(B) May not exceed 1 percent of the principal balance for a loan disbursed on or after July 1, 1994;

(C) Shall be 1 percent of the principal balance of a loan guaranteed on or after July 1, 2006.

(v) If the circumstances specified in paragraph (vi) exist, the guaranty agency shall refund to the lender any insurance premium or Federal default fee paid by the lender.

(vi) The lender shall refund to the borrower by a credit against the borrower's loan balance the insurance premium or Federal default fee paid by the borrower on a loan under the following circumstances:

(A) The insurance premium or Federal default fee attributable to each disbursement of a loan must be refunded if the loan check is returned uncashed to the lender.

(B) The insurance premium or Federal default fee, or an appropriate prorated amount of the premium or fee, must be refunded by application to the borrower's loan balance if—

\*      \*      \*      \*      \*

(14) \* \* \*

(iii) Not more than 97 percent of the unpaid principal balance of each loan guaranteed for loans first disbursed on or after July 1, 2006.

\*      \*      \*      \*      \*

(27) *Consolidation of defaulted FFEL loans.*

(i) A guaranty agency may charge collection costs in an amount not to exceed 18.5 percent of the outstanding principal and interest on a defaulted FFEL Program loan that is paid off by a Federal Consolidation loan.

(ii) Prior to October 1, 2006, when returning the proceeds from the consolidation of a defaulted loan to the Secretary, a guaranty agency may only retain the amount charged to the borrower pursuant to this paragraph.

(iii) On or after October 1, 2006, when returning proceeds to the Secretary from the consolidation of a defaulted loan, a guaranty agency that charged the borrower collection costs must remit an amount that equals the lesser of the actual collection costs charged or 8.5 percent of the outstanding principal and interest of the loan.

(iv) On or after October 1, 2009, when returning proceeds to the Secretary from the consolidation of a defaulted loan that is paid off with excess consolidation proceeds as defined in paragraph (b)(27)(ii)(D) of this section, a guaranty agency must remit the entire amount of collection costs repaid through the consolidation loan pursuant to paragraph (b)(27)(ii) of this section.

(v) The term *excess consolidation proceeds* means, for any Federal fiscal year beginning on or after October 1, 2009, the amount of Consolidation Loan proceeds received for defaulted loans under the FFEL Program that exceed 45 percent of the agency's total collections

on defaulted loans in that Federal fiscal year.

\*      \*      \*      \*      \*

(29) *Plans to Reduce Consolidation of defaulted loans.* A guaranty agency shall establish and submit to the Secretary for approval, procedures to ensure that consolidation loans are not an excessive proportion of the guaranty agency's recoveries on defaulted loans.

\*      \*      \*      \*      \*

(f) *College Access Initiative.* (1) A guaranty agency shall establish a plan to promote access to postsecondary education by—

(i) Providing the Secretary and the public with information on Internet web links and a comprehensive listing of postsecondary education opportunities, programs, publications and other services available in the State, or States for which the guaranty agency serves as the designated guaranty agency;

(ii) Promoting and publicizing information for students and traditionally underrepresented populations on college planning, career preparation, and paying for college in coordination with other entities that provide or distribute such information in the State, or States for which the guaranty agency serves as the designated guaranty agency;

(2) The activities required by this section may be funded from the guaranty agency's Operating Fund in accordance with § 682.423(c)(1)(vii) or from funds remaining in restricted accounts established pursuant to section 422(h)(4) of the HEA.

(3) The guaranty agency shall ensure that the information required by this subsection is available to the public by November 5, 2006 and is—

(i) Free of charge; and

(ii) Available in print.

\*      \*      \*      \*      \*

■ 51. Section 682.402 is amended by:

■ A. Amending paragraph (a)(4) by removing the words "paragraphs (e)(1)(ii)" and, inserting in their place, the words "paragraph (e)(1)(ii) or (iii)".

■ B. Revising paragraph (e)(1)(i) introductory text.

■ C. Adding a new paragraph (e)(1)(i)(C).

■ D. Adding a new paragraph (e)(1)(iii).

■ E. Redesignating paragraphs (e)(3)(v) and (e)(3)(vi) as paragraphs (e)(3)(vi) and (e)(3)(vii), respectively.

■ F. Adding a new paragraph (e)(3)(v).

■ G. In the heading of paragraph (e)(7), adding the words "that he or she was a victim of the crime of identity theft" after the word "note."

■ H. In paragraph (e)(7)(ii)(C)(2), removing the punctuation ".", and adding, in its place, the words "; and".

Confidential

■ I. In paragraph (e)(7)(ii), adding a new paragraph (e)(7)(ii)(D).

■ J. In the heading of the paragraph (e)(9), adding the words "that he or she was a victim of the crime of identity theft," after the word "note,".

■ K. In paragraph (e)(9)(ii)(B), removing the word "and".

■ L. In paragraph (e)(9)(ii)(C), removing the punctuation ".", and adding, in its place, the words "; and".

■ M. In paragraph (e)(9)(ii), adding a new paragraph (e)(9)(ii)(D).

■ N. Redesignating paragraph (e)(14) as paragraph (e)(15).

■ O. Adding a new paragraph (e)(14).

The revisions and additions read as follows:

### § 682.402  Death, disability, closed school, false certification, unpaid refunds, and bankruptcy payments.

\*    \*    \*    \*    \*

(e) *False certification by a school of a student's eligibility to borrower and unauthorized disbursements.*

(1) *General.* (i) The Secretary reimburses the holder of a loan received by a borrower on or after January 1, 1986, and discharges a current or former borrower's obligation with respect to the loan in accordance with the provisions of paragraph (e) of this section, if the borrower's (or the student for whom a parent received a PLUS loan) eligibility to receive the loan was falsely certified by an eligible school. On or after July 1, 2006, the Secretary reimburses the holder of a loan, and discharges a borrower's obligation with respect to the loan in accordance with the provisions of paragraph (e) of this section, if the borrower's eligibility to receive the loan was falsely certified as a result of a crime of identity theft. For purposes of a false certification discharge, the term "borrower" includes all endorsers on a loan. A student's or other individual's eligibility to borrow shall be considered to have been falsely certified by the school if the school—

\*    \*    \*    \*    \*

(C) Certified the eligibility of an individual for an FFEL Program loan as a result of the crime of identity theft committed against the individual, as that crime is defined in § 682.402(e)(14).

\*    \*    \*    \*    \*

(iii) If a loan was made as a result of the crime of identity theft that was committed by an employee or agent of the lender, or if at the time the loan was made, an employee or agent of the lender knew of the identity theft of the individual named as the borrower—

(A) The Secretary does pay reinsurance, and does not reimburse the holder, for any amount disbursed on the loan; and

(B) Any amounts received by a holder as interest benefits and special allowance payments with respect to the loan must be refunded to the Secretary, as provided in paragraphs (e)(8)(ii)(B)(4) and (e)(10)(ii)(D) of this section.

\*    \*    \*    \*    \*

(3) \*    \*    \*

(v) In the case of an individual who is requesting a discharge of a loan because the individual's eligibility was falsely certified as a result of a crime of identity theft committed against the individual—

(A) Certify that the individual did not sign the promissory note, or that any other means of identification used to obtain the loan was used without the authorization of the individual claiming relief;

(B) Certify that the individual did not receive or benefit from the proceeds of the loan with knowledge that the loan had been made without the authorization of the individual;

(C) Provide a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is named as the borrower of the loan was the victim of a crime of identify theft;

(D) If the judicial determination of the crime does not expressly state that the loan was obtained as a result of the crime, provide—

(1) Authentic specimens of the signature of the individual, as provided in paragraph (e)(3)(iii)(B), or other means of identification of the individual, as applicable, corresponding to the means of identification falsely used to obtain the loan; and

(2) A statement of facts that demonstrate, to the satisfaction of the Secretary, that eligibility for the loan in question was falsely certified as a result of the crime of identity theft committed against that individual.

\*    \*    \*    \*    \*

(7) \*    \*    \*

(ii) \*    \*    \*

(D) Within 30 days, demand payment in full from the perpetrator of the identity theft committed against the individual, and if payment is not received, pursue collection action thereafter against the perpetrator.

\*    \*    \*    \*    \*

(9) \*    \*    \*

(ii) \*    \*    \*

(D) Within 30 days, demand payment in full from the perpetrator of the identity theft committed against the individual, and if payment is not received, pursue collection action thereafter against the perpetrator.

