# Exhibit 155

# CONFIDENTIAL

# FILED UNDER SEAL

**Ricky Turman**

| | |
|---|---|
| **From:** | Saul Moskowitz [moskowitz@msbllaw.com] |
| **Sent:** | Tuesday, November 04, 2003 11:55 AM |
| **To:** | adele.williams@bhesc.org |
| **Cc:** | Ricky Turman |
| **Subject:** | RE: Loan Swapping Opinion... |



Saul Questions on
Loan Swappin...

Adele:  the description looks pretty straightforward.  However, while you're
not legally required to do so, I recommend the volume of loans that you put
through this process in a way that you can defend politically as reasonable.

Answers to your questions are attached.  Pls. let me know how you would like
to proceed.

Saul Moskowitz
Moskowitz & Austin LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:   301.562.0600
Fax: 301.562.0635
Email:  moskowitz@msbllaw.com <mailto:moskowitz@msbllaw.com>

The information contained in this email may be confidential and privileged
attorney-client information or work product and is intended only for the
individual or entity to whom it is addressed. Any unauthorized use,
distribution or copying of this communication is strictly prohibited. If you
have received this communication in error, please notify this firm
immediately.  Moskowitz & Austin LLC believes that this E-mail and any
attachments were free of any virus, worm, or Trojan horse when sent.
However, this message and its attachments could have been infected during
transmission. By reading the message and opening any attachments, the
recipient accepts full responsibility for taking remedial action about
viruses and other defects. Moskowitz & Austin LLC is not liable for any loss
or damage arising in any way from this message or its attachments.

-----Original Message-----
From: Adele Williams [mailto:adele.williams@bhesc.org]
Sent: Monday, November 03, 2003 5:50 PM
To: Saul L. Moskowitz
Cc: RICKY TURMAN
Subject: Loan Swapping Opinion...

Hello Saul,

Enclosed please find the following 3 files:

1.  A summary of what Brazos' intentions are with regards to swapping or
transferring tax-exempt loans into taxable deals and replacing them with
other eligible loans.

2.  A list of questions that have come up as a result of various discussions
that will need to be addressed before this write up is complete.  Any
information that you can provide to assist in resolving these issues would
be greatly appreciated.

1

Confidential

B0270003

3.   Detail of outstanding tax-exempt debt.

If you should have any questions, I can be reached at (254) 753-0915 ext. 3227.  I am hoping that once we have resolved the outstanding issues, the information I have provided will enable you to give an opinion on this matter.  If after reviewing the attachments you need additional information in order to give an opinion, please let me know.

Thank you in advance for your assistance.

Adele

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED.  If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
BHESC-Brazos Higher Education Service Corp.

Confidential

B0270004

## ADELE/RICKY:  MY RESPONSES ARE BELOW.

## Questions on Loan Swapping

1. How does defeasance, maturity, and/or refunding impact the loan transfer process?  If the tax-exempt debt has been refunded or defeased, do the loans lose the floor status? What if the refunding/defeasance was being done to retire debt that was a scheduled maturity? I DON'T HAVE THE EXPERTISE TO BE ABLE TO DETERMINE WHETHER A PARTICULAR TRANSACTION IS A REFUNDING, DEFEASANCE, RETIREMENT, OR MATURITY.  I NEED TO RELY ON YOU TO TELL ME WHICH ONE WE'RE DEALING WITH. DEFEASANCE AND RETIREMENT ARE TREATED DIFFERENTLY FROM REFUNDING AND MATURITY FOR FLOOR PURPOSES.

2. What effect does the 10% deminimus rule have on this process? Are we also able to attach floor status to non Texas Nexus loans if these loans are included in a tax-exempt issue as part of the deminimus rule? DE MINIMUS AND TEXAS-NEXUS ARE NOT RELEVANT TO THE FLOOR ISSUE. *WOULD GET FLOOR*

3. Can loans be transferred from the tax-exempt debt into any taxable issue of a Brazos company i.e. BSFC or even a line of credit, or do the loans have to be transferred to a BHEA bond issue? IT DEPENDS ON THE RELATIONSHIP BETWEEN THE BRAZOS COMPANY AND BHEA, BUT THE ANSWER PROBABLY IS THAT THE FLOOR STILL APPLIES EVEN IF THE TRANSFER IS TO A BRAZOS AFFILIATE. *① BHEA ② others*

4. How are consolidation or PLUS loans treated with respect to the "floor"?  Does the parent have to live in Texas to qualify for a Texas-Nexus loan since they are technically the borrower or can the student (child) attend a Texas school with the parent living in another state and still qualify? TEXAS-NEXUS IS IRRELEVANT TO WHETHER A LOAN NOW ELIGIBLE FOR THE FLOOR KEEPS THAT ELIGIBILITY AFTER A TRANSFER TO FUNDING UNDER ANOTHER OBLIGATION.  OF COURSE, IT MAY BE RELEVANT TO WHETHER THE LOAN COULD LEGALLY BE INCLUDED IN THE TAX-EXEMPT INDENTURE IN THE FIRST PLACE.  THAT DEPENDS ON THE TERMS OF THE INDENTURE ITSELF AND, PERHAPS, APPLICABLE STATE LAW.

*Retire / Defease :*

*Defeasance: defeasance w/a defeasance → non issue*

*Retirement : "paid off"*

*Refunding - gray*
*Maturity -*

B0270005

**Ricky Turman**

| | |
|---|---|
| **From:** | Adele Williams [adele.williams@bhesc.org] |
| **Sent:** | Monday, November 03, 2003 4:50 PM |
| **To:** | Saul L. Moskowitz |
| **Cc:** | RICKY TURMAN |
| **Subject:** | Loan Swapping Opinion... |

    

Loan Swapping.doc   Saul Questions on   TaxExempt Debt
Loan Swappin...   Analysis.xls

Hello Saul,

Enclosed please find the following 3 files:

1.  A summary of what Brazos' intentions are with regards to swapping or transferring tax-exempt loans into taxable deals and replacing them with other eligible loans.

2.  A list of questions that have come up as a result of various discussions that will need to be addressed before this write up is complete.  Any information that you can provide to assist in resolving these issues would be greatly appreciated.

3.  Detail of outstanding tax-exempt debt.

If you should have any questions, I can be reached at (254) 753-0915 ext. 3227.  I am hoping that once we have resolved the outstanding issues, the information I have provided will enable you to give an opinion on this matter.  If after reviewing the attachments you need additional information in order to give an opinion, please let me know.

Thank you in advance for your assistance.

Adele

*********************************************************************************
*********************************
This transmission may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED.  If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format.  Thank you.
*********************************************************************************
*********************************
BHESC-Brazos Higher Education Service Corp.

1

B0270006

# Swapping Taxable Loans into Tax Exempt Debt
### Policy and Procedures

According to the interpretation of Section       of the Higher Education Act, it is permissible to sell, swap or transfer student loans purchased with tax-exempt debt into a taxable bond issue and those student loans will retain their "floor" status. It is also possible to acquire new student loans to replace those that have been transferred out of the tax-exempt bond issues.

Based on this interpretation, Brazos Higher Education Authority, Inc. will first use recycling proceeds from taxable bond issues to purchase loans currently housed in tax-exempt bond issues that are earning the floor. The proceeds generated by the selling tax-exempt bond issues will be used to purchase **Texas Nexus** loans from third party sellers, if available, or existing eligible loans not earning the floor that are currently housed in taxable bond issues of various Brazos companies.

Eligible loans that qualify for the floor treatment are loans financed with tax-exempt bond proceeds that were originally issued before October 1, 1993. For the Brazos Higher Education Authority, Inc., only Texas-Nexus Loans can meet this requirement. A Texas-Nexus Loan is defined as an "eligible loan made for or on behalf of a student who is or was at the time the Eligible Loan was made a resident of the State of Texas and/or who is or was, at the time the Eligible Loan was made, enrolled at an educational institution located in the State of Texas."

In the event that the recycling provisions have expired, the various bond issues may be permitted to sell loans pursuant to specific sections of the Student Loan Fund. The proceeds of the sale will then be deposited into the Student Loan Fund and used for purchasing additional student loans with similar characteristics.

Once the Texas-Nexus loans have been acquired with tax-exempt funds and have obtained the floor characteristic, the loans will be sold, swapped or transferred to a taxable Brazos Higher Education Authority, Inc. bond issue and, once again, the proceeds will be used to purchase additional non-floor earning Texas-Nexus loans.

This process will cease once the outstanding tax-exempt debt matures. At which time, the corresponding loan pools will be transferred to the General Fund thereby maintaining the pre-established floor status for the life of the loan.

Brazos has developed the following procedures in order to ensure that this process will be administered with minimal difficulty.

Procedures:

    A. Evaluate the total amount of pre October 1, 1993 debt currently outstanding, including debt that has been refunded.

B0270007

B. Evaluate the student loan volume present in those trust estates that have the tax-exempt floor designation.

C. Determine the student loan volume that can be purchased with tax-exempt funds from either taxable bond issues or third party portfolios. Borrowers who qualify are required to live in Texas or attend a Texas school.

D. Determine which bond issues are currently recycling with taxable funds and the amount of funds available.

E. In the event that recycling has expired, review the loan sale provisions of the tax-exempt bond issue to ensure that loans can be purchased to replace any loans previously transferred/sold to a taxable issue.

F. Set up separate bond codes with each servicer for all loans transferring from a tax-exempt bond with the floor designation to a taxable bond in order to maintain and track the floor loans.

G. Sell loans from the tax-exempt bond issue to a taxable bond issue.

H. Purchase qualified loans into tax-exempt bond from taxable bond issues or third party portfolio, if available.

Confidential

B0270008

## TAX EXEMPT FUNDS
### PRE 9/30/93 ~ OLD LAW

| Issue | Issue Date | Maturity Date | Final Maturity Date | Type of Money | Tax Exempt Issued | Current Debt Outstanding | Recycling Termination Date |
|---|---|---|---|---|---|---|---|
| 92A | 1/15/1992 | Various | | Refunding 87 | 101,000,000 | - | N/A |
| 92C | 10/15/1992 | Various | | Refunding 89A | 55,000,000 | - | N/A |
| 93A | 2/17/1993 | 12/1/2003 | 12/1/2006 | Refunding 90A | 49,900,000 | 590,000 | N/A |
| | | 12/1/2004 | 12/1/2006 | | | 2,990,000 | |
| | | 11/1/2004 | 12/1/2006 | | | 4,125,000 | |
| | | | | | | 7,705,000 | |
| 93C | 8/24/1993 | 6/1/2004 | 3/1/2006 | Refunding 88A | 61,075,000 | - | N/A |
| | | 6/1/2004 | 3/1/2006 | Refunding 88B & 89A | 114,700,000 | 14,220,000 | |
| | | 6/1/2004 | 3/1/2006 | Refunding 89A | 30,300,000 | 6,940,000 | |
| | | | | | 206,075,000 | 21,160,000 | |
| 94 AE | 8/3/1994 | 6/1/2004 | 5/1/2009 | Refunding 92B | 50,000,000 | 1,070,000 | N/A |
| 97A-2 | 3/27/1997 | 6/1/2002 | | Refunding 93C-1 | 23,100,000 | - | 7/1/2004 |
| 97A-3 | 3/27/1997 | 12/1/2008 | 5/1/2009 | Refunding 94A-2 | 3,000,000 | 3,000,000 | 7/1/2004 |
| 98A-1(1N) | 1/16/1998 | 8/1/2002 | | Refunding 97A-2 | 900,000 | - | 7/1/2004 |
| | | 11/1/2004 | | Refunding 92A | 3,550,000 | 3,550,000 | |
| | | 12/1/2005 | | Refunding 93C-1 | 4,650,000 | 4,650,000 | |
| | | 3/1/2006 | | Refunding 92C1;92C2;93C2 | 21,050,000 | 21,050,000 | |
| | | 12/1/2006 | | Refunding 93A-1 | 11,850,000 | 11,850,000 | |
| | | | | | 42,000,000 | 41,100,000 | |
| 98A-2(1E) | 1/16/1998 | 5/1/2009 | 5/1/2009 | Refunding 94A-2/B-1 | 5,050,000 | 5,050,000 | 7/1/2004 |

Confidential

B0270009

# TAX EXEMPT FUNDS
## PRE 9/30/93 ~ OLD LAW

| Issue | Issue Date | Maturity Date | Final Maturity Date | Type of Money | Tax Exempt Issued | Current Debt Outstanding | Recycling Termination Date |
|---|---|---|---|---|---|---|---|
| 98A-4(2E) | 3/4/1998 | 8/1/2002 | | Refunding 93C-1 | 18,550,000 | - | 7/1/2004 |
| | | 8/1/2002 | | Refunding 97A-2 | 1,200,000 | - | |
| | | 12/1/2005 | | Refunding 93C-1 | 3,300,000 | 3,200,000 | |
| | | | | | 23,050,000 | 3,200,000 | |
| 98A-4(2N) | 3/4/1998 | 5/1/2009 | | Refunding 94A-2 | 4,950,000 | 4,950,000 | 7/1/2004 |
| 99A-1 | 3/5/1999 | 5/1/2009 | | Refunding 94A-2 | 6,800,000 | 6,800,000 | 2/1/2004 |
| | | 6/1/2010 | 6/1/2023 | Refunding 93B-2 | 1,300,000 | 1,300,000 | |
| | | | | | 8,100,000 | 8,100,000 | |
| 99A-2 | 3/5/1999 | 8/1/2002 | | Refunding 97A-2 | 4,100,000 | - | 2/1/2004 |
| | | 11/1/2004 | | Refunding 92A | 6,950,000 | 6,950,000 | |
| | | 12/1/2005 | | Refunding 92C-1,93C-1 | 25,500,000 | 25,500,000 | |
| | | 12/1/2006 | | Refunding 93A-1 | 6,150,000 | 6,150,000 | |
| | | | | | 42,700,000 | 38,600,000 | |
| A99C1 | 12/15/1999 | 8/1/2002 | | Refunding 97A-2 | 2,600,000 | - | 8/1/2004 |
| | | 11/1/2004 | | Refunding 92A | 6,000,000 | 6,000,000 | |
| | | 3/1/2006 | | Refunding 92C1;93C2 | 12,800,000 | 12,800,000 | |
| | | 12/1/2006 | | Refunding 93A-1 | 6,300,000 | 6,300,000 | |
| | | 5/1/2009 | | Refunding 94A-1/B-2 | 1,700,000 | 1,700,000 | |
| | | | | | 29,400,000 | 26,800,000 | |
| A01A1E | 2/27/2001 | 11/1/2004 | | Refunding of 92A | 2,800,000 | 2,800,000 | 7/1/2004 |
| | | 12/1/2005 | | Refunding of 93C-2 | 18,300,000 | 18,300,000 | |
| | | | | | 21,100,000 | 21,100,000 | |

Confidential

B0270010

# TAX EXEMPT FUNDS
### PRE 9/30/93 ~ OLD LAW

| Issue | Issue Date | Maturity Date | Final Maturity Date | Type of Money | Tax Exempt Issued | Current Debt Outstanding | Recycling Termination Date |
|---|---|---|---|---|---|---|---|
| A01D1E | 6/14/2001 | 12/1/2005 | | Refunding of 93C-1 | 24,600,000 | 24,600,000 | 8/1/2004 |
| | | 5/1/2009 | | Refunding of 94A-2 | 7,400,000 | 7,400,000 | |
| | | | | | 32,000,000 | 32,000,000 | |
| A01F1E | 11/27/2001 | 5/1/2009 | | Refunding of 94A-2 | 7,100,000 | 7,100,000 | 7/1/2004 |
| | | 11/1/2004 | | Refunding of 92A | 2,300,000 | 2,300,000 | |
| | | 3/1/2006 | | Refunding of 92C-1 | 4,400,000 | 4,400,000 | |
| | | 12/1/2006 | | Refunding of 93A-1 | 3,000,000 | 3,000,000 | |
| | | | | | 16,800,000 | 16,800,000 | |
| A02A1E | 2/20/2002 | 11/1/2004 | | Refunding of 92A | 6,400,000 | 6,400,000 | 7/1/2004 |
| A02B1E | 5/29/2002 | 12/1/2005 | | Refunding of 93C-1 | 15,100,000 | 15,100,000 | 7/1/2004 |
| | | 3/1/2006 | | Refunding of 92C-1,92C-2 | 8,000,000 | 8,000,000 | |
| | | 5/1/2009 | | Refunding of 94A-2 | 7,700,000 | 7,700,000 | |
| | | | | | 30,800,000 | 30,800,000 | |
| A03A1E | 3/5/2003 | 5/1/2009 | | Refunding of 94A-2 | 4,900,000 | 4,900,000 | 7/1/2004 |
| A03A1E | | 12/1/2005 | | Refunding of 93C-1 | 15,100,000 | 15,100,000 | |
| A03A1E | | 12/1/2006 | | Refunding of 93A-1 | 2,300,000 | 2,300,000 | |
| | | | | | 22,300,000 | 22,300,000 | |
| A03D1 | 6/1/2003 | 6/1/2023 | | Refunding of 93B-1 | 48,700,000 | 48,700,000 | 8/1/2004 |
| | | | | Total Tax Exempt Debt | 821,425,000 | 338,835,000 | |

B0270011

# Exhibit 158

# CONFIDENTIAL

# FILED UNDER SEAL

## PANHANDLE-PLAINS HIGHER EDUCATION AUTHORITY, INC.
### BOARD OF DIRECTORS
### REGULAR MEETING
### December 17, 2002
### 1:00 p.m.

