Exhibit 184

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Friday, March 14, 2003 9:04 AM |
| **To:** | Watson, Cheryl; Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE |
| **Subject:** | RE: Mike D Reauth Priority |

I don't think he believes they "will" not try to fix this issue, I think he believes they "may" not try to fix this issue. They might just want to ride out the current interest rate environment, or they might have other political reasons for not rocking the boat on this issue. This is just what I have gleamed from hearing him speak.

I just spoke to Mike and as you know he is pretty adamant about trying to get the loophole killed so the less competitive players within the industry can not use it as a competitive advantage in the long run.  My position is still to let someone else lead the charge and we can follow.  Mike's position is that we should lead the charge.  I yield to a higher power (i.e. Paul Tone).  That is the second time in as many weeks.  I'm batting zero percent out here.

-----Original Message-----
From: Watson, Cheryl
Sent: Friday, March 14, 2003 8:42 AM
To: Noordhoek, Jeff; Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Noordy,

Why does John Dean believe the department will not try to fix this issue in reauth?  It was my understanding that our meeting with the department gave us a very clear indication that this would be modified...timing was the only outstanding question.  I was not in either meeting, so I'd like to get input from those who were.

Cheryl

-----Original Message-----
From: Noordhoek, Jeff
To: Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE
Sent: 3/14/2003 10:02 AM
Subject: RE: Mike D Reauth Priority

I think if the administration proposes the idea then we quietly support it, as long as we are not the ones who propose it.  From sitting in with two different calls with John Dean and our bankers it is my impression that he believes there is a real possibility that the administration will not propose a change on this matter.

If we are successful in "tagging" a large amount of loans, we might very well give up some lender yield on new originations to keep our ability to tag because the economics of tagging are enormous.  Just a thought. I am sure you guys already hashed all of this out in the meeting.  Tell me to shut up if you like.

Noordy

-----Original Message-----
From: Tone, Paul
Sent: Thursday, March 13, 2003 6:21 PM
To: Noordhoek, Jeff; Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Not that I am aware of..  however, there is a strong possibility that the Administration will propose..

1

N0118987

In addition to Ed's comments, please know that Mike has expressed an interest in eliminating the 9.5% floor process..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Thursday, March 13, 2003 2:37 PM
To: Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Is there any industry discussion at this point (outside of Nelnet) about specifically eliminating the "tagging" loophole?

Jeff

-----Original Message-----
From: Schleuger, Gary
Sent: Thursday, March 13, 2003 12:57 PM
To: Noordhoek, Jeff; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Others are traveling now, and will probably chime in, but our reasoning is that we feel the "tagging" loophole will be eliminated through reauthorization anyway, if not before, so we might be able to get some positive benefit politically by leading an effort to fix it proactively....  We would still do everything we can to take full advantage of tagging in the meantime..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Thursday, March 13, 2003 2:51 PM
To: Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Sorry I missed the meeting.  I am a bit confused, one question.  Why do we want to get rid of tagging?  We could become a huge beneficiary of this.

Jeff

-----Original Message-----
From: Schleuger, Gary
Sent: Thursday, March 13, 2003 12:39 PM
To: *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority
Importance: High


Draft reply to Mike based upon our discussions this morning in DC (Jeff, since you weren't at the meetings this week, please call me if you have questions):

Increased loan limits is a very important issue, but there are many others in the community/industry that will be pushing for this change. We should stand ready to support their efforts, while not being in the lead ourselves.

Not coincidentally, there are two other reauthorization issues that are very important to Nelnet:  extended repayment terms and variable interest rates.

To promote these issues, we should employ a strategy of quietly proposing the elimination of floor earnings, including the elimination of "loan tagging" between taxable and tax-exempt financings.  In order

2

to lead on this effort, we will need the immediate assistance of an
expert in the area of federal budget scoring, and we will need to move
very quickly.

The issue of a 60bp tax on the tax-exempt organizations (or killing them
completely) is an extremely difficult one politically; it is not even an
issue that CBA will take on because there are no partners to join the
fight against the tax-exempts (the "good guys").  Over time there may be
ways to mitigate the advantages of the tax-exempts (e.g. "loan
tagging"), but this must be done through an extended, deliberative
process.

Please send any comments on this draft to the entire group since Don and
Paul intend to speak with Mike on Monday.

-----Original Message-----
From: Bouc, Don
Sent: Tuesday, March 11, 2003 3:15 PM
To: Tone, Paul; Schleuger, Gary; Nowikowski, Elise
Subject: Mike D Reauth Priority


In a call today, Mike was insistent that the number one issue we should
"push for" in reauthorization is: Increased Loan Limits.

His further insistence was that they should be paid for in 3 ways:
1) get rid of floors
2) get rid of "sheep dip"
3) cut SAP's by 60bp for all tax-exempt secondary markets (they use
"windfalls" to unfairly compete with tax-paying agencies, and, in fact,
their original purpose for existence has long-ago been perverted)

3

N0118989

Exhibit 185

# CONFIDENTIAL

# FILED UNDER SEAL

FSA/Financial Partners Channel
UCP – 112l4
830 First Street, NE
Washington, DC 20202
Phone: 202.377.3529
Fax: 202.275.5000
E-mail: Frank.X.Miller@ed.gov

**U.S. Department of Education Federal Student Aid**



# Fax

| To: | Elise Nowikowski | From: | Frank X. Miller |
|---|---|---|---|
| | Nelnet – Policy Support Services | | |
| **Fax:** | 904.281.1774 | **Pages:** | 2 (including cover) |
| **Phone:** | 904.281.7074 | **Date:** | 2/14/2003 |
| **Re:** | Hansen Response | **CC:** | |

☐ **Urgent**      ☐ **For Review**      ☐ **Please Comment**      ☐ **Please Reply**      ☐ **Please Process**

Elise,

I am transmitting this document to you for Kristie Hansen.

02/14/2003 16:13 FAX 202 275 0913          FSA FP Channel                              ☑002

 **elnet**     6620 SOUTHPOINT PARKWAY      p 904 281-7100     www.nelnet.net
                                   JACKSONVILLE, FL 32216                           NELNET CORPORATION

February 6, 2003

Kristie Hansen, FSA General Manager
U.S. Department of Education
830 First Street NE, MS 5144
Washington, DC  20202-5144

Dear Ms  Hansen:

As we have discussed extensively, Nelnet has an outstanding audit finding cited by the
Department of Education.  In order to resolve this finding, Nelnet will modify the language
included in the notice sent to borrowers during the delinquency period as required by
682.411(b)(3).  The revised language will be as follows:

   "If you dispute the terms or status of your account, please contact us immediately to resolve the
   situation.  If necessary, we will refer you to your Guaranty Agency for additional assistance.  If
   together we are unable to resolve your dispute, we will provide you with the contact information
   for the U.S. Department of Education's Office of the Ombudsman for further consideration."

I believe that this language supports the dispute resolution process, is compliant with the
requirements as prescribed in 682.208(c)(3), and addresses your concerns conveyed to me in
our phone conversation.  Those concerns were - first, not all guaranty agencies have an
individual designated as an Ombudsman, and second, that if a borrower's dispute cannot be
resolved by Nelnet, the Department of Education's Ombudsman contact information described
in DCL GEN-00-04 will be provided to the borrower.  Additionally, Debra Wiley, the FSA
Ombudsman for the Department of Education agreed with our process by stating, "the agency is
to demonstrate how it notifies student loan borrowers of the availability of the Office of the
Ombudsman in Federal Student Aid, U.S. Department of Education.  Contact information can be
provided, but is not required, in the written notice of availability of the office.  If not provided in
the written notice of availability, the agency must demonstrate how it provides borrowers with
the contact information to ensure that borrowers can choose the contact mechanism most
convenient for them."

Please indicate your agreement below that the contact information for the Ombudsman is not
required as part of the notice sent during the delinquency period and that Nelnet's process for
providing the contact information is compliant with the federal regulations.

Nelnet is very anxious to resolve these audit findings cited independently and jointly by
Department of Education and guaranty agency auditors.  Consequently, I would appreciate a
quick response to this matter.  Please fee free to contact me at 904.281.7074 or via e-mail at
elise.nowikowski@nelnet.net.

Sincerely,

Elise A. Nowikowski, Director
Policy Support Services

_I concur with the above_                          _2/10/03_
                                                   Date

Confidential                                       N0039678

Exhibit 186

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| | |
|---|---|
| **From:** | Scott, Dana |
| **Sent:** | Thursday, February 13, 2003 7:14 AM |
| **To:** | Aversman, Carol |
| **Cc:** | Kruger, Jim |
| **Subject:** | RE: Sheep Dipping Strategy |

Yes, I have the transfers that will run on 2/14 backdated to 1/1/03, if this is not correct, please let me know so that I can have this changed.

Thanks.

-----Original Message-----

| | |
|---|---|
| **From:** | Aversman, Carol |
| **Sent:** | Wednesday, February 12, 2003 6:21 PM |
| **To:** | Scott, Dana |
| **Cc:** | Kruger, Jim |
| **Subject:** | FW: Sheep Dipping Strategy |

Dana
Is the transfer described in Phase 1, #3, that will happen this Friday being backdated to 1/1/03?
And, if not, should it (Jim?)

Thanks.
Carol

-----Original Message-----

| | |
|---|---|
| **From:** | Kruger, Jim |
| **Sent:** | Wednesday, February 12, 2003 3:11 PM |
| **To:** | Pohl, Mike; Smitterberg, Hannah; Butterfield, Steve; Heimes, Terry; Noordhoek, Jeff |
| **Cc:** | Aversman, Carol; Scott, Dana |
| **Subject:** | Sheep Dipping Strategy |

Attached is a draft document which outlines the strategy and steps to implement the strategy related to the 9.50% floor issue. This is the first draft and it still need some work but I think it summarizes most of the issues and prioritizes such issues. Lets discuss in the near future.

<< File: 9.5%floorREV.doc >>

1

N0102843

Exhibit 187

# CONFIDENTIAL

# FILED UNDER SEAL

**Subject:**

Whether s438 (b)(2)(B)(iv) of the Act should be interpreted to mean that

    a)    the special allowance formula, applicable to the loan at the time it was made with taxable funds continues to apply after the loan is purchased with new money or

    b)    the special allowance formulas found in S438(b)(2)(A),(E), or (F) of the Act apply once the loan is purchased with new money.

Department of Education reponse letter to Nellie Mae dated March 14, 1994 (see attached)

Larry O'Toole from Nellie Mae wrote a letter to the Department of Education ("DOE") concerning the appropriate special allowance formula applicable to loans purchased with tax-exempt debt originally issued on or after Oct 1, 1993. Leo Kornfeld- Deputy Assistant Secretary of the DOE responded on March 14, 1994 and agreed with Larry O'Toole's conclusion that loans purchased with new money continue to qualify for special allowance calculated using the formula applicable at the time the loan was made.

Section s438 (b)(2)(B)(iv) of the Act states that special allowance on loans "financed" with new money shall be the rate established under s438(b)(2)(A),(E) or (F). The special allowance formula found in s438(b)(2)(A) is the quarterly 91-day t-bill average plus 3.1 percent less the interest on the loan. Leo Kornfeld noted that both of the above interpretations (a and b) had merit. Kornfeld stated "in the absence of any legislative history that would support one over the other, it was necessary to consider that, generally, the special allowance formula has been "set" at the time the loan was made and has not changed as a result of subsequent transfers."

How ironic that Larry O'Toole used to work for Sallie Mae and Leo Kornfeld is a consultant making $250,000 a year for Sallie Mae.   The Devil strikes again.

Dear Colleague Letter written March 1996 (see attached)

A Dear Colleague letter was written on March 1996 regarding the clarification and the interpretative guidance on certain provisions in the FFELP regulations that were published on December 18, 1992. The Dear Colleague letter noted the following:

Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations.

Under the regulations, if a loan was made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the <u>authority retains legal interest in the loan.</u> If however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt). This change is effective as of the effective date of the 1992 regulations, February 1, 1993 and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

N0117977

The Dear Colleague Letter as well as Kornfeld's letter to Nellie Mae clearly states that the special allowance formula, applicable to the loan at the time it was made with taxable funds, continues to apply after the loan is purchased with new money.

<u>Economic Impact</u>

|  | Pre 10.1/93 tax-exempt | Annual Pre 10/93 Spread | Annual $ |
|---|---|---|---|
| Nebhelp | $449 mm | 400-500 bp | $18.0-$22.5 mm |
| Maine | $ 40 mm | 400-500 bp | $1.6 –2.0 mm |
| Arizona SLAA | | | |
| Total | $489 mm | 400-500 bp | $19.6-$22.5 mm (annually) |

Of note, the current spread differential between a 9.5 tax-exempt and taxable financing is approximately 400-500 bp under this current low T-bill environment.  Annual income generated for Nelnet using this concept could exceed $20 million annually.

<u>Strategy and discussion points</u>

- ✓ Do we want Ed, Paul and Don to go to the DOE and attempt to get written approval  of the interpretation of movement of loans  or do we proceed without a written approval letter?  Need to check with Paul Sheldon to see if any more letters have been written by secondaries to the DOE regarding this isuse.

- ✓ If the DOE does not give us written approval, do we request verbal approval based on the interpretation?  If the DOE tells us verbally that the interpretation is correct, do we proceed?  Going to the DOE may precipitate the DOE to change the interpretation of the language and eventually not allow movement of loans going forward or even make it retroactive.  If we proceed with this concept, the group may consider reserving income in the event the DOE comes back and makes language retroactive.

- ✓ How many times do we want to move Maine and Nebhelp loans from a tax-exempt financing to taxable financing and still receive the special allowance formula-9.5 floor?  Do we want to take a more conservative approach and  move the $480 million  only once and receive the $20 annually or do we want to take a more aggressive approach and turnover the $480 million multiple times (every month, 3 months, 6 months)?  Need to check with Paul Sheldon to see the reason why so many secondaries are aggressively pursuing this concept.  Are the secondaries doing this prior to 12/31/02 because of tax implications or are they rolling over concept at 12/31/02 and then rolling again the portfolios in 2003.  Should we be doing this by year end and apply same concept annually thereafter?

- ✓ Are there other taxable entities that have acquired secondaries that have tax-exempt debt-9.5 floor loans doing this?  Who are they?  I believe Sallie Mae is a good example who has acquired Nellie Mae and Ohio. Also, Greater Texas has converted and it is my understanding they are moving loans as well.

- ✓ Do we test the waters by implementing this concept with Maine ($40 mm) and Arizona (SLAA) first then Nebhelp ($449 mm), a gradual approach or do we implement or flip the switch all at once with the  $489 mm?

- ✓ Do we need to get an opinion from Saul Moskowitz (our friend) or can we pursue John Dean, etc?  Has John Dean provided any opinions for this cause?  Would Saul's opinion bring more credibility than John's?  Evidently Saul has been giving opinions to a number of the secondary markets for approximately $5,000-$10,000.  Paul also noted that John Keohene (spelling) from Orrick has provided opinions as well.  Do we need an opinion at all?

N0117978

✓ The window of opportunity is running out here.  Paul Sheldon has indicated that the DOE has pretty much figured out how much and to whom they are paying out sap.  As a result, the DOE might very well change this rule given the current budget crisis.

✓ There are approximately 10-12 secondary markets currently taking advantage of this concept.  I am trying to get a list of secondaries involved.  Paul Sheldon has indicated that more secondary markets over the last 2 months  have been pursuing this concept agggressively.  The fear is that the DOE will issue a letter stating that this concept will not be allowed going forward or the DOE might even make change the language to make it retroactive.

✓ We need to identify the loans to be moved?  Need to identify the taxable transactions that these loans will go?  Also keep in mind with these tax-exempt transactions, loans transferred from the tax-exempt to taxable transactions must still maintain the 90% rule. For example, moving $40 million of Maine loans from a Maine tax-exempt  to a maine taxable transaction must have at least 90% of borrowers that are Maine residents attending schools outside of Maine or are borrowers attending Maine schools.  The same concept will apply for Nebhelp as well as SLAA.

✓ Need to figure out in the Maine and Nebhelp indentures what is permissable- (movement of loans from tax-exempt to taxable as well as how many loans can be moved at once)?  Rating agency issues possibly.

✓ Need to identify the taxable transactions the loans will be moved to.  Can we avoid issuing new taxable deals with Maine and Nebhelp?  Can we avoid issuing new deals if we are going to create deals every 3 months?  Can we swap loans from one existing tax-exempt transaction to a taxable transaction without issuing new deals?  Nebhelp's-SLMA CP transaction is expiring in may 2003?  Should we attempt to renew if we proceed with this concept?

## Strategy- (Let's roll- God Bless George Bush)

1. Have Ed, Don and Paul go to DOE and attempt to get written leter.  If not get verbal approval (asking the aforementioned questions).

2. Get opinion from either Saul M or possibly John Dean. Probably not from Saul because of the recent developments.

3. At the very least, take the conservative approach and move the $489 million once.  Possibly move $489 annually thereafter.  Do all transactions (Maine, Nebhelp and SLAA all at once)

4. Identify loans and what can be moved?  Setup strategy for tax transactions.  Work through indenture and rating agency issues.

Exhibit 188

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Wednesday, March 05, 2003 9:47 AM |
| **To:** | Butterfield, Steve; Dunlap, Mike; Heimes, Terry; Kruger, Jim; Pohl, Mike; Smitterberg, Hannah; Watson, Cheryl |
| **Subject:** | memo/letter to Christie Hanson |

All bankers who are helping us to achieve the 9.5% tagging issue are coming back with similar questions about "Headline risk" and if it sounds too good too be true it usually is, etc.

To help further protect Nelnet from some future DOE staff questioning our practices, I have asked Ed
to draft a letter to Christie Hanson at the DOE describing the meeting they had including the topic of 9.5% floors and what was said by both parties and to have a signature line that she agrees with the what was discussed at the meeting.  This would be for our files if the DOE ever came back and tried to take back any floor earnings.

Ed will draft it and circulate internally so we can debate the potential ramifications of sending it to DOE.  My goal would not to wait to get it to go forward, but hopefully get it eventually to paper our files.

This letter will not be an approval by the DOE to do what we want just an acknowledgement of what they talked about on how the law was written and can be interpreted.  Hopefully this will not take a long time to get back from them and will give some comfort to our bankers.

Noordy

1

N0118352

Exhibit 189

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Friday, March 14, 2003 9:04 AM |
| **To:** | Watson, Cheryl; Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE |
| **Subject:** | RE: Mike D Reauth Priority |

I don't think he believes they "will" not try to fix this issue, I think he believes they "may" not try to fix this issue.  They might just want to ride out the current interest rate environment, or they might have other political reasons for not rocking the boat on this issue.  This is just what I have gleamed from hearing him speak.

I just spoke to Mike and as you know he is pretty adamant about trying to get the loophole killed so the less competitive players within the industry can not use it as a competitive advantage in the long run.   My position is still to let someone else lead the charge and we can follow.  Mike's position is that we should lead the charge.  I yield to a higher power (i.e. Paul Tone).  That is the second time in as many weeks.  I'm batting zero percent out here.

-----Original Message-----
From: Watson, Cheryl
Sent: Friday, March 14, 2003 8:42 AM
To: Noordhoek, Jeff; Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority

Noordy,

Why does John Dean believe the department will not try to fix this issue in reauth?  It was my understanding that our meeting with the department gave us a very clear indication that this would be modified...timing was the only outstanding question.  I was not in either meeting, so I'd like to get input from those who were.

Cheryl

-----Original Message-----
From: Noordhoek, Jeff
To: Tone, Paul; Schleuger, Gary; *POLICYCOMMITEE
Sent: 3/14/2003 10:02 AM
Subject: RE: Mike D Reauth Priority

I think if the administration proposes the idea then we quietly support it, as long as we are not the ones who propose it.  From sitting in with two different calls with John Dean and our bankers it is my impression that he believes there is a real possibility that the administration will not propose a change on this matter.

If we are successful in "tagging" a large amount of loans, we might very well give up some lender yield on new originations to keep our ability to tag because the economics of tagging are enormous.  Just a thought. I am sure you guys already hashed all of this out in the meeting.  Tell me to shut up if you like.

Noordy

-----Original Message-----
From: Tone, Paul
Sent: Thursday, March 13, 2003 6:21 PM
To: Noordhoek, Jeff; Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority

Not that I am aware of..  however, there is a strong possibility that the Administration will propose..

1

Confidential

N0118987

In addition to Ed's comments, please know that Mike has expressed an interest in eliminating the 9.5% floor process..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Thursday, March 13, 2003 2:37 PM
To: Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Is there any industry discussion at this point (outside of Nelnet) about specifically eliminating the "tagging" loophole?

Jeff

-----Original Message-----
From: Schleuger, Gary
Sent: Thursday, March 13, 2003 12:57 PM
To: Noordhoek, Jeff; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Others are traveling now, and will probably chime in, but our reasoning is that we feel the "tagging" loophole will be eliminated through reauthorization anyway, if not before, so we might be able to get some positive benefit politically by leading an effort to fix it proactively....  We would still do everything we can to take full advantage of tagging in the meantime..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Thursday, March 13, 2003 2:51 PM
To: Schleuger, Gary; *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority


Sorry I missed the meeting.  I am a bit confused, one question.  Why do we want to get rid of tagging?  We could become a huge beneficiary of this.

Jeff

-----Original Message-----
From: Schleuger, Gary
Sent: Thursday, March 13, 2003 12:39 PM
To: *POLICYCOMMITEE
Subject: RE: Mike D Reauth Priority
Importance: High


Draft reply to Mike based upon our discussions this morning in DC (Jeff, since you weren't at the meetings this week, please call me if you have questions):

Increased loan limits is a very important issue, but there are many others in the community/industry that will be pushing for this change. We should stand ready to support their efforts, while not being in the lead ourselves.

Not coincidentally, there are two other reauthorization issues that are very important to Nelnet:  extended repayment terms and variable interest rates.

To promote these issues, we should employ a strategy of quietly proposing the elimination of floor earnings, including the elimination of "loan tagging" between taxable and tax-exempt financings.  In order

2

to lead on this effort, we will need the immediate assistance of an expert in the area of federal budget scoring, and we will need to move very quickly.

The issue of a 60bp tax on the tax-exempt organizations (or killing them completely) is an extremely difficult one politically; it is not even an issue that CBA will take on because there are no partners to join the fight against the tax-exempts (the "good guys").  Over time there may be ways to mitigate the advantages of the tax-exempts (e.g. "loan tagging"), but this must be done through an extended, deliberative process.

Please send any comments on this draft to the entire group since Don and Paul intend to speak with Mike on Monday.

-----Original Message-----
From: Bouc, Don
Sent: Tuesday, March 11, 2003 3:15 PM
To: Tone, Paul; Schleuger, Gary; Nowikowski, Elise
Subject: Mike D Reauth Priority


In a call today, Mike was insistent that the number one issue we should "push for" in reauthorization is: Increased Loan Limits.

His further insistence was that they should be paid for in 3 ways:
1) get rid of floors
2) get rid of "sheep dip"
3) cut SAP's by 60bp for all tax-exempt secondary markets (they use "windfalls" to unfairly compete with tax-paying agencies, and, in fact, their original purpose for existence has long-ago been perverted)

3

Exhibit 190

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Scott, Dana |
| **Sent:** | Wednesday, April 16, 2003 9:55 AM |
| **To:** | Kruger, Jim |
| **Subject:** | 9 1/2 Floor Transfers |

On 1/17 we swapped approximately $57M between NEBHELP 93A and 93A5A6 (backdated to 1/1/03)

On  1/24 we swapped approximately $8M between MELMAC 94-A and 99T (backdated to 1/1/03)

On 2/14 we swapped approximately $24M between NEBHELP 93A and 85A

Let me know if you need any additional information on these.

Thanks.

**Dana Scott**
**Nelnet**
**(402)458-2307**

1

N0119109

Exhibit 191

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Tuesday, April 22, 2003 2:47 PM |
| **To:** | Bouc, Don; Tone, Paul |
| **Cc:** | Dunlap, Mike |
| **Subject:** | memo to file |

Don and Paul:

Concerning your meetings with the DOE today about the 9.5% floor opportunities, I would highly recommend drafting a memo to file which outlines what was discussed and providing it to Dan Kaplan and Ed Martinez.  I think this might really help us years down the road if any government authority were to question our past practices as it relates to this matter. Just a thought.