\*    \*    \*    \*    \*

(14) *Identity theft.* (i) The unauthorized use of the identifying

information of another individual that is punishable under 18 U.S.C. 1028, 1029, or 1030, or substantially comparable State or local law.

(ii) Identifying information includes, but is not limited to—

(A) Name, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, and employer or taxpayer identification number;

(B) Unique biometric data, such as fingerprints, voiceprint, retina or iris image, or unique physical representation;

(C) Unique electronic identification number, address, or routing code; or

(D) Telecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e)).

\*    \*    \*    \*    \*

■ 52. Section 682.404 is amended by:

■ A. Redesignating paragraph (a)(1)(iii)(D) as paragraph (a)(1)(iii)(E).

■ B. Adding a new paragraph (a)(1)(iii)(D).

■ C. Adding a new paragraph (a)(2)(iii).

The additions read as follows:

### § 682.404  Federal reinsurance agreement.

(a) \*    \*    \*

(1) \*    \*    \*

(iii) \*    \*    \*

(D) For loans that meet the definition of exempt claims in paragraph (a)(2)(iii) of this section;

(2) \*    \*    \*

(iii) *Exempt claims* means claims with respect to loans for which it is determined that the borrower (or student on whose behalf a parent has borrowed), without the lender's or the institution's knowledge at the time the loan was made, provided false or erroneous information or took actions that caused the borrower or the student to be ineligible for all or a portion of the loan or for interest benefits on the loan.

\*    \*    \*    \*    \*

■ 53. Section 682.405 is amended by:

■ A. Revising paragraphs (a)(1) and (2).

■ B. Revising paragraph (b)(1).

■ C. Redesignating paragraphs (b)(2) and (b)(3) as paragraphs (b)(3) and (b)(4), respectively.

■ D. In newly redesignated paragraph (b)(4), removing the words "12 consecutive" both times they appear and adding, in their place, the figure "9".

■ E. Add new paragraph (b)(2).

The revisions read as follows:

### § 682.405  Loan rehabilitation agreement.

(a) *General.* (1) A guaranty agency that has a basic program agreement must

Confidential

B0270272

enter into a loan rehabilitation agreement with the Secretary. The guaranty agency must establish a loan rehabilitation program for all borrowers with an enforceable promissory note for the purpose of rehabilitating defaulted loans, except for loans for which a judgment has been obtained, loans on which a default claim was filed under § 682.412. and loans on which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance, so that the loan may be purchased, if practicable, by an eligible lender and removed from default status.

(2) A loan is considered to be rehabilitated only after—

(i) The borrower has made and the guaranty agency has received nine of the ten payments required under a monthly repayment agreement.

(A) Each of which payments is—

(1) Made voluntarily;

(2) In the full amount required; and

(3) Received within 20 days of the due date for the payment, and

(B) All nine payments are received within a 10-month period that begins with the month in which the first required due date falls and ends with the ninth consecutive calendar month following that month, and

(ii) The loan has been sold to an eligible lender.

(b) * * *

(1) A borrower may request rehabilitation of the borrower's defaulted loan held by the guaranty agency. In order to be eligible for rehabilitation of the loan, the borrower must voluntarily make at least nine of the ten payments required under a monthly repayment agreement.

(i) Each of which payment is—

(A) Made voluntarily,

(B) In the full amount required, and

(C) Received within 20 days of the due date for the payment, and

(ii) All nine payments are received within a ten-month period that begins with the month in which the first required due date falls and ends with the ninth consecutive calendar month following that month.

(2) For the purposes of this section, payment in the full amount required means payment of an amount that is reasonable and affordable, based on the borrower's total financial circumstances, as agreed to by the borrower and the agency. Voluntary payments are those made directly by the borrower and do not include payments obtained by Federal offset, garnishment, income or asset execution, or after a judgment has been entered on a loan. A guaranty agency must attempt to secure a lender

to purchase the loan at the end of the 9- or 10-month payment period as applicable.

§ 682.406   [Amended]

■ 54. Section 682.406 is amended in paragraph (a)(9) by removing the figure "45" and adding, in its place, the figure "30".

■ 55. Section 682.408 is amended by revising paragraph (c) to read as follows:

§ 682.408   Loan disbursement through an escrow agent.

*    *    *    *    *

(c) Transmittal of FFEL loan proceeds by an escrow agent. The escrow agent shall transmit Stafford and PLUS loan proceeds received from a lender under this section to a school in accordance with the requirements of § 682.207(b)(1)(ii) and (iv) not later than 10 days after the agent receives the funds from the lender.

*    *    *    *    *

§ 682.410   [Amended]

■ 56. Section 682.410 is amended by:

■ A. In paragraph (a)(1)(i), adding the words "and Federal default fees" after the word "premiums".

■ B. In paragraph (a)(2)(vi), adding the words "and Federal default fees" after the word "premiums".

■ C. In paragraph (b)(9)(i)(A), removing the figure "10" and adding, in its place, the figure "15".

■ 57. Section 682.415 is amended by revising paragraph (a)(1) to read as follows:

§ 682.415   Special insurance and reinsurance rules.

(a)(1) A lender or lender servicer (as an agent for an eligible lender) designated for exceptional performance under paragraph (b) of this section shall receive reimbursement at the applicable rate under paragraphs (a)(1)(i) or (a)(1)(ii) of this section on all claims submitted for insurance during the 12-month period following the date the lender or lender servicer and appropriate guaranty agencies receive notification of the designation of the eligible lender or lender servicer under paragraph (b) of this section. A guaranty agency or a guaranty agency servicer (as an agent for a guaranty agency) designated for exceptional performance under paragraph (c) of this section shall receive the applicable reinsurance rate under section 428(c)(1) of the Act on all claims submitted for payments by the guaranty agency or guaranty agency servicer during the 12-month period following the date the guaranty agency receives notification of its designation, or its servicer's designation, under

paragraph (c) of this section. A notice of designation for exceptional performance under this section is deemed to have been received by the lender, servicer, or guaranty agency no later than 3 days after the date the notice is mailed, unless the lender, servicer, or guaranty agency is able to prove otherwise. A lender or lender servicer designated for exceptional performance shall receive reimbursement at the rate of—

(i) 100 percent of the unpaid principal and interest for default claims submitted to the guaranty agency for payment before July 1, 2006; and

(ii) 99 percent of the unpaid principal and interest for default claims submitted to the guaranty agency for payment on or after July 1, 2006.

*    *    *    *    *

§ 682.419   [Amended]

■ 58. Section 682.419 is amended by:

■ A. In paragraph (b)(2), adding the words "or Federal default fees" after the word "premiums".

■ B. In paragraph (c)(7), by adding the words "or Federal default fees" after the word "premiums".

■ 59. Section 682.601 is revised to read as follows:

§ 682.601   Rules for a school that makes or originates loans.

(a) General. To make or originate loans under the FFEL program, a school—

(1) Must employ at least one person whose full-time responsibilities are limited to the administration of programs of financial aid for students attending the school;

(2) Must not be a home study school;

(3) Must not—

(i) Make a loan to any undergraduate student;

(ii) Make a loan other than a Federal Stafford loan to a graduate or professional student; or

(iii) Make a loan to a borrower who is not enrolled at that school;

(4) Must award any contract for financing, servicing, or administration of FFEL loans on a competitive basis;

(5) Must offer loans that carry an origination fee or an interest rate, or both, that are less than the fee or rate authorized under the provisions of the Act;

(6) Must not have a cohort default rate, as calculated under subpart M of 34 CFR part 668, greater than 10 percent;

(7) Must, for any fiscal year beginning on or after July 1, 2006 in which the school engages in activities as an eligible lender, submit a compliance audit conducted in accordance with the requirements of 34 CFR 682.305(c)(2);

(8) Must use any proceeds from special allowance payments and interest payments from borrowers, interest subsidy payments, and any proceeds from the sale or other disposition of loans (exclusive of return of principal, any financing costs incurred by the school to acquire funds to make the loans, and the cost of charging origination fees or interest rates at less than the fees or rates authorized under the HEA) for need-based grants which does not include providing origination fees or interest rates at less than the fee or rate authorized under the provisions of the Act; and

(9) Must have met the requirements to be an eligible lender as of February 7, 2006, and must have made loans on or before April 1, 2006.