### MINUTES

A regular meeting of the Board of Directors of the Panhandle-Plains Higher Education Authority, Inc. was held at 1:00 p.m. on Tuesday, December 17, 2002, at Panhandle-Plains Student Loan Center.

Board members in attendance:

| | |
|---|---|
| Bill Forbes | Tammy Roark |
| Duane Howard | Jack Rich |
| Mike Schueler | Marcus Wilson (arrived at 1:15 p.m.) |
| Charles Bassett | |

Board members absent:

| | |
|---|---|
| Earl Hudgins | Mike Ryan |
| Ron Hiner | Linda Gonzalez-Hensgen |

Board advisors in attendance: Cathryn Wright, Jim Reed and Bob Womack

Board advisors absent: Faye Dodson, Lyn Wheeler, Tia Clary, and Ann Duncan

Staff members in attendance:

| | |
|---|---|
| Clifford Baker | Chris Carroll |
| Rita Craddock | Melissa Yauck |
| Ronny Barnes | Darlene Brasington |
| Jimmy Parker | Glenn Parker |
| Clint Townsley | Tim Willis |
| Terry Langehennig | Candace Stagner |

Others in attendance:

| | |
|---|---|
| Ron Gammage | Paul Sheldon |
| Jan Benton | David Mooney |
| Beverly Cottingham | Lance Jones |

There being a quorum present, the president called the meeting to order at 1:10 p.m. The president then welcomed everyone in attendance and acknowledged Paul Sheldon, David Mooney, and Lance Jones.

1. Consider and approve minutes of the August 7, 2002 regular meeting.

Copies of the minutes of the August 7, 2002 regular meeting were provided to board members prior to the meeting. Jack Rich moved the minutes be approved, as presented. Tammy Roark seconded the motion. The motion carried unanimously.

1

HIGHLY CONFIDENTIAL

PPHEA_029472

2. Consider and approve minutes of the November 6, 2002 special meeting.

Copies of the minutes of the November 6, 2002 special meeting were provided to board members prior to the meeting.  Mike Schueler moved the minutes be approved, as presented.  Charles Bassett seconded the motion.  The motion carried unanimously.

3. Authorize Panhandle-Plains Management & Servicing Corporation to pay Board of Directors' and Advisory Directors' expenses.

Marcus Wilson moved that the Board authorize Panhandle-Plains Management & Servicing Corporation to pay Board of Directors' and Advisory Directors' expenses.  Mike Schueler seconded the motion.  The motion carried unanimously.

4. Consider and approve resolution of the Board of Directors of the Panhandle-Plains Higher Education Authority, Inc., designating the date, time and place for 2003 annual regular meeting of the Corporation.

In connection with the upcoming annual regular meeting, Clifford Baker announced that the following director's terms were due to expire in 2003:  Charles Bassett, Mike Schueler, Tammy Roark, Jack Rich, and Duane Howard.  Mr. Baker advised the Board that he had contacted each of these directors to discuss serving another term on the Authority Board.  Each director with the exception of Dr. Bassett had expressed his or her desire to serve another term.

Brief discussion relating to the resolution was had.  After discussion, Marcus Wilson moved to designate February 26, 2003 as the annual regular meeting of the Corporation.  Jack Rich seconded the motion.  The motion carried unanimously.

5. Presentation by Paul Sheldon concerning the excess interest held by the Authority and the 9.5% floor on student loans in older bond issues.

Mr. Sheldon discussed the following topics:  ways that the Authority may use excess interest; the 9.5% floor on loans; student loans issued before 1993 have the 9.5% floor; and the '91, '92, and '93 issues on Sallie Mae of $150,000,000.00 worth of loans transferred to the 9.5% floor.  There was discussion relating to the upcoming tax-exempt bond issue.  Discussion followed relating to the upcoming taxable bond issue with regard to the 9.5% floor.  There was discussion relating to the date of the closing of the taxable bond issue during which Mr. Sheldon advised the Board that in order to get the 9.5% floor, the bond closing could be moved up to a date in February.  It was discussed to change the annual regular meeting date from February 26, 2003 to a date in January.  Marcus Wilson moved to rescind his earlier motion to designate February 26, 2003 as the annual regular meeting of the Corporation.  Jack Rich seconded the motion.  The motion carried unanimously.

At this time, Marcus Wilson moved to approve the resolution setting January 22, 2003 at 1:00 p.m. at the office of the Corporation located at 1403 23rd Street, Canyon, Texas 79015 as the date, time and place for the 2003 annual regular meeting of the Corporation.  Jack Rich seconded the motion.  The motion carried unanimously.  Attached hereto is a copy of the resolution.

6. Review and take action on the Authority's financial audit FY02 performed by Brown, Graham & Company.

2

HIGHLY CONFIDENTIAL

PPHEA_029473

President Forbes asked Lance Jones of Brown, Graham & Company, to present to the Board in more detail the Authority's financial audit, copies of which were provided to Board members at the meeting. Mr. Jones thanked the Board for engaging Brown, Graham & Company to do the audit. He reviewed the audit in general and detail highlighting specific areas for the Board. Brief discussion followed. After discussion, Mike Schueler moved to approve the financial audit, as presented. Tammy Roark seconded the motion. The motion carried unanimously. Attached and made a part hereof, is a copy of the Authority's financial audit FY02.

7. Executive Director's report.

Executive Director Clifford Baker reported on the following topics: a meeting with other Authorities held in Austin to discuss legislative issues that he and Jimmy Parker had attended; the Cost Effective Programs, Inc. (CEPI) vs. Sun Microsystems lawsuit and hiring an expert witness to testify in the lawsuit; Bob Ziemski's departure from COSTEP; and the invitation from Mr. Don Bentsen, of the South Texas Authority, to Mr. Baker to visit with the Authority.

Senior Vice President Rita Craddock reported on the following: the debt that the Student Loan Center owes to the Authority and plans to payoff the loan owed to the Authority of $630,000.00 by March 2003; and the installation of the security system, in preparation of the SAS 70 Audit, is complete.

Senior Vice President Ronny Barnes reported that Courtney May had been hired as new marketing person and was doing a very good job.

Senior Vice President Jimmy Parker reported on the Alternative Loan Program. He also reported on ProBill and told the Board that currently Angelo State University (ASU) and Abilene Christian University (ACU) are under contract and that other schools are considering contracting to use ProBill. He reported that ASU and ACU began using ProBill July 15, 2002 and to date ASU has collected $73,000.00 and ACU has collected $76,000.00.

Senior Vice President Clint Townsley expressed his appreciation, for a job well done, to vice presidents: Melissa Yauck, Chris Carroll, Darlene Brasington, and Tim Willis; and assistant vice presidents: Ronna Simpson and Amy Slover. He reported on these topics: payment processing for COSTEP to be implemented February 1, 2003 (tentative date); lender audit with KPMG; KPMG is to present the loan servicing review at the upcoming annual meeting; and continuing to work on automation of services.

At this time, President Bill Forbes announced that the Board of Directors would now go into executive session.

**Executive Session**

Convened into executive session at 2:34 p.m.

Those present in attendance were all of the Directors of the Authority who were in attendance in the Open Session, Clifford Baker, and Terry D. Langehennig.

The first item was a review and discussion of the minutes from the Budget & Evaluation Committee meeting.

HIGHLY CONFIDENTIAL                                   PPHEA_029474

Next, Jack Rich inquired about the progress of the revision of the Servicing Agreement between the Authority and Panhandle-Plains Management & Servicing Corporation. It was reported that revision is in progress.

The next item was discussion of the evaluation of Mr. Baker regarding job performance and compensation.

President Bill Forbes left the meeting at 2:50 p.m.

Vice President Tammy Roark assumed the duty as presiding officer.

The next item of business was presented by Mr. Baker with reference to the letter dated November 13, 2002 that was sent to Nelnet. Mr. Baker provided a copy of the letter to board members. He reported on the letter to Nelnet and then discussed the matter.

Marcus Wilson moved to approve the recommendation of the Budget & Evaluation Committee as reflected in the letter from the Committee to the Panhandle-Plains Management & Servicing Corporation. Jack Rich seconded the motion. The motion carried unanimously.

With no further business in executive session, Ms. Roark adjourned the executive session and reconvened the Board in open session at 3:00 p.m.

**Open Session**

9. Review Panhandle-Plains Management & Servicing Corporation's operating budget for fiscal year 2003.

Ms. Roark called on Rita Craddock to present this item. Board members were provided with a copy of the budget. Ms. Craddock reviewed the budget in general and detail highlighting specific areas for the Board.

10. Consider a date and location for the Authority's 2003 retreat.

After brief discussion of this item, no action was taken. The item will be placed on the agenda of the upcoming January 22, 2003 annual regular meeting.

11. Other business.

There was no other business for consideration.

12. Adjourn.

With no further business at hand, Duane Howard moved the meeting be adjourned. Marcus Wilson seconded the motion. The motion carried unanimously. The meeting adjourned at 3:15 p.m.

Secretary to the Board                          Presiding Officer

HIGHLY CONFIDENTIAL                                   PPHEA_029475

Exhibit 159

# CONFIDENTIAL

# FILED UNDER SEAL

11/2002

9.5% Floor Loans

Moskowitz
12
5/14/10   ☒


11/7/2002 Kathleen is going to draft comfort letter with Greg Jones

11/8/2002 We called Dianne Stewart. She said this a DOE issue and. not a Treas. issue. She said this was not an area of her expertise. Dianne said she only knew of two or three clients that were taking the agressive approch of running loans through it and creating an entire portfolio of floor loans.

Conservative approch is to trunfer 9.5% floor loans to taxable issue. Then fill up Tax-exempt issue with low interest loans which you would not bill the floor on but this would reduce Excess interest. Recycling on taxable issue would not have 9½% Floor

11/8/2002 Talked with Kathleen & Paul both. They said recyling loans in taxable issue would get floor if purchesed from tax exempt issue. Both the tax-exempt and taxable issue would get 9.5% floors.

PPHEA_045871

HIGHLY CONFIDENTIAL

11/18/2002 Call with Jimmy, Glenn, Kathleen, John, & Sol

1. Pre - 93 - 91, 92, pre Oct. 1, 1993 have floor
2. DOE took this position when rates were higher. They wanted loans subject to ½ SAP. They made a choice in the regulation and have stuck with it.
3. This was intentional not a loop hole.
4. Guidance #310 an hour
   Opinion on issue priced about $5,000

5. Jimmy will try to get a call set up for Monday 11/25. He will be in Florida. He will email options to Sol.

11/18/2002

Glenn & I called Kathleen about buying consolidation loan from PPSFC and then having PPSFC buy SLMA loans. She said we can to 10% of loans outstanding each year. We will do $9 MM in Dec. and $9 MM in Jan.

PPHEA_045872

HIGHLY CONFIDENTIAL

Exhibit 160

# CONFIDENTIAL

# FILED UNDER SEAL

## John Wright

**From:**    "John Wright" <johnw@ppslc.com>
**To:**      "Kathleen Ellison" <kellison@fulbright.com>; "Paul Sheldon" <paul.b.sheldon@ssmb.com>; "Jimmy Parker" <jimmyp@ppslc.com>; "Glenn Parker" <glennp@ppslc.com>; "Clifford Baker" <clifford@ppslc.com>
**Sent:**    Friday, November 15, 2002 2:48 PM
**Attach:**  Consolidation.xls; 9.5% Floor.doc; 9.5% Floor Loans 2.xls
**Subject:** Floor Bonds

The attachments relate to our strategy concerning the use of our floor bonds. Document 1 details our consolidation loans with rates at 5% or less. Whether we swap loans around to maximize yields will depend on which option we choose. Document 2 setsforth various options and questions. Document 3 shows the financial impact to the Authority by having the floor on loans in a taxable issue. I used the September quarter end rates.

11/18/2002

PPHEA_045867

HIGHLY CONFIDENTIAL

## Consolidation Loans 5% or Less

| Int. Rate | SFC | 91AB | 92AB | 93AB | 97X | 99A-1 | 99A-2 | 01A-3 | 01A-5 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.250 | | | | | | | 40,729 | | | 40,729 |
| 3.375 | 36,678 | | | | | | | 35,513 | 6,468 | 78,659 |
| 3.500 | 815,264 | | | | 250,410 | 72,468 | | 368,801 | 412,189 | 1,919,132 |
| 3.625 | 965,715 | | 22,383 | | 273,571 | 112,464 | | 433,280 | 642,497 | 2,449,930 |
| 3.750 | 960,017 | | | | 96,166 | 76,822 | | 200,044 | 99,238 | 1,432,287 |
| 3.875 | 948,076 | | | | 37,979 | 209,348 | | 161,884 | 276,281 | 1,633,568 |
| 4.000 | 865,369 | | | | 116,625 | 219,353 | | 120,874 | 244,399 | 1,566,660 |
| 4.125 | 2,181,295 | | 67,817 | | 33,112 | 108,326 | | 452,418 | 465,443 | 3,308,411 |
| 4.250 | 2,466,657 | | 38,783 | | 30,056 | 227,745 | | 596,477 | 370,745 | 3,730,463 |
| 4.375 | 1,785,710 | | 107,664 | | 164,958 | 195,887 | | 528,332 | 423,974 | 3,206,525 |
| 4.500 | 1,618,542 | | 31,515 | | 78,307 | 339,924 | | 622,390 | 352,403 | 3,043,081 |
| 4.625 | 1,639,238 | | 50,029 | | 68,253 | 163,243 | | 546,084 | 314,941 | 2,781,788 |
| 4.750 | 1,265,334 | | 13,728 | | 155,495 | 165,593 | | 396,759 | 446,396 | 2,443,305 |
| 4.875 | 1,709,903 | | 59,666 | | 133,267 | 529,893 | | 390,984 | 629,136 | 3,452,849 |
| 5.000 | 838,313 | | 18,596 | | 2,635 | 40,077 | | 311,888 | 224,903 | 1,436,402 |
| *4.86 | 18,096,111 | 11,412,965 | 410,171 | 4,097,616 | 1,163,624 | 1,440,834 | 2,501,932 | 489,410 | 5,165,728 | 4,909,013 |

$ 32,523,789  Total Fixed Rate
$ 17,163,615  Total Variable Rate
$ 49,687,404  Total booked as of 10/31/02

| | |
|---|---|
| ** Nov. 2002 | 5,600,000 |
| ** Dec. 2002 | 5,500,000 |
| ** Jan. 2002 | 5,500,000 |
| ** Feb. 2002 | 5,500,000 |
| ** Mar. 2002 | 6,000,000 |
| Total | $ 77,787,404  Grand Total as of March, 2003 |

*Variable rate consolidation loans originated between and including 11/13/97-9/30/98. Borrower rate is the bond equivalent rate of the 91-day Treasury bills auctioned at the final auction before June 1, plus 3.1%, not to exceed 8.25%. Borrower rate is effective July 1 of current year through June 30 of the following year. Rate for July 1, 2002 through June 30, 2003 is 4.86% (1.76% plus 3.10%).

**The majority of the new consolidation loans should be fixed rate 4.06%.

HIGHLY CONFIDENTIAL

PPHEA_045868

## OPTIONS REGARDING 9.5% FLOOR

1. Do nothing.

2. Use the tax-exempt floor issues to make all of our portfolio 9.5% loans.

3. Use the tax-exempt floor issues to make all future acquisitions 9.5% loans.

3. Issue taxable bonds, purchase existing loans subject to 9.5%, claim 9.5% in the taxable issue on existing portfolio, do not claim floor on loans purchased with recycled funds of taxable issue, and don't claim floor on future loans purchased in tax exempt issues. We would fill tax-exempt issues with low interest rate loans to reduce excess interest liability.

4. Same as #3 except claim 9.5% floor on all current and future loans in both issues.

5. Swap fixed rate low interest loans into tax exempt issues, purchase into taxable issue to maximize spread, claim 9.5% floor on loans in both issues but never more than twice the original amount of 9.5% loans, currently $143MM which would allow us to have $286MM of floor loans.