Jeff

1

Confidential

N0119122

Exhibit 192

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Tone, Paul |
| **Sent:** | Sunday, January 05, 2003 9:22 AM |
| **To:** | Dunlap, Michael (UBT); Bouc, Don; Heimes, Terry; Bottegal, Dave; Pohl, Mike; Pohl, Mike; Schleuger, Gary; Butterfield, Steve; Martinez, Ed; Noordhoek, Jeff; Sabo, Tim (MAINE); Tone, Paul |
| **Subject:** | 9.5% Floor |

*Following Gary's quick summary of the meeting last Friday, I promised to summarize the preceding phone conversation with Kristie as well as our follow-up meeting. My apologies for any duplication that may occur.*

In conversation with Kristie Hansen on the 23rd of December, she was enthusiastic about a meeting with Nelnet staff to discuss the 9.5% floor earnings issue on loans moved from certain tax-exempt financings to taxable financings. She noted that ED's reviewers had raised the issue.. and had expressed concern about the growing number of loans in this particular category.

She said that in response to their concerns she had done some research already.. part of which included a call to Shelia Ryan - formerly with Nellie Mae. Shelia reminded Kristie that the Department had initially taken the position that loans moved from certain tax exempt financings to taxable financings had to carry the characteristics of the tax exempt financing to preclude holders from moving loans to avoid the ½ SAP characteristics of the tax exempt issue. Shelia recalls that the FFEL community attempted to convince the Department that while such an opinion might be to its advantage at the time - it might be to its disadvantage in another interest rate environment. The Department was not convinced.. and later issued the March 1986 DCL that re-enforced the contention that loans moved from certain tax exempt issues also carried the floor earnings characteristic of 9.5% if loans were then moved into the taxable financings.

Our conversation with Kristie on the 23rd further supported the belief that it would be legal for us to bill under a 9.5% floor for loans moved from certain tax exempt financings to taxable financings. Our meeting with her planned for either the 2nd or 3rd of January will be to further solidify that perception. In addition, we expect that she will want to discuss what ED can and should do about the on-going nature of their position.

_____

As Gary and others have described, our meeting on the 3rd confirmed that from Kristie's perspective, the movement of certain loans from tax-exempt issues to taxable issues while retaining the 9.5% floor was not precluded. Given her awareness of the issues and her receptivity to our thoughts, we raised the issue of the possible frequency of the movement of loans through the tax-exempt financings to taxable financings. While there seemed to be common agreement that the DCL does not put limits timing, Kristie seemed most uncomfortable expressing an opinion that confirmed no limits on timing. As a result, we would expect the Department to focus on the timing issue even before they do a more studied analysis of the larger practice.

In that regard, the Department is clearly concerned about the practice but can't immediately preclude it given the March DCL. As Gary has suggested, the Department is very likely to consider ways to limit or control the activity but will first look carefully at a continuum of the effects on lenders/holders of both the issues of ½ SAP and the 9.5% floor. She acknowledged that the ½ SAP issue has had and may again have an adverse effect on lenders and that the current 9.5% floor opportunity may be balancing those losses. Kristie indicated interest also in the possible structural limits of the effects of the activity - given the need first to have tax-exempt financings, the nexus requirements of those financings as well as the fact that the pre '93 tax-exempt financings will expire in time. Simply, the opportunity posed by the March DCL is largely limited to tax-exempt secondary markets… for nexus loans.. for a limited period of time. Kristie indicated an interest in talking with Wall Street folks.. like Wozniak about the issue and its effects.

1

N0124998

Kristie further noted that Bill Hansen is very aware of the issue and any change in ED policy will be vetted through his office.

Confidential

N0124999

# Exhibit 193

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

**From:**       Martinez, Ed
**Sent:**       Wednesday, January 08, 2003 9:51 AM
**To:**         Noordhoek, Jeff; Tone, Paul; Bouc, Don; Schleuger, Gary; Dunlap, Michael (UBT)
**Subject:**    RE: 9.5% Floor Opinion

I think we did decide to do that yesterday especially if the opinion were to cost $5,000.

-----Original Message-----
**From:**       Noordhoek, Jeff
**Sent:**       Wednesday, January 08, 2003 10:47 AM
**To:**         Tone, Paul; Bouc, Don; Martinez, Ed; Schleuger, Gary; Dunlap, Michael (UBT)
**Subject:**    RE: 9.5% Floor Opinion

I say do it for the belt and suspenders protection.

-----Original Message-----
**From:**       Tone, Paul
**Sent:**       Tuesday, January 07, 2003 3:16 PM
**To:**         Bouc, Don; Martinez, Ed; Schleuger, Gary; Noordhoek, Jeff; Dunlap, Michael (UBT)
**Subject:**    9.5% Floor Opinion

John will do the opinion for $5,000

1

Exhibit 194

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| | |
|---|---|
| **From:** | Martinez, Ed |
| **Sent:** | Friday, February 28, 2003 10:13 AM |
| **To:** | Dean, John (Dean Blakey) |
| **Cc:** | Noordhoek, Jeff |
| **Subject:** | 9.5% Floor Opinion |

Hi John.  In connection with our discussion today, I am writing you regarding the opinion you gave Nelnet regarding the transfer of FFEL loans into or from tax exempt bond estates created prior to October 1, 1993, dated January 20, 2003.  In that opinion you stated that the opinion may be relied upon only by Nelnet and its affiliates.  We are in the process of moving some of the subject loans into a financing that is funded by the Royal Bank of Canada.  They would like to be able to rely on your opinion as well.  In addition Royal Bank would like to engage a conference call with you so you could walk through the analysis of the opinion with them.  They will also have question for me regarding my meeting with Kristie Hansen at the Department of Education.  I understand that as compensation for reliance by this additional party, Nelnet would pay you $3,000.00.   I anticipate a conference call around next Thursday, March 7.  I am not yet sure of the date.  The following people will likely be on the call:  Royal Bank and counsel, John Keohane (Orrick Harrington), Anne Gish (Kutac), Jeff Noordhoek (Nelnet Capital Markets) and I.  Please acknowledge via email.  Thanks for your assistance John.

*My new e-mail address is: ed.martinez@nelnet.net*

1

N0125018

Exhibit 195

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

**From:**            Noordhoek, Jeff
**Sent:**            Wednesday, March 05, 2003 4:18 PM
**To:**              Tone, Paul
**Cc:**              Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don
**Subject:**         RE: Re: 9.5% Floor

You are awesome Paul.  I know you can walk the fine political tight rope and come out a
winner with Nelnet's rear end protected!  I have faith in you brother Tone!  Bring us to
the promise land.

-Amen

-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:39 PM
To: Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don
Subject: RE: Re: 9.5% Floor

Understood..  but be prepared - despite our best efforts to soft sell it..  that they
will realize that we are putting them on the spot - for them to want to avoid that in the
future..

In the federal bureaucracy..  one of the most difficult things to maintain is to be a
decision maker..  someone who is perceived to be decisive will be challenged by the
bureaucracy..  memorializing the meeting with a formal memo will cause folks to see that
Kristie made a decision..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Wednesday, March 05, 2003 4:26 PM
To: Tone, Paul
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike;
Bouc, Don
Subject: RE: Re: 9.5% Floor

Paul:

The idea is not to get them to accept or commit in writing to our plan, but to acknowledge
the meeting and the tenor and concepts discussed in the meeting.  We would want you (or
someone) to contact Kristie first and let her know that we would like to send her the
letter and get her ok long before we sent it.  This would hopefully keep you safe from
being excluded from future "informal" meetings.

Our fear is that 3-5 years down the road no one that was in the meeting is left at the DOE
to acknowledge that it occurred and what was discussed if future staff wanted to make a
claw back claim to Nebhelp.

If they are not even willing to acknowledge the discussion then how can we proceed without
real fear about the future?

I believe the key is to very delicately word the letter so it is factual yet does not pen
them down to a decision.

Jeff

-----Original Message-----

1

Confidential                                                                    N0125030

From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:15 PM
To: Noordhoek, Jeff
Subject: Fw: Re: 9.5% Floor


-----Original Message-----
From: Tone, Paul <paul.tone@nelnet.net>
To: Martinez, Ed <ed.martinez@nelnet.net>
CC: 'Mike.Dunlap@ubt.com' <Mike.Dunlap@ubt.com>; Butterfield, Steve
<stephen.butterfield@nelnet.net>; 'noordhoek@UFSCorp.com' <noordhoek@UFSCorp.com>; Bouc,
Don <Don.Bouc@nelnet.net>; Schleuger, Gary <gary.schleuger@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>
Sent: Wed Mar 05 16:11:51 2003
Subject: Re: 9.5% Floor

I'm not sure that we should do that..   I believe that it will put a severe chill on our
ability to have additional meetings with her.

-----Original Message-----
From: Martinez, Ed <ed.martinez@nelnet.net>
To: Tone, Paul <paul.tone@nelnet.net>; Bouc, Don <Don.Bouc@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed Mar 05 14:59:14 2003
Subject: 9.5% Floor

The Capital Markets Group has asked that I prepare a letter to Kristie Hansen that
memorializes our meeting on the above matter this past January.  They would like me to
include an acknowlegment space for her to sign on the correspondence.  I will send to you,
Gary and Don for accuracy.

My new e-mail address is: ed.martinez@nelnet.net

2

N0125031

Exhibit 196

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

| | |
|---|---|
| **From:** | Noordhoek, Jeff |
| **Sent:** | Thursday, March 06, 2003 9:25 AM |
| **To:** | Bouc, Don; Tone, Paul |
| **Cc:** | Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike |
| **Subject:** | RE: Re: 9.5% Floor |

I yield to greater intellect than mine.  It is a bad idea.

Jeff

-----Original Message-----
From: Bouc, Don
Sent: Wednesday, March 05, 2003 5:34 PM
To: Tone, Paul; Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike
Subject: RE: Re: 9.5% Floor

I agree with Paul...I think this is a very bad idea.  Kristie will resist signing it as she would fear it was a "committment" by DE without her first taking it through "channels".  I think we had the meeting and got the result we desired, now we should proceed and leave well enough alone.  We will likely need future meetings on other issues and don't want these limited due to fear of another "summarization" letter...

-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 5:39 PM
To: Noordhoek, Jeff
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don
Subject: RE: Re: 9.5% Floor

Understood..  but be prepared - despite our best efforts to soft sell it..  that they will realize that we are putting them on the spot - for them to want to avoid that in the future..

In the federal bureaucracy..  one of the most difficult things to maintain is to be a decision maker..  someone who is perceived to be decisive will be challenged by the bureaucracy..  memorializing the meeting with a formal memo will cause folks to see that Kristie made a decision..

-----Original Message-----
From: Noordhoek, Jeff
Sent: Wednesday, March 05, 2003 4:26 PM
To: Tone, Paul
Cc: Martinez, Ed; Schleuger, Gary; Butterfield, Steve; Dunlap, Mike; Bouc, Don
Subject: RE: Re: 9.5% Floor

Paul:

The idea is not to get them to accept or commit in writing to our plan, but to acknowledge the meeting and the tenor and concepts discussed in the meeting.  We would want you (or someone) to contact Kristie first and let her know that we would like to send her the letter and get her ok long before we sent it.  This would hopefully keep you safe from being excluded from future "informal" meetings.

Our fear is that 3-5 years down the road no one that was in the meeting is left at the DOE to acknowledge that it occurred and what was discussed if future staff wanted to make a claw back claim to Nebhelp.

1

N0125034

If they are not even willing to acknowledge the discussion then how can we proceed without real fear about the future?

I believe the key is to very delicately word the letter so it is factual yet does not pen them down to a decision.


Jeff


-----Original Message-----
From: Tone, Paul
Sent: Wednesday, March 05, 2003 4:15 PM
To: Noordhoek, Jeff
Subject: Fw: Re: 9.5% Floor



-----Original Message-----
From: Tone, Paul <paul.tone@nelnet.net>
To: Martinez, Ed <ed.martinez@nelnet.net>
CC: 'Mike.Dunlap@ubt.com' <Mike.Dunlap@ubt.com>; Butterfield, Steve
<stephen.butterfield@nelnet.net>; 'noordhoek@UFSCorp.com' <noordhoek@UFSCorp.com>; Bouc,
Don <Don.Bouc@nelnet.net>; Schleuger, Gary <gary.schleuger@nelnet.net>; Tone, Paul
<paul.tone@nelnet.net>
Sent: Wed Mar 05 16:11:51 2003
Subject: Re: 9.5% Floor

I'm not sure that we should do that..   I believe that it will put a severe chill on our
ability to have additional meetings with her.

-----Original Message-----
From: Martinez, Ed <ed.martinez@nelnet.net>
To: Tone, Paul <paul.tone@nelnet.net>; Bouc, Don <Don.Bouc@nelnet.net>; Schleuger, Gary
<gary.schleuger@nelnet.net>
Sent: Wed Mar 05 14:59:14 2003
Subject: 9.5% Floor

The Capital Markets Group has asked that I prepare a letter to Kristie Hansen that
memorializes our meeting on the above matter this past January.  They would like me to
include an acknowlegment space for her to sign on the correspondence.  I will send to you,
Gary and Don for accuracy.

My new e-mail address is: ed.martinez@nelnet.net

2

N0125035

Exhibit 197

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Martinez, Ed |
| **Sent:** | Monday, January 13, 2003 9:42 AM |
| **To:** | Pohl, Mike |
| **Subject:** | FW: DRAFT Opinion |
| **Attachments:** | NELNET438.doc |

Keep it confidential

-----Original Message-----
**From:** Tone, Paul
**Sent:** Saturday, January 11, 2003 8:46 AM
**To:** Martinez, Ed
**Subject:** FW: DRAFT Opinion


-----Original Message-----
**From:** John Dean [mailto:jdean@deanblakey.com]
**Sent:** Friday, January 10, 2003 2:50 PM
**To:** PaulT
**Subject:** DRAFT Opinion

Here is the draft.  Please let me know if this meets your needs.  Thanks.

3/3/2010

N0125331

Exhibit 198

# CONFIDENTIAL

# FILED UNDER SEAL

**Microsoft Outlook**

**From:**        Olsen, Kerrie
**Sent:**        Monday, January 27, 2003 2:51 PM
**To:**          Heimes, Terry
**Subject:**     FW: Legal Opinion

Terry-

I have an invoice for $5,000 from Dean Blakey for a legal opinion re: 9.5% floor earnings.  Should I forward to your staff to process for payment or can you give me a lob/cost center to use?  Thanks.

-----Original Message-----
**From:**        Tone, Paul
**Sent:**        Monday, January 27, 2003 9:55 AM
**To:**          Olsen, Kerrie
**Subject:**     FW: Legal Opinion

Would you find out from Terry's staff it they would prefer to have the bill forwarded to them..   or if they would prefer to have you fill out the appropriate form and process with their accounting info..

Thanks..

-----Original Message-----
**From:**        Martinez, Ed
**Sent:**        Monday, January 27, 2003 9:53 AM
**To:**          Noordhoek, Jeff; Tone, Paul; Olsen, Kerrie
**Subject:**     RE: Legal Opinion

Actually Terry has paid all the bills for the direct loan litigation.

-----Original Message-----
**From:**        Tone, Paul
**Sent:**        Monday, January 27, 2003 8:12 AM
**To:**          Olsen, Kerrie
**Cc:**          Martinez, Ed
**Subject:**     Legal Opinion

John Dean has submitted a bill for a legal opinion re: 9.5% floor earnings..   would you check with Ed to see from where that should be paid...

1

N0125789

Exhibit 199

# CONFIDENTIAL

# FILED UNDER SEAL

# Special Allowance Payments to Nelnet
# for Loans Funded by Tax-Exempt Obligations

## FINAL AUDIT REPORT



**ED-OIG/A07F0017**
**September 2006**

Our mission is to promote the
efficiency, effectiveness, and
integrity of the Department's
programs and operations.



U.S Department of Education
Office of Inspector General
Chicago, Illinois

N0016967

# NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General.  Determinations of corrective action to be taken will be made by the appropriate Department of Education officials.

In accordance with Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.

N0016968




**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**
Chicago/Kansas City Audit Region

111 N. Canal St. Ste. 940          8930 Ward Parkway, Ste 2401
Chicago, IL 60606-7297            Kansas City, MO 64114-3302
Phone (312) 886-6503              Phone (816) 268-0500
Fax (312) 353-0244                Fax (816) 823-1398

September 29, 2006

Michael S. Dunlap
Chairman and Co-CEO
Nelnet, Inc.
121 South 13th Street, Suite 201
Lincoln, NE 68508

Dear Mr. Dunlap:

Enclosed is our final audit report, Control Number ED-OIG/A07F0017, titled *Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations*. This report incorporates the comments you provided in response to the draft report. Because of the voluminous number of exhibits included in your comments, we did not include the exhibits in the report, but we will make copies of the attachments available upon request.

If you have any additional comments or information that you believe may have a bearing on the resolution of this audit, you should send them directly to the following Education Department official, who will consider them before taking final Departmental action on this audit:

> Theresa S. Shaw
> Chief Operating Officer
> Federal Student Aid
> U.S. Department of Education
> Union Center Plaza
> 830 First Street NE
> Washington, DC 20202

It is the policy of the U. S. Department of Education to expedite the resolution of audits by initiating timely action on the findings and recommendations contained therein. Therefore, receipt of your comments within 30 days would be appreciated.

In accordance with the Freedom of Information Act (5 U.S.C. §552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.

Sincerely,

Richard J. Dowd
Regional Inspector General
for Audit

Enclosure

*Our mission is to promote the efficiency, effectiveness, and integrity of the Department's programs and operations.*

# TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY ...........................................................................................1

BACKGROUND............................................................................................................3

AUDIT RESULTS ........................................................................................................6

      FINDING –   The Increase in Nelnet's Special Allowance Payments under the 9.5 Percent Floor Was Based on Ineligible Loans ...................................................................................................6

OBJECTIVE, SCOPE, AND METHODOLOGY .................................................16

Enclosure 1: Nelnet's Written Inquiry and FSA's Response............................18

Enclosure 2: Estimates of Special Allowance Improper Payments..................22

Enclosure 3: Nelnet's Comments........................................................................26

# EXECUTIVE SUMMARY

Special allowance payments are made to lenders in the Federal Family Education Loan (FFEL) Program to ensure that lenders receive an equitable return on their loans. In general, the amount of a special allowance payment is the difference between the amount of interest the lender receives from the borrower or the government and the amount that is provided under requirements in the Higher Education Act of 1965, as amended (HEA).

The HEA includes a special allowance calculation for loans that are funded by tax-exempt obligations issued before October 1, 1993. The quarterly special allowance payment for these loans may not be less than 9.5 percent, minus the interest the lender receives from the borrower or the government, divided by 4. In this report, we refer to this calculation as the "9.5 percent floor." When interest rates are low, the 9.5 percent floor provides a significantly greater return than lenders receive for other loans.

In April 2003, Nelnet implemented a process ("Project 950") to increase the amount of its loans receiving special allowance under the 9.5 percent floor. Through Project 950, Nelnet transferred loans into and out of an eligible tax-exempt obligation from taxable obligations, continuing to bill under the 9.5 percent floor for those loans after they were transferred to the taxable obligations. Nelnet repeated this process many times, increasing the amount of loans it billed under the 9.5 percent floor from about $551 million in March 2003 to about $3.66 billion in June 2004.

The objective of our audit was to determine whether, for the period January 1, 2003, through June 30, 2005, Nelnet's use of Project 950 to increase the amount of its student loans billed under the 9.5 percent floor complied with the requirements in the HEA, regulations, and other guidance issued by the U.S. Department of Education (Department). To accomplish our objective, we gained an understanding of Project 950, examined Nelnet's tax-exempt and taxable obligations, reviewed the criteria used by Nelnet to determine whether a loan qualified for the 9.5 percent floor, and reviewed other related information.

Nelnet's Project 950 did not fund loans from an eligible source in compliance with the HEA, regulations, and other guidance issued by the Department. Therefore, the increased amount of loans created by Project 950 was ineligible to be billed under the 9.5 percent floor. We estimate that Nelnet was improperly paid more than $278 million in special allowance for these loans from the quarter ended March 31, 2003, through the quarter ended June 30, 2005, and that Nelnet could be improperly paid about $882 million for the ineligible loans after June 2005 if Nelnet's billings are not corrected.[1]

---

[1] Our estimates of improper payments to Nelnet include the entire payment to Nelnet for loans billed improperly under the 9.5 percent floor. We have not reduced our estimates by the amount of the special allowance payments that Nelnet may have received for the loans if it had billed under the regular special allowance calculation. However, our analysis of Nelnet's 9.5 percent loan portfolio indicates that any eligibility for regular special allowance payments during our audit period would be limited and likely be a small portion of the amount received under the 9.5 percent floor.

N0016971

We recommend that the Chief Operating Officer (COO) for Federal Student Aid (FSA) instruct Nelnet to exclude all Project 950 loans from its claims for payment under the 9.5 percent floor. We also recommend that the COO require the return of the overpayments described in this report.

A draft of this report was provided to Nelnet for review and comment on August 9, 2006. In its comments dated September 7, 2006, Nelnet strongly disagreed with our finding and recommendations, stating that its billing under the 9.5 percent floor complies with the HEA, regulations, and authoritative guidance. Where appropriate, we have incorporated into this report summaries of Nelnet's comments and our responses. In response to comments received, we modified our conclusion that Nelnet's transactions did not qualify as sales under the regulations. Because this was an alternative basis for our finding, our basic finding that Nelnet billed ineligible loans under the 9.5 percent floor did not change. We provide Nelnet's response to our draft report as Enclosure 3.

N0016972

# BACKGROUND

**Special Allowance Payments**

A lender participating in the FFEL Program is entitled to a quarterly special allowance payment for loans in its portfolio.  In general, for Stafford loans,[2] the amount of the quarterly special allowance payment is calculated in four steps:

1. Determining the average of the bond equivalent rates of 91-day Treasury bills auctioned during the quarter,
2. Adding a specified percentage to this amount (the specified percentage varies based on the loan type, origination date, and other factors),
3. Subtracting the applicable interest rate for the loan and
4. Dividing the resulting percentage by 4.  (34 C.F.R. § 682.302(c))[3]

According to Section 438(a) of the HEA, the purpose of special allowance payments is to ensure—

> . . . that the limitation on interest payments or other conditions (or both) on loans made or insured under this part, do not impede or threaten to impede the carrying out of the purposes of this part or do not cause the return to holders of loans to be less than equitable . . . .

**9.5 Percent Floor**

The Education Amendments of 1980 (Pub. L. 96-374) created a separate special allowance calculation for FFEL Program loans made or purchased with proceeds of tax-exempt obligations, and the Higher Education Amendments of 1992 (Pub. L. 102-325) continued this separate calculation for loans with variable interest rates.

In general, the quarterly special allowance payments for these loans is one half of the percentage determined under the method described above, using 3.5 percent as the specified percentage in Step 2.  However, the separate calculation also provides a minimum payment.  The special allowance payments for these loans "shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4."  (Section 438(b)(2)(B)(i) and (ii) of the HEA)

In this report, we refer to the separate calculation as the "9.5 percent floor."  When interest rates are low, the 9.5 percent floor results in significantly greater special allowance payments than a lender would otherwise receive.  For example, for the quarter ended December 31, 2003, for a FFEL Program Stafford loan made on January 15, 2000, with an average daily balance of $5,000, a lender would receive $76 under the 9.5 percent floor (payment rate of 1.52 percent).

---

[2] The calculation used for other types of FFEL Program loans is slightly different.
[3] All regulatory citations are to the version dated July 1, 2004.

N0016973

Under the calculation that would be used if the same loan were not eligible for the 9.5 percent floor (payment rate of 0.0025 percent), the lender would receive $0.125.

The Student Loan Reform Act of 1993, which was included in the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66), repealed the 9.5 percent floor, restricting it to loans made or purchased with the proceeds of tax exempt obligations that were originally issued before October 1, 1993.  The Taxpayer-Teacher Protection Act of 2004 (Pub. L. 108-409) and the Higher Education Reconciliation Act of 2005 (Pub. L. 109-171) placed further restrictions on loans' eligibility for the 9.5 percent floor.

## Dear Colleague Letter 96-L-186

In March 1996, the Department issued Dear Colleague Letter 96-L-186, *Clarification and interpretative guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992*.  Item 30 of this Dear Colleague Letter addressed the 9.5 percent floor:

> Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

## Nelnet and Project 950

Nelnet is headquartered in Lincoln, Nebraska, and makes, purchases, and finances student loans as part of its activities as a secondary market of student loans.  It is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998, and as such, is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985.

Nelnet officials designed a process so Nelnet could increase the amount of loans it billed as eligible under the 9.5 percent floor (Project 950).  Through Project 950, Nelnet used a series of internal transactions to increase the amount of loans ostensibly funded by tax-exempt obligations from approximately $551 million for the quarter ended March 31, 2003, to nearly $3.66 billion for the quarter ended June 30, 2004.  There was no increase in the amount of Nelnet's outstanding tax-exempt obligations during this period.

On May 29, 2003, Nelnet sent a letter to the Department requesting guidance on its special allowance billing process.  (Nelnet's letter and FSA's response are included as Enclosure 1 to this report.)  In its letter, Nelnet described Project 950 and asked for the Department's concurrence:

> As part of [Nelnet's] overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by [Nelnet] under that financing for a period of time depending upon case management needs and other internal concerns, but in any event for at least one

day or longer.  Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis . . . .

. . . During the time that the loans are held in the 1985 Indenture . . . we intend to bill for special allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, [Nelnet] will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate . . . .  We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by [Nelnet] (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

The Department responded to Nelnet's letter on June 30, 2004.  This response provided only references to other authorities: it neither concurred with nor objected to the process described in Nelnet's letter.  After receipt of this letter, Nelnet recognized $124.3 million in earnings, citing "certain clarifying information received in connection with the guidance it had sought, including written and verbal communications with the Department . . . ."[4]

In the year and a quarter after Nelnet sent its letter to the Department, Nelnet's portfolio of loans billed under the 9.5 percent floor increased by more than 560 percent:

- For the last quarter before starting Project 950 (the quarter ended March 31, 2003), Nelnet reported a tax-exempt average daily principle balance of approximately $551 million and received nearly $6.7 million in special allowance payments;

- For the following quarter (ended June 30, 2003), Nelnet reported a tax-exempt average daily principal balance of nearly $856 million and received just over $10.6 million in special allowance payments; and

- After more than a year of Project 950 (for the quarter ended June 30, 2004), Nelnet reported a tax-exempt principal balance of nearly $3.66 billion and received approximately $51.4 million in special allowance payments.

Nelnet terminated Project 950 in May 2004, after the introduction of H.R. 4283, the College Access and Opportunity Act, which included provisions later enacted under the Taxpayer-Teacher Protection Act of 2004.  Among other requirements, the Taxpayer-Teacher Protection Act amends the HEA to make loans that are transferred, sold, or refinanced by taxable obligations after September 30, 2004, ineligible for the 9.5 percent floor.

---

[4] SEC Filing, Form 10-Q (August 16, 2004).

# AUDIT RESULTS

Nelnet's use of Project 950 was not in compliance with requirements in the HEA, regulations, and the Department's guidance.  The increased amount of loans billed under the 9.5 percent floor that resulted from Project 950 was not funded by any eligible source listed in 34 C.F.R. § 682.302(c)(3)(i).  We estimate that Nelnet—

- Was improperly paid about $278 million in special allowance from the quarter ended March 31, 2003, through the quarter ended June 30, 2005; and

- Could be improperly paid about $882 million in special allowance after the quarter ended June 30, 2005, if Nelnet's billings are not corrected.

**FINDING – The Increase in Nelnet's Special Allowance Payments under the 9.5 Percent Floor Was Based on Ineligible Loans**

The amount of loans for which Nelnet received special allowance payments under the 9.5 percent floor increased from about $551 million for the quarter ended March 31, 2003, to about $3.66 billion for the quarter ended June 30, 2004.  This increase is attributable, primarily, to Nelnet's use of Project 950 to increase the amount of loans Nelnet billed under the 9.5 percent floor.  However, the loans upon which this increase was based were not funded by eligible sources.

**Project 950**

Nelnet implemented Project 950 in April 2003 to increase the amount of loans that it billed for special allowance payments under the 9.5 percent floor.  Under Project 950, Nelnet temporarily transferred student loans into its NEBHELP 1985A trust estate, which secures repayment of $143,035,000 in 30-year tax exempt bonds.  These bonds are scheduled to be retired in 2015.[5] About 94 percent of the loans transferred into the 1985A trust estate consisted of loans already held by Nelnet affiliates.

After transferring loans into its 1985A trust estate, Nelnet transferred    as little as one day later—the loans from the 1985A trust estate to the estates of various Nelnet taxable obligations.[6] Some of these taxable obligations were the same obligations from which Nelnet originally transferred the loans into the 1985A trust estate.  In general, no funds were transferred into the 1985A trust estate from the trust estate receiving the loans from the 1985A trust estate.

---

[5] Although Nelnet has other pre-1993 tax-exempt bonds outstanding, it used only the bonds secured by the 1985A trust estate for Project 950, because the 1985A trust indenture has few limitations on the types of loans that can be financed and no limitations on the geographic origin of the financed loans.

[6] All of these obligations were issued by Nelnet Education Loan Funding, Inc., formerly known as Nebraska Higher Education Loan Program, Inc.

N0016976

For each transaction, Nelnet attempted to match the amount of the loans being transferred into and from the 1985A trust estate to reduce the need to transfer cash to settle the transaction. When transferring loans out of the 1985A trust estate, Nelnet received the required concurrence of the bond trustee to release collateral from the estate. Nelnet, through its subsidiary Nelnet Education Loan Funding, Inc., remained the 100 percent beneficial owner of the student loans that were transferred out of the 1985A trust estate.

Nelnet billed all of the loans purchased by or transferred into the 1985A trust estate under the 9.5 percent floor and continued to bill under the 9.5 percent floor for those loans after they were transferred to the taxable obligations. By repeating this process many times over a 13-month period, Nelnet increased the amount of loans it billed under the 9.5 percent floor by over $3 billion.

As of March 31, 2005, most of the loans billed under the 9.5 percent floor were identified with three of Nelnet's taxable bond issues:

- 2003-1 issue, $798,753,435 in loans billed ($848,050,000 in outstanding bonds);
- 2004-1 issue, $928,307,650 in loans billed ($1,010,000,000 in outstanding bonds); and
- 2004-2 issue, $949,759,185 in loans billed ($969,718,000 in outstanding bonds).[7]

As of March 31, 2005, the 1985A trust estate held only $71,411,805 in loans billed under the 9.5 percent floor.

The Project 950 transactions were unrelated to Nelnet's ability to meet its 1985A bond obligations. Nelnet sold the 2004-1 and 2004-2 bonds to investors with the express condition that 9.5 percent special allowance payments would not become part of the trust estates; only an amount equal to regular special allowance payments would be pledged toward repayment of the bonds. The excess would be payable to Nelnet for its own purposes.

**Department Guidance to Nelnet**

In response to our request for information and in interviews we conducted, Nelnet identified communications with, and guidance received from, the Department related to Project 950. The only written guidance specific to Project 950 identified by Nelnet was a letter dated June 30, 2004, to the Managing Director, Government and Industry Relations for Nelnet, from the Acting General Manager, Financial Partner Services, FSA. (See Enclosure 1.) This letter did not approve or disapprove of Nelnet's use of Project 950: it only referred Nelnet to existing authorities.

Nelnet provided its documentation of a conversation with FSA's former General Manager for Financial Partners Services on January 3, 2003:

> Based upon the guidance that was issued by ED in 1996, [the Director] agrees that there is no legal argument prohibiting a process of passing loans through a tax-

---

[7] None of these bond issues refunded prior tax-exempt bonds.

N0016977

exempt issuance and into a taxable, while permanently retaining on such loans the floor earnings/half-SAP characteristics of the tax-exempts. She also agreed that the ED guidance is silent on issues such as how often loans could be passed through the tax exempt or how long they had to stay in the tax exempt.

Nelnet also provided its documentation of a verbal statement made by the Chief of Staff, Financial Partners Services, FSA, on June 30, 2004, concerning the June 30, 2004, letter to Nelnet. The Chief of Staff allegedly stated that "he thought it was a positive letter." Nelnet officials told us that, as a result of the June 30, 2004, letter, the verbal statements, legal opinions it received, and the fact that the Department paid Nelnet's billings without objection, they believed Nelnet's billing practices for Project 950 were proper. In its comments on the draft of this report, Nelnet also stated that Department guidance and statements by Department officials supported its position.

Our review of Nelnet's documentation did not identify any direct or explicit approval by the Department of Project 950. Further, the documentation, including Nelnet's letter of May 29, 2003, to FSA (Enclosure 1), does not appear to reflect a comprehensive disclosure by Nelnet of the nature or effect of Project 950. For example, Nelnet's May 29, 2003, letter and its accompanying flow chart described only the basic process. The letter did not identify the eligible source of funds that would be used to purchase and qualify loans for the 9.5 percent floor, did not state directly that the process would be repeated many times, and did not state that the process would result in a substantial increase in the amount of loans billed under the 9.5 percent floor.

**Qualifying Sources of Funds**

Pursuant to 34 C.F.R. § 682.302(c)(3)(i), there are five funding sources that qualify loans to be billed under the 9.5 percent floor. A loan is billed under the 9.5 percent floor if it is—

> . . . a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from—
> (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993, the income from which is exempt from taxation under the Internal Revenue Code of 1986 (26 U.S.C.);
> (B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
> (C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
> (D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
> (E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

According to 34 C.F.R. § 682.414(a)(4)(ii)(L), a lender must keep "[a]ny additional records that are necessary to document the validity of a claim against the guarantee or the accuracy of reports

N0016978

submitted under this part." Also, under 34 C.F.R. § 682.414(a)(1)(i), "[t]he records must be maintained in a system that allows ready identification of each loan's current status . . . ."

The loan records we reviewed during our audit did not readily identify the loans' funding sources as described in 34 C.F.R. § 682.302(c)(3)(i). Nelnet's loan records only identified the tax-exempt obligation with which each loan was associated. Different rules apply to loans that are funded by different sources, and as such, loan records need to identify their loans' funding sources in order to determine whether they should be billed under the 9.5 percent floor.

## Loans Funded by Transfers or Sales

The Department's guidance in DCL 96-L-186 allows a lender to continue to receive special allowance payments under the 9.5 percent floor after the lender transfers an eligible loan to a taxable obligation, as long as the original tax-exempt obligation has not been retired or defeased. However, Project 950 went beyond the scope of the guidance in DCL 96-L-186. The Dear Colleague Letter did not address the circumstances by which a loan qualified for the 9.5 percent floor before being transferred.

During Project 950, Nelnet transferred loans from the 1985A trust estate to one of several trust estates for taxable obligations. Nelnet then transferred loans from the receiving trust estate to the 1985A trust estate in an amount equal to the principal and accrued interest of the transferred loans. If these transfers were considered sales, they might result in an eligible source for 9.5 percent floor funding.

To be considered an eligible source under criteria in 34 C.F.R. § 682.302(c)(3)(i)(D), "funds [must] be obtained by the holder from . . . [t]he sale of a loan . . . ." As such, to be considered a sale for the purpose of this requirement, the transaction must be a sale of a loan by its holder, and funds must be received from the sale.

The evidence we reviewed was mixed as to whether the transactions qualified as sales. According to Nelnet, each of its trusts is a separate legal entity, and an exchange of loans from one holder trust to another was sufficient to qualify as a sale. However, Nelnet's internal documentation varied in its characterization of the Project 950 transactions as transfers or sales. Other evidence indicates that the transactions may not qualify as sales under the regulations:

- Nelnet, in its Form 10-K filed with the SEC on March 16, 2005, stated, "The transfers of student loans to the eligible lender trusts do not qualify for sales under the provisions of SFAS No. 140 . . . as the trusts continue to be under the effective control of the Company." Under the Financial Accounting Standards Board (FASB) Accounting Standards, Statements of Standards FAS 125 and FAS 140, the transfers do not meet the criteria to be counted as sales. Nelnet has also acknowledged that for federal income tax purposes the transfer of loans to taxable trust estates does not qualify as a sale.

- The eligible lender and holder for almost all of the Project 950 loans was Wells Fargo Bank Minnesota, National Association (Wells Fargo), the trustee for the 1985A trust estate and for all of the receiving trust estates. Wells Fargo, as trustee for the 1985A trust estate, generally received no funds in exchange for the Project 950 loans transferred out

of that trust estate. Wells Fargo received funds only if the amount transferred out did not match the loans transferred in on a given day. In those cases, Wells Fargo received only the difference between loans transferred out and in. The trustee's statements for the trust accounts designated for the sale or acquisition of loans neither reflect the receipt or expenditure of funds corresponding to or commensurate with the Project 950 transactions nor do those accounts reflect the acquisition or disposition of loans.

- Although Wells Fargo was acting as trustee for separate trust estates, the transactions were initiated and controlled by the same entity, Nelnet. While the sales may have been irrevocable between the trust estates, Nelnet remained the beneficial owner and retained the authority to direct Wells Fargo to transfer loans back to their original obligations or to other obligations. Nelnet set both the buying and selling price, which was always the loan's principal amount and accrued interest, with no consideration for the loan's future income.

**Later Generation Loans Are Ineligible**

Regardless of whether the Project 950 transfers qualify as sales, most of the Project 950 loans would still be ineligible for the 9.5 percent floor. The cycling of loans through the 1985A trust estate to qualify for the 9.5 percent floor is not permitted under the regulations because funds received from the proceeds of a loan that is eligible under 34 C.F.R. § 682.302(c)(1)(i)(B) through (E) cannot be used to make another eligible loan.

The eligible funding sources described in 34 C.F.R. § 682.302(c)(3)(i)(A) through (E) are summarized below:

- **Source A**: Proceeds of the eligible tax-exempt obligations.
- **Source B**: Collections or payments on a loan funded by Source A.
- **Source C**: Interest benefits or special allowance payments on a loan funded by Source A.
- **Source D**: Funds obtained from the sale of a loan that was funded by Source A.
- **Source E**: The investment of funds in Source A.

As such, Sources B through E can only be created with funds that are derived from a loan funded by Source A. An example is provided below:

- *Loan 1*, funded by the proceeds of the original tax-exempt obligation, is eligible for the 9.5 percent floor because it is funded by Source A.

- *Loan 2*, purchased with funds obtained from the sale of Loan 1, is eligible for the 9.5 percent floor because it is funded by Source D.

- *Loan 3*, purchased with funds obtained from the sale of Loan 2, is not eligible for the 9.5 percent floor. It is not funded by Source D, because its funds were not obtained from the sale of a loan that was funded by Source A.

Project 950 loans transferred into the 1985A trust estate were not "purchased with funds obtained by the holder from the issuance of tax-exempt obligations," but were the result of ineligible later

N0016980

Final Audit Report
ED-OIG/A07F0017
Page 11 of 66

generation "sales." Assuming that at the outset of Project 950 the 1985A trust estate held loans equal to the face amount of the 1985A bonds, and that those loans were made or purchased with the original bond proceeds, the maximum amount that Nelnet could have legitimately increased its 9.5 percent floor portfolio was $143,035,000.[8] However, Project 950 increased Nelnet's billing under the 9.5 percent floor about $3.1 billion, which is almost $3 billion more than the potential maximum increase of $143,035,000.

**Estimate of Special Allowance Improper Payments before June 2005**

We did not determine the exact amount of the overpayments attributed to these ineligible loans. However, we estimate a total potential improper payment to Nelnet of about $1,160,000,000.

Table 1 provides our estimates of improper payments to Nelnet before June 2005 (during our audit period), and our estimate of potential improper payments to Nelnet after June 2005, if Nelnet's billings are not corrected. The table includes an estimate based on all Project 950 loans being ineligible for the 9.5 percent floor and a reduced estimate allowing for possible eligible loans based on first generation loan sales.[9] The calculation of our estimates is explained and provided in Enclosure 2.

**Table 1**

| | Improper Payment Estimate Based on All Project 950 Loans Being Ineligible | Improper Payment Estimate Allowing for Possible Eligible First Generation Loan Sales |
|---|---|---|
| Before June 2005 | $278,000,000 | $260,000,000 |
| After June 2005 | $882,000,000 | $835,000,000 |
| **Totals:** | $1,160,000,000 | $1,095,000,000 |

Our estimates of improper payments to Nelnet include the entire payment to Nelnet for loans billed improperly under the 9.5 percent floor. We have not reduced our estimate by the amount of the special allowance payments that Nelnet may have received for the loans if it had billed under the regular special allowance calculation. However, our analysis of Nelnet's 9.5 percent loan portfolio indicates that any eligibility for regular special allowance payments during our audit period would be limited and likely be a small portion of the amount received under the 9.5 percent floor. In its comments, Nelnet estimated that the difference between what it received under the 9.5 percent floor and the regular special allowance was $322.6 million through June 30, 2006.

---

[8] An adjustment for possible sales of first generation loans may not be necessary. On page 6 of its comments on our draft report, Nelnet stated, "virtually all tax-exempt obligations originally issued prior to October 1, 1993 are, by now, funding new loan purchases with later generation proceeds."
[9] See footnote 8, above.

N0016981

Final Audit Report
ED-OIG/A07F0017                                                          Page 12 of 66

## Recommendations

We recommend that the COO for FSA—

1.1    Require Nelnet to calculate special allowance payments received for Project 950 loans for the quarters ended March 31, 2003, through June 30, 2005 (for which we estimate $278 million in improper payments), and return all overpayments.

1.2    Require Nelnet to calculate and return all overpayments it received for special allowance after June 30, 2005, and instruct Nelnet to exclude all Project 950 loans from its claims for payment under the 9.5 percent floor.

## NELNET'S COMMENTS and OIG'S RESPONSE

Nelnet strongly disagrees with our finding and recommendations and requested that our draft report be withdrawn. Nelnet's comments are included in Enclosure 3. Nelnet's comments also included a memorandum with exhibits from its legal counsel. Because of the voluminous number of exhibits to the legal memorandum, we have not included the exhibits in Enclosure 3.[10] We summarize and respond to Nelnet's comments below.

### Nelnet's Comments on Existing Guidance

Nelnet asserted that the draft report was inconsistent with the HEA, regulations, and authoritative guidance. Nelnet places particular emphasis on a letter from former Secretary Rod Paige to Senator Edward M. Kennedy, dated November 18, 2004; a press release issued by Secretary Paige; Dear Colleague Letter 96-L-186; a report issued by the Government Accountability Office in 2004 (GAO-04-1070); and records of Congressional debate on the Taxpayer-Teacher Protection Act of 2004. According to Nelnet, implementing the OIG recommendations would violate established law, which can be modified only through regulatory or statutory change.

### OIG Response

Our report acknowledges that Department guidance in Dear Colleague Letter 96-L-186 permits lenders to continue to bill loans under the 9.5 percent floor after a transfer from a tax-exempt obligation to a taxable obligation. We do not recommend recovery because of Nelnet's process of transferring loans out of the 1985A trust estate disqualified the loans from billing under that floor. We question whether the Project 950 loans qualified for the 9.5 percent floor prior to being transferred. We have reviewed the Department guidance and statements cited by Nelnet and do not agree that they provide authorization for the increase in Nelnet's billings that resulted from its Project 950. Neither the guidance nor statements cited specifically addressed whether the loans qualified for the 9.5 percent floor prior to the transfer.

---

[10] The legal memorandum includes a document (Ex. 23, a description of Project 950) that the memorandum asserts was jointly prepared by OIG and Nelnet. An initial draft of that document was prepared by OIG auditors; Ex. 23, however, includes additional materials and edits not approved by OIG.

The most immediate and direct guidance provided to Nelnet was in the Department's response to Nelnet's letter dated May 29, 2003. Nelnet's letter asked the Department to indicate its "confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below." The Department did not sign or indicate its concurrence, and the Department's written response to Nelnet did not provide approval of Nelnet's billing procedure. The letter from Secretary Paige to Senator Kennedy, issued less than five months later, confirms this understanding by stating, "The Department did not approve or disapprove of the methods that Nelnet and other lenders were using." As detailed in our report, Nelnet's Project 950 loans did not qualify for the 9.5 percent floor under existing law.

**Nelnet's Comments on Transfers**

Nelnet disagreed with our conclusion in our draft report that transfers of loans from the 1985A trust estate did not constitute sales resulting in proceeds that could qualify new loans for the 9.5 percent floor under 34 C.F.R. § 682.302(c)(3)(i)(D). Nelnet asserted that the transfers between the separate trust estates for reasonable value qualified as sales under commercial and property law, and that different treatment under accounting standards or federal income tax law did not preclude the transfers from qualifying as sales under the HEA.

**OIG Response**

After evaluation of Nelnet's comments, we modified our conclusion and finding to indicate that the evidence of whether the transfers qualify as sales is mixed. We have been unable to obtain the views of responsible Department officials on whether the regulations and the HEA preclude Nelnet's Project 950 transactions, as described in our report, from qualifying as sales under 34 C.F.R. § 682.302(c)(3)(i)(D).

**Nelnet's Comments on Later Generation Proceeds**

Nelnet disagreed with our finding that proceeds obtained from the sale of later generation loans cannot be used to qualify a loan for the 9.5 percent floor under 34 C.F.R. § 682.302(c)(3)(i)(D). Nelnet asserted that it is well-established law that proceeds from later generation proceeds still constitute proceeds, and as such, the loans qualify for the 9.5 percent floor under 34 C.F.R. § 682.302(c)(3)(i)(A), which makes loans eligible for the 9.5 percent floor if they are "obtained by the holder from . . . [t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993 . . . ."

**OIG Response**

We have not changed our finding. The HEA and implementing regulations explicitly identify the specific and exclusive funding sources that may be used to qualify loans for the 9.5 percent floor. Accepting Nelnet's interpretation of 34 C.F.R. § 682.302(c)(3)(i)(A) would make 34 C.F.R. § 682.302(c)(3)(i)(B) through (E) redundant, because the requirements in those paragraphs would already be included in Nelnet's definition of "proceeds." Any reading of the HEA or regulations that makes some words redundant or surplusage is not reasonable.

The language in the HEA makes the limits in the regulations clear. The first sentence of Section 438(b)(2)(B)(i) states, "The quarterly rate of the special allowance for holders of loans which were made or purchased with *funds obtained by the holder from the issuance of obligations* . . . ." (Emphasis added.) The second sentence of the same paragraph states—

> Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds *described in the preceding sentence of this subparagraph* or from income on the investment of such funds. (Emphasis added.)

As such, the HEA limits eligible funding sources to funds obtained from collections, default reimbursement, interest, or other income received for loans that are made or purchased with funds *obtained from the issuance of obligations*.

**Nelnet's Comments on Sufficiency of Loan Records**

Nelnet responded to a statement in our report that Nelnet's records did not readily identify the loans' funding sources as described in 34 C.F.R. § 682.302(c)(3)(i); Nelnet's loan records only identified the tax-exempt obligation with which each loan was associated. According to Nelnet, the requirements in the HEA and regulations do not require a lender to maintain records that identify the loans' funding sources. However, since Nelnet's records identify the trust that sells the loan and the trust that buys the loan, including each party's unique bond identification number, those records clearly reflect each loan's source of funding and are sufficient to determine a loan's eligibility for the 9.5 percent floor.

**OIG Response**

We did not conclude that Nelnet's records were legally insufficient. However, as we state in our report, 34 C.F.R. § 682.414(a)(4)(ii)(L) requires lenders to maintain "records that are necessary to document the validity of a claim against the guarantee or the accuracy of reports submitted under this part." Without records identifying the specific funding source used to make or purchase loans (whether the loans are funded under paragraph (A), (B), (C), (D), or (E) of 34 C.F.R. § 682.302(c)(3)(i)), a lender cannot readily and accurately determine which of its loans are eligible for the 9.5 percent floor.

**Nelnet's Comments on Estimates**

In a legal analysis provided to Nelnet by Perry, Guthery, Haase & Gessford, P.C., L.L.O. (Enclosure 3 legal memorandum, page 30), our estimates of overpayments are described as flawed because the estimates do not represent the difference between what Nelnet received or will receive under the 9.5 percent floor and the regular special allowance rate. Nelnet estimated that the difference between what it received under the 9.5 percent floor and the regular special allowance was $322.6 million through June 30, 2006. Nelnet stated that the estimate of future payments is speculative due to fluctuating interest rates and reductions of loan volumes due to payoffs and consolidations. Nelnet reserved the right to challenge the overpayment amount at an appropriate time.

N0016984

**OIG Response**

We have modified our report to refer to our calculations as estimates of *improper payments* rather than *overpayments*. Although it is appropriate to refer to the amounts received in violation of program rules as overpayments, we made this change and clarified the recommendations to avoid confusion between the improper payment amount and the amount Nelnet may have to return to the Department.

We have annotated the report to indicate that the estimates do not reflect the amount of the special allowance payments that Nelnet could be eligible to receive under the regular special allowance calculation. However, based on the low interest rate environment during our audit period and an analysis of Nelnet's 9.5 percent portfolio, any eligibility for regular special allowance payments during our audit period would be limited and likely be a small portion of the amount received under the 9.5 percent floor.

Nelnet's own estimate of $322.6 million indicates that the amounts of regular special allowance payments would be limited and indicates our estimate of improper payments through June 30, 2005, could be reasonable. Regarding future estimates, we acknowledge the possibility of interest rate fluctuations; our estimate is nevertheless reasonable based on current information.

In any event, we have not recommended that the Department recover the amounts we calculated. Instead, we have recommended that the Department require Nelnet to calculate and return the actual overpayments received and exclude ineligible loans from future billings. While loan volume can fluctuate due to payoffs and consolidation, our future estimate takes payoffs into account. In addition, 92 percent of Nelnet's 9.5 percent portfolio consists of consolidation loans, which have a fixed rate of interest and are less susceptible to payoff through further consolidation.