(b) An eligible school lender may use a portion of the proceeds described in paragraph (a)(8) of this section for reasonable and direct administrative expenses. Reasonable and direct administrative expenses are those that are incurred by the school and are directly related to the school's performance of actions required of the school under the Act or the regulations in this part. Reasonable and direct administrative expenses do not include financing and similar costs such as costs paid by the school to obtain funding to make FFEL loans, the cost of paying Federal default fees on behalf of borrowers, or the cost of providing origination fees or interest rates at less than the fee or rate authorized under the provisions of the Act.

(c) An eligible school lender must ensure that the proceeds described in paragraph (a)(8) of this section are used to supplement, and not to supplant, non-Federal funds that would otherwise be used for need-based grant programs.

(Authority: 20 U.S.C. 1077, 1078–1, 1078–2, 1078–3, 1082, 1085)

### § 682.603   [Amended]

■ 60. Section 682.603 is amended, in paragraph (h), by adding the word "parent" immediately after the words "in the case of a".

*       *       *       *       *

■ 61. Section 682.604 is amended by:
■ A. In paragraph (c)(3) introductory text, adding the word "parent" immediately after the words "in the case of".
■ B. Revising paragraph (b)(1).
■ C. In paragraph (c)(2)(i), removing the words "§ 682.207(b)(1)(v)(C)(*1*) and (D)(*1*)" and adding, in their place, the words "§ 682.207(b)(1)(v)(C)(*1*) and (D)".

■ D. In paragraphs (c)(5)(i) and (c)(10)(i)(B), adding the word "or" after the punctuation ";".
■ E. In paragraphs (c)(5)(ii) and (c)(10)(ii), removing the words "; or" and adding, in their place, the punctuation ".".
■ F. Removing paragraphs (c)(5)(iii) and (c)(10)(iii).
■ G. In paragraph (h) introductory text, removing the words ", or in the case of a student attending a foreign school,".
The revision reads as follows:

### § 682.604   Processing the borrower's loan proceeds and counseling borrowers.

*       *       *       *       *

(b) *Releasing loan proceeds.* (1)(i) Except as provided in § 682.207(b)(1)(v)(C)(1) and (D), the proceeds of a Stafford or PLUS loan disbursed using electronic transfer of funds must be sent directly to the school by the lender.

(ii) Upon notification by a lender under § 682.207(b)(2)(iv) that it has disbursed a loan directly to a borrower as provided under § 682.207(b)(1)(v)(C)(1) and (D), the institution must immediately notify the lender if the student is no longer eligible to receive the disbursement.

*       *       *       *       *

## PART 685—WILLIAM D. FORD FEDERAL DIRECT LOAN PROGRAM

■ 62. The authority citation for part 685 continues to read as follows:

**Authority:** 20 U.S.C. 1087a *et seq.,* unless otherwise noted.

■ 63. Section 685.100 is amended by:
■ A. In paragraph (a)(3), adding the words "and to graduate or professional students" immediately after the words "dependent students."
■ B. Revising paragraph (c)(2).
The revision reads as follows:

### § 685.100   The William D. Ford Federal Direct Loan Program.

*       *       *       *       *

(c) * * *
(2) A borrower with a loan made under the Federal Family Education Loan Program who—
(i) Is not able to obtain a Federal Consolidation Loan;
(ii) Is not able to obtain a Federal Consolidation Loan with income-sensitive repayment terms that are satisfactory to the borrower; or
(iii) Has a Federal Consolidation Loan that has been submitted by the lender to the guaranty agency for default aversion, and wishes to consolidate the Federal Consolidation Loan into the Direct Loan Program for the purpose of obtaining an income contingent repayment plan.

*       *       *       *       *

■ 64. Section 685.101 is amended by revising paragraph (b) to read as follows:

### § 685.101   Participation in the Direct Loan Program.

*       *       *       *       *

(b) An eligible undergraduate student who is enrolled at a school participating in the Direct Loan Program may borrow under the Federal Direct Stafford/Ford Loan and Federal Direct Unsubsidized Stafford/Ford Loan Programs. An eligible graduate or professional student enrolled at a school participating in the Direct Loan Program may borrow under the Federal Direct Stafford/Ford Loan, Federal Direct Unsubsidized Stafford/Ford Loan, and Federal Direct PLUS Programs. An eligible parent of an eligible dependent student enrolled at a school participating in the Direct Loan Program may borrow under the Federal Direct PLUS Program.

*       *       *       *       *

■ 65. Section 685.102(b) is amended by:
■ A. Revising the definition of *estimated financial assistance.*
■ B. Revising the definition of *Federal Direct Consolidation Loan Program.*
■ C. Revising the definition of *Federal Direct PLUS Program.*
■ D. In paragraph (2) of the definition of *Satisfactory repayment arrangement,* removing the reference to "685.220(d)(1)(ii)(E)" and adding, in its place, a reference to "685.220(d)(1)(ii)(C)".
The revisions read as follows:

### § 685.102   Definitions.

*       *       *       *       *

(b) * * *
*Estimated financial assistance.* (1) The estimated amount of assistance for a period of enrollment that a student (or a parent on behalf of a student) will receive from Federal, State, institutional, or other sources, such as scholarships, grants, net earnings from need-based employment, or loans, including but not limited to—
(i) Except as provided in paragraph (2)(iv) of this definition, veterans' educational benefits paid under chapters 30 (Montgomery GI Bill—Active Duty), 31 (Vocational Rehabilitation and Employment Program), 32 (Veterans' Educational Assistance Program), and 35 (Dependents' Educational Assistance Program) of title 38 of the United States Code;
(ii) Educational benefits paid under chapters 31 (National Call to Service), 1606 (Montgomery GI Bill—Selected Reserve), and 1607 (Reserve Educational Assistance Program) of title 10 of the United States Code;

(iii) Reserve Officer Training Corps (ROTC) scholarships and subsistence allowances awarded under chapter 2 of title 10 and chapter 2 of title 37 of the United States Code;

(iv) Benefits paid under Public Law 96–342, section 903: Educational Assistance Pilot Program;

(v) Any educational benefits paid because of enrollment in a postsecondary education institution, or to cover postsecondary education expenses;

(vi) Fellowships or assistantships, except non-need-based employment portions of such awards;

(vii) Insurance programs for the student's education;

(viii) The estimated amount of other Federal student financial aid, including but not limited to a Federal Pell Grant, Academic Competitiveness Grant, National SMART Grant, campus-based aid, and the gross amount (including fees) of subsidized and unsubsidized Federal Stafford Loans or subsidized and unsubsidized Direct Stafford Loans and Federal PLUS or Direct PLUS Loans; and

(ix) Except as provided in paragraph (2)(iii) of this definition, national service education awards or post-service benefits under title I of the National and Community Service Act of 1990 (AmeriCorps).

(2) Estimated financial assistance does not include—

(i) Those amounts used to replace the expected family contribution (EFC), including the amounts of any unsubsidized Federal Stafford Loans or Direct Stafford Loans, Federal PLUS or Direct PLUS Loans, and non-federal non-need-based loans, including private, state-sponsored, and institutional loans. However, if the sum of the loan amounts received that are being used to replace the student's EFC exceed the EFC, the excess amount must be treated as estimated financial assistance;

(ii) Federal Perkins loan and Federal Work-Study funds that the student has declined;

(iii) Non-need-based employment earnings;

(iv) For the purpose of determining eligibility for a Direct Subsidized Loan, veterans' educational benefits paid under chapter 30 of title 38 of the United States Code (Montgomery GI Bill—Active Duty) and national service education awards or post-service benefits under title I of the National and Community Service Act of 1990 (AmeriCorps);

(v) Any portion of the estimated financial assistance described in paragraph (1) of this definition that is

included in the calculation of the student's EFC; and

(vi) Assistance not received under this part if that assistance is designated to offset all or a portion of a specific amount of the cost of attendance and that component is excluded from the cost of attendance as well. If that assistance is excluded from either estimated financial assistance or cost of attendance, it must be excluded from both.

\*   \*   \*   \*   \*

*Federal Direct Consolidation Loan Program:* (1) A loan program authorized by title IV, part D of the Act that provides loans to borrowers who consolidate certain Federal educational loan(s), and one of the components of the Direct Loan Program. Loans made under this program are referred to as Direct Consolidation Loans.