## Questions

1. If the loans retain the 9.5% characteristic when purchased into the taxable issue, could DOE take the position that the yield restriction also transfers?
2. If interest rates start rising and the lender rate exceeds 9.5%, we would only get ½ the SAP which is over the floor, i.e. the lender rate rises to 11%, SAP over 9.5% is 1.5%, we would only get .75%. This could put us in a bind on the taxable bond. We need to determine at what point during rising interest rates would we need to do a swap?
3. How will rating agencies look at the transaction and what stress factors will they require?
4. Do we have to add any notes to our audit?
5. Do we have to disclose any risk in our official statement ?
6. Are there any 15( c ) 2-12 disclosure requirements?
7. Will the IFA system be able to make accurate prior period adjustments to the 799? If a loan goes from a taxable issue with no floor, to the tax-exempt issue with floor, and then to a taxable issue with floor, can IFA track adjustments across different SAP codes?

PPHEA_045869

HIGHLY CONFIDENTIAL

**EFFECT OF 9.5% LOANS IN TAXABLE ISSUES**

|  | CP | | Add on | Yield |
|---|---|---|---|---|
| Current Lender Yield on Grace and In-school Loans |  | 1.77% | 1.74% | 3.51% |
| Current Lender Yield on Repayment Loans |  | 1.77% | 2.34% | 4.11% |
| Student Rate--Grace and In-school (lender's floor) |  |  |  | 3.46% |
| Student Rate --Repayment (lender's floor) |  |  |  | 4.06% |

|  | Grace | | Repay | |
|---|---|---|---|---|
| Floor on loans purchased from |  |  |  |  |
| Bond Series 91AB,92AB,93AB |  | 9.50% |  | 9.50% |
| Lender Yield |  | 3.51% |  | 4.11% |
| Increase in Yield |  | 5.99% |  | 5.39% |
| Funds available in above Bonds | $ | 143,000,000 | $ | 143,000,000 |
| Increase in Yield |  | 5.99% |  | 5.39% |
| Increase in Gross Revenue | $ | 8,565,700 | $ | 7,707,700 |

PPHEA_045870

HIGHLY CONFIDENTIAL

Exhibit 161

# CONFIDENTIAL

# FILED UNDER SEAL

## John Wright

**From:** "Ellison, Kathleen" <kellison@fulbright.com>
**To:** "Jimmy Parker (E-mail)" <jimmyp@ppslc.com>; "Glenn Parker (E-mail)" <glennp@ppslc.com>; "John Wright (E-mail)" <johnw@ppslc.com>
**Sent:** Wednesday, March 19, 2003 4:07 PM
**Subject:** Questions on Applicability of Half Sap/Floor

I believe these are the scenarios we were going to ask Saul:

1. May the Authority transfer student loans from a pre 1993 bond indenture into a new tax-exempt bond indenture and retain the floor on those loans?

2. Should all loans in a pre 1993 bond indenture (regardless of whether they were purchased from a third party, transferred from a taxable line of credit of the Authority, or transferred from a tax-exempt indenture of the Authority) be billed at the floor?

Let me know if there are others. Thanks! Kathleen
Kathleen R. Ellison
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
713-651-3612
FAX: 713-651-5246
kellison@fulbright.com

3/19/2003 Jimmy, Glenn, Kathleen, & I had a call with Saul. Saul said loans would have floor. We asked Saul for an opinion. Saul said for Kathleen to send him an e-mail with her questions. Saul said it might be a week before he could get to writing the opinion as he would be out of the office.

03/21/2003

PPHEA_045899

HIGHLY CONFIDENTIAL

Exhibit 162

# CONFIDENTIAL

# FILED UNDER SEAL

November 1, 2001

Mr. Clifford Baker, Executive Director
Panhandle-Plains Higher Education Authority, Inc.
1403 23rd Street
Canyon, Texas 79015

Re:    Request for Opinion

Ladies and Gentlemen:

This is in response to your request for our opinion regarding various proposed transactions involving the transfer of Federal Family Education Loan Program (FFELP) loans from a pre-October 1, 1993 Panhandle-Plains Higher Education Authority, Inc., (hereinafter "AUTHORITY") tax-exempt bond estate to another financing facility of AUTHORITY. For each proposed transaction, you ask whether the special allowance paid by the Department of Education on such loans after the transactions are completed would be calculated under the rules applicable to loans made or purchased with the proceeds of tax-exempt bonds or, alternatively, under the rules applicable to other FFELP loans.

In preparing this opinion, we have reviewed the FFELP statute and regulations, email correspondence between this firm and the Department of Education officials on these issues, and other materials we deem appropriate. We note that the guidance we have received from the Department by email has been confusing, and in some ways inconsistent with prior guidance and/or the unambiguous language of the regulations. As you will note from our discussion, this has significantly complicated our analysis.

**Facts**

The first proposed transaction involves the transfer of approximately $150 million in loans now held in AUTHORITY's tax-exempt bond estate created prior to October 1,

HIGHLY CONFIDENTIAL

PPHEA_045883

1993, to a taxable bond estate to be created by the Authority, in exchange for a payment to the tax-exempt bond estate from the taxable estate of an amount equal to the then-outstanding principal and interest on the transferred loans. AUTHORITY intends this process to result in the transferred loans remaining subject to the "floor yield/half sap" special allowance calculation described below after completion of the transaction.

After completion of this transaction, the funds received by the tax-exempt bond estate would be used to purchase loans from third parties. To the extent that such purchases result in loans in excess of $150 million residing in the tax-exempt estate, those loans would be transferred to the taxable estate in exchange for cash, as with the initial transaction. AUTHORITY's intent in these transactions would be that the loans purchased into the tax-exempt estate and then transferred to the taxable estate in this manner would ~~become~~ remain subject to the "floor yield/half sap" special allowance calculation at purchase and remain subject to such calculation after completion of the transfer.

~~As a matter of policy, AUTHORITY would not engage in such transactions to the extent that the resulting volume of outstanding loans held by the Authority in the taxable estate that remain subject to the "floor yield/half sap" special allowance calculation would exceed $150 million.~~

### Opinion

For the reasons set forth below, it is our opinion that each of the proposed series of transactions described above would result in the loans at issue receiving "floor yield/half sap" special allowance treatment at the conclusion of those transactions.

### Analysis

### I.    The Regulation, Its History, and Intent

The Federal regulation governing this issue is 34 CFR 682.302 (the "Regulation"). Under the Regulation, special allowance is paid when the interest payable on an FFEL loan by the borrower (or the Department on the borrower's behalf) falls below statutory levels deemed to represent a market level yield for the holder. Under subsection (c) of the Regulation, the special allowance rate is calculated quarterly by determining the average of the bond equivalent rates of the 91-day Treasury bills auctioned during the quarter, subtracting the applicable interest rate for that loan, and adding a certain percentage, which varies with the type of loan and when it was made. Subsections (c) and (e) of the Regulation set forth when the Department will pay the holder of a qualified student loan full special allowance payments ("full sap") and when the Department will pay the holder of a qualified student loan reduced special allowance payments, subject to certain minimums.

HIGHLY CONFIDENTIAL

PPHEA_045884

According to paragraph (c)(3) of the Regulation, the special allowance rate is one-half of the full sap rate for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from the proceeds of tax-exempt obligations issued prior to October 1, 1993, subject to certain minimum floors. This is referred to throughout this memorandum as "floor yield/half sap treatment". This treatment also applies to loans made with certain moneys derived from such loans and from the investment of proceeds of tax-exempt obligations.

Paragraph (e)(2) of the Regulation provides that, notwithstanding paragraph (c)(3), the Department will pay a special allowance to an authority at the full sap rate for a loan which has been made or purchased with the proceeds of tax-exempt obligations issued prior to October 1, 1993 –

> (1)    After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than pre-October 1, 1993 tax-exempt obligations; and

> (2)    If the authority retains a legal or equitable interest in the loan, the tax-exempt obligation is retired or defeased.

In 1992, when paragraph (e)(2) of the Regulation was issued in its current form, the interest rate environment was such that the floor yield was not applicable, while the half sap calculation significantly reduced the yield on loans subject to floor yield/half sap treatment. This had created a substantial incentive for holders of such loans to find ways to convert them to full sap treatment through refinancing with taxable bonds and similar transactions. Existing Department guidance had exacerbated this problem by interpreting the prior regulations in a way that facilitated those activities.

The Regulation was issued in 1992 to make it more difficult to convert loans from floor yield/half sap treatment to full sap treatment, thus saving the Federal government money under then-existing market conditions. As the Department explained in Question 30 of Dear Colleague Letter 96-L-186--

> The [prior] regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions–if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

> In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the

HIGHLY CONFIDENTIAL

PPHEA_045885

> proceeds of a tax-exempt obligation is refinanced with proceeds of a
> taxable obligation, the loan remains subject to the tax-exempt special
> allowance provisions if the authority retains legal interest in the loan. If,
> however, the original tax-exempt obligation is retired or defeased, special
> allowance is paid based on the rules applicable to the new funding source
> (taxable or tax-exempt).

(Emphasis added.)[1]

Now, of course, market interest rates are considerably lower than in 1992. As a result, a holder of loans subject to floor yield/half sap treatment is loath to take any action that would convert the loan to full sap treatment and lose the benefit of the floor. However, in 1992 the Department "chose its poison" -- i.e., it chose to make it harder to convert loans from floor yield/ half sap to full sap treatment, thus making it easier to avoid such a conversion today.

## II.   Conditions for Floor Yield/Half Sap Treatment of the Loans at Issue

Paragraph (e)(2) as explained by the Dear Colleague, requires that eligible loans financed with the proceeds of a tax-exempt obligation originally issued prior to October 1, 1993 remain subject to the tax-exempt special allowance provisions (i.e., receive floor yield/half sap treatment) unless two conditions are met:

(1) the loans have been pledged or otherwise transferred in consideration of funds derived from sources other than tax-exempt obligations; and

(2) if the Authority retains a legal or equitable interest in the loans, the tax-exempt obligations which previously financed the loans are not retired or defeased.

Pamela Moran of the Department has informed us by email correspondence of August 8, 2001 (Appendix B), that the required pledge or transfer described in the Regulation does not occur when an authority engages in a transaction that is more akin to a "refinancing" than a "sale". Specifically, Ms. Moran indicated that the requisite pledge or transfer was lacking in a situation where an authority purchased a loan out of a tax-

---

[1] In fact, the predecessor provision of paragraph (e)(2) closely resembled the revised language, save that the predecessor provision did not require the authority to retain a legal or equitable interest in the loan. See 34 CFR 682.302(e)(3)(1988). Thus, the revised language is susceptible to the same interpretation that the Department adopted with respect to the prior language—i.e., that it is silent on what special allowance treatment applies when the conditions in the paragraph are not met. From the Dear Colleague, however, it is clear that the Department did not intend the revised language to allow for such an interpretation, sAuthorityc the result would then be to frustrate the stated purpose of the revised language to require tax-exempt special allowance treatment to continue on a loan refinanced with taxable funds if the authority retains an interest in the loan, absent retirement or defeasance of the prior tax-exempt obligation.

PPHEA_045886

HIGHLY CONFIDENTIAL

exempt indenture by the use of monies held in the authority's general fund. Ms. Moran's rationale was that "nothing has changed about the loan except where it is held by the authority". However, in the Dear Colleague, the Department clearly stated that both paragraph (e)(2) and its predecessor, old paragraph (e)(3), applied to instances where a loan made with tax-exempt bond proceeds is "refinanced" by taxable bond proceeds.

This creates considerable doubt as to the vitality of Ms. Moran's guidance on this point. Nevertheless, the Department's current interpretation of its regulations might receive considerable deference from a court. Each of the transfers from the tax-exempt estate to the taxable estate at issue here involve what are essentially refinancing, rather than sale, transactions. Thus, if a court were to follow the Department's current interpretation, it would conclude that each of the transactions described in your email would <u>not</u> satisfy Condition (1), above.

However, Ms. Moran sent the undersigned an email on October 10, 2001 interpreting the word "and" in paragraph (e)(2)(i) as meaning, in effect, "or". Thus, under Ms. Moran's emails, satisfaction of Condition (1) is not a prerequisite for full sap treatment of a loan originally financed with tax-exempt funds. Under Ms. Moran's interpretation, the special allowance treatment of the loans at issue would depend on whether Condition (2) is satisfied. The issue of Condition (2) would also become dispositive if Ms. Moran's interpretation of Condition (1) did not prevail in court. Accordingly, we now turn to an analysis of Condition (2).

Condition (2) is not met if the authority retains a legal or equitable interest in the loan and the relevant tax-exempt bond is not retired or defeased. In each of the proposed transactions involving the movement of loans among AUTHORITY facilities, it is clear that the first element exists, in that AUTHORITY retains an interest in the loan.

The second element of Condition (2) is not met in each of the proposed transactions because the tax-exempt obligation which previously financed the loans is not being retired or defeased. Therefore, given the clear statement in the Dear Colleague that tax-exempt loans refinanced by taxable funds retain tax-exempt special allowance treatment if the authority retains an interest in the loans and the prior tax-exempt obligation is not retired or defeased, we believe it is more likely than not that a court would find that the loans at issue retain floor yield/half sap treatment after their transfer to the taxable estate.

The above opinion is limited to the specific issues discussed herein under the FFELP statute and regulations. We express no opinion with regard to any other issue or any other laws. This opinion may be relied on only by AUTHORITY, in connection with the proposed transactions described above. It may not be relied upon by any other party or for any other purpose without our express written consent.

Please let us know if you would like to discuss any of the above issues in further detail

HIGHLY CONFIDENTIAL

PPHEA_045887

Sincerely,

MOSKOWITZ STRICKLAND BROCKINGTON
LEWIS  PLLC


By:  _____
     Saul L. Moskowitz
     Principal


Enclosures

Cc:  Kathleen Ellison, Esq.

PPHEA_045888

HIGHLY CONFIDENTIAL

Exhibit 167

# CONFIDENTIAL

# FILED UNDER SEAL

*Draft for 2004*

**From:**      "Saul Moskowitz" <moskowitz@msbllaw.com>
**To:**        "John Wright" <johnw@ppslc.com>
**Date:**      2/3/04 10:15AM
**Subject:**   RE: 9.5% Floor Opinion

*2/4/2004 called Saul
He will make changes
& FedEx to us.*

Draft revised opinion attached. Pls. note the change in the Analysis
section to clarify that we're not opining as to whether a retirement or
defeasance is in fact occurring. With your ok, I'll finalize. Saul

Saul Moskowitz
Moskowitz & Austin LLC
1100 Wayne Ave.
Suite 1111
Silver Spring, MD  20910
Ph:  301.562.0600
Fax: 301.562.0635
Email:  moskowitz@msbllaw.com <mailto:moskowitz@msbllaw.com>

The information contained in this email may be confidential and privileged
attorney-client information or work product and is intended only for the
individual or entity to whom it is addressed. Any unauthorized use,
distribution or copying of this communication is strictly prohibited. If you
have received this communication in error, please notify this firm
immediately.  Moskowitz & Austin LLC believes that this E-mail and any
attachments were free of any virus, worm, or Trojan horse when sent.
However, this message and its attachments could have been infected during
transmission. By reading the message and opening any attachments, the
recipient accepts full responsibility for taking remedial action about
viruses and other defects. Moskowitz & Austin LLC is not liable for any loss
or damage arising in any way from this message or its attachments.

-----Original Message-----
From: John Wright [mailto:johnw@ppslc.com]
Sent: Monday, February 02, 2004 10:48 AM
To: moskowitz@msbllaw.com
Cc: Glenn Parker; Jimmy Parker; John Wright
Subject: 9.5% Floor Opinion

Saul, I have attached a revised Facts paragraph relating to the new
PPHEA bond issues scheduled to close February 10, 2004. Please review
for accuracy and revise your opinion of June 24, 2003 accordingly.

The new opinion along with your invoice should be forwarded to:

Mr. Glenn Parker
Panhandle-Plains Student Loan Center
1403 23rd Street
Canyon, TX  79015

Like the June 24, 2003 opinion, the new opinion should be directed to
Mr. Clifford Baker, Executive Director.

Should you have any questions or need additional information, you may

PPHEA_045924

HIGHLY CONFIDENTIAL

contact me at 800-677-1456.