N0016985

# OBJECTIVE, SCOPE, AND METHODOLOGY

The objective of our audit was to determine whether, for the period January 1, 2003, through June 30, 2005, Nelnet's use of Project 950 to increase the amount of student loans billed under the 9.5 percent floor complied with the requirements in the HEA, regulations, and other guidance issued by the Department.

To accomplish our audit objective, we—

- Obtained from the Department the amount of 9.5 percent special allowance payments to Nelnet and the average daily loan balances included on Nelnet's billings on which these payments were based, in total, for the period January 1, 2002, through June 30, 2005;
- Obtained and documented an understanding of the governing law, regulations, and guidance applicable to the issuance of tax-exempt and taxable obligations used to fund student loans that will be billed at the 9.5 percent allowance rate;
- Obtained and documented a listing of Nelnet's bonds issued from October 1, 1993, through June 30, 2005, along with information related to each bond, and Nelnet's use of proceeds to fund student loans that would be billed at the 9.5 percent special allowance rate;
- Reviewed and documented Nelnet's Project 950 procedures and methodologies used to fund student loans that would be billed at the 9.5 percent special allowance rate;
- Reviewed supporting documentation for a randomly selected sample of 30 student loans, from the universe of 350,407 student loans that were included in Nelnet's 9.5 percent special allowance billings for the quarter ended March 2005, to determine whether Nelnet's Project 950 methodologies and practices used were in effect;
- Reviewed supporting documentation for a judgmentally[11] selected sample of 20 student loans, from a bond-to-bond listing that documents the student loans transferred between Project 950 bonds, dated January 22, 2004, to determine whether Nelnet's Project 950 methodologies and practices were in effect;
- Reviewed supporting documentation for all 120 student loans originated after May 1, 2004, and associated with a Project 950 bond code, from the universe of 350,407 student loans that were included in Nelnet's 9.5 percent special allowance billings for the quarter ended March 2005, to determine whether Nelnet terminated Project 950 after May 1, 2004;
- Reviewed supporting documentation for 287 judgmentally[12] selected student loans, from bond-to-bond listings that document the student loans transferred between Project 950 bonds, dated May 28, 2004, to determine whether Nelnet terminated Project 950 after May 1, 2004; and
- Examined the bond transcript and other bond documentation for each bond, associated with Project 950, that funded a loan in the sample.

---

[11] We selected loans with a high principal balance from 14 pages of the listing.
[12] We selected the first loan on each page of the listings.

We also relied, in part, on computer-processed data provided by Nelnet.  To ensure the reliability of the data, we performed limited data testing.  We obtained Nelnet's Lender Reporting Form (LaRS) database for the quarter ended March 2005.  We validated that the database was complete and reliable by comparing the ending principal balance against the Department's Financial Management Systems Data Mart total and verifying that the dates on the loan history detail, names, social security numbers, and the loan amounts matched the information in Nelnet's system.

We conducted our audit in accordance with generally accepted government auditing standards appropriate to the scope described above.  From July 2005 through July 2006, we conducted our work at Nelnet's offices in Lincoln, Nebraska, and our offices in Chicago, Illinois, and Kansas City, Missouri.  We discussed the results of our audit with Nelnet officials on June 22, 2006.

N0016987

# Enclosure 1: Nelnet's Written Inquiry and FSA's Response

*nold 4/5/05*

**Nelnet Education Loan Funding, Inc.**
121 South 13th Street, Suite 201
Lincoln, Nebraska 68508
402.458.2303

May 29, 2003

Angela Roca-Baker
United States Department of Education
Federal Student Aid
Union Center Plaza
830 First Street, NE
Room 52E4
Washington, DC 20202

Re:   **LaRS Billing Statement Confirmation**

Dear Ms. Roca-Baker:

This letter is being written to confirm the proper way to submit Lender's Request for Payment of Interest and Special Allowance (LaRS) for the second quarter of 2003 by Nelnet Education Loan Funding, Inc. (NELF). Some background information may be helpful in your consideration of this issue. NELF is the successor in interest to a qualified scholarship funding corporation which converted to for-profit status in 1998 under § 150(d) of the tax Code. NELF is the issuer of tax exempt obligations pursuant to an Indenture of Trust dated November 15, 1985 (the 1985 Indenture) with Wells Fargo Bank Minnesota, National Association as trustee. NELF makes, purchases and finances student loans as part of its ordinary activities as a secondary market of student loans in the state of Nebraska. The trustee holds title to NELF's student loans and NELF holds 100% beneficial owner interest in its loans.

NELF is purchasing portfolios of FFEL loans with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions. Some of the portfolios will be purchased from third party non-affiliated sellers, and some will be purchased from affiliated sellers. Some of the portfolios will be transferred into the 1985 Indenture from the seller and some will be financed by a different NELF financing prior to being placed into the 1985 Indenture. As part of NELF's overall cash flow management plan, the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing for a period of time depending upon cash management needs and other internal concerns, but in any event for at least one day or longer. Thereafter, loans will be refinanced and placed into financings which are taxable on a longer term basis; however, NELF will remain the 100% beneficial owner of the student loans that were previously funded in the tax exempt 1985 indenture. A flow chart is being sent with this letter to help illustrate.

We have reviewed applicable law, discussed with officials at the Department of Education the manner in which billing for special allowance should be handled in such circumstances and considered industry practices. During the time that the loans are held in the 1985 Indenture,

Final Audit Report
ED-OIG/A07F0017                                                                    Page 19 of 66

under 20 U.S.C. § 1087-1(b)(2)(B) and 34 C.F.R. § 682.302(c)(3), we intend to bill for special allowance at the quarterly rate of one-half the average of the bond equivalent rates of 91-day Treasury bill plus 3.5%, divided by 4, subject to a minimum of 9.5% minus the applicable interest rate on a loan, divided by 4. Since the loans thereafter will be refinanced under a taxable financing, NELF will maintain its 100% beneficial ownership interest in the loans previously purchased with proceeds of the 1985 Indenture, and the 1985 Indenture will not be retired or defeased, we intend to continue to bill for special allowance at such same quarterly rate (one-half of 91-day Treasury bill plus 3.5%, divided by 4, subject to the minimum of 9.5% minus the applicable rate on the loan, divided by 4) following such long term refinancing. We have based this upon 34 C.F.R. § 682.302(e)(2) as well as Dear Colleague Letter 96-L-186, 96-G-287 (Q&A No. 30), and our previous discussions with the Department on this matter. We intend to submit billings for special allowance at this same rate until such refinanced loans are either no longer beneficially owned by NELF (and are transferred to an unrelated or an affiliated purchaser), or until the 1985 Indenture is retired or defeased.

We would appreciate if you would consider our intended billing procedure summarized above and verify that it conforms to existing applicable laws and regulatory guidance at your earliest convenience, since we will be calculating the special allowance billings in the upcoming second quarter LaRS within the next few weeks. Please indicate your confirmation that our intended billing procedure is compliant with the Higher Education Act of 1965, as amended, and regulations promulgated thereunder, by signing below. We intend to proceed under the analysis described above and assume its correctness, unless we are otherwise directed by you. Thank you for your consideration of this matter.

Sincerely,

Terry J. Heimes
President of Nelnet Education Loan Funding, Inc.


I concur with the above.                              Date

cc:  Terri Shaw
     Kristie Hansen
     Frank Ramos
     Sally Stroup

Final Audit Report
ED-OIG/A07F0017



Final Audit Report
ED-OIG/A07F0017                                                                Page 21 of 66



FSA
FEDERAL
STUDENT AID
To Help Put America Through School

Mr. Paul Tone                                          JUN 3 0 2004
Government and Industry Relations
Nelnet
3015 South Parker Road, Suite 400
Aurora, CO 80014

Dear Mr. Tone,

This letter is in response to Nelnet's May 29, 2003 correspondence with regard to
confirmation of the proper way for a lender to submit the Lender's Request for Payment of
Interest and Special Allowance (LaRS) as it relates to portfolios funded from the proceeds of
the tax- exempt 1985 Indenture.

34 C.F.R. Section 682.302(e) provides guidance with regard to special allowance payments
for loans financed by proceeds of tax-exempt obligations. Additionally, the formulas for the
calculations are provided in 34 C.F.R. Section 682.302(c).  You can also refer to Dear
Colleague Letter 96–L–186 for additional information.

Please let me know if you have any questions or concerns.

Sincerely,

Victoria L. Bateman, CPA, CGFM
Chief Financial Officer and
Acting General Manager, Financial Partner Services, FSA

Confidential                                                                   N0016991

# Enclosure 2: Estimates of Special Allowance Improper Payments

**Estimates of Special Allowance Improper Payments before June 2005**

The calculation of our estimate of the special allowance improper payments based on all Project 950 loans being ineligible is provided in **Table 2-1**:

### Table 2-1

| Quarter Ending | Balance Claimed | Special Allowance Paid | Revised Balance | Revised Payment | Potential Improper Payment |
|---|---|---|---|---|---|
| 3/31/2003 | $432,168,564 | $5,334,343 | $432,168,564 | $5,334,343 | $0 |
| 6/30/2003 | $736,347,966 | $9,293,367 | $432,168,564 | $5,454,352 | $3,839,015 |
| 9/30/2003 | $1,433,766,618 | $19,161,070 | $432,168,564 | $5,775,565 | $13,385,505 |
| 12/31/2003 | $2,065,372,597 | $28,325,817 | $432,168,564 | $5,927,031 | $22,398,786 |
| 3/31/2004 | $2,949,297,160 | $41,223,576 | $432,168,564 | $6,040,603 | $35,182,973 |
| 6/30/2004 | $3,550,519,779 | $50,002,081 | $432,168,564 | $6,086,243 | $43,915,837 |
| 9/30/2004 | $3,389,308,493 | $47,781,542 | $432,168,564 | $6,092,594 | $41,688,948 |
| 12/31/2004 | $3,291,717,236 | $46,399,112 | $432,168,564 | $6,091,725 | $40,307,387 |
| 3/31/2005 | $3,215,007,716 | $45,289,782 | $432,168,564 | $6,087,954 | $39,201,828 |
| 6/30/2005 | $3,148,631,415 | $44,377,891 | $432,168,564 | $6,091,132 | $38,286,759 |
| **Totals:** | | $337,188,580 | | $58,981,542 | $278,207,038 |

The calculation of our estimate of the special allowance improper payments, based on an allowance for possible eligible first generation loan sales, is provided in **Table 2-2**:

### Table 2-2

| Quarter Ending | Balance Claimed | Special Allowance Paid | Revised Balance | Revised Payment | Potential Improper Payment |
|---|---|---|---|---|---|
| 3/31/2003 | $432,168,564 | $5,334,343 | $432,168,564 | $5,334,343 | $0 |
| 6/30/2003 | $736,347,966 | $9,293,367 | $575,203,564 | $7,259,581 | $2,033,786 |
| 9/30/2003 | $1,433,766,618 | $19,161,070 | $575,203,564 | $7,687,106 | $11,473,964 |
| 12/31/2003 | $2,065,372,597 | $28,325,817 | $575,203,564 | $7,888,703 | $20,437,114 |
| 3/31/2004 | $2,949,297,160 | $41,223,576 | $575,203,564 | $8,039,864 | $33,183,712 |
| 6/30/2004 | $3,550,519,779 | $50,002,081 | $575,203,564 | $8,100,610 | $41,901,471 |
| 9/30/2004 | $3,389,308,493 | $47,781,542 | $575,203,564 | $8,109,062 | $39,672,480 |
| 12/31/2004 | $3,291,717,236 | $46,399,112 | $575,203,564 | $8,107,906 | $38,291,206 |
| 3/31/2005 | $3,215,007,716 | $45,289,782 | $575,203,564 | $8,102,887 | $37,186,895 |
| 6/30/2005 | $3,148,631,415 | $44,377,891 | $575,203,564 | $8,107,116 | $36,270,775 |
| **Totals:** | | $337,188,580 | | $76,737,178 | $260,451,403 |

Final Audit Report
ED-OIG/A07F0017

In **Tables 2-1 and 2-2,** the column(s) headed—

- **Balance Claimed** and **Special Allowance Paid** contain the actual average daily principle balance of the loans reported for Nelnet by its trustee, Wells Fargo Bank, as eligible for the 9.5 percent floor on its quarterly special allowance billing requests and the actual amount of the Department's special allowance payment on those loans.[13]

- **Revised Balance,** in Table 2-1, is the loan amount reported as eligible for the 9.5 percent floor for the quarter ended March 31, 2003, before the billed amount was increased with ineligible loans created by Project 950. In Table 2-2, amounts for quarters ending June 30, 2003, and later are increased by $143,035,000, which is the amount of the 1985A trust estate and the maximum potential increase of eligible funds. (See our explanation under "Later Generation Loans Are Ineligible.")

- **Revised Payment** is our estimate of the amount of the Special Allowance Paid that is proportional to the revised balance. To calculate the Revised Payment, we determined the percentage of the Balance Claimed represented by the Special Allowance Paid, and we multiplied the Revised Balance by that percentage: (Special Allowance Paid / Balance Claimed) X Revised Balance.

- **Potential Improper Payment** is the Special Allowance Paid minus the Revised Payment.

**Estimates of Special Allowance Improper Payments after June 2005**

On December 1, 2015, Nelnet's 1985A bonds are scheduled to be retired, and Nelnet will no longer be able to bill under the 9.5 percent floor for loans made or purchased by that trust estate. We estimate that Nelnet potentially could be improperly paid about $882 million in special allowance from July 2005 through at least December 1, 2015, if Nelnet's billings are not corrected. Requiring Nelnet to correct its post-June 2005 special allowance billings could allow the Federal government to put the $882 million to better use.

The method we used to calculate our estimates is described below:

- **Determine the date that Project 950 loans will be paid off.** For purposes of its estimates under the Federal Credit Reform Act of 1990, the Department estimates that a student entering repayment on a FFEL Program loan will take approximately 13 years to repay his or her loan. Because May 31, 2017, is 13 years after May 31, 2004 (the month during which Project 950 ended), we estimate that the ineligible loans will be paid down to $0 by May 31, 2017.

---

[13] Nelnet bills for special allowance payments under three separate lender IDs: Wells Fargo Bank (Lender IDs 821666 and 833500) and Melmac Zions Bank (Lender ID 831300). We have limited the data used to calculate our estimate to special allowance payments to Lender ID 833500 because virtually all transfers from the 1985A trust estate to a taxable obligation, under Project 950, were transfers to Lender ID 833500. The sole transfer under Project 950 to a different Lender ID was a transfer of $463,964 to Melmac Zions Bank, on June 4, 2004.

N0016993

- **Calculate potential quarterly special allowance improper payments after June 2005.** There are about 48 quarters between June 30, 2005, and May 31, 2017. As such, Nelnet's potential improper payment estimated in Table 2-1 for the quarter ended June 30, 2005 ($38,286,759) must be reduced by about $802,588 for each following quarter in order to be reduced to $0 on May 31, 2017. Nelnet's potential improper payment estimated in Table 2-2 for the quarter ended June 30, 2005 ($36,270,775) must be reduced by about $760,328 for each following quarter in order to be reduced to $0 on May 31, 2017.

- **Total quarterly special allowance improper payment estimates.** In **Table 2-3**, we estimate special allowance improper payments for each quarter from the quarter ended September 30, 2005, through the quarter ending December 31, 2015. Except as noted, each quarterly estimate is about $802,588 (for Table 2-1) or $760,328 (for Table 2-2), as appropriate, less than the estimate for the previous quarter. Our total estimates of potential special allowance improper payments to Nelnet after June 30, 2005, is provided in the final row.

**Table 2-3**

| Quarter Ending | Potential Improper Payment Based on All Project 950 Loans Being Ineligible | Potential Improper Payment Allowing for Possible Eligible First Generation Loan Sales |
|---|---|---|
| 9/30/2005 | $37,484,171 | $35,510,447 |
| 12/31/2005 | $36,681,583 | $34,750,119 |
| 3/31/2006 | $35,878,994 | $33,989,791 |
| 6/30/2006 | $35,076,406 | $33,229,463 |
| 9/30/2006 | $34,273,818 | $32,469,135 |
| 12/31/2006 | $33,471,229 | $31,708,806 |
| 3/31/2007 | $32,668,641 | $30,948,478 |
| 6/30/2007 | $31,866,053 | $30,188,150 |
| 9/30/2007 | $31,063,465 | $29,427,822 |
| 12/31/2007 | $30,260,876 | $28,667,494 |
| 3/31/2008 | $29,458,288 | $27,907,166 |
| 6/30/2008 | $28,655,700 | $27,146,838 |
| 9/30/2008 | $27,853,112 | $26,386,510 |
| 12/31/2008 | $27,050,523 | $25,626,182 |
| 3/31/2009 | $26,247,935 | $24,865,854 |
| 6/30/2009 | $25,445,347 | $24,105,525 |
| 9/30/2009 | $24,642,758 | $23,345,197 |
| 12/31/2009 | $23,840,170 | $22,584,869 |
| 3/31/2010 | $23,037,582 | $21,824,541 |
| 6/30/2010 | $22,234,994 | $21,064,213 |
| 9/30/2010 | $21,432,405 | $20,303,885 |
| 12/31/2010 | $20,629,817 | $19,543,557 |
| 3/31/2011 | $19,827,229 | $18,783,229 |
| 6/30/2011 | $19,024,640 | $18,022,901 |
| 9/30/2011 | $18,222,052 | $17,262,573 |

Final Audit Report
ED-OIG/A07F0017

| Quarter Ending | Potential Improper Payment Based on All Project 950 Loans Being Ineligible | Potential Improper Payment Allowing for Possible Eligible First Generation Loan Sales |
|---|---|---|
| 12/31/2011 | $17,419,464 | $16,502,244 |
| 3/31/2012 | $16,616,876 | $15,741,916 |
| 6/30/2012 | $15,814,287 | $14,981,588 |
| 9/30/2012 | $15,011,699 | $14,221,260 |
| 12/31/2012 | $14,209,111 | $13,460,932 |
| 3/31/2013 | $13,406,523 | $12,700,604 |
| 6/30/2013 | $12,603,934 | $11,940,276 |
| 9/30/2013 | $11,801,346 | $11,179,948 |
| 12/31/2013 | $10,998,758 | $10,419,620 |
| 3/31/2014 | $10,196,169 | $9,659,292 |
| 6/30/2014 | $9,393,581 | $8,898,963 |
| 9/30/2014 | $8,590,993 | $8,138,635 |
| 12/31/2014 | $7,788,405 | $7,378,307 |
| 3/31/2015 | $6,985,816 | $6,617,979 |
| 6/30/2015 | $6,183,228 | $5,857,651 |
| 9/30/2015 | $5,380,640 | $5,097,323 |
| 12/31/2015 | $3,052,004 (a) | $2,891,301 (a) |
| **Total:** | $881,780,622 | $835,350,584 |

(a) The estimates for the quarter ending December 31, 2015, are two-thirds the amount that would result from subtracting $802,588 or $760,328 from the amount for the previous quarter, because Nelnet's loans lose their eligibility for the 9.5 percent floor after two-thirds of this quarter, on December 1, 2015.

**Limitation on Estimates**

Our estimates of improper payments to Nelnet include the entire payment to Nelnet for loans billed improperly under the 9.5 percent floor. We have not reduced our estimate by the amount of the special allowance payments that Nelnet may have received for the loans if it had billed under the regular special allowance calculation. However, our analysis of Nelnet's 9.5 percent loan portfolio indicates that any eligibility for regular special allowance payments during our audit period would be limited and likely be a small portion of the amount received under the 9.5 percent floor. In its comments, Nelnet estimated that the difference between what it received under the 9.5 percent floor and the regular special allowance was $322.6 million through June 30, 2006.

N0016995

# Enclosure 3: Nelnet's Comments

Because of the voluminous number of exhibits included in Nelnet's comments on the draft report, we have not included the exhibits in this enclosure. Copies of the exhibits are available on request.

   121 SOUTH 13TH STREET, SUITE 301   p 402.458.2370   www.nelnet.net
LINCOLN, NE 68508   f 402.458.2399   NELNET, INC.

September 7, 2006

Richard J. Dowd
Regional Inspector General for Audit
U.S. Department of Education
Office of Inspector General
111 N. Canal Street, Suite 940
Chicago, IL 60606-7204

Re:  *Control Number ED-OIG/AO7F0017*
     *Response to Draft Audit Report*

Dear Mr. Dowd:

This letter is in response to your correspondence dated August 9, 2006 and the Draft Audit Report ED-OIG/A07F0017 dated August 2006 (the "Draft Report") issued by the Office of Inspector General of the Department of Education (the "OIG"). The Draft Report made the preliminary finding that Nelnet, Inc. did not qualify certain of its student loans for the 9.5 percent special allowance rate, and recommended that Nelnet repay any amounts billed above the ordinary special allowance rate. We have reviewed the Draft Report and strongly disagree with its preliminary finding and recommendations. The Draft Report is inconsistent with the Higher Education Act, governing regulations and authoritative guidance. This inconsistency is reflected in Secretary of Education Paige's statement in 2004 that the regulatory guidance followed by Nelnet and other lenders "was specifically endorsed by the prior administration and has been on the books for close to a decade." (11/18/04 letter from Sec'y of Education Paige to Sen. Kennedy). Since the Draft Report's finding is inconsistent with established precedent, following the Draft Report's recommendation would violate established law. A summary of our response to the preliminary contentions and finding contained in the Draft Report is set forth below; in addition, enclosed please find the legal analysis in support of our response that was provided by Perry, Guthery, Haase & Gessford, P.C., L.L.O. (the "Legal Memorandum").

I.      **History and Overview of 9.5 Percent Floor.**

It is important to understand the genesis and context of the 9.5 percent floor. Prior to 1980, the government paid the same special allowance rate to student loan lenders who financed their loans with tax-exempt obligations and those who financed their loans with taxable obligations. In 1980, Congress recognized that lenders who did not enjoy the ability to issue tax-exempt bonds had become subject to competitive disadvantage. Thus Congress imposed a statutory penalty upon student loan lenders who financed their loans through tax-exempt obligations by



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 2

reducing their special allowance rate to one-half the rate paid to other lenders. In order to protect lenders who used tax-exempt financing (and holders of tax-exempt bonds) from hardships in the event interest rates fell precipitously, however, those lenders were given a floor of at least a 9.5 percent return on their loans.

Thus in high interest rate environments, tax-exempt issuers would be subject to a considerable penalty, and in extremely low interest rate environments, the 9.5 percent floor rate could result in special allowance payments being higher than those paid to lenders relying on taxable financings. The Department of Education (the "Department") adopted regulations (34 C.F.R. § 682.302(e)) and in 1996 issued a Dear Colleague Letter (96-L-186), both of which prevented tax-exempt issuers from shedding the one-half special allowance rate by merely shifting their student loans to taxable financings; those regulations and the Dear Colleague Letter made it clear that loans transferred from tax-exempt to taxable financings remain subject to the one-half special allowance rate (and the 9.5 percent floor). As a result of the Part 682 regulations and the regulatory interpretation contained in the Dear Colleague Letter (issued in the previous administration), the Department could not lawfully end the 9.5 percent floor without engaging in a notice-and-comment rulemaking proceeding, notwithstanding the fact that interest rates hit historic lows in 2003 and 2004. Indeed, Department personnel observed on several occasions that it would have been required to engage in a negotiated rulemaking proceeding, an even lengthier administrative process.

After carefully reviewing the provisions of the governing statute, the regulations, and the regulatory interpretation contained in the Dear Colleague Letter, and after seeking guidance from the Department, Nelnet qualified certain loans for the 9.5 percent floor in the manner described below. In qualifying those loans for the 9.5 percent floor, Nelnet, in good faith, closely followed all of the requirements existing at the time. In implementing this process, Nelnet has consistently complied with the law and regulations and has adopted an asset/liability management strategy similar to the strategy commonly utilized by many other student loan organizations. Concurrently, Nelnet led efforts to eliminate the ability to qualify new loans for the 9.5 percent floor by working with Department personnel and Congress beginning in early 2003. Nelnet stopped qualifying any new loans for the 9.5 percent floor when legislation was introduced in early 2004 to end the ability to qualify new loans for the 9.5 percent floor, well before the new statute was enacted in late 2004.

## II.    The Loans at Issue in the Draft Report Were Purchased with Qualifying Sources of Funds and Are Thus Eligible for the 9.5 Percent Special Allowance

Field auditors of the OIG wrapped up their field audit in 2005 and told Nelnet that they had found no material exceptions to Nelnet's billings for the 9.5 percent special allowance rate. Approximately one year later, however, the OIG's Draft Report now has called into question whether the purchases of loans by the 1985A Trust were made with qualifying sources of funds under 34 C.F.R. § 682.302(c)(3)(i).