(2) The term "Direct Subsidized Consolidation Loan" refers to the portion of a Direct Consolidation Loan attributable to certain subsidized title IV education loans that were repaid by the consolidation loan. Interest is not charged to the borrower during deferment periods, or, for a borrower whose consolidation application was received before July 1, 2006, during in-school and grace periods.

(3) The term "Direct Unsubsidized Consolidation Loan" refers to the portion of a Direct Consolidation Loan attributable to unsubsidized title IV education loans, certain subsidized title IV education loans, and certain other Federal education loans that were repaid by the consolidation loan. The borrower is responsible for the interest that accrues during any period.

(4) The term "Direct PLUS Consolidation Loan" refers to the portion of a Direct Consolidation Loan attributable to Direct PLUS Loans, Direct PLUS Consolidation Loans, Federal PLUS Loans, and Parent Loans for Undergraduate Students that were repaid by the consolidation loan. The borrower is responsible for the interest that accrues during any period.

\*   \*   \*   \*   \*

*Federal Direct PLUS Program:* A loan program authorized by title IV, Part D of the Act that is one of the components of the Federal Direct Loan Program. The Federal Direct PLUS Program provides loans to parents of dependent students attending schools that participate in the Direct Loan Program. The Federal Direct PLUS Program also provides loans to graduate or professional students attending schools that participate in the Direct Loan Program. The borrower is responsible for the interest that accrues during any period. Loans made under

this program are referred to as Direct PLUS Loans.

\*   \*   \*   \*   \*

■ 66. Section 685.200 is amended by:
■ A. In paragraph (a), revising the paragraph heading to read as set forth below.
■ B. Redesignating paragraphs (b), (c), and (d) as paragraphs (c), (d), and (e), respectively.
■ C. Adding a new paragraph (b).
■ D. In newly redesignated paragraph (c), revising the paragraph heading to read as set forth below and adding a new paragraph (c)(3).
■ E. In newly redesignated paragraph (c)(1)(vii)(B) introductory text, removing the reference to "(b)(1)(vii)(A)" and adding, in its place, a reference to "(c)(1)(vii)(A)".
■ F. In newly redesignated paragraph (c)(1)(vii)(C), removing the reference to "(b)(1)(vii)(A)" adding, in its place, a reference to "(c)(1)(vii)(A)".
■ G. In newly redesignated paragraph (c)(2), removing the reference to "(b)(1)" and adding, in its place, a reference to "(c)(1)".
■ H. In newly redesignated paragraph (d), by removing the reference to "685.220(d)(1)(ii)(F)" and adding, in its place, a reference to "685.220(d)(1)(ii)(D)".
■ I. Revising newly redesignated paragraph (e).

The additions read as follows:

**§ 685.200   Borrower eligibility.**

(a) *Student Direct Subsidized or Direct Unsubsidized borrower.*

\*   \*   \*   \*   \*

(b) *Student PLUS borrower.* (1) A graduate or professional student is eligible to receive a Direct PLUS Loan originated on or after July 1, 2006, if the student meets the following requirements—

(i) The student is enrolled, or accepted for enrollment, on at least a half-time basis in a school that participates in the Direct Loan Program.

(ii) The student meets the requirements for an eligible student under 34 CFR part 668.

(iii) The student meets the requirements of paragraphs (a)(1)(iv) and (a)(1)(v) of this section, if applicable.

(iv) The student has received a determination of his or her annual loan maximum eligibility under the Federal Direct Stafford/Ford Loan Program and the Federal Direct Unsubsidized and Stafford/Ford Loan Program; and

(v) The student does not have an adverse credit history in accordance with paragraph (c)(1)(vii) of this section.

\*   \*   \*   \*   \*

B0270275

(c) *Parent PLUS borrower.*

\*   \*   \*   \*   \*

(3) Has completed repayment of any title IV, HEA program assistance obtained by fraud, if the parent has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance.

\*   \*   \*   \*   \*

(e) *Use of loan proceeds to replace expected family contribution.* The amount of a Direct Unsubsidized Loan, a Direct PLUS loan, or a non-federal non-need based loan, including a private, state-sponsored, or institution loan, obtained for a loan period may be used to replace the expected family contribution for that loan period.

\*   \*   \*   \*   \*

■ 67. Section 685.201 is amended by revising paragraph (b) to read as follows:

### § 685.201   Obtaining a loan.

\*   \*   \*   \*   \*

(b) *Application for a Direct PLUS Loan.* (1) For a parent to obtain a Direct PLUS Loan, the parent must complete the Direct PLUS MPN and submit it to the school at which the student is enrolled.

(2) For a graduate or professional student to apply for a Direct PLUS Loan, the student must complete a Free Application for Federal Student Aid and submit it in accordance with instructions in the application. The graduate or professional student must also complete the PLUS MPN and submit it to the school.

(3) For either a parent or student PLUS borrower, as applicable, the school must complete its portion of the PLUS MPN and submit it to the Servicer, which makes a determination as to whether the parent or graduate or professional student has an adverse credit history. Unless a school's agreement with the Secretary specifies otherwise, the school must perform the following functions: A school participating under school origination option 2 must draw down funds and disburse the funds. For a school participating under school origination option 1 or standard origination, the Servicer initiates the drawdown of funds, and the school disburses the funds.

\*   \*   \*   \*   \*

■ 68. Section 685.202 is amended by:
■ A. In the heading of paragraph (a)(1)(iii), adding the words "and before July 1, 2006" immediately after the words "July 1, 1998".
■ B. Adding a new paragraph (a)(1)(iv).
■ C. In the heading of paragraph (a)(2)(ii), adding the words "and before

July 1, 2006" after the words "July 1, 1998".
■ D. Adding a new paragraph (a)(2)(iii).
■ E. In paragraph (b)(2), adding the words "under the regulations that were in effect for consolidation applications received before July 1, 2006" after the words "grace period".
■ F. In paragraph (b)(3), removing the reference to "685.208(g)(5)" and adding, in its place, a reference to "85.208(l)(5)".
■ G. In paragraph (b)(4), removing the reference to "685.208(g)(5)" and adding, in its place, a reference to "685.208(l)(5)".
■ H. Revising paragraph (c)(1).
   The revisions and additions read as follows:

### § 685.202   Charges for which Direct Loan Program borrowers are responsible.

(a) \*   \*   \*
(1) \*   \*   \*
(iv) *Loans first disbursed on or after July 1, 2006.* The interest rate is 6.8 percent.
(2) \*   \*   \*
(iii) *Loans first disbursed on or after July 1, 2006.* The interest rate is 7.9 percent.
(c) \*   \*   \*
(1)(i) For a Direct Subsidized or Direct Unsubsidized loan first disbursed prior to February 8, 2006, charges a borrower a loan fee not to exceed 4 percent of the principal amount of the loan;
(ii) For a Direct Subsidized or Direct Unsubsidized loan first disbursed on or after February 8, 2006, but before July 1, 2007, charges a borrower a loan fee not to exceed 3 percent of the principal amount of the loan;
(iii) For a Direct Subsidized or Direct Unsubsidized loan first disbursed on or after July 1, 2007, but before July 1, 2008, charges a borrower a loan fee not to exceed 2.5 percent of the principal amount of the loan;
(iv) For a Direct Subsidized or Direct Unsubsidized loan first disbursed on or after July 1, 2008, but before July 1, 2009, charges the borrower a loan fee not to exceed 2 percent of the principal amount of the loan;
(v) For a Direct Subsidized or Direct Unsubsidized loan first disbursed on or after July 1, 2009, but before July 1, 2010, charges the borrower a loan fee not to exceed 1.5 percent of the principal amount of the loan;
(vi) For a Direct Subsidized or Direct Unsubsidized loan first disbursed on or after July 1, 2010, charges the borrower a loan fee not to exceed 1 percent of the principal amount of the loan; and
(vii) Charges a borrower a loan fee of four percent of the principal amount of the loan on a Direct PLUS loan.