John

**CC:**          "Glenn Parker" <Glennp@ppslc.com>, "Jimmy Parker" <JIMMYP@ppslc.com>

PPHEA_045925

HIGHLY CONFIDENTIAL

Exhibit 168

# CONFIDENTIAL

# FILED UNDER SEAL

# SallieMae



## Project Troy Update

**July 8, 2004**



*Confidential and Proprietary - For Internal SLM Board and Management Use Only*



# Southwest Student Services Corporation- Business Overview

## *Corporate Overview*

- Southwest Student Services Corporation ("Troy") is a for-profit subsidiary of the recently created Helios Foundation; Troy management owns a 1.7% stake

- Troy integrates formerly non-profit entities converted per 150(d) of the tax code, preserving value of existing tax-exempt debt for buyer

- 9th largest owner of FFELP assets and, in FFY 2003, 31st largest originator, 10th largest servicer

- Approximately 270 employees, 170 in servicing, the balance in IT, sales, and G&A; more than 90% of total in AZ

- Recent growth driven by consolidation volume, sourced via marketing relationships with third parties

- Troy has retained Aurora Consulting (Larry O'Toole) to advise them on the transaction

## *Business Components*

| Component | Scope and Scale | Business Model |
|---|---|---|
| **Loan Portfolio** | ▪ $4B portfolio as of March 31;  $5.1B projected as of September 30<br>▪ Virtually all FFELP<br>▪ 82% Consolidation loans<br>▪ $580M in 9.5% floor loans<br>▪ $760M total tax-exempt financing | ▪ Grow portfolio aggressively<br>▪ Leverage tax-exempt financing<br>▪ Short-fund to benefit from interest rate decline (have not sold floors)<br>▪ 97% in-house servicing (lease IFA system from Nelnet for servicing and originations) |
| **Consolidation Loan Originations** | ▪ $1.2B net additions in FY03<br>▪ Approximately 10% from SLM | ▪ Source leads via telemarketers, direct mail marketers at average cost of 3.67%<br>▪ 1% interest rate deduction for 24 on-time payments; 2% for AZ/FL (introduced over last 12-18 months) |
| **Other Loan Originations** | ▪ $305M in traditional, school-based FFELP projected for FY04; U of AZ accounts for nearly 30%<br>▪ $95M projected for FFELP school-as-lender (biggest is U of Phoenix)<br>▪ Modest private loan volume ($25M), originated by partner bank and sold to First Marblehead | ▪ Traditional FFELP: Grow in nexus states (AZ/FL) and other targeted states through competitive discounting and benefits (zero fees in AZ/FL, 1% interest rate reduction at repayment for borrowers who stay in current status)<br>▪ School-as-lender: Aggressive pricing (premium of 1.06% at U of Phoenix) with plans to grow rapidly<br>▪ Private loans: keep fee-income model, but plan to grow acquisition channel and to service loans in-house |



2



# Valuation

| Component | Value | Calculations and Comments |
|---|---|---|
| **1. Loan Portfolio**<br>  **a. Portfolio with SLM financing**<br><br>  **b. Incremental value of 9.5% floors** | **a. $300M**<br><br><br>**b. $105M** | ▪ (a) $300M value at 10% NPV/ROI, based on $5.1B portfolio (May 31 portfolio of $4.25B plus projected additions of $850M between May 31 and September 30 closing); total premium of 5.88%<br>▪ (b) $105M current value of $580M in 9.5% floors, , assuming no more can be created post reauthorization in mid-2005; some potential upside if any new loans can be created after mid-2005 and interest rates stay relatively low<br>▪ Valuations factor in Troy portfolio's delinquency/default characteristics and borrower benefits<br>▪ A $534M spot purchase from Citibank in February 2004 closed at a blended premium of 4.50% |
| **2. Brand and school origination channel** | **$95M** | ▪ $40M in value to existing base of $300M in annual FFELP volume, coupled with proportionate SLM private loan volume, growing at 25% per year for five years<br>▪ Additional value of at least $55M to (a) new regional brand platform under SLM sponsorship and (b) protection of USAF guarantor volume currently flowing through Troy<br>▪ No value assigned to school-as-lender or consolidation channels due to high acquisition cost |
| **3. Balance sheet – tangible net assets** | **$70M** | ▪ $70M is value of tangible net worth projected for September 30, 2004 balance sheet – includes roughly $10M for real estate/fixed assets, balance is primarily cash and receivables<br>▪ Final closing price would be lowered if $70M target not met<br>▪ Potential for additional value if SLM can use up $15M+ arbitrage rebate liability that will convey with balance sheet |
| **4. Transition expense** | **($20M)** | ▪ Assume $6M severance cost (160 people at $20,000 plus $3M special executive packages)<br>▪ Assume $8M IT transition cost<br>▪ Assume $6M in extra cost structure "carry" for nine months ($10M pre-tax) |
| **TOTAL** | **$550M** | |





# Accretion Analysis

| (Dollars in millions) | | **2004** | | **2005** | | **2006** | | **2007** | | **2008** |
|---|---|---|---|---|---|---|---|---|---|---|
| NII before Benefit from 9.5% Loans | $ | 9.4 | $ | 40.8 | $ | 47.7 | $ | 53.7 | $ | 61.2 |
| Benefit from 9.5% Loans | | 7.9 | | 28.1 | | 21.9 | | 18.5 | | 15.1 |
| **Net Interest Income** | | **17.3** | | **68.8** | | **69.5** | | **72.3** | | **76.4** |
| **Other income** | | **0.5** | | **2.0** | | **2.1** | | **2.2** | | **2.4** |
| **Operating expenses** | | **(4.8)** | | **(14.6)** | | **(10.1)** | | **(10.1)** | | **(10.1)** |
| **Amortization of Intangible Assets** | | **(1.3)** | | **(5.0)** | | **(5.0)** | | **(5.0)** | | **(5.0)** |
| **Income before Tax & Financing Costs** | | **11.8** | | **51.3** | | **56.6** | | **59.4** | | **63.7** |
| Financing Costs of Purchase Price | | (6.9) | | (27.2) | | (26.0) | | (24.6) | | (23.0) |
| Income tax before effect of Sec. 338 Election | | (1.8) | | (9.0) | | (11.4) | | (13.0) | | (15.2) |
| Tax Effect of Sec. 338 Election | | 1.1 | | 4.3 | | 4.3 | | 4.3 | | 4.3 |
| **NET INCOME** | $ | **4.1** | $ | **19.4** | $ | **23.5** | $ | **26.2** | $ | **29.8** |
| **Core EPS - Diluted (Post-Split)** | | **$0.009** | | **$0.044** | | **$0.055** | | **$0.062** | | **$0.072** |
| Diluted CSEs (Post-Split) | | 448.5 | | 441.3 | | 431.0 | | 421.0 | | 411.2 |
| **ROE** | | | | **8.9%** | | **11.0%** | | **12.4%** | | **14.4%** |

**ALLOCATION OF PURCHASE PRICE**

| | |
|---|---|
| Loan Premiums | 280,500 |
| Net Assets | 74,000 |
| Intangible Assets | 50,000 |
| Goodwill | 145,500 |
| TOTAL PURCHASE PRICE | 550,000 |



# Strategic Benefits and Integration Plans

***Accretive Portfolio Purchase***

- Opportunity to add $5 billion portfolio at reasonable price
- Projected 2005 EPS contribution = $.04 ; $.06 in 2006 after integration is completed and $.07 by 2008.

***Regional Brand Platform***

- Base of $300M+ in FFELP originations
- Southwest (and Florida) brand identity is platform for regional growth
- Competitive leverage against Bank One

***Operations Capability***

- Can complement existing originations and customer support capacity with southwest regional center of 100-150 staff
- Would retain most sales and servicing staff, cut most G&A staff
- Staff transition must be handled with care given prior SLM shutdown of AZ servicing





# Due Diligence and Deal Status

**Due Diligence**

- Overall: clean operation with no big surprises
- Finance/accounting: Clean audit record, solid accounting; arbitrage rebate liability is being revalued by Troy now
- Tax: SLM to benefit from Section 338 tax election
- REDACTED
- IT: Transition cost of roughly $8M, transition to SLM systems within 12 months
- Operations: Excellent facility with capacity for 375 employees (sublease or sell), reasonably clean operating practices
- Sales & Marketing:Consolidation channel no value to SLM (too expensive); school-as-lender deals of marginal value; traditional school channel projected $305M for FY 04  - 50% year over year growth
- HR: Comparable benefits; executive severance obligation of $3M - $4M

**Status/Competitive Position**

- SLM is one of three final bidders; reportedly, one is industry player (e.g., Nelnet, CFS) and one is potential new entrant
- Preliminary bids by other two were reportedly in $550M to $600M range, all cash, strong financing, with intent to retain substantial portion of company staff
- Firm offers, including general plans for staff, due July 9



6

# Next steps

- July 9th offer letter
  - Purchase price of $550 million in cash
  - Restricted stock for management related to transition support/stay bonuses valued at approximately $2 million
  - Express intent to retain majority of sales and servicing positions
  - Contingencies include final negotiation of purchase agreement

- Expect quick feedback on offer/status

- If SLM bid is successful, project close in September



Exhibit 169

# CONFIDENTIAL

# FILED UNDER SEAL

# SallieMae



## Project Troy Update

July 6, 2004

*Confidential and Proprietary - For Internal SLM Management Use Only*





# Southwest Student Services Corporation-Business Overview

### *Corporate Overview*

- Southwest Student Services Corporation ("Troy")  is a for-profit subsidiary of the recently created Helios Foundation; Troy management owns a 1.7% stake

- Troy integrates formerly non-profit entities converted per 150(d) of the tax code, preserving value of existing tax-exempt debt for buyer

- 9th largest owner of FFELP assets and, in FFY 2003, 31st largest originator, 10th largest servicer

- Approximately 270 employees, 170 in servicing, the balance in IT, sales, and G&A; more than 90% of total in AZ

- Dramatic recent growth driven by consolidation volume, sourced via marketing relationships with third parties

- For current fiscal year (September 30), project $100M in pre-tax income

### *Business Components*

| Component | Scope and Scale | Business Model |
|---|---|---|
| **Loan Portfolio** | ▪ $4B portfolio as of March 31;  $5.1B projected as of September 30<br>▪ Virtually all FFELP; just $5M private<br>▪ 82% Consolidation loans<br>▪ $580M in 9.5% floor loans<br>▪ $760M total tax-exempt financing | ▪ Grow portfolio aggressively<br>▪ Leverage tax-exempt financing<br>▪ Short-fund to benefit from interest rate decline (have not sold floors)<br>▪ 97% in-house servicing (lease IFA system from Nelnet for servicing and originations) |
| **Consolidation Loan Originations** | ▪ $1.2B net additions in FY03<br>▪ Approximately 10% from SLM | ▪ Source leads via telemarketers, direct mail marketeters at average cost of 3.67%<br>▪  1% interest rate deduction for 24 on time payments; 2% for AZ/FL (introduced over last 12-18 months) |
| **Other Loan Originations** | ▪ $305M in traditional, school-based FFELP projected for FY04; U of AZ accounts for nearly 30%<br>▪ $95M projected for FFELP school-as-lender (biggest is U of Phoenix)<br>▪ Modest private loan volume ($25m), originated by partner bank and sold to First Marblehead | ▪ Traditional FFELP: Grow in nexus states (AZ/FL) and other targeted states through competitive discounting and benefits (zero fees in AZ/FL, 1% interest rate reduction at repayment for borrowers who stay in current status)<br>▪ School-as-lender: Extremely aggressive pricing (106 at U of Phoenix) with plans to grow aggressively<br>▪ Private loans: keep fee-income model, but plan to grow acquisition channel and to service loans in-house |





# Financial Performance

CONSOLIDATED FINANCIAL STATEMENTS  (Fiscal Year End September 30th)

### Condensed Statements of Income ($ in thousands)

|  | FY 2002 actual | FY 2003 actual | FY 2004 estimate |
|---|---|---|---|
| Net Interest Income | $ 35,226 | $ 81,299 | $129,394 |
| Less: Provision for Losses | 3,697 | ( 443) | 1,295 |
| Net Interest Income After Provision For Losses | $ 31,529 | $ 81,742 | $128,099 |
| Processing & Servicing Revenue | 1,702 | 1,430 | 1,239 |
| Other Income | 7,661 | 4,209 | 354 |
| Operating Expenses | 21,058 | 25,793 | 30,562 |
| Net Income Before Taxes | $ 19,834 | $ 61,588 | $ 99,130 |
| Taxes |  |  | 14,232 |
| Net Income | $ 19,834 | $ 61,588 | $ 84,898 |

### Condensed Balance Sheet ($ in Millions)

|  | FY 2002 actual | FY 2003 actual | FY 2004 At 5/31 |
|---|---|---|---|
| **Assets** |  |  |  |
| Student Loans | $ 2,024 | $ 3,256 | $ 4,228 |
| Cash and Investments | 594 | 392 | 704 |
| Other Assets | 69 | 104 | 218 |
| Total Assets | $ 2,687 | $ 3,752 | $ 5,150 |
| **Liabilities and Equity** |  |  |  |
| Borrowings | $ 2,627 | $ 3,628 | $ 4,905 |
| Other Liabilities | 7 | 9 | 47 |
| Total Liabilities | $ 2,634 | $ 3,637 | $ 54,952 |
| Equity | 53 | 115 | 198 |
| Total Liabilities and Equity | $ 2,687 | $ 3,752 | $ 5,150 |



3



# Loan Growth By Channel

**Loan Volume Channels and Growth Rates**
*Projections Are Troy's*

| ($ in millions) | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| **School Channel** | | | | | | | | |
| FFELP Origination (AELMAC & FELMAC)) | $89 | $119 | $182 | $290 | $360 | $435 | $525 | $605 |
| School-as-Lender (note 1) | | 3 | 17 | 95 | 175 | 306 | 255 | 250 |
| Private Loans | | | | 5 | 10 | 20 | 30 | 45 |
| **Sub-total School Channel** | **$89** | **$122** | **$199** | **$390** | **$545** | **$761** | **$810** | **$900** |
| *4 year growth rate* | | 64% | | | | | | |
| *5 year growth rate (post acquisition)* | | | | | 23% | | | |

*Note 1:  Primary school as lender client is University of Phoenix*

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| **Loan Consolidation** | 114 | 922 | 1281 | 1435 | 1465 | 900 | 600 | 600 |
| *4 year growth rate* | | 133% | | | | | | |
| *5 year growth rate (post acquisition)* | | | | | -20% | | | |
| **Loan Acquisition (Secondary Market)** | 26 | 35 | 73 | 77 | 113 | 145 | 185 | 230 |
| *4 year growth rate* | | 44% | | | | | | |
| *5 year growth rate (post acquisition)* | | | | | 31% | | | |
| **Direct to Consumer** | | | | 20 | 80 | 170 | 260 | 350 |
| *4 year growth rate* | | nm | | | | | | |
| *5 year growth rate (post acquisition)* | | | | | 105% | | | |
| **TOTAL** | **$229** | **$1,079** | **$1,553** | **$1,922** | **$2,203** | **$1,976** | **$1,855** | **$2,080** |
| *4 year growth rate* | | 103% | | | | | | |
| *5 year growth rate (post acquisition)* | | | | | 2% | | | |