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 3

A. <u>The loans at issue are entitled to the 9.5 percent special allowance rate under applicable regulations and authority.</u>

Loans which are purchased with funds obtained from qualifying sources are eligible for the minimum 9.5 percent special allowance rate. These qualifying sources are set forth in 34 C.F.R. § 682.302(c)(3)(i)(A) – (E), and are generally funds obtained from proceeds of tax-exempt obligations originally issued prior to October 1, 1993. Loans purchased with funds from qualifying sources and thus eligible for the 9.5 percent rate remain eligible for that minimum rate even if they are subsequently financed with funds derived from taxable obligations or other non-qualifying sources. 34 C.F.R. § 682.302(e)(2); Dear Colleague Letter (96-L-186).

Nelnet's 1985A Trust was created pursuant to an Indenture of Trust in which student loans were pledged as collateral on tax-exempt bonds originally issued in 1985, and an indirect Nelnet subsidiary was the beneficiary of that trust. The 1985A Trust purchased its first student loans with funds obtained from tax-exempt obligations originally issued by the 1985A Trust prior to October 1, 1993. The 1985A Trust sold certain of those loans to five different purchasing trusts, and the Nelnet subsidiary was beneficiary of each of those purchasing trusts. Thereafter, the 1985A Trust purchased the new loans at issue in the Draft Report with the proceeds from those sales. All of the loan sales transactions were irrevocable, on a non-recourse basis, for which the selling trust received reasonably equivalent value, and as a result of which the selling trust surrendered all rights and control over the loans being sold to the purchasing trusts.

Nelnet billed the Department for these new loans at the 9.5 percent special allowance rate based on the fact that the funds used to purchase the loans into the 1985A Trust came from qualifying sources under 34 C.F.R. § 682.302 (c) (3) (i). Specifically, funds used to purchase those loans were obtained from (i) proceeds of the pre-October 1, 1993 tax-exempt obligations issued by the 1985A Trust, (ii) the sale of loans that had been purchased with funds obtained from the pre-October 1, 1993 tax-exempt obligations issued by the 1985A Trust, and/or (iii) investment of proceeds of the pre-October 1, 1993 tax obligations issued by the 1985A Trust. The 1985A Trust sold the loans to the purchasing trusts (which were utilizing taxable financing) in precisely the manner provided for in 34 C.F.R. § 682.302(e) and the 1996 Dear Colleague Letter, resulting in those loans retaining eligibility for the 9.5 percent floor.

B. <u>The transfers of loans from the 1985A Trust constituted sales and the proceeds of those sales constitute a qualified source of funds.</u>

The Draft Report contends that the "transfers" of loans from the 1985A Trust to the purchasing trusts did not constitute "sales" under Section 682.302(c)(3)(i)(D), and thus the proceeds of those transfers were not a qualifying source of funds with which to purchase loans, and in turn the purchased loans were not eligible for the 9.5 percent minimum rate.

The Draft Report's assertion that transfers from the 1985A Trust were not "sales" is based upon faulty premises and is thus wrong. The Draft Report offers five interrelated arguments in its contention that the transfers of loans from the 1985A Trust did not constitute sales. First, the



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 4

Draft Report (at 9) asserts that the 1985A Trust "received no funds" in exchange for the loans transferred out of that trust, but instead "received only the difference between the loans transferred out and in." The Draft Report fails to acknowledge the fact that in each of the sales, the 1985A Trust received a sale price equal to the aggregate outstanding principal balance and accrued interest on the loans being sold. Such sale proceeds were applied to and then netted out against funds to be paid by the 1985A Trust to purchase new loans in instances where a sale and purchase were occurring simultaneously. Such application and netting of funds is commonly used in simultaneous purchase and sale transactions, and is similar to other commonly used methods of funds delivery such as wire transfers or checks which do not require the physical movement of cash. In fact, the Department itself regularly uses the netting method to net special allowance to be paid to lenders against amounts to be paid by those lenders, and the Department has consistently recognized that loans qualifying for the 9.5 percent rate may be purchased with those netted payments. The Draft Report (at 9) does subsequently acknowledge that "[t]he purchase price for a loan was always the loan's principal amount and accrued interest." We agree with this statement but note that it belies and undermines the Draft Report's earlier assertion that the 1985A Trust received no funds in the sales.

Second, the Draft Report (at 9) asserts that the sales from the 1985A Trust were not at arms length for the stated reason that "the transactions were initiated and controlled by the same entity, Nelnet." This contention ignores the fact that each sale in question was made from one trust to a different and separate trust, and that the 1985A Trust and each of the purchasing trusts are separate and distinct legal entities. The Draft Report (at 9) further contends that the sales were not at arms length for the stated reason that "[t]he trustee made no attempt to obtain a price for the loans that reflected their actual market value." This contention applies an erroneous standard which seems to require a selling party to receive "actual market value," whereas the existing legal authority on whether a sale has occurred merely looks at whether the sale is made for "reasonably equivalent value." The outstanding principal and accrued interest on a loan is certainly that loan's reasonably equivalent value. An appraisal of the market value of an asset being sold, in order to determine whether precise market value was obtained, has never been a condition for treatment of a transfer as a sale, as such a condition would be far too difficult and cumbersome to serve as an appropriate standard. Certainly no requirement that the sale be for appraised market value is found in 34 C.F.R. § 682.302(c)(3)(i)(D) or anywhere else in the regulations or the 1996 Dear Colleague Letter.

Third, the Draft Report (at 9) asserts that the sales of loans from the 1985A Trust were "not irrevocable," as the authority was retained "to direct Wells Fargo [as trustee] to transfer them back." This assertion is flatly wrong. The 1985A Trust did not maintain control over any loans after they were sold. Upon sale, the loans sold from the 1985A Trust were all released from the indenture and related security interest, thus placing those loans beyond the reach of the 1985A Trust and its creditors. Nothing in any agreement between the 1985A Trust and any purchasing trust permits revocation of the sale of any of the loans. The purchasing trust has the right to pledge the loans purchased, and each of those purchasing trusts do, indeed, pledge the purchased loans as collateral and grant security interests in those loans, subject to no other liens or security interests. There are no provisions whereby the 1985A Trust can require the repurchase of any of



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 5

the loans sold. The 1985A Trust has no power to unilaterally cause the return of the loans following sale. Thus the sales of the loans by the 1985A Trust were irrevocable.

Fourth, the Draft Report (at 9) argues that the transfers of loans by the 1985A Trust do not constitute sales for the stated reason that Nelnet held beneficial ownership in the loans before and after the transfers. Once again, this argument ignores the plain fact that the sale was made by one trust to a different trust, each of which is a separate and distinct legal entity. It further fails to acknowledge fundamental law providing that separate trusts can not commingle their separate trust assets, and that assets are permitted to be properly transferred from one trust to another in a sale for reasonably equivalent consideration.

Fifth, the Draft Report (at 9) asserts that the sales of loans by the 1985A Trust "do not meet the criteria to be counted as sales" under FAS 140 or federal income tax law for the stated reason that Nelnet "did not surrender control over the transferred assets." Nothing in the Higher Education Act, its regulations or any other applicable law warrants the application of accounting or tax standards to this issue. The purpose of FAS 140 is strictly for accounting and reporting guidance to accountants and was not intended to define the term "sale" or provide a legal standard as to whether or not a transfer of loans qualifies as a sale under applicable law. Nevertheless, the discussion above in response to the other four arguments put forth by the Draft Report clearly establishes that the 1985A Trust did, in fact, surrender control over the loans sold out of the trust. Similarly, income tax standards have no relation to whether a transaction is a "true" sale under commercial and property law, but instead relate only to how such sales are reflected on tax returns.

    C.   Later generation proceeds are a qualifying source of funds for the purchase of loans to be eligible for the 9.5 percent special allowance rate.

As an alternative to the Draft Report's assertion that the 1985A Trust's transfers of loans did not constitute sales, the Draft Report (at 9) also argues that "[e]ven if the transfers could be characterized as sales," the loans would be ineligible for the 9.5 percent special allowance rate for the stated reason that "any funds obtained from later generation sales are not eligible sources" under 34 C.F.R. § 682.302(c)(3)(i)(D). The Draft Report appears to be trying to insert a requirement to the regulations which would only permit funds "*originally*" obtained from a pre-October 1, 1993 tax-exempt obligation to be a qualifying source of funds. No such language or requirement exists in the statute or regulations, however. Moreover, the Draft Report focused exclusively on whether the funds used to purchase 9.5 percent loans were obtained from the sale of loans under § 682.302(c)(3)(i)(D). Since it is well established law that later generation proceeds still constitute proceeds, however, the later generation proceeds would constitute a qualifying source of funds under § 682.302(c)(3)(i)(A) as funds obtained from "the proceeds of tax-exempt obligations originally issued prior to October 1, 1993." Thus, regardless of whether the transfers from the 1985A Trust constitute sales, those transfers produced funds obtained from proceeds of the pre-October 1, 1993 tax-exempt obligations. Since loans are commonly and regularly sold out of and into long term tax-exempt obligations, the Draft Report's assertion is



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 6

not rooted in reality, as virtually all tax-exempt obligations originally issued prior to October 1, 1993 are, by now, funding new loan purchases with later generation proceeds.

>   D.   The Draft Report's suggestion that Nelnet's records are insufficient is wrong.

Finally, the Draft Report (at 8) has indicated that Nelnet's records were insufficient for the stated reason that they "did not readily identify the loans' funding sources." Nowhere in the regulations of the Higher Education Act is there a requirement to maintain records which identify loans' funding sources. Nelnet's records satisfy each of the requirements set forth in 34 C.F.R. §§ 682.515 and 682.414(a)(ii), and furnish plentiful additional information beyond the regulatory requirements. During the field audit, Nelnet furnished detailed documentation and reports at the loan level identifying the selling trust as the "Selling Lender," the purchasing trust as the "Buying Lender," referencing each party's unique bond identification number, setting forth the sale date, identifying the borrower by name and social security number and providing other information. Thus the source of funds is clearly reflected in Nelnet's documentation, whether or not such information is required to be maintained by regulation.

**III. Conclusion.**

It is important to remember that the origin of the 9.5 percent minimum rate may be traced to Congressional intent to protect lenders who used tax-exempt financing and would thus otherwise be subject to the one-half special allowance rate in low interest rate environments. Indeed, when the previous administration issued Dear Colleague Letter 96-L-186 in 1996, it made a cost/benefit analysis as to whether a lender should be able to shed the half special allowance rate by funding loans with taxable obligations. Although critics have placed much focus on the 9.5 percent floor during recent low interest rate environments, student loan industry participants who hold those loans know and understand that interest rates fluctuate greatly over the life of a 30-year loan and that the one-half special allowance rate may once again result in significant savings for the government in years to come. If prevailing interest rates had been at historic highs (rather than historic lows) over the part few years, it is unimaginable that the Draft Report would have advanced the same novel interpretations which are contrary to longstanding law and guidance, and recommended that Nelnet be compensated for underbilling the Department.

It would be inconsistent (and indeed unlawful) to retroactively change established interpretations when interest rates swing one direction, particularly when those interest rates may swing in the opposite direction in the future to the lender's detriment. When asked why the Department of Education had not sought to recover 9.5 percent floor payments made to Nelnet and other lenders, the former Secretary of Education correctly pointed out that the Department was bound by "existing Department regulations, and interpretations of those regulations, including an interpretation issued by the prior administration expressly permitting" the methods that Nelnet and other lenders had used, and could not change existing rules without going through lengthy rulemaking procedures. (November 18, 2004 letter from Sec'y of Education Paige to Sen. Kennedy). The U.S. Government Accountability Office (GAO) found in its September 2004 report that the method used by Nelnet and other lenders to qualify loans for the



September 7, 2006
U.S. Department of Education
Office of Inspector General
Page 7

9.5 percent floor was one of the ways to increase 9.5 percent loan volume, and acknowledged that legislation or regulatory change were the only avenues available to prospectively end the ability to use that method in the future. Floor debate on the 2004 legislation ending the ability to qualify new loans for the 9.5 percent floor demonstrates that members of Congress consistently found the practice to be perfectly valid and legitimate, and that legislation or rulemaking was required to change the rules and to end future activity.

Our actions and documentation are consistent with the laws, regulations and guidance governing the 9.5 percent special allowance rate on the loans at issue in the Draft Report, and the loans for which we have billed and received the 9.5 percent rate were fully eligible for that rate. For the reasons set forth above as well as in the enclosed Legal Memorandum, we do not concur with the finding in the Draft Report, nor with its recommendations. We thus propose that the Draft Report be withdrawn.

We appreciate your review of the response materials and look forward to working with you to complete the audit.

Sincerely,

Terry J. Heimes
Chief Financial Officer

# MEMORANDUM

TO:        Nelnet, Inc.; Jeffrey R. Noordhoek, President and Terry J. Heimes, Chief
           Financial Officer

FROM:      Daniel F. Kaplan

DATE:      September 6, 2006

SUBJECT:   **Legal Analysis of Draft Audit Report of Inspector General**

===============================================================

## 1.    INTRODUCTION

Nelnet qualified certain student loans for the 9.5% special allowance rate using a process permitted by the governing statute, implementing regulations, and authoritative departmental guidance. In this process, a trust that benefited an indirect Nelnet subsidiary used the proceeds of a tax-exempt obligation to purchase loans, which it subsequently sold to other trusts. In each sales transaction, legal title to the loans passed to the trustee of the purchasing trust and the selling trust received valuable consideration. The sales were irrevocable and without recourse. Because the loans were acquired with the proceeds of a tax-exempt bond issued before October 1, 1993 that had not been retired or defeased, they were eligible for billing at the 9.5% special allowance rate set forth in 34 C.F.R. § 682.302(c)(3)(i), and, pursuant to 34 C.F.R. § 682.302(e)(2), remained eligible for that rate even after they were subsequently sold.

On August 9, 2006, the Department's Office of Inspector General ("OIG") issued a Draft Audit Report (the "Draft Report") contending (at 5) that "[t]he increase in Nelnet's special allowance payments under the 9.5 percent floor was based on ineligible loans." Recognizing that "a lender may continue to receive special allowance payments under the 9.5 percent floor after the lender transfers an eligible loan to a taxable obligation," the OIG previously conceded in its Exception Report (at ¶1) that "[t]he basic premise" for Nelnet's process "is in compliance with Departmental Guidance." Yet the Draft Report claims (at 5) that the increased amount of loans billed under the 9.5% floor that resulted from Nelnet's process were not funded by any eligible source listed in 34 C.F.R. § 682.302(c)(3)(i). It therefore recommends (at 13) that Nelnet be required to calculate and return the special allowance overpayments it received for the allegedly ineligible loans.

The Draft Report's finding rests on two faulty premises. *First*, the Draft Report contends (at 8-9) that the transactions among the trusts do not qualify as "sale[s]" of loans, and that the trusts did not obtain "funds" from those transactions that could be used to purchase additional eligible loans under 34 C.F.R. § 682.302(c)(3)(i)(D). *Second*, the Draft Report contends (at 9) that even if the transactions qualified as sales, "[a]ny funds obtained from later generation sales

1

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

are not eligible sources under 34 C.F.R. § 682.302(c)(3)(i)(D)." As explained more fully below, however, the relevant transactions were sales: the loans were sold by one trust and bought by a legally distinct trust without any right of revocation or recourse and in return for funds representing reasonably equivalent value. *See* Part III, *infra*. Furthermore, both the plain text of the regulation and the Department's official pronouncements show that a loan funded by subsequent generation proceeds of a tax-exempt obligation issued prior to October 1, 1993 is eligible for the 9.5% floor. *See* Part IV.A., *infra*. Finally, the Draft Report is inconsistent with the Department's authoritative interpretation of the regulations as well as guidance and public statements by both the previous and current administrations. *See* Part IV.B., *infra*. Accordingly, the Draft Report's finding is incorrect and the recommendations based on it should be withdrawn.

2

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Confidential

N0017005

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   BACKGROUND ................................................................................. 5

      A.   Statutory And Regulatory Context......................................................... 5

      B.   The Relevant Entities.......................................................................... 6

      C.   Nelnet's Process................................................................................ 8

      D.   The OIG Exception Reports And Draft Audit Report ............................... 8

III.  THE LOANS AT ISSUE ARE ELIGIBLE FOR THE 9.5% SPECIAL
      ALLOWANCE RATE BECAUSE THEY WERE ACQUIRED WITH
      FUNDS OBTAINED FROM A QUALIFYING SOURCE. ............................... 9

      A.   A "Sale" Is A Transfer Of Property From One Entity To Another For A Price.......... 9

      B.   The Transfers From The 1985A Trust Constitute True Sales............................ 11

      C.   The 1985A Trust And The Purchasing Trusts Are Discrete Legal Entities,
           Distinct From Each Other And From Their Common Beneficiary. ..................... 13

           1.   The 1985A Trust and the Purchasing Trusts are duly established trusts. ........ 14

           2.   Trusts are, as a matter of law, distinct from their beneficiaries and each other........... 14

      D.   Consistent With Applicable Trust Law, The Transfers To The Purchasing
           Trusts Were Via Sales At A Reasonably Equivalent Price in Netted "Funds." ............ 15

      E.   The Accounting And Tax Definitions Of "Sale" Do Not Apply. ...................... 17

IV.   LOANS PURCHASED WITH THIRD GENERATION PROCEEDS OF
      A TAX-EXEMPT OBLIGATION QUALIFY FOR THE 9.5% SPECIAL
      ALLOWANCE RATE........................................................................... 18

      A.   Third Generation Proceeds Are A Qualifying Source Of Funds Under
           34 C.F.R. § 682.302(c)(3)(i). ............................................................... 18

           1.   Third generation proceeds constitute "proceeds" under 34 C.F.R.
                § 682.302(c)(3)(i)(A). .................................................................... 19

           2.   A loan acquired with third generation proceeds also qualifies for the 9.5%
                floor under 34 C.F.R. § 682.302(c)(3)(i)(D)........................................ 20

3
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

B.   The Department's Authoritative Interpretation And Public Guidance Confirm
     That Nelnet's Loans Were Entitled To The Special Allowance Rate. ........................... 21

  1.   The governing regulation and a Dear Colleague Letter established the rules
       on eligibility for the 9.5% floor. ........................................................................... 21

  2.   The Department is bound by these rules. ................................................................. 22

  3.   The Department's actions, guidance, and public statements confirm that
       these rules allowed Nelnet to qualify additional loans for the 9.5% floor. ................... 23

  4.   The Draft Report's suggestion that Nelnet did not adequately disclose its
       process is inaccurate. ............................................................................................ 27

  5.   The regulatory history further refutes the Draft Report. ........................................... 28

C.   Nelnet's Records Are Sufficient. ................................................................................ 30

CONCLUSION ..................................................................................................................... 32

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

N0017007

## II.   BACKGROUND

### A.   Statutory And Regulatory Context

The federal government pays a special allowance rate on many student loans to private student loan lenders. That special allowance rate is based on a formula. The rate rises as interest rates rise, and falls as interest rates fall. Prior to 1980, the special allowance rate paid on a student loan to a student loan lender did not depend on whether the loan had been financed with a taxable or tax-exempt obligation. Congress altered that state of affairs when, having concluded that lenders who financed loans through tax-exempt obligations were enjoying an undue competitive advantage, it enacted the Education Amendments of 1980. Section 420 of the Education Amendments reduced the special allowance rate paid on loans that had been financed by tax-exempt obligations to one-half the rate paid on loans financed by taxable obligations. At the same time, to protect lenders in the event interest rates fell, lenders were guaranteed at least a 9.5% return on loans that had been financed by tax-exempt obligations. *See* Pub. L. No. 96-374 § 420, 94 Stat 1367, *codified at* 20 U.S.C. § 1087-1(b).

By 1992, the Department had grown concerned that interest rates might again rise. The Department feared that if rates did rise, lenders who held loans that had been financed with tax-exempt obligations would transfer such loans to taxable obligations and then claim the full special allowance rate rather than the halved special allowance rate applicable to loans financed through tax-exempt obligations. To forestall that possibility, the Department promulgated regulations that define which loans are subject to the reduced special allowance rate (and corresponding 9.5% floor). Federal Family Education Loan Programs, 57 Fed. Reg. 60280 (Dec. 18, 1992). The regulations define the loans that are subject to the reduced special allowance rate in terms of the sources of funds used to make or purchase them. The enumerated sources include "funds obtained by the holder from":

> (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993 . . . ;
>
> . . .
>
> (D) The sale of a loan that was made or purchased with funds obtained by the holders from [tax-exempt obligations originally issued prior to October 1, 1993]; or
>
> (E) The investment of the proceeds of [tax-exempt obligations originally issued prior to October 1, 1993].

34 C.F.R. § 682.302(c)(3)(i)(A), (D), (E).

To prevent lenders from transferring loans to taxable obligations and subsequently claiming the full special allowance rate on such loans, the regulations provided that the reduced special allowance rate would continue to apply to a loan that had been funded with one of the enumerated sources "[a]fter the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in [34 C.F.R. § 682.302(c)(3)(i)]," so long as "the authority retains a legal or equitable interest in the loan" and the tax-exempt obligation has

5

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

not been "retired" or "defeased." 34 C.F.R. § 682.302(e)(2).   In 1996, the Department interpreted § 682.302(e) in a Dear Colleague letter, explaining that:

> Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

U.S. Dep't of Education, Dear Colleague Letter 96-L-186 (Q&A No. 30) (Ex. 1).

Rather than rising, interest rates ultimately fell following these regulatory actions. As a consequence, rather than having a regulatory incentive to transfer loans *from* tax-exempt obligations (and the corresponding one-half special allowance rate provisions), lenders had a regulatory incentive to transfer loans *to* tax-exempt obligations (thereby securing eligibility for the 9.5% floor on such loans).

**B.     The Relevant Entities**

Nelnet Education Loan Funding, Inc. ("NELF"), the successor entity to NEBHELP, INC., is a corporation located and organized in the State of Nebraska and is an indirect wholly-owned subsidiary of Nelnet, Inc.  NELF is a party to various trust agreements, each of which is associated with a particular indenture or credit facility.  Pursuant to the Higher Education Act of 1965, as amended, only an "eligible lender" (as defined therein) may own legal title to certain federally guaranteed student loans such as those at issue.  Wells Fargo Bank, N.A. ("Wells Fargo") is an "eligible lender" under the Higher Education Act.  In its capacity as trustee under various eligible lender trust agreements with NELF, Wells Fargo acquired legal title to the student loans with funds provided pursuant to an indenture or credit facility to which NELF is a party.

One of these trust arrangements—the 1985A Trust—issued tax-exempt obligations called the Series 1985A bonds prior to October 1, 1993.  NELF used proceeds of those bonds to purchase or originate student loans.  The Series 1985A bonds were issued under an indenture, in relation to which NELF entered into an eligible lender trust agreement.  Documentation relating to the 1985A trust was made available to the OIG during its audit.  The indenture and the eligible lender trust agreement are, by their terms, governed by Nebraska law.

NELF is also the beneficiary of several eligible lender trust agreements relating to financing programs that issue various taxable obligations.  Wells Fargo is the eligible lender trustee for each of these "Purchasing Trusts," which include: (i) a securitization program created by a Trust Indenture dated as of June 1, 1993, between NELF, as grantor and beneficiary, and Wells Fargo, as trustee that relates to a Student Loan Trust and Agency Agreement dated as of June 1, 1993 (the "1993A Trust"); (ii) an Eligible Lender Trust Agreement dated as of June 1, 2003, that relates to a securitization program trust created by an Indenture of Trust dated as of June 1, 2003, between NELF, as grantor and beneficiary, and Wells Fargo, as trustee (the "NELF

6

2003-1 Trust"); (iii) a Student Loan Trust and Agency Agreement dated as of May 1, 1997 that relates to a securitization program trust created by a Trust Indenture dated as of May 1, 1997, between NELF, as grantor and beneficiary, and Wells Fargo, as trustee (the "SLM CP Trust"); (iv) an Eligible Lender Trust Agreement dated as of May 1, 2003, that relates to a securitization program trust created by the Warehouse Note Purchase and Security Agreement dated as of May 1, 2003, among NELF as borrower, Wells Fargo, as trustee, and various other parties (the "BofA Trust"); and (v) an Eligible Lender Trust Agreement dated as of April 28, 2003, that relates to a securitization program trust created by the Amended and Restated Warehouse Loan and Security Agreement dated as of April 28, 2003 among NELF, as borrower, Zions First National Bank, as trustee, and various other parties (the "RBC Trust").  Most of these trust arrangements are, by their terms, governed by Nebraska law; the remainder are governed by Minnesota law.

Although NELF is the grantor and beneficiary of each eligible lender trust, each trust is a separate entity, distinct from both NELF and the other trusts.  The following attributes of the respective trusts are among the many indicia of their separate existence and independence from each other:

- Each trust is established pursuant to separate agreements which, in turn, set forth separate and distinct sets of obligations and rights.