\*   \*   \*   \*   \*

### § 685.203   [Amended]

■ 69. Section 685.203 is amended by:
■ A. In paragraph (a)(1)(i), adding the words ", or, for a loan originated on or after July 1, 2007, $3,500," immediately after the figure "$2,625".
■ B. In paragraph (a)(1)(ii), adding the words ", or, for a loan originated on or after July 1, 2007, $3,500," immediately after the figure "$2,625".
■ C. In paragraph (a)(1)(iii), adding the words ", or, for a loan originated on or after July 1, 2007, $3,500" immediately after the figure "$2,625".
■ D. In paragraph (a)(2)(i), adding the words ", or, for a loan originated on or after July 1, 2007, $4,500," immediately after the figure "$3,500".
■ E. In paragraph (a)(2)(ii), adding the words ", or, for a loan originated on or after July 1, 2007, $4,500," immediately after the figure "$3,500".
■ F. In paragraph (c)(2)(v), adding the words ", or, for a loan originated on or after July 1, 2007, $12,000," immediately after the figure "$10,000".
■ G. In paragraph (c)(2)(vi)(B), adding the words ", or, for a loan originated on or after July 1, 2007, $7,000," immediately after the figure "$5,000".
■ H. In paragraph (c)(2)(vii), adding the words ", or, for a loan originated on or after July 1, 2007, $7,000," immediately after the figure "$5,000".
■ I. In paragraph (f), adding the words ", or that a graduate or professional student may borrow," immediately after the words "dependent student" and removing the words "that student" and adding, in their place, the words "the student".
■ J. In paragraph (g), adding the words ", or that a graduate or professional student may borrow," immediately after the words "dependent student".

■ 70. Section 685.204 is amended by:
■ A. In paragraph (a)(1), removing the words "paragraph (b)" and adding, in their place, the words "paragraphs (b) and (e)".
■ B. In paragraph (a)(2), removing the words "paragraph (b)" and adding, in their place, the words "paragraphs (b) and (e)".
■ C. In paragraph (b), removing the parenthetical "(e)" and adding, in its place, the parenthetical "(f)".
■ D. Redesignating paragraph (e) as paragraph (f).
■ E. In paragraph (d)(1), removing the words "paragraph (b)" and adding, in their place, the words "paragraphs (b) and (e)".
■ F. Adding a new paragraph (e).
   The addition reads as follows:

### § 685.204   Deferment.

\*   \*   \*   \*   \*

B0270276

(e)(1) A borrower who receives a Direct Loan Program loan first disbursed on or after July 1, 2001, may receive a military service deferment for such loan for any period not to exceed 3 years during which the borrower is—

(i) Serving on active duty during a war or other military operation or national emergency; or

(ii) Performing qualifying National Guard duty during a war or other military operation or national emergency.

(2) *Serving on active duty during a war or other military operation or national emergency* means service by an individual who is—

(i) A Reserve of an Armed Force ordered to active duty under 10 U.S.C. 12301(a), 12301(g), 12302, 12304, or 12306;

(ii) A retired member of an Armed Force ordered to active duty under 10 U.S.C. 688 for service in connection with a war or other military operation or national emergency, regardless of the location at which such active duty service is performed; or

(iii) Any other member of an Armed Force on active duty in connection with such emergency or subsequent actions or conditions who has been assigned to a duty station at a location other than the location at which the member is normally assigned.

(3) *Qualifying National Guard duty during a war or other operation or national emergency* means service as a member of the National Guard on full-time National Guard duty, as defined in 10 U.S.C. 101(d)(5) under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days under 32 U.S.C. 502(f) in connection with a war, other military operation, or national emergency declared by the President and supported by Federal funds.

(4) These provisions do not authorize the refunding of any payments made by or on behalf of a borrower during a period for which the borrower qualified for a military service deferment.

(5) A borrower is eligible for a military service deferment on a Direct Consolidation Loan only if the borrower meets the conditions described in this section and all of the title IV loans included in the Consolidation Loan were first disbursed on or after July 1, 2001.

(6) As used in this section—

(i) *Active duty* means active duty as defined in 10 U.S.C. 101(d)(1) except that it does not include active duty for training or attendance at a service school;

(ii) *Military operation* means a contingency operation as defined in 10 U.S.C. 101(a)(13); and

(iii) *National emergency* means the national emergency by reason of certain terrorist attacks declared by the President on September 14, 2001, or subsequent national emergencies declared by the President by reason of terrorist attacks.

\*       \*       \*       \*       \*

### § 685.205   [Amended]

■ 71. Section 685.205 is amended in paragraph (b)(5) by adding the words "obtained by a parent borrower" after the words "Direct PLUS Loan".

■ 72. Section 685.207 is amended by revising paragraphs (e)(2) and (3). The revisions read as follows:

### § 685.207   Obligation to repay.

\*       \*       \*       \*       \*

(e) \* \* \*

(2) In the case of a borrower whose consolidation application was received before July 1, 2006, a borrower who obtains a Direct Subsidized Consolidation Loan during an in-school period will be subject to the repayment provisions in paragraph (b) of this section.

(3) In the case of a borrower whose consolidation application was received before July 1, 2006, a borrower who obtains a Direct Unsubsidized Consolidation Loan during an in-school period will be subject to the repayment provisions in paragraph (c) of this section.

\*       \*       \*       \*       \*

■ 73. Section 685.208 is revised to read as follows:

### § 685.208   Repayment plans.

(a) *General.* (1) *Borrowers who entered repayment before July 1, 2006.* (i) A borrower may repay a Direct Subsidized Loan, a Direct Unsubsidized Loan, a Direct Subsidized Consolidation Loan, or a Direct Unsubsidized Consolidation Loan under the standard repayment plan, the extended repayment plan, the graduated repayment plan, or the income contingent repayment plan, in accordance with paragraphs (b), (d), (f), and (k) of this section, respectively.

(ii) A borrower may repay a Direct PLUS Loan or a Direct PLUS Consolidation Loan under the standard repayment plan, the extended repayment plan, or the graduated repayment plan, in accordance with paragraphs (b), (d), and (f) of this section, respectively.

(2) *Borrowers entering repayment on or after July 1, 2006.* (i) A borrower may repay a Direct Subsidized Loan or a

Direct Unsubsidized Loan under the standard repayment plan, the extended repayment plan, the graduated repayment plan, or the income contingent repayment plan, in accordance with paragraphs (b), (e), (g), and (k) of this section, respectively.

(ii) A borrower may repay a Direct PLUS Loan under the standard repayment plan, the extended repayment plan, or the graduated repayment plan, in accordance with paragraphs (b), (e), and (g) of this section, respectively.

(iii) A borrower may repay a Direct Consolidation Loan under the standard repayment plan, the extended repayment plan, the graduated repayment plan, or the income contingent repayment plan, in accordance with paragraphs (c), (e), (h), and (k) of this section, respectively.

(3) The Secretary may provide an alternative repayment plan in accordance with paragraph (l) of this section.

(4) All Direct Loans obtained by one borrower must be repaid together under the same repayment plan, except that—

(i) A borrower of a Direct PLUS Loan may repay the Direct PLUS Loan separately from other Direct Loans obtained by the borrower; and

(ii) A borrower of a Direct PLUS Consolidation Loan that entered repayment before July 1, 2006 may repay the Direct PLUS Consolidation Loan separately from other Direct Loans obtained by that borrower.

(5) The repayment period for any of the repayment plans described in this section does not include periods of authorized deferment or forbearance.

(b) *Standard repayment plan for all Direct Subsidized Loan, Direct Unsubsidized Loan, and Direct PLUS Loan borrowers, regardless of when they entered repayment, and for Direct Consolidation Loan borrowers who entered repayment before July 1, 2006.* (1) Under this repayment plan, a borrower must repay a loan in full within ten years from the date the loan entered repayment by making fixed monthly payments.

(2) A borrower's payments under this repayment plan are at least $50 per month, except that a borrower's final payment may be less than $50.

(3) The number of payments or the fixed monthly repayment amount may be adjusted to reflect changes in the variable interest rate identified in § 685.202(a).

(c) *Standard repayment plan for Direct Consolidation Loan borrowers entering repayment on or after July 1, 2006.*

B0270277

(1) Under this repayment plan, a borrower must repay a loan in full by making fixed monthly payments over a repayment period that varies with the total amount of the borrower's student loans, as described in paragraph (j) of this section.

(2) A borrower's payments under this repayment plan are at least $50 per month, except that a borrower's final payment may be less than $50.

(d) *Extended repayment plan for all Direct Loan borrowers who entered repayment before July 1, 2006.*

(1) Under this repayment plan, a borrower must repay a loan in full by making fixed monthly payments within an extended period of time that varies with the total amount of the borrower's loans, as described in paragraph (i) of this section.