# Top 25 School Customers

| School Name | State | AY 2003 Southwest Dollars | SW Mkt Shr | SLM Pref Channel | SM Mkt Shr | AY 2002 Southwest Dollars | SW Mkt Shr | SLM Pref Channel | SM Mkt Shr |
|---|---|---|---|---|---|---|---|---|---|
| UNIVERSITY OF ARIZONA (THE) | AZ | $ 55,671,469 | 52.8% | $ 24,446,059 | 23.2% | $ 30,016,514 | 30.8% | $ 34,491,950 | 35.4% |
| APOLLO COLLEGE - ALL (AZ,NM, OR, WA) | AZ + | $ 10,043,785 | 56.4% | $ 4,453,562 | 25.0% | $ 4,588,068 | 32.1% | $ 7,227,021 | 50.6% |
| ARTISTIC BEAUTY COLLEGES - ALL (AZ, CO) | AZ+ | $ 8,331,058 | 96.1% | $ 186,001 | 2.1% | $ 3,638,207 | 56.1% | $ 2,345,175 | 36.2% |
| GRAND CANYON UNIVERSITY | AZ | $ 6,617,695 | 41.4% | $ 5,215,772 | 32.7% | $ 4,042,016 | 22.1% | $ 8,736,417 | 47.7% |
| NATIONAL SCHOOL OF TECHNOLOGY | FL | $ 3,834,578 | 44.6% | $ 407,196 | 4.7% | $ 2,851,930 | 31.6% | $ 53,949 | 0.6% |
| PIMA MEDICAL INSTITUTE - | AZ | $ 3,792,539 | 87.4% | $ 299,223 | 6.9% | $ 2,192,438 | 63.2% | $ 692,997 | 20.0% |
| UNIVERSITY OF REDLANDS | CA | $ 3,760,601 | 13.5% | $ 15,655,178 | 56.2% | $ 1,025,128 | 4.8% | $ 11,766,290 | 55.7% |
| MIAMI-DADE COMMUNITY COLLEGE - NORTH CAMPUS | FL | $ 3,352,657 | 44.0% | $ 303,631 | 4.0% | $ 2,924,332 | 42.2% | $ 396,527 | 5.7% |
| OTTAWA UNIVERSITY - ALL AZ & KS) | AZ+ | $ 3,254,789 | 16.5% | $ 12,290,591 | 62.4% | $ 455,429 | 2.8% | $ 12,102,374 | 74.3% |
| MESA COMMUNITY COLLEGE | AZ | $ 3,163,815 | 17.4% | $ 2,398,009 | 13.2% | $ 1,818,018 | 13.3% | $ 1,761,604 | 12.8% |
| CONCORDE CAREER INSTITUTE | FL | $ 3,024,085 | 22.3% | $ 5,688,340 | 41.9% | $ 2,862,063 | 22.1% | $ 4,876,219 | 37.6% |
| AMERICAN INSTITUTE OF TECHNOLOGY | AZ | $ 2,788,445 | 100.0% | | 0.0% | $ 2,301,675 | 99.8% | | 0.0% |
| ARIZONA STATE UNIVERSITY | AZ | $ 2,769,875 | 1.5% | $ 13,414,820 | 7.4% | $ 2,084,770 | 1.4% | $ 9,755,788 | 6.5% |
| FLORIDA INTERNATIONAL UNIV - UNIV PARK CAMPUS | FL | $ 2,652,578 | 4.2% | $ 7,993,303 | 12.6% | $ 1,794,357 | 3.6% | $ 1,501,950 | 3.0% |
| CONSERVATORY OF RECORDING ARTS & SCIENCES | AZ | $ 2,608,603 | 85.9% | $ 272,929 | 9.0% | $ 386,164 | 15.1% | $ 1,327,736 | 52.1% |
| NATIONAL SCHOOL OF TECHNOLOGY | FL | $ 2,499,060 | 52.2% | $ 477,732 | 10.0% | $ 2,552,124 | 40.7% | $ - | 0.0% |
| CALIFORNIA STATE UNIVERSITY, NORTHRIDGE | CA | $ 2,367,617 | 4.7% | $ 7,203,127 | 14.3% | $ 3,574,364 | 5.4% | $ 5,474,588 | 8.3% |
| PROFESSIONAL TRAINING CENTERS | FL | $ 2,287,983 | 100.0% | | 0.0% | $ 1,207,912 | 100.0% | | 0.0% |
| CHAPMAN UNIVERSITY | CA | $ 2,207,488 | 3.0% | $ 21,579,245 | 29.0% | $ 888,024 | 1.4% | $ 21,260,964 | 33.1% |
| NATIONAL AVIATION ACADEMY OF MISSISSIPPI | FL | $ 2,170,412 | 100.0% | $ - | 0.0% | $ 2,404,198 | 99.4% | $ 5,000 | 0.2% |
| EDWARD WATERS COLLEGE | FL | $ 1,673,806 | 33.4% | $ 3,800 | 0.1% | $ 681,713 | 12.8% | $ 6,799 | 0.1% |
| UTAH COLLEGE OF MASSAGE THERAPY -ARIZONA SCHOOL | AZ | $ 1,666,960 | 44.3% | $ 105,964 | 2.8% | $ 1,906,732 | 58.4% | $ 455,518 | 13.9% |
| PHOENIX COLLEGE | AZ | $ 1,651,616 | 19.3% | $ 1,956,687 | 22.8% | $ 375,669 | 6.8% | $ 1,310,111 | 23.9% |
| MIAMI-DADE COMMUNITY COLLEGE - INTERAMERICAN | FL | $ 1,625,285 | 50.2% | $ 101,875 | 3.1% | $ - | 0.0% | $ - | 0.0% |
| DAHAN INSTITUTE OF MASSAGE STUDIES | NV | $ 1,595,155 | 100.0% | | 0.0% | $ 3,268,216 | 100.0% | | 0.0% |
| Top 25 School Clients | | $ 135,411,954 | | $ 124,453,044 | | $ 79,840,061 | | $ 125,548,977 | |
| Remainder approx 370 school relationships | | $ 47,083,272 | | | | $ 40,122,067 | | | |
| Total AY2003 and AY2002 | | $ 182,495,226 | | | | $ 119,962,128 | | | |



5

 # Due Diligence and Deal Status

**Due Diligence**

- Overall: clean operation with no big surprises
- Finance/accounting: Clean audit record, solid accounting; arbitrage rebate liability is being revalued by Troy now
- Tax: Has achieved "busted 351" in conversion, enabling SLM to benefit from 338 election
- REDACTED
- IT: Confirms transition cost of roughly $8M, transition to SLM systems within 12 months
- Operations:Excellent facility with capacity for 375 (sublease or sell), reasonably clean operating practices
- Sales & Marketing:Consolidation channel no value to SLM (too expensive); school-as-lender deals of marginal value (premium at U of Phoenix is 105.6% with 1.5% interest rate reduction if first payment is on time); traditional school channel projected $305M for FY 04  - 50% year over year growth a mix of serialization and new schools additions
- HR: Reasonably comparable benefits; executive severance obligation of $3M - $4M

**Status/Competitive Position**

- SLM is one of three final bidders; reportedly, one is industry player (e.g., Nelnet)  and one is potential new entrant (e.g., Lehman Brothers)
- Preliminary bids by other two were reportedly in $550M to $600M range, all cash, strong financing, with intent to retain substantial portion of company staff
- Firm offers, including general plans for staff, due July 9





# Valuation Update - Key Variables Are Portfolio ROI Target and Use of 9.5% Floor Capacity

| Component | Value | Calculations and Comments |
|---|---|---|
| 1. **Loan Portfolio with SLM financing** | **$207M to $254M** | ▪ For 15% NPV ACC, 4.26% premium on projected $4.25B portfolio as of May 31 plus 3.0% premium on $850M in projected portfolio growth by September 30<br>▪ For 10% NPV ACC, 5.19% premium on May 31 portfolio, and 3.9% premium on additions projected as od September 30<br>▪ Assumes 40% of eligible borrowers earn on-time payment interest benefit on consolidations |
| 2. **9.5% Floor Loans – Incremental Value** | **$105M to $155M** | ▪ $105M is incremental value of $580M in 9.5% loan floors, assuming no more can be created post reauthorization in mid-2005; some potential upside if any new loans can be created after mid-2005 and intrerest rates stay relatively low<br>▪ Roughly $50M in additional value could be achieved if SLM aggressively creates additional 9.5% loans over next year, before reauthorization; e.g., entire annual AZ origination of $300M via SLM owned brands – strategy creates political risk |
| 3. **New consolidation Channel** | **$0** | ▪ Loans are worth pre-tax NPV of 1.77% (at standard financing cost), but Troy reports paying more than 3.50% in premiums to third-party marketing partners |
| 4. **New school-based origination channel** | **$40M** | ▪ Roughly 1.00% pre-tax NPV on $290M traditional FFELP originations, growing @ 25%/year, with blend of SLM/Troy benefits – for 5 years only, 15% NPV<br>▪ 4.15% pre-tax NPV on $65M in new Signature volume (2005), growing @ 30%/year for 5 years only, 15% NPV<br>▪ No value to school-as-lender |
| 5. **Balance sheet – tangible net assets** | **$70M - $85M** | ▪ $70M is value of tangible net worth projected for September 30, 2004 balance sheet<br>▪ Final closing price would be lowered if $70M target not met<br>▪ Could achieve up to $15M in additional value if $15M arbitrage rebate liability can be used up on benefits already projected to be paid as part of portfolio valuation |
| 6. **Transition expense** | **($20M)** | ▪ Assume $6M severance cost (160 people at $20,000 plus $3M special executive packages)<br>▪ Assume $8M IT transition cost<br>▪ Assume $6M in extra cost structure "carry" for nine months ($10M pre-tax) |
| **TOTAL** | **$402M - $514M** | |



7

# Other Considerations

***Staffing/Operations***

- Assume SLM will retain 100+ operating staff, reassigned to SLM originations and school support roles in addition to dedicated marketing/sales staff

- Vince Roig and Jane Stewart intend to leave after transition period (e.g., 9-12 months); Rich Nickel would be key senior manager on site

- Portion of building could be sub-leased

- PR of consolidating/downsizing AZ operations a second time is a negative compared with SLM simply hiring staff to add to Mesa contingent if deal is not consummated

***Brand and Competition***

- Some value in brand/regional identity, particularly in light of EOG developments

- Potential to use AZ tax-exempt funding to support zero-fee approach in AZ for all owned SLM brands, including Southwest/AELMAC



# Offer Letter

- Cash offer - $450M to $500M (discuss)
- Some restricted stock for management team (discuss)
- Express intent to retain substantial number (more than half) of operating positions



Exhibit 170

# CONFIDENTIAL

# FILED UNDER SEAL

# INTEROFFICE MEMORANDUM                DATE:  June 8, 2005

**TO**:        Rich Nickel

**FROM**:      Finance Division

**SUBJECT**:  **DIVISIONAL STATUS / CRITICAL ISSUES REPORT**


### -FINANCE DIVISION-

- ♦ Continuing SLMA integration activities including the implementation of detailed action plans supporting assigned projects.
- ♦ There are preliminary discussions regarding the movement of Lockbox activities from Southwest to Wilkes-Barre.  The focus of the conversations has been payment processing transfer from Bank One to Wilkes-Barre.  To date, no one has addressed the associated issues of loan accounting and cash management.
- ♦ June financials are completed.
- ♦ We have supplied information to Corporate regarding the breakdown of Sap received from pre 10/1/93 9.5% floor bonds versus all other loans receiving the 9.5% floor for the past 5 years.
- ♦ John McManus, Reston Tax, has been trying to work with Reston Legal to complete the merger of SSSC Finance Inc. with and into SSSFC.  We elevated this item to 'Yellow' on the work package status report sent on 6/7/05.
- ♦ The next priority in the division is implementing Tracker reconciliations by the end of the month.
- ♦ We need to schedule internal meetings with Rich, Stacy, Michael and Lisa regarding divisional responsibilities and management.

Exhibit 171

# CONFIDENTIAL

# FILED UNDER SEAL

# INTEROFFICE MEMORANDUM            DATE:  June 22, 2005

**TO**:        Rich Nickel

**FROM**:      Finance Division

**SUBJECT**:   **DIVISIONAL STATUS / CRITICAL ISSUES REPORT**


## -FINANCE DIVISION-

♦ There are preliminary discussions regarding the movement of Lockbox activities from Southwest to Wilkes-Barre.  The focus of the conversations has been payment processing transfer from Bank One to Wilkes-Barre.

♦ Last week, we supplied information to Corporate regarding the breakdown of Sap received from pre 10/1/93 9.5% floor bonds versus all other loans receiving the 9.5% floor for the past 5 years.  *UPDATE: We now have supplied information on the associated replacement of Sap calculated on a taxable basis.  We believe our requirements are now complete.*

♦ John McManus, Reston Tax, has been trying to work with Reston Legal to complete the merger of SSSC Finance Inc. with and into SSSFC.  This remains 'Yellow' on the work package status report sent on 6/21/05 as no further progress has been made on a response from Legal.

♦ All Tracker reconciliations assignments have been made.  The next priority in the division is implementing Tracker reconciliations for the June close.

♦ Effective immediately, the management of benefits such as split dollar and exec-u-care with Reston occurs through Human Resources.  Ricki is now involved and transition is in process.

♦ We are gearing up for the June 30 close, with the corporate schedule received and committed.  Saturday and Sunday, July 2-3, are required as normal business days to accommodate the quarter close requirements.

Exhibit 173

# CONFIDENTIAL

# FILED UNDER SEAL

<div align="center">Attachment A</div>



<div align="center">

## Signature Authorization Policy
## Approval and Authorization Requirements

</div>

Prepared By:  Kelli McWhorter
              Leah Lutz
Approved By: _____
Revision Date: _____
Effective Date:  December 1, 2004   (amended April 1, 2005)


**PURPOSE:**  To define the minimum signature approval required prior to the purchase of goods and services for most categories, on behalf of SLM Corporation and its subsidiaries and affiliates.

**POLICY:**
This Policy documents the approval and authorization requirements necessary to commit Company funds or assets for the purchase of certain goods and services.  Appropriate authorization must be obtained prior to ordering such goods and services (**Refer to Purchasing Policy section 7.0**) and, in no event will payment be made prior to receiving proper authorization.  Any misconduct or fraudulent activity with regard to signature approvals is strictly prohibited and will result in disciplinary actions, including termination of employment.  This Policy is intended to apply to SLM Corporation and all subsidiaries, effective December 1, 2004.

It is the policy of SLM Corporation to allow only those personnel who have direct departmental budget responsibility, project budget responsibility or have been identified as a designated financial signatory to commit resources on behalf of SLM Corporation. By their signature, the signatory is certifying that SLM Corporation has granted them the authority to do so. The authorized signatory is also certifying that they have reviewed the transaction and all related documentation and that it conforms to Company policy and goals as well as all applicable laws. **By his/her signature the signatory is also certifying that   (1) the transaction is within his/her approval limits', (2) the accounting information on the document is correct, (3) the transaction is budgeted; unbudgeted transactions must be indicated as such and signatory authority must be consistent with the Unbudgeted Purchases section of the Signature Authority Approval Matrix (Attachment B) and (4) that he/she is authorized to sign for the indicated department. Under no circumstance shall an authorized signatory both initiate and approve the same transaction.  Also, authorized signatories may not approve payments of any kind to themselves or on their own behalf.**  Company attorneys who review and approve the contract are signifying that they have reviewed the legal terms of the contract.

Approvals by authorized signatories to commit resources on behalf of SLM Corporation are also accepted via email.  It is the responsibility of the authorized signatory to ensure strict security of their email account.  Sharing of email passwords is strictly prohibited and will result in disciplinary actions, including termination of employment.

CONFIDENTIAL                                                                                   SLMA_P0027861

# Attachment A

Signature Authorization Policy
Approval and Authorization Requirements

## SPECIFIC GUIDELINES RELATED TO THIS POLICY INCLUDE:

1.0  All employees must be aware of and adhere to their signature authority approval limits.

2.0  The Finance organization is responsible for ensuring compliance with these guidelines.  Either the CEO, COO, Executive Vice President of Finance or Executive Vice President of Accounting & Risk Management may approve exceptions to this Policy but not beyond the limits of their authority.

3.0  All signature approvals must include: the approver's full printed name, title, the approver's full signature, and the date of approval.

## APPROVALS / DOCUMENTATION:

1.0  All commitments require appropriate documentation and approval prior to submission for processing.  The requisition/payment request documentation will include:  the requestor's name/signature, the business unit being charged for the goods/services, a brief description of the goods/service being requested, the cost of the request, acknowledgement if the commitment is budgeted or non-budgeted and the printed name and signature of the individual approving the request
   - All requisitions/requests for payment require two signatures.
   - The first signature will be the signature of the requestor and the second signature must be an approver with the appropriate authorization limits.

2.0  The originator of the requisition is responsible for obtaining all authorizing signatures.  The Purchasing Department/Accounts Payable Department will confirm that the authorizing signatures are appropriate prior to processing a purchase order/payment request.

3.0  The Company's Signature Authority Approval Matrix (**Attachment B**), contains a listing of the most common types of commitments and expenditures for the purchase of goods and services and the appropriate signature level required.  Each requisition/payment request must have the signature of an individual with the appropriate level of authorization.

4.0  Expense reports will be approved by the employees' immediate supervisor, within the supervisor's authorization limit.  No employee shall approve his/her own expenditures.  **Refer to section 7.0 for further information.**

5.0  Employees are strictly prohibited from requesting that a vendor issue more than one invoice in order to meet the approval limits of this Policy.

   - During an authorized signer's absence from the office, signature authorization may **only** be obtained from an individual in the same Authorized Category level or at the next **higher** level, as indicated on the Signature Authority Approval Matrix (**Attachment B**)

6.0  **Non-Budgeted Expenditures -** Validation of the department budget is required by the authorized signatory when completing a requisition or a payment request.  In those instances whereby a non-budgeted item is to be purchased, additional signature authorization at the **Category D level or above** is mandatory.

CONFIDENTIAL                                                                                    SLMA_P0027862

**Attachment A**

Signature Authorization Policy
Approval and Authorization Requirements

# REDACTED

8.0   Detailed Corporate Policy information for **Purchasing** can be located on the intranet at::
http://salliemaecentral.com/humanres/adminpolicy/COG/Purchasing.htm

Detailed Corporate Policy information for **Information Technology** can be located on the intranet at:
http://salliemaecentral.com/is/techwrit/Policies/Index.htm#Procedures

Detailed Corporate Policy information for **Travel & Entertainment** can be located on the intranet at:
http://salliemaecentral.com/finance/travel/Policy.htm

Detailed Corporate Policy information for **Cash Disbursement** can be located on the intranet at:
http://salliemaecentral.com/humanres/adminpolicy/COG/CashDisbursements.htm

Detailed Corporate Policy information for **Legal Review of Contracts** can be located on the intranet
at:   http://salliemaecentral.com/legal/contracts/index.htm

8.1   This policy does not apply to the expenditure of funds specifically granted by the Board of Directors of
of SLM Corporation or its subsidiaries, such as specific Board approval for a merger or acquisition,
transferring client funds from a trust account to the client, the purchase of real property, collection
disbursements, or the company's corporate finance activities which shall be under the approval of the
Executive Vice President, Finance.

05/27/10                                                                                                  3

# Attachment A

Signature Authorization Policy
Approval and Authorization Requirements

## FREQUENTLY ASKED QUESTIONS:

*When is this policy effective?*
This Policy is effective December 1, 2004, and was first amended April 1, 2005.