- The loans held by each trust are assigned a designation which is distinct from all other assets in which NELF has an interest.

- The loans and other assets held in each trust are segregated and not commingled.

- The bank accounts of each trust are separate and segregated.

- Each trust holds itself out to the public and its creditors under its capacity as a separate and distinct trust.

- None of the trusts have guaranteed or pledged any assets to secure liabilities, obligations, or indebtedness of the other trusts.

- The loans relating to each respective trust consist of specific, identifiable and segregated assets.

- The loans relating to each trust are pledged under separate security arrangements with different creditors.

- The obligations owed to such different creditors are limited obligations payable solely from a discrete and specific pool of collateral, separate from each other trust.

- No trust will bear any losses or take on the ultimate risk of failure of payment on loans held in any of the other trusts.

7

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Final Audit Report
ED-OIG/A07F0017                                                              Page 41 of 66

- The loans relating to each trust are serviced under separate servicing agreements.

- The servicing agent under each such servicing agreement has been directed to transmit collections of borrower, guarantor and governmental payments separately to the trustee for deposit in segregated accounts.

- The loans relating to each trust are held under separate custodian agreements proving for the segregated possession of loans and funds.

- The loans relating to each trust are reported on separately to the creditors relating to such trust and the related trustee.

- No trust pays any of the other trusts' debts.

- The loans held by each trust are assigned a separate and distinct bond identification number and the eligible lender trustee for each such trust is able to readily distinguish which loans belong to which trust at any given time.

- Each trust retains separate books of account and records.

**C.     Nelnet's Process**

Nelnet adopted an asset/liability management strategy similar to strategies commonly used by many other student loan organizations, and such strategies included use of the 9.5% floor provisions. The process that Nelnet used to qualify loans for the 9.5% floor involved a series of sale and purchase transactions between the 1985A Trust and the Purchasing Trusts. The 1985A Trust sold loans, which had been acquired with funds obtained from the Series 1985A bonds, to the Purchasing Trusts at reasonably equivalent value. The proceeds of those sales were then used to acquire, also at reasonably equivalent value, other loans from the Purchasing Trusts. The process of selling loans and buying other loans with the proceeds of those sales is a common industry practice called "netting." When a given loan was sold, legal title passed from the trustee of the selling trust to the trustee of the purchasing trust. In each instance, the sales were irrevocable and without recourse: the seller could not unilaterally reverse the sale, and the buyer had no recourse against the seller, even if the borrowers defaulted on the loans.

Recognizing that the loans sold by the 1985A Trust had been acquired with "[t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993," 34 C.F.R. § 682.302(c)(3)(i)(A), Nelnet billed the Department on loans sold by the 1985A Trust at the 9.5% special allowance rate, including after their sale to the Purchasing Trusts.

**D.     The OIG Exception Reports and Draft Audit Report**

The OIG issued two Exception Reports against Nelnet relating to its audit of Nelnet's 9.5% loans on April 17, 2006. In its Exception Report relating to the method Nelnet used to

8
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017011

qualify loans for the 9.5% rate, the OIG asserted that loans acquired by the 1985A Trust "did not qualify for the 9.5 percent floor" because the funds with which the loans were acquired purportedly fell outside the categories of qualifying funds enumerated in 34 C.F.R. § 682.302(c)(3)(i). In particular, the OIG claimed that the funds used to acquire the loans did not constitute funds obtained from the "sale" of loans as provided in § 682.302(c)(3)(i)(D).

In the Nelnet Loan Records Exception Report, the OIG claimed, as an initial matter, that "Nelnet's loan records might not be adequate to determine a loan's eligibility for the 9.5 percent floor." The OIG's principal contention in this exception report, however, was that funds derived from the sale of loans that were themselves acquired with funds derived from the sale of loans (later generation sale proceeds) did not constitute qualifying funds under § 682.302(c)(3)(i).

Nelnet expressed its disagreement with the Exception Reports in a letter, attaching a lengthy memorandum from outside counsel discussing the legal issues, a legal opinion from independent counsel that the trust transactions were true sales for commercial and property law purposes, and numerous exhibits.

On August 9, 2006, the OIG issued its Draft Audit Report. The core positions set forth in the Draft Report are the same as those set forth in the OIG's Exception Reports.

### III.     THE LOANS AT ISSUE ARE ELIGIBLE FOR THE 9.5% SPECIAL ALLOWANCE RATE BECAUSE THEY WERE ACQUIRED WITH FUNDS OBTAINED FROM A QUALIFYING SOURCE.

There is no dispute that a loan is eligible for the 9.5% special allowance rate if it is purchased with funds from one (or more) of the five qualifying sources enumerated in 34 C.F.R. § 682.302(c)(3)(i). As noted above, the qualifying sources include "funds obtained by the holder from" any one or more of the following: "[t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993"; "[t]he sale of a loan that was made or purchased with funds obtained ... from [such] obligations"; or "[t]he investment of the proceeds of [such] obligations." *Id.* § 682.302(c)(3)(i)(A), (D), (E).

The OIG also appears to agree that the loans initially acquired by the 1985A Trust with funds obtained from pre-October 1, 1993 tax-exempt obligations qualified for the 9.5% special allowance rate under § 682.302(c)(3)(i)(A). Thus, the only question presented by the Draft Report is whether loans acquired by the 1985A Trust with funds obtained—either directly or indirectly—from the disposition of such initially acquired loans also qualified for the 9.5% floor.

As framed by the Draft Report, resolution of this question turns on the definition of "sale." The Draft Report focuses on 34 C.F.R. § 682.302(c)(3)(i)(D), contending that loans acquired by the 1985A Trust with the consideration obtained from the disposition of previously held loans do not qualify for the 9.5% special allowance rate because, according to the Draft Report, the antecedent transactions did not constitute "sales" from which "funds" were obtained for purposes of § 682.302(c)(3)(i)(D). In those transactions, which were between the 1985A Trust and the Purchasing Trusts, the 1985A Trust relinquished legal title to certain loans and, in exchange, received consideration of reasonably equivalent value. According to the Draft Report (at 8-9), those transactions constituted "internal transfer[s] or barter[s]" rather than "sales"

9

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Confidential

because: (1) the 1985A Trust received "only limited amounts" of cash "funds" in exchange for the loans to which it relinquished title; (2) the trustee made no attempt to obtain a price for the loans that reflected their actual market value; (3) Nelnet "retained the authority" to revoke the transactions by directing the trustee to transfer the loans back to the 1985A Trust; (4) the transactions "did not cause a change in the beneficial ownership of the loans", and (5) the transactions did not count as sales for accounting or tax purposes. Consequently, the Draft Report concludes, the loans received by the 1985A Trust in these transactions were not funded by an eligible source and thus do not qualify for the 9.5% special allowance rate.

The Draft Report is mistaken in both its premises and its conclusion. First, by focusing exclusively on § 682.302(c)(3)(i)(D), which extends the 9.5% special allowance rate to loans purchased with funds obtained from "[t]he sale of a loan that was made or purchased with funds obtained" from a tax-exempt obligation originally issued prior to October 1, 1993, the Draft Report disregards the fact that the loans at issue also qualify for the 9.5% rate under § 682.302(c)(3)(i)(A) and (E)—which do not require a "sale." *See* Part IV, *infra*. Second, and perhaps more importantly for present purposes, the relevant transactions were indeed "sales" and therefore the loans also qualify for the 9.5% floor under § 682.302(c)(3)(i)(D).

    **A.**    **A "Sale" Is A Transfer Of Property From One Entity To Another For A Price.**

Neither the Higher Education Act nor its implementing regulations define the term "sale." It is a well-established rule of statutory construction that "absent contrary indications, Congress intends to adopt the common law definition of statutory terms." *United States v. Shabani*, 513 U.S. 10, 13 (1994). *See also NLRB v. Amax Coal Co.*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."). It is also well established that courts "construe a regulation in the same manner as . . . a statute," *Tesoro Hawaii Corp. v. United States*, 405 F.3d 1339, 1346 (Fed. Cir. 2005), and will thus "accord[] words used in the regulations their 'ordinary and common meaning' unless a definition is provided." *Adair v. United States*, 70 Fed. Cl. 65, 70 (Fed. Cl. 2006).

The 1985A Trust, which is governed by Nebraska law, transferred legal title in the loans to the Purchasing Trusts. The majority of the Purchasing Trusts are also governed by Nebraska law; those that are not are governed by Minnesota law. Not surprisingly, each of the relevant states defines the term "sale" similarly. According to the Nebraska Supreme Court, "[t]he term 'sale' ordinarily means a transmutation of property from one man to another in consideration of some price or recompense of value." *Dial Realty, Inc. v. Cudahy Co.*, 254 N.W.2d 421, 423 (Neb. 1977); *see also Lucas v. County Recorder*, 106 N.W. 217, 220 (Neb. 1905). The Minnesota courts have looked to standard dictionaries to define the term as "the 'exchange of

N0017013

goods or services for an amount of money or its equivalent'" or "an 'exchange of property of any kind, or of services, for an agreed sum of money or other valuable consideration.'" *Husbands v. City of Baudette*, 2003 WL 22952754, at *4 (Minn. App. Ct. Dec. 16, 2003) (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1591 (3d ed. 1992) and WEBSTER'S NEW WORLD DICTIONARY 1255-56 (2d College ed. 1980)); *Knese v. Heidgerken*, 358 N.W.2d 177, 179 (Minn. Ct. App. 1984) (defining "sale" as "a bargained-for exchange"). *See also* BLACK'S LAW DICTIONARY (8th ed. 2004) (defining sale as "[t]he transfer of property or title for a price"). Under each of these definitions, the transfer of a loan's legal title by the 1985A Trust to another trust in exchange for value constitutes a "sale."

The conclusion that these transfers were sales is confirmed by the Department's recently proposed regulations, which were promulgated to implement the reauthorization of the Higher Education Act in 2006. Those regulations clarify that "a loan is purchased" with funds obtained from tax-exempt obligations "when it is refinanced in consideration of those funds," and explain that a loan is "refinanced" when it is released as collateral for one obligation and pledged as collateral for another. 34 C.F.R. § 682.302(c)(5), (f)(3), 71 Fed. Reg. 45666, 45704-05 (Aug. 9, 2006). The Department explained that the reason for this clarification was that "[c]urrent regulations do not incorporate . . . the Department's longstanding interpretation of the statute and regulations as applicable to the treatment of loans acquired from tax-exempt funding sources listed in the statute and in Sec. 682.302(c)(3)(i)." 71 Fed.Reg. 45680. Under this longstanding interpretation and the new regulations, a refinancing is treated as a sale that generates qualifying funds for purposes of § 682.302(c)(3)(i)(D). Because the loans at issue here were refinanced when they were released to the Purchasing Trusts, which then pledged them as collateral for taxable obligations, those transactions constitute sales.

**B.     The Transfers From The 1985A Trust Constitute True Sales.**

None of the five arguments contained in the Draft Report prevents the sales of loans by the 1985A Trust to the Purchasing Trusts from meeting the general requirements of "true sales" under ordinary commercial and property law principles. The transfers of loans by the 1985A Trust to the Purchasing Trusts were part of "securitization" transactions involving the Purchasing Trusts. In a securitization, assets (in this case loans) are pooled and used as collateral for debt or other securities issued to third parties. It is critical for purposes of a securitization that the loans be transferred in a sale because the transfers are designed to remove the assets from the potential bankruptcy estate of the transferor of the loans.

For this reason, the question of what constitutes a sale has been addressed with particular rigor in the context of securitizations. Law firms regularly provide legal opinions to the effect that a particular transfer of loans is a sale, and bankruptcy court decisions have affirmed sales made in securitization transactions. Courts addressing the "true sale" issue in the securitization context typically employ a multi-factor test. The factors they consider include the sufficiency of the consideration paid in exchange for the assets; the intent of the parties to the transaction; how the parties described the transaction between themselves and to third parties; whether the consideration paid changed after the transfer; whether the transferor bore the risk of loss or default by the underlying borrower; whether the transferor had the right to reacquire the property transferred; and whether the transferor retained the burden of servicing the loans. *See generally* 1 Jason H.P. Kravitt, SECURITIZATION OF FINANCIAL ASSETS § 5.03 (2d ed. 2005 Supp.); Thomas

11

Confidential

N0017014

E. Plank, *The True Sale of Loans and the Role of Recourse*, 14 GEO. MASON U. L. REV. 287 (1992); *see also In re Kassuba*, 562 F.2d 511 (7th Cir. 1977); *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538 (3d Cir. 1979).

Applying these well-established standards under existing law, the sales of loans by the 1985A Trust to the various Purchasing Trusts were true sales for commercial and property law purposes. The Purchasing Trusts gave reasonably equivalent consideration for the loans, paying a purchase price equal to the loans' outstanding principal and accrued interest as of the sale date. The sales were recorded as sales at the trust level and documented accordingly in, for example, releases from the trustee, funds transfer records, and loan transfer records. *See* Ex. 2. Furthermore, no agreement exists whereby the purchase price may be adjusted if collections on the loans exceed or fall below expectations. Thus, neither the form nor the amount of consideration paid ever changed after any of these loans was transferred.

The Draft Report confuses the sale issue by focusing (at 9) on whether Nelnet had control over trust transactions and authority to direct the trustees because its indirect subsidiary NELF is the beneficiary of the 1985A Trust and the Purchaser Trusts. The pertinent question for determining whether these loan transfers were sales is not whether Nelnet as *parent* controlled the common beneficiary and thus the trusts, but instead whether the 1985A Trust *as seller* controlled the Purchasing Trusts with respect to the transferred loans. Indeed, the Draft Report's focus on common parentage cannot be correct because it is well established that common ownership or control does not deprive sales between related entities of commercial effect.

Here, the 1985A Trust had no control over the Purchasing Trusts with respect to the transferred loans. Contrary to the Draft Report's position (at 9), the 1985A Trust retained no right to revoke the transfers after sale of the loans and in fact no rights of any kind in the loans. Instead, the Purchasing Trusts gained the rights to all benefits of ownership of the transferred loans upon consummation of the transfers, and they then pledged those loans as collateral subject to no other liens or security interests. The 1985A Trust was entitled to none of the interest or principal payments, special allowance payments, guarantor payments, or any other form of income from the transferred loans upon their sale. Following transfer, all future activities with respect to a transferred loan were reflected on the books and records of the Purchasing Trust effective as of the date of transfer. Nor was there any agreement between the 1985A Trust and any of the Purchasing Trusts whereby, in the event of insolvency of the 1985A Trust, the relationship between it and any of the Purchasing Trusts would change with respect to any of the student loans.

Similarly, the 1985A Trust did not retain any liabilities with respect to the transferred loans. No recourse rights were granted by the 1985A Trust to the purchasing trusts, and the purchasing trusts assumed all risks associated with a borrower's default on the underlying transferred loans. No loss arising from default of a borrower on any of the transferred loans was ever recognized by the 1985A Trust after transfer.

Servicing of the loans purchased from the 1985A Trust was conducted by a servicer pursuant to a separate servicing agreement relating to the indenture or credit facility for the applicable Purchasing Trusts. Servicing fees for the servicing of such transferred loans were no longer paid by the 1985A Trust following transfer, and all such servicing fees from the date of

Confidential

N0017015

transfer forward were paid pursuant to the indenture or credit facility relating to the applicable Purchasing Trust.

Finally, in keeping with the other "true sale" indicia, Nelnet, in its internal description of the loan transactions, consistently referred to them as sales and treated those transactions as sales. *See, e.g.*, Ex. 3, at 1 (internal Nelnet memorandum expressly stating intention that the loans "sold" into the 1985A Trust thereafter be "sold" to the taxable bond transaction). Moreover, prior to each sale, a "loan list" was prepared that identified the specific loans that were to be sold, the "Selling Lender" trust, the "Buying Lender" trust, and the "sale date." *See, e.g.*, Ex. 4.

The internationally recognized law firm of Mayer, Brown, Rowe & Maw LLP, through its senior partner Jason H.P. Kravitt, who is widely recognized as the pre-eminent national expert on true sales and is editor of SECURITIZATION OF FINANCIAL ASSETS (2d ed.), has undertaken an independent examination of the facts and law in this situation. Its opinion, issued as independent counsel and attached as Ex. 5, concludes that the transfers in question from the 1985A Trust to the five Purchasing Trusts constituted true sales. In reaching that conclusion, the Mayer Brown opinion applies a detailed analysis of the law on true sales to the process Nelnet used to qualify loans for the 9.5% floor. A Mayer Brown opinion concluding that such transfers constituted true sales was also submitted previously in response to the OIG Exception Reports.

**C.    The 1985A Trust And The Purchasing Trusts Are Discrete Legal Entities, Distinct From Each Other And From Their Common Beneficiary.**

The Draft Report does not dispute that legal title in the loans was transferred by one *bona fide* trust to another in exchange for value. Rather, it maintains (at 9) that a "sale" did not occur because the transfers "did not cause a change in the beneficial ownership of the loans." That argument appears to be based on a fundamental misunderstanding of trust law.

Duly established trusts, such as those involved in the transactions at issue here, are distinct legal entities. Accordingly, sales between separate trusts are precisely that, sales between separate trusts, regardless of the beneficiaries involved. In Nelnet's process, one trust gave another trust legal title to certain loans in exchange for reasonably equivalent value. The mere fact that the beneficiary of the 1985A Trust, NELF, was also the beneficiary of the trusts to which the loans were sold does not render those sales anything other than sales. The trust that relinquished legal title, the 1985A Trust, did so irrevocably; the trusts that acquired legal title did so without recourse to the 1985A Trust, even if the borrowers defaulted on those loans. Under these circumstances, the subject transactions were indeed "sales" within the meaning of § 682.302(c)(3)(i)(D). Again, the Draft Report confuses the sale issue by misdirecting its "control" analysis to the relationship between Nelnet and NELF rather than to the relationship between the transferor and transferee trusts.

13

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017016

1.   **The 1985A Trust and the Purchasing Trusts are duly established trusts.**

Although the Draft Report does not suggest otherwise, it is worth noting that the 1985A Trust and the Purchasing Trusts are *bona fide* trusts duly established under the laws of their respective states.

The 1985A Trust is expressly governed by Nebraska law, which generally defines a trust as "a fiduciary relationship with respect to property, subjecting the person by whom the property is held to equitable duties to deal with the property for the benefit of another person" *O'Connor v. Burns, Potter & Co.*, 36 N.W.2d 507, 517 (Neb. 1949); *Parker v. Bourke*, 269 N.W. 102, 104 (Neb. 1936). *See also* NEB. REV. STAT. § 30-3828 (listing requirements for creation of a trust); RESTATEMENT (THIRD) OF TRUSTS § 2 (2003) (defining trust); 1 SCOTT ON TRUSTS § 2.3, at 41 (4th ed. 1987). In the 1985A Trust, NELF granted property to the named trustee, and set forth equitable and fiduciary duties of that trustee in dealing with such property for the benefit of NELF. Thus, the 1985A Trust is clearly a trust under Nebraska law.

The Purchasing Trusts are likewise duly established Trusts under the relevant state's laws. Two of the Purchasing Trusts are governed by Minnesota law; the other Purchasing Trusts are governed by Nebraska law. Minnesota defines a trust the same as Nebraska—as the grant of legal title in property to a fiduciary for benefit of another. *See, e.g., Schlug v. Michael*, 245 N.W.2d 587, 590 (Minn. 1976) (defining trust as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it") (citing RESTATEMENT (SECOND) OF TRUSTS § 2). When the Purchasing Trusts were created, NELF granted the trustee of each trust legal title to specified loans to hold as trustee and fiduciary. Thus, the Purchasing Trusts, like the 1985A Trust, are properly established and fully cognizable trusts.

2.   **Trusts are, as a matter of law, distinct from their beneficiaries and each other.**

As noted above, the 1985A Trust was created under Nebraska law, as were a majority of the Purchasing Trusts, while the Purchasing Trusts not formed under Nebraska law were established under Minnesota law. It is well settled, in each of these jurisdictions, that a trust creates a separate legal entity distinct from its creator, its beneficiary, and all other entities. For example, according to the Nebraska Supreme Court:

> Grantors of trusts create a legal entity separate and apart from themselves. Except as the law may otherwise provide, such grantors are not free to alternately embrace or disown their creation as their individual interests may dictate at a particular moment. As long as the trust exists, its separate nature must be respected.

*Payless Building Center, Inc. v. Wilmoth*, 581 N.W.2d 420, 423 (Neb. 1998). *See also* Nebraska Attorney General Opinion No. 96087 (December 20, 1996) ("trusts are recognized as separate

14

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Confidential

legal and administrative entities under the law").[1]  Similarly, under Minnesota law, "once a trust has been created, it becomes a legal entity unto itself and is subject to judicial supervision and scrutiny under established doctrines of trust administration."  *Edmondson v. Edmondson*, 226 N.W.2d 615, 617 (Minn. 1975).

The 1985A Trust, the Purchasing Trusts, and their beneficiary, NELF, are not only distinct as a matter of law, but also distinct as a matter of fact.  As cataloged above, *see* pages 7-8, *supra,* the trusts feature numerous indicia of independence, including creation by different instruments, maintenance of separate assets that are not commingled, and loans pledged under separate security arrangements with different creditors.

The fact that the same entity, Wells Fargo, serves as trustee for the transferring and purchasing trusts is immaterial.  The trustee's powers and duties are defined in the respective trust agreements, and the trustee has a separate duty of loyalty and fairness to each trust that it serves.  The mere fact that the same entity, NELF, is the beneficiary of the transferring and purchasing trusts is likewise immaterial.  NELF has separate and distinct rights and duties in each of the trusts of which it is a beneficiary.  Applicable law provides that two trusts may engage in a transaction even where the trustee and the beneficiary of the first trust are, respectively, identical to the trustee and the beneficiary of the second trust.  *See, e.g.,* Neb. Rev. Stat. § 30-3867(g)(3) (expressly authorizing "a transaction between a trust and another trust . . . of which the trustee is a fiduciary or in which a beneficiary has an interest"); Uniform Trust Code § 802(h).

Furthermore, the documents creating the respective trusts provide that the assets of each are to be kept separate and apart pursuant to custodian agreements.  Independent of the particular trust agreements, the law itself imposes upon the trustee the duty "not to mingle property held upon one trust with property held upon another trust, *whether the two trusts are created by separate settlers or by the same settler.*"  RESTATEMENT (SECOND) OF TRUSTS § 179 cmt. (c) (emphasis added); *see also* SCOTT ON TRUSTS § 1179.2, at 502 (4th ed. 1987).  Hence, notwithstanding the fact that NELF was the beneficiary of each trust, the trustee would have violated both the respective trust agreements and its fiduciary duties had it commingled loans from the various trusts.  Consequently, the only way in which loans could properly be transferred from one trust to another was through a sale.

**D.      Consistent With Applicable Trust Law, The Transfers To The Purchasing Trusts Were Via Sales At A Reasonably Equivalent Price in Netted "Funds."**

The law has long recognized the authority of a trustee for two trusts to sell property from one trust to the other at a fair or reasonably equivalent price.  As noted by a leading treatise: "Where the same person is trustee under two separate trusts, a sale of property by himself as trustee to himself as trustee under the other trust cannot be set aside if the transaction was fair to both trusts."  SCOTT ON TRUSTS § 170.16, at 381 (4th ed. 1987).  Here, the trustee who engaged in the sales was Wells Fargo, a national bank subject to regulation by the Comptroller of the Currency.  Under regulations promulgated by the Comptroller, "[a] national bank may sell assets held by it as fiduciary in one account to itself as fiduciary in another account if the transaction is

---

[1]      *Available at* http://ago.nol.org/local/opinion/index.html?topic=details&id=1929.

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

fair to both accounts and if such transaction is not prohibited by the terms of any governing instrument or by local law." 12 C.F.R. § 9.12(d). *See also* Neb. Rev. Stat. § 30-3867(g)(3) (noting that a transaction between trusts with common trustees is permissible if it is "fair to the beneficiaries").

In Nelnet's process, the Purchasing Trusts bought loans from the 1985A Trust for a purchase price consisting of consideration of reasonably equivalent value. The loans were priced at their outstanding principal plus accrued interest. Because the transactions at issue were sales in exchange for a reasonably equivalent (and therefore fair) value, they comported with the applicable trust agreements and governing law discussed above. Nothing in the governing law described in Part III.A. above required the loans to be priced at their precise market value, or indeed at any particular value, for the transaction to constitute a sale. The Draft Report fails to acknowledge it is standard in the context of true sales in asset-backed securitization for loans to be sold at a purchase price equal to the outstanding principal and accrued interest.