(2) A borrower makes fixed monthly payments of at least $50, except that a borrower's final payment may be less than $50.

(3) The number of payments or the fixed monthly repayment amount may be adjusted to reflect changes in the variable interest rate identified in § 685.202(a).

(e) *Extended repayment plan for all Direct Loan borrowers entering repayment on or after July 1, 2006.*

(1) Under this repayment plan, a new borrower with more than $30,000 in outstanding Direct Loans accumulated on or after October 7, 1998 must repay either a fixed annual or graduated repayment amount over a period not to exceed 25 years from the date the loan entered repayment. For this repayment plan, a new borrower is defined as an individual who has no outstanding principal or interest balance on a Direct Loan as of October 7, 1998, or on the date the borrower obtains a Direct Loan on or after October 7, 1998.

(2) A borrower's payments under this plan are at least $50 per month, and will be more if necessary to repay the loan within the required time period.

(3) The number of payments or the monthly repayment amount may be adjusted to reflect changes in the variable interest rate identified in § 685.202(a).

(f) *Graduated repayment plan for all Direct Loan borrowers who entered repayment before July 1, 2006.*

(1) Under this repayment plan, a borrower must repay a loan in full by making payments at two or more levels within a period of time that varies with the total amount of the borrower's loans, as described in paragraph (i) of this section.

(2) The number of payments or the monthly repayment amount may be adjusted to reflect changes in the

variable interest rate identified in § 685.202(a).

(3) No scheduled payment under this repayment plan may be less than the amount of interest accrued on the loan between monthly payments, less than 50 percent of the payment amount that would be required under the standard repayment plan described in paragraph (b) of this section, or more than 150 percent of the payment amount that would be required under the standard repayment plan described in paragraph (b) of this section.

(g) *Graduated repayment plan for Direct Subsidized Loan, Direct Unsubsidized Loan, and Direct PLUS Loan borrowers entering repayment on or after July 1, 2006.*

(1) Under this repayment plan, a borrower must repay a loan in full by making payments at two or more levels over a period of time not to exceed ten years from the date the loan entered repayment.

(2) The number of payments or the monthly repayment amount may be adjusted to reflect changes in the variable interest rate identified in § 685.202(a).

(3) A borrower's payments under this repayment plan are at least $50 per month, except that a borrower's final payment may be less than $50. No single payment under this plan will be more than three times greater than any other payment.

(h) *Graduated repayment plan for Direct Consolidation Loan borrowers entering repayment on or after July 1, 2006.*

(1) Under this repayment plan, a borrower must repay a loan in full by making monthly payments that gradually increase in stages over the course of a repayment period that varies with the total amount of the borrower's student loans, as described in paragraph (j) of this section.

(2) A borrower's payments under this repayment plan are at least $50 per month, except that a borrower's final payment may be less than $50.

(i) *Repayment period for the extended and graduated plans described in paragraphs (d) and (f) of this section, respectively.* Under these repayment plans, if the total amount of the borrower's Direct Loans is—

(1) Less than $10,000, the borrower must repay the loans within 12 years of entering repayment;

(2) Greater than or equal to $10,000 but less than $20,000, the borrower must repay the loans within 15 years of entering repayment;

(3) Greater than or equal to $20,000 but less than $40,000, the borrower

must repay the loans within 20 years of entering repayment;

(4) Greater than or equal to $40,000 but less than $60,000, the borrower must repay the loans within 25 years of entering repayment; and

(5) Greater than or equal to $60,000, the borrower must repay the loans within 30 years of entering repayment.

(j) *Repayment period for the standard and graduated repayment plans described in paragraphs (c) and (h) of this section, respectively.* Under these repayment plans, if the total amount of the Direct Consolidation Loan and the borrower's other student loans, as defined in § 685.220(i), is—

(1) Less then $7,500, the borrower must repay the Consolidation Loan within 10 years of entering repayment;

(2) Equal to or greater than $7,500 but less than $10,000, the borrower must repay the Consolidation Loan within 12 years of entering repayment;

(3) Equal to or greater than $10,000 but less than $20,000, the borrower must repay the Consolidation Loan within 15 years of entering repayment;

(4) Equal to or greater than $20,000 but less than $40,000, the borrower must repay the Consolidation Loan within 20 years of entering repayment;

(5) Equal to or greater than $40,000 but less than $60,000, the borrower must repay the Consolidation Loan within 25 years of entering repayment; and

(6) Equal to or greater than $60,000, the borrower must repay the Consolidation Loan within 30 years of entering repayment.

(k) *Income contingent repayment plan.* (1) Under the income contingent repayment plan, a borrower's monthly repayment amount is generally based on the total amount of the borrower's Direct Loans, family size, and Adjusted Gross Income (AGI) reported by the borrower for the most recent year for which the Secretary has obtained income information. The borrower's AGI includes the income of the borrower's spouse. A borrower must make payments on a loan until the loan is repaid in full or until the loan has been in repayment through the end of the income contingent repayment period.

(2) The regulations in effect at the time a borrower enters repayment and selects the income contingent repayment plan or changes into the income contingent repayment plan from another plan govern the method for determining the borrower's monthly repayment amount for all of the borrower's Direct Loans, unless—

(i) The Secretary amends the regulations relating to a borrower's

B0270278

monthly repayment amount under the income contingent repayment plan; and

(ii) The borrower submits a written request that the amended regulations apply to the repayment of the borrower's Direct Loans.

(3) Provisions governing the income contingent repayment plan are in § 685.209.

(l) *Alternative repayment.* (1) The Secretary may provide an alternative repayment plan for a borrower who demonstrates to the Secretary's satisfaction that the terms and conditions of the repayment plans specified in paragraphs (b) through (h) of this section are not adequate to accommodate the borrower's exceptional circumstances.

(2) The Secretary may require a borrower to provide evidence of the borrower's exceptional circumstances before permitting the borrower to repay a loan under an alternative repayment plan.

(3) If the Secretary agrees to permit a borrower to repay a loan under an alternative repayment plan, the Secretary notifies the borrower in writing of the terms of the plan. After the borrower receives notification of the terms of the plan, the borrower may accept the plan or choose another repayment plan.

(4) A borrower must repay a loan under an alternative repayment plan within 30 years of the date the loan entered repayment, not including periods of deferment and forbearance.

(5) If the amount of a borrower's monthly payment under an alternative repayment plan is less than the accrued interest on the loan, the unpaid interest is capitalized until the outstanding principal amount is 10 percent greater than the original principal amount. After the outstanding principal amount is 10 percent greater than the original principal amount, interest continues to accrue but is not capitalized. For purposes of this paragraph, the original principal amount is the amount owed by the borrower when the borrower enters repayment.

(Authority: 20 U.S.C. 1087a *et seq.*)

■ 74. Section 685.209 is amended by revising paragraph (c)(4)(ii) to read as follows:

### § 685.209   Income contingent repayment plan.

\*     \*     \*     \*     \*

(c) \* \* \*

(4) \* \* \*

(ii)(A) The repayment period includes—

(*1*) Periods in which the borrower makes payments under the standard

repayment plan described in § 685.208(b); and

(*2*) If the repayment period is not more than 12 years, periods in which the borrower makes payments under the extended repayment plans described in § 685.208(d) and (e), or the standard repayment plan described in § 685.208(c).

(B) The repayment period does not include—

(*1*) Periods in which the borrower makes payments under the graduated repayment plans described in § 685.208(f), § 685.208(g) and § 685.208(h);

(*2*) Periods in which the borrower makes payments under an alternative repayment plan;

(*3*) Periods of authorized deferment or forbearance; or

(*4*) Periods in which the borrower makes payments under the extended repayment plans described in § 685.208(d) and

(e) in which payments are based on a repayment period that is longer than 12 years.

\*     \*     \*     \*     \*

■ 75. Section 685.211 is amended by:
■ A. Revising paragraph (d)(3)(ii).
■ B. In paragraph (e)(1) introductory text, adding the words ", has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program funds," after the word "information".
■ C. In paragraph (f)(1), in the first sentence, removing the words "twelve consecutive, on-time," and adding, in their place, the words "nine voluntary," and adding the words "within 20 days of the due date during ten consecutive months" after the word "payments".
■ D. Adding a new paragraph (f)(3). The additions and revisions read as follows:

### § 685.211   Miscellaneous repayment provisions.

\*     \*     \*     \*     \*

(d) \* \* \*

(3) \* \* \*

(ii) If a borrower defaults on a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct Consolidation Loan, the Secretary may designate the income contingent repayment plan for the borrower.