*How many signatures do I need for my requisition/payment request?*
At least two signatures are required -- one from the requestor and one from the appropriate authorized approver in accordance with the Signature Authority Approval Matrix.

*Where can I find a purchase requisition form?*
The Sallie Mae Purchase Requisition can be found on the on the Sallie Mae Intranet;
Policies and Procedures/Corporate Operations Guide/Purchasing Policy.

*Where can I find a check request form?*
The Sallie Mae Request for Check Disbursement can be found on the Sallie Mae Intranet;
Policies and Procedures/Corporate Operations Guide/Cash Disbursement Policy

*Is just my signature sufficient?*
No, as many signatures are illegible, it is required that you print your full name, title, and approval date.

*Are the use of Delegation of Authority forms still permitted for the purchase of goods and services?*
No, as approval authority limits for the purchase of goods and services are based on the Signature Authority Approval Matrix the Delegation of Authority form will no longer be used.

*How do I delegate my signature authorization if I plan to be out of the office?*
Other than by the Board of Directors of SLM Corporation and in the Corporate Finance area, Delegations will not be utilized for the purchase of goods and services. During a signatory authority's absence, signature authorization may **only** be obtained from an individual in the same Authorized Category level or at the next **higher** level, as indicated on the Signature Authority Approval Matrix (**Attachment B**)

*How are unbudgeted requests handled?*
In those instances whereby a non-budgeted item is to be purchased, additional signature authorization at the **Category D level or above** is mandatory.

CONFIDENTIAL                                                                                 SLMA_P0027864

Exhibit 174

# CONFIDENTIAL

# FILED UNDER SEAL

**Attachment B**

## SLM Corporation and Subsidiaries
## Signature Authority Approval Matrix
### Amended 9/14/2005

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| EXPENDITURE TYPE | | AUTHORIZATION CATEGORIES | | | | | |
|---|---|---|---|---|---|---|---|
| **Salary and Benefits** | A | B | C | D | E | EVP | COO/CEO |
| Tuition Assistance (3A) | | 1,000 | 5,250 | 10,000 | 20,000 | 50,000 | (1) |
| Relocation (3) | | | | 10,000 | 25,000 | 50,000 | (1) |
| Employee Awards Cash | | | | 7,000 | 10,000 | 25,000 | (1) |
| Employee Awards Non-Cash | | | | 7,000 | 10,000 | 25,000 | (1) |
| Employee Discretionary Benefits (mementos of nominal value) | | | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Health, Life & Dental Insurance (3) | | | 200,000 | 300,000 | 5,000,000 | 10,000,000 | (1) |
| | | | | | | | |
| **Personnel & Development** | | | | | | | |
| Recruiting (3) | | 1,000 | 5,000 | 10,000 | 25,000 | 200,000 | (1) |
| Temporary Employment (3) | 1,000 | 2,000 | 5,000 | 10,000 | 20,000 | 75,000 | (1) |
| Seminars & Conferences | 1,000 | 2,000 | 5,000 | 25,000 | 150,000 | 500,000 | (1) |
| Dues & Subscriptions | 250 | 1,000 | 2,500 | 5,000 | 10,000 | 25,000 | (1) |
| | | | | | | | |
| **Travel & Entertainment** | | | | | | | |
| Travel Advances | | 500 | 1,000 | 2,000 | 5,000 | 5,000 | (1) |
| Expense Reports | 1,000 | 2,000 | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Employee Discretionary Benefits (mementos of nominal value) | | | 5,000 | 15,000 | 25,000 | 50,000 | (1) |
| Official Corporate Functions | | | | 100,000 | 150,000 | 300,000 | (1) |

9/15/2005

1

CONFIDENTIAL

SLMA_P0027865

**SLM Corporation and Subsidiaries**
**Signature Authority Approval Matrix**

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| BUDGETED PURCHASES | A | B | C | D | E | EVP | COO/CEO |
|---|---|---|---|---|---|---|---|
| | | | **AUTHORIZATION CATEGORIES** | | | | |
| **Capital Asset** | | | | | | | |
| All Categories | | | 25,000 | 500,000 | 1,000,000 | 2,500,000 | (1) |
| | | | | | | | |
| **Professional Fee & Service** | | | | | | | |
| Legal Fees (2) | | 30,000 | 30,000 | 300,000 | 500,000 | 1,000,000 | (1) |
| Accounting Fees (7) | | | | 300,000 | 500,000 | 1,000,000 | (1) |
| Other Professional Fees | | | | 300,000 | 500,000 | 1,000,000 | (1) |
| | | | | | | | |
| **Advertising & Promotion** | | | | | | | |
| Advertising Media & Production | | | | 50,000 | 500,000 | 1,000,000 | (1) |
| Promotion Exhibit & External | | | | 25,000 | 50,000 | 100,000 | (1) |
| | | | | | | | |
| **Computer Operation** | | | | | | | |
| Computer Data Service (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Hardware and Software Maintenance (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Computer Rent & Purchase (6) | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| Supply Mainframe Computer | | | 25,000 | 250,000 | 500,000 | 2,500,000 | (1) |
| | | | | | | | |
| **Office Occupancy** | | | | | | | |
| Rent (4) | | | 50,000 | 400,000 | 500,000 | 10,000,000 | (1) |
| Utilities | | | 100,000 | 150,000 | 300,000 | 350,000 | (1) |
| Building Repair & Maint. (includes janitorial and breakroom supplies) | | | 15,000 | 30,000 | 50,000 | 300,000 | (1) |
| Furniture & Equipment | | | 25,000 | 100,000 | 200,000 | 300,000 | (1) |
| Telephone Service | | | 100,000 | 150,000 | 300,000 | 350,000 | (1) |

9/15/2005                                                                                                2

CONFIDENTIAL                                                                    SLMA_P0027866

**SLM Corporation and Subsidiaries**
**Signature Authority Approval Matrix**

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| BUDGETED PURCHASES | AUTHORIZATION CATEGORIES | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Office Occupancy (cont.)** | | | | | | | |
| Printing Promotional | | | 100,000 | 500,000 | 1,000,000 | 4,000,000 | (1) |
| Postage and Delivery | | | 100,000 | 500,000 | 1,000,000 | 4,000,000 | (1) |
| Printing Office | | | 25,000 | 100,000 | 200,000 | 500,000 | (1) |
| Office Supplies | 500 | 1,000 | 2,500 | 5,000 | 10,000 | 50,000 | (1) |
| | | | | | | | |
| **Other** | | | | | | | |
| Charitable Contributions | | | | | 50,000 | 100,000 | 2,000,000 |
| Corporate Aviation  (4) | | | | 40,000 | 50,000 | 75,000 | (1) |
| Award Payment - Non-employee | | | | | | 50,000 | (1) |

| UNBUDGETED PURCHASES | | | | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Capital Asset** | | | | | | | |
| All Categories | | | | 100,000 | 500,000 | 1,000,000 | 5,000,000(13) |
| | | | | | | | |
| **Professional Fee & Service** | | | | | | | |
| Legal Fees (2) | | | | | 300,000 | 500,000 | 10,000,000 |
| Accounting Fees | | | | | 300,000 | 500,000 | 10,000,000 |
| Other Professional Fees | | | | | 300,000 | 500,000 | 10,000,000 |

9/15/2005

3

CONFIDENTIAL

SLMA_P0027867

## SLM Corporation and Subsidiaries
## Signature Authority Approval Matrix

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| UNBUDGETED PURCHASES | | | AUTHORIZATION CATEGORIES | | | | |
|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | EVP | COO/CEO |
| **Advertising & Promotion** | | | | | | | |
| Advertising Media & Production | | | | | 100,000 | 500,000 | 10,000,000 |
| Promotion Exhibit & External | | | | | 25,000 | 50,000 | 10,000,000 |
| **Computer Operation** | | | | | | | |
| Computer Data Service (6) | | | | 100,000 | 200,000 | 500,000 | 10,000,000 |
| Hardware and Software Maintenance (6) | | | | 100,000 | 200,000 | 500,000 | 10,000,000 |
| Computer Rent & Purchase (6) | | | | 100,000 | 200,000 | 500,000 | 5,000,000 |
| Supply Mainframe Computer | | | | 100,000 | 200,000 | 500,000 | 5,000,000 |
| **Office Occupancy** | | | | | | | |
| Rent (4) | | | | 100,000 | 150,000 | 500,000 | 10,000,000 |
| Utilities | | | | 100,000 | 150,000 | 300,000 | 10,000,000 |
| Building Repair & Maint. (includes janitorial and breakroom supplies) | | | | 15,000 | 30,000 | 50,000 | 5,000,000 |
| Furniture & Equipment | | | | 25,000 | 100,000 | 200,000 | 10,000,000 |
| Telephone Service | | | | 100,000 | 150,000 | 300,000 | 10,000,000 |
| Printing Promotional | | | | | 100,000 | 500,000 | 10,000,000 |
| Postage and Delivery | | | | | 100,000 | 500,000 | 10,000,000 |
| Printing Office | | | | | 25,000 | 200,000 | 10,000,000 |
| Office Supplies | | | | 2,500 | 5,000 | 10,000 | 5,000,000 |

**SLM Corporation and Subsidiaries**
**Signature Authority Approval Matrix**

**CATEGORY KEY**
A - Supervisor
B - Manager
C - Director
D - Sr. Director/Managing Director/Vice President
E - LSC Head/Subsidiary President/Corp Sr.Vice President

**Footnote Key - Page 7**

| UNBUDGETED PURCHASES | AUTHORIZATION CATEGORIES | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | EVP | COO/CEO |
| **Other** | | | | | | | |
| Charitable Contributions | | | | | | | 2,000,000 |
| Corporate Aviation (4) | | | | 40,000 | 50,000 | 75,000 | 5,000,000 |
| Award Payment - Non-employee | | | | | | 50,000 | (1) |

9/15/2005

5

CONFIDENTIAL

SLMA_P0027869

**Attachment C**
Amended April 1, 2005
**SLM Corporation and Subsidiaries**
**Establishment of Contracts / Miscellaneous Transactions**

| Type | Footnote |
|---|---|
| Financings | 2 |
| Loan Purchases or Loan Disbursements/Contracts | 14 |
| Loan Purchase Funding/Post settlement transactions | 8 |
| Investment/Hedge Portfolio Transactions | 5 |
| Swap/Debt Transactions | 5 |
| Leveraged Lease Transactions | 5 |
| Leases of facilities, property, equipment | 4 |
| Acquisitions | 2 |
| Formation/Capitalization of subsidiaries | 2 |
| Licensing and Royalty Arrangements | 2 |
| Insurance Policies | 2 |
| Intercompany funds transfers | 5 |
| Offset fees | 9 |
| Consolidation lender fees | 9 |
| ED799 payments | 9 |
| Servicing invoices | 9 |
| Buybacks/Unclaimed Property | 10 |
| Consolidation loan rebate fees | 9 |
| Consolidation funding wires | 9 |
| Warehousing advances | 2 |
| Commitments and reserve account payments | 9 |
| Common/preferred stock dividend payments | 11 |
| Money market funds transfers | 5 |
| Futures equity payments | 5 |
| Expenses related to drawdowns on credit line | 5 |
| College Credit Trust transactions | 11 |
| Equity premium payments | 5 |
| Debt issuances | 5 |
| Guarantor Insurance premiums | 12 |
| Vital Statistics Professional Fees | 15 |
| Third Party Servicing Related Invoices | 16 |
| State and Federal Tax payments | 17 |

9/15/2005

6

CONFIDENTIAL

SLMA_P0027870

## Footnote Key
### Amended 4/1/2005

| | |
|---|---|
| 1 | Up to Board approved Annual Business Plan. |
| 2 | Requires General Counsel's office review/approval |
| 3 | Requires Managing Director/Vice President Human Resources review/approval |
| | **New hires/positions of SVP level & above require Board approval |
| 3A | Requires HR Department Location Head/Director HR review/approval |
| 4 | Requires Managing Director/Vice President of Facilities review/approval |
| 5 | Requires Managing Director/Vice President Corporate Finance review/approval |
| 6 | Requires IT review/approval |
| 7 | Requires Accounting Risk Management review/approval |
| 8 | Requires Loan Acquisition Department review/approval |
| 9 | Requires Corporate Loan Accounting review/approval |
| 10 | Requires Servicing Accounting review/approval |
| 11 | Requires Subsidiary Accounting review/approval |
| 12 | Requires Servicing review/approval |
| 13 | Requires Finance Committee approval for amounts over $5,000,000 |
| 14 | Approval Authority as detailed in June McCormack memo dated 12/09/2004 |
| 15 | Requires Director Claims review/approval |
| 16 | Requires Manager Accounts Receivable/Third Party Servicing review/approval |
| 17 | Requires Tax department review/approval |

9/15/2005

7

CONFIDENTIAL

SLMA_P0027871

Exhibit 175

# CONFIDENTIAL

# FILED UNDER SEAL

## REVOLVING CREDIT AGREEMENT

THIS REVOLVING CREDIT AGREEMENT dated as of February 1, 2005, is made by and between SLM CORPORATION, a Delaware corporation (the "Lender") and SOUTHWEST STUDENT SERVICES FINANCE CORPORATION, a Delaware CORPORATION (the "Borrower").

## ARTICLE I. DEFINITIONS

SECTION 1.1  Defined Terms.  All capitalized terms used in this Agreement shall have the meaning ascribed to them in this Section 1.1.  Such meanings are equally applicable to both the singular and plural forms of the terms defined.  The following terms have the following meanings:

"Advance" means each advance of funds made to the Borrower by the Lender pursuant to Section 2.1.

"Agreement" means this Revolving Credit Agreement, as may be amended or supplemented from time to time.

"Borrower" means Southwest Student Services Finance Corporation, together with its successors and permitted assigns.

"Business Day" means any day (i) on which commercial banks located in New York, New York are not required or authorized to close, (ii) which is not a Saturday, Sunday or other legal holiday and (iii) which is not any other day of the year on which the Lender is closed.

"Event of Default" means any event of default specified in Section 5.1.

"Expiration Date" means the earlier to occur of (i) the date designated as such in writing by the Borrower and the Lender from time to time and (ii) the date this Agreement is terminated by the Lender pursuant to Section 5.2.

"Lender" means SLM Corporation, together with its successors and assigns.

"London Business Day" means any Business Day on which commercial banks are open for international business (including dealings in dollar deposits) in London, England.

"LIBOR Rate" means (a) the offered rate for dollar deposits for a period of three (3) months which appears on the display page designated as page "3750" on the Moneyline Telerate service (or such other page as may replace page "3750" on the Moneyline Telerate service or such other service as may be nominated by the British Bankers' Association to be the information vendor for the purpose of displaying British Bankers' Association Interest Settlement Rates for Dollar Deposits) ("Telerate Page 3750") as of 11:00 A.M. (London

CONFIDENTIAL

time) on the day which is two (2) London Business Days prior to each Reset Date, (b) if, as of 11:00 A.M. (London time) on any such date, such rate does not appear on Telerate Page 3750, the arithmetic mean (rounded to the nearest 1/100th of 1%) of the offered rates for dollar deposits, for a period of three (3) months, as such rates appear on the display designated "LIBO" on the Reuters Money Rates Service (or such other page as may replace the "LIBO" page on that service for the purpose of displaying London interbank offered rates of major banks) ("Reuters Screen LIBO Page") as of 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date, or (c) if neither of the above rates is available on such date, the average (rounded upward, if necessary, to the next higher 1/100th of 1%) of the respective rates per annum at which deposits in dollars are offered to each of the Reference Banks in the London interbank market at approximately 11:00 A.M. (London time) on the day which is two (2) London Business Days prior to such Reset Date in an amount approximately equal to the principal amount of the Advances outstanding as of such Reset Date for a period of three (3) months.

"Reference Banks" means four (4) major banks in the London interbank market as selected by the Lender.

"Reset Date" means (a) the date of this Agreement and (b) thereafter, the third Wednesday of each September, December, March and June during the term of this Agreement; provided, if such day is not a Business Day, the Reset Date for such period shall be the Business Day immediately following such day.

"Spread" means (a) for the period from the date first written above to the first Reset Date occurring thereafter, fifty (50) basis points (0.50%) and (b) and for each interest period thereafter, such rate as may be designated as such in writing by the Borrower and the Lender from time to time.

"Subsidiary" means, with respect to any person, (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees is at such time owned directly or indirectly by such person or one or more of such person's Subsidiaries, (ii) any partnership of which such person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries, (iii) any limited liability company of which such person is a member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such person or one or more of such person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such person or one or more of such person's Subsidiaries.

SECTION 1.2  Headings.  The various headings used in this Agreement are inserted for convenience only and in no way define, limit, amplify, modify, restrict or describe the scope or intent of, or otherwise affect the meaning of this Agreement or any provision of this Agreement.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002853

## ARTICLE II.  AMOUNT AND TERMS OF COMMITMENT

SECTION 2.1  Lender's Commitment.  Subject to the terms and conditions of this Agreement and in reliance on the representations and warranties set forth herein, the Lender agrees to make Advances to the Borrower, from time to time from the date of this Agreement to but excluding the Expiration Date, in an aggregate principal amount outstanding at any one time not to exceed   FIVE BILLION AND NO/100 DOLLARS ($5,000,000,000.00). The obligation of the Lender to make an Advance is subject to the condition that no event has occurred and is continuing, or would occur by the borrowing of the Advance, which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both, would constitute an Event of Default.