Moreover, the purchase price that the 1985A Trust obtained from the sale of its loans was paid in "funds" within the meaning of 34 C.F.R. § 682.302(c)(3)(i). Funds to be paid by the Purchasing Trusts to (and to be received by) the 1985A Trust in payment of the purchase price were simply applied to (and netted against) funds to be paid by the 1985A Trust in its contemporaneous purchase of loans. Thus, although the Purchasing Trusts did not physically deliver cash to the 1985A Trust, the Purchasing Trusts did pay funds over to the 1985A Trust by applying such funds to reduce amounts that were to be paid simultaneously by the 1985A Trust to the Purchasing Trusts. The fact that the dollar amounts of these purchases and sales were netted does not mean that "funds" were not paid by the Purchasing Trusts. As the attached Mayer Brown opinion explains, such netting is a common and acceptable means of funding purchase and sale transactions. It would be completely unreasonable to insist that offsetting funds be physically "moved from one trust estate to the other," as the Draft Report suggests (at 8), in order to be deemed funds.

Even if it were construed that the 1985A Trust received some of the purchase price in the form of other loans rather than cash, the common-law meaning of the term "funds" includes securities and other evidences of debt. *E.g., Salter v. Salter*, 155 N.E.2d 430, 432 (Mass. 1959) (funds ordinarily is "used to describe an accumulation of money or collection of securities set apart and held for a definite purpose"); *Williams v. Best*, 142 S.E. 2, 4 (N.C. 1928) ("money, securities, and other evidences of debt … fall[] within the accepted definition of the word 'funds'"); see also BLACK'S LAW DICTIONARY 697 (8th ed. 2004) (plural term funds includes not only "money" but "other assets, such as stocks, bonds, or working capital, available to pay debts, expenses, and the like"). The Department's new interim final regulations confirm that the physical movement of cash is not required in order to purchase a loan with "funds." 34 C.F.R. § 682.302(c)(5) (2006) ("a loan is purchased with funds described in [paragraph (c)(3)] when the loan is refinanced in consideration of those funds.").

Finally, the Department engages in netting every quarter with holders of loans, as the Department nets special allowance payments it owes lenders against amounts that the lenders are required to pay the Department. If the Draft Report's novel interpretation were adopted now, it would result in lenders being deemed not to have received funds from such netting, and the netting payments could not be utilized to purchase or make new loans that would be eligible for

16
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

the 9.5% floor. Yet netting is a well-established, common student loan industry and finance industry practice, recognized as appropriate – and utilized – by the Department.

### E.    The Accounting And Tax Definitions Of "Sale" Do Not Apply.

The Draft Report also asserts (at 9) that the transfers of loans by the 1985A Trust to the Purchasing Trusts "do not meet the criteria to be accounted for as sales" under FAS 140 or federal income tax law. Yet it offers no explanation as to why accounting or income tax standards are relevant in the very different property and commercial law context. Nothing in the Higher Education Act or its implementing regulations warrants their application to this case. The definition of "sale" for purposes of § 682.302(c)(3)(i)(D) is properly determined by reference to its plain commercial and property law meaning, not by reference to the specialized and complex rules relating to accounting and tax sales. *See Shabani*, 513 U.S. at 13; *Tesoro*, 405 F.3d at 1346; *Adair*, 70 Fed. Cl. at 70. Such accounting and tax rules often relate to balance sheet performance and income recognition to gauge the financial health of a company, not to whether title to an item has passed from a seller to a buyer under commercial and property law principles. In particular, FAS 140 contains provisions unique to accounting standards that are skewed toward avoiding the removal of assets from the balance sheet for accounting purposes in instances where affiliates transfer assets to each other. In addition, with respect to tax rules, it is common in consolidated group tax returns for transfers that otherwise constitute "true sales" for legal purposes to be treated as other than sales for tax purposes.

Nevertheless, if Nelnet were to assume that FAS 140 applies in this situation, it would consider its application at the trust level. Based on a review of the provisions of FAS 140 and preliminary discussions with Nelnet's independent auditors, Nelnet is confident that the loan sales would be treated as sales when accounting for and reporting those transactions at the individual trust level.

The specific issue with respect to FAS 140 raised in the Draft Report concerns whether there was a surrender of control, which is governed by paragraph 9(c) of FAS 140:

> The transferor has surrendered control over transferred assets if . . . the transferor does not maintain effective control over the transferred assets through either (1) an agreement that both entitles and obligates the transferor to repurchase or redeem them before their maturity . . . or (2) the ability to unilaterally cause the holder to return specific assets, other than through a cleanup call . . . .

Here, the 1985A Trust (as transferor) did not maintain any control over the loans after they were sold from the trust and no longer pledged as collateral for the bonds. Upon sale, the loans transferred from the 1985A Trust were all released from the indenture and related security interest created under that selling trust, thus placing those loans beyond the reach of the 1985A Trust and its creditors. Nothing in any agreement between the 1985A Trust and the Purchasing Trusts permits revocation of the sale of any of the loans. There is no contractual restraint on the Purchasing Trusts' right to pledge the loans purchased by them; indeed, in each of the documents creating the Purchasing Trusts, the purchased loans are pledged as collateral and first security interests are granted, subject to no other liens or security interests. There are no provisions

17
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

whereby the 1985A Trust as transferor can require the repurchase of any of the loans sold under any terms. Thus, although the standard set forth in FAS 140 is irrelevant to the eligibility of Nelnet's portfolio for the 9.5% floor, that standard is nevertheless met at the trust level.

\* \* \* \* \*

In sum, the transactions characterized by the OIG as mere "internal transfers"—*i.e.*, the transfer of loans from the 1985A Trust to the Purchasing Trusts in exchange for the loans' reasonably equivalent market value—were in fact "sales" within the meaning of § 682.302(c)(3)(i)(D). Thus, even if subsection (D) were the only regulatory provision on which Nelnet relies, it would be sufficient to make the loans at issue eligible for the 9.5% floor.

### IV.   LOANS PURCHASED WITH THIRD GENERATION PROCEEDS OF A TAX-EXEMPT OBLIGATION QUALIFY FOR THE 9.5% SPECIAL ALLOWANCE RATE.

The Draft Report asserts that even if the loan transfers in question were sales, loans that the 1985A Trust purchased with third generation proceeds of a tax-exempt obligation—*i.e.*, funds obtained from the sale of a loan that was itself purchased with funds obtained from the sale of a loan that had been made or purchased with the proceeds of a tax-exempt obligation originally issued before October 1, 1993—are ineligible for the 9.5% floor. According to the Draft Report (at 9), funds obtained from later generation sales are not eligible sources under 34 C.F.R. § 682.302(c)(3)(i)(D) because "eligible funds only result from the sale of a loan that is made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations." As explained below, the Draft Report's view that third generation proceeds are ineligible for the 9.5% floor is incorrect in light of well-established law, departmental pronouncements, and the relevant regulatory history.

The Draft Report also contends (at 8) that the loan records reviewed by the OIG during its audit "did not readily identify the loans' funding sources as described in 34 C.F.R. § 682.302(c)(3)(i)." In fact, as further explained below, Nelnet's records comply with all applicable regulations and allow an auditor to determine whether a particular loan is eligible for the 9.5% floor.

#### A.   Third Generation Proceeds Are A Qualifying Source Of Funds Under 34 C.F.R. § 682.302(c)(3)(i).

A loan qualifies for the 9.5% floor under § 682.302(c)(3)(i)(A) if it was purchased with funds obtained from "[t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993." Similarly, a loan qualifies for the 9.5% floor under 34 C.F.R. § 682.302(c)(3)(i)(D) if it was purchased with funds obtained from "[t]he sale of a loan that was made or purchased with funds obtained . . . from" a tax-exempt obligation issued prior to October 1, 1993. In concluding that loans purchased with third generation proceeds (or later) do not qualify for the 9.5% floor under subsections (A) or (D), the Draft Report makes two errors. First, it misconstrues the term "proceeds" of an obligation to exclude proceeds derived from proceeds. Second, it implicitly and impermissibly amends subsection (D) to insert the word "originally" so that only loans acquired with funds from the sale of a loan "made or purchased with funds *originally* obtained"

18

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

Final Audit Report
ED-OIG/A07F0017                                                              Page 52 of 66

from a pre-October 1, 1993, tax-exempt obligation qualify for the 9.5% special allowance rate. These two errors must be corrected, and with such corrections the Draft Report's conclusions cannot stand.

        1.    **Third generation proceeds constitute "proceeds" under 34 C.F.R. § 682.302(c)(3)(i)(A).**

      The Draft Report focused exclusively on whether the funds used to purchase loans billed under the 9.5% floor qualified as funds obtained from the sale of loans under 34 C.F.R. § 682.302(c)(3)(i)(D). Yet § 682.302(c)(3)(i)(A) provides that eligible loans also may be acquired with funds obtained from "[t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993." Neither the Higher Education Act nor its implementing regulations define the term "proceeds." Therefore, the term must be given its ordinary meaning. *See, e.g., Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) ("[w]hen the applicable statute or regulation has left a word undefined, 'the most basic principle of statutory construction requires us to give that word its ordinary meaning"); *Adair*, 70 Fed. Cl. at 70 ("the court 'ascertain[s] the plain meaning' of the regulations by according words used in the regulations their 'ordinary and common meaning' unless a definition is provided").

      In ordinary legal usage, the term "proceeds" encompasses proceeds of proceeds. The UCC as adopted in Nebraska makes clear that "proceeds" include "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." Neb. Rev. Stat. U.C.C. § 9-102(a)(64)(A). The accompanying commentary makes clear that the idea "that proceeds of proceeds are themselves proceeds" is "expressed in the revised definition of 'collateral' in section 9-102." *Id.* cmt. c.[2] Indeed, numerous courts have expressly recognized that "[t]he term 'proceeds' includes proceeds of proceeds." *Bank of California v. Thornton-Blue Pacific, Inc.*, 62 Cal. Rptr. 2d 90, 94 n.4 (Cal. Ct. App. 1997); *see, e.g., In re Tri-State Equipment, Inc.*, 792 F.2d 967, 969 (10th Cir. 1986) (applying identical UCC provision as that enacted in Nebraska and concluding that "[p]roceeds will include proceeds of proceeds.").

      Because proceeds of proceeds (*i.e.*, second generation proceeds) are "proceeds," proceeds of proceeds of proceeds (*i.e.*, third generation proceeds) are also "proceeds." *See, e.g., In re Placid Oil*, 102 B.R. 538, 541-42 (Bankr. N.D. Tex. 1988) (granting lien where creditor claimed security interest in "proceeds of proceeds of proceeds"). Indeed, given the "undeniable fact that under the Uniform Commercial Code . . . second generation proceeds of liened proceeds are merely 'proceeds of proceeds,'" "'[t]here is no limit on the number of steps through which the creditor can follow the collateral as long as it is possible to trace from one step to another.'" *In re Package Design & Supply Co.*, 217 B.R. 422, 423 & n.3 (W.D.N.Y. 1998) (quoting 9 ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9-306:63, at 275 & n.253 (3d ed. 1994)). In other words, proceeds of proceeds remain proceeds, no matter how many intervening transactions have occurred.

      Thus, the proceeds that the 1985A Trust received when it sold loans that had been purchased with the proceeds of earlier loan sales were just as much proceeds of the trust's tax-

---

[2]    As defined in the Nebraska UCC, collateral "means the property subject to a security interest" and expressly includes "proceeds to which a security interest attaches." Neb. Rev. Stat. § 9-102(a)(12).

19

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017022

exempt bonds as were the proceeds of the initial loan sale. Because they were acquired with funds from "the proceeds of tax-exempt obligations originally issued prior to October 1, 1993," loans that were acquired by the 1985A Trust with third and subsequent generation proceeds are loans acquired with qualifying funds under 34 C.F.R. § 682.302(c)(3)(i)(A). As such, they are entitled to the 9.5% special allowance rate irrespective of whether a sale occurred under subsection (D).

In summary, the plain and ordinary meaning of proceeds should be adopted. Indeed, prior to the Draft Report, no person in the Department, the student loan industry, or the tax-exempt bond markets has ever contemplated that loans financed by a pre-1993 tax-exempt obligation would somehow fail to qualify for the 9.5% rate due to some earlier loan sale. It is commonly understood that the underlying loan portfolios in a 30-year bond estate may turn over several times. If the Draft Report's interpretation were to be adopted, unintended results impacting tax-exempt financings all the way back to the 1980s would follow. All the holders and lenders that purchased loans with special allowance payments, payoffs, interest payments, guarantee payments, recycled funds, and sale proceeds of later generation loans that had been placed into their tax-exempt financings would now be told that their billings for special allowance at the 9.5% minimum rate were incorrect over the prior decades. This unprecedented interpretation would impermissibly apply on a retroactive basis, notwithstanding the fact that the student loan industry had relied upon existing authoritative interpretations which are directly in conflict with the Draft Report's new position. The Draft Report's interpretation fails to acknowledge the fact that Congress has already addressed the issue via legislation in the Taxpayer-Teacher Protection Act and the Higher Education Reauthorization Act. Adopting the Draft Report's unprecedented and unduly restrictive interpretation of qualifying proceeds would have significant and far-reaching and industry-wide impact upon student loan providers using tax-exempt financing.

The Department has already furnished guidance on a similar issue raised in the New Mexico Educational Assistance Foundation audit, where the OIG found that refundings of pre-October 1, 1993 tax-exempt obligations did not qualify as proceeds of those obligations. The Department correctly rejected this finding, thus confirming that proceeds of proceeds are still qualifying sources of funds.

2.    A loan acquired with third generation proceeds also qualifies for the 9.5% floor under 34 C.F.R. § 682.302(c)(3)(i)(D).

It is black-letter law that a regulation, like a statute, is to be construed as written. *See Wronke v. Marsh*, 787 F.2d 1569, 1574 (Fed.Cir. 1986) ("As in the interpretation of statutes, . . . we begin, as we must, with the plain language of the regulation"); *see also Laird v. Redwood Trust LLC*, 392 F.3d 661, 668 (4th Cir. 2004) (Duncan, J., dissenting) ("As with the interpretation of statutes, our interpretation of regulations begins with their text"); *Wilson v. U.S. Parole Comm'n*, 193 F.3d 195, 197 (3d Cir. 1999) ("Our starting point on any question concerning the application of a regulation is its particular written text"); *Sierra Club v. Sigier*, 695 F.2d 957, 973 (5th Cir. 1983) ("interpretation of an administrative regulation must begin with its text"). Here, the text of the governing regulation expressly states that loans purchased with funds obtained from "[t]he sale of a loan that was made or purchased with funds obtained

20

Confidential

. . . from" a tax-exempt obligation issued prior to October 1, 1993 are eligible for the 9.5% floor. 34 C.F.R. § 682.302(c)(3)(i)(D).

Nothing in the regulation's plain text suggests that, to qualify under this provision, the funds must have been obtained from the sale of a loan that was "made or purchased with funds *originally* obtained" from a pre-October 1, 1993 tax-exempt obligation. The Department could have drafted the regulation that way had it so intended, but it did not. Indeed, a related subsection, 682.302(c)(3)(i)(A), shows that the Department affirmatively used the word "originally" when it wished to limit the range of qualifying funds. *See id.* (defining qualifying funds to include those obtained from "[t]he proceeds of tax-exempt obligations *originally* issued prior to October 1, 1993") (emphasis added). The fact that subsection (D), in contrast to subsection (A), specifically omits the limiting term "originally" prohibits reading subsection (D) to include that term. See *United States v. Hohri*, 482 U.S. 64, 71 (1987). Accordingly, the Draft Report is mistaken in assuming that only loans acquired with second generation proceeds—*i.e.*, with funds from the sale of a loan "made or purchased with funds *originally* obtained" from a pre-October 1, 1993, tax-exempt obligation—qualify for the 9.5% floor under subsection (D).

**B.      The Department's Authoritative Interpretation And Public Guidance
            Confirm That Nelnet's Loans Were Entitled To The Special Allowance Rate.**

**1.      The governing regulation and a Dear Colleague Letter established the
            rules on eligibility for the 9.5% floor.**

As explained above, under the plain meaning of the applicable statute and regulations, Nelnet's loans qualified for the 9.5% floor. The Department's own authoritative interpretation and public guidance support that conclusion.

In February 1993, 34 C.F.R. § 682.302(c)(2) initially established the rule that a loan subject to the 9.5% floor does not lose the minimum special allowance rate even if the loan is transferred from a tax-exempt financing to a taxable financing. In March 1996, the Department authoritatively confirmed that 9.5% loans could be transferred to taxable vehicles without losing their 9.5% status so long as the original tax-exempt obligation with which they were associated remained effective. Specifically, the Department interpreted § 682.302(c)(2) in a Dear Colleague Letter (DCL 96-l-186) (the "1996 Dear Colleague Letter"), explaining:

> Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

Ex. 1.

21
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017024

### 2.    The Department is bound by these rules.

In its regulation and the 1996 Dear Colleague Letter, the previous administration unambiguously mandated that a lender following the process used by Nelnet can claim only the one-half special allowance rate (subject to the 9.5% floor). If the Department wishes to change these rules, it may do so only through notice and comment rulemaking under the Administrative Procedure Act and negotiated rulemaking under the Higher Education Act. 5 U.S.C. § 551 *et seq.*; 20 U.S.C. § 1098a; *see Alaska Prof'l Hunters Ass'n, Inc. v. FFA*, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999) ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." (quoting *Paralyzed Veterans of Am. v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997)).

No such rulemaking procedure has occurred with respect to the 9.5% floor. Although Congress enacted legislation prospectively eliminating the ability to qualify new loans for the 9.5% floor in the Taxpayer-Teacher Protection Act of 2004, Congress never passed any legislation eliminating pre-existing eligibility for the 9.5% floor. Moreover, the current administration has consistently acknowledged that it is bound by the regulation and the 1996 Dear Colleague Letter, notwithstanding its dislike of the payments those rules require in the current low-interest rate environment. The then-Assistant Secretary of Education, in response to a draft of a GAO report on the 9.5% floor, gave a detailed analysis of why the Department could not act on the GAO's recommendation to prospectively scale back eligibility for the 9.5% floor for Nelnet and other lenders:

> Th[e] [GAO] study reports the recent increases in the Department's special allowance payments to lenders and other loan holders on student loans financed with tax-exempt securities, i.e. "9.5 percent loans," and describes three strategies employed by such lenders and loan holders to maintain and even increase their 9.5 percent loan portfolios. The report recommends the Department change, through rulemaking, its current interpretation of the provision in the Higher Education Act of 1965, as amended (HEA), that governs eligibility for the special subsidy for 9.5 percent loans.
>
> . . .
>
> The Department believes that these special allowance payments should be scaled back considerably, and, as you noted, the President proposed this in his fiscal year 2005 budget request. Last year the Department considered undertaking the process to issue new regulations or to reverse the Clinton Administration's regulatory interpretation. However, we quickly realized that doing so would have resulted in the new policy becoming effective no sooner than July 2005—long after we expected the HEA to be amended to address the issue. This is so because of certain requirements in the HEA and other applicable laws.

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Confidential

N0017025

Ex. 6, at 1. The then-Assistant Secretary went on to explain that "the Department believes negotiated rulemaking is required for changes of regulatory interpretation, like changes to the 1996 interpretation at issue here." *Id.* at 2.

Secretary of Education Rod Paige reiterated that the Department's hands were tied by the prior administration's authoritative pronouncements. A joint letter from Secretary Paige and the then-Director of the Office of Management and Budget to the Chairman of the House Committee on Education and Workforce acknowledged that 9.5% floor payments to Nelnet and other lenders, "which are made pursuant to a regulatory interpretation by the prior administration, have increased significantly." Ex. 7. The letter then explained that "[t]he most direct and expeditious path" to change the rule was "through legislation." The Secretary further explained that "[b]ecause the current Higher Education Act (HEA) provisions that govern rulemaking prevent the Secretary of Education from immediately stopping these payments, the administration urges the Congress to enact legislation" ending the ability to qualify new loans for the 9.5% minimum rate. Ex. 7.

In a press release issued by Secretary Paige on October 7, 2004, he stated that "[d]espite partisan finger pointing to the contrary, the [ability to qualify new loans for the 9.5% floor] . . . was not the making of this administration. It came about 8 years ago when the Clinton Administration interpreted an existing Department regulation. Federal courts in the District of Columbia have ruled that changes in regulatory interpretations require using the standard rulemaking process." Ex. 8.

In response to questions from Senator Kennedy as to why the Department had not sought to recover 9.5% floor payments previously made to Nelnet and other lenders, Secretary Paige stated again that "[i]n March 1996, the prior administration issued an authoritative interpretation of Department regulations that provided 'if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions.'" Ex. 9. Secretary Paige then explained in detail that the law restricted the Department from reversing such an "authoritative interpretation" unless it adhered to the lengthy rulemaking process: "Although we would have preferred an even quicker fix" to end the ability to qualify loans for the 9.5% rate, other than new legislation, "some actions taken by the administration legally require notice to the public and an opportunity to comment pursuant to the Administrative Procedures Act (APA)." Ex. 9.

3. **The Department's actions, guidance, and public statements confirm that these rules allowed Nelnet to qualify additional loans for the 9.5% floor.**

Notwithstanding that the Department under the current administration wished to end the ability to qualify additional loans for the 9.5% floor, it recognized that the regulations and the 1996 Dear Colleague letter permitted that practice (at least until passage of the Taxpayer-Teacher Protection Act). Relying upon these established rules and the Department's statements, Nelnet obtained a series of legal opinions, beginning March 4, 2003, which affirmed that loans transferred from tax-exempt to taxable status would remain lawfully eligible for the 9.5% rate so long as the original tax-exempt obligation was not retired or defeased. These opinions were

23

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017026

authored by John E. Dean of Dean Blakey, a law firm specializing in student loan issues. *See* Ex. 10.

Although the Draft Report asserts that Nelnet received no formal approval from the Department for the process it followed to qualify loans for the 9.5% floor, the Department's actions and its guidance and public statements on the 9.5% floor support the conclusion that Nelnet's process would qualify additional loans. The history of the Department's approach to this issue is summarized below.

- Nelnet has billed the Department, on a quarterly basis, for the 9.5% loans since 2003. The Department has paid all of Nelnet's bills without suggesting any impropriety.

- The Department expressly rejected a suggestion from its auditors that transferred loans of the type at issue were ineligible for the 9.5% floor. The audit in question concerned the Iowa Student Loan Liquidity Corporation ("ISLLC"). As Nelnet would do in conjunction with its process, ISLLC had billed the Department at the 9.5% special allowance rate on loans transferred from a tax-exempt obligation to taxable obligations and on replacement loans subsequently acquired by the tax-exempt obligation. The Department's field auditors objected, stating in their draft report: "The regulations do not permit unlimited growth of tax-exempt funds by transferring loans from one bond issue to another. . . . If a lender moves a loan from a qualifying tax-exempt bond to a non-qualifying bond, it may continue to bill the loan as a qualifying tax-exempt issue. However, this diminishes the available qualifying funds in the original bond subject to the minimum special allowance rate." Ex. 11. To our knowledge, the Department never adopted this finding.

- On May 29, 2003, Nelnet sent a letter (with an accompanying process flow chart) to the Department describing the entire process utilized by Nelnet to qualify loans for the 9.5% floor—including how it planned to bill the Department for such loans—and asking for the Department's concurrence. Ex. 12. Specifically, Nelnet's letter described how the 1985A Trust intended to purchase multiple portfolios of loans and then sell those portfolios into a taxable financing.

- The Department's formal response took the form of a June 30, 2004 letter to Nelnet's Paul Tone. It stated that the Department's regulations, as well as DCL 96-L-186, provided the necessary guidance. Ex. 13. The letter contained no indication that Nelnet's treatment of the 1985A loans was in any way invalid and reconfirmed the Department's adherence to the 1996 Dear Colleague Letter.

- Secretary of Education Paige's characterization of the Department's response to Nelnet in his November 18, 2004 letter to Senator Kennedy is enlightening. The Secretary's letter was in response to Senator Kennedy's question why the Department had not sought to recover the 9.5% floor payments from Nelnet. The Secretary responded by explaining that "the Department implemented regulations, and interpretations of those regulations, including an interpretation issued by the

24

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

N0017027

- prior administration expressly permitting lenders to extend the excessive special allowance payments indefinitely."

- Meanwhile, Nelnet had voluntarily discontinued qualifying new loans for the 9.5% floor in May 2004, after ranking Republicans introduced a bill in the House to prospectively eliminate the 9.5% floor provisions from the Higher Education Act. That legislative initiative followed the acknowledgement that a change in the law was the swiftest way to end the ability to qualify loans for the 9.5% floor as provided in the regulations. See, *e.g.*, Ex. 14 (Kennedy-Kildee letter).

- In the then-Assistant Secretary of Education's September 14, 2004 response to the draft GAO report on student loan financing, the Department stated that only "a change in the law" could preclude lenders from taking advantage of the 9.5% opportunity. The letter explained that, under existing regulations, transferred 9.5% loans "retain that eligibility as long as the tax-exempt bond whose proceeds were used to make or purchase the loans remains open." Ex. 6.