(f) \* \* \*

(3) A Direct Loan obtained by fraud for which the borrower has been convicted of, or has pled nolo contendere or guilty to, a crime involving fraud in obtaining title IV, HEA program assistance may not be rehabilitated.

\*     \*     \*     \*     \*

### § 685.212   [Amended]

■ 76. Section 685.212 is amended by:
■ A. In paragraph (a)(1), in the second parenthetical, adding the words "obtained by a parent borrower" after the words "Direct PLUS loan".
■ B. In paragraph (h), adding the words ", or up to $17,500," after the figure "$5,000".

■ 77. Section 685.215 is amended by:
■ A. Adding a new paragraph (a)(1)(iv).
■ B. In paragraph (c) introductory text, in the last sentence, by removing the parenthetical "(5)" and, in its place, adding the parenthetical "(6)".
■ C. Redesignating paragraphs (c)(4), (c)(5), and (c)(6) as paragraphs (c)(5), (c)(6), and (c)(7), respectively.
■ D. Adding a new paragraph (c)(4). The additions read as follows:

### § 685.215   Discharge for false certification of student eligibility or unauthorized payment.

(a) \* \* \*

(1) \* \* \*

(iv) Certified the individual's eligibility for a Direct Loan as a result of the crime of identity theft committed against the individual, as that crime is defined in § 682.402(e)(14).

(c) \* \* \*

(4) *Identity theft.* In the case of an individual whose eligibility to borrow was falsely certified because he or she was a victim of the crime of identity theft and is requesting a discharge, the individual shall—

(i) Certify that the individual did not sign the promissory note, or that any other means of identification used to obtain the loan was used without the authorization of the individual claiming relief;

(ii) Certify that the individual did not receive or benefit from the proceeds of the loan with knowledge that the loan had been made without the authorization of the individual;

(iii) Provide a copy of a local, State, or Federal court verdict or judgment that conclusively determines that the individual who is named as the borrower of the loan was the victim of a crime of identity theft; and

(iv) If the judicial determination of the crime does not expressly state that the loan was obtained as a result of the crime of identity theft, provide—

(A) Authentic specimens of the signature of the individual, as provided in paragraph (c)(2)(ii), or of other means of identification of the individual, as applicable, corresponding to the means of identification falsely used to obtain the loan; and

(B) A statement of facts that demonstrate, to the satisfaction of the Secretary, that eligibility for the loan in

Confidential

B0270279

question was falsely certified as a result of the crime of identity theft committed against that individual.

\* \* \* \* \*

■ 78. Section 685.217 is amended by:
■ A. Revising paragraph (a).
■ B. In paragraph (b), adding, in alphabetical order, a new definition for "Highly qualified".
■ C. Revising paragraph (c)(1)(iii).
■ D. Revising paragraph (c)(3).
■ E. Revising paragraph (c)(4).
■ F. Redesignating paragraphs (c)(5), (c)(6), (c)(7), (c)(8), and (c)(9) as paragraphs (c)(7), (c)(8), (c)(9), (c)(10), and (c)(11), respectively.
■ G. Adding a new paragraph (c)(5).
■ H. Adding a new paragraph (c)(6).
■ I. Removing the parentheticals "(c)(5)" and adding, in their place, the parentheticals "(c)(7)" in redesignated paragraph (c)(8).
■ J. Revising paragraph (d)(1).
■ K. Revising paragraph (d)(2).

The revisions and additions read as follows:

### § 685.217   Teacher loan forgiveness program.

(a) *General.* The teacher loan forgiveness program is intended to encourage individuals to enter and continue in the teaching profession. For new borrowers, the Secretary repays the amount specified in this paragraph on the borrower's subsidized and unsubsidized Federal Stafford Loans, Direct Subsidized Loans, Direct Unsubsidized Loans, and in certain cases, Federal Consolidation Loans or Direct Consolidation Loans. The forgiveness program is only available to a borrower who has no outstanding loan balance under the FFEL Program or the Direct Loan Program on October 1, 1998 or who has no outstanding loan balance on the date he or she obtains a loan after October 1, 1998. The borrower must have been employed as a full-time teacher for five consecutive complete academic years, at least one of which was after the 1997–1998 academic year, in certain eligible elementary or secondary schools that serve low-income families. All borrowers eligible for teacher loan forgiveness may receive loan forgiveness of up to a combined total of $5,000 on the borrower's eligible FFEL and Direct Loan Program loans. If the borrower taught for five consecutive years as a highly qualified mathematics or science teacher in an eligible secondary school, or as a highly qualified special education teacher in an eligible elementary or secondary school, the borrower may receive loan forgiveness of up to a combined total of $17,500 on the borrower's eligible FFEL and Direct Loan Program loans. The

loan for which the borrower is seeking forgiveness must have been made prior to the end of the borrower's fifth year of qualifying teaching service.

(b) \* \* \*

*Highly qualified* means highly qualified as defined in section 9101 of the Elementary and Secondary Education Act of 1965, as amended.

\* \* \* \* \*

(c) \* \* \*
(1) \* \* \*

(iii) Is listed in the *Annual Directory of Designated Low-Income Schools for Teacher Cancellation Benefits.* If this directory is not available before May 1 of any year, the previous year's directory may be used. The Secretary considers all elementary and secondary schools operated by the Bureau of Indian Affairs (BIA) or operated on Indian reservations by Indian tribal groups under contract with the BIA to qualify as schools serving low-income students.

\* \* \* \* \*

(3) In the case of a borrower whose five consecutive complete years of qualifying teaching service began before October 30, 2004, the borrower—

(i) May receive up to $5,000 of loan forgiveness if the borrower—

(A) Demonstrated knowledge and teaching skills in reading, writing, mathematics, and other areas of the elementary school curriculum, as certified by the chief administrative officer of the eligible elementary school in which the borrower was employed; or

(B) Taught in a subject area that is relevant to the borrower's academic major as certified by the chief administrative officer of the eligible secondary school in which the borrower was employed.

(ii) May receive up to $17,500 of loan forgiveness if the borrower—

(A) Taught mathematics or science on a full-time basis in an eligible secondary school and was a highly qualified mathematics or science teacher; or

(B) Taught as a special education teacher on a full-time basis to children with disabilities in either an eligible elementary or secondary school and was a highly qualified special education teacher whose special education training corresponded to the children's disabilities and who has demonstrated knowledge and teaching skills in the content areas of the elementary or secondary school curriculum.

(4) In the case of a borrower whose five consecutive years of qualifying teaching service began on or after October 30, 2004, the borrower—

(i) May receive up to $5,000 of loan forgiveness if the borrower taught full

time in an eligible elementary or secondary school and was a highly qualified elementary or secondary school teacher.

(ii) May receive up to $17,500 of loan forgiveness if the borrower—

(A) Taught mathematics or science on a full-time basis in an eligible secondary school and was a highly qualified mathematics or science teacher; or

(B) Taught as a special education teacher on a full-time basis to children with disabilities in either an eligible elementary or secondary school and was a highly qualified special education teacher whose special education training corresponded to the children's disabilities and who has demonstrated knowledge and teaching skills in the content areas of the elementary or secondary school curriculum.

(5) To qualify for loan forgiveness as a highly qualified teacher, the teacher must have been a highly qualified teacher for all five years of eligible teaching service.

(6) For teacher loan forgiveness applications received by the Secretary on or after July 1, 2006, a teacher in a private, non-profit elementary or secondary school who is exempt from State certification requirements unless otherwise applicable under State law may qualify for loan forgiveness under paragraphs (c)(3)(ii) or (c)(4) of this section if—

(i) The private school teacher is permitted to and does satisfy rigorous subject knowledge and skills tests by taking competency tests in applicable grade levels and subject areas;

(ii) The competency tests are recognized by 5 or more States for the purposes of fulfilling the highly qualified teacher requirements under section 9101 of the Elementary and Secondary Education Act of 1965; and

(iii) The private school teacher achieves a score on each test that equals or exceeds the average passing score for those 5 states.