SECTION 2.2  Borrower's Obligations. The Borrower hereby promises to pay in full the unpaid principal balance of the Advances on the Expiration Date and any and all accrued and unpaid interest on the Advances as more fully set forth in Section 2.4 below. The obligation of the Borrower to pay the principal of, and interest on, the Advances shall be absolute and unconditional, shall be binding and, to the fullest extent permitted by law, enforceable in all circumstances whatsoever and shall not be subject to setoff, recoupment or counterclaim.  The Lender shall maintain on its books and records a register on which it will record each Advance made and each repayment of any Advance and interest thereon.  Any such recordation by the Lender shall be presumptively correct, absent manifest error.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrower's obligations hereunder.

SECTION 2.3  Requests for Advances. The Borrower will give the Lender notice of a request for an Advance at least one (1) Business Day prior to the day on which the Borrower wishes an Advance.  Subject to the terms and conditions of this Agreement, the Lender will make the requested Advance on the Business Day specified in the notice in immediately available funds in accordance with the Borrower's payment instructions.

SECTION 2.4  Interest.  Interest will accrue on the average daily balance of the unpaid principal amount of the Advances, for each day from the date such Advances are made until they become due or are paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate then in effect plus  (ii) the Spread.  Should any principal of, or accrued interest on, an Advance not be paid when due, such amount will bear interest from its due date until paid in full, at a rate per annum equal to the sum of (i) the LIBOR Rate plus the Spread, in each case, then in effect plus (ii) one hundred (100) basis points (1.00%). The interest rate and the Spread applicable to all Advances hereunder shall be adjusted on each Reset Date during the term hereof.  The Lender shall give the Borrower notice of changes to the Spread and the Reset Date on which such change will be effective.  Any requests for an Advance and acceptance of an Advance thereafter shall be deemed to be an acceptance by the Lender of such new Spread.

Interest shall be payable prior to the day that is five (5) business days after each Reset Date occurring  during the term of this Agreement and on the Expiration Date.  Interest will be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day). In no event will the rate of interest hereunder exceed the maximum rate allowed by law.  A certificate of the Lender as to determination of the LIBOR Rate,

3

CONFIDENTIAL

SLMA_P0002854

the Spread, the calculation of the interest rate therefrom and the calculation of any interest due and payable will be, absent manifest error, conclusive and binding on the Borrower.

SECTION 2.5  Repayment and Prepayment of the Advances.  The outstanding principal amount of all Advances and all accrued and unpaid interest thereon will be due and payable in full on the Expiration Date.  The Borrower may prepay any outstanding Advance, in whole or in part, at any time without penalty.  The proceeds of any prepayment made in accordance with this Section 2.5 shall be applied entirely to the outstanding principal balance due from the Borrower on the Advances and accrued interest owing on such prepayment(s) shall be paid as more fully set forth in Section 2.4 above.  Any amounts prepaid may be reborrowed.

SECTION 2.6  Payments.  All payments of principal of and interest on the Advances will be made in lawful money of the United States, in immediately available funds, to the agent of Lender (as may be designated in writing by the Lender from time to time).  If any such payment falls due on a day which is not a Business Day, such payment will be due on the next following Business Day.  Except as set forth in Section 2.5 above, payments received by the Lender will be applied: first, to accrued and unpaid interest on the Advances, and second, to the principal of the Advances.  Any excess amounts remaining shall be repaid to the Borrower.

## ARTICLE III.   REPRESENTATIONS AND WARRANTIES

3.1. Representations and Warranties.  To induce the Lender to extend this Agreement and to make Advances hereunder, the Borrower represents and warrants as follows:

(a)  It is duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization and has the power and authority to own and operate its assets and to conduct its business as now or proposed to be carried on;

(b)  It has full power and authority to enter into the transactions provided for in this Agreement and has been duly authorized to do so by all necessary and appropriate action and when executed and delivered by it, this Agreement executed and delivered pursuant hereto will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their terms; and

(c)  There does not exist any default or violation by it of or under any of the terms, conditions or obligations of:  (i) its organizational documents; (ii) any material agreement or other instrument to which it is a party or by which it is bound; or (iii) any law, regulation, ruling, order, injunction, decree, condition or other requirement applicable to or imposed upon it by any law or by any governmental authority, court or agency.

## ARTICLE IV.   COVENANTS

SECTION 4.1  Compliance with Laws.  The Borrower shall, and shall cause each of its Subsidiaries, if any, to, comply with all applicable laws, rules and regulations in all material respects.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002855

SECTION 4.2  Keeping of Records and Books of Account.  The Borrower shall, and shall cause each of its Subsidiaries, if any, to, maintain and keep proper books and records and account which enable the Borrower to prepare and issue financial statements in accordance with generally accepted accounting principles and as otherwise may be required by any applicable law, rule or regulation and in which full, true and correct entries shall be made of all of their respective dealings and business and financial affairs. The Borrower shall, and shall cause each of its Subsidiaries, if any, to, permit the Lender to examine and make excerpts from such books and records at such times and as often as the Lender may reasonably request. The Borrower shall permit, upon the request of the Lender, an audit to be conducted of the Borrower's financial statements and books and records.  Any such audit shall be at the Borrower's expense and shall be conducted by independent accountants selected by the Lender.

SECTION 4.3  Monthly Financial Statements.  The Borrower  will furnish or cause to be furnished to the Lender, as soon as available and in any event within fifteen (15) calendar days after the end of each calendar month, the Borrower's financial statements, consisting of a consolidated and consolidating balance sheet as of the end of such month and related consolidated and consolidating statements of income, stockholders' equity and cash flows for the month then ended and the fiscal year through that date, all in reasonable detail, prepared in accordance with GAAP, consistently applied, and setting forth in comparative form financial statements for the corresponding date and period in the previous fiscal year.

## ARTICLE V.  EVENTS OF DEFAULT

SECTION 5.1  Events of Default.  Each of the following shall constitute an Event of Default:

(a)  the Borrower fails to pay, within five (5) Business Days after it is due, any principal of or interest on any of the Advances or any other amount outstanding hereunder; or

(b)  the Borrower fails to perform or observe any other term or condition of any of this Agreement applicable to it and such event or circumstance, if capable of being cured, is not cured within 30 days after written notice thereof is given by the Lender to the Borrower; or

(c)  the Borrower applies for or consents to the appointment of any receiver, trustee, or similar officer for it or for all or any substantial part of its property or admits in writing its inability to pay its debts as they mature; or such a receiver, trustee or similar officer is appointed without the application or consent of the Borrower and such appointment continues undischarged for a period of 60 days; or the Borrower institutes (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding is instituted (by petition, application or otherwise) against the Borrower and remains undismissed for a period of 60 days; or the Borrower makes a general assignment for the benefit of creditors.

CONFIDENTIAL

SLMA_P0002856

SECTION 5.2 <u>Remedies</u>.  Upon the occurrence of an Event of Default, the Lender may do any one or more of the following (without presentment, protest or notice of protest, all of which are expressly waived by the Borrower):  (i) terminate this Agreement and declare the principal of and interest on the Advances and all other sums owing by the Borrower to the Lender under this Agreement forthwith due and payable, whereupon this Agreement will terminate and the principal of, and interest on, the Advances and all such other sums will become forthwith due and payable; and (ii) exercise all rights granted pursuant to this Agreement, in such order and in such manner as the Lender may, in its sole and exclusive judgment, determine.

## ARTICLE VI.  MISCELLANEOUS

SECTION 6.1 <u>Notices</u>.  All notices, requests, demands, and other communications herein shall be in writing, and, except as otherwise specifically provided in this Agreement, shall be deemed given (i) if sent by fax, when sent to the appropriate fax number, (ii) if hand delivered or delivered by nationally recognized courier, when delivered to the appropriate notice address, or (ii) if mailed by first class mail, postage prepaid, three (3) Business Days after deposit in the United States mail addressed to the appropriate notice address.  The parties listed below may, by notice given hereunder, designate any further or different fax numbers or addresses to which subsequent notices, certificates or other communications shall be sent.  Any notice required or permitted hereunder shall be directed to the following notice address:

(a)  If to the Lender:

SLM Corporation
11600 Sallie Mae Drive
Reston, VA  20193
Attention:  Jack Remondi, Executive Vice President, Finance
Telephone number:  (703) 810-7815

(b)  If to the Borrower:

Southwest Student Services Finance Corporation
3993 Howard Hughes Parkway, Suite 250
Las Vegas, Nevada  89109
Telephone number: 480-461-9830

SECTION 6.2 <u>Severability</u>.  If any provision in this Agreement shall be declared or found to be invalid, illegal or unenforceable in any jurisdiction, such provision will be severable from the remainder thereof as to such jurisdiction and the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired in any jurisdiction.

SECTION 6.3 <u>Assignability</u>.  This Agreement will be binding upon the parties hereto and their respective successors and assigns, and will inure to the benefit of the parties hereto and the successors and assigns of the Lender.  The Borrower may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lender.

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002857

SECTION 6.4  Modification. This Agreement may not be amended, waived or modified in any manner without the prior written consent of the Lender and the Borrower.  Any such amendment, modification or waiver will be effective only in the specific instance and for the specific purpose for which given.

SECTION 6.5  Miscellaneous. No delay or omission of the Lender to exercise any right or power arising hereunder shall impair any such right or power or be considered to be a waiver of any such right or power or any acquiescence therein, nor shall the action or inaction of the Lender impair any such right or power.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 6.6  Counterparts and Integration.  This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original but all of which taken together will constitute one agreement, and any of the parties hereto may execute this Agreement by signing any such counterpart.  This Agreement constitutes the entire agreement and understanding of the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

SECTION 6.7  Governing Law.  This Agreement will be construed in accordance with, and governed by, the laws of the Commonwealth of Virginia without reference to any provisions thereof regarding choice of law.

7

CONFIDENTIAL

SLMA_P0002858

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date and year first above written.

**SOUTHWEST STUDENT SERVICES FINANCE CORPORATION,**
as the borrower

By: _____
Name:      Barbara Ryan
Title:        Secretary


**SLM CORPORATION,**
as the Lender


By: _____
Name:      John F. Remondi
Title:        Executive Vice President, Finance

8

SLM Corporation/AMS Education Loan Trust - Credit Agreement – 2004_
Form Rev.  03/04

CONFIDENTIAL

SLMA_P0002859

Exhibit 179

# CONFIDENTIAL

# FILED UNDER SEAL

Message                                                                    Page 1 of 1

**From:**   Daniel F. Kaplan [dkaplan@perrylawfirm.com]

**Sent:**   Wednesday, May 28, 2003 10:36 AM

**To:**     Dunlap, Mike; Heimes, Terry; Watson, Cheryl; Noordhoek, Jeff; Tone, Paul; Nowikowski, Elise; Pohl, Mike; Martinez, Ed; Munn, Bill; Schleuger, Gary

**Subject:** DOE letter

Attached please find the redlined and clean draft of the letter to the DOE on Project 950, together with the enclosure (the flow chart).  Let me know if you have changes, comments or questions, thanks.

10/25/2004

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00005

N0001005

# Nelnet Education Loan Funding, Inc.

121 South 13th Street, Suite 201
Lincoln, Nebraska 68508
402.458.2303

May 28, 2003

United States Department of Education
Attention: Angela Roca-Baker
600 Independence Avenue S.W.
Washington, DC 20202

Re:   **LaRS Billing Statement Confirmation**

Dear Ms. Roca-Baker:

This letter is being written to confirm the proper way to submit Lender's Request for Payment of
Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan
Funding, Inc. (NELF). Some background information may be helpful in your consideration of
this issue. NELF is the successor in interest to a qualified scholarship funding corporation which
converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax
exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985
Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes,
purchases and finances student loans as part of its ordinary activities as a secondary market of
student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF
holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax
exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from
third party non-affiliated sellers, and some will be purchased from affiliated sellers. Some of the
portfolios will be transferred into the 1985 Indenture from the seller and some will be financed
by a different NELF financing prior to being placed into the 1985 Indenture. As part of NELF's
overall cash flow management plan, the purchased loans will be held within the 1985 Indenture
and financed by the tax exempt obligations issued by NELF under that financing for a period of
time depending upon cash management needs and other internal concerns, but in any event for at
least one day or longer. Thereafter, loans will be refinanced and placed into financings which are
taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the
student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is
being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the
manner in which billing for special allowance should be handled in such circumstances and
considered industry practices. During the time that the loans are held in the 1985 Indenture,
under 20 U.S.C. § 1087-1(b)(2)(B) and 34 C.F.R. § 682.302(c)(3), we intend to bill for special
allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00006

N0001006

Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, NELF will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (one-half of 91-day Treasury bill plus 3.5%, divided by 4, subject to the minimum of 9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to existing applicable laws and regulatory guidance at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. We intend to proceed under the analysis described above and assume its correctness, unless we are otherwise directed by you. Thank you for your consideration of this matter.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.

_____          _____
I concur with the above.                          Date

cc:  Kristie Hansen
     Frank Ramos
     Sally Stroup
     Jeff Andrade

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00007

N0001007

[NELF Letterhead]

[Date]

United States Department of Education
Attention: Angela Roca-Baker
600 Independence Avenue S.W.
Washington, DC 20202

Deleted: [Insert Address]¶
[Insert Address]¶

Re:    LaRS Billing Statement Confirmation

Dear Ms. Roca-Baker:

This letter is being written to confirm the proper way to submit Lender's Request for Payment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed by a different NELF financing prior to being placed into the 1985 Indenture. As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture, under 20 U.S.C. § 1087-1(b)(2)(B) and 34 C.F.R. § 682.302(c)(3), we intend to bill for special allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable

Deleted: 1)(ii

FOIA-CONFIDENTIAL TREATMENT REQUESTED BY NELNET, INC.

NNI 00008

N0001008

financing, NELF will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (one-half of 91-day Treasury bill plus 3.5%, divided by 4, subject to the minimum of 9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(c)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to existing applicable laws and regulatory guidance at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. We intend to proceed under the analysis described above and assume its correctness, unless we are otherwise directed by you. Thank you for your consideration of this matter.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.

I concur with the above.                                    Date

cc: Kristie Hansen
    Frank Ramos
    Sally Stroup
    Jeff Andrade

| Deleted: your view |

| Deleted: If you feel our analysis is incorrect or deficient in any manner, please advise us as soon as possible. |

| Deleted: Rod Paige¶  William Hansen¶ |

| Deleted: Andre |

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00009

N0001009



FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00010

Exhibit 180

# CONFIDENTIAL

# FILED UNDER SEAL

| | |
|---|---|
| From: | Mike Dunlap [Mike.Dunlap@ubt.com] |
| Sent: | Thursday, May 29, 2003 7:49 AM |
| To: | Nowikowski, Elise; Kaplan, Dan (PERRY); Dunlap, Mike; Butterfield, Steve; Heimes, Terry; Bouc, Don; Kruger, Jim; Martinez, Ed; Tone, Paul; Munn, Bill; Pohl, Mike; Schleuger, Gary |
| Subject: | RE: DOE letter and chart |

Terry cc her boss also. Thanks


-----Original Message-----
From: Nowikowski, Elise <elise.nowikowski@nelnet.net>
To: Kaplan, Dan (PERRY) <dkaplan@perrylawfirm.com>; Dunlap, Mike <Mike.Dunlap@nelnet.net>;
Butterfield, Steve <stephen.butterfield@nelnet.net>; Heimes, Terry
<terry.heimes@nelnet.net>; Bouc, Don <don.bouc@nelnet.net>; Kruger, Jim
<jim.kruger@nelnet.net>; Martinez, Ed <ed.martinez@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>; Munn, Bill <bill.munn@nelnet.net>; Pohl, Mike
<mike.pohl@nelnet.net>; Nowikowski, Elise <elise.nowikowski@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed May 28 07:26:49 2003
Subject: RE: DOE letter and chart

Dan,
I agree with Gary that Angela Roca-Baker is the expert but I question her authority to
sign this letter.  In the very least, her boss, Frank Ramos should be copied.  Angela
reports to Frank who reports to Kristie.  If Bill Hansen is being copied, perhaps Terry
Shaw (Kristie's boss) should be as well - then you have the entire FSA chain of command
covered.  Jeff's last name is spelled Andrade.  I presume that Gary is the best person to
have all the correct addresses.

I also recommend deleting the next to the last sentence of the last paragraph, "If you
feel our analysis is incorrect . . .".  It gives them an out.