- On September 21, 2004, the GAO issued its final report. It noted that, under existing law and the Department's regulations, "loans that are financed with the proceeds of tax-exempt bonds issued prior to October 1, 1993 are guaranteed a minimum 9.5 percent yield." Ex. 15 at 2. The GAO recognized that "under Education regulations, a lender can significantly increase its 9.5 percent loan volume" by buying and selling loans in the process utilized by Nelnet. *Id.* at 4. In fact, the GAO noted "an increase in the volume of 9.5 percent loans" due, at least in part, to this process. *Id.* The diagram on page 32 of the GAO's report fully illustrates the process engaged in by Nelnet and other lenders. The GAO recommended prospectively eliminating the ability to qualify loans for the 9.5% floor using this process and called for changing the law and regulations to do so. *Id.* at 6.

- Secretary of Education Paige also recognized the lawfulness of existing 9.5% lending practices. He and the then-OMB Director sent a joint letter to the Chairman of the House Committee on Education and the Workforce. The letter acknowledged that these payments were "made pursuant to a regulatory interpretation by the prior administration," which "*expressly permitted lenders to extend these payments indefinitely.*" The letter urged Congress "to enact legislation" ending the practice "without delay." Ex. 7 (emphasis added).

- The House approved the requested legislation on October 6, 2004, and the Senate followed suit on October 9. The floor debate consistently recognized that the new legislation was required to end lenders' admittedly lawful practices under the 9.5% loan program. As a primary sponsor of the House bill put it, "the loan providers were told by the Clinton administration that it was *perfectly legal and legitimate.*" Ex. 16 (Cong. Rec. H8320 (Oct. 6, 2004). Senators also acknowledged that actions had not yet been taken to end the law permitting such practices. Ex. 17 (Cong. Rec. S10918 (Oct. 9, 2004). Hence, both Democratic

Confidential

N0017028

and Republican administrations were as one when it came to recognizing that the targeted 9.5% lending practices were legitimate under existing law.

- Immediately after passage of the House bill, Secretary Paige issued a press release praising the bill and confirming that it would end the process to qualify loans "that *allows* lenders to receive special allowance payments on FFEL loans permitting a return of 9.5%." Ex. 8 (10/7/04 press release, emphasis added).

- In fact, the Department has recognized that the Taxpayer-Teacher Protection Act of 2004, signed by the President on October 30, 2004, had no retroactive effect. A November 2004 Dear Colleague Letter from the then-Assistant Secretary of Education stated expressly that loans "purchased with funds obtained by the holder from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds from the original pre-October 1993 tax-exempt obligations or from income on the investment of such funds would *still* receive a special allowance of not less than 9.5 percent minus the applicable interest rate on such loans." Ex. 18 (emphasis added).

- Following termination of the 9.5% student loan program, the Department continued to recognize that 9.5% loan practices initiated prior to the effective date of the new legislation, such as those utilized by Nelnet, were valid. For example, after OIG issued a report contending that 9.5% secondary market loans of the New Mexico Educational Assistance Foundation ("NMEAF") were unlawful, the NMEAF sued to prevent enforcement of the audit findings, and the Department publicly agreed that the NMEAF was right, leading the NMEAF to dismiss the suit. Exs. 19-20. And in a November 18, 2004 letter to Sen. Kennedy, the Department reaffirmed that, in DCL 96-L-186, "the prior administration issued an authoritative interpretation of Department regulations that provided 'if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions.'" Ex. 9 (Secretary Paige's 11/18/04 letter).

- In an August 2005 audit, the Department found nothing improper with respect to LoanSTAR Funding Group's 9.5% Loan billings, including its transfers of loans tied to a tax-exempt financing instrument issued before October 1, 1993 to taxable financing instruments, resulting in continued entitlement to the 9.5% floor. Ex. 21.

- As recently as December 31, 2005, the Washington Post quoted the following remarks by the then-Assistant Secretary of Education regarding the validity of the 9.5% floor payments to Nelnet and other lenders using similar practices: "The law is the law is the law . . . . What the law says is what you pay people. We didn't make this stuff up. We may not like it, but we can't just unilaterally ignore Congress."

- The OIG requested information with respect to oral conversations between Nelnet personnel and Department officials, in which Nelnet's plans to qualify loans for

the 9.5% floor and the relationship of the regulations and the 1996 Dear Colleague Letter to those plans were discussed. Nelnet complied with this request.

Given this history, most of which the Draft Report disregards, Nelnet had no reason to doubt that its practices with respect to 9.5% loans were entirely consistent with the law, the Department's regulations, and the Department's interpretation of those regulations. Indeed, there is no indication that anyone ever suggested, prior to the change in the law in late 2004, that the process followed by Nelnet would result in anything other than loans being eligible for the 9.5% floor. The Draft Report contends that the Department's "only written guidance specific" to Nelnet's process was its June 30 letter to Nelnet's Paul Tone, which "did not approve or disapprove" of Nelnet's practices, and that none of the additional communications referenced in Nelnet's June 30, 2004 letter constituted a "direct or explicit approval by the Department." Rather, according to the Draft Report, the Department "only referred Nelnet to existing authorities." But as explained above, those existing authorities approved 9.5% loan transfers from tax-exempt to taxable vehicles without ever suggesting that the Department would deem any such transfers, including multi-generational transfers, ineligible for the 9.5% floor.

The Draft Report also suggests that Nelnet's process "went beyond the scope of the guidance in DCL 96-L-186," which "did not address the circumstances by which a loan qualified for the 9.5 percent floor before being transferred." That is simply not the case. The DCL expressly stated that, if two conditions were satisfied, any loan "made or acquired with the proceeds of a tax-exempt obligation [that] is refinanced with the proceeds of a taxable obligation" would remain eligible for "the tax-exempt special allowance provisions." Ex. 1. The two conditions were that the holder of the 9.5% loan retain a legal or equitable interest in the loan and that the original tax-exempt obligation not be retired or defeased. Nelnet's process satisfied both conditions, and the Draft Report does not suggest otherwise. There is no legal basis for retroactively imposing new conditions now.

The substantial record of recognition by the Department, other Executive Branch officials, Congress, and informed commentators that programs such as Nelnet's were valid until Congress prospectively changed the law in October 2004 refutes any notion that Nelnet's 9.5% loan practices were inconsistent with the Department's guidance. The Draft Report not only disregards this record, but also fails to suggest any reason why Congress had to pass legislation to end these lending practices if such practices were already invalid. Perhaps the former Secretary of Education summed it up best when he stated that the process used by Nelnet and others to qualify loans for the 9.5% floor "was specifically endorsed by the prior administration and has been *on the books for close to a decade*." Ex. 9 (emphasis added).

**4.    The Draft Report's suggestion that Nelnet did not adequately disclose its process is inaccurate.**

Implicitly recognizing that the Department did in fact authorize the 9.5% loan practices implemented by Nelnet, the Draft Report tries (at 7) to attribute that authorization to a lack of "comprehensive disclosure by Nelnet of the nature or effect" of its process. In particular, according to the Draft Report, Nelnet's May 29, 2003 letter to the Department "did not identify the eligible source of funds that would be used to purchase and qualify loans for the 9.5 percent

Confidential

floor, did not state directly that the process would be repeated many times, and did not state that the process would result in a substantial increase in the amount of loans billed under the 9.5 percent floor." *Id.*

The Draft Report's first criticism is flatly inaccurate. Nelnet's May 29 letter did identify the eligible source of funds as purchases of "portfolios with funds obtained from proceeds of the tax exempt 1985 Indenture in a series of acquisitions." Ex. 12. The Draft Report's second and third points also are clearly inaccurate. Nelnet's May 29 letter expressly stated that "the purchased loans will be held within the 1985 Indenture and financed by the tax exempt obligations issued by NELF under that financing" and "[t]hereafter . . . will be refinanced and placed into financings which are taxable on a longer term basis." *Id.* Nelnet's detailed description of the 1985A Trust's intent to purchase and then refinance multiple loan "portfolios" in a "series" of transactions disclosed that Nelnet's process contemplated repetition and would result in an increase of loans eligible for the 9.5% floor. In fact, Nelnet had reason to believe that the Department not only understood that its process would result in growth of 9.5% loans, but that it planned to analyze how this development might benefit the Department in the event of future interest rate increases. Accordingly, the Draft Report's suggestion that Nelnet was not forthcoming about its 9.5% loan program cannot be reconciled with the factual record and should be withdrawn.

Nelnet is unaware of any other participant in the entire education finance industry who proactively contacted the Department and walked through in detail the precise process it would use to quality loans for the 9.5% floor. In fact, Nelnet was one of the first in the industry to bring the prospect of ending this practice to the attention of the Department and Congressional leaders. Nelnet worked with the Department and Congress to draft and pass legislation to eliminate the ability of all education finance industry participants to qualify additional loans for the 9.5% floor and voluntarily discontinued such activity upon introduction of that legislation. Nelnet could have quietly qualified loans and collected the 9.5% floor without attracting attention. Instead, it sought guidance so that it would not be placed into its current predicament, and it sought to be a responsible industry participant pushing for responsible change.

**5.   The regulatory history further refutes the Draft Report.**

By focusing on the fact that the Nelnet transactions were "repeated many times" (Draft Report at 7), the Draft Report may simply be reiterating its position that "later generation sales are not eligible sources" of 9.5% loans. That position not only is contrary to the applicable regulation's plain meaning (*see* Part IV.A., *supra*), but also is inconsistent with the regulation's history. The 9.5% floor was enacted in 1980 as part of a statutory reform meant to lower the subsidy paid to lenders financing student loans with tax-exempt bonds. In exchange for receiving only half of the otherwise applicable special allowance, lenders financing student loans with tax-exempt bonds were guaranteed a minimum return of 9.5%. *See* 20 U.S.C. § 1087-1(b)(2)(B)(ii). In 1992, out of concern that lenders might transfer loans from tax-exempt to taxable obligations in times of rising interest rates and thereby regain the full special allowance, the Department issued 34 C.F.R. § 682.302(e). Under that provision, a loan originally financed with a tax-exempt obligation would remain subject to the reduced special allowance rate (and the 9.5% floor) so long as the lender retained a legal or equitable interest in the loan, even if the loan were transferred (by sale or otherwise) to a taxable obligation. *See* DCL 96-L-186 (Ex. 1).

28

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

N0017031

It would have defeated the purpose of § 682.302(e) if a lender could have freed a loan from the reduced special allowance rate simply by selling it more than once.  Indeed, if interest rates had remained high, the Department undoubtedly would have refused to pay more than half the regular special allowance on a loan originally financed from the proceeds of a tax-exempt obligation no matter how many times it was bought and sold.  If the Draft Report's position—that a later generation loan is not subject to the provisions of § 682.302(c)—were correct, then § 682.302(e) could never have achieved the Department's stated goal; lenders would have been able to evade § 682.302(c) simply by reselling previously sold loans.  Thus, the Draft Report's current view makes no sense in light of the history and purpose of § 682.302(e).

Unintended results flowing from the Draft Report's finding are revealed when one considers that if prevailing interest rates had been at historic highs (instead of historic lows) over the past few years, such that Nelnet's 9.5% loans would have been subject to the one-half special allowance penalty rate, the OIG would surely not be making the same arguments it makes now, and demanding to pay Nelnet the full special allowance rate.  In such circumstances, it is unimaginable that a Draft Report would advance unprecedented and novel interpretations of the law, which are inconsistent with the established regulations and agency guidance that has been relied upon by industry participants for over a decade, in order to help a holder of loans receive the full special allowance rate rather than the half rate.  Interest rates will certainly fluctuate over the life of a thirty year tax-exempt bond.  The OIG has stepped in after a short period of some of the lowest interest rates seen in history, and the OIG may regret its market-timed position if interest rates rise in the future.  The arguments advanced in the Draft Report may inadvertently enable holders of loans to circumvent the one-half special allowance penalty rate as rates continue to swing higher.  Such an outcome would fly in the face of the clear intent of the 1996 Dear Colleague Letter.

Furthermore, the Department was aware that Nelnet and other lenders that had issued tax-exempt obligations before October 1, 1993 used third generation proceeds to acquire new loans which then became subject to § 682.302(c).  The House Budget Committee also recognized the propriety of using proceeds to qualify additional generations of 9.5% loans, stating that "[i]n 1996 the Clinton Administration issued another piece of administrative guidance that permitted loans to be transferred in and out of eligible bonds, allowing *still more loans* to become subject to the higher guaranteed rate of return." H. Rep. No. 109-276, at 218 (2005) (emphasis added).  The GAO, too, explained that one of the ways a lender could legitimately increase its volume of 9.5% loans was "by issuing a taxable bond," then "using the proceeds to purchase 9.5 percent loans financed by a pre-October 1, 1993 tax-exempt bond," and "then us[ing] the cash available from the pre-October 1, 1993 tax-exempt bond to make or buy *additional loans*, which are guaranteed the minimum 9.5 percent yield." GAO, *Federal Family Education Loan Program, supra*, at 4 (emphasis added).  The GAO report even provided a circular diagram to portray this process, noting that a "[l]ender can *continue to transfer* so long as the pre 10/1/93 tax-exempt bond is not retired or defeased." *Id.* at 32 (emphasis added).

In short, the argument that Nelnet's loan transfers were invalid because such transfers were frequent and relied on multiple generations of proceeds is a red herring.  Not only was the validity of the transactions not lost through repetition, but the regulations in fact contemplated that there would be repetition, and policy makers acknowledged that repetition was occurring.

29

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

* * * * *

The preliminary finding of the Draft Report is contrary to existing law, regulation, and Departmental guidance. Legal and policy issues, taken in conjunction with the potential economic impact on Nelnet (at least according to the Draft Report's calculations),[3] as well as the rest of the student loan industry, are sufficiently substantial to make "reasoned decisionmaking" critical in this matter. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 474-76 (D.D.C. 1995). It is not reasoned decisionmaking for an agency to construe a statute or regulation inconsistently with its prior representations. *City of Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991); *accord State Farm*, 463 U.S. at 57. Nor is it reasoned decisionmaking for an agency to authorize (or even allow) a lender to make government-subsidized loans under a widely accepted construction of the agency's regulations that agency officials repeatedly promulgated, only to reverse course years later and say "we want our subsidies back." The "reasonable decisionmaking" standard should be kept in mind as the propriety of Nelnet's 9.5% loans is evaluated.

**C.     Nelnet's Records Are Sufficient.**

Finally, the Draft Report intimates that Nelnet's loan records are inadequate under regulatory mandates. The OIG made a similar finding in its audit of the New Mexico Educational Assistance Foundation, but its finding was rejected by the Department. Nelnet's records fulfill the record-keeping requirements of the applicable regulations and are sufficient to determine whether a loan qualifies for the 9.5% floor.

Lender recordkeeping requirements are found at 34 C.F.R. § 682.515, which states that lenders must maintain "current, complete, and accurate records of each loan that it holds, including but not limited to the records described in Section 682.414(a)(3)(ii)." There is no subsection (ii) of § 682.414(a)(3); the cross-reference was apparently intended to be to § 682.414(a)(4)(ii), which lists certain records to be maintained by lenders. Nelnet has fully complied with the recordkeeping requirements of these provisions, which do not impose any obligation to "readily identify the loans' funding sources," as the Draft Report alleges (at 8). OIG's inference of such a requirement from the general obligation in § 682.414(a)(4)(ii)(L) to retain records sufficient to "document . . . the accuracy of reports submitted under this Part" is an unduly broad interpretation. But even if there were such a requirement, Nelnet has satisfied it, as shown below.

Section 682.515(a) provides:

---

[3]     Nelnet believes the Draft Report's calculations are fundamentally flawed because the asserted overpayment does not represent the difference between what Nelnet received and what it would have received absent availability of the 9.5% rate. Nelnet calculates that difference to be approximately $322.6 million through June 30, 2006. Further, any attempt to quantify potential future overpayments is speculative in light of fluctuating interest rates and diminishing volumes of 9.5% loans due to payoffs and consolidations. Because Nelnet was not overpaid at all as demonstrated in this Memorandum, however, it would be premature to detail those flaws at this point. Nelnet reserves its right to challenge the asserted overpayment amount if and when it becomes appropriate to do so.

30

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

(1) A lender shall maintain current, complete, and accurate records of each loan that it holds, including, but not limited to, the records described in § 682.414(a)(3)(ii). The records must be maintained in a system that allows ready identification of each loan's current status.

(2) A lender shall retain the records required for each loan for not less than five years following the date the loan is repaid in full by the borrower or the lender is reimbursed on a claim. However, in particular cases the Secretary may require the retention of records beyond this minimum period.

(3)(i) The lender may store the records specified in § 682.414(a)(3)(ii)(C)-(K) on microfilm, optical disk, or other machine readable format.

(ii) The holder of the promissory note shall retain the original note and repayment instrument until the loan is fully repaid. At that time the holder shall return the original note and repayment instrument to the borrower and retain copies for the prescribed period.

(iii) The lender shall retain the original or a copy of the loan application.

34 C.F.R. § 682.414(a)(4)(ii) provides:

(ii) The lender shall keep—

(A) A copy of the loan application if a separate application was provided to the lender;

(B) A copy of the signed promissory note;

(C) The repayment schedule;

(D) A record of each disbursement of loan proceeds;

(E) Notices of changes in a borrower's address and status as at least a half-time student;

(F) Evidence of the borrower's eligibility for a deferment;

(G) The documents required for the exercise of forbearance;

(H) Documentation of the assignment of the loan;

I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Confidential

(I) A payment history showing the date and amount of each payment received from or on behalf of the borrower, and the amount of each payment that was attributed to principal, interest, late charges, and other costs;

(J) A collection history showing the date and subject of each communication between the lender and the borrower or endorser relating to collection of a delinquent loan, each communication other than regular reports by the lender showing that an account is current, between the lender and a credit bureau regarding the loan, each effort to locate a borrower whose address is unknown at any time, and each request by the lender for default aversion assistance on the loan;

(K) Documentation of any MPN confirmation process or processes; and

(L) Any additional records that are necessary to document the validity of a claim against the guarantee or the accuracy of reports submitted under this part.

Nelnet's records satisfy each of these requirements and provide plentiful additional information. Whenever a loan was acquired by the 1985A Trust, it was contemporaneously recorded on a report listing the acquired loans. That report was furnished to the trustees of the 1985A Trust and the applicable Purchasing Trusts. Each report expressly identifies the "Selling Lender" and references the selling lender's unique bond identification number. The report further identifies the "Buying Lender" and its own unique bond identification number. The "Sale Date" is also included in each report. The report also identifies each loan by the borrower's Social Security Number and includes additional detailed information with respect to each loan, such as the principal balance, accrued and unpaid interest, accrued fees, and the identity of the loan's servicing agent. *See, e.g.,* Ex. 4 (sample of such a detailed report). In addition to maintaining the detailed list of acquired loans, Nelnet generated transfer summaries that provided information with respect to ten or more transfers at a time. Those summaries identified the origin of the acquired loans, described the placement of the loans into the 1985A Trust, and contained aggregated data on outstanding principal and interest. *See* Ex. 22. Thus, Nelnet's records establish the date each loan went into an eligible bond and identify the number of that bond.

Furthermore, as described both in a summary prepared jointly by the OIG and Nelnet and in an internal Nelnet memorandum (*see* Exs. 23 & 3 ), Nelnet has established internal control procedures documented by, *inter alia,* written sale reports, Bond Transfer Logs, Detailed Trial Balance reports, loan sale summaries, preliminary status summary reports, certificates, and releases signed by the trustee. *See, e.g.,* Exs. 2, 22, 24, & 25. Additionally, the interest accrual income, guarantor payments, special allowance payments, and borrower payments received by the 1985A Trust with respect to each eligible loan are documented in servicing reports. These control procedures, which adhere to the practices originally described to the Department, augment the loan sale documentation discussed above.

32
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response 9-7-06.DOC

Although the record-keeping provisions set forth in 34 C.F.R. § 682.515 do not require such information, Nelnet has—notwithstanding the Draft Report's suggestion to the contrary—maintained, and made available to the OIG, records identifying each loan's funding source. The relevant information is clearly identified in the sales reports described above (Ex. 26) and in the "Detailed Trial Balance," a sample of which is attached as Ex. 25. The Detailed Trial Balance shows that the 1985A Trust bought loans with proceeds from sales of loans previously financed by the bonds issued by that Trust, and tracks the flow of funds from such sales. The documentation described above further establishes each loan's funding source. In a March 5, 2005 audit report (at 13), which was issued following the Department's audit of Nelnet, the Department stated that Nelnet "currently retains sufficient backup documentation to validate the reports submitted to ED . . . ." Accordingly, the Draft Report's conclusion that Nelnet's loan records "did not readily identify the loans' funding sources" is incorrect.

## CONCLUSION

The loans acquired by the 1985A Trust were acquired with funds obtained from the "sale" of loans that had been acquired with the "proceeds" of a tax-exempt obligation. Therefore, the loans were obtained with qualifying funds from an eligible source as enumerated in 34 C.F.R. § 682.302(c)(3)(i), and, pursuant to 34 C.F.R. § 682.302(e)(2), remained eligible for the 9.5% special allowance rate after being sold to the Purchasing Trusts. Accordingly, the Draft Audit Report's finding and recommendations should be withdrawn.

33
I:\WP\Dfk\Nelnet Inc\OIG Audit\Nelnet FINAL Response  9-7-06.DOC

Exhibit 200

# CONFIDENTIAL

# FILED UNDER SEAL

## Microsoft Outlook

**From:**      mike.pohl@verizon.net
**Sent:**      Friday, December 13, 2002 5:25 PM
**To:**      Bottegal, Dave
**Subject:**      [Fwd: money]

X-Mozilla-Status2: 00000000
Message-ID: <3DFA7D19.6505C764@verizon.net>
Date: Fri, 13 Dec 2002 19:36:41 -0500
From: mike pohl <mike.pohl@verizon.net>
X-Mailer: Mozilla 4.73 [en]C-CCK-MCD BA45DSL  (Win95; U)
X-Accept-Language: en
MIME-Version: 1.0
To: Jim.Kruger@nelnet.net
CC: jeff.noordhoek@nelnet.net, Terry.Heimes@nelnet.net
Subject: Re: money
References: <TFSMTZPA@nelnet.net>
Content-Type: text/plain; charset="us-ascii"
Content-Transfer-Encoding: 7bit
i will fax over the dear colleague letter.  Paul Sheldon noted that over 10 secondaries were using concept.  i will find out how many opinions.  paul indicated that most of the secondaries got opinions from saul moskowitz  i will do some digging.
let's talk monday morning
Jim.Kruger@nelnet.net wrote:

> I agree we need to re-visit this issue with Mike, Steve and others to determine if this is the direction Nelnet wants to go
as this decision will have significant ramification for the organization.  The impact of this decision is approx $20-22 mm per
year of additional earnings based on the 9.5% floor.  At this point, we need more info on what entities are actually doing
this practice, do they have legal opinions to support their actions, who is providing those legal opinions and has DOE
published any information on the issue which may assist in the decision process.
>
>  -----Original Message-----
> From:   mike.pohl@verizon.net [mailto:mike.pohl@verizon.net] Sent:     Tuesday, December 10, 2002 5:18 PM
> To:    Noordhoek, Jeff; Heimes, Terry; Kruger, Jim; Aversman, Carol
> Subject:     money
>
> Jeff and I have been talking with paul sheldon regarding loans that are
> purchased with new money (taxable debt) and  continue to qualify for
> special allowance calculated using the formula applicable at the time
> the loan was made 9.5 floor -  pre oct 1993 deals.  Paul indicated that
> a number of people most recently are continuing to take advantage of
> this feature.  In fact Saul Moskowitz is providing opinions
> ($5,000-$10,000 range).  Carol is determining how much of maine and neb
> bond deals would qualify pre oct 1993.  I think we have a range of
> approx $400-$500 million. If that is the case, if you compare the spread
> difference between a 9.5 floor bond deal versus a taxable deal (keep in
> mind that we would have to use a maine or neb taxable transaction) it
> could be 400-500 basis points difference in this t-bill environment.
>
> Tax-exempt spread  approx    6.00  (9.50-2.50- less arbitrage, etc)
> taxable spread   approx         1.25
> difference                            4.75  under this current
> t-bill environment
>
> the risk here is if the t-bill increases and takes away spread from the
> taxable deal.  Carol is looking into and verifying these spreads.
>
> That means   $500 million with a 400 bp spread would equal  $20 million
> annually for the company.  i know this is big picture but we wanted to
> get group together to discuss.  Would like to setup a call wed or thurs

1

N0134075

> to discuss.  pohlcat
>
>  << File: ALTERNATIVE.HTM >>

2

N0134076