\* \* \* \* \*

(d) *Forgiveness amount.* (1) A qualified borrower is eligible for forgiveness of up to $5,000, or up to $17,500 if the borrower meets the requirements of paragraphs (c)(3)(ii) or (c)(4)(ii) of this section. The forgiveness amount is deducted from the aggregate amount of the borrower's Direct Subsidized Loan or Direct Unsubsidized Loan or Direct Consolidation Loan obligation that is outstanding after the borrower completes his or her fifth consecutive complete academic year of teaching as described in paragraph (c) of this section. Only the outstanding portion of the Direct Consolidation Loan

Confidential

B0270280

that was used to repay an eligible subsidized or unsubsidized Federal Stafford Loan, an eligible Direct Subsidized Loan, or an eligible Direct Unsubsidized Loan qualifies for loan forgiveness under this section.

(2) A borrower may not receive more than a total of $5,000, or $17,500 if the borrower meets the requirements of paragraphs (c)(3)(ii) or (c)(4)(ii) of this section, in loan forgiveness for outstanding principal and accrued interest under both this section and under section 34 CFR 682.215.

\*    \*    \*    \*    \*

■ 79. Section 685.220 is amended by:
■ A. In paragraph (a), revising the first sentence to read as set forth below.
■ B. Revising paragraphs (c) and (d).
■ C. In paragraph (e), in the first sentence, removing the words "or borrowers" and removing, in its entirety, the second sentence.
■ D. In paragraph (f)(1)(iii), removing the words "that and may impose reasonable limits on collection costs paid to the holder".
■ E. Revising paragraphs (h) and (i).
■ F. In paragraph (l) introductory text, adding the words "in accordance with the regulations that were in effect for consolidation applications received prior to July 1, 2006" after the word "borrowers".

The revisions read as follows:

§ **685.220   Consolidation.**

(a) *Direct Consolidation Loans.* A borrower may consolidate education loans made under certain Federal programs into a Direct Consolidation Loan. \*  \*  \*

\*    \*    \*    \*    \*

(c) *Subsidized, unsubsidized, and PLUS components of Direct Consolidation Loans.* (1) The portion of a Direct Consolidation Loan attributable to the loans identified in paragraphs (b)(1) through (5) of this section, and to Federal Consolidation Loans under paragraph (b)(15) of this section if they are eligible for interest benefits during a deferment period under Section 428C(b)(4)(C) of the Act, is referred to as a Direct Subsidized Consolidation Loan.

(2) Except as provided in paragraph (c)(1) of this section, the portion of a Direct Consolidation Loan attributable to the loans identified in paragraphs (b)(6) through (8) and (b)(13) through (21) of this section is referred to as a Direct Unsubsidized Consolidation Loan.

(3) The portion of a Direct Consolidation Loan attributable to the loans identified in paragraphs (b)(9) through (12) of this section is referred to as a Direct PLUS Consolidation Loan.

(d) *Eligibility for a Direct Consolidation Loan.* (1) A borrower may obtain a Direct Consolidation Loan if, at the time the borrower applies for such a loan, the borrower meets the following requirements:

(i) The borrower either—
(A) Has an outstanding balance on a Direct Loan; or
(B) Has an outstanding balance on an FFEL loan and—
(*1*) The borrower is unable to obtain a FFEL consolidation loan;
(*2*) The borrower is unable to obtain a FFEL consolidation loan with income-sensitive repayment terms acceptable to the borrower; or
(*3*) The borrower has an FFEL Consolidation Loan that has been submitted to the guaranty agency by the lender for default aversion, and the borrower wants to consolidate the FFEL Consolidation Loan into the Direct Loan Program for the purpose of obtaining an income contingent repayment plan.

(ii) On the loans being consolidated, the borrower is—
(A) In a six-month grace period;
(B) In a repayment period but not in default;
(C) In default but has made satisfactory repayment arrangements, as defined in applicable program regulations, on the defaulted loan; or
(D) Except as provided in paragraph (d)(4) of this section, in default but agrees to repay the loan under the income contingent repayment plan described in § 685.208(k) and signs the consent form described in § 685.209(d)(5).
(E) Not subject to a judgment secured through litigation, unless the judgment has been vacated; or
(F) Not subject to an order for wage garnishment under section 488A of the Act, unless the order has been lifted.

(iii) The borrower certifies that no other application to consolidate any of the borrower's loans listed in paragraph (b) of this section is pending with any other lender.

(iv) The borrower agrees to notify the Secretary of any change in address.

(*2*) A borrower may not consolidate a Direct Consolidation Loan into a new consolidation loan under this section or under § 682.201(c) unless at least one additional eligible loan is included in the consolidation.

(3) Eligible loans received before or after the date a Direct Consolidation Loan is made may be added to a subsequent Direct Consolidation Loan.

(4) A borrower may not consolidate a defaulted Direct Consolidation Loan.

\*    \*    \*    \*    \*

(h) *Repayment plans.* A borrower may choose a repayment plan for a Direct

Consolidation Loan in accordance with § 685.208, except that a borrower who became eligible to consolidate a defaulted loan under paragraph (d)(1)(ii)(D) of this section must repay the consolidation loan under the income contingent repayment plan unless—

(1) The borrower was required to and did make a payment under the income contingent repayment plan in each of the prior three (3) months; or

(2) The borrower was not required to make payments but made three reasonable and affordable payments in each of the prior three (3) months; and

(3) The borrower makes and the Secretary approves a request to change plans.

(i) *Repayment period.* (1) Except as noted in paragraph (i)(4) of this section, the repayment period for a Direct Consolidation Loan begins on the day the loan is disbursed.

(2)(i) *Borrowers who entered repayment before July 1, 2006.* The Secretary determines the repayment period under § 685.208(i) on the basis of the outstanding balances on all of the borrower's loans that are eligible for consolidation and the balances on other education loans except as provided in paragraphs (i)(3)(i), (ii), and (iii) of this section.

(ii) *Borrowers entering repayment on or after July 1, 2006.* The Secretary determines the repayment period under § 685.208(j) on the basis of the outstanding balances on all of the borrower's loans that are eligible for consolidation and the balances on other education loans except as provided in paragraphs (i)(3)(i) and (ii) of this section.

(3)(i) The total amount of outstanding balances on the other education loans used to determine the repayment period under §§ 685.208(i) and (j) may not exceed the amount of the Direct Consolidation Loan.

(ii) The borrower may not be in default on the other education loan unless the borrower has made satisfactory repayment arrangements with the holder of the loan.

(iii) The lender of the other educational loan may not be an individual.

(4) Borrowers whose consolidation application was received before July 1, 2006. A Direct Consolidation Loan receives a grace period if it includes a Direct Loan or FFEL Program loan for which the borrower is in an in-school period at the time of consolidation. The repayment period begins the day after the grace period ends.

\*    \*    \*    \*    \*

Confidential

B0270281

■ 80. Section 682.301 is amended by revising paragraph (b)(8)(ii) to read as follows:

### § 685.301   Origination of a loan by a Direct Loan Program school.

\*     \*     \*     \*     \*

(b) \* \* \*

(8) \* \* \*

(ii) Paragraphs (b)(8)(i)(A) and (B) of this section do not apply to any loans originated by the school beginning 30 days after the date the school receives notification from the Secretary of a cohort default rate, calculated under subpart M of 34 CFR part 668, that causes the school to no longer meet the qualifications outlined in paragraph (A) or (B), as applicable.

\*     \*     \*     \*     \*

■ 81. Section 685.303 is amended by:
■ A. In paragraph (b)(2)(i), by adding the words "obtained by a parent borrower" after the words "PLUS loan".
■ B. By revising paragraph (b)(4)(ii).
The revisions read as follows:

### § 685.303   Processing loan proceeds.

\*     \*     \*     \*     \*

(b) \* \* \*

(4) \* \* \*

(ii) Paragraphs (b)(4)(i)(A) and (B) of this section do not apply to any loans originated by the school beginning 30 days after the date the school receives notification from the Secretary of a cohort default rate, calculated under subpart M of 34 CFR part 668, that causes the school to no longer meet the qualifications outlined in paragraph (A) or (B), as applicable.

\*     \*     \*     \*     \*

[FR Doc. 06–6696 Filed 8–8–06; 8:45 am]

**BILLING CODE 4000–01–P**

B0270282