Elise
-----Original Message-----
From: Daniel F. Kaplan [mailto:dkaplan@perrylawfirm.com]
Sent: Tuesday, May 27, 2003 5:56 PM
To: Dunlap, Mike; Steve Butterfield; Heimes, Terry; Don Bouc; Kruger, Jim; Martinez, Ed;
Tone, Paul; Munn, Bill; Pohl, Mike; Nowikowski, Elise; Gary Schleuger
Subject: DOE letter and chart


Attached please find a revised draft of the letter to the DOE with respect to Project 950;
one version has been blacklined to reflect the changes, and one is clean.  Please note
that we have added a long list of people to receive copies of the letter; I'm sure that I
have butchered up spellings of names, so someone please help me with this.  Also, can
someone please furnish me with the correct addresses for all of these people?  I'll
apologize in advance if I left anyone off of this email that should have been included.
Please respond with comments/questions as soon as possible since we intend to get this out
Wednesday.  Thanks. dfk



--------------------------------------------------------------
The information contained in this message is confidential proprietary property of Nelnet,
Inc. and its affiliated
companies (Nelnet) and is intended for the recipient only.
Any reproduction, forwarding, or copying without the express permission of Nelnet is
strictly prohibited. If you have received this communication in error, please notify us
immediately by replying to this e-mail.

1

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00011

N0001011

Exhibit 181

# CONFIDENTIAL

# FILED UNDER SEAL

[NELF Letterhead]

[Date]

United States Department of Education
Attention: ————————————Angela Roca-Baker
[Insert Address]
[Insert Address]

Re:   799LaRS Billing Statement QuestionConfirmation

Dear ————————Ms. Roca-Baker:

A question has arisen asThis letter is being written to confirm the proper way to submit 799 billing statementsLender's Request for special allowance paymentsPayment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. [Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed fromby a different NELF financing prior to being placed into the 1985 Indenture.] As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture, under 20 U.S.C. § 1087-1(b)(1)(ii) and 34 C.F.R. § 682.302(c)(3), we intend to bill for special allowance at the quarterly rate of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, NELF will maintain its

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00015

N0001015



...ficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to your view at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter 799's LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. If you feel our analysis is incorrect or deficient in any manner, please advise us as soon as possible. Thank you for your consideration of this matter.

Sincerely,


Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.




I concur with the above.                                    Date

cc: Rod Paige
    William Hansen
    Kristie Hansen
    Sally Stroup
    Jeff Andre

FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00016

N0001016



FOIA-CONFIDENTIAL TREATMENT
REQUESTED BY NELNET, INC.

NNI 00017

N0001017

Exhibit 182

# CONFIDENTIAL

# FILED UNDER SEAL

Sep 24 04 12:35p      Nelnet              202-659-1382            p.2

RE: 9.5% Floor                                                  Page 1 of 2



| | Close |

**From:** Tone, Paul

**To:** Tone, Paul; Dunlap, Michael (UBT); Bouc, Don; Heimes, Terry; Bottegal, Dave; Pohl, Mike; Pohl, Mike; Schleuger, Gary; Butterfield, Steve; Martinez, Ed; Noordhoek, Jeff; Sabo, Tim (MAINE)

**Cc:**

**Subject:** RE: 9.5% Floor

**Sent:** 1/5/03 1:26 PM                              **Importance:** Normal

---

Mike P reminds that the DCL was written in 1990...

-----Original Message-----
**From:** Tone, Paul
**Sent:** Sunday, January 05, 2003 10:22 AM
**To:** Dunlap, Michael (UBT); Bouc, Don; Heimes, Terry; Bottegal, Dave; Pohl, Mike; Pohl, Mike; Schleuger, Gary; Butterfield, Steve; Martinez, Ed; Noordhoek, Jeff; Sabo, Tim (MAINE); Tone, Paul

**Subject:** 9.5% Floor

*Following Gary's quick summary of the meeting last Friday, I promised to summarize the preceding phone conversation with Kristie as well as our follow-up meeting. My apologies for any duplication that may occur.*

In conversation with Kristie Hansen on the 23rd of December, she was enthusiastic about a meeting with Nelnet staff to discuss the 9.5% floor earnings issue on loans moved from certain tax-exempt financings to taxable financings. She noted that ED's reviewers had raised the issue.. and had expressed concern about the growing number of loans in this particular category.

She said that in response to their concerns she had done some research already.. part of which included a call to Shelia Ryan - formerly with Nellie Mae. Shelia reminded Kristie that the Department had initially taken the position that loans moved from certain tax exempt financings to taxable financings had to carry the characteristics of the tax exempt financing to preclude holders from moving loans to avoid the ½ SAP characteristics of the tax exempt issue. Shelia recalls that the FFEL community attempted to convince the Department that while such an opinion might be to its advantage at the time - it might be to its disadvantage in another interest rate environment. The Department was not convinced.. and later issued the March 1986 DCL that re-enforced the contention that loans moved from certain tax exempt issues also carried the floor earnings characteristic of 9.5% if loans were then moved into the taxable financings.

Our conversation with Kristie on the 23rd further supported the belief that it would be legal for us to bill under a 9.5% floor for loans moved from certain tax exempt financings to taxable financings. Our meeting with her planned for either the 2nd or 3rd of January will be to further solidify that perception. In addition, we expect that she will want to discuss what ED can and should do about the on-going nature of their position.

---

https://owa.unipac.com/exchange/forms/IPM/NOTE/read.asp?command=open&obj=00000...    1/6/2003

Confidential                                                      N0002360

Sep 24 04 12:36p     Nelnet                   202-659-1382               p.3

· RE: 9.5% Floor                                                Page 2 of 2

As Gary and others have described, our meeting on the 3rd confirmed that from Kristie's perspective, the movement of certain loans from tax-exempt issues to taxable issues while retaining the 9.5% floor was not precluded. Given her awareness of the issues and her receptivity to our thoughts, we raised the issue of the possible frequency of the movement of loans through the tax-exempt financings to taxable financings. While there seemed to be common agreement that the DCL does not put limits timing, Kristie seemed most uncomfortable expressing an opinion that confirmed no limits on timing. As a result, we would expect the Department to focus on the timing issue even before they do a more studied analysis of the larger practice.

In that regard, the Department is clearly concerned about the practice but can't immediately preclude it given the March DCL. As Gary has suggested, the Department is very likely to consider ways to limit or control the activity but will first look carefully at a continuum of the effects on lenders/holders of both the issues of ½ SAP and the 9.5% floor. She acknowledged that the ½ SAP issue has had and may again have an adverse effect on lenders and that the current 9.5% floor opportunity may be balancing those losses. Kristie indicated interest also in the possible structural limits of the effects of the activity - given the need first to have tax-exempt financings, the nexus requirements of those financings as well as the fact that the pre '93 tax-exempt financings will expire in time. Simply, the opportunity posed by the March DCL is largely limited to tax-exempt secondary markets... for nexus loans.. for a limited period of time. Kristie indicated an interest in talking with Wall Street folks.. like Wozniak about the issue and its effects.

Kristie further noted that Bill Hansen is very aware of the issue and any change in ED policy will be vetted through his office.

Confidential

N0002361

Sep 24 04 12:36p     Nelnet                    202-659-1382              p.4

RE: Tax Exempts/Floor Earnings/Half-SAP                                    Page 1 of 2

| 📧 | 📧 | 📧 | 📧 | 📧 | ✕ | ▲ | ▼ | ? |                                    Close

| **From:** | Bouc, Don |
| **To:** | Dunlap, Michael (UBT); Schleuger, Gary; Butterfield, Steve; Watson, Cheryl; Noordhoek, Jeff; Pohl, Mike; Heimes, Terry; Kruger, Jim; 'rpierce@mesfoundation.com '; Bottegal, Dave; 'tsabo@mesfoundation.com '; Kaplan, Dan (PERRY) |
| **Cc:** | Tone, Paul; Martinez, Ed; Bouc, Don |
| **Subject:** | RE: Tax Exempts/Floor Earnings/Half-SAP |
| **Sent:** | 1/5/03 8:07 AM                                   **Importance:**   Normal |

She was not definite on this, I don't think she had thought about it before.  As we discussed it, however, she seemed to think that the "authority" didn't make any difference if the ultimate legal owner didn't change after the transfer.

-----Original Message-----
From: Mike Dunlap
To: 'gary.schleuger@nelnet.net'; Mike Dunlap; stephen.butterfield@nelnet.net; cheryl.watson@nelnet.net; jeff.noordhoek@nelnet.net; mike.pohl@nelnet.net; Terry.Heimes@nelnet.net; Jim.Kruger@nelnet.net; rpierce@mesfoundation.com; dave.bottegal@nelnet.net; tsabo@mesfoundation.com; Dan Kaplan

Cc: Paul Tone; Ed Martinez; Don Bouc
Sent: 1/5/03 8:09 AM
Subject: RE: Tax Exempts/Floor Earnings/Half-SAP

do the loans have to be owned by the same authority?? nebhelp, Melmac, etc???

-----Original Message-----
From: gary.schleuger@nelnet.net [mailto:gary.schleuger@nelnet.net]
Sent: Friday, January 03, 2003 10:26 AM
To: Mike.Dunlap@ubt.com; stephen.butterfield@nelnet.net; cheryl.watson@nelnet.net; jeff.noordhoek@nelnet.net; mike.pohl@nelnet.net; Terry.Heimes@nelnet.net; Jim.Kruger@nelnet.net; rpierce@mesfoundation.com; dave.bottegal@nelnet.net; tsabo@mesfoundation.com; dkaplan@perrylawfirm.com
Cc: paul.tone@nelnet.net; ed.martinez@nelnet.net; Don.Bouc@nelnet.net
Subject: Tax Exempts/Floor Earnings/Half-SAP

Don, Ed, Paul and I had a very productive meeting this morning with Kristie
Hansen at the Department.  Based upon the guidance that was issued by ED in
1996, Kristie agrees that there is no legal argument prohibiting a process
of passing loans through a tax-exempt issuance and into a taxable, while
permanently retaining on such loans the floor earnings/half-SAP
characteristics of the tax-exempts.  She also agreed that the ED guidance is
silent on issues such as how often loans could be passed through the tax

Confidential

N0002362

Sep 24 04 12:36p      Nelnet                    202-659-1382              p.5

RE: Tax Exempts/Floor Earnings/Half-SAP                          Page 2 of 2

exempt or how long they had to stay in the tax exempt.

Kristie indicated that these are issues ED needs to look at internally,
and
that they need to do a cost analysis to determine how the feds are
affected.
She agreed that a change in guidance from ED on these issues, if any,
would
have to be prospective in nature.

Don, Ed and Paul, please add anything I may have overlooked..

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
The information contained in this message is
confidential proprietary property of Nelnet, Inc. and
its affiliated companies (Nelnet) and is intended
for the recipient only. Any reproduction, forwarding,
or copying without the express permission of Nelnet
is strictly prohibited. If you have received this
communication in error, please notify us immediately
by replying to this e-mail.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
-------------------------------------------------------------
----
--------------------

The information in this email is confidential and if you are not the
intended recipient be advised that you have received this email in error
and
any use, dissemination, forwarding, printing or copying of it is
strictly
prohibited. If you have received this email in error you should notify
the
sender by return email and delete this message from your computer
system. It
is the responsibility of the addressee to scan this mail and any
attachments
for computer viruses or other defects. The sender does not accept
liability
for any loss or damage of any nature, however caused, which may result
directly or indirectly from this email or any file attached.

-------------------------------------------------------------
----
--------------------

https://owa.unipac.com/exchange/forms/IPM/NOTE/read.asp?command=open&obj=00000...   1/6/2003

Confidential                                                    N0002363

Sep 24 04 12:36p     Nelnet                    202-659-1382        p.6

## Schleuger, Gary

| | |
|---|---|
| From: | Martinez, Ed |
| Sent: | Friday, January 03, 2003 1:21 PM |
| To: | 'tim.sabo@nelnet.net'; Bouc, Don; Schleuger, Gary; Dunlap, Michael (UBT); Butterfield, Steve; Watson,Cheryl -nelnet.net; Noordhoek, Jeff; 'Mike.Pohl@verizon.net'; Pohl, Mike; Heimes, Terry; Kruger, Jim; Pierce, Dick (MAINE); Bottegal, Dave; 'tim.sabo@nelnet.net'; Kaplan, Dan (PERRY) |
| Cc: | Tone, Paul |
| Subject: | Re: Tax Exempts/Floor Earnings/Half-SAP |

I believe the fence will involve the frequency with which loans can circulate from tax exempt debt into taxable.  To erect ffurther limitations would likely require regulatory or legislative action.  This issue is on the radar screen of ED.  But, not only did she advise that if they impose a change or limitation on their prior guidance, they will also look at the entire timeline to consider the budget impact or cost.  In other words, Kristie did mention there was a time period in which the dear colleague letter worked in the Department's favor.

-----Original Message-----
From: tim.sabo@nelnet.net <tim.sabo@nelnet.net>
To: Bouc, Don <DBOUC@unipac.com>; Schleuger, Gary <GSchleuger@unipac.com>; Dunlap, Michael (UBT) <Mike.Dunlap@ubt.com>; Butterfield, Steve <sbutterfield@unipac.com>; Watson,Cheryl -nelnet.net <cheryl.watson@nelnet.net>; Noordhoek, Jeff <JNoordhoek@unipac.com>; Mike.Pohl@verizon.net <Mike.Pohl@verizon.net>; Pohl, Mike <mpohl@unipac.com>; Heimes, Terry <THeimes@unipac.com>; Kruger, Jim <JKruger@unipac.com>; Pierce, Dick (MAINE) <rpierce@mesfoundation.com>; Bottegal, Dave <DBottegal@unipac.com>; tim.sabo@nelnet.net <tim.sabo@nelnet.net>; Kaplan, Dan (PERRY) <dkaplan@perrylawfirm.com>
CC: Tone, Paul <ptone@unipac.com>; Martinez, Ed <EMartinez@unipac.com>
Sent: Fri Jan 03 11:02:24 2003
Subject: RE: Tax Exempts/Floor Earnings/Half-SAP

Let's make sure we are inside the "fence" when it goes up. Let's roll. -Tim

-----Original Message-----
From: Don.Bouc@nelnet.net [mailto:Don.Bouc@nelnet.net]
Sent: Friday, January 03, 2003 11:38 AM
To: gary.schleuger@nelnet.net; Mike.Dunlap@ubt.com; stephen.butterfield@nelnet.net; cheryl.watson@nelnet.net; jeff.noordhoek@nelnet.net; mike.pohl@nelnet.net; Terry.Heimes@nelnet.net; Jim.Kruger@nelnet.net; rpierce@mesfoundation.com; dave.bottegal@nelnet.net; tsabo@mesfoundation.com; dkaplan@perrylawfirm.com
Cc: paul.tone@nelnet.net; ed.martinez@nelnet.net
Subject: Re: Tax Exempts/Floor Earnings/Half-SAP

That's all accurate.  It was also very obvious that she wants to "put a fence around this", but is not sure how to approach it.  Whatever the "fence" turns out to be, she made it clear it would be prospective, not retroactive.
--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Schleuger, Gary <GSchleuger@unipac.com>
To: Dunlap, Michael (UBT) <Mike.Dunlap@ubt.com>; Butterfield, Steve

1

N0002364

Sep 24 04 12:37p    Nelnet                    202-659-1382         p.7

-<sbutterfield@unipac.com>; Watson,Cheryl -nelnet.net
<cheryl.watson@nelnet.net>; Noordhoek, Jeff <JNoordhoek@unipac.com>; Pohl,
Mike <mpohl@unipac.com>; Heimes, Terry <THeimes@unipac.com>; Kruger, Jim
<JKruger@unipac.com>; Pierce, Dick (MAINE) <rpierce@mesfoundation.com>;
Bottegal, Dave <DBottegal@unipac.com>; Sabo, Tim (MAINE)
<tsabo@mesfoundation.com>; Kaplan, Dan (PERRY) <dkaplan@perrylawfirm.com>
CC: Tone, Paul <ptone@unipac.com>; Martinez, Ed <EMartinez@unipac.com>;
Bouc, Don <DBOUC@unipac.com>
Sent: Fri Jan 03 10:25:50 2003
Subject: Tax Exempts/Floor Earnings/Half-SAP

Don, Ed, Paul and I had a very productive meeting this morning with Kristie
Hansen at the Department.  Based upon the guidance that was issued by ED in
1996, Kristie agrees that there is no legal argument prohibiting a process
of passing loans through a tax-exempt issuance and into a taxable, while
permanently retaining on such loans the floor earnings/half-SAP
characteristics of the tax-exempts.  She also agreed that the ED guidance is
silent on issues such as how often loans could be passed through the tax
exempt or how long they had to stay in the tax exempt.

Kristie indicated that these are issues ED needs to look at internally, and
that they need to do a cost analysis to determine how the feds are affected.
She agreed that a change in guidance from ED on these issues, if any, would
have to be prospective in nature.

Don, Ed and Paul, please add anything I may have overlooked..

2

Confidential

N0002365

Confidential

N0